Maria A. Bourn (SBN 269322)
Anthony Tartaglio (SBN 280286)
GOMERMAN | BOURN & ASSOCIATES
825 Van Ness Ave, Suite 502
San Francisco, CA 94109
Telephone: (415) 545-8608
Email: maria@gobolaw.com
          tony@gobolaw.com

Attorneys for Plaintiff
JANE DOE

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>BLACKBERRY CORPORATION; a Delaware Corporation; and JOHN GIAMATTEO; an individual,<br><br>Defendants. | **Case No.:** 3:24-cv-02002<br><br>**COMPLAINT FOR:** |

1. **UNLAWFUL RETALIATION IN VIOLATION OF LABOR CODE § 1102.5;**

2. **DISCRIMINATION IN VIOLATION OF THE LABOR CODE § 1197.5;**

3. **HOSTILE WORK ENVIRONMENT BASED ON SEX IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900 *et seq.*;**

4. **FAILURE TO PREVENT HARASSMENT AND RETALIATION BASED ON SEX AND/OR GENDER IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900 *et seq.*;**

5. **RETALIATION IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900 *et seq.*;**

6. **NEGLIGENT HIRING, FIRING, AND RETENTION;**

7. **FAILURE TO PROMPTLY PAY WAGES; and**

8. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY.**

- 1 -

**DEMAND FOR JURY TRIAL**

PLAINTIFF JANE DOE ("PLAINTIFF") alleges against DEFENDANT BLACKBERRY CORPORATION ("BLACKBERRY") and DEFENDANT JOHN GIAMATTEO ("GIAMATTEO"), (collectively, "DEFENDANTS"), and each of them, as follows:

<u>**INTRODUCTION**</u>

1.      PLAINTIFF JANE DOE dedicated many years and worked hard to deliver standout results for BLACKBERRY, and her success in doing so meant that she rapidly rose through the ranks of BLACKBERRY.  Her efforts were impeded, however, when she resisted and reported DEFENDANT JOHN GIAMATTEO's romantic overtures and attempts to bully her into being a woman that was submissive and subordinate to him.  GIAMATTEO sabotaged PLAINTIFF's career by obstructing her ability to do her job, taking credit for her work, and ultimately ending her career at BLACKBERRY.  For example, GIAMATTEO would choose not to invite her to meetings and then spread gossip that her absence from the meetings meant she had trouble collaborating with colleagues. He would also unabashedly tell co-workers that he was working on getting her out of the company. BLACKBERRY's Board of Directors conducted a sham investigation into GIAMATTEO's reported treatment of women, as they wanted to make him BLACKBERRY's CEO.  Subsequently, just two days before GIAMATTEO became the CEO, PLAINTIFF was fired.  On information and belief, BLACKBERRY fired PLAINTIFF because she rejected GIAMATTEO and failed to be submissive to him, and because BLACKBERRY's Board of Directors wished to make GIAMATTEO CEO and the presence of a woman he had harassed would make this embarrassing for them.  Rather than hiring a CEO whose behavior was in alignment with its professed values, BLACKBERRY instead fired a whistleblower who threatened to expose BLACKBERRY's misdeeds.  BLACKBERRY then attempted to have her agree to release them from claims, including those relating to unlawful retaliation.

1

**THE PARTIES**

2    2.    PLAINTIFF JANE DOE is, and at all times herein mentioned was, an adult

3   woman residing in the State of California.

4    3.    PLAINTIFF is informed, believes, and thereon alleges that DEFENDANT

5   BLACKBERRY CORPORATION is, and at all times herein mentioned was, a Delaware

6   Corporation conducting business in California.

7    4.    PLAINTIFF is informed, believes, and thereon alleges that DEFENDANT JOHN

8   GIAMATTEO is, and at all relevant times herein mentioned was, an adult man residing in Texas.

9    5.    PLAINTIFF is informed, believes, and thereon alleges that each defendant aided

10   and abetted each other such that the principal is liable for the acts of each DEFENDANT.

11    6.    PLAINTIFF is informed, believes, and thereon alleges, that at all times mentioned

12   in this Complaint, DEFENDANTS were the agents and employees of their co-Defendants, and in

13   doing the things alleged in this Complaint were acting within the course and scope of such agency

14   and employment and acted in such a manner as to ratify the conduct of their co-Defendants.

15    7.    PLAINTIFF is informed, believes, and thereon alleges that, at all times herein

16   mentioned, DEFENDANTS, and each of them, were the agents of each and all of the other

17   DEFENDANTS, and in doing the things hereinafter alleged, were acting in the course and scope

18   of such agency and with the permission and consent of their co-defendants.

19    8.    PLAINTIFF is informed, believes, and thereon alleges that DEFENDANTS

20   employed PLAINTIFF individually and as joint employers and/or as an integrated enterprise.

21   Each DEFENDANT exercised substantial control over PLAINTIFF'S compensation, hours, and

22   terms of employment, and knew or should have known of the discriminatory conduct alleged

23   herein and failed to take those corrective measures within its control.  DEFENDANTS, and each

24   of them, further operated as an integrated enterprise with interrelation of operations, centralized

25   control of labor relations, common management, and/or common ownership or financial control.

26

**JURISDICTION AND VENUE**

27    9.    The Court may exercise diversity jurisdiction here, under 28 U.S.C. § 1332,

28   because PLAINTIFF is a California resident, GIAMATTEO is a Texas resident, and

**COMPLAINT & DEMAND FOR JURY TRIAL**

BLACKBERRY is a Delaware corporation with its principal place of business in Texas.  The amount in controversy exceeds $75,000.

10.     As provided for by 28 U.S.C. § 1391, venue in this District is proper because a substantial part of the events or omissions giving rise to the claim occurred in this District. Plaintiff resides in this District.  BLACKBERRY maintains a large office in this District.  And DEFENDANT JOHN GIAMATTEO frequently interacted with PLAINTIFF while working from BLACKBERRY'S office in this District.

11.     Intra-district assignment to the San Francisco Division or the Oakland Division is proper under Local Rule 3-2(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the counties of Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, or Sonoma.

**ADMINISTRATIVE EXHAUSTION**

12.     PLAINTIFF submitted an administrative complaint to the California Civil Rights Department ("CRD") against BLACKBERRY and GIAMATTEO alleging multiple violations of the California Fair Employment and Housing Act ("FEHA"). On February 16, 2024, CRD issued Plaintiff a right-to-sue letter permitting Plaintiff to file this civil action.

