UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE,<br><br>    Plaintiff,<br><br>  v.<br><br>BLACKBERRY CORPORATION, et al.,<br><br>    Defendants. | Case No. 24-cv-02002-SK<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Regarding Docket No. 10 |

   This matter comes before the Court upon consideration of Defendants' motion to dismiss. Having carefully considered the parties' papers, relevant legal authority, and the record in the case, and having had the benefit of oral argument, the Court will grant Defendants' motion for the reasons set forth below.

## BACKGROUND

   Plaintiff, proceeding under the pseudonym "Jane Doe,"[1] is a resident of California and was formally employed for over ten years by the company Blackberry Corporation, which is a Delaware corporation. (Dkt. No. 1, ¶¶ 1-3, 15.) Defendants are Blackberry Corporation ("Blackberry") and individual Defendant John Giamatteo ("Giamatteo"), a resident of Texas and the now-current chief executive officer ("CEO") for Blackberry. (*Id*. at ¶ 1.)

   While at Blackberry, Plaintiff "worked hard to deliver standout results," and "her success in doing so meant that she rapidly rose through the ranks." (*Id*. at ¶1.) Indeed, Plaintiff alleges she was a "high performer" from the time she was hired by Blackberry. (*Id*. at ¶ 15.) As part of her commitment to Blackberry, Plaintiff relocated to different cities throughout her tenure, both

---

[1] As discussed at the hearing, Plaintiff did not obtain court approval to proceed under a pseudonym. The Court has directed Plaintiff to move for permission to proceed under a pseudonym.

internationally and within the United States. (*Id*. at ¶ 17.) In addition to the recognition from her supervisors and coworkers, Blackberry itself recognized Plaintiff as a "high potential employee" and gave her a special project to prove herself. (*Id*. at ¶ 16.) With such standout results, Plaintiff again and again obtained promotions. (*Id*. at ¶ 16.) Plaintiff's role naturally expanded to executive-level responsibility with a change in title and pay. (*Id*. at ¶ 18.) During and following the COVID-19 pandemic, Blackberry continued to expand Plaintiff's responsibilities to an increased scope and function. (*Id*. at ¶ 20.)

With her success, Plaintiff alleges that "she received pushback from white-male co-workers." (*Id*. at ¶ 19.) Plaintiff alleges that her "career at Blackberry was derailed when she was subjected to Giamatteo's sexual harassment." (*Id*. at ¶ 26.) In or around October 2021, Blackberry hired Giamatteo as president of the Cyber Business Unit ("CBU"). (*Id*. at ¶ 24.) Plaintiff alleges that while Giamatteo was assigned to lead the CBU, its "financial performance continuously declined." (*Id*. at ¶ 25.) However, during that same time, Plaintiff states her metrics demonstrated "expanded success." (*Id*. at ¶ 25.)

When Giamatteo became president of the CBU, he asked Plaintiff to work for him. (*Id*. at ¶ 27.) The only reason he provided Plaintiff for his request was so that they could "travel together." (*Id*. at ¶ 27.) Without a business reason for this request, Plaintiff became very uncomfortable. (*Id*. at ¶ 27.) Plaintiff "politely rejected" Giamatteo's request, explaining "she was not looking to change her reporting structure." (*Id*. at ¶ 27.)

The next workday, Giamatteo invited Plaintiff to dinner. (*Id*. at ¶ 28.) Plaintiff expected it to be "an ordinary business dinner." (*Id*. at ¶ 29.) However, Plaintiff alleges that Giamatteo "treated [the dinner] as a 'date' in which he attempted to woo Plaintiff." (*Id*. at ¶ 29.) Specifically, Giamatteo was "overly friendly with Plaintiff and tried to get close to her," making "Plaintiff very uncomfortable." (*Id*. at ¶ 29.) At some point, Giamatteo "made comments about how his daughters dressed, their age, and stated that when he is out with his daughters he gets dressed up, and people think 'he is a dirty old man' because it appears he is out on a date with them." (*Id*. at ¶ 30.) Plaintiff, who is younger than Giamatteo, became "very uncomfortable with these comments, given that she [was] out to dinner with him as he [made these comments]." (*Id*.

2

at ¶ 30.) Plaintiff believed that the point of the dinner was to "see what Plaintiff would tolerate regarding Giamatteo's advances." (*Id.* at ¶ 31.)

Following, Plaintiff reported the dinner and Giamatteo's comments to Blackberry's then CEO John Chen. (*Id.* at ¶¶ 21, 31.) Plaintiff asked Chen to assure her that she would not have to travel alone with Giamatteo, to which Chen agreed. (*Id.* at ¶ 32.)

