1  Maria A. Bourn (SBN 269322)
2  Anthony Tartaglio (SBN 280286)
   GOMERMAN | BOURN & ASSOCIATES
3  825 Van Ness Ave, Suite 502
   San Francisco, CA 94109
4  Telephone: (415) 545-8608
   Email: maria@gobolaw.com
5          tony@gobolaw.com

6  Attorneys for Plaintiff
7  NEELAM SANDHU

8                  **UNITED STATES DISTRICT COURT**

9
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

11 NEELAM SANDHU, an individual,          **Case No.: 3:24-cv-02002**

                      Plaintiff,          **FIRST AMENDED COMPLAINT FOR:**
12

13    vs.                                 1. **UNLAWFUL RETALIATION IN**
                                             **VIOLATION OF LABOR CODE §**
14 BLACKBERRY CORPORATION; a                  **1102.5;**
   Delaware Corporation; and
15 JOHN GIAMATTEO; an individual,         2. **DISCRIMINATION IN VIOLATION**
                                             **OF THE LABOR CODE § 1197.5;**
                      Defendants.
16                                        3. **HOSTILE WORK ENVIRONMENT**
                                             **BASED ON SEX/GENDER IN**
17                                           **VIOLATION OF THE FEHA, CAL.**
                                             **GOV. CODE § 12900** *et seq.***;**
18

19                                        4. **FAILURE TO PREVENT**
                                             **HARASSMENT AND RETALIATION**
20                                           **BASED ON SEX AND/OR GENDER IN**
                                             **VIOLATION OF THE FEHA, CAL.**
21                                           **GOV. CODE § 12900** *et seq.***;**

22                                        5. **RETALIATION IN VIOLATION OF**
                                             **THE FEHA, CAL. GOV. CODE**
23                                           **§ 12900** *et seq.***;**

24                                        6. **NEGLIGENT RETENTION;**

25                                        7. **WRONGFUL TERMINATION IN**
                                             **VIOLATION OF PUBLIC POLICY;**
26

27                                        8. **DISCRIMINATION BASED ON**
                                             **SEX/GENDER IN VIOLATION OF**
28                                           **THE FEHA, CAL. GOV. CODE**

                                    - 1 -

§ **12900** *et seq.***; and**

9. **FAILURE TO PREVENT DISCRIMINATION AND RETALIATION BASED ON SEX AND/OR GENDER IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900** *et seq.*

**DEMAND FOR JURY TRIAL**

PLAINTIFF NEELAM SANDHU ("PLAINTIFF") alleges against DEFENDANT BLACKBERRY CORPORATION ("BLACKBERRY") and DEFENDANT JOHN GIAMATTEO ("GIAMATTEO"), (collectively, "DEFENDANTS"), and each of them, as follows:

## INTRODUCTION

1.      PLAINTIFF dedicated many years and worked hard to deliver standout results for BLACKBERRY, and her success in doing so meant that she rapidly rose through the ranks of BLACKBERRY.  Her efforts were impeded, however, when she resisted and reported DEFENDANT JOHN GIAMATTEO's romantic overtures and attempts to bully her into being a woman that was submissive and subordinate to him.  GIAMATTEO sabotaged PLAINTIFF's career by obstructing her ability to do her job, taking credit for her work, and ultimately ending her career at BLACKBERRY.  For example, GIAMATTEO would choose not to invite her to meetings and then spread gossip that her absence from the meetings meant she had trouble collaborating with colleagues. He would also unabashedly tell co-workers that he was working on getting her out of the company. BLACKBERRY's Board of Directors conducted a sham investigation into GIAMATTEO's reported treatment of women, as they wanted to make him BLACKBERRY's CEO.  Subsequently, just two days before GIAMATTEO became the CEO, PLAINTIFF was fired.  On information and belief, BLACKBERRY fired PLAINTIFF because she rejected GIAMATTEO and failed to be submissive to him, and because BLACKBERRY's Board of Directors wished to make GIAMATTEO CEO and the presence of a woman he had harassed would make this embarrassing for them.  Rather than hiring a CEO whose behavior was in alignment with its professed values, BLACKBERRY instead fired a whistleblower who

1    threatened to expose BLACKBERRY's misdeeds.  BLACKBERRY then attempted to have her

2    agree to release them from claims, including those relating to unlawful retaliation.

3                                              **THE PARTIES**

4             2.        PLAINTIFF NEELAM SANDHU is, and at all times herein mentioned was, an

5    adult woman residing in the State of California.

6             3.        PLAINTIFF is informed, believes, and thereon alleges that DEFENDANT

7    BLACKBERRY CORPORATION is, and at all times herein mentioned was, a Delaware

8    Corporation conducting business in California.

9             4.        PLAINTIFF is informed, believes, and thereon alleges that DEFENDANT JOHN

10   GIAMATTEO is, and at all relevant times herein mentioned was, an adult man residing in Texas.

11            5.        PLAINTIFF is informed, believes, and thereon alleges that each defendant aided

12   and abetted each other such that the principal is liable for the acts of each DEFENDANT.

13            6.        PLAINTIFF is informed, believes, and thereon alleges, that at all times mentioned

14   in this Complaint, DEFENDANTS were the agents and employees of their co-Defendants, and in

15   doing the things alleged in this Complaint were acting within the course and scope of such agency

16   and employment and acted in such a manner as to ratify the conduct of their co-Defendants.

17            7.        PLAINTIFF is informed, believes, and thereon alleges that, at all times herein

18   mentioned, DEFENDANTS, and each of them, were the agents of each and all of the other

19   DEFENDANTS, and in doing the things hereinafter alleged, were acting in the course and scope

20   of such agency and with the permission and consent of their co-defendants.

21            8.        PLAINTIFF is informed, believes, and thereon alleges that DEFENDANTS

22   employed PLAINTIFF individually and as joint employers and/or as an integrated enterprise.

23   Each DEFENDANT exercised substantial control over PLAINTIFF'S compensation, hours, and

24   terms of employment, and knew or should have known of the discriminatory conduct alleged

25   herein and failed to take those corrective measures within its control.  DEFENDANTS, and each

26   of them, further operated as an integrated enterprise with interrelation of operations, centralized

27   control of labor relations, common management, and/or common ownership or financial control.

28

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

## JURISDICTION AND VENUE

9.      The Court may exercise diversity jurisdiction here, under 28 U.S.C. § 1332, because PLAINTIFF is a California resident, GIAMATTEO is a Texas resident, and BLACKBERRY is a Delaware corporation with its principal place of business in Texas.  The amount in controversy exceeds $75,000.

10.      As provided for by 28 U.S.C. § 1391, venue in this District is proper because a substantial part of the events or omissions giving rise to the claim occurred in this District. Plaintiff resides in this District.  BLACKBERRY maintains a large office in this District.  And DEFENDANT JOHN GIAMATTEO frequently interacted with PLAINTIFF while working from BLACKBERRY'S office in this District.

11.      Intra-district assignment to the San Francisco Division or the Oakland Division is proper under Local Rule 3-2(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the counties of Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, or Sonoma.

## ADMINISTRATIVE EXHAUSTION

12.      PLAINTIFF submitted an administrative complaint to the California Civil Rights Department ("CRD") against BLACKBERRY and GIAMATTEO alleging multiple violations of the California Fair Employment and Housing Act ("FEHA"). On February 16, 2024, CRD issued Plaintiff a right-to-sue letter permitting Plaintiff to file this civil action.

## GENERAL ALLEGATIONS

13.      BLACKBERRY claims it is "driving diversity, equity and inclusion for all" because "harnessing cultural diversity is essential for a cohesive society and a thriving economy." It further claims:

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

> Our people are at the very heart of BlackBerry—and the reason for our success. Our diverse employee community is built on integrity, innovation, accountability, and respect.

14.    BLACKBERRY further promotes "creating a Vibrant Culture for Our Future" with having more women in Cyber.  In explaining why there are so few women in cybersecurity, BLACKBERRY writes:

> Understanding the Undercurrent
>
> According to June Sugiyama, Director of the Vodafone Americas Foundation, while "most women don't experience obvious forms of discrimination or sexism" in the workforce, "they face an undercurrent of condescension that leads to a feeling of isolation."
>
> Since women in tech are underrepresented, many may have the experience of being the "only woman in the room." McKinsey & Company research refers to "microaggressions" that underrepresented groups can experience in situations that lack diversity, such as dealing with teammates who interrupt them, repeat their ideas as if they are their own, or ask them to do menial tasks such as take the meeting notes. The research suggests women are also more likely than men to have their competence questioned and their authority undermined, even when in leadership positions

15.    During her employment with BLACKBERRY, PLAINTIFF held several positions in the executive team, which she excelled at.  From the time BLACKBERRY hired PLAINTIFF fifteen years ago, she has been a high performer.

16.    PLAINTIFF's supervisors and coworkers identified her as one of the hardest working employees at BLACKBERRY, and in 2011, BLACKBERRY identified PLAINTIFF as a "high potential employee" and gave her a special project to prove herself.  PLAINTIFF continuously delivered standout results for BLACKBERRY, resulting in promotion after promotion.

