1  Maria A. Bourn (269322)
2  Anthony Tartaglio (280286)
   GOMERMAN | BOURN & ASSOCIATES
3  825 Van Ness Ave, Suite 502
   San Francisco, CA 94109
4  Telephone: (415) 545-8608
   Email: maria@gobolaw.com
5          tony@gobolaw.com

6  Attorneys for Plaintiff
7  NEELAM SANDHU

8               **UNITED STATES DISTRICT COURT**

9            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

11 | NEELAM SANDHU, an individual, | Case No.: **3:24-cv-02002** |
   |                               |                              |
12 |                    Plaintiff, | **PLAINTIFF'S OPPOSITION TO** |
   |                               | **DEFENDANTS' MOTION TO PARTIALLY** |
13 |                       vs.     | **DISMISS AND STRIKE FIRST AMENDED** |
   |                               | **COMPLAINT**                |
14 | BLACKBERRY CORPORATION; a     |                              |
   | Delaware Corporation; and     | Date: Nov. 18, 2024          |
15 | JOHN GIAMATTEO; an individual,| Time 9:30 am                 |
   |                               | Judge: Hon. Sallie Kim       |
16 |                   Defendants. |                              |

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

### CASES

3

*Allen v. Staples, Inc*., 84 Cal. App. 5th 188 ...........................................................11

*Bass v. Great W. Sav. & Loan Assn*., 58 Cal. App. 3d.........................................11

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 ...................................................4

*Beltran v. Hard Rock Hotel Licensing, Inc*., 97 Cal. App. 5th 865 ..................6

*Beltran*, 97 Cal. App. 5th at 880 .........................................................................9

*Caldera v. Dep't of Corr. & Rehab*., 25 Cal. App. 5th 31 ................................7

*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590...................6, 9

*Mokler v. County of Orange* (2007) 157 Cal.App.4th 121 ...............................9

### STATUTES

Cal. Gov't Code § 12923 .....................................................................................5

Cal. Gov't Code § 12923(a) ..............................................................................5, 7

Cal. Gov't Code § 12923(b) ................................................................................5

Cal. Gov't Code § 12923(e) ................................................................................5

Gov't Code § 12923(b) ........................................................................................9

### RULES

CACI Jury Instruction 2524 ................................................................................6

FRCP 12(f) ...........................................................................................................4

FRCP 8(a)(2) ........................................................................................................3

Rule 12(f), Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial Ch. 9-G..............4

### SECONDARY SOURCES

CACI Jury Instruction 2524 ................................................................................6

FRCP 12(f) ...........................................................................................................4

FRCP 8(a)(2) ........................................................................................................3

Rule 12(f), Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial Ch. 9-G..............4

ii

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    PROCEDURAL LEGAL STANDARD ............................................................... 3

III.   ARGUMENT ....................................................................................................... 4

   A.   The Court Should Disregard Blackberry's "Summary of Allegations".............. 4

   B.   The Court Should Disregard the Original Complaint ........................................ 4

   C.   Plaintiff Has Adequately Pled Sexual Harassment and Discrimination ............ 5

      1.   The Current Law on the "Severe and Pervasive" Requirement ..................... 5

      2.   Plaintiff Has Met The "Severe and Pervasive" Standard................................ 6

      3.   Gender-Based Harassment ............................................................................. 7

      4.   Defendants' Arguments are Unavailing ......................................................... 9

   D.   Plaintiff Has Pled Facts Showing Sex Discrimination in Pay........................... 11

   E.   The Court Should Not Strike the Harassment & Unequal Pay Allegations....................... 14

   F.   Blackberry is not Moving to Dismiss the 8th & 9th Causes of Action................................ 14

IV.   CONCLUSION.................................................................................................... 14

iii

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO PARTIALLY DISMISS AND STRIKE

1    **I.        INTRODUCTION**

2          Plaintiff alleges that Defendants Blackberry Corp. and its current CEO, John Giamatteo,

3    subjected her to a long-running campaign of sexual gender-based harassment that culminated in

4    her termination.

5          Cases like this are fact-intensive and typically not amenable to summary judgment, much

6    less a motion to dismiss. So much so that California SB 1300 made it clear within the Fair

7    Employment Housing Act "harassment cases are rarely appropriate for disposition on summary

8    judgment…hostile working environment cases in issues 'not determinable on paper.'"

9    Government Code §12923(e)

10          Here, the standard is even more favorable for plaintiffs.  To survive the motion to dismiss,

11   all Plaintiff shall do is allege facts that—if accepted as true—could make out a plausible prima

12   facia case.  Plaintiff has done so here because she has alleged, among other things, the following:

13          ➢    "As Plaintiff's role expanded, she received pushback from white-male co-workers.

