UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEELAM SANDHU,<br><br>    Plaintiff,<br><br> v.<br><br>BLACKBERRY CORPORATION, et al.,<br><br>    Defendants. | Case No. 24-cv-02002-SK<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO STRIKE**<br><br>Regarding Docket No. 37 |

   This matter comes before the Court upon consideration of the second motion to dismiss and motion to strike filed by Defendants BlackBerry Corporation and John Giamatteo (collectively, "Defendants"). (Dkt. No. 37.) More specifically, Defendants ask this Court to dismiss with prejudice Plaintiff's claims alleging that Defendants created a hostile work environment based on sex and/or gender and engaged in wage discrimination based on sex. (*Id.* at p. 1.) Defendants also move to strike related references to harassment and disparate pay in Plaintiff's complaint. (*Id.* at p. 22.)

   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, and all parties have consented to the jurisdiction of a magistrate judge. (Dkt. Nos. 7, 8, 17.) Having carefully considered the parties' papers, relevant legal authority, and the record in the case, and having had the benefit of oral argument, the Court hereby GRANTS Defendants' motion to dismiss and DENIES Defendants' motion to strike for the reasons set forth below.

## PROCEDURAL HISTORY

   Plaintiff Neelam Sandhu ("Plaintiff") filed her Initial Complaint in this matter on April 3, 2024. (Dkt. 1.) After the Court dismissed with leave to amend Plaintiff's hostile work

1  environment and wage discrimination claims,[1] (Dkt. No. 31.), Plaintiff filed her First Amended

2  Complaint ("FAC") on August 19, 2024, (Dkt. No. 34.). Defendants filed the instant motion to

3  dismiss and motion to strike on September 16, 2024. (Dkt. No. 37.) Plaintiff opposed the motion.

4  (Dkt. No. 38.) The Court heard oral argument on November 18, 2024. (Dkt. No. 49.)

## FACTUAL ALLEGATIONS

Plaintiff's FAC alleges the following facts, which the Court accepts as true for purposes of this motion.

BlackBerry Corporation ("BlackBerry") is a Delaware Corporation with its principal place of business in Texas. (Dkt. No. 34, ¶ 9.) BlackBerry hired Plaintiff, a California resident, over 15 years ago. (*Id.* at ¶ 15.) During her tenure, Plaintiff was recognized for her hard work and high potential, and she received multiple promotions. (*Id.* at ¶¶ 15-17.) Ultimately, Plaintiff was promoted to two roles, which she performed simultaneously: Chief Elite Customer Success Officer and Chief Marketing Officer. (*Id.* at ¶¶ 18, 20.) These were executive team positions, which reported to the CEO. (*Id.*) BlackBerry terminated Plaintiff's employment in December 2023. (*Id.* at ¶ 79.)

### A. Hostile Workplace Allegations

Plaintiff's hostile workplace claims center around her working relationship with Defendant John Giamatteo, a Texas resident. (*Id.* at ¶ 4.) Giamatteo served as President of BlackBerry's Cyber Security Business Unit ("Cyber Unit") during Plaintiff's tenure. (*Id.* at ¶ 33.) Shortly after Plaintiff's termination, Giamatteo was appointed to the position of CEO, a position he still occupies. (*Id.* at ¶ 83.) Plaintiff alleges that BlackBerry, and Giamatteo in particular, subjected her to sexual and gender harassment. (*Id.* at ¶ 116.)

Plaintiff points to three particular exchanges that made her uncomfortable. The first occurred during Plaintiff's first meeting with Giamatteo, shortly after he joined the company in October of 2021. (*Id.* at ¶¶ 34, 39.) He started the conversation by asking, "[a]re you Indian?" (*Id.*) He then asked Plaintiff to work for him "so that they could travel together," which would

---

[1] The Court dismissed two additional claims with prejudice, which are not at issue in this motion. (Dkt. No. 31, p. 17.)

2

have been a demotion from Plaintiff's current structure of reporting directly to the CEO. (*Id.*) Giamatteo did not offer a business reason for the proposed reporting change. (*Id.*) Plaintiff declined, explaining that she did not wish to change her reporting structure. (*Id.*) Giamatteo's "tone was sexually suggestive," and the exchange made Plaintiff uncomfortable. (*Id.*)

