KATHERINE M. FORSTER (State Bar No. 217609)
Katherine.Forster@mto.com
CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
LAUREN N. BECK (State Bar No. 343375)
Lauren.Beck@mto.com
KYRA E. SCHOONOVER (State Bar No. 343166)
Kyra.Schoonover@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

Attorneys for Defendant BLACKBERRY
CORPORATION

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEELAM SANDHU, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>BLACKBERRY CORPORATION, a<br>Delaware Corporation,<br><br>Defendant. | Case No. 3:24-cv-02002-SK<br><br>**DEFENDANT BLACKBERRY CORPORATION'S MOTION FOR SUMMARY JUDGMENT**<br><br>Redacted Version<br><br>Hearing Date:     January 26, 2026<br>Time:            9:30 AM<br>Place:           Courtroom C<br>Judge:           Hon. Sallie Kim |

# NOTICE OF MOTION & MOTION

**PLEASE TAKE NOTICE** that on January 26, 2026, at 9:30 a.m., or as soon thereafter as the matter may be heard, before the Honorable Sallie Kim in Courtroom C of the United States District Court for the Northern District of California, Defendant BlackBerry Corporation ("BlackBerry") will and hereby does seek a ruling under Federal Rule of Civil Procedure 56 entering summary judgment in BlackBerry's favor on each of Plaintiff's claims.

BlackBerry moves for summary judgment on Plaintiff's retaliation, discrimination, negligent retention, wrongful termination, and failure to prevent claims, as well as Plaintiff's request for punitive damages, as set forth in Plaintiff's First Amended Complaint.

This motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the concurrently filed Declaration of Lauren Beck and exhibits thereto, the concurrently filed Declaration of Fraser Deziel and exhibits thereto, the concurrently filed Declaration of Jennifer Bramhill, all papers on file in this action, and any argument, evidence, or authority presented in reply or at the hearing.

DATED: December 10, 2025          MUNGER, TOLLES & OLSON LLP


                                  By:  _____
                                              */s/ Katherine M. Forster*
                                       KATHERINE M. FORSTER

                                  Attorneys for Defendant BLACKBERRY
                                  CORPORATION

# **TABLE OF CONTENTS**

Page

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. II

I.    INTRODUCTION ...................................................................................................... 1

II.   FACTS ....................................................................................................................... 2

III.  LEGAL STANDARD ............................................................................................... 9

IV.   ARGUMENT ........................................................................................................... 10

    A.  Plaintiff's Retaliation Claims Fail as a Matter of Law ............................. 10

        1.  Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation. ..... 10

            *(a)*  *Termination* ....................................................................... 11

            *(b)*  *Transfer of Accounts* ......................................................... 12

            *(c)*  *Alleged Conduct by Mr. Giamatteo* ................................. 14

            *(d)*  *Alleged Conduct from the So-Called "Boys Club"* .......... 16

        2.  BlackBerry Has Legitimate Reasons for Each Claimed Adverse Action. ...................................................................................... 16

            *(a)*  *Termination* ....................................................................... 16

            *(b)*  *Account Transfer* ............................................................... 17

            *(c)*  *Treatment by Mr. Giamatteo and the So-Called "Boys Club"* ... 17

        3.  Plaintiff Cannot Show Pretext or Improper Intent. ....................... 18

            *(a)*  *Termination* ....................................................................... 18

            *(b)*  *Account Transfer* ............................................................... 19

            *(c)*  *Treatment by Mr. Giamatteo and the "Boys Club"* .......... 20

            *(d)*  *No Cat's Paw Theory Is Available* ..................................... 20

    B.  Plaintiff's Discrimination Claim Fails as a Matter of Law. ...................... 21

        1.  Termination ........................................................................... 21

        2.  Transfer of Accounts ............................................................ 22

        3.  Treatment by Mr. Giamatteo and the "Boys Club" ................... 22

    C.  Plaintiff's Evidence Regarding Other Women Does Not Show Intent. .... 22

D.       Plaintiff's Derivative Claims Fail. ................................................................24

E.       Plaintiff Cannot Establish Negligent Retention. ......................................24

F.       Punitive Damages Are Unavailable as a Matter of Law. ........................24

V.       CONCLUSION ............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alhozbur v. McUgh,*
2011 WL 13243131 (N.D. Cal. July 21, 2011) ...............................................12, 15

*Anderson v. City & Cnty. of San Francisco,*
169 F. Supp. 3d 995 (N.D. Cal. 2016) ................................................................13

*Aragon v. Repub Silver State Disposal Inc.,*
292 F.3d 654 (9th Cir. 2002)...............................................................................23

*Bishop v. Garland,*
2023 WL 3719747 (9th Cir. 2023)................................................................14, 15

*Brooks v. City of San Mateo,*
229 F.3d 917 (9th Cir. 2000)...............................................................................19

*Burlington Indus., Inv. v. Ellerth,*
524 U.S. 742 (1998) .....................................................................................15, 16

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .............................................................................................9

*Cloud v. Brennan,*
436 F. Supp. 3d 1290 (N.D. Cal. 2020) ..............................................................15

*Coghlan v. American Seafoods Co. LLC,*
413 F.3d 1090 (9th Cir.2005)........................................................................20, 22

*Cohen v. Fred Meyer, Inc.,*
686 F.2d 793 (9th Cir. 1982) ..............................................................................12

*Coleman v. Quaker Oats Co.,*
232 F.3d 1271 (9th Cir. 2000).............................................................................23

*Day v. Sears Holdings Corp.,*
930 F. Supp. 2d 1146 (C.D. Cal. 2013) .........................................................*passim*

*Derr v. Encore Grp. USA LLC,*
2023 WL 4768721 (C.D. Cal. Jan. 5, 2023) ........................................................13

*Fu v. Walker Parking Consultants,*
796 F. Supp. 2d 1148 (N.D. Cal. 2011) ...............................................................17

*Miller v. T-Mobile U.S.A. Inc,*
2025 WL 3085722 (N.D. Cal. Nov. 5, 2025) .......................................................20

*Love v. Motion Indus., Inc.,*
309 F. Supp. 2d 1128 (N.D. Cal. 2004) ..............................................................14

*Machado v. Johnson,*
191 Fed. App'x 531 (9th Cir. 2006)....................................................................24

*Manatt v. Bank of Am., NA,*
339 F.3d 792 (9th Cir. 2003) ..............................................................................15

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) ...............................................................................................9

*Merrick v. Hilton Worldwide, Inc.,*
867 F.3d 1139 (9th Cir. 2017).......................................................................10, 24

*Monaghan v. El Dorado Cty. Water Agency,*
2011 WL 4738356 (E.D. Cal. Oct. 5, 2011) .....................................................15

*Muldrow v. City of St. Louis, Missouri,*
144 S. Ct. 967 (2024) ...........................................................................................22

*In re Oracle Corp. Sec. Litig.,*
627 F.3d 376 (9th Cir. 2010)..........................................................................12, 16

*Perata v. City & Cnty. of San Francisco,*
2023 WL 4537695 (N.D. Cal. July 13, 2023) ...................................................15

*Quigley v. United Airlines, Inc.,*
2021 WL 1176687 (N.D. Cal. Mar. 29, 2021) ..................................................24

*Reed v. Avis Budget Grp., Inc.,*
472 F. App'x 525 (9th Cir. 2012)........................................................................11

*Rodriguez v. Comcast Inc.,*
2020 WL 4368213 (N.D. Cal. July 30, 2020) .......................................10, 19, 25

*Schechner v. KPIX-TV,*
686 F.3d 1018 (9th Cir. 2012).............................................................................17

*Sengupta v. Morrison-Knudsen Co., Inc.,*
804 F.2d 1071 (9th Cir. 1986).............................................................................23

*Swirski v. Protec Bldg. Servs., Inc.,*
2021 WL 5771222 (S.D. Cal. Dec. 6, 2021) .....................................................14

*Talamantes v. Costco Wholesale Corp.,*
2025 WL 1785766 (N.D. Cal. June 27, 2025) ...................................................25

*Tandon v. GN Audio USA, Inc.,*
2022 WL 1210945 (9th Cir. Apr. 25, 2022).............................................18, 19, 24

*Wallis v. J.R. Simplot Co.,*
26 F.3d 885 (9th Cir. 1994), *as amended on denial of reh'g* (July 14, 1994)..........................19

*Xu v. LightSmyth Techs. Inc.*,
  2024 WL 4562748 (9th Cir. 2024) ............................................................12

**STATE CASES**

*Alamo v. Prac. Mgmt. Info. Corp.*,
  219 Cal. App. 4th 466 (2013) ...................................................................18

*Alexander v. Cmty. Hosp. of Long Beach*,
  46 Cal. App. 5th 238 (2020) ....................................................................24

*Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*,
  96 Cal. App. 4th 1017 (2002) ..................................................................25

*Arnold v. Dignity Health*,
  53 Cal. App. 5th 412 (2020) ....................................................................20

*Arteaga v. Brink's Inc.*,
  163 Cal. App. 4th 327 (2008) ..................................................................19

*Bailey v. San Francisco Dist. Atty's Office*,
  552 P.3d 433 (Cal. 2024) .........................................................................14

