# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--o0o--

NEELAM SANDHU, an individual,

       Plaintiff,

    vs.

BLACKBERRY CORPORATION; a
Delaware Corporation; and
JOHN GIAMATTEO, an
individual,

       Defendants.

_____/

Case No.:
3:24-cv-02002-SK

**CERTIFIED TRANSCRIPT**

REMOTE VIDEOTAPED

DEPOSITION OF JOHN CHEN

DATE: Tuesday, August 5, 2025

TIME: 8:59 a.m. - 4:03 p.m.

LOCATION: REMOTE VIA ZOOM

REPORTED BY:    Karen Ferguson, CSR
                Certified Shorthand Reporter #5970
                TALTY COURT REPORTERS
                2131 The Alameda, Suite D
                San Jose, California 95126
                (408) 244-1900

Page 18

1    Q. Generally, what kind of products or
2  services did Sybase sell?
3    A. A database -- software product.
4    Q. And over the course of 13 years I assume
5  you did many things at Sybase, but if you could just
6  briefly describe in a couple sentences your
7  strategic vision that you implemented at Sybase, how
8  would you describe that?
9    A. I -- excuse me -- I'm failing to understand
10  where this is going other than time or using of
11  time.
12    Is there something that you could explain to
13  me?
14    Q. Well, this is -- this is going to be the
15  only question I ask about Sybase, just to give -- we
16  can skip it if you like, but it might help provide
17  some context.
18    A. I do -- I do exactly what every CEO is
19  expected to do and chairman is expected to do. To
20  create a business plan with growth and profitability
21  to make sure that we have integrity in how we run
22  the company and the governance of it, to do
23  succession planning -- just the normal what CEO are
24  supposed to do.
25    Q. And after Silver Lake did you join

Page 19

1  BlackBerry?
2    A. Yes, I did.
3    Q. When you joined Blackberry, what position
4  did you hold?
5    A. I was the executive chairman and Chief
6  Executive Officer of Blackberry.
7    Q. Did you hold those positions for your
8  entire time at BlackBerry?
9    A. Yes, I did.
10    Q. Approximately when did you join BlackBerry?
11    A. I joined November of 2013.
12    Q. And do you remember approximately when you
13  left?
14    A. November of 2023.
15    Q. So it sounds like you were there around 10
16  or 11 years -- something like that?
17    A. Exactly ten years to the day.
18    Q. I'm going to ask a question now that you
19  don't have to answer if you don't want to -- some
20  people they don't want to answer this question, but
21  I'll give you the choice if you want to answer it or
22  not.
23    Why did you leave BlackBerry?
24    A. It's time to move on. I have the
25  contract -- I have two five-year terms contract and

Page 20

1  I chose not to continue.
2    Q. And when you left, was there a succession
3  plan in place for who would replace you?
4    A. Yes.
5    Q. Who was the successor?
6    A. John Giamatteo.
7    Q. And he ultimately ended -- did end up
8  becoming CEO; correct?
9    A. That was correct.
10    Q. When the -- well, strike that.
11    As far as you are aware, did BlackBerry ever
12  hire some sort of consulting firm to help them find
13  a potential CEO successor for someone other than
14  John Giamatteo?
15    A. As -- you mean the independent members of
16  the board -- is that what you meant?
17    Q. Well, I'll -- I'll ask this way.
18    Sometimes when a company is looking for a new
19  Chief Executive they'll work with some sort of
20  recruiting agency or head hunting agency -- they'll
21  hire some sort of firm to propose a few candidates.
22    Do you know if BlackBerry ever did that to fill
23  the vacancy when you left?
24    A. No, because I hired John Giamatteo probably
25  around 2021 and the idea was eventually for him to

Page 21

1  take over if business growth were there and -- and
2  so I don't -- I don't believe that we have hire a
3  search firm to do another search in parallel to
4  that.
5    Q. To your knowledge, did BlackBerry ever
6  consider anyone other than John Giamatteo to succeed
7  you as CEO?
8    A. To my knowledge, no, but then what the
9  independent director discuss among themselves, that
10  I'm not privileged to that.
11    Q. Are you currently working anywhere?
12    A. Am I what?
13    Q. Do you work anywhere currently?
14    A. No.
15    Q. Do you still own stock in BlackBerry?
16    A. Yes.
17    Q. So Miss Sandhu -- Neelam Sandhu -- at some
18  point she was the head of the Elite Customer Group;
19  is that correct?
20    A. That's correct.
21    Q. Could you please describe what the Elite
22  Customer Group did generally?
23    A. Elite customers focus on our top revenue
24  producing or representational customers and to
25  create a deeper relationship with a much broader set

of the people at the customer base, so i.e., for example, not just focusing on dealing with head of engineering or procurement, but much broader and their objective is to actually move up strategically with the account at the CEO, CIO, CTO level that the C-suites of the customer base. So that -- that's the elite program.

Q. And was there some sort of problem or need that led to the creation of the elite customer program?

A. Well, that -- could you please ask that again.

Q. Sure.

Was there some sort of incident or problem or unfulfilled need that led to the creation of the Elite Customer Group?

A. So there were both offensive and defensive reasons.

The offensive reason is that we would like to expand our footprint in these top customers. These top customers are the who's who's in banks -- investment banking -- like ▓▓▓▓▓▓▓ and Bank of America and ▓▓▓▓▓▓▓ et cetera -- as well as who's who's in the major government around the world, particularly, Canada and United States.

So -- so for an offensive reason we want to be more strategic to the account. We want them to know that they're important to us and they could any time pick up the phone and call the elite group and then the elite group will on a daily basis re-update me as the CEO of what is happening.

So on the more defensive reason we were under a lot of competitive pressure because these are the accounts that everybody would want and, in particularly, Microsoft has been creating a lot of account doubts and problems for us so it was very important that we keep our customer base happy with us and well understood of our strategic direction and then we understand their strategic direction so that -- so that we could provide the product and services required.

So that was -- those were the two major reasons.

Q. For the time period that the elite customer program existed, was Miss Sandhu the -- the head of that program?

A. Yes.

Q. What -- well, strike that.

Did you decide to have Miss Sandhu be the head of the elite customer program?

A. A couple of reasons.

One, the elite program that I have seen work in my prior career point directly report to the CEO and is not part of sales and the reason is the customer perception.

Whether I created this effort to fully service them and understand their needs, or just want to sell them more stuff.

If it's the latter it loses the elite intentions, so to speak, and efforts. So -- so that was the major -- one of the major reason.

And so, therefore, it cannot be in sales -- I'm sorry I didn't follow through with that thought -- so, therefore, it cannot be in sales.

We don't have an executive that could do this and Neelam has proven that she's very good in some very focus area so this -- this is the reason why that we had picked her.

Q. Did you consider the Elite Customer Group to be a successful program?

A. I always wanted more, but I guess on balance I'm will have to say yes.

Q. Were there any tensions between the Elite Customer Group and the other business units, for example, the Cyber Business Unit?

A. Yes, I was -- I was aware of that and, honestly speaking, is -- I've seen it in other company is somewhat natural.

Q. What kind of tensions did you observe between those groups?

A. A salesperson would always want the account control and their commissions and their performance depended on that.

And so when somebody else comes in to do even a broader set of tasks in that account it always feel very uncomfortable.

Q. And do you recall specifically any individuals who complained about the Elite Customer Group to you?

A. No, not -- not -- not individually, other than the -- the person who runs sales. In this particular case in the Cyber Unit it was John Giamatteo.

Q. What do you recall John Giamatteo saying to you about how he felt about the Elite Customer Program?

A. I think the major complaint was elite was not sharing the account information and what is happening with these accounts and then that's simply the area that was the most uncomfortable to them.



Page 26

1    Q.  Did you have an opinion as to whether what
2  John Giamatteo was telling you was accurate?
3    A.  No, I don't have an opinion whether it's
4  accurate or not.  I was hoping that they work it out
5  among themselves for the benefit of the company.
6    Q.  I'm going to ask a few background questions
7  about Miss Sandhu now.
8    Do you recall when you met her, approximately?
9    A.  Yes.  Early -- early when I joined the
10  company she was already an employee of the company.
11    Q.  Do you recall what her position was when
12  you first met her -- it's okay if you don't -- but
13  maybe you remember?
14    A.  She was in marketing.
15    Q.  At some point did you recommend that she be
16  promoted?
17    A.  It was recommended by the -- at that time
18  the head of marketing, which I concur.
19    Q.  At which point did she start working
20  directly -- well, let me phrase it this way.
21    When Miss Sandhu started directly working for
22  you what was her position?
23    A.  She was a staff person to myself and I
24  believe it's a director position -- I cannot be
25  100 percent sure.

Page 27

1    Q.  And did you recommend her for a promotion
2  at some point?
3    A.  She's been promoted a number of times since
4  she had worked directly for me.
5    Q.  Do you recall ever personally recommending
6  that she be promoted?
7    A.  I -- I -- I'm not quite sure what the -- so
8  I guess I answer the question.
9    Is there -- is there some part of my answer
10  that doesn't -- isn't exactly what you were looking
11  for?
12    Q.  Let me ask --
13    A.  The answer has to be yes because I'm the
14  only one that could promote my staff so that would
15  have to be yes.
16    Q.  And did you ever approve a bonus for her?
17    A.  Oh, yes, I'm -- I am -- that's a normal
18  annual review process.
19    Q.  Did you recommend that she be promoted to
20  Chief Marketing Officer?
21    A.  Yes, I did -- I believe -- yes, I did in
22  2023 -- beginning of the year or about that time
23  period.
24    Q.  I'm going to ask now a few questions about
25  the way and the frequency with which you worked

Page 28

1  together with Miss Sandhu, and I'll ask about the
2  last two years that you were at BlackRerry, just to
3  put a timeframe around it.
4    So about how frequently would you interact with
5  Miss Sandhu in your last two years at BlackBerry?
6    A.  Almost daily.
7    Q.  And when you interacted with her, would
8  that be in person, phone calls, emails, some
9  combination of those things?
10    A.  Combinations -- a combination.
11    Q.  How would you describe Miss Sandhu's work
12  ethic compared to her peers?
13    A.  She is very devoted, committed and work
14  extremely, extremely hard.
15    Q.  Can you think of an example or two to help
16  the jury understand her work ethic.
17    A.  Whenever I gave her assignment -- and it
18  ranges from very specific to quite broad -- she has
19  been -- she has always impressed me being able to
20  jump in and kind of put the arms around the problem
21  and just work very diligently.  So it's very
22  extremely reliable in that -- in that sense.
23    Q.  I'm going to ask now about her -- her
24  competence -- so her ability to solve problems,
25  let's say, her ability to get things done, I guess,

Page 29

1  for lack of a better way of describing it.
2    How would you describe Miss Sandhu's competence
3  compared to her peers?
4    A.  Better than average.  Certainly, as I said,
5  is very reliable to produce results.  As I said
6  earlier -- I didn't mean jokingly -- but, you know,
7  I would have wanted more sooner, but that's the
8  nature of the business, but it's -- I am -- I was
9  always comfortable with her diligent and the ability
10  to be -- to be on top of the assignments.
11    Q.  I'm going to ask now about Miss Sandhu's
12  ability to get along with clients and customers,
13  customer service attitude -- that sort of thing.
14    Did you ever have any concerns about her
15  ability to get along with her clients and customers?
16    A.  No, I would say 90 percent of the time she
17  gets along great with the customers and I
18  occasionally have a side email or a comment even
19  verbally from some customers said good things about
20  her ability to manage the account and service the
21  account and -- no, I don't normally have that
22  problem.
23    Q.  How would you describe Miss Sandhu's
24  ability to get along with her co-workers -- let's
25  call it her collegiality -- how would you describe



Page 30

1  her collegiality compared with her peers?
2      A.  That's a challenge.  Oftentime in the
3  attempt to get the work done it so-called crosses
4  the organization line and it created some tensions
5  from time to time with different individual in the
6  company and the colleagues in the company.
7      Q.  And later on I'll show you some documents
8  about that issue, but from memory are you able to
9  recall any particular instances where there was some
10 issues that came about because of Miss Sandhu's
11 personality issues?
12     A.  Well, it -- a number of times from the
13 marketing organization, particularly the marketing
14 communication organization.  We also had issues
15 with, obviously, the sales, but that's as we
16 discussed earlier a little bit more understandable,
17 given the way that the job and the functions of the
18 job line up -- or overlapped.
19     There are some issues with the finance
20 organization, but only pretty much limited to the
21 investment -- investor relationship function.
22     And I believe that there was also an incident
23 with the government affairs group under a program
24 called IBT.
25     So those -- those are what I could remember.

Page 31

1      Q.  On benefit, if you were to weigh the
2  positive things that Miss Sandhu -- her positive
3  attributes -- and you weigh that against her
4  negative attributes, would you say she was a net
5  positive for the company or a net negative for the
6  company?
7      A.  She was a net positive.
8      Q.  And what makes you reach that conclusion?
9      A.  Again -- so on -- on one thing I'll -- I
10 remember -- on our elite program she was able to
11 renew the SSC, which is the share service center --
12 the IT arm of the Canadian Government.
13     We have a very dominant position in terms of
14 providing software for the Government of Canada and
15 we also know that they were looking at potential
16 alternatives like Microsoft and I, myself, flew up
17 over there a number of times and had spoken to some
18 of the ministers, et cetera, to make sure that we
19 stay at BlackBerry and we put Neelam and her team on
20 top of that.
21     The end result was -- although later than I
22 like -- but she was able to renew the entire project
23 for what I could remember one of the biggest deal
24 that we had done -- at least in the past number of
25 years in software.

Page 32

1      So -- so yes, I think, you know, on balance
2  it's definitely a net positive.
3      Q.  I'm going to ask now about performance
4  reviews and evaluations, if any, that Miss Sandhu
5  may have received when she was -- in the last couple
6  of years, let's say, the last two or three years
7  that you were at the company.
8      I imagine that for rank and file employees
9  there's kind of a formal process for that, but I
10 honestly don't know how that works for the
11 management -- the hire level employees -- so for
12 someone in Neelam's position -- let's say Chief
13 Marketing Officer -- that level within the
14 company -- what kind of performance reviews or
15 evaluations, if any, would -- would happen for them?
16     A.  With all my direct reports I gave them
17 constant feedback instead of a formal sit down
18 review.
19     Once a year HR -- human resources and myself --
20 we provide a very comprehensive look at every single
21 individual on my staff and look at them from a
22 performance standpoint, the conversation we had
23 about net positive versus net negative -- and that
24 also -- then we do a comparison to a industry survey
25 from a pay point of view -- compensation point of

Page 33

1  view -- and then we go back and I review that in
2  private session with the entire board of director
3  and then they would approve whatever or not
4  regarding the recommendation I made in equity, in
5  pay, in other benefits.
6      So that's -- that's just a process.
7      My performance review with my staff is a more
8  of a one-on-one -- I tend -- I normally do a
9  one-on-one every week -- if not every week, every
10 other week for sure -- with each of my staff to
11 discuss performance, challenges, help that's
12 required on a regular basis and I've done that for,
13 I would say, the decade I was at BlackBerry.
14     Q.  To your knowledge, was Miss Sandhu ever
15 formally disciplined at the company -- and I'll give
16 you a few examples of potential discipline -- could
17 be something as minor as a counseling letter that's
18 put in their personnel file, could be a letter of
19 reprimand, could be a suspension, could be a
20 demotion -- could be a lot of different things.
21     To your knowledge, did Miss Sandhu ever receive
22 any company discipline like that?
23     A.  No, I do not remember that.  No, I don't --
24 no, I don't.
25     Q.  And for the performance evaluations and



Page 38

1  process.
2      Q.  During your time working with John
3  Giamatteo were you satisfied with the performance
4  that he provided to the company?
5      A.  Again, I -- I say the same thing, you know,
6  I'm hard to -- to kept satisfied.  I haven't seen
7  the growth I was hoping for, but I, you know, I also
8  wanted to make sure that I gave them enough chance
9  to get the program and the process going.
10     Q.  And so assuming you agree that John
11 Giamatteo of some strong attributes and some
12 attributes that maybe he needed to improve on, what
13 would you say his strong attributes are?
14     A.  I think he has a good understanding of the
15 channel -- the channel -- the kind of the party that
16 is required to recruit to help out for the growth of
17 the business.
18     I would say that the results weren't there --
19 were not there when was there and he was a little
20 jumpy about wanting the CEO job and so that's kind
21 of the good and bad.
22     I haven't really worked with him long enough to
23 know the other bad things, but by and large he seems
24 to deal with the troops okay.
25     I haven't heard much about a issue in that

Page 39

1  area.  He was able to recruit a couple of people
2  that I like.  It's feel like it's a negative -- a
3  net positive to the company versus the people in the
4  position prior -- and then, again, mostly in sales
5  so he does have the network out there.
6      So those are the -- other than waiting for the
7  results I didn't have much of a problem with him.
8      Q.  I think you said something along the lines
9  of Mr. Giamatteo being jumpy about wanting the CEO
10 job and I see you nodding your head.
11     What did you mean by that?
12     A.  One of the last conversation -- you know,
13 and, again, we -- we do try to meet up whenever he
14 visit San Ramon where I located, and we do our
15 one-on-one, you know.
16     I could see that he's pushing to want to become
17 the CEO, which I was fine with to be honest with
18 you, I just was looking for the -- for the growth
19 numbers -- the results.
20     And so that's kind of the difference in timing
21 between him and I in our head, but then I wasn't too
22 hung up on -- on, you know, leaving at my ten-year
23 anniversary so that's -- that's pretty much the
24 reality.
25     Q.  Do you still follow BlackBerry's

Page 40

1  performance in the news -- how the company's doing?
2      A.  Yes, I do.
3      Q.  Do you have an opinion about John
4  Giamatteo's performance as CEO of BlackBerry?
5      A.  I believe it's still early.  Again, I
6  haven't seen the growth -- and the growth was not
7  there.
8      One could -- one could cut costs and become
9  profitable, but there is a limit to that and so we
10 do need to grow the business and I assume that a
11 board and him is working hard on coming up with a
12 good plan and program to grow the business.
13     Q.  Did Miss Sandhu ever discuss with you some
14 criticism she had of John Giamatteo?
15     A.  Yes.
16     Q.  What do you recall her saying along those
17 lines?
18     A.  She had a very hard time working with John
19 Giamatteo and it center a lot on, you know, she feel
20 like that she wasn't invited to some of the joint
21 staff meeting and then John's complaint to me was
22 when he invited her she didn't show up and it's just
23 there's a lot of these kind of a low level
24 frustration in working together.
25     So I told both of them that they really do need

Page 41

1  to sit down and, I mean, these are very simple
2  things to work through for an executive at this
3  level.  That's what I told them.
4      Q.  Do you recall whether Miss Sandhu had ever
5  complained to you that she felt she was being
6  treated differently by Mr. Giamatteo because she was
7  a woman?
8      A.  Not in those words.  She had complained
9  about having a very negative meeting with John where
10 she felt somewhat intimidated and maybe, you know,
11 uncomfortable area of being suggested how it should
12 work together and all that.
13     After I listen to that I advise her to go to
14 see the head of human resources to make sure that
15 she laid out her feelings on it and then human
16 resources could do their investigations or to look
17 into the situation.
18     Q.  Can you recall any more details about what
19 she told you about this encounter with Mr. John
20 Giamatteo that she found to be intimidating?
21     A.  I remember it center quite a bit on
22 traveling together and -- because when Neelam came
23 to me she told me that -- I still remember she was
24 saying I -- "I don't want to travel with him" and I
25 replied to her "You don't need to travel with



