# EXHIBIT 20

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NEELAM SANDHU,

      Plaintiff,

vs.                  CASE NO. 24-cv-02002-SK

BLACKBERRY CORPORATION, a
Delaware Corporation; and JOHN
GIAMATTEO, an individual,



      Defendants.
_____/


VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF
RICHARD LYNCH



DATE:         Thursday, June 5, 2025

TIME:         9:06 a.m. - 5:05 p.m.

LOCATION:     (All attendees appearing remotely.)

REPORTED BY:  JULIE L. ANDERSON, CSR
             Stenographic California CSR No. 11422


             Talty Court Reporters
             2131 The Alameda, Suite D
             San Jose, California 95126
             (408) 244-1900

Page 30

1    Q.  I'm going to ask about some of the other
2  jobs you had.  I'm not going to go back all the way
3  to your jobs in high school, college, that sort of
4  thing.  But before you became a -- before you worked
5  exclusively as a member of boards of directors, did
6  you work at a company in more of a day-to-day role?
7    A.  Yes, I did.
8    Q.  And what was the most recent company where
9  you had that kind of a day-to-day role?
10   A.  It was at Verizon Corporation.
11   Q.  And are you able to estimate when you
12  started working at Verizon and when you stopped
13  working at Verizon?
14   A.  Yes, fairly accurately.  I started working
15  at the predecessor to Verizon, which was the Bell
16  System, back in 1972, and I retired from Verizon
17  Corporation as it then existed and still exists in
18  2011.
19   Q.  And is it accurate that there were perhaps
20  some mergers, name changes, et cetera, but you
21  stayed within the same organization, more or less,
22  for that whole stretch of time?
23   A.  Yes, that is correct.
24   Q.  What was your job title or position title at
25  the end of your tenure at Verizon?  So the last job

Page 31

1  title that you held?
2    A.  Executive vice president and chief
3  technology officer.
4    Q.  And are you able to estimate for about how
5  long those were your job titles at Verizon?
6    A.  Let me describe it for you this way:  I was
7  the executive vice president and chief technology
8  officer for Verizon Wireless and then became same
9  title for the entire Verizon Corporation, and that
10  spanned between approximately 1992 and 2011.
11   Q.  Presumably when you started off at Verizon,
12  you were not management, although maybe that's
13  incorrect.  So how did you start off at Verizon?
14  What was your job when you started, I guess, at
15  Bell?
16   A.  When I -- and that's the best way to
17  describe it, is Bell.  When I began, I was actually
18  a supervisor at -- in the network organization in
19  Boston.
20   Q.  And did you ever work as an engineer doing
21  engineering, like, let's say, design engineering or
22  were you always a supervisor or manager?
23   A.  No.  I did engineering work when I moved to
24  Philadelphia.
25   Q.  I'm going to ask a little bit about your

Page 32

1  educational background now.  Do you have a college
2  degree or multiple perhaps?
3    A.  Multiple.  I have -- I have a bachelor's
4  degree and master's degree in electrical
5  engineering, and I did some postgraduate work at
6  Johnson School at Cornell and at Wharton School of
7  the University of Pennsylvania.
8    Q.  What kind of the -- strike that.
9        What is taught at the Johnson School?  Is
10  that a business school?
11   A.  Yes.
12   Q.  And do you have a master's in business
13  administration degree?
14   A.  I did not get a master's as such.  The
15  Wharton program was the equivalent.
16   Q.  Okay.
17   A.  But no degree as such.
18   Q.  So although you do not have an MBA degree,
19  it sounds like you did take some graduate-level
20  business courses at universities?
21   A.  Oh, yes.
22   Q.  So the plaintiff in this case is Neelam
23  Sandhu.  Before John Giamatteo -- well,
24  before -- strike that.
25        Before John Chen resigned, do you recall

Page 33

1  working with Neelam?
2    A.  I would not describe it as "working with."
3  I was -- I had been introduced to her.  I knew who
4  she was but did not work with her.
5    Q.  And what was the context in which you had
6  been introduced to her if you can recall?
7    A.  I believe that it was at board dinner once I
8  was first introduced to her in person.  Of course, I
9  saw the performance statistics for all of the
10  management people that reported to John Chen on a
11  regular basis at board meetings, and her name was on
12  there.
13   Q.  And so before John Chen resigned, other than
14  meeting Neelam -- or Ms. Sandhu at this dinner, do
15  you recall interacting with her besides that?
16   A.  I do not.
17   Q.  And I think you mentioned some performance
18  statistics that were presented to the board that
19  discussed the managers.  Is that -- is that
20  accurate?
21   A.  Yes.
22   Q.  What do you recall from -- well, if
23  anything, what do you recall of Ms. Sandhu's
24  performance statistics?
25   A.  The last ones that I recall seeing, the



Page 34

1  performance of her organization was really not very
2  good relative to the other performance comparatives,
3  the other organizations.  Her results were actually
4  not all that good.
5      Q.  And do you remember any performance
6  statistics that you saw about Ms. Sandhu before
7  those -- the statistics you were just discussing
8  right then?
9      A.  I do not.
10     Q.  So did you ever see Ms. Sandhu manage one of
11 her subordinates?
12     A.  In terms of face-to-face?
13     Q.  Yes.
14     A.  No.
15     Q.  Did you ever see Ms. Sandhu speak with one
16 of the customers of the business?
17     A.  No.
18     Q.  Did you ever see Ms. Sandhu speak at a -- at
19 a meeting, such as a board meeting or some other
20 public meeting?
21     A.  I do not recall that.
22     Q.  Did you -- so before John Chen resigned, did
23 you form an opinion about what it was like working
24 with Ms. Sandhu?
25     A.  I have --

Page 35

1      Q.  Well, let me put it this way --
2      A.  Yeah.  I think I'd like the question
3  rephrased if you could.
4      Q.  Based on your firsthand knowledge of -- of
5  dealing with Ms. Sandhu, did you have an opinion
6  about what it would be like to work with her before
7  John Chen resigned?
8      A.  Based on the dinner I had with her, yes, I
9  had developed some initial beliefs.
10     Q.  What were those initial beliefs?
11     A.  That she was very aggressive.  That she was
12 not necessarily focused on the same things that I
13 might have been focused on.
14     Q.  What was it that Ms. Sandhu did or said that
15 led you to form the belief that she was acting
16 aggressively or was aggressive?
17     A.  The -- the dialogue that we had suggested to
18 me that opinion.  I also would say that she was
19 particularly opinionated relative to -- and I
20 honestly can't remember exactly what topics we were
21 talking about.  But she was very opinionated on
22 these various topics during the course of our
23 discussion, and I would necessarily not have agreed
24 with all of those views.
25     Q.  And so can you remember specifically some of

Page 36

1  these opinions that you mentioned?
2      A.  I cannot at this point.  This was a number
3  of years ago.
4      Q.  And other than the fact that she seemed to
5  be opinionated, was there something else about the
6  conversation with her that -- or in which she acted
7  aggressively?
8      A.  Just the overall interaction, but I can't
9  give you anything specific.  As I say, it was a
10 number of years ago.
11     Q.  And I think you also mentioned that
12 Ms. Sandhu was -- seemed to be not focused on the
13 things that you would have been focused on.  Is that
14 an accurate paraphrasing?
15     A.  Yes.
16     Q.  And what did you mean by that?
17     A.  Again, I -- it was so long ago that I can't
18 give you anything specific, but those are the
19 impressions that stuck in my mind after the -- after
20 the dinner.
21     Q.  Before John Chen resigned, had you heard
22 from other people about what it was like to work
23 with Neelam?
24     A.  I had not.
25     Q.  To your knowledge did -- and this is before

Page 37

1  John Chen resigned.  To your knowledge, did
2  Ms. Sandhu have a reputation one way or another
3  about being difficult to work with?
4      A.  Yes.
5      Q.  And how did you come to learn of that?
6      A.  John Chen, for one, very specifically
7  indicated that, and I heard from another one or two
8  people whose -- currently I can't -- I can't
9  identify who they are -- that had indicated that it
10 was difficult to work with her.
11     Q.  And what, if anything, do you remember about
12 John Chen telling you about what it was like working
13 with Neelam?
14     A.  John expressed to me a concern that in order
15 to have success in the elite group, he had to
16 continually get involved and that frustrated him.
17     Q.  Do you remember anything else that Mr. Chen
18 told you along those lines?
19     A.  No.
20     Q.  And I think you mentioned that there was
21 another conversation you had with someone you didn't
22 remember about what it was like working with
23 Ms. Sandhu.  Is that fair to say?
24     A.  I did indicate that I recall having had --
25 overheard and/or had very quick dialogue about that.



Page 38

1  I don't remember who it was nor do I remember the
2  specific topics.  But, yes, she was known as being
3  difficult to work for.
4      Q.  Okay.  And you kind of anticipated some of
5  my questions.  What details, if any, can you
6  remember from that conversation?
7      A.  I believe I've given you everything I can
8  really give you.
9      Q.  That -- that she was difficult to work with
10  essentially.  Can you remember anything more than
11  that?
12      A.  Not during the time frame you're talking
13  about.
14      Q.  Before John Chen resigned, had you heard
15  anyone discuss Neelam's competence or ability to do
16  her job?  So, for example, hit her sales quotas.
17  That sort of thing.  Had you discussed Neelam's
18  competence and ability to do the work with anyone
19  before John Chen resigned?
20      A.  I did not.
21      Q.  Do you know -- and so this is before John
22  Chen resigned still.  Do you know whether Ms. Sandhu
23  had a reputation for being a highly competent person
24  who could get the job done?  Maybe not so competent?
25  Something in between?  Do you know what her

Page 39

1  reputation was?
2      A.  I would not know at that point, no.
3      Q.  Did Mr. Chen ever discuss to you -- or
4  discuss with you his opinion about whether Neelam
5  was competent, could get things done?
6      A.  Only the reference that I've already
7  described to you, which is his frustration of having
8  to get involved to get things done within the elite
9  group.
10      Q.  Before John Chen resigns, had you met John
11  Giamatteo?
12      A.  Yes.
13      Q.  And what kind of interactions had you had
14  with Mr. Giamatteo before John Chen resigned?
15      A.  John Giamatteo was a member of the executive
16  management team and would come in on a regular basis
17  to the board and would present to us his results,
18  his actions, his plans, and that was the primary
19  interaction that I had with him.
20      Q.  Did you ever interact with Mr. Giamatteo in
21  a social setting before John Chen resigned?
22      A.  Only at board dinners.
23      Q.  Would you have considered yourself to be a
24  friend of Mr. Giamatteo's before John Chen resigned?
25      A.  No.

Page 40

1      Q.  Did you ever socialize outside of the work
2  context with Mr. Giamatteo before John Chen
3  resigned?
4      A.  No.
5      Q.  Did you form a reputation -- or
6  not -- strike that.
7          Did you form an opinion about -- about
8  Mr. Giamatteo's collegiality, his ability to get
9  along with his coworkers, before John Chen resigned?
10  Did you form any opinion about that?
11      A.  Only what I observed, which was at the board
12  level, and at the interaction with other management
13  during board meetings.
14      Q.  Before John Chen resigned, did you form any
15  opinion one way or another about John Giamatteo's
16  ability to be collegial with his female coworkers?
17      A.  No.  I would not have separated male or
18  female in my assessment of him.  I didn't see any
19  difference.
20      Q.  Before John Chen resigned, did you form an
21  opinion about Mr. Giamatteo's competence, ability to
22  do the work that he was required to do?
23      A.  Yes.
24      Q.  What was that opinion?
25      A.  The opinion was that he was very good at --

Page 41

1  in terms of sales, sales planning, organizational
2  activities.  I felt that he had potential to do
3  more.  But that was what I had seen him doing, and
4  it was -- I was pleased with that.
5      Q.  And what -- what led you to form that
6  opinion about Mr. Giamatteo's competence and ability
7  to do the work?
8      A.  John would come in during the meeting, tell
9  us what he was going to do and come back at the next
10  meeting and tell us he's accomplished it.  Or if he
11  hadn't, why it hadn't worked out and what he was
12  going to do to fix it.  Typical, what I would call,
13  executive level management interaction with the
14  board.  And results that indicated that he was
15  carrying out those plans that he was asked to
16  execute on.
17      Q.  Have you spoken with Mr. Giamatteo about
18  this lawsuit?
19      A.  I have spoken with him.  Not about the
20  lawsuit, per se.  But there was a point in time when
21  we were concerned that he would be leaving before
22  the lawsuit had completed and that it was my concern
23  that he not leave at that point.  So I spoke to him
24  to ask him to be patient.  That was it.
25      Q.  Can you remember anything else about that



Page 42

1  conversation you just referenced?
2      A.  I just gave you everything that really
3  happened.  I asked him to please not be impatient,
4  that we needed to see this through, and that -- I
5  asked him to please be patient.  That was it.
6      Q.  And I think you mentioned that there was
7  some discussion at least on one occasion at the
8  board of directors about the lawsuit; right?
9      A.  Yes.
10     Q.  Was John Giamatteo present for that
11 discussion?
12     A.  I don't believe so.
13     Q.  Does Mr. Giamatteo --
14     A.  He was not -- he was not on the board at
15 that point.
16     Q.  Is he -- does he have a spot on the board of
17 directors currently?
18     A.  Yes, he does.
19     Q.  And so do you feel confident that
20 Mr. Giamatteo was not present for this board
21 meeting -- well, for this portion of the board
22 meeting in which the lawsuit was discussed -- or is
23 that something you feel not so confident about?
24     A.  No.  I feel confident about the -- the
25 meeting in which I am referring to, John was not yet

Page 43

1  a member of the board.  He was not yet in his CEO
2  role.
3      Q.  Well, the lawsuit was filed -- this is not
4  really a question, I guess.  But the lawsuit was
5  filed after Giamatteo already had become CEO so --
6      A.  Then I'm referring to the investigation that
7  was done prior to his being appointed.  I apologize
8  for that.  He was not present for any of those
9  discussions on the -- the investigation.
10     Q.  Before John Chen resigned, had you ever
11 talked with John Giamatteo about Neelam Sandhu, I
12 guess, in any capacity on any topic?
13     A.  No.
14     Q.  And before John Chen resigned, had you ever
15 spoken with Phil Kurtz about Neelam Sandhu?
16     MS. FORSTER:  Objection.  To the extent that
17 calls for privileged communications, I will instruct
18 the witness not to answer.
19     If you can recall any nonprivileged
20 communications during the time frame counsel
21 referenced, you may testify.  Otherwise, do not
22 respond.
23     THE WITNESS:  Let me -- Anthony, ask the
24 question again so that I'm clear on exactly the time
25 frames you're talking about.

Page 44

1  BY MR. TARTAGLIO:
2      Q.  Before John Chen resigned, had you ever
3  spoken with Phil Kurtz about Ms. Sandhu?
4      A.  No.
5      Q.  And since this is going to come up, I'm sure
6  later on, I'll just give a brief explanation that
7  the case law of attorney-client privilege on
8  in-house counsel is kind of tricky.  But the general
9  idea is that if the dominant purpose of the
10 communication is legal in nature, it's privileged.
11 But the dominant purpose -- or if the dominant
12 purpose is not legal in nature, it's not privileged.
13 And the rule's that way because sometimes in-house
14 counsel -- they will talk about things that are not
15 strictly legal in nature.  But that's kind of, like,
16 a high-level explanation of how that works.  I guess
17 it doesn't apply right now, but I'm sure that will
18 come up later on in the deposition.
19     Before John Chen resigned, had you ever
20 spoken with Tim Foote about Neelam Sandhu?
21     A.  No.
22     Q.  What's -- well, strike that.
23     Does the BlackBerry company still have an
24 elite customers division or unit?
25     A.  No.

Page 45

1      Q.  At some point earlier in time did BlackBerry
2  have some sort of a group or division focused on
3  elite customers?
4      A.  Yes.
5      Q.  And what was your understanding of the
6  mandate for the elite customer group?
7      A.  The elite customer group was formed for the
8  purpose of focusing on a very small number of
9  customers and giving them a level of service and
10 attention that was greater than the average customer
11 in the bigger group if you will.
12     Q.  And when there was an elite customer team,
13 did you have an opinion about whether this was good
14 idea, bad idea, neutral?
15     A.  I questioned why it would need to exist,
16 reporting in differently than the rest of the sales
17 organization.  But I was -- it was a decision that
18 the CEO had made and I had no objection to allowing
19 the CEO to make that call.  He was in a better
20 position than me.
21     Q.  Before John Chen resigned had you heard
22 about any tensions between the elite customers group
23 and other groups within BlackBerry?
24     A.  No.  Let me -- let me take that back.  There
25 was one instance where John Chen indicated -- and



Page 46

1  this is back to my point earlier. There was one
2  point in which John Chen was frustrated that in
3  order to have this elite group work successfully, he
4  had to continually get involved, and that he
5  attributed some of that to the friction between
6  organizations.
7      Q.  Okay. And one thing I should have mentioned
8  earlier is that you can revisit an answer if you
9  think it needs to be clarified or changed. That's
10  fine. I might be able to comment on -- about that
11  at trial, but your answers are not chiseled into
12  stone. If you want to revise an answer, you can --
13  you can do so, and it might be to your benefit to do
14  it now than to try to do it at trial, you know, a
15  year from now. Whenever that is.
16      A.  That revision is the one that I would stick
17  with.
18      Q.  Okay. I'm going to ask now about when John
19  Chen resigned. So you became interim CEO after he
20  announced his resignation; is that fair to say?
21      A.  Yes.
22      Q.  To your understanding, what was the process
23  by which you became interim CEO?
24      A.  I was asked by the CNG chair -- the CNG is
25  the compensation nominating governance committee

Page 47

1  chair, which is a board committee. I was asked if I
2  would take on that role as of the time that John
3  left, and I agreed to do so for a short period of
4  time.
5      Q.  When John Chen resigned, did you think that
6  there was -- well, strike that.
7          When John Chen resigned, did you have a
8  candidate in mind as someone who would be a good
9  successor?
10      A.  We had been looking at John Giamatteo for
11  that role since he was hired. The -- John Chen was
12  charged by the board with attempting to identify at
13  least one candidate that could play that role. And
14  John was -- John Chen had recommended John Giamatteo
15  for that particular role.
16      Q.  And I think you said something -- something
17  to the effect of the board had been looking at John
18  Giamatteo as a potential successor. What is it that
19  the board did -- well, I guess I should ask, was
20  there a formal process to identify a successor or
21  was it more of an informal discussion about who
22  might be a good successor?
23      A.  I think your question suggested that we were
24  trying to replace John Chen. Or -- yeah. I think
25  you have the names backwards. But regardless, I

Page 48

1  understand the question. The board -- because of
2  the way that John Chen's contract was written, the
3  board asked John Chen to please provide with -- the
4  board with candidates that he recommended, and John
5  Giamatteo was the latest one that he brought before
6  the board.
7      Q.  And besides asking John Chen to identify
8  potential successor, did the board of directors do
9  anything else before the John Chen resignation to
10  try to identify potential successor candidates?
11      A.  Informally, yes, formally no. And I would
12  say that the process was more or less that we would
13  identify and watch the candidate that John Chen
14  recommended to us, and that's the way the board was
15  working.
16      Q.  Do you recall there being any informal
17  discussions among the board about whether Giamatteo
18  would have been a good successor? And this is all
19  before John Chen resigned, by the way.
20      A.  I cannot recall a specific instance, so I'm
21  going to answer no.
22      Q.  Did the board ever discuss to your knowledge
23  any -- any other potential successors? And this
24  is -- again the time period would be before John
25  Chen resigned. Did the board of directors discuss

Page 49

1  any other potential successors besides John
2  Giamatteo?
3      A.  There was another name that was presented
4  prior to that. That individual left the business.
5  And I'm at a loss as to who that individual was.
6      Q.  So I'm going to ask now kind of similar
7  questions to what I asked earlier, but now I'm going
8  to talk -- now I want to ask about after John Chen
9  left, or he announced his resignation rather. So
10  after John Chen announced his resignation, did you
11  have some sort of a meeting with Ms. Sandhu?
12      A.  I had a meeting with her after John Chen
13  left. You -- I want to clarify. Are you asking
14  about the time between John Chen's announcement and
15  the time he terminated, or are you asking between
16  the time that he announced and the time that I
17  became the CEO?
18      Q.  Just -- just any time after John Chen
19  announced his resignation, did you have a meeting
20  with Ms. Sandhu?
21      A.  I had a -- I had a -- I had a phone call
22  meeting with her, consistent with the meetings I had
23  with every executive once I became the interim CEO.
24      Q.  And other than this one phone call -- well,
25  I guess I should ask you this way: So at some point



Page 50

1  you had -- did you have another phone call or
2  another meeting with Ms. Sandhu to tell her that she
3  was going to have to leave the company?
4      A.  Yes.  But I'm referring to a meeting where I
5  had committed to interviewing each of the executives
6  right after John Chen left.  There was a second
7  interaction when I unfortunately had to terminate
8  Neelam.
9      Q.  And between the first phone call with
10 Ms. Sandhu and the communications with her in which
11 you told her that she was going to be separated from
12 the company, did you have any other meetings, calls
13 with Ms. Sandhu, or was it just that one phone call?
14     A.  It was that one phone call.
15     Q.  Do you remember about how long that phone
16 call lasted?
17     A.  Probably 30 minutes.
18     Q.  And we're going to look at some notes later
19 on so we can -- this is not a gotcha question.  I
20 just want to see what you remember from this meeting
21 without looking at the notes.  So what do you
22 remember from the meeting with Ms. Sandhu?
23     A.  I asked her what she was doing.  I asked her
24 her views on the business.  I asked her her views on
25 how the business could operate differently and

Page 51

1  better.  It's the same set of questions I asked
2  everyone, so it essentially boiled down to those
3  questions.  And I looked for answers and responses
4  as a way of assessing each individual that I was
5  talking with.
6      Q.  And when you conducted this discussion did
7  you have a list of topics that you were going to try
8  to -- that you were going to try to discuss with
9  her?
10     A.  The best way to describe that is no.  And
11 the reason is because I was looking for them to do
12 most of the talking.  So I was not looking to talk
13 about a specific set of topics, if you will.  Just
14 the three comments that I iterated before, which is
15 I was looking for feedback from them.
16     Q.  Okay.  So let me know if you agree with
17 this.  You did not have a particular script for this
18 call with Ms. Sandhu, but you did have a few kind of
19 high-level general questions that were more to get
20 her point of view --
21     A.  Yes.
22     Q.  -- and get her talking?
23     A.  Yes.
24     Q.  And was that the same approach you used with
25 the other folks that you spoke with?

Page 52

1      A.  Exactly.
2      Q.  Was there some discussion during this
3  meeting with Ms. Sandhu about the possibility of her
4  becoming CEO?
5      A.  In the last five minutes of the call, I
6  asked her if there was anything else we should talk
7  about, and she indicated that she felt that she was
8  eligible for, qualified for the CEO role, and she
9  wanted to let me know that she would like to have --
10 be considered for it.
11     Q.  Do you remember whether you brought up the
12 topic of her potentially being CEO first or was that
13 something that she brought up?
14     A.  She brought that up.
15     Q.  And I want to make sure that we get your
16 best recollection as to this because there's a few
17 nuances potentially in how this is phrased.
18         So to your best recollection what did she
19 say about her desire to be CEO?
20     A.  She felt that she was qualified and that she
21 wanted to be considered.  Beyond that, I can't
22 recall any specificity to -- to the discussion.
23     Q.  And so there's a distinction that I'm going
24 to draw here between being considered for CEO and
25 becoming CEO.  The distinction being that someone

Page 53

1  might be considered but ultimately might not get the
2  position.  So with that distinction in mind, do you
3  recall her saying that she wanted to be considered
4  for CEO, or did she want to be the CEO?
5      A.  I cannot recall that specificity within the
6  conversation.
7      Q.  Do you recall whether Ms. Sandhu said that
8  she thought she should be the CEO?
9      A.  I believe that she suggested that to me.  I
10 cannot give you back her words of over a year ago.
11     MR. TARTAGLIO:  Let's take a break now.  I
12 think now is a good time for a break.
13     THE WITNESS:  Okay.
14     MS. FORSTER:  Okay.
15     THE VIDEOGRAPHER:  We're going off the
16 record.  The time is 10:08 a.m.
17     (Off the record:  10:08 a.m. to 10:17 a.m.)
18     THE VIDEOGRAPHER:  We are now back on the
19 record.  The time is 10:17 a.m.
20 BY MR. TARTAGLIO:
21     Q.  So, Mr. Lynch, are you able to remember
22 anything else about this phone call that you had
23 with Ms. Sandhu -- this approximately 30-minute
24 phone call -- other than what we've already
25 discussed?



Page 54

1    A.  She was very critical of some of the
2  organizations and the way that they were functioning
3  and felt that change was needed in the business.
4  That's about the only other one that comes to mind
5  immediately.
6    Q.  Can you remember any of the details of what
7  criticisms that Ms. Sandhu had for some of the other
8  parts of the business?
9    A.  Primarily related to the other sales
10  organizations.  She didn't really speak to the rest
11  of the business.  But to the other sales
12  organizations, she felt that there were changes that
13  could be made that could improve the way the
14  business was operating.
15    Q.  Can you remember any more details of what
16  she said along those lines?
17    A.  No.  I think I've stretched to the limit of
18  what I can recall now.
19    Q.  Did -- would one of these other
20  organizations have been headed up by John Giamatteo?
21    A.  Yes, I'm sure.
22    Q.  And do you remember that or is that
23  something that you're kind of inferring?
24    A.  Well, I'm inferring.  However, he ran one of
25  only two sales organizations other than her own.  So

Page 55

1  by implication, if we're talking about the sales
2  organizations not performing well, it would have to
3  be his organization.
4    Q.  Do you recall Ms. Sandhu discussing any
5  interpersonal conflicts with Mr. Giamatteo during
6  this phone call you had with her?
7    A.  No.
8    Q.  I'm going to ask now about -- well, did you
9  have a similar call with Mr. Giamatteo?
10    A.  I did.
11    Q.  What do you remember from that call, at a
12  high level?
13    A.  He too felt that the organization needed to
14  change.  He was focused on cost control.  He was --
15  it was a much bigger picture discussion where he --
16  he spoke about the number of engineering functions
17  spread around the world.  He spoke about the real
18  estate and the amount of real estate we had that he
19  felt was excessive.  He ticked down the list of all
20  of the things that I would have expected someone who
21  was focused on expense issues would talk about.
22    Q.  Can you recall anything else that you
23  discussed with Mr. Giamatteo during this phone call
24  or, I guess, this conversation?
25    A.  Not -- not at the moment, no.

