# EXHIBIT 25

**ATTORNEY-CLIENT PRIVILEGED COMMUNICATION**
**ATTORNEY WORK PRODUCT**

MEMORANDUM

---

TO: File

FROM: Christin Hill

DATE: November 13, 2023  FILE: 051568/114

RE: Blackberry Investigation – Interview of Neelam Sandu

---

This memorandum reflects attorney recollections, impressions, legal opinions, and thoughts about what facts are important. Any facts referenced herein are not intended to and do not reflect a verbatim recitation of the content of any communication. This memorandum and its contents are confidential, and are protected by the attorney-client privilege and the attorney-work-product doctrine.

**Date:** November 6, 2023

**Morrison & Foerster Participants:** Eric Tate, Christin Hill

**Blackberry Participant:** Neelam Sandu

**Introduction**

- Morrison & Foerster was retained to investigate an anonymous EthicsLink hotline complaint regarding John Giamatteo. As part of our investigation, we are speaking with people who have interacted with or may otherwise have information about John in the workplace.
- Admonitions
  - Upjohn warning
    - Represent company / not your lawyer
    - Anything you say to me is protected by the company's attorney-client privilege
    - It is the company's privilege and only it has the right to waive it
    - Neelam asked whether she needed an attorney.
    - We said that we cannot advise her on whether or not she needs an attorney
    - We also told her that she is not the focal point of the investigation we're conducting at this time.
  - Confidentiality
    - Supervisor admonition: As mentioned, our conversation is protected by the attorney-client privilege, and is confidential. Please do not

sf-5670267

share our discussion or the existence of this investigation with anyone. If you have any questions following our meeting today, you may reach out to Blackberry Legal or to us.

**Background / Demeanor**

- We requested a 1 hour call. Prior to the call, Neelam indicated via email that she has only 55 minutes, as she was scheduled to speak to the interim CEO. When the call began, Neelam indicated she only had 45-50 minutes as she wanted to prepare for the meeting.
- Neelam pressed to understand the nature of the investigation.
- When we indicated that the complaint has to do with John Giamatteo, she indicated that it's very emotional to discuss John Giamatteo.
- Early on, she asked to take a break, which we allowed

**Interactions with John G**

- Neelam interacted with John G in her elite customer success role.
- They are colleagues
- At one point, they had 1:1s but for the past few months, JG has continually cancelled the 1:1s
- Neelam indicated that when he first joined, JG made inappropriate comments, and that he has been on a campaign to get him out of the company.

**Inappropriate Conduct by John G**

- When we asked Neelam to describe inappropriate conduct by JG, she provided three examples:
    1. Shortly after he joined the company, JG invited her to dinner in San Ramon. She believes he had meals with a number of people during this visit. Prior to the dinner, JG informed Neelam that he needed to go back to his hotel to shower prior to the dinner. They ended up going to dinner "across the street." He came to the dinner dressed up and smelling like after shave. Neelam does not believe that he similarly freshened up prior to his dinners with other employees.
    2. At the dinner, JG asked her if she would move to reporting to him. Neelam said JG did not explain the rationale behind the move. Did not ask about career history or role descriptions, but wanted her to become his subordinate. The only justification he provided was the he wanted to "travel" together.
    3. At a meeting on a separate occasion, JG made a comment about going to dinner with his daughters where he gets dressed up and people think he's a "dirty old man."

2

- Neelam indicated that she viewed JG's conduct as the dinner as an inappropriate advance, and she was not at all interested so decided to keep her distance from him going forward.

**Conversation with** ▮

- Neelam also indicated that JG recommended that she speak to a former colleague from ▮. JG recommended this as part of her assessment to determine whether she wanted to work for him. Neelam had this call, and ▮ advised her to "make sure she has regular 1:1s with the CEO" if she were to begin reporting to JG. ▮ told Neelam that when she worked for JG, Shayla continued to have "secret" 1:1s with the CEO.
- Following the call with ▮ Neelam decided she did not want to work for JG

**Possible Threat**

- When Neelam told JG she decided not to work for him, he said, "I know a lot of people. It could impact your career in the industry." Neelam viewed this as a threat.
- Neelam said since that time, JG has refused to work with her as a peer and has consistently tried to undermine her, make negative comments about her, and generally try to push her out of the company.

**Examples of Ongoing Mistreatment by JG**

- When we asked Neelam to describe ongoing mistreatment by JG, she provided the following examples:
    1. JG's team circulated an org chart that showed Neelam reporting to JG. This org chart went to a customer and JG was close to correct it.
    2. Members of JG's team told Neelam that JG said she was leaving the company. And that he told people that if Neelam was still at the company in the coming months, he would leave the company
    3. JG complained to John Chen that Neelam would not join his team call. Suggesting that Neelam was not collaborative. Neelam said in truth, she agreed to join his call as her schedule permits, but then JG took several months to send her a calendar invite, and he only sent it after she repeatedly requested it.

**Other Inappropriate Conduct by JG**

- We asked Neelam if she was aware of any other inappropriate conduct by JG, or whether anyone had complained to her about JG

- Neelam provided one other example: ▮▮▮▮. Neelam said that ▮▮ is an ▮▮ employee and while at a BB event, ▮▮ and Neelam discussed JG, and ▮▮ told Neelam that JG tried to take a selfie with ▮▮ and ▮▮ thought it was "creepy."

**Confirm Incidents**

- We asked Neelam to confirm any and all incidents of misconduct. Neelam again confirmed the same three incidents: (1) aftershave; (2) travel; and (3) "dirty old man."
- We asked Neelam if she spoke to anyone about the misconduct. She indicated that she spoke to John Chen and Steve Rai about the dinner and the "travel" comment in particular. She did not discuss the conduct with HR.

**Experience at Blackberry**

- When we asked Neelam to describe the culture at Blackberry. She said the following:
    - Boys club culture
    - Women have a harder time being taken seriously.
    - Closed the biggest deal at the company. No one congratulated her.
    - Boys club always seemed better off
    - Noticed that the issues has gotten worse as she has gotten more senior
    - She said the company deals with some cultural issues promptly: "too many Black people at the company." That person was fired.

**Anyone else we should speak with**

- We asked if there is anyone else we should speak to about any of the concerns we discussed, she suggested ▮▮▮▮▮▮▮▮▮▮.

**Retaliation admonition**

➢ Blackberry has a policy against retaliation. Any attempt to influence the outcome of the investigation by retaliating against anyone who participates, providing false information, or failing to be forthcoming can be the basis for corrective action up to and including termination.

CONFIDENTIAL                                                                                                                    MoFo-00000076