# EXHIBIT 26

# IIIORRISON FOERSTER

MEMORANDUM

| TO: | Lisa Disbrow, Audit Committee Chair<br>Phil Kurtz, Chief Legal Officer and Corporate Secretary |
|---|---|
| FROM: | Morrison & Foerster |
| DATE: | November 22, 2023 |
| RE: | Privileged & Confidential BlackBerry Workplace Investigation Report |

The Audit Committee of BlackBerry's Board of Directors retained Morrison & Foerster LLP to investigate an anonymous report submitted through the Company's EthicsLink website alleging sexual harassment and gender discrimination by John Giamatteo. Specifically, the complaint alleges that Giamatteo: (1) made unprofessional, sexually suggestive, and aggressive comments; (2) made women feel marginalized and like they are unable to succeed in careers; (3) made "veiled threats" based on his "influence and reach within the industry"; and (4) proliferated a sexist, male dominated mindset.[1] This report contains attorney mental impressions and opinions concerning the credibility of individuals who were interviewed, as well as an assessment of reasonable inferences drawn from facts discovered during the investigation. This report is confidential and is protected from disclosure by both the attorney-client privilege and the attorney work product doctrine.

## Executive Summary

On October 26, 2023, BlackBerry received an anonymous report submitted through the Company's EthicsLink website about John Giamatteo, President of the Cybersecurity Business Unit. Morrison & Foerster attorneys interviewed 21 witnesses, including Giamatteo, reviewed the complaint at issue, investigative files from potentially related complaints, relevant BlackBerry policies, a portion of BlackBerry's organization chart, and approximately 2,621 emails located through a key word search of Giamatteo's mailbox.

---

[1] **Warning**: This report may also contain information that comprises trade secret information within the meaning of the Uniform Trade Secret Act as it may include sensitive business information that is not known outside of BlackBerry, provides BlackBerry with a competitive advantage, and over which BlackBerry has taken reasonable measures to protect from disclosure. The report also includes sensitive personnel information. As such, disclosure is limited and may only be authorized by the Chief Legal Officer, or his designee.

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

Based on the facts gathered and information reviewed, we conclude that there is no evidence that Giamatteo engaged in conduct that rises to the level of sexual or any other unlawful harassment or gender discrimination under California law or that would constitute a violation of BlackBerry policy. We further conclude that there is insufficient evidence to support allegations that Giamatteo made unprofessional comments specifically to female employees or has engaged in any conduct that could reasonably be found to be threatening or marginalizing to them. The vast majority of witnesses expressed high regard for Giamatteo. With two notable exceptions, no witness indicated they had heard Giamatteo make any concerning comments toward women. With the same notable exceptions, no witness had observed Giamatteo engage in discriminatory conduct toward women. Almost all witnesses felt that Giamatteo is a strong leader who treats women with respect.

Despite the widespread praise for Giamatteo, two witnesses expressed a different view: First, Neelam Sandhu reported three examples of behavior by Giamatteo that she regarded as inappropriate and sexually suggestive. However, even if these incidents occurred exactly as Sandhu describes, Giamatteo's alleged conduct does not rise to the level of harassment or gender discrimination under California law or constitute a violation of BlackBerry policy. Further, multiple witnesses confirmed ongoing conflict between Sandhu and Giamatteo that may call into question Sandhu's interpretation of Giamatteo's motivations. Second,



While not specific to Giamatteo, a number of women raised concerns about a long-standing trend (pre-dating Giamatteo) of a lack of women in leadership roles within the Company, and a Company culture that leaves little opportunities for advancement for women. Again, separate from any issues related to Giamatteo, several female witnesses (current and former employees) described challenging aspects of BlackBerrry's culture specifically as it relates to women. More than one witness described BlackBerry as a "Boy's Club," wherein women face certain disadvantages. This sentiment was not universal, but it was certainly present. This report closes with recommendations for BlackBerry to consider that may help to address some of these concerns, and that could minimize legal risk and potentially prevent complaints regarding gender discrimination in the future.

Should you have any questions, please do not hesitate to ask us or to request further clarification.

2

 BB13-00019105

# MORRISON FOERSTER

## Summary of Complaints

On or about October 26, 2023, BlackBerry received an anonymous report though the Company's EthicsLink website.[2]  The complaint alleges that Giamatteo regularly made and continues to make unprofessional comments towards women and in specific instances has used sexually suggestive and aggressive comments towards women.  The complaint further alleges current female BlackBerry employees feel marginalized and unable to succeed in their careers due to comments and loosely veiled threats about Giamatteo's "influence and reach within the industry."  The complaint also asserts that the lack of women directly reporting to Giamatteo demonstrates the male-dominated sexist mindset that thrives under his leadership.

