# EXHIBIT 27

| **From:** | Hill, Christin Joy [CHill@mofo.com] |
| **Sent:** | 11/27/2023 4:04:42 PM |
| **To:** | Dick Lynch ███████████; Lisa Disbrow ████████████; Mike Daniels (external) ████████████; Prem Watsa (external) ████████████; Laurie Smaldone (external) ████████████; Wayne Wouters (external) ████████████ |
| **CC:** | Phil Kurtz [pkurtz@blackberry.com]; Tate, Eric Akira [ETate@mofo.com]; Rodriguez, Monica A. [MRodriguez@mofo.com]; Spinelli, Cooper J. [CSpinelli@mofo.com]; BlackBerry ELInv [BlackBerry_ELInv@mofo.com] |
| **Subject:** | Confidential Report |
| **Attachments:** | BB - Confidential EthicsLink_Report_Anonymous.pdf |

**CAUTION** - This email is from an external source. Please be cautious with links and attachments. (go/taginfo)

PRIVILEGED & CONFIDENTIAL

Dear BlackBerry Directors,

Please see attached for a confidential and privileged report prepared by Morrison & Foerster LLP.  Please let us know if you have any questions or wish to discuss.

Thank you,
Christin

**CHRISTIN HILL**
Partner
CHill@mofo.com
T +1 (415) 268-7610
M +1 (510) 206-9894

**ꟿORRISON
FOERSTER**

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

# ΙΙΙORRISON FOERSTER

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED/ATTORNEY WORK PRODUCT

MEMORANDUM

| TO: | Lisa Disbrow, Audit Committee Chair<br>Phil Kurtz, Chief Legal Officer and Corporate Secretary |
|---|---|
| FROM: | Morrison & Foerster |
| DATE: | November 22, 2023 |
| RE: | Privileged & Confidential BlackBerry Workplace Investigation Report |

The Audit Committee of BlackBerry's Board of Directors retained Morrison & Foerster LLP to investigate an anonymous report submitted through the Company's EthicsLink website alleging sexual harassment and gender discrimination by John Giamatteo. Specifically, the complaint alleges that Giamatteo: (1) made unprofessional, sexually suggestive, and aggressive comments; (2) made women feel marginalized and like they are unable to succeed in careers; (3) made "veiled threats" based on his "influence and reach within the industry"; and (4) proliferated a sexist, male dominated mindset.[1] This report contains attorney mental impressions and opinions concerning the credibility of individuals who were interviewed, as well as an assessment of reasonable inferences drawn from facts discovered during the investigation. This report is confidential and is protected from disclosure by both the attorney-client privilege and the attorney work product doctrine.

## Executive Summary

On October 26, 2023, BlackBerry received an anonymous report submitted through the Company's EthicsLink website about John Giamatteo, President of the Cybersecurity Business Unit. Morrison & Foerster attorneys interviewed 21 witnesses, including Giamatteo, reviewed the complaint at issue, investigative files from potentially related complaints, relevant BlackBerry policies, a portion of BlackBerry's organization chart, and approximately 2,621 emails located through a key word search of Giamatteo's mailbox.

---

[1] **Warning**: This report may also contain information that comprises trade secret information within the meaning of the Uniform Trade Secret Act as it may include sensitive business information that is not known outside of BlackBerry, provides BlackBerry with a competitive advantage, and over which BlackBerry has taken reasonable measures to protect from disclosure. The report also includes sensitive personnel information. As such, disclosure is limited and may only be authorized by the Chief Legal Officer, or his designee.

# ШORRISON FOERSTER

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

Based on the facts gathered and information reviewed, we conclude that there is no evidence that Giamatteo engaged in conduct that rises to the level of sexual or any other unlawful harassment or gender discrimination under California law or that would constitute a violation of BlackBerry policy. We further conclude that there is insufficient evidence to support allegations that Giamatteo made unprofessional comments specifically to female employees or has engaged in any conduct that could reasonably be found to be threatening or marginalizing to them. The vast majority of witnesses expressed high regard for Giamatteo. With two notable exceptions, no witness indicated they had heard Giamatteo make any concerning comments toward women. With the same notable exceptions, no witness had observed Giamatteo engage in discriminatory conduct toward women. Almost all witnesses felt that Giamatteo is a strong leader who treats women with respect.

Despite the widespread praise for Giamatteo, two witnesses expressed a different view: First, Female Executive 1 reported three examples of behavior by Giamatteo that she regarded as inappropriate and sexually suggestive. However, even if these incidents occurred exactly as Female Executive 1 describes, Giamatteo's alleged conduct does not rise to the level of harassment or gender discrimination under California law or constitute a violation of BlackBerry policy. Further, multiple witnesses confirmed ongoing conflict between Female Executive 1 and Giamatteo that may call into question Female Executive 1's interpretation of Giamatteo's motivations. Second, Female Executive 2 reported widespread inappropriate comments in the Cybersecurity Business Unit, and disparate treatment of women. Female Executive 2 was unable to attribute any specific comments or conduct to Giamatteo, but nonetheless deems him to be part of the larger problem. Additionally, Female Executive 2 declined to acknowledge that her interactions with Giamatteo may have been impacted by the fact that she was leading a division—channel sales—that at least one disinterested witness described as a division that Chief Executive Officer John Chen determined not to invest in. Female Executive 2 was ultimately let go as part of an organization restructure in or around January 2023.

While not specific to Giamatteo, a number of women raised concerns about a long-standing trend (pre-dating Giamatteo) of a lack of women in leadership roles within the Company, and a Company culture that leaves little opportunities for advancement for women. Again, separate from any issues related to Giamatteo, several female witnesses (current and former employees) described challenging aspects of BlackBerry's culture specifically as it relates to women. More than one witness described BlackBerry as a "Boy's Club," wherein women face certain disadvantages. This sentiment was not universal, but it was certainly present. This report closes with recommendations for BlackBerry to consider that may help to address some of these concerns, and that could minimize legal risk and potentially prevent complaints regarding gender discrimination in the future.

Should you have any questions, please do not hesitate to ask us or to request further clarification.

sf-5678171

CONFIDENTIAL

BB13-00018652

# MORRISON FOERSTER

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

## Summary of Complaints

On or about October 26, 2023, BlackBerry received an anonymous report though the Company's EthicsLink website.[2] The complaint alleges that Giamatteo regularly made and continues to make unprofessional comments towards women and in specific instances has used sexually suggestive and aggressive comments towards women. The complaint further alleges current female BlackBerry employees feel marginalized and unable to succeed in their careers due to comments and loosely veiled threats about Giamatteo's "influence and reach within the industry." The complaint also asserts that the lack of women directly reporting to Giamatteo demonstrates the male-dominated sexist mindset that thrives under his leadership.

The complaint purports to be brought as a joint complaint by several current and former BlackBerry women employees (some who are former McAfee employees) who have worked directly or indirectly with Giamatteo. The complaint seeks a detailed investigation into Giamatteo's conduct and states that some women have sought legal counsel.

In response to this report, BlackBerry retained Morrison Foerster. At Morrison & Foerster's instruction, BlackBerry responded to the anonymous report through the EthicsLink website to ask for further details regarding the alleged conduct, including how many individuals were involved, the dates of any alleged incidents, and whether any reports were brought to the attention of BlackBerry HR.

On October 28, 2023, the anonymous reporter replied,[3] and denied the request for further details citing fears of retaliation and reiterated—again, without providing specific examples—that Giamatteo made unprofessional comments towards women, including sexually suggestive comments, and loosely veiled threats. The reporter further stated that there is a collective of about 10 women consisting of current and former BlackBerry employees as well as current and former McAfee employees who have interacted with Giamatteo over the last 10 years.

## Investigation Process

Morrison & Foerster attorneys interviewed 21 witnesses, including 14 women, 10 of whom are current BlackBerry employees, two who are former BlackBerry employees, and two women who worked with Giamatteo at prior companies (including McAfee). Morrison & Foerster attorneys also reviewed numerous documents, including certain of Giamatteo's personnel records, relevant complaints submitted to BlackBerry HR, and emails retrieved from Giamatteo's electronic mailbox.

---

[2] The full complaint is included as **Appendix A**.
[3] The reply is included as **Appendix B**.

sf-5678171

MORRISON FOERSTER

A full list of the witnesses interviewed is included as **Appendix C**.[4]  Summaries of our witness interviews are included as **Appendix D**.[5]

## Factual Findings

The following provides a high-level summary of our factual findings.  It is not intended to be a recitation of all facts.

1. **We Did Not Locate Sufficient Evidence of Conduct by Giamatteo That Would Qualify as Sexual Harassment or Gender Discrimination Under California Law or Otherwise Support the Allegations of Inappropriate or Unlawful Conduct in the Anonymous Complaint**

Our investigation was unable to corroborate the assertion that multiple women experienced the conduct alleged in the complaint, and we have to date not been contacted by any attorney on behalf of any current or former BlackBerry employees.  Instead, the vast majority of witnesses reported they were unaware of any conduct by Giamatteo that might be construed as "unprofessional toward women"; "sexually suggestive or aggressive" or "veiled threats."  Indeed, nearly every witness—including twelve of the fourteen female witnesses—expressed largely positive, or at least neutral, sentiments about Giamatteo.

*Information provided by Giamatteo's female peer at BlackBerry did not support the allegations.*  Female Executive 3, one of the two most senior women we interviewed, reported that she has a "good working relationship" with Giamatteo.  Female Executive 3 and Giamatteo are peers, regularly attend staff meetings together, and meet with some regularity.  Female Executive 3 reported that she has never heard Giamatteo say anything inappropriate or sexually suggestive.  She has never observed him treat women differently than men.  And no one has ever complained to her about Giamatteo.  As discussed further below, Female Executive 3 expressed some concern about BlackBerry culture broadly, but stated she does not believe that this has anything to do with Giamatteo.

*Information provided by Giamatteo's current direct report did not support the allegations.*  Female EA, Giamatteo's only current female direct report, likewise reported that she has never observed Giamatteo engage in any inappropriate conduct toward women.  Female EA began working with Giamatteo at McAfee in 2013, and came to BlackBerry with him.  She said working for Giamatteo is "amazing" as he is a "great boss and great leader."  She has never heard him say anything sexually suggestive toward women or threatening toward women.  She said she does not find anything about him threatening or uncomfortable.  They work together in the Irving, Texas office, which is a small office, and Giamatteo has tried to cultivate a positive culture within the office.  Female EA believes that both at

---

[4] Removed from this report for anonymity.
[5] Removed from this report for anonymity.

sf-5678171

## MORRISON FOERSTER

McAfee and at BlackBerry, Giamatteo has a positive reputation, and she has never heard any rumors of any inappropriate or discriminatory conduct.

***Information provided by Giamatteo's female indirect reports did not support the allegations.*** Five of the women we interviewed are / were indirect reports to Giamatteo: Female Executive 4, Female Executive 5, Female Executive 6, Female Executive 7, and Female Executive 8. None reported that they had observed Giamatteo engage in any inappropriate conduct toward women.

Female Executive 4 reported that she meets with Giamatteo twice weekly, and also attends monthly meetings held by Giamatteo. She also communicates with him via Teams, text, and email. Female Executive 4 described Giamatteo's communication style as "super appropriate." She has never heard him say anything inappropriate or unprofessional toward women, or otherwise demean women. She described Giamatteo as "not intimidating at all" and "like a dad." Though she acknowledged that Giamatteo is "a mathematical mental giant," so his intelligence could intimidate some people. When asked if anyone ever complained to her about Giamatteo, Female Executive 4 said that Female Executive 2 confided in her as a friend that Female Executive 2 felt Giamatteo "dismissed" her. Female Executive 4's view of the situation is that Giamatteo was dismissive of Female Executive 2's business—channel sales—not Female Executive 2 herself. Female Executive 4 explained that Female Executive 2 had been brought in to fix a challenging business line, which ultimately failed. Female Executive 4 said the fact that BlackBerry did not value the channel business came from John Chen, not Giamatteo.

Female Executive 5 is an indirect report to Giamatteo, and also previously worked with him at McAfee. Regarding her time at McAfee, Female Executive 5 reported that Giamatteo was generally regarded as a great leader. She never heard any allegations, complaints, or rumors about Giamatteo doing or saying anything inappropriate at McAfee. Since joining BlackBerry, Female Executive 5 has little interaction with Giamatteo but those limited interactions have been positive. She describes him as friendly and not intimidating. Female Executive 5 has never heard Giamatteo say anything inappropriate or observe him interact differently with women compared to men.

Female Executive 7 is an indirect report to Giamatteo, and has had limited interaction with him. Female Executive 7 reported that she has never observed him make inappropriate comments toward women, sexually suggestive or aggressive comments toward women, or threatening or intimidating comments. Female Executive 7 said that she has heard Giamatteo talk about his "influence and reach within the industry" in explaining his background or introducing himself in a larger group context. She did not view this as an effort to intimidate others, and has not heard others characterize it in that matter. Her only complaints about Giamatteo are a lack of communication—though Female Executive 7 insisted that is not unique to Giamatteo—and she has heard him use swear words, though not directed to anyone. Female Executive 7 also alleged one instance where she felt slighted by Giamatteo.

sf-5678171

# IΠORRISOΠ FOERSTER

According to Female Executive 7, she had the opportunity to attend the quarterly review for Channel Operations in Europe in person in May of 2023. Her supervisor and supervisor's European counterpart approved her to attend, but Giamatteo vetoed it, citing cost-cutting. But Female Executive 7 alleges that, the following week, Giamatteo had his entire leadership team, all men, travel from around the world to New York for their quarterly meeting. When we asked Female Executive 7 if she was aware of any male counterpart attending the European quarterly review in person, she said she was not aware of any and that nobody usually attends this meeting from her division. As discussed further below, Female Executive 7 also expressed some concern about BlackBerry culture broadly. She did not attribute those concerns specifically to Giamatteo, but she stated that she does not believe he has done anything to change it.

Female Executive 6 is another indirect report to Giamatteo. She has met him in person four times, including twice at group dinners, and otherwise interacts with him through email and on calls a fair amount. Female Executive 6 also reported that she is friends to some degree with Female Executive 1 and enjoys working with her. Regarding Giamatteo, Female Executive 6 stated she enjoys working with him as well and described him as "insightful," "responsive," and "very professional." She has never heard or seen him say or do anything inappropriate toward women. And while Female Executive 1 has complained to her about Giamatteo before, Female Executive 1 did not allege to her that Giamatteo was harassing or discriminating against her because she is a woman. Female Executive 6 instead attributes Female Executive 1's and Giamatteo's tension to their being "oil and water" and their disagreement over how the Elite Program was structured. According to Female Executive 6, Giamatteo was right to question the reporting structure for the Elite Program and why it operated outside the sales organization.

Femail Executive 8 is a former BlackBerry employee who was an indirect report to Giamatteo before being let go as part of a reduction in force. She was employed at BlackBerry for 2.5 years and worked remotely the entire time. She had limited interactions with Giamatteo but never observed him yell, use inappropriate language, or make sexually suggestive comments. She also never heard any employees complain about Giamatteo. She did hear Female Executive 2 complain about the culture broadly, including possibly making a comment that BlackBerry is a "boy's club." Female Executive 8's view is that BlackBerry is no more of a boy's club than any other big tech firm.

***Information provided by female former colleagues did not support the allegations.***
We also interviewed two women who previously worked with Giamatteo: ████████ ████████████████████. Again, neither reported having observed Giamatteo engage in any inappropriate conduct toward women.



She expressed only high praise for Giamatteo, and confirmed she never witnessed him say or do anything inappropriate toward women. Nor, to her knowledge, did anyone else allege he

sf-5678171

did so. She went further and said that, of all the people she has worked with, he is one of the last people she would expect to be accused of inappropriate conduct toward women.

██████████████████████████████████████████████████████

She expressed only positive sentiments about Giamatteo, and confirmed she never witnessed him say or do anything inappropriate toward women. To the contrary, she recalled an incident where a female colleague was inebriated at a team event in Vegas, and Giamatteo asked ██████ to take the colleague home. Like ████████████████ was surprised by the line of questioning as Giamatteo is not the type to engage in inappropriate conduct toward women.

**Information provided by male executives did not support the allegations.** Senior male executives likewise confirmed that they had not observed Giamatteo engage in any inappropriate conduct.

Male Executive 1 and Male Executive 2 are both direct reports to Giamatteo. They spoke positively about Giamatteo and his management style. Neither had heard Giamatteo say or do anything inappropriate toward women, or discriminate against women. In fact, Male Executive 1 reported that Giamatteo specifically asked to include Female Executive 4 in certain meetings because he saw that she added value. Male Executive 1 was aware that Female Executive 2 expressed concerns about the opportunities for women at BlackBerry, but Male Executive 1 believes these comments were general and not specific to Giamatteo. Male Executive 2 similarly praised Giamatteo for his leadership and his intelligence.

**Information provided by human resources did not support the allegations.** We also interviewed three individuals from the HR function: █████████████████████ ██████████████████████████████████████████

None reported having personally observed Giamatteo engage in any conduct that could be deemed "unprofessional toward women"; "sexually suggestive or aggressive" or "veiled threats." All three were aware of two specific complaints about Giamatteo that were made by Female Executive 1, and are discussed further below. Other than Female Executive 1's complaints, ████-██ reported that one other employee complained about Giamatteo: Female Executive 2, however those complaints were not of a sexual nature.[6] Rather, Female Executive 2 complained that she was not being included in meetings and was being isolated and ignored. ████-██ instructed Female Executive 2 to speak with Giamatteo about this. Female Executive 2 reported that she spoke with Giamatteo about not being included in a QBR around the time Giamatteo was hired. Female Executive 2 reported that Giamatteo told her this was an oversight. Giamatteo denied excluding Female Executive 2 from meetings.

---

[6] During our interview with Female Executive 2, she reported that Giamatteo had made sexually suggestive comments or jokes but could not provide a specific example of a comment or joke made by Giamatteo. Given the belated nature of this complaint coupled with the lack of specific examples, we do not find this allegation credible.

sf-5678171

BB13-00018657

After notified of her termination, Female Executive 2 retained an attorney to challenge her separation. Specifically, Female Executive 2 alleged that she was excluded from meetings, had her job duties diminished, had higher targets to meet than her male colleagues, and she and ███ were paid less than their male colleagues. The parties ultimately reached a confidential settlement without admission of any wrongdoing.

*Email review did not support the allegations.* Finally, our review of Giamatteo's electronic mailbox did not reveal any conduct by Giamatteo that could be deemed "unprofessional toward women"; "sexually suggestive or aggressive" or "veiled threats." There were no emails suggesting that Giamatteo made any sexist comments or otherwise contributed to a misogynistic culture at BlackBerry.

2. **Two Female Witnesses Reported Inappropriate Conduct by Giamatteo, But Even if True, the Conduct Reported Does Not Rise to the Level of Harassment or Discrimination in Violation of BlackBerry Policy or Under California Law**

Only two of the 21 witnesses we interviewed reported observing what they described as inappropriate conduct on the part of Giamatteo: Female Executive 1 and Female Executive 2. We conclude that the conduct Female Executive 1 and Female Executive 2 describes does not rise to the level of harassment or discrimination in violation of BlackBerry policy or under California law.

A. **Female Executive 1**

Female Executive 1 described three examples of conduct that she deemed inappropriate and of a sexual nature:

i. Shortly after he joined the company, Giamatteo invited Female Executive 1 to dinner in San Ramon. Female Executive 1 understood that he had 1:1 meals with a number of people during this visit. Prior to the dinner, Giamatteo informed Female Executive 1 that he needed to go back to his hotel to shower prior to the dinner. They ended up going to dinner "across the street." He came to the dinner dressed up and smelling like after shave. Female Executive 1 does not believe that he similarly freshened up prior to his dinners with other employees (though she did not indicate that she had asked anyone else or done anything to actually confirm this belief).

ii. At the dinner, Giamatteo asked Female Executive 1 if she would report to him in the CyberSecurity business unit. At this time, Female Executive 1 reported directly to the CEO, John Chen. Female Executive 1 said Giamatteo did not explain the rationale behind the move, and did not ask about her career history or role descriptions, but wanted her to become his subordinate. The only justification he provided was that he wanted to "travel" together.

CONFIDENTIAL

BB13-00018658

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

    iii.    At a meeting on a separate occasion, Giamatteo made a comment about going to dinner with his daughters where he gets dressed up and people think he is a "dirty old man."

Female Executive 1 indicated that she viewed Giamatteo's conduct as the dinner as an expression of romantic interest, and she was not at all interested so decided to keep her distance from him going forward.

Female Executive 1 reported that in connection with Giamatteo's effort to convince Female Executive 1 to become his subordinate, he recommended that she speak to a former colleague ███████████. Female Executive 1 reported that she spoke with █████ by phone, and █████ advised her to "make sure she has regular 1:1s with the CEO" if she were to begin reporting to Giamatteo. █████ told Female Executive 1 that when she worked for Giamatteo, █████ continued to have "secret" 1:1s with the CEO. Female Executive 1 indicated that she viewed this as █████ warning her to be careful around Giamatteo.

Following the call with █████ Female Executive 1 decided she did not want to work for Giamatteo and informed him of her decision. In response, he said, "I know a lot of people. It could impact your career in the industry." Female Executive 1 viewed this as a threat.

Female Executive 1 said since that time, Giamatteo has refused to work with her as a peer and has consistently tried to undermine her, make negative comments about her, and generally try to push her out of the company. Female Executive 1 provided three examples of ongoing mistreatment by Giamatteo:

    i.    Giamatteo's team circulated an org chart that showed Female Executive 1 reporting to Giamatteo. This org chart went to a customer and Giamatteo was slow to correct it.

    ii.    Members of Giamatteo's team told Female Executive 1 that Giamatteo said she was leaving the company. And that he told people that if Female Executive 1 was still at the company in the coming months, he would leave the company.

    iii.    Giamatteo complained to John Chen that Female Executive 1 would not join his team call, suggesting that Female Executive 1 was not collaborative. Female Executive 1 said in truth, she agreed to join his call as her schedule permits, but then Giamatteo took several months to send her a calendar invite, and he only sent it after she repeatedly requested it..[7]

---

[7] During our follow-up interview with Giamatteo on November 20, 2023, Giamatteo reported that he invited Female Executive 1 to his staff meetings in an effort to create a collaborative culture. Female Executive 1 was initially invited to the meetings but was removed from the calendar invite because she did not attend or otherwise participate in the meetings, with the exception of attending one meeting.

CONFIDENTIAL

BB13-00018659

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

We asked Female Executive 1 if she was aware of any other inappropriate conduct by Giamatteo, or whether anyone had complained to her about Giamatteo.

Female Executive 1 provided one final example: She said that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮ an ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, told Female Executive 1 during a BlackBerry event that Giamatteo tried to take a selfie with ▮▮▮▮▮▮▮▮▮▮▮ thought it was "creepy."



Based on our investigation, we conclude that none of the conduct rises to the level of sexual harassment or gender discrimination under California law, or a violation of BlackBerry policy.

### a. The Dinner and Giamatteo's Effort to Have Female Executive 1 Report to Him.

Female Executive 1 contends Giamatteo arrived at dinner smelling like aftershave and emphasized that she should work for him so they could "travel" together. She characterized this alleged behavior as a "sexual advance." This dinner occurred shortly after Giamatteo arrived at BlackBerry, so it would have been in late 2021 or early 2022.

Female Executive 1 explained that she was uncomfortable at the dinner with Giamatteo, and although she never reported the incident to HR, she discussed it with John Chen and Steve Rai around the time of the incident.

John Chen recalled discussing the travel comment with Female Executive 1 around the time of the incident. Female Executive 1 told Chen that Giamatteo wanted to "travel" with her. At the time, Chen responded by encouraging Female Executive 1 to speak to HR if she felt uncomfortable, and that even if Female Executive 1 decided to work for Giamatteo, they did not necessarily have to travel on the same plane or stay at the same hotel. Chen confirmed that travel is part of the job function for the sales team, but that merely means meeting at the client site at the same time. Chen also recognized this dinner as a turning point between Giamatteo and Female Executive 1, and that from that point on, they were like "oil and water."

Steve Rai also recalled Female Executive 1 telling him that Giamatteo wanted to "travel" with her and that she viewed the comment as an advance. Rai's recollection is that Giamatteo's comment did not "raise a red flag" that would indicate to Rai that Giamatteo was engaged in inappropriate conduct. Rather, the comment was too subtle and vague. Rai did not recall that Female Executive 1 was particularly bothered by the comment at the time. But Rai agreed that Female Executive 1 and Giamatteo clearly did not get along, and that they were like "oil and water."

CONFIDENTIAL
BB13-00018660

# IIORRISON FOERSTER

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

Giamatteo reported that he had dinner with Female Executive 1 in San Ramon at a restaurant at the mall "across the street" from the office. He described the restaurant as a public and casual restaurant with high top tables that seat up to six people. He denied telling Female Executive 1 that he needed to shower before diner or returning to the dinner "freshened up." Giamatteo believed they went to the restaurant directly from the office. Giamatteo also did not recall telling Female Executive 1 that they should travel together.

We conclude that more likely than not, Giamatteo did not intend to make a sexual advance toward Female Executive 1. We further find that more likely than not Giamatteo made some comment related to travel related to business purposes.

Even assuming Giamatteo acted in the manner Female Executive 1 describes, the purported conduct at the dinner, as described by Female Executive 1, does not rise to the level of sexual harassment or gender discrimination under California law because it is neither severe nor pervasive. It appears to be an isolated incident, and it is not at all clear that Giamatteo intended the travel comment as an expression of romantic interest as there are legitimate business reasons for executives to travel to see clients. Nor is showering prior to a dinner an indication of romantic interest.

Also, although Female Executive 1 vaguely alluded to other women who may have experienced inappropriate conduct by Giamatteo – these incidents also appear insignificant or unsubstantiated.

Specifically, Female Executive 1 vaguely alluded to the idea that Giamatteo's former ███████████████████████████—may have experienced some unwelcome attention from Giamatteo, thus prompting ██████ to maintain a "secret" backchannel to the CEO to be able to report any issues. ██████ wholly rejected this narrative. ██████ insisted that she never observed any improper conduct by Giamatteo, and the 1:1's with the CEO was merely an effort to maintain a relationship with the CEO. Female Executive 1 also mentioned that ████████████████████ referred to Giamatteo as "creepy."[8]

Fundamentally, a conflict of opinion exists between Female Executive 1 and Giamatteo about how the Elite Program is structured. Giamatteo believed that the Elite Program should be under his purview, and that Female Executive 1 should take a General Manager position that would report directly to Giamatteo. Female Executive 1 opposed this change. This issue has created significant conflict between the two, and calls into question Female Executive 1's interpretation of Giamatteo's motivations during the dinner.

Giamatteo and others noted that there was a business reason for proposing this change: Female Executive 1 was in charge of the Elite Program. These were the company's

---

[8] Female Executive 1 reported that Giamatteo had asked ██████ for a "selfie." Giamatteo denied this allegation. Even if true, this allegation would not rise to the level of a violation of BlackBerry's harassment policy.

sf-5678171

CONFIDENTIAL                                                                                              BB13-00018661

best customers and represent millions of dollars in business. As the head of the sales organization, Giamatteo believed that these customers should be under his domain. Prior to the dinner, Giamatteo had understood that Female Executive 1 had already spoken with Chen about the opportunity of a General Manager position because Female Executive 1 had expressed a desire to have more responsibility. Because her experience was with UEM as a client and UEM is supported by the Cybersecurity business unit, it made sense for the General Manager to report to Giamatteo. Others in the sales organization agreed that having the Elite Program separate from sales created logistical challenges. Female Executive 6—who considers herself a friend to Female Executive 1—acknowledged that keeping the Elite Program separate created challenges and believes that it would be better for Elite customers to be brought under Giamatteo's organization.

John Chen initially made the decision to put Female Executive 1 in charge of Elite, and ultimately supported Female Executive 1 in her desire to maintain separateness from Giamatteo's organization. According to Giamatteo and Rai, however, Chen socialized to Female Executive 1 that many Elite customers would be transitioning to the Cybersecurity business unit. This fiscal year, 20 of the 30 Elite customers Female Executive 1 had been assigned have transitioned to the Cybersecurity business unit.

Multiple witnesses, including John Chen, Steve Rai, Female Executive 6, and Sean Shai, reported that the separation of the Elite customers from the Sales team in the Cybersecurity business unit caused significant tension between Giamatteo and Female Executive 1 and their respective teams. An example provided by Giamatteo was that Female Executive 1 did not want to collaborate with German SVP, Hans-Peter Bauer, on a German Elite client. According to Giamatteo, Female Executive 1 ignored his requests for calls, and so Giamatteo had to facilitate a call between Female Executive 1 and Bauer. This tension was corroborated in our review of Giamatteo's emails.

### b. Giamatteo's Alleged Ongoing Effort to Undermine or Exclude Female Executive 1

The conflict between Giamatteo and Female Executive 1 has persisted, and Female Executive 1 has lodged at least two formal complaints about Giamatteo's ongoing effort to undermine and exclude her: Giamatteo's direct report, Hans-Peter Bauer, circulating an org chart that erroneously showed Female Executive 1 reporting to Giamatteo and sales personnel saying that Female Executive 1 would soon be leaving the Company. Giamatteo denied knowing about the distribution of the org chart and denied saying that Female Executive 1 would be leaving the Company.

These incidents were investigated by BlackBerry outside counsel Rich Curiale who concluded that the evidence corroborated Female Executive 1's underlying factual allegations—that she was excluded from certain meetings—but not that it was on account of her gender. Curiale found that many, not just Giamatteo, thought Female Executive 1 was

sf-5678171

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

"unpleasant" to work with and took advantage of her relationship with John Chen. Following the investigation into these complaints, Curiale coached Female Executive 1 on how to interact better with her colleagues. He reportedly told her to "tone it down" and not "rub in people's noses" that she reports to the CEO. Curiale alleges that Female Executive 1 replied that she would try to, but the salespeople were "lazy" and just wanted to pick "low hanging fruit."

We agree with Curiale's conclusion that these incidents—even when considered in light of Female Executive 1's recent allegations about the dinner—do not rise to the level of harassment or gender discrimination.

Female Executive 1 also reported that in November 2023, Giamatteo retaliated against her by excluding her from a press release relating to the Malaysian deal that the Cybersecurity team recently closed. Female Executive 1 reported that pursuant to the MAP process, her team was responsible for drafting press releases that she reviews/edits/ approves before sending to the CEO. Giamatteo reported that because this deal was of an incredibly sensitive nature involving two different governments – Canada and Malaysia – the potential signing of the deal was highly confidential. For this reason, the press release was drafted by the internal Cybersecurity marketing team and the Government Relations team, and the draft was not shared with the CEO, Chief Legal Officer and Female Executive 1, among others, until shortly after it was clear that the deal would close. Giamatteo denied being familiar with the MAP process as it related to the marketing function. ██ ████-█ reported that executives frequently complained that the MAP process is not followed. Given the legitimate business rational provided on this particular incident, and ████-██ confirmation that the MAP process is not consistently followed, the allegation that this conduct rises to the level of retaliation is not substantiated.[9]

### B. Female Executive 2

Female Executive 2 reported during our interview that she experienced aggressive comments, hostility, and inappropriate language by Giamatteo. Female Executive 2 also reported that Giamatteo had diminished her job duties and dismissed her complaint that her direct report, ██ was paid at a 60/40 ratio instead of a 70/30 ratio paid to male counterparts.

### a. Aggressive, Hostile, and Inappropriate Comments

Female Executive 2 reported one specific example wherein she believed Giamatteo acted aggressively or in a hostile manner. The example she provided involved a situation wherein the product was not working and, as a result, BlackBerry's partner was unable to conduct business. Female Executive 2 reported that she reached out to Giamatteo for

---

[9] To our knowledge, on or about November 16, 2023, when Giamatteo circulated the draft press release, he was unaware that Female Executive 1 was a participant in this investigation.

CONFIDENTIAL

BB13-00018663

support. According to Female Executive 2, Giamatteo aggressively stated to her and her team (two of Female Executive 2's direct reports who are both male), "I can't understand why you guys can't handle this. What am I paying you for." Female Executive 2 reported that her colleague said he was particularly demeaning to Female Executive 2. Female Executive 2 did not know whether Giamatteo had this reaction because she was pushing him to assist the team or because she is a woman. Other witnesses have reported that Giamatteo can become frustrated with his team when, for example, metrics are not being met. We find that Giamatteo likely did make this comment to Female Executive 2 and her team. However, because this comment was made to Female Executive 2 and her two male direct reports and other witnesses shared that Giamatteo has, at times, taken a frustrated tone with his team during staff meetings (wherein the majority of the attendees are men), we do not find that this comment was made because Female Executive 2 is a woman.

Female Executive 2 also reported that Giamatteo and members of his team dropped "F bombs." Other witnesses similarly reported that Giamatteo has at times used curse words, but that they are directed at situations and not individuals. Female Executive 2 could not provide a specific example of sexually suggestive comments made by Giamatteo. While use of curse words in the workplace is unprofessional, it does not rise to the level of harassment or discrimination under BlackBerry policy.

### b. Diminishment of Job Duties and Exclusion from Meetings

Female Executive 2 also reported that Giamatteo diminished her job duties. Female Executive 2 and others acknowledged that the Channel business unit was reorganized into regions as opposed to a global footprint. According to Sean Shai, Giamatteo discussed reorganization of business units in Cybersecurity from as early as during his interviews for the role of President in Cybersecurity. In addition to Female Executive 2 being impacted by the change from global leaders to regional leaders, Shai reported that two other individuals were impacted from the transition to global to regional – one man and one woman. At least one witness – including a witness who reported to be friends with Female Executive 2 – also reported that John Chen did not see the value in the Channel business unit, and that as a result, Giamatteo did not value this business unit as much as the others. We find that it is possible that Female Executive 2's job duties may have been diminished but that did not find evidence to demonstrate that this change was due to gender, as opposed to strategic business decisions.

Female Executive 2 also complained that Giamatteo excluded her from meetings. She specifically mentioned one QBR in Dallas. Giamatteo denied excluding Female Executive 2 from meetings in his communications to Curiale when he investigated the allegations. Our review of calendar invitations in Giamatteo's email inbox with QBR in the subject line revealed that Female Executive 2 was invited to all QBR meetings for which there was an invitation in Giamatteo's inbox. As such, we find that this allegation was not substantiated.

14

                                    BB13-00018664

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

### c. Complaint Related to Pay

Female Executive 2 further raised concerns about pay equity. Specifically, she shared that she and her direct report at that time – ██ – was paid less than her male counterparts. ██ was paid 60% salary and 30% commissions ("60/40"), whereas her male counterparts were paid 70% salary and 40% commissions ("70/30"). According to Female Executive 2, HR was responsible for setting salaries and she simply went along with the compensation structure. An email from Female Executive 2 to the former BlackBerry President, Tom Eacobacci, suggests that she sought actively sought approval for the 70/30 "competitive" compensation structure for the male candidate..[10]

Female Executive 2 reported that when she learned of the pay disparity, she raised the issue to Giamatteo and he refused to increase ██ compensation structure to 70/30. Female Executive 2 admitted that Giamatteo explained that the reason he did not want to change ██ compensation structure to match was because Giamatteo wanted to revert the team to a 60/40 compensation structure. Female Executive 2 claims this change never occurred.

Our review of email correspondence between HR regarding the ██ pay issue corroborated Giamatteo's position that he wanted to transition the team to a 60/40 model and that such a change would occur in fiscal year 2024. As a remedial measure, Giamatteo approved increasing ██ base salary..[11] The change to a 60/40 compensation structure has not yet occurred. Regardless, prior HR email correspondence suggests that the change was not set to occur until 2024.

### 3. Several Women Voiced Concerns About the Lack of Women in Leadership Roles Within the Company, and Reported Certain Challenges for Women at BlackBerry

Although not attributed specifically to Giamatteo, several women voiced concerns about the lack of women in leadership roles within the Company, and generally reported an atmosphere that created certain challenges for women.

Female Executive 3 reported that BlackBerry is a "challenging" place for women. Specifically, she commented on the lack of women in upper management, and general lack of support for women. She mentioned that she recently won an award that would have been celebrated at her last job, but at BlackBerry there has been almost no acknowledgement. She also believes that there is inequity in pay. She raised concerns about her own compensation with Nita White-Ivy, but felt that those efforts were not fruitful. Notably, Female Executive 3 stated that Female Executive 1 has been the one exception to the allegedly challenging

---

[10] It is our understanding that this male candidate accepted the offer with 70/30 compensation and built out his team based on the model negotiated by Female Executive 2.

[11] We have not conducted a pay equity analysis as to this issue as it is outside the scope of this investigation.

15

sf-5678171

# ΙΙΙORRISON FOERSTER

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

culture for women. In Female Executive 3's view, Female Executive 1 has received more preferential treatment than anyone—man or woman. Female Executive 3 also described Female Executive 1 as someone who is untrustworthy, hostile, and negatively impacts the culture of the company.

Female Executive 7 expressed the sentiment that it is more difficult for women to succeed at BlackBerry. She lamented the lack of women in leadership roles, and on Giamatteo's team in particular. She also observed that with the reductions in force, women have been disproportionally impacted. She said few women are hired, and few women are promoted. She said this culture predates Giamatteo, though she does not believe that Giamatteo is making the situation any better.

Female Executive 4 acknowledged the lack of women in leadership roles at BlackBerry, and lamented that BlackBerry has not made more of an effort to hire more women, as other companies have done.

Female Executive 2 similarly reported that BlackBerry was a difficult place to work and described the culture as a "boy's club" and attributed it to Giamatteo hiring many of his former colleagues at McAfee, all who were men.

Female Executive 9, who works as a senior leader in the IoT business unit, shared that her business unit was also male dominated. Female Executive 9 informally complained to HR and John Chen about what she viewed as a toxic work environment (e.g., colleagues did not treat each other with respect and a particular group of men "hated" colleagues who were not part of their group), and filed a formal complaint with HR after conditions did not improve.[12] Female Executive 9 reported that not many women hold leadership positions at BlackBerry and, in her view, this is getting worse.

██████████ likewise mentioned that not many women are hired in leadership positions. She stated that she has flagged to Giamatteo that his team needs more diversity. She reported that Giamatteo is respective, but also noted that of the nine hires Giamatteo has made, only one has been a woman.

These sentiments were not universally held. For example, at least one female witness rejected the notion of BlackBerry as a "boy's club." Female Executive 5 has not observed any differences in the opportunities afforded to women relative to men. She does not see any barriers to her success within the Company.

Giamatteo acknowledged that there were fewer women in leadership than he would prefer. He reported that diversity is important to him and shared a QBR slide deck, which

---

[12] Female Executive 9 reported that she has decided to leave her employment with BlackBerry after 20 years with the company because of her perception of a toxic environment in IoT. Female Executive 9 has signed a separation agreement.

sf-5678171

CONFIDENTIAL

BB13-00018666

includes diversity as a value. Giamatteo expressed that his philosophy is ensure that women have a seat at the table. Other witnesses confirmed that Female Executive 4 attends Giamatteo's staff meetings with his direct reports at Giamatteo's request even though she is not his direct report. Giamatteo further shared that as a father of three daughters it is personally important to him that corporate America is inclusive.

## Legal Risk Assessment

Based on our investigation, we found no evidence that Giamatteo engaged in conduct that rises to the level of sexual harassment or discrimination under California law nor do they constitute a violation of BlackBerry policy. With that said, several women, though not all women, voiced concerns about the lack of women in leadership roles at the Company, and reported that BlackBerry sometimes feels like a boy's club. This may be, in part, due to Giamatteo hiring predominantly his former McAfee colleagues, most of whom are men.

## Recommendations

Even where no unlawful conduct or policy violation has occurred, it is a best practice for companies to periodically review their policies and procedures to foster an inclusive working environment.[13] This is especially true where, as here, it is undisputed that there are not many women in leadership and employees have raised concerns about this. To that end, we have included the following recommendations for BlackBerry's consideration:

1. **Workplace culture survey.** We recommend BlackBerry conduct a workplace culture survey. Based on our witness interviews, it is our understanding that a workplace survey has not been conducted at BlackBerry since before the COVID-19 pandemic. A culture survey could help identify additional areas for improvement and sends a message to the employees that the company is interested and committed to improving the work environment. We are happy to assist with the survey. An important benefit of engaging counsel to assist with the survey is that it increases the likelihood of the survey, at least at the outset, being protected by the attorney-client privileged.

2. **Exit interviews.** We understand that BlackBerry conducts exit interviews. From our discussions with witnesses, however, it does not appear that BlackBerry is leveraging the information it learns during the interviews to improve the workplace culture. We are happy to partner with BlackBerry to conduct a thorough review of its exit interview processes and provide recommended strategies for maximizing the information learned during the interviews.

3. **Pay equity audit.** We recommend that BlackBerry conduct a pay equity audit. Pay equity and transparency is an area of law that is gaining significant traction by plaintiff's attorneys and state and federal regulatory bodies. This topic is also

---

[13] We understand that BlackBerry supports such efforts.
https://www.blackberry.com/us/en/company/corporate-responsibility/ungc-sdgs/equality

sf-5678171

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

top of mind for at least some BlackBerry employees as more than one witness raised the issue of unequal pay based on gender. Should BlackBerry proceed with a pay equity audit, we strongly recommend that this audit be performed by and/or at the direction of counsel to increase the likelihood of maintaining the confidentiality of the audit through the attorney-client privilege protection. We have an experienced pay equity task force at Morrison & Foerster that can assist BlackBerry with an audit if it would likely to conduct one.

4. **Review statistical analysis of impact of reductions in force on certain demographics**. We understand that BlackBerry's HR team in conjunction with external counsel conducts an analysis of the impact a reduction in force would have on the demographics of the affected business unit. It is unclear, however, whether statistical analysis is prepared and reviewed. We recommend that statistical analysis of the impact the reduction on demographic groups be conducted to reduce the legal risk of claims of disparate treatment.

5. **Mentoring and professional development program.** It is unclear whether BlackBerry has a mentorship and professional development program aimed at developing internal talent, particularly women and people of color. We recommend that BlackBerry consider implementing such a program. In such programs, executives and other senior leaders serve as mentors and sponsors to identify high potential employees and help them find opportunities to develop professionally. If there is a disparity in the demographics of the high potential individuals who are identified, then an analysis should be conducted as to why, and strategies should be developed on how to bridge the gap.

6. **Create a role focus on DEI**. It is our understanding that BlackBerry does not have a role outside of HR dedicated to diversity, equity, and inclusion. BlackBerry may want to consider creating a dedicated position – ideally an executive level position or at least direct reporting to executive leadership – to help create a more inclusive environment.

7. **Employee resource groups**. To the extent it does not have them already, BlackBerry may want to consider establishing employee resource groups. Employee resource groups help foster diversity and inclusion and empower employees to help create a better workplace culture. Given that many witnesses raised concerns about the culture at BlackBerry, we believe that BlackBerry could benefit from introducing employee resources groups.

8. **Training**. We recommend that all senior leaders and executives be required to take implicit bias training. A repeated concern that was raised was the lack of women in senior leadership positions. To the extent it is not already happening, implicit bias training could help senior leaders better understand and manage their unconscious biases when looking to hire and promote individuals into leadership positions.

9. **Accessibility of C-Suite and senior leaders.** At least one witness raised a concern that senior leaders, including Giamatteo are not sufficiently communicative or available to their indirect reports. Creating a more open

CONFIDENTIAL

BB13-00018668

**IIIORRISON FOERSTER**

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

environment where C-level executives and other senior leaders are accessible across their teams helps create a more open environment and improve workplace culture.  If this is something BlackBerry is interested in, we can strategize about ways to approach and achieve this.

sf-5678171

BB13-00018669

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

**Appendix A**

**Case: 362 - EP Website**
**Reports to the Audit Committee**
**Discrimination, Harassment or Diversity**

**Case Snapshot**

**Opened:** 10/26/2023
**Days open:** Less than 24 hours
**Last modified:** 10/26/2023 10:40 AM
**Intake method:** EP Website
**Status:** Unassigned
**Alert:** Green

**General Case Info**

**Case number:**
362
**Received/Reported date:**
10/26/2023
**Language:**
English
**Assigned tier:**
Reports to the Audit Committee

**Issue**
**Primary issue:**
Discrimination, Harassment or Diversity

**Case Details**



20

sf-5678171

BB13-00018670

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

**Reporter anonymous:**
Yes

**Case Information**



sf-5678171

IIIORRISON FOERSTER

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product



**Legacy information**

**Follow-ups**



**Assignments & Access**

**Case assignee(s):** None
**Restricted access:** None
**Case access list:** Bramhill, Jennifer; Disbrow, Lisa; White-Ivy, Nita; Wilson, Jim

sf-5678171

CONFIDENTIAL                                                                 BB13-00018672

# MORRISON FOERSTER

Privileged & Confidential
Attorney-Client Privileged/Attorney Work Product

## **Appendix B**

**10/28/2023 - Reporter**
**Response** Thank you very much for your prompt response.





sf-5678171

CONFIDENTIAL