# EXHIBIT 42

IN THE UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


---o0o---


NEELAM SANDHU,

     Plaintiff,

   VS.         CASE NO:
                 24-CV-02002-SK
BLACKBERRY CORPORATION, et al,

     Defendants,

_____/


VIDEOTAPED VIDEOCONFERENCE

DEPOSITION OF

MARJORIE DICKMAN

SEPTEMBER 11, 2025


Reported by:  MYRA A. PISH, RPR, CSR #11613

Page 2

1       IN THE UNITED STATES DISTRICT COURT
2                   FOR THE
3            NORTHERN DISTRICT OF CALIFORNIA
4
5              ---oOo---
6
7   NEELAM SANDHU,
8        Plaintiff,
9       VS.        CASE NO:
                24-CV-02002-SK
10  BLACKBERRY CORPORATION, et al,
11       Defendants,
    _____/
12
13
14      VIDEOTAPED VIDEOCONFERENCE deposition of Marjorie
15  Dickman, commencing at the hour of 9:06 a.m, Thursday,
16  September 11, 2025, held remotely, before Myra Pish,
17  Certified Shorthand Reporter in and for the State of
18  California.
19
20              ---oOo---
21
22
23
24
25

Page 3

1   APPEARANCES:
2   FOR THE PLAINTIFF:
3      GOMERMAN BOURN & ASSOCIATES
       BY: ANTHONY TARTAGLIO, ESQ.
4         MARIA BOURN, ESQ.
       825 VAN NESS AVENUE, SUITE 502
5      SAN FRANCISCO, CALIFORNIA  94109
       415.545.8608
6      Tony@gobolaw.com
7
8   FOR THE DEFENDANTS, BLACKBERRY CORPORATION:
9      MUNGER, TOLLES & OLSON, LLP
       BY:  LAUREN BECK, ESQ.
10     350 S. GRAND AVENUE, FLOOR 50
       LOS ANGELES, CALIFORNIA  90071
11     213.683.9576
       Lauren.Beck@mto.com
12
13  FOR THE WITNESS, MARJORIE DICKMAN:
14     EMPLOYMENT LAW GROUP
       BY:  BRIANA SCHOLAR, ESQ.
15     1717 K STREET, NW, SUITE 1110
       WASHINGTON, D.C.  20006
16     202.331.3911
       bscholar@employmentlawgroup.com
17
18  ALSO PRESENT:
19     JACQUELINE HIOCO, VIDEOGRAPHER
       LINDSAY SKYERS
20     MARGARET MAYO
21              ---oOo---
22
23
24
25

Page 4

1                    INDEX
2   EXAMINATION                      PAGE
3   By Mr. Tartaglio              8
    By Ms. Beck                  121
4   By Ms. Bourn                 168
5
              ---oOo---
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1                   EXHIBITS
2   NO.  DESCRIPTION                    PAGE
3   EXH 0   Document                 15
4   EXH 1   Text Messages              17
5   EXH 2   Text Messages Bates Stamped      19
          Dickman 4-19
6
    EXH 3   Text Messages Bates Stamped      22
7         20-23
8   EXH 4   Document Bates Stamped       23
          24-27
9
    EXH 5   E-mail                 47
10
    EXH 6   E-mails                51
11
    EXH 7   E-mail                 57
12
    EXH 8   E-mail                 65
13
    EXH 9   Confidential Separation and Release    89
14
    EXH 10  E-mail                 94
15
    EXH 11  BlackBerry Proxy Statement for     160
16        June 25, 2024 Meeting
17              ---oOo---
18
19
20
21
22
23
24
25

Page 6

1      VIDEOTAPED VIDEOCONFERENCE
2      DEPOSITION OF MARJORIE DICKMAN
3      THURSDAY, SEPTEMBER 11, 2025
4            ---o0o---
5      THE VIDEOGRAPHER:  Good morning.  We are going
6  on the video record at 9:06 a.m., on Thursday,
7  September 11th, 2025.  This is the video deposition of
8  Marjorie Dickman, taken by the plaintiff, in the matter
9  of Neelam Sandhu versus BlackBerry Corporation, et al.,
10 filed in the United States District Court for the
11 Northern District of California.  Case number
12 24-CV-02002-SK.
13     This deposition is being held via Zoom
14 videoconference.  My name is Jacqueline Hioco, a notary
15 public in and for the state of California.  Today's
16 reporter is Myra Pish, CSR number 11613.  We are both
17 with the firm Talty Court Reporters, Incorporated, with
18 offices in San Jose, California.
19     Please note that we will remain on the video
20 record until all parties have agreed to go off.
21     Before we proceed, I will ask counsel to state
22 their appearance and affiliation for the record, starting
23 with the noticing attorney.
24     MR. TARTAGLIO:  For the plaintiff, you have
25 Anthony Tartaglio from the Gomerman, Bourn law firm.

Page 7

1  It's possible that the client herself will be observing,
2  by which I mean the plaintiff -- and it's also possible
3  that Maria Bourn from my office might also hop in and
4  observe.
5      MS. BECK:  This is Lauren Beck with Munger,
6  Tolles & Olson, for defendant BlackBerry Corporation.
7  I'm also joined on the line by Margaret Mayo and Lindsay
8  Skyers, who are both in-house at BlackBerry.
9      MS. SCHOLAR:  This is Briana Scholar, of The
10 Employment Law Group, on behalf of the witness, Marjorie
11 Dickman.
12     THE VIDEOGRAPHER:  Thank you.  Will the court
13 reporter please administer the oath, then counsel may
14 proceed.
15     THE COURT REPORTER:  My name is Myra Pish.  I'm
16 a certified shorthand reporter in the state of
17 California.  My license number is 11613.
18     Ms. Dickman, if you will please raise your right
19 hand.
20            MARJORIE DICKMAN,
21     called as a witness by and on behalf
22     of the Plaintiff, being first duly
23     sworn, was examined and testified as
24     follows:
25 ////

Page 8

1            EXAMINATION
2  BY MR. TARTAGLIO:
3      Q.  Good morning, Ms. Dickman.
4      A.  Good morning.
5      Q.  Since you live outside of California, it's
6  pretty likely that if this case goes to trial that we'll
7  be playing this video instead of having you testify live,
8  so I don't know if that really changes anything, but just
9  wanted you to be aware of that fact.  Okay?  All right.
10     So, I believe your an attorney, right?
11     A.  Yes.  Nonpracticing.
12     Q.  So, I have a list of admonitions that normally I
13 walk through that takes five to ten minutes to explain
14 how the deposition process works.  I am -- I'm totally
15 happy to go through that list with you if you would like,
16 but if you already feel comfortable with the deposition
17 process, I can skip those.  So, your choice.
18     A.  I'd say you should please go through those.  I
19 have never been, you know, this is my first time doing a
20 deposition, as well as, you know, never been involved in
21 litigation, so...
22     Q.  All right.  That's fine.
23     Do you understand that the oath you just took is
24 similar to the oath that you would take if you testified
25 in court?

Page 9

1      A.  Yes.
2      Q.  Because we have a court reporter who is writing
3  down our conversation, it's important that we try not to
4  speak over each other and have just one person talking at
5  any given time, okay?
6      A.  Sure.
7      Q.  Your answers will need to be verbal, even though
8  in ordinary conversation often times we respond with
9  nonverbal cues, but for today's purposes, for example,
10 you can't answer just by shaking your head, you will have
11 to say "no".  So you will have to make sure that your
12 responses are verbal so that our stenographer can type
13 your answer.  Okay?
14     A.  Okay.
15     Q.  The court reporter might interrupt us from time
16 to time, ask us to slow down, ask us "what was that last
17 part", that sort of thing.  That happens pretty commonly.
18 And if that happens, I'm going to do my best to help the
19 court reporter get a good record.  Hopefully, you can do
20 the same.  You can ask for questions to be read out to
21 you if you -- you missed part of it.
22     So, if you have any questions about how to get a
23 good record let me know, but hopefully we can make that
24 happen today, okay?
25     A.  Thank you.

Page 26

1    political campaign law, antitrust law.
2        Q. And after that four or five-year stint, did you
3    continue practicing law or did you pivot to some other
4    kind of work?
5        A. I pivoted to other -- so I moved from a law firm
6    to private practice, but I still have my law license as
7    active.
8        Q. And you worked at BlackBerry for awhile, I take
9    it?
10       A. 5 years after 16 years at Intel Corporation.
11       Q. And when you left Intel Corporation, what was
12   your job title, if you remember?
13       A. Global director and associate general counsel.
14       Q. And then you moved to BlackBerry after working
15   at Intel for 16 years; is that right?
16       A. Yes, sir.
17       Q. Do you recall when you started work for --
18   working for BlackBerry? Estimate is okay, it doesn't
19   have to be the exact date.
20       A. I actually, I believe it was March 4th, 2020,
21   because it was about a week, two weeks before COVID.
22       Q. Wow. And when you joined BlackBerry, what was
23   your job title, if you recall?
24       A. A chief government affairs and public policy
25   officer.

Page 27

1        Q. Did you provide legal advice as part of your --
2    well, let me ask it this way.
3        As part of your formal job duties, was it
4    expected that you would provide legal advice on a regular
5    basis?
6        A. No. It was expected that I would, similar to
7    Intel, I would use my -- you know, when Mr. Chen hired
8    me, I think he valued the fact that I was a lawyer,
9    because running global government affairs, you need to
10   understand the law to understand legislation and
11   regulation, which is what was my job to, you know, advocate on
12   behalf of the company, as well as geopolitics. And so to
13   that extent. But I was not in, you know, I was not the
14   general counsel.
15       Q. Did your job titles change at some point during
16   your work at BlackBerry or did you have the same job
17   title the whole --
18       A. Same title. I was C-suite. Typically in
19   C-suite, your job title doesn't really change that much.
20       Q. And are you able to remember about when you left
21   BlackBerry?
22       A. Yes, sir.
23       Q. And when would that be?
24       A. End of February, with three months of advisor to
25   CEO after that.

Page 28

1        Q. And would that be 2024?
2        A. No, that would be this year, because we're
3    August. That would be this year.
4        Q. Oh. So it was February of 2025 when you left?
5        A. Yes, sir.
6        Q. So --
7        A. So exactly five years.
8        Q. And since leaving BlackBerry, have you gotten a
9    new job?
10       A. Full-time, no. But I have been appointed to a
11   corporate board, and -- I'll stop there.
12       Q. And is that public information which board you
13   worked for?
14       A. Oh, yeah. Oh, yeah.
15       Q. Which company is that, then?
16       A. It's called Pivotal Aero -- P-I-V-O-T-A-L,
17   A-E-R-O, LLC. There was a -- there was a press release.
18       Q. So the plaintiff in this case is Neelam Sandhu,
19   which you probably already know, but, so I'm going to a
20   few questions now about your interactions with
21   Ms. Sandhu.
22       In your interactions with her, did you find her
23   to be competent at performing her job?
24       A. So for context, I interacted with her very
25   little. So, she was in sales like Mr. Giamatteo, and she

Page 29

1    was also in San Ramon. I was in Washington, D.C., so my
2    interactions with her were very limited. And I also
3    wasn't her supervisor, so I really didn't have a, you
4    know, I wasn't evaluating her competence.
5        Q. And for the benefit of the jury, what, at a high
6    level, would you -- are the general job duties of a
7    government affairs official within BlackBerry?
8        A. To lead -- my job was to lead global engagements
9    with governments.
10       Q. And was there something about government
11   customers that required distinctive skill set, do you
12   think?
13       A. Do I th- -- can you rephrase the question?
14       Q. Sure. What was your understanding of why there
15   was a separate business unit for, or a separate group of
16   people focused on government customers, when there was
17   already, you know, other -- other business units and
18   sales units and so forth?
19       A. Oh, because it does -- it does require a very
20   special niche skill set. I mean, it's something you
21   know, I have a degree in, I studied at LSE, and I -- most
22   if not -- most public companies have a government affairs
23   organization because there are certain ways that -- it --
24   kind of accepted ways to interact with government. It's
25   like any other kind of industry.

Page 42

1    MS. SCHOLAR: Objection to the extent the
2    question is vague and calls for speculation.
3        MS. BECK: BlackBerry joins that objection.
4        MR. TARTAGLIO: I can -- I can rephrase it.
5        Did you ever see John Giamatteo do anything you
6    thought was sexist towards women?
7        THE WITNESS: I never saw him hit on a woman,
8    no. Like, hit on an employee. No.
9    BY MR. TARTAGLIO:
10       Q. And I'll represent to you that in California,
11   the law is such that if women are mistreated in a way
12   that is not sexual, that can still be unlawful,
13   potentially. And so putting aside, you know, sexual
14   overtures, that sorta thing, did you ever observe John
15   Giamatteo behave in a way that you thought was sexist
16   towards women?
17       MS. SCHOLAR: Object to form. Objection to the
18   extent that it calls for a legal conclusion.
19       THE WITNESS: What do I do?
20       MS. SCHOLAR: You can answer the question.
21       THE WITNESS: Okay. What was the question? Can
22   you restate the question again?
23       MR. TARTAGLIO: Yeah. The question is, I'll
24   represent to you that it doesn't have necessarily be
25   sexual in nature, sexual harassment or sex

Page 43

1    discrimination.
2        Did you ever see Mr. Giamatteo behave in a way
3    that you thought was sexist towards women?
4        MS. BECK: Same objections.
5        MR. TARTAGLIO: I'll give you an example.
6        Sometimes when there's a group of people, and
7    let's say there's one woman in the group, and the woman
8    is always told to go get coffee for the group. It's not
9    a sexual overture, but that might be construed as sexist.
10       Sometimes female attorneys will come to a
11   deposition and they are asked, "Oh, are you the court
12   reporter today?" I have never been asked that question.
13   My wife has been asked that question many times.
14       THE WITNESS: I was asked that question early in
15   my career.
16       MR. TARTAGLIO: Yeah. So those are not
17   necessarily overtly sexual in nature, but a lot of women
18   would consider that to be sexist.
19       So with that little speech in your mind, did you
20   observe anything that Giamatteo did that you thought was
21   potentially sexist?
22       MS. BECK: Object to -- to -- to form. Object
23   to form.
24       THE WITNESS: I didn't observe him ask any, a
25   woman, to other that his EA, to bring him coffee, going

Page 44

1    to your example.
2        MR. TARTAGLIO: Yeah. And that was just an
3    example. But can you think of any -- anything else along
4    those lines you observed where you thought, oh, you know,
5    why -- why is he asking her to do that? Why is he
6    talking like that to her?
7        Well, that was pretty vague. I'll move on.
8        Did you ever observe any of Mr. Giamatteo's
9    co-workers behave in a way that was sexist and that you
10   thought that Mr. Giamatteo should have intervened and put
11   a stop to it?
12       MS. BECK: Object to form.
13       THE WITNESS: I think the dinner to which I
14   referred.
15   BY MR. TARTAGLIO:
16       Q. And except for the dinner, can you think of any
17   other examples along those lines?
18       A. Coworkers. Can you be specific to a specific
19   coworker?
20       Q. Well, I'll ask a more generally --
21       A. This is over six months ago for me, so I'm kind
22   of -- remembering all my BlackBerry coworkers is, was or
23   is, you know, is --
24       Q. Just generally, did you see a situation in which
25   you saw someone behave in a way that was sexist and

Page 45

1    Giamatteo, Mr. Giamatteo, knew about it and did not
2    intervene?
3        Can you remember anything like that?
4        MS. SCHOLAR: Objection to the extent that it's
5    vague and calls for speculation.
6        MS. BECK: BlackBerry joins.
7        THE WITNESS: Do I answer?
8        MS. SCHOLAR: Yes. You can answer. Unless I
9    instruct you not to answer, you can answer the question.
10       THE WITNESS: Okay. Sorry.
11       If I -- if I did -- I don't recall. I generally
12   didn't watch observations with others. More focused on
13   my team, and kind of company.
14       Also, I was, again, I was removed. I was, you
15   know, based out of Washington, so there wasn't a time
16   that I was physically in the same place as him are
17   very -- or very limited.
18   BY MR. TARTAGLIO:
19       Q. Did you ever meet -- could be virtually, could
20   be in person -- did you ever meet with Richard Lynch?
21       A. Yes.
22       Q. Approximately how frequently would you meet with
23   Mr. Lynch?
24       A. Very little. He was interim CEO. Maybe a
25   couple -- couple of meetings.

Page 46

1   Q.  Did you have a one-on-one conversation with Mr.
2   Lynch after he became interim CEO?
3   A.  I believe so.
4   Q.  What do you remember from that meeting, if -- if
5   you remember it?
6   A.  I don't really -- don't remember that much about
7   it.
8   Q.  Did he say anything about whether your position
9   would continue to be within the company?
10   A.  I don't remember.
11   MS. SCHOLAR:  If this is a good time for a
12   break?  I apologize, but is this a good time for a break?
13   Or in the next few minutes, if you don't mind, if we can
14   take a break.
15   MR. TARTAGLIO:  That's fine.  Let's come back at
16   10:15 our time, if that works for everyone.
17   MS. SCHOLAR:  Sure.
18   THE VIDEOGRAPHER:  We are now off the record.
19   The time is 10:09 a.m.
20   (Whereupon, a break was taken.)
21   THE VIDEOGRAPHER:  We are now back on the
22   record.
23   The time is 10:16 a.m.
24   BY MR. TARTAGLIO:
25   Q.  Ms. Dickman, I'll ask you to download Exhibit 5,

Page 47

1   which I just put in chat.
2   A.  Yes, sir.
3   Q.  And while you are reviewing that, I'll -- well,
4   first I'll let you know that these e-mails, you have to
5   go to the bottom of the chain and then kinda work your
6   way to the top.
7   It starts at -- Exhibit 5 starts at exhibit --
8   or Bates number BB 1312255 and goes to 12258.
9   A.  Sure.
10   (Thereafter, Exhibit Number 5 was
11   marked for identification.)
12   THE WITNESS:  Is it all Exhibit 5?
13   MR. TARTAGLIO:  Yeah.  It's, I think, four
14   pages.
15   THE WITNESS:  Okay.
16   MR. TARTAGLIO:  A couple of e-mails.
17   THE WITNESS:  Yes, sir.  Okay.
18   BY MR. TARTAGLIO:
19   Q.  Are you ready to discuss this exhibit?
20   A.  Sure.
21   Q.  Okay.  Well, there's a lot of acronyms and
22   inside speak, but, so I'm not going to go through all of
23   it.  But what does ITB stand for?
24   A.  ITB is the policy, it's a Canadian government
25   policy where if you take, if, say, a defense contractor

Page 48

1   wins, a non-Canadian contractor, wins a defense contract,
2   they have to, at a high level, turn around and spend the
3   amount of that defense contract with Canadian companies.
4   Q.  And during these discussions of ITB, do you
5   think that Ms. Sandhu overstepped her -- her lane a
6   little bit?
7   A.  I don't know if she overstepped.  This is kind
8   of the miss -- one, you know, the miscommunication I was
9   referring -- to which I was referring.
10   Yeah.  This is where, you know, my staff called
11   me, and he -- he was very upset.  He felt this project we
12   had been working on for, you know, I had been leading and
13   he had been working on, had been -- and I had actually
14   presented to, you know, John Chen in my first, like, six
15   months or year, and got all these internal approvals for,
16   and was running a cross-functional team on this -- and so
17   he -- he essentially called me and said this ITB project
18   is being taken away from us, from, you know, government
19   affairs leadership.
20   And this was, is what I was referring to before.
21   My response to him was, let me get the facts.  Let's
22   don't, you know, don't engage.  Let's not, you know,
23   increase the drama, let me get the facts first.
24   So I reached out to Neelam and kind of just, you
25   know, tried to start it with a positive.  And then, you

Page 49

1   know, I'm reaching out to cover any potential
2   misunderstanding, right?  I didn't know -- and what I
3   came to find out, is that Ms. -- I believe Ms. Sandhu and
4   Mr. Giamatteo, and I don't know who else was involved,
5   had -- MAP was our internal policies and guidelines, and
6   they had restructured which clients, which customers
7   belonged to who, and I -- I did not know about that.
8   And -- and, first of all, I spoke with, you
9   know, to get the facts, with my boss.  And I
10   said, "Hey, this project that you -- that I, you know,
11   pitched, that I have been leading for two years, did you
12   take this project away from my, you know, leadership and
13   my team?"  And he said, "No.  Where did you get that?"
14   And I told him, you know, and -- so basically he
15   said just send an e-mail.  So I sent this e-mail in his
16   direction.  He said send an e-mail to Neelam, CC me and
17   Steve.  So I'm getting now at this point, that Steve was
18   probably involved in that divvying up.  I was not
19   involved, like I said, with the divvying up with the
20   customers.  Send an e-mail to Steve and I, and, you know,
21   send an e-mail to Neelam, CC Steve and I, and, you know,
22   just -- and that's exactly what I did.
23   And that's -- that's what this is all referring
24   to.
25   Q.  And was it your interpretation that Ms. Sandhu

Page 50

1   was trying to take over this project or was she just
2   trying to have her team assist in the project?
3       MS. SCHOLAR: Objection to the extent it calls
4   for speculation.
5       MS. BECK: BlackBerry joins.
6       THE WITNESS: And my laptop says it's time to
7   restart. I can say not right now.
8       What is the question?
9       MR. TARTAGLIO: Did you interpret the,
10  Ms. Sandhu's actions, as trying to take over the project
11  or more like her team wanted to be involved in the
12  project?
13      I lost the witness it looks like.
14      THE WITNESS: It wouldn't have made -- it just
15  wouldn't have made sense, but --
16      MR. TARTAGLIO: I missed the first part of your
17  answer, by the way.
18      THE WITNESS: You know, my staff knew she was
19  trying to take it over.
20  BY MR. TARTAGLIO:
21      Q. Okay.
22      A. That's why he called me up. You know, that's --
23  that's why --
24      Q. You're frozen on my screen. Is that the same
25  for everyone else?

Page 51

1       MS. BECK: It is. Should we go off the record,
2   Tony?
3       MR. TARTAGLIO: Yeah. Let's do that.
4       THE WITNESS: Bri, can you help me?
5       THE VIDEOGRAPHER: Give me one moment.
6       We are now off the record. The time is
7   10:22 a.m.
8       (Off the record for technical issues.)
9       THE VIDEOGRAPHER: We are now on the record.
10  The time is 10:22 a.m.
11  BY MR. TARTAGLIO:
12      Q. Did this interaction with Ms. Sandhu over ITB
13  leave any hard feelings for you towards Ms. Sandhu?
14      A. No. It's just per, you know, it's just, you
15  have misunderstandings within, this happens. So, it's my
16  job as, you know, the manager, to reach out and try to
17  get the facts. And once you get the facts, you can often
18  clear things up.
19      Q. I'm going to put another exhibit in chat. This
20  will be Exhibit 6.
21      (Thereafter, Plaintiff's Exhibit
22      Number 6 was marked for
23      identification.)
24  BY MR. TARTAGLIO:
25      Q. And, for the record, this is produced at BB13

Page 52

1   several trailing zeroes, and then 23978, and it's two
2   pages, so it goes to 23979.
3       A. Okay. Let me read this. One second, please.
4   11/14/23. Okay. Yes, sir.
5       Q. And -- so are you done reading this?
6       A. Yes, sir.
7       Q. Okay. So this appears to be an e-mail from
8   yourself to Dick Lynch, correct?
9       A. Yes, sir.
10      Q. And do you have any reason to doubt that this is
11  an authentic copy of an e-mail from yourself to Dick
12  Lynch?
13      A. No, sir.
14      Q. And was this e-mail sent around the time Dick
15  Lynch was the interim CEO for BlackBerry?
16      A. It appears so.
17      Q. And the second sentence of your e-mail says, "I
18  greatly appreciate your candor and commitment to making
19  the necessary changes to improve the company."
20      Do you remember what kind of changes to the
21  company you discussed with Mr. Lynch?
22      A. Probably financial. I mean, the company was in
23  a difficult position.
24      Q. Did you discuss -- sorry, what was that?
25      A. The company -- I believe it was financial.

Page 53

1       Q. Did you discuss with Mr. Lynch potentially
2   eliminating certain roles within the company?
3       A. No. He wouldn't have discussed that with me.
4       And then, the couple of sentences in, the e-mail
5   talks about discussing your career, aspirations, and
6   having a larger role within the BlackBerry -- or within
7   BlackBerry.
8       Do you remember what that discussion was about?
9       A. I think that was me stating, you know, I have a
10  much larger skill set than, you know, than this, you
11  know, government, you know, this niche. You know, when I
12  was in Intel, I was used in a much broader way.
13      And I -- so I think that's discussing, you know,
14  so he becomes my current manager as the interim CEO, he's
15  also the chairman of the board, so I'm stating my career
16  aspirations and positivity, you know, positivity looking
17  forward.
18      Q. Did Mr. Lynch discuss with you whether you have
19  a future role within the company?
20      A. I'm going to say --
21      Q. Don't speculate.
22      A. Oh, okay. I'd have to speculate.
23      Q. Okay. Then I'll ask my next question.
24      And if we look down the list, there's the third
25  bullet point down, a discussion about CMO not doing a

Page 54

1    press release.
2    A. Yeah.
3    Q. Who is the CMO?
4    A. It would be either Mark or -- it would have been
5    Mark Wilson or Neelam. I don't know when the roles
6    switched.
7    Q. And I guess the gist of this is that it looks
8    lick the CMO missed an opportunity to get some good
9    publicity for BlackBerry.
10   Is that the gist of this?
11   A. Yeah. And more than publicity, it was
12   something, you know, very important to me as attracting
13   and retaining women.
14   BlackBerry at the, you know, C-suite level, you
15   know, does not have a lot of women. And, you know, often
16   I remember this, you know, when I was a, you know, in my
17   junior years, and even, you know, midlevel management
18   years, when you look up to the C-suite, you want to see
19   yourself and that there's opportunity.
20   And so I have always been a big advocate of, you
21   know, mentoring women, you know --
22   My laptop just turned off. I'm sorry, did -- my
23   laptop turned off for me, did it turn off for you?
24   Q. I can still hear you.
25   A. Okay. So I have always been a big advocate of,

Page 55

1    you know, mentoring women, attracting and retaining
2    women, and this was an opportunity. I had won this top
3    100 most profitable women in Canada award, so there were,
4    you know, they had various categories. One was a C-suite
5    category, and I was one of the five in the C-suite
6    category, as referred to in the bullet above.
7    This gave us an opportunity to, for a very low
8    cost -- what I wanted to do was buy a table at the gala.
9    Canada does things right. It's a two-day event with a
10   formal gala, and it is -- it's a big deal in Canada.
11   And it was an opportunity to -- I wanted to
12   bring nine up-and-coming women at BlackBerry, and just
13   show the company's appreciation for these women, and also
14   get these women, you know, excited about, you know, being
15   at BlackBerry. And I was turned down multiple times.
16   I ultimately got a yes. Because when it comes
17   to advocating for women, you know, and, you know, I -- I
18   thought this was, you know, kind of a -- it was an
19   important thing to do, as well as a no-brainer.
20   And, you know, I spent, before the event, you
21   know, spoke with each of these women's managers, and
22   sometimes their managers' managers. I did not know these
23   women. Or -- or maybe I kinda knew one of them, I don't
24   know.
25   I really asked for, you know -- it wasn't my

Page 56

1    list. I asked -- I believe I asked, I don't remember who
2    for a list, probably HR, of up-and-coming strong --
3    strong women at BlackBerry. And so I spent, you know,
4    the day or day or two before the event, you know, in my
5    free time, speaking to their manager managers, and
6    getting information on them so that I could have, you
7    know, speak to, you know, commend each of them one-on-one
8    about something wonderful they are doing in BlackBerry.
9    And, ultimately, like I said, I got a yes. We
10   bought the table. And these women, you know, I offered
11   myself as a mentor to these women, and many have -- the
12   majority took me up on that.
13   And it was -- I think I put it in a post on
14   LinkedIn. It was probably my proudest moment at
15   BlackBerry. It had nothing to do with winning the award.
16   I just remember walking into the event and seeing the
17   faces of those nine women with, you know, the BlackBerry
18   logo on the table, and these women, you know, just
19   cheering. And it -- it was just a proud moment for
20   BlackBerry. And, you know, and these women told me it
21   was a very -- that they were extremely happy to be
22   invited to this event. They felt, you know, very
23   special, and that was the goal.
24   Q. Do you recall around this November 2023 time
25   period, who in the BlackBerry C-suite was female?

Page 57

1    A. The head of HR, myself, Neelam.
2    Q. And do you recall anyone else?
3    A. Oh gosh. I don't think so. Wait. I don't
4    think so.
5    Q. I'm going to move to the next exhibit now.
6    (Thereafter, Plaintiff's Exhibit
7    Number 7 was marked for
8    identification.)
9    MR. TARTAGLIO: So go ahead and read this one
10   while I read a little information into the record.
11   So Exhibit 7 has Bates number, it's a BlackBerry
12   document, 23982 and it goes to 23987.
13   THE WITNESS: I'm still trying to download.
14   It's not downloading. They were all downloading, then it
15   stopped. Do we have an IT person?
16   MR. TARTAGLIO: I can send it by e-mail if you
17   are having trouble downloading from the Zoom chat.
18   MS. SCHOLAR: It would probably be easier if you
19   sent all the exhibits by e-mail in advance, depending on,
20   you know, when you are going to use them, and then we can
21   just have them on the desktop.
22   MR. TARTAGLIO: Okay. I'll send this to
23   Ms. Scholar right now.
24   MS. SCHOLAR: Do we want to go off the record
25   for five minutes so I can get those together for her?

Page 74

1   It's just, let's just be direct about what the situation
2   is, and then just work together to, you know, get the
3   right result.
4        In -- in an environment where women might be,
5   you know, viewed differently from men, that might -- that
6   type of directness, or, you know, just kind of -- men
7   can -- men could say the same thing that the women could
8   say in the exact same way that the women says it, and a
9   man would be praised for -- for it, a woman would be
10  chastised for it.
11  BY MR. TARTAGLIO:
12       Q.  And can you think of an example at BlackBerry
13  where you received some blow back for communicating in a
14  way that you thought was -- was fine and would have not
15  raised any eyebrows had you been a man?
16       MS. BECK:  Object to form.
17       MS. SCHOLAR:  You can answer.
18       THE WITNESS:  Not specifically.  I -- I am
19  guessing that, you know, there probably was, but there's
20  nothing specific that comes to mind right now.
21  BY MR. TARTAGLIO:
22       Q.  And this document goes on to talk about inequity
23  in pay.
24       What did you mean by that?
25       A.  What it states.

Page 75

1        Q.  So did you believe that you were underpaid given
2   the value you provided to the company?
3        MS. BECK:  Object to form.
4        THE WITNESS:  What do I -- do I answer?
5        MS. SCHOLAR:  You can answer.
6        THE WITNESS:  Okay.  What was the question
7   again?
8        MR. TARTAGLIO:  Do you believe you were
9   underpaid given the value you provided to the company?
10       THE WITNESS:  I definitely wasn't on the, you
11  know, for others that, you know, ran global government
12  affairs for tech companies and were lawyers and had my
13  decades of experience, it's debatable.
14  BY MR. TARTAGLIO:
15       Q.  Do you believe that the compensation you
16  received, was it influenced by the fact that you are a
17  woman?
18       A.  No.
19       Q.  And so when you say "inequity", were you
20  referring to gender inequity about pay?
21       A.  I don't know.
22       Q.  This document refers to a conversation with you
23  and Nita White-Ivy about inequity in pay, right?
24       A.  Yes.
25       Q.  And do you remember -- do you remember that

Page 76

1   conversation or communication with Ms. White-Ivy?
2        A.  I don't.
3        Q.  Did you ever receive any indication that
4   BlackBerry had investigated whether your pay was
5   inequitable?
6        A.  I don't.  The only conversation I remember
7   vividly is, before I started and she told me my whatever
8   box, the -- and I don't know what the HR word is for, you
9   know, it's whatever company it is, and it's arguable
10  whether that was the right box, you know, went from, you
11  know, my starting salary, what the number I started at to
12  a number -- my screen just went off.
13       Q.  We can still see you.
14       THE WITNESS:  Bri, it needs a password.
15       Yeah, so the only conversation that I recall is,
16  they were going to start me at the bottom end of that
17  box.  The salary range of that box.  But that I would
18  quickly be moved to the top of the box, and that didn't
19  necessarily happen.
20  BY MR. TARTAGLIO:
21       Q.  And -- and then, this document goes on to have
22  some discussion of Ms. Sandhu, correct?
23       A.  Yes.
24       Q.  So did the MoFo investigators ask you about your
25  interactions with Ms. Sandhu?  And here's the

Page 77

1   distinction.
2        A.  I'm guessing yes, because it's saying, "Dickman
3   stated that Sandhu has been the one exception."
4        Q.  Yeah.  And what I'm getting at is, do you recall
5   whether you were asked about Ms. Sandhu or is that
6   something you volunteered?
7        A.  Oh, no, I was asked.  I -- I don't think I would
8   just raise -- I don't know.  I have to say honestly, I
9   don't know.  Or, you know -- I don't know.  And my --
10  what I -- I'm speculating, but what I guess is that they
11  had asked some questions about Ms. Sandhu, and then,
12  so -- and I don't know if this was answered to a specific
13  question or that they had previously raised questions
14  about Ms. Sandhu, and then I, so I was then referencing
15  her.
16       Q.  And then there's a statement here that,
17  "Ms. Sandhu has received more preferential treatment than
18  anyone."
19       Why did you think that?
20       A.  I think what I was talking about was, I mean,
21  she was very close with Mr. Chen.  And, you know, she had
22  less experience than, you know, others in the C-suite.
23  And I believe she had three different titles in three
24  years while I was there.  I don't know if they were
25  promotions or -- or just new titles.

Page 82

1   was someone right as I started at BlackBerry.
2   BY MR. TARTAGLIO:
3      Q. And what is the ethic reporting tool, if you
4   know?
5      A. I have no idea. I never used it.
6      Q. Was that a tool for reporting stuff going on
7   within the company that –
8      A. I would assume it's, like, it's reporting ethic
9   complaints. I mean, I think I knew it existed in some
10  way, but I – I never utilized it.
11     Q. And if we go down to the next paragraph, you are
12  quoted as saying, "she was surprised to be one of the
13  three women in the C-suite, and the other two were close
14  to John Chen."
15     So who were those other two you were thinking
16  of?
17     A. Ms. Sandhu and Ms. White-Ivy.
18     Q. And then you are also quoted as saying, "A lot
19  of women had left the company."
20     Do you know what you are referring to there?
21     A. I – I can only surmise, you know, speculate
22  that in my time from joining the company to that point I
23  had seen women leave the company. I'm taking this from
24  the context of the statement.
25     Q. And then later you are quoted as saying that,

Page 83

1   "Men and women were looked at very different when it came
2   to salary."
3      Do you know what you meant by that?
4      A. I don't.
5      Q. Do you think that men and women were assessed
6   differently in the manner in which they were paid?
7      MS. SCHOLAR: Objection to the extent it's
8   already been asked and answered.
9      You can answer.
10     MS. BECK: I'd also object that it calls for
11  speculation.
12     MR. TARTAGLIO: Yeah. And the distinction was,
13  my first question was whether you remember the context
14  when you said this. But now I'm just asking generally,
15  do you think that at BlackBerry, men and women were
16  looked at differently when this came to their salaries?
17     THE WITNESS: I'll go with my prior answer.
18  BY MR. TARTAGLIO:
19     Q. At some point you left the company, correct?
20     A. Correct.
21     Q. Was that departure voluntary?
22     A. No.
23     Q. Who, to your knowledge anyways – well, strike
24  that.
25     Did anyone tell you who made the decision to

Page 84

1   eliminate your position?
2      A. No.
3      Q. Who notified you that you would be leaving the
4   company?
5      A. John Giamatteo and Jenny C-H-R-O.
6      Q. And did you have an in-person meeting for that?
7      A. No. No.
8      Q. Was that over Zoom?
9      A. Yes.
10     Q. Or I guess it could be Teams, but I mean that
11  generically. Some sort of videoconferencing software?
12     A. Yes.
13     Q. Were you given an explanation for why you would
14  be leaving the company?
15     A. Yes.
16     Q. What was that explanation that was given?
17     A. That my function – now that – my function was
18  cut and the company – I don't know what they said now.
19  But my function was no longer needed at my level.
20     Q. Do you – well, strike that.
21     To your knowledge, has BlackBerry continued to
22  sell products to governments?
23     MS. SCHOLAR: Objection to the extent it calls
24  for speculation.
25     MS. BECK: Join that objection.

Page 85

1      MS. SCHOLAR: You can answer.
2      THE WITNESS: Yes.
3   BY MR. TARTAGLIO:
4      Q. And was an explanation given as to why your role
5   was being eliminated, even though presumably BlackBerry
6   wanted to continue trying to sell to governments?
7      MS. BECK: Objection, form. Objection,
8   argumentative. You can answer.
9      THE WITNESS: No.
10  BY MR. TARTAGLIO:
11     Q. Were you told that there was some sort of
12  broader government restructuring that was – or, not
13  government. Were you told that there was some broader
14  corporate restructuring that was going on?
15     A. I don't recall if – if – if I was, I don't
16  recall. If they did, I don't recall.
17     I recall the first part. It was a very quick
18  video call, and it was very surprising to me.
19     Q. Was your – was your departure from the company
20  part of a larger wave of layoffs?
21     MS. SCHOLAR: Objection to the extent it calls
22  for speculation.
23     MR. TARTAGLIO: Well, let me put it this way.
24     Was there a wave of layoffs that happened around
25  the same time that you were told you were leaving the

Page 86

1  company?
2      THE WITNESS: Yes.
3  BY MR. TARTAGLIO:
4      Q. Were you told that your departure from the
5  company was due to a performance issues on your part?
6      A. I was -- it was -- no. No. No one said it was
7  due to performance issues. And I don't see how it could
8  have possibly been related to performance issues.
9      Q. Did you ever get any sort of disciplinary write
10 up while you were at BlackBerry?
11     A. I don't -- I don't recall.
12     Q. Well, to your knowledge, did you ever get any
13 sort of disciplinary write up?
14     A. No. I don't believe so. Disciplinary meaning
15 that the -- I wasn't performing well?
16     Q. I'll ask more specifically. Were you ever put
17 on a performance improvement plan?
18     A. Oh, absolutely not.
19     Q. Were you ever reprimanded formally for some of
20 your conduct? So, like a letter of reprimand, was that
21 ever put in your HR file?
22     A. I think -- so early on, yes.
23     Q. And when you were notified that you would be
24 leaving the company, were you told it was because you had
25 some sort of disciplinary issues?

Page 87

1      A. No. And I didn't have disciplinary issues. I
2  was basically -- I mean, the -- it was a situation where
3  an employee was basically trying to -- it was very early
4  on, my first six months with BlackBerry -- my screen just
5  went out -- and an employee was trying to avoid a bad
6  review.
7      And the claims were, I wrote a 60-page personal
8  reply to it, because the claims were bogus. It was just
9  a very obvious situation. This man did not want a bad
10 review. He knew he had not performed well and that I had
11 been covering for him. And I wasn't necessarily going to
12 give him a bad review, but I wasn't going to give him a
13 great review, and it was also, he was --
14     Q. I think we might need to take a tech pause. I
15 can't see your face anymore. Can others see
16 Ms. Dickman's screen? It's black to me.
17     Okay. Oh, you are back.
18     A. Yeah. That would be, I mean -- it would be very
19 odd to me if that had anything to do with it, because
20 John Chen himself told me not to worry about it, that
21 this was absolutely nothing, and that he understood the
22 situation.
23     Q. Do you feel as though the reason given for your
24 departure from the company was -- was the true motivating
25 factor for the company's decision?

Page 88

1      MS. BECK: Objection to the extent it calls for
2  a legal conclusion and for speculation.
3      MS. SCHOLAR: Join those objections. You can
4  answer.
5      THE WITNESS: What's the question again? I'm so
6  sorry.
7      MR. TARTAGLIO: Yeah. Could you read it out,
8  Ms. Pish?
9      (Thereafter, the requested testimony
10     was read by the court reporter.)
11     THE WITNESS: Only they would know.
12 BY MR. TARTAGLIO:
13     Q. Do you feel that you were fired as retaliation?
14     MS. SCHOLAR: Objection to extent it calls for
15 speculation and for a legal conclusion.
16     MS. BECK: Join.
17     MS. SCHOLAR: You can answer.
18     THE WITNESS: Only they would know.
19 BY MR. TARTAGLIO:
20     Q. Well, your attorney took the position that you
21 were fired as retaliation, correct?
22     THE WITNESS: Bri?
23     MS. SCHOLAR: You can answer that question based
24 on your knowledge of non-privileged communications, if
25 you can answer.

Page 89

1      THE WITNESS: I don't know.
2      MR. TARTAGLIO: Okay. Well --
3      MS. SCHOLAR: I'm sorry, this may be a good time
4  before you move on if you are going to show an exhibit,
5  to take a facilities break, and then I can fix the screen
6  issue as well.
7      MR. TARTAGLIO: All right. Let's take a quick
8  break.
9      THE VIDEOGRAPHER: We are now off the record.
10 The time is 11:27 a.m.
11     (Whereupon, a break was taken.)
12     THE VIDEOGRAPHER: We are now back on the
13 record. The time is 11:36 a.m.
14 BY MR. TARTAGLIO:
15     Q. I put Exhibit 9 into the chat.
16     (Thereafter, Plaintiff's Exhibit
17     Number 9 was marked for
18     identification.)
19     MR. TARTAGLIO: Please take a look at that.
20     THE WITNESS: Yes.
21 BY MR. TARTAGLIO:
22     Q. And for the record, this is a document that
23 states Confidential Separation Agreement and Release.
24     Even though it says it's confidential, I
25 downloaded it from the BlackBerry website. It was part

DEPONENT: MARJORIE DICKMAN
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

September 11, 2025

Page 102

1     a – it was a rough situation.
2         But this is, I mean, if I – if I may, this
3     is – like I said at the beginning, this is my first
4     deposition. And this is just – I would rather be at the
5     dentist.
6         This is antithetical to – sorry to break up a
7     little here – to everything that I am. You know, I
8     never talk about my prior company, including BlackBerry,
9     in any way but positively in public.
10        I talk about Mr. Giamatteo positively in public,
11    as I would any prior employer, any, you know, prior
12    manager. Any prior colleague, you know, and I'm sorry if
13    I'm getting emotional. This is incredibly uncomfortable
14    for me, because this is completely opposite to the person
15    who I am. So just – sorry.
16        MS. SCHOLAR: Why don't we take a break.
17        THE WITNESS: Yeah.
18        MR. TARTAGLIO: Okay. Let's take a break.
19        THE VIDEOGRAPHER: We are now off the record.
20    The time is 11:59 a.m.
21        (Whereupon, a break was taken.)
22        THE VIDEOGRAPHER: We are now back on the
23    record. The time is 12:10 p.m.
24    BY MR. TARTAGLIO:
25        Q. Ms. Dickman, I want to try to zoom in on what it

Page 103

1     is specifically you told Giamatteo about – Mr. Giamatteo
2     – about feeling marginalized in the C-suite. So please,
3     if you can, try to let us know what specifically you told
4     him along those lines.
5         MS. BECK: Object to form.
6         MS. SCHOLAR: Object to the extent it
7     mischaracterizes the record. You can answer.
8         THE WITNESS: What I told – what I told him?
9     BY MR. TARTAGLIO:
10        Q. Yeah.
11        A. I told him that I wanted to – that I wanted to
12    be a part of the team. I wanted to contribute everything
13    I could to BlackBerry, and I didn't feel like my skills
14    were being leveraged anymore to the extent that I could
15    contribute. And I, you know, I felt like an outsider. I
16    felt like I was being – I wasn't being valued as part of
17    the team.
18        Q. Did you – well, strike that.
19        Sorry. One second.
20        And at that time, who were the women that were
21    in the C-suite?
22        A. Myself and the CHRO.
23        Q. And the CHRO, that's the chief human resources
24    officer?
25        A. Yes.

Page 104

1         Q. And that was someone who Mr. Giamatteo knew from
2     before he came over to BlackBerry?
3         A. Yeah. A long time.
4         MS. BECK: Object to foundation.
5     BY MR. TARTAGLIO:
6         Q. Okay. So, at the time you had this conversation
7     with Mr. Giamatteo, the only women in the C-suite were
8     yourself and the human resources officer, who he knew
9     before joining BlackBerry.
10        Is that all accurate?
11        A. Yes.
12        Q. Did you tell Mr. Giamatteo that you felt as
13    though you were not fitting in because you were a woman?
14        A. I don't believe it was based – that I referred
15    to being a woman.
16        Q. Do you feel that you were marginalized because
17    you are a woman?
18        A. I'd be speculating as to what was in his head.
19        Q. But I'm asking for your opinion.
20        Do you feel like you are marginalized because
21    you are not a man?
22        A. I'd be speculating. I don't know.
23        Q. About how much time elapsed – well, strike
24    that.
25        So, when you told this to Mr. Giamatteo about

Page 105

1     feeling like you were not fitting in, was that one
2     conversation or was that multiple conversations?
3         A. There was one conversation.
4         Q. And –
5         A. You know, to try and kind of continue trying.
6     And it was – it was after a second ELT business trip, I
7     think within a few weeks of that, I raised it with him.
8         Q. And so about how much time elapsed between the
9     conversation with Mr. Giamatteo in which you said you
10    felt like you were not fitting in, and you were told that
11    you were going to be terminated from the company?
12        A. Less than a year. Prob- – I mean, I don't
13    know, somewhere between six – I want to guess around six
14    months'ish.
15        Q. We looked earlier at an exhibit showing that you
16    had an interview with some lawyers from Morrison
17    Foerster, correct?
18        A. Yes, sir.
19        Q. And you told Morrison Foerster, among other
20    things, that you thought BlackBerry was a pretty
21    challenging place for women; is that right?
22        A. Yes, sir.
23        Q. Did anyone at the company ever indicate to you
24    that they knew that you had told the Morrison Foerster
25    investigators that BlackBerry was a challenging place to

Page 106

1 work for women?
2    A. I'm trying to think. If they did, I don't
3 recall anything specific. I don't recall it right now.
4    Q. Did you ever receive any indication that your
5 discussion with MoFo about BlackBerry having a
6 challenging culture for women, did you receive any
7 indication that that contributed to your being fired?
8    MS. SCHOLAR: Objection to the extent that it's
9 vague. You can answer.
10    THE WITNESS: I – no. They didn't tell me
11 that's the reason.
12 BY MR. TARTAGLIO:
13    Q. And are you able to tell me what John Giamatteo
14 was thinking when he decided to fire you?
15    MS. SCHOLAR: Objection to the extent it calls
16 for speculation and to form.
17    MS. BECK: Joined.
18    MS. SCHOLAR: You can answer the question.
19    THE WITNESS: I would surmise – I don't think
20 it had anything to do with the – if it was his mind,
21 with the MoFo interview, because I didn't say anything
22 negative about him in the MoFo interview. So, I wouldn't
23 imagine that he would choose to fire me because of the
24 MoFo interview.
25    MR. TARTAGLIO: You did tell MoFo that

Page 107

1 BlackBerry had a challenging culture for women, though,
2 correct?
3    THE WITNESS: Yes. But I also supported him.
4 Prior to him becoming CEO, I said positive things about
5 him in that same interview.
6 BY MR. TARTAGLIO:
7    Q. Can you rule out the possibility that John
8 Giamatteo decided to fire you because you had told the
9 MoFo investigators that BlackBerry had a –
10    MS. BECK: Objection, calls for speculation.
11 Argumentative. And form, sorry.
12    MS. SCHOLAR: I join those objections.
13    MR. TARTAGLIO: Can you rule out that
14 possibility?
15    THE WITNESS: I guess not.
16 BY MR. TARTAGLIO:
17    Q. Can you rule out the possibility that John
18 Giamatteo fired you because you had a conversation with
19 him in which you said you felt like you were not fitting
20 in with the other executives?
21    A. I wouldn't say –
22    MS. SCHOLAR: I'm sorry, Lauren was speaking,
23 and if Lauren wasn't, I was going to, so you go ahead,
24 Lauren.
25    MS. BECK: Same objections.

Page 108

1    MS. SCHOLAR: Here as well. You can answer.
2    THE WITNESS: And what was the question again?
3 Sorry. I got – with the objections, I forgot the
4 question.
5    MR. TARTAGLIO: Can you rule out the possibility
6 that John Giamatteo fired you because you had told him
7 you felt like you were not fitting in with the other
8 executives?
9    THE WITNESS: Yeah. And I don't think – it
10 wasn't not fitting in, it was – it was, like, that
11 wouldn't be the word I would use. It was, you know, they
12 had their click, and, you know. It – it sounds very odd
13 at a C-suite level, but – and, you know, the click was
14 not open.
15    Did I rule it out? I can't rule anything out.
16 I'd say that would be more likely because it was reaction
17 to that was not – was an overreaction. I think that
18 would be more likely than the MoFo interview that
19 occurred, you know, way prior to that. I have no idea.
20    You are asking me to, you know – what was in
21 his mind. I don't know what was in his mind.
22 BY MR. TARTAGLIO:
23    Q. And the click that existed around John
24 Giamatteo, were there any women in the click besides the
25 human resources officer?

Page 109

1    A. No.
2    Q. So the only woman in the click was the human
3 resources officer?
4    A. Yes. At the time I was there. But there was an
5 interesting move that did not, you know, that did not
6 escape my, you know – a couple weeks before I was let
7 go, he switched out his chief of staff essentially, to a
8 woman.
9    Q. Do you recall her name?
10    A. Which would effectively keep – if you call
11 that – her a member of the C-suite, that would
12 effectively, if I'm gone, he still keeps the same number
13 of women in the C-suite.
14    I can't remember her name. I mean, it was two
15 weeks, or, you know, it was very close to my end.
16    Q. And if his chief of staff had not become a
17 woman, then after you left, the only female officer in
18 the C-suite would have been the HR officer, correct?
19    A. Yeah, and she still was the only –
20    MS. SCHOLAR: Object to the extent it's been
21 asked and answered.
22    THE WITNESS: Yeah. The CHRO was the only
23 female officer in the C-suite after I left. I don't know
24 if that's the case now, or if, you know, I assume it is,
25 but I don't know.

Page 122

1    Q. No one from BlackBerry told you how to testify?
2    A. Correct.
3    Q. And you and I have never met, true?
4    A. No.
5    Q. I want to speed through a few of the issues and
6    documents that plaintiff showed you. I will – I will
7    try to be efficient, but some things I do want to cover
8    to make sure the record is clear.
9       If we could start, please, with the exhibit
10   plaintiff entered as Exhibit 8.
11   A. Okay. Bear with me. I just have to open it.
12   Q. No problem.
13   A. Okay. It's open.
14   Q. You were interviewed by investigators from
15   Morrison & Foerster in November 2023; is that right?
16   A. Yes.
17   Q. And you testified today that the summaries you
18   reviewed from this report with plaintiff's counsel were
19   accurate to your knowledge; is that right?
20   A. Correct. As to the time period, as to the date
21   of the interview.
22   Q. If I could take you, please, to the fourth page.
23   A. Bear with me, please. Okay.
24   Q. This is a paragraph we looked at with
25   plaintiff's counsel.

Page 123

1    Do you remember that?
2    A. Yes.
3    Q. And it says here that you were peers with Mr.
4    Giamatteo in 2023?
5    A. Yes.
6    Q. Was that true?
7    A. Yes.
8    Q. And at the time you spoke with Morrison
9    Foerster, you'd worked as a peer with Mr. Giamatteo for
10   approximately two years; is that right?
11   A. I don't recall when he started.
12   Q. I can represent to you that he joined BlackBerry
13   in October 2021. Any reason to dispute that?
14   A. No.
15   Q. So fair to say when you were giving these
16   answers to Morrison Foerster, you had worked with a peer
17   with John Giamatteo for approximately two years?
18   A. I was his peer. We would be – we'd worked
19   together, yeah. Not tons, but we worked together.
20   Q. During that two-year period, you attended staff
21   meetings with Mr. Giamatteo?
22   A. Yes. I would be virtual, he would sometimes be
23   virtual, and sometimes live.
24   Q. And it says here that you told the investigators
25   that you never observed Mr. Giamatteo treat women

Page 124

1    differently than men, right?
2    A. Yeah. And what I was referring to, and I
3    remember this specifically, is I talked to them about a
4    dinner soon after he joined the company, where there were
5    both women and men at the dinner, and I didn't see him
6    treat women differently than men.
7    Q. You also told investigators that you'd never
8    heard anyone complain about Mr. Giamatteo; is that right?
9    A. Correct. But, again, it's important, as the
10   same way as it was with Ms. Sandhu, to have context here.
11      I was in Washington, D.C., they were – they
12   were in San Ramon or, you know – I was not physically,
13   you know, in the same place as these people but a handful
14   of times.
15   Q. Fair enough. But – but was it true, sort of
16   with those caveats, that in the two years you worked
17   together, you never heard anyone complain about Mr.
18   Giamatteo?
19   A. If I said that, it's true. I mean – and I tend
20   not to engage in, you know, gossip stuff anyway, so I
21   wouldn't be someone to hear that.
22   Q. Fair enough. It says here that you told them
23   that you had a good working relationship with John
24   Giamatteo.
25      Do you see that?

Page 125

1    A. Yeah, we did. I mean, we – you know, a good
2    working relationship, like we got, you know, we were
3    professional. Colleagues.
4    Q. So that was true?
5    A. Correct.
6    Q. You talked this morning, and it's reflected here
7    about – about the fact that BlackBerry had a difficult
8    culture for women in your view; is that right?
9    A. Yes. Stemming from women being
10   underrepresented, you know, in the C-suite, and then it
11   kinda falls, you know, when women are underrepresented in
12   the C-suite it tends to, you know, have cascading
13   effects.
14   Q. And you talked about that with the Morrison
15   Foerster investigators?
16   A. True.
17   Q. It says here that you believed those issues had
18   nothing to do with Mr. Giamatteo.
19      Do you see that? It's the last sentence in the
20   paragraph.
21   A. Correct. Correct.
22   Q. Was that true? Was your view that BlackBerry
23   had a challenging culture for women, but – but that
24   wasn't to do with Mr. Giamatteo, at the time of this
25   interview?

Page 126

1    A. I mean, to put it in perspective, he and I, you
2    know, we didn't work together a lot at the time. We
3    worked together much more after, or, you know,
4    communicated more after he became CEO.
5        If that is what I said, it is, it was my true
6    belief at the time, yes.
7    Q. I think you testified earlier that -- that you
8    only said positive things about Mr. Giamatteo during this
9    interview with Morrison Forester.
10       Did I hear you right? Is that your testimony?
11   A. Yes. Yes. And I -- I mean, yeah. And I was
12   well aware at the time as well, that, or had a gut
13   feeling, that he would be the next CEO, so I would be
14   quite stupid to -- and that Mr. Lynch wanted him to be
15   the next CEO.
16       So, you know, number one at that time, all of
17   this is true. And so, yes. It -- at the time, all of
18   this is true.
19   Q. Plaintiff's counsel asked you a number of
20   questions, and I'll return to this again, but about
21   retaliation.
22       Do you remember -- do you remember that in
23   general?
24   A. Yes.
25   Q. Sitting here today, do you have any any specific

Page 127

1    reason to believe that Mr. Giamatteo fired you for
2    participating in the Morrison Foerster investigation?
3        MS. SCHOLAR: Objection to the extent it calls
4    for speculation.
5        THE WITNESS: Do I --
6        MS. SCHOLAR: You can answer.
7        THE WITNESS: I don't know.
8    BY MS. BECK:
9    Q. Sorry, I just don't hear you. Did you say no
10   or I don't know?
11   A. I don't know.
12   Q. Can you -- can you think of any specific facts
13   that would lead you to conclude that or not, as you sit
14   here today?
15   A. Yeah, as I answered Mr. Tartaglio, I would think
16   no. This is surmise. It's guessing. But I would think
17   no, because I didn't say anything negative about him in
18   that interview.
19   Q. And fair to say there's nothing -- there's
20   nothing sort of non-guessing, no hard facts that make you
21   think that's what happened?
22   A. No one has told me that is what happened. This
23   is the first time it was suggested that, to me, that that
24   interview could have anything to do with why I was
25   terminated, like --

Page 128

1    Q. Okay. If we could go, please, in the same
2    document, to page 15.
3    A. Wait, you want to go back to exhibit -- bear
4    with me, please.
5    Q. Is it easier for you, Ms. Dickman --
6    A. No, no, this works out just fine. It works just
7    fine. Just let me get to page. Okay. I'm there.
8    Q. And this is another paragraph you discussed with
9    plaintiff's counsel.
10       Do you remember that?
11   A. Yes.
12   Q. And I think you agreed generally with the
13   statements attributed to you here; is that right?
14   A. Yes.
15   Q. This morning plaintiff's counsel asked you if
16   Morrison & Foerster investigators asked you about
17   Ms. Sandhu in the interview.
18       Do you remember plaintiff's counsel asking you
19   that?
20   A. Yes.
21   Q. And I think you testified that you could only
22   speculate.
23       Did I get your testimony correct?
24   A. Right. I wasn't -- I -- I believe, I mean, this
25   is all going back awhile, you know. I think what I said

Page 129

1    is -- or I think his question was something, did you know
2    that this, that Ms. Sandhu had filed the complaint? And
3    my answer was that they either told me directly, or I
4    surmised it from the questions they were asking.
5    Meaning, they were asking me questions about Ms. Sandhu.
6    Q. Sorry. I understood your testimony this morning
7    that you didn't remember. You didn't have a real memory
8    one way or the other whether they asked about Ms. Sandhu.
9        Do I have that right or I misheard you?
10       MS. SCHOLAR: Objection to the extent it
11   mischaracterizes the record. You can answer.
12       THE WITNESS: Did they ask me about Ms. Sandhu?
13   I think so. I don't -- I think so. I can't say
14   a hundred percent.
15   BY MS. BECK:
16   Q. Okay. Sounds like not confident either way. Is
17   that fair?
18   A. I believe they -- I believe they did. I'd go
19   back to -- they either inferred it was about Ms. Sandhu,
20   or they, or that she had filed the complaint, or they
21   asked me questions about her directly.
22       I can guess they asked me questions about her
23   directly, which is, like I said this morning, was why I,
24   when I'm answering this question, that I -- I speak about
25   her.

Page 130

1   Q. I see. Okay. I don't want you to guess, so
2   I'll keep moving.
3      I wouldn't have raised her name out of the blue.
4   Q. Got it. Okay. I want to walk through some of
5   the statements here.
6      You talked this morning about there being few
7   women in upper management at BlackBerry. Do you remember
8   that?
9   A. Yes.
10  Q. And I think you testified that this is somewhat
11  common in the tech industry. Did I get that right?
12  A. No.
13  Q. No?
14  A. That's not necessarily true. I mean, you see
15  tech female CEO's, you see, you know – a lot has changed
16  over the years I have been in tech.
17  Q. You talked with plaintiff's counsel about
18  another sentence here which references an award that
19  would have been celebrated at her last job, but at
20  BlackBerry there's been almost no acknowledgement.
21     Do you remember that conversation?
22  A. I don't remember what the award was.
23  Q. So, I wanted to see if we could refresh on that.
24     So – so the paragraph here says, "She mentioned
25  that she had recently won an award that would have

Page 131

1   been" –
2   A. Yeah, so it could either be –
3      (Court reporter clarification.)
4   MS. BECK: Oh, I'm sorry.
5      I said that – I don't know if I can do it
6   verbatim, but I said – effectively what I meant to say
7   was that the paragraph says, "she mentioned that she
8   recently won an award that would have been celebrated at
9   her last job," and I was emphasizing "recently".
10     Sorry, that was not a good – should I just
11  re-ask the question? Sorry about that.
12     (Court Reporter admonition to the witness.)
13  MS. BECK: Should we strike that and start over?
14     (Court reporter response.)
15  BY MS. BECK:
16  Q. So if you look here, Ms. Dickman, it says, "She
17  mentioned that she recently won an award that would have
18  been celebrated at her last job."
19     Do you see that?
20  A. Uh-huh. Yes.
21  Q. So this would have been a recent award,
22  according to this document from November 2023, right?
23  A. Yes.
24  Q. Do you remember any other awards that,
25  significant awards you won during this time, the November

Page 132

1   timeframe?
2   A. It could have been. I don't remember exactly.
3   These came out, the awards in the fall, top lobbyist, you
4   know, in the nation. I don't remember when top women in
5   tech came out. I don't remember. It was probably – it,
6   you know – I don't know.
7   Q. Fair enough. I don't want you to speculate.
8      Let's go please, to Plaintiff's Exhibit 6. Let
9   me know when you are there.
10  A. Oh, Exhibit 6, not page 6. Hold on. Yes.
11  Q. This is another document you discussed with
12  plaintiff's counsel this morning, correct?
13  A. Yes.
14  Q. And this is an e-mail from mid-November 2023,
15  right?
16  A. Yes.
17  Q. So, same month in which you spoke to the
18  Morrison & Foerster investigators?
19  A. Yes.
20  Q. And here you told Dick Lynch that you received
21  the top 100 most powerful women in Canada award, and you
22  highlight that you think the award matters for women,
23  right?
24  A. Yeah. It's about women. Yeah. And more
25  importantly, it matters, like, in the last exhibit when

Page 133

1   you, I was saying we celebrated my prior company, because
2   it's not – it's an award for the individual, but it's
3   really an award that elevates the company's brand.
4   These – you know, all of these types of things.
5   Q. And it sounds like you were ultimately able to
6   use it that way, correct? To elevate other women, not
7   just yourself.
8   A. Yes. Yes.
9   Q. And here you're, I think, flagging the
10  opportunity for Mr. Lynch. You say, "Opportunity to
11  leverage this free advertising to the fullest extent to
12  attract and retain women. However, CMO did not do press
13  release, X unit Waterloo press releases, or even
14  congratulatory social media post, effectively negating
15  one BlackBerry team."
16     Do you see that?
17  A. Yes.
18  Q. You testified earlier that CMO here refers to
19  Ms. Sandhu; is that right?
20  A. Yes.
21  Q. So you were highlighting to Mr. Lynch in this
22  e-mail that Ms. Sandhu declined to issue a press release
23  about the award, right?
24  A. Yes. And it's not that – the most important
25  thing for me, I remember, it wasn't necessarily the press

Page 134

1  release. She put out, I do recall, she put out a lot of
2  press releases about herself, and, you know, or – what
3  was most important to me here, was the – was using it
4  to, you know, elevate other women and give them an
5  opportunity to feel important and have BlackBerry make
6  them feel important.
7      Q. This was an opportunity to sort of promote women
8  across the board at the company. Fair?
9      A. Oh, yeah. Fair.
10     Q. You say here in this part I just read,
11  "effectively negates/one BlackBerry team."
12         What did you mean by that?
13     A. If you, you know – one BlackBerry, which was,
14  you know, a thing that people used at the time, one
15  BlackBerry, meaning we're one team. We should all, you
16  know, when we win awards, it's – I don't look at awards
17  about the individual, I look at awards about, like,
18  elevating BlackBerry, and, you know, the one BlackBerry
19  team. It's our recognition together, right?
20         You know, Executive A could win an award,
21  Executive B could win an award, but really what it's
22  about is bringing, elevating, you know, the BlackBerry
23  team. It's elevating the BlackBerry brand.
24     Q. And you felt that Ms. Sandhu was sort of missing
25  or blocking an opportunity to do that; is that right?

Page 135

1      A. Yes.
2      Q. And in this e-mail chain you ask Mr. Lynch to
3  support buying a table at the event, right?
4      A. Yes.
5      Q. You were sort of turning to Mr. Lynch here to
6  resolve the issue with Ms. Sandhu. Is that fair?
7      A. Not so much to resolve it, but I needed approval
8  from a manager. The way that I think that was at the
9  time, or the way, you know, first I'm, you know, asking
10  to take employees offsite, you know, out of work for you,
11  you know, what it would be a day or, you know, half a day.
12         And then, secondly, it's, you know, MAP approval
13  was so low at that time for executives that you had to
14  go – I mean, even senior executives like myself had to
15  go to your manager for things –
16     Q. So –
17     A. – as small as this. So I needed his – he was
18  the interim CEO, I needed his approval/ that's why I say
19  at the end, "Dick, may I have your approval to proceed?"
20     Q. Got it. And he did approve, correct?
21     A. Correct.
22     Q. Does this – does looking back at this change
23  your sense of whether this is the award you were talking
24  about when you talked about the recent award in
25  November –

Page 136

1      A. No. No.
2      Q. Fair enough.
3      A. No. No. I mean, I think, you know, my
4  sentiment there was, you know, regularly with awards, you
5  know. They weren't – it was just weird to me. I
6  was – we, you know, the company, you know, I'd see
7  things, you know, people post, you know, other – you
8  know, the company will post other people's awards. And
9  we had to even ask, like, hey, can BlackBerry jump on
10  this? It was just weird.
11         It was just, you almost felt bad for,
12  honestly – it was, I almost felt bad for winning an
13  award. It was – it's just weird. I – not – the exact
14  opposite of what I experienced at my prior company.
15     Q. Let's take a look – that's probably a good
16  segue. Let's take a look at Exhibit 7, please.
17  Plaintiff's Exhibit 7.
18     A. Yes.
19     Q. So, way at the bottom of the chain, the first
20  e-mails discuss some back and forth about the table for
21  the event, right?
22     A. Let me read this.
23     Q. Yeah, take your time.
24     A. Yes.
25     Q. And then Neelam, Ms. Sandhu writes to Mr. Lynch

Page 137

1  about whether, effectively, it's – it's still happening.
2         Do you see that?
3      A. Yeah. I mean, and so that first one you are
4  asking me about, I believe Shack, maybe Kristi worked for
5  her, and Sherry was the CEO of the entity that gave out
6  the award.
7      Q. Uh-huh.
8      A. Oh, no. The WXN, it's women's something
9  network. So that woman Karen is saying, I'm sorry,
10  Sherry the CEO of WXN and I won't be able to meet you, so
11  they have basically told her no it sounds like.
12     Q. And Mr. Lynch replies to Neelam on this chain,
13  I'm looking halfway down page 4, an e-mail of Monday,
14  November 20th.
15         Let me know when you are there.
16     A. Okay.
17     Q. He says, "Neelam, no change in direction from
18  me. I think this is a great idea for messaging to our
19  women."
20         And at the bottom he says – and he says, "Would
21  you coordinate further with Marjorie, please?" And he
22  CC's you into the chain.
23         Do you see all that?
24     A. Yes.
25     Q. And then you reply the next message up.

Page 138

1   A. Gotcha.
2   Q. And in the third paragraph you say, "This is the
3   first I'm hearing that marketing inquired about table."
4      Do you remember how long this was before the
5   event?
6   A. Very soon before the event. I want to say a
7   week.
8   Q. So it sounds fast for something like this.
9   A. Oh, very. I mean, but I had asked for it, you
10  know, multiple times prior to that. I didn't wait until
11  the last week. It was just this became urgent because it
12  was no, no, and then it got to -- I think the event was
13  November 30th and December 1.
14  Q. And you are saying sort of, marketing basically
15  is only just telling you about -- about it a week out?
16  A. Oh, no. Marketing -- the first I'm hearing from
17  marketing, so I was -- after Dick told Neelam to get the
18  table, it wasn't conveyed to me that they had asked for
19  the table.
20     This is what I'm reading and what I'm saying
21  here, that they had even spoken to WXN about a table
22  after Dick, you know, had instructed her. It was no, no,
23  then I asked Dick for approval. He instructed her to do
24  it. And, but it wasn't communicated to me that after he
25  instructed her to do it, she had reached out, you know,

Page 139

1   or her team had reached out to inquire about a table.
2   Q. So you didn't hear any confirmation from
3   Ms. Sandhu's team until very soon before the event, that
4   it was actually coming up?
5   A. Oh, yeah, yeah, yeah. It became this very
6   last -- an unnecessarily last-minute thing.
7   Q. So this e-mail chain goes on, and I want to skip
8   up to a paragraph that plaintiff's counsel focused you
9   on.
10     This is on the first page. It's the bottom
11  paragraph of your e-mail. Let me know when you are
12  there.
13  A. Okay. Just bear with me. Okay.
14  Q. This is the one where you say, "This is just a
15  taste of why it is so difficult to try to do the right
16  thing for employees in our brand, and often not worth the
17  squeeze. Situations like this, instead of being a
18  positive moment for Blackberry that we can leverage for
19  our employees and the company, are made painful to
20  execute. A straightforward simple ask/action is
21  unreasonably made to divert leadership time away from
22  work, costing the company money, and creating a hostile
23  work environment. Why I rarely ask."
24     See that?
25  A. Uh-huh.

Page 140

1   Q. You talked with plaintiff's counsel this morning
2   about the line "painful to execute".
3      Do you remember that?
4   A. Yes.
5   Q. Did you feel that Ms. Sandhu's marketing team
6   had made the experience around the award painful to
7   execute?
8   A. Yes. And at Ms. Sandhu's direction. I mean, it
9   wasn't her team making the decision, it was her.
10  Q. Got it. So -- so in this case, Ms. Sandhu had
11  made the experience painful to execute.
12  A. Yes.
13  Q. And you also talked with plaintiff's counsel
14  about this language about a hostile work environment.
15     Do you remember that?
16  A. Yes.
17  Q. And you -- was your view that the way Ms. Sandhu
18  handle this situation made it hostile?
19  A. I believe that's what I was referring to. And
20  again, I don't know that I was using that, or I wasn't
21  using that a legal term. I was using it in the, this
22  is super frustrating. I'm spending an unreasonable
23  amount of time trying to do this for the women of
24  BlackBerry, and I am -- I can read it in the e-mail -- I
25  am super frustrated.

Page 141

1   Q. Did you feel that Ms. Sandhu in this instance,
2   was sort of standing in the way of recognizing women at
3   BlackBerry?
4   A. Yes. Or -- yes. Me as a woman at BlackBerry,
5   yes.
6      And then the other -- but more importantly, yes.
7   The, you know, the up-and-coming women at BlackBerry that
8   would be able to take part in this event.
9   Q. Forgive me if I asked you this earlier.
10     Did you feel that you had Mr. Lynch's support in
11  pursuing this event?
12  A. Ultimately, yes.
13  Q. Did you feel that Mr. Lynch recognized that it
14  was a good opportunity to build up women at BlackBerry?
15     MS. SCHOLAR: Objection to the extent it calls
16  for speculation. You can answer.
17     THE WITNESS: I can only answer to what he says
18  in his e-mail.
19  BY MS. BECK:
20  Q. Did you feel what he said, was --
21  A. It was -- oh, no, that's not 3:56 p.m.
22  there's an e-mail he referenced to me before where he
23  said he thought it was a good thing.
24  Q. We can keep moving. I should ask, I have lost
25  track of time. If you want a break at any point,

Page 142

1  Ms. Dickman, we can do that.
2      A. Sure.
3      Q. Okay. If we could go please, to plaintiff's
4  Exhibit 5. This is another e-mail chain --
5      A. Yes.
6      Q. -- you had talked about with plaintiff's
7  counsel.
8      Do you remember that?
9      A. Yes.
10     Q. If we go to the very bottom, please.
11     A. Yes.
12     Q. The first e-mail here is from you to Ms. Sandhu
13  on May 25, 2023, right?
14     A. Yes.
15     Q. You say, "Congratulations again on SSC contract.
16  Fantastic move. Congrats. I'm reaching out to clear up
17  any potential misunderstandings regarding ITB," and it
18  goes on, correct?
19     A. Yes.
20     Q. And so you start off by congratulating
21  Ms. Sandhu?
22     A. Yes.
23     Q. Pretty courteous e-mail, right? From you?
24     A. Yes. I'm trying to deescalate the situation.
25     Q. And Ms. Sandhu writes back, and she says, "Hi,

Page 143

1  Marjorie. Thanks for your e-mail, but there isn't any
2  confusion on this from me or my team. I think the issue
3  is the ITB team's hesitation to collaborate with my
4  team."
5      And she ends the e-mail with, "I would recommend
6  you can pick up the phone to me if you have a question in
7  the future, rather than a CEO escalation as a first step.
8  Thanks for your collaboration."
9      You're laughing. Why are you laughing?
10     A. It's just -- it's not a friendly e-mail. It's
11  very -- it's very passive aggressive. It's frustrating,
12  right? You are trying to deescalate a situation, you
13  have employees that are upset because they are hearing
14  that a project is being taken away, and so I, you know,
15  the first thing I need to do, you know, is calm the
16  employees, tell them not to, you know, just please wait.
17     As I testified to this morning, please wait.
18  Let me get the facts. Well, where am I going to get the
19  facts? Mr. Chen is in charge, right? He's my -- right?
20  If Neelam is the one telling them that a project has been
21  taken away from me that Mr. Chen gave me, then Mr. Chen,
22  as the person that assigned me the project two years ago
23  or two and a half years ago, is the appropriate person to
24  ask, as my manager also as well, did you take this
25  project away from me and from my team and this team that

Page 144

1  I'm overseeing?
2      So, it's -- you know, it's -- there is a --
3  it's -- it's -- her e-mail is deflection and it's kind of
4  turning the facts on their head.
5      Q. And a little hostile. Is that fair?
6      A. Not friendly. I mean, definitely not what I was
7  trying to do in my e-mail, which was to start friendly
8  and to give her the benefit of the doubt, you know, with
9  potential misunderstanding and all of that.
10     Q. Were you surprised by the tone of this e-mail?
11     A. Yes and no. I mean, yes in, it's just not
12  appropriately professional; and no in, she had tried to
13  take -- she had tried to take this project, you know,
14  that -- away. It's -- and no communication to me.
15     I mean, I had no idea even prior, like, my staff
16  is calling me that her and Mr. Giamatteo and so it would
17  be Steve Ray and John Chen had -- and I don't know who
18  else, or if there were other, had divided up, you know,
19  you know, customers differently at that point. So I
20  wasn't involved in that, so this was all news to me. And
21  I'm just trying to get the facts, and trying to, you
22  know, keep everyone calm, and just, you know, figure out
23  the right -- resolve it, and figure out the right
24  solution for BlackBerry so we can just move forward.
25     Q. And it sounds like you're concerned here,

Page 145

1  because this is sort of a land grab from Ms. Sandhu; is
2  that fair?
3      A. My concern wouldn't be that it's a land grab, my
4  concern would be that -- yeah, yeah. The concern -- I'm
5  not territorial, so I don't really -- but if someone's
6  taking a project away, you know, I'd like to know about
7  it, like, you know, to know why.
8      Q. So, Mr. Chen -- oh sorry.
9      A. I'm sorry, go ahead. Please.
10     Q. So Mr. Chen replies the next e-mail up, "ITB is
11  not part of Elite."
12     Do you see that?
13     A. Yes.
14     Q. And there's some more replies, and then there's
15  one from Ms. Sandhu back to Mr. Ray and Mr. Chen that
16  drops you from the chain.
17     Do you see that?
18     A. Yes.
19     Q. And then Steve Ray forwards the whole chain back
20  to you.
21     A. Professional.
22     Q. After you have been dropped. And then you reply
23  subsequent to that.
24     Do you agree with all that?
25     A. I see that, yes.

Page 146

1  Q. And you say, "Responses to you and me are
2  disappointing."
3  A. Where is that?
4  Q. In the first paragraph -- in the first kind of
5  big paragraph here in your e-mail.
6  A. Well, I -- real quick. Yes, I see that.
7  Q. And disappointing, is that -- is that referring
8  back to some of what you were talking about a minute ago?
9  A. Yes. Everything below this. Yeah. How her
10  response was really the opposite of my outreach.
11     And I was directed by Mr. Chen, by the way,
12  after I inquired, you know, what is happening here and
13  why is my staff hearing this? He directed me to send the
14  e-mail to her and CC him and Mr. Ray. I was following
15  direction.
16  Q. You say later in the sentence, "As it appears
17  intent was, in fact, for Elite to take over ITB, as well
18  as get in the way of GA and PP, Heidi and BUs from doing
19  jobs. This is antithetical to MAP, as you note, and BB's
20  best interest."
21     So, sort of, I think this is similar to,
22  maybe similar to what you have been saying, but if you
23  had to sort of crystalize very quickly what you meant by
24  that, can you explain?
25  A. I think I crystalized it better here than I did,

Page 147

1  you know, a few seconds ago. It's exactly what I was
2  saying. So when you called it a land grab, yeah, I did
3  feel -- yeah, they were -- land grab or trying to take
4  over, I think.
5     So it was a positive project that created
6  opportunity for the company, we're two, two and a half
7  years in, and, yeah, she was trying to take it over.
8  That's the facts that came out. She was trying to take
9  it over. And it had been a collaboration that I had been
10  overseeing between my organization, GAPP, Heidi, and the
11  BUs from doing their jobs.
12     The other thing that staff were upset about is,
13  so, CANSEC is related to ITB -- it's the Canadian
14  security something. It's Canadian defense-related
15  conference.
16     And so, we're ITB, right? Our people would be
17  discussing ITB with defense contractors. And I learned
18  that day from -- that Neelam had told people -- I don't
19  know if they were, you know, in the Cyber Business Unit,
20  that they should not -- they should not -- that she own
21  -- she was the one who controlled the invites for CANSEC,
22  and they should no longer attend.
23  Q. So Ms. Sandhu's team -- I'm just trying to make
24  sure I understand -- Ms. Sandhu's team was trying to
25  block people from the Cyber BU team from attending the

Page 148

1  CANSEC conference.
2     Is that your testimony?
3  A. Yeah. I -- one of the gentlemen that I remember
4  specifically was David, a VP. He's based out of
5  Virginia. Don't remember his last name. And there were
6  others.
7  Q. You said at the top of this e-mail in the
8  paragraph we just looked at that all this was
9  antithetical to BlackBerry's best interest, right?
10  A. Sure. Yeah.
11  Q. You believed that?
12  A. Yes.
13  Q. And at the very bottom e-mail from you, you have
14  a paragraph that says "bottom line".
15     Do you see that?
16  A. Okay. Good thing I put "bottom line" after this
17  long of an e-mail.
18     Must be able to operate fairly consistent with
19  MAP.
20     Yes, ma'am.
21  Q. One thing you say here is, "The Elite team
22  prevents people from participating at events like CANSEC,
23  harms BB's ability to win business."
24     Do you see that?
25  A. Yes.

Page 149

1  Q. What did you mean by that?
2  A. So, just what I said before. That the defense
3  contractors are at that event, and the defense
4  contractors are the ones that, as I explained with ITB,
5  if any defense contractor -- non-Canadian contractor --
6  gets a defense contract with the Canadian government, say
7  it's for a hundred million or billion dollars, they have
8  to then turn around and spend that hundred million or
9  billion dollars with Canadian companies. I mean, at a
10  high level. That explains.
11     So, BlackBerry being a Canadian company, if we
12  or certain sales people are not able to attend these
13  events in collaboration with the government affairs
14  team -- because government affairs is not sales, it is
15  government relations. If these people are not able to
16  attend, then it harms BlackBerry's ability to win
17  business with these defense contractors.
18  Q. Makes sense.
19     Did you feel here that Ms. Sandhu was creating
20  unnecessary conflict?
21  A. Yes.
22  Q. I know you testified earlier that you worked
23  with Ms. Sandhu a relatively limited amount of times; is
24  that right?
25  A. Yes.

Page 150

1    Q. Did you feel, when you did work with Ms. Sandhu,
2    that – that she, that she was difficult to work with?
3        MS. SCHOLAR: Objection to the extent it's been
4    asked and answered. You can answer.
5        THE WITNESS: I think what we're seeing today is
6    probably the, a good representation of the amount. I
7    probably, I mean, close to maybe, you know, all.
8        Well, I worked with her very rarely. This is
9    probably a good representation of it.
10   BY MS. BECK:
11       Q. And the two instances we have looked at both
12   involved sort of unnecessary conflict and friction.
13   Would you agree?
14       A. Yes.
15       Q. Would it be fair to say that the majority of
16   times you worked with Ms. Sandhu there was unnecessary
17   conflict and friction?
18       A. Just frustrating. Yeah. It is just – it just
19   wasn't easy. Things that should be easy, weren't easy.
20       Q. Is your assessment that Ms. Sandhu created
21   unnecessary conflict at work, influenced at all by the
22   fact that Ms. Sandhu was a woman or a person of color?
23       A. No. I think there are just sometimes people
24   that, you know – no. The answer is no.
25       Q. And I take it your assessment that Ms. Sandhu

Page 151

1    was difficult, or didn't make things easy when you worked
2    with her, also was not influenced by the fact that
3    Ms. Sandhu was a woman or a person of color. Is that
4    fair?
5        A. Can you say that – can you say that again?
6    Sorry.
7        Q. I'll put it in a – strike that.
8        Is your assessment that Ms. Sandhu was difficult
9    to work with, influenced by the fact that Ms. Sandhu was
10   a woman or a person of color?
11       A. No.
12       Q. Okay. Let's, if we can, go back, please, to
13   Plaintiff's Exhibit 8.
14       MS. SCHOLAR: Lauren, if you wouldn't mind, can
15   we – there's been too many breaks – a facilities break,
16   would you mind taking one? Unless you have got
17   20 minutes or less worth of questioning, then we can go
18   through.
19       THE WITNESS: Yeah, let's just go.
20       MS. SCHOLAR: Well, actually, I need to take a
21   break.
22       MS. BECK: A break works great. Happy to.
23       MS. SCHOLAR: Five minutes. Be back at 4:35?
24       MS. BECK: Sure. Okay.
25       THE VIDEOGRAPHER: We are now off the record.

Page 152

1    The time is 1:30 p.m.
2        (Whereupon, a break was taken.)
3        THE VIDEOGRAPHER: We are now back on the
4    record. The time is 1:35 p.m.
5    BY MS. BECK:
6        Q. Welcome back, Ms. Dickman. I'm going to try to
7    get through this as fast as I possibly can. I know it's
8    a long day.
9        If I could take you back, please, to Exhibit 8,
10   Plaintiff Exhibit 8.
11       A. Yes.
12       Q. And if you could flip, please, to page 15.
13       A. Yes.
14       Q. You discussed the paragraph here at some length
15   with plaintiff's counsel this morning, right?
16       A. Yes.
17       Q. I wanted to ask you just a few things here.
18       It says in the paragraph that you reported that
19   Ms. Sandhu had received more preferential treatment than
20   anyone, man or woman, at BlackBerry, correct?
21       A. Yes.
22       Q. Was that true when you said it? Did you believe
23   that Ms. Sandhu had received more preferential treatment
24   than anyone else at BlackBerry, regardless of gender?
25       A. Yes. It was rare to see a new title, someone

Page 153

1    receive a new title every year. Yeah. That's just one
2    example. And she – she was very close with Mr. Chen.
3        Q. You also talked about, with plaintiff's counsel,
4    this line at the end, "Dickman also describes Sandhu as
5    somebody who is untrustworthy, hostile, and negatively
6    impacts the culture of the company." Right?
7        A. Yeah. I think the prior exhibit that you
8    raised, examples that you raised, suggests my state of
9    thought, why I would say that.
10       Q. This was your view at the time, in other words.
11       A. Yeah. I'd say based on the ITB example, and
12   the – the, you know, gala example, wanting to bring the
13   nine up-and-coming, you know, BlackBerry women, and that
14   being so difficult.
15       Q. And your opinion that Ms. Sandhu was
16   untrustworthy, hostile, and negatively impacted the
17   culture of the company, that was not influenced by the
18   fact that Ms. Sandhu was a woman or a person of color,
19   correct?
20       A. No. A man could be untrustworthy, hostile, and
21   negatively impact the culture of the company.
22       Q. It was based on her behavior, in other words.
23       A. Yes. Based on those – at the time, I'd say
24   those two examples were fresh in my mind, as examples.
25   The ITB example and the, you know, the example of wanting

Page 154

1    to bring up-and-coming women at BlackBerry, you know --
2    give women an opportunity to go to a women's gala.
3        Q. I'd like to take you, please, quickly to
4    Plaintiff's Exhibit Number 2.
5        A. Okay. One second, please. Fudge. I'm sorry.
6        Bri, can you -- I pushed something. The tab
7    isn't closing. Oh, okay. Okay.
8        Q. And you testified about these messages this
9    morning, right?
10       A. Yes.
11       Q. And these are messages with -- with Mr. de Boer?
12       A. Yes.
13       Q. If you scroll to page 3 --
14       A. 3. Bear with me. Yes.
15       Q. There's a message on the left hand side, top,
16   says, "FYI, I keep getting calls from senior reps in GOC
17   who are confused about purpose of meetings Neelam is
18   booking. They are asking me what the agenda is. I'm
19   trying to manage in best way possible for BlackBerry."
20       Do you see that?
21       A. Yes.
22       Q. This message is from you to Mr. de Boer?
23       A. No. That's from him to me.
24       Q. I see. Okay. Thank you. And GOC here, does
25   that refer to the Government of Canada?

1        A. Yes.
2        Q. And your team was the Government Affairs Team?
3        A. Yes.
4        Q. And part of your team's role was to manage the
5    relationship with --
6        A. Yes.
7        Q. -- the Government of Canada?
8        A. Yes. And other governments around the world.
9        Q. And this message is saying that Ms. Sandhu
10   booked meetings with senior people at the Government of
11   Canada without coordinating with your team; is that
12   right?
13       A. Yes. That seems to be what -- what he is
14   saying. Yes.
15       Q. Was -- and you say, "Er" --
16       A. That's frustration. Okay.
17       Q. You say "Er, we'll try to raise this again
18   organically tomorrow," right?
19       A. Yeah.
20       Q. So this is something you -- you have to follow
21   up on.
22       A. Yes. And I don't want to write -- he tends to
23   complain, so, again, he was the one that complained
24   also -- I need to get the facts.
25       Q. And part of what Mr. de Boer is reporting to you

Page 156

1    here, is that BlackBerry's clients are confused by this.
2    Is that fair?
3        A. Yes. It's -- it's best practice in -- and this
4    is the reason why you have a niche government, you know,
5    that you have a government affairs team.
6        Just like it's frustrating, you know, when, you
7    know, if you or I were to call a company and they move
8    you from one person to the next to the next. Like,
9    governments need to have one point of contact. It makes
10   us easy for them to work with, and that is what you want
11   to be.
12       Q. Would it be fair to say this is sort of another
13   example of Ms. Sandhu encroaching into the role of your
14   team?
15       A. So, this one's -- yes. It -- this one's a
16   little unclear. So, yes -- yes and possibly no. And
17   that's why I am trying to figure out from him what's
18   going on here. Like, who was she meeting with? Are
19   these any political or elected officials, right? Because
20   there's a distinction between a political official and a
21   bureaucrat.
22       He whinges, has a tendency to whinge. So, I'm
23   trying to get the facts here.
24       So she, I believe, is -- so at the time, I
25   believe the government of Canada, it -- don't quote me on

Page 157

1    this -- but was a customer under her purview. Meaning
2    that the, for example, procurement. Sales procurement
3    are under her purview. But engaging -- but engaging on
4    anything beyond that is not.
5        And also not -- in Canada, you know, it's a --
6    it's -- you know -- that's why I asked for the
7    bureaucrats or are they politically-appointed.
8        Politically-appointed is very clear, that's
9    government affairs. Bureaucrats in Canada can be both
10   government affairs or -- it's not like in the U.S., where
11   there are many politically-appointed.
12       There -- so they can be either, you know, either
13   purview in Canada. And that's why I'm saying, you know,
14   what's -- he kinda tells me things I already know. Like,
15   in Canada we have, you know, few politically -- I know
16   all this.
17       But -- but it's -- so what's the question? So I
18   just -- basically bottom line, like, I am trying to get
19   the facts from him, and then say, here, send her a
20   friendly e-mail. Write this. Because I don't want him
21   causing drama, I just want him to say, hey, this is
22   happening, can we talk about it?
23       Q. I want to ask you just a sort of yes or no, if
24   you'll permit me. Yes or no, do you remember how this
25   shook out and how it got resolved? It's fine.

Page 158

1  A. No. No.
2  Q. Okay. Then I will -- then I will move on.
3     Earlier this morning you testified about a
4  dinner at which a member of Mr. Giamatteo's staff yelled
5  at a waiter.
6     Do you remember that conversation?
7  A. Yes.
8  Q. I just want to ask you two really simple
9  questions about this, just to sort of make the -- make
10 the record clear.
11    I think you testified that the waiter was a man;
12 is that right?
13 A. I recall -- pretty sure.
14 Q. And you also testified, I believe, that -- that
15 Mr. Giamatteo wasn't doing any yelling, that was someone
16 else; is that right?
17 A. Yes.
18 Q. You also said this morning, plaintiffs asked you
19 about a statement in the Morrison & Foerster
20 investigation report that -- that indicated that you had
21 been told that Ms. Sandhu used the ethic reporting tool
22 as a weapon.
23    Do you remember that discussion?
24 A. Yes.
25 Q. And I think -- I think you testified that

Page 159

1  someone had told you that when you joined BlackBerry.
2     Do I have that right?
3  A. Yes. Yeah, I remember -- I don't remember who.
4  I remember it was very -- because I was learning names,
5  but I remember it was very early on in my time with
6  BlackBerry.
7  Q. Were you being sort of warned about Ms. Sandhu
8  as you joined the company?
9  A. I don't know if I was being warned or if -- I --
10 I don't know.
11 Q. In either case, sounds like that conversation
12 would have been in early 2020; is that right?
13 A. Yeah.
14 Q. Okay. I want to talk about -- okay.
15    Plaintiff's counsel, this morning, asked you a
16 lot of questions about your severance agreement and your
17 severance payouts.
18    Do you remember that?
19 A. Yes.
20 Q. And I believe you estimated that you received a
21 severance package ultimately worth one -- maybe something
22 like $1.3 million?
23    Do I have that right?
24 A. He estimated that, yes.
25 Q. Does -- does -- does that sound like the right

Page 160

1  order of magnitude, something like a million dollars, to
2  your memory?
3  A. Yeah. Above a million. Yeah.
4  Q. You were entitled, under your employment
5  contract, to a certain amount of severance; is that
6  right?
7  A. Yes.
8  Q. Do you remember how much that was?
9  A. I do not.
10 Q. You testified this morning that you were a
11 C-suite executive at the time you were terminated, right?
12 A. Yes.
13 Q. And as a C-suite executive, BlackBerry reported
14 your compensation packages in its SEC filings, right?
15 A. Yeah. I don't know if was because I was a
16 C-suite executive or corporate officer. I don't know.
17 Q. In either case, your sort of stature with the
18 company was such that BlackBerry had report your
19 compensation, right?
20 A. I learned that today, yeah.
21 Q. I would like to, please, put a new exhibit in
22 the chat. I will mark this as Exhibit 11.
23    (Thereafter, Defendant's Exhibit
24    Number 11 was marked for
25    identification.)

Page 161

1     MS. BECK: Which says it's loading, which on my
2  end, which might take a second on yours.
3     THE WITNESS: What is this?
4     MS. BECK: If you go to the first page, you see
5  there's a slip sheet for a filing with the U.S.
6  Securities and Exchange Commission.
7     I will represent to you that this is
8  BlackBerry's proxy statement for a meeting on June 25,
9  2024.
10    THE WITNESS: Uh-huh.
11 BY MS. BECK:
12 Q. You can see that date on page 3.
13    Do you see that?
14 A. Uh-huh.
15 Q. If you go, please, to page 39.
16 A. 39. Bear with me, please.
17 Q. No problem.
18 A. Uh-huh.
19 Q. There is a summary, executive compensations
20 table.
21    Do you see that?
22 A. Uh-huh.
23 Q. It says, "The following table provides a summary
24 of the total compensation awarded to --"
25    (Court Reporter interjection.)

## Page 166

1   A. I was told that -- it was a very quick call. I
2   was told that my function was no longer needed at my
3   level.
4   Q. To your knowledge, has BlackBerry ever hired
5   someone to replace you as chief government affairs?
6   A. I haven't followed -- I put that behind me.
7   Haven't followed to look.
8   Q. To your knowledge, has BlackBerry hired any new
9   C-suite executive to manage government affairs or public
10  policy functions?
11  A. I don't know how BlackBerry's managing it now.
12  Q. But you would expect that person to also be
13  reported in BlackBerry's SEC filings if they existed,
14  right?
15  MS. SCHOLAR: Objection to the extent it calls
16  for speculation. You can answer.
17  THE WITNESS: What's the question? Would they
18  be reported? I --
19  MS. BECK: I can ask a better question.
20  THE WITNESS: This is beyond my -- I don't
21  follow BlackBerry's SEC filings, so, anymore, so...
22  BY MS. BECK:
23  Q. Your role at your level was reported by
24  requirement in BlackBerry's SEC filings, right?
25  A. I see it in BlackBerry's SEC filings that you

## Page 167

1   put in front of me.
2   Q. So if someone had replaced you at the same
3   level, you'd expect to see them in SEC filings, too,
4   right?
5   MS. SCHOLAR: Objection.
6   THE WITNESS: Yeah. Or -- or it could have been
7   transferred to someone who was already in the SEC
8   filings. I don't know.
9   BY MR. BECK:
10  Q. Fair enough.
11  A. I don't follow BlackBerry -- I think we're
12  getting beyond my, you know -- this is -- and I've
13  honestly just not been following what BlackBerry's been
14  doing.
15  Q. Very fair.
16  A. After I, you know -- this is six months ago
17  behind me.
18  Q. Very fair. So, fair to say you don't have any
19  reason to think -- you don't have any reason to think
20  that BlackBerry replaced you? You haven't been
21  following.
22  A. I haven't been following whether they replaced
23  me or whether they replaced me by moving it to someone
24  else in the C-suite. It's -- they could have done that,
25  I don't know.

## Page 168

1   Q. I think -- I think this may be the end of my
2   questions. But if we -- if everyone doesn't mind, if we
3   can just take a five-minute break so I can make sure I'm
4   not -- not missing anything.
5   MS. SCHOLAR: Sounds good.
6   THE VIDEOGRAPHER: We are now off the record.
7   The time is 2:01 p.m.
8   (Whereupon, a break was taken.)
9   THE VIDEOGRAPHER: We are now back on the
10  record. The time is 2:04 p.m.
11  MS. BECK: That's all the questions I have for
12  the moment, Ms. Dickman. Thank you.
13  MS. BOURN: Just really quickly.
14  EXAMINATION
15  BY MS. BOURN:
16  Q. Ms. Dickman, from what I understand your
17  testimony past Ms. Beck's asking you questions, is that
18  you had very little interactions with Ms. Sandhu; is that
19  right?
20  A. Yeah. Limited. I think you saw -- yeah,
21  examples of the limited interaction. Yeah.
22  Q. And those two limited interactions included two
23  exhibits that we looked at today?
24  A. Yes.
25  MS. BECK: Objection, misstates testimony.

## Page 169

1   BY MS. BOURN:
2   Q. And in your work, Ms. Neelam was working in
3   California and you were working in a different location;
4   is that right?
5   A. Yes, ma'am.
6   Q. And the interactions of the two of you would
7   have had would have been primarily documented in e-mails;
8   is that right?
9   A. Yeah. And those were probably the ones.
10  Q. So the extent is as to what you can testify to
11  as to who Neelam was as an employee and your experiences
12  with her are limited to two e-mails; is that about right?
13  A. Yeah.
14  MS. BECK: Objection, misstates testimony.
15  BY MS. BOURN:
16  Q. Yeah.
17  A. I mean, it's -- so, I also sat in staff meetings
18  with her. I was on video, you know, but we weren't in a,
19  you know -- but there were a lot of people there, and --
20  yeah.
21  Q. So you really don't have much experience working
22  with Ms. Sandhu, do you?
23  A. No. People in sales would have much more
24  experience.
25  MS. SCHOLAR: I apologize, I don't -- I believe

Page 186

1  think the record's clear, and – and hopefully we can let
2  Ms. Dickman go.
3       MS. BOURN:  Yeah.  Have a good evening,
4  Ms. Dickman.  Thank you.
5       MS. SCHOLAR:  The witness will read and sign.
6       Will I receive the contact information for
7  Ms. Pish so that I may reach out for a transcript or will
8  I receive automatic notification?
9       THE VIDEOGRAPHER:  I was going to get them on
10  the record, just a moment, and then I will ask for
11  everybody's – thank you.
12       Madam Court Reporter, would you like to get all
13  orders, including video requests, on the record?
14       MS. BOURN:  The plaintiff will take the
15  deposition and video, no rush.
16       MS. BECK:  Same for defendant, please, and
17  synced, please.
18       MS. SCHOLAR:  Yes.  Yes.  You asked for that,
19  and it completely slipped my mind, and I apologize.
20       THE VIDEOGRAPHER.  Thank you.
21       This concludes the video record of today's
22  deposition of Marjorie Dickman.  The original media of
23  this deposition will remain in the custody of Talty Court
24  Reporters, Incorporated, located in San Jose, California.
25       We're going off the record at 2:30 p.m.

Page 187

1       (Whereupon, the proceedings concluded.)
2       ---oOo---

Page 188

1  STATE OF CALIFORNIA  )
                        )  Ss.
2  COUNTY OF MARIPOSA  )
3       I, MYRA A. PISH, Certified Shorthand Reporter, in and
4  for the State of California, Certificate No. 11613, do hereby
5  certify:
6       That the witness in the foregoing remote deposition was
7  by me first duly sworn to testify to the truth, the whole
8  truth, and nothing but the truth in the foregoing cause; that
9  the deposition was taken before me at the time and place herein
10  named; that said deposition was reported by me, to the best of
11  my ability by machine shorthand, and transcribed through
12  computer-aided means, under my direction; and that the
13  foregoing transcript is a true record of the testimony elicited
14  at the proceedings had at said remote deposition.
15       I do further certify that I am a disinterested person
16  and am in no way interested in the outcome of this action or
17  connected with, or related to, any of the parties in this
18  action, or to their respective counsel.
19
20       DATED:   September 25, 2025
              MARIPOSA, CALIFORNIA
21
22
23
              MYRA A. PISH, CSR, RPR
24            Certificate No. 11613
25

Page 189

1       DECLARATION UNDER PENALTY OF PERJURY
2
3       I, Marjorie Dickman, do hereby certify under penalty of
4  perjury that I have read the foregoing transcript of my
5  deposition, taken on September 11, 2025, that I have made such
6  corrections as appear noted on the Deposition Errata Page,
7  attached hereto, signed by me; that my testimony as contained
8  herein, as corrected, is true and correct.
9
10       Dated this _____ day of _____, 2025, at
11  _____, California.
12
13
14       _____
15       MARJORIE DICKMAN

Page 190

1       DEPOSITION ERRATA SHEET

2

3       Page No. _____ Line No. _____ Change to: _____

4       _____

5       Reason for change: _____

6       Page No. _____ Line No. _____ Change to: _____

7       _____

8       Reason for change: _____

9       Page No. _____ Line No. _____ Change to: _____

10      _____

11      Reason for change: _____

12      Page No. _____ Line No. _____ Change to: _____

13      _____

14      Reason for change: _____

15      Page No. _____ Line No. _____ Change to: _____

16      _____

17      Reason for change: _____

18      Page No. _____ Line No. _____ Change to: _____

19      _____

20      Reason for change: _____

21      Signature: _____ Date: _____

22

23

        _____     _____

24

        MARJORIE DICKMAN              DATE

25