**GENERAL ALLEGATIONS**

13.     BLACKBERRY claims it is "driving diversity, equity and inclusion for all" because "harnessing cultural diversity is essential for a cohesive society and a thriving economy." It further claims:

> Our people are at the very heart of BlackBerry—and the reason for our success. Our diverse employee community is built on integrity, innovation, accountability, and respect.

14.     BLACKBERRY further promotes "creating a Vibrant Culture for Our Future" with having more women in Cyber.  In explaining why there are so few women in cybersecurity, BLACKBERRY writes:

**COMPLAINT & DEMAND FOR JURY TRIAL**

Understanding the Undercurrent

According to June Sugiyama, Director of the Vodafone Americas Foundation, while "most women don't experience obvious forms of discrimination or sexism" in the workforce, "they face an undercurrent of condescension that leads to a feeling of isolation."

Since women in tech are underrepresented, many may have the experience of being the "only woman in the room." McKinsey & Company research refers to "microaggressions" that underrepresented groups can experience in situations that lack diversity, such as dealing with teammates who interrupt them, repeat their ideas as if they are their own, or ask them to do menial tasks such as take the meeting notes. The research suggests women are also more likely than men to have their competence questioned and their authority undermined, even when in leadership positions

15.    During her employment with BLACKBERRY, PLAINTIFF held several positions in the executive team, which she excelled at.  From the time BLACKBERRY hired PLAINTIFF over ten years ago, she has been a high performer.

16.    PLAINTIFF's supervisors and coworkers identified her as one of the hardest working employees at BLACKBERRY, and in 2011, BLACKBERRY identified PLAINTIFF as a "high potential employee" and gave her a special project to prove herself.  PLAINTIFF continuously delivered standout results for BLACKBERRY, resulting in promotion after promotion.

17.    PLAINTIFF's commitment to BLACKBERRY was unparalleled.  She moved throughout her employment, both internationally and throughout the United States.

18.    As BLACKBERRY promoted PLAINTIFF, her role naturally expanded to executive level responsibility, changing her title and pay.

19.    As PLAINTIFF's role expanded, she received pushback from white-male co-workers.  These white-male co-workers were openly upset with PLAINTIFF receiving well-deserved promotions and recognition for her hard work.  The white-male co-workers continuously made it difficult for PLAINTIFF to complete her job and created a hostile work environment for her.

20.    Throughout the COVID-19 pandemic and afterwards, BLACKBERRY continued to expand PLAINTIFF's responsibilities to an increased scope and function.

21.     Despite experiencing continued gender and race discrimination, PLAINTIFF fought to excel with each new task given to her because PLAINTIFF believed she had the support of John Chen, BLACKBERRY'S former CEO ("CEO Chen") and Nita White-Ivy, BLACKBERRY's former Chief Human Resources Officer ("CHRO White-Ivy").

22.     PLAINTIFF did not entirely hide her struggles as a woman of color and explicitly told BLACKBERRY: "my path has been more difficult as a woman at BlackBerry, it's harder than a man might have."  "For example, John G[iamatteo] comes in and gets the opportunity to prove himself, if something fails he still gets the benefit of the doubt. With myself, my voice is not taken seriously UNTIL I have proven results. It is more work for me to prove myself."

23.     PLAINTIFF also raised some of her concerns to management, which had human resources and its attorneys investigate her claims.  BLACKBERRY, for the most part, substantiated PLAINTIFF's claims.  PLAINTIFF felt reassured that BLACKBERRY was committed to provide a work environment free of gender and race discrimination.  She thus continued to be an exceptional employee and sought advancement opportunities within BLACKBERRY.

24.     On or about October 2021, BLACKBERRY hired GIAMATTEO as the President of the Cyber BU.

25.     While GIAMATTEO was assigned to lead the Cyber BU, the Cyber BU's financial performance continuously declined under his management.  In contrast, PLAINTIFF's metrics demonstrated expanded success which included, but was not limited to, achieving exceptional double digit billings growth, closing multiple large multi-year deals, and delivering record customer and prospect engagement, all with a significantly smaller team than GIAMATTEO had supporting him.

26.     PLAINTIFF's career at BLACKBERRY was derailed when she was subjected to GIAMATTEO's sexual harassment.

27.     From the beginning of when GIAMATTEO became President of the Cyber BU, he asked PLAINTIFF to work for him, with the only reason he provided to PLAINTIFF to report to him being so that they could "travel together."  No business reason was provided by

1   GIAMATTEO. This made PLAINTIFF very uncomfortable. PLAINTIFF politely rejected

2   GIAMATTEO's request to report to him so that they could "travel together," explaining to him

3   she was not looking to change her reporting structure.

4          28.     After a workday, GIAMATTEO then invited PLAINTIFF to dinner.

5          29.     Although PLAINTIFF was expecting to have an ordinary business dinner,

6   GIAMATTEO treated it as a "date" in which he attempted to woo PLAINTIFF. During dinner,

7   GIAMATTEO was overly friendly with PLAINTIFF and tried to get close to her.  Again, this

8   made PLAINTIFF very uncomfortable.

9          30.     GIAMATTEO later made comments about how his daughters dressed, their age,

10  and stated that when he is out with his daughters he gets dressed up, and people think "he is a dirty

11  old man" because it appears he is out on a date with them.  PLAINTIFF is younger than

12  GIAMATTEO and was very uncomfortable with these comments, given that she had been out to

13  dinner with him as he had described with his daughters.

14         31.     Overall, the dinner did not come off as a professional dinner, but more as an

15  attempt to see what PLAINTIFF would tolerate regarding GIAMATTEO's advances.  PLAINTIFF

16  did not tolerate it and reported it and his comments to CEO Chen.

17         32.      PLAINTIFF being so uncomfortable with GIAMATTEO's behaviors that she

18  reported them to CEO Chen, asked CEO Chen to assure her that she would not have to travel alone

19  with GIAMATTEO, to which he agreed.

20         33.     In spite of GIAMATTEO's harassment, PLAINTIFF sought to have a positive

21  work environment and remain collaborative with GIAMATTEO for the benefit of

22  BLACKBERRY.  Accordingly, she attempted to set up collaborative meetings with him.

23  GIAMATTEO complained about PLAINTIFF's request and brought it up to CEO Chen, claiming

24  it was "offensive."  When GIAMATTEO set up meetings, on the other hand, PLAINTIFF

25  indicated she was happy to join them.

26         34.     Immediately after reporting GIAMATTEO's conduct to CEO Chen, PLAINTIFF

27  was retaliated against by GIAMATTEO.  For example: GIAMATTEO stopped inviting

28  PLAINTIFF to meetings she should have been invited to; if GIAMATTEO invited PLAINTIFF to

1   meetings, he would invite her as a lower-level employee and ask her to do presentations for him;

2   he failed to treat PLAINTIFF as an executive; he would make false claims to others alleging

3   PLAINTIFF was not attending meetings when he did not invite her; he would then actively spread

4   the false rumor to employees that PLAINTIFF was not a good collaborator when in fact he

5   excluded her from being able to collaborate; he would take credit for PLAINTIFF's work; he

6   would make disparaging comments about PLAINTIFF to others, including business partners; and

7   GIAMATTEO started openly telling employees he wanted PLAINTIFF "out" and he was working

8   on getting PLAINTIFF "out." PLAINTIFF went to GIAMATTEO to ask him about wanting to get

9   her "out."  He admitted making these comments, but said he told only four people.

10          35.     In or around late 2021 to early 2022, GIAMATTEO threatened PLAINTIFF,

11   saying if she "is not nice to him, he has a large network and could impact her career."

12   GIAMATTEO was in effect asking PLAINTIFF to be submissive to GIAMATTEO.  PLAINTIFF

13   told GIAMATTEO she too had a large network and that she would not want to work with

14   someone that would allow his comments to impact her career.

15          36.     In or around 2022, GIAMATTEO or his subordinates submitted an organization

16   chart to PLAINTIFF's customers showing PLAINTIFF reporting to GIAMATTEO.  PLAINTIFF

17   did not report to GIAMATTEO and had told GIAMATTEO that she did not want to change her

18   reporting structure.  The chart was sent out to PLAINTIFF's customers, which created confusion

19   and essentially communicated to clients that PLAINTIFF had been demoted and was no longer in

20   charge of her unit.  This issue was reported to human resources.  GIAMATTEO was dismissive of

21   the entire issue.  BLACKBERRY agreed with PLAINTIFF by determining that the chart had been

22   improper.

23          37.     GIAMATTEO refused to speak to his staff about the incorrect organization chart

24   showing PLAINTIFF reporting to GIAMATTEO.  Human resources, following multiple

25   communications directly to GIAMATTEO from CHRO White-Ivy requesting that he address the

26   issue, ultimately stepped in and spoke with GIAMATTEO's staff, as he would not.

27          38.     PLAINTIFF asked BLACKBERRY whether they would have taken the same

28   approach [demoting an employee on an organization chart sent out to a client] with a white male.

BLACKBERRY acknowledged the organizational chart was not correct but denied that it had treated her any differently based on her gender.  PLAINTIFF did not push the matter because she wanted to move on and focus on ensuring her team was successful for BLACKBERRY—which she did.

39.     It was clear to PLAINTIFF this was just another attempt by GIAMATTEO to make PLAINTIFF be submissive to him.  And even after PLAINTIFF pointed out the issue, GIAMATTEO continued to find ways to try and make PLAINTIFF submit to him.

40.     Despite PLAINTIFF and GIAMATTEO working on separate teams, GIAMATTEO took credit for PLAINTIFF's success.  When PLAINTIFF confronted GIAMATTEO about his taking credit for her work, he denied it.  Nevertheless, there was a video of GIAMATTEO taking credit for PLAINTIFF's work.

41.     GIAMATTEO's conduct created additional work for PLAINTIFF, for example, requiring her to go out of her way to make sure she was invited to meetings and to make sure accurate information was being disseminated about her work contributions.

42.     GIAMATTEO's conduct became so petty that he refused to engage with PLAINTIFF on an issue that could have saved BLACKBERRY nearly $1 million.

43.     PLAINTIFF reported GIAMATTEO's harassment in early 2023 to human resources.  BLACKBERRY's response was to try and create increased separation between the two roles.  In this separation, BLACKBERRY removed half of PLAINTIFF's customers and gave them to GIAMATTEO and in turn, gave PLAINTIFF customers that the Cyber BU had lost business from and asked her to win the customers back.

44.     On or about October 30, 2023, CEO Chen announced he would be retiring from BLACKBERRY.  On the same day, Board Member Dick Lynch announced that he would be the Interim CEO.



**Richard Lynch**

Mr. Lynch is Chair of the Board of Directors. He has served as a director of the Company since February 2013. He has bachelor's and master's degrees in Electrical Engineering from Lowell Technological Institute (now University of Massachusetts) and post-graduate executive education from the Wharton School at the University of Pennsylvania and the Johnson School of Management at Cornell University. Mr. Lynch is President of FB Associates, LLC, which provides advisory and consulting services at the intersection of technology, marketing and business operations. Prior to his current role, Mr. Lynch served as Executive Vice-President & Chief Technology Officer for Verizon Communications and Verizon Wireless. He is a Life Fellow of The Institute of Electrical and Electronic Engineers. Mr. Lynch previously served as Chairman of Ribbon Communications and as a director of Ruckus Wireless.  He has also served on a number of professional organizations including the GSM Association, the CDMA Development Group, the Federal Communications Commission Technical Advisory Committee and the Communications Security Reliability and Interoperability Council. Mr. Lynch has been honored with the President's Award by the Cellular Telecommunications and Internet Association and has also been inducted into the Wireless History Foundation's Hall of Fame.

45.     During this timeframe, BLACKBERRY's Board of Directors was planning CEO Chen's replacement and decided to promote GIAMATTEO to the position.



**John Giamatteo**
Chief Executive Officer

John Giamatteo is BlackBerry's Chief Executive Officer and President of its Cybersecurity division. John brings to BlackBerry over 30 years of experience in P&L, go-to-market, marketing, customer relationships, and customer success with global high technology companies.  He came to BlackBerry from McAfee where he was President and Chief Revenue Officer for over six years.  Prior to that John served as Chief Operating Officer at AVG Technologies, a leading provider of internet and mobile security. He also held leadership positions with Solera, RealNetworks and Nortel Networks.

John holds an MBA and Bachelor of Accounting from St. John's University in New York.

46.     During the period that BLACKBERRY's Board of Directors was deciding to make GIAMATTEO the CEO, it was reported to BLACKBERRY that GIAMATTEO had engaged in harassment towards women. This report was known to BLACKBERRY's Board of Directors.

47.     BLACKBERRY hired the Morrison & Foerster LLP law firm to conduct the investigation into the sexual harassment complaint regarding GIAMATTEO.

48.     On Friday November 3, 2023, Christin Hill and Eric Tate, at Morrison & Foerster, contacted PLAINTIFF to set up an interview via a video call.  Morrison & Foerster was not the same firm that had previously conducted investigations regarding human resources issues over the last decade.  Furthermore, it did not appear as if human resources were managing the process. This raised red flags for PLAINTIFF because Morrison & Foerster did not have the years of

- 10 -

1    context the prior firm had regarding ongoing gender discrimination issues she faced while at

2    BLACKBERRY, and because this was not the normal process BLACKBERRY followed

3    regarding its investigations.  Nevertheless, PLAINTIFF hoped for a full and thorough

4    investigation.

5              49.    The attorneys wanted to have a call that day, but refused to provide information

6    regarding what the call was about.  PLAINTIFF was unavailable to immediately speak, so she set

7    the call for Monday, November 6, 2023.

8              50.    On November 6, Interim CEO Lynch sent an email to the entire BLACKBERRY

9    team.  In his email, he said the Board of Directors had been busy working on getting a replacement

10   CEO and would "conclude the process soon."  He further pointed out "we need to be very

11   thoughtful and thorough as we consider our candidates."

12             51.    That same morning, November 6, Interim CEO Lynch hosted a leadership call and

13   was asked who the new permanent CEO would be.  He responded, saying the person was chosen,

14   but the Board had "run into a couple of process hiccups in appointing the person."  As per Interim

15   CEO Lynch's own words, the investigation conducted was just a *pro forma* process rather than an

16   attempt to make any determinations that could be averse to GIAMATTEO.

17             52.    Later that morning, PLAINTIFF spoke with Ms. Hill and Mr. Tate, who informed

18   her they were investigating GIAMATTEO's behavior towards women.  PLAINTIFF told them she

19   was nervous about speaking with them knowing GIAMATTEO was on the list to become CEO.

20   Concerned, PLAINTIFF asked Morrison & Foerster who would get the information she shared.

21   She was told it would go to Phil Kurtz (Chief Legal Officer), and he would decide what to share

22   with the Board.  This was not the typical process regarding investigations because it excluded

23   human resources who would normally lead such an investigation.



Phil Kurtz
Chief Legal Officer and Corporate Secretary

Phil Kurtz is BlackBerry's Chief Legal Officer and Corporate Secretary with responsibility for the company's worldwide legal affairs, including commercial contracting, litigation, regulatory and privacy compliance, risk management and strategic transactions.

Phil joined the company over 12 years ago as M&A Commercial Counsel, progressed to Deputy General Counsel and Assistant Corporate Secretary, and Vice President, Deputy General Counsel and Corporate Secretary before his promotion to Chief Legal Officer. Phil holds a BA Philosophy from Huron University and LLB/MBA in Law & Business (Finance) from University of Toronto.

Phil holds LLB and MBA degrees from the University of Toronto and a BA from The University of Western Ontario.  In 2012, Phil was a recipient of the Forty Under 40 Award from the Ottawa Business Journal and Ottawa Chamber of Commerce.

**COMPLAINT & DEMAND FOR JURY TRIAL**

53.     The attorneys assured PLAINTIFF no retaliation would occur.  Based on this assurance, she shared with them her experience with GIAMATTEO and how he sexually harassed her and retaliated against her after she rejected him.

54.     PLAINTIFF informed the attorneys that in her complaint to human resources in early 2023 about GIAMATTEO, she focused on the retaliation but did not bring forth the sexual harassment because she did not have physical or documentary evidence, such as emails or text messages.

55.     PLAINTIFF told the attorneys that she had shared her experience at or around the time it occurred with her family, friends, co-workers, and former CEO Chen.  PLAINTIFF offered to provide evidence reflecting her complaints about sexual harassment to family, friends, co-workers, and former CEO Chen.

56.     The attorneys asked PLAINTIFF if she knew of other women, and she provided the names of two other women.

57.     A minute (i.e. immediately) after the meeting with Ms. Hill and Mr. Tate, PLAINTIFF had a meeting with Interim CEO Lynch.  PLAINTIFF asked him how he was deciding who the CEO was going to be, and he quickly replied the CEO was already selected.

58.     On November 7, PLAINTIFF emailed the attorneys evidence regarding GIAMATTEO's retaliation after she failed to acquiesce to his sexual harassment, along with other evidence.  This evidence included information she previously sent to human resources, for example: documents showing GIAMATTEO had refused to meet with her after raising concerns, GIAMATTEO's failure to provide invitations to PLAINTIFF to meetings, a video of GIAMATTEO taking credit for a deal PLAINTIFF closed.  In her email with the evidence, PLAINTIFF explained that these were "just some examples."  The attorneys confirmed receipt of PLAINTIFF's email and informed her they would let her know if they had any follow-up questions.

59.     On November 11, PLAINTIFF followed up with the attorneys noting that when she last talked with them, they did not ask her for the contact information for the women she mentioned with information about GIAMATTEO's previous conduct.  In her email, she provided

1  the attorneys with their contact information and the names of people she discussed

2  GIAMATTEO's harassment with.

3       60.    Also on November 11, PLAINTIFF informed the attorneys investigating

4  GIAMATTEO that she was continuing to be retaliated against by GIAMATTEO.

5       61.    On November 16, PLAINTIFF reached back out to the Morrison & Foerster

6  attorneys.  PLAINTIFF shared with the attorneys "another example of John Giamatteo's

7  retaliation against me as it continues today with him still cutting me out of my job."  PLAINTIFF

8  cc'd human resources on the email.

9       62.    On November 16, PLAINTIFF reached out to Interim CEO Lynch and shared with

10 him a copy of her correspondence with the attorneys investigating GIAMATTEO's sexual

11 harassment.  PLAINTIFF wrote "I believe that company culture, transparency, and teamwork are

12 important to you, to ultimately drive company results. With that, I would like to make you aware

13 of this recent example where that has not happened (and has not been happening for a long time),

14 and request your help with addressing it. I would appreciate your support."

15      63.    The next day, November 17, Interim CEO Lynch responded to PLAINTIFF's

16 email regarding GIAMATTEO's retaliation, writing "I obviously don't know the history but I

17 believe that this will get solved based on the processes for change that we have undertaken.

18 Obviously, we need a little time, but change is coming."

19      64.    On or about November 30, 2023, PLAINTIFF received an email seeking to set up

20 a 1:1 with Interim CEO Lynch.

21      65.    On December 4, PLAINTIFF landed overseas for a business trip.  Upon arriving,

22 she went to her hotel and set up her computer for a 1:1 meeting with Interim CEO Lynch.  When

23 she arrived at the call, Human Resources Director Kelly Cheun was also on.  Interim CEO Lynch

24 informed PLAINTIFF that her job duties were terminated effective immediately, but her last day

25 with the company would be on December 8.  They told PLAINTIFF the termination was for

26 "restructuring".  Previously Interim CEO Lynch told everyone in senior leadership restructuring

27 was coming but that everyone in senior leadership would have a chance to find a new home in the

28 company because he believed everyone was good at what they do.  PLAINTIFF asked Interim

1   CEO Lynch what she could tell her team would happen to them. He replied that it was "nice that

2   you care about your team, but don't worry about it."

3        66.    After the call ended, PLAINTIFF asked Human Resources Director Cheun if she

4   knew PLAINTIFF was being terminated.  Director Cheun said "no" and that she had been invited

5   to the call without any notice.  Further, Director Cheun explained that CHRO White-Ivy was not

6   aware of the PLAINTIFF's termination.  PLAINTIFF again confirmed with Director Cheun her

7   lack of notice and that CHRO White-Ivy had been excluded from the process when PLAINTIFF

8   went to the office to pick up her personal belongings a few days later.

9        67.    Upon learning that PLAINTIFF was overseas, Interim CEO Lynch changed the

10  termination date to December 15.  He also told PLAINTIFF it would be better if she told people

11  she resigned.  PLAINTIFF was the only person on the senior leadership team being terminated.

12       68.    That day, December 4, BLACKBERRY provided PLAINTIFF a letter noting she

13  had "been relieved of all job duties effective immediately" and any payment was conditional upon

14  signing a separation agreement releasing all her claims, including claims relating to unlawful

15  retaliation.  The letter also directed PLAINTIFF to provide her response to Phil Kurtz, as opposed

16  to human resources, which was abnormal.  Interim CEO Lynch signed the termination letter.  The

17  letter expressly states "the Company has decided to terminate Employee's employment…"

18       69.    On December 6, BLACKBERRY offered GIAMATTEO the CEO position and

19  President of Cybersecurity.  It required GIAMATTEO's signature on or before December 8.

20  Interim CEO Lynch signed the offer letter.  GIAMATTEO's salary was set at $700,000 with

21  bonuses and stocks.  GIAMATTEO signed the offer letter the next day and Interim CEO Lynch

22  signed it on December 8.  In the offer letter, there was a special $350,000 bonus.

23       70.    On December 8, 2023, Interim CEO Lynch emailed PLAINTIFF with the subject

24  line "resignation option."  In his email, he wrote "I gave you the option to portray your departure

25  as a resignation in spite of the fact that the company has determined to sever you and pay you what

26  is due in these circumstances. It is unfair to your employees and the company not to begin the

27  restructuring of your organization and duties while we wait indefinitely for your decision on how

28  you want your departure to be portrayed….If I have not seen a resignation announcement…I will

1   be prepared to put out an announcement that you are scheduled to leave the business."  This was

2   the first time PLAINTIFF was told that there was a deadline to inform people she was terminated

3   from BLACKBERRY.

4       71.    On December 10, 2023, Interim CEO Lynch sent an email to PLAINTIFF's teams

5   stating PLAINTIFF was "leaving" BLACKBERRY.

6       72.    The next day, December 11, Interim CEO Lynch sent an email announcing "the

7   Board of Directors has appointed John Giamatteo as the new CEO of BlackBerry…I have gotten

8   to know John fairly well over the last two years."

9       73.    Prior to BLACKBERRY promoting GIAMATTEO, he had failed to implement

10   the company's stated goals of diversity, equity, and inclusion.  His organization was only 18%

11   female.  He had no women as direct reports.  And all his direct reports were white men.  After

12   GIAMATTEO was advanced to CEO, even more women and people of color were released at

13   BLACKBERRY.

14       74.    Based on information and belief, BLACKBERRY intended to appoint an interim

15   lead to replace PLAINTIFF.  But upon finding out PLAINTIFF would not sign the severance

16   agreement releasing her claims, BLACKBERRY decided to instead allocate PLAINTIFF's duties

17   to other currently employed people to disguise the fact that PLAINTIFF's termination was a firing,

18   rather than a "restructuring."

19       75.    PLAINTIFF has since learned of other women who have experienced similar

20   gender discrimination issues with GIAMATTEO and were retaliated against after raising concerns

21   about GIAMATTEO's conduct.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE LABOR CODE § 1102.5**
**(AGAINST BLACKBERRY)**

24

25       76.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in

the preceding paragraphs fully as though set forth at length herein.

26

27       77.    Labor Code section 1102.5(b) prohibits employers from retaliation against

28   employees for "disclosing information" concerning suspected violations of the law, either

**COMPLAINT & DEMAND FOR JURY TRIAL**

internally or to government or law enforcement agencies.  It is unlawful to sexually harass an employee and/or retaliate against an employee for reporting sexual harassment.  Here, PLAINTIFF reported sexual harassment to BLACKBERRY's attorneys and reported retaliation.  Thus, she reported a suspected violation of the law under Labor Code section 1102.5.

78.    PLAINTIFF reported unlawful sexual harassment on November 6 and was notified that she would be terminated less than a month later, on December 4.

79.    PLAINTIFF reported GIAMATTEO's harassing and retaliatory conduct to BLACKBERRY and directly to the Board Chair Lynch.  BLACKBERRY failed to conduct a thorough investigation.  This was a contributing factor in BLACKBERRY's decision to discharge PLAINTIFF.  Thus, BLACKBERRY discharged PLAINTIFF in violation of Labor Code section 1102.5.

80.    The above-described acts of BLACKBERRY were willful, intentional, and malicious and done with the intent to vex, injure and annoy PLAINTIFF and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish BLACKBERRY, and to deter others from engaging in similar conduct.  BLACKBERRY authorized and ratified the wrongful acts of its agents and employees, knew in advance that its agents and employees were likely to commit such acts and employed them with conscious disregard of the rights or safety of others, and/or its officers, director, and/or managing agents were themselves guilty of oppression, fraud, and malice.  Those who terminated PLAINTIFF were officers, directors, and/or managing agents who were vested with discretionary authority to make decisions affecting company policy regarding significant aspects of the company's business.  These officers, director, and/or managing agents acted with malice in terminating PLAINTIFF because she reported and/or was trying to report illegal conduct despite knowing it was illegal to do so under California and federal law, in conscious disregard of PLAINTIFF's rights.  Those officers, director, and/or managing agents who terminated PLAINTIFF further acted with malice by fabricating false reasons for PLAINTIFF's termination in order to cover up their true, discriminatory reason for terminating PLAINTIFF.

81.    BLACKBERRY's wrongful conduct was a substantial factor in causing and/or as a direct and proximate result of the acts of GIAMATTEO, as alleged above, PLAINTIFF has

1  suffered and will continue to suffer economic damages, including lost wages and benefits, and

2  other compensatory damages in an amount to be ascertained at the time of trial.

3         82.     BLACKBERRY's wrongful conduct was a substantial factor in causing and/or as a

4  direct and proximate result of the acts of GIAMATTEO, as alleged above, PLAINTIFF is also

5  entitled to reinstatement with backpay and benefits and/or PLAINTIFF's actual damages.

6  
7  **SECOND CAUSE OF ACTION**
**DISCRIMINATION IN PAYMENT OF WAGES BASED ON SEX IN**
**VIOLATION OF THE LABOR CODE § 1197.5**
**(AGAINST ALL DEFENDANTS)**

8  

9         83.     PLAINTIFF re-alleges and incorporates by reference the allegations contained in

10  the preceding paragraphs fully as though set forth at length herein.

11         84.     Labor Code section 1197.5 prohibits an employer from paying an employee wage

12  rates less than the rates paid to an employee of the opposite sex for substantially similar work

13  when viewed as a composite of skill, effort, and responsibility.  Prior salary shall not justify "any

14  disparity in compensation."

15         85.     Under Labor Code section 1197.5(h), any employer who violates subdivision (a)

16  or (b) is liable to the employee affected in the amount of wages, interest thereon, an additional

17  equal amount as liquidated damages, attorney's fees, and costs.

18         86.     PLAINTIFF was not paid a wage rate equal to GIAMATTEO, despite performing

19  substantially similar work when viewed as a composite of skill, effort, and responsibility.

20         87.     GIAMATTEO was similarly situated with PLAINTIFF, yet he received

21  substantially more pay, despite his poor performance.

22         88.     As a direct and proximate result of the acts of DEFENDANTS, and each of them,

23  as alleged above, PLAINTIFF has suffered and will continue to suffer economic damages,

24  including lost wages and benefits, and other compensatory damages in an amount to be ascertained

25  at the time of trial.

26         89.     As a direct and proximate result of the acts of DEFENDANTS, and each of them,

27  as alleged above, PLAINTIFF has necessarily retained attorneys to prosecute the within action.

28

1    PLAINTIFF therefore is entitled to reasonable attorney's fees and litigation expenses, including

2    expert witness fees and costs, incurred in bringing the within action.

3          90.      Because DEFENDANTS acted with malice, oppression, and fraud, PLAINTIFF is

4    entitled to punitive damages for this claim.

5
**THIRD CAUSE OF ACTION**
**HOSTILE WORK ENVIRONMENT BASED ON SEX AND/OR GENDER**
6
**IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900 _et seq._**
**(AGAINST ALL DEFENDANTS)**
7

8          91.      PLAINTIFF re-alleges and incorporates by reference the allegations contained in

9    the preceding paragraphs fully as though set forth at length herein.

10          92.      California's Fair Employment and Housing Act ("FEHA") prohibits harassing an

11    employee in the workplace "because of race, religious creed, color, national origin, ancestry,

12    physical handicap, medical condition, marital status, sex or age" and retaliation for complaining of

13    sexual harassment.

14          93.      At all relevant times, PLAINTIFF was (1) a member of a protected class [woman];

15    (2) subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4)

16    the harassment unreasonably interfered with her work performance by creating an intimidating,

17    hostile, or offensive work environment; and (5) BLACKBERRY is liable for the harassment.  For

18    supervisors, such as GIAMATTEO, BLACKBERRY is strictly liable for harassment.

19          94.      The sexual harassment was so severe and/or pervasive as to alter the conditions of

20    PLAINTIFF's employment and created a hostile and abusive work environment that affected

21    tangible aspects of PLAINTIFF's employment, including, but not limited to the terms, conditions,

22    and/or privileges of her employment.

23          95.      BLACKBERRY is vicariously liable under FEHA for sexual harassment of

24    PLAINTIFF by GIAMATTEO because it was aware of the sexual harassment and did nothing to

25    stop it.

26          96.      As a direct and proximate result of the acts of DEFENDANTS, and each of them,

27    as alleged above, PLAINTIFF has suffered and will continue to suffer economic damages,

28

including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

97.     As a further direct and proximate result of the acts of DEFENDANTS, and each of them, as alleged above, PLAINTIFF has suffered mental, physical, and emotional distress, including but not limited to anxiety, nervousness, depression, sleeplessness, and has been generally damaged in an amount to be ascertained at the time of trial.

98.     As a further direct and proximate result of the acts of DEFENDANTS, and each of them, as alleged above, PLAINTIFF will continue to expend sums in the future for the treatment of the emotional, physical, and mental injuries sustained by PLAINTIFF as a result of said DEFENDANTS, and each of their, acts in an amount to be ascertained at the time of trial.

99.     As a further direct and proximate result of the above-described acts of DEFENDANTS, and each of them, PLAINTIFF has incurred attorney's fees and costs and, pursuant to the provisions of California Government Code section 12965, subdivision (b), PLAINTIFF is entitled to the reasonable value of such attorney's fees.

100.     The conduct of DEFENDANTS, and each of them, as alleged above, was a substantial factor in causing PLAINTIFF's harm, as described above.

101.     The above-described acts of DEFENDANTS, and each of them, were willful, intentional and malicious and done with the intent to vex, injure and annoy PLAINTIFF and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said DEFENDANTS, and each of them, and to deter others from engaging in similar conduct. DEFENDANTS, and each of them, authorized and ratified the wrongful acts of their agents and employees, knew in advance that their agents and employees were likely to commit such acts and employed them with conscious disregard of the rights or safety of others, and/or their officers, directors, and/or managing agents were themselves guilty of oppression, fraud, and malice.  Those who harassed PLAINTIFF were officers, directors, and/or managing agents who were vested with discretionary authority to make decisions affecting company policy regarding significant aspects of the company's business.  These officers, directors, and/or managing agents acted with malice in

harassing PLAINTIFF in that they did so because of PLAINTIFF's gender/sex despite knowing it was illegal to do so under the law, in conscious disregard of PLAINTIFF's rights.

**FOURTH CAUSE OF ACTION**
**FAILURE TO PREVENT HARASSMENT AND RETALIATION**
**IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900 *et seq.***
**(AGAINST BLACKBERRY)**

102.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in the preceding paragraphs fully as though set forth at length herein.

103.    In violation of the FEHA, BLACKBERRY failed to take all reasonable steps necessary to prevent discrimination and harassment against its employees.

104.    In perpetrating the above-described conduct, BLACKBERRY engaged in a pattern, practice, policy, and custom of unlawful discrimination.  Said conduct constituted a policy, practice, tradition, custom, and usage that denied PLAINTIFF protections of the FEHA.

105.    At all relevant time periods, BLACKBERRY established a policy, custom, practice, or usage within the organization that condoned, encouraged, tolerated, sanctioned, ratified, approved of, and/or acquiesced in unlawful harassment and discrimination towards its employees including, but not limited to, PLAINTIFF.

106.    BLACKBERRY was put on notice that it might be committing harassment and discrimination in the workplace and/or was strictly liable for the discriminatory behaviors.  Once BLACKBERRY was put on notice that it might be committing discrimination in the workplace, it was a reasonable step to conduct a thorough investigation into whether there was harassment and discrimination in the workplace.  BLACKBERRY failed to take this reasonable step of conducting a thorough investigation into PLAINTIFF's complaint of harassment and retaliation in the workplace.

107.    BLACKBERRY knew, or reasonably should have known, that the failure to provide any or adequate education, training, and information as to their personnel policies and practices regarding harassment and discrimination would result in retaliation.  Providing adequate education, training, and information as to their personnel policies and practices regarding

1   harassment and discrimination was a reasonable step that BLACKBERRY could have taken, but

2   did not take, to prevent harassment and discrimination in the workplace.

3       108.    The failure of BLACKBERRY to take the above-mentioned reasonable steps to

4   prevent harassment and discrimination constituted deliberate indifference to the rights of its

5   employees including, but not limited to, those of PLAINTIFF.

6       109.    By reason of the conduct of BLACKBERRY, as alleged herein, PLAINTIFF has

7   necessarily retained attorneys to prosecute the within action.  PLAINTIFF therefore is entitled to

8   reasonable attorney's fees and litigation expenses, including expert witness fees and costs,

9   incurred in bringing the within action.

10       110.    As a direct and proximate result of the acts of BLACKBERRY, as alleged above,

11   PLAINTIFF has suffered and will continue to suffer economic damages, including lost wages and

12   benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

13       111.    As a further direct and proximate result of the acts of BLACKBERRY, as alleged

14   above, PLAINTIFF has suffered mental, physical, and emotional distress, including but not limited

15   to anxiety, nervousness, depression, sleeplessness, and has been generally damaged in an amount

16   to be ascertained at the time of trial.

17       112.    As a further direct and proximate result of the acts of BLACKBERRY,

18   PLAINTIFF will continue to expend sums in the future for the treatment of the emotional,

19   physical, and mental injuries sustained by PLAINTIFF as a result of said DEFENDANTS, and

20   each of their, acts in an amount to be ascertained at the time of trial.

21       113.    As a further direct and proximate result of the above-described acts of

22   BLACKBERRY, PLAINTIFF has incurred attorney's fees and costs and, pursuant to the

23   provisions of California Government Code section 12965, subdivision (b), PLAINTIFF is entitled

24   to the reasonable value of such attorney's fees.

25       114.    The failure by BLACKBERRY to take all reasonable steps to prevent sexual

26   harassment was a substantial factor in causing PLAINTIFF's harm, as described above.

27       115.    The above-described acts of BLACKBERRY were willful, intentional and

28   malicious and done with the intent to vex, injure, and annoy PLAINTIFF and warrant the

1   imposition of exemplary and punitive damages in an amount sufficient to punish said

2   DEFENDANTS, and each of them, and to deter others from engaging in similar conduct.

3   DEFENDANTS, and each of them, authorized and ratified the wrongful acts of their agents and

4   employees, knew in advance that their agents and employees were likely to commit such acts and

5   employed them with conscious disregard of the rights or safety of others, and/or their officers,

6   directors, and/or managing agents were themselves guilty of oppression, fraud, and malice.  Those

7   who terminated and/or otherwise discriminated against and failed to prevent harassment,

8   discrimination, and retaliation against PLAINTIFF were officers, directors, and/or managing

9   agents who were vested with discretionary authority to make decisions affecting company policy

10   regarding significant aspects of the company's business.  These officers, directors, and/or

11   managing agents acted with malice in terminating and/or otherwise discriminating against

12   PLAINTIFF and failing to prevent harassment, discrimination, and retaliation against her in that

13   they did so because of sexual harassment despite knowing it was illegal to do so under the law, in

14   conscious disregard of PLAINTIFF's rights.  Those officers, directors, and/or managing agents

15   who terminated and/or otherwise discriminated against PLAINTIFF acted with malice.

16   **FIFTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900 *et seq.***
17   **(AGAINST BLACKBERRY)**

18   116.   PLAINTIFF re-alleges and incorporates by reference the allegations contained in

19   the preceding paragraphs fully as though set forth at length herein.

20   117.   California Government Code section 12940(h) provides that it is an unlawful

21   employment practice "[f]or any employer . . . or person to discharge, expel, or otherwise

22   discriminate against any person because the person has opposed any practices forbidden under this

23   part or because the person has filed a complaint, testified, or assisted in any proceeding under

24   [FEHA]."

25   118.   PLAINTIFF exercised her rights under FEHA and engaged in legally protected

26   activity, including but not limited to, by notifying DEFENDANTS, and each of them, regarding

27   GIAMATTEO's harassing and retaliatory conduct.

28

**COMPLAINT & DEMAND FOR JURY TRIAL**

119.    PLAINTIFF's protected activity under the FEHA was a substantial motivating reason for BLACKBERRY's decision to discharge PLAINTIFF and subject her to other adverse employment actions.

120.    The above-described acts of BLACKBERRY were willful, intentional and malicious and done with the intent to vex, injure, and annoy PLAINTIFF and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said DEFENDANTS, and each of them, and to deter others from engaging in similar conduct. DEFENDANTS, and each of them, authorized and ratified the wrongful acts of their agents and employees, knew in advance that their agents and employees were likely to commit such acts and employed them with conscious disregard of the rights or safety of others, and/or their officers, directors, and/or managing agents were themselves guilty of oppression, fraud, and malice.  Those who terminated and/or otherwise discriminated against and failed to prevent harassment, discrimination, and retaliation against PLAINTIFF were officers, directors, and/or managing agents who were vested with discretionary authority to make decisions affecting company policy regarding significant aspects of the company's business.  These officers, directors, and/or managing agents acted with malice in terminating and/or otherwise discriminating against PLAINTIFF and failing to prevent harassment, discrimination, and retaliation against her in that they did so because of sexual harassment despite knowing it was illegal to do so under the law, in conscious disregard of PLAINTIFF's rights.  Those officers, directors, and/or managing agents who terminated and/or otherwise discriminated against PLAINTIFF acted with malice.

121.    BLACKBERRY's discharge of PLAINTIFF has directly and proximately caused PLAINTIFF to suffer lost wages and other benefits of employment in an amount to be proven at trial.

122.    As a further direct and proximate result of the above-described acts of BLACKBERRY, PLAINTIFF has incurred attorney's fees and costs and, pursuant to the provisions of California Government Code Section 12965(c), PLAINTIFF is entitled to the reasonable value of such attorney's fees.

1

2

**SIXTH CAUSE OF ACTION**
**NEGLIGENT HIRING, FIRING, AND RETENTION**
**(AGAINST BLACKBERRY)**

3

4

123.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in the preceding paragraphs fully as though set forth at length herein.

5

6

7

8

9

124.    California case law holds that "An employer may be liable for injuries caused by an unfit employee if the employer knows or has reason to know that an employee hired or retained is incompetent or unfit to perform the duties required of the job, or if the employer fails to use reasonable care to discover the employee's incompetence or unfitness before hiring the employee." (*Roman Catholic Bishop v. Superior Court*, (1996) 42 Cal.App.4th 1556, 1564-1565).

10

11

125.    At all times mentioned in this complaint, BLACKBERRY negligently and carelessly trained and retained its employees including, but not limited to GIAMATTEO.

12

13

126.    At all times mentioned in this complaint, BLACKBERRY negligently and carelessly fired its employees including, but not limited to PLAINTIFF.

14

15

16

17

127.    BLACKBERRY breached the duty to exercise reasonable care and acted negligently and carelessly in the training and retention by failing to give employees adequate training as to laws and regulations pertaining to FEHA and by failing to give GIAMATTEO proper discipline.

18

19

128.    BLACKBERRY negligently failed to investigate the background of its employees. BLACKBERRY further failed to monitor the conduct of its employees, including GIAMATTEO.

20

21

22

129.    PLAINTIFF further alleges that BLACKBERRY negligently investigated, appointed, retained, and supervised GIAMATTEO because it knew of the harassment, discrimination, and retaliation perpetrated by him.

23

24

25

130.    Despite notice of inappropriate and illegal conduct, BLACKBERRY failed to adequately and appropriately supervise GIAMATTEO, and failed to take the necessary actions to protect PLAINTIFF.

26

27

131.    BLACKBERRY's negligence in investigating, appointing, retaining, and supervising GIAMATTEO was a substantial factor leading to PLAINTIFF's termination.

28

- 24 -
**COMPLAINT & DEMAND FOR JURY TRIAL**

1    132.    As a direct and proximate result of the negligence of BLACKBERRY as set forth

2  above, PLAINTIFF sustained general and special damages including but not limited to mental

3  anguish and pain and suffering and continues to suffer humiliation, embarrassment, mental and

4  emotional distress, and discomfort, all to PLAINTIFF's damage in an amount to be determined by

5  proof at trial.

6    133.    BLACKBERRY committed the despicable acts alleged herein maliciously, and

7  oppressively, with the wrongful intent of injuring PLAINTIFF, and have acted with an improper

8  and evil motive amounting to malice, and in conscious disregard of PLAINTIFF's rights.  Because

9  the despicable acts taken toward PLAINTIFF were carried out by managerial employees acting in

10  a deliberate, cold, callous, and intentional manner to injure and damage PLAINTIFF, she is

11  entitled to recover punitive damages from BLACKBERRY in an amount according to proof.

12                    **SEVENTH CAUSE OF ACTION**
                 **FOR FAILURE TO PROMPTLY PAY WAGES**
13                       **(AGAINST  BLACKBERRY)**

14    134.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in

15  the preceding paragraphs as though fully set forth herein.

16    135.    Labor Code section 201 requires an employer who discharges an employee to pay

17  compensation due and owing immediately upon discharge.  Further, section 203 provides that if an

18  employer willfully fails to pay, without abatement or reduction, in accordance with California

19  Labor Code section 201, 201.5, 202, 205.5, any wages of an employee who is discharged, the

20  wages of the employee shall continue as a penalty from the due date thereof at the same rate until

21  paid up to a maximum of thirty days.

22    136.    Here, DEFENDANTS terminated PLAINTIFF's employment on December 15,

23  2023, yet they failed to pay PLAINTIFF all due wages after her termination.

24    137.    PLAINTIFF demands all penalties available to her under Labor Code § 203.

25                    **EIGHTH CAUSE OF ACTION**
     **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
26                       **(AGAINST  BLACKBERRY)**

27

28    138.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in

**COMPLAINT & DEMAND FOR JURY TRIAL**

the preceding paragraphs fully as though set forth at length herein.

139.   PLAINTIFF's termination was in violation of fundamental public policies of the state of California, including but not limited to, exercising a statutory right or privilege, and the right to complain to administrative law bodies about perceived violations of the laws which they are charged to enforce.

140.   As a result of the wrongful conduct of BLACKBERRY, PLAINTIFF has suffered damages, including but not limited to lost pay and benefits and damage to future employability, all in an amount within the jurisdiction of this court.

141.   The conduct of BLACKBERRY was carried on in violation of Civil Code § 3294 in the following respects:

   a.   The conduct was despicable and was carried on by BLACKBERRY with a willful and conscious disregard of PLAINTIFF's rights.

   b.   BLACKBERRY's conduct was oppressive in that it was despicable conduct that subjected PLAINTIFF to cruel and unjust hardship in conscious disregard of her rights.

142.   PLAINTIFF alleges that BLACKBERRY is liable in punitive damages for the conduct of its managing agents.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays judgment as against all Defendants, and each of them, as follows:

1.   For compensatory damages against all Defendants, and each of them, according to proof;

2.   For special damages against all Defendants, and each of them, according to proof;

3.   For general damages against all Defendants, and each of them, according to proof;

4.   For costs pursuant to California Code of Civil Procedure section 1032, or as otherwise provided by law;

5.   For prejudgment interest;

**COMPLAINT & DEMAND FOR JURY TRIAL**

6.      For an award of costs and attorney's fees, in an amount the court determines to be reasonable, as authorized by the provisions of Government Code section 12965(c), Code of Civil Procedure section 1021.5, or as otherwise provided by law;

7.      For equitable relief, including injunctive relief where available, including, but not limited to, quantum meruit for services performed, and injunctive relief pursuant to *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203;

8.      For injunctive relief directing Blackberry to implement anti-harassment and anti-discrimination training and audits; and

9.      For such other and further relief as the court deems just and proper.

Dated: April 3, 2024                     GOMERMAN | BOURN & ASSOCIATES

By: _____
MARIA BOURN
Attorney for Plaintiff
JANE DOE

**COMPLAINT & DEMAND FOR JURY TRIAL**

# **DEMAND FOR JURY TRIAL**

Plaintiff JANE DOE demands a trial by jury as to all issues so triable.

Dated: April 3, 2024                    GOMERMAN | BOURN & ASSOCIATES


By:_____
             MARIA BOURN
             Attorney for Plaintiff
             JANE DOE