Plaintiff remained with Blackberry because she believed that she had the support of Chen and Nita White-Ivy, Blackberry's former Chief Human Resources Officer. (*Id.* at ¶¶ 21, 33.) According to Plaintiff, she sought to create a positive relationship with Giamatteo for the benefit of Blackberry. (*Id.* at ¶ 33.) Plaintiff alleges that she attempted to set up collaborative meetings with Giamatteo, but he complained about this meeting to Chen, claiming it was "offensive." (*Id.* at ¶ 33.) On the other hand, when Giamatteo set up meetings, Plaintiff indicated that she was happy to join them. (*Id.* at ¶ 33.)

Plaintiff alleges that after she reported Giamatteo's conduct to Chen, Giamatteo stopped inviting Plaintiff to meetings to which she should have been invited. (*Id.* at ¶ 34.) If Giamatteo invited Plaintiff to meetings, he would invite her as a lower-level employee and ask her to provide presentations for him. (*Id.* at ¶ 34.) In other words, Plaintiff alleges that Giamatteo failed to treat her like an executive. (*Id.* at ¶ 34.) Additionally, Plaintiff states that Giamatteo made false claims to others that Plaintiff was not attending meetings when he did not invite her and that Plaintiff was not a good collaborator. (*Id.* at ¶ 34.) Plaintiff alleges that Giamatteo took credit for Plaintiff's work (which was captured on video) and made disparaging comments about Plaintiff to others, including business partners. (*Id.* at ¶¶ 34, 40.) At some point, Giamatteo stated to others that he wanted Plaintiff "out" and was working on accomplishing that. (*Id.* at ¶ 34.) Plaintiff confronted Giamatteo, and he admitted to making statements regarding wanting Plaintiff "out," but Giamatteo stated that he told only four people. (*Id.* at ¶ 34.)

Also at some point, Plaintiff raised her concerns to Blackberry management, which had human resources and its attorneys investigate. (*Id.* at ¶ 23.) Plaintiff alleges that Blackberry substantiated her claims, which made her feel reassured that it was "committed to provid[ing] a work environment free of gender and race discrimination." (*Id.* at ¶ 23.)

3

In or around late 2021 or early 2022, Plaintiff alleges that Giamatteo told Plaintiff that if she "is not nice to him, he has a large network and could impact her career." (*Id*. at ¶ 35.) Plaintiff responded that "she too had a large network and that she would not want to work with someone that would allow his comments to impact her career." (*Id*. at ¶ 35.)

Later in 2022, Plaintiff alleges that Giamatteo or his subordinates submitted an organizational chart to Plaintiff's customers that indicated that Plaintiff reported to Giamatteo. (*Id*. at ¶ 36.) However, Plaintiff did not report to Giamatteo, and Plaintiff alleges that the chart created confusion. (*Id*. at ¶ 36.) Plaintiff reported the issue to human resources. (*Id*. at ¶ 36.) Plaintiff alleges that Giamatteo was dismissive of the entire issue, but Blackberry determined that the chart had been improper. (*Id*. at ¶ 36.) Despite this, Plaintiff alleges that Giamatteo refused to speak to his staff about the improper chart. (*Id*. at ¶ 37.) Plaintiff states that someone in the human resources department reached out to Giamatteo multiple times requesting that he address the issue with his staff. (*Id*. at ¶ 37.) Following these attempts, the human resources department stepped in and spoke with Giamatteo's staff. (*Id*. at ¶ 37.)

Plaintiff states that she asked Blackberry whether it would have taken the same approach if she had been a white male. (*Id*. at ¶ 38.) Blackberry acknowledged that the chart had been improper, but it denied that the company had treated her differently because of her gender. (*Id*. at ¶ 38.) At another point, Plaintiff alleges she told Blackberry that her "path has been more difficult as a woman at BlackBerry, it's harder than a man might have." (*Id*. at ¶ 22.) Plaintiff told Blackberry:

> For example, [Giamatteo] comes in a gets the opportunity to prove himself, if something fails he still gets the benefit of the doubt. With myself, my voice is not taken seriously UNTIL I have proven results. It is more work for me to prove myself.

(*Id*. at ¶ 22.)[2]

Plaintiff alleges that Giamatteo created additional work for Plaintiff by requiring her to go out of her way to make sure she was invited to meetings and to make sure accurate information

---

[2] Plaintiff does not identify to whom she made these statements.

4

was being disseminated regarding her work contributions. (*Id*. at ¶ 41.) According to Plaintiff, Giamatteo also refused to engage with Plaintiff on an issue that could have saved Blackberry nearly one million dollars. (*Id*. at ¶ 42.)

In early 2023, Plaintiff again reported Giamatteo, and Blackberry's response was to try and create increased separation between the roles each held. (*Id*. at ¶ 43.) As part of this plan, Blackberry removed half of Plaintiff's customers and gave them to Giamatteo. (*Id*. at ¶ 43.) Blackberry then gave Plaintiff the information on the customers the CBU had lost business from and asked her to win the customers back. (*Id*. at ¶ 43.)

In October 2023, Chen announced that he would be retiring from Blackberry, and board member Richard Lynch announced that he would be interim CEO. (*Id*. at ¶ 44.) While the board was making its determination on who to appoint as CEO, Plaintiff alleges that "it was reported to Blackberry that Giamatteo had engaged in harassment toward women" and that the board of directors was aware of this. (*Id*. at ¶ 46.) In response, Blackberry hired a law firm to conduct an investigation into these complaints, which Plaintiff alleges was not the normal process for Blackberry. (*Id*. at ¶¶ 47, 48.) In November 2023, this law firm set up an interview with Plaintiff. (*Id*. at ¶ 48.) However, Plaintiff alleges that it appeared to her that Blackberry's human resources team was not managing the process. (*Id*. at ¶ 48.) Further, Plaintiff states that the decision by Blackberry to use a firm "raised red flags" because the firm did not have the years of context regarding her ongoing discrimination issues at Blackberry. (*Id*. at ¶ 48.) Despite these feelings, Plaintiff "hoped for a full and thorough investigation." (*Id*. at ¶ 48.)

On November 6, 2023, interim CEO Lynch sent a company-wide email to Blackberry's employees in which he stated that the process of hiring a permanent CEO was concluding soon. (*Id*. at ¶ 50.) That same morning, Lynch held a leadership meeting and was asked who the new CEO would be. (*Id*. at ¶ 50.) Lynch responded that the board had chosen a person, but the board had "run into a couple of process hiccups in appointing the person." (*Id*. at ¶ 51.) Plaintiff alleges that Lynch stated that the investigation was simply *pro forma* process. (*Id*. at ¶ 51.) Later that same day, Plaintiff met with the law firm conducting the investigation into Giamatteo. (*Id*. at ¶ 52.) Plaintiff explained to the attorneys that she felt "nervous speaking with them about

5

Giamatteo [because he] was on the list to become CEO." (*Id*. at ¶ 52.) Plaintiff asked the attorneys who would get the information she shared. (*Id*. at ¶ 52.) The attorneys explained that any shared information would go to Blackberry's Chief Legal Officer, who would decide what to share with the board. (*Id*. at ¶ 52.) Plaintiff again alleges that this process was not typical for Blackberry. (*Id*. at ¶ 52.) Because the attorneys assured Plaintiff that no retaliation would occur, Plaintiff shared with them her experiences with Giamatteo. (*Id*. at ¶ 53.)

Plaintiff explained to the attorneys that in early 2023, she had reported only behavior she believed to be retaliation and not any sexual harassment allegations because "she did not have physical or documentary evidence, such as emails or text messages." (*Id*. at ¶ 54.) Plaintiff informed the attorneys that she had told her family, friends, coworkers, and former CEO Chen about the behavior she believed to be sexual harassment. (*Id*. at ¶ 55.) The attorneys asked if Plaintiff knew of any other women who had similar experiences, and Plaintiff provided them with two names. (*Id*. at ¶ 56.) Immediately after Plaintiff's meeting with the attorneys, Plaintiff met with Lynch. (*Id*. at ¶ 57.) Plaintiff asked Lynch how the board was deciding who the CEO would be, and Lynch responded that the CEO had been already selected. (*Id*. at ¶ 57.)

On November 7, 2023, Plaintiff emailed the firm investigating Giamatteo "evidence regarding Giamatteo's retaliation . . . along with other evidence," which included evidence she had already provided to the human resources department. (*Id*. at ¶ 58.) The attorneys confirmed the receipt of Plaintiff's email and told her they would reach out if they had any follow-up questions. (*Id*. at ¶ 58.) A few days later, Plaintiff again sent an email to the firm, in which she provided contact information for names of the other women she had previously identified. (*Id*. at ¶ 59.) Plaintiff also informed the firm that she believed Giamatteo was still engaging in retaliatory behavior. (*Id*. at ¶ 60.)

On November 16, 2023, Plaintiff again emailed the firm and shared with the attorneys "another example of John Giamatteo's retaliation against me as it continues today with him still cutting me out of my job." (*Id*. at ¶ 61.) Plaintiff included Blackberry's human resources department on the email. (*Id*. at ¶ 61.) On that same day, Plaintiff reached out to Lynch and provided him a copy of her recent correspondence with the firm. (*Id*. at ¶ 62.) On November 17,

2023, Lynch responded to Plaintiff stating that "[he] believed that this will get solved based on the process for change that we have undertaken." (*Id*. at ¶ 63.)

On November 30, 2023, Plaintiff received an email from Lynch, seeking to set up a one-on-one meeting. (*Id*. at ¶ 64.) On December 4, 2023, Plaintiff had a virtual meeting with Lynch, while she was overseas on business. (*Id*. at ¶ 65.) When Plaintiff arrived on the call, Lynch was accompanied by human resources director Kelly Cheun. (*Id*. at ¶ 65.) Lynch informed Plaintiff that her job duties were terminated effective immediately but that her last day at Blackberry would be December 8, 2023. (*Id*. at ¶ 65.)[3] Plaintiff alleges that Lynch told her that it would be better if she told people she had resigned. (*Id*. at ¶ 67.) Lynch stated that Plaintiff was terminated based on "restructuring." (*Id*. at ¶ 65.) Plaintiff alleges that Lynch had previously told senior leadership that while a restructuring was imminent, senior leadership would have a chance to find a new position in Blackberry. (*Id*. at ¶ 65.) Shortly after, Plaintiff received an email confirming her termination and that "any payment was conditional upon signing a separation agreement releasing all her claims, including claims relating to unlawful retaliation." (*Id*. at ¶ 68.) Plaintiff alleges that she was directed to give her response to someone other than human resources, which was "abnormal." (*Id*. at ¶ 68.)

Ultimately, on December 6, 2023, the board of directors decided to offer Giamatteo the position of CEO. (*Id*. at ¶¶ 45, 69.) And on December 8, 2023, the appointment became official. (*Id*. at ¶ 69.) On that same day, Plaintiff received an email from Lynch with the subject line "resignation option." (*Id*. at ¶ 70.) Plaintiff alleges that Lynch wrote that Blackberry did not want to wait indefinitely on how to portray Plaintiff's departure, that she still had time to circulate a resignation announcement, and that, if such an announcement was not received soon, Lynch was prepared to "make an announcement on her behalf." (*Id*. at ¶ 70.) Plaintiff states that this was the first time she had been made aware that there was a deadline on informing people at Blackberry

---

[3] Plaintiff later asked Cheun if she had known that Plaintiff was going to be terminated. (Dkt. No. 1, ¶ 66.) Cheun responded that she had not known. (*Id*. at ¶ 66.) Plaintiff alleges that Cheun stated that White-Ivy was not aware of the termination of Plaintiff's employment. (*Id*. at ¶ 66.) In addition, upon learning that Plaintiff was overseas, Blackberry extended her last day to December 15, 2023. (*Id*. at ¶ 66.)

7

1    about her leaving her job.  (*Id*. at ¶ 70.)

2           On December 10, 2023, Lynch emailed Plaintiff's teams at Blackberry, informing them

3    that she was "leaving."  (*Id*. at ¶ 71.)  The next day, Plaintiff states that Lynch circulated a

4    company-wide email announcing Giamatteo as the new CEO of Blackberry.  (*Id*. at ¶ 72.)

5    Plaintiff states that Giamatteo's organization had only 18% female employees and no women were

6    direct reports.  (*Id*. at ¶ 73.)  According to Plaintiff, once Giamatteo became CEO, "even more

7    women and people of color were released at Blackberry."  (*Id*. at ¶ 73.)

8           Plaintiff alleges, "[b]ased on information and belief [that] Blackberry intended to appoint

9    an interim lead to replace Plaintiff."  (*Id*. at ¶ 74.)  According to Plaintiff, when Blackberry

10   learned that Plaintiff would not sign a severance agreement, Blackberry decided to allocate

11   Plaintiff's duties to other current employees "to disguise the fact that Plaintiff's termination was a

12   firing, rather than a 'restructuring.'"  (*Id*. at ¶ 74.)  Plaintiff alleges that after she left her job with

13   Blackberry, she learned that other women had experienced similar "gender discrimination issues

14   with Giamatteo and were related against after raising concerns about [his] conduct."  (*Id*. at ¶ 75.)

15          Plaintiff then submitted an administrative complaint to the California Civil Rights

16   Department against Blackberry and Giamatteo alleging multiple violation of the California Fair

17   Employment and Housing Act ("FEHA").  (*Id*. at ¶ 12.)  On February 16, 2024, that department

18   issued Plaintiff a right-to-sue letter.  (*Id*.)  On April 4, 2024, Plaintiff brought filed her Complaint

19   in this Court, brining eight claims against Defendants:

20       (1) violation of California's Whistleblowing Protections for Disclosing Legal Violations

21           statute, California Labor Code § 1102.5, against Blackberry,

22       (2) wage discrimination based on sex in violation of California Labor Code § 1197.5, the

23           California Equal Pay Act, against both Defendants,

24       (3)  hostile work environment based on sex and/or gender, in violation of California Govt.

25           Code § 12923 against both Defendants,

26       (4) failure to prevent harassment and retaliation claim, in violation of California Govt.

27           Code § 12940(j) against Blackberry,

28       (5) retaliation in violation of California Govt. Code § 12940(h) against Blackberry,

1   (6) negligent hiring, firing, and retention against Blackberry,

2   (7) violation of California Labor Code§ 201 for failure to promptly pay wages claim

3   against Blackberry,

4   (8) wrongful termination in violation of public policy against Blackberry.

(Dkt. No. 1.) Plaintiff prays for compensatory, special and punitive damages, as well as costs pursuant to California Code of Civil Procedure § 1032 or as otherwise provided by law; prejudgment interest, attorney's fees as authorized by Government Code § 12965(c) and Code of Civil Procedure § 1021.5 or as otherwise provided by law; equitable and injunctive relief including but not limited to *quantum meruit* for services performed and injunctive relief pursuant to *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 294 P.3d 49 (2013); and injunctive relief directing Blackberry to implement anti-harassment and anti-discrimination training and audits.

All parties have consented to the jurisdiction of a federal magistrate judge. (Dkt. Nos. 7, 8, 17.) On June 3, 2024, Defendants filed their motion to dismiss. (Dkt. No. 10.) On July 22, 2024, the Court held a hearing on the motion. (Dkt. No. 28).

**ANALYSIS**

**A.   Applicable Legal Standard on Motion to Dismiss.**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. On a motion to dismiss under Rule 12(b)(6), the Court construes the allegations in the complaint in the light most favorable to the non-moving party and takes as true all material allegations in the complaint. *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986). Even under the liberal pleading standard of Rule 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Rather, a plaintiff must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . When a complaint pleads facts

1    are merely consistent with a defendant's liability, it stops short of the line between possibility and
2    plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting
3    *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).  If the allegations are insufficient to
4    state a claim, a court should grant leave to amend, unless amendment would be futile.  *See, e.g.*
5    *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Lieche, Inc. v. N.*
6    *Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

7          As a general rule, "a district court may not consider material beyond the pleadings in ruling
8    on a Rule 12(b)(6) motion." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on*
9    *other grounds, Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (citation omitted).
10   However, documents subject to judicial notice, such as matters of public record, may be
11   considered on a motion to dismiss.  *See Harris v. Cnty of Orange*, 682 F.3d 1126, 1132 (9th Cir.
12   2011).  In doing so, the Court does not convert a motion to dismiss to one for summary judgment.
13   *See Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other*
14   *grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991).  "The court need
15   not . . . accept as true allegations that contradict matters properly subject to judicial notice . . . ."
16   *Sprewell v. Golden State Warriors*, 266 F. 3d 979, 988 (9th Cir. 2001).

17   **B.    Defendants' Motion to Dismiss for Failure to State a Claim.**

18         Defendants seek partial dismissal of Plaintiff's third claim (hostile work environment
19   based on sex and/or gender), second claim (discrimination of payment of wages based on sex); and
20   seventh claim (failure to promptly pay wages).  Defendants also ask the Court to strike certain
21   portions of the Complaint.  For the hostile work environment claim, Defendants argue that
22   Plaintiff's claim fails because the allegations do not sufficiently plead that the purported behavior
23   was "pervasive" or "severe," as required by California law.  (Dkt. No. 10, 7-15.)  Regarding the
24   discrimination of payment of wages based on sex claim, Defendants assert that Plaintiff's claim
25   because Giamatteo is an improper defendant and Plaintiff does not plead basic essential facts, such
26   as her pay, title, experience, or responsibilities.  (*Id*. at 15-18.)  For the failure to promptly pay
27   wages claim, Defendants argue that Plaintiff's claim against Blackberry fails because Plaintiff
28   alleges only a bare, conclusory allegation.  (*Id*. at 18-19.)  Finally, Defendants also ask the Court

1  to "strike" Plaintiff's use of the term "negligent hiring" in her sixth claim (*Id*. at 19-20) and strike

2  Plaintiff's use of the terms "harassment," and "discrimination" in her fourth cause of action. (*Id*.

3  at 21-22.)

4         In her opposition, Plaintiff argues that Defendants' characterization of California law

5  regarding hostile work environment is incorrect and that in any event, she has sufficiently pleaded

6  allegations that are pervasive and severe. (Dkt. No. 22, 4-9.) While Plaintiff does not oppose

7  dismissal of Giamatteo as a defendant in her claim for discrimination of pay based on sex, she

8  argues that she has sufficiently pleaded such a claim against Blackberry. (*Id*. at 9-10.) Plaintiff

9  also does not oppose dismissal of her claim for failure to promptly pay wages, nor does she

10  oppose striking the term "negligent hiring" in her sixth cause of action. (*Id*. at 11.) Finally,

11  Plaintiff opposes striking the terms harassment and discrimination from her fourth cause of action

12  because, she argues, she has pleaded facts demonstrating harassment and discrimination. (*Id*.)

13         The Court largely agrees with Blackberry. However, given that the Court will allow

14  Plaintiff to file an amended complaint, the Court need not address Blackberry's motion to strike at

15  this time and dispenses with this argument.

16         **1.  Plaintiff's Claim for Work Environment.**

17         Defendants argue that Plaintiff does not allege facts sufficient to support a claim for a

18  hostile work environment because she fails to allege "pervasive" or "severe" harassment that

19  altered the conditions of Plaintiff's employment. (Dkt. No. 10, 8-13.) Plaintiff responds that she

20  has met the "pervasive" and "severe" standard. (Dkt. No. 22, 6-9.) Specifically, Plaintiff argues

21  that the totality of her allegations shows specific, non-conclusory facts that, if true, would

22  constitute "pervasive" and "severe" harassment. The Court finds that Plaintiff's allegations fail to

23  withstand a motion to dismiss.

24         Under California law, [i]t is an unlawful employment practice for "an employer . . . to

25  harass an employee," and "an employer is strictly liable for harassing conduct of its agents and

26  supervisors." *Beltran v. Hard Rock Hotel Licensing, Inc*., 97 Cal. App. 5th 865, 877 (Cal. Ct.

27  App. 2023), quoting Cal. Gov. Code § 12940 (j)(1). "Sexual harassment consists of any

28  unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a

11

sexual nature." *Id*. at 878, quoting *Rieger v. Arnold*, 104 Cal. App. 4th 451, 459 (Cal. Ct. App. 2002). As relevant here, "'[h]ostile work environment' harassment has the purpose or effect of either interfering with the work performance of an employee, or creating an intimidating workplace." *Id*., citing *Weeks v. Baker & McKenzie*, 63 Cal. App. 4th 1128 (Cal. Ct. App. 1998).

A claim for sexual harassment requires an employee to demonstrate "severe or pervasive" harassment. Cal. Gov. Code § 12923(b). In 2019, the California Legislature clarified its "intent" on how courts are to apply this statute, first by observing that:

> harassment creates a hostile, offensive, oppressive, or intimidating work environment and deprives victims of their statutory right to work in a place free of discrimination when the harassing conduct sufficiently offends, humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being.

Cal. Gov. Code § 12923(a). "A plaintiff is not required to show a decline in productivity, only 'that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to make it more difficult to do the job.'" *Beltran v. Hard Rock Hotel Licensing, Inc*., 97 Cal. App. 5th 865 (Cal. Ct. App. 2023) (citing *Harris v. Forklift Sys., Inc*. 510 U.S. 17, 25 (Ginsberg, J., concurring). Critically, as part of the amendment in 2019, the California Legislature explained that "[a] single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment." Cal. Gov. Code § 12923(b) (explicitly rejecting *Brooks v. City of San Mateo* 229 F.3d 917 (9th Cir. 2000)). Finally, the California Legislature admonished that "[h]arassment cases are rarely appropriate for disposition on summary judgment." *Beltran*, 97 Cal. App. 5th at 853 (quoting Cal. Gov. Code 12923(e)).

The parties dispute the practical effect of this amendment in 2019, especially regarding reliance on pre-2019 authority. While Plaintiff is correct about the shift in California law, insofar as it clarifies the existing statute generally, the Court agrees with Defendants' position that this legislative clarification did not alter the law on how courts are to interpret "severity" or

12

"perverseness" of alleged conduct. Thus, cases preceding the 2019 amendment retain their precedential value to the extent not abrogated by Cal. Govt. Code § 12923.

California courts have given several examples on whether conduct meets the severe or pervasive standard. In *Hughes v. Pair*, the California Supreme Court decided that the defined terms "severe" or "pervasive" in the context of harassment inside the workplace should be imported into a statute regarding harassment outside of the workplace. 46 Cal. 4th 1035, 1045-46, 209 P.3d 963, 972-73 (2009). The court then applied the pervasive or severe standard in reviewing the trial court's grant of summary judgment to the defendant. The court concluded that the defendant's conduct had not been pervasive because "it was not so egregious as to alter the conditions of the underlying professional relationship." 46 Cal. 4th at 1048. In particular, the court stressed that the factual allegations included only comments made during a single phone call and a brief statement made by the defendant to the plaintiff later that same day in a museum. *Id*. Regarding severity, the court began by acknowledging that a single incident of a physical assault could qualify as severe. But the Court noted that the plaintiff's case did not include a physical assault, but what the plaintiff believed was a threat of violence from the defendant. *Id*. at 1049. Specifically, the plaintiff alleged that the defendant told her: "I'll get you on your knees eventually. I'm going to fuck you one way or another." *Id*. The court discussed that, "although vulgar and highly offensive, this remark, which was made in the presence of other people attending a private showing at a museum, would not plausibly be construed by a reasonable trier of fact as a threat to commit a sexual assault on plaintiff." *Id*. Also, the court noted that, in context, the threat was not of physical violence but of "financial retaliation." *Id*. Thus, the court concluded that the plaintiff had failed to state a claim for sexual harassment. *Id*.

In *Haberman v. Cengage Learning, Inc.*, the California Court of Appeal affirmed summary judgement in favor of the defendant on plaintiff's claim for a hostile work environment. 180 Cal. App. 4th 365 (2009). Among other things, the plaintiff had alleged that her male coworker had joked in her presence about the size of his penis; remarked that she was "pretty" and "'drop dead' gorgeous"; told the plaintiff on the phone while trailing her in his car that he was "coming right up behind her and it felt pretty good"; expressed interest in casual sex and asked on two occasions

13

whether the plaintiff had any friends who just wanted to have sex; and asked the plaintiff how she knew whether someone was "good in bed." *Id*. at 383-84.  While the court agreed that there had been 11 instances of alleged sexual harassment between the plaintiff and her male coworker, the court noted that there had been no allegations of "any physical contact," the coworker had never asked the plaintiff out on a date, and there were no allegations that the coworker threatened the plaintiff or used explicit language in her presence. *Id*. at 385.  Moreover, the 11 instances occurred over a two- or three-year period. *Id*.  Thus, the plaintiff had failed to demonstrate that any harassment was pervasive because she had not "shown [a] pattern of harassment of a repeated, routine, or generalized nature" by her male coworker. *Id*.  Likewise, considering "the totality of the circumstances," the court concluded that the plaintiff had not established that her male coworker's behavior had been severe. *Id*. at 386.

Here, the Court notes that Plaintiff has included only three sets of allegations that could relate to a claim for a hostile work environment.  First, Plaintiff alleges that Giamatteo asked Plaintiff to work for him and did not give Plaintiff a "business reason" as to why. (Dkt. No. 1, ¶ 27.)  Second, Plaintiff alleges that Giamatteo invited Plaintiff to dinner and attempted to "woo" her. (*Id*. at ¶¶ 28-29.)  Third, Plaintiff alleges that during this dinner, Giamatteo was "overly friendly" and made a comment about sometime feeling like he is perceived as a "dirty old man" when he goes out to dinner with his daughters. (*Id*. at ¶¶ 29-30.)  The Court finds that these allegations, either individually or taken together, do not allege behavior that is severe or pervasive.

While cognizant of the liberal pleading standards, the Court nonetheless finds that Plaintiff has failed to allege conduct by Giamatteo or anyone else that support severity or pervasiveness. Plaintiff has given little, if any substance, to these allegations.  For example, Plaintiff does not explain the details surrounding Giamatteo's alleged request to Plaintiff to work for him without a business reason.  Additionally, the Court is given no facts to understand what Plaintiff meant when she alleges that Giamatteo attempted to "woo" her or was "overly friendly" toward her.  The terms "woo" and "overly friendly" in this context are vague and give no substance to what actually happened at that dinner.  Finally, while Plaintiff gives some detail regarding the "dirty old man" comment by Giamatteo, the allegation lacks any connection between Giamatteo and Plaintiff

14

beyond the fact that the two were sitting together when Giamatteo told Plaintiff this anecdote. Moreover, the allegations lack any inference or explanation as to why such a comment made Plaintiff uncomfortable.

More generally, the Court observes that Plaintiff's Complaint contains a multitude of bald assertions of legal conclusions, as well as vague allegations. For example, Plaintiff alleges that her "career at Blackberry was derailed when she was subjected to Giamatteo's sexual harassment." (Dkt. No. 1, ¶ 26.) Simply stating that Giamatteo subjected Plaintiff to sexual harassment provides no salient fact to support a claim. Another example is that Plaintiff alleges that "[t]he white-male co-workers continuously made it difficult for Plaintiff to complete her job and created a hostile work environment for her." (*Id*. at ¶ 19.) There are no factual allegations that support this. Plaintiff fails to explain who these white-male coworkers were and how they created a hostile work environment for her. These are merely two examples.

Accordingly, the Court concludes that Plaintiff's allegations fail to state a claim of a hostile work environment based on sex and/or gender. The Court GRANTS Defendants' motion to dismiss on this claim, but Plaintiff may amend her complaint to add additional details or facts to support her claim.

**2. Plaintiff's Discrimination in Payment of Wages Based on Sex Claim.**

Defendants argue that Plaintiff has failed to state a claim for under Cal. Labor Code § 1197.5 – the California Equal Pay Act – against Blackberry. (Dkt. No. 10, 15-18.) The California Equal Pay Act states that "[n]o employer shall pay any individual in the employer's employ at wage rates less than the rates paid to employees of the opposite sex in the same establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . ." Cal. Lab. Code § 1197.5. The California Equal Pay Act is nearly identical the Federal Equal Pay Act. *Green v. Par Pools, Inc*. 111 Cal. App. 4th 620, 623 (Cal. Ct. App. 2003); *compare* Cal. Lab. Code § 1197.5 *with* 29 U.S. Code § 206. Under Ninth Circuit precedent, when analyzing the federal statute, "the proper test for establishing a prima facie case in a professional setting such as that of a college is whether the plaintiff is receiving lower wages than the average of wages paid to all employees of the opposite

15

sex performing substantially equal work." *Hein v. Oregon College of Education*, 718 F.2d 910, 916; *see also Duke v. City Coll. of San Francisco*, No. 19-CV-06327-PJH, 2020 WL 512438, at *7 (N.D. Cal. Jan. 31, 2020). A plaintiff can point to only one other employee who receives higher pay, a single comparator, when there is no other appropriate comparator who has been wrongly excluded. *See Hein*, 718 F.2d at 918. California district courts have similarly found that, as the California Equal Pay Act is "nearly identical to the federal statute," it is therefore subject to the same analysis. *See Davis v. Inmar, Inc.*, No. 21-CV-03779 SBA, 2022 WL 3722122, at *5 (N.D. Cal. Aug. 29, 2022).

Defendants argue that Plaintiff fails to state a claim because she made conclusory allegations; specifically, Plaintiff has failed to allege that Giamatteo performed "substantially similar work" under "substantially similar work conditions." Second, Defendants argue that Plaintiff fails to state a claim because she named Giamatteo as the sole male comparator for the claim "without alleging facts to support such a limited comparison." In response, Plaintiff argues that she has pleaded sufficient facts demonstrating that she was paid less to perform "substantially similar work" to Giamatteo under "substantially similar work conditions." Plaintiff also argues that, under California law, a sole male comparator is sufficient to state a claim. Here, the Court finds that Plaintiff has failed to state a claim.

First, Plaintiff's claim is insufficient because Plaintiff does not plead facts to demonstrate that Plaintiff and Giamatteo were performing "substantially equal work." Plaintiff claims to be a member of the "executive" team. (Dkt. No. 1, ¶¶ 15, 18.) However, Plaintiff does not further specify what position either she or Giamatteo held and does not specify with any level of description what their duties were and why they were similar. Further, Plaintiff has not alleged in her Complaint that Giamatteo was a member of the executive team. The purpose of a complaint is to provide fair notice to the defendant of the claim, and here, Plaintiff does not do so.

Second, with regard to comparators, Defendants are correct that Plaintiff fails to plead sufficient facts to provide only a single comparator. Plaintiff points to a single case from the California Court of Appeal that they argue states that a single male comparator is enough. *See Allen v. Staples, Inc.*, 84 Cal. App. 5th 188, 194-95. However, the *Allen* court relied on a case

16

from the District of New Jersey. *See Dubowsky v. Stern, Lavinthal, Norgaard & Daly*, 922 F. Supp. 985, 990 (D.N.J. 1996) (finding that plaintiff need only establish that she was paid differentially because of her sex with respect to a single male employee to prove her claim under the federal Equal Pay Act). There was no reasoning or explanation in *Allen*, but *Hein*, cited above, is the better reasoned case that explains that a single comparator is appropriate only if the plaintiff can allege facts showing that there are no other comparators. Plaintiff could, but does not, show that she can only provide one comparator, Giamatteo, because only Giamatteo had a job similar to hers. If she could provide those facts, she would be able to proceed with her claim based only on a single comparator. Here, Plaintiff does not explain why she can provide only one comparator. allegations

Therefore, the Court concludes that Plaintiff has failed to state a claim under the California Equal Pay Act. The Court GRANTS Defendants' motion to dismiss on this claim, but Plaintiff may amend her complaint to add additional details or facts to support her claim.

### 3. Undisputed Claims Requiring Dismissal.

Following briefing, the parties have established that two claims should be dismissed: Plaintiff's seventh claim for failure to promptly pay wages and Plaintiff's second claim for discrimination in payment of wages based on sex claim against individual Defendant Giamatteo.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss. The Court DISMISSES Plaintiff's seventh claim under California Labor Code § 201 for failure to promptly pay wages WITH PREJUDICE. The Court also DISMISSES Plaintiff's second claim under California's Equal Pay Act, Cal. Lab. Code 1197.5 for discrimination in payment of wages based on sex claim against Defendant Giamatteo WITH PREJUDICE.

The Court DISMISSES WITHOUT PREJUDICE Plaintiff's third claim, hostile work environment based on sex and/or gender, in violation of California Govt. Code § 12923 *et seq*. against both Defendants, as well as Plaintiff's second claim under California's Equal Pay Act, Cal. Lab. Code 1197.5 for discrimination of payment of wages based on sex against Blackberry.

Plaintiff is given leave to amend the second and third claims by August 19, 2024.

17

**IT IS SO ORDERED**.

Dated: July 26, 2024

_____
SALLIE KIM
United States Magistrate Judge