17.    PLAINTIFF's commitment to BLACKBERRY was unparalleled.  She moved throughout her employment, both internationally and throughout the United States.

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

18.    As BLACKBERRY promoted PLAINTIFF, her role naturally expanded to executive level responsibility, changing her title and pay.  Eventually she was promoted to Chief Elite Customer Success Officer and Chief Marketing Officer.

19.    PLAINTIFF, GIAMATTEO, and Mattias Ericksson performed in substantially similar roles.  GIAMATTEO's role was "President of BlackBerry's Cyber Security Business Unit with responsibility for its business strategy, engineering, go-to-market, customer support and operations."[1]

20.    PLAINTIFF served as "Chief Elite Customer Success Officer and Chief Marketing Officer, at BlackBerry, reporting to the CEO. As Chief Elite Customer Success Officer she [led] the strategic relationships, sales, and co-sell, and customer success, including strategic product engineering, with BlackBerry's top customers and top target customers, driving them to gain long-term competitive advantages by leveraging the breadth and depth of the BlackBerry platform. As Chief Marketing Officer she [led] marketing across channels, including public relations, social media, editorial content, branding, advertising, web, and corporate events. Neelam [was] also Head of Sustainability, responsible for corporate sustainability, at BlackBerry, and has delivered the company's inaugural ESG report and its carbon neutral status. Additionally, she [assisted] the CEO on some operational tasks."[2]

21.    Ericksson is "President and General Manager of BlackBerry's IOT Business Unit. The business unit consists of BlackBerry Technology Solutions or BTS (BlackBerry® QNX®, BlackBerry Certicom®, BlackBerry Radar® and BlackBerry Jarvis™) and BlackBerry IVY™."[3] All three served as senior managers and reported directly to the company CEO.

22.    PLAINTIFF, GIAMATTEO, and Ericksson oversaw teams that helped configure and sell Blackberry software to customers.  All three worked in the United States.

23.    PLAINTIFF'S job duties as Chief Elite Customer Success Officer encompassed: pre and post-sales; customer success; product development; field marketing; partner ecosystem;

---

[1] https://www.blackberry.com/us/en/company/leadership, as accessed by the Wayback Machine for December 7, 2023.  https://web.archive.org/web/20231207140955/https://www.blackberry.com/us/en/company/leadership
[2] *Id.*
[3] *Id.*

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

and sales operations.  The job duties of GIAMATTEO and Ericksson encompassed these same job duties.

24.    PLAINTIFF, GEIAMATTEO and Ericksson's compensation was also structured similarly, with all three of their bonuses being 50% ViP (corporate performance) and 50% SiP (sales performance).

25.    Despite performing substantially similar work under similar circumstances, GIAMATTEO and Ericksson (who are both male) earned far more money than PLAINTIFF did. For example, in 2023, GIAMATTEO earned $2,330,822.[4]  In 2022, he earned $5,659,565.[5]  In 2023, Eriksson earned $1,691,671.  And in 2024, Eriksson earned $4,373,775.  Plaintiff earned far less than GIAMATTEO and Eriksson.

26.    When PLAINTIFF was appointed Chief Marketing Officer, which meant taking on another function in addition to her existing role, she was not given a pay rise.  She was told by former CEO Chen that GIAMATTEO was already upset that PLAINTIFF had been given the role and if she were given a pay rise, it would amplify his animosity.  Chen added that Tim Foote—who was one of the white men hostile to PLAINTIFF—would know if PLAINTIFF were given a pay raise, as he is in the Finance team and had access to this type of information.

27.    When other male co-workers, such as GIAMATTEO, were given increased roles they received raises.

28.    As PLAINTIFF's role expanded, she received pushback from white-male co-workers.  These white-male co-workers were openly upset with PLAINTIFF receiving well-deserved promotions and recognition for her hard work.  The white-male co-workers continuously made it difficult for PLAINTIFF to complete her job and created a hostile work environment for her.  GIAMATTEO led this hostility toward PLAINTIFF regarding making it difficult for her to complete her job.  As a supervisor, GIAMATTEO should have stopped his employees from engaging in ongoing harassment, but instead encouraged it.

---

[4] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001070235/000107023523000080/bbry-20230516.htm
[5] *Id.*

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

29.     Throughout the COVID-19 pandemic and afterwards, BLACKBERRY continued to expand PLAINTIFF's responsibilities to an increased scope and function.

30.     Despite experiencing continued gender and race harassment and discrimination, PLAINTIFF fought to excel with each new task given to her because PLAINTIFF believed she had the support of John Chen, BLACKBERRY'S former CEO ("CEO Chen") and Nita White-Ivy, BLACKBERRY's former Chief Human Resources Officer ("CHRO White-Ivy").

31.     PLAINTIFF did not entirely hide her struggles as a woman of color and explicitly told BLACKBERRY: "my path has been more difficult as a woman at BlackBerry, it's harder than a man might have."  "For example, John G[iamatteo] comes in and gets the opportunity to prove himself, if something fails he still gets the benefit of the doubt. With myself, my voice is not taken seriously UNTIL I have proven results. It is more work for me to prove myself."

32.     PLAINTIFF also raised some of her concerns to management, which had human resources, and its attorneys investigate her claims.  BLACKBERRY, for the most part, substantiated PLAINTIFF's claims.  PLAINTIFF felt reassured that BLACKBERRY was committed to providing a work environment free of gender and race harassment and discrimination.  She thus continued to be an exceptional employee and sought advancement opportunities within BLACKBERRY.

33.     On or about October 2021, BLACKBERRY hired GIAMATTEO as the President of the Cyber Business Unit.

34.     While GIAMATTEO was assigned to lead the Cyber BU, the Cyber BU's financial performance continuously declined under his management.  In contrast, PLAINTIFF's metrics demonstrated expanded success which included, but was not limited to, achieving exceptional double digit billings growth, closing multiple large multi-year deals, and delivering record customer and prospect engagement, all with a significantly smaller team than GIAMATTEO had supporting him. PLAINTIFF, as a woman, would not have continued to receive promotions if her performance was similar to GIAMATTEO's.

35.     GIAMATTEO, directly and through his harassed female employees, including PLAINTIFF. This harassment was, in part, via a "boys' club" culture that GIAMATTEO created

where he would mistreat, harass, and marginalize women with impunity. Some of the white males within the "boys' club" included Tim Foote, Phil Kurtz, Don Giorgio, and Hans-Peter Bauer.

36.     On a daily or near daily basis GIAMATTEO and other white males engaged in the following gender-based harassment:

- o  excluding PLAINTIFF from internal meetings and emails relevant to her role;
- o  excluding her from external meetings with Elite customers and from events;
- o  talking over her in meetings;
- o  laughing at her when she talked in meetings;
- o  downgrading her contributions while encouraging her to leave the company, telling her it would be better for her if she left;
- o  taking credit for her work; and
- o  minimizing her work contributions and achievements while applauding each other for lesser achievements.

37.     Male co-workers were not treated this way. This conduct was constant daily harassment directed at Plaintiff, a woman. GIAMATTEO led this unwelcome gender-based harassment and did not stop other co-workers from engaging in it, which led to increased daily gender-based harassment.

38.     PLAINTIFF's career at BLACKBERRY was derailed when she was subjected to GIAMATTEO's gender harassment and gender-based discrimination.

39.     Shortly after GIAMATTEO joined Blackberry, PLAINTIFF met with him for the first time in his office in San Ramon. He started the conversation by asking her "Are you Indian?" She paused, taken aback by his question, and then said "Yes, I am." He then told her he wanted her to change her reporting line to report to him so that they could travel together. At the time PLAINTIFF was reporting directly to the CEO, thus this would have been a demotion. His tone was sexually suggestive, which made her uncomfortable. She declined the offer stating that she did not want to alter her reporting line. GIAMATTEO provided no business rationale or other justification for her to report him or for them to travel together. This unwelcome exchange made

1   PLAINTIFF very uncomfortable.  On information and belief, GIAMATTEO never made a similar

2   request to a man.

3        40.    GIAMATTEO later invited PLAINTIFF to a 1:1 dinner with him.  Before the

4   dinner, he left the office and went back to his hotel.  He then arrived at the dinner in different

5   clothing and wearing a lot of aftershave (he was more dressed up).  During the dinner he made

6   unwelcome sexual advances and his behaviors exhibited sexual undertones, both verbally and

7   physically.  His body language was sexually suggestive and unwelcome. He looked PLAINTIFF

8   up and down when they met at the restaurant.  During the dinner he leaned over the table towards

9   her attempting to touch her hands/arms.  He made prolonged eye contact throughout the dinner.

10  His tone of voice had sexual undertones, which was unlike the tone of his voice with others at

11  work.  As they left dinner, he attempted to walk very close to PLAINTIFF, again touching her.

12  This behavior was unwelcome and made PLAINTIFF very uncomfortable.

13        41.    When PLAINTIFF attempted to have a work discussion with GIAMATTEO, he

14  did not engage in the conversation. Instead, he made suggestive comments about how his

15  daughters dressed, their age, and stated that when he is out with his daughters he gets dressed up,

16  and people think "he is a dirty old man" because it appears he is out on a date with them.

17  PLAINTIFF is younger than GIAMATTEO and was very uncomfortable with these comments,

18  given that she had been out to dinner with him as he had described with his daughters.

19        42.    Overall, the dinner did not come off as a professional dinner, but more as an

20  attempt to see what PLAINTIFF would tolerate regarding GIAMATTEO's advances.

21        43.    PLAINTIFF was so uncomfortable with GIAMATTEO's behaviors that she

22  reported them to CEO Chen, asked CEO Chen to assure her that she would not have to travel alone

23  with GIAMATTEO, to which he agreed.  On information and belief, no male employee ever had

24  to seek such an assurance.

25        44.    GIAMATTEO, in a subsequent 1:1 again asked PLAINTIFF to report to him.

26  PLAINTIFF again declined the demotion. GIAMATTEO then threatened PLAINTIFF saying if

27  she is not "nice to him, he has a large network and could impact her career."  He emphasized the

28  word "nice" in a manner that was sexually suggestive.  GIAMATTEO was in effect asking

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

1    PLAINTIFF to be submissive and subservient to GIAMATTEO.  PLAINTIFF told GIAMATTEO

2    she too had a large network and that she would not want to work with someone that would allow

3    his comments to impact her career.

4         45.    Despite GIAMATTEO's harassment and discrimination, PLAINTIFF sought to

5    have a positive work environment and remain collaborative with GIAMATTEO for

6    BLACKBERRY's benefit.  Accordingly, she attempted to set up collaborative meetings with him.

7    GIAMATTEO complained about PLAINTIFF's request to meet with him and brought it up to

8    CEO Chen, claiming it was "offensive."  When GIAMATTEO set up meetings, on the other hand,

9    PLAINTIFF indicated she was happy to join the meetings.

10        46.    Immediately after rejecting GIAMATTEO's advances and reporting

11   GIAMATTEO's conduct to CEO Chen, GIAMATTEO retaliated against PLAINTIFF. His two-

12   year campaign of retaliation created a hostile work environment for PLAINTIFF, which impacted

13   PLAINTIFF negatively daily and ultimately ended in her being fired when GIAMATTEO had the

14   influence to do so – when he was chosen to be CEO. For example: GIAMATTEO stopped inviting

15   PLAINTIFF to meetings she should have been invited to; if GIAMATTEO invited PLAINTIFF to

16   meetings, he would invite her as a lower-level employee and ask her to do presentations for him

17   (as in be subservient to him); he failed to treat PLAINTIFF as an executive; he would make false

18   claims to others alleging PLAINTIFF was not attending meetings when he did not invite her; he

19   would then actively spread the false rumor to employees that PLAINTIFF was not a good

20   collaborator when in fact he excluded her from being able to collaborate; he would take credit for

21   PLAINTIFF's work;; he would make disparaging comments about PLAINTIFF to others,

22   including business partners; and GIAMATTEO started openly telling employees he wanted

23   PLAINTIFF "out" and he was working on getting PLAINTIFF "out." PLAINTIFF went to

24   GIAMATTEO to ask him about wanting to get her "out."  He admitted making these comments,

25   but said he told only four people.

26        47.    In or around 2022, GIAMATTEO, or his subordinates, submitted an organization

27   chart to PLAINTIFF's customers showing PLAINTIFF reporting to GIAMATTEO.  PLAINTIFF

28   did not report to GIAMATTEO and had told GIAMATTEO that she did not want to change her

reporting structure/accept a demotion.  The chart was sent out to PLAINTIFF's customers, which created confusion and essentially communicated to clients that PLAINTIFF had been demoted, was no longer in charge of her unit, and was subordinate to GIAMATTEO.  This issue was reported to human resources.  GIAMATTEO was dismissive of the entire issue and refused to fix the issue despite human resources asking him to do so.

48.    GIAMATTEO refused to speak to his staff about the incorrect organization chart showing PLAINTIFF reporting to GIAMATTEO.  Human resources, following multiple communications directly to GIAMATTEO from Chief Human Resources Officer White-Ivy, requested that he address the issue. GIAMATTEO refused, forcing White-Ivy to ultimately step in and correct the issues.

49.    PLAINTIFF asked BLACKBERRY whether it would have taken the same approach [demoting an employee on an organization chart sent out to a client] with a white male. BLACKBERRY acknowledged the organizational chart was not correct but denied that it had treated her any differently based on her gender.  PLAINTIFF did not push the matter because she wanted to move on and focus on ensuring her team was successful for BLACKBERRY—which she did.

50.    It was clear to PLAINTIFF this was just another attempt by GIAMATTEO to make PLAINTIFF be submissive to him.  Despite PLAINTIFF making it clear through previous interactions and then reporting the issue to human resources, GIAMATTEO continued to find ways to try and make PLAINTIFF submissive and subservient to him.  GIAMATTEO was not harassing men in this manner.

51.    Despite PLAINTIFF and GIAMATTEO working on separate teams, GIAMATTEO took credit for PLAINTIFF's success.  When PLAINTIFF confronted GIAMATTEO about his taking credit for her work, he denied it.  Nevertheless, there was a video of GIAMATTEO taking credit for PLAINTIFF's work. GIAMATTEO did not harass men in this manner.

52.    GIAMATTEO's conduct created additional work for PLAINTIFF, for example, requiring her to go out of her way to make sure she was invited to meetings and to make sure

1  accurate information was being disseminated about her work contributions. GIAMATTEO did not

2  harass men in this manner.

3      53.    GIAMATTEO's conduct became so petty that he refused to engage with

4  PLAINTIFF on an issue that could have saved BLACKBERRY nearly $1 million.  GIAMATTEO

5  did not harass men in this manner.

6      54.    Although Elite customer proposals were supposed to be sent to PLAINTIFF before

7  being sent to a customer or partner, GIAMATTEO and others routinely ignored this requirement,

8  which impeded PLAINTIFF's ability to approve customer proposals.

9      55.    PLAINTIFF learned from another employee that GIAMATTEO had been working

10  to prevent her from working with certain coveted customers. GIAMATTEO did not harass men in

11  this manner.

12      56.    Around March of 2022, PLAINTIFF had a phone call with a co-worker in which

13  she was asked "why do they [Giamatteo and his group] always try to exclude you?"  This was after

14  PLAINTIFF was excluded from emails and a meeting with a large client that she should have been

15  invited to.  GIAMATTEO did not harass men in this manner and instead included them on emails.

16      57.    PLAINTIFF reported GIAMATTEO's harassment and discrimination in early

17  2023 to human resources.  BLACKBERRY's response was to try and create increase separation

18  between the two roles.  In this separation, BLACKBERRY removed half of PLAINTIFF's

19  customers and gave them to GIAMATTEO and in turn, gave PLAINTIFF customers that the

20  Cyber BU had lost business from and asked her to win the customers back.

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

58.     On or about October 30, 2023, CEO Chen announced he would be retiring from BLACKBERRY.  On the same day, Board Member Dick Lynch announced that he would be the Interim CEO.



**Richard Lynch**

Mr. Lynch is Chair of the Board of Directors. He has served as a director of the Company since February 2013. He has bachelor's and master's degrees in Electrical Engineering from Lowell Technological Institute (now University of Massachusetts) and post-graduate executive education from the Wharton School at the University of Pennsylvania and the Johnson School of Management at Cornell University. Mr. Lynch is President of FB Associates, LLC, which provides advisory and consulting services at the intersection of technology, marketing and business operations. Prior to his current role, Mr. Lynch served as Executive Vice-President & Chief Technology Officer for Verizon Communications and Verizon Wireless. He is a Life Fellow of The Institute of Electrical and Electronic Engineers. Mr. Lynch previously served as Chairman of Ribbon Communications and as a director of Ruckus Wireless.  He has also served on a number of professional organizations including the GSM Association, the CDMA Development Group, the Federal Communications Commission Technical Advisory Committee and the Communications Security Reliability and Interoperability Council. Mr. Lynch has been honored with the President's Award by the Cellular Telecommunications and Internet Association and has also been inducted into the Wireless History Foundation's Hall of Fame.

59.     During this timeframe, BLACKBERRY's Board of Directors was planning CEO Chen's replacement and decided to promote GIAMATTEO to the position.



**John Giamatteo**
Chief Executive Officer

John Giamatteo is BlackBerry's Chief Executive Officer and President of its Cybersecurity division. John brings to BlackBerry over 30 years of experience in P&L, go-to-market, marketing, customer relationships, and customer success with global high technology companies.  He came to BlackBerry from McAfee where he was President and Chief Revenue Officer for over six years.  Prior to that John served as Chief Operating Officer at AVG Technologies, a leading provider of internet and mobile security. He also held leadership positions with Solera, RealNetworks and Nortel Networks.

John holds an MBA and Bachelor of Accounting from St. John's University in New York.

60.     During the period that BLACKBERRY's Board of Directors was deciding to make GIAMATTEO the CEO, it was reported to BLACKBERRY that GIAMATTEO had engaged in harassment towards women. This report was known to BLACKBERRY's Board of Directors.

61.     BLACKBERRY hired the Morrison & Foerster LLP law firm to conduct the investigation into the sexual harassment complaint regarding GIAMATTEO.

62.     On Friday November 3, 2023, Christin Hill and Eric Tate, at Morrison & Foerster, contacted PLAINTIFF to set up an interview via a video call.  Morrison & Foerster was not the same firm that had previously conducted investigations regarding human resources issues over the last decade.  Furthermore, it did not appear as if human resources were managing the process. This raised red flags for PLAINTIFF because Morrison & Foerster did not have the years of

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

context the prior firm had regarding ongoing gender discrimination issues she faced while at BLACKBERRY, and because this was not the normal process BLACKBERRY followed regarding its investigations.  Nevertheless, PLAINTIFF hoped for a full and thorough investigation.

63.    The attorneys wanted to have a call that day, but refused to provide information regarding what the call was about.  PLAINTIFF was unavailable to immediately speak, so she set the call for Monday, November 6, 2023.

64.    On November 6, Interim CEO Lynch sent an email to the entire BLACKBERRY team.  In his email, he said the Board of Directors had been busy working on getting a replacement CEO and would "conclude the process soon."  He further pointed out "we need to be very thoughtful and thorough as we consider our candidates."

65.    That same morning, November 6, Interim CEO Lynch hosted a leadership call and was asked who the new permanent CEO would be.  He responded, saying the person was chosen, but the Board had "run into a couple of process hiccups in appointing the person."  As per Interim CEO Lynch's own words, the investigation conducted was just a *pro forma* process rather than an attempt to make any determinations that could be averse to GIAMATTEO.

66.    Later that morning, PLAINTIFF spoke with Ms. Hill and Mr. Tate, who informed her they were investigating GIAMATTEO's behavior towards women.  PLAINTIFF told them she was nervous about speaking with them knowing GIAMATTEO was on the list to become CEO.  Concerned, PLAINTIFF asked Morrison & Foerster who would get the information she shared.  She was told it would go to Phil Kurtz (Chief Legal Officer), and he would decide what to share with the Board.  This was not the typical process regarding investigations because it excluded human resources who would normally lead such an investigation.



Phil Kurtz
Chief Legal Officer and Corporate Secretary

Phil Kurtz is BlackBerry's Chief Legal Officer and Corporate Secretary with responsibility for the company's worldwide legal affairs, including commercial contracting, litigation, regulatory and privacy compliance, risk management and strategic transactions.

Phil joined the company over 12 years ago as M&A Commercial Counsel, progressed to Deputy General Counsel and Assistant Corporate Secretary, and Vice President, Deputy General Counsel and Corporate Secretary before his promotion to Chief Legal Officer. Phil holds a BA Philosophy from Huron University and LLB/MBA in Law & Business (Finance) from University of Toronto.

Phil holds LLB and MBA degrees from the University of Toronto and a BA from The University of Western Ontario.  In 2012, Phil was a recipient of the Forty Under 40 Award from the Ottawa Business Journal and Ottawa Chamber of Commerce.

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

67.     The attorneys assured PLAINTIFF no retaliation would occur.  Based on this assurance, she shared with them her experience with GIAMATTEO and how he sexually harassed and discriminated against her and retaliated against her after she rejected him.

68.     PLAINTIFF informed the attorneys that in her complaint to human resources in early 2023 about GIAMATTEO, she focused on the retaliation but did not bring forth the sexual harassment and discrimination because she did not have physical or documentary evidence, such as emails or text messages.

69.     PLAINTIFF told the attorneys that she had shared her experience at or around the time it occurred with her family, friends, co-workers, and former CEO Chen.  PLAINTIFF offered to provide evidence reflecting her complaints about sexual harassment and discrimination to family, friends, co-workers, and former CEO Chen.

70.     The attorneys asked PLAINTIFF if she knew of other women, and she provided the names of two other women.

71.     A minute (i.e. immediately) after the meeting with Ms. Hill and Mr. Tate, PLAINTIFF had a meeting with Interim CEO Lynch.  PLAINTIFF asked him how he was deciding who the CEO was going to be, and he quickly replied the CEO was already selected.

72.     On November 7, PLAINTIFF emailed the attorneys evidence regarding GIAMATTEO's retaliation after she failed to acquiesce to his sexual harassment and discrimination, along with other evidence.  This evidence included information she previously sent to human resources, for example: documents showing GIAMATTEO had refused to meet with her after raising concerns, GIAMATTEO's failure to provide invitations to PLAINTIFF to meetings, a video of GIAMATTEO taking credit for a deal PLAINTIFF closed.  In her email with the evidence, PLAINTIFF explained that these were "just some examples."  The attorneys confirmed receipt of PLAINTIFF's email and informed her they would let her know if they had any follow-up questions.

73.     On November 11, PLAINTIFF followed up with the attorneys noting that when she last talked with them, they did not ask her for the contact information for the women she mentioned with information about GIAMATTEO's previous conduct.  In her email, she provided

1    the attorneys with their contact information and the names of people she discussed

2    GIAMATTEO's harassment and discrimination with.

3        74.    Also on November 11, PLAINTIFF informed the attorneys investigating

4    GIAMATTEO that she was continuing to be retaliated against by GIAMATTEO.

5        75.    On November 16, PLAINTIFF reached back out to the Morrison & Foerster

6    attorneys.  PLAINTIFF shared with the attorneys "another example of John Giamatteo's

7    retaliation against me as it continues today with him still cutting me out of my job."  PLAINTIFF

8    cc'd human resources on the email.

9        76.    On November 16, PLAINTIFF reached out to Interim CEO Lynch and shared with

10   him a copy of her correspondence with the attorneys investigating GIAMATTEO's sexual

11   harassment.  PLAINTIFF wrote "I believe that company culture, transparency, and teamwork are

12   important to you, to ultimately drive company results. With that, I would like to make you aware

13   of this recent example where that has not happened (and has not been happening for a long time),

14   and request your help with addressing it. I would appreciate your support."

15       77.    The next day, November 17, Interim CEO Lynch responded to PLAINTIFF's

16   email regarding GIAMATTEO's retaliation, writing "I obviously don't know the history but I

17   believe that this will get solved based on the processes for change that we have undertaken.

18   Obviously, we need a little time, but change is coming."

19       78.    On or about November 30, 2023, PLAINTIFF received an email seeking to set up

20   a 1:1 with Interim CEO Lynch.  On information and belief, Defendants had already decided to

21   terminate Plaintiff by then.

22       79.    On December 4, PLAINTIFF landed overseas for a business trip.  Upon arriving,

23   she went to her hotel and set up her computer for a 1:1 meeting with Interim CEO Lynch.  When

24   she arrived at the call, Human Resources Director Kelly Cheun was also on.  Interim CEO Lynch

25   informed PLAINTIFF that her job duties were terminated effective immediately, but her last day

26   with the company would be on December 8.  They told PLAINTIFF the termination was for

27   "restructuring".   Previously Interim CEO Lynch told everyone in senior leadership restructuring

28   was coming but that everyone in senior leadership would have a chance to find a new home in the

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

1   company because he believed everyone was good at what they do.  PLAINTIFF asked Interim

2   CEO Lynch what she could tell her team would happen to them. He replied that it was "nice that

3   you care about your team, but don't worry about it."

4           80.     After the call ended, PLAINTIFF asked Human Resources Director Cheun if she

5   knew PLAINTIFF was being terminated.  Director Cheun said "no" and that she had been invited

6   to the call without any notice.  Further, Director Cheun explained that CHRO White-Ivy was not

7   aware of the PLAINTIFF's termination.  PLAINTIFF again confirmed with Director Cheun her

8   lack of notice and that CHRO White-Ivy had been excluded from the process when PLAINTIFF

9   went to the office to pick up her personal belongings a few days later.

10           81.     Upon learning that PLAINTIFF was overseas, Interim CEO Lynch changed the

11   termination date to December 15.  He also told PLAINTIFF it would be better if she told people

12   she resigned.  PLAINTIFF was the only person on the senior leadership team being terminated.

13           82.     That day, December 4, BLACKBERRY provided PLAINTIFF a letter noting she

14   had "been relieved of all job duties effective immediately" and any payment was conditional upon

15   signing a separation agreement releasing all her claims, including claims relating to unlawful

16   retaliation.  The letter also directed PLAINTIFF to provide her response to Phil Kurtz, as opposed

17   to human resources, which was abnormal.  Interim CEO Lynch signed the termination letter.  The

18   letter expressly states "the Company has decided to terminate Employee's employment…"

19           83.     On December 6, BLACKBERRY offered GIAMATTEO the CEO position and

20   President of Cybersecurity.  It required GIAMATTEO's signature on or before December 8.

21   Interim CEO Lynch signed the offer letter.  GIAMATTEO's salary was set at $700,000 with

22   bonuses and stocks.  GIAMATTEO signed the offer letter the next day and Interim CEO Lynch

23   signed it on December 8.  In the offer letter, there was a special $350,000 bonus.

24           84.     On December 8, 2023, Interim CEO Lynch emailed PLAINTIFF with the subject

25   line "resignation option."  In his email, he wrote "I gave you the option to portray your departure

26   as a resignation in spite of the fact that the company has determined to sever you and pay you what

27   is due in these circumstances. It is unfair to your employees and the company not to begin the

28   restructuring of your organization and duties while we wait indefinitely for your decision on how

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

you want your departure to be portrayed….If I have not seen a resignation announcement…I will be prepared to put out an announcement that you are scheduled to leave the business." This was the first time PLAINTIFF was told that there was a deadline to inform people she was terminated from BLACKBERRY.

85.    On December 10, 2023, Interim CEO Lynch sent an email to PLAINTIFF's teams stating PLAINTIFF was "leaving" BLACKBERRY.

86.    The next day, December 11, Interim CEO Lynch sent an email announcing "the Board of Directors has appointed John Giamatteo as the new CEO of BlackBerry…I have gotten to know John fairly well over the last two years."

87.    Blackberry has claimed that Lynch alone made the decision to terminate PLAINTIFF. It is inconceivable, however, that a mere interim CEO (Lynch) would have fired such a high-level executive (PLAINTIFF) without GIAMATTEO's approval after GIAMATTEO was already the heir apparent to the CEO position. Blackberry has therefore gone to extraordinary lengths to make it appear as though GIAMATTEO was not involved in the decision to fire PLAINTIFF.

88.    Prior to BLACKBERRY promoting GIAMATTEO, he had failed to implement the company's stated goals of diversity, equity, and inclusion. Giamatteo was urged by CEO Chen and HR to improve his team's DEI numbers. He failed to do so. His organization was only 18% female. He purged multiple employees from his organization who were not white men, so that he had no women (with the exception of his secretary) as direct reports. And all his direct reports were white men. After GIAMATTEO was advanced to CEO, even more women and people of color were released at BLACKBERRY.

89.    Based on information and belief, BLACKBERRY intended to appoint an interim lead to replace PLAINTIFF. But upon finding out PLAINTIFF would not sign the severance agreement releasing her claims, BLACKBERRY decided to instead allocate PLAINTIFF's duties to other currently employed people to disguise the fact that PLAINTIFF's termination was a firing, rather than a "restructuring."

90.     PLAINTIFF has since learned GIAMATTEO harassed and discriminated against other women and then retaliated against them after they raised concerns about his unlawful gender harassment and discrimination.

91.     For example, three women had direct knowledge of several female executives whose roles were diminished during GIAMATTEO'S tenure as a division president.  Two of these women had some of their responsibilities removed under GIAMATTEO'S leadership, and one of them claimed her duties were given to male counterparts.

92.     A woman that worked with GIAMATTEO explained the gender-based harassment and discrimination as: "I felt like I had gone back to the 1980s in tech, where there was truly a culture of misogyny," and that "I thought: I started my career that way and now I'm ending my career that way."

93.     PLAINTIFF expects the evidence will further show that GIAMATTEO inappropriately touched one of these women at a Blackberry event.  These experiences are relevant to Plaintiff's claims.  *See e.g., Beyda v. City of Los Angeles*, 65 Cal. App. 4th 511, 520 (1998) (harassment of other women relevant if plaintiff was aware of it); *Pantoja v. Anton*, 198 Cal. App. 4th 87, 115 (2011) ("For example, evidence of a male supervisor's sexually offensive remarks to and touching of other women employees is probative of the supervisor's discriminatory intent in firing a female plaintiff for refusing to have sex with him.")

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE LABOR CODE § 1102.5**
**(AGAINST BLACKBERRY)**

94.     PLAINTIFF re-alleges and incorporates by reference the allegations contained in the preceding paragraphs fully as though set forth at length herein.

95.     Labor Code section 1102.5(b) prohibits employers from retaliation against employees for "disclosing information" concerning suspected violations of the law, either internally or to government or law enforcement agencies.  It is unlawful to sexually harass or discriminate against an employee and/or retaliate against an employee for reporting sexual harassment or discrimination.  Here, PLAINTIFF reported discrimination and sexual harassment

to BLACKBERRY's attorneys and reported retaliation.  Thus, she reported a suspected violation of the law under Labor Code section 1102.5.

96.    PLAINTIFF reported unlawful sexual harassment and discrimination on November 6 and was notified that she would be terminated less than a month later, on December 4.

97.    PLAINTIFF reported GIAMATTEO's harassing and discriminatory and retaliatory conduct to BLACKBERRY and directly to the Board Chair Lynch.  BLACKBERRY failed to conduct a thorough investigation.  This was a contributing factor in BLACKBERRY's decision to discharge PLAINTIFF.  Thus, BLACKBERRY discharged PLAINTIFF in violation of Labor Code section 1102.5.

98.    The above-described acts of BLACKBERRY were willful, intentional, and malicious and done with the intent to vex, injure and annoy PLAINTIFF and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish BLACKBERRY, and to deter others from engaging in similar conduct.  BLACKBERRY authorized and ratified the wrongful acts of its agents and employees, knew in advance that its agents and employees were likely to commit such acts and employed them with conscious disregard of the rights or safety of others, and/or its officers, director, and/or managing agents were themselves guilty of oppression, fraud, and malice.  Those who terminated PLAINTIFF were officers, directors, and/or managing agents who were vested with discretionary authority to make decisions affecting company policy regarding significant aspects of the company's business.  These officers, director, and/or managing agents acted with malice in terminating PLAINTIFF because she reported and/or was trying to report illegal conduct despite knowing it was illegal to do so under California and federal law, in conscious disregard of PLAINTIFF's rights.  Those officers, director, and/or managing agents who terminated PLAINTIFF further acted with malice by fabricating false reasons for PLAINTIFF's termination in order to cover up their true, discriminatory reason for terminating PLAINTIFF.

99.    BLACKBERRY's wrongful conduct was a substantial factor in causing and/or as a direct and proximate result of the acts of GIAMATTEO, as alleged above, PLAINTIFF has

1    suffered and will continue to suffer economic damages, including lost wages and benefits, and

2    other compensatory damages in an amount to be ascertained at the time of trial.

3         100.    BLACKBERRY's wrongful conduct was a substantial factor in causing and/or as a

4    direct and proximate result of the acts of GIAMATTEO, as alleged above, PLAINTIFF is also

5    entitled to reinstatement with backpay and benefits and/or PLAINTIFF's actual damages.

6                        **SECOND CAUSE OF ACTION**
         **DISCRIMINATION IN PAYMENT OF WAGES BASED ON SEX IN**
7             **VIOLATION OF THE LABOR CODE § 1197.5**
                      **(AGAINST BLACKBERRY)**
8

9         101.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in

10   the preceding paragraphs fully as though set forth at length herein.

11        102.    Labor Code section 1197.5 prohibits an employer from paying an employee wage

12   rates less than the rates paid to an employee of the opposite sex for substantially similar work

13   when viewed as a composite of skill, effort, and responsibility.  Prior salary shall not justify "any

14   disparity in compensation."

15        103.    Under Labor Code section 1197.5(h), any employer who violates subdivision (a)

16   or (b) is liable to the employee affected in the amount of wages, interest thereon, an additional

17   equal amount as liquidated damages, attorney's fees, and costs.

18        104.    PLAINTIFF was not paid a wage rate equal to GIAMATTEO or Ericksson,

19   despite performing substantially similar work when viewed as a composite of skill, effort, and

20   responsibility.

21        105.    GIAMATTEO and Ericksson were similarly situated with PLAINTIFF, yet they

22   received substantially more pay than her.

23        106.    As already discussed, even though GIAMATTEO and Eriksson were paid far more

24   than PLAINTIFF, their job duties were substantially similar.  PLAINTIFF anticipates that she will

25   find additional suitable equal-pay comparators during discovery.  (Blackberry's SEC disclosures

26   reveal the compensation figures for only the five highest-paid employees, meaning that

27   PLAINTIFF's ability to identify comparators at this early stage of the case is limited.)

28

107.    As a direct and proximate result of the acts of DEFENDANTS, and each of them, as alleged above, PLAINTIFF has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

108.    As a direct and proximate result of the acts of DEFENDANTS, and each of them, as alleged above, PLAINTIFF has necessarily retained attorneys to prosecute the within action. PLAINTIFF therefore is entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

109.    Because DEFENDANTS acted with malice, oppression, and fraud, PLAINTIFF is entitled to punitive damages for this claim.

**THIRD CAUSE OF ACTION**
**HOSTILE WORK ENVIRONMENT BASED ON SEX AND/OR GENDER**
**IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900 *et seq.***
**(AGAINST ALL DEFENDANTS)**

110.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in the preceding paragraphs fully as though set forth at length herein. Herein, PLAINTIFF points out some, not all, incidents regarding sexual/gender based harassment.

111.    Government Code section 12923 declares that "harassment creates a hostile, offensive, oppressive, or intimidating work environment and deprives victims of their statutory right to work in a place free of discrimination when the harassment conduct sufficiently offends, humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being." This affirms its approval of the standard set forth by Justice Ruth Bader Ginsburg in her concurrence in *Harris v. Forklift Systems* (1993) 510 U.S. 17 writing "the plaintiff need to prove that his or her tangible productivity had declined as a result of the harassment. It suffices to prove that a reasonable person subjected to this discriminatory conduct would find, as plaintiff did, that the harassment altered working conditions as to make it more difficult to do the job." *Id*. at 26.

112.    The law makes clear, "a single incident of harassment conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonable interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment." *Brooks v. City San Mateo* (2000) 229 F.3d 917.

113.    The law explains "the existence of a hostile work environment depends upon the totality of the circumstances and a discriminatory remark, even if not made directly in the context of an employment decision or uttered by a nondecisionmaker, may be relevant, circumstantial evidence of discrimination." *Reid v. Google, Inc.* (2010) 50 Cal.4th 512.

114.    Based on this law, and the realities regarding harassment amended Government Code section 12923 to state "Harassment cases are rarely appropriate for disposition on summary judgement. In that regard, the Legislature affirms the decision in *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243 and its observation that hostile working environment cases involve issues 'not determinable on paper.'"

115.    California's Fair Employment and Housing Act ("FEHA") prohibits harassing an employee in the workplace "because of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, sex or age" and retaliation for complaining of sexual harassment.

116.    At all relevant times, PLAINTIFF was (1) a member of a protected class [woman]; (2) subjected to unwelcome harassment based on her protected class [gender]; (3) the harassment was based on her protected status (woman); (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) BLACKBERRY is liable for the harassment.  For supervisors, such as GIAMATTEO, BLACKBERRY is strictly liable for harassment.

117.    The sexual and gender harassment was so severe and/or pervasive as to alter the conditions of PLAINTIFF's employment and created a hostile and abusive work environment that affected tangible aspects of PLAINTIFF's employment, including, but not limited to the terms, conditions, and/or privileges of her employment. This included, but was not limited to, making it

1   more difficult for Plaintiff to complete her work, attend meeting, maintain exceptional customer

2   service, manager her work schedule, maintain good working relationships with co-workers, and

3   many other issues.

4           118.    GIAMATTEO created a hostile work environment.  This included making

5   unwelcome comments, such as, asking PLAINTIFF to change her reporting structure so they could

6   travel together, commenting at a working dinner about being a "dirty old man" referring to a

7   working dinner as a "date", talking over PLAINTIFF, laughing at PLAINTIFF, taking credit for

8   PLAINTIFF's work, and minimizing PLAINTIFF's contributions.

9           119.    GIAMATTEO's conduct created a hostile work environment based on

10   PLAINTIFF's gender.  This included making an unwanted sexual advance at PLAINTIFF at

11   dinner which included talking using sexually based undertones then leaning over the table towards

12   PLAINTIFF to attempt to touch PLAINTIFF's hands/arms.

13           120.    GIAMATTEO's conduct created a hostile work environment based on

14   PLAINTIFF's gender.  This included offering employment benefits in exchange for accepting his

15   unwanted advances and then threatening that if PLAINTIFF did not accept them, he had many

16   contacts and would harm her future career.

17           121.    GIAMATTEO's conduct created a hostile work environment based on

18   PLAINTIFF's gender.  This included leering at PLAINTIFF while at a work-related dinner.

19           122.    GIAMATTEO created a hostile work environment based on PLAINTIFF's gender

20   by excluding her from meetings.

21           123.    GIAMATTEO created a hostile work environment based on PLAINTIFF's gender

22   by excluding her external meetings.

23           124.    GIAMATTEO created a hostile work environment based on PLAINTIFF's gender

24   by downgrading her contributions while encouraging her to leave the company.

25           125.    GIAMATTEO created a hostile work environment based on PLAINTIFF's gender

26   by taking credit for her work.

27

28

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

126.    GIAMATTEO created a hostile work environment based on PLAINTIFF's gender by minimizing her work contributions and achievements while applauding other male co-workers for lesser achievements.

127.    GIAMATTEO created a hostile work environment based on PLAINTIFF's gender by creating a "boy's club."

128.    GIAMATTEO created a hostile work environment based on PLAINTIFF's gender by speaking negatively about PLAINTIFF to co-workers.

129.    GIAMATTEO created a hostile work environment based on PLAINTIFF's gender by refusing to correct a false reporting structure showing PLAINTIFF reported to him.

130.    BLACKBERRY is vicariously liable under FEHA for sexual harassment of PLAINTIFF by GIAMATTEO because it was aware of the sexual harassment and did nothing to stop it.

131.    As a direct and proximate result of the acts of DEFENDANTS, and each of them, as alleged above, PLAINTIFF has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

132.    As a further direct and proximate result of the acts of DEFENDANTS, and each of them, as alleged above, PLAINTIFF has suffered mental, physical, and emotional distress, including but not limited to anxiety, nervousness, depression, sleeplessness, and has been generally damaged in an amount to be ascertained at the time of trial.

133.    As a further direct and proximate result of the acts of DEFENDANTS, and each of them, as alleged above, PLAINTIFF will continue to expend sums in the future for the treatment of the emotional, physical, and mental injuries sustained by PLAINTIFF as a result of said DEFENDANTS, and each of their, acts in an amount to be ascertained at the time of trial.

134.    As a further direct and proximate result of the above-described acts of DEFENDANTS, and each of them, PLAINTIFF has incurred attorney's fees and costs and, pursuant to the provisions of California Government Code section 12965, subdivision (b), PLAINTIFF is entitled to the reasonable value of such attorney's fees.

135.     The conduct of DEFENDANTS, and each of them, as alleged above, was a substantial factor in causing PLAINTIFF's harm, as described above.

136.     The above-described acts of DEFENDANTS, and each of them, were willful, intentional and malicious and done with the intent to vex, injure and annoy PLAINTIFF and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said DEFENDANTS, and each of them, and to deter others from engaging in similar conduct. DEFENDANTS, and each of them, authorized and ratified the wrongful acts of their agents and employees, knew in advance that their agents and employees were likely to commit such acts and employed them with conscious disregard of the rights or safety of others, and/or their officers, directors, and/or managing agents were themselves guilty of oppression, fraud, and malice.  Those who harassed PLAINTIFF were officers, directors, and/or managing agents who were vested with discretionary authority to make decisions affecting company policy regarding significant aspects of the company's business.  These officers, directors, and/or managing agents acted with malice in harassing PLAINTIFF in that they did so because of PLAINTIFF's gender/sex despite knowing it was illegal to do so under the law, in conscious disregard of PLAINTIFF's rights.

### FOURTH CAUSE OF ACTION
### FAILURE TO PREVENT HARASSMENT AND RETALIATION
### IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900 *et seq.*
### (AGAINST BLACKBERRY)

137.     PLAINTIFF re-alleges and incorporates by reference the allegations contained in the preceding paragraphs fully as though set forth at length herein.

138.     In violation of the FEHA, BLACKBERRY failed to take all reasonable steps necessary to prevent discrimination and harassment against its employees.

139.     In perpetrating the above-described conduct, BLACKBERRY engaged in a pattern, practice, policy, and custom of unlawful discrimination.  Said conduct constituted a policy, practice, tradition, custom, and usage that denied PLAINTIFF protections of the FEHA.

140.     At all relevant time periods, BLACKBERRY established a policy, custom, practice, or usage within the organization that condoned, encouraged, tolerated, sanctioned,

ratified, approved of, and/or acquiesced in unlawful harassment and discrimination towards its employees including, but not limited to, PLAINTIFF.

141.    BLACKBERRY was put on notice that it might be committing harassment and discrimination in the workplace and/or was strictly liable for the discriminatory behaviors.  Once BLACKBERRY was put on notice that it might be committing discrimination in the workplace, it was a reasonable step to conduct a thorough investigation into whether there was harassment and discrimination in the workplace.  BLACKBERRY failed to take this reasonable step of conducting a thorough investigation into PLAINTIFF's complaint of harassment and retaliation in the workplace.

142.    BLACKBERRY knew, or reasonably should have known, that the failure to provide any or adequate education, training, and information as to their personnel policies and practices regarding harassment and discrimination would result in retaliation.  Providing adequate education, training, and information as to their personnel policies and practices regarding harassment and discrimination was a reasonable step that BLACKBERRY could have taken, but did not take, to prevent harassment and discrimination in the workplace.

143.    The failure of BLACKBERRY to take the above-mentioned reasonable steps to prevent harassment and discrimination constituted deliberate indifference to the rights of its employees including, but not limited to, those of PLAINTIFF.

144.    By reason of the conduct of BLACKBERRY, as alleged herein, PLAINTIFF has necessarily retained attorneys to prosecute the within action.  PLAINTIFF therefore is entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

145.    As a direct and proximate result of the acts of BLACKBERRY, as alleged above, PLAINTIFF has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

146.    As a further direct and proximate result of the acts of BLACKBERRY, as alleged above, PLAINTIFF has suffered mental, physical, and emotional distress, including but not limited

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

1    to anxiety, nervousness, depression, sleeplessness, and has been generally damaged in an amount

2    to be ascertained at the time of trial.

3        147.    As a further direct and proximate result of the acts of BLACKBERRY,

4    PLAINTIFF will continue to expend sums in the future for the treatment of the emotional,

5    physical, and mental injuries sustained by PLAINTIFF as a result of said DEFENDANTS, and

6    each of their, acts in an amount to be ascertained at the time of trial.

7        148.    As a further direct and proximate result of the above-described acts of

8    BLACKBERRY, PLAINTIFF has incurred attorney's fees and costs and, pursuant to the

9    provisions of California Government Code section 12965, subdivision (b), PLAINTIFF is entitled

10   to the reasonable value of such attorney's fees.

11       149.    The failure by BLACKBERRY to take all reasonable steps to prevent sexual

12   harassment was a substantial factor in causing PLAINTIFF's harm, as described above.

13       150.    The above-described acts of BLACKBERRY were willful, intentional and

14   malicious and done with the intent to vex, injure, and annoy PLAINTIFF and warrant the

15   imposition of exemplary and punitive damages in an amount sufficient to punish said

16   DEFENDANTS, and each of them, and to deter others from engaging in similar conduct.

17   DEFENDANTS, and each of them, authorized and ratified the wrongful acts of their agents and

18   employees, knew in advance that their agents and employees were likely to commit such acts and

19   employed them with conscious disregard of the rights or safety of others, and/or their officers,

20   directors, and/or managing agents were themselves guilty of oppression, fraud, and malice.  Those

21   who terminated and/or otherwise discriminated against and failed to prevent harassment,

22   discrimination, and retaliation against PLAINTIFF were officers, directors, and/or managing

23   agents who were vested with discretionary authority to make decisions affecting company policy

24   regarding significant aspects of the company's business.  These officers, directors, and/or

25   managing agents acted with malice in terminating and/or otherwise discriminating against

26   PLAINTIFF and failing to prevent harassment, discrimination, and retaliation against her in that

27   they did so because of sexual harassment despite knowing it was illegal to do so under the law, in

28

1   conscious disregard of PLAINTIFF's rights.  Those officers, directors, and/or managing agents

2   who terminated and/or otherwise discriminated against PLAINTIFF acted with malice.

3                              **FIFTH CAUSE OF ACTION**
    **RETALIATION IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900 *et seq.***
4                           **(AGAINST BLACKBERRY)**

5           151.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in

6   the preceding paragraphs fully as though set forth at length herein.

7           152.    California Government Code section 12940(h) provides that it is an unlawful

8   employment practice "[f]or any employer . . . or person to discharge, expel, or otherwise

9   discriminate against any person because the person has opposed any practices forbidden under this

10  part or because the person has filed a complaint, testified, or assisted in any proceeding under

11  [FEHA]."

12          153.    PLAINTIFF exercised her rights under FEHA and engaged in legally protected

13  activity, including but not limited to, by notifying DEFENDANTS, and each of them, regarding

14  GIAMATTEO's harassing, discriminatory, and retaliatory conduct.

15          154.    PLAINTIFF's protected activity under the FEHA was a substantial motivating

16  reason for BLACKBERRY's decision to discharge PLAINTIFF and subject her to other adverse

17  employment actions.

18          155.    The above-described acts of BLACKBERRY were willful, intentional and

19  malicious and done with the intent to vex, injure, and annoy PLAINTIFF and warrant the

20  imposition of exemplary and punitive damages in an amount sufficient to punish said

21  DEFENDANTS, and each of them, and to deter others from engaging in similar conduct.

22  DEFENDANTS, and each of them, authorized and ratified the wrongful acts of their agents and

23  employees, knew in advance that their agents and employees were likely to commit such acts and

24  employed them with conscious disregard of the rights or safety of others, and/or their officers,

25  directors, and/or managing agents were themselves guilty of oppression, fraud, and malice.  Those

26  who terminated and/or otherwise discriminated against and failed to prevent harassment,

27  discrimination, and retaliation against PLAINTIFF were officers, directors, and/or managing

28  agents who were vested with discretionary authority to make decisions affecting company policy

regarding significant aspects of the company's business.  These officers, directors, and/or managing agents acted with malice in terminating and/or otherwise discriminating against PLAINTIFF and failing to prevent harassment, discrimination and retaliation against her in that they did so because of sexual harassment and discrimination despite knowing it was illegal to do so under the law, in conscious disregard of PLAINTIFF's rights.  Those officers, directors, and/or managing agents who terminated and/or otherwise discriminated against PLAINTIFF acted with malice.

156.    BLACKBERRY's discharge of PLAINTIFF has directly and proximately caused PLAINTIFF to suffer lost wages and other benefits of employment in an amount to be proven at trial.

157.    As a further direct and proximate result of the above-described acts of BLACKBERRY, PLAINTIFF has incurred attorney's fees and costs and, pursuant to the provisions of California Government Code Section 12965(c), PLAINTIFF is entitled to the reasonable value of such attorney's fees.

**SIXTH CAUSE OF ACTION**
**NEGLIGENT RETENTION**
**(AGAINST BLACKBERRY)**

158.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in the preceding paragraphs fully as though set forth at length herein.

159.    California case law holds that "An employer may be liable for injuries caused by an unfit employee if the employer knows or has reason to know that an employee hired or retained is incompetent or unfit to perform the duties required of the job, or if the employer fails to use reasonable care to discover the employee's incompetence or unfitness before hiring the employee." (*Roman Catholic Bishop v. Superior Court*, (1996) 42 Cal.App.4th 1556, 1564-1565).

160.    At all times mentioned in this complaint, BLACKBERRY negligently and carelessly retained its employees including, but not limited to GIAMATTEO, despite knowing he had discriminated against, harassed, and retaliated against PLAINTIFF.

161.    BLACKBERRY breached the duty to exercise reasonable care and acted negligently and carelessly in the retention by failing to give employees adequate training as to laws and regulations pertaining to FEHA and by failing to give GIAMATTEO proper discipline.

162.    BLACKBERRY further failed to monitor the conduct of its employees, including GIAMATTEO.

163.    PLAINTIFF further alleges that BLACKBERRY negligently investigated, appointed, retained, and supervised GIAMATTEO because it knew of the harassment, discrimination, and retaliation perpetrated by him.

164.    Despite notice of inappropriate and illegal conduct, BLACKBERRY failed to adequately and appropriately supervise GIAMATTEO, and failed to take the necessary actions to protect PLAINTIFF.

165.    BLACKBERRY's negligence in investigating, appointing, retaining, and supervising GIAMATTEO was a substantial factor leading to PLAINTIFF's termination.

166.    As a direct and proximate result of the negligence of BLACKBERRY as set forth above, PLAINTIFF sustained general and special damages including but not limited to mental anguish and pain and suffering and continues to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to PLAINTIFF's damage in an amount to be determined by proof at trial.

167.    BLACKBERRY committed the despicable acts alleged herein maliciously, and oppressively, with the wrongful intent of injuring PLAINTIFF, and have acted with an improper and evil motive amounting to malice, and in conscious disregard of PLAINTIFF's rights.  Because the despicable acts taken toward PLAINTIFF were carried out by managerial employees acting in a deliberate, cold, callous, and intentional manner to injure and damage PLAINTIFF, she is entitled to recover punitive damages from BLACKBERRY in an amount according to proof.

**SEVENTH CAUSE OF ACTION**
**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
**(AGAINST  BLACKBERRY)**

168.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in

1  the preceding paragraphs fully as though set forth at length herein.

2      169.    PLAINTIFF's termination was in violation of fundamental public policies of the

3  state of California, including but not limited to, exercising a statutory right or privilege, and the

4  right to complain to administrative law bodies about perceived violations of the laws which they

5  are charged to enforce.

6      170.    As a result of the wrongful conduct of BLACKBERRY, PLAINTIFF has suffered

7  damages, including but not limited to lost pay and benefits and damage to future employability, all

8  in an amount within the jurisdiction of this court.

9      171.    The conduct of BLACKBERRY was carried on in violation of Civil Code § 3294

10  in the following respects:

11          a.   The conduct was despicable and was carried on by BLACKBERRY with a willful

12               and conscious disregard of PLAINTIFF's rights.

13          b.   BLACKBERRY's conduct was oppressive in that it was despicable conduct that

14               subjected PLAINTIFF to cruel and unjust hardship in conscious disregard of her

15               rights.

16      172.    PLAINTIFF alleges that BLACKBERRY is liable in punitive damages for the

17  conduct of its managing agents.

18                          **EIGHTH CAUSE OF ACTION**
19              **DISCRIMINATION BASED ON SEX AND/OR GENDER**
                **IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900 _et seq._**
20                          **(AGAINST BLACKBERRY)**

21      173.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in

22  the preceding paragraphs fully as though set forth at length herein.

23      174.    California's Fair Employment and Housing Act ("FEHA") prohibits

24  discriminating against an employee in the workplace "because of race, religious creed, color,

25  national origin, ancestry, physical handicap, medical condition, marital status, sex or age" and

26  retaliation for complaining of discrimination.

27

28

175.    At all relevant times, PLAINTIFF was (1) a member of a protected class [woman]; (2) was undermined, disparaged, and ultimately fired; (3) her sex and gender were a substantial motivation for the adverse actions she experienced; and (4) BLACKBERRY is liable for the discrimination.  Several supervisors within Blackberry were aware of the discrimination but did nothing to stop it.

176.    As a direct and proximate result of the acts of DEFENDANTS, and each of them, as alleged above, PLAINTIFF has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

177.    As a further direct and proximate result of the acts of DEFENDANTS, and each of them, as alleged above, PLAINTIFF has suffered mental, physical, and emotional distress, including but not limited to anxiety, nervousness, depression, sleeplessness, and has been generally damaged in an amount to be ascertained at the time of trial.

178.    As a further direct and proximate result of the acts of DEFENDANTS, and each of them, as alleged above, PLAINTIFF will continue to expend sums in the future for the treatment of the emotional, physical, and mental injuries sustained by PLAINTIFF as a result of said DEFENDANTS, and each of their, acts in an amount to be ascertained at the time of trial.

179.    As a further direct and proximate result of the above-described acts of DEFENDANTS, and each of them, PLAINTIFF has incurred attorney's fees and costs and, pursuant to the provisions of California Government Code section 12965, subdivision (b), PLAINTIFF is entitled to the reasonable value of such attorney's fees.

180.    The conduct of DEFENDANTS, and each of them, as alleged above, was a substantial factor in causing PLAINTIFF's harm, as described above.

181.    The above-described acts of DEFENDANTS, and each of them, were willful, intentional and malicious and done with the intent to vex, injure and annoy PLAINTIFF and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said DEFENDANTS, and each of them, and to deter others from engaging in similar conduct. DEFENDANTS, and each of them, authorized and ratified the wrongful acts of their agents and

employees, knew in advance that their agents and employees were likely to commit such acts and employed them with conscious disregard of the rights or safety of others, and/or their officers, directors, and/or managing agents were themselves guilty of oppression, fraud, and malice. Those who harassed PLAINTIFF were officers, directors, and/or managing agents who were vested with discretionary authority to make decisions affecting company policy regarding significant aspects of the company's business. These officers, directors, and/or managing agents acted with malice in harassing PLAINTIFF in that they did so because of PLAINTIFF's gender/sex despite knowing it was illegal to do so under the law, in conscious disregard of PLAINTIFF's rights.

**NINTH CAUSE OF ACTION**
**FAILURE TO PREVENT DISCRIMINATION**
**IN VIOLATION OF THE FEHA, CAL. GOV. CODE § 12900 *et seq.***
**(AGAINST BLACKBERRY)**

182.    PLAINTIFF re-alleges and incorporates by reference the allegations contained in the preceding paragraphs fully as though set forth at length herein.

183.    In violation of the FEHA, BLACKBERRY failed to take all reasonable steps necessary to prevent discrimination against its employees.

184.    In perpetrating the above-described conduct, BLACKBERRY engaged in a pattern, practice, policy, and custom of unlawful discrimination. Said conduct constituted a policy, practice, tradition, custom, and usage that denied PLAINTIFF protections of the FEHA.

185.    At all relevant time periods, BLACKBERRY established a policy, custom, practice, or usage within the organization that condoned, encouraged, tolerated, sanctioned, ratified, approved of, and/or acquiesced in unlawful discrimination towards its employees including, but not limited to, PLAINTIFF.

186.    BLACKBERRY was put on notice that it might be committing discrimination in the workplace and/or was strictly liable for the discriminatory behaviors. Once BLACKBERRY was put on notice that it might be committing discrimination in the workplace, it was a reasonable step to conduct a thorough investigation into whether there was harassment and discrimination in the workplace. BLACKBERRY failed to take this reasonable step of conducting a thorough investigation into PLAINTIFF's complaint of discrimination and retaliation in the workplace.

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

187.    BLACKBERRY knew, or reasonably should have known, that the failure to provide any or adequate education, training, and information as to their personnel policies and practices regarding harassment and discrimination would result in retaliation.  Providing adequate education, training, and information as to their personnel policies and practices regarding harassment and discrimination was a reasonable step that BLACKBERRY could have taken, but did not take, to prevent harassment and discrimination in the workplace.

188.    The failure of BLACKBERRY to take the above-mentioned reasonable steps to prevent discrimination constituted deliberate indifference to the rights of its employees including, but not limited to, those of PLAINTIFF.

189.    By reason of the conduct of BLACKBERRY, as alleged herein, PLAINTIFF has necessarily retained attorneys to prosecute the within action.  PLAINTIFF therefore is entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

190.    As a direct and proximate result of the acts of BLACKBERRY, as alleged above, PLAINTIFF has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

191.    As a further direct and proximate result of the acts of BLACKBERRY, as alleged above, PLAINTIFF has suffered mental, physical, and emotional distress, including but not limited to anxiety, nervousness, depression, sleeplessness, and has been generally damaged in an amount to be ascertained at the time of trial.

192.    As a further direct and proximate result of the acts of BLACKBERRY, PLAINTIFF will continue to expend sums in the future for the treatment of the emotional, physical, and mental injuries sustained by PLAINTIFF as a result of said DEFENDANTS, and each of their, acts in an amount to be ascertained at the time of trial.

193.    As a further direct and proximate result of the above-described acts of BLACKBERRY, PLAINTIFF has incurred attorney's fees and costs and, pursuant to the provisions of California Government Code section 12965, subdivision (b), PLAINTIFF is entitled to the reasonable value of such attorney's fees.

194.    The failure by BLACKBERRY to take all reasonable steps to prevent discrimination was a substantial factor in causing PLAINTIFF's harm, as described above.

195.    The above-described acts of BLACKBERRY were willful, intentional and malicious and done with the intent to vex, injure, and annoy PLAINTIFF and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said DEFENDANTS, and each of them, and to deter others from engaging in similar conduct. DEFENDANTS, and each of them, authorized and ratified the wrongful acts of their agents and employees, knew in advance that their agents and employees were likely to commit such acts and employed them with conscious disregard of the rights or safety of others, and/or their officers, directors, and/or managing agents were themselves guilty of oppression, fraud, and malice. Those who terminated and/or otherwise discriminated against and failed to prevent discrimination and retaliation against PLAINTIFF were officers, directors, and/or managing agents who were vested with discretionary authority to make decisions affecting company policy regarding significant aspects of the company's business. These officers, directors, and/or managing agents acted with malice in terminating and/or otherwise discriminating against PLAINTIFF and failing to prevent discrimination and retaliation against her in that they did so because of discrimination despite knowing it was illegal to do so under the law, in conscious disregard of PLAINTIFF's rights. Those officers, directors, and/or managing agents who terminated and/or otherwise discriminated against PLAINTIFF acted with malice.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF prays judgment as against all Defendants, and each of them, as follows:

1.    For compensatory damages against all Defendants, and each of them, according to proof;

2.    For special damages against all Defendants, and each of them, according to proof;

3.    For general damages against all Defendants, and each of them, according to proof;

4.      For costs pursuant to California Code of Civil Procedure section 1032, or as otherwise provided by law;

5.      For punitive damages against all Defendants, and each of them, according to proof;

6.      For prejudgment interest;

7.      For an award of costs and attorney's fees, in an amount the court determines to be reasonable, as authorized by the provisions of Government Code section 12965(c), Code of Civil Procedure section 1021.5, or as otherwise provided by law;

8.      For equitable relief, including injunctive relief where available, including, but not limited to, quantum meruit for services performed, and injunctive relief pursuant to *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203;

9.      For injunctive relief directing Blackberry to implement anti-harassment and anti-discrimination training and audits; and

10.    For such other and further relief as the court deems just and proper.

Dated: August 19, 2024                    GOMERMAN | BOURN & ASSOCIATES


                                          By: _____
                                               MARIA BOURN
                                               Attorney for Plaintiff
                                               NEELAM SANDHU

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

1

**<u>DEMAND FOR JURY TRIAL</u>**

2

Plaintiff demands a trial by jury as to all issues so triable.

3

4

Dated: August 19, 2024                    GOMERMAN | BOURN & ASSOCIATES

5

6

By:_____
              MARIA BOURN
              Attorney for Plaintiff
              NEELAM SANDHU

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28