14   These white-male co-workers were openly upset with Plaintiff receiving well-deserved

15   promotions and recognition for her hard work. The white-male co-workers continuously made it

16   difficult for Plaintiff to complete her job and created a hostile work environment for her."  (FAC

17   at ¶ 28.)

18          ➢    Plaintiff was required to work harder to get the same recognition as her male co-

19   workers, such as Giamatteo.  (FAC at ¶ 31) ("John G[iamatteo] comes in and gets the opportunity

20   to prove himself, if something fails he still gets the benefit of the doubt. With myself, my voice is

21   not taken seriously UNTIL I have proven results. It is more work for me to prove myself.")

22          ➢    Giamatteo asked Plaintiff to work for him, for no legitimate business need, so that

23   they could travel together.  (FAC at ¶ 39.)  A reasonable woman could have interpreted this to

24   mean that Giamatteo wished to make sexual overtures towards Plaintiff on business trips, where

25   his misbehavior would be less likely to be discovered.

26          ➢    Giamatteo conducted a business dinner with Plaintiff as if it were a date by being

27   overly friendly with her and attempting to sit uncomfortably close to her.  (FAC at ¶ 40.)  He

28   arrived at the dinner in different clothing and wearing a lot of aftershave (he was more dressed

1

up).  (*Id.*)  During the dinner he made unwelcome sexual advances and his behaviors exhibited

sexual undertones, both verbally and physically.  (*Id.*)  His body language was sexually

suggestive and unwelcome.  (*Id.*)  He looked Plaintiff up and down when they met at the

restaurant.  (*Id.*)  During the dinner he leaned over the table towards her attempting to touch her

hands/arms.  (*Id.*)  He made prolonged eye contact throughout the dinner. His tone of voice had

sexual undertones, which was unlike the tone of his voice with others at work.  (*Id.*)  As they left

dinner, he attempted to walk very close to Plaintiff, again touching her.  (*Id.*)  He later talked

about how people think he is a "dirty old man" when his daughters go out to eat with him (as

Plaintiff had done).  (FAC at ¶ 41.)

> Giamatteo complained to the then-CEO that it was "offensive" to request that he

attend collaborative meetings with Plaintiff.  (FAC at ¶ 45.)  Plaintiff reasonably understood this

to mean he found it offensive to force him to collaborate with a woman.

> Giamatteo stopped inviting Plaintiff to meetings she should have been invited to; if

Giamatteo invited Plaintiff to meetings, he would invite her as a lower-level employee and ask

her to do presentations for him; he failed to treat Plaintiff as an executive; he would make false

claims to others alleging Plaintiff was not attending meetings when he did not invite her; he

would then actively spread the false rumor to employees that Plaintiff was not a good collaborator

when in fact he excluded her from being able to collaborate; he would take credit for Plaintiff's

work; he would make disparaging comments about Plaintiff to others, including business

partners; and Giamatteo started openly telling employees he wanted Plaintiff "out" and he was

working on getting Plaintiff "out." (FAC at ¶ 46.)

> When Plaintiff was not receptive to his advances, Giamatteo threatened Plaintiff,

saying if she "is not nice to him, he has a large network and could impact her career."  (FAC at ¶

44.)  He emphasized the word "nice" in a manner that was sexually suggestive.  (*Id.*)

> Giamatteo or one of his subordinates sent an organizational chart to Plaintiff's

customers indicating (incorrectly) that she was subordinate to him, which demeaned and

humiliated Plaintiff and sowed doubt and suspicion among her customers.  (FAC at ¶ 47.)

Giamatteo then refused to correct the problem.  (*Id.* at ¶ 48.)

1        ➢     Giamatteo took credit for Plaintiff's work and then when confronted about it,

2  denied it.  (FAC at ¶ 51.)

3        ➢     As a result of Giamatteo's harassment, Plaintiff was forced to spend extra time and

4  effort to avoid being sabotaged by Giamatteo.  (FAC at ¶ 52.)

5        ➢     Although Elite customer proposals were supposed to be sent to Plaintiff before

6  being sent to a customer or partner, Giamatteo and others routinely ignored this requirement,

7  which impeded Plaintiff's ability to approve customer proposals.  (FAC at ¶ 54.)

8        ➢     Plaintiff learned from another employee that Giamatteo had been working to

9  prevent her from working with certain coveted customers.  (FAC at ¶ 55.)

10        ➢     Around March of 2022, Plaintiff had a phone call with a co-worker in which she

11  was asked "why do they [Giamatteo and his group] always try to exclude you?"  (FAC at ¶ 56.)

12  This was after Plaintiff was excluded from emails and a meeting with a large client that she

13  should have been invited to.  (*Id.*)  Giamatteo did not harass men in this manner and instead

14  included them on emails.  (*Id.*)

15        ➢     Plaintiff was fired around the same time Giamatteo became CEO.  (FAC at ¶¶ 82-

16  83.)  Plaintiff believes that Giamatteo orchestrated her firing.  (Discovery will help confirm who

17  made the decision.)

18        Contrary to Defendants' arguments, therefore, this is not a case involving boilerplate,

19  conclusory allegations such as "Giamatteo sexually harassed Plaintiff."  Nor is this a case about a

20  few off-color remarks or stray touches.  Plaintiff has pled many specific, non-exhaustive facts that,

21  if true and viewed in their totality, state a claim for sexual gender-based harassment.

22        At trial, Defendants will have the opportunity to challenge Plaintiff's factual allegations.

23  Now is not the time for such a challenge, however.  The Court must therefore deny the partial

24  motion to dismiss.

25  **II.    PROCEDURAL LEGAL STANDARD**

26        "A pleading that states a claim for relief must contain . . . a short and plain statement of

27  the claim showing that the pleader is entitled to relief."  FRCP 8(a)(2). "[S]tating such a claim

28  requires a complaint with enough factual matter (taken as true) to suggest that" the elements of a

1   claim could be met. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "Asking for

2   plausible grounds to infer [the elements] does not impose a probability requirement at the pleading

3   stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal

4   evidence of illegal [conduct]." *Id.* "[A] well-pleaded complaint may proceed even if it strikes a

5   savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and

6   unlikely." *Id.* (quotation omitted).

7       "The court may strike from a pleading an insufficient defense or any redundant,

8   immaterial, impertinent, or scandalous matter." FRCP 12(f). "Despite the functions they serve,

9   motions to strike are regarded with disfavor because they are often used as a delaying tactic, and

10  because of the policy favoring resolution on the merits." G. Motion to Strike (Rule 12(f)), Rutter

11  Group Prac. Guide Fed. Civ. Pro. Before Trial Ch. 9-G. "Regardless of whether prejudice is

12  technically required, most motions to strike will be denied unless the moving party makes some

13  showing of prejudice." *Id.*

14  **III.    ARGUMENT**

15      **A.    The Court Should Disregard Blackberry's "Summary of Allegations"**

16      Blackberry's opposition brief includes a "summary of allegations" that includes a self-

17  serving paragraph in which Blackberry gives its theory of the case. (Motion at 4 & footnotes 2 &

18  3). Notably, Blackberry fails to cite to a declaration to support its theory of the case. The Court

19  should disregard these allegations because on a motion to dismiss, what matters are the allegations

20  in the operative complaint, rather than Defendants' recital of self-serving factual allegations

21  extrinsic to the operative complaint. *See* FRCP 12(d) (to avoid converting motion to dismiss to

22  summary-judgment motion, court must exclude matters from outside the pleadings).

23      **B.    The Court Should Disregard the Original Complaint**

24      Defendants, as part of their motion, attach a "redline" comparison between the First

25  Amended Complaint and the original Complaint that shows the substantial amount of factual

26  allegations Plaintiff has added to the First Amended Complaint. Here, however, the Court should

27  focus its analysis on the First Amended Complaint. The Court should disregard the original

28

4

1  Complaint because, with limited exceptions not present here,[1] the original Complaint is now a

2  nullity with no legal significance.  *See, e.g., Rhodes v. Robinson*, 621 F.3d 1002, 1005 (9th Cir.

3  2010) (relying on "the general rule of pleading that the SAC [amended complaint] completely

4  supersedes any earlier complaint, rendering the original complaint non-existent . . . .").

5           **C.**      **Plaintiff Has Adequately Pled Sexual Harassment and Discrimination**

6                 **1.**      **The Current Law on the "Severe and Pervasive" Requirement**

7          Although courts have long held that sexual harassment must be "severe and pervasive" to

8  be actionable, a recent statute clarified this requirement.  The statute was codified at Cal. Gov't

9  Code § 12923.  "The Legislature hereby declares that harassment creates a hostile, offensive,

10 oppressive, or intimidating work environment and deprives victims of their statutory right to work

11 in a place free of discrimination when the harassing conduct sufficiently offends, humiliates,

12 distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the

13 workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and

14 undermine the victim's personal sense of well-being."  Cal. Gov't Code § 12923(a).  "The plaintiff

15 need not prove that her productivity suffered: she need only prove that 'the harassment so altered

16 working conditions as to make it more difficult to do the job.'"  *Id.*

17         The statute also clarified that "[a] single incident of harassing conduct is sufficient to

18 create a triable issue regarding the existence of a hostile work environment if the harassing

19 conduct has unreasonably interfered with the plaintiff's work performance or created an

20 intimidating, hostile, or offensive working environment."  Cal. Gov't Code § 12923(b); *see also*

21 *Bailey v. San Francisco Dist. Attorney's Off.*, 16 Cal. 5th 611, 634, 552 P.3d 433, 448 (2024)

22 ("Applying these standards to the facts of this case, we conclude there is a triable issue of fact

23 whether Larkin's one-time use of the N-word was, under the totality of the circumstances,

24 sufficiently severe so as to create a hostile work environment.")

25         The statute further declared that "[h]arassment cases are rarely appropriate for disposition

26 on summary judgment."  Cal. Gov't Code § 12923(e).

27

28 [1] For example, a superseded complaint can be relevant when a plaintiff seeks to "relate back" allegations in the face of a statute-of-limitations challenge.

5

1   "Prior to 2019, [the 'severe and pervasive'] requirement was quite a high bar for plaintiffs

2   to clear, even in the context of a motion for summary judgment." *Beltran v. Hard Rock Hotel*

3   *Licensing, Inc.*, 97 Cal. App. 5th 865, 878 (2023), review filed (Jan. 16, 2024).  Now, however, the

4   Court should be wary about relying on pre-2020 case law.  *Id.* at 880 ("The trial court relied

5   heavily on case law decided before section 12923 was adopted. This failed to take into account

6   several key principles . . . ."); *Martinez v. AJM Packaging Corp.*, No. 24-CV-00268-BAS-DTF,

7   2024 WL 3274857, at *4 (S.D. Cal. July 2, 2024) ("Third, much of the authority AJM cites to

8   show Medina's harassment is not actionable is outdated. As Plaintiff highlights, the law changed

9   in 2019. . . . Hence, AJM's reliance on older California cases and nonbinding federal authority is

10  unpersuasive."); CACI Jury Instruction 2524, Directions for Use ("In determining what constitutes

11  'sufficiently pervasive' harassment, the courts have held that acts of harassment cannot be

12  occasional, isolated, sporadic, or trivial. (*See Fisher v. San Pedro Peninsula Hospital* (1989) 214

13  Cal.App.3d 590, 610 [262Cal.Rptr. 842].) Whether this limitation remains in light of Government

14  Code section 12923 is not clear.").

### 2.      Plaintiff Has Met The "Severe and Pervasive" Standard

16  Plaintiff pled many specific, non-conclusory facts that—if true—would constitute severe

17  and pervasive harassment.  (*See, e.g.,* FAC at ¶ 28) (Plaintiff received pushback from white-male

18  co-workers who continuously made it difficult for her to complete her job and created a hostile

19  work environment for her); (*Id.* at ¶ 31) (Plaintiff was required to work harder to get the same

20  recognition as her male co-workers, such as Giamatteo); (*Id.* at ¶ 39) (Giamatteo asked Plaintiff to

21  work for him so that they could travel together); (*Id.* at ¶¶ 40-41) (Giamatteo conducted a business

22  dinner with Plaintiff as if it were a date by being overly friendly with her; attempting to sit

23  uncomfortably close to her; and later talking about how people think he is a "dirty old man" when

24  his daughters go out to eat with him (as Plaintiff had done)); (*Id.* at ¶ 45) (Giamatteo complained

25  to the then-CEO that it was "offensive" to request that he attend collaborative meetings with

26  Plaintiff, which he would not have said if Plaintiff were male); (*Id.* at ¶ 46) (Giamatteo stopped

27  inviting Plaintiff to meetings she should have been invited to; if Giamatteo invited Plaintiff to

28  meetings, he would invite her as a lower-level employee and ask her to do presentations for him;

6

he failed to treat Plaintiff as an executive; he would make false claims to others alleging Plaintiff was not attending meetings when he did not invite her; he would then actively spread the false rumor to employees that Plaintiff was not a good collaborator when in fact he excluded her from being able to collaborate; he would take credit for Plaintiff's work; he would make disparaging comments about Plaintiff to others, including business partners; and Giamatteo started openly telling employees he wanted Plaintiff "out" and he was working on getting Plaintiff "out."); (*Id.* at ¶ 44) (After she rejected his advances, Giamatteo threatened Plaintiff, saying if she "is not nice to him, he has a large network and could impact her career," and said "nice" in a sexually suggestive manner); (*Id.* at ¶¶ 47-48) (Giamatteo or one of his subordinates sent an organizational chart to Plaintiff's customers indicating (incorrectly) that she was subordinate to him and then refused to correct the problem); (*Id.* at ¶ 51) (Giamatteo took credit for Plaintiff's work and then when confronted about it, denied it); (*Id.* at ¶ 52) (As a result of Giamatteo's harassment, Plaintiff was forced to spend extra time and effort to avoid being sabotaged by Giamatteo); (*Id.* at ¶ 56) (Around March of 2022, Plaintiff had a phone call with a co-worker in which she was asked "why do they [Giamatteo and his group] always try to exclude you?"); (*Id.* at ¶¶ 82-83) (Plaintiff was fired around the same time Giamatteo became CEO).

Although Defendants might try to argue that a particular incident was not egregious, the Court must analyze Giamatteo's course of conduct as a whole, under the totality of the circumstances. *Caldera v. Dep't of Corr. & Rehab*., 25 Cal. App. 5th 31, 38 (2018) ("As to whether the alleged conduct is sufficiently severe or pervasive, a jury is to consider the totality of circumstances."); *Bailey*, 16 Cal. 5th at 628. When the Court does so, it should conclude that Plaintiff has pled ample facts demonstrating that Giamatteo "offend[ed], humiliate[d], distresse[d], or intrude[d] upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being." *See* Cal. Gov't Code § 12923(a).

### 3.    Gender-Based Harassment

The Fair Employment and Housing Act prohibits an employer from harassing an employee because of sex or gender. Gov. Code § 12940, subd. (j).  "Harassment because of sex

1   includes sexual harassment" and "gender harassment."  *Id.*  Here, Plaintiff alleges gender

2   harassment, which Defendant seems to confuse with sexual harassment.  "The plaintiff must show

3   that the harassing conduct took place because of the plaintiff's sex, but need not show that the

4   conduct was motivated by sexual desire. (*Singleton v. United States Gypsum Co.*[, *supra,*] 140

5   Cal.App.4th [at p.] 1564 ... ; *see also Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S.

6   75, 80 [140 L.Ed.2d 201, 118 S.Ct. 998] [same principle applies under tit. VII].)"  *Pantoja v.*

7   *Anton,* 198 Cal.App.4th 87, 114 [129 Cal.Rptr.3d 384] (2011) (*Pantoja*).  "Sexual harassment does

8   not necessarily involve sexual conduct. It need not have anything to do with lewd acts, double

9   entendres or sexual advances. Sexual harassment may involve conduct, whether blatant or subtle,

10  that discriminates against a person solely because of that person's sex." *Accardi v. Superior Court,*

11  17 Cal.App.4th 341, 345 [21 Cal.Rptr.2d 292] (1993) (*Accardi*). "For example, a female plaintiff

12  can prevail by showing that the harassment was because of the defendant's bias against women" or

13  that an employer created a hostile work environment "because the employer feels important or

14  powerful while humiliating women." *Pantoja,* at pp. 114-115.  Harassment "because of sex" may

15  be shown where "an abusive bully takes advantage of a traditionally female workplace because he

16  is more comfortable when bullying women than when bullying men." *E.E.O.C. v. National*

17  *Education Assn.* (9th Cir. 2005) 422 F.3d 840, 845 (*E.E.O.C.*).  To plead a cause of action for

18  sexual harassment in the form of a hostile environment, "it is 'only necessary to show that gender

19  is a substantial factor in the discrimination, and that if the plaintiff "had been a man she would not

20  have been treated in the same manner."' (*Tomkins v. Public Serv. Elec. & Gas Co.,* 568 F.2d 1044,

21  1047, fn. 4.) (3d Cir.1977)."  *Accardi,* at p. 348.

22       In *Accardi,* for example, some allegations were overtly sexual, but many were neither

23  explicitly sexual nor explicitly gendered. The misconduct plaintiff alleged included, among other

24  things, "spreading untrue rumors about her abilities, deliberately singling her out for unfavorable

25  work assignments and work shifts, making unsubstantiated complaints about her performance, ...

26  stuffing her shotgun barrels with paper so that the weapon would explode if fired, ... and

27  threatening to disrupt her wedding."  *Accardi,* 17 Cal.App.4th at 346.  The court disagreed with an

28  argument that allegations concerning "a disputed workers' compensation claim, job assignments,

8

1    and disability claims" did not relate to sexual harassment, finding the argument "too narrowly

2    define[s] the scope of Accardi's sexual harassment claim" as "[t]he gist of [the] complaint is that

3    the [police department] waged a decade-long campaign against her" due to the department's

4    "unwritten policy that law enforcement has traditionally been `a man's job' and, hence, `no

5    women need apply.'" *Id.* at 349-350.

6    **4.    Defendants' Arguments are Unavailing**

7        The Court should reject all of Defendants' arguments.  For example, Defendants

8    repeatedly argue that Plaintiff alleges only five incidents of sexual harassment.  (*See, e.g.*, Motion

9    at 5) ("Plaintiff's amended complaint characterizes five incidents involving Giamatteo as 'sexual

10   harassment' across roughly two years.")   That assertion is not correct, as Plaintiff alleged a

11   continual course of harassment over two years and listed a few non-exhaustive examples merely to

12   help illustrate the harassment.  And, in any event, there is no rule stating that Plaintiff must plead a

13   particular number of incidents of harassment.  *See* Gov't Code § 12923(b) ("A single incident of

14   harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work

15   environment if the harassing conduct has unreasonably interfered with the plaintiff's work

16   performance or created an intimidating, hostile, or offensive working environment."); *see also*

17   *Beltran,* 97 Cal. App. 5th at 880 ("Instead, the trial court relied on older cases that did not take

18   these principles into account, such as *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 68

19   Cal.Rptr.3d 568, where the court concluded that three incidents of harassment over five weeks was

20   not severe and pervasive, and *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590,

21   609, 262 Cal.Rptr. 842, which stated that 'plaintiff must show a concerted pattern of harassment of

22   a repeated, routine or a generalized nature.' These cases are no longer good law when it comes to

23   determining what conduct creates a hostile work environment in the context of a motion for

24   summary judgment or adjudication.")

25       Similarly, Defendants repeatedly make the mistake of analyzing incidents in isolation,

26   rather than as a whole.  (*See, e.g.*, Motion at 14) ("Taken together, Plaintiff tries to allege that

27   Giamatteo made a pass at her at a single dinner. But even if that were taken as true (which it is

28   not), the California Court of Appeal's holding in *Haberman* makes clear that such conduct could

9

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO PARTIALLY DISMISS AND STRIKE

not support a hostile work environment claim.")  The proper analysis is not whether this or that particular incident constitutes sexual harassment.  The proper analysis is whether the allegations, viewed in their totality, plausibly state a claim for sexual harassment.

Defendants argue that "Rather than plead specific facts regarding Giamatteo's conduct, Plaintiff has alleged vague, innuendo-filled conclusions . . . ."  (Motion at 9.)  Defendants, however, demand a level of specificity not required by the law.  A complaint requires only a "short and plain" statement of a plausible claim.  FRCP 8(a)(2).  Plaintiff is not required, for example, to describe the minute inflections in Giamatteo's voice.  After all, the purpose of a motion to dismiss is not to weigh the evidence.  It is to determine whether the facts—if true—could plausibly give rise to a cause of action.

Defendants contend that "Plaintiff also realleges a variety of nonsexual, ordinary workplace tensions between herself and Giamatteo (and now, other coworkers who are not parties to this case), but those allegations continue to bear no plausible relationship to Plaintiff's sex . . . .")  (Motion at 9.)  By this argument, Defendants are improperly assuming what is in dispute.  At every turn, Defendants interpret Giamatteo's conduct in the light most flattering to him while dismissing any alternative interpretation.  (*See e.g. id*. at 15) ("There is nothing inherently sexual about someone changing clothes or wearing aftershave to a work dinner.")  To take another example, Defendants characterize Giamatteo's sexual advances as "benign."  (*Id.* at 12 ("These are not facts, but are rather attempts to label otherwise benign behavior as somehow being 'sexual.'").)  But it is for the jury to decide whether his behavior was benign or sinister.  As a further example, Defendants' insistence that "nice" is a "patently nonsexual term"[2] demonstrates a fundamental misunderstanding of how human beings communicate.  Communication involves much more than the literal contents of a verbal statement or a physical touch.  Subtle gestures and vocal inflections are crucial means of communication that cannot be easily summarized in writing.  But that does that mean they are irrelevant.  In fact, they are often more important than the actual words being exchanged.

---

[2] *Id.* at 12.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO PARTIALLY DISMISS AND STRIKE

1    In arguing that Giamatteo's alleged misconduct was neither severe nor pervasive,

2   Defendants misunderstand the scope of Plaintiff's allegations.  This is not a case about a few

3   "ordinary workplace slights."  (Motion at 21.)  Giamatteo a waged a months-long campaign to

4   isolate and undermine Plaintiff.  That campaign culminated in her firing.  The interactions between

5   Giamatteo and Plaintiff must be viewed in this context.

6       **D.    Plaintiff Has Pled Facts Showing Sex Discrimination in Pay**

7    Plaintiff has pled facts indicating that she was paid less for doing work substantially

8   similar to the work that Giamatteo and Mattias Ericksson performed.

9    To prove a prima facie case of wage discrimination, "a plaintiff must establish that, based

10   on gender, the employer pays different wages to employees doing substantially similar work under

11   substantially similar conditions."  *Allen v. Staples, Inc*., 84 Cal. App. 5th 188, 194 (2022).  A

12   California opinion has held that even a complaint that "is not a model of pleading" is sufficient to

13   withstand a demurrer.  *See Bass v. Great W. Sav. & Loan Assn*., 58 Cal. App. 3d 770, 773–74, (Ct.

14   App. 1976) ("Although the second cause of action is not a model of pleading and although

15   patently it seeks to recover sums far in excess of those for which appellant is entitled to bring suit

16   under section 1197.5, it does make a decisive allegation that respondent paid more compensation

17   to its male salesmen who are no more qualified than appellant for substantially the same work

18   performed by appellant.")

19    The following factual allegations (FAC ¶¶ 19-27) are relevant to the Equal Pay claim:

20    PLAINTIFF, GIAMATTEO, and Mattias Ericksson performed in substantially
21    similar roles. GIAMATTEO's role was "President of BlackBerry's Cyber Security
      Business Unit with responsibility for its business strategy, engineering, go-to-
22    market, customer support and operations."

23    PLAINTIFF served as "Chief Elite Customer Success Officer and Chief Marketing
      Officer, at BlackBerry, reporting to the CEO. As Chief Elite Customer Success
24    Officer she [led] the strategic relationships, sales, and co-sell, and customer success,
      including strategic product engineering, with BlackBerry's top customers and top
25    target customers, driving them to gain long-term competitive advantages by
      leveraging the breadth and depth of the BlackBerry platform. As Chief Marketing
26    Officer she [led] marketing across channels, including public relations, social media,
      editorial content, branding, advertising, web, and corporate events. Neelam [was] also
27    Head of Sustainability, responsible for corporate sustainability, at BlackBerry, and has

28

11

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO PARTIALLY DISMISS AND STRIKE

delivered the company's inaugural ESG report and its carbon neutral status. Additionally, she [assisted] the CEO on some operational tasks."

Ericksson is "President and General Manager of BlackBerry's IOT Business Unit. The business unit consists of BlackBerry Technology Solutions or BTS (BlackBerry® QNX®, BlackBerry Certicom®, BlackBerry Radar® and BlackBerry Jarvis™) and BlackBerry IVY™." All three served as senior managers and reported directly to the company CEO.

PLAINTIFF, GIAMATTEO, and Ericksson oversaw teams that helped configure and sell Blackberry software to customers. All three worked in the United States.

PLAINTIFF'S job duties as Chief Elite Customer Success Officer encompassed: pre and post-sales; customer success; product development; field marketing; partner ecosystem; and sales operations. The job duties of GIAMATTEO and Ericksson encompassed these same job duties.

PLAINTIFF, GEIAMATTEO [sic] and Ericksson's compensation was also structured similarly, with all three of their bonuses being 50% ViP (corporate performance) and 50% SiP (sales performance).

Despite performing substantially similar work under similar circumstances, GIAMATTEO and Ericksson (who are both male) earned far more money than PLAINTIFF did. For example, in 2023, GIAMATTEO earned $2,330,822. In 2022, he earned $5,659,565. In 2023, Eriksson earned $1,691,671. And in 2024, Eriksson earned $4,373,775. Plaintiff earned far less than GIAMATTEO and Eriksson.

When PLAINTIFF was appointed Chief Marketing Officer, which meant taking on another function in addition to her existing role, she was not given a pay rise. She was told by former CEO Chen that GIAMATTEO was already upset that PLAINTIFF had been given the role and if she were given a pay rise, it would amplify his animosity. Chen added that Tim Foote—who was one of the white men hostile to PLAINTIFF— would know if PLAINTIFF were given a pay raise, as he is in the Finance team and had access to this type of information.

To be sure, Plaintiff's, Giamatteo's, and Eriksson's job duties were not identical. As Defendants note, Blackberry categorized Plaintiff as a "Senior Leader," rather than a "President." But, as Defendants concede, Plaintiff and the comparators share "some common job duties." (Motion at 18.) And job duties are not required to be identical—they just need to be "substantially similar." Here, they were. The employees were executives within Blackberry, were tasked with developing customer relationships to grow the business, and reported to the CEO. At a minimum, Plaintiff can plausibly contend that she and the comparators performed substantially similar work. And whether their job duties are substantially similar is a question of fact that must be answered by the jury. *See, e.g., Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1221 (9th Cir. 2021) ("The

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO PARTIALLY DISMISS AND STRIKE

1    dissent complains that we emphasize a 'superficial' common core of tasks and downplay the

2    'obvious' differences between Freyd and her male comparators. Dissenting Op. at 1231. The

3    differences are not so obvious, however, that for purposes of the Equal Pay Act, we can discern

4    them without recourse to the finder of fact, the jury."); *Duke v. City Coll. of San Francisco*, 445 F.

5    Supp. 3d 216, 230 (N.D. Cal. 2020) ("It may be the case that, at a later stage, other associate vice

6    chancellors may also have similar job responsibilities making plaintiff's single comparator

7    inappropriate. However, for purposes of a motion to dismiss, plaintiff has alleged sufficient facts

8    to demonstrate the two jobs were substantially equal.").  In fact, their job duties were so similar

9    that the CEO often asked Plaintiff to help close Giamatteo's performance gaps.

10        Defendants' argument regarding "equal skills" is misguided because Plaintiff and the

11   comparators all used general managerial and executive skills at Blackberry.  Defendants' focus on

12   the individuals' resumes is unavailing because it is the "skills" that must be substantially similar:

13   not the resumes.  For example, Defendants contend that Eriksson has "two decades of experience

14   in automotive location data services."  (Motion at 20.)  But Blackberry is not in the automotive

15   location data services business.  Presumably, Eriksson was hired for his more generalized

16   executive and management skills.  These are the same skills that Plaintiff exercised on

17   Blackberry's behalf.

18        Blackberry argues that "Plaintiff does not quantitatively compare her pay to Giamatteo's

19   and Eriksson's, presumably because the disparity is so vast between the two Presidents of the

20   company and Plaintiff that it would foreclose her allegation that they occupied substantially

21   similar roles."  (Motion at 22.)  Here, Defendants are improperly conflating the "substantially

22   similar work" and "substantially similar pay" inquiries, which are conceptually distinct.  And

23   needless to say, it is no defense in an Equal Pay Act case to argue that the plaintiff's pay is so

24   much lower than her comparators' pay that she could not possibly prevail.  Indeed, the size of the

25   pay disparity only intensifies the harm Plaintiff has suffered.

26        Finally, discovery will likely uncover additional comparators who were paid more than

27   Plaintiff for similar work.

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO PARTIALLY DISMISS AND STRIKE

1    **E.    The Court Should Not Strike the Harassment & Unequal Pay Allegations**

2         Defendants ask the Court to strike references to "harassment" and unequal pay in the

3    Complaint.  (ECF No. 10 at 23.)  As previously explained, however, Plaintiff has pled facts

4    demonstrating harassment and unequal pay.  The request to strike is therefore improper.

5    **F.    Blackberry is not Moving to Dismiss the 8th & 9th Causes of Action**

6         For the benefit of the Court, Plaintiff notes that although Blackberry is moving to dismiss

7    and/or strike allegations of unequal pay, the Eighth and Ninth causes of action for sex

8    discrimination and failure to prevent sex discrimination go far beyond the equal pay issue.  For

9    example, Plaintiff contends that her termination was an act of sex discrimination because she is a

10   woman.  (FAC at ¶ 175) (alleging that Plaintiff "was undermined, disparaged, and ultimately

11   fired" because she is a woman).  Accordingly, even if the Court were to grant the partial motion to

12   dismiss in its entirety, the Eighth and Ninth causes of action would still survive.

13   **IV.    CONCLUSION**

14        For these reasons, the Court should deny the partial motion to dismiss.

15   Dated: October 15, 2024                    GOMERMAN | BOURN & ASSOCIATES

16

17                                        By:___*/s/ Anthony Tartaglio*_____
                                             Anthony Tartaglio
18                                           Maria Bourn
                                             Attorney for Plaintiff
19                                           NEELAM SANDHU

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO PARTIALLY DISMISS AND STRIKE