Second, Giamatteo invited Plaintiff to a one-on-one dinner, during which "he made unwelcome sexual advances and his behaviors exhibited sexual undertones, both verbally and physically." (*Id.* at ¶ 40.) In particular, Giamatteo dressed up for the dinner, "looked Plaintiff up and down when they met," leaned over the table in an attempt to touch Plaintiff's hands and arms, made prolonged eye contact, and attempted to walk close to Plaintiff and touch her while leaving the dinner. (*Id.*) Giamatteo's "body language was sexually suggestive" and his "tone of voice had sexual undertones." (*Id.*) Plaintiff attempted to discuss work, but Giamatteo did not engage with this topic. (*Id.* at ¶ 41.) Giamatteo made a "suggestive comment" about how people think 'he is a dirty old man' when he gets dressed up and is out with his daughters. (*Id.*) Given that Plaintiff is younger than Giamatteo, this comment made her uncomfortable. (*Id.*) Overall, Giamatteo's behavior during the dinner made Plaintiff uncomfortable, and Plaintiff views the dinner as "an attempt to see what [she] would tolerate regarding Giamatteo's advances." (*Id.* at ¶¶ 40-42.) After the dinner, Plaintiff reported Giamatteo's behavior to BlackBerry's then-CEO John Chen. (*Id.* at ¶ 43.) Plaintiff asked Chen to assure her that she would not have to travel alone with Giamatteo, to which Chen agreed. (*Id.*)

Third, in a subsequent one-on-one meeting, Giamatteo repeated his request for Plaintiff to report to him. (*Id.* at 44.) When Plaintiff declined, Giamatteo "threatened Plaintiff saying if she is not 'nice to him, he has a large network and could impact her career.'" (*Id.*) Giamatteo emphasized the word "nice" in a manner that was "sexually suggestive." (*Id.*) Plaintiff responded that "she too had a large network and that she would not want to work with someone that would allow his comments to impact her career." (*Id.*) Plaintiff interpreted this exchange as a request "to be submissive and subservient to Giamatteo." (*Id.*)

Plaintiff alleges that after rejecting Giamatteo's advances and reporting him to Chen, Giamatteo and other white men harassed Plaintiff on a "daily or nearly daily" basis. (*Id.* at ¶¶ 1,

36, 46.) Giamatteo and other white men excluded Plaintiff from meetings, took over Plaintiff's meetings, laughed at Plaintiff when she spoke during meetings, made disparaging comments about Plaintiff, took credit for Plaintiff's work, downgraded Plaintiff's contributions while applauding lesser contributions, encouraged Plaintiff to leave the company, told other employees Giamatteo wanted Plaintiff to leave the company, and "failed to treat Plaintiff as an executive." (*Id.*) Plaintiff states that Giamatteo did not harass men in this manner. (*Id.* at ¶ 37.) After Plaintiff was excluded from a meeting she should have been invited to, a co-worker asked Plaintiff why Giamatteo and his group "always try to exclude" her. (*Id.* at ¶ 56.) Plaintiff confronted Giamatteo about taking credit for her work, but he denied doing so. (*Id.* at ¶ 51.)

Plaintiff gives several examples of this pattern of harassment but clarifies that these are "some, not all, incidents regarding sexual/gender based harassment." (*Id.* at ¶ 110.) These examples consist of:

- Giamatteo or his subordinates circulated an erroneous organization chart that depicted Plaintiff as reporting to Giamatteo, and he refused to correct the chart until the Chief of Human Resources intervened. (*Id.* at ¶¶ 47-48.)
- Giamatteo "refused to engage with Plaintiff on an issue that could have saved BlackBerry nearly $1 million." (*Id.* at ¶ 53.)
- Giamatteo "and others" routinely ignored the requirement to send elite customer proposals to Plaintiff for approval. (*Id.* at ¶ 54.)
- Giamatteo prevented Plaintiff from working with coveted customers. (*Id.* at ¶ 55.)

After nearly every allegation, Plaintiff states that Giamatteo did not harass men in this manner. (*Id.* at ¶¶ 37, 43, 50-56.)

Giamatteo's conduct created extra work for Plaintiff and made it difficult for her to do her job. (*Id.* at ¶¶ 28, 52.) For example, she had to "go out of her way" to ensure she was invited to meetings and to ensure accurate information about her work was being disseminated. (*Id.* at ¶ 52.) Plaintiff believes Giamatteo "sabotaged" her career "by obstructing her ability to do her job, taking credit for her work, and ultimately ending her career at BlackBerry." (*Id.* at ¶ 1.)

Plaintiff engaged with BlackBerry over the issue of sexual harassment and gender

discrimination on several occasions. As previously discussed, Plaintiff spoke with Chen about her dinner with Giamatteo and with human resources about the erroneous organization chart issue. (*Id.* at ¶¶ 43, 49.) Plaintiff asked BlackBerry[2] whether it would have approached the organization chart issue the same way if Plaintiff was a white man; BlackBerry acknowledged the organization chart error but denied that it had treated Plaintiff differently because of her gender. (*Id.* at ¶ 49.) (*Id.*) At some unidentified time, Plaintiff told BlackBerry that "my path has been more difficult as a woman at BlackBerry, it's harder than a man might have . . . It is more work for me to prove myself." (*Id.* at ¶ 31.) When Plaintiff raised concerns, BlackBerry substantiated Plaintiff's claims "for the most part," and Plaintiff "felt reassured that BlackBerry was committed to providing a work environment free of gender and race harassment and discrimination." (*Id.* at ¶ 32.) Lastly, Plaintiff reported Giamatteo's conduct again in early 2023. (*Id.* at ¶ 57.) In response, BlackBerry created more separation between the job responsibilities of Plaintiff and Giamatteo. (*Id.*) BlackBerry transferred half of Plaintiff's customers to Giamatteo. (*Id.*) Plaintiff became responsible for the customers that Giamatteo's organization had lost and was tasked with winning the customers back. (*Id.*)

On or about October 30, 2023, Chen announced he would be retiring as CEO of BlackBerry. (*Id.* at ¶ 58.) While BlackBerry's Board of Directors was determining who to appoint as CEO, "it was reported to BlackBerry that Giamatteo had engaged in harassment toward women." (*Id.* at ¶ 60.) In response, BlackBerry hired a law firm to investigate the complaint against Giamatteo, which was not the normal process for internal investigations. (*Id.* at ¶¶ 61, 66.)

On November 6, 2023, Interim CEO David Lynch announced during a leadership meeting that the Board had chosen a new permanent CEO but had "run into a couple of process hiccups in appointing the person." (*Id.* at ¶ 65.) Plaintiff believes this statement suggests the investigation into Giamatteo's reported harassment was a "*pro forma* process rather than an attempt to make any determinations that could be averse to Giamatteo." (*Id.*) Later that same day, the attorneys investigating sexual harassment complaints against Giamatteo interviewed Plaintiff. (*Id.* at ¶ 66.)

---

[2] Plaintiff does not identify to whom she made these statements.

5

During the interview, Plaintiff explained that she was nervous speaking with the attorneys because Giamatteo was shortlisted for CEO, and she asked who her statements would be shared with. (*Id.*) The attorneys explained that the information would be shared with BlackBerry's Chief Legal Officer, who would decide what to share with the Board. (*Id.*) The attorneys assured Plaintiff that no retaliation would occur. (*Id.* at ¶ 67.) Based on this assurance, Plaintiff shared her experience with Giamatteo with the attorneys. (*Id.*) After the attorneys asked "if [Plaintiff] knew of other women," Plaintiff provided the names of two other women. (*Id.* at ¶ 70.)

Immediately after the interview, Plaintiff had a meeting with Lynch, who reiterated that the new CEO had been selected. (*Id.* at ¶ 71.) The following day, Plaintiff sent an email to the attorneys with documentary evidence of Giamatteo's retaliation against her, such as refusals to meet, failures to provide meeting invites, and a video of Giamatteo taking credit for Plaintiff's work. (*Id.* at ¶ 72.) On November 11, 2023, Plaintiff followed up with the contact information of the two other women she had mentioned, as the attorneys had not asked for this during the interview. (*Id.* at ¶ 73). Plaintiff also informed the attorneys that she was still experiencing retaliation from Giamatteo. (*Id.* at ¶ 74.) On November 16, 2023, Plaintiff followed up again with an additional example of retaliation. (*Id.* at ¶ 75.)

Also on November 16, 2023, Plaintiff emailed Lynch asking for his support in addressing Giamatteo's continued harassment. (*Id.* at ¶ 76.) Lynch responded, "I obviously don't know the history but I believe that this will get solved based on the processes for change that we have undertaken. Obviously, we need a little time, but change is coming." (*Id.* at ¶ 77.)

On December 4, 2023, Lynch informed Plaintiff that her job duties had been terminated due to "restructuring." (*Id.* at ¶ 79.) The same day, Plaintiff received a letter noting that "any payment was conditional upon signing a separation agreement releasing all her claims, including claims relating to unlawful retaliation." (*Id.* at ¶ 82.) Previously, Lynch had "told everyone in senior leadership restructuring was coming but that everyone in senior leadership would have a chance to find a new home in the company because he believed everyone was good at what they do." (*Id.* at ¶ 79.) Plaintiff was the only member of the senior leadership team who was terminated. (*Id.* at ¶ 81.) Lynch twice asked Plaintiff to announce that she had "resigned." (*Id.* at

6

¶¶ 81, 84.) On December 10, 2023, Lynch sent an email to Plaintiff's teams announcing that she was "leaving" the company. (*Id.* at ¶ 85.)

On December 6, 2023, Giamatteo was appointed CEO of BlackBerry. (*Id.* at ¶ 83.) Plaintiff believes she was fired "because she rejected Giamatteo and failed to be submissive to him, and because BlackBerry's Board of Directors wished to make Giamatteo CEO and the presence of a woman he had harassed would make this embarrassing for them." (*Id.* at ¶ 1.) However, "BlackBerry has . . . gone to extraordinary lengths to make it appear as though Giamatteo was not involved in the decision to fire [her]." (*Id.* at ¶ 87.) Plaintiff also believes that BlackBerry originally intended to appoint a replacement for her, but instead decided to allocate Plaintiff's duties to existing employees "to disguise the fact that Plaintiff's termination was a firing, rather than a 'restructuring.'" (*Id.* at ¶ 89.)

After leaving BlackBerry, Plaintiff learned that Giamatteo subjected several other women to harassment, discrimination, and retaliation. (*Id.* at ¶ 90.) For example, several female executives' roles were diminished under Giamatteo's leadership, and he "purged multiple employees from his organization who were not white men." (*Id.* at ¶¶ 88, 91.) Then-CEO Chen urged Giamatteo to improve diversity in his organization, which was only 18% women, but Giamatteo failed to do so. (*Id.* at ¶ 88.) Plaintiff also expects evidence will show that Giamatteo inappropriately touched a female coworker at a work event. (*Id.* at ¶ 93.) In addition, one female coworker of Giamatteo explained that his organization felt like going "back to the 1980s in tech, where there was truly a culture of misogyny." (*Id.* at ¶ 92.)

**B.     Wage Discrimination Allegations**

Plaintiff claims that she was paid less for performing substantially similar work as Giamatteo and Mattias Eriksson. (*Id.* at ¶¶ 104-06.) Giamatteo was President of the Cyber Unit, and Eriksson was President of the IOT Business Unit ("IOT Unit"). (*Id.* at ¶¶ 19, 21.) Plaintiff, Giamatteo, and Eriksson all reported to the CEO, oversaw teams that helped configure and sell BlackBerry software, and worked on sales, customer success, product development, marketing, and partnerships. (*Id.* at ¶¶ 21-23.) All three had a similar compensation structure, but Giamatteo and Eriksson earned far more than Plaintiff. (*Id.* at ¶ 25.) In 2023, Giamatteo earned

$2,330,822, Eriksson earned $1,691,671, and Plaintiff earned "far less." (*Id.* (citing Sec. Exch. Comm'n, Proxy Statement Filed by BlackBerry Limited (June 27, 2023) https://www.sec.gov/ix?doc=/Archives/edgar/data/0001070235/000107023523000080/bbry-20230516.htm).)

Several other allegations pertinent to Plaintiff's wage discrimination claim are scattered throughout the FAC. Plaintiff had a "significantly smaller" team than Giamatteo. (*Id.* at ¶ 34.) The financial performance of the Cyber Unit declined under Giamatteo's management, while Plaintiff's metrics demonstrated expanded success. (*Id.*) When Plaintiff was appointed to Chief Marketing Officer, she was not given a pay raise. (*Id.* at ¶ 26.) Chen told Plaintiff that Giamatteo was unhappy that Plaintiff had been given the role and that giving her a pay raise would amplify his animosity. (*Id.*) Men who were given increased roles, such as Giamatteo, received raises. (*Id.* at ¶ 27.)

**C.    Causes of Action**

Plaintiff's FAC includes eight claims:

(1) violation of California's Whistleblowing Protections for Disclosing Legal Violations statute, California Labor Code § 1102.5, against BlackBerry,

(2) wage discrimination based on sex in violation of California Labor Code § 1197.5, against BlackBerry,

(3) hostile work environment based on sex and/or gender, in violation of California Government Code § 12923, against both Defendants,

(4) failure to prevent harassment and retaliation, in violation of California Government Code § 12940(j), against BlackBerry,

(5) retaliation in violation of California Government Code § 12940(h) against BlackBerry,

(6) negligent retention, against BlackBerry,

(7) wrongful termination in violation of public policy, against BlackBerry,

(8) discrimination based on sex and/or gender, in violation of California Government Code § 12900 *et seq.*, against Blackberry,

(9) failure to prevent discrimination, in violation of California Government Code § 12900 *et seq.*,

8

1  against Blackberry. (*Id.* at ¶¶ 94-194.)

## ANALYSIS

**I.    Motion to Dismiss**

**A.    Applicable Legal Standard on Motion to Dismiss.**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. On a motion to dismiss under Rule 12(b)(6), the Court construes the allegations in the complaint in the light most favorable to the non-moving party and takes as true all material allegations in the complaint. *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986) (per curiam). A plaintiff's obligation to provide the grounds of her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, a plaintiff must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

"[A]s a general rule, a district court may not consider materials beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 n.9 (9th Cir. 2012). However, documents subject to judicial notice, such as matters of public record, may be considered on a motion to dismiss. *See id.* In doing so, the Court does not convert a motion to dismiss into one for summary judgment. *See id.* "The court need not . . . accept as true allegations that contradict matters properly subject to judicial notice . . . ." *Sprewell v. Golden State Warriors*, 266 F. 3d 979, 988 (9th Cir. 2001).

**B.    Defendants' Motion to Dismiss.**

**1.    Hostile Workplace (Claim 3)**

To state a claim for hostile work environment based on sexual harassment under California's Fair Employment and Housing Act ("FEHA"), a plaintiff must allege that she was subjected to severe or pervasive harassment, *Fisher v. San Pedro Peninsula Hosp.*, 262 Cal. Rptr.

1   842, 850-52 (Ct. App. 1989), and that gender was a substantial factor in that discrimination,

2   *Accardi v. Superior Ct.*, 21 Cal. Rptr. 2d 292, 295-96 (Ct. App. 1993).

3        In its prior Order, the Court specifically instructed Plaintiff that her pleadings regarding her claim for a hostile workplace were insufficient for two reasons. (Dkt. No. 31, pp. 12-15.) First, many of Plaintiff's allegations consisted entirely of legal conclusions without supporting factual allegations. (*Id.* at p. 15.) Second, Plaintiff's relevant allegations—Giamatteo's request to change Plaintiff's reporting structure, his dinner invitation, and his comments during dinner—did not satisfy California's "severe or pervasive" standard. (*Id.* at pp. 12-15.) Plaintiff's FAC has not remedied either deficiency.

          **i.    Legal Conclusions.**

        "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft*, 556 U.S. at 679. To survive a motion to dismiss, a complaint "must contain sufficient factual matter," *id.*, that raises "a right to relief above the speculative level," *Twombly*, 550 U.S. at 555. "[S]peculation 'stops short of the line between possibility and plausibility of entitlement to relief.'" *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 765 (9th Cir. 2018) (quoting *Twombly*, 550 U.S. at 557). The FAC includes Plaintiff's speculation, perceptions, opinions, and beliefs about Giamatteo's and BlackBerry's motives and behavior. For example, Plaintiff perceived Giamatteo's tone of voice to be sexually suggestive on several occasions. (Dkt. No. 34, ¶¶ 39, 40, 44.) As another example, Plaintiff believes she was fired "because she rejected Giamatteo and failed to be submissive to him . . . ." (*Id.* at ¶ 1.) These allegations are not "factual matter," and are thus not entitled to an assumption of truth. *See Ashcroft*, 556 U.S. at 678-79.

        In addition, Plaintiff has not sufficiently alleged that she was subjected to a hostile work environment because she is a woman. *See Accardi*, 21 Cal. Rptr. 2d at 295-96. In *Austin v. Univ. of Oregon*, the Ninth Circuit held that to survive a motion to dismiss, a complaint alleging gender discrimination violations under Title IX must contain "sufficient, nonconclusory allegations plausibly linking the [conduct] to discrimination on the basis of sex." 925 F.3d 1133, 1138 (9th Cir. 2019). "Just saying" that men and women were treated differently was "not enough," to

10

1    allege a nexus between conduct and prohibited discrimination.  *Id.*  On the other hand, the Ninth

2    Circuit has found sufficient allegations of a motive to discriminate, in combination with

3    allegations of a pattern of gender-based decisionmaking.  *Doe v. Regents of Univ. of California*, 23

4    F.4th 930, 936-41 (9th Cir. 2022); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 948-51 (9th

5    Cir. 2020).

6          Although *Austin*, *Doe*, and *Schwake* are Title IX cases, they are equally applicable to

7    Plaintiff's FEHA claim.  *See Austin*, 925 F.3d at 1136 n.3 (explaining that Title IX and Title VII

8    cases apply the same principles); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1219 (9th Cir.

9    1998) (explaining that FEHA mirrors Title VII).  Accordingly, California Courts dismiss FEHA

10   claims that allege "no facts from which discriminatory intent [can] be inferred," *Brown v. Los*

11   *Angeles Unified Sch. Dist.*, 275 Cal. Rptr. 3d 322, 333 (Ct. App. 2021), but allow claims to

12   proceed upon allegations of discriminatory statements, patterns, or statistics, *E.g., Accardi,* 21 Cal.

13   Rptr. 2d at 297 (allegations that the plaintiff was explicitly told that her male colleagues "did not

14   wish to have a female" working with them); *Clark v. City of Ontario*, No. E073663, 2021 WL

15   1961752, at *9-10 (Cal. Ct. App. June 9, 2021) (allegations of bigoted statements and gross

16   statistical disparities in hiring).

17         Here, Plaintiff alleges that she experienced a continuous deluge of demeaning conduct,

18   such as exclusion from meetings and being subjected to disparaging comments about her work.

19   (Dkt. No. 34, ¶¶ 1, 36, 46-55.)  But Plaintiff has not alleged any facts suggesting that she was

20   subjected to this conduct because she is a woman.  Just like the plaintiffs in *Austin*, Plaintiff relies

21   solely on conclusory allegations that she was treated differently from her male coworkers.  (*Id.* at

22   ¶¶ 37, 43, 50-56.).  Those allegations are insufficient to suggest a plausible causal link between

23   gender discrimination and the alleged conduct.

24         Lastly, the Court cannot rely on Plaintiff's suggestion that she experienced more

25   harassment than what is alleged in the FAC.  (Dkt. No. 34, ¶ 110 ("Plaintiff points out some, not

26   all, incidents regarding sexual/gender based harassment.").)  The FAC must itself contain

27   sufficient allegations to state a claim, otherwise it does not "give the defendant fair notice of what

28   the claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (citation omitted,

United States District Court
Northern District of California

1  cleaned up).

2                **ii.**       **Entitlement to Relief.**

3        The Court "next consider[s] the factual allegations in [the FAC] to determine if they

4  plausibly suggest an entitlement to relief." *Ashcroft*, 556 U.S. at 681.  After eliminating Plaintiff's

5  conclusory allegations, including allegations with no factual connection to gender discrimination,

6  all that remains are the three exchanges between Plaintiff and Giamatteo described in the FAC: (1)

7  the first one-on-one meeting, during which Giamatteo asked Plaintiff if she was Indian and

8  whether she would work for him so they could travel together; (2) the one-on-one dinner, during

9  which Giamatteo made the "dirty old man" comment, looked Plaintiff up and down, and attempted

10  to touch her; and (3) the subsequent one-on-one meeting, during which Giamatteo repeated his

11  request to work for him and told Plaintiff he could affect her career adversely if she were not

12  "nice" to him.  (Dkt. No. 34, ¶¶ 34, 39-44.)  In addition, the FAC alleges that since leaving

13  BlackBerry, Plaintiff has learned of Giamatteo's harassment of other women.  (*Id.* at ¶ 90-93.)

14        The three exchanges between Plaintiff and Giamatteo do not constitute severe or pervasive

15  harassment, even under California's "low bar" for the severe or pervasive standard.  *See*

16  *Wawrzenski v. United Airlines, Inc.*, __Cal. Rptr. 3d.__, 2024 WL 4750558, at \*1, 17 (Ct. App.

17  2024).  In 2019, California Government Code section 12923 took effect, which clarified that a

18  hostile work environment exists "when the harassing conduct sufficiently offends, humiliates,

19  distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the

20  workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and

21  undermine the victim's personal sense of well-being."  Cal. Gov't Code § 12923(a).  Section

22  12923 also clarified that "[a] single incident of harassing conduct is sufficient to create a triable

23  issue regarding the existence of a hostile work environment if the harassing conduct has

24  unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile,

25  or offensive working environment."  Cal. Gov't Code § 12923(b).  "[A] court's inquiry into

26  whether a hostile work environment exists—be it under the definition in section 12923 or the

27  extremely similar formulations in earlier case law—has both an objective and subjective

28  component."  *Jackson v. Pepperdine Univ.*, No. B296411, 2020 WL 5200946, at \*9 (Cal. Ct. App.

Sept. 1, 2020); *see also Bailey v. San Francisco Dist. Att'y's Off.*, 552 P.3d 433, 443-44 (Cal. 2024) (explaining that conduct is not actionable unless it is "objectively hostile or abusive" as "judged from the perspective of a reasonable person in the plaintiff's position").

Plaintiff alleges that the three exchanges were unwelcome and made her uncomfortable, (Dkt. No. 34, ¶¶ 39 -44), and the Court agrees that Giamatteo's alleged conduct could put a reasonable woman ill at ease. But FEHA only creates liability for conduct that is objectively hostile, not merely uncomfortable. "[I]solated incidents (unless extremely serious) are not sufficient to create an actionable claim of harassment." *Bailey*, 552 P.3d at 444 (quoting *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 687 (9th Cir. 2017)). Two peculiar requests to change Plaintiff's reporting structure, in combination with allegedly signaling of sexual interest during a single dinner, is simply not "extremely serious."

During the hearing on this matter, Plaintiff did not argue that her FAC alleged objective hostility but instead argued that the Court did not have the power to decide what is objectively severe at the motion to dismiss stage. Yet both before and after the enactment of § 12923, "[c]ommon sense, and an appropriate sensibility to social context, . . . enable[s] *courts* and juries to distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Miller v. Dep't of Corr.*, 115 P.3d 77, 88 (Cal. 2005) (emphasis added) (quoting *Oncale v. Sundowner Offshore Services, Inc.* 523 U.S. 75, 81–82 (1998)). And since 2019, California courts have continued to dismiss FEHA hostile workplace claims based on insufficient allegations of severe or pervasive harassment. *See Jackson*, 2020 WL at *5-9 (explaining that the plaintiff bears the burden of establishing objective hostility and affirming dismissal of the plaintiff's claim based on her failure to allege objectively severe harassment); *see also Yates v. California State Univ. of the E. Bay*, No. A162131, 2022 WL 1301800, at *3-6 (Cal. Ct. App. Apr. 29, 2022) (affirming dismissal of hostile workplace claim where alleged incidents were not sufficiently severe or pervasive).

In addition, Plaintiff's allegations regarding Giamatteo's harassment of other women are not relevant to Plaintiff's experience of her work environment. Harassment against others could only alter Plaintiff's conditions of employment if she had "personal knowledge" of it. *Beyda v.*

13

1    *City of Los Angeles*, 76 Cal. Rptr. 2d 547, 552 (Ct. App. 1998).  Because Plaintiff alleges that she

2    did not learn of the harassment against others until after she left BlackBerry, the harassment

3    against others cannot form the basis for Plaintiff's hostile workplace claim.

4    The Court GRANTS Defendants' motion to dismiss as to Plaintiff's hostile workplace

5    claim.

### 2. Wage Discrimination (Claim 2).

7    To establish liability under the California Equal Pay Act (EPA), a plaintiff must show that

8    her employer paid an individual of the opposite sex more than her for "substantially similar work,

9    when viewed as a composite of skill, effort, and responsibility, and performed under similar

10   working conditions . . . ."  Cal. Labor Code § 1197.5; *Hein v. Oregon Coll. of Educ.*, 718 F.2d

11   910, 913 (9th Cir. 1983); *Green v. Par Pools, Inc.*, 3 Cal. Rptr. 3d 844, 846 (Ct. App. 2003)

12   (holding that the California EPA is subject to the same analysis as its federal counterpart).

13   "Substantially equal" does not necessarily mean "identical."  *Forsberg v. Pac. Nw. Bell Tel. Co.*,

14   840 F.2d 1409, 1414 (9th Cir. 1988) (citation omitted).  Further, "it is actual job performance

15   requirements, rather than job classifications or titles, that is determinative."  *EEOC. v. Maricopa

16   Cnty. Cmty. Coll. Dist.*, 736 F.2d 510, 513 (9th Cir. 1984).

17   In her initial complaint, Plaintiff alleged only that she was paid less than Giamatteo despite

18   performing substantially similar work.  (Dkt. 1, ¶ 86.)  The Court specifically instructed Plaintiff

19   that her claim was lacking because (1) she did not include any description of her or Giamatteo's

20   positions and duties, and (2) she did not show that only Giamatteo had a job similar to hers to

21   justify her provision of only one comparator.  (Dkt No. 31, pp. 16-17.)

22   Defendants argue that Plaintiff's claim is still deficient because Giamatteo and Erikkson,

23   both company Presidents, are not appropriate comparators for Plaintiff.  (Dkt. No. 37, pp. 18-21.)

24   Plaintiff argues that she can plausibly contend that she performed substantially similar work to

25   Giamatteo and Erikkson because all three were executives, reported to the CEO, used general

26   managerial and executive skills, and were tasked with developing customer relationships to grow

27   the business.  (Dkt. No. 38, pp. 12-13.)  The Court does not find these facts sufficient to plead a

28   claim.

1  The allegations are insufficient to allow the Court to reasonably infer that the two positions
2  (President of a Business Unit and "Chief Elite Customer Success Officer and Chief Marketing
3  Officer") involve equal skill, effort, and responsibility in substantially similar working conditions.
4  As a preliminary matter, the FAC does not include the jobs' requirements of each position, so the
5  Court cannot ascertain what is required of each role.  For example, the only description of
6  Eriksson's position is "President and General Manager of BlackBerry's IOT Business Unit. The
7  business unit consists of BlackBerry Technology Solutions or BTS (BlackBerry® QNX®,
8  BlackBerry Certicom®, BlackBerry Radar® and BlackBerry Jarvis™) and BlackBerry IVY™."
9  (Dkt. No. 34, ¶ 21 (citation omitted).)  This description tells the Court little about the skill, effort,
10 responsibility, and working conditions required of the IOT Unit President.

Moreover, the limited information contained in the FAC suggests that Plaintiff did not perform substantially similar work as Giamatteo and Eriksson.  The FAC explains that Giamatteo and Eriksson were each responsible for one of Blackberry's two "Business Units," but Plaintiff does not allege that she oversaw a Business Unit.  (*Id.* at ¶¶ 19-23.)  Plaintiff also admits that she had "a significantly smaller team than Giamatteo."  (*Id.* at ¶ 34.); *See Goins v. United Parcel Serv. Inc.*, No. 21-CV-08722-PJH, 2023 WL 3047388, at *13 (N.D. Cal. Apr. 20, 2023) (holding comparator did not have a substantially similar role where the plaintiff's complaint acknowledged that the comparator held additional responsibility).  Plaintiff alleges that she and the comparators shared general managerial skills and duties (e.g., sales, product development), but those allegations are meaningless absent more information about each role's responsibility over these functions.  *See e.g., Negley v. Jud. Council of California*, 458 F. App'x 682, 684 (9th Cir. 2011) (holding that, although two positions shared a common core of tasks, the comparator position entailed significant additional responsibilities that distinguished it from the plaintiff's position).  Because it appears that the comparators had greater responsibility than Plaintiff, their greater pay does not violate equal pay principles.

In addition, the equal pay analysis is based on "*all* employees of the opposite sex performing substantially equal work." *Hein*, 718 F.2d at 916 (emphasis added).  Plaintiff alleges that Giamatteo and Eriksson are appropriate comparators because all three were senior managers

15

1    who reported directly to the CEO, but several additional BlackBerry employees held similarly

2    senior positions. (*See* Dkt. No. 37-1, Appendix A (BlackBerry Webpage listing ten other

3    employees who were members of the "BlackBerry Executive Team" or "Senior Leaders").)[3]  The

4    FAC asserts that Plaintiff may identify additional comparators through discovery. (Dkt. No. 34, ¶

5    106.)  But "[o]ur case law does not permit plaintiffs to rely on anticipated discovery to satisfy

6    Rules 8 and 12(b)(6); rather, pleadings must assert well-pleaded factual allegations to advance to

7    discovery." *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1177 (9th Cir. 2021).

8    The Court GRANTS Defendants' motion to dismiss as to Plaintiff's claim for wage

9    discrimination.

### C. Leave to Amend.

Leave to amend "is properly denied . . . if amendment would be futile." *Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).  Courts have "particularly broad" discretion to deny leave to amend "where the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (citation and quotation marks omitted).

The Court has already once dismissed Plaintiff's claims for hostile workplace and wage discrimination and granted leave to amend. (Dkt. No. 31.)  The Court's prior order gave Plaintiff specific instructions on the pleading requirements for the two claims, (*id.*) which Plaintiff did not heed.  Plaintiff's new submission barely altered her pleadings, and the new allegations added to the FAC are either too conclusory or irrelevant to cure Plaintiff's complaint.  Because granting leave to amend a second time would be futile, Plaintiff's hostile workplace and wage discrimination claims are dismissed WITH PREJUDICE.

### II. Motion to Strike

Federal Rule of Civil Procedure 12(f) allows courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Motions to strike are disfavored.  *See Bogazici Hava Tasimaciligi A.S. v.*

---

[3] The Court takes notice of the Webpage cited in the FAC.  (Dkt. No. 34, p. 6 n.1-3.); *See Twombly*, 550 U.S. at 568 n.13 (noting articles referenced in the complaint).

1 *McDonnell Douglas Corp.*, 932 F.2d 972, at \*2 (9th Cir. 1991) (unpublished table decision)
2 (citing *Stabilisierundfonds Fur Wein v. Kaiser*, 647 F.2d 200, 201 (D.C. Cir. 1981)).  Motions to
3 strike are only appropriate when "it is clear that the matter to be stricken could have no possible
4 bearing on the subject matter of the litigation."  *Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp.
5 1335, 1339 (N.D. Cal. 1991).

6 Defendants move to strike certain references to sexual harassment and disparate pay.  (Dkt.
7 No. 37, pp. 28-31.)  Defendants' position is that, if the Court dismisses Plaintiff's hostile
8 workplace sexual harassment and disparate pay claims, Plaintiff cannot use allegations of sexual
9 harassment or disparate pay as support for other claims.  (*Id.*)  For example, Defendants argue that,
10 as a matter of law, Plaintiff cannot succeed on a claim for failure to prevent harassment if she has
11 not properly pled any harassment.  (*Id.*)

12 Defendants motion to strike is really an attempt to have portions of Plaintiff's claims
13 dismissed because, Defendants argue, they fail as a matter of law.  The Ninth Circuit has
14 cautioned against 12(f) motions that are "really an attempt to have certain portions of [the]
15 complaint dismissed" as these actions are "better suited for a Rule 12(b)(6) motion."  *Whittlestone,*
16 *Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010).  "Rule 12(f) does not authorize district
17 courts to strike claims . . . on the ground that such claims are precluded as a matter of law."  *Id.* at
18 974-75.  In light of this holding, courts sometimes construe such deficient motions to strike as
19 motions to dismiss and analyze them accordingly.  *Bremer v. Cnty. of Contra Costa*, 2015 WL
20 5158488, at \*9 (N.D. Cal. Sept. 2, 2015) (gathering cases).  Given the scant briefing on the issue
21 by both parties, the Court declines to construe the motion to strike as a motion to dismiss.
22 Accordingly, the Court DENIES Defendants' motion to strike.
23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss Plaintiff's second and third claims and dismisses those claims WITH PREJUDICE. The Court DENIES Defendants' motion to strike.

**IT IS SO ORDERED**.

Dated: November 21, 2024

_____
SALLIE KIM
United States Magistrate Judge