*Doe v. Cap. Cities*,
  50 Cal. App. 4th 1038 (1996) ..................................................................24

*Garcia-Brower v. Premier Auto. Imports of CA, LLC*,
  55 Cal. App. 5th 961 (2020) ..............................................................11, 16

*Guz v. Bechtel Nat. Inc.*,
  8 P.3d 1089 (Cal. 2000) ....................................................................10, 17, 21

*Harris v. City of Santa Monica*,
  294 P.3d 49 (Cal. 2013) ...........................................................................21

*Husman v. Toyota Motor Credit Corp.*,
  12 Cal. App. 5th 1168 (2017) ..................................................................13

*Kourounian v. Calif. Dep't of Tax & Fee Admin.*,
  91 Cal. App. 5th 1100 (2023), *review denied* (Aug. 30, 2023) ..................16

*Lawson v. PPG Architectural Finishes, Inc.*,
  503 P.3d 659 (Cal. 2022) .........................................................................11

*Light v. Dep't of Parks & Recreation*,
  14 Cal. App. 5th 75 (2017) ......................................................................12

*McRae v. Dep't of Corr.*,
  142 Cal. App. 4th 377 (2006) .............................................................12, 17

*Morgan v. Regents of Univ. of Calif.*,
  88 Cal. App. 4th 52 (2000) .............................................................. *passim*

*Mueller v. Cnty. of Los Angeles*,
  176 Cal. App. 4th 809 (2009) ..................................................................14

*Patten v. Grant Joint Union High Sch. Dist.*,
    134 Cal. App. 4th 1378 (2005) .............................................................11

*Reeves v. Safeway Stores, Inc.*,
    121 Cal. App. 4th 95 (2004) ...............................................................21

*Wawrzenski v. United Airlines Inc.*,
    106 Cal. App. 5th 663 (2024) .............................................................10

*Yanowitz v. L'Oreal USA, Inc.*
    116 P.3d 1123 (Cal. 2005) ........................................................... *passim*

*Z.V. v. County of Riverside*,
    238 Cal. App. 4th 889 (2015) .............................................................24

**STATE STATUTES**

Cal. Civ. Code § 3294(a)..............................................................................25

Cal. Lab. Code § 1102.5.........................................................................11, 14

**FEDERAL RULE**

Fed. R. Civ. P. 56(a)..........................................................................9, 12, 16

MOTION FOR SUMMARY JUDGMENT

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

In the early 2010s, BlackBerry was a market leader in the growing smartphone industry.  But as Apple and other competitors overtook that business, BlackBerry shrunk from ~17,500 to ~3,500 employees between 2011 and 2021.  By the 2020s, BlackBerry no longer made smartphones and instead principally consisted of a Cyber group, which sold cybersecurity software products, and an Internet of Things (IoT) group, which focused on automotive software.  BlackBerry also had a large corporate team supporting the two business units.  That corporate team reported into John Chen, who had served as CEO since 2013 and had overseen the transition of BlackBerry's business.

Between 2011 and 2021, BlackBerry was not profitable, posting net losses in more years than it posted net gains, and in May of 2023, BlackBerry's Board announced that it would conduct a review of strategic alternatives to enhance shareholder value.  Then, in late October 2023, BlackBerry announced that John Chen would retire.  BlackBerry was poised to elevate John Giamatteo, President of the Cyber division, to replace Mr. Chen as CEO.  Days before the public announcement of Mr. Chen's departure, however, BlackBerry received an anonymous complaint accusing Mr. Giamatteo of sexual harassment.  BlackBerry promptly hired outside counsel to investigate and appointed Richard Lynch, a longstanding member of its Board and the former Chief Technology Officer of Verizon, as interim CEO.

Not knowing whether he would be CEO for a few days or many months, Mr. Lynch began executing on a restructuring plan that he believed was important for the company's survival.  His plan aimed to separate BlackBerry's two business units and eliminate the company's "big-company corporate bureaucracy."  On a call with BlackBerry's executive team on November 6, Mr. Lynch explained that restructuring was coming and could impact executives' roles.  By November 13, he had identified three executives whose roles would be eliminated at the outset of the restructuring: ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████; and Plaintiff Neelam Sandhu, who held two roles—Chief Elite Customer Success Officer and CMO—and led some sustainability functions.

Case No. 3:24-cv-02002

In the case of Ms. Sandhu, her role as Chief Elite Customer Success Officer overlapped with the work of the Cyber business unit, where Mr. Lynch determined all sales functions for BlackBerry's cybersecurity products should reside. With respect to Ms. Sandhu's CMO role, Mr. Lynch determined that the two separate business units—not a corporate umbrella layer—should handle their respective marketing needs. And Mr. Lynch believed that BlackBerry's legal department could manage Plaintiff's sustainability work. On December 4, 2023, Mr. Lynch notified Plaintiff that her role was being eliminated due to restructuring.

In the ensuing months, BlackBerry continued its downsizing and reorganization, cutting hundreds of additional jobs. Ms. Sandhu's Elite Customer Success Team—which formerly had eight employees—was disbanded and permanently eliminated, and BlackBerry has not had a corporate Chief Marketing Officer, nor an executive outside of its legal department responsible for sustainability functions, since Plaintiff's departure two years ago.

Mr. Lynch's decision to terminate Ms. Sandhu was not retaliatory, discriminatory, or unlawful in any way, and Plaintiff has failed to adduce evidence sufficient to raise a material dispute of fact that it was. Nor has she adduced facts that the litany of other workplace grievances she alleges, such as being left off meeting invites or having responsibilities for certain customers reshuffled, constituted unlawful conduct. To avoid summary judgment for BlackBerry on her claims under California's Fair Housing & Employment Act (FEHA), Ms. Sandhu must show—by "specific and substantial" evidence—that relevant decisionmakers acted with retaliatory or discriminatory intent. She cannot do so on any of her scattershot discrimination or retaliation theories, even taking all disputed facts in Plaintiff's favor. Since Plaintiff's discrimination and retaliation claims fail, so do her derivative claims for failure to prevent and wrongful termination. Summary judgment is also appropriate on Ms. Sandhu's claim for negligent retention and her request for punitive damages because she has failed develop evidence to support them. For the reasons stated below, BlackBerry is entitled to summary judgment.

## II.    **FACTS**

By the time events related to this lawsuit began in 2021, BlackBerry was no longer profitable. *See* Ex. Declaration of F. Deziel ("Deziel Decl.") ¶ 6. The prior ten years had been a

period of significant change for the company. It had contracted from approximately 17,500 to 3,500 employees. Declaration of J. Bramhill ("Bramhill Decl.) ¶¶ 4, 5. And BlackBerry, which had commanded a significant share of the smartphone market in 2011, no longer made smartphones at all. *Id.* at ¶ 3.

By 2021, BlackBerry principally consisted of two internal business units: the Cyber group, which developed and sold cybersecurity software products, and IoT, which focused largely on automotive software. *Id.* ¶ 6. The Cyber business was led by John Giamatteo, who joined BlackBerry in October 2021 as President of the Cyber division and as a potential successor to then-CEO John Chen. Ex. 1 to Declaration of L. Beck (Chen Dep.) at 19:18-20:4.[1] The two business units were supported by a large corporate team that reported to Mr. Chen.

At the time, Ms. Sandhu served as Mr. Chen's chief of staff and ran BlackBerry's Elite Customer Success Team ("Elite"), a role Mr. Chen created for her in early 2020. *Id.*; Ex. 1 (Chen Dep.) at 21:17-25:18. Elite's goal was to deliver specialized, high-touch service to BlackBerry's most important customers of cybersecurity products. *Id.* at 21:17-25:18. While the Cyber team was responsible for the development of BlackBerry's cybersecurity products and the majority of the customers for them, the Elite team was designed to ensure extra care for top accounts. *Id.* Despite overlapping responsibilities, the teams' reporting lines were separate: Plaintiff, at the helm of Elite, and Mr. Giamatteo, as President of Cyber, each reported directly to the CEO. *Id.*

Friction emerged between the teams before Mr. Giamatteo joined BlackBerry. By early 2021—one year into Elite's existence and months before Mr. Giamatteo arrived—BlackBerry's longtime outside counsel reported to the company that "[t]he atmosphere that hangs over the two teams is nothing short of toxic." Ex. 2 (DOE000186) at 2. Ms. Sandhu admits tensions existed and predated Mr. Giamatteo. *See* Ex. 3 (Sandhu Dep.) at 95:16-24 (blaming two individuals, but acknowledging that some issues predated Mr. Giamatteo's hiring); *see also* Ex. 1 (Chen Dep.) at 158:4-159:2; 160:3-9. As Ms. Sandhu explained at her deposition, the tension was partly structural: "[T]he sales team, as salespeople always do, want the best accounts or want the accounts that are

---

[1] Unless otherwise stated, all exhibits cited are exhibits to the Declaration of Lauren Beck.

doing well. Salespeople always fight about territories and things like that." Ex. 3 (Sandhu Dep.) at 98:1-18 (describing tension in October 2021); *see also* Ex. 1 (Chen Dep.) at 25:4-11 ("A salesperson would always want the account control and their commissions and their performance depended on that"); *id.* at 23:23-24:18, 172:2-12.

On October 20, 2021, two weeks after Mr. Giamatteo joined the company, he and Plaintiff had dinner at a restaurant close to BlackBerry's San Ramon office. Plaintiff alleges that Mr. Giamatteo approached the dinner like a date, and that she interpreted his actions during the dinner as a sexual advance. *See* FAC ¶ 39-40; Ex. 3 (Sandhu Dep.) at 124:13-128:20, 145:10-24. Plaintiff further claims that she reported to Mr. Chen within 24 to 48 hours of the dinner that Mr. Giamatteo got "too close" in a way that made her "highly uncomfortable," and that Mr. Giamatteo suggested they travel together—a comment Ms. Sandhu perceived as sexual. Ex. 3 (Sandhu Dep.) at 114:21-116:16; 132:4-134:1. Ms. Sandhu never reported to BlackBerry HR any conduct by Mr. Giamatteo that she perceived as a sexual advance. Ex. 3 (Sandhu Dep.) at 225:20-227:1.

Ms. Sandhu did, however, go on to submit two complaints to HR about Mr. Giamatteo in 2022 and 2023. The first, submitted in July 2022, concerned an organizational chart the Cyber sales team sent to a client that incorrectly showed Plaintiff as reporting to Mr. Giamatteo. Ex. 4 (BB13-00002445); *see also* Ex. 5 (BB13-00002384). HR investigated and found the org chart was incorrect, but "did not conclude that incorrect information was intentionally circulated or that leadership provided direction to any individual to produce incorrect information." Ex. 6 (BB13-00004042). No evidence suggests that Mr. Giamatteo was aware of the chart before Plaintiff brought it to his attention after it was circulated. *See* Ex. 7 (BB13-00002456).

Ms. Sandhu's second complaint, submitted in February 2023, stated that Mr. Giamatteo "would like my role to be diminished or for me to be exited from the company." Ex. 8 (BB13-00004373). She cited (1) the July 2022 org chart incident; (2) three incidents she summarized as showing that "[Mr. Giamatteo's] team, on an ongoing basis, does not appropriately acknowledge my role"; and (3) two instances of Mr. Giamatteo allegedly telling his team, without basis, "that [Ms. Sandhu's] role will be changing on March 1." *Id.*; *see also* Ex. 9 at 2 (Second Amended Interrogatory Resps.) (citing this complaint as outlining her retaliation allegations). Ms. Sandhu's

February 2023 complaint never alluded to discrimination, retaliation, sexual harassment, or any gendered conduct. *See* Ex. 8 (BB13-00004373).

Outside counsel for BlackBerry investigated, and on March 10, 2023, issued a report concluding that "there is no concerted <u>intentional</u> effort to diminish Neelam's roles within the Elite Group or to force her out of the company." Ex. 10 (BB13-00019395) (emphasis in original). Counsel observed that, "[w]hile there are significant issues that are impeding the working relationship between the Elite Group and the [Cyber] sales people, these are issues that have been ongoing for some period of time and are not unique to John Giamatteo or his sales people." *Id.* Counsel credited Ms. Sandhu's "energy, talents, and [] record of success," *id.* at 2, but noted she had a "dictatorial image" and made peers feel "like second class citizens," leaving them "disengaged and angry." *Id.* The report found that, while "Neelam's complaint that the salespeople are trying to diminish her job is not accurate with regard to actual 'intent,' . . . there is certainly evidence that they do try to avoid interacting with her to every extent they possibly can." *Id.*

Two days later, counsel emailed Ms. Sandhu, asking to discuss a plan "to improve relations between Elite and sales." Ex. 11 (BB13-00011766). A plan emerged: Mr. Chen would reallocate accounts to give each group "exclusive jurisdiction over their respective clients." Ex. 40 (BB13-00012142). At the same time, Ms. Sandhu would be promoted to CMO. Ex. 1 (Chen Dep.) at 173:16-174:4; Ex. 3 (Sandhu Dep.) at 250:25-251:10 (CMO offer "came on the table" at the same time as account transfers). On April 19, Mr. Chen re-allocated accounts between Elite and Cyber, reducing the total number of Elite accounts. *See* Ex. 1 (Chen Dep.) at 111:6-9; Ex. 41 (BB13-00006406). Ms. Sandhu became CMO shortly thereafter. *See* Ex. 14 (DOE000098); Ex. 12 (BB13-00012834); Ex. 13 (BB13-00012829).

In the background, the company continued to struggle with profitability. In fiscal year 2021, BlackBerry reported a net loss of $1.1 billion. *See* Deziel Decl. ¶ 6. And although it posted a small net income ($12 million) in fiscal year 2022, it again reported a significant net loss ($734 million) in fiscal year 2023. *See id*.

In May of 2023, shortly before Ms. Sandhu became CMO, BlackBerry's Board announced that it would conduct a review of strategic alternatives to enhance shareholder value, as part of

what became known as "Project Imperium." *See* Ex. 16 (BB13-00022511). On October 4, the Board announced that the review was complete and that BlackBerry would separate the IoT and Cyber business units, with a plan to pursue a subsidiary initial public offering for the IoT business. Ex. 17 (BB13-00022508); Ex. 1 (Chen Dep.) at 57:4-20; *see also* Ex. A to Deziel Decl. at 59.

On October 30, Mr. Chen announced that he was retiring after 10 years as CEO. FAC ¶ 58; Ex. 18 (BB13-00022503). Four days before Mr. Chen's resignation became public, an anonymous complaint accused the Board's intended CEO-successor, Mr. Giamatteo, of sexual harassment. Ex. 19 (BB13-00016005); *see also* Ex. 20 (Lynch Dep.) at 48:7-15. The complaint stated that it was from "several women" "who [had] directly or indirectly worked under the leadership of John J. Giamatteo." Ex. 19 (BB13-0016006). A follow-up message stated that the complainant was "a collective of about 10 women." Ex. 21 (BB13-00016979). BlackBerry hired Morrison Foerster LLP to investigate. FAC ¶ 61. Richard Lynch, a long-time member of BlackBerry's Board and former Chief Technology Officer at Verizon, stepped in as interim CEO. Ex. 39 (BB13-00022505).

Mr. Lynch immediately set about implementing the company's restructuring plan, which he viewed as important to the survival of the business. Ex. 20 (Lynch Dep.) at 71:23-72:20. Responding to unfavorable investor feedback on Project Imperium, Mr. Lynch developed a new plan, which he called "Project Mustard." Ex. 22 (BB13-00017578); Ex. 20 (Lynch Dep.) at 228:19-229:6. Under the Project Mustard plan, BlackBerry would no longer seek a sub-IPO of its IoT business, but would separate Cyber and IoT into virtually autonomous divisions and eliminate all but a thin "umbrella" layer of corporate functions outside of them, to streamline operations and cut costs. Ex. 20 (Lynch Dep.) at 212:23-214:4, 71:24-79:4, 156:12-15.

On November 6, Mr. Lynch held a meeting with BlackBerry's executives to preview changes Project Mustard would require. Ex. 20 (Lynch Dep.) at 132:14-137:20; Ex. 22 (BB13-00017578). At the meeting, which Ms. Sandhu attended, Mr. Lynch said that BlackBerry "can't afford big-company bureaucracy" and "[c]ertain functions have to be rethought." Ex. 22 (BB13-00017578) at 2. He said that the restructuring could impact executives' roles. FAC ¶ 79.

The same day, Ms. Sandhu met with investigators from Morrison & Foerster. *See* Ex. 24 (BB13-00017752); Ex. 3 (Sandhu Dep.) at 320:21-321:5, 323:20-324:4, 325:14-19. Ms. Sandhu

was one of 21 witnesses interviewed. Ex. 27 (BB13-00018651) at 1. She told investigators that Mr. Giamatteo had freshened up before the dinner in October 2021 and that, at a separate meeting, he had joked that he looked like a "dirty old man" when out with his adult daughters and suggested Ms. Sandhu report to him so they could travel together. Ex. 25 (MoFo-00000073) at 2. Although Ms. Sandhu indicated that she considered this conduct a sexual advance, the investigators concluded that the conduct would not constitute sexual harassment or violate BlackBerry policy, even if it occurred as Ms. Sandhu described. Ex. 27 (BB13-00018651).

On November 7, the day after her interview, Ms. Sandhu wrote to one of the investigators, attaching "some documents that demonstrate [Mr. Giamatteo's] harassment of me, which commenced after I did not respond positively to his suggestive comments." Ex. 29 (BB13-00017812). Ms. Sandhu's email stated that Mr. Giamatteo excluded her from meetings, attaching emails from 2021 as background. *Id.* She stated he had taken credit for her work in a presentation and refused to meet with her about an idea she had for the business. *Id.* At the time of Ms. Sandhu's November 7 email, Mr. Lynch was not aware of her conversation with investigators or any follow-up emails. Ex. 20 (Lynch Dep.) at 260:18-22 (testifying that he was unaware of Ms. Sandhu's complaints when he reached the decision that week to terminate her). Ms. Sandhu also never told Mr. Lynch about any alleged advance by Mr. Giamatteo. Ex. 3 (Sandhu Dep.) at 320:2-20.

The first phase of Project Mustard focused on cuts at the executive level, with the expectation that further separations would follow at lower levels of the business. Ex. 20 (Lynch Dep.) at 79:2-17, 71:24-72:20; 181:20-182:25. To identify the roles BlackBerry would eliminate, Mr. Lynch analyzed the company's org chart and conducted one-on-one meetings with BlackBerry's executives over the next week to understand their roles and their views of the challenges facing the company. Ex. 20 (Lynch Dep.) at 79:2-17; 70:24-73:16. Mr. Lynch identified for termination three executives whose roles resided exclusively within BlackBerry's corporate umbrella layer: Ms. Sandhu, head of the Elite team, corporate CMO, and head of certain sustainability functions;

███████████████████████████████████████████████████████

████████. Ex. 20 (Lynch Dep.) at 70:24-80:22; 181:20-184:6; 202:12-203:21; 259:13-260:22. Mr. Lynch decided on all three separations by November 13, 2023. Ex. 20 (Lynch Dep.)

at 260:2-12 ("I had concluded what I needed to do by November 13th.").  He acted alone—without input from Mr. Giamatteo or anyone else—in selecting executives for termination.  Ex. 20 (Lynch Dep.) at 211:1-212:5; *see also id.* at 92:5-93:2; Ex. 30 (Giamatteo Dep.) at 95:3-6; 108:3-18; 111:16-19; 256:3-25 (Mr. Lynch did not discuss Ms. Sandhu's termination with Mr. Giamatteo until after the decision was made).

After deciding that Ms. Sandhu's roles would be eliminated, Mr. Lynch did not attempt to find her a new role within the company for two reasons.  Ex. 20 (Lynch Dep.) at 79:2-17.  *First*, he understood from Ms. Sandhu's colleagues—including Marjorie Dickman, a fellow C-Suite executive—that Ms. Sandhu was unusually difficult to work with, *id.* at 79:18-80:4, and he concluded that her performance was unlikely to outweigh those difficulties, *see id.* at 84:8-89:5.  *Second*, Mr. Lynch believed that reducing executive headcount was essential to BlackBerry successfully and sustainably cutting its costs.  *Id.* at 79:2-17.

On November 16, Ms. Sandhu emailed the investigator again, "sharing another example of John Giamatteo's retaliation against me as it continues today with him still cutting me out of my job."  Ex. 28 (BB13-00018146) at 1.  Her email stated that Mr. Giamatteo had arranged a press release for a deal his team had executed, without coordinating with Ms. Sandhu as CMO.  *Id.*  Later that day, Ms. Sandhu forwarded the note to Mr. Lynch.  Ex. 32 (BB13-00018204).

On November 27, Morrison & Foerster sent its final investigation report to BlackBerry.  It described complaints from Ms. Sandhu and one other female (former) employee, identified to the business only as Female Executive 1 and Female Executive 2.  *See* Ex. 27 (BB13-00018651); Ex. 20 (Lynch Dep.) 179:3-182:6.  The report concluded that there was no evidence of harassment or any pattern of gendered behavior by Mr. Giamatteo, including based on what Ms. Sandhu reported.  Ex. 27 (BB13-00018651) at 2.  After receiving the final report, BlackBerry moved forward with negotiating Mr. Giamatteo's CEO contract.  *See* Ex. 20 (Lynch Dep.) at 104:7-105:9; 199:2-14.

In the background, Mr. Lynch continued working on the separations he had identified during the week of November 13.  On November 29, he received information from BlackBerry HR regarding severance terms for all three executives.  Ex. 33 (BB13-00018714) at 15.  Mr. Lynch planned to allow each executive the opportunity to resign.  Ex. 20 (Lynch Dep.) at 202:24-203:21.

Following conversations with Mr. Lynch, ████████████████████ opted to resign and accept severance.  Ex. 20 (Lynch Dep.) at 202:24-203:21; *id.* at 63:2-23, 69:2-11; Ex. 34 (BB13-00004693); Ex. 31 (Kurtz Dep.) at 66:1-18.  On December 4, Mr. Lynch notified Plaintiff that her role was being eliminated due to restructuring.  *See* Ex. 20 (Lynch Dep.) at 194:23-197:9; FAC ⁋⁋ 79; Ex. 35 (BB13-00018742).  He gave Plaintiff the option to style her departure as a resignation, but Plaintiff declined to respond and did not accept or attempt to negotiate a severance package.  FAC ¶ 84; Ex. 36 (BB13-00004714); Ex. 3 (Sandhu Dep.) at 266:17-21.

On December 11, 2023, BlackBerry publicly announced the Project Mustard restructuring and its appointment of Mr. Giamatteo as CEO.  Ex. 39 (BB13-00022505).  By February 2024, the company reported a headcount reduction since the prior year of approximately 20% and an expected savings of over $100 million.  Ex. A to Deziel Decl. at 58, 59; Ex. 43 (BB13-00022362).  All told, Project Mustard resulted in over 500 eliminated roles.  *See* Ex. 30 (Giamatteo Dep.) at 254:4-14; 260:21-261:9.  As part of the restructuring, the Elite and Corporate Marketing teams were permanently disbanded, and the teams' 44 combined employees (in addition to Ms. Sandhu) were reassigned or terminated.  Bramhill Decl. ¶ 10-11.  As of the date of this filing—two years after Ms. Sandhu's termination—none of her former roles exist within the organization.  *Id.* ¶ 9.

## III.    <u>LEGAL STANDARD</u>

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment must be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Retaliation and discrimination claims under the California Fair Employment and Housing Act (FEHA) are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Morgan v. Regents of Univ. of Calif.*, 88 Cal. App. 4th 52, 68 (2000); *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1160 (C.D. Cal. 2013) ("In evaluating discrimination claims under FEHA, California courts look to federal precedent governing analogous federal discrimination laws.") (citing *Guz v. Bechtel Nat. Inc.*, 8 P.3d 1089 (Cal. 2000)).

To survive summary judgment on retaliation claims, a plaintiff must first prove a *prima facie* case of retaliation by showing "(1) [she] engaged in a 'protected activity,' (2) the employer subjected [her] to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Yanowitz v. L'Oreal USA, Inc.*, 116 P.3d 1123, 1130 (Cal. 2005); *Rodriguez v. Comcast Inc.*, 2020 WL 4368213, at *6 (N.D. Cal. July 30, 2020) (Kim, J.).

The burden then shifts to the employer to produce a "legitimate, nonretaliatory reason for the adverse employment action." *Yanowitz*, 116 P.3d at 1130. Once the employer offers a nonretaliatory reason, "the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation." *Id.* If a plaintiff relies on circumstantial evidence at the third stage, he or she must show "specific and substantial" evidence of retaliatory intent. *Morgan*, 88 Cal. App. 4th at 54.

The same three-part framework applies to discrimination claims. *See Guz*, 8 P.3d at 1132-33. At the *prima facie* stage, a plaintiff must show that: (1) she belongs to a protected class; (2) she was performing competently in her position; (3) she suffered an adverse employment action; and (4) a "causal nexus" existed between the adverse employment action and her sex. *Wawrzenski v. United Airlines Inc.*, 106 Cal. App. 5th 663, 685 (2024). If a plaintiff does so, the burden shifts to the employer to articulate "legitimate, nondiscriminatory reason[s] for the adverse employment action." *Id.* at 684. At the final step, the burden shifts back to the plaintiff, who must raise a "triable issue suggesting that the employer's proffered reason is mere pretext for unlawful discrimination, or offer other evidence of discriminatory motive." *Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1146 (9th Cir. 2017). Ultimately, Plaintiff must prove that discriminatory animus was a "substantial motivating factor" behind the employer's actions. *Wawrenski*, 106 Cal. App. 5th at 658. If the plaintiff relies on circumstantial evidence, that evidence must again "be 'specific' and 'substantial' in order to create a triable issue." *Morgan*, 88 Cal. App. 4th at 69 (citation omitted).

## IV. ARGUMENT

### A. Plaintiff's Retaliation Claims Fail as a Matter of Law.

#### 1. Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation.

Plaintiff has offered four theories of retaliation, involving multiple coworkers, based on

(1) Mr. Lynch's decision to terminate her in December 2023; (2) Mr. Chen's decision to reassign certain of her customer accounts in April 2023; (3) Mr. Giamatteo's day-to-day treatment of her, such as allegedly excluding her from meetings, from late 2021 to 2023; and (4) day-to-day treatment by an unspecified "boys club." Plaintiff cannot meet her *prima facie* burden on any theory.[2]

#### *(a)* Termination

Plaintiff cannot establish a *prima facie* case of retaliation based on her termination because the evidence establishes that Richard Lynch was unaware Plaintiff had engaged in any protected activity at the time he decided to terminate her, and Plaintiff cannot put forth evidence to the contrary. *Garcia-Brower v. Premier Auto. Imports of CA, LLC*, 55 Cal. App. 5th 961, 978 (2020) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."); *Reed v. Avis Budget Grp., Inc.*, 472 F. App'x 525, 526 (9th Cir. 2012).

By November 13, 2023, Mr. Lynch had made the decision to terminate Plaintiff. Ex. 20 (Lynch Dep.) at 259:10-260:22. And as he explained in his deposition, Mr. Lynch was not aware at that time of any conduct that Ms. Sandhu alleges constituted protected activity. Ex. 20 (Lynch Dep.) at 260:18-22 ("Q. . . . Did you know at the time you decided to terminate Ms. Sandhu whether she had ever complained about colleagues in the past? A. I did not know."); *see also* Ex. 9 (Second Amended Responses to Interrogatories, Set 1) (Plaintiff's list of alleged protected activities); Ex. 3 (Sandhu Dep.) at 320:14-20 ("Q. Did you ever tell Dick Lynch that John Giamatteo had made an advance at you? A. I didn't get the opportunity to . . . ."). Plaintiff herself did not make Mr. Lynch aware of any complaints until November 16—several days after he decided to separate her and two other executives. Ex. 32 (BB13-00018204). Plaintiff has adduced no evidence to the contrary, leaving an irreparable hole in her *prima facie* case. *See Cohen v. Fred Meyer, Inc.*, 686 F.2d 793,

---

[2] Summary judgment for BlackBerry is likewise appropriate on Plaintiff's claims under California Labor Code section 1102.5, because, for the same reasons discussed *infra* pp. 11-21, Plaintiff cannot "demonstrate[] by a preponderance of the evidence" that protected activity was a "contributing factor" to an adverse employment decision. *Lawson v. PPG Architectural Finishes, Inc.*, 503 P.3d 659, 663 (Cal. 2022); *see also Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378, 1386 (2005), *disapproved of on other grounds by Lawson*, 503 P.3d at 659 (FEHA standard for "adverse employment action" applies to Labor Code § 1102.5 claims).

797 (9th Cir. 1982) ("An employer who has decided upon a new policy is not guilty of unlawful retaliation simply because it proceeds with the implementation of that policy after learning that one of the employees who will be affected thereby has recently engaged in a protected activity.").

Plaintiff believes that Mr. Giamatteo was involved in her termination, but her belief is not supported by any evidence. To the contrary, the undisputed evidence shows that Mr. Lynch acted alone and without input from Mr. Giamatteo. Ex. 20 (Lynch Dep.) at 92:15-93:2; *see also* Ex. 31 (Kurtz Dep.) at 62:5-65:25, 183:8-185:16; Ex. 30 (Giamatteo Dep.) at 95:3-6; 256:3-25. Plaintiff's unsupported belief does not suffice to avoid summary judgment. *See McRae v. Dep't of Corr.*, 142 Cal. App. 4th 377, 391 (2006) (rejecting plaintiff's unsupported belief that various acts by different decisionmakers were part of a single campaign of retaliation); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010) (speculative, self-serving narrative cannot create question of fact under Rule 56); *Alhozbur v. McHugh*, 2011 WL 13243131, at *8 (N.D. Cal. July 21, 2011) ("To meet her burden, Plaintiff must come forward with admissible evidence.").

### *(b) Transfer of Accounts*

Plaintiff also alleges that Mr. Chen retaliated against her when he decided to shift certain customers from Ms. Sandhu's sales team to Mr. Giamatteo's sales team midway through 2023. Plaintiff cannot make a *prima facie* case for this theory, for two independent reasons.

*First*, the account transfer was not an adverse employment action. Changes to an employee's responsibilities qualify as adverse in the retaliation context only where they are "reasonably likely to impair [plaintiff's] job performance or prospects for advancement." *Yanowitz*, 116 P.3d at 1139; *see also Xu v. LightSmyth Techs. Inc.*, 2024 WL 4562748, *2 (9th Cir. Oct. 24, 2024) (in the retaliation context, adverse employment actions must be "serious enough to 'dissuade[] a reasonable worker from making or supporting a charge" of improper conduct); *Light v. Dep't of Parks & Recreation*, 14 Cal. App. 5th 75, 92 (2017) ("A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient."). The undisputed evidence shows that Mr. Chen promoted Ms. Sandhu to CMO at the same time he transferred the accounts. *See* Ex. 1 (Chen Dep.) at 107:8-24, 172:2-174:4; *see also* Ex. 38 (BB13-00011767); Ex. 12 (BB13-00012834). Ms. Sandhu concedes that these changes were a package, and the CMO role a

promotion.  *See* FAC ¶ 18; Ex. 3 (Sandhu Dep.) at 54:3-16, 250:3-251:16 (testifying that promotion was negotiated in connection with the account transfer).  The change therefore did not "impair [her] job performance or prospects for advancement."  *Yanowitz*, 116 P.3d at 1139.  To the contrary, Mr. Chen promoted Plaintiff to advance her career.  Ex. 1 (Chen Dep.) at 173:16-174:4 (promotion was "to give more to Neelam to further her role and career.").

*Second*, Plaintiff cannot show a protected activity with any causal link to the account transfer.  Much of the activity that Ms. Sandhu identifies as protected—the transmission of an org chart with an error in July 2022, and her alleged complaint to Mr. Chen in 2021—occurred long before the transfer and is too remote in time to support an inference of causation.  *See Anderson v. City & Cnty. of San Francisco*, 169 F. Supp. 3d 995, 1028 (N.D. Cal. 2016) (seven months too long to support inference of retaliatory motive) (citing cases); *cf. Day*, 930 F. Supp. 2d at 1181 ("[T]he Ninth Circuit has held that gaps of one to three months" support an inference).

The only other activity prior to the account transfer that Ms. Sandhu identifies is her February 2023 complaint about Mr. Giamatteo, Ex. 9 (Second Amended Resps. to Interrogatories, Set 1)—but that complaint is not protected activity.  To constitute protected activity, a complaint must put an employer on notice of conduct FEHA prohibits.  *See Yanowitz*, 116 P.3d at 1133.  As the California Supreme Court has explained, "complaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct."  *Id.*; *see also Husman v. Toyota Motor Credit Corp.*, 12 Cal. App. 5th 1168, 1193-94 (2017) (complaints are not protected unless they convey that the plaintiff believes the employer is acting in a discriminatory or unlawful manner); *Derr v. Encore Grp. USA LLC*, 2023 WL 4768721, *3 (C.D. Cal. Jan. 5, 2023) (same).  Plaintiff's complaint in February 2023 did not suggest harassment, discrimination, or any other conduct prohibited by FEHA.  *See supra* pp. 4-5.  To the contrary, it appeared to focus only on *professional* grievances, including concerns about information-sharing on client accounts and exclusion from client-facing communications.  Ex. 8 (BB13-00004373); Ex. 10 (BB13-00019395).  Because the complaint "relate[d] more to personal grievances in the workplace rather than to unlawful discriminatory behavior," it is not protected activity.  *Swirski v. Protec Bldg. Servs., Inc.*, 2021 WL 5771222, at *9

(S.D. Cal. Dec. 6, 2021).[3]

### (c)     *Alleged Conduct by Mr. Giamatteo*

Plaintiff's allegation that Mr. Giamatteo engaged in a years-long retaliation campaign against her also fails at the *prima facie* stage, for two independent reasons.

*First*, Mr. Giamatteo's alleged conduct is not an adverse employment action as a matter of law. As noted, to qualify as adverse, an action must be "reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion." *Yanowitz*, 116 P.3d at 1139. "[A] pattern of social slights by either the employer or co-employees cannot properly be viewed as affecting the terms, conditions, or privileges of employment," under FEHA. *Id.* at 1138.

The alleged conduct by Mr. Giamatteo—whom Ms. Sandhu concedes was a fellow executive and never her supervisor, *see* Ex. 3 (Sandhu Dep.) at 22:3-12—amounts to (at most) such minor slights. Ms. Sandhu claims Mr. Giamatteo: (1) excluded her from meetings; (2) once took credit for her work; (3) organized his own press for a deal he worked on, despite Ms. Sandhu's role as CMO; (4) circulated an incorrect org chart; (5) did not appropriately "acknowledge" her role; and (6) told others he was working on getting her out of the company. *See* Ex. 8 (BB13-00004373); Ex. 32 (BB13-00018204); FAC ¶¶ 45-57; Ex. 3 (Sandhu Dep.) at 218:17-221:7. BlackBerry disagrees with those claims—but even taking them as true, the conduct Ms. Sandhu alleges constitutes merely "minor or relatively trivial adverse actions" that are "not actionable," even if they "anger[ed] or upset" Ms. Sandhu—particularly because Mr. Giamatteo was only her peer. *See Bailey v. San Francisco Dist. Atty's Office*, 552 P.3d 433, 450 (Cal. 2024) (citation omitted).

Indeed, courts have determined that far worse conduct by non-supervisory employees does not rise to the level of an adverse employment outcome. In *Bishop v. Garland*, for example, coworkers widely and repeatedly circulated an email that harshly criticized an employee and her work performance. 2023 WL 3719747, at *2-3 (9th Cir. May 30, 2023). The employee alleged that

---

[3] For the same reasons, Plaintiff's complaints are not protected under Labor Code § 1102.5, which requires a reasonable belief that "the disclosed activity [] violates [a] federal or state statute, rule, or regulation," *Love v. Motion Indus., Inc.*, 309 F. Supp. 2d 1128, 1134 (N.D. Cal. 2004), and excludes complaints primarily about routine personnel matters, *see Mueller v. Cnty. of Los Angeles*, 176 Cal. App. 4th 809, 822 (2009) ("To exalt these exclusively internal personnel disclosures with whistleblower status would create all sorts of mischief.").

the email "tarnish[ed] her reputation," "humiliated her," and caused her peers to "ignore[] her and avoid[] her" and lose trust in her as a leader. *Id.* at *2, 4. Although the email "ignored basic principles of tact and civility," the panel nevertheless held that the plaintiff's "claimed consequences" did not constitute an adverse employment action. *Id.* at *3-4. "[C]hilly treatment from coworkers is not an adverse employment action," even where an employee finds it isolating or humiliating. *Id*. at *2 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Other courts have similarly held that such conduct does not amount to an adverse employment action. *See, e.g.*, *Manatt v. Bank of Am., NA*, 339 F.3d 792, 803 (9th Cir. 2003) (no adverse employment action where immediate supervisor "stared at [plaintiff] in an angry way and allowed [her] co-workers to be mean to her."). As in *Bishop*, Plaintiff asserts *social* slights from *peers*—that she was avoided professionally, not given due deference, or criticized.[4] None of that changed the terms or conditions of her employment.

Second, Plaintiff has articulated no protected activity with a causal connection to the conduct of which she complains. Ms. Sandhu claims that Mr. Giamatteo began retaliating against her "immediately" after two alleged protected activities in October 2021: (1) rejecting an alleged sexual advance; and (2) reporting that advance to Mr. Chen 24 to 48 hours later. *See* FAC ¶ 46; Ex. 3 (Sandhu Dep.) at 243:6-8; 114:21-116:16. Neither activity can provide the basis for a *prima facie* case. Rebuffing an advance is *not* a protected activity under FEHA. *See Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1300 ("[Plaintiff] cannot state a retaliation claim based on her refusing her supervisors' sexual advances."); *Alhozbur*, 2011 WL 13243131, at *8 (same); *Monaghan v. El Dorado Cty. Water Agency*, 2011 WL 4738356, at *7 (E.D. Cal. Oct. 5, 2011) (same). And Ms. Sandhu's claimed report to Mr. Chen cannot support a retaliation theory because there is no evidence that Mr. Giamatteo was aware of it. To establish "a causal link" between protected activity and retaliatory conduct, an employee must show that the relevant decisionmaker "was aware that the plaintiff had engaged in the protected activity." *Garcia-Brower*, 55 Cal. App. 5th at 978.

---

[4] Ms. Sandhu's allegation that Mr. Giamatteo told others he was "working on removing [her]," Ex. 8 (BB13-00004373), is inadmissible hearsay that cannot support Ms. Sandhu's claims. *See, e.g.*, *Perata v. City & Cnty. of San Francisco*, 2023 WL 4537695, at *16 (N.D. Cal. July 13, 2023) (refusing to consider hearsay evidence of claimed retaliatory conduct).

Case No. 3:24-cv-02002

Thus, the first potentially protected activity of which Mr. Giamatteo was aware was Plaintiff's report regarding the incorrect org chart in July 2022—a report made well after Mr. Giamatteo's allegedly retaliatory conduct began. For example, Plaintiff alleges that Mr. Giamatteo began excluding her from meetings in January 2022. *See* Ex. 3 (Sandhu Dep.) at 219:4-12. And the org chart incident itself obviously occurred before Plaintiff reported it to HR, so it cannot be tied to *any* alleged protected activity and is irrelevant to Plaintiff's claims. *See Kourounian v. Calif. Dep't of Tax & Fee Admin.*, 91 Cal. App. 5th 1100, 1113 (2023), *review denied* (Aug. 30, 2023) (excluding conduct before an employer was aware of protected activity because "[a]s a matter of both logic and law, acts of retaliation must occur after the protected activity.").

### (d)    Alleged Conduct from the So-Called "Boys Club"

Plaintiff's barebones claims about retaliation by a "boys club" also fail at the *prima facie* stage. *First*, although Plaintiff's complaint alleges that a "boys club" mistreated her "[o]n a daily or near daily basis," FAC ¶ 35-36, Plaintiff has developed no evidence of retaliatory conduct by such a group. That lack of evidence is fatal to her claims. *See In re Oracle*, 627 F.3d at 385 (speculative, self-serving narrative cannot create question of fact under Rule 56). *Second*, the alleged slights from Plaintiff's peers—i.e., employees other than her supervisor who did not control the terms of her employment—are not an adverse employment action. *See, e.g.*, *Yanowitz*, 116 P.3d at 1139 (adverse employment actions must "materially affect[] the terms, conditions, or privileges of employment."); *Burlington*, 524 U.S. at 761 (chilly, isolating hostility from coworkers is not an adverse action). *Finally*, Plaintiff cannot show the requisite causal link, because there is no evidence that any member of the so-called "boys club" was aware of any protected activity. *Ahmed v. Wormuth*, 2024 WL 5077606, at *9 (N.D. Cal. Dec. 10. 2024) (causation requires awareness).

### 2.    BlackBerry Has Legitimate Reasons for Each Claimed Adverse Action.

Because Plaintiff has not met her burden of establishing a *prima facie* case as to any of her retaliation theories, her claim fails at the starting line. Regardless, BlackBerry has stated a legitimate reason for each act Plaintiff challenges as retaliatory, satisfying its burden at the second step and shifting the burden back to Plaintiff to show intentional retaliation. *See Yanowitz*, 116 P.3d at 1130.

### (a)    Termination

Plaintiff was terminated for a non-retaliatory reason:  Her roles were eliminated as part of a large-scale restructuring.  That plan was public and targeted for elimination jobs that performed corporate functions or resided outside the company's two business units.  *See* Ex. 17 (BB13-00022508); Ex. 39 (BB13-00022505).  It is undisputed that Plaintiff reported directly to BlackBerry's CEO for each of her roles, outside the structure of BlackBerry's two business units.  *See* Ex. 20 (Lynch Dep.) at 70:21-80:22, FAC ¶ 20.  Corporate downsizing based on objective criteria, as here, is a legitimate basis for termination.  *See Guz*, 8 P.3d at 1115 (corporate downsizing is a legitimate rationale where no evidence shows discriminatory motive drove employee selection); *Fu v. Walker Parking Consultants*, 796 F. Supp. 2d 1148, 1156 (N.D. Cal. 2011) (same); *Schechner v. KPIX-TV,* 686 F.3d 1018, 1025 (9th Cir. 2012) (same).  After deciding to eliminate Plaintiff's roles based on BlackBerry's restructuring goals, the company was not required to find Plaintiff an alternative role. It declined to do so for two non-retaliatory reasons:  Plaintiff had demonstrated an inability to get along with coworkers, *see* Ex. 20 (Lynch Dep.) at 79:2-92:9, and Mr. Lynch believed reducing executive roles was essential to BlackBerry's cost-cutting goals, *id.* at 79:2-17.

### (b)    Account Transfer

Mr. Chen's decision to re-allocate accounts in the second quarter of 2023 was likewise based on a legitimate purpose.  The transfer attempted to address long-term friction between the Elite and Cyber teams—a phenomenon that predated Mr. Giamatteo—by giving each exclusive control over a subset of customers.  *See* Ex. 1 (Chen Dep.) at 107:8-24; Ex. 40  (BB13-00012142).  Transfers to address organizational conflict are legitimate management decisions.  *See McRae*, 142 Cal. App. 4th at 393 (transfer geared to address friction was a "reasonable management decision.").

### (c)    Treatment by Mr. Giamatteo and the So-Called "Boys Club"

The record reveals two non-retaliatory reasons for friction between Ms. Sandhu, on the one hand, and Mr. Giamatteo and Plaintiff's other coworkers, on the other.  *First*, as Ms. Sandhu has conceded, Elite and Cyber had overlapping responsibilities and thus a natural reason for conflict.  *See supra* pp. 3-4.  *Second*, several of Ms. Sandhu's colleagues reported that they found it difficult to work with her.  BlackBerry's outside counsel indicated as much when evaluating tensions between the Elite and Cyber teams.  *See infra* pp. 4-5.  Other coworkers observed the same: Marjorie

1  Dickman, a former C-Suite executive at BlackBerry, testified that Ms. Sandhu was "hostile,

2  untrustworthy," and "created "unnecessary conflict and friction" every time she and Dickman

3  interacted.  *See* Ex 42 (Dickman Dep.) at 149:19-154:2.

4         **3.    Plaintiff Cannot Show Pretext or Improper Intent.**

5         Even if Ms. Sandhu's claim did not fail at the *prima facie* stage, summary judgment is proper

6  because she cannot show "intentional retaliation." *Yanowitz*, 116 P.3d at 1130.  Because BlackBerry

7  has articulated legitimate reasons for the challenged conduct, the burden shifts to Plaintiff to show

8  intentional retaliation either by offering evidence of retaliatory intent or by showing BlackBerry's

9  rationale is pretextual.  *Id.*  If Plaintiff relies on circumstantial evidence of retaliatory intent, that

10  evidence must be "specific and substantial."  *Morgan*, 88 Cal. App. 4th at 69.  To show pretext,

11  Plaintiff must prove, by "specific and substantial supporting evidence," that there are "weaknesses,

12  implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for

13  its actions [such] that a reasonable factfinder could rationally find them 'unworthy of credence.'"

14  *Tandon v. GN Audio USA, Inc.*, 2022 WL 1210945, at *1 (9th Cir. Apr. 25, 2022) (citing cases).

15  For the reasons stated below, Plaintiff cannot meet that burden as to any theory.

16         *(a)    Termination*

17         Plaintiff cannot show that retaliatory intent motivated her termination or that BlackBerry's

18  proffered reasons for that termination are pretextual.  To begin, Mr. Lynch testified that Ms.

19  Sandhu's termination was not based on retaliatory motive, Ex. 20 (Lynch Dep.) at 260:13-22, and

20  Plaintiff has adduced no evidence to the contrary.  Indeed, Mr. Lynch was not aware of any protected

21  activity when he decided to terminate her.  *See supra* pp. 11-12.

22         Lacking affirmative evidence of retaliatory intent, Plaintiff appears instead to rely on (1) Mr.

23  Lynch's speculation that Ms. Sandhu may have submitted the anonymous complaint accusing Mr.

24  Giamatteo of sexual harassment, Ex. 20 (Lynch Dep.) at 105:10-106:12; and (2) the short interval

25  between her participation in the investigation and her termination.  Neither is sufficient to show—

26  as Plaintiff must to survive summary judgment—that BlackBerry's stated rationale was pretext or

27  that retaliatory intent was a "substantial motivating factor" behind the termination.  *Alamo v. Prac.*

28  *Mgmt. Info. Corp.*, 219 Cal. App. 4th 466, 479 (2013); *see also Morgan*, 88 Cal. App. 4th at 76 (to

survive summary judgment, a plaintiff "must do more than establish a prima facie case and deny the credibility of the defendant's witnesses."). The speculation about Ms. Sandhu's involvement in the complaint fails because even *actual knowledge* of protected activity is insufficient to show retaliatory intent. *See, e.g.*, *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 892 (9th Cir. 1994), *as amended on denial of reh'g* (July 14, 1994) (granting summary judgment because, although plaintiff had shown employer was aware of protected conduct, he had not offered any specific evidence of pretext or retaliatory intent). Were the law otherwise, *any* employee who feared termination could create a successful retaliation claim simply by making a complaint and making sure the company was aware of it. *Cf. Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (noting courts' concern that "employers will be paralyzed into inaction once an employee has lodged a complaint under Title VII, making such a complaint tantamount to a 'get out of jail free' card for employees engaged in job misconduct"); *Arteaga v. Brink's Inc.*, 163 Cal. App. 4th 327, 354 (2008) ("Precedent does not prevent [an employer] from removing an employee simply because the employee [recently] engaged in a protective activity."). Similarly, courts have held that a plaintiff cannot satisfy her third-step burden merely by pointing to temporal proximity of protected activity and an adverse action. *See Rodriguez*, 2020 WL 4368213 at *7; *Arteaga*, 163 Cal. App. 4th at 354.

Nor has Plaintiff identified "weaknesses, implausibilities, inconsistencies, or contradictions" in BlackBerry's rationale for her termination. *Tandon*, 2022 WL 1210945, at *1. The parties agree that BlackBerry told Ms. Sandhu her termination was due to restructuring. *See* Ex. 3 (Sandhu Dep.) Tr. 271:6-19. And the undisputed evidence shows that BlackBerry eliminated Ms. Sandhu's roles, along with hundreds of other jobs. *See* Bramhill Decl. ¶ 9-12 (BlackBerry has not had a CMO, Chief Elite Customer Success Officer, or executive outside legal in charge of sustainability functions since Ms. Sandhu departed); Ex. 43 (BB13-00022363); Ex. 30 (Giamatteo Dep.) at 260:15-261:9.

### (b)     *Account Transfer*

Plaintiff likewise cannot meet her burden to show—by "specific and substantial" evidence—that discriminatory intent drove Mr. Chen's decision to reallocate accounts in 2023, for two reasons. *Morgan*, 88 Cal. App. 4th at 69. *First*, the uncontroverted evidence shows that Ms. Sandhu was *promoted* at the same time by Mr. Chen, the same decisionmaker. *See supra* p. 12-13. That is

"strong evidence" that no improper motive drove the transfer. *See Coghlan v. American Seafoods Co. LLC,* 413 F.3d 1090, 1096 (9th Cir. 2005); *cf. Day*, 930 F. Supp. 2d at 1161 (in the discrimination context, if "the same actor is responsible for both the hiring and firing . . . and both actions occur within a short period of time, a strong inference arises that there was no [improper] motive."). *Second*, no evidence suggests that Mr. Chen's rationale was pretextual. *Cf.* Ex. 1 (Chen Dep.) at 172:22-173:15 (move was not retaliatory or based on gender). To the contrary, it is undisputed that the tensions the transfer sought to address existed and were structural: Plaintiff herself complained about the tensions in February 2023, Ex. 8 (BB13-00004373), and concedes that frictions stemmed partly from the teams' overlapping roles. Ex. 3 (Sandhu Dep.) at 98:1-18.

### (c)    Treatment by Mr. Giamatteo and the "Boys Club"

Finally, Ms. Sandhu cannot meet her burden to show—by "specific and substantial" evidence—that any of her coworkers were motivated by retaliatory intent. Plaintiff has alleged, at most, that coworkers sought to avoid her and undermine her professionally—but no evidence suggests that their conduct was motivated by retaliatory intent for something Ms. Sandhu did or said. Indeed, no evidence suggests that any member of the alleged "boys club" was even *aware* of protected activity. *See supra* pp. 16. Nor was Mr. Giamatteo aware of any protected activity before July 2022—almost a year after Ms. Sandhu alleges retaliation from him began. *See supra* pp. 15-16. Plaintiff therefore has not met her burden to show "specific and substantial evidence" that the treatment she allegedly experienced from her peers was motivated by retaliatory intent, rather than normal, professional dislike. *See Arnold v. Dignity Health*, 53 Cal. App. 5th 412, 430 (2020) (to survive summary judgment, Plaintiff must show "a rational inference that discrimination . . . was the true reason" for complained-of actions).

### (d)    No Cat's Paw Theory Is Available

Finally, Plaintiff cannot rely on a "cat's paw" theory of intent—*i.e.*, attempting to show that other employees' alleged bias influenced Mr. Lynch's or Mr. Chen's actions. That theory applies only where a plaintiff's *supervisor* influences the ultimate decisionmaker. *See Miller v. T-Mobile U.S.A. Inc*, 2025 WL 3085722, at *10 (N.D. Cal. Nov. 5, 2025). As a court in this district recently explained, "[e]very Ninth Circuit case this Court has found [applying a cat's paw theory] involved

the bias of a subordinate supervisor, *i.e.*, a person who was subordinate to the final decisionmaker, but who acted *in a supervisory capacity over the plaintiff*." *Id.* (emphasis added); *see also id.* (noting that California courts "do not yet appear to have addressed" the theory as applied to a "coworker's biased conduct either" and citing *Reeves v. Safeway Stores, Inc.,* 121 Cal. App. 4th 95, 109 n.9 (2004), as "expressly cabining its analysis of cat's paw liability to supervisors").

It is undisputed that Plaintiff reported directly to BlackBerry's CEO at all times relevant to this suit. *See* Ex. 3 (Sandhu Dep.) at 146:17-147:7. As Ms. Sandhu acknowledged, Mr. Giamatteo was never her supervisor, *id.* at 22:3-12, and Ms. Sandhu, as she wrote in 2023, did not "consider him to have any authority over [her] role." Ex. 8 (BB13-00004373). Nor did any other employee in the so-called "boys club" oversee Ms. Sandhu or her work. *See* Bramhill Decl. ¶ 6.

### B. Plaintiff's Discrimination Claim Fails as a Matter of Law.

Plaintiff's discrimination claim (premised on the same allegations as her retaliation claims) fails because she cannot show her gender was a "substantial motivating factor" behind BlackBerry's actions on any theory. *See Harris v. City of Santa Monica*, 294 P.3d 49, 66 (Cal. 2013).

#### 1. Termination

BlackBerry has articulated a legitimate rationale for Plaintiff's termination that has nothing to do with her gender. *See supra* pp. 17. "[T]he presumption of discrimination" thus "disappears," *Guz*, 8 P.3d at 1114, and Plaintiff must show that an illegitimate criterion was "a *substantial motivating factor*" in her firing, *Harris*, 56 Cal. 4th at 232 (emphasis added).

Plaintiff cannot meet that burden. Plaintiff has *no* evidence that Mr. Lynch was motivated by an improper purpose. *See supra* pp. 18-19. Nor can she rely on circumstantial evidence of bias: Although she has sought discovery on *other* women's experiences, that evidence is insufficient to show intent, including because none of it bears on Mr. Lynch—the decisionmaker in Ms. Sandhu's firing. *See infra* pp. 23. Finally, Plaintiff cannot show intent based on a cat's paw theory, *see supra* pp. 20-21, even if such evidence existed.

Ms. Sandhu also cannot show that BlackBerry's stated rationale for her termination is an attempt to mask intentional discrimination. To the contrary, the undisputed evidence shows that her termination was part of a broader restructuring, which eliminated her roles along with many others.

*See supra* pp. 19. Ms. Sandhu has no evidence suggesting her gender was an actual motivating

2  cause (much less a substantial one) for her termination.

### 2. Transfer of Accounts

4  As for the transfer of accounts, Plaintiff cannot meet even her *prima facie* burden because

5  the transfer is not an adverse employment action: The transfer, which was paired with a promotion

6  to CMO, did not leave her "worse off." *Muldrow v. City of St. Louis, Mo.*, 144 S. Ct. 967, 977

7  (2024); *see supra* p. 12-13.

8  Although the inquiry can end there, BlackBerry has articulated a legitimate reason for the

9  account transfers. *See supra* pp. 17. To survive summary judgment, Plaintiff must thus show

10  "meaningful evidence that her supervisor harbored discriminatory animus," *Day*, 930 F. Supp. 2d

11  at 1162 (citation omitted). She again cannot meet that burden. Plaintiff *conceded* that she does not

12  believe Mr. Chen was prejudiced against her because of her gender. *See* Ex. 3 (Sandhu Dep.) at

13  34:14-17 ("Q. Do you believe that John Chen was prejudiced against you because of your race or

14  gender? A. No."). In any event, Mr. Chen's decision to promote Ms. Sandhu to CMO, and his

15  record of giving her "promotion after promotion," FAC ¶¶ 16, 30, are "strong evidence" that no

16  discrimination was at play. *See Coghlan*, 413 F.3d at 1096.

### 3. Treatment by Mr. Giamatteo and the "Boys Club"

18  The treatment Ms. Sandhu claims she experienced from Mr. Giamatteo and the unspecified

19  "boys club" cannot support a *prima facie* discrimination claim for the same reasons that Plaintiff's

20  retaliation claim fails: The conduct Plaintiff has *alleged* would not amount to an adverse

21  employment action as a matter of law, and Plaintiff has failed to develop evidence of most of that

22  alleged conduct. *See supra* pp. 16. In any case, Ms. Sandhu cannot offer "meaningful evidence"

23  that conflict with her peers was motivated by intentional discrimination, *Day*, 930 F. Supp. 2d at

24  1162, as she must to survive summary judgment given that BlackBerry has articulated a non-

25  discriminatory reason for that tension, *see supra*, pp. 18.

### C. <u>Plaintiff's Evidence Regarding Other Women Does Not Show Intent.</u>

27  Without affirmative evidence that improper intent actually motivated any of the conduct she

28  challenges, Plaintiff has focused her discovery on anecdotes from women who worked in different

departments and had different supervisors than Plaintiff. But even crediting that disputed evidence as fact, it is insufficient as a matter of law to carry Plaintiff's claims for two reasons.

*First*, Plaintiff relies on anecdotes that, even if proven, would be insufficient to show a pattern of retaliatory or discriminatory intent. Plaintiffs relying on a pattern of discrimination to indicate intent must present statistical samples sufficient to show a "stark pattern of discrimination unexplainable on grounds other than" gender. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th Cir. 2000). Accounts from a handful of employees are insufficient. *See, e.g.*, *Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072, 1076 (9th Cir. 1986) (declining to consider evidence that four of the five employees laid off in a pool of 28 employees were African American because "statistical evidence derived from an extremely small universe . . . has little predictive value and must be disregarded"); *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 663 (9th Cir. 2002) (refusing to "give . . . much weight" to evidence that "three of the four" employees "singled out for [a] lay off" were of the same race, because "the sample size is so small"). The same high standard applies to retaliation claims: Courts require statistical evidence showing a "stark pattern of retaliation." *Day*, 930 F. Supp. 2d at 1185. Courts have repeatedly held that a handful of examples are insufficient to demonstrate a "stark pattern," particularly in the context of a large company like BlackBerry. *See id.* (citing cases).

Lacking statistical evidence, Ms. Sandhu appears poised to rely on precisely the sort of anecdotes—depositions of just five former employees across four departments—that courts have held insufficient to demonstrate a pattern of improper intent. Even if each former employee had offered evidence of discrimination or retaliation (they did not), the experience of five people in a large multinational company could not indicate the "stark pattern" courts require. *See Sengupta*, 804 F.2d at 1076; *Day*, 930 F. Supp. 2d at 1186 (sample of four insufficient).

*Second*, Plaintiff's evidence from other women also fails to show improper intent because those women's experiences do not bear on the decisionmakers relevant to Plaintiff's termination and the transfer of accounts. None of the women from whom Ms. Sandhu sought testimony offered *any* evidence of discriminatory or retaliatory conduct from Mr. Lynch or Mr. Chen. *See* Ex. 42 (Dickman Dep.) at 45:19-46:7; Ex. 44 (McMillan Dep.) at 36:24-25; Ex. 45 (Ransom Dep.) at 19:15-

17; Ex. 46 (Slimmon Dep.) at 35:15-16; Ex. 47 (Tatsis Dep.) at 79:21-80:10. Anecdotes from those women are thus irrelevant to Plaintiff's theories based on her termination or the transfer of accounts. *See Day*, 930 F.Supp.2d at 1184 (evidence suggesting improper intent was irrelevant because it did not concern the decisionmakers involved in termination); *see also id.* (citing cases); *Machado v. Johnson*, 191 Fed. App'x 531, 533 (9th. Cir. 2006) (refusing to consider evidence related to allegedly discriminatory conduct by actor "not linked to the decision to fire [plaintiff]").

### D. <u>Plaintiff's Derivative Claims Fail.</u>

Plaintiff's failure to prevent and wrongful termination claims are derivative of her FEHA claims. Because Plaintiff has failed to demonstrate a triable issue on her FEHA claims, her derivative claims fail as well. *See Van Osten v. Home Depot, U.S.A, Inc.*, 2021 WL 3913483, at *11 (S.D. Cal. Aug. 27, 2001) ("A claim for failure to prevent discrimination or retaliation requires discrimination or retaliation to have occurred in the first place."); *Merrick*, 867 F.3d at 1150 (dismissing wrongful termination claim where Plaintiff failed to raise triable issue as to FEHA claims); *Tandon*, 2022 WL 1210945, at *2 (same).

### E. <u>Plaintiff Cannot Establish Negligent Retention.</u>

Plaintiff likewise cannot show BlackBerry was negligent in hiring or maintaining Mr. Giamatteo as an employee of the company. Liability for negligent hiring "is based upon the facts that the employer knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes." *Quigley v. United Airlines, Inc.*, 2021 WL 1176687, at *10 (N.D. Cal. Mar. 29, 2021) (quoting *Doe v. Cap. Cities*, 50 Cal. App. 4th 1038, 1054 (1996)). "To establish negligent supervision, a plaintiff must show that a person in a supervisorial position over the actor had *prior* knowledge of the actor's propensity to do the bad act." *Alexander v. Cmty. Hosp. of Long Beach*, 46 Cal. App. 5th 238, 264 (2020) (quoting *Z.V. v. County of Riverside*, 238 Cal. App. 4th 889, 902 (2015)). Plaintiff has no evidence that BlackBerry was on notice of any alleged impermissible conduct by Mr. Giamatteo. To the contrary, investigations at the company concluded Mr. Giamatteo had not engaged in any improper conduct at all.

### F. <u>Punitive Damages Are Unavailable as a Matter of Law.</u>

Punitive damages likewise are not available to Plaintiff, because she has not shown, or even

alleged conduct sufficient to show, that BlackBerry acted with "malice, oppression, or fraud." *Rodriguez*, 2020 WL 4368213 (quoting Cal. Civ. Code § 3294(a)).

Punitive damages are an extreme remedy that requires "clear and convincing evidence" that an officer of the company acted with "malice, oppression, or fraud." *Rodriguez*, 2020 WL 4368213, at *8 (quoting Cal. Civ. Code § 3294(a)); *Van Osten*, 2021 WL 3913483, at *9. This remedy requires conduct "so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." *Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1050-51 (2002). "Such conduct has been described as '[having] the character of outrage frequently associated with crime." *Id.* Even *intentional* discrimination, without more, is generally insufficient to support punitive damages. *Talamantes v. Costco Wholesale Corp.*, 2025 WL 1785766, at *8 (N.D. Cal. June 27, 2025).

Plaintiff has not adduced evidence—or, indeed, even *alleged* conduct—close to that threshold. Courts have found far more egregious conduct insufficient to support punitive damages at summary judgment. *Id.* at *8 (excluding punitive damages where plaintiff was allegedly "told not to disclose his disabilities," "laughed at for requesting a no heavy lifting accommodation for his ankle," "forced to lift a couch over his objection," and "mocked for having childhood-related PTSD"). The Court should strike Plaintiff's request for punitive damages.

## V. CONCLUSION

For the reasons set forth above, the Court should grant summary judgment against each of Plaintiff's claims in their entirety, as well as Plaintiff's request for punitive damages.


DATED: December 10, 2025                    MUNGER, TOLLES & OLSON LLP



By: _____
              */s/ Katherine M. Forster*
              KATHERINE M. FORSTER

        Attorneys for Defendant BLACKBERRY
        CORPORATION