Page 42

1   anybody you don't want to travel with," I mean,
2   that's -- and I think she was satisfied with that
3   and then -- and she then relate a dinner with John
4   Giamatteo which was uncomfortable to her with some
5   of the words that being used and so that's when I
6   advise Neelam to go see the head of human resources
7   who, obviously, is trained to deal with some of
8   these sensitivity situations.
9       Q.  Are you able to remember what Miss Sandhu
10  told you about the dinner with any more details?
11      A.  No, no, I -- no, I did not.  I don't want
12  to -- I don't want to speculate here what I
13  remember, what I didn't remember.
14      Q.  Oh.
15      Someone who's also involved in this case is
16  Phil Kurtz.
17      Do you remember him?
18      A.  Phil Kurtz is our legal -- legal counsel --
19      Q.  Right.
20      A.  -- in-house legal.  Involved in what case?
21  I didn't know that he was involved in it.
22      Q.  Oh, well, he testified at a deposition, but
23  I just have a few general questions about your
24  experience working with him now.
25      So did you help bring Phil Kurtz to the

Page 43

1   company -- is that something that you helped bring
2   about?
3       A.  Phil Kurtz was already in the company when
4   I join.
5       Q.  Did you find that Mr. Kurtz provided --
6   well, strike that.
7       Were you satisfied with Mr. Kurtz in your
8   dealings with him?
9       A.  It could be better.  I think there is a --
10  I think Phil has a lot of issue in supporting my
11  agendas and my strategy with the company.
12      Q.  And I should probably say before you go too
13  much further -- you shouldn't talk about legal
14  advice that he gave you so -- because that might be
15  privileged -- but just in general, you know, what --
16  I'm interested in were you satisfied with how he
17  performed for the company.
18      ATTORNEY MALDONADO:  And before you answer I'm
19  going to object relevance and vague.
20      But you may answer, John.
21      THE WITNESS:  Yeah, I mean, you know,
22  relationship between me and Phil -- it's not
23  relevant to this case.  I am not aware that he's
24  involved, even if he had made a deposition.
25  ///   ///   ///

Page 44

1   ATTORNEY TARTAGLIO:
2       Q.  Well, it's our position that he was
3   involved pretty closely actually.  So --
4       A.  Not -- not -- not -- not with me he's not.
5       Q.  Right.
6       But later on after you left and what happened
7   to Neelam he was actually pretty involved in that,
8   I'll represent to you.
9       ATTORNEY LAVOIE:  Objection.  Argumentative.
10      ATTORNEY TARTAGLIO:  Okay.
11      Well, I'll rephrase it.
12      Q.  Do you have any criticisms for the way that
13  Mr. Kurtz performed his job?
14      ATTORNEY LAVOIE:  Now, again, I'll caution -- I
15  don't see how this is relevant, but also I'll just
16  caution you to avoid disclosing any, you know,
17  satisfaction or dissatisfaction that you had with
18  particular legal advice that Mr. Kurtz gave you.
19      THE WITNESS:  Yeah, I -- you know, in general I
20  would like to have a better working relationship
21  with my legal counsel, which I have experienced in
22  the last two years of my -- of my time at
23  BlackBerry.  I would just leave it as that.  I will
24  not go into anymore detail of any -- any counsel.
25  ///   ///   ///

Page 45

1   ATTORNEY TARTAGLIO:
2       Q.  Did anyone tell you that there was some
3   sort of personality conflict between Phil Kurtz and
4   Miss Sandhu?
5       A.  No.
6       Q.  Are you aware of any personality conflicts
7   between Tim Foote -- and that's F-o-o-t-e -- are you
8   aware of any personality conflicts between Tim Foote
9   and Miss Sandhu?
10      A.  I was aware of an incident and there also
11  could be a personality conflict, but I don't know
12  whether it was -- in the beginning when I saw them
13  working many years back, since they both came from
14  our London office I don't -- I don't really see the
15  conflict until the last couple of years.  I have
16  seen one incident which Tim Foote had came to me and
17  asked for advice so --
18      Q.  What is that incident you're thinking of?
19      A.  The incidents I know was there -- Neelam
20  was running a marketing conference in New York and
21  she was asking and reaching out to buy Cy and sell
22  Cy analysts of our investor base, which is the
23  responsibility of Tim Foote, who is the led of
24  investor relations, and Tim took it really
25  negatively and felt that, you know, Neelam should --



Page 50

1    ATTORNEY TARTAGLIO:
2    Q. And I'll ask some more specific questions
3  now -- maybe that will help.
4    Did you ever see Miss Sandhu yell at anybody?
5    **A. Not that I recall, no.**
6    Q. Did you ever see Miss Sandhu insult
7  somebody to their face?
8    **A. No.**
9    Q. Did you ever see Miss Sandhu act in a way
10 that you thought was very disrespectful?
11   **A. No, no, I would have pointed out -- no.**
12   Q. Did anyone ever talk to you about -- and
13 this could be Miss Sandhu, it could be anyone
14 else -- but did anyone ever talk to you about what
15 might happen to her within the company after you
16 left?
17   **A. I don't recall who, but yes, it did come up**
18 **one -- one time in conversation.**
19   Q. What do you recall from that conversation?
20   **A. That after I left that Neelam will probably**
21 **not far behind in leaving.**
22   Q. And are you able to remember who said that?
23   **A. No, it actually could be a privilege**
24 **information, too.**
25   Q. Did --

Page 51

1    ATTORNEY LAVOIE: And just to interject here, I
2  think -- I'm trying to be helpful here, Tony, and
3  also to the witness.
4    So, Mr. Chen, the company has produced
5  documents involving Rich Curiale in which he was
6  essentially serving in a role as, like, a quasi
7  executive coach for Neelam in the spring of 2023,
8  especially, and so to the extent that that was a
9  comment or a discussion that you had with Rich
10 Curiale about whether, you know, Neelam would stay
11 at the company after you left or conversations
12 around whether she should accept the CMO position --
13 those are things I'll ask you about and I'll show
14 you some documents about those things -- so I don't
15 want to inhibit your from testifying.
16   BlackBerry has taken a position that -- that
17 those types of communications were not privileged
18 since Mr. Curiale was not relaying legal advice.
19   So if that -- if that changes any context --
20 you may have been thinking about something else --
21 but I just wanted you to be aware of that so as to
22 not inhibit your answers to plaintiff's counsel's
23 questions while, you know, answering my questions
24 later on.
25   THE WITNESS: Yeah -- yes, that was the

Page 52

1  privilege I was referring to. I use Richard Curiale
2  in a legal capacity. I was surprised that that
3  privilege has been lifted, but that said, that was
4  the comment that came from and I heard -- and I
5  heard that from Richard.
6    ATTORNEY TARTAGLIO:
7    Q. Did Mr. Curiale explain the basis for that
8  opinion?
9    **A. He did not.**
10   Q. What was your interpretation, if any, of
11 why he made that remark?
12   **A. Well, it was purely an interpretation on my**
13 **part, but I just assume that because Neelam has some**
14 **conflict working with people like John Giamatteo and**
15 **et cetera that -- that it's not going to be very**
16 **positive environment after I left.**
17   Q. To your knowledge, did Mr. Curiale ever
18 work with Miss Sandhu in sort of a coaching role, as
19 opposed to providing legal advice?
20   **A. I know they get along well and I know**
21 **Neelam things highly of Richard's thoughts and**
22 **comments and suggestions, so in that sense it was**
23 **not a official executive training role, but it was**
24 **more of, you know, Neelam needs somebody's help to**
25 **talk through situation and give her advice and I**

Page 53

1  thought since Neelam accepts Richard's comments and
2  advice readily it was useful for them to have
3  discussion, but it was not a -- a BlackBerry
4  assigned role, if that makes sense to you.
5    Q. Do you know whether Mr. Curiale ever
6  investigated a complaint that Miss Sandhu had made
7  about the company or a co-worker?
8    **A. I -- I need counsel's advice on this. This**
9  **is --**
10   ATTORNEY LAVOIE: You can -- you're permitted
11 to answer that question.
12   THE WITNESS: Could you please repeat the
13 question so I get it right.
14   ATTORNEY TARTAGLIO: Yes.
15   Q. My question is, do you know whether Mr.
16 Curiale ever investigated a complaint made by Miss
17 Sandhu about one of her co-workers?
18   **A. You have to be more specific. I -- I don't**
19 **know. It is not -- anybody could pick up the phone**
20 **and call Richard Curiale, who is on retainer to our**
21 **company that you have to -- any investigation that**
22 **we ask Richard to do -- Mr. Curiale to do -- has to**
23 **come through either human resources or myself**
24 **directly.**
25   **So I -- I'm -- I can't believe that he would**



Page 54

1  investigate something based on Neelam's telling him
2  to do that, or asking him to do that.
3      Q.  Do you know whether Mr. Curiale ever
4  investigated some complaints that Miss Sandhu had
5  made about Mr. Giamatteo?
6      A.  I don't know.
7      Q.  Did you ever use Mr. Curiale as an
8  executive coach for your own purposes?
9      ATTORNEY MALDONADO:  Objection.  Relevance.
10     ATTORNEY LAVOIE:  Objection.  Vague.
11     THE WITNESS:  Yeah.  I could answer that, but
12  no.
13     ATTORNEY TARTAGLIO:
14     Q.  Do you know who Nita White-Ivy is?
15     A.  Yes.
16     Q.  Who is Nita White-Ivy -- I guess what was
17  she -- what was her role at BlackBerry?
18     A.  She was the head of human resources.
19     Q.  Do you know why she left BlackBerry?
20     A.  Oh, she was way past her retirement --
21  retirement reason.
22     Q.  Do you know whether she had any sort of
23  clause in her contract that mentioned your
24  departure?
25     A.  I believe so, yes.

Page 55

1      Q.  What's your understanding of that?
2      A.  When I recruited her in the early 20- -- in
3  2013 when I first came -- to come in and help me to
4  turn the company around, a number of executive at
5  that time in order to convince them to come to a
6  situation that is very fluid that they came to
7  support me and we have to put in the contract that
8  if they no longer report to me they have the ability
9  to exercise their contract for a severance payment.
10  Only a handful of people has it.  Only a
11  handful of very long-term that came in with me had
12  it and so that's the sum total that I remember.
13     Q.  Do you know whether Miss White-Ivy resigned
14  from the company, as opposed to being fired?
15     A.  Yes, she --
16     ATTORNEY LAVOIE:  Objection.  Lacks foundation.
17     THE WITNESS:  She exercise the clause -- the
18  clause in the -- in the agreement -- employment
19  agreement per what I just said.
20     ATTORNEY TARTAGLIO:
21     Q.  How did you come to learn that Miss
22  White-Ivy had exercised that clause?
23     A.  She told me she was going to do it.
24     Q.  So is it fair to say that Miss White-Ivy
25  was not terminated from BlackBerry?

Page 56

1      A.  No, not that I know of.
2      ATTORNEY LAVOIE:  Objection.  Lacks foundation.
3      THE WITNESS:  Yeah, not that I know of.
4      ATTORNEY TARTAGLIO:
5      Q.  Who is Mark Wilson?
6      A.  Our Chief Marketing Officer.
7      Q.  And at some point Miss Sandhu became Chief
8  Marketing Officer; correct?
9      A.  At the -- at the end of -- close to the end
10  of 2023, yes.
11     Q.  What happened to ████████ role after
12  Miss Sandhu became Chief Executive -- or Chief
13  Marketing Officer?
14     A.  ████████████████████████████
15  ████████████████████████████████████.
16     Q.  Was there a -- well, strike.
17  What was ████████ position before he
18  retired?
19     A.  ████████████████ -- oh, sorry,
20  sorry.  ████████████████████████████
21  ████████████████████████████████████
22  ████████████████████████████████████████
23  ████████████████████████████████████
24  ████████████████████████████████████
25  ████████████████████████████

Page 57

1      THE WITNESS:  Oh, Project Imperium.
2  Thank you.
3      ATTORNEY TARTAGLIO:
4      Q.  What was the gist of what Project Imperium
5  was hoping to accomplish?
6      A.  To come up with means to enhance the
7  shareholder value.
8      Q.  And was that project successful, do you
9  think?
10     A.  I think it came to a conclusion that was
11  logical, and yes, in that sense it was successful.
12     Q.  What was the conclusion it reached?
13     A.  At the time we were going to split the
14  company into two pieces and let both of them become
15  public after a certain period of time and so that
16  was the -- that was the outcome.
17     Q.  And did the company BlackBerry eventually
18  split off in the way you just described?
19     A.  It's speculation on my part, but after I
20  left it seems to have went a different direction.
21     Q.  And from what you've seen in the news and
22  so forth, is BlackBerry still one company?
23     ATTORNEY LAVOIE:  Objection.  Lacks foundation.
24     THE WITNESS:  Yeah, this is not something that
25  I have any credibility in answering.  I'm no longer



Page 58

1  in the board room.  I haven't -- this is -- this is
2  something you have to ask the company.
3      ATTORNEY TARTAGLIO:
4      Q.  Did ████████ talk to you about his
5  leaving the company?
6      A.  Talk to me?
7      Q.  Well, let me put it this way -- did ███
8  ████ express to you that he wanted to leave the
9  company?
10     A.  Yes, as I said earlier in 2022 he wanted to
11 plan an exit from the company and went into
12 retirement, which he did.
13     Q.  And how do you know that -- well, let me
14 first ask -- do you know whether ████████ retired
15 as opposed to being terminated?
16     ATTORNEY LAVOIE:  Objection.  Lacks foundation.
17 Calls for speculation.
18     THE WITNESS:  He retired.
19     ATTORNEY TARTAGLIO:
20     Q.  And how do you know that ████████
21 retired, as opposed to being terminated?
22     A.  I was --
23     ATTORNEY LAVOIE:  Objection.  Lacks foundation.
24 Calls for speculation.
25     THE WITNESS:  I was still here, I mean, I

Page 59

1  assume this conversation -- it's leading to some
2  point, right -- ████████████████████████████
3  ██████████████████████████████████████████
4  ██████████████████████████████████████████████
5  ████████████████████████████████████████████████
6  ██████████████████████████████████████████████
7  ██████████████
8      So the arrangement were made and everyone was
9  behind it so I'm not -- I'm not quite sure where
10 this conversation is leading.
11     Q.  What I'm getting at is that there were
12 several people who left the company around the time
13 Miss Sandhu left and I'm trying to see if they left
14 voluntarily or left involuntarily -- if you know --
15 maybe you don't know -- but I'm trying to learn
16 whether that's something you know.
17     And ████████ one of those people and so
18 what I'm getting at is, did he leave voluntarily,
19 did he leave involuntarily -- and maybe you don't
20 know and that's fine -- but I'm just trying to see
21 if that's something that you know.
22     ATTORNEY LAVOIE:  Objection.  Lacks foundation.
23 Calls for speculation.
24     THE WITNESS:  I think you need to ask the
25 company on that one because, you know, I already

Page 60

1  left.
2      ATTORNEY TARTAGLIO:
3      Q.  And earlier we talked about ████
4  ████████ -- I had similar lines of questioning
5  about that -- ████████████████████████████████
6  ██████████████████████████████████████████
7  ████████████████████████████
8  ████████████████████████████████████████
9  ██████████████████████████████████████████████
10 ████████████████████████████████████████████
11 ██████
12     ATTORNEY LAVOIE:  Objection.  Vague.
13     THE WITNESS:  No, again, you have to ask the
14 company.  This is after I'm -- I was gone.
15     ATTORNEY TARTAGLIO:
16     Q.  As project -- as part of Project Imperium,
17 was there some discussion about removing some of the
18 management positions that covered both the Cyber
19 Business Unit and the Internet of Things Business
20 Unit?
21     ATTORNEY LAVOIE:  Objection.
22     THE WITNESS:  There was -- there was a
23 recognition that when the company split into two
24 pieces management shuffling is going to happen, but
25 there was never a discussion of any details beyond

Page 61

1  that statement.
2      ATTORNEY TARTAGLIO:
3      Q.  So did anyone discuss eliminating the Chief
4  Marketing Officer role as a result of the company's
5  submitting up?
6      A.  Not with me, no.
7      Q.  Did anyone mention that Miss Sandhu's
8  position might become redundant in Project Imperium
9  were to go forward?
10     A.  Not with me, no.
11     Q.  Were there -- was there -- were there
12 discussions about any other specific position that
13 might become redundant if the company were to split
14 into two?
15     A.  Again, let me repeat, there was a
16 recognition that when we split the company there
17 will be management reshuffling -- oh, and by the
18 way, it was not always about redundancy -- because
19 now we have two companies and technically there are
20 position that will have to be created.
21     So -- but there was no discussion on which
22 position, who, where, when of any sorts -- with me.
23     Q.  What was the strategic thinking as to why
24 Project Imperium would be beneficial to the
25 company -- so, in other words, why would it be a

Page 62

1  good idea to split the company up?
2      ATTORNEY LAVOIE:  Objection.  Relevance
3  advance.
4      THE WITNESS:  Yeah, I'll answer the question,
5  but there is a level of relevancy, that's correct.
6      It hopefully will create more values in the
7  eyes of the investors who would prefer to invest in
8  one piece of business versus the other.
9      ATTORNEY TARTAGLIO:
10     Q.  And those two businesses -- I think we've
11  kind of discussed this in passing -- but what would
12  those two businesses have consisted of?
13     A.  One is the IoT business or QNX,
14  particularly very focused on auto -- automotive
15  space.
16     The other one is cybersecurity.
17     Q.  And for the QNX, what kind of automotive
18  products did BlackBerry sell?
19     A.  The software that managed the operating
20  systems of how a -- how a car operates inside --
21  inside the engine.
22     Q.  Did you ever talk with Miss Sandhu about
23  what you might be doing after you left the company?
24     A.  No.  I was going to retire.
25     Q.  Did she ever talk to you about what she

Page 63

1  might do after you left the company?
2      A.  No, never did.
3      Q.  Do you consider yourself to be friends with
4  Miss Sandhu?
5      A.  I don't see why not.
6      Q.  Do you ever socialize together since you
7  left the company?
8      A.  No, we have not.
9      Q.  When you were at the company together would
10  you socialize outside of the work context, for
11  example, go to a party that was not strictly a work
12  party?
13     A.  No, not that -- no.
14     Q.  Do you -- do you consider John Giamatteo to
15  be a friend of yours?
16     A.  No.
17     Q.  Did you ever socialize with him outside of
18  the work context?
19     A.  No.
20     Q.  Did John Giamatteo ever ask you to move the
21  elite customer function to John Giamatteo's business
22  unit?
23     A.  Don't recall.  Even if he had it -- it --
24  it's go against the principle of why we need the
25  elite program per the earlier conversation we had.

Page 64

1  So I wouldn't support it.
2      Q.  Did you and John Giamatteo ever talk about
3  Neelam's title -- what the title of her job should
4  be?
5      A.  No.
6      Q.  Did John Giamatteo ever say that he would
7  be success -- he would be upset if the word
8  "success" were in her job title or not in her job
9  title?
10     A.  I don't remember that.
11     Q.  So, for example, did you have any
12  discussions about whether Neelam should be Chief
13  Elite Customer Success Officer versus Chief Elite
14  Customer Officer?
15     A.  It -- it did not leave an impression with
16  me, no.
17     Also, that's really the sole -- it's my sole
18  responsibility.  I don't feel anybody would come and
19  make those suggestions, but I could be wrong, but
20  no, I don't have the impression of it.
21     Q.  Did you ever discuss Miss Sandhu's
22  compensation with John Giamatteo?
23     A.  No.
24     Q.  Did you ever tell John Giamatteo -- well,
25  strike that.

Page 65

1      Did you ever tell Miss Sandhu that John
2  Giamatteo was upset that she had gotten the Chief
3  Marketing Officer role?
4      A.  No.
5      Q.  Did John Giamatteo ever tell you that it
6  might cause problems if Miss Sandhu got a salary
7  increase?
8      A.  No, and I know the counsel wouldn't want me
9  to say this, but it's none of his business.
10     Q.  Did John Giamatteo make more money in his
11  position than Miss Sandhu did?
12     A.  Yes.
13     Q.  What were the factor -- well, strike that.
14     Who decided how much Neelam -- Miss Sandhu --
15  should have been compensated?
16     A.  Every year in September prior to the
17  September board meeting the company, headed by the
18  head of human resources, with external help and
19  consultants from time to time, we go through every
20  single direct report of mine, we analyze their
21  performance, their role, we compare that with
22  outside organizations -- consulting firms data like
23  Radford, Parents -- ***Tower Parents -- and we do a
24  compensation analysis and then on top of that then
25  we do a compensation adjustment if needed that ties

Page 66

1  to a performance individual, as well as the
2  performance of the company.
3      And then that got rescinded by individual to
4  the board of directors that is outside myself --
5  because I'm a inside person -- and then the board --
6  the independent board of directors will make their
7  determination whether they will accept the assessed
8  recommendations.  And so that's the process.
9      So it's not just a one person thing about oh,
10  we do a salary increase and so forth.  It's a --
11  it's a very programmatic thing that is very much
12  defendable and in how these numbers got arrived.
13      Q.  To your knowledge, was Miss Sandhu paid
14  less than Mr. Giamatteo?
15      A.  I already answered -- yes.
16      Q.  Why is it that Mr. Giamatteo was paid more?
17      ATTORNEY MALDONADO:  Objection.  Foundation.
18      THE WITNESS:  Experience, scope are the two
19  reasons normally.
20      ATTORNEY TARTAGLIO:
21      Q.  And by "scope," what do you mean by that?
22      A.  John Giamatteo has a much bigger target in
23  terms of total revenue targets, as well as the scope
24  of the organization.
25      Q.  And you alluded to experience.

Page 67

1      Did Mr. Giamatteo have more experience than
2  Miss Sandhu?
3      A.  I believe so, yes.
4      Q.  Was Mattias Eriksson paid more than Miss
5  Sandhu?
6      A.  I don't know now.  Those you have to ask
7  the company.  I'm sure you have the records.
8      Q.  Mark Wilson was the Chief Marketing Officer
9  before Miss Sandhu took on that role; right?
10      A.  Yes.
11      Q.  Do you know whether Mark Wilson was paid
12  more than Miss Sandhu when he was in that role?
13      A.  I don't know.  You have -- you really need
14  to go back to the company and ask for those
15  information.
16      Q.  If Mark Wilson were paid more as Chief
17  Marketing Officer than Miss Sandhu was, are you
18  aware of any reason why that might be the case?
19      ATTORNEY LAVOIE:  Objection.  Lacks foundation.
20  Calls for speculation.
21      THE WITNESS:  You have to go back to the
22  company.  If you're very interested in the analysis
23  you have to go back to the company and get the
24  analysis from human resources.
25  ///   ///   ///

Page 68

1      ATTORNEY TARTAGLIO:
2      Q.  And if we did do that and we found that
3  Mark Wilson were paid more, would you have any
4  explanation for that?
5      ATTORNEY LAVOIE:  Objection.  Lacks foundation.
6  Calls for speculation.  Asked and answered.
7      THE WITNESS:  It's -- should not be answered by
8  myself.  I explained to you the process of the
9  company, how it's determined and the number of pair
10  of eyes that sees it.
11      This is not a -- an individual thing.  It is a
12  programmatic group thing and so you should not be
13  asking me to explain individual differences.
14      Does that make sense?
15      ATTORNEY TARTAGLIO:  Sorry -- I'm thinking
16  about my next question.
17      Q.  Did you overhear any -- aside from
18  potentially Miss Sandhu -- did you ever hear any
19  complaints about John Giamatteo -- the way that he
20  treated women?
21      A.  I heard that a issue came up right around
22  when I was leaving the company, I mean, literally,
23  like, within a week to ten days.
24      So yes, I did, but that's the sum total of
25  knowledge I have.

Page 69

1      Q.  And what's your knowledge of that
2  complaint?
3      A.  I was told that there was a whistleblower
4  email submitted to the -- in this case -- the audit
5  chair of the board of director and I was not copied
6  on it.
7      Q.  Do you know anything about how that
8  complaint was investigated?
9      A.  I believe that a law firm was hired to do
10  so.
11      Q.  As part of the investigation into that
12  complaint against John Giamatteo, did anyone reach
13  out to you?
14      A.  The law firm had reach out to me.
15      Q.  Were you interviewed as part of the
16  investigation?
17      A.  I was interviewed as part of the
18  investigation.
19      Q.  What sort of things were you asked about --
20  obviously, you can't be expected to remember
21  everything, but --
22      A.  I should not -- you know, unless -- unless
23  BlackBerry wants to waive that privilege, too.
24      ATTORNEY LAVOIE:  Yeah, you know, so -- so we
25  have waived privilege over the law firm



Page 70

1  investigation of that complaint, Mr. Chen, just in
2  an act of full transparency in response to Miss
3  Sandhu's allegations so you are perfectly free to
4  answer questions about questions that the law firm
5  asked you and your responses.  We have no objection
6  to that.
7      THE WITNESS:  Oh, no, no, no.  This is a
8  different issue.
9      ATTORNEY LAVOIE:  Oh.
10     THE WITNESS:  This is a different issue.  This
11 is the -- this is the issue of when I was leaving I
12 was aware of a letter -- a whistleblower letter --
13 that came in and went to our audit chair and that
14 was -- and I know the company want to do an
15 investigation.
16     The firm that was hired was Morrison &
17 Foerster.  I was interviewed by them relating to
18 that and then I should not answer anymore details of
19 that conversation.
20     By the way, to save you the trouble, I do not
21 know and nobody share with me the outcome, the
22 process because I already left the company.  So I
23 know nothing after that interview and nobody had
24 reach out to me and told me anything.
25     ATTORNEY LAVOIE:  And just to be really

Page 71

1  specific because I don't -- I don't want Tony to
2  think that we're getting in the way here, but we
3  have waived attorney-client privilege over the
4  Morrison & Foerster investigation.
5      So Miss Sandhu's counsel has a report, for
6  example, that Mo-Fo prepared, they have summarized
7  notes of various interviews, so you're not revealing
8  confidences, you're free to answer questions about
9  what you discussed with Mo-Fo.
10     THE WITNESS:  I don't remember what I discuss
11 with Mo-Fo, but I know it's kind of not much of
12 details and I know -- I know nobody had share with
13 me any reports so you will -- you know a lot more
14 than I do.
15     ATTORNEY MALDONADO:  Just for a clear record
16 for you, so given what Craig just mentioned you have
17 that liberty, let's have plaintiff's counsel ask his
18 questions and you give your responses.
19     THE WITNESS:  Uh-huh.
20     ATTORNEY TARTAGLIO:
21     Q.  Do you remember discussing Miss Sandhu with
22 Mo-Fo?
23     A.  No, I do not.
24     Q.  Do you remember discussing Mr. Giamatteo
25 with Mo-Fo?

Page 72

1      A.  Yes, I did because that was the -- what the
2  whistleblower complaint was about.
3      Q.  And what, if anything, do you remember
4  about discussing Mr. Giamatteo with Mo-Fo?
5      A.  That whether John Giamatteo have a
6  discrimination against women -- a gender
7  discrimination.
8      Q.  Did you see any evidence of that?
9      A.  No, I did not.
10     Q.  Other than this complaint that we were just
11 talking about, during your time at BlackBerry did
12 you become aware of any other complaints of
13 discrimination against women?
14     A.  This is about John Giamatteo or
15 everybody -- anybody else?
16     Q.  Yeah, I'm asking a broader question now,
17 which is, other than this complaint about John
18 Giamatteo, were you ever made aware of any other
19 complaints about alleged discrimination against
20 women within the company?
21     A.  No.
22     Q.  Other than this complaint against John
23 Giamatteo, were you ever made aware of any
24 complaints about potential sexual harassment going
25 on within the company?

Page 73

1      A.  Very rare -- very rare -- maybe -- but they
2  all go through human resources.
3      Q.  Did anyone ever tell you about allegations
4  that BlackBerry had a sexist culture?
5      A.  No.
6      Q.  What measures, if any, did BlackBerry take
7  to ensure that it was treating its female employees
8  fairly?
9      ATTORNEY LAVOIE:  Objection.
10     THE WITNESS:  That's very broad.  Very, very
11 broad and we empower human resources.  We have all
12 the governance trigger in place.  We have a direct
13 line to the board of directors and, particularly,
14 the audit committee, and so the answer to your
15 question, I have always been very sensitive about
16 any kind of discriminations whether it's race, age,
17 gender, religion of any sorts.
18     The company I ran normally don't ever have that
19 problem so -- and maybe it was because of the
20 empowerment of the different organization that could
21 go do their investigation, hire outside consultant
22 and counsel.
23     And every time that -- anything of that happen
24 it reports on a quarterly meeting to the board of
25 directors and an immediate escalation alert to the



Page 74

1    chairman of the audit committee.
2        So I am very proud of BlackBerry's records.
3    ATTORNEY TARTAGLIO:
4        Q.  Sometimes companies will hire an outside
5    consultant to do what they call a pay equity audit
6    to look at how much women make and how much men make
7    and see if there's any problems with that.
8        Do you know if BlackBerry ever conducted such
9    an audit while you were CEO?
10       A.  I am sure we have done that and part of the
11   reason why I'm sure we have done is because it's
12   different -- in a few years back different
13   organization, government -- sorry -- different
14   government around the world have asked for those
15   information as a matter of routine for every company
16   so -- but this -- these questions you have to refer
17   to either the legal -- legal team or the human
18   resources team.
19       Q.  Sometimes a company will have a position
20   within management that's a focused on diversity or
21   inclusion or equity -- they go by various names --
22   could be equity inclusion officer or ESG officer --
23   well, maybe those are different concepts -- but
24   let's focus on the DEI -- and you know what I mean
25   when I say DEI?

Page 75

1        A.  (Witness nods head).
2        Q.  Okay.  The witness is nodding his head.
3        Did BlackBerry while you were CEO ever have a
4    management position that was focused on diversity,
5    equity or inclusion?
6        A.  No, we do not have a DEI officer, if that's
7    what you're asking.
8        Q.  And there's another concept a little bit
9    different, but kind of similar for ESG,
10   environmental social governance -- that might be
11   right -- I don't know -- does that sound right to
12   you?
13       A.  Uh-huh, yeah, I know what you're referring
14   to.
15       Q.  And while you were CEO did BlackBerry ever
16   have an officer whose full-time responsibilities
17   were ESG issues?
18       A.  No, we don't.  We typically put that under
19   the finance organization.  The CFO is responsible
20   for filing the ESG report.
21       Q.  For this next question -- maybe you have
22   knowledge about this, maybe you don't -- so if you
23   don't know you can say don't know.
24       Who fired Neelam Sandhu?
25       A.  I don't know.

Page 76

1    ATTORNEY LAVOIE:  Objection.  Lacks foundation.
2    Calls for speculation.
3    ATTORNEY TARTAGLIO:
4        Q.  Did anyone ever tell you why Miss Sandhu
5    was fired?
6        A.  Nobody discuss anything of that sort with
7    me.
8        Q.  Did you ever consider firing Miss Sandhu
9    when you were CEO?
10       A.  No, I never did consider firing her.
11       Q.  Do you think that it was a net benefit to
12   the company to fire Miss Sandhu?
13       A.  Speculation.  I shouldn't speculate
14   whatsoever.
15       Q.  Did you ever speak with anyone within the
16   company about potentially firing Miss Sandhu?
17       A.  No.
18       Q.  Did anyone ever suggest that she should be
19   fired?
20       A.  Not directly to -- I mean, not to me.
21       Q.  Did anyone ever suggest to you that Miss
22   Sandhu should have been demoted?
23       A.  No.
24       Q.  Did anyone ever suggest to you that Miss
25   Sandhu should ever be subjected to any sort of

Page 77

1    discipline within the company?
2        A.  No.
3        Q.  Did you ever speak with Richard Lynch about
4    whether Miss Sandhu should be fired?
5        A.  No.
6        Q.  So when -- before Mr. Lynch became the
7    interim CEO he was the chairman of the -- well, I
8    should not assume that.
9        Before Mr. Lynch became interim CEO, what's
10   your understanding of what his relationship was with
11   the company?
12       ATTORNEY LAVOIE:  Objection.  Asked and
13   answered.
14       THE WITNESS:  Lynch -- Dick Lynch was on our
15   board.
16       ATTORNEY TARTAGLIO:
17       Q.  And how frequently would the board of
18   directors interact with Miss Sandhu, meaning, like,
19   have a phone call with her, be in a meeting with
20   her -- that sort of thing?
21       A.  I do not keep track of those things.
22   Individual board member -- they all are free to
23   reach out to any of my direct reports in the company
24   at any time without having to go through me or
25   update me, for that matter so I -- I wouldn't know.



Page 102

1    A.  Okay.

2    Q.  So sometimes a witness will read a document
3  and say oh, yeah, I remember this and sometimes they
4  read a document and they say I see the words here,
5  it looks like I wrote them, but I honestly don't
6  remember what this is all about.

7    So sitting here today do you remember what this
8  dispute was being referred to in Exhibit 6?

9    A.  This dispute regarding that Neelam
10  suggested that she either didn't or seldom get
11  invitation from John Giamatteo to their -- to his
12  weekly team meeting where John Giamatteo suggests
13  differently.

14    Is that what you're referring to?

15    Q.  That's right.

16    A.  Yes, I remember the conversation.  I
17  believe that earlier in my testimony I highlight --
18  I talk about that, too.

19    Q.  Does reviewing this document refresh your
20  recollection as to the conversations you had with
21  Miss Sandhu about --

22    A.  I'm not -- I mean, again, it's consistent
23  with what I understood and I knew there was a
24  conversation and I asked them -- I asked Neelam to
25  go work it out with John Giamatteo because I think

Page 104

1  they go up here, so they're printed out in reverse
2  chronological order.

3    A.  Okay.

4    Q.  So it's fair to say that Miss Sandhu here
5  is making a report to you about how she feels as
6  though she's being excluded from some discussions
7  going on; is that right?

8    A.  Yes.

9    Q.  And do you remember talking with Mr.
10  Enterkin about this?

11    A.  No, I don't remember talking to him.  I may
12  have, but --

13    Q.  Do you remember generally any discussions
14  you had with Mr. Enterkin about his collaboration
15  with Miss Sandhu?

16    A.  Well, you know, I have to say something
17  here.  See, I'm not quite sure where we're going
18  with this because as CEO it's -- I really don't have
19  time every day to go figure out who should talk to
20  who and include who's in what.

21    This needs to be, you know, discussed and
22  worked out among themselves.  As I've said, these
23  are all senior level people.  I really don't have
24  the bandwidth to deal with it, so I'm very doubtful
25  that I would pick up the phone and call Adam who, by

Page 103

1  at this level both of them should be capable of
2  getting this thing resolved.

3    Q.  And other than what you just discussed, do
4  you recall if you did anything else in response to
5  receiving this email from Miss Sandhu?

6    A.  No.  I probably had raised that with John
7  Giamatteo in our one-on-one conversation -- those
8  things -- it's normally covered in my one-on-one
9  conversation with individuals.

10    And, again, if I had that conversation with
11  John I -- the whole conversation would be the same
12  as with Neelam, which is please work with Neelam to
13  resolve this -- to get to the bottom of it and to
14  resolve this because their understanding is exactly
15  opposite to each other.

16    ATTORNEY TARTAGLIO:  Let's go to Exhibit 7.

17        (Whereupon, Plaintiff's Exhibit No. 7 was
18        marked for identification.)

19    ATTORNEY TARTAGLIO:  For the record, this
20  starts at Bates page 877 -- oh, it's just one page.
21  That's -- that's it.

22    So here I'll scroll up like this.

23    Why don't you take a few moments to read
24  this -- and the way these print out is they start at
25  the bottom here and then they go up here and then

Page 105

1  the way, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, but if I
2  happen to have a conversation with Adam it happened
3  to come up and I may have said something, but,
4  again, you know, every time I repeat something he
5  said, she said, you know, it create more problem
6  than it's help to solve.

7    Does that make sense to you?

8    Q.  Yeah.

9    And it might be helpful to clarify that we all
10  understand that as CEO there's a lot of things going
11  on that you were not aware of that you don't
12  remember here today, and that's fine.

13    So if you don't remember --

14    A.  Yes.

15    Q.  -- the follow-up --

16    A.  I don't -- I don't remember and this --
17  again, this -- I would not put it on my top ten
18  things to do.

19    Q.  And can you -- other than what we discussed
20  generally -- namely your conversations with people
21  about how they should work it out -- do you recall
22  doing anything else in response to this email from
23  Miss Sandhu talking about her interactions in this
24  email here?

25    A.  No, I don't recall.



1    ATTORNEY TARTAGLIO:  Let's to Exhibit 8 now.
2  This starts at page 11448 and goes to page 11449.
3        (Whereupon, Plaintiff's Exhibit No. 8 was
4        marked for identification.)
5    ATTORNEY TARTAGLIO:
6    Q.  And this is the first email.
7    You can let me know when you're done reading
8  this.
9    A.  Uh-huh.
10   Q.  And, then, it's a little hard to see here
11 so I'll zoom in.
12   A.  Uh-huh.  Okay.
13   Q.  And so this document appears to be a
14 succession plan; is that correct?
15   A.  Uh-huh, that is correct.
16   Q.  And who was scheduled to succeed you?
17   A.  To -- yeah, John -- John Giamatteo.
18   Q.  And there's --
19   A.  Or something from the outside.
20   Q.  And were there any conversations that you
21 had about who from the outside would be a potential
22 successor if John Giamatteo was not going to be the
23 successor?
24   A.  No, that's a determination by the board if
25 they want to do that.  This is a presentation to the

1  board.
2    Q.  And down here Mark Wilson, corporate
3  marketing, so was that functionally a CMO type role?
4    A.  Yeah, correct.
5    Q.  And Kevin Easterwood is listed here as
6  being one potential successor?
7    A.  Uh-huh.
8    Q.  Do you know why ████████████ ended up
9  not taking over as Chief Marketing Officer?
10   A.  Because I have a different -- by that time
11 I -- when ████████████████ I came
12 up with a different organization thought.
13   Q.  And what was that organizational thought?
14   A.  Because ████████████ I wanted to
15 create an organization that has less conflict
16 between John Giamatteo and Neelam Sandhu and I
17 thought I will give Neelam the opportunity to become
18 the CMO and thereby will change the scope of the
19 elite -- the number of elite's account -- and so
20 that was the new organization thinking I have to
21 help smooth some of the waters and take advantage of
22 two talents.
23   Q.  And the two talents would be?
24   A.  John Giamatteo and Neelam Sandhu.
25   ATTORNEY TARTAGLIO:  Let's go to Exhibit 9.

1        (Whereupon, Plaintiff's Exhibit No. 9 was
2        marked for identification.)
3    ATTORNEY TARTAGLIO:
4    Q.  So this starts at page 12725 and goes to
5  12726.  So go ahead and -- and I'll start it from
6  the bottom here.
7    Let me know when you're ready for me to scroll
8  up.
9    A.  Send it from whom?  Oh, from Neelam to
10 Nita.  Okay.
11   Q.  And -- oh, I'll scroll up so you can see
12 this up here.
13   A.  Okay.
14   Q.  And I'm not going to ask you about the
15 redacted box, but do you remember receiving this --
16 this email from Miss Sandhu?
17   A.  Me?
18   Q.  Yes.
19   A.  I don't know.  I don't seem like I'm on the
20 CC list.  Oh, I'm here.  Okay.  Okay.
21   I don't recall, but since I'm on the CC list I
22 must have received it.
23   Q.  And do you recall what was done by
24 BlackBerry in response to receiving this email from
25 Miss Sandhu?

1    A.  I thought Nita was investigating it -- no?
2    Q.  Well, I'm curious as to what you recall
3  happening.
4    A.  I don't --
5    Q.  Other than perhaps Nita investigating this,
6  do you know if anything else was done in response to
7  this email from Miss Sandhu?
8    A.  No, I'm sure Nita's investigating it and I
9  normally don't -- unless something comes up that she
10 will come -- Nita will come update me.  No, I
11 normally don't do anything about it.
12   ATTORNEY TARTAGLIO:  Let's go to Exhibit 10.
13       (Whereupon, Plaintiff's Exhibit No. 10 was
14       marked for identification.)
15   ATTORNEY TARTAGLIO:
16   Q.  This is a one-page email at Bates No.
17 12141.
18   A.  Okay.
19   Q.  And so this appears to be an email from
20 Richard Curiale to Neelam Sandhu; is that right?
21   A.  Uh-huh.
22   Q.  And the witness said yes, for the record.
23   A.  Yes, uh-huh.
24   Q.  Do you have any reason to doubt that this
25 is an authentic copy of the BlackBerry email?



Page 110

1    A.  No, I -- no reason to doubt it.

2    Q.  And Mr. Curiale says "I spoke to John Chen

3  regarding what I thought was a very constructive

4  dialogue we had at lunch."

5    Do you remember this conversation that Mr.

6  Curiale is referring to?

7    A.  Yes, I -- I do remember.

8    Q.  What do you remember from that?

9    A.  I remember that it's from his report that

10  he had a good lunch with -- with Neelam.

11    Q.  Okay.

12    And then there's a reference to "two separate

13  groups each having exclusive jurisdiction over their

14  respective clients."

15    Do you see that?

16    A.  Yeah.

17    Q.  Did that ever come -- come to pass?

18    A.  I believe so.  I believe that's part of the

19  CMO shift that we were talking about earlier.

20    Q.  And then Mr. Curiale goes on to say "John

21  would like you to offload a number of your current

22  clients and replace them with a larger group of win

23  back targets."

24    What is a win back target?

25    A.  Major accounts that we already lost.

Page 111

1    Q.  So the win back targets are companies that

2  were once BlackBerry customers that BlackBerry is --

3  would like to recover as clients?

4    A.  Uh-huh, correct.

5    Q.  And was it -- or strike that.

6    Were you in agreement with the idea of

7  offloading some of Miss Sandhu's current clients and

8  giving her some win back targets?

9    A.  Yes, I came up with that idea.

10    Q.  And this last sentence says "I think this

11  will really challenge you" and it goes on for a bit.

12    Do you think it was a challenge for Miss Sandhu

13  to be given a list of win back clients as opposed to

14  current clients?

15    A.  Yes, win back is always difficult.

16    Q.  And this is probably pretty obvious to you,

17  but for the benefit of the jury, why is a win back

18  target more difficult than servicing a current

19  customer?

20    A.  Because winning back in pride you have to

21  replace something that's already in store that was

22  just replaced you so, you know, that would require

23  quite a bit of work and not to say -- not to, you

24  know, mention political -- politicalness of the

25  account inside the account who had made a

Page 112

1  determination to move away from us, so to win back

2  causes some operational challenges, causes some

3  political challenges at the account so it's not

4  easy.

5    So the competitor has to stumble, has not, you

6  know, has to not be able to deliver per their will

7  promises for somebody who say, okay, we're going --

8  we going to go back to BlackBerry.  So it is a

9  challenge.

10    Q.  So based on this email here, was the plan

11  to give John Giamatteo some existing clients and to

12  then give Miss Sandhu some win back targets?

13    A.  Yes, that's correct.

14    Q.  And do you recall if that plan was ever

15  ultimately implemented?

16    A.  I don't -- I don't recall because shortly

17  after when this happened with the CMO change shortly

18  after I was leaving.

19    ATTORNEY TARTAGLIO:  We'll turn now to

20  Exhibit 11, which is produced at Bates No. 12835.

21    (Whereupon, Plaintiff's Exhibit No. 11 was

22    marked for identification.)

23    ATTORNEY TARTAGLIO:

24    Q.  So take a look at this then I'll ask you a

25  couple of questions about it.

Page 113

1    ATTORNEY LAVOIE:  How much more do you have,

2  Tony?

3    ATTORNEY TARTAGLIO:  Depends on how fast we'll

4  go, but you have the exhibits.

5    ATTORNEY LAVOIE:  You're saying you -- how many

6  more do you intend to ask about?

7    ATTORNEY TARTAGLIO:  Well, the other ones that

8  are in the document I sent around this morning.

9    ATTORNEY LAVOIE:  You don't have -- you can't

10  tell me the number?

11    ATTORNEY TARTAGLIO:  Okay.

12    Well, the witness is reading, but I can scroll

13  through and count it.  I think it's maybe 19

14  exhibits, something like that.

15    ATTORNEY LAVOIE:  Okay.

16    I'm just pointing this out because I think we

17  share an objective that we're going to split the

18  time evenly and that we're also going to get Mr.

19  Chen out of here by 4:00 when he has a hard stop; is

20  that right?

21    ATTORNEY TARTAGLIO:  Well, I don't think we

22  ever agreed to splitting the time equally because

23  I'm covering a lot of ground, like, I don't think

24  there's going to be that much follow-up, but I'm

25  moving pretty fast, I think.



Page 114

1    ATTORNEY LAVOIE:  Okay.
2    Well, I don't -- you know, I don't want you
3  guys to be the reason why Mr. Chen has to come back
4  another day, you know, I'm going -- I'm not going to
5  waste any time -- certainly not like what we've seen
6  so far -- so I would suggest that you move it along
7  faster than you've been.
8    THE WITNESS:  Okay.
9    I read it.
10   ATTORNEY TARTAGLIO:
11   Q.  And so this appears to be an email from
12  yourself to Richard Curiale; correct?
13   A.  Uh-huh.
14   Q.  And is this narrative something that you
15  wrote or is this a narrative that you're passing on
16  that someone else wrote?
17   A.  This is from Neelam.
18   Q.  And so this paragraph you're forwarding a
19  report from Miss Sandhu over to Mr. Curiale; is that
20  right?
21   A.  Yeah -- well, it's not a report -- a email
22  that she send me that I forwarded to Richard.
23   Q.  And do you recall discussing this with Mr.
24  Curiale?
25   A.  Not discussing the email itself, I mean,

Page 115

1  we -- we -- we both realize that there is a lot of
2  emotion in this email, but it really did cross the
3  line, I mean, it's -- it's something that I felt
4  very uncomfortable about.
5    Q.  And why is that?
6    A.  Well, it's, you know, accusing for the
7  benefit, "sacrificing by you for the benefit of new
8  people who you don't know and haven't been loyal to
9  you haven't done a good job."
10   I mean, I disagree any decision I made is
11  unbalance what I believe is the best for the
12  company -- for the business.
13   This is not about a personality thing, about,
14  you know, only loyalty.  Loyalty is a part -- it is
15  a part -- but it's also the structure of the
16  organization, the implication to the organization,
17  the going forward plan -- there's a whole bunch of
18  reasons behind it.
19   You have to take a total package.  It's not as
20  simple as -- as a, you know, single -- single item.
21  You have to take the good and the bad and everything
22  else.  And I do disagree with the fact that I
23  sacrifice people for the benefit of these new
24  people.  I don't know what sacrifice means, but --
25  but, anyway, so that was -- that was the reaction,

Page 116

1  but instead of me reacting to it I like Richard to
2  address it.
3    Q.  Do you remember having a conversation with
4  Miss Sandhu about this email here?
5    A.  No, because I -- I believe that -- no, I
6  don't remember, but I doubt very much I would
7  escalate by having a conversation with her about
8  this.  That's -- that's usually my style.
9    ATTORNEY TARTAGLIO:  Let's turn to Exhibit 12.
10   (Whereupon, Plaintiff's Exhibit No. 12 was
11   marked for identification.)
12   ATTORNEY TARTAGLIO:
13   Q.  And this one -- you might want to just look
14  at the version I emailed to you because there's
15  quite a bit going on here.
16   Really, I'm interested in the first two pages,
17  but if you'd like to read the whole thing --
18   A.  No, I don't need to read the whole thing.
19  Let's just go back to the first two pages.
20   Q.  Sure.
21   And let me know when you'd like me to scroll
22  up.
23   A.  Okay.
24   You could scroll up.  Okay.  Okay.  Okay.
25  Okay.

Page 117

1    Q.  So I think it's fair to say that Exhibit
2  12 -- which begins, by the way, at Bates No. 9916 --
3  this email chain has some conversations with you and
4  Mr. Giamatteo about some conflict that he was having
5  with Miss Sandhu; is that right?
6    A.  Yes, yes, yes.
7    Q.  And if you look at the bottom of the first
8  page you write "John," comma, "I see both sides
9  contribute to the problem," and then it goes on for
10  a little bit there.
11   What did you mean by both sides contributing to
12  the problem?
13   A.  Both sides meaning the -- the elite side
14  and the sales side -- the Cybersecurity Business
15  Unit.
16   I mean, in general, I, you know, you're going
17  around in circles, okay, so we -- we spoke about the
18  fact that Neelam's contribution is a net positive to
19  the company -- not without conflicts with other
20  people and other organization -- and so all I could
21  do is to try to preserve their ability to contribute
22  to the BlackBerry -- the company -- and create a
23  better environment so they won't have that many
24  conflict.
25   In the case of sales, it was the most difficult

Page 118

1  because functionally they overlap and it also have
2  some implication -- directly or indirectly to
3  compensations so -- and that's what you're
4  witnessing -- and, honestly speaking, you know, I
5  got upset about the fact that senior people should
6  think about a company first and less about, you
7  know, I win, I lost, you know, I lose face, you
8  know, this, that, and the other.
9      And I kind of took a look at both organization.
10  They both have some responsibility to bare.
11      Q.  And would you agree -- well, strike that.
12      Did John Giamatteo and cyber contribute to some
13  of the conflicts that he had with Miss Sandhu?
14      A.  I told him many times whether he agrees or
15  not, that's up to him.  He and I never discuss that.
16  I wasn't -- I wasn't opening up for discussion.  I
17  was just informing how I feel.
18      Q.  What sort of things, if any, did Mr.
19  Giamatteo do to contribute to the problems between
20  him and Miss Sandhu?
21      A.  Just the fact that he's, you know, not a
22  big thinker enough to understand that there are
23  always ways to work these conflicts at the account
24  base and to benefit BlackBery, I mean, it has to be
25  it's either you or mine, it's yours or mine, it's

Page 119

1  almost like kids on playgrounds and that's how I
2  felt, but I express that to -- actually, I think I
3  believe I express it to both of them.
4      But it's need to -- they need to work it out
5  because I -- I can't -- I can't do this for them.
6      Q.  And Mr. Giamatteo says here after a
7  sentence talking about elite "I really hope we can
8  move this whole thing back to where it belongs as
9  we" had discussed -- or "as we have been discussing
10  since I joined."
11      Do you know what Mr. Giamatteo is referring to
12  there?
13      A.  Did I know what?
14      Q.  Yeah.
15      What he's referring to when he says "I really
16  hope" --
17      A.  Oh, he always wanted elite to report to
18  him.  I disagree.  I told you folks early on today
19  there's a special business reason for it.
20      ATTORNEY TARTAGLIO:  Let's go to Exhibit 13.
21          (Whereupon, Plaintiff's Exhibit No. 13 was
22          marked for identification.)
23      ATTORNEY TARTAGLIO:
24      Q.  So, let's see how long this one is.
25      It's about three pages.  If you like you can

Page 120

1  read the whole thing.
2      Would you like to do that?
3      A.  No, I think just give me the relevant
4  pages.
5      Q.  Okay.
6      Well, let's see -- so this exhibit starts at
7  Bates 9934 -- for the record this is Exhibit 13.
8      And, then, we have here on the first page an
9  email to you saying "Here are the accounts left
10  after giving the four to Neelam, the four to JJG and
11  pulling out the QNX."
12      So is this related to the discussion we had
13  earlier about giving Miss Sandhu the win back
14  targets?
15      A.  Uh-huh.
16      Q.  And so the highlighted ones are those that
17  I understand to be mostly lost so would that be --
18  well, what's your interpretation of what a mostly
19  lost client would be?
20      A.  Either the account already have move away
21  from us, or they're reducing the buy to gradually
22  move away from us in phases.
23      Q.  And so does Exhibit 13 to you -- and take
24  as much time as you like to look at it -- I can
25  scroll through it.

Page 121

1      Does this appear to be an accurate description
2  of how Miss Sandu was given some win back targets
3  and some other clients were given to John Giamatteo?
4      A.  Yeah, this is a work in progress between me
5  and John Routa from finance.
6      ATTORNEY TARTAGLIO:  Let's go to Exhibit 14.
7          (Whereupon, Plaintiff's Exhibit No. 14 was
8          marked for identification.)
9      ATTORNEY TARTAGLIO:
10      Q.  So this is a one-page document at 9962.
11      A.  Uh-huh.
12      Q.  And so similar sort of question here --
13  does this agree to be a description of how Miss
14  Sandhu was given some win back targets and John
15  Giamatteo was given some other customers?
16      A.  Yes, this is mostly the win back target.
17  This is the Neelam side.
18      Q.  Okay.
19      And so down here from Amazon, Cap Gemini, et
20  cetera -- those are the win back targets?
21      A.  Those are the win back targets or -- or
22  they're in the process of moving away.
23      ATTORNEY TARTAGLIO:  Let's look at Exhibit 15,
24  which starts at page 12167.
25          ///

Page 126

1    Is your interpretation of what John Mattel's
2  saying here -- John Giamatteo's saying here -- is he
3  talking about this particular deal or is he talking
4  about without Miss Sandhu at the company?
5    A.  I don't -- my interpretation is the deal,
6  but --
7    ATTORNEY TARTAGLIO:  Let's go to Exhibit 17.
8       (Whereupon, Plaintiff's Exhibit No. 17 was
9       marked for identification.)
10   ATTORNEY TARTAGLIO:
11   Q.  Okay.
12   Thi's is one page.  It's at Bates No. 12219.
13   A.  Uh-huh.
14   Q.  Go ahead -- go ahead and read this, if you
15  like.
16   A.  I read this.
17   Q.  Okay.
18   A.  I read this.  It's in material that's
19  provided by BlackBerry to me.
20   Q.  And do you recall this conflict between
21  Miss Sandhu and Miss Dickman?
22   A.  Yes.
23   Q.  Did you do anything -- well, it looks like
24  you emailed Richard Curiale about this conflict;
25  correct?

Page 127

1    A.  Uh-huh.
2    Q.  Do you recall if you did anything else to
3  respond to it other than letting Mr. Curiale know
4  about the situation?
5    A.  Well, and I also let Neelam know that she
6  should not touch ITB, which ITB is a program -- I
7  think it's called industrial technology bilateral or
8  something.
9    It's a program by Canadian Government to
10  encourage US technology company to buy from Canadian
11  technology company.
12   After, as a response or as a conditions of the
13  Canadian Government buying these US technology,
14  like, you know, fighter jets and tanks and missile
15  and so forth.
16   So ITB was really very political in nature --
17  and it's multiple number of years.  I think they
18  have, like, five to seven years to do that.
19   So for the elite team to venture into the ITB
20  area, I disagree.
21   For Marjorie to respond the way she responded I
22  also find it, unfortunately, a little overreaction
23  and a little child-ish, but -- but it just the same
24  as the sales people.  It's just the same.
25   Q.  Okay.

Page 128

1    Do you know whether Miss Dickman ended up
2  leaving the company?
3    A.  I just recently found out that she's no
4  longer with the company.
5    Q.  How did you learn that?
6    A.  I think it's -- I don't recall how I know
7  that.  I think it has something to do with either a
8  social media post or something -- I don't remember.
9  But not -- I was not told directly by somebody.
10   Q.  And what were you told about -- well,
11  strike that.
12   Were you told why Miss Dickman left the
13  company?
14   A.  No, nobody --
15   ATTORNEY LAVOIE:  Objection.  Objection.  Lacks
16  foundation.
17   THE WITNESS:  You know, nobody tell me why.
18   ATTORNEY TARTAGLIO:  Let's look at Exhibit 18.
19       (Whereupon, Plaintiff's Exhibit No. 18 was
20       marked for identification.)
21   ATTORNEY TARTAGLIO:
22   Q.  And this is produced at Bates page 13083.
23   And I just have one question about this
24  document.
25   A.  Okay.

Page 129

1    Q.  Does this document refresh your
2  recollections about any conversations you had with
3  Richard Curiale?
4    A.  No.
5    ATTORNEY TARTAGLIO:  Let's go to Exhibit 19.
6       (Whereupon, Plaintiff's Exhibit No. 19 was
7       marked for identification.)
8    ATTORNEY TARTAGLIO:
9    Q.  This starts at page 16477, goes on for a
10  few pages.
11   Had you ever -- well, I'll let you read it so
12  let me know when you want me to scroll, if you would
13  like me to scroll.
14   A.  Okay.
15   Please scroll.  Uh-huh.  Okay.
16   You can move.  Okay.  Okay.
17   Q.  So I'm not asking you to endorse everything
18  in this report, but would you say that in general
19  you agree with the conclusions that Mr. Curiale
20  reached in this report?
21   ATTORNEY LAVOIE:  Objection.  Lacks foundation.
22  Calls for speculation.
23   THE WITNESS:  Yeah, that's a little too broad.
24  I think in general the -- his conclusion at a
25  level -- at the highest level makes some sense, but



Page 146

1    A. Uh-huh.

2    Q. -- it appears that BlackBerry was not
3 ultimately split into two separate companies; is
4 that correct?

5    A. Say that again -- repeat that, please.

6    Q. Yeah.

7    Was BlackBerry ultimately split into two
8 companies as we had previously discussed?

9    ATTORNEY LAVOIE: Objection. Asked and
10 answered. Lacks foundation. Calls for speculation.

11    THE WITNESS: I have no -- I have no idea. It
12 hasn't yet, but that doesn't mean it won't.

13    ATTORNEY TARTAGLIO:

14    Q. As Chief People Officer, Miss
15 Armstrong-Owen would be in charge of both the
16 Internet of Things Group, as well as the Cyber
17 Group; right?

18    ATTORNEY LAVOIE: Objection. Lacks foundation.
19 Calls for speculation.

20    THE WITNESS: I don't know her. Never met her
21 in my life.

22    ATTORNEY TARTAGLIO:

23    Q. Was Miss White-Ivy Chief People Officer
24 when she worked for the company?

25    A. Yes, yes.

Page 147

1    Q. And did Miss White-Ivy provide human
2 resources services to both the Internet of Things
3 Group, as well as the Cyber Group?

4    A. Yes, that was because it hasn't split yet,
5 right?

6    Q. And then -- let's see -- so Chief Financial
7 Officer you see here it's Tim Foote.

8    Does the Chief Financial Officer provide
9 services to both the Internet of Things Group, as
10 well as the Cyber Group?

11    ATTORNEY LAVOIE: Objection. Vague as to time.

12    THE WITNESS: You're talking about split
13 already or you're talking about not split?

14    ATTORNEY TARTAGLIO:

15    Q. What I'm getting at is, do these
16 individuals listed here on the BlackBerry website
17 provide services to both Internet of Things as well
18 as Cyber?

19    A. Because they hasn't split yet.

20    Q. And so my question is -- I guess we can
21 just ask generally about these folks -- is it your
22 understanding they provide their services to both
23 business departments?

24    A. They -- they do because it hasn't split
25 yet.

Page 148

1    Q. All right.

2    In your time at BlackBerry did anyone complain
3 to you about the personalities of any of the male
4 colleagues that they had to work with?

5    ATTORNEY LAVOIE: Excuse me -- sorry.

6    What was the question?

7    ATTORNEY TARTAGLIO:

8    Q. During your time at BlackBerry did anyone
9 complain about the personalities -- difficult
10 personalities of male colleagues that they worked
11 with?

12    A. Yes, I'm sure that happened, but it's been
13 ten years.

14    Q. Have you read the complaint that Miss
15 Sandhu filed in this lawsuit?

16    A. No.

17    Q. Have you read any of the press about this
18 case?

19    A. No -- very early on very preliminary I
20 think in mail or something and that was it. I have
21 not follow it.

22    Q. How do you feel about the fact that Miss
23 Sandhu -- who you worked with closely for quite a
24 long period of time -- is alleging that she was
25 retaliated against and discriminated against by

Page 149

1 BlackBerry?

2    A. That had nothing to do with me.

3    Q. Do you have any feelings one way or another
4 about the case?

5    A. I shouldn't speculate. This is the
6 cornerstone of the whole lawsuit and complaint so
7 I'll let you folks, you know, worry about that.

8    Q. When Mr. Lynch became interim CEO, did you
9 have any conversation with him to help pass the
10 baton, so to speak -- help transition him?

11    A. No, none.

12    Q. Do you think that BlackBerry should have
13 fired Miss Sandhu?

14    A. Speculation.

15    ATTORNEY LAVOIE: Yeah, objection. Lacks
16 foundation. Calls for speculation.

17    ATTORNEY TARTAGLIO:

18    Q. If you had stayed on as CEO would you have
19 fired Miss Sandhu?

20    ATTORNEY LAVOIE: Objection. Assumes facts.
21 Lacks foundation. Calls for speculation.
22 Incomplete hypothetical.

23    THE WITNESS: I don't have any -- if things
24 continue -- progresses the way that it's been
25 progresses for the past ten years, I have no



Page 150

1  intention to fire Miss Sandhu.
2      ATTORNEY TARTAGLIO:
3      Q.  And what makes you say that?
4      A.  As we have a long discussion this morning,
5  there's a -- whole equation of net positive.
6  She has a lot of quality and qualifications and she
7  has edges that needs to be addressed, but on balance
8  it's a good employee for our company.
9      ATTORNEY TARTAGLIO:  Okay.
10     That's all the questions I have.
11     THE WITNESS:  Thank you.
12     ATTORNEY MALDONADO:  Mr. Chen's prepared to go
13  ahead to switch here -- we don't need a break.
14     ATTORNEY LAVOIE:  Sounds good.
15             EXAMINATION BY
16     ATTORNEY LAVOIE:
17     Q.  Mr. Chen, I'm going to just try to be
18  really direct and respect your time -- go as quickly
19  as I can.
20     So just to clean up something that just
21  occurred, do you, yourself, have any personal
22  knowledge, i.e. rooted in your experience or
23  observation about what functions people at the
24  company have been performing since you stopped
25  working there, for example, do you have personal

Page 151

1  knowledge of what function the CFO of BlackBerry or
2  the Chief People Officer of BlackBerry -- positions
3  like that -- are performing since you left the
4  company in October of 2023 -- do you have personal
5  knowledge of that?
6      A.  No, I don't have any personal knowledge.
7  In fact, they have changed most, if not all, of
8  the officer and the individuals.
9      Q.  And so if -- if we wanted to know whether
10  the CFO or the Chief People Officer were supporting
11  this business unit or that business unit since you
12  left the company we would need to ask somebody who
13  has been at the company since you left; right?
14     A.  Absolutely.
15     Q.  Okay.
16     When was the Elite Customer Team created?
17     A.  Don't have really good memory.  I would
18  think roughly about five, six years ago.
19     Q.  Okay.
20     A.  Oh, oh, five, six years before I left --
21  sorry.
22     Q.  So maybe 2018, 2019 -- something like
23  that -- a year or two before the pandemic, let's
24  say?
25     A.  Yes, it's before the pandemic because we

Page 152

1  were having trouble seeing customers in Washington
2  D.C. because of the COVID.
3      ATTORNEY LAVOIE:  Okay.  All right.
4      I'm going to share my screen and this next
5  document is Tab 1 in my spreadsheet.
6      It's going to be Exhibit 24.
7          (Whereupon, Plaintiff's Exhibit No. 24 was
8          marked for identification.)
9      ATTORNEY TARTAGLIO:
10     Q.  So do you see this -- I'm going to turn
11  your attention first to a document -- to the email
12  at the bottom.
13     This is an email from you to Steve Rai and
14  Neelam Sandhu on October 5th, 2021, and you copy
15  John Giamatteo here.
16     Do you see that?
17     A.  Uh-huh, uh-huh.
18     Q.  And Steve Rai was the Chief Financial
19  Officer at BlackBerry at the time; correct?
20     A.  Correct.
21     Q.  What was Adam Enterkin's role at this time?
22     A.  He was the -- at that time he was running
23  Europe sales for Cyber.
24     Q.  John Giamatteo is copied here.
25     I'll represent to you that he joined BlackBerry

Page 153

1  in October 2021 -- right around the time of this
2  email.
3      Does that sound right now?
4      A.  Correct.
5      ATTORNEY TARTAGLIO:  Objection.  Assumes facts.
6  Leading.
7      ATTORNEY LAVOIE:
8      Q.  Does that sound correct to you?
9      A.  That's -- that's a correct statement.
10     Q.  You write here "Steve, please get this
11  completed as none of us," parentheses, "(you, me,
12  Neelam and Adam) would like to continue to spend
13  time on this."
14     A.  Yes.
15     Q.  And then you write "This is now a binary
16  situation."
17     What is the "this" that you didn't want to
18  continue spending time on?
19     A.  The approval matrix.  What -- what
20  everybody has a responsibility for.
21     Q.  The division of responsibility between the
22  Elite Customer Team led by Miss Sandhu and the Cyber
23  Sales Team; is that right?
24     A.  That's correct.  And then also the
25  authority level meaning, you know, what level of



Page 154

1  approval do you have to go through if you want to
2  submit a bid, et cetera, et cetera.
3      Q.  Then you write "You should brief John G. on
4  the wordings."
5      Why did you write that?
6      A.  Well, John just came in and Adam reports to
7  John.  I want to make sure that the alignments are
8  there.
9      Q.  Let's scroll up a little bit.
10     So Miss Sandhu later removes yourself and John
11 Giamatteo from the email and writes only to the
12 Chief Financial Officer Steve Rai.
13     And she writes "This is an example of what I
14 mean by constant opinions/discussions about my role.
15 This now gives JG" -- John Giamatteo -- "the
16 opportunity to have an opinion about it."
17     Do you see that?
18     A.  Uh-huh, yes.
19     Q.  It's a pretty confrontational tone to take
20 with the company CFO; would you agree?
21     ATTORNEY TARTAGLIO:  Argumentative.
22     THE WITNESS:  Yeah, I would agree that it's --
23 it's certainly some level of frustration, sure.
24     ATTORNEY LAVOIE:
25     Q.  Does it surprise you to see Miss Sandhu

Page 155

1  taking this tone with the Chief Financial Officer of
2  the company?
3      A.  I wouldn't -- I wouldn't put it that way,
4  but I think we're kind of a little used to her
5  tone -- not really reading it more than, you know,
6  just her frustration versus disrespectful.
7      Q.  So you'd -- let me know if I'm -- if this
8  is accurate.
9      You'd be -- you'd become accustomed to Miss
10 Sandhu communicating in a way that you didn't view
11 as disrespectful coming from her, but if it had come
12 from someone else you might view as disrespectful;
13 is that what you're saying?
14     A.  You could say that.  And also in the case
15 of Neelam I know very well that if I, or other
16 people point that out, she will not be as defensive,
17 meaning that if I call her up and say hey, that's --
18 that's really uncalled for -- and I know her well
19 enough that she more than likely would say oh, okay,
20 didn't mean it that way, but understood.
21     Q.  Based on your observation, was Miss Sandhu
22 happy about BlackBerry hiring John Giamatteo?
23     ATTORNEY TARTAGLIO:  Speculation.
24     THE WITNESS:  I don't know whether she was
25 happy or not happy, but they seemed to have a

Page 156

1  problem working together from literally day one.
2      ATTORNEY LAVOIE:
3      Q.  Mr. Rai notes -- Rai notes -- here in the
4  next email -- he then forwards Neelam's email to you
5  and says "Below just FYI.  I hope she can get her
6  mind out of the loop it is in," and then you write
7  back "Hope so."
8      A.  Uh-huh.
9      Q.  What loop are you referring to?
10     A.  The loop of every changes or lack of
11 written down she interpret that as a negative to
12 her.
13     Q.  And did you think that was counter -- a
14 counterproductive mindset?
15     A.  Well, it's certainly unnecessary because
16 it's -- people might take advantage of it, but at
17 the level that, you know, my CFO and myself -- we
18 don't have that mindset.
19     ATTORNEY LAVOIE:  Let's take a look at what is
20 Tab 2 in the digital binder.
21     I'll mark this as Exhibit 25.
22     (Whereupon, Plaintiff's Exhibit No. 25 was
23     marked for identification.)
24     ATTORNEY LAVOIE:
25     Q.  We'll go down to the bottom email -- so

Page 157

1  this is a long email from Steve Rai on October 4th,
2  2021, that he sends to yourself, Adam Enterkin,
3  Neelam Sandhu, he copies John Giamatteo and Tom
4  Eacobacci.
5      What was Tom Eacobacci's role?
6      A.  Tom was leaving the company, but he was the
7  predecessor of -- of John Giamatteo.
8      Q.  Mr. Rai writes here "The genesis and aim of
9  these discussions was to resolve conflicts between
10 the teams (whether real or perceived; personal or
11 structural) and improve our internal coordination
12 for the good of BlackBerry and its customers."
13     Is Steve Rai mediating here between Miss
14 Sandhu's Elite Customer Group and Cybersecurity
15 Sales?
16     A.  It's -- could you repeat that question --
17 is Steve Rai --
18     Q.  Is he mediating, in effect, here between
19 Miss Sandhu's Elite Team and the Cyber Sales Group?
20     A.  In some ways.  You want to assess some
21 boundaries -- I don't whether he view it as mediate.
22 He would like to find a way that both sides would
23 agree, but he knows ultimately -- and he had I
24 discussed this -- you know, we gave it a round -- a
25 few rounds -- so that everybody feels like they have



Page 158

1  a word in it and they express their opinion and
2  concerns that ultimately Steve Rai and I would have
3  to sit down and decide.
4      Q.  How long after Miss Sandhu's Elite Customer
5  Team was created in 2018 or 2019 did there start to
6  become tensions with the Cyber Sales Team?
7      A.  I think the tension -- I think the tension
8  was there early on.  Different leaders had different
9  views of this.
10     Tom Eacobacci has a very low level response to
11 it, meaning he knows that he needs to work on his
12 organization.  He knows there's plenty of things to
13 do.  And we should divide and concur and so forth.
14     So he tends listen less to the sales force and
15 doesn't amplify their concern as much.  So it's
16 really kind of the personality of the leadership.
17     As I said earlier today, structurally sales
18 force would like to control all the accounts whether
19 they could do anything about it or not.
20     I, on the other hand, with, as I said, it was
21 produced by my CFO of the past, you know, it's
22 important to keep the customers -- these elite
23 customers -- happy and stay with BlackBerry.  It's
24 very important for both revenue and reputation.
25     So -- so there's a bigger purpose here than

Page 159

1  just, you know, whether you want to control
2  everything.
3      Q.  Mr. Rai writes here on October 4th, 2021,
4  "Frustration," slash, "emotions are very high."
5      Did you understand that to mean frustrations
6  and emotions as between the Elite Team and the Cyber
7  Sales Team?
8      A.  Yes.
9      Q.  And this is in October 2021 before
10 essentially John Giamatteo even walks in the door --
11 frustrations and emotions are high between the Elite
12 Team and Cyber Sales Team; is that right?
13     A.  Uh-huh, yeah.
14     ATTORNEY TARTAGLIO:  Argumentative.
15     ATTORNEY LAVOIE:
16     Q.  Would it be accurate to say that at the
17 time John Giamatteo started at BlackBerry in October
18 2021 the relationship between Miss Sandhu's Elite
19 Team and Cybersecurity Sales was already quite
20 tense?
21     A.  Not anywhere close to the last two years.
22     Q.  There were some -- there were frustrations
23 and emotions that were running high at the time?
24     A.  By -- by some -- by some individuals
25 because of the accounts, but not -- not like the --

Page 160

1  it hasn't really bubble up to the level like a John
2  Giamatteo or the Tom Eacobacci level at that time.
3      Q.  The tension -- did the tension between Miss
4  Sandhu's Elite Team and Cyber Sales -- did it start
5  because of John Giamatteo?
6      A.  No, it did not start because of him.  It
7  was there, but, as I said, it was a level lower --
8  visibly lower then -- and then when John -- when
9  John Giamatteo came in it -- it heightened up.
10     ATTORNEY LAVOIE:  So let's look at what is Tab
11 4 in the binder.
12     We'll mark it as Exhibit 26.
13     (Whereupon, Plaintiff's Exhibit No. 26 was
14         marked for identification.)
15     ATTORNEY LAVOIE:
16     Q.  So there's a long exchange here -- I'll
17 just direct your attention -- this is October --
18 this is the end of October 2021 so we're
19 fast-forwarding just a few weeks.
20     John Giamatteo has been on the job for a few
21 weeks and this is an email exchange between Neelam
22 Sandhu, Billy Ho, Adam Enterkin, John Giamatteo
23 dated October 29, 2021.
24     Do you see that on your screen?
25     A.  Uh-huh.

Page 161

1      Q.  What was Billy Ho's role?
2      A.  Head of engineering for Cyber.
3      Q.  And Mr. Ho forwards this email chain to you
4  on October 29, 2021, and writes "John, she sounds
5  like my CEO," and then a frowning face.  "Very
6  frustrated with her," he goes on to say.  "Our Elite
7  Team has no ability to discuss any" -- "at any
8  technical discussion."
9      Do you see that?
10     A.  Yeah.
11     Q.  What is happening here?
12     A.  I -- I -- I believe that Neelam's account
13 is looking for some fix -- engineering fix --
14 product fix -- and she had related that to Billy Ho
15 and I guess she came across like his CEO.
16     Q.  And did it surprise you to hear the head of
17 cyber engineering saying that he was very frustrated
18 with Neelam and that she sounded like his CEO in the
19 way that she communicated with him -- did that
20 surprise you?
21     A.  A little bit.  But -- but unfortunate, you
22 know, obviously in this case the approach is wrong.
23     Q.  And then you forward this to Steve Rai --
24     A.  Uh-huh.
25     Q.  -- the next day and you write "Private and

Page 166

1  for the regulatory filing and the board -- I don't
2  see anybody attacking her, I mean, she just make a
3  totally untrue statement and I'm just thinking that
4  maybe just, you know, her being reactive and
5  hopefully she reflect on it later and find it's
6  inappropriate.
7      Q.  Was it common for Miss Sandhu to think that
8  her peers were attacking her?
9      ATTORNEY TARTAGLIO:  Speculation.
10     THE WITNESS:  Don't know.  Don't know.  It's
11 not the subject that she speak to me about.  Don't
12 know.
13     ATTORNEY LAVOIE:
14     Q.  Based on your interactions with her, did
15 she seem quick to perceive things as slights from
16 colleagues?
17     ATTORNEY TARTAGLIO:  Calls for speculation.
18     THE WITNESS:  Again, I -- you have to ask her.
19 I -- I don't -- I don't know.
20     ATTORNEY LAVOIE:
21     Q.  Do you think Mr. Rai's email to her where
22 he says "Appreciate update tomorrow, please" --
23 do you think that email was inappropriate?
24     A.  No, no.
25     Q.  It's polite; right?

Page 167

1      A.  Very polite and, you know, no.
2      ATTORNEY LAVOIE:  Okay.
3      Let's -- I'm going to show two branches of an
4  email which I'm going to mark -- I'm going to mark
5  Tab 6 as Exhibit 28 and I'm going to mark Tab 7 as
6  Exhibit 29.
7          (Whereupon, Plaintiff's Exhibits Nos. 28
8          and 29 were marked for identification.)
9      ATTORNEY LAVOIE:  So let's go to Tab 6 first.
10     Q.  So Mr. Curiale write to you -- or sorry --
11 writes to Miss Sandhu on February 13th, 2023, and
12 the subject line is "lunch."
13     A.  Uh-huh.
14     Q.  How long have you known Richard Curiale?
15     A.  Twenty years.
16     Q.  And have you engaged him or have your
17 companies engaged him to perform a fair amount of
18 legal work over the years?
19     A.  Yes, yes.
20     Q.  Based on your conversations and
21 interactions with him, is it your sense that he
22 feels some loyalty to you?
23     A.  Yes.
24     ATTORNEY TARTAGLIO:  Speculation.
25 //  ///  ///

Page 168

1      ATTORNEY LAVOIE:
2      Q.  Why do you say that?
3      A.  Well, I mean, we work well together.  We
4  think very much alike and, you know, he's always
5  been trying to help the company to achieve the
6  company purposes and so, yes, I would say from that
7  perspective I feel pretty good about working with
8  him.
9      Q.  Mr. Curiale writes here -- if you look at
10 the right side of the kind of top right of the
11 box -- "John suggested it would be a good idea if
12 you and I work together to come up with a plan
13 moving forward to improve relations between Elite
14 and Sales, such that Sales will recognize the value
15 added that you bring and will be more receptive to
16 the sales model BlackBerry has established."
17     Do you see that?
18     A.  Yes.
19     Q.  So Mr. Curiale sends this email to Miss
20 Sandhu on February 13th at 7:42 a.m. in the
21 morning -- I just want to take note of that -- so
22 morning time.
23     A.  Okay.
24     Q.  So let's took at Tab -- and in this email
25 he's inviting Neelam to go to lunch to discuss this

Page 169

1  topic -- do you see that?
2      A.  Yeah.
3      Q.  So now let's go to Tab 7, which is
4  Exhibit 29.
5      This is at 6:49 p.m. on that same day -- so he
6  writes to Neelam before business hours in the
7  morning, he writes this message to you about 11
8  hours later after business hours at 6:49.
9      Do you see that?
10     A.  Uh-huh.
11     Q.  Subject line is "Neelam" and he writes
12 "Never even got the courtesy of a response from her.
13 Very disappointing."
14     Do you see that?
15     A.  Yeah.
16     Q.  You write back "Yep, that drove John G.
17 crazy."
18     A.  Uh-huh.
19     Q.  Do you see that?
20     A.  Yes.
21     Q.  What are you referring to there -- "that
22 drove John G. crazy"?
23     A.  John has always complained to me about lack
24 of response from Neelam and that's -- that's just in
25 line for the same example.

Page 170

1    Q.  So you're -- you're trying to communicate
2  that this experience that Mr. Curiale is having with
3  Neelam was similar to one that John Giamatteo had
4  talked to you about himself experiencing with
5  Neelam?
6    A.  Correct.
7    Q.  Let's go to Tab 3, which has previously
8  been marked as Exhibit 12.
9    We'll look at the bottom of the first page --
10  sorry -- we'll look at the very bottom of the first
11  page where you can just see this is an email -- a
12  one-on-one email from John Giamatteo to you on April
13  4th, 2023.
14    And Mr. Giamatteo writes to you "We are at the
15  peak of dysfunctionality with Elite.  I really hope
16  we can move this whole thing back to where it
17  belongs as we have been discussing since I joined.
18  I get that we may need to do it in phases, but her
19  inability to collaborate with anyone in the company
20  is exhausting and, honestly, makes us look really
21  bad," slash "weak with the rank and file in the
22  organization."
23    Do you see that?
24    A.  Yes.
25    Q.  You respond "Will do in phase.  Best for

Page 171

1  the company on more than one dimensions."
2    Did you think or decide at any point in time
3  that the Elite Team should be scaled back or phased
4  out at some point in the future?
5    A.  Phase out is probably not on my mind.
6  Scale back, yes.
7    Q.  When did that thought or plan occur to you?
8    A.  Probably in the mixture of Elite doing the
9  job, but the conflict with the salespeople and the
10  sales management, you know, sometime is too high a
11  price to pay so that needs to be a phase approach,
12  but I still maintain that they really miss for the
13  convenience of, you know, the internal operation and
14  make everybody feel good, so to speak, in the sale
15  organization we may miss a very important function
16  with a very important business reason for the
17  company so I never -- I never really thought about
18  phasing it out, but I had thought about reducing it.
19    Q.  And was that your plan if you had remained
20  CEO -- would you have kind of reduced it, scaled it
21  back, reorganized it in some form?
22    A.  Yes.
23    Q.  And the principle reason for that being
24  to -- because of the unsustainable tension between
25  Elite and Cyber Sales?

Page 172

1    A.  That's -- that's a major part of it, yes.
2    Q.  And you -- you say here "I see both sides
3  contribute to the problem.  May pre-dated you."
4    "May pre-dated you" -- is that a reference to
5  this tension to some extent pre-dating Mr.
6  Giamatteo?
7    A.  Yes, I think this is, again, a -- the
8  functional overlap and the commission calculations
9  of -- of those -- those organizations -- the two
10  organizations.  It's a natural response -- it's an
11  unfortunate response, but it's a natural response
12  for salespeople.
13    Q.  So you agree to ultimately that moving
14  Elite accounts into Cyber Sales was best for the
15  company --
16    A.  No.
17    Q.  -- in 2023 -- or some accounts?
18    A.  Some accounts, yeah.  But the Elite
19  Program -- I have never intended to move the Elite
20  Program into sales because then it created a
21  different feeling with the customer base.
22    Q.  Did Neelam's gender or race have anything
23  to do with your decision to rearrange the accounts
24  between Elite and Cyber Sales?
25    A.  No.  I -- no.

Page 173

1    Q.  And by this time Neelam had said something
2  to you about a dinner with John Giamatteo that she
3  said made her feel uncomfortable; is that right?
4    A.  I don't know when that happened.
5    Q.  Okay.
6    A.  I don't -- I don't know what one pre-dates
7  which one.
8    Q.  Irrespective of when it happened, when you
9  moved certain Elite accounts to Cyber Sales, did you
10  do that in retaliation against Neelam for talking to
11  you about this dinner with John Giamatteo?
12    A.  Oh, no, absolutely not.  Absolutely not.
13  If it's a retaliation I would have done, you know,
14  differently like moving Elite into Sales and, I
15  mean, no, no, I don't do things retaliating.
16    Q.  And at the time that you reorganized some
17  of the customers between the two groups --
18    A.  Uh-huh.
19    Q.  -- you additionally gave Miss Sandhu the
20  position of Chief Marketing Officer; is that right?
21    A.  Correct, correct.  Because I feel like that
22  there's a balance between how big the Elite is -- I
23  also want to have some win back accounts -- so there
24  was a swap there -- and then also try to give more
25  to Neelam to further her role and career.



Page 174

1  So there's a combination -- and in the meantime
2  we could reduce the tension to some degree.  I never
3  thought it would completely eliminate the tension,
4  but it will reduce the tension.
5        Q.  Let's look at -- I want to ask you about
6  this statement.
7        Mr. Giamatteo, further up the chain, says "The
8  PTSD effect of Neelam and her interaction with the
9  organization is very ugly," slash, "dysfunctional.
10 I spend a lot of time conducting therapy sessions
11 with everyone.  In my 30-plus years I have never
12 seen such a polarizing figure."
13       Do you see that?
14       A.  Yeah.
15       Q.  Is John Giamatteo the only person who ever
16 made comments to you about Neelam like this?
17       A.  Oh, yeah.  I believe so.
18       Q.  He's the only person who said that she was
19 this polarizing?
20       A.  Oh, no, no, not polarizing, you know,
21 the -- you know, other implication, you know, I
22 mean, other things like PTSD effect and stuff -- I
23 just ignore it.  It's totally inappropriate.
24       But polarizing, I understand where he's coming
25 from, but I maintain -- I maintain -- I maintain my

Page 175

1  statement.
2        I believe that for the benefit of the company
3  they should work well -- they should try to do that
4  and work well together, but it -- it's -- seems to
5  be an impossible task.
6        Q.  You thought that -- was it your perception
7  that Mr. Giamatteo didn't want the Elite Group
8  because he wanted those accounts -- customer
9  accounts -- to be within Cyber Sales --
10 was that your perception?
11       ATTORNEY TARTAGLIO:  Speculation.
12       THE WITNESS:  Yeah, I mean, he -- you know, a
13 sales guy always wants complete control over all
14 their accounts, I mean, that's just, unfortunately,
15 how we -- how we were brought up.
16       ATTORNEY LAVOIE:
17       Q.  A salesperson, man or woman; right -- would
18 like the control of the customer accounts?
19       A.  Exactly.  I, you know, I see success in
20 other company -- big company -- with the Elite
21 accounts and, in fact, I live through that -- that
22 change in one of my prior lives, too.
23       Q.  Did Mr. Giamatteo ever say anything to you
24 that made you think that he wanted Elite to go away
25 because Neelam was a woman or a person of color?

Page 176

1        A.  Oh, no, no, I never heard that, no.
2        Q.  You never thought that?
3        A.  Never thought that.  Never heard that.
4        Q.  Have you observed turf wars over your years
5  presiding over major corporations?
6        ATTORNEY TARTAGLIO:  Vague.
7        THE WITNESS:  I have -- I have -- yes, I did.
8        ATTORNEY LAVOIE:
9        Q.  Is this -- is this back and forth between
10 Neelam and John Giamatteo -- is this an example of a
11 type of turf war over control that you've seen over
12 the years?
13       ATTORNEY TARTAGLIO:  Leading.  Argumentative.
14       THE WITNESS:  I won't answer that.  It's -- it
15 much more higher intensity than I ever experienced,
16 even with company that's much bigger in size.
17       ATTORNEY LAVOIE:  Let's look at Tab 13, which
18 I'll mark as exhibit -- what's the exhibit number,
19 Lauren -- Exhibit 30.  Okay.  Exhibit 30.  Tab 13.
20       (Whereupon, Plaintiff's Exhibit No. 30 was
21       marked for identification.)
22       THE REPORTER:  I'm sorry, counsel, can we take
23 a quick break for a couple minutes?
24       ATTORNEY LAVOIE:  Okay.
25       THE REPORTER:  Thank you.

Page 177

1        THE VIDEOGRAPHER:  All right.
2        This ends Media No. 4 in the deposition of John
3  Chen.
4        We are off the record.
5        The time is 1:52 p.m.
6        (Off the record at 1:52 p.m.)
7        (Resumed at 1:58 p.m.)
8        THE VIDEOGRAPHER:  Let me read us on here.
9        On the record at 1:58 p.m. and this begins
10 Media 5 in the deposition of John Chien.
11       You may continue.
12       ATTORNEY LAVOIE:  Okay.
13       Q.  When we -- when we logged off I was just
14 about to share what is Tab 13 in the binder and
15 Exhibit 30, so Tab 13.
16       You referenced before, Mr. Chen, a situation
17 involving Tim Foote and Miss Sandhu in May of 2023.
18       Is this email on page 2 of Exhibit 30 part of
19 what you were testifying about this morning?
20       A.  Uh-huh, correct.
21       Q.  So Mr. Foote writes to you -- this is about
22 five months before you stepped down as CEO, about
23 seven months before Miss Sandhu was fired.
24       Tim Foote writes to you and says he'd like your
25 advice on the situation -- which you testified about



1  with you that might have been uncommon coming from
2  other of your direct reports?
3      A.  Yes.
4      ATTORNEY TARTAGLIO:  Leading.
5      THE WITNESS:  That's -- that's -- in now
6  looking at it in kind of a concentrated form.
7      ATTORNEY LAVOIE:
8      Q.  If -- if -- if you had stepped down and,
9  let's say, Dick Lynch was in the picture -- just as
10 career advice to Neelam -- would you have advised
11 Neelam to talk to Dick Lynch in this kind of
12 fashion?
13     ATTORNEY TARTAGLIO:  Incomplete hypothetical.
14     THE WITNESS:  Yeah, that's -- that's very
15 hypothetical.  I mean, I wouldn't advise Neelam to
16 say to -- in any way -- any which way talking to
17 anybody for that matter, but --
18     ATTORNEY LAVOIE:
19     Q.  Whenever it was pointed out to Neelam that
20 she had been discourteous or could have been
21 friendlier in an interaction with a colleague, would
22 she sometimes turn the blame back on that other
23 person who she had been interacting with?
24     ATTORNEY TARTAGLIO:  Leading.
25     THE WITNESS:  From your email you show me it

1  seems that way.
2      ATTORNEY LAVOIE:  Let's look at the next
3  document, which I'll mark as Exhibit 34.
4      (Whereupon, Plaintiff's Exhibit No. 34 was
5      marked for identification.)
6      ATTORNEY LAVOIE:
7      Q.  This is Tab 17 in the binder and it's an
8  email from Rich Curiale to you.  This is just two
9  days after this whole Dickman dispute in May -- on
10 May 26, 2023.
11     And he writes in the subject line "Let me
12 know," and then in the body "How your meeting with
13 Neelam went."
14     And you write back "Went okay.  I hope she
15 understands my concern and steps up the effort of
16 proper collaboration with others."
17     Do you see that?
18     A.  Uh-huh, yes.
19     Q.  Tell me about what you told Neelam in that
20 meeting?
21     A.  Oh, I can't remember, but -- I mean, I
22 can't even remember the particular meeting -- but in
23 general, you know, I asked her to make sure that she
24 expand her efforts in collaboration with others in
25 the company -- the senior management -- and so

1  forth.  She always said that she has been and it was
2  one-way street.  That has always been the response.
3  And I guess when I say it went okay it went okay, I
4  mean, she was probably more in the listening mode
5  and less argumentative, I suppose.
6      Q.  Just so I understand -- her typical
7  response to this sort of feedback was to say it's a
8  one-way street as in she's being nice to people, but
9  other people aren't being nice to her -- is that
10 what you're saying?
11     A.  Yes, that's been -- that's been something
12 that she always -- whenever I counsel working
13 together and collaboration and, you know, and she
14 said -- she always said that it's -- seems like
15 she's always been doing that and other people
16 doesn't have to do that in return.  That's been what
17 she has been talking about.
18     Q.  Whenever you gave Neelam feedback about
19 better collaboration with people, did she ever take
20 ownership or recognize that she had ever done
21 anything wrong in these situations?
22     A.  From time to time, I mean, not every time,
23 but -- as I said earlier, you know, you sit Neelam
24 down and talk through it, usually it deescalate.
25 That's all I could remember.

1      Q.  So just to kind of pause and take stock,
2  we've been through a bunch of documents and we've
3  seen Miss Sandhu have disputes with you to some
4  extent, with Steve Rai, with John Giamatteo, with
5  Adam Enterkin, with Billy Ho, with Marjorie Dickman
6  with Tim Foote.
7      Is that accurate?
8      A.  You have email to back it up.
9      Q.  So yes?
10     A.  I -- I could only say, I mean, I can't -- I
11 can't -- I can't argue with you.
12     Q.  And you were asked --
13     A.  Because it's too -- as I said, I think I
14 understand, you know, the -- the team now on both
15 sides.  I think -- I think I want to caution that I
16 don't -- made it sound like everything is so binary,
17 okay.
18     There are good moments.  There are productive
19 moments.  And so, I mean, I'm just saying maybe you
20 bend it over backwards too much, but you -- but it's
21 really about taking the total package, you know, and
22 I like the conversation earlier today about is it a
23 net positive or not.
24     It's been a lot of negative, so to speak, but
25 if -- if you -- if you have my attitude about just

Page 190

1  ignoring things -- just thinking about this being --
2  I don't want to use the word child-ish, but it was,
3  you know, being something normally people just don't
4  take it seriously and ignore it -- it's not as bad
5  enough -- it's not that bad -- but I could
6  understand why the organization respond differently
7  because they also have their people that look at
8  them and how they respond.
9      Q.  I want to ask -- I want to ask you about an
10  answer you gave this morning about whether you --
11  let me actually just say, like, I know that you
12  believe -- and I'm not even going to contest -- that
13  Neelam was a very hard worker, right, and she was
14  very devoted to the company and she had some
15  positive characteristics and so, you know,
16  obviously, you perceived that plaintiff's counsel
17  asking you more about her positive characteristics
18  and I'm asking more about the constructive feedback
19  that you gave her so -- and I fully understand the
20  testimony that you've given about your view about in
21  the net overall, like, how you viewed it, so but --
22  so all of that is on record and I'm just asking, you
23  know, some kind of specific questions about some of
24  the constructive feedback, but I just wanted you to
25  no I've heard you and I'm not disputing, for

Page 191

1  example, that she was a very hard worker.
2      So I want to ask you about an answer you gave
3  this morning about whether you personally observed
4  any of Miss Neelam's negative traits.
5      It was sort of an ambiguous question whether
6  you personally observed any of Neelam's ambiguous
7  traits and you answered that you hadn't personally
8  observed any negative traits.
9      We've just looked at a ton of emails that you
10  were on where she's kind of bickering with people.
11      Would you revise that statement based on some
12  of the emails that we've walked through together?
13      ATTORNEY TARTAGLIO:  Objection.
14      THE WITNESS:  Yeah.
15      ATTORNEY TARTAGLIO:  Argumentative and leading.
16      THE WITNESS:  Yeah, as I said, if you look
17  at -- if you think about me looking at it as a total
18  package I didn't really believe it was that negative
19  because I tend to just ignore it or have a
20  conversation or have Richard to have a conversation
21  and so -- but, yes, she definitely -- when we talk
22  about net positive there are obviously negative to
23  create a net positive, otherwise it's all positive.
24      ATTORNEY LAVOIE:
25      Q.  And -- and just to contextualize your

Page 192

1  testimony from this morning, did you personally
2  observe some of those negative characteristics, such
3  as in some of the emails that we've reviewed?
4      A.  Yeah, I -- this morning I was thinking more
5  of a -- a different type of traits, but, yes, you
6  know, the -- some of these response and some of
7  these kind of push back, the comments and -- yes,
8  it's something that she definitely needs to address.
9      Q.  Did it ever exhaust you dealing with Miss
10  Neelam's disputes with various people at the
11  company?
12      A.  Oh, yeah, from time to time it does, but
13  fortunately I got enough help around me.
14      Q.  And did you ever get tired of Miss Sandhu
15  struggling to get along with her peers?
16      ATTORNEY TARTAGLIO:  Leading.  Argumentative.
17      THE WITNESS:  Get tired.  When I get tired I
18  speak to her.
19      ATTORNEY LAVOIE:  I think -- I'm just skipping
20  over some questions because I think you've mooted
21  them with some of your testimony so if you just give
22  me a quick second I think I can consolidate some
23  things here.
24      Okay.
25      Let's go to -- what's the next exhibit number,

Page 193

1  Lauren -- 35 she tells me so I'm going to mark Tab
2  20 -- Tab 8 as Exhibit 35.
3      (Whereupon, Plaintiff's Exhibit No. 35 was
4      marked for identification.)
5      ATTORNEY LAVOIE:
6      Q.  So Mr. Curiale writes to you -- this is
7  March 3rd, 2023, so the spring of 2023.  This is
8  about seven months or so before you step down and
9  about nine months before Miss Sandhu is terminated.
10      And Mr. Curiale writes to Neelam with a subject
11  line "Possible compromise."  He writes "I spoke to
12  John Chen regarding what I thought was a very
13  constructive dialog we had at lunch.  The bottom
14  line is John will consider two separate groups, each
15  having exclusive jurisdiction over their respective
16  clients."
17      Do you see that?
18      A.  Yeah.
19      Q.  And did you authorize Rich Curiale to
20  deliver this potential compromise or proposal to
21  Miss Sandhu?
22      A.  I had mention to Rich that that is
23  something that I'm thinking about.
24      Q.  And one advantage -- would one advantage of
25  this with respect to the Elite Group be that they

Page 194

1  have, quote, "exclusive jurisdiction" over a certain
2  set of customers?
3      A.  Yes.
4      Q.  And was that different from the state of
5  play at the time with respect to their customers --
6  did they not have exclusive jurisdiction at the time
7  over their customers?
8      A.  Kind of yes and no.  A lot of the accounts
9  in the Elite -- on the Elite Team -- Elite had
10  started with 30 accounts.
11      A lot of the accounts Elite Team -- when they
12  made a sale -- I also credit the sales force so --
13  but being exclusive now that has good and bad.
14      The good is I was hopping that the sales force
15  will work on it as a team because they got to share
16  the results.
17      The negative is the sales force want to jump in
18  and they have their own idea about the campaign so
19  there lies the sauce of a lot of the conflicts.
20      Q.  So Mr. Curiale writes "I don't know if that
21  is acceptable to you."
22      A.  Right.
23      Q.  "I hope you will consider it."
24      A.  Right.
25      Q.  In your view was this just an idea that

Page 195

1  Neelam was free to accept or reject -- was it up to
2  her what you were going to do with this situation?
3      A.  Well, later on -- I had a conversations
4  with Neelam, but I don't remember the pre-date this
5  or after that, and she knows very well that I will
6  make some changes and the question is what is there
7  to change and she's free to -- to reject it -- but
8  the end result of the rejection could lead to her
9  leaving the company.
10      And this is why there were some email -- me --
11  regarding me asking for what is Neelam's severance
12  calculation.  It was not a -- it's not a means to
13  say I want to terminate her, but it's -- it's my
14  message or methods of if we were to the point that
15  there's no longer -- no longer an acceptable
16  solution from all sides, then I just have to go to
17  that path.
18      And Neelam was well aware of that.  It was not
19  a surprise or it's not -- but she knows that it was
20  a path that we could end up taking if, you know,
21  nothing is acceptable to herself and myself in
22  addressing the situation that we had gone through in
23  the past few hours.
24      Q.  In 2023 -- and I'm not saying that you
25  considered doing this -- in fact, it sounds like you

Page 196

1  didn't consider it -- but based on knowing the
2  interactions with her, if you had told her in 2023
3  I'm going to reassign you such that you're no longer
4  reporting to me -- you're reporting to John
5  Giamatteo -- based on your interactions and dealings
6  with her up to that point, do you expect she would
7  have accepted that or would she have left the
8  company?
9      A.  I think she would have left the company.
10      Q.  Why do you think that?
11      A.  I would think she would have -- knowing her
12  relationship with John Giamatteo, probably something
13  that she will want to negotiate out.
14      ATTORNEY TARTAGLIO:  And that's an incomplete
15  hypothetical.  Speculation.
16      THE WITNESS:  Yes, it is -- it is hypothetical,
17  but -- again, but, please, you know, we went back
18  and forth the same thing.
19      Please make sure you understand there are no
20  intention of mine for the benefit of the company to
21  fold Elite into sales.
22      ATTORNEY LAVOIE:
23      Q.  Right.  Understood.
24      A.  Right.  So that option may be real in John
25  Giamatteo's mind -- on his mind -- but it's not

Page 197

1  something that I believe in for the benefit of the
2  company.  I need those set of elite accounts.
3      Q.  And based on your dealings with Miss Sandhu
4  and your conversations with her, did you perceive
5  her as having respect for John Giamatteo
6  professionally?
7      ATTORNEY TARTAGLIO:  Speculation.
8      THE WITNESS:  We never had that discussion, but
9  I -- it's speculation on my part.
10      ATTORNEY LAVOIE:
11      Q.  Well, just, you know, you talked with her a
12  lot, like, you dealt with her almost every day.
13      Like, based on your perceptions and her
14  dealings with her, did you think that she respected
15  him professionally -- was it your impression that
16  she had respect for him?
17      ATTORNEY TARTAGLIO:  Calls for speculation.
18      THE WITNESS:  Yeah, I -- I don't -- I don't
19  feel so.  If you wanted me to speculate, it never
20  came out that she said wow, John's great on this
21  and --
22      ATTORNEY LAVOIE:  So I'm going to skip over a
23  document and go to -- mark this next one as Exhibit
24  36.
25      This is Tab 11.



Page 202

1   customer side changes I am not open to that being
2   executed on without the marketing piece being
3   agreed."
4       Do you see that?
5       A.  Yeah.
6       Q.  "I am not open to that."
7       Why is Miss Sandhu talking as though she has
8   veto power over this restructure?
9       ATTORNEY TARTAGLIO:  Objection.  Assumes facts.
10  Argumentative.
11      THE WITNESS:  Well, simple.  She thinks she
12  has.  As said to you, to me -- I mean, I would want
13  somebody to accept a role wholeheartedly with
14  excitement, that's a better for the company -- and
15  she doesn't want to do this and there's no path
16  then, as I told you, then the only path is to
17  separate.
18      Q.  So she writes here in a passage that you
19  testified about a bit this morning "I have seen
20  before people who have been very loyal to you be
21  sacrificed by you for the benefit of new people who
22  you don't know and haven't been loyal to you or
23  haven't done a good job."
24      She's insulting you to your face here
25  basically.

Page 203

1       A.  I know.
2       ATTORNEY TARTAGLIO:  Objection.  Argumentative.
3       THE WITNESS:  Well, this -- remember earlier
4   when you asked me about the comments and stuff I
5   just ignore it -- this one gets me.  I remember.
6   And so this is why I send it to Richard.  It -- that
7   cross the line.
8       ATTORNEY LAVOIE:
9       Q.  You're the CEO -- is it accurate to say
10  you're the CEO of the company, you're her boss, and
11  she's writing you something that insults you to your
12  face -- is that accurate?
13      ATTORNEY TARTAGLIO:  Leading.  Argumentative.
14      THE WITNESS:  I -- I felt that way when I read
15  it, but I think you need to ask her.
16      ATTORNEY LAVOIE:
17      Q.  Have any of your other direct reports in
18  your recollection over your 20 or 30 years as an
19  executive, have any of your direct reports ever
20  insulted you to your face in this fashion?
21      ATTORNEY TARTAGLIO:  Argumentative.
22      THE WITNESS:  No, no, I can't remember any.
23      ATTORNEY LAVOIE:
24      Q.  Did it surprise you for Neelam to insult
25  you to your face this way?

Page 204

1       ATTORNEY TARTAGLIO:  Argumentative.
2       THE WITNESS:  I look at it as an inability to
3   control her own frustration.  She -- she does that.
4   And now, as I said, other than this one I could -- I
5   could go right back at it and escalate it, which
6   typically is not my style to do with any of my
7   direct reports.
8       ATTORNEY LAVOIE:
9       Q.  So -- and I appreciate that and you've
10  testified that way and I completely here you that
11  it's -- that you sometimes got accustomed to it or
12  you looked past it; is that fair?
13      A.  Yeah, it could be fair, but not -- but --
14  but, yeah, not this one.
15      Q.  Do you think it would be reasonable for
16  someone in your position -- not how you felt -- but
17  do you think it would be reasonable for a different
18  CEO to observe Neelam's difficulty getting along
19  with people, remarks that she makes to her boss and
20  just say I don't want to put up with this, you're
21  not worth it.
22      Would that have been reasonable for someone
23  else to think that?
24      ATTORNEY TARTAGLIO:  Incomplete hypothetical.
25  Assumes facts.

Page 205

1       THE WITNESS:  That's somewhat speculative in a
2   sense, too.  I can't tell you whether the CEOs are.
3   My style are not come across as authoritative or, I
4   mean, you know, I have a certain level of ego, but
5   it's not to the level that, you know, take offense
6   in everything that was said to me.
7       Again, this one exempt from that, but -- so
8   my -- my point is, yeah, I suppose other CEOs will
9   respond with -- respond very differently.
10      ATTORNEY LAVOIE:
11      Q.  You've been in this business for four
12  decades or more?
13      A.  Uh-huh.
14      Q.  And you, yourself, before you had the top
15  job you reported to a bunch of people.
16      A.  Uh-huh.
17      Q.  Could you ever imagine sending something
18  like this to your boss insulting your boss directly
19  in this way -- would you ever imagine doing that?
20      A.  No.
21      ATTORNEY TARTAGLIO:  Argumentative.  And we
22  spent quite a bit of time asking the same question.
23      THE WITNESS:  Yeah, I don't understand where
24  we're going here.
25      I already told you it's not my style.  This one

1  is different.
2      You know, I tent to try to solve the problems.
3  If I can't solve the problem we separate.
4      And no, I wouldn't send it to anybody -- my
5  boss or otherwise.  I don't even speak to my
6  subordinate in this way either.
7      ATTORNEY LAVOIE:
8      Q.  Has John Giammatteo ever sent you a message
9  like this?
10     A.  No, no, I don't feel he did.
11     Q.  And Mr. Curiale writes back to you saying
12  that Neelam has crossed a line here and that "it may
13  be time to part ways."
14     A.  Uh-huh.
15     Q.  And I just want to be clear -- you had
16  considered potential severance for Miss Sandhu at
17  some points over the years; right?
18     A.  Yes, only -- only if things can't improve
19  or can't work out, organizationally or otherwise.
20     ATTORNEY LAVOIE:  I'm going to mark this next
21  one as Exhibit 38.
22         (Whereupon, Plaintiff's Exhibit No. 38 was
23         marked for identification.)
24     ATTORNEY LAVOIE:
25     Q.  This is Tab 18.  So this is a fuller

1  version of the BBMe messages, I would say, between
2  yourself and Neelam, but if we scroll to the bottom
3  of this -- sorry -- I overshot it.
4      There was a portion on December 10th that
5  was -- where it says "Neelam Sandhu chat retracted."
6      So if you look above we can see all of your
7  messages to Neelam, but we don't see any of Neelam's
8  messages to you.
9      Do you see that?
10     A.  Yeah.
11     Q.  And did you communicate frequently with
12  Miss Sandhu on BBMe?
13     A.  Yes, quite, I mean, I'm always quick on
14  BBM.
15     Q.  Why did you communicate with her sometimes
16  on BBMe instead of email?
17     A.  I actually encourage people to use BBM
18  because it's our product.
19     Q.  And what type of thing might you put into a
20  BBM instead of to an email?
21     A.  Well, you know, BBM is really more better
22  for short messages and so forth.  It's more like a
23  chat thing and email is email.
24     Q.  All right.
25     I'm going to go to page 5 of Exhibit 38.

1      And let me see if I can find -- the very top
2  message.  This is October 23rd, 2023.
3      A.  Uh-huh.
4      Q.  This is, like, days before you step down, I
5  believe.
6      And you write "Tomorrow we need to work on my
7  letter."
8      A.  Uh-huh.
9      Q.  Is that a reference to your resignation
10  letter or some kind of correspondence related to you
11  stepping down?
12     ATTORNEY TARTAGLIO:  Leading.  Leading.
13     THE WITNESS:  Yeah, I think it's -- I think
14  it's a letter to the troops about my departure.
15     ATTORNEY LAVOIE:  Okay.
16     ATTORNEY TARTAGLIO:  Belated objection.
17  Leading.
18     ATTORNEY LAVOIE:
19     Q.  Did you ever ask -- I guess Tony wants me
20  to take more time in asking questions, but, you
21  know, I'm trying to be respectful of your time.
22     So did you ask Miss Sandhu for help in drafting
23  a letter that you would write to BlackBerry
24  employees regarding your departure?
25     A.  To help me work on it, yeah -- yes.

1      Q.  So as of at least this time on
2  October 23rd, 2023, Miss Sandhu was aware that you
3  were going to be stepping down?
4      A.  Yes.  I think my whole direct reports team
5  is aware of that.
6      Q.  Okay.
7      And in a separate communication -- I won't --
8  I'm trying to avoid putting just more and more
9  documents in front of you for time purposes -- but
10  Miss Sandhu also told someone named Prem Watts
11  (phonetic) that she was working with you in
12  confidence -- or that you had hold her in confidence
13  about your departure and that you had asked for her
14  help in drafting a press release.
15     Did you ask Miss Sandhu for help in drafting
16  any kind of press release related to your stepping
17  down?
18     ATTORNEY TARTAGLIO:  Assumes facts.  Attorney
19  testifying.
20     THE WITNESS:  I don't -- I don't know
21  whether -- that might be a thought of having a press
22  release, but I don't -- I don't remember that, to be
23  honest with you.
24     ATTORNEY LAVOIE:
25     Q.  When you informed Miss Sandhu that you were

Page 214

1  to collaborate with peers gets even more important
2  when you're ascending to a more senior executive
3  level of the company?
4      ATTORNEY TARTAGLIO:  Argumentative.
5      THE WITNESS:  I agree.
6      ATTORNEY LAVOIE:  So I'd like to walk you
7  through a few statements that Miss Sandhu attributes
8  to you in some of her filings in this case.
9      So I'm going to mark this next one as Exhibit
10 39 -- I believe, Lauren, unless you tell me I'm
11 wrong -- this is Tab B in the binder.
12     (Whereupon, Plaintiff's Exhibit No. 39 was
13     marked for identification.)
14     ATTORNEY LAVOIE:
15     Q.  So these are some discovery responses that
16 Miss Sandhu has served in this case.
17     I'm going to go down to page 10 and focus your
18 attention on lines 17 and 18.
19     Actually, you know, I think that you've -- I
20 think you've addressed this so I'm going to skip
21 this part and let's move to lines 19 through 20.
22     In these discovery responses here it says "When
23 plaintiff wanted her title to be Chief Elite
24 Customer Officer Giamatteo objected to John Chen
25 about the job title because he did not want the" --

Page 215

1  "he did not want the," quote, "'success' removed
2  from her job title."
3      Did John Giamatteo object to you about the word
4  "success" being removed from Miss Sandhu's job
5  title?
6      ATTORNEY TARTAGLIO:  Asked and answered.
7      THE WITNESS:  I don't -- I really don't recall.
8  I always -- to me it was such a small thing and --
9  but I don't -- I don't actually recall.
10     ATTORNEY LAVOIE:
11     Q.  Do you remember John Giamatteo complaining
12 to you about anything related to Miss Sandhu's job
13 title?
14     A.  No, I -- not really, I mean, it -- he might
15 have mention it, you know, among, like, hours of
16 conversation we had, like, one time, but I wasn't
17 interested in, you know, working on those title
18 naming anyway.  I thought success is important,
19 but --
20     Q.  Success does sound important.
21     A.  Right, so I --
22     ATTORNEY TARTAGLIO:  There's no question
23 pending, by the way.
24     THE WITNESS:  It's, you know, again, you have
25 to come from the point of view of customers.  You

Page 216

1  know, I think all these conversations we had the
2  principals focus more about inside.  I focus more
3  about outside.
4      When the customer see the title the customer
5  wants to know people are focusing on their success,
6  okay, and not like, oh, you have another chief of
7  this and that or another.
8      And I -- I really -- maybe I just dismissed it
9  in my head too quickly but --
10     ATTORNEY LAVOIE:
11     Q.  So -- so you thought it was a good thing
12 for the title to be Chief Elite Customer Success
13 Officer, as opposed to just Chief Customer Officer
14 or something like that?
15     A.  Exactly.  Exactly.  Success is very
16 important.
17     Q.  So --
18     A.  It's -- it's where the customer's looking
19 at it.
20     Q.  Let's look at page 10, lines 21 through 23.
21 Miss Sandhu's discovery responses state
22 "Plaintiff was not given a salary increase when she
23 took on the CMO role.  John Chen told her that
24 Giamatteo was already upset that she had been given
25 the CMO role and that Giamatteo would create

Page 217

1  problems if plaintiff were already given a salary
2  increase.
3      When you made Miss Sandhu BlackBerry's Chief
4  Marketing Officer, did you tell her that you would
5  not be giving her a pay rise because you were afraid
6  of John Giamatteo's reaction -- did you tell her
7  that?
8      A.  No, I -- so this might be taken out of
9  context or whatever.  So, first of all, salary
10 action, as I explained earlier today, goes through
11 human resources, do the analysis, we have a
12 programmatic way to address it.  This is not me
13 sitting down on my chair and just randomly come up
14 with a number.
15     HR will then recommend to me what we should do
16 and not do and then we take that and make sure that
17 all my direct reports salary actions are at least in
18 informed, if not cleared, by the board of directors.
19     Q.  So I just want to make sure I have a clear
20 whether you're saying yes or no.
21     So did you or did you not tell Miss Sandhu that
22 you wouldn't be giving her a pay raise because you
23 were afraid about how John Giamatteo would react --
24 did you tell her that or did you not?
25     A.  I wouldn't -- I wouldn't -- even if that is

Page 218

1 the case I wouldn't be saying it that way, okay, I
2 mean that way only create more problems between the
3 two of them, not a less problem, which I was
4 striving to do.
5 So -- but that's not the case. The case is I
6 asked human resources -- Nita White-Ivy -- to do the
7 analysis, come back to me with the recommendation.
8 The ins and out and all the math behind it you
9 need to ask human resources. I'm sure they have the
10 files.
11 ATTORNEY LAVOIE: Okay.
12 I'm going to pivot over here to Tab A, which
13 I'm going to mark as Exhibit 40.
14 (Whereupon, Plaintiff's Exhibit No. 40 was
15 marked for identification.)
16 ATTORNEY LAVOIE:
17 Q. This is Miss Sandhu's complaint in this
18 lawsuit. This is, like, the document that starts
19 the lawsuit and contains the plaintiff's
20 allegations.
21 And I'm going to take you to page 7, lines 16
22 through -- 11 through 16 -- I'll just delete this
23 highlighting -- I didn't intend for that to be
24 there.
25 So looking at lines 11 through 16, Miss Sandhu

Page 219

1 in her complaint alleges that "When she was
2 appointed Chief Marketing Officer, which meant
3 taking on another function in addition to her
4 existing role, she was not given a pay raise. She
5 was told by former CEO Chen that Giamatteo was
6 already upset that plaintiff had been given the role
7 and if she were given a pay raise, it would amplify
8 his animosity. Chen added that Tim Foote, who was
9 one of the white men hostile to plaintiff, would
10 know if plaintiff were given a pay raise, as he is
11 in the Finance Team and had access to this type of
12 information."
13 Did you see that?
14 A. Yes. I don't remember saying any of those
15 stuff on that paragraph and if I had say that it
16 would be a complete misjudgment on my part, but I
17 really don't remember saying it.
18 And, again, let me repeat the process is not
19 Giamatteo will approve or not approve. The process
20 is it comes from human resources, what their advice
21 is.
22 And it has a lot to do with everything I talk
23 about in terms of analyst -- comparisons and
24 industry comparison and stuff -- but also the last
25 increase, the potential next increase -- the

Page 220

1 whole -- so it's an analysis being done by human
2 resources, not -- not being done by myself sitting
3 there.
4 Q. Is it your style or practice as a leader to
5 deny people pay raises because you're afraid that
6 giving them pay raises is going to upset other
7 people?
8 A. Absolutely -- absolutely not. Absolutely
9 not.
10 Q. So what's your --
11 A. And I hope, you know, although we only met
12 today, by now you wouldn't believe -- I hope you
13 don't believe that John Chen will deny somebody
14 increases because he was afraid of one -- how one of
15 his people would react. I hope that's not -- that I
16 won't leave you that impression.
17 Q. Understood.
18 So I'm going to take you to -- back to
19 Exhibit 39, which is the discovery responses, and
20 point your attention to page 10 at lines 24 through
21 25 where plaintiff writes "Giamatteo roadblocked
22 plaintiff" -- that being Miss Sandhu -- "from being
23 named an officer, which limited her compensation."
24 Did you ever see or observe Miss -- Mr.
25 Giamatteo -- blocking Miss Sandhu from becoming an

Page 221

1 officer of BlackBerry?
2 A. I don't work for Giamatteo -- I never did
3 so --
4 Q. I just asked the question directly.
5 A. There is no way that he would even be in
6 the picture. The only thing that is happening is
7 that under the advisement of the board that -- not
8 immediate, but a couple years back -- given the size
9 of the company they were advising me to limit the
10 number of officers.
11 Q. So just a yes or no -- did Mr. Giamatteo
12 block Miss Sandhu from becoming an officer of
13 BlackBerry?
14 A. No.
15 ATTORNEY TARTAGLIO: And I'm going to object
16 to the yes or no instruction. The witness can clarify
17 if he wants.
18 ATTORNEY LAVOIE:
19 Q. I'm just -- I'm doing this just kind of
20 largely in the interest of trying to keep -- get
21 through, you know, three and a half hours of
22 material in two-and-a-half hours or so -- three
23 hours -- so, you know, I hope -- you should answer
24 the questions however you want, but that's the
25 spirit in which it's intended.



Page 222

1   Did you -- did you at any time discuss Neelam
2   Sandhu's pay or compensation with John Giamatteo?
3       A.  Absolutely not.
4       Q.  And you decided Miss Sandhu's role and pay
5   along with the board -- not John Giamatteo --
6       ATTORNEY TARTAGLIO:  Misstates --
7       ATTORNEY LAVOIE:
8       Q.  -- is that right?
9       ATTORNEY TARTAGLIO:  Misstates testimony.
10      THE WITNESS:  I decided under the advisement of
11  human resources and then go to the board to -- in
12  this particular case, because she was not an
13  officer, I -- my obligation is to inform the
14  board -- not necessarily need the approval.  If
15  you're an officer I need the approval.
16      ATTORNEY LAVOIE:  Let's look a little bit
17  deeper.  This is going to be starting -- this is the
18  basket of critiques about Tim Foote -- excuse me.
19      So I'm going to direct your attention to the
20  bottom of page 10, line 26, all the way through line
21  14 of page 11 and the plaintiff's discovery
22  responses say that Tim "Foote would block Miss
23  Sandhu from getting credit for her work, e.g., her
24  sales contributions to the company's billing
25  numbers."

Page 223

1   Did you ever see Tim Foote blocking Neelam
2   Sandhu for getting credit for her work?
3       A.  I was not aware of any of this.
4       Q.  You didn't see him -- you never saw him do
5   that?
6       A.  No, but I think the statement here about
7   John Giamatteo and Mattias Eriksson speaking -- that
8   was only because they're the president of the two
9   division of the two -- two partner in business.
10      Q.  Yeah.
11      So would you agree that there was some
12  differences in the amount of speaking opportunities
13  on behalf of the company as between John Giamatteo
14  and Mattias Eriksson, who were both presidents, and
15  Miss Sandhu, who was not a company president -- were
16  there differences in the number of public speaking
17  opportunities?
18      A.  Yeah.
19      Q.  Why?
20      A.  Well, investors will probably appreciate
21  hearing from the -- the president of the business
22  about where the business is going, more so than any
23  other -- it's not -- this is not about Neelam or
24  anybody else.
25      This is, you know, the public would like to

Page 224

1   hear from myself, my CFO, or the two presidents.
2       Q.  And, then, these discovery responses --
3   Miss Sandhu's discovery responses say "they" -- as
4   in John Giamatteo and Mattias Eriksson -- would then
5   get public credit for her, Miss Sandhu's, sales.
6       Do you see that?
7       A.  Yeah.
8       Q.  Is that how you viewed it -- that they were
9   stealing credit for her sales when they spoke
10  publicly?
11      A.  I -- I don't, I mean, unless there is some
12  specific examples I -- I don't -- I wouldn't
13  interpret it that way.
14      It is only based on the fact that these people
15  are speaking more -- and they should be speaking
16  more.
17      Q.  So this is in reference to Tim Foote.  Miss
18  Sandhu's discovery responses say that Tim Foote
19  "would lie about plaintiff, for example, he told
20  John Chen that she had not sent him a particular
21  press release for review when she had."
22      Are you aware of Tim Foote ever lying to you
23  about something related to Miss Sandhu?
24      A.  I -- I wouldn't know one way or the other.
25      Q.  Did you ever catch Tim Foote lying to you

Page 225

1   about something?
2       A.  No, no, no, no, but, again, I mean, this is so
3   out of my day-to-day context.  I wouldn't know
4   whether there is lying or not.
5       Q.  Miss Sandhu writes, "Tim would also exclude
6   plaintiff from emails that he would include the
7   prior CMO," parentheses, "(white male) on and
8   plaintiff raised this to both CEO John Chen and CFO
9   Steve Rai asking for their help to resolve it."
10      Did Miss Sandhu ever tell you that Mr. Foote
11  was excluding her from emails that he had included
12  her white male predecessor on?
13      A.  No, I -- I need the example for then.  I
14  don't remember being asked due to the gender
15  situation.  I -- if I would have -- if I would have
16  been asked that way I'm sure that I would have a
17  conversation with Tim and/or Steve Rai.
18      Q.  Did Miss Sandhu -- you spoke -- you
19  communicated with her pretty much daily?
20      A.  Uh-huh.
21      Q.  How -- at what point in time in your tenure
22  did you begin communicating with her almost daily --
23  was that throughout your entire time or beginning,
24  like, 2015, '16, or something like that?
25      A.  Oh no, from the time when she started



Page 226

1 working for me as a staff.
2     Q. And when did that happen again?
3     A. That's probably -- let's see -- I join the
4 company 2013. I'd say sometime a year later --
5 2014.
6     Q. Okay.
7     So -- so for almost a decade you were
8 communicating with Miss Sandhu on a -- almost on a
9 daily basis?
10    A. Yes.
11    Q. And during all that time, did she ever tell
12 you that the company was discriminating against her
13 based on being a woman?
14    A. I -- because when the company -- when -- if
15 she had said that I would have asked her to go see
16 human resources because that would also imply that,
17 you know, the company is really me.
18    Q. Well, let me just ask the question, though,
19 as to whether she did or did not say that to you.
20    So you interacted with her on an almost daily
21 basis for about ten years.
22    Did she ever tell you this company is
23 discriminating against me based on my gender or
24 raise?
25    A. I don't -- I don't remember. I don't

Page 227

1 believe so, but I don't remember.
2     Q. Did she ever tell you that another member
3 of the company -- not you -- did she ever say
4 somebody is retaliating against me for something
5 I've done -- did she ever tell that to you?
6     A. I never remember any conversation
7 retaliation and if it happens, you should rest
8 insured that she'd be speaking to human resources.
9     Q. And did she ever -- I know that she told
10 you about an interaction that she had with John
11 Giamatteo that she told you made her feel
12 uncomfortable.
13    Did she ever tell you that John Giamatteo was
14 sexually harassing her?
15    ATTORNEY TARTAGLIO: Objection. Calls for a
16 legal conclusion.
17    THE WITNESS: Not in those words, no. Not in
18 those words. I think she -- she certainly indicated
19 to me that she felt uncomfortable.
20    ATTORNEY TARTAGLIO: And my objection was legal
21 conclusion. I just wanted the record to reflect
22 that.
23    ATTORNEY LAVOIE:
24    Q. I'm just asking what she said or didn't say
25 and I think the witness understood the question.

Page 228

1     So if understood your testimony from this
2 morning, Miss Sandhu told you about a particular
3 occasion where she had had an interaction with John
4 Giamatteo that left her feeling uncomfortable.
5     That's what she told you; correct?
6     A. Correct.
7     Q. Did she tell you that Mr. Giamatteo was on
8 an ongoing basis engaging in some kind of sexually
9 inappropriate conduct toward her?
10    A. Not an ongoing -- we were just talking
11 about that one situation -- one incident -- where
12 they had a dinner together.
13    Q. And that came up one time?
14    A. That came up after the dinner.
15    Q. And then after she told you about that, did
16 she ever come back to you again and say well, now,
17 he's behaving inappropriately in some sexual
18 oriented way, like, in some other way?
19    A. The way I addressed it -- I asked her to go
20 sit down with human resources to make sure that Nita
21 White-Ivy is aware of all the -- the situation where
22 she was describing. So I intend -- and she knows it
23 very clearly -- even if it happened she wouldn't
24 come back to me, but she would go back to human
25 resources.

Page 229

1     Q. Now, I think -- I think we've seen this
2 based on a number of the emails that we've walked
3 through today, but in your experience, would Neelam
4 pull punches or be hesitant to complain to you when
5 she was unhappy about things?
6     ATTORNEY TARTAGLIO: Speculation.
7     THE WITNESS: I don't -- I don't know. I
8 assume that what she talk about is not the sum
9 total. She knows that I don't really have a very
10 high tolerance in every little changes of this, you
11 know, dissatisfaction.
12    So, I mean, I assume that there are some that
13 are important that she brought up, but I also assume
14 there are a bunch that she didn't bring up.
15    ATTORNEY LAVOIE:
16    Q. So let me -- let me ask you this -- we're
17 at the bottom of page 12 on Exhibit 39. These are
18 the discovery responses still.
19    And I'm just going to ask you a series of very
20 specific questions because you've given testimony
21 about what Miss Sandhu told you about this
22 interaction with Mr. Giamatteo, that according to
23 her left her feeling uncomfortable.
24    A. Uh-huh.
25    Q. And I'm just going to ask you some very



Page 234

1  you know, confidential and doesn't need a CEO to
2  interfere and also the sense that, you know, I don't
3  want people to think that I'm protecting either
4  party, so I wanted HR to do the investigation
5  properly.
6      Q.  Let's look back at the first amended
7  complaint, which I've marked as Exhibit 40, and go
8  to page 8, lines 3 through 6.
9      Miss Sandhu alleges in her complaint, "Despite
10 experiencing continued gender and race harassment
11 and discrimination, plaintiff fought to excel with
12 each new task given to her because plaintiff
13 believed she had the support of John Chen," and she
14 goes on from there.
15     Did you -- did you, yourself, ever observe
16 anyone treat Miss Sandhu in a way that you thought
17 was harassment or discrimination?
18     ATTORNEY TARTAGLIO:  Compound.
19     THE WITNESS:  I don't see a lot of interactions
20 so I wouldn't -- I wouldn't be a good person to
21 comment on this.
22     I'm -- I'm quite shocked it said that because
23 she has supported myself and Nita White-Ivy that she
24 ended continued gender and race harassment and
25 discrimination, but, again, maybe something that she

Page 235

1  never told us -- or tell myself at least.
2      ATTORNEY LAVOIE:
3      Q.  Yes, she never -- if she thought that she
4  was being subjected to continued ongoing gender and
5  race harassment and discrimination, she never told
6  you that?
7      A.  No.
8      ATTORNEY TARTAGLIO:  Calls for legal
9  conclusion.
10     THE WITNESS:  Yeah -- no, she never told me
11 that, but it's -- if it's true then it's really
12 disturbing because she should have known me well
13 enough that this will turn into a full-blown serious
14 look at.
15     ATTORNEY LAVOIE:
16     Q.  So let's look at the complaint on page --
17 which is Exhibit 40 on page 11 at lines four through
18 nine.
19     Plaintiff alleges "Despite Giamatteo's
20 harassment and discrimination, plaintiff sought to
21 have a positive work environment and remain
22 collaborative with Giamatteo for BlackBerry's
23 benefit.  Accordingly, she attempted to set up
24 collaborative meetings with him.  Giamatteo
25 complained about plaintiff's request to meet with

Page 236

1  him and brought it up to CEO Chen, claiming it was
2  offensive.  When Giamatteo set up meetings, on the
3  other hand, plaintiff indicated she was happy to
4  join the meetings."
5      Did John Giamatteo ever complain to you that
6  Miss Sandhu's attempt to set up a meeting with him
7  was offensive?
8      A.  No.  The only complaint I heard from John
9  Giamatteo was he tried to set up meetings that
10 Neelam never showed up and Neelam complained to me
11 that she was never invited to those meetings.
12 One -- one of them is wrong.
13     Q.  But -- but you don't recall Mr. Giamatteo
14 ever saying that "I'm offended at the concept that I
15 would meet with Neelam"?
16     A.  No, I never -- I never -- they won't say
17 that to me, I mean, I think we need to understand
18 one thing.  That's not what, you know, it might --
19 it sound like my day-to-day job is to service the
20 Neelam and John Giamatteo and Tim Foote and stuff,
21 you know, it's not.
22     Everyone -- when these things happen I'm sure,
23 you know, some of them are true, some of them are
24 probably misconceptions or perceptions, but I don't
25 spend my day on items like this, but --

Page 237

1      Q.  So did Miss Sandhu -- separate from the
2  word retaliation -- did she ever tell you that she
3  thought that after that dinner that Mr. Giamatteo
4  was mistreating her because of the way that she
5  reacted to what she described as a sexual advance --
6  did she say I rebuffed his sexual advance and now in
7  reaction to that he's mistreating me.
8      Did she ever tell you that?
9      A.  I don't remember that and -- but, again,
10 she knows well enough not to keep inundating me
11 with, quote, unquote, continuos updates and she
12 needs to go and continuous update minimally Nita
13 White-Ivy and then Nita White-Ivy will assign
14 investigators and so forth.
15     So, you know -- you know, I would have trouble
16 meeting with her if every day the meeting was about
17 some kind of retaliations and advances and all that.
18 I -- this is best handled by the professional in
19 human resources.
20     Q.  Let's look at a different part of the
21 complaint on page 13.
22     This is Exhibit 40, paragraph 57, lines 16
23 through 20.
24     Miss Sandhu alleges "Plaintiff reported
25 Giamatteo's harassment and discrimination in early



Page 238

1  2023 to human resources.  BlackBerry's response was
2  to try to" -- to try and create -- "create increased
3  separation between the two roles.  In this
4  separation BlackBerry removed half of plaintiff's
5  customers and gave them to Giamatteo and, in turn,
6  gave plaintiff customers that the Cyber BU had lost
7  business from and asked her to win the customers
8  back."
9      Was your rearranging of the customers between
10 the Elite Team and Cyber Sales a reaction to Miss
11 Sandhu making some kind of complaint about
12 harassment and discrimination -- was that your
13 motivation for rearranging the customer list?
14     ATTORNEY TARTAGLIO:  Calls for legal
15 conclusion.
16     THE WITNESS:  I -- I thought I answered this
17 question a couple of times already.  The answer as
18 absolutely no retaliation.  I am not that -- I don't
19 believe in it, I don't support any retaliation.
20     I wan ted to create an environment that
21 everybody could contribute to the success of the
22 company in a hopefully the most peaceful and smooth
23 environment possible.
24     You know, our enemies out there are
25 competitors, right.  I only mean what's going on

Page 239

1  within.  So I created that so that Neelam has a
2  better runway and better areas to operate and John
3  Giamatteo has a better area to operate, so that's
4  it.  That's the, you know, that's the sum total sum
5  of the motivation behind it.
6      ATTORNEY LAVOIE:
7      Q.  So just -- just to be very clear in terms
8  of a yes or no -- did you rearrange the customer
9  accounts as a reaction to Neelam making some sort of
10 complaint about harassment or discrimination, or was
11 that not your reason for rearranging the customer
12 accounts?
13     A.  No.
14     Q.  It was not your reason?
15     A.  It was not my reason at all.
16     ATTORNEY LAVOIE:  Let's look at Tab 10, which
17 I'm going to mark as whatever Lauren tells me is the
18 next exhibit number --
19     THE WITNESS:  Uh-huh.
20     ATTORNEY LAVOIE:  41 -- thank you, Lauren.
21        (Whereupon, Plaintiff's Exhibit No. 41 was
22        marked for identification.)
23     ATTORNEY LAVOIE:
24     Q.  So Tab 10.  This is March 8, 2023, Rich
25 Curiale emails you with the subject line "Neelam

Page 240

1  just called" and he says "Said she couldn't thank me
2  enough.  She felt things were going to work out.
3  She said she was ready to compromise now and was
4  enthusiastic about what she perceived as your
5  openness to hammering out a list of Elite and win
6  win" -- I assume that might be win back --
7      A.  Win back.
8      Q.  -- the clients --
9      A.  Win back.
10     Q.  Yeah.
11     "That she could focus on with no interference
12 from the sales group."
13     And do you recall Miss Neelam -- Miss Sandhu
14 having a favorable reaction to the concept of having
15 some customers who were just purely her own that she
16 wouldn't have to deal with the sales organization
17 on?
18     A.  Yes, I -- I remember that was where it
19 finally end up.
20     Q.  Did Miss Sandhu ever say you're rearranging
21 the customer list, you know, you're doing this to
22 punish me for making some kind of complaint --
23 did she ever say something like that?
24     A.  Not to me.  I think Neelam knows that it's
25 not my intent, but, of course, you have to ask her,

Page 241

1  I mean, I'm -- that's my interpretation.
2      Q.  Do you believe that under your leadership
3  as CEO for a decade from 2013 to 2023, do you
4  believe that during that time the company treated
5  women employees at the company fairly?
6      A.  I believe so.
7      Q.  Why do you think that?
8      A.  I mean, that's our policy and oh, by the
9  way, we got a lot of guardrail.  Our human resources
10 head is a minority lady herself and, you know, our
11 legal department, in this case, operates, you know,
12 rather independently, as I said.
13     Our board of directors is very sensitive to it.
14 Our employee is well trained and well briefed on an
15 annual basis, including every other year I think we
16 have a business practice harassment lesson or
17 lecture -- or whatever -- training -- training.
18     So we put in a lot of guardrail, not to talk
19 about the BS, you know, the business ethicals
20 practice, so I believe that we done a very good job.
21     Q.  Do you believe that during your decade long
22 tenure as BlackBerry's CEO from 2013 to 2023 that
23 the company valued its female employees?
24     A.  I believe it, yes.
25     Q.  Why do you think that?



Page 242

1    A.  Again, you know, I think there was a lot of
2  executives that are female.  More so than before --
3  it's still not a good enough number -- but we focus
4  on -- we focus on that.
5    And so -- we also focus on training and peer
6  group support for the women in the executive rank --
7  they're more minority, women, vice presidents and
8  up -- you know, I think these numbers you could get
9  up on the company.
10   Q.  What was the total -- just approximate --
11  employee head count at the company -- what was the
12  highest that it was during your tenure and what was
13  the lowest?
14   A.  When I joined the company it's roughly
15  about 4,500 people.  That was probably at the
16  highest level.
17   And when I left the company it was roughly over
18  3,000.
19   Q.  So, yeah -- so the head count was maybe
20  30 -- a third lower, 50 percent lower -- something
21  like that over the course of the ten years -- it
22  contracted a bit in terms of head count?
23   A.  Yeah, right, right -- something like that,
24  yeah.
25   Q.  When a company is going through shrinkage

Page 243

1  or reduction in overall head count, does that have
2  any impact on its ability to improve diversity?
3    A.  No, no, those are two different things
4  because when you're going through the reduction
5  you're also -- and we going through a reduction for
6  business realignment, you know, going from a
7  hardware company that makes cell phones into a
8  software company that makes product for
9  cybersecurity and IoT, and et cetera, et cetera, so
10  skill makes a difference.
11   Some of them I recruited externally.  Some of
12  them I promoted internally.  So there are rooms that
13  you could do it.  Maybe not as fast as one would
14  want, but I believe when I look at the numbers last
15  time I look at the numbers, you know, we make
16  progress.  So that's the only thing I could say.
17   Q.  Is, you know, looking outside of BlackBerry
18  at the industry broadly, would you say that the
19  cybersecurity -- and the internet of things software
20  space -- have those areas historically been male
21  dominated?
22   ATTORNEY TARTAGLIO:  Lack of foundation.
23   THE WITNESS:  It's really hard to -- I don't
24  have enough data to answer your question.
25   ATTORNEY LAVOIE:

Page 244

1    Q.  Well, you're -- you're sophisticated in
2  that.  You want data.  So I think that's a very
3  reasonable reaction.
4    I'm going to point your attention -- I'm
5  continuing to race through to try to get through
6  everything that I'm -- that we can get through while
7  getting you out of here by 4:00 p.m., so --
8    A.  Thank you.  Thank you very much.
9    ATTORNEY LAVOIE:  Let's go to what I'm going to
10  mark as the next exhibit number, which is 42, I
11  believe, and it is a -- it is an article from KRON4
12  titled "BlackBerry enabled," quote, "'Mad Men-era
13  sexual harassment,' lawsuit alleges.
14   (Whereupon, Plaintiff's Exhibit No. 42 was
15   marked for identification.)
16   ATTORNEY LAVOIE:
17   Q.  And the -- let's go down to -- so this --
18  this article recounts allegations from Miss Sandhu's
19  lawsuit against BlackBerry, discusses about how John
20  Giamatteo tried to 'woo' her, references the travel
21  together comment and then on the second page the
22  article quotes Miss Sandhu's attorney -- let me make
23  sure I'm getting the right place -- and it contains
24  a quote from Miss -- one of Miss Sandhu's attorneys
25  that says "BlackBerry seeks to present itself as a

Page 245

1  modern company, but the new management's tolerance
2  and enablement of 'Mad Men-era' sexual harassment
3  reflects their toxic and antiquated values."
4    Do you see that?
5    A.  Yeah -- yes.
6    Q.  Now let's look at the top of the third page
7  where she was being referred to as a Jane Doe, but
8  no one will dispute that this was Miss Sandhu.
9    One of Miss Sandhu's lawyers is quoted as
10  saying that "Miss Sandhu's story underscores the
11  disturbing reality of workplace harassment and
12  discrimination that too many working women know all
13  too well.  Despite a litany of complaints against
14  him Giamatteo was not only shielded from
15  consequence, but rewarded with a promotion to the
16  highest position in the company."
17   Let me just step back from that and ask you a
18  simple question.
19   Do you agree with Miss Sandhu -- with Miss
20  Sandhu's lawyer -- "that BlackBerry had a toxic and
21  antiquated values with respect to women"?
22   A.  Not -- I cannot agree when I was here.
23   Q.  And that was during the bulk of Miss
24  Sandhu's tenure -- everything except for the last
25  few weeks you were in charge of the place; right?



Page 270

1  confidential.  This is a public case and this is --
2  nothing in this is confidential.
3      ATTORNEY LAVOIE:  Yeah, okay, Maria, we don't
4  need to take up the witnesses time with our dispute,
5  like, if you're correct in the law, then that will
6  be the case.  If you're not, then you won't.
7      **THE WITNESS:  Okay.**
8      **I'm going to sign off.**
9      ATTORNEY LAVOIE:  Thanks, Mr. Chen.
10     **THE WITNESS:  Okay.**
11     **Bye.**
12     ATTORNEY LAVOIE:  Okay.
13     Thanks, everybody.
14     THE VIDEOGRAPHER:  Let me read the closing
15  statement, please.
16     ATTORNEY LAVOIE:  Sure.
17     THE VIDEOGRAPHER:  This concludes today's video
18  record of deposition of John Chen.
19     The original media of this deposition will
20  remain in the custody of Talty Court Reporter's,
21  Inc. located in San Jose, California.
22     We're going off the record.
23     The time is now 4:03 p.m.
24     ATTORNEY BOURN:  And just to confirm, this is
25  not a confidential deposition.

Page 271

1      ATTORNEY LAVOIE:  Maria, we're going to follow
2  the protective order, okay?
3      Thanks.
4      ATTORNEY BOURN:  Good luck.
5
6              --o0o--

Page 272

1      I, KAREN L. FERGUSON, CSR No. 5970, Certified
2  Shorthand Reporter, certify;
3      That the foregoing proceedings were taken before me
4  at the time and place therein set forth, at which time
5  the witness declared under penalty of perjury;
6      That the testimony of the witness and all
7  objections made at the time of the examination were
8  recorded stenographically by me and were thereafter
9  transcribed under my direction and supervision;
10     That the foregoing is a full, true, and correct
11  transcript of my shorthand notes so taken and of the
12  testimony so given;
13     (  ) Reading and signing was requested.
14     (  ) Reading and signing was waived.
15     (XX) Reading and signing was not requested.
16     I further certify that I am not financially
17  interested in the action, and I am not a relative or
18  employee of any attorney of the parties, nor of any of
19  the parties.
20     I declare under penalty of perjury under the laws
21  of California that the foregoing is true and correct.
22     Dated this 5th day of August, 2025.
23
24     _Karen L. Ferguson_
       KAREN L. FERGUSON, CSR No. 5970
25