Page 56

1    Q.  Do you recall during this conversation
2  whether Ms. Sandhu was discussed?
3    A.  Do I recall it, no?  I don't believe it
4  happened however.
5    Q.  Was the elite customer group discussed
6  during this phone call with Mr. Giamatteo?
7    A.  Specifically, no.
8    Q.  Was it discussed more generally?
9    A.  If you talk about sales alignment, sales
10  organization, sales objectives, yes.
11    Q.  Did Mr. Giamatteo express to you that he
12  thought the sales structure should have been
13  reorganized?
14    A.  During that conversation, I don't recall
15  that having been a topic.
16    Q.  During this phone call with Mr. Giamatteo
17  did you discuss the possibility of his becoming CEO?
18    A.  No.
19    Q.  Other than what we've discussed, can you
20  recall anything else that you discussed with
21  Mr. Giamatteo during the conversation shortly after
22  you became interim -- well, assuming that this is
23  shortly after you became interim CEO?
24    A.  No, I can't recall anything else.
25    Q.  My next question, you might need to consult

Page 57

1  with Ms. Forster, so if we have to take a short
2  break to do so, that's fine.  I guess the next
3  couple of questions.
4      Did you meet with Mr. Kurtz and have a
5  conversation with him along the lines that we've
6  been discussing?
7      MS. FORSTER:  I think the witness can answer
8  whether he met with Mr. Kurtz.  I think
9  characterizing the nature of the conversation might
10  invade the attorney-client privilege, and I would
11  instruct the witness not to answer as to that
12  aspect.  If that's acceptable to you, Counsel, then
13  we can proceed.
14      And, Mr. Lynch, if you have any question
15  about that, we can take a break.
16      THE WITNESS:  I have no question on that
17  basis.  Okay.  The answer is yes, I met with
18  Mr. Kurtz in exactly the same way I met with
19  everyone else.
20  BY MR. TARTAGLIO:
21    Q.  I'm going to ask you a question now you
22  probably need to consult with Ms. Forster about, so
23  if you need to take a short break to do so, go
24  ahead, because it's kind of legalistic in nature.
25      But during this discussion with Mr. Kurtz,



Page 58

1 did you discuss any topics that were not covered by
2 the attorney-client privilege?
3        MS. FORSTER:  Yeah.  I'm not going to have
4 my witness opining as to what's within
5 attorney-client privilege as a lay witness.
6        So I will just instruct the witness not to
7 answer that question.
8        THE WITNESS:  Okay.
9        MR. TARTAGLIO:  Well, I'm inviting you to
10 have a discussion.  Perhaps they talked about
11 business things, reorganizing the business,
12 streamlining, closing offices.  I don't know.  This
13 is all speculation.  But if they talked nonlegal
14 matters, you two can confer and see if you can
15 answer the question without revealing privilege.  I
16 would encourage you to do so actually.
17        MS. FORSTER:  Would it not make more sense
18 for us to do that during a break rather than taking
19 a break now just for this specific purpose of that?
20 I'm not sure that is something that we can untangle
21 quickly.  Maybe it is, but I don't know.  So are you
22 suggesting you want to stop the deposition and take
23 a break for the purpose of me conferring with
24 Mr. Lynch about that for this one question?
25        MR. TARTAGLIO:  If you think it can be done

Page 59

1 in five minutes, I think that's worth it.  If not,
2 we can -- we can do it -- you can talk about it over
3 lunch perhaps.
4        MS. FORSTER:  I think that would make more
5 sense.
6 BY MR. TARTAGLIO:
7 * Q.    Okay.  Well, how about this?  During this
8 conversation with Mr. Lynch -- Mr. Kurtz, did you
9 discuss Neelam Sandhu?
10        MR. TARTAGLIO:  I, again, will instruct the
11 witness not to answer as to the content of the
12 conversation with Mr. Kurtz at least pending our
13 discussion over lunch to tease out whether there was
14 any nonprivileged aspect to that conversation.
15        MR. TARTAGLIO:  All right.  I'll make a note
16 to revisit this later in the day.
17        MS. FORSTER:  Yeah, that's fine.
18 BY MR. TARTAGLIO:
19
20
21
22
23
24
25

Page 60

Page 61



Page 62



Page 63

10    Q.   I think you mentioned that when you were
11  talking about your conversation with Ms. White-Ivy,
12  she mentioned some friction among some of the --
13  well, I don't want to put words in your mouth, but
14  do you remember -- do you remember that point from
15  earlier?
16    A.   Yes.
17    Q.   What do you recall from what Ms. White-Ivy
18  said about the friction within the company?
19    A.   She -- I essentially have already described
20  it to you this way and just reiterated, she told me
21  that there was friction among the executive team and
22  it was frustrating to her and I should just know
23  that.
24    Q.   Did she say anything about Ms. Sandhu
25  specifically?

Page 64

1    A.   No.
2    Q.   Did you meet with Tim Foote in a similar
3  fashion shortly after you became interim CEO?
4    A.   I did.  I met with him for two reasons.
5  Number one, in a similar fashion, yes.  Also
6  recognizing that he was the investor relations
7  person.  It was important that we be on the same
8  page relative to the public pronouncements that
9  would be made through the office of the investor
10  relations person.
11    Q.   And investor relations -- because some of
12  the jurors, they might -- might not be familiar with
13  that.  What generally does investor relations do
14  within the company?
15    A.   Investor relations is essentially a public
16  relations-type of function that is focused
17  specifically on shareholders and other investors
18  within the business.  So if it's a shareholder or a
19  bondholder or a loan note holder that is interfacing
20  with BlackBerry, the investor relations people are
21  the ones that have that day-to-day relationship with
22  them.
23    Q.   And what do you recall from the conversation
24  you had with Mr. Foote after you became interim CEO?
25    A.   Because he wasn't a direct report, he wasn't

Page 65

1  a -- what I will call the executive cadre, per se.
2  The discussion was somewhat abbreviated.  I didn't
3  pursue a lot of points that I might have with the
4  other folks about, you know, how would you organize
5  the business, what did you see in it.  I spent more
6  time with him discussing the investor perspective of
7  what was going on and how we needed to message that.
8    Q.   And did Mr. Foote discuss with you any
9  interpersonal conflicts at the management level?
10    A.   No.
11    Q.   Did Mr. Foote say anything to you about
12  Neelam Sandhu?
13    A.   No.
14    Q.   Did you have a similar --
15    A.   Now, you -- let me again -- let me clarify.
16  The question is during that initial discussion with
17  him?
18    Q.   Yes.
19    A.   Okay.
20    Q.   And after that initial discussion, did you
21  have a conversation with Mr. Foote about working
22  with Ms. Sandhu?
23    A.   I had a follow-on discussion where I asked
24  him to please oversee the totality of the public
25  relations, investor relations function but that was



Page 66

1  after the decision had been made to terminate
2  Neelam.
3        Q.  And between this initial call with Mr. Foote
4  and the subsequent discussions about him taking over
5  some functions in light of Ms. Sandhu's departure,
6  did you have any other conversations with Mr. Foote?
7        MS. FORSTER:  Objection.  The question as
8  phrased misstates the witness's testimony.
9           If you understand it, though, you may go
10  ahead and answer.
11        MR. TARTAGLIO:  Okay.  I'll ask you,
12  Ms. Forster, because I'd rather ask a good question
13  than a bad question, what did I get wrong there?
14        MS. FORSTER:  I think you said -- you asked
15  Mr. Lynch whether his conversation -- you
16  characterized the conversation with Mr. Foote as
17  taking over certain functions in light of
18  Ms. Sandhu's departure, and that's -- I don't
19  believe he testified that that was the reason for
20  his call with Mr. Foote.  It may have been, but I
21  don't think he testified to that.
22        MR. TARTAGLIO:  Okay.  All right.  I may
23  have been assuming some facts there, so I will
24  restate it.
25  ///

Page 67

1  BY MR. TARTAGLIO:
2        Q.  So between the initial phone call with
3  Mr. Foote and then later on you had some discussions
4  about him taking on some PR-type duties, did you
5  have any other conversations with Mr. Foote in the
6  meantime?
7        A.  I had periodic very quick phone calls with
8  him.  I'm sure that I can't cite each and every one.
9  But they went to the heart of the investor relations
10  issue that we were contending with at the time.
11        Q.  And during that interim period when you'd
12  have these conversations with Mr. Foote, did
13  Ms. Sandhu ever come up?
14        A.  I don't -- I think the answer is no, yeah.
15  ███████████████████████████████████████████████
16  ███████████████████████████████
17  ███████████
18  ████████████████████████████████████████████████
19  ████████████████████████████████████████████████
20  ████████
21  ██████████████████████████████████████████████████
22  █████████████████████████████████████████████████
23  ████████████████████████████████████████████████
24  ██████████████████████████████████████████████████
25  ████████████████████████████████████████████████

Page 68

1  ███████████████████████████████████████████████
2  █████████████████████████████████████████████████
3  ███████████████████████████████████████████████████
4  █████████████████████████████████████████████████
5  ███████████████████████████████████████████████
6  ███████████
7  ██████████████████████████████████████████████████
8  █████████████████████████████████████████████████
9  ████████████████████████████████████████████████
10  ███████████████████████████████████████████
11  █████████████████████████████████████████████
12  █████████████████████████
13  █████████████████████████████████████████████████
14  █████████████████████████
15  ████████████████████████████████████████████████
16  ████████████████████████████████████████████
17  █████████████████████████████████████████████████
18  ██████████████████████████████████
19  █████████████████████████████████████████████████
20  █████████████████████████████████████
21  ███████████████████████████████████████████████
22  ███████████████████████████████████████████████
23  ████████████████████████████████████████████████
24  ████████████████████████████████████████████████
25  ████████████████████████████████████

Page 69

1  ██████████████████████████
2  █████████████████████████████
3  ███████████████████████████
4  ██████████████████████████
5  ████████████████████████████████████████████████
6  ████████████████████████████████████████████████
7  ████████████████████████████████████████████████
8  ██████████████████████
9  █████████████████████████████████████████████████████
10  ███████████████████████████████████████████
11  ███████████████████████
12        Q.  Do you know who ████ -- and I'll put it in
13  here for the court reporter spelling.
14           Do you know who Steve Rai was?
15        A.  I do not recall the name.  What's the last
16  name again?
17        Q.  ████
18        A.  Oh, ████████████
19        Q.  Oh, ████.  Okay.
20        A. ████  ██████  yes. ██████████████████████
21  ███████████
22        Q.  Did you have a similar sort of phone call or
23  other communication with ██████  after becoming
24  interim CEO?
25        A.  I did have a discussion with him as I did



Page 70

1   with the other executives.  It was a -- again,
2   roughly a 30-minute discussion.  We discussed many
3   of the same topics that each of the other managers
4   talked about with us.
5        Q.  And during this conversation with █████
6   did Neelam Sandhu come up at all?
7        A.  No.
8        Q.  And did -- did friction between some of the
9   business units come up during this discussion with
10  Mr. Rai?
11       A.  Yes.
12       Q.  What do you recall along those lines?
13       A.  That -- that █████ was frustrated and
14  unhappy that his cost-reduction objectives were not
15  being taken seriously, as he perceived it, by others
16  within the executive team.
17       Q.  Do you recall █████ saying anything about
18  tensions between the elite customers group and some
19  other group within the company?
20       A.  No.
21       Q.  And this is something where you can look at
22  the documents to help you if you'd like, because I
23  think it's pretty important.
24           Do you recall when you had this conversation
25  with Ms. Sandhu, this 30-minute phone call that we

Page 71

1   talked about earlier?
2        A.  It was right after the group meeting that I
3   had by phone with the executive team.  I believe it
4   was within a day or two.  May have been the same day
5   for all I remember.
6        Q.  At some point -- well, I should ask you:  At
7   some point did you decide to terminate Ms. Sandhu's
8   employment?
9        A.  Yes.
10       Q.  When -- and you can go either with a
11  specific date or just perhaps in relation to some
12  other dates or events.  Recall the example earlier,
13  "Oh, I remember that was about the time my daughter
14  graduated high school."  So if you can estimate that
15  way, that's fine.  But are you able to provide an
16  estimate for when you decided that you would be
17  terminating Ms. Sandhu's employment?
18       A.  It was between the first day that I was in
19  the role and probably the end of that week.
20       Q.  And did you make the decision to terminate
21  her employment before or after the 30-minute phone
22  call you had with her?
23       A.  Oh, it was after the 30-minute phone call.
24       Q.  And before the phone call, going into the
25  phone call, were you already thinking about

Page 72

1   potentially terminating her or was that a thought
2   that came up later?
3        A.  If you're asking was it driven by the
4   interview, no.  I need to explain the process if
5   you'd allow me.  Project mustard is an important
6   component of the survival of BlackBerry as we knew
7   it.  And in order to accomplish project mustard,
8   three or four things had to happen.  One of them was
9   an enormous reduction in the executive team, a
10  streamlining of the business, an elimination of
11  corporate roles, and the establishment of two
12  separate business units.  And I did that a variety
13  of ways, but one of the ways in which I did it was
14  to look at the organization chart and identify the
15  people who were not in one of those business unit
16  roles and had no business unit functions.  And I --
17  I refer to those as "corporate people."  And as a
18  result of that thinking, I had already identified
19  Neelam's role as one that would not survive the
20  project mustard process.
21  ███████████████████████████████████████████
22  ███████████████████████████████████████████
23  ███████████████████████████████████████████
24  ███████████████████████████████████████████
25  ███████████████████████████████████████████

Page 73

1   █████████████████████████████████████████████
2   █████████████████████████████████████████████
3   █████████████████████████████████████████████
4   ████████████████████████████████████
5   █████████████████████████████████████████████
6   █████████████████████████████████████████
7   ██████████████████████████████
8   ██████████████████████████████████████
9   ████████████████████████████████████████
10  █████████████████████████████████████████████
11  █████████████████████████████████████████████
12  ██████████████████████████████████████████
13  █████████████████████████████████████████████
14  ███████████████████████████████████████████
15  █████████████████████████████████████████████
16  ████████████████████████████
17       Q.  Sorry.  There's a siren going by.
18           And do you recall what Neelam's -- well,
19  Ms. Sandhu's job titles were around the time you
20  became interim CEO?
21       A.  She was the corporate marketing.  She was
22  the corporate elite salesperson, and she had a
23  sustainability role, which I don't believe had a
24  title with it.
25       Q.  And so what was the -- what was the thinking





Page 74

1  about what would happen to her marketing duties
2  after she was terminated?
3      A.  They would move to the two business units
4  and there would be little or no corporate marketing.
5      Q.  So the two business units, what were those
6  two, by the way, that you're referring to?
7      A.  At the time they were called "cyber business
8  unit" and "internet of things," or "IoT" business
9  unit.
10     Q.  And did cyber and internet of things already
11  have their own head of marketing?
12     A.  Yes.
13     Q.  And as for the sustainability aspect of her
14  job, what was the plan for how that would be handled
15  after project mustard went into effect?
16     A.  We would find a home for that in the legal
17  organization, which is where the other components of
18  that role were already.  And so putting
19  sustainability into legal was a fairly easy way to
20  accomplish the elimination of the corporate, you
21  know, function that Neelam was doing.
22     Q.  And I think the third thing you mentioned
23  was elite customer group; is that -- is that
24  correct?
25     A.  Yes.

Page 75

1      Q.  And what was the plan for what was going to
2  happen to the elite customer group after project
3  mustard?
4      A.  Well, that was easy because essentially the
5  elite customer group was a sales function with some
6  sales support.  And cyber and IoT both have a sales
7  function with sales support, so it was a matter of
8  moving those customers back into one of the two
9  business units.
10  [REDACTED]
11  [REDACTED]
12  [REDACTED]
13  [REDACTED]
14  [REDACTED]
15  [REDACTED]
16  [REDACTED]
17  [REDACTED]
18  [REDACTED]
19  [REDACTED]
20  [REDACTED]
21  [REDACTED]
22  [REDACTED]
23  [REDACTED]
24  [REDACTED]
25  [REDACTED]

Page 76

1  [REDACTED]
2      Q.  And so I'm going to make a statement now
3  which you're probably going to disagree with, but
4  I'm interested to see why you would disagree with
5  it.  So here's something that someone might say.  It
6  looks as if this project mustard is taking job
7  duties that would have been done by one person and
8  having it being done by two people.  So isn't that
9  less efficient to have two people doing it instead
10  of one person?  How would you respond to that?
11     A.  I can talk all afternoon on that.  No, I
12  [REDACTED]
13  [REDACTED]
14  [REDACTED]
15  [REDACTED]
16  [REDACTED]
17  [REDACTED]
18  [REDACTED]
19     The idea of having two separate business
20  units that are mean and lean and don't require a lot
21  of corporate overhead was a good portion of the
22  reason for mustard.  And so if you take what was
23  being done in one place and you move only what needs
24  to be done to the two business units and make them
25  responsible for the cost of those functions, it's

Page 77

1  amazing how quickly a lot of that functionality
2  isn't needed anymore.  And that was the thinking
3  that I used in driving early project mustard.
4      Q.  Was the plan for project mustard to have a
5  formal separation of the two business units?  For
6  example, a spinoff company, or was it to have the
7  same legal structure but just have more of a
8  different internal structure?
9      A.  The answer I have to give you is the public
10  answer, which is that we are positioned to prepare
11  for any strategic eventuality.  I hope that's clear.
12  If not, I'll try again.
13     But, Katherine, help me here to make sure I
14  don't go off too far.  But the whole concept --
15     MS. FORSTER:  If I may -- if I may, if
16  you're concerned about confidentiality, I know that
17  we have a protective order in place in the case, and
18  if there is more of an explanation you can provide,
19  if it is designated as confidential, then we can do
20  that.  So would you feel more comfortable responding
21  to this question if we designate this as
22  confidential?
23     THE WITNESS:  Yes.
24  BY MR. TARTAGLIO:
25     Q.  It might help if I ask it this way:  So

Page 78

1  BlackBerry, they might have future plans for
2  acquisition or spinoffs, corporate restructuring, I
3  don't know.  But I'm not asking about things that
4  might happen in the future.  So 2025 going onward,
5  you don't have to worry about that.
6      So -- but around the time that you were
7  interim CEO, was the thinking that for project
8  mustard there was going to be some sort of a formal
9  company split or spinoff or was this more of like an
10 internal restructuring?
11     A.  This was an internal restructuring to
12 prepare for the future.
13     Q.  And was there eventually some sort of a
14 spinoff or formal separation of the business units?
15     A.  There has been a sale of a piece of the
16 cyber business unit since project mustard has
17 occurred.  That was publicly announced when we sold
18 the Cylance business, which was a part of the
19 project mustard focus.  So, yes, we have seen some
20 action since -- since the separation of the two
21 business units.  But there is still a -- what I
22 refer to as a thin corporate layer because we only
23 have one stock, and we have corporate entities that
24 we have to deal with.  So that is what remains in
25 the -- the corporate world.  Everything else is in

Page 79

1  the business units.
2      Q.  Was there some thinking around the time you
3  decided to terminate Ms. Sandhu's employment about
4  finding her another role within the company?
5      A.  I am always open to those kinds of things,
6  and I told all of the executive team that I was open
7  to that, but we needed to cut back the number of
8  executives.  I warned over the years that you can't
9  cut back executives or I -- say it the other way.
10 You cannot effectively reduce the cost of doing
11 business if you don't reduce the number of
12 executives that are in that business.  And so to me,
13 executive reduction needs to precede the reduction
14 of the overall business.  And there were and have
15 been thousands or more people who have been let go
16 from Verizon -- from BlackBerry since we began
17 project mustard.
18     Q.  And I guess more specifically, did you
19 consider placing Neelam -- Ms. Sandhu somewhere else
20 in the company, for example, within the IoT group,
21 let's say, as their head of marketing?  Was there
22 any consideration about -- about that sort of a
23 placement?
24     A.  No.
25     Q.  Why not?

Page 80

1      A.  Because the business already had functioning
2  marketing people in those roles, and it seemed to me
3  that that was a more effective way to -- to handle
4  the business.
5      Q.  Did Ms. Sandhu's personality have anything
6  to do with the decision not to place her in a
7  different role in the company?
8      A.  I would say yes, it did.
9      Q.  How so?
10     A.  I had come to learn from the variety of
11 interviews I had done and some feedback I'd received
12 since I became the interim CEO that she had
13 difficulties in relating to others within the
14 business.  I had watched her interact very
15 negatively with one of her peers that I had to
16 manage and make peace.  It just seemed to me that
17 based upon my experiences with her in that period of
18 time that she was not -- there was no justification
19 for me to move someone else out to find her a role.
20 I thought it made more sense to -- since none of her
21 roles would continue as they were, it seemed logical
22 that she would be the one that we would terminate.
23     Q.  I'm going to ask you a series of questions,
24 and I'm going to make a distinction between
25 firsthand knowledge -- so things that you observe

Page 81

1  personally.  You hear things, see things -- and
2  secondhand knowledge, which is things you hear about
3  from someone else.  You probably -- well you might
4  know this in the law, those are sometimes treated
5  differently.  So I'm going to make a distinction
6  between firsthand knowledge, things you personally
7  observed, secondhand knowledge, events you heard
8  about from someone else.
9      And so for firsthand knowledge, what sort of
10 things did you observe about Ms. Sandhu that -- that
11 influenced the opinion you reached about her ability
12 to work with her colleagues?
13     A.  I recently -- I earlier described the
14 interaction I had with her at dinner.  Refer you
15 back to that as one of the things that I recall and
16 it left an impression for me.  The second was the
17 actual dialogue I had with her in that 30-minute
18 call, that I just felt that her approach to the
19 problems was that they were problems and she could
20 fix them, but no follow through on that.  I think
21 that those things, coupled with her position,
22 coupled with my desire to move forward with the
23 people that were in place, all led me to believe
24 that she was the one that should be terminated.
25     Q.  And I think you mentioned -- the phrase you



Page 82

1  used was "no follow through" in this conversation
2  with Ms. Sandhu.  Could you explain what you meant
3  by that?
4      A.  The -- the best way to describe it is that
5  I -- I -- there was -- I hate to use the word
6  "accusation."  There was opinions expressed, and
7  there was not a, "Here's what I'm going to do about
8  it.  Here's what I can do about it."  It was, there
9  were opinions expressed.  Where some of the other
10 people I interviewed and talked with, "here's the
11 issues, here's how we should fix them."
12     Q.  And you mentioned a negative interaction
13 that Ms. Sandhu had had with one of her colleagues.
14 What do you recall about that?
15     A.  Yes.  The interaction there was that one of
16 her colleagues was being awarded -- given an award
17 and that colleague was looking to provide some
18 expense support for bringing female managers from
19 BlackBerry to the awards dinner to demonstrate that
20 BlackBerry was supportive of female managers and
21 female engineers, and Neelam refused to.  And I was
22 asked to -- by the other manager who was being given
23 the award, I was asked to essentially negotiate it
24 between the two of them, and I did.  And Neelam
25 immediately agreed to make the expenditure.  But

Page 83

1  there should have been no need for the CEO of the
2  business to get involved with what amounted to a
3  very, very insignificant amount of money.
4      Q.  And who was that other person?
5      A.  It's a woman by the name of Marjorie
6  Dickman.
7      Q.  So it sounds like -- and so going on your
8  firsthand experience with Ms. Sandhu, it sounds like
9  you had this dinner with Ms. Sandhu before you
10 became interim CEO.  It sounds like you had some
11 conversations with her about this issue with
12 Ms. Dickman, and --
13     A.  Emails.  Those were all done with email.
14     Q.  Email.  Okay.  So sounds like -- and this is
15 going to be kind of a long question, so I will give
16 you a roadmap of where I am going.  I'm trying to
17 get an exhaustive collection of the conversations --
18 I guess, it could be over email -- but
19 conversations, interaction you had with Ms. Sandhu
20 before you decided to terminate her or before you
21 told her you would be terminating her.
22     So it sounds like before you told Ms. Sandhu
23 about her termination, you had this dinner with her,
24 which is before you became interim CEO.  You had the
25 30-minute phone call we talked about earlier.  You

Page 84

1  had some emails regarding this dispute with
2  Ms. Dickman.  Can you recall any other interactions
3  you had with her before you told her of her
4  termination?
5      A.  Yes.  Well, direct, no.  No, they were --
6  I'll wait for your second question to give the next
7  answer.
8      Q.  My follow-up question, which looks like you
9  anticipated is I'm now going to pivot to not
10 firsthand interactions with Ms. Sandhu.  In other
11 words, things that other people told you about
12 Ms. Sandhu.
13     Did anyone tell you that Ms. Sandhu was -- I
14 guess other than the John Chen conversation we had
15 earlier -- or we discussed earlier, did anyone else
16 tell you that they found it difficult to work with
17 Ms. Sandhu?
18     A.  If I can rephrase your question just
19 slightly I can answer it more productively.
20     Q.  Go ahead.
21     A.  That is, did anyone else make it clear to me
22 that she was -- she had difficulties with others?
23 Yes.  I have been told by people within the HR
24 organization that she had difficulties with other
25 people.  That was all in the -- didn't it run up to

Page 85

1  the actual termination discussion I had with her,
2  but that came out of that one.
3      Another example of that is that I had
4  specifically instructed that John Chen's biography
5  be removed from the BlackBerry website over the
6  weekend.  Sorry, don't remember which weekend, but
7  over the weekend.  And Neelam made very clear that
8  that was her decision to make and not mine, and that
9  she told someone in her organization not to do it.
10 And I have seen an email to the effect that -- it
11 was an explanation back that, you know, it was her
12 role and that her role was not to be violated.  I
13 obviously beg to differ with that as the CEO of the
14 company.
15     Q.  And as for this website issue, did you -- do
16 you remember who this individual was who had been
17 asked to change the website?
18     A.  The -- the long -- the individual that I
19 asked was I instructed Phil Kurtz to get it done.
20 The individual who Phil Kurtz asked to get it done
21 is not within my purview to remember, I'm afraid.
22 So I don't remember the last -- the individual who
23 was actually told not to do it, but Phil Kurtz was
24 the one I asked to have it done.
25     Q.  Might it have been Ms. Hanson?



Page 86

1    A.  I don't know.  I don't remember.

2    Q.  Do you know whether BlackBerry had some sort

3  of policy in place about how the website should be

4  updated?

5    A.  They had policies for everything, including

6  travel to various places that you had to run through

7  John Chen to get just about anything done.  But that

8  was again part of the John Chen era and at the time

9  it made sense but it didn't make sense now.

10   Q.  Do you have an opinion on whether Ms. Sandhu

11 was following the policy when she insisted that the

12 website update be approved by her?

13   A.  She's not following policy when the CEO

14 tells someone to get it done.  That's -- a policy is

15 something that comes to eliminate the need for the

16 individuals within the organization who have that

17 decision-making to delegate that decision-making.

18 But as the CEO of the company, I don't believe that

19 someone who is, quote, got a policy in their -- in

20 their hand or in their pocket can overrule what the

21 CEO says they want to do.  If it's a board policy,

22 that's a different story.  But if it's a policy that

23 comes from the CEO, CEO can overrule it.  So I -- I

24 don't buy that argument.

25   Q.  And I think you mentioned that Mr. Kurtz had

Page 87

1  executed your instruction to update the website; is

2  that right?

3    A.  He attempted to, yes.

4    Q.  Do you know if Ms. Sandhu was aware that

5  even though Mr. Kurtz was the one giving this order,

6  that it was actually you who had originated the

7  order?

8    A.  I do not know that.

9    Q.  So we talked about -- or you mentioned

10 rather some conversations with HR about Ms. Sandhu.

11 What do you recall from that?

12   A.  At the time that I indicated that, you know,

13 I was looking to package the necessary documents to

14 terminate her, I was told that she probably would be

15 difficult to deal with about these things and that I

16 needed to just be aware of that and I was.  She --

17 I'd been made aware of it.

18   Q.  Can you recall with any more specificity

19 what was told to you about her being difficult?

20   A.  No, I can't.

21   Q.  Okay.  And so we spoke about the fact that

22 you had some discussions with HR in which Ms. Sandhu

23 was described as being difficult to work with in

24 some ways.  We discussed about -- we discussed this

25 website update incident.  Do you recall any other

Page 88

1  conversations where you heard secondhand about

2  Ms. Sandhu being difficult to work with?

3    MS. FORSTER:  Vague and ambiguous as to

4  time.

5    THE WITNESS:  I can't give you a specific

6  time and individual, but I can tell you that during

7  the course of my dialogues with the executive team

8  immediately after taking place -- taking John Chen's

9  place that I was told that she was difficult to work

10 with.

11 BY MR. TARTAGLIO:

12   Q.  Do you remember who told you that?

13   A.  No.

14   Q.  Can you remember with any more detail the

15 words that were used to convey this idea that she

16 was difficult to work with?

17   A.  No.

18   Q.  Did -- well, so this is kind of a broader

19 question.  We've been talking for a while now about

20 the reasons why you decided not to -- to, I guess,

21 reposition or relocate Ms. Sandhu within the

22 company.  Can you think of any other reasons other

23 than what we've discussed today about why you

24 decided not to place Ms. Sandhu somewhere else

25 within the organization?

Page 89

1    A.  No.  Frankly, I don't think that I would

2  need any other reasons.  I think I had a very

3  logical management-driven process that I used and

4  that -- that was really my decision process that

5  drove to that -- that end point.

6    Q.  Did you ask Ms. Sandhu her opinion about

7  project mustard and her role being eliminated as a

8  result of that?

9    A.  No.

10   Q.  Did you ask Ms. Sandhu about these

11 allegations you had been hearing about her being

12 difficult to work with?

13   A.  No.

14   Q.  So I'll give you an example of something

15 that happens in the media.  Oftentimes when an

16 article is published about someone, that person

17 will -- the reporter will call up that person, give

18 them the chance to respond before the article goes

19 to press.  The thinking being that if accusations

20 are being made against someone, they should have a

21 chance to give their side of the story so to speak.

22 So that's a preamble.  That's not my question.

23   My question is did you go to Ms. Sandhu and

24 ask her for her side of the story as to these

25 allegations about her being difficult to work with?

Page 90

1     A.  No, because it wasn't relevant.  I had
2  already made the decision based on, I think, sound
3  management judgment that she was in a position that
4  was going to be terminated -- or eliminated is the
5  better word, and that I had concluded that we needed
6  to eliminate some of our executive team, and that it
7  was logical that a person whose total job was
8  eliminated that would be one of the people that
9  would leave.  So the answer to your question with
10  that caveat is no, I did not, and I don't think I
11  should have at that point because it would have been
12  of no additional value since the decision process
13  that I made was driven primarily by the
14  organizational requirements and those other items
15  that we've talked about, the -- our -- what I would
16  call confirmatory points that justified -- not
17  justified but confirmed my earlier decision.  So
18  sorry to be so emotional about it, but it just seems
19  like we're going down a track that says, "Well,
20  shouldn't we ask?"  Well, not, really.  In my view,
21  at this point we're talking about a management
22  decision that needed to be made.  So sorry about
23  that, but I just needed to get that off my chest.
24     Q.  Do you know whether Ms. Sandhu was ever
25  given performance reviews, let's say for the time

Page 91

1  period for the three years leading up to her
2  termination?
3     A.  I don't know that.
4     Q.  Did you make any attempt to determine
5  whether she had any performance reviews in the years
6  leading up to her termination?
7     A.  No.
8     Q.  Do you know whether she had gotten any
9  promotions or raises within, let's say, the three
10  years leading up to her termination?
11     A.  I can't give you the answer on basis of
12  three years.  I can tell you that she had moved from
13  one role to another and that the role that she --
14  that had been created for her was the role that she
15  had been put in.  That's the totality of what I know
16  about that.
17     Q.  Sometimes employees will get commendations
18  or awards from the company.  Did you inquire as to
19  whether Ms. Sandhu had ever received any sort of
20  commendation or award from BlackBerry?
21     A.  No.
22     Q.  Sometimes people, especially in more
23  customer-facing roles, will keep laudatory feedback
24  from a client.  So let's say a client sends an email
25  that says, "Hey, you did an awesome job on this

Page 92

1  particular sale or this particular project," and
2  employees will oftentimes keep those sorts of
3  communications, give them to their manager, give
4  them to HR.
5     Did you make any inquiries as to whether
6  Ms. Sandhu had received any sort of laudatory praise
7  from a customer?
8     A.  No.  I'm sorry.  Did you miss my last
9  answer?
10     Q.  No, I'm just thinking.  I don't have every
11  question scripted out so I need --
12     A.  No, that's okay.  I -- you just looked like
13  you had froze there, and I wanted to be sure the
14  electronics were still working.
15     Q.  Did anyone tell you -- so this is for the
16  time period you're interim CEO.  Did anyone tell you
17  that they thought that Ms. Sandhu should be fired?
18     A.  No.
19     Q.  Did Mr. Giamatteo -- Giamatteo ever tell you
20  that he thought Ms. Sandhu should be fired?
21     A.  No.
22     Q.  Did Mr. Giamatteo ever tell you that he
23  thought Ms. Sandhu was difficult to work with?
24     A.  No.
25     Q.  Did Mr. Giamatteo ever tell you that he

Page 93

1  wanted Ms. Sandhu to be fired before he became CEO?
2     A.  No.
3     MR. TARTAGLIO:  This seems like a good time
4  for another break.
5     MS. FORSTER:  Okay.  How long?
6     MR. TARTAGLIO:  Can we come back at, I
7  guess, like, 11:25?  Does that work for people?
8     MS. FORSTER:  Yep.
9     MR. TARTAGLIO:  Okay.  See you soon.
10     THE VIDEOGRAPHER:  This marks the end of
11  Media Number 1.  We are now going off the record.
12  The time is 11:17 a.m.
13     (Off the record:  11:17 a.m. to 11:28 a.m.)
14     THE VIDEOGRAPHER:  We are now on the record.
15  The time is 11:28 a.m.  This marks the beginning of
16  Media Number 2 in the deposition of Dick Lynch on
17  June 5, 2025.  Please continue.
18  BY MR. TARTAGLIO:
19     Q.  Mr. Lynch, I think you testified earlier
20  that at a high level, the thinking behind some of
21  these management cuts was that there were some
22  company-wide management duties that could have been
23  done within the individual business units.  Was that
24  the gist of it?
25     A.  That's -- that's a subordinate component of

Page 94

1  the strategy, yes.
2      Q. But that was one part of the strategy?
3      A. That was part of the strategy, yes.
4      Q. And I think you mentioned that there were
5  some duties that would still need a company-wide
6  manager. I think you mentioned chief financial
7  officer, and I assume chief executive officer as
8  well. But did -- were there any other company-wide
9  management positions that you think needed to stay
10  and continue to be company wide?
11     A. We needed a -- a legal representative on a
12  company-wide basis, and we needed a very small
13  function for human resources on a company-wide
14  basis.
15     Q. And for -- so for human resources, was the
16  thinking that the management role -- the
17  company-wide management role would be eliminated or
18  that there would be someone who would continue to be
19  sort of a company-wide HR person?
20     A. Well, actually the way that the process has
21  planned and worked out is that all four of the
22  individuals who are in the, quote, corporate
23  functions are also within a business unit and
24  function as a business unit and as the corporate
25  function. And I'll use as an example of that, the

Page 95

1  corporate CFO is also the CFO for the cyber business
2  unit. And we have done that with each of the four
3  people who are still, quote, corporate level.
4      Q. Is there a chief executive officer
5  currently?
6      A. Yes.
7      Q. And presumably his duties accompany both of
8  the -- cyber security and internet of things
9  business units?
10     A. At a corporate reporting level, yes. But
11  there are two presidents of the two business units.
12  The CEO is also the -- you know, name is important
13  here, I'm sure. But Giamatteo is the corporate CEO.
14  He is also the president of the cyber business unit
15  or what is now called the secure communications
16  business unit.
17     There is a -- someone by the name of Mattias
18  Eriksson, who is the president of the IT or what we
19  now call the QNX business, and while he reports to
20  John Giamatteo corporately, he runs his own
21  business.
22     Q. Do you recall what -- and you don't have to
23  have the exact wording if you don't remember it.
24  But do you recall what Nita White-Ivy's job duty was
25  when she was -- well, when she left the company?

Page 96

1      A. Well, her role was the -- the totality of
2  all of the HR functions throughout the entire
3  company. It incorporated and everyone reported to
4  her on a straight-line basis into her for all the HR
5  functions.
6      Q. Does BlackBerry currently have a chief
7  people officer?
8      A. Yes. But also runs the cyber business unit
9  HR organization. Because there is no full-time role
10  for a chief people officer at a corporate level.
11     Q. Does the BlackBerry chief peoples officer's
12  job duties encompass both the QNX as well as the
13  cyber security divisions?
14     A. From an oversight standpoint, I would say
15  yes. From a functional standpoint, no.
16     Q. Well, let me know if you disagree with the
17  statement or agree with it, that Nita White-Ivy's
18  job position remains, even though she's no longer
19  with the company, but there is someone who does
20  similar job duties to what she did. Is that a
21  statement you agree with?
22     A. No, I don't. Her role was three functions,
23  all of which have gone into the business units. And
24  only one of which, sustainability, would be
25  perceived as being a corporate role today. The

Page 97

1  other two roles are clearly business unit roles.
2      Q. And BlackBerry currently has a chief
3  financial officer?
4      A. Yes.
5      Q. And who holds that position currently?
6      A. That's Tim Foote, and he's also the CFO of
7  the cyber business unit because there isn't a
8  full-time CFO role at the corporate level required.
9      Q. And then there's the chief legal officer.
10  Is that Phil Kurtz?
11     A. Yes.
12     Q. Okay. I'm going to share a screen, because
13  I'm not trying to play pop quiz with you. I don't
14  think we're going to make this an exhibit because I
15  think you probably know who these people are.
16  But -- so would you agree that Jennifer
17  Armstrong-Owen is the chief people officer of
18  BlackBerry?
19     A. Yes.
20     Q. And her job duties would encompass both QNX
21  as well as the cyber business unit?
22     A. Not in the same sense that Nita White-Ivy's
23  function was construed.
24     Q. Well, would you agree that
25  Ms. Armstrong-Owen is the chief people officer for



Page 98

1  the entire company of BlackBerry?
2      A.  I would give -- I would say, yes, she has
3  that title, and she has oversight on one business
4  unit and has functional responsibility for the
5  other.
6      Q.  And then there's Mr. John Dimitropoulos.
7  I'm probably butchering his name.  Apologies to him.
8  And his job duty is listed as senior vice president
9  and chief strategy officer.
10     A.  Yeah.
11     Q.  Is that consistent with your understanding?
12     A.  Yes.
13     Q.  And does Mr. Dimitropoulos -- does -- do his
14  job duties encompass one particular business unit or
15  the whole company's?
16     A.  It is -- it is essentially the cyber
17  business unit or the -- what you would call the --
18  now call the secure communications business unit.
19  But he also assists Mattias to the degree that
20  Mattias needs strategic help.
21     Q.  And then we've been talking about
22  Mr. Mattias Eriksson, so he's president of
23  BlackBerry Internet of Things, which I guess could
24  also be known as QNX; is that correct?
25     A.  Yes.

Page 99

1      Q.  And we talked about Mr. Foote.  He's chief
2  financial officer.
3      A.  Well, but he's chief financial officer for
4  the business unit, and he also does the chief
5  financial officer function as it exists in its
6  reduced state for the corporation.  So his role is a
7  business unit role with the add on of what is --
8  whatever is left in the corporate world.
9      Q.  Well, would you agree that Tim Foote is
10  BlackBerry's chief financial officer?
11     A.  Oh, sure.  Yeah.
12     Q.  He's responsible for the financial reporting
13  compliance with the whole company of BlackBerry?
14     A.  That's the role that he plays there, yes.
15     Q.  And then I see Jesse Harold here, who is
16  listed -- Harold is with an O, by the way.
17  H-A-R-O-L-D.  He's listed as a senior vice
18  president, chief information officer and chief
19  information security officer.  Are his duties
20  company wide or are they focused on one particular
21  business unit?
22     A.  Actually his -- it's a combination of
23  things.  Jesse is in the process of working himself
24  out of a job.  He still runs the -- what I will call
25  "old corporate systems" for the entirety of the

Page 100

1  company.  But his job is to whittle those down to
2  the point where the two entities have their own
3  units, and he would at that point in time be
4  subsumed into one of those units or no longer
5  needed.  So that's -- that's what he is working on
6  currently.  But to argue his title, that's his
7  title, yes.
8      Q.  And we see Phil Kurtz is chief legal officer
9  and corporate secretary for BlackBerry; right?
10     A.  Correct, yes.
11     Q.  And so his duties encompass all the business
12  units; is that fair to say?
13     A.  Yes.  Except that there is actually a chief
14  legal officer, probably not by that title, inside
15  the QNX business -- who handles the QNX business.
16     Q.  How would you respond if someone were to
17  argue that, well, we have all of these corporate
18  people who still -- still have responsibility over
19  the whole company so -- so why is that the case when
20  you testified earlier that the intent was to try to
21  reduce some of these company-wide corporate
22  management roles?
23     A.  This is substantially reduced from where it
24  was last October.  There's a lot of people that
25  aren't here anymore, and they all were in their

Page 101

1  roles and they were all on that -- that list back at
2  that time.
3          The second thing that I mentioned is that
4  virtually all of those people in that list are
5  working in one or another of the business units and
6  only spend part time in the corporate overhead
7  business.  So it's all part of the mustard strategy,
8  which is still being carried out.
9      Q.  After John Chen stepped down -- so
10  presumably the board of directors had John Giamatteo
11  in mind as a potential successor; right?
12     A.  Yes.
13     Q.  Was there any other candidate who was
14  considered as potential successor?
15     A.  Not in the interim period in the last six
16  months that John Chen was in place.  As I have
17  described to you earlier, other people were
18  considered historically, but we had reached the
19  point where John Giamatteo was being watched over,
20  looked at, as the likely candidate for replacing
21  John Chen.
22     Q.  So was there a specific other individual who
23  was being considered for the role of CEO other than
24  John Giamatteo?
25     A.  Not at that point.



Page 102

1    Q.  And you said "not at that point."  Was
2   there -- okay.  Strike that.  I think I know what
3   you mean.
4        Sometimes when a company has a vacancy at
5   the management level, the executive level, they will
6   work with some sort of recruiting agency,
7   headhunting agency, some sort of agency that
8   specializes in finding executives.
9        Did BlackBerry, to your knowledge, work with
10  any sort of a recruiting or headhunting agency to
11  help them find CEO candidates?
12   A.  The process that we used based upon the
13  arrangement we had with John Chen was that John Chen
14  was commissioned to find a CEO replacement.  And
15  John Chen may or may not have used such agencies.
16  That was not something that I really am in a
17  position to answer, whether he did or did not do
18  that.  But he was commissioned to find us a
19  replacement for himself.
20   Q.  When you were interim CEO did you ask that
21  some sort of headhunting, recruiting agency be
22  contacted to see if they could find some candidates?
23   A.  No.
24   Q.  After John Giamatteo became the -- I don't
25  know if permanent is the right word, but became the

Page 103

1   CEO, so nonacting CEO, did you have any other
2   position within the company on a day-to-day basis or
3   were your duties just as a member of the board of
4   directors after that?
5    A.  No.  As we covered earlier, I was on the
6   board of directors and was the chairman of, but that
7   was -- as of the day that John Giamatteo took over,
8   that was the only thing I was doing.  No management
9   role.
10   Q.  Around the time that John Chen announced
11  that he was going to be leaving the company, there
12  was an anonymous complaint that was filed against
13  him.  Do you recall that?
14       MS. FORSTER:  Objection.  I think your
15  question misstated something, Counsel.
16       MR. TARTAGLIO:  Okay.  Well, let me --
17       MS. FORSTER:  It's not really an objection.
18  But I think just so you get a clean record, you said
19  when John Chen announced he was resigning there was
20  an anonymous complaint against him.
21  BY MR. TARTAGLIO:
22   Q.  Okay.  Let me -- let me put it this way.
23  Were you aware in late 2023 of any anonymous
24  complaints made against John Giamatteo?
25   A.  I became aware of the one that caused us to

Page 104

1   do the investigation, yes.
2    Q.  What was the -- the general nature of -- and
3   we have a copy of it.  But what do you recall the
4   general nature of the complaint being?
5    A.  There was a sexual harassment claim, I
6   believe.
7    Q.  And what decision did the company make as to
8   how to respond to that complaint?
9    A.  Well, first of all, that we were going to do
10  a very thorough investigation.  That John
11  Giamatteo's position was essentially held in
12  abeyance.  That's why I was put into the role
13  because frankly if the results had come back
14  differently, I might have been getting rid of John
15  Giamatteo in the same time period that we asked
16  Neelam to leave.  So we put everything in abeyance
17  until we got the results of the report.
18   Q.  Was -- was BlackBerry negotiating with John
19  Giamatteo potential pay package for CEO while the
20  investigation was pending?
21   A.  No, no.  I did that negotiation and that
22  negotiation did not take place.  There was no offer
23  made until after we had the results of the
24  investigation.
25   Q.  Were there any sort of discussions with John

Page 105

1   Matteo [sic] about potentially becoming CEO while
2   the investigation was pending?
3    A.  No.  There were none that were discussed
4   during that period.  John Giamatteo clearly had been
5   aware of why he was hired, but there had been no
6   discussion from the day that they -- the
7   investigation was triggered by the complaint, there
8   was no -- no discussion of him doing anything at
9   that point.
10   Q.  Okay.  Let's see.  Did anyone tell you --
11  could have been then, could have been now.  Did
12  anyone ever tell you who wrote the anonymous
13  complaint against John Giamatteo?
14   A.  I am obviously aware now that there's people
15  who believe that Neelam was the one that put in the
16  complaint.  I would not have come to that conclusion
17  on my own, but that's -- that's not an unknown
18  assumption by me or other people.
19   Q.  And do you recall who said that -- who was
20  it that said that perhaps Ms. Sandhu had submitted
21  the complaint against John Giamatteo?
22   A.  I believe that the suggestion was made well
23  into the investigation that it looked to Phil Kurtz
24  like Neelam may very well have been involved, but he
25  claimed no knowledge of it and he cautioned us that



Page 106

1  it was still anonymous.
2       Q.  And do you remember with any more
3  specificity what is -- what is it that Mr. Kurtz
4  said about perhaps Neelam being the one who filed
5  the complaint?
6       A.  That's about it.  That it could very well
7  have been Neelam.  But that -- that's it.  Nothing
8  more.
9       Q.  Other than Mr. Kurtz, do you recall anyone
10  else discussing who might it have been who filed the
11  complaint?
12       A.  No.
13       Q.  And do you recall about how far -- well,
14  this discussion with Mr. -- so let me put it this
15  way.  Do you recall about how far along into the
16  investigation that Mr. Kurtz made these comments
17  that perhaps Neelam was the one who had filed the
18  complaint?
19       A.  I recall it was well into the investigation
20  process.
21       Q.  I'm still here by the way.  Just thinking.
22          So do you know who Richard Curiale is?
23       A.  That name came up to me for the first time
24  when I reviewed the investigation report.  I had not
25  met him before.  Still haven't, frankly.

Page 107

1       Q.  I'll just -- I'll represent to you that he
2  did some investigation work for BlackBerry about
3  some of the complaints that Ms. Sandhu had made.
4          Did you -- have you ever seen any of those
5  reports?
6       A.  No.
7       Q.  Does Marjorie Dickman still work for the
8  company?
9       A.  No, she does not.
10       Q.  Do you know why she left?
11       A.  I was not part of that process.  That was
12  advised to me by John, but he -- his -- his
13  description was that the role no longer needed to
14  exist, particularly at a corporate level.
15       Q.  Do you know if she ever made sort of -- any
16  sort of demand for severance from the company?
17       A.  I don't know.
18       Q.  Did anyone on the board of directors while
19  the investigation -- the MoFo investigation was
20  still pending indicate that they thought that the
21  anonymous complaint was unfounded?
22       A.  No.  No, quite the contrary.  The board's
23  view was that the process had to work itself through
24  and that until that process was done, the board had
25  no opinion.

Page 108

1       Q.  I think I'm going to turn to the exhibits
2  now.  So let me know if you still have those or if
3  you need me to send them.
4       A.  No, they are here.
5          MR. TARTAGLIO:  And we'll start with
6  Exhibit 1 for the record.  This is marked with the
7  Bates Number BB13, a bunch of zeros, 456.  So I'll
8  call this Bates Number 456.
9          (DEPOSITION EXHIBIT 1 WAS MARKED.)
10  BY MR. TARTAGLIO:
11       Q.  Do you see the document I'm looking at here,
12  the BlackBerry Code of Business Standards and
13  Principles?
14       A.  Yes.
15       Q.  Okay.  I'll ask you to turn to page 7.  Let
16  me know when you're there.
17       A.  I'm here.
18       Q.  Yeah.  And the Bates number is 462.  And
19  I'll just read a little bit from here where they
20  say -- or this document -- well, I should start off
21  with what's your understanding of just at a high
22  level what this document is?
23       A.  This is a document that is used to introduce
24  the employees to the expectations of the company
25  relative to -- to ethics and code of conduct.

Page 109

1       Q.  And so some things that this document says
2  are, "Speak up and act."  And then a couple
3  sentences down, the heading, "Where appropriate,
4  speak up and act.  Be bold.  BlackBerry supports
5  you."
6          And then the next paragraph, it says, "You
7  must promptly report any knowledge of or concerns
8  regarding actual or potential violations of law or
9  policy whether they occur inside BlackBerry or
10  through external dealings."
11          So it seems as though this document from
12  BlackBerry is encouraging people -- employees to
13  speak up about potential violations of law or
14  policy.  Is that fair to say?
15       A.  Yes.
16       Q.  And do you agree that that's an appropriate
17  message to be sending to BlackBerry's employees?
18       A.  Absolutely.
19       Q.  Do you think it's important for people
20  within the company to speak up and report potential
21  violations of law or policy?
22       A.  I do.
23       Q.  And why do you think that?
24       A.  Because the company will be stronger for it
25  in the end.  I've -- I've been around long enough to



Page 110

1  know that when it doesn't happen, companies lose
2  themselves, lose their business and can go out of
3  business. So I believe very strongly that we ought
4  to do exactly what this says.
5       Q. I'll ask you to turn to page 13 now. For
6  the record this is page 46 if we're going by Bates
7  number. Let me know when you're there.
8       A. Got it. Okay.
9       Q. I should have said this earlier, but if you
10 want to take some time to read the document, go
11 ahead and let me know if you want to do that.
12      A. Yeah. No, I don't believe at this point I
13 need to.
14      Q. And in the first column on the left-hand
15 side of the page about halfway down, the document
16 says, "Retaliation is not tolerated. Retaliating
17 against anyone who makes a good faith report of
18 suspected unethical or legal conduct is a violation
19 of the BS&P and will not be tolerated by
20 BlackBerry."
21        Do you see that sentence there?
22      A. Uh-huh. Yeah.
23      Q. Do you agree with that sentiment?
24      A. I do.
25      Q. Okay. And do you think it is important for

Page 111

1  retaliation against good faith reports to be not
2  tolerated?
3       A. I agree. We should not tolerate
4  retaliation.
5       Q. And why do you agree with that?
6       A. Because again you're -- you're taking the --
7  I mean, it's almost like a whistleblower in the U.S.
8  government. You know, people are not going to be as
9  willing to call something when they see it if they
10 feel that they are going to be retaliated against,
11 and so I think this makes perfect sense.
12      Q. I'll ask you to turn now to page 39 in the
13 document. By Bates number this is page 494. Let me
14 know when you're there.
15      A. Got it. 39, okay.
16      Q. And on the right-hand side of the page about
17 halfway down, do you see where it says, "Do not
18 tolerate discrimination or harassment"?
19      A. Uh-huh.
20      Q. And for the record, I'll read out that it
21 says, "You may never make any employment-related
22 decisions based upon a person's race, color, gender,
23 national origin, age, religion, citizenship,
24 disability, medical condition, sexual orientation,
25 gender identity, gender expression, marital status

Page 112

1  or any other basis protected by law."
2       A. I don't see that. Where are you reading?
3       Q. Oh, let's see.
4       A. Okay. It goes to the next page. I'm sorry.
5       Q. Right. And so I'll focus here on gender
6  because the document mentions gender. Do you think
7  it's important for a company to not discriminate
8  against an employee based on his or her gender?
9       A. I agree.
10      Q. And why do you think that's important?
11      A. Because what I'm looking for as a manager
12 and a supervisor and oversight of the business is
13 the strongest people I can get, and I don't really
14 think that I care what sex they are or what country
15 they come from. I want the best I can get.
16      Q. And we see -- if you look at page 40. This
17 will be page 495 of the Bates numbers. If you look
18 on the left-hand side of the page there's a big
19 paragraph there that talks about sexual harassment.
20 Why don't you take a few moments to read that.
21      A. Okay.
22      Q. Do you think it's important for companies
23 like BlackBerry to prohibit sexual harassment?
24      A. Yes.
25      Q. And why do you think that's important?

Page 113

1       A. Because, again, you want to have a workforce
2  that is smoothly operating at high efficiency, and
3  you don't want people to feel like they are a
4  second-class citizen. You want everybody to
5  contribute.
6       Q. Sometimes companies have a program or
7  programs in place to try to provide support to women
8  at the company, help them achieve their goals within
9  the company. Do you know whether BlackBerry had any
10 such groups in 2023?
11      A. I can't speak to the specificity of a
12 particular group, but I can give you back the
13 example I gave you before where we tried to entice a
14 good portion of the BlackBerry managers to go to the
15 awards dinner that was being held for one of our
16 women managers. So I think there's an example.
17        The other example is that the board looks at
18 these statistics on a quarterly basis. So we do a
19 lot of things like that, and I would -- I would
20 argue that BlackBerry is -- is doing well in many of
21 those areas. Can we do better? Probably could.
22 But statistically we're doing quite well, and I
23 don't know of any issues other than the ones at play
24 here where I think we would be challenged on that.
25      Q. And I'll go -- real quickly I'll go back to



Page 114

1  this website we were looking at earlier. It's
2  mainly just for your reference. We don't have to
3  make this an exhibit.
4       But how many women are currently in the
5  executive leadership at BlackBerry?
6       A. Based upon this scroll you're giving me,
7  it's one.
8       Q. And so let's see, I count 1, 2, 3, 4, 5, 6,
9  7 company-wide executive positions. Does that seem
10 fair to you?
11      A. No. That doesn't seem fair but your premise
12 is that these people are all corporate as opposed to
13 being business unit people who also do corporate.
14 If you were to look at it that way, I think your
15 numbers would come out differently.
16      Q. Well, would you agree that if we're looking
17 at the leadership website for BlackBerry, there are
18 seven people listed?
19      A. Yes, that's true. There are seven people
20 listed, but -- but you continue to avoid my point.
21 That's people, while listed here because they have a
22 part-time role as the corporate end of the business,
23 they are also in the business units for the most
24 part and that those statistics would be very
25 different.

Page 115

1       Q. And of the seven people listed here as
2  comprising the leadership of BlackBerry on
3  BlackBerry's website, only one of them is a woman;
4  right?
5       MS. FORSTER: Asked and answered.
6       Go ahead.
7       THE WITNESS: Yes.
8  BY MR. TARTAGLIO:
9       Q. And she's the chief people officer?
10      A. Yes.
11      Q. So she's essentially head of human resources
12 for the company?
13      A. No. She is the head of human resources for
14 the cyber business unit and has oversight
15 responsibility for the QNX business or the IoT
16 business.
17      Q. Let's turn to Exhibit 2.
18      (DEPOSITION EXHIBIT 2 WAS MARKED.)
19 BY MR. TARTAGLIO:
20      Q. Let me know when you're there. And this one
21 has an email as well as an attachment, so you'll
22 probably want to look at both. And while you're
23 looking at the exhibit, I'll note for the record
24 that this bears the Bates numbers -- it's BlackBerry
25 document, one -- 11448. So 11448 and it goes to

Page 116

1  11449.
2       Let me know when you're ready to discuss
3  that.
4       A. I'm at -- I'm at Exhibit 2, the divider page
5  now. What's the page I want?
6       Q. Well, it's an email and then a chart.
7       A. Okay.
8       Q. Let me know you're ready to discuss the
9  exhibit.
10      A. I have to make it bigger first somehow.
11 Okay. I have it.
12      Q. And so the first page of this appears to be
13 an email from John Chen to
14 board.jschen@blackberry.com. Do you see that?
15      A. Yes.
16      Q. Does this appear to be an email from John
17 Chen to the board of directors for BlackBerry?
18      A. It does.
19      Q. And the subject line is "Officers'
20 succession planning"; correct?
21      A. Uh-huh.
22      Q. So would you agree that this document and
23 the attachment appears to be a succession plan if
24 for whatever reason some of these officers would no
25 longer be able to do the job?

Page 117

1       A. Yes. And John was asked to provide this.
2       Q. And it's a little hard to see, but if we go
3  to the attachment and we look at the box for John
4  Chen. Do you see that?
5       A. Yes.
6       Q. And that's at the top of the page; right?
7       A. Yep, uh-huh.
8       Q. And so it looks like Number 1 would be John
9  Giamatteo?
10      A. Yes.
11      Q. And then Number 2 does -- well, I'll ask
12 you. What does Number 2 -- although it looks like
13 it's both Number 1, but I guess with the -- who the
14 second -- what does the second entry there say?
15      A. The -- the distinction here is that a 1
16 would indicate ready now, and a 2 would indicate an
17 alternative solution. That's -- that's the way this
18 should be read.
19      Q. And -- sorry. Go ahead.
20      A. So, for example, on John Chen, his -- his
21 view of this is John Giamatteo is ready now, or we
22 can go to somebody outside if for some reason John
23 Giamatteo didn't work out.
24      Q. So is it fair to say that as of -- let's
25 see. This email is dated June 2022. Is it fair to



Page 126

BY MR. TARTAGLIO:

1
2   Q.  Do you recall whether this appendix B was
3   provided to the board of directors either in the
4   original form or some sort of summary or paraphrase?
5   A.  It was not provided to the board of
6   directors to my knowledge.  I've never seen it.  It
7   would have been part of the investigation and would
8   have been part of the readout of the investigation.
9        MR. TARTAGLIO:  Let's go to Exhibit 6.
10       (DEPOSITION EXHIBIT 6 WAS MARKED.)
11       THE WITNESS:  Yep.
12  BY MR. TARTAGLIO:
13  Q.  And do you see here -- and this was
14  actually -- let's see, which one did I put in chat?
15  Did you put the version with the black redaction
16  bars or the one with the --
17       MS. FORSTER:  You did.  I -- I thought you
18  were going to use the one that didn't contain that
19  piece and had the prior substantive communication,
20  but this is what's here.
21       MR. TARTAGLIO:  Let me -- okay.  Let me see
22  if I can substitute that out.
23       You know, this might be a good time for a
24  lunch break anyway.
25       MS. FORSTER:  That's probably true.

Page 127

1        MR. TARTAGLIO:  This morning -- this morning
2   I tried to swap that out but, I guess, that didn't
3   happen, so maybe we -- maybe we go for lunch.  Come
4   back, like, 1:00 o'clock.  Does that work for
5   people?
6        MS. FORSTER:  Yep.
7        MR. TARTAGLIO:  Okay.
8        THE WITNESS:  So you're swapping something
9   out.  Do I need to delete something here or just let
10  it go?
11       MR. TARTAGLIO:  I'll recirculate.
12       MS. FORSTER:  Yeah, he'll send a new one.
13       THE WITNESS:  Okay.  So 40 minutes?
14       MR. TARTAGLIO:  Yes.
15       THE WITNESS:  Thank you.
16       THE VIDEOGRAPHER:  We are going off the
17  record.  The time is 12:21 p.m.
18       (Lunch recess:  12:21 p.m. to 1:05 p.m.)
19            -oOo-
20       ::: AFTERNOON SESSION :::
21       THE VIDEOGRAPHER:  We are now back on the
22  record.  The time is 1:05 p.m.
23  BY MR. TARTAGLIO:
24  Q.  Okay.  I'm going to move on to Exhibit 6.
25  Before I do, though, there was some discussion

Page 128

1   earlier about the phone call you had with Phil Kurtz
2   around the time you became interim CEO, and you may
3   have discussed that with your attorney over the
4   break.  So don't tell me what she discussed with
5   you.  But I'm going to ask, was there any part of
6   that discussion that is not covered by the
7   attorney-client privilege?
8        A.  I'm sorry.  But which phone call are we
9   talking about?
10  Q.  So I think around the time you became
11  interim CEO we had -- you had phone calls with all
12  of the executive leadership; is that right?
13  A.  Oh, yes.  Yeah.
14  Q.  And one of those was with Phil Kurtz?
15  A.  Correct.
16  Q.  And did you have a chance to talk -- and
17  don't tell me what you talked about.  But did you
18  have a chance to talk with your attorney about that
19  phone call?
20  A.  Yes.  And that's the one that we're going to
21  do a revision on.
22       THE WITNESS:  Right, Katherine.
23       MS. FORSTER:  Yes, yes.  So, in other words,
24  we talked about this before we went back on the
25  record, but just for clarification on the record, we

Page 129

1   will be producing a revised version of Mr. Lynch's
2   notes from that meeting where the privileged portion
3   of that discussion is still redacted.  The
4   unprivileged portion will be unredacted.  So it was
5   a mix.  Is that -- I hope that clarifies things.
6        MR. TARTAGLIO:  Okay.  Then I think instead
7   of asking these abstract questions now, I'll just
8   ask about the document when it comes in.
9        MS. FORSTER:  Okay.
10  BY MR. TARTAGLIO:
11  Q.  And so in the meantime, could you please
12  turn to Exhibit 6.
13  A.  Got it.
14  Q.  And for the record, this was produced at
15  17504 to 17505.  Let me know if you need any more
16  time to read this document?
17  A.  Yep.  I understand this one.
18  Q.  And by the way, you probably already know
19  this, but they tend to print out reverse
20  chronological so you have to go to the bottom and
21  read your way up but --
22  A.  Yeah.  I -- actually I'm familiar enough
23  with it that I don't need to read my way up.  I'm
24  good with it.
25  Q.  Okay.  And so some of this document has been



Page 130

1  redacted on the grounds of attorney-client privilege
2  so you can consult with your attorney if you want
3  before you answer this question.
4      But my question is that -- is the fact that
5  this email was forwarded from you to Phil Kurtz,
6  does that have anything to do with the decision to
7  terminate Ms. Sandhu?
8      A.  No.
9      MS. FORSTER:  You've answered his question.
10     THE WITNESS:  All right.
11     MR. TARTAGLIO:  Okay.
12     MS. FORSTER:  I'm stopping you because we
13 waived privilege over communications that related to
14 her termination.  I believe that was the reason
15 counsel asked you the question in the form he did,
16 and you have answered that.  So -- okay.
17     MR. TARTAGLIO:  Yeah.  Let's go to Exhibit 7
18 then.
19         (DEPOSITION EXHIBIT 7 WAS MARKED.)
20 BY MR. TARTAGLIO:
21     Q.  Let me know when you've had a chance to go
22 through this.
23         And while you're doing that, for the record
24 this was produced at 17564 and there's also an
25 attachment.  So that's the email.  And then there

Page 131

1  was also an attachment produced at 17578 that goes
2  to 17581.
3      A.  This -- this is familiar with -- to me.  I
4  wrote it.
5      Q.  Okay.  Great.  And so Exhibit 7 appears to
6  be email to your -- to yourself essentially?
7      A.  Yes.
8      Q.  And it looks like there's several
9  attachments to this email; right?
10     A.  I don't believe there's any attachments to
11 this email.
12     Q.  Okay.  If you -- if you look on the -- the
13 email itself, you'll see that, under subject line,
14 there's "attachments" and then there's several file
15 names that are listed.
16     A.  Okay.  I believe that the reason these are
17 consolidated like this is I believe this was part of
18 the search that I was asked to do.
19     Q.  Okay.  And so I'll show you.  This might
20 help.  So you see here attachments and there's
21 several file names?
22     A.  Yep.
23     Q.  So I'll just represent to you that when I
24 put together this exhibit, I took one of the
25 attachments.  I didn't take all of them because

Page 132

1  there's just one that I wanted to ask about.  And so
2  with that discussion in mind, are you able to
3  determine which file name corresponds to the
4  attachment that's included as part of the exhibit?
5      A.  I'm assuming you're referring to Exhibit 8?
6      Q.  So I'm referring to Exhibit 7, but
7  Exhibit 7 -- the first page is an email and then
8  there's some text.
9      A.  Yeah, but it's all one piece.
10     Q.  Right.
11     A.  Okay.  It was not -- you're suggesting that
12 it was part of attachments.  It is not.  As I recall
13 it, this was -- I just sat and typed this.
14     Q.  Okay.  And if you look on the first page,
15 one of the file names for the attachments is "ELT
16 intro discussion notes.docx."  Do you see that?
17     A.  Yes.
18     Q.  Do you think that is the file that --
19     A.  Yes, I think that's -- that's what this
20 is -- this is, yes.
21     Q.  Okay.  And that's what I was getting at.  I
22 was perhaps a little clumsy.
23     A.  Okay.
24     Q.  And -- and this email was sent around
25 November 6, 2023.  Do you see that?

Page 133

1      A.  Yep.
2      Q.  Do you know if that's around -- well, strike
3  that.
4      Do you know if that's the same day as the
5  ELT intro discussion?
6      A.  This is the outline of the intro discussion.
7  It was all sent the same day.
8      Q.  And do you know -- it looks like you gave
9  some sort of a -- I don't know if speech is the
10 right word, but some sort of discussion.  You led
11 some sort of discussion that you have notes here
12 for; right?
13     A.  Yep.
14     Q.  And are you able to say what day you gave
15 that discussion?
16     A.  I believe that was the Monday of the day
17 that -- of the week that I was first appointed.
18     Q.  And so if we go to a calendar for 2023, are
19 you able to give a date?  I see Mondays in -- around
20 that time period.  October 30 was a Monday.
21 November 6th was a Monday.  November 13 was a
22 Monday.  Does that help you date when you would have
23 given this talk?
24     A.  Not directly because the calendar that I was
25 using at that time was the BlackBerry Outlook



Page 134

1  calendar. I'm now on my own calendar here, but let
2  me do my best to see if I can figure that out
3  quickly.
4        MS. FORSTER: Is there perhaps a 2023
5  calendar you have on your screen, Tony, that you
6  could share?
7        THE WITNESS: We're okay. I -- I have it
8  here.
9        MS. FORSTER: Okay.
10        THE WITNESS: This was given on -- this was
11  November 6.
12  BY MR. TARTAGLIO:
13        Q. I'm going to ask about the -- the notes
14  here. So is this -- are these notes that you
15  prepared in advance of giving the talk?
16        A. The notes being -- what? -- the questions
17  and discussion?
18        Q. Yes. Starting on page 17578.
19        A. Yep.
20        Q. And who was this -- who was this talk given
21  to?
22        A. This was the -- the talk that I have been
23  referring to as the executive team. This is all of
24  the people that were -- at that point in time had
25  become my direct reports. This was the day that

Page 135

1  I -- I opened the kimono and said, "Here I am."
2  Prior to that it was -- I had not communicated with
3  everybody in a group session. This is the first
4  group session that I had.
5        Q. And so if you look at page 17578, you'll see
6  that I put some annotations there. That was not
7  original. The underlining and the arrow. Do you
8  see that?
9        A. Uh-huh.
10        Q. And I did that just because it often makes
11  things go fast. So the arrow says, "Well, this
12  wasn't the way it was supposed to be." Do you see
13  that?
14        A. Yep.
15        Q. Do you know what you were trying to convey
16  by that?
17        A. Yes. I was not intended to be the CEO, and
18  it was not expected that I would be. So this was my
19  introduction to why I was there.
20        Q. And then the next page -- or the next line
21  down says, "The board ran into a couple of issues in
22  the process of a new CEO -- or in the process to a
23  new CEO." What were the couple of issues that you
24  had in mind there?
25        A. Well, the -- the couple of issues is

Page 136

1  actually one issue, and that was the -- the --
2  the -- the interim report, the -- first of all, the
3  challenge to -- for the filing of the complaint and
4  the fact that the board had not seen a resolution of
5  that yet, had not seen the outcome of the
6  investigation that had -- was still well underway.
7  And so couple of issues is just, you know,
8  rhetorical. It was a single issue and that was that
9  we didn't yet have an outcome, and we didn't know
10  who our new CEO was going to be. But I was not
11  going to tell the executive team all of that. That
12  was none of their business. So my way of answering
13  it was the board ran into a couple of issues.
14  That's kind of just alliteration, if you will, in a
15  sense.
16        Q. Let's go to the next page. So this will be
17  17579. You'll see that I have some highlighting --
18  or underlining here. Do you see where -- and just
19  for the record, it says, "We can't afford
20  big-company bureaucracy, and we've got some of it."
21  Do you see that?
22        A. Yep.
23        Q. What did you mean by that?
24        A. What I meant was to give them a very clear
25  indication that we were going to be cutting a lot of

Page 137

1  costs and that we would be cutting our organization
2  down to match the revenue stream that we had coming
3  in, and that's my introductory way of getting to
4  that point.
5        Q. Do you remember if there was any follow-up
6  discussion after you -- after you gave this -- this
7  little speech to the group?
8        A. Well, that's what the questions are at the
9  end, and there was a very small amount of discussion
10  if much at all. I didn't really give them an awful
11  lot of time to get into a lot of detail. I -- I
12  told them that, you know, either in questions, let's
13  have quick discussion, but let's wrap it up. And so
14  I believe there may have been a couple of comments
15  that were made, like, "Dick, glad to have you" or
16  things of that nature, but nothing substantive that
17  I can recall. And then I ended with my last points,
18  which was the wrap up, and I told them that I'd be
19  calling each one of them and that's what I started
20  doing on that day.
21        MR. TARTAGLIO: Let's go now to Exhibit 8.
22        (DEPOSITION EXHIBIT 8 WAS MARKED.)
23  BY MR. TARTAGLIO:
24        Q. And for the record, while you're looking at
25  this, this was produced at 19036 going down to



Page 138

1  19051.
2        Let me know when you're ready to discuss
3  this.
4     A.  Oh, I have that.  It's here.
5     Q.  And do you feel ready to discuss it or would
6  you like a little more time?
7     A.  No, no.  I mean, I wrote it.  So I'm -- I'm
8  comfortable.  It's -- it's a little out of order,
9  but it's -- it's all here.
10    Q.  Okay.  And so -- so these handwritten notes
11 were written by yourself?
12    A.  Yep.
13    Q.  And so I'll start on the first page.  This
14 is 19036.  So at the top does that say, "Morale is
15 worst it's ever been"?
16    A.  Yes.  In quotes.
17    Q.  Do you recall who told you that?
18    A.  This -- maybe you should ask me first what
19 this was used for.  This was an outline of items
20 which I used to read out to the board on my initial
21 perceptions based upon all the discussions that I
22 had had with people.  So with -- with that in mind,
23 I didn't attribute any of these comments to a
24 particular individual in my notes necessarily.  I'm
25 not a great notetaker frankly.  Although this would

Page 140

1     A.  No.
2     Q.  And a couple lines down, the notes say,
3  "Bureaucracy structured and sized for much larger
4  company and protected by ELT."  Is that a correct
5  reading of the handwriting?
6     A.  Yeah, exactly.
7     Q.  Okay.  And "ELT," would that be executive
8  leadership team?
9     A.  Yes.
10    Q.  And then the next line refers to management
11 being hub-and-spoke.  What did you mean by
12 hub-and-spoke-type management?
13    A.  Management, top down is another way to say
14 the same thing.  Where everything came down from one
15 individual or a couple of individuals and that
16 everybody else just does what they are told.
17    Q.  Who was the hub -- or I guess what person or
18 people were the hub that you had in mind?
19    A.  John Chen.
20    Q.  And then the next couple lines down, it
21 says, "Cyber is top heavy with products and
22 territories.  No apparent thought of pruning
23 either."
24        What led you to conclude that cyber was top
25 heavy with products?

Page 139

1  challenge that, but this is unusual for me.  "Morale
2  is worst it's ever been" I heard from more than one
3  person.  And --
4     Q.  I'm sorry.  Go ahead.
5     A.  The quotes -- the quotes merely indicate for
6  my benefit when I talked to the board that I heard
7  this from people that I had interviewed.
8     Q.  And then the next line down says "Quiet
9  quitting all over the company"; correct?
10    A.  Same issue.
11    Q.  And what is "quiet quitting"?
12    A.  Quiet quitting is when you stay in your job
13 and you don't do anything.  You just sit there.  You
14 do the bare-bones minimum to stay employed.
15    Q.  And in the next line down, there's three
16 dots in a triangle.  Is there any significance to
17 that?
18    A.  No.  It's just that I indicate here that
19 there's a -- a lot of high energy achievers still
20 inside the business.  So in spite of the first two
21 points, the bottom line is that there's still a lot
22 of people and we can make that work.
23    Q.  And as for the core of high energy
24 achievers, did you have a specific group of people
25 in mind?

Page 141

1     A.  That was a result of the feedback I had
2  received -- all of this is the result of the
3  feedback I had received from the people who I
4  interviewed and from other people who sent me
5  things.  And, you know, indicated to me message-wise
6  that this is how they felt.  And the feeling about
7  cyber was top heavy and that we needed to be pruned
8  out, so I reported that to the board.
9     Q.  And so "top heavy," does that refer to too
10 many products when you say "top heavy with
11 products"?
12    A.  Yes.  There's too many products.  There's
13 too much territory that we're trying to cover, and
14 we need to be more rational in how we do this.
15 That's the bottom line of that view.
16    Q.  And a few lines down, it says, "Need
17 cultural shift."  What -- what did you have in mind
18 there if you recall?
19    A.  Yeah, that's easy.  My belief and -- has
20 always been, and I wanted to put it into
21 BlackBerry -- is that the people that are in the
22 best position to make decisions are the people that
23 are affected by those decisions or see the results
24 of those decisions, and that we needed to get rid of
25 the hub and spoke, and we needed people in a



Page 142

1  position where they felt empowered to make a
2  decision and move forward.  To me, that's a real
3  cultural shift.
4      Q.  Let's go to page 19038.  Let me know when
5  you're there.
6      A.  I'm here.
7      Q.  Okay.  And the top says, "Individual
8  discussions with all direct reports.  Some/most very
9  open.  2 couple not so."  Do you see that?
10     A.  "A couple not so."
11     Q.  Oh, "a couple"?
12     A.  Yeah.
13     Q.  Who are the couple people who were not very
14  open?
15     A.  I would tell you that my view was that I
16  didn't feel comfortable that -- well, I say "couple
17  not open," I'm not going to be able to give you a
18  lot of names associated with each of these.  But
19  there were a couple people that were, as I recall it
20  now, telling me what I wanted to hear but somewhat
21  reluctant to really give me what I needed in terms
22  of feedback that I could use to improve the
23  business.  I can't give you specific names this far
24  out since I wrote this.
25     Q.

Page 143



9      Q.  And I should have asked this earlier, but
10  looking at this page here, are you able to estimate
11  about when this page would have been drafted?  Let
12  me put it this way, was this after the interviews?
13     A.  Oh, yes.  Yeah, this was well after the
14  interviews.
15     Q.  And next on the list is Neelam Sandhu.  So
16  we already talked about why you ended up firing her.
17  But at this point was your thinking any different
18  than what we talked about earlier today?
19     A.  It wasn't as resolved at this point.  This
20  was still my thinking process at this point in time.
21  But the rationale behind it hasn't changed.



Page 144



17     Q.  And then a few lines down we get to
18  "Surprise:  John G."  Is that John Giamatteo?
19     A.  Yes, yeah.
20     Q.  And you -- you wrote "somewhat territorial."
21  Do you remember what you were thinking there?
22     A.  Yeah.  This is what I -- I had received from
23  a couple of folks of his peer group.  That a lot of
24  people didn't really know him because he spent most
25  of his time out -- out in the marketplace.  He

Page 145

1  wasn't around headquarters a lot, so he wasn't
2  really all that well known to a lot of his peer
3  group.  He -- "somewhat territorial" was essentially
4  that he was, you know, wedded to his -- his role and
5  that his -- his first loyalty was to achieving his
6  results and that there was a perception among a
7  couple of the corporate people that he should have
8  been a little more balanced in his view of how he
9  got things done.
10     Q.  Can you provide an example to elaborate on
11  the response you just gave about --
12     A.  Yeah.  I mean -- and this one came from, you
13  know, the finance side of the business, is that John
14  was asked to produce a certain amount of savings,
15  and he kept dragging his feet on actually executing
16  the savings levels that he was being asked to
17  achieve because it was going to interfere with his
18  delivery of his results.  And so he was perceived as
19  not fully responsive to the cuts that he was being
20  asked to make.
21     Q.  And so when this -- so when we're talking
22  about John Giamatteo being somewhat territorial, is
23  that referring to geography or is that referring to
24  his particular business unit?
25     A.  It's business unit.



Page 146

1    Q.  So would you agree that he was being tear --
2  by being territorial, is it fair to say that he was
3  trying to protect the cyber business unit?
4    A.  I wouldn't say he was trying to protect it
5  as much as he was trying to maximize the resources
6  he could get for it so that he could deliver as much
7  as possible.  He -- for example, he didn't see -- at
8  that point in time he didn't see QNX as being in
9  need of a lot more resources.  He saw his own group
10  as being in need.  Quite the contrary to where he is
11  today, but that's -- that's what I meant by that.
12    Q.  And if we go to the next page.  Let me know
13  when you're there.  So this would be 19039.
14    A.  Uh-huh.
15    Q.  And about two thirds down the page there's a
16  sentence here that says, "I'm reviewing all PR and
17  IR and social messaging until Tim and Neelam
18  understand new strategy."  So would "PR" be public
19  relations?
20    A.  Yes.
21    Q.  And "IR," is that investor relations?
22    A.  Correct, yes.
23    Q.  And what's the new strategy being alluded to
24  here?
25    A.  The old strategy was one of one big

Page 147

1  corporation, everything was synergistic.  We had no
2  problems.  Everyone needed to know we were the king
3  of the hill.  The new strategy is two small business
4  units that are small and scrappy and are the best
5  that there could possibly be and that each one would
6  succeed on its own.
7    Q.  Let's turn to page 19043.
8    A.  Okay.
9    Q.  And these are notes -- well, I should ask
10  you.  What do these -- what does this page appear to
11  be?
12    A.  This is my interview with Neelam.  Most of
13  this is what she told me.
14    Q.  And --
15    A.  If you recall, when I talked about these
16  interviews earlier today, I said that my view was
17  that they should do all the talking.  I was doing
18  the listening, and so I merely asked a couple of
19  leading questions and let them go.  And what I see
20  here is what I got from her at the time that she and
21  I had the discussion.
22    Q.  And if you look under her name, it looks
23  like "UK arrow, NY arrow.  John offered chief staff
24  10 years ago."  Are you able to explain the
25  shorthand there?

Page 148

1    A.  Yeah.  I mean, she told me she came -- she
2  started with the business in the UK.  She
3  transferred to New York, and John offered her the
4  chief of staff role back in 2013.
5    Q.  And then below here, "M-K-G" is that
6  marketing?
7    A.  Yeah.  Marketing, go to market, sales
8  engineering, operations, and strategic.  Right now I
9  don't know what that meant, but it -- it all -- that
10  was my shorthand for what she was saying at the
11  time.
12    Q.  And if we go down a couple lines.  So under
13  sales arm, there's a line -- I'll just ask you to
14  read it since I want to make sure we all understand
15  what you're trying to write there.  Do you see where
16  it says, something "too much personal churn"?
17        (Reporter clarification.)
18  BY MR. TARTAGLIO:
19    Q.  "Personal churn."
20    A.  Churn.  Oh, "Solve too much personal churn."
21  I don't -- I don't recall at this point what that
22  meant.
23    Q.  And a couple lines down, it says, "Grew
24  billings above overall rate," and then maybe that's
25  a minus sign.  I'm not sure.

Page 149

1    A.  Now it's "approximately."
2    Q.  Oh, "approximately 33 percent."
3    A.  Yeah.
4    Q.  So you -- do you interpret that to mean that
5  Ms. Sandhu was saying that the elite group had grew
6  its billings about 33 percent?
7    A.  That's what she told me, yeah.
8    Q.  Do you know whether that was accurate or
9  not?
10    A.  No, I don't.  Based upon performance results
11  I had seen at board meetings earlier, it would
12  surprise me if it were that, but I don't recall.  I
13  didn't ever check the number.  The numbers weren't
14  meaningful to me that day.  What was meaningful was
15  what are the big items that I could get out of these
16  discussions I was having and how could I consolidate
17  them into some going-forward activity, so I didn't
18  follow up on things like that.
19    Q.  And then the sentence below says, "This year
20  15 C-U-S-T."  Is that --
21    A.  Customer.
22    Q.  And then "CA is biggest."  Do you know what
23  the CA abbreviation is?
24    A.  Canadian government.
25    Q.  And then a little bit down the page, maybe



Page 150

1  two-thirds of the way down, there's a bullet point
2  where it says, "Smart city, GEM." Do you know what
3  that's referring to?
4      A.  I don't know specifically the context that
5  she relayed to me at that point in time.  But smart
6  city is a name for a whole subset of opportunities
7  that the -- the device-centric electronic industry
8  has been going after for a number of years now.  And
9  so I suspected it had something to do with a
10  recognition that that was something we needed to
11  talk about.
12      Q.  And if you go to the next page, 19044.  Let
13  me know when you're there.
14      A.  Yep.
15      Q.  And near the top it says, "Neelam paid on
16  VIP with 15 paid on VIP and SIP."  Is that -- am I
17  reading that correctly?
18      A.  Yes.
19      Q.  And then it goes on to say, "Why not paid on
20  revenue?"  Do you remember what that discussion
21  is -- was about?
22      A.  Yeah.  She was complaining about -- she
23  complained to me that she was being paid on the --
24  the VIP, which is the -- the corporate performance
25  criteria where other people inside the business,

Page 151

1  namely John Giamatteo and Eriksson over at the QNX
2  business were being paid -- or their marketing or
3  their salespeople were being paid on the SIP, which
4  is sales incentive plan.
5      Q.  Do you know what the "V" stands for in VIP?
6      A.  I don't remember.
7      Q.  At a high level --
8      A.  I don't remember.  All I always know is VIP
9  is the nonsales plan.  SIP is the sales plan.
10  You're usually on one or the other.  Some of --
11  there's a small number of people that are paid on
12  both, but they neither -- they don't get the full
13  amount of both.  They get a percentage of each.
14      Q.  And then we go down near the bottom, do you
15  see where it says, "Problem is internal" exclamation
16  point?
17      A.  Uh-huh.
18      Q.  Do you know what problem is being referred
19  to there?
20      A.  I was taking down what she was telling me.
21  And I recall very little of the detail, but I will
22  tell you that "problem is internal" is essentially
23  saying that all the difficulties that BlackBerry is
24  having are generated inside the business, and that
25  it's not externalities that's causing BlackBerry's

Page 152

1  current financial sufferings.  Speaking in the
2  terminology of that time.
3      Q.  And so was this -- this document here, the
4  Neelam notes, were you writing these as you were
5  speaking with her or maybe shortly afterwards?  Do
6  you remember?
7      A.  It was while she was speaking I was -- I was
8  taking these down.  This is -- this is what -- if
9  you want to call it, this is verbatims of things
10  that she said to me.
11      Q.  And then at the very bottom of this page, it
12  says "Wants CEO role.  Wants to apply," exclamation
13  point.
14      A.  That was a surprise.
15      Q.  And given that you were writing those notes
16  as Ms. Sandhu was talking to you, do you consider
17  this to be a reliable record of what Ms. Sandhu told
18  you?
19      A.  Yeah, I do.
20      Q.  And so you mentioned that you were surprised
21  by this last part; is that correct?
22      A.  Yes.
23      Q.  Why was that surprising?
24      A.  In my mind a CEO needs a variety of
25  expertises before they can be in that kind of a

Page 153

1  role.  She, from what she had described herself in
2  terms of the things she had done in her career,
3  didn't fit that structure of what I think a CEO
4  needs to do, and so it kind of surprised me that she
5  would consider herself ready for something like
6  that.
7      Q.  Did you think that it was -- it was bad that
8  apparently Ms. Sandhu wanted the CEO role and wanted
9  to apply for it?
10      A.  I wouldn't say it was bad, no.  I mean,
11  people can aspire and should aspire to a variety of
12  jobs.  But she wasn't ready for that at that point.
13      Q.  Do you think it would be wrong for her to
14  have an ambition to become CEO?
15      A.  I thought I just said that anybody can
16  aspire to that.  So, no, I don't think it was wrong
17  for her to have that.
18      Q.  Let's go to the next page.  This is 19045.
19  And so this appears to be notes for the call with
20  John Giamatteo.  Does that seem right to you?
21      A.  Yeah.
22      Q.  And so would these, again, have been
23  contemporaneous -- in other words, the same time
24  that you were talking with him?
25      A.  Yes.



Page 154

1   Q. So would you say that this is probably quite
2   a reliable record of the conversation you had with
3   Mr. Giamatteo?
4   A. Yeah, yep.
5   Q. So if we look at -- near the top it says,
6   "Employee malaise." Is that what it says?
7   A. Yes.
8   Q. And is that something that Mr. Giamatteo
9   conveyed to you?
10  A. Yes. All these notes except for a couple,
11  which I can point out as we go through them, they
12  are all things that I took down right from the
13  verbatims of what I heard from them.
14  Q. And the next line says, "No culture."
15      Do you remember what -- what that particular
16  discussion was about?
17  A. He told me he didn't believe there was a
18  consistent culture within the business.
19  Q. And then next sentence, "John had no
20  relationship to employees."
21      Do you remember any additional discussion
22  about that?
23  A. That's -- just to clarify, that's John Chen.
24  Q. Oh, okay.
25  A. It was John Giamatteo's view that John Chen

Page 155

1   had no relationship with the employees.
2   Q. And then below that it says, "Change MAP
3   ASAP."
4   A. Uh-huh.
5   Q. Do you remember -- and you don't have to
6   remember the precise acronym. I know there's a lot
7   of acronyms, but do you remember what the MAP was?
8   A. The MAP by acronym, I don't remember. But
9   what it is, it is the book of, if you will, rules
10  and regulations. It is who can buy what and what
11  level of the business. Do you need authority to do
12  something? It's a variety of the administrative
13  procedures of the business. It wouldn't surprise me
14  if it means master administrative procedures, but I
15  don't know that. I never -- never did know, but I
16  know everybody refers to it as MAP.
17  Q. Do you remember what Mr. Giamatteo said as
18  to why the MAP should be changed ASAP?
19  A. Yes. Because it was pretty -- it was
20  actually restricting his people's ability to quickly
21  move on things because they needed to seek approvals
22  for things that could take a few days or longer and
23  often they needed to make decisions overnight.
24      (Videographer interruption.)
25  / / /

Page 156

1   BY MR. TARTAGLIO:
2   Q. And a couple lines down it says -- I think
3   it says, "Balanced reality comm." Do you know what
4   that's referring to?
5   A. I think that what he's saying there is he
6   was suggesting that we needed a balanced reality
7   communications plan. In other words, don't tell
8   everybody things are great. Don't tell everybody
9   things are bad. Tell them a little bit of both and
10  communicate with them regularly. That was, again,
11  one of the things he felt was necessary.
12  Q. And then below this we see, "Too much
13  overhead. G&A/HQ." Would "G&A" be general and
14  administrative?
15  A. Yes.
16  Q. And "HQ" be headquarters?
17  A. Yep, yeah.
18  Q. And then "even after cuts 10 percent" is
19  below that. Do you see that?
20  A. Yep.
21  Q. So was this John Giamatteo conveying to you
22  that there was too much overhead at the corporate
23  level?
24  A. Yep.
25  Q. And then it looks like there's some

Page 157

1   discussion about potential cost savings; is that
2   correct?
3   A. This was his view of some of the ways that
4   you could save money.
5   Q. And there's four numbers here. "Charles
6   Egan org, corp. marketing."
7       Do you see what I am pointing to?
8   A. Yeah.
9   Q. And so these are -- these are four areas
10  where John Giamatteo suggested potential cost
11  savings; is that correct?
12  A. That's right.
13  ████████████████████████████████████████
14  ████████████████████████
15  ██████████████████████████████████
16  ███████████████████████████████████
17  ████████████████████████████████████████
18  ██████████████████████████████████████
19  ████████████████████
20  Q. And the next one would be corporate
21  marketing. Is that what's being referred to there?
22  A. Yep.
23  Q. And Ms. Sandhu was the chief marketing
24  officer at the time; is that correct?
25  A. Yeah, that's correct.



Page 162

1  would that be Steve Rai?
2      A.  Yes, correct.
3      Q.  And if we look down about halfway down the
4  page, maybe 40 percent down, I suppose, it says,
5  "John G. has fought cost reduction job, refuse
6  product and region reductions."
7          So presumably that's something that Mr. Rai
8  told you?
9      A.  That's correct.
10     Q.  And did you -- other than being told this by
11 Mr. Rai, did you have any other evidence as to
12 whether this was actually the case or not?
13     A.  No, no.  But it was obviously something to
14 follow up on.  But as I told you before when we did
15 his page, it doesn't surprise me.  An aggressive
16 sales guy is always going to try to maintain his
17 resources.
18         MR. TARTAGLIO:  Let's go to the next
19 exhibit.  This will be Exhibit 9.
20         (DEPOSITION EXHIBIT 9 WAS MARKED.)
21         MS. FORSTER:  Would it be helpful -- we have
22 a sort of temporary version of the reredacted
23 document with that one page, 19050, ready.  Do you
24 want to give you that now so that you can do all
25 of this together before we move on to a new exhibit?

Page 163

1          MR. TARTAGLIO:  I'm fine with getting a
2  ready-for-showtime version that we can attach as a
3  new exhibit at the very end just so that we have the
4  exhibits more -- more formalized, I suppose.  So
5  assuming we can get it back before we're done today,
6  I'm fine with doing it out of order at the very end.
7          MS. FORSTER:  Okay.  That's fine.  Thanks.
8  BY MR. TARTAGLIO:
9      Q.  All right.  Let's turn to Exhibit 9.  Let me
10 know when you're there.
11     A.  I'm there.
12     Q.  And so do you need some more time to read
13 this exhibit?
14     A.  If I could, please.
15     Q.  Sure.  And while you're doing that, I'll
16 note for the record that this has a Bates
17 Number 18101.
18     A.  Okay.  I've read it.
19     Q.  And so I'll start at the bottom half of this
20 email.  So was that from Mike Daniels?
21     A.  Yes.
22     Q.  And who is Mike Daniels?
23     A.  Mike Daniels was the chair of the
24 comp/nom/gov committee.  As I said earlier today,
25 that's compensation nominating and governance.  It's

Page 164

1  a -- it's really the administrative board committee.
2      Q.  And one of the recipients of this is Lisa
3  Disbrow?
4      A.  Disbrow, yeah.  She's the --
5          (Simultaneous speakers.  Reporter
6          clarification.)
7  BY MR. TARTAGLIO:
8      Q.  You go ahead.  Sorry.
9          MS. FORSTER:  Go ahead and finish your
10 response.
11         THE WITNESS:  That was it.  I said that Lisa
12 was the chair of the audit committee.
13 BY MR. TARTAGLIO:
14     Q.  And there's -- it looks like there's one
15 recipient, "Prem Watsa Private."  Do you see that
16 email?  Do you know what that is?
17     A.  Yes.  Prem Watsa used to be a board member,
18 a major investor as well.  He is no longer on the
19 board.  But at this point in time, he had not yet
20 left the board.
21     Q.  And so this email from Mike Daniels starts,
22 "Just FYI.  Got a call from John G.  Checking on
23 status.  Told him we would know more shortly re
24 legal process."
25         So looking at this email here, what's

Page 165

1  your -- how did you interpret this phrase, "Checking
2  on status" to -- what did you interpret that to
3  mean?
4      A.  Well, I assume that John was asking, you
5  know, if he was -- if he was ready to go, and that's
6  the essence of the "checking on status."  I can't
7  imagine anything else would have been in his mind.
8      Q.  And for "ready to go," do you mean to become
9  CEO?
10     A.  Yes.
11     Q.  And then it goes down to say, "Asked about
12 status of comp package."  Is that compensation?
13     A.  Yes.
14     Q.  And do you recall whether -- well, actually
15 so this email was sent November 13; correct?
16     A.  What it says.
17     Q.  And would that have been before the decision
18 was made that John Giamatteo would be the next CEO?
19     A.  Yes.  Because there was going to be no
20 decision made until and unless the investigation
21 came back and cleared him.
22     Q.  And so would you agree that it looks like
23 there was some discussions on November 13, 2023,
24 between John Giamatteo and Mike Daniels about his
25 compensation package if you were CEO?



Page 166

1    A.  I would assume from that that's the case,
2  yeah.
3    Q.  All right.  And then below that there's some
4  discussion about Malaysian deal.  Do you see that?
5    A.  Yes.
6    Q.  And then it says, "Said it would be great to
7  announce at that meeting his appointment as CEO if
8  at all possible."
9       Do you interpret that to be John Giamatteo
10  saying that it would be great to announce his
11  appointment as CEO if possible?
12      MS. FORSTER:  Calls for speculation.
13      Go ahead.
14      THE WITNESS:  I can't say.
15  BY MR. TARTAGLIO:
16    Q.  Okay.  And if we go up.  It looks like
17  there's an email from you to the same group of
18  people.  You see that?
19    A.  Yes.
20    Q.  And you mention here, "If we are going to do
21  the survey Lisa suggested last Friday, don't see how
22  it can be done this week."
23      Do you know what survey was being referred
24  to here?
25    A.  You'd have to ask Lisa the details, but she

Page 167

1  was looking at the potential for doing an employee
2  survey, focused on a couple of different areas that,
3  again, I don't recall exactly.  But that was the
4  essence of that -- that line.
5    Q.  And the email goes on to say, "He's a great
6  salesman.  Wants to use signing between PMs to close
7  his deal too."
8       So the PM --
9    A.  Correct.
10    Q.  Sorry.  What was that?
11    A.  To prime ministers.
12    Q.  That was my next question.  And when you
13  say, "He's a great salesman," are you referring to
14  John Giamatteo?
15    A.  Yes.
16    Q.  And when you say "close his deal too," what
17  were you referring to there?
18    A.  His -- his CEO role.
19      MR. TARTAGLIO:  Let's go to Exhibit 10.
20  This is a two-page document.  It was produced at
21  19788 and 19789.
22      (DEPOSITION EXHIBIT 10 WAS MARKED.)
23  BY MR. TARTAGLIO:
24    Q.  Let me know when you're ready to --
25    A.  I'm ready.

Page 168

1    Q.  Okay.  So this appears to be a text message
2  chain.  Does that sound right?
3    A.  It appears to be.
4    Q.  And one person on this text message chain
5  appears to be yourself, Dick Lynch; correct?
6    A.  Yeah.
7    Q.  Do you know who the other person was on this
8  text chain?
9    A.  I believe it was Phil Kurtz.
10    Q.  And some of these chat bubbles there over on
11  the right-hand side and, I guess, we don't really
12  have a color, but it's a darker color.  And some of
13  the chat bubbles on the left-hand side, they are a
14  lighter color.
15      Do you know which side of this screen your
16  text messages are on?
17    A.  The side that's clearer.  It's the left
18  side.
19    Q.  Okay.  And so -- so the right side you
20  believe was Phil Kurtz?
21    A.  Yes.
22    Q.  Okay.  And so Phil Kurtz -- when he says,
23  "JJG could use some hand holding," is that John
24  Giamatteo?
25    A.  Yes.

Page 169

1    Q.  And then it goes on to say, "He seems to
2  believe the process is taking time because there's
3  been a change of heart.  He fears he's going to be
4  told right after Malaysia has been secured."
5       So this reference to change of heart, what
6  was your interpretation of what -- what Phil Kurtz
7  was saying there?
8    A.  I think what Phil was saying -- and this is
9  how I read it -- is that John Giamatteo was feeling
10  that we were going to use him to secure the Malaysia
11  deal and then terminate him.  He didn't feel that
12  things were moving along quickly.  He's aggressive,
13  and he didn't feel things were moving along quickly.
14  And the concern that I had was I had not talked to
15  him, wouldn't talk to him during the course of the
16  investigation, because I wanted to be very clear
17  that I was neutral on this and I had to hear the
18  results, and frankly, if the results had been
19  negative, I was firing him.  So I had been
20  deliberately avoiding him for the reasons that I
21  just told you about.  But I -- at that point I said
22  we can't lose him until we know with certainty, so I
23  agreed to call him to tell him he needed to be more
24  patient and that there was no change of heart but
25  that the outcome of the results of the investigation



Page 170

1  needed to be clear and in his favor or things would
2  be different.  But that if they were as he expected
3  them to be, then we would end up moving forward.
4      Q.  And did you explicitly convey to
5  Mr. Giamatteo that if the investigation found that
6  essentially he had violated company policy, that his
7  termination was a possibility?
8      A.  I don't recall exactly the words I used with
9  him, but I think I made it pretty clear, yes.
10     Q.  Okay.  And then there's a -- the next text
11 bubble says, "I've been deliberating avoiding him,"
12 and it goes on for a little bit.  And then it says,
13 "I will call him."  So that message was from you;
14 correct?
15     A.  Yes.  That's from me, yes.
16     Q.  And do you remember what was said during --
17 well, I guess, did you call him?
18     A.  I did, and that's what I just described to
19 you.  I called him and I said he had to be patient
20 and that until the outcome of the investigation
21 cleared him, there would be no discussion of him
22 moving on to the CEO role, but that he should be
23 patient.  I didn't want him jumping ship to some
24 other company until we knew with certainty whether
25 he was going to be in a position to take the job or

Page 171

1  we would be dismissing him.
2      Q.  Did you -- strike that.
3          Do you remember what Mr. Giamatteo told --
4  told you during this phone call?
5      A.  I think he just expressed frustration and
6  that was the end of the call.
7      Q.  Other than what we've just been discussing
8  the past few minutes, can you remember anything else
9  that was discussed during this phone call with
10 Mr. Giamatteo?
11     A.  No.  It was a very quick phone call.  That
12 was it.
13     Q.  And if we go to page 2 of this text message
14 chain, the first sentence says, "He's well over the
15 edge."
16         Do you recall what you meant by that?
17     A.  Yeah.  He was -- he was very agitated about
18 the whole thing, and that I think I calmed him down.
19 And I told him it would be at least a couple more
20 weeks.  That's what I say in the text.  But, yeah,
21 he was -- he was quite exercised over the whole
22 thing.
23     Q.  And if you go back to the first page, going
24 a little bit out of order here.  It looks like you
25 wrote, "I have been deliberately avoiding him for

Page 172

1  the reason we discussed."
2          Were you saying you were deliberately
3  avoiding John Giamatteo?
4      A.  Yes.
5      Q.  And why was it that you were deliberately
6  avoiding him?
7      A.  Because I didn't think it would be
8  appropriate for me to be talking to someone who
9  could very well be terminated from the company in
10 two weeks for negative findings to the
11 investigation, and I didn't want to leave him with
12 any impression that he was safe and free.  That he
13 had to allow this whole process to proceed and that
14 it was going to be done objectively.  And it seemed
15 to me that if I was speaking with him regularly,
16 that that perception in reality couldn't happen, and
17 so I tried to avoid talking with him.
18         MR. TARTAGLIO:  Let's go to the next
19 exhibit, Exhibit 11.  For the record, this begins at
20 18320 and goes to 18321.
21         (DEPOSITION EXHIBIT 11 WAS MARKED.)
22 BY MR. TARTAGLIO:
23     Q.  Let me know when you're ready to discuss
24 this one.
25     A.  Okay.

Page 173

1      Q.  And so would you agree that -- at least
2  towards the bottom of the chain this appears to
3  be -- well, let me ask you this way.  So if we look
4  at this first page halfway down, there's an email
5  from Neelam Sandhu to yourself; right?
6      A.  Yep.
7      Q.  And so this is an email in which Ms. Sandhu
8  is making you aware of what she is contending is
9  some sort of problem with company culture.  Is that
10 fair to say?
11     A.  I don't know about that.  I'd say it's a
12 complaint about John Giamatteo.
13     Q.  And we don't have to read all this, but it
14 appears that she's accusing John Giamatteo of
15 retaliating against her; is that right?
16     A.  That's the term I see here, yes.
17     Q.  And it appears that you forwarded her email
18 to Mr. Kurtz; correct?
19     A.  Yes.
20     Q.  And so you can take a break to discuss it
21 with your lawyer if you want but -- for this next
22 question.  Did you end up discussing this email with
23 Mr. Kurtz?
24     A.  I don't honestly remember having follow-up
25 discussions.  We may have, but I don't remember



Page 174

1   them.

2       Q.  Other than forwarding this email to
3   Mr. Kurtz and potentially speaking with him about
4   it, do you recall doing anything else in response to
5   receiving this email from Ms. Sandhu?

6       A.  No, I do not.  I would be making an
7   assumption, but I believe that Phil's -- Phil may
8   have provided me advice that this was part of the
9   investigation, that it would be covered by that, but
10  I don't recall anything further than that.

11      Q.  Did you ask someone to investigate
12  Ms. Sandhu's allegations to see if there was any
13  merit to them?

14      A.  No.  Because it was -- it looked to me like
15  it's already under -- it's already underway.  It's
16  in the EthicsLink already.  And if EthicsLink is as
17  it's supposed to be somewhat blind to names, that
18  would not make sense for me to do a lot with it.  So
19  I believe the answer is that I sent it off to Phil,
20  and Phil told me they were being covered and that
21  was the extent of what I did.

22      Q.  Do you know whether you sent this complaint
23  to HR person -- to Ms. Nita White-Ivy?

24      A.  That's already to her.

25      Q.  Oh, I see.

Page 175

1       MR. TARTAGLIO:  Let's go to Number 12 --
2   Exhibit 12.  So this will be 18460 to 18461.

3       (DEPOSITION EXHIBIT 12 WAS MARKED.)

4   BY MR. TARTAGLIO:

5       Q.  Let me know when you've had a chance to
6   review this and you're ready to discuss it.

7       A.  It's the same -- basically the same thing as
8   the last one except that it's back to Neelam.

9       Q.  Right.  And I'm going to ask about your
10  response to Ms. Sandhu.  So if we look at the top of
11  page 1, looks like there's an email from you to
12  Ms. Sandhu; is that correct?

13      A.  Yes.

14      Q.  And you have a first paragraph there, which
15  we can -- I'll read.  I'm not going to read that
16  into the record.  But then you go on to write, "On
17  this particular issue, I obviously don't know the
18  history but I believe that this will get solved
19  based on the processes for change that we have
20  undertaken.  Obviously, we need a little time, but
21  change is coming."

22      So what did you mean when you wrote that
23  this will get solved based on the process used for
24  change that we have undertaken?

25      A.  In my view, the process changes that we

Page 176

1   needed within the business would have put the -- all
2   of this into a single HR organization that would
3   have been close to the problem and that the -- it
4   would have been -- become very quickly solved
5   because the people that were being accused and the
6   accusee and the accuser, I guess, would be all
7   working in the same organization, and there would
8   not be this large bureaucracy that would be out
9   there and that there would be a lot more sensitivity
10  to the issues that are alleged here if, in fact,
11  they were real.

12      Q.  And you wrote that "change is coming" at the
13  very end.  What did you mean by that?

14      A.  The business was dramatically changing.
15  That we were going to be seeing smaller businesses
16  that were a lot more nimble and a lot closer to the
17  activities like this, that are alleged here, than we
18  have in this big bureaucracy that was at the time
19  the BlackBerry of that day.

20      Q.  When you wrote "change is coming," were you
21  alluding to the fact that you were planning to
22  terminate Ms. Sandhu's employment?

23      A.  No.

24      MR. TARTAGLIO:  Let's take a break.  We've
25  been going for a while.

Page 177

1       THE VIDEOGRAPHER:  This marks the end of --
2   go ahead.

3       I'll take us off.  This marks the end of
4   Media Number 2.  We are now going off the record.
5   The time is 2:14 p.m.

6       (Off the record:  2:14 p.m. to 2:29 p.m.)

7       THE VIDEOGRAPHER:  We are now on the record.
8   The time is 2:29 p.m.  This marks the beginning of
9   Media Number 3 in the deposition of Dick Lynch on
10  June 5, 2025.  Please continue.

11  BY MR. TARTAGLIO:

12      Q.  Please turn to Exhibit 13 if you're not
13  already there.

14      (DEPOSITION EXHIBIT 13 WAS MARKED.)

15      THE WITNESS:  I am.

16      MR. TARTAGLIO:  And for the record, this is
17  Bates Number 19790.

18  BY MR. TARTAGLIO:

19      Q.  Are you ready to discuss this exhibit, sir?

20      A.  Yes.

21      Q.  This appears to be a text email chain;
22  correct?

23      A.  Yes, it is.

24      Q.  Or I guess, text message chain, I should
25  say.  And the "LD" in the bubble at the top, do you



Page 178

1  know who that's referring to?
2      A.  LD?  To be honest, no.
3      Q.  Could that --
4      A.  It's Phil, so I don't know who "LD" is.  Oh,
5  Lisa.  Yeah, okay.  I do.  Lisa Disbrow.
6      Q.  Okay.  So does this appear to be -- well,
7  would you say you're the "DL" at the very top?
8      A.  I'm sure I am, yes.
9      Q.  And do you know -- are you able to tell from
10 reading these messages if there was a third
11 participant in this message chain?
12     A.  I can see that the top message was signed
13 "Phil."
14         (Reporter clarification.)
15         THE WITNESS:  I see from the messages that
16 the signator on the top message is Phil.
17 BY MR. TARTAGLIO:
18     Q.  So is your inference --
19     A.  What I -- what I don't -- what I don't know
20 is whether Phil was communicating with Lisa and then
21 Lisa forwarded this on to me or if it was directly
22 from Phil to Lisa and myself.  But I have to
23 conclude based upon the bubbles at the top that Phil
24 sent this to Lisa and Lisa forwarded it on to me.
25     Q.  So at the top of this page, we see a message

Page 179

1  that is signed at the end "Phil"; correct?
2      A.  Yes.
3      Q.  And there's some discussion about two
4  versions, one with witnesses named and one
5  anonymized.  Do you know what document they are
6  talking about here?
7      A.  They're talking about the report of the
8  investigation.
9      Q.  And Mr. Kurtz says, "I struggle to see the
10 harm in sharing the version with the names," and
11 then he provides an explanation; correct?
12     A.  Yes.
13     Q.  And then there's a message that appears to
14 be from you.  Do you see that?
15     A.  Yes.
16     Q.  And you wrote, "Given what personnel actions
17 are planned, might there be protective value in me
18 not seeing the version with names?"
19         What -- what are the personnel actions that
20 you're alluding to there?
21     A.  By this point in time I have clearly in my
22 mind decided that we need to reduce the people at
23 the top level of the business, and that based on
24 that and not knowing what was going to be coming out
25 in the report, I decided that it would be better for

Page 180

1  me not to see any names whatsoever on any side of
2  these arguments.
3      Q.  Why would it not be better for you to see
4  those names?
5      A.  Because I didn't want to color my decision
6  in any way based upon the outcome of the report.
7  The report to me had nothing to do with the actions
8  I was going to take.  The additional action that
9  would have been possible based upon the outcome of
10 the report is I may have terminated John Giamatteo
11 in addition to the others.  But at this point I felt
12 that regardless of the names and the dates and the
13 whatevers, that I would be better off not seeing
14 anything additional.
15     Q.  Would one of the personnel actions being
16 referred to here be the termination of Neelam
17 Sandhu?
18     A.  Among the others, yes.
19     Q.  What -- what might -- what bad consequences
20 might happen had you seen the report with the names
21 in it?
22     A.  In my view that the -- seeing the names in
23 the report would have provided me with no added
24 value and potential for being accused of retaliating
25 or something, and I wasn't in the mood of being --

Page 181

1  for retaliating because my decision process was
2  pretty clear by that point.  So I thought it better
3  not to be able to be accused of retaliating for
4  something.
5      Q.  As the interim CEO did you think it was
6  important to be apprised and aware of the complaint
7  that had been made against John Giamatteo?
8      A.  Yes.  But that has nothing to do with the
9  names that were at that point supposed to be
10 completely foreign to me.  I was supposed to see
11 this as anonymous, and I wanted to continue to see
12 it as anonymous.
13     Q.  And when you referred to "protective value"
14 were -- what were you referring to?
15     A.  I was referring to what I just described.  I
16 didn't want to be able to be accused later of having
17 taken any names out of a report and taken any
18 actions against anyone as a result of the decisions
19 that I needed to make as the CEO.
20     Q.  So at this point how many people had you
21 decided to terminate?
22     A.  At the top level of the business or
23 throughout the whole business --
24     Q.  Let's say --
25     A.  -- total.



Page 182

1    Q. I didn't get that last sentence. Sorry?
2    A. Over a thousand total.
3    Q. And among the executive leadership team, at
4  this point, November 23, 2023, how many people had
5  you decided to terminate?
6    A. Four.
7    Q. And I think you mentioned a larger wave of
8  layoffs; is that correct?
9    A. Yes.
10   Q. And is that something that you implemented
11 as interim CEO?
12   A. I didn't implement it in the logistical
13 sense. I set the stage for that to happen by virtue
14 of budget changes and by virtue of reducing the
15 executive count.
16   Q. And -- but as for the number of people that
17 you actually terminated, I think you said it was
18 four; correct?
19   A. Well, you asked about the executive level.
20 There's four at the executive level, yes.
21   Q. Oh. And as CEO, did you fire anyone who was
22 not at the executive level?
23   A. I did not. That would be done by the people
24 below in the executive branch -- executive layer or
25 below that.

Page 183

1    Q. And so the four people that you did fire
2  would be -- well, who would those be?
3    A. First of all, I don't think the term "fire"
4  is appropriate. We've separated people. And all
5  four of those -- your first question was had I
6  decided. Not taken action, so I decided on four.
7  And the actions speak for themselves as we've
8  discussed before. But there are four. They were
9  all done in different ways, and they were all done
10 [redacted]
11 [redacted]
12 [redacted]
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]

Page 184

1  [redacted]
2  [redacted]
3    Q. So when you said "might there be protective
4  value in me not seeing the version with names" were
5  you referring to Ms. Sandhu?
6    A. And anyone else who would come up.
7       MR. TARTAGLIO: Let's turn to Exhibit 14.
8       (DEPOSITION EXHIBIT 14 WAS MARKED.)
9  BY MR. TARTAGLIO:
10   Q. And while you're reviewing this, I'm not
11 going to ask about all the details, but, again,
12 you're welcome to read the whole thing if you'd
13 like. And while you're looking this over, I'll note
14 for the record that this is an email that was
15 produced at 18650, and additionally, there's a
16 document that begins at 18651 and then goes all the
17 way to 18673.
18      MS. FORSTER: Counsel, given the length of
19 the exhibit, I think it may be helpful if you -- if
20 you're willing, if you could let the witness know
21 what your question is going to be so that he knows
22 the level of sort of detail with which he needs to
23 read this.
24      MR. TARTAGLIO: Yeah. Basically I'm going
25 to ask, what, if anything, he did to address some of

Page 185

1  the concerns that were raised and some of the
2  recommendations that were made by MoFo law firm.
3       MS. FORSTER: Thank you.
4       THE WITNESS: Okay. Okay.
5  BY MR. TARTAGLIO:
6    Q. So I'm -- if you turn to page 18652, you'll
7  see that there's a red box that I added, that was my
8  handiwork there. Let me know when you see that.
9    A. Uh-huh.
10      MS. FORSTER: Was that a "yes"?
11      THE WITNESS: Yes. I'm just -- actually I
12 haven't responded in any way yet. Okay. I see it
13 now.
14 BY MR. TARTAGLIO:
15   Q. I'm not going to read the whole thing in the
16 record, but I encourage you to read that paragraph
17 right now and let me know when you're done.
18   A. Yes, okay.
19   Q. And so I'm not going to read the whole thing
20 but there's a summary here of some allegations about
21 lack of women in leadership roles, some challenges
22 that women experienced at the company, or so they
23 claimed.
24      Do you recall reviewing this document before
25 today?



Page 186

1    A.  Yes.
2    Q.  And did you review this document while you
3  were still interim CEO?
4    A.  I did not review the entirety of the
5  document in the detail that I've had an opportunity
6  to do since then.  So when I was CEO, no, I did not
7  review the accusations, the investigation.  I merely
8  focused on the executive summary and the -- and, if
9  you will, the end.  The analysis of what could be
10  done differently.
11    Q.  And you may have already answered this, but
12  do you think when you were interim CEO that you did
13  review this executive summary at the beginning of
14  the report?
15    A.  Yes.
16    Q.  In response to receiving this report, did
17  you do anything -- well, let me ask this:  What, if
18  anything, did you do to respond to the allegations
19  about lack of women in leadership roles, culture --
20  about so-called boy's club culture, et cetera,
21  et cetera?
22        Did you do anything in response to seeing
23  these allegations here?
24    A.  No.  And the reason is that I was in the
25  role for three weeks.  And during that time, focused

Page 187

1  on getting project mustard off the ground, focused
2  on reducing the executive cadre.  The thing I did
3  know is that the board has been reviewing the
4  analysis of women in the business and taken actions
5  on that over time.  So it was not a new finding, but
6  it was one that I knew was already something that
7  was sensitive to the board and sensitive to the top
8  management.  So I didn't feel that in the two -- in
9  the less than two weeks that I was in place after
10  this, that I could create any momentum in these
11  areas.  So I did not attempt to even begin to.
12    Q.  Did you ask Giamatteo to take a look at
13  these allegations and try to do something within the
14  company to address them?
15    A.  I have not talked to John about the
16  investigation or the follow-ups to that.  This would
17  be something that would have come out of Lisa's
18  group within the audit team.  It would have come out
19  of the HR organization within the business.
20    Q.  Let's turn -- it's near the end.  Let's go
21  to page 18667, please.
22    A.  Okay.
23    Q.  And there's a list of recommendations here.
24  Do you see that?
25    A.  Yes.

Page 188

1    Q.  And the first recommendation is "Workplace
2  culture survey."
3        Do you know if BlackBerry conducted such a
4  survey in response to this recommendation?
5    A.  I believe this morning you asked me about a
6  survey that Lisa referred to in an email and that's
7  the survey that she was talking about.  And to my
8  knowledge that has been completed and a follow-up
9  has been scheduled.
10    Q.  And the second recommendation is "exit
11  interviews," and more specifically the
12  recommendation is to leverage the information
13  BlackBerry learned during the interviews to improve
14  the workplace culture.
15        Do you know if there were any efforts made
16  in response to this recommendation?
17    A.  My understanding is there are exit
18  interviews done regularly and have been.  What is
19  done with them, I am not able to testify to you
20  today that exactly A, B, and C have happened.  But I
21  know those exit interviews take place.
22    Q.  And the third recommendation is a "pay
23  equity audit."  Do you know if BlackBerry conducted
24  such a pay equity audit in response to this
25  recommendation?

Page 189

1    A.  In response to this, no, I don't believe so
2  because it's been done as a routine item.
3    Q.  And is -- is a pay equity audit completed
4  regularly, like once a year, once every two years?
5  Do you know if there's a regular schedule for that?
6    A.  I can't -- I can't give you the answer to
7  that.  I'd have to look.
8    Q.  Do you know whether a pay equity audit has
9  been conducted since this report was provided to
10  BlackBerry?
11    A.  No.
12    Q.  Number 4 says, "Review statistical analysis
13  of impact of reductions in force on certain
14  demographics."  Do you know if --
15    A.  No.
16    Q.  Okay.  And you're going to -- you're going
17  to have to let me finish my question.
18        Do you know if any statistical analysis was
19  performed in response to this recommendation?
20    A.  No.
21    Q.  And does that response mean you don't know
22  or you feel confident that no response -- or that no
23  analysis has been performed?
24    A.  I'm saying exactly the answer to your
25  question.  I don't know whether it has or has not.



Page 190

1    Q.  Recommendation 5 is "mentoring and
2  professional development program."  Did BlackBerry
3  do anything to implement the recommendation here in
4  Number 5?
5    A.  I do not know.
6    Q.  And Number 6 is "create a role focus on
7  DEI."  Has BlackBerry created a role focused on DEI
8  within the company?
9    A.  I do not know.
10    Q.  And does BlackBerry currently have an
11  executive-level position on DEI or ESG?
12    A.  Executive level position, no.  Only the
13  chief people officer.
14    Q.  Number 7 says, "Employee resource groups."
15  Has BlackBerry done anything to implement
16  recommendation number 7?
17    A.  No, not to my knowledge.
18    Q.  Number 8 is "training," implicit bias
19  training.  Do you know whether BlackBerry conducted
20  implicit bias training?
21    A.  No.
22    Q.  And I should -- I should rephrase that.
23  Does BlackBerry implement implicit bias training?
24    A.  I don't know.
25    Q.  Number 9 says, "Accessibility of C-Suite and

Page 191

1  senior leaders."  Has BlackBerry done anything to
2  implement the recommendations at Number 9?
3    A.  I can't answer that question.  I don't know.
4    Q.  Let's go to Number 15.  This was produced at
5  18714 and it goes to 18715.
6       (DEPOSITION EXHIBIT 15 WAS MARKED.)
7  BY MR. TARTAGLIO:
8    Q.  Let me know when you're ready to discuss
9  this one.
10    A.  Okay.  Ready.
11    Q.  So if we go near the bottom, there
12  is -- well, strike that.
13       So this appears to be an email chain upon --
14  or which you were included on; is that correct?
15    A.  Yes.
16    Q.  And it appears that this email chain, near
17  the bottom anyways, concerns potential severance
18  calculations for several employees?
19    A.  Correct.
20    Q.  And one of those is Ms. Sandhu; correct?
21    A.  Yes.
22    Q.  So would you agree that by this point in
23  November 29, 2023, it appears that progress was
24  underway for terminating Ms. Sandhu?
25    A.  That is correct.

Page 192

1    Q.  And it appears that Ms. Sandhu's
2  severance -- it's a little hard to see.  But it
3  looks like it was about 50 weeks.  Do you see that?
4    A.  Yes.
5    Q.  And is that consistent with the discussions
6  you had around this time about her severance pay?
7    A.  Uh-huh, yes.
8    Q.  And if we look at the -- around the middle
9  of the first page, there's an email from you to Phil
10  Kurtz that says, "Phil, you and I need to play out
11  some scenarios on Neelam as I need/want some
12  flexibility that this doesn't give me."
13       Do you see that?
14    A.  Yes, I do.
15    Q.  What did you mean when you wrote "play out
16  some scenarios on Neelam"?
17    A.  I wanted the opportunity to offer Neelam
18  something greater than the amount that she was
19  allocated by the plan and by her contract, and I
20  didn't want to violate any of the scenarios of
21  process or the legal contracts that might be at
22  play.  I'm no legal expert, and so I wanted to
23  figure out how I could position things so that I
24  could offer a different outcome for her than the one
25  that was preordained.

Page 193

1    Q.  And do you know what the offer of severance
2  to Ms. Sandhu ended up being?
3    A.  I don't know exactly.  I assume it's the
4  50 weeks.
5    Q.  And did you speak with Mr. Kurtz about
6  potential severance packages for Ms. Sandhu?
7    A.  What I told -- yes, what I -- didn't tell
8  him specifically, come up with another package, but
9  it was a discussion of, "What if I offered her an
10  additional amount of money?  What if I were to offer
11  her some, you know, benefit of some sort other than
12  what was in the package?"
13    Q.  Can you remember anything else that
14  Mr. Kurtz told you about this topic of Ms. Sandhu's
15  potential severance package?
16    A.  He was as, I guess, you'd expect, very
17  cautious, telling me that, you know, he didn't -- he
18  didn't want me doing, quote, crazy things.  That's
19  my quote, not his.  But I was -- I was pushing to
20  see what kind of flexibility I would have in
21  discussions with her.
22    Q.  And there's -- in the email at the top of
23  the page, there's a reference to external counsel.
24  Did you ever discuss a potential severance package
25  for Ms. Sandhu with an external counsel, so



Page 194

1  presumably outside of BlackBerry?
2      A.  No, I did not.
3          MR. TARTAGLIO:  Let's go to the next
4  exhibit, 16, and this will be -- 4627 is the Bates
5  Number.
6          (DEPOSITION EXHIBIT 16 WAS MARKED.)
7  BY MR. TARTAGLIO:
8      Q.  Do you see this one?
9      A.  Yes.
10     Q.  This one is very short.  I'm sure we're all
11 grateful for that.  And this appears to be an email
12 from you to Mary Hundt, H-U-N-D-T; is that right?
13     A.  Correct.
14     Q.  And who is she?
15     A.  Mary is the -- she's in the HR organization,
16 but in addition to that, she also serves as the
17 executive administrator for the board.  So you could
18 look at her as my executive assistant, if you will.
19     Q.  And would you agree that as of December 1,
20 2023, it appears that the plan was for Neelam to be
21 notified of her termination by the next Monday?
22     A.  Yes.
23         MR. TARTAGLIO:  Let's go to Exhibit 17.
24         (DEPOSITION EXHIBIT 17 WAS MARKED.)
25 / / /

Page 195

1  BY MR. TARTAGLIO:
2      Q.  And this has the copy of the severance
3  package, but I'm not -- severance offer.  I'm not
4  going to ask about the offer, so you can -- you can
5  read it, but I'm not going to ask about the fine
6  details of it.  But your choice as to how much you
7  want to read.
8          And for the record this begins at page 18741
9  and goes to 18751.
10     A.  Okay.  I've seen it here.  I'm ready.
11     Q.  And I'm going to ask not about the full
12 severance offer, but I'm going to start off by
13 asking about these bullet points on the second page.
14         Do you see that?
15     A.  Yes.
16     Q.  And so did these appear to be talking
17 points?
18     A.  The first two bullet points where it says
19 "just to keep you in the loop"?  Or are you talking
20 about the lower ones?
21     Q.  So this would be page 18742.
22     A.  Okay.
23     Q.  Yes.
24     A.  Those are what they recommended I use as
25 talking points.

Page 196

1      Q.  And when you had a -- well, so when you had
2  the conversation with Ms. Sandhu -- well, strike
3  that.
4          Did you have a conversation with Ms. Sandhu
5  in which you relayed those talking points here on
6  page 7 -- 1874?
7      A.  Yes.
8      Q.  Would you agree that although perhaps not an
9  exclusive list of items that were discussed with
10 Ms. Sandhu, that you would have discussed these
11 talking points with her?
12     A.  Yes, I did.
13     Q.  In other words, maybe there were other
14 things in addition to this that you talked about,
15 but do you believe that you did speak about these
16 items with her?
17     A.  I believe I used that list to make this
18 discussion occur so, yes, I talked about all of
19 them.
20     Q.  And when you spoke with Ms. Sandhu about the
21 company's new direction of business operations, her
22 position becoming redundant, did you elaborate on
23 that at all in the conversation you had with
24 Ms. Sandhu or was that the level of generality that
25 you conveyed the message?

Page 197

1      A.  I honestly don't recall exactly what I said
2  in terms of the explanation there, so I don't want
3  to try to conclude now what was said then.
4      Q.  When you notified Ms. Sandhu that she was
5  being terminated, did you say anything about the
6  fact that some people had found her difficult to
7  work with?
8      A.  No.  No, I -- I stuck pretty much to this
9  script here.
10         MR. TARTAGLIO:  Let's go to the next
11 exhibit.  This will be 18, and it starts on
12 page 4638, goes to 4639.
13         (DEPOSITION EXHIBIT 18 WAS MARKED.)
14 BY MR. TARTAGLIO:
15     Q.  Let me know when you're ready to discuss
16 this one.
17     A.  Okay.
18     Q.  And it appears that this is a letter that
19 was dated December 4, 2023; is that correct?
20     A.  Correct.
21     Q.  And it looks like Ms. Sandhu's employment
22 was scheduled to formally terminate on December 15,
23 2023; is that right?
24     A.  As of this letter, yes.  Initially I had
25 considered an earlier date, but finding that she was



Page 198

1  out of the country and would need to travel back and
2  wanted to give her time to do the resignation
3  scenario if she chose to, I moved it out to
4  December 15.
5      Q.  And it looks like there's a signature block
6  at the bottom of the document that has your name
7  there.  Do you see that?
8      A.  That's correct.
9      Q.  Do you know if you ended up signing a
10 document similar to this one?
11     A.  I believe I did.  I don't have a copy of it.
12 I wouldn't keep such a thing, but I believe I did
13 sign it, yes.
14     MR. TARTAGLIO:  Let's go to Exhibit 19.
15     (DEPOSITION EXHIBIT 19 WAS MARKED.)
16 BY MR. TARTAGLIO:
17     Q.  Let me know when you're here.
18     A.  I'm there.
19     Q.  For the record, this was produced at 18892.
20 And so I'm going to ask about just the part with the
21 underlines, but you can read the whole thing if you
22 want.
23     A.  I see that.  I'm ready.
24     Q.  And so this appears to be an email from you
25 to Ms. Disbrow; correct?

Page 199

1      A.  Correct.
2      Q.  The last paragraph says, "By the way, I
3  spent yesterday afternoon and evening with John.
4  He's a decent negotiator relative to his comp
5  package," and goes on for a bit.
6      So is it fair to say that as of December 6,
7  2023, that BlackBerry was negotiating a potential
8  compensation package for Mr. Giamatteo?
9      A.  Yes.
10     Q.  And do you recall when negotiations over his
11 compensation package started?
12     A.  I believe it was the day before.
13     Q.  So December 5, 2023?
14     A.  Yes.
15     Q.  And then you go on to write, "The delay is
16 waiting for Neelam to tell me whether she wants her
17 separation from the company to be portrayed as a
18 resignation or severance," and it goes on for a
19 little bit.
20     A.  Uh-huh.
21     Q.  So what was the delay that you were
22 referring to here?
23     A.  Let me -- let me reread to make sure I'm
24 going to answer you correctly.  I believe that I had
25 concluded that it would be better for Neelam to have

Page 200

1  announced before John was announced as the CEO so
2  that it provided more validation to a resignation
3  scenario for Neelam.
4      If we had -- by this point in time I
5  obviously knew that Neelam and John did not get
6  along well, and I found out, of course, that, you
7  know, that was not a secret.  I wanted Neelam to be
8  able to leave head high and not be pro -- be
9  perceived as having been fired by the new incoming
10 CEO, so I was anxious to delay the announcement on
11 John until such time as Neelam had made her decision
12 and hopefully would have decided to resign or
13 portray the thing as a resignation.
14     Q.  So to recap, you thought that it would have
15 been beneficial to have Ms. Sandhu announce her
16 departure from the company before Mr. Giamatteo was
17 announced to be the CEO?
18     A.  Yes.
19     MR. TARTAGLIO:  Let's go to Exhibit 20.
20 This goes from 4693 and goes to 4694, so two pages.
21     (DEPOSITION EXHIBIT 20 WAS MARKED.)
22 BY MR. TARTAGLIO:
23     Q.  Let me know when you're ready to discuss
24 this one.  And just so you know, I'm basically going
25 to ask you to authenticate this email.  I'm not

Page 201

1  going to really get into the details of it.
2      A.  Oh, okay.  Everything in this looks like it
3  was valid.  This looks like mine.
4      Q.  Okay.  And so this appears to be an email
5  that you sent to the recipients listed at the top
6  there; is that correct?
7      A.  That's correct, and that is the board.
8      Q.  And if we go down -- about two-thirds down
9  the way, the first page, do you see the paragraph
10 that starts, "The message to Neelam of her
11 severance"?
12     A.  Yes.
13     Q.  Looking at that paragraph there -- and you
14 can read the whole thing if you want before you
15 answer my next question.  Does that appear to be an
16 accurate summary of the chronology described here?
17 In other words, do you see any reason to doubt the
18 accuracy of this paragraph?
19     A.  Yes, that is accurate.
20     Q.  And then I guess I said I wasn't going to
21 ask about the details but just a few questions.  I
22 ████████████████████████████████████████
23 ████████████████████████████████
24 ███████████████████
25 ████████████████████████████████████████





Page 202

1  quote, good reason, unquote, clause in her contract.
2  Do you see that?
3      A.  Yes, I do.
4      Q.  Does that refresh your recollection as to
5  that clause in the contract?
6      A.  It very much does, yes.
7      Q.  And so does the summary of it in this email
8  appear consistent with your recollection of this
9  contract?
10     A.  Let me again read it in detail.  Yes, that's
11 accurate.
12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
16 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
17 ▓▓▓▓▓▓▓▓▓
18 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
19 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
23     Q.  And so as interim CEO, would you agree that
24 the only termination you personally affected was
25

Page 203

1  that of Neelam Sandhu?
2      A.  In a very strict interpretation of your
3  words, the answer is yes.  But I would object to the
4  question in the sense -- I know I'm not supposed
5  to -- but all of these people would have been
6  terminated if we hadn't been able to find another
7  way to exit them from the business.
8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14
15     Q.  And so if we're looking at the number of
16 people that you yourself terminated, it was just
17 Ms. Sandhu; correct?
18     A.  No, I wouldn't say so.  Except in a very
19 technical term of terminated, yes.  But exited from
20 the business, I would take credit for all three of
21 these.
22     MR. TARTAGLIO:  Let's turn to Exhibit 21.
23 For the record, this is 18942 and goes to 18943.
24     (DEPOSITION EXHIBIT 21 WAS MARKED.)
25     MR. TARTAGLIO:  And actually this may be a

Page 204

1  duplicate.  I'm not sure.  I think maybe it is.
2  Yeah, I think we can just skip this one.
3      And, Counsel, you might want to look to see
4  maybe there's a clawback needed because --
5      MS. FORSTER:  Yeah.  I saw it.  We'll take a
6  look.
7      MR. TARTAGLIO:  Okay.  I think we can skip
8  this one and go to Exhibit 22.
9      So let's go to Exhibit 22, and that's 4714.
10     (DEPOSITION EXHIBIT 22 WAS MARKED.)
11     THE WITNESS:  Okay.  I have it.
12 BY MR. TARTAGLIO:
13     Q.  Let me know when you're ready to discuss it.
14     MS. FORSTER:  I apologize, Counsel.  Which
15 page did you point the witness to?
16     MR. TARTAGLIO:  This is Exhibit 22.
17     MS. FORSTER:  Oh, it's one page.  Thank you.
18     MR. TARTAGLIO:  Yeah.  It's just one page.
19     THE WITNESS:  Okay.  I've read it.
20 BY MR. TARTAGLIO:
21     Q.  And so this appears to be an email from you
22 to Ms. Sandhu; correct?
23     A.  Correct.
24     Q.  And do you recall why Phil Kurtz was cc'd on
25 this email?

Page 205

1      A.  Phil Kurtz and Tim Foote were responsible
2  for picking up pieces of her organization.  If not
3  permanently, on an interim basis.  And Phil Kurtz
4  was taking the sustainability, and I had asked Tim
5  Foote to oversee the dissemination of the public
6  relations duties, which was somewhat consistent with
7  the IR work that he typically does.
8      Q.  Did you have any reservations about cc'ing
9  Mr. Foote in an email message about the details of
10 Ms. Sandhu's termination?
11     A.  No, I did not.  I don't see this as details
12 in the sense that it's only talking about the date.
13     Q.  And it appears that this email was sent on a
14 Friday evening; is that fair to say?
15     A.  It's dated 12/8.  If that's a Friday, yes.
16 It was afternoon, so it would have been -- assuming
17 that this was off of my computer, it would have been
18 still morning in San Francisco.
19     Q.  And the first sentence says, "It is after
20 5:00 p.m. on Friday here in the east."
21     A.  Then it was -- then it's been redated by
22 this computer.  So -- okay.  So it was 5:00 o'clock.
23 5:00 o'clock.
24     Q.  Sorry?  What was the last thing?
25     A.  So I'll accept that it was after 5:00.

Page 206

1     Q.  And then about halfway through the document,
2  it says, "I need an answer from you no later than
3  5:00 p.m. EST on Sunday."  Do you see that?
4     A.  Yes.
5     Q.  What was the urgency in requiring a response
6  from Ms. Sandhu over the weekend?
7     A.  It was my intention that beginning on the
8  10th, I gather, which is, I guess, the Monday.  Or,
9  no, I'm sorry.  It's Tuesday.  I'm sorry.  It's
10  Sunday going to Monday.  It was my intention that
11  the organization would be divided up as quickly as
12  possible beginning on that Monday and that we needed
13  to notify the employees before we started shuttling
14  them around.  And that we needed to know that so
15  that we could begin to execute the plan to advise
16  the employees and tell them where they were going to
17  report to.
18     Q.  And you can look at some of the previous
19  emails if you want to confirm the chronology.  But
20  did you ask Ms. Sandhu to announce her
21  resignation -- in quotes -- by Sunday so
22  that Monday morning the announcement for John
23  Giamatteo, CEO, could come out?
24     A.  That may have been a piece of it.  I know I
25  discussed the -- the organizational sequence that I

Page 207

1  wanted to go through and that I wanted her to be
2  announced first.  That may have played a role here.
3  I don't remember.
4     Q.  Do you know if Ms. Sandhu sent a response to
5  this email?
6     A.  I never got one.
7        MR. TARTAGLIO:  Let's go to the next
8  exhibit, so 23 has Bates Number 18966.
9        (DEPOSITION EXHIBIT 23 WAS MARKED.)
10  BY MR. TARTAGLIO:
11     Q.  Let me know when you're ready to discuss
12  this one.
13     A.  Uh-huh.
14     Q.  And so the second half of this document
15  appears to be an email written by yourself; is that
16  correct?
17     A.  The top half, yes.
18     Q.  Well, I'm looking at the bottom half of the
19  page.
20     A.  Okay.  Yes.
21     Q.  And there's a sentence that says, "She has
22  not responded, which doesn't surprise any of us."
23  Do you see that?
24     A.  Yes.
25     Q.  Were you referring to Ms. Sandhu there?

Page 208

1     A.  I was.
2     Q.  And why were you not surprised by her
3  response -- or lack of response?
4     A.  We had heard nothing from her since the day
5  that I told her that we were going to terminate her,
6  that people had not heard from her, and that the
7  assumption that I was making at that point and that
8  I think the other gentlemen were making was that
9  having not responded until that time, we would not
10  hear anything else from her.  And it turned out that
11  that was the case and that -- I'm just making that
12  statement there.
13        MR. TARTAGLIO:  Let's go to the next
14  Exhibit 24.  It's going to be page 18972.
15        (DEPOSITION EXHIBIT 24 WAS MARKED.)
16  BY MR. TARTAGLIO:
17     Q.  And I'm probably just going to ask you to
18  authenticate this one, but go ahead and read the
19  whole thing if you'd like.  It's not very long.
20     A.  No.  I think I know what it is.  I did write
21  that.
22     Q.  Okay.  Well, that's probably all we need
23  there.
24        MR. TARTAGLIO:  Exhibit 25 has the Bates
25  Number 5008.

Page 209

1        (DEPOSITION EXHIBIT 25 WAS MARKED.)
2  BY MR. TARTAGLIO:
3     Q.  And let me know when you're ready to discuss
4  this one.
5     A.  I see it and I've read it.
6     Q.  So the bottom appears to be an email from
7  Maria Bourn from my law firm.  Does that sound right
8  to you?
9     A.  If that's where she's from, yes.
10     Q.  And who is Kelly Cheun, C-H-E-U-N?
11     A.  Kelly is in our HR organization.
12     Q.  And it looks like you forwarded this email
13  on to Nita White-Ivy; correct?
14     A.  Yes.
15     Q.  And you wrote, "Nita, disappointing, but,
16  dot dot, dot."  What did you mean by the "but, dot,
17  dot, dot"?
18     A.  Well, it's -- it's my way of ending the --
19  ending the discussion or the point I was making
20  there that I was disappointed.  That we haven't been
21  able to make this happen in a way that was, I guess,
22  a lot better for everybody at the end.  So I was
23  just disappointed to get that -- to get to see that
24  email from -- was it Maria?
25     Q.  I'm going to make a suggestion now, which is



Page 210

1  perhaps completely wrong, but I'll see if you agree
2  with it or not, that this email from Ms. Bourn was
3  disappointing but not unexpected.  Is that
4  consistent with your perception?
5      A.  No.  I don't know that I'd agree with that
6  necessarily.  Looking back historically, I guess I'm
7  not surprised now, but I was -- I wasn't expecting
8  or hoping for that.  So I don't -- I don't need to
9  fill in the dots with your words.  I -- I --
10 essentially I was disappointed.  You don't like to
11 have a person walk away like that, but -- so I was
12 disappointed in it.
13     MR. TARTAGLIO:  Let's go to Exhibit 26.
14 There's no Bates numbers here, but this is something
15 that was exchanged in -- as part of this lawsuit.
16     (DEPOSITION EXHIBIT 26 WAS MARKED.)
17 BY MR. TARTAGLIO:
18     Q.  And you can read the whole thing, but really
19 I want to ask you about Number 2 and Number 3.
20     A.  I'm sorry?  2 -- 2 meaning what?
21     Q.  So if you scroll down, you'll see
22 "Information Number 2," and then "Response to
23 Information Number 2."
24     A.  Okay.  Information, okay.  I see
25 "Information Number 2," yes.

Page 211

1      Q.  And the response says, "Richard Lynch was
2  the only person involved in making the decision to
3  terminate plaintiff."  Do you see that?
4      A.  Yes.
5      Q.  Do you think that's accurate?
6      A.  Yes.
7      Q.  Did you communicate with Mr. Kurtz as part
8  of the decision to terminate Ms. Sandhu?
9      A.  As the general counsel of the company, I
10 advised him, yes.  I did not consult with him.  I
11 told him what I was going to do.
12     Q.  Was Mr. Kurtz involved in the decision to
13 terminate Ms. Sandhu?
14     A.  No, it was my decision.  He was -- he
15 advised me, but he was not the decision-maker, nor a
16 co-decision-maker.
17     Q.  Was Lisa Disbrow involved in the decision to
18 terminate Ms. Sandhu?
19     A.  No.
20     Q.  Did you ever discuss with her?
21     A.  I advised her what my intent was.  As the
22 audit committee chair and as the person who was
23 responsible for the investigation, I thought she
24 needed to know.  But she was not a decision-maker.
25 I did it.

Page 212

1      Q.  Other than through a more general email that
2  would have gone to many people, did you advise John
3  Giamatteo that you would be terminating Ms. Sandhu's
4  employment?
5      A.  No.
6      MR. TARTAGLIO:  Let's go to the next one,
7  Exhibit 27.  These are interrogatory responses.
8      (DEPOSITION EXHIBIT 27 WAS MARKED.)
9  BY MR. TARTAGLIO:
10     Q.  And you don't need to read the whole thing,
11 although you're welcome to.  But I plan to direct
12 you to the ones that I'm most interested in.
13     A.  Okay.
14     Q.  Would you like me to do so?
15     A.  Yes, please.
16     Q.  Okay.  Let's turn to page 11.  And I guess
17 10 -- page 10 as well, so pages 10 to 11.
18     A.  Okay.  I have them.
19     Q.  Okay.  And the bottom says, "State the
20 reasons for your decision to terminate plaintiff."
21 Do you see that?
22     A.  Yes.
23     Q.  And so we'll go ahead and walk through some
24 of these response statements now.  And if you look
25 at the top of page 11, the second sentence says, "In

Page 213

1  October of 2023, BlackBerry announced that it would
2  separate the IoT" -- presumably internet of
3  things -- "and cybersecurity businesses into two
4  standalone entities."
5      Did that happen?
6      A.  It has happened in a way slightly different
7  than the October announcement.  But it -- yes, it
8  has happened.
9      Q.  And how is -- how did it happen differently
10 than the way it was announced in October of 2023?
11     A.  The announcement that you're talking about
12 is referred to as "project imperium" and that was a
13 plan that would have placed QNX or the IoT division
14 in a quasi public environment with its own stock --
15 tracking stock.  We chose not to do that.  That's
16 when project mustard was initiated, and what we have
17 done now is made the two business units essentially
18 self-sufficient with some exceptions to which we're
19 still evolving away from.  But the essence of the
20 October 2023 versus the November or December project
21 mustard separation, there's a -- there's a
22 distinction I just want to call there.
23     Q.  And currently are the internet of things
24 group and cybersecurity business in two standalone
25 entities?

Page 214

1    A.  They are two separate business units.  When
2  you refer to a standalone entity, that's not in my
3  mind as clear as saying "two separate business
4  units."
5    Q.  And if we go down to the next paragraph, the
6  second sentence says, "As a result, plaintiff's
7  position was eliminated along with those of two
8  other executives and more than 500 employees."
9      Do you see that?
10    A.  I don't see it yet, but I'm sure I will find
11  it.  Yes, I see that.  Okay.
12  ███████████████████████████████████████████
13  ████████████████████████████████████
14  ██████████████████████████████████████████
15  ██████████████████████████████████████████
16  ████████████████████████████████████
17  ███████████████████████████████████████████
18  ████████████
19  ██████
20    Q.  Doesn't BlackBerry currently have a chief
21  people officer?
22    A.  No.  We went through this this morning.  The
23  chief people officer today has a much honed down
24  role, and that individual is also running the
25  cybersecurity or what is now called the secure

Page 215

1  ███████████████████████████████████████████
2  ███████████████████████████████████████████
3  ████████████████████████████
4  ███████████████████████████████████████████
5  ██████████████
6    Q.  And there's reference here to more than 500
7  employees being laid off.  Do you see that?
8    A.  I think it's more than that now.
9    Q.  When -- when did the layoff referred to here
10  occur?
11    A.  It's been --
12      MS. FORSTER:  Objection.  Assumes -- just a
13  second.  Assumes facts not in evidence.
14      Go ahead.
15      THE WITNESS:  Okay.  It's an incremental
16  number that has been done since the beginning of
17  2024, and I believe this number is actually low now.
18  BY MR. TARTAGLIO:
19    Q.  What -- so there was multiple rounds of
20  layoffs; is that fair to say?
21    A.  Yes.
22    Q.  And are you able to estimate that -- what
23  the number of people would be laid off as a result
24  of this shift in strategy?
25    A.  I believe it's reaching closer to a thousand

Page 216

1  people now, but I can't give you a definitive
2  number.
3    Q.  And do you know when the -- the amount of
4  time -- are you able to estimate the amount of time
5  that elapsed between the termination of Ms. Sandhu
6  and the first round of layoffs after that?
7    A.  Weeks.  It was not a long period of time.
8  It was planning underway by the first of the year,
9  and I believe the first layoff of what I will call
10  the subordinate levels of people occurred early in
11  the first quarter.
12    Q.  And I'll -- I'm not going to make this an
13  exhibit because it's the Canadian Press news
14  website, but I will just quickly share my screen
15  here.  Are you able to see this, "BlackBerry to lay
16  off more staff as part of splitting up business"?
17    A.  I see that, yes.
18    Q.  And this is dated February 12, 2024.
19    A.  Uh-huh.
20    Q.  And then it goes on to say that BlackBerry
21  would be laying off 200 jobs as part of the effort
22  to slash costs.
23    A.  I see that, yeah.
24    Q.  So I'm not going to ask you to vouch for the
25  accuracy of this article, but looking at this

Page 217

1  article, does it appear that the first round of
2  layoffs we were just discussing would have been
3  February 12, 2024?
4    A.  That's reasonable.  I can't -- I can't vouch
5  for the number, but I think the -- that date is
6  probably reasonable as a press release out of a
7  newspaper.  I think that the actual announcement of
8  the people that were leaving was probably a little
9  before that.
10    Q.  And the next sentence says, "BlackBerry
11  declined to place plaintiff in another role at the
12  company because she displayed a pattern of
13  noncollaborative, antagonistic conduct with her
14  colleagues and expressed a belief that they were not
15  contributing as much as she was."
16      Do you agree with that sentence?
17    A.  I do.  And particularly the belief that
18  they're not contributing as much as she was is
19  consistent with the discussion I had with her back
20  in November when I first interviewed with her.
21    Q.  Do you know whether others were, in fact,
22  not contributing as much as she was to the business?
23    A.  At the executive level, which is the only
24  level I'd be aware of, I -- I can't say that there
25  were.  But below the executive level, I'm sure there



Page 218

1  were other people in that same position.
2      Q.  And the next sentence says, "BlackBerry
3  specifically declined to place plaintiff in another
4  role serving the BlackBerry customer accounts she
5  had managed in her role on the elite team because
6  plaintiff's performance with those customer accounts
7  was not strong." And it goes on, but I want to
8  focus on this first part here.
9          Do you agree that plaintiff's performance
10 with her customer accounts -- her elite customer
11 accounts was not strong?
12     A.  Two comments, if I might, there.  First,
13 yes, but I -- we have to talk about the performance
14 criteria that were displayed at the board meetings
15 where elite accounts was significantly below the
16 performance of many of the other groups, if not all
17 the other groups.  And I recall that.  But the other
18 important point is that it is important to include
19 the fact that John Chen expressed frustration to me
20 at one point that he had to get involved
21 significantly with elite accounts in order to push
22 it along, making things happen.  So I tie those two
23 pieces together.
24     Q.  And so it sounds like as to her performance
25 with customer accounts, you recall some discussions

Page 219

1  at the -- at board meetings in which the elite
2  performance was discussed?
3      A.  It was discussed as part of the -- the bonus
4  performance plan when it was reviewed by John Chen
5  at each annual point where that was done, and also
6  the comments that he made to me in a break during
7  that period -- during the meeting.
8      Q.  Do you remember with any more detail the
9  performance with customer accounts?  So I'll give
10 you an example.  Perhaps cyber business unit was up
11 10 percent but elite down 10 percent.  Something
12 like that.
13         Are you able to recall at that level of
14 generality why the performance with elite customer
15 accounts was not strong?
16     A.  Yeah.  The best way to describe it is that
17 we were presented with the annual performance of
18 each of the individual business units.  Or -- don't
19 use the term "business units."  But the business
20 managers and the performance against their plans.
21 And the elite I can still remember being something
22 like 1 percent where most of the other units were
23 not doing all that well, but they are 50 and
24 60 percent of their plan.
25     Q.  When you say "percent of plan," do you mean

Page 220

1  like percentage of a quota that they are hitting?
2      A.  You could describe it that way.  It's a
3  percent of what they -- their plan of what they
4  would commit to and deliver on.
5      Q.  And is it your recollection that -- that the
6  elite accounts group was hitting only 1 percent of
7  its target goals?
8      A.  That's one of the numbers I remember, yeah.
9  No, you can't say 1 percent of their goals.  You can
10 only say 1 percent of the calculated deliverables.
11 Whatever those goals accumulated to.  It's easier to
12 show on a chart, but it is essentially the
13 calculation of what the payout will be for the
14 individuals short of John Chen overriding those
15 numbers and awarding something better to people,
16 which he did periodically.  But it is a
17 representation of the overall performance of the
18 individual and their group.
19     Q.  And so if elite group were meeting only
20 1 percent of its expectations, that would appear to
21 be pretty catastrophic; right?
22     A.  Yes.
23     Q.  And you're confident that it was 1 percent?
24     A.  I recall that it's not every month, not
25 every year, but it was at one point -- I believe at

Page 221

1  the end of one of the years, it was -- was quite
2  low.
3      Q.  And the response goes on to say, "Plaintiff
4  told interim CEO Richard Lynch that she wanted to be
5  CEO herself."  Is that accurate?
6      A.  Yes.  Yes, that is accurate.
7      Q.  And then it goes on to say, "Mr. Lynch did
8  not think that plaintiff would be able to carry on
9  with the business in a constructive or successful
10 way when she lacked good relationships with others
11 in the organization, especially when she wanted the
12 CEO role and was not going to get it."  Do you agree
13 with that?
14     A.  Yes.
15     Q.  If Ms. Sandhu had said that she was not
16 interested in the CEO role, would that demonstrate a
17 lack of ambition on her part?
18     A.  No, I don't think so.  I think that silence
19 in that area would have been prudent.  And you don't
20 say you don't want a role, but silence on that --
21 that point is, I think, appropriate.
22     Q.  And earlier there was discussion -- way back
23 earlier in the deposition we had a discussion about
24 Ms. Sandhu saying she wanted to be CEO versus she
25 wanted to be considered as CEO.



Page 222

1      Now that we've gone through a bunch of
2  exhibits, are you able to -- to say whether she
3  wanted to be CEO or whether she wanted to be
4  considered for CEO?
5      A.  I don't parse the difference very well in my
6  mind.  A person may -- if they want to be CEO, they
7  want to be considered to be CEO.  And if you don't
8  want to be, you don't want to be considered.  So to
9  me it's one in the same.  She wanted to be the CEO,
10  and I didn't feel that she was ready for it, and I
11  didn't feel she was ready for it from an experience
12  standpoint nor did I feel she was ready for it from
13  a relationship standpoint with her peers.
14      Q.  So is it fair to say one of the reasons why
15  she was let go from the company rather than being
16  given a new placement is that she had expressed
17  interest in being CEO?
18      A.  No, no.  She was in a job which
19  unfortunately was a job that was all corporate level
20  and would be all put back into the business units
21  from which it would have come logically as you were
22  laying out the two business units' strategy.  She
23  had a piece of something that belonged in cyber
24  business unit.  She had a piece of something that
25  would be divided and put into the two business

Page 223

1  units.  And the third piece, the sustainability
2  piece, we put that into corporate legal group.  It's
3  kind of a -- an ancillary person or something.  But
4  the -- the two bigger pieces she had both belonged
5  to business units.
6      So the major determinative that she was not
7  needed in the business and that I chose to terminate
8  her was the fact that her role would expire on the
9  basis of the new definition of how BlackBerry was
10  organized.
11      Q.  And let's go to the last page of this
12  exhibit.  This is the verification.  Do you see
13  that?
14      A.  Yes.
15      Q.  And did you sign that document?
16      A.  That's not me.  That's -- oh, the one down
17  here is.  Okay.  Yes.
18      Q.  For numbers 5 and 6 specifically?
19      A.  Yes.
20      MR. TARTAGLIO:  Let's go to Exhibit 28.  And
21  for the record, this was not produced, but it was
22  filed at docket Number 60 -- 60.
23      (DEPOSITION EXHIBIT 28 WAS MARKED.)
24  BY MR. TARTAGLIO:
25      Q.  And I'm not going to ask you to read the

Page 224

1  whole thing if you want to.  I am going to ask about
2  the first three pages.  So -- well, not the whole
3  thing, but basically parts of the first three pages.
4  So I would suggest reading those if you have not
5  seen this document before.
6      A.  I would like to read them then.
7      Q.  And let me know when you're ready to discuss
8  this.
9      A.  I will.  I will.  I've read it.
10      Q.  All right.  So I'm going to ask now about
11  the first page that -- well, I guess technically
12  it's page 2 of 41.  And a couple lines down from the
13  top, it says that Ms. Sandhu "demonstrated that she
14  viewed her colleagues as enemies and rivals, rather
15  than teammates, and she appeared to have convinced
16  herself that she was the only person at Blackberry
17  who was good at her job."
18      Do you agree -- well, strike that.
19      Is that sentence consistent with your
20  assessment of Ms. Sandhu's personality?
21      A.  Yes.
22      Q.  And the document goes on to say, "She became
23  antagonistic, and her toxic competitiveness sowed
24  animosity, blocked collaboration, and took an
25  extreme toll on the people who worked with her."

Page 225

1      Is that also consistent with your assessment
2  of Ms. Sandhu's personality?
3      A.  I -- I may have used slightly different
4  words, but yes.
5      Q.  Can you provide any examples of the extreme
6  emotional toll that Ms. Sandhu inflicted on her
7  coworkers?
8      A.  Well, I do know that two of her employees
9  all of a sudden decided to take leaves to the
10  surprise of everyone involved.  I was made aware of
11  that.  And to me, that's an indication of a problem,
12  and that was with a couple of her own employees.
13      Q.  And did those people say that they were
14  going on leave because --
15      A.  I did -- I did not talk to them directly.
16  But my experience is quite clear that two people
17  leave on the same day, or in the same short period
18  of time, that there's -- there's an issue beyond
19  them having some illness that's come up.
20      (Reporter clarification.)
21      THE WITNESS:  Illness.
22  BY MR. TARTAGLIO:
23      Q.  And the following sentence says, "Over many
24  years, Ms. Sandhu alienated nearly everyone within
25  BlackBerry's leadership and beyond."



Page 226

1        Do you agree with that statement?
2     A.  I do today.  I did by the time I got to the
3  end of my CEO role.  I did not realize that early
4  on, but I did by the end of the period I was there.
5     Q.  Who can you think of who was alienated
6  beyond BlackBerry's leadership?
7     A.  The people in her organization in a number
8  of cases actually sent me emails indicating the
9  pleasure with which they took their reassignments
10  into other organizations.
11     Q.  Can you recall who sent those emails you
12  just referred to?
13     A.  Not by name.  But a couple of the employees
14  within the organization.
15     Q.  And I think you mentioned a few employees
16  within Ms. Sandhu's organization she had alienated.
17     A.  Yes.
18     Q.  Who were you thinking of?
19     A.  Again, I'm referring to the ones I'm just
20  talking about, which is people who said to me,
21  "We're glad that this change has been made.  Things
22  were very difficult here."
23     Q.  The last -- well, the second-to-last
24  sentence to this page says, "She was adversarial
25  with the cyber BU team and actively blocked the two

Page 227

1  groups from working together or sharing information
2  for the best interest of the company."
3        Do you have any knowledge of this happening?
4     A.  Examples, I cannot give you.  But this is,
5  as been reported, again at a level beneath the
6  executive team, that there was difficulties between
7  the groups.  And it was her group that indicated
8  that they would have liked to have worked more
9  closely with the cyber business unit on certain
10  things.
11     Q.  If we go to the next page about halfway down
12  the page starting at row 11 -- or I guess line 11,
13  it says, "In mid-2023, the company had announced
14  that it would review its portfolio of businesses
15  and, after several months of consideration, this
16  review led to a further announcement that the
17  company intended to split into two standalone
18  businesses, with the goal at the time of pursuing a
19  subsidiary initial public offering of the internet
20  of things business."
21        Was there ever an international public
22  offering for the internet of things business?
23     A.  No.  That's -- you may recall earlier today
24  I talked about project imperium.  That was the
25  defined goal of project imperium, and the board felt

Page 228

1  that that was not the right way to go.  And once
2  John Chen left, we reformed that into project
3  mustard and defined the two standalone businesses as
4  staying within the corporate umbrella of BlackBerry
5  with the idea that down the road there may be some
6  strategic activity.
7     Q.  And if we go down to the underlined
8  portions.  That's from me, by the way.  That's not
9  original to the document.  The second underlined
10  sentence says, "Despite that history, Ms. Sandhu
11  expressed to Mr. Lynch during their meeting that she
12  believed she should be the next CEO of BlackBerry."
13        Do you agree that Ms. Sandhu told you that
14  she should be the next CEO of BlackBerry?  Emphasis
15  on the word "should."
16     A.  Emphasis on the word "should," no.  But she
17  certainly did express that it was her intention to
18  be considered for the position of CEO of BlackBerry.
19     Q.  The next page.  There's an underlined
20  sentence that says, "Mr. Lynch further believed that
21  Ms. Sandhu's sustainability" -- sorry.  I'll read a
22  little slower -- "sustainability work would be
23  better handled by BlackBerry's legal term."
24        Why is it that BlackBerry's legal team would
25  be better at doing sustainability work than

Page 229

1  Ms. Sandhu?
2     A.  Because the view of the sustainability work
3  is that it is one person or a fraction of a person
4  and that there was no value in Neelam being that
5  individual, that it could be grouped with other
6  activities ongoing in the legal organization.
7     Q.  Does legal team have any particular
8  expertise in the field of sustainability?
9     A.  It's my understanding that there is someone
10  within that group that has the responsibility to
11  respond to any governmental requirements --
12  governmental requests, and so the answer to that
13  from my perspective is yes.
14     Q.  Do you know who that person is?
15     A.  No.
16     Q.  And the next couple of sentences -- so I'm
17  not going to read the whole thing, but near the end
18  of the paragraph, there's a reference here to,
19  quote, "She deserved the CEO role" comma.
20        Do you agree that Ms. Sandhu told you that
21  she deserved the CEO role?
22     A.  I wouldn't say that she said she deserved.
23  That wasn't her words.
24        MR. TARTAGLIO:  Let's go to the next
25  exhibit.



Page 230

1    (Reporter clarification.)
2    MR. TARTAGLIO:  Sure.  Let's take a break.
3  Want to come back at 4:00?
4    THE VIDEOGRAPHER:  This marks the end of
5  media Number 3.  We are now going off the record.
6  The time is 3:52 p.m.
7    (Off the record:  3:52 p.m. to 4:02 p.m.)
8    THE VIDEOGRAPHER:  We're now going on the
9  record.  The time is 4:02 p.m.  This marks the
10  beginning of Media Number 4 in the deposition of
11  Dick Lynch on June 5, 2025.  Please continue.
12    MR. TARTAGLIO:  Let's go to Exhibit
13  Number 29.
14    (DEPOSITION EXHIBIT 29 WAS MARKED.)
15  BY MR. TARTAGLIO:
16    Q.  And I'm not going to ask you about the
17  minutiae of this agreement.  I'll give you a little
18  introduction to this.  So this is something I got
19  from an SEC filing, so just -- public filing from --
20  I forget if it was BlackBerry's website or the SEC
21  website.  And it's an agreement that was made with
22  Marjorie Dickman.
23    So go ahead and take a look at this.  I'm
24  not going to ask about every little clause.
25  But I will ask about -- a few kind of

Page 231

1    high-level questions about this.  And let me
2    know when you're ready to discuss.
3    A.  Okay.  I think it would be easier if you
4  asked the questions rather than me trying to read
5  through the whole thing initially here.
6    Q.  Sure.  So before just now, were you -- and I
7  guess let's exclude yesterday.  Maybe you talked
8  about this with your lawyers.  But before yesterday
9  were you aware of this separation agreement between
10  Ms. Dickman and BlackBerry?
11    A.  No.  I was aware of the separation but not
12  the agreement.
13    Q.  And were you aware that Ms. Dickman was paid
14  a severance payment of $900,000?
15    A.  Not until just now.
16    Q.  And were you aware that according to
17  Paragraph 2(c), in addition to the $900,000 payment,
18  Ms. Dickman was also -- and I don't understand
19  exactly how this worked -- but she was given some
20  sort of equity in addition to severance payment?
21    A.  Well, allow me to read that paragraph,
22  please.
23    Q.  Sure.
24    MS. FORSTER:  While the witness is reading,
25  I will interpose the objection that I find that

Page 232

1  question vague and ambiguous.
2    MR. TARTAGLIO:  I will ask it again after he
3  has the chance to read.
4    THE WITNESS:  Okay.  I've read it now.
5  Thank you.
6  BY MR. TARTAGLIO:
7    Q.  And until just now, were you aware that in
8  addition to being paid $900,000, Ms. Dickman was
9  also given some equity rights in addition to that?
10    A.  No.
11    Q.  And were you aware until just now that
12  Ms. Dickman, as part of her severance, was also
13  given a pro rata amount of variable incentive plan
14  bonus?
15    A.  I believe that's standard, but, no, I was
16  not.
17    Q.  Until recently were you -- until just now,
18  were you aware that in addition to what we've also
19  discussed, Ms. Dickman was also, according to
20  subsection E, paid about $13,000 for attorneys'
21  fees?
22    A.  No.
23    Q.  And looking at subsection F, were you aware
24  until just now that Ms. Dickman was also apparently
25  given some sort of reimbursement for vacation?

Page 233

1    A.  No, I was not.
2    Q.  Do you know whether Ms. Dickman threatened
3  to bring a lawsuit against BlackBerry?
4    A.  I do not.
5    Q.  Do you know that Ms. Dickman alleged that
6  resulted in this severance package of over $900,000?
7    MS. FORSTER:  Objection.  Assumes facts not
8  in evidence.
9    THE WITNESS:  No, I do not.
10  BY MR. TARTAGLIO:
11    Q.  As a member of the board of directors, would
12  you expect that you would have been informed of
13  agreements such as this one for over $900,000
14  settlement?
15    A.  No.  Not if it doesn't come to the level at
16  which it exceeds the executive's authority.  If an
17  executive has the authority to -- as an example, to
18  make an agreement for a million dollars, unless it
19  came above $2 million, we would not necessarily have
20  board approval requirements.
21    Q.  And that million dollars, is that a rule
22  that's in place or was that just a hypothetical
23  example?
24    A.  That's a hypothetical example.
25    Q.  Is there a rule in place that the board



Page 238

1  this one.
2      A.  Yep.  That one is easy.  I can -- I'm ready.
3      Q.  And so this email refers to discussing the
4  separations -- I'm reading from the first sentence,
5  the separations with Phil Kurtz.  Would that have
6  included Ms. Sandhu?
7      A.  Yes.
8      Q.  And you go on to say, "I think I have three
9  different situations and I want to handle them all
10  properly but differently."
11         What were those three situations you're
12  referring to?
13      A.  The three individuals.  We had one where we
14  had intended to do a termination with an offer to --
15  to have it look like a resignation.  We had one
16  where I was getting the distinct impression that a
17  resignation would be forthcoming before I needed to
18  go any further with a discussion of termination.
19  And the third one was an individual who understood
20  that he would be terminated and would like to
21  resign.  Those are the three situations as we've
22  described them before.
23      Q.  And the next -- well, two sentences further
24  along, it says, "I want help keeping us out of legal
25  trouble, or at least position the situation to best

Page 239

1  protect us if there's legal activity."
2         So were you contemplating that there might
3  be some legal trouble associated with the three
4  terminations we were just discussing?  Or I guess
5  three separations we were just discussing?
6      A.  Any time you separate people against their
7  will, you have to be prepared for a blowback
8  reaction.  Whether it happens or not, a lot has to
9  do with the way that the situation is handled.  And
10  in this case, I just wanted to be sure that, should
11  we have a problem, that I had done the right things.
12      Q.  So at this point, November 24, 2023, did you
13  think that Neelam Sandhu might sue the company over
14  her termination?
15      A.  No more so than Nita or Mark.
16      Q.  But did you think that Ms. Sandhu might sue
17  the company as of this date?
18      A.  That probability is always there, so I had
19  to assume that that's a possibility.
20      MR. TARTAGLIO:  Let's go to the next
21  exhibit, 32.  This is 20172.
22      (DEPOSITION EXHIBIT 32 WAS MARKED.)
23  BY MR. TARTAGLIO:
24      Q.  That is a short one.  Let me know when
25  you're ready to discuss.

Page 240

1      A.  Okay.
2      Q.  And so there's some discussion here.
3  Ms. Forster, I'm sure she's pleased to see herself
4  being discussed positively.
5         So did you have a discussion with
6  Ms. Forster before terminating Ms. Sandhu?
7      A.  No.
8      Q.  Was that "no"?
9      A.  No.  I'm sorry.
10      Q.  And I phrased that incorrect -- I think
11  poorly.  So did you have a call with Ms. Forster
12  before notifying Ms. Sandhu that she was being
13  terminated?
14      A.  I did not.
15      Q.  Is there any particular reason
16  why -- well, strike that.
17         So in referring to -- to present purposes in
18  this email, were you thinking about the termination
19  of Ms. Sandhu?
20      A.  Among others.
21      Q.  And what was it about the decision to
22  terminate Ms. Sandhu that you thought justified
23  bringing in an outside attorney?
24      A.  In her case specifically?  I can't -- I
25  can't speak to that.  I was advised by my counsel

Page 241

1  that we should -- given the number of terminations
2  we'd be making that this was a good idea.
3      MR. TARTAGLIO:  Let's go to Exhibit 33.
4      (DEPOSITION EXHIBIT 33 WAS MARKED.)
5  BY MR. TARTAGLIO:
6      Q.  This is a printout from the website we were
7  looking at earlier today, so I guess there's not a
8  whole lot to say here, other than does this appear
9  to be a printout from BlackBerry's web page?
10      A.  Yes.
11      MR. TARTAGLIO:  And Exhibit 34.
12      (DEPOSITION EXHIBIT 34 WAS MARKED.)
13  BY MR. TARTAGLIO:
14      Q.  We already reviewed much of this today, but
15  I do want to go to page -- I want to -- see, there's
16  two Bates numbers, but this would be BB13-000019050
17  [sic].
18         I'm not sure why there's two numbers, but do
19  you see the page I'm looking at?
20      A.  I'm looking for it.  You said 050, and I'm
21  still getting there.  Yes.
22      Q.  And so this page -- does this appear to be
23  some notes from a call with Phil Kurtz?
24      A.  Yes, it is.
25      Q.  And in this call you discussed asking



Page 242

1   Ms. Sandhu to see press releases, blogs, LinkedIn
2   for the next month or so.  Do you see that?
3       A.  That is -- that is correct.
4       Q.  And what was the reason for that?
5       A.  As -- as we had discussed before, I was
6   trying to change the public perception of the
7   business, the employee perception of the business,
8   and the press releases and the blogs and such had
9   all been coming out of the same organization that
10  Neelam had been running for some extended period of
11  time.  She did not yet have my full understanding of
12  what I wanted to accomplish, and I thought that by
13  being able to see these releases before they went
14  out, that I'd be able to tweak them to make sure
15  that they were representing the messaging that I
16  wanted to have put into the public form.  And Phil,
17  as my go-to guy, I asked him to please check in with
18  her and ask to see all those.
19      Q.  I'm going to ask a few follow-up questions
20  about topics we discussed earlier today.  So I think
21  you mentioned that you had a discussion with John
22  Chen about some conflict that the elite customer
23  group had had with another group.  Do you recall
24  that?
25      A.  I do.

Page 243

1       Q.  And did John Chen say that he thought that
2   Ms. Sandhu was to blame for that tension that
3   existed?
4       A.  His words to me were "I'm tired of having to
5   be in the middle of everything the elite group does.
6   This should be done on their own."  I conclude from
7   that that the elite groups' performance was not
8   consistent with his expectation.
9       Q.  Did he say anything that would rule out the
10  possibility that there was another group who was to
11  blame for causing the friction between the elite
12  group and that other group?
13      A.  He didn't describe friction.  He described
14  the malfunctioning of the elite group.  He didn't
15  talk about any other groups.
16      Q.  Do you remember earlier when we talked about
17  two people within Ms. Sandhu's group suddenly going
18  out on leave at the same time?
19      A.  Yes.
20      Q.  Did you ask anyone to look into why these
21  two individuals had gone out on leave?
22      A.  No.
23      Q.  And so your inference that they did not want
24  to work with Ms. Sandhu, is that based on anything
25  other than the fact that they had both taken leave

Page 244

1   at the same time?
2       A.  In the context in which I was operating at
3   that time, I drew that conclusion and would stick by
4   that conclusion.
5       Q.  And did -- did anyone ever tell you why
6   these two folks had gone out on leave?
7       A.  I never asked.
8       Q.  So earlier we talked about the fact that
9   Neelam's -- well, that Ms. Sandhu's elite business
10  group had been having some performance issues.  Do
11  you remember that?
12      A.  Yes.
13      Q.  Did you ever speak with Ms. Sandhu to ask
14  her to explain why these performance issues had been
15  happening?
16      A.  No, no.  The performance issues that I'm
17  referring to were in 2022, 2023, prior to my -- my
18  taking the temporary role, and I was not in a
19  position to do that at that time.
20      Q.  Well, before deciding to terminate
21  Ms. Sandhu, did you give her a chance to explain
22  what might have caused some of the performance
23  problems with the elite customer group?
24      A.  I did not because the primary decision had
25  nothing to do with the performance.  It had to do

Page 245

1   with the role that she was playing in the company at
2   that point in time.  The performance component was
3   merely an additional, what I would call, relevant
4   contributor to my confirmation of my decision.
5       Q.  At some point while the Morrison Foerster
6   Law Firm was investigating the allegation of --
7   against John Giamatteo, did that investigation's
8   scope grow to also increase some allegations against
9   Neelam Sandhu?
10      A.  I am not aware of the investigation other
11  than the reading that I have done on it, and so to
12  the extent that its description in the -- in the
13  document, that's all I have to read from.  So I
14  can't -- I can't comment on that.
15      Q.  And so to kind of summarize, can you say one
16  way or another whether the scope of the
17  investigation grew to include some allegations
18  against Ms. Sandhu?
19      A.  I don't recall that.
20      Q.  Do you think that it would be best -- or it
21  would have been best to have waited for the Morrison
22  Law Firm to complete its investigation before
23  reaching a conclusion as to whether the allegations
24  investigated were actually true?
25          MS. FORSTER:  Sorry.  Can you -- may I ask



1  the court reporter to please read that question
2  back.
3       (Record read as follows:
4       "Question: Do you think that it
5       would be best -- or it would have
6       been best to have waited for the
7       Morrison Law Firm to complete its
8       investigation before reaching a
9       conclusion as to whether the
10      allegations investigated were
11      actually true?")
12      **THE WITNESS: But we did do that. We -- we**
13 **waited for the end result before we took any further**
14 **actions.**
15 BY MR. TARTAGLIO:
16      Q. And why would it be important to not
17 prejudge the results of the Morrison Foerster
18 investigation?
19      **A. Because if the accusations were correct,**
20 **we'd be firing someone else and that would have been**
21 **John Giamatteo.**
22      Q. I'm going to share an exhibit now.
23      MR. TARTAGLIO: And I think I'll ask
24 Ms. Forster to review the document before Mr. Lynch
25 looks at it just to make sure that it's okay to show

1  it to him. It is stamped confidential. I just want
2  to be careful about this.
3       MS. FORSTER: Yeah. There's no reason you
4  can't show this to him.
5       (DEPOSITION EXHIBIT 35 WAS MARKED.)
6  BY MR. TARTAGLIO:
7       Q. Okay. Then take a look at Exhibit 35. I
8  just put it in the chat.
9       MR. TARTAGLIO: And this was produced at
10 19473.
11      **THE WITNESS: Okay.**
12 BY MR. TARTAGLIO:
13      Q. And so this is an email from Phil Kurtz to
14 "etate." Do you know who etate is?
15      **A. No.**
16      Q. And the recipient is at mofo.com. Do you
17 know who MoFo is?
18      (Reporter clarification.)
19      (Record read as follows:
20      "Question: And the recipient is at
21      mofo.com. Do you know who MoFo is?")
22      **THE WITNESS: Yes.**
23 BY MR. TARTAGLIO:
24      Q. And who is MoFo?
25      **A. It is the firm that was used for the**

1  **investigation.**
2       Q. The first sentence of this email says, "Hi
3  Eric, the board is wondering whether Neelam is in
4  scope for our investigation now."
5       Do you remember any discussions at the board
6  of directors about whether the MoFo investigation
7  should include allegations against Ms. Sandhu?
8       MS. FORSTER: I just have -- objection.
9  Assumes facts not in evidence.
10      **THE WITNESS: I do not recall that**
11 **discussion taking place at a board meeting.**
12 BY MR. TARTAGLIO:
13      Q. Do you recall any discussion at a board
14 meeting of whether Ms. Sandhu should be part of the
15 MoFo investigation in whatever capacity?
16      **A. No.**
17      Q. And then if we look at the big paragraph,
18 the last sentence says, "She can only be a
19 fraudulent complainant, which negates any right to
20 anonymity in my view." Do you see that?
21      **A. I see it.**
22      Q. Do you think it was acceptable for Phil
23 Kurtz to tell the investigators at MoFo that he
24 thought that complaint was fraudulent?
25      MS. FORSTER: Objection. Mischaracterizes

1  the document. Lacks foundation. Calls for
2  speculation.
3       **THE WITNESS: I'm -- my answer to you is**
4  **that I can't speak for Phil Kurtz. And this is the**
5  **first I've seen of this email, and I -- I don't**
6  **understand how I could be really competent to answer**
7  **the question on it.**
8  BY MR. TARTAGLIO:
9       Q. If there were an active investigation, would
10 you tell the investigator that you thought the
11 complaint was fraudulent?
12      MS. FORSTER: Objection. Misstates the
13 document. Incomplete hypothetical.
14      **THE WITNESS: I would certainly give the**
15 **investigators the freedom to do what they felt was**
16 **necessary.**
17 BY MR. TARTAGLIO:
18      Q. Do you think a better approach would be to
19 tell the investigator to use his judgment and come
20 up with a conclusion that matches the facts?
21      **A. I think that's what I just said. That was**
22 **my intent.**
23      MR. TARTAGLIO: Let's take a five-minute
24 break. I might be done. Maybe I have a couple
25 questions, but I just need to go over -- through my

Page 250

1  notes.
2      THE WITNESS:  Okay.
3      MS. FORSTER:  Okay.
4      THE VIDEOGRAPHER:  We are going off the
5  record.  The time is 4:31 p.m.
6      (Off the record:  4:31 p.m. to 4:42 p.m.)
7      THE VIDEOGRAPHER:  We are now back on the
8  record.  The time is 4:42 p.m.
9  BY MR. TARTAGLIO:
10     Q.  Mr. Lynch, do you ever recall there being a
11 promotion for Ms. Sandhu that had to be approved by
12 the board of directors?
13     A.  I don't recall it being within the last
14 couple of years.  I do not recall anything, no.
15     Q.  Did the board of directors ever have to
16 approve a bonus for Ms. Sandhu?
17     A.  Yes.
18     Q.  Do you recall how many times that happened?
19     A.  It would be an annual event.  It's a -- it's
20 a -- it's not an approval per se.  It was a review
21 of John Chen's decisions to make the awards.
22     Q.  Could the board of directors have vetoed a
23 bonus to Ms. Sandhu had it wished?
24     A.  It would have been the first and only one we
25 would have vetoed so, yes, I guess they could but we

Page 251

1  never did.
2      Q.  When making the decision to terminate
3  Ms. Sandhu's employment, did you consider her
4  history of promotions?
5      A.  No.
6      Q.  Did you consider her history of bonuses?
7      A.  No.
8      Q.  And similar questions.  So did the board
9  ever have to approve an award of stock equity to
10 Ms. Sandhu?  Or it could be options, I suppose.  But
11 did the board have to approve any equity packages to
12 Ms. Sandhu?
13     A.  I do not recall any at this point.  I think
14 the answer is I don't recall.  I'll leave it with
15 that.
16     MR. TARTAGLIO:  Well, that's all the
17 questions I have.
18     Ms. Forster might have some follow-up
19 questions for you, so I'll let her take the wheel.
20     MS. FORSTER:  Yeah.  I only have a few
21 questions hopefully.
22     First of all, I do have one new exhibit.  So
23 let me see if I can figure out how to put that in
24 the chat.  Bear with me.
25     And let me ask, Kyra, if you know how to do

Page 252

1  this, I can send it to you.  I'm trying to figure it
2  out right now.  Wait, wait.  Maybe I can do it this
3  way.  Let's see.
4      Will that work?  Sorry.
5      (Technical discussion off the stenographic
6  record.)
7      MS. FORSTER:  There we go.  Should be here.
8  Okay.  Save.  I tried to mark it with -- so this
9  will be Exhibit 36.
10     (DEPOSITION EXHIBIT 36 WAS MARKED.)
11     MS. FORSTER:  I need to close that.  Sorry.
12 I'm going to try one more time.  See if this will
13 come up.  There it is.  Okay.  Here it comes.
14     THE VIDEOGRAPHER:  There it is.
15     MS. FORSTER:  All right.  You all have
16 Exhibit 36 now.
17         EXAMINATION BY MS. FORSTER
18 BY MS. FORSTER:
19     Q.  Mr. Lynch, please let me know when you --
20     A.  Just got here.
21     Q.  -- have access to it.
22     A.  I have it now.
23     MS. FORSTER:  Counsel, I'll give you a
24 moment to look it over too since I know you
25 haven't -- it's been produced, but you haven't sort

Page 253

1  of seen it today until right now.
2      MR. TARTAGLIO:  You can go ahead and ask
3  about it.
4      MS. FORSTER:  Okay.
5  BY MS. FORSTER:
6      Q.  Mr. Lynch, do you recognize Exhibit 36?
7      A.  Exhibit 36 is a typical package that's
8  presented to the board on a regular basis, and it
9  shows the performance of each of the higher level
10 management organizations against their plans.
11     Q.  Who would present this information to the
12 board?
13     A.  Typically in the past, it was John Chen.
14     Q.  And was it John -- is this -- pardon.  Let
15 me start again.
16     Is Exhibit 36 a performance report regarding
17 the executives that John Chen presented to the board
18 in 2023?
19     A.  Let me scroll through here.  Make sure I got
20 it right.  I'm troubled by the March 26, 2015, dates
21 on slides, which I think is just a carry over.  But
22 I -- because of them, I want to be sure that -- yes.
23 This is -- I think there's some potential typos.
24 But, yes, this is -- this has been presented to the
25 board.

Page 254

1    Q.  So let me direct your attention to page 4.
2  The Bates Number on page 4 of this exhibit is
3  Number 9787, so BB13-00009787.
4    **A.  Okay.  I have it.**
5    Q.  The one that's entitled "FY23 VIP update"?
6    **A.  Yes.**

Page 255

3         MR. TARTAGLIO:  Objection.  Argumentative.
4    (Simultaneous speakers.  Reporter
5    clarification.)
6         MS. FORSTER:  I'm sorry, Madam Reporter, can
7  you repeat that?
8         **THE WITNESS:  Okay.  Can you repeat the**
9  **question so I can give you the answer, please?**
10  BY MS. FORSTER:
11    Q.  Let me try to rephrase it and see if I can
12  address counsel's objection as well.

17    Q.  Okay.  Give me just a moment.  There's
18  another page I want to ask you about.
19         Can you go to page 14 of the PDF?  That is
20  the page Bates-numbered BB13-00009797.
21    A.  I have it.

Page 256

Page 257

16         MR. TARTAGLIO:  Objection.  Leading.
17  BY MS. FORSTER:

21    Q.  And for the record, can you explain what
22  "UEM" means?
23    A.  It is -- acronym aside, it is the product
24  that BlackBerry offers to administer and control
25  devices on a network.  So, for example, in a -- in a



Page 258

1  corporation or in a government, that entity likes to
2  control all of the devices that they give out, so
3  that they can call certain places, not call other
4  places. They can text. They can't text. It's
5  essentially setting up a personality for the device
6  and monitoring that device and that's what those
7  products are.
8      Q. And very briefly, what does "UES" mean?
9      A. I can't describe the distinction as well as
10  I probably should be able to, but they -- they are
11  different kinds of a similar kind of product.
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22  [redacted]
23  [redacted]
24  [redacted]
25  [redacted]

Page 259

1  [redacted]
2      Q. Okay. Thank you.
3      You testified earlier today -- we're done
4  with that exhibit.
5      You testified earlier today that you
6  conducted one-on-one interviews with the executive
7  leaders right away when you were appointed as
8  interim CEO. Do you recall that testimony?
9      A. Yes.
10     Q. Over what period of time did those
11  one-on-one interviews with the executive leaders
12  occur?
13     A. I recall most of them taking place on the
14  very same day that I had that introductory phone
15  call with them, which I think was a Monday.
16  November 6, I think it was. And I finished them up
17  on the following day.
18     Q. November 7?
19     A. Yes.
20     Q. On what date did you reach the conclusion
21  that you would need to terminate Neelam Sandhu?
22     A. Among others, probably within a week after
23  that.
24     Q. And by "among others," what did you mean in
25  that response?

Page 260

1  [redacted]
2      Q. So within a week would be a week from which
3  date? I'm sorry.
4      A. From -- probably a week from the date of
5  interview, which were all the same dates. So
6  November -- if it was November 6, I was -- I had
7  concluded what I needed to do by November 13th.
8      Q. Did Ms. Sandhu's role -- gender -- let me
9  start again.
10     Did Ms. Sandhu's gender play any role
11  whatsoever in your decision to terminate her?
12     A. No.
13     Q. Did Ms. Sandhu's participation in the
14  investigation by the Morrison Foerster law firm play
15  any role whatsoever in your decision to terminate
16  her employment?
17     A. No.
18     Q. And did -- let me ask you this: Did you
19  know at the time you decided to terminate Ms. Sandhu
20  whether she had ever complained about colleagues in
21  the past?
22     A. I did not know.
23     MS. FORSTER: Okay. That's it. I have no
24  other questions.
25     MR. TARTAGLIO: I have, like, two minutes of

Page 261

1  follow-up if that's okay with everyone. I know it's
2  5:00. If we go to exhibit -- sorry? Okay.
3      MS. FORSTER: That was me shuffling paper.
4  I now understand what happened. Sorry.
5  FURTHER EXAMINATION BY MR. TARTAGLIO
6  BY MR. TARTAGLIO:
7      Q. Okay. Let's go to -- back to Exhibit 36,
8  page 4. And let me know when you're there, sir.
9      A. The VIP update?
10     Q. Yes.
11     A. Yes.
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17  [redacted]
18     Q. And John Giamatteo was president of that
19  group?
20     A. He also had AtHoc and Secusmart and BTS.
21     Q. And as for cybersecurity, was that a group
22  that John Giamatteo was president of?
23     A. Yes.
24  [redacted]
25  [redacted]

Page 262

1    Q.  Who was in charge of Spark?
2    A.  That was John Giamatteo as well.
3    
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 263

1
2
3
4
5
6
7
8
9
10
11    A.  That is correct, yes.
12    Q.  And John Giamatteo was the president of the
13   cybersecurity business unit?
14    A.  He was.
15        MR. TARTAGLIO:  Okay.  That's all my
16   questions.
17        MS. FORSTER:  I have one quick thing I would
18   like to ask.
19         FURTHER EXAMINATION BY MS. FORSTER
20   BY MS. FORSTER:
21    Q.  Mr. Lynch, can you explain how the
22   BlackBerry fiscal year works?  Like what -- what --
23   what is the fiscal year?  What are the quarters,
24   like in terms of what months of the year?
25    A.  Yeah.  Fiscal year actually ends in

Page 264

1   February.  So the end of February of this year was
2   the end of fiscal year 2025.  So we are now in
3   fiscal year 2026, and they'll -- since February was
4   the end of the first quarter.  You add three, you
5   get May.  You add three more, you get August.  And
6   you add three more, you get November.  Those are the
7   ends of the quarters.
8    Q.  So when we look at quarter 4, fiscal year
9   2023, on page 14 of Exhibit 36, what months and
10   calendar year were represented by Q4 fiscal year
11   2023?
12    A.  That is actually -- that is calendar year
13   2022/2023.  For fourth quarter is December of '22
14   and January and February of '23.
15        MS. FORSTER:  Thank you.  That's all I have.
16    THE WITNESS:  Okay.
17        THE REPORTER:  Ms. Forster, would you like a
18   copy of the transcript?
19        MS. FORSTER:  Yes, please.
20        Oh, and I'd -- before we actually -- I'm
21   sorry.  Before we can go off the record, I don't
22   know that we will need to make any, but we do
23   reserve the right to make confidentiality
24   designations to deposition testimony within 21 days
25   as provided by the protective order in the case.

Page 265

1        MR. TARTAGLIO:  Okay.  I like that system a
2   lot better than having to do it on the fly.
3        That's all for me unless anyone needs orders
4   or anything.
5        THE VIDEOGRAPHER:  I'll take us off.
6        This concludes today's video record of
7   deposition of Dick Lynch.  The original media of
8   this deposition will remain in the custody of Talty
9   Court Reporters, Inc., located in San Jose,
10   California.  We are now going off the record at
11   5:05 p.m.
12        (End time:  5:05 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 266

1          ::: DECLARATION OF WITNESS :::

2

3          I hereby declare I am the deponent in the
within matter; that I have read the foregoing

4    deposition and know the contents thereof, and I
declare that the same is true of my knowledge except

5    as to the matters which are therein stated upon my
information or belief, and as to those matters, I

6    believe it to be true.

          I declare under the penalties of perjury of

7    the State of California that the foregoing is true
and correct.

8

9          Executed this _____ day of
_____,

10

     2025, at _____, _____.

11       (City)                      (State)

12

     _____

13       RICHARD LYNCH

14

15

16

17

18

19

20

21

22

23

24

25

Page 267

1          ::: CERTIFICATE OF REPORTER :::

2

3          I, JULIE L. BANTLEY, a Certified Shorthand
Reporter, holding a valid and current license issued

4    by the State of California, CSR No. 11422, duly
authorized to administer oaths, do hereby certify:

5          That the witness in the foregoing remote
deposition was administered an oath remotely to

6    testify to the whole truth in the within-entitled
cause.

7          That said deposition was taken down
remotely by me in shorthand at the time and place

8    therein stated and thereafter transcribed into
typewriting, by computer, under my direction and

9    supervision.

10   (X) Reading and signing was not requested/offered.

11         Should the signature of the witness not be
affixed to the original deposition transcript, the

12   witness shall not have availed himself/herself of
the opportunity to sign or the signature has been

13   waived.
     The dismantling, unsealing, or unbinding of the

14   original transcript will render the Reporter's
Certificate null and void.

15

16         I further certify that I am neither counsel
for nor related to any party in the foregoing

17   depositions and caption named nor in any way
interested in the outcome thereof.

18

19

20   DATED:  June 20, 2025

21

22   *Julie L. Anderson* _____

23   _____
     JULIE L. BANTLEY, CSR

24   California Certified Shorthand Reporter 11422

25