The complaint purports to be 

In response to this report, BlackBerry retained Morrison Foerster.  At Morrison & Foerster's instruction, BlackBerry responded to the anonymous report through the EthicsLink website to ask for further details regarding the alleged conduct, including how many individuals were involved, the dates of any alleged incidents, and whether any reports were brought to the attention of BlackBerry HR.

On October 28, 2023, the anonymous reporter replied,[3] 

—that Giamatteo made unprofessional comments towards women, including sexually suggestive comments, and loosely veiled threats.  The reporter further stated that

## Investigation Process

Morrison & Foerster attorneys interviewed 21 witnesses, including 14 women, 10 of whom are current BlackBerry employees, two who are former BlackBerry employees, and two women who worked with Giamatteo at prior companies (including McAfee).  Morrison & Foerster attorneys also reviewed numerous documents, including certain of Giamatteo's personnel records, relevant complaints submitted to BlackBerry HR, and emails retrieved from Giamatteo's electronic mailbox.

---

[2] The full complaint is included as **Appendix A**.
[3] The reply is included as **Appendix B**.

CONFIDENTIAL

BB13-00019106

## MORRISON FOERSTER

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

A full list of the witnesses interviewed is included as **Appendix C**.  Summaries of our witness interviews are included as **Appendix D**.

### Factual Findings

The following provides a high-level summary of our factual findings.  It is not intended to be a recitation of all facts.

1. **We Did Not Locate Sufficient Evidence of Conduct by Giamatteo That Would Qualify as Sexual Harassment or Gender Discrimination Under California Law or Otherwise Support the Allegations of Inappropriate or Unlawful Conduct in the Anonymous Complaint**

Our investigation was unable to corroborate the assertion that multiple women experienced the conduct alleged in the complaint, and we have to date not been contacted by any attorney on behalf of any current or former BlackBerry employees.  Instead, the vast majority of witnesses reported they were unaware of any conduct by Giamatteo that might be construed as "unprofessional toward women"; "sexually suggestive or aggressive" or "veiled threats."  Indeed, nearly every witness—including twelve of the fourteen female witnesses—expressed largely positive, or at least neutral, sentiments about Giamatteo.

*Information provided by Giamatteo's female peer at BlackBerry did not support the allegations.*

*Information provided by Giamatteo's current direct report did not support the allegations.*

4

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

***Information provided by Giamatteo's female indirect reports did not support the allegations.*** Five of the women we interviewed are / were indirect reports to Giamatteo:

███████████████████████████████████████████████████

None reported that they had observed Giamatteo engage in any inappropriate conduct toward women.



CONFIDENTIAL

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



***Information provided by female former colleagues did not support the allegations.***
We also interviewed two women who previously worked with Giamatteo: ████ ██████
████████████████. Again, neither reported having observed Giamatteo engage in
any inappropriate conduct toward women.

CONFIDENTIAL

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



**_Information provided by male executives did not support the allegations._**  Senior male executives likewise confirmed that they had not observed Giamatteo engage in any inappropriate conduct.

**_Information provided by human resources did not support the allegations._**  We also interviewed three individuals from the HR function: ███████████████████.

None reported having personally observed Giamatteo engage in any conduct that could be deemed "unprofessional toward women"; "sexually suggestive or aggressive" or "veiled threats."  All three were aware of two specific complaints about Giamatteo that were made by Neelam Sandhu, and are discussed further below.  Other than Sandhu's complaints, ████████ reported that one other employee complained about Giamatteo: ████ ████, however those complaints were not of a sexual nature.[4]  Rather, ██████ complained that she was not being included in meetings and was being isolated and ignored. ████████ instructed ██████ to speak with Giamatteo about this.  ████████ reported that she spoke with Giamatteo about ████████████████ around the time Giamatteo was hired.  ██████ reported that Giamatteo told her this was an oversight.  Giamatteo denied excluding ██████ from meetings.  After notified of her termination, ████████ retained an attorney to challenge her separation.  Specifically, ██████ alleged that she was excluded from meetings, had her job duties diminished, had higher targets to meet than her male colleagues, and she and ████████████ were paid less than their male colleagues.  The parties ultimately reached a confidential settlement without admission of any wrongdoing.

**_Email review did not support the allegations._**  Finally, our review of Giamatteo's electronic mailbox did not reveal any conduct by Giamatteo that could be deemed

---

[4] During our interview with ██████ she reported that Giamatteo had made sexually suggestive comments or jokes but could not provide a specific example of a comment or joke made by Giamatteo.  Given the belated nature of this complaint coupled with the lack of specific examples, we do not find this allegation credible.

CONFIDENTIAL

"unprofessional toward women"; "sexually suggestive or aggressive" or "veiled threats." There were no emails suggesting that Giamatteo made any sexist comments or otherwise contributed to a misogynistic culture at BlackBerry.

**2. Two Female Witnesses Reported Inappropriate Conduct by Giamatteo, But Even if True, the Conduct Reported Does Not Rise to the Level of Harassment or Discrimination in Violation of BlackBerry Policy or Under California Law**

Only two of the 21 witnesses we interviewed reported observing what they described as inappropriate conduct on the part of Giamatteo: Neelam Sandhu and ▇▇▇▇ ▇▇▇▇ We conclude that the conduct Sandhu and ▇▇▇▇ describes does not rise to the level of harassment or discrimination in violation of BlackBerry policy or under California law.

**A. Neelam Sandhu**

Sandhu described three examples of conduct that she deemed inappropriate and of a sexual nature:

i. Shortly after he joined the company, Giamatteo invited Sandhu to dinner in San Ramon. Sandhu understood that he had 1:1 meals with a number of people during this visit. Prior to the dinner, Giamatteo informed Sandhu that he needed to go back to his hotel to shower prior to the dinner. They ended up going to dinner "across the street." He came to the dinner dressed up and smelling like after shave. Sandhu does not believe that he similarly freshened up prior to his dinners with other employees (though she did not indicate that she had asked anyone else or done anything to actually confirm this belief).

ii. At the dinner, Giamatteo asked Sandhu if she would report to him in the CyberSecurity business unit. At this time, Sandhu reported directly to the CEO, John Chen. Sandhu said Giamatteo did not explain the rationale behind the move, and did not ask about her career history or role descriptions, but wanted her to become his subordinate. The only justification he provided was that he wanted to "travel" together.

iii. At a meeting on a separate occasion, Giamatteo made a comment about going to dinner with his daughters where he gets dressed up and people think he is a "dirty old man."

Sandhu indicated that she viewed Giamatteo's conduct as the dinner as an expression of romantic interest, and she was not at all interested so decided to keep her distance from him going forward.

Sandhu reported that in connection with Giamatteo's effort to convince Sandhu to become his subordinate, he recommended that she speak to a former colleague from McAfee ▇▇▇▇▇▇▇▇▇▇▇▇▇. Sandhu reported that she spoke with ▇▇▇▇ by phone, and

8

**IIIORRISON FOERSTER**

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

████ advised her to "make sure she has regular 1:1s with the CEO" if she were to begin reporting to Giamatteo. ████ told Sandhu that when she worked for Giamatteo, ████ continued to have "secret" 1:1s with the CEO. Sandhu indicated that she viewed this as ████ warning her to be careful around Giamatteo.

Following the call with ████ Sandhu decided she did not want to work for Giamatteo and informed him of her decision. In response, he said, "I know a lot of people. It could impact your career in the industry." Sandhu viewed this as a threat.

Sandhu said since that time, Giamatteo has refused to work with her as a peer and has consistently tried to undermine her, make negative comments about her, and generally try to push her out of the company. Sandhu provided three examples of ongoing mistreatment by Giamatteo:

    i.    Giamatteo's team circulated an org chart that showed Sandhu reporting to Giamatteo. This org chart went to a customer and Giamatteo was slow to correct it.

    ii.    Members of Giamatteo's team told Sandhu that Giamatteo said she was leaving the company. And that he told people that if Sandhu was still at the company in the coming months, he would leave the company.

    iii.    Giamatteo complained to John Chen that Sandhu would not join his team call, suggesting that Sandhu was not collaborative. Sandhu said in truth, she agreed to join his call as her schedule permits, but then Giamatteo took several months to send her a calendar invite, and he only sent it after she repeatedly requested it.[5]

We asked Sandhu if she was aware of any other inappropriate conduct by Giamatteo, or whether anyone had complained to her about Giamatteo.

Sandhu provided one final example: She said that ██████████████████████  ████ who does business with BlackBerry, told Sandhu during a BlackBerry event that Giamatteo tried to take a selfie with ████████ and ████████ thought it was "creepy."

Based on our investigation, we conclude that none of the conduct rises to the level of sexual harassment or gender discrimination under California law, or a violation of BlackBerry policy.

---

[5] During our follow-up interview with Giamatteo on November 20, 2023, Giamatteo reported that he invited Sandhu to his staff meetings in an effort to create a collaborative culture. Sandhu was initially invited to the meetings but was removed from the calendar invite because she did not attend or otherwise participate in the meetings, with the exception of attending one meeting.

CONFIDENTIAL      BB13-00019112

### a. The Dinner and Giamatteo's Effort to Have Sandhu Report to Him

Sandhu contends Giamatteo arrived at dinner smelling like aftershave and emphasized that she should work for him so they could "travel" together. She characterized this alleged behavior as a "sexual advance." This dinner occurred shortly after Giamatteo arrived at BlackBerry, so it would have been in late 2021 or early 2022.

Sandhu explained that she was uncomfortable at the dinner with Giamatteo, and although she never reported the incident to HR, she discussed it with John Chen and Steve Rai around the time of the incident.

John Chen recalled discussing the travel comment with Sandhu around the time of the incident. Sandhu told Chen that Giamatteo wanted to "travel" with her. At the time, Chen responded by encouraging Sandhu to speak to HR if she felt uncomfortable, and that even if Sandhu decided to work for Giamatteo, they did not necessarily have to travel on the same plane or stay at the same hotel. Chen confirmed that travel is part of the job function for the sales team, but that merely means meeting at the client site at the same time. Chen also recognized this dinner as a turning point between Giamatteo and Sandhu, and that from that point on, they were like "oil and water."

Steve Rai also recalled Sandhu telling him that Giamatteo wanted to "travel" with her and that she viewed the comment as an advance. Rai's recollection is that Giamatteo's comment did not "raise a red flag" that would indicate to Rai that Giamatteo was engaged in inappropriate conduct. Rather, the comment was too subtle or vague. Rai did not recall that Sandhu was particularly bothered by the comment at the time. But Rai agreed that Sandhu and Giamatteo clearly did not get along, and that they were like "oil and water."

Giamatteo reported that he had dinner with Sandhu in San Ramon at a restaurant at the mall "across the street" from the office. He described the restaurant as a public and casual restaurant with high top tables that seat up to six people. He denied telling Sandhu that he needed to shower before diner or returning to the dinner "freshened up." Giamatteo believed they went to the restaurant directly from the office. Giamatteo also did not recall telling Sandhu that they should travel together.

We conclude that more likely than not, Giamatteo did not intend to make a sexual advance toward Sandhu. We further find that more likely than not Giamatteo made some comment related to travel related to business purposes.

Even assuming Giamatteo acted in the manner Sandhu describes, the purported conduct at the dinner, as described by Sandhu, does not rise to the level of sexual harassment under California law because it is neither severe nor pervasive. It appears to be an isolated incident, and it is not at all clear that Giamatteo intended the travel comment as an

BB13-00019113

# IIIORRISON FOERSTER

expression of romantic interest as there are legitimate business reasons for executives to travel to see clients. Nor is showering prior to a dinner an indication of romantic interest.

Also, although Sandhu vaguely alluded to other women who may have experienced inappropriate conduct by Giamatteo – these incidents also appear insignificant or unsubstantiated.

Specifically, Sandhu vaguely alluded to the idea that Giamatteo's ███████ ████████████████████—may have experienced some unwelcome attention from Giamatteo, thus prompting ████ to maintain a "secret" backchannel to the CEO to be able to report any issues. ██████ wholly rejected this narrative. ██████ insisted that she never observed any improper conduct by Giamatteo, and the 1:1's with the CEO was merely an effort to maintain a relationship with the CEO. Sandhu also mentioned that ████ employee ██████ referred to Giamatteo as "creepy."[6]

Fundamentally, a conflict of opinion exists between Sandhu and Giamatteo about how the Elite Program is structured. Giamatteo believed that the Elite Program should be under his purview, and that Sandhu should take a General Manager position that would report directly to Giamatteo. Sandhu opposed this change. This issue has created significant conflict between the two, and calls into question Sandhu's interpretation of Giamatteo's motivations during the dinner.

Giamatteo and others noted that there was a business reason for proposing this change: Sandhu was in charge of the Elite Program. These were the company's best customers and represent millions of dollars in business. As the head of the sales organization, Giamatteo believed that these customers should be under his domain. Prior to the dinner, Giamatteo had understood that Sandhu had already spoken with Chen about the opportunity of a General Manager position because Sandhu had expressed a desire to have more responsibility. Because her experience was with UEM as a client and UEM is supported by the Cybersecurity business unit, it made sense for the General Manager to report to Giamatteo. Others in the sales organization agreed that having the Elite Program separate from sales created logistical challenges. ████ ████████—who considers herself a friend to Sandhu—acknowledged that keeping the Elite Program separate created challenges and believes that it would be better for Elite customers to be brought under Giamatteo's organization.

John Chen initially made the decision to put Sandhu in charge of Elite, and ultimately supported Sandhu in her desire to maintain separateness from Giamatteo's organization. According to Giamatteo and Rai, however, Chen socialized to Sandhu that many Elite customers would be transitioning to the Cybersecurity business unit. This fiscal year, 20 of

---

[6] Sandhu reported that Giamatteo had asked ██████ for a "selfie." Giamatteo denied this allegation. Even if true, this allegation would not rise to the level of a violation of BlackBerry's harassment policy.

11

the 30 Elite customers Sandhu had been assigned have transitioned to the Cybersecurity business unit.

Multiple witnesses, including ██████████████████████████████ reported that the separation of the Elite customers from the Sales team in the Cybersecurity business unit caused significant tension between Giamatteo and Sandhu and their respective teams. An example provided by Giamatteo was that Sandhu did not want to collaborate with German SVP, Hans-Peter Bauer, on a German Elite client. According to Giamatteo, Sandhu ignored his requests for calls, and so Giamatteo had to facilitate a call between Sandhu and Bauer. This tension was corroborated in our review of Giamatteo's emails.

### b. Giamatteo's Alleged Ongoing Effort to Undermine or Exclude Sandhu

The conflict between Giamatteo and Sandhu has persisted, and Sandhu has lodged at least two formal complaints about Giamatteo's ongoing effort to undermine and exclude her: Giamatteo's direct report, Hans-Peter Bauer, circulating an org chart that erroneously showed Sandhu reporting to Giamatteo and sales personnel saying that Sandhu would soon be leaving the Company. Giamatteo denied knowing about the distribution of the org chart and denied saying that Sandhu would be leaving the Company.

These incidents were investigated by BlackBerry outside counsel Rich Curiale who concluded that the evidence corroborated Sandhu's underlying factual allegations—that she was excluded from certain meetings—but not that it was on account of her gender. Curiale found that many, not just Giamatteo, thought Sandhu was "unpleasant" to work with and took advantage of her relationship with John Chen. Following the investigation into these complaints, Curiale coached Sandhu on how to interact better with her colleagues. He reportedly told her to "tone it down" and not "rub in people's noses" that she reports to the CEO. Curiale alleges that Sandhu replied that she would try to, but the salespeople were "lazy" and just wanted to pick "low hanging fruit."

We agree with Curiale's conclusion that these incidents—even when considered in light of Sandhu's recent allegations about the dinner—do not rise to the level of harassment or gender discrimination.

Sandhu also reported that in November 2023, Giamatteo retaliated against her by excluding her from a press release relating to the Malaysian deal that the Cybersecurity team recently closed. Sandhu reported that pursuant to the MAP process, her team was responsible for drafting press releases that she reviews/edits/ approves before sending to the CEO. Giamatteo reported that because this deal was of an incredibly sensitive nature involving two different governments – Canada and Malaysia – the potential signing of the deal was highly confidential. For this reason, the press release was drafted by the internal Cybersecurity marketing team and the Government Relations team, and the draft was not

**ΙΙΙORRISON FOERSTER**

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

shared with the CEO, Chief Legal Officer and Sandhu, among others, until shortly after it was clear that the deal would close.  Giamatteo denied being familiar with the MAP process as it related to the marketing function. ███ ████ ██ reported that executives frequently complained that the MAP process is not followed.  Given the legitimate business rational provided on this particular incident, and ████-█ confirmation that the MAP process is not consistently followed, the allegation that this conduct rises to the level of retaliation is not substantiated.[7]

**B.** ████████████



-----

[7] To our knowledge, on or about November 16, 2023, when Giamatteo circulated the draft press release, he was unaware that Sandhu was a participant in this investigation.

13

BB13-00019116

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

**b. Diminishment of Job Duties and Exclusion from Meetings**



**c.** ▉▉▉▉▉▉▉▉▉▉

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



### 3. Several Women Voiced Concerns About the Lack of Women in Leadership Roles Within the Company, and Reported Certain Challenges for Women at BlackBerry

Although not attributed specifically to Giamatteo, several women voiced concerns about the lack of women in leadership roles within the Company, and generally reported an atmosphere that created certain challenges for women.



---

[9] We have not conducted a pay equity analysis as to this issue as it is outside the scope of this investigation.

CONFIDENTIAL

# MORRISON FOERSTER



These sentiments were not universally held. For example, at least one female witness rejected the notion of BlackBerry as a "boy's club." ███████████ has not observed any differences in the opportunities afforded to women relative to men. She does not see any barriers to her success within the Company.

Giamatteo acknowledged that there were fewer women in leadership than he would prefer. He reported that diversity is important to him and shared a QBR slide deck, which includes diversity as a value. Giamatteo expressed that his philosophy is ensure that women have a seat at the table. Other witnesses confirmed that ███ ███ attends Giamatteo's staff meetings with his direct reports at Giamatteo's request even though she is not his direct report. Giamatteo further shared that as a father of three daughters it is personally important to him that corporate America is inclusive.

## Legal Risk Assessment

Based on our investigation, we found no evidence that Giamatteo engaged in conduct that rises to the level of sexual harassment or discrimination under California law nor do they constitute a violation of BlackBerry policy. With that said, several women, though not all women, voiced concerns about the lack of women in leadership roles at the Company, and reported that BlackBerry sometimes feels like a boy's club. This may be, in part, due to Giamatteo hiring predominantly his former McAfee colleagues, most of whom are men.

## Recommendations

Even where no unlawful conduct or policy violation has occurred, it is a best practice for companies to periodically review their policies and procedures to foster an inclusive working environment.[11] This is especially true where, as here, it is undisputed that there are not many women in leadership and employees have raised concerns about this. To that end, we have included the following recommendations for BlackBerry's consideration:

---

[10] ███████████████████████████████████████████

[11] We understand that BlackBerry supports such efforts.
https://www.blackberry.com/us/en/company/corporate-responsibility/ungc-sdgs/equality

16

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

1. **Workplace culture survey.** We recommend BlackBerry conduct a workplace culture survey. Based on our witness interviews, it is our understanding that a workplace survey has not been conducted at BlackBerry since before the COVID-19 pandemic. A culture survey could help identify additional areas for improvement and sends a message to the employees that the company is interested and committed to improving the work environment. We are happy to assist with the survey. An important benefit of engaging counsel to assist with the survey is that it increases the likelihood of the survey, at least at the outset, being protected by the attorney-client privileged.

2. **Exit interviews.** We understand that BlackBerry conducts exit interviews. From our discussions with witnesses, however, it does not appear that BlackBerry is leveraging the information it learns during the interviews to improve the workplace culture. We are happy to partner with BlackBerry to conduct a thorough review of its exit interview processes and provide recommended strategies for maximizing the information learned during the interviews.

3. **Pay equity audit.** We recommend that BlackBerry conduct a pay equity audit. Pay equity and transparency is an area of law that is gaining significant traction by plaintiff's attorneys and state and federal regulatory bodies. This topic is also top of mind for at least some BlackBerry employees as more than one witness raised the issue of unequal pay based on gender. Should BlackBerry proceed with a pay equity audit, we strongly recommend that this audit be performed by and/or at the direction of counsel to increase the likelihood of maintaining the confidentiality of the audit through the attorney-client privilege protection. We have an experienced pay equity task force at Morrison & Foerster that can assist BlackBerry with an audit if it would likely to conduct one.

4. **Review statistical analysis of impact of reductions in force on certain demographics.** We understand that BlackBerry's HR team in conjunction with external counsel conducts an analysis of the impact a reduction in force would have on the demographics of the affected business unit. It is unclear, however, whether statistical analysis is prepared and reviewed. We recommend that statistical analysis of the impact the reduction on demographic groups be conducted to reduce the legal risk of claims of disparate treatment.

5. **Mentoring and professional development program.** It is unclear whether BlackBerry has a mentorship and professional development program aimed at developing internal talent, particularly women and people of color. We recommend that BlackBerry consider implementing such a program. In such programs, executives and other senior leaders serve as mentors and sponsors to identify high potential employees and help them find opportunities to develop professionally. If there is a disparity in the demographics of the high potential individuals who are identified, then an analysis should be conducted as to why, and strategies should be developed on how to bridge the gap.

6. **Create a role focus on DEI.** It is our understanding that BlackBerry does not

CONFIDENTIAL

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

have a role outside of HR dedicated to diversity, equity, and inclusion. BlackBerry may want to consider creating a dedicated position – ideally an executive level position or at least direct reporting to executive leadership – to help create a more inclusive environment.

7. **Employee resource groups**. To the extent it does not have them already, BlackBerry may want to consider establishing employee resource groups. Employee resource groups help foster diversity and inclusion and empower employees to help create a better workplace culture. Given that many witnesses raised concerns about the culture at BlackBerry, we believe that BlackBerry could benefit from introducing employee resources groups.

8. **Training**. We recommend that all senior leaders and executives be required to take implicit bias training. A repeated concern that was raised was the lack of women in senior leadership positions. To the extent it is not already happening, implicit bias training could help senior leaders better understand and manage their unconscious biases when looking to hire and promote individuals into leadership positions.

9. **Accessibility of C-Suite and senior leaders.** At least one witness raised a concern that senior leaders, including Giamatteo are not sufficiently communicative or available to their indirect reports. Creating a more open environment where C-level executives and other senior leaders are accessible across their teams helps create a more open environment and improve workplace culture. If this is something BlackBerry is interested in, we can strategize about ways to approach and achieve this.

18

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

### **Appendix A**

## Case: 362 - EP Website
## Reports to the Audit Committee
## Discrimination, Harassment or Diversity

## Case Snapshot

**Opened:** 10/26/2023
**Days open:** Less than 24 hours
**Last modified:** 10/26/2023 10:40 AM
**Intake method:** EP Website
**Status:** Unassigned
**Alert:** Green

## General Case Info

**Case number:**
362
**Received/Reported date:**
10/26/2023
**Language:**
English
**Assigned tier:**
Reports to the Audit Committee

**Issue**
**Primary issue:**
Discrimination, Harassment or Diversity

## Case Details

**Reported tier information**
**Case type:**
Allegation
**Intake method:**
EP Website

**Location**
**Organization/Building name:**
BlackBerry
**Location/Address:**
█████████████████████████████████

**Country/Territory:**
USA
**BGS:**
No
**Audit:**
Yes

**Reporter Information**

19

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



20

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



**Legacy information**

**Follow-ups**

**Reporter Additional Information**
There are no additional notes for this incident.

**Questions/Comments and Reporter Responses**
There are no questions asked by the client.

**Assignments & Access**

**Case assignee(s):** None
**Restricted access:** None
**Case access list:** Bramhill, Jennifer; Disbrow, Lisa; White-Ivy, Nita; Wilson, Jim

CONFIDENTIAL

# ||ORRISON FOERSTER

## **Appendix B**

**10/28/2023 - Reporter**

**Response** Thank you very much for your prompt response.



Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

**Appendix C**

| | Witnesses Interviewed | | |
|---|---|---|---|
| | **Witness** | **Role** | **Date of Interview** |
| 1 | ▰▰▰▰ | BlackBerry ▰▰▰▰▰ | October 27, 2023 November 20,2023 |
| 2 | ▰▰▰ | BlackBerry ▰▰▰▰ | November 2, 2023 |
| 3 | ▰▰▰▰▰ | ▰▰▰▰▰ ▰▰ | November 2, 2023 |
| 4 | ▰▰▰ | BlackBerry ▰▰▰▰▰ | November 3, 2023 |
| 5 | ▰▰▰▰ | BlackBerry ▰▰▰▰ ▰▰ | November 3, 2023 |
| 6 | ▰▰▰ | BlackBerry ▰▰▰ | November 3, 2023 |
| 7 | ▰▰▰▰ | BlackBerry ▰▰▰▰▰ ▰▰ | November 3, 2023 |
| 8 | ▰▰▰ | BlackBerry ▰▰ | November 3, 2023 November 17, 2023 |
| 9 | ▰▰▰▰ | BlackBerry ▰▰▰▰ ▰▰ | November 5, 2023 |
| 10 | ▰▰▰ | BlackBerry ▰▰▰▰ ▰▰ | November 6, 2023 |
| 11 | ▰▰ | BlackBerry ▰▰▰ | November 6, 2023 |
| 12 | ▰▰▰▰ | BlackBerry ▰▰▰▰▰ | November 6, 2023 |
| 13 | ▰▰▰ | ▰▰▰ ▰▰ | November 6, 2023 |
| 14 | ▰▰▰▰ | BlackBerry ▰▰▰▰ | November 6, 2023 |
| 15 | ▰▰ | BlackBerry ▰ | November 8, 2023 |
| 16 | ▰▰▰ | BlackBerry ▰▰▰▰ | November 8, 2023 |

23

BB13-00019126

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

| 17 | ███████ | ██████ | November 8, 2023 |
|----|---------|--------|------------------|
| 18 | ████ | Former BlackBerry ██ | November 10, 2023 |
| 19 | █████ | Former BlackBerry ████████ ████████ ██████ | November 17, 2023 |
| 20 | ██████ | Former BlackBerry | November 21, 2023 |
| 21 | ████ | BlackBerry ███████ █████ | November 21, 2023 |

24

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

**Appendix D**

The following provides high-level points from our witness interviews and aims to include information not discussed in the report.  It is not intended to be a recitation of all facts.



25

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



26

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



CONFIDENTIAL

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



7. <u>John Giamatteo</u>.   John was surprised and offended by the sexual harassment allegations, noting that he has three daughters and wants "corporate to be a better place" for them.  When asked about the complaints in detail, he denied making sexually suggestive and aggressive comments towards women.  He denied making veiled threats about his influence and reach within the industry.

He admitted that he has no women reporting to him, though a past direct report, ████ ████  was upset with him because her job was eliminated.  He recalled that she sent BlackBerry a demand letter, and BlackBerry now has a separation agreement with her.  he acknowledged that at McAfee, he had more women reporting to him.  He explained that McAfee was more diverse in general, and he hasn't been able to replicate that diversity at BlackBerry.  He described other ways in which he has supported diversity at McAfee, but noted that BlackBerry isn't in "growth mode" and isn't focused on bringing in talent now.

Giamatteo reported he is familiar with the Company's harassment policy and received training when he started at BlackBerry.  He completes the annual refresher.  He has not received training any other than anti-harassment or inclusive leadership training.

In a subsequent interview, Giamatteo also denied the specific allegations Neelam Sandhu raised against him during this investigation and that are covered in detail in the report.



CONFIDENTIAL

BB13-00019131

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



CONFIDENTIAL

BB13-00019132

MORRISON FOERSTER

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



CONFIDENTIAL BB13-00019133

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



14. <u>Neelam Sandhu</u>. Sandhu stated it was very emotional to discuss Giamatteo. She indicated that when Giamatteo first joined BlackBerry, he made inappropriate comments, and has been on a campaign to get her out of the company.

Sandhu provided three examples of inappropriate conduct by Giamatteo. First, shortly after he joined the company, Giamatteo invited her to dinner. While Sandhu believes that Giamatteo had meals with a number of people, she did not believe he freshened up prior to his dinners with other employees. At the dinner, Giamatteo asked her if she would move to report to him, and his only stated rationale was that he wanted to "travel" together. Finally, at another meeting with Giamatteo made a comment about going to dinner with his daughters where he gets dressed up and people think he's a

31

MORRISON FOERSTER

"dirty old man." To Sandhu, she viewed Giamatteo's conduct at the dinner as an inappropriate advance, and she was not interested so she decided to keep distance from him going forward.

At the dinner, Giamatteo recommended Sandhu speak to his former colleague at ███████████████ This recommendation was made to help her better assess whether she wanted to work for him. ████ advised Sandhu to have regular 1:1s with the CEO if she were to begin reporting to Giamatteo. She claimed that ████ had "secret" 1:1s with the CEO while reporting to Giamatteo, and after this conversation Sandhu decided she did not want to work with Giamatteo.

After informing Giamateo she did not want to work with him, he told her "I know a lot of people. It could impact your career in the industry." Sandhu interpreted this as a threat. She further stated that Giamatteo has refused to work with her as a peer and has consistently tried to undermine her, make negative comments about her, and generally try to push her out of the company.

When asked to elaborate on his continued negative behavior towards Sandhu, she referenced a few specific incidents with Giamatteo. First, Sandhu mentioned that his team circulated an organization chart that showed Sandhu reporting to Giamatteo, and the chart went to a customer without Giamatteo correcting it despite his close proximity to the chart. Next, Sandhu mentioned that members of Giamatteo's team told Sandhu that he said she was leaving the company and that if she remained at the company he would leave. Finally, she stated Giamatteo complained to John Chen that Sandhu would not join his team call, which suggested that Sandhu was not collaborative. Sandhu said that to the contrary, she agreed to join his call when her scheduled permitted, but Giamatteo took months to send her a calendar invite and only after she repeatedly requested it. When asked if anyone else had mentioned additional inappropriate conduct by Giamatteo, she mentioned that ████ █████████ from Amazon felt Giamatteo was being "creepy" when he tried to take a selfie with ███████.

Ultimately, Sandhu stated the only three incidents of misconduct she could recall were: (1) aftershave; (2) travel; and (3) "dirty old man." She indicated she had spoken to John Chen and Steve Rai about the dinner and the "travel" comment, but did not discuss the conduct with HR.

Speaking on the culture of BlackBerry, Sandhu explained there was a boys club culture where women had a harder time being taken seriously. More specifically, Sandhu mentioned that she closed the biggest deal at the company, and no one congratulated her. She stated that as she got more senior the issues seemed to get worse. She noted

CONFIDENTIAL

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

the company dealt with cultural issues promptly, explaining that when an employee stated there were "too many Black people at the company" that person was fired.



33

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



34

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



35

MORRISON FOERSTER

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



CONFIDENTIAL

BB13-00019139

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



37

BB13-00019140

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



38

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



CONFIDENTIAL                                                    BB13-00019142