# EXHIBIT 44

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

NEELAM SANDHU,

CERTIFIED
TRANSCRIPT

       Plaintiff,

vs.           Case No:  24-cv-02002-SK

BLACKBERRY CORPORATION,
et al,

       Defendants.

_____/


VIDEO DEPOSITION OF
COLLEEN McMILLAN

FEBRUARY 24, 2025


9:05 a.m.

(Via Zoom)


Talty Court Reporters

2131 The Alameda, Suite D

San Jose, California 95126


Reported By:  Teresa C. Smith, CSR 13473

A P P E A R A N C E S:

FOR PLAINTIFF:   GOMERMAN BOURN & ASSOCIATES

                 BY:  ANTHONY TARTAGLIO, ESQ.

                 825 VAN NESS AVENUE, SUITE 502

                 SAN FRANCISCO, CALIFORNIA 94109

                 (415) 545-8608

                 tony@gobolaw.com


FOR DEFENDANT:   MUNGER, TOLLES & OLSON, LLP

                 BY:  LAUREN N. BECK, ESQ.

                 350 S. GRAND AVENUE, FLOOR 50

                 LOS ANGELES, CALIFORNIA 90071

                 (213) 683-9576

                 lauren.beck@mto.com


ALSO PRESENT:    MARGARET MAYO - BLACKBERRY

                 MATTHEW PEYTON - VIDEOGRAPHER

                 NEELAM SANDHU


--oOo--

INDEX OF EXAMINATION

Witness:                                            Page

  COLLEEN McMILLAN         (Sworn)

Examination by Mr. Tartaglio                          5

Examination by Ms. Beck                              56

Further Examination by Mr. Tartaglio                121

Witness' Signature                                  124

Witness' Corrections                                125

Certificate of Reporter                             126

INDEX OF EXHIBITS

No.        Description                              Page


EXH 1    Letter dated January 25, 2023               45

EXH 2    Email correspondence - June 2022            76

EXH 3    Email correspondence - June 2021            76

EXH 4    Email correspondence - November 2022        84

EXH 5    Email correspondence - December 2022        97

EXH 6    FY21 Year-End Performance Review

         (1 Mar 2020 - 28 Feb 2021)                 101

--oOo--

THE VIDEOGRAPHER:  We are going on the record at 9:05 a.m. on February 24th, 2025.  This is the video deposition of Colleen McMillan, taken by the Plaintiff in the matter of Neelam Sandhu versus BlackBerry Corporation, filed in the United States District Court for the Northern District of California.  Case Number 24-cv-02002-SK.

This deposition is being held via Zoom videoconference.  My name is Matthew Peyton, and the court reporter is Terrie Smith, CSR Number 13473, both from the firm Talty Court Reporters, Inc., with offices in San Jose, California.

Before we proceed, I will ask counsel to state their appearance and affiliation for the record, starting with the noticing attorney.

MR. TARTAGLIO:  For Plaintiff you have Anthony Tartaglio from the Gomerman Bourn Law Firm, and the Plaintiff herself is also observing today.

MS. BECK:  For Defendant you have Lauren Beck of Munger, Tolles & Olson.  I'm also joined by Margaret Mayo, who's in-house counsel for BlackBerry.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness and we may begin.

THE REPORTER:  Yes.  Just a correction.  My name is actually Teresa Smith, California CSR Number 13473.

If you'll raise your right hand for me, please.

COLLEEN McMILLAN,

called as a witness, being first duly sworn,

testified as follows:

THE REPORTER:  I think you're on mute, ma'am.

**THE WITNESS:  Yes.**

THE REPORTER:  Thank you.  Counselor?

EXAMINATION

BY MR. TARTAGLIO:

Q.  Good morning, Ms. McMillan.

**A.  Good morning, Anthony.**

Q.  Do you have a lawyer representing you for the purposes of the deposition today?

**A.  No.**

Q.  Okay.  I'm going to start off by giving an explanation for how this process works.  Okay?

**A.  That sounds good.**

Q.  So do you understand that the oath that you just took is similar to the oath that you would take if you testified in court?

**A.  Yes.**

Q.  Because we have a court reporter who's writing down what we're all saying, it's important that we try not to speak over each other and speak only one at a time.  Okay?



A.  (No response.)

Q.  Is that okay?

A.  Yes.

Q.  And you'll also need to make sure that your answers are verbal, even though in ordinary conversation you might nod your head or shrug your shoulders to respond to a question, here today you'll need to make sure that all of your answers are verbal.  Okay?

A.  Okay.

Q.  The court reporter might interrupt us from time to time or ask us to slow down or ask us to spell out a word.  That's all pretty common.  And I'm going to do my best to try and help the court reporter today, and hopefully you can too.  Okay?

A.  Okay.

Q.  If you have any questions today about one of my questions, for example if I ask a question that's unclear, you don't understand it, you think that I'm misunderstanding some aspect of your experience, let me know.

So in other words, if -- you don't have to take my question as-is if you think it's unclear, and I'll do my best to rephrase it.  Okay?

A.  Sounds good.

Q.  You might be provided with some exhibits today.

If that happens, it's your right as a witness to read the whole exhibit, even if the lawyer wants to ask about just one sentence or one paragraph.  I'm not anticipating a lot of documents today, but that -- that might come up.  And if it does, you should read the whole document if that's what you want to do.  Okay?

A.  Okay.

Q.  And -- and you'll need to respond to my -- to these instructions when I -- when I ask if you understand them.

A.  Okay.  Yes.

Q.  Yeah.  It's a bit artificial, this process, but I think you'll get used to it pretty quickly.

You can look to documents to help you answer questions.  Let's say you don't remember something but you think you have an email that might have the answer, that's fine.  You don't have to do that.  Some people, if they have a document at their fingertips, they'll look at that.

I will ask you, though, to do your best to try to testify from memory first before searching for any documents.  Okay?

A.  Okay.

Q.  You can -- well, strike that.

So you should provide an estimate if you have

grounds to estimate, but you should not speculate or guess.  And I'll give you a couple of examples.  So dates that happened two or three years ago, people almost never remember the exact date, but they might be able to estimate what year it happened or they might say, "Oh, that was the fall of 2022."  So if you can make an estimate like that, that's fine, and you should go ahead and do so.

Another estimate is that oftentimes people don't remember every word of a conversation that happened, but they remember the gist of it, kind of the high-level summary of it.  That's an estimate.  That's fine.  You should provide that.

Guessing and speculating, some common examples of that are what other people were thinking.  That would just be guessing because we can't read each other's minds.  And also, sometimes people, they say, "Well, I don't remember that meeting, but if there were a meeting, I would have said this or I would have said that."  That would -- that would most likely be speculation.

So if you have any questions about this distinction between estimation and speculation, you can ask me as we go through the deposition today.  Okay?

A.  Okay.

Q.  We can take breaks.  We will be taking breaks.

I normally go for about an hour between breaks, but if you need a break on a different schedule than that, that's no problem.  Just let me know and we'll take a break.  Okay?

A.  Do we know how long this will take today?

Q.  My guess, I think I'll be done within 90 minutes.  Opposing counsel for BlackBerry also wants to ask some questions, I think.  I don't know how long they had in mind, but I'm going to -- I'm going to do my best to get my questioning done quickly.

From time to time the counsel for BlackBerry might object to one of my questions, and when she starts asking questions, I might object to those.  The typical procedure for objections is this:  You should pause so that the lawyer can make the objection, and then once the objection is complete, you will go ahead and answer the question, unless you're instructed not to by one of the lawyers, which I think today would be unusual, but it happens.

And the reason we do it this way is that later on, the judge will review the objections if the case goes to trial.  So we're putting the objections on the record right now, but you're going to go ahead and answer the question anyway, unless one of the lawyers instructs you not to answer.



at BlackBerry?

A. So I -- I don't understand the question. Like, what -- what did she -- when we first talked, like what did she talk about her time at BlackBerry or the negative experiences specifically?

Q. Yes.

A. It centered around J -- John G. and her experiences with him and why she was frustrated and why she was upset how they let her go, you know, after her -- I think she had either complained about it or it was well-known or something. I don't know the details, but just that she was let go and seemed to be part of a behavior on John G.'s part of treating women differently than treating the male employees.

Q. And for the record, John G, is that John Giamatteo?

A. Yes.

MR. TARTAGLIO: G-I-A-M-A-T-T-E-O, I believe, for the court reporter.

BY MR. TARTAGLIO:

Q. Has anyone offered you anything of value for your testimony here today, other than the witness fee, which I think is $40?

A. No.

Q. Oh, by the way. Have you gotten the $40 witness

fee yet?

A. No.

Q. Okay. I'll -- I'll ask our paralegals to do that at the end of the deposition today. Do you stand to gain financially from this lawsuit one way or the other?

A. No.

Q. I'm going to ask a few questions about your educational background now. Do you have a high school degree or GED equivalent?

A. Yes.

Q. Did you attend college anywhere?

A. Yes.

Q. And where did you attend college?

A. Florida State.

Q. And did you obtain a degree from Florida State University?

A. Yes. Undergrad and graduate.

Q. And what was your undergrad degree in?

A. Business.

Q. And what about your graduate degree?

A. Master's of Business.

Q. Other than getting the Master's in Business, have you done any other post-graduate coursework?

A. No.

Q. I'm going to ask a bit about your professional

background now, and I'll try to keep it to the relevant timeline. I'm not going to go all the way back to the time you were flipping burgers in high school or whatever. So are you working now?

A. No.

Q. And what was the last job that you had?

A. BlackBerry.

Q. And when did you leave BlackBerry?

A. In February -- I thought it was February. Maybe it was January. Let me look. January 6th, 2023.

Q. And how long had you been at BlackBerry?

A. A few (phonetic) years. I'd have to look at my LinkedIn official date. Almost three years, I think, but I can get you that. 2023. I started at BlackBerry, let's see. So about three years.

Q. And did you have the same job title for your entire time at BlackBerry?

A. Yes, I did.

Q. What was that job title?

A. Worldwide VP Channel Sales Programs and Alliances.

Q. I'm sure your job encompassed many, many different things, but at a high level, how would you describe your job at BlackBerry?

A. I was responsible for building a channel team to

help develop partnerships and drive sales through the channel so that we ultimately drove revenue across the globe.

Q. And before BlackBerry, where did you work?

A. Before BlackBerry, I was at F5, worldwide vice president, global channel and alliance sales.

Q. How long were you at F5?

A. Just over a year.

Q. And were you at a different company before F5?

A. Yes. I was at Gemalto. I was there for three years.

Q. And at any of your companies that you worked at before BlackBerry, did you ever work with John Giamatteo?

A. No.

Q. I'm going to ask now why you left BlackBerry, and if you don't want to answer this question, I'm not going to force the issue. So if you're -- if you feel comfortable saying that, that's fine; but if you don't feel comfortable, I'm not going to force you to answer this question.

So my question is, why did you leave BlackBerry at the beginning of 2023?

A. John G. decided they did not need my role anymore. They laid me off.

Q. And how -- how do you know that John Giamatteo



A.  Yes, John G.  This is who I was talking with, John G., you know.  I brought this to his attention and pushed -- I pushed hard on this.  And I also, you know, pushed hard on why were the two gentlemen that were in similar global roles, their -- their roles weren't reduced.  The whole excuse was, We're moving from a global to in theater (phonetic) region.  Why did Alex's role not change.  Why did Kevin Easterwood's not change.  Why was it only the women on the team.  And you know, I got very agitated, and he disagreed with me on the whole, you know, ████ thing; but I felt like as a company, we were doing the wrong thing and the men were getting paid differently.

And when I look at the men he brought in and now, you know, looking at their -- their experiences, I don't know what they were paid, but it would be interesting to see based on -- on the quota they were carrying and how much they were paid against people carrying much bigger quotas.  But I, of course, don't have all the data points on that.  I can only speak to the one on my team that we tried to fix it, had HR support at different levels, and he denied it.

Q.  And so when you were laid off, was that around the same time that John Giamatteo became CEO?

A.  No.  It was before he did.

Q.  About how much time do you think elapsed, if you -- well, I guess --

(Simultaneous crosstalk.)

THE WITNESS:  -- right.  So January 6th through whatever.  So I don't know when it was official.  I know when it was announced.  I know -- but I did try to speak up for myself.  I did try to look after myself, and I'm certain that did not probably help me; otherwise, I mean, I'm basically in a similar situation as Neelam.

BY MR. TARTAGLIO:

Q.  And were you told who made the decision to eliminate your position?

MS. BECK:  Objection.  Vague.

BY MR. TARTAGLIO:

Q.  It looks like --

A.  Say that again.

Q.  Yeah.  Were you told who made the decision to lay you off from BlackBerry?

A.  John G.

Q.  And did he say that it was his decision?

A.  He did.

Q.  And I'm sure -- well, strike that.

And at the time that you were laid off, were you -- were you busy?  Did you have enough work to sustain your -- your position?

A.  Yes.  We had doubled the deal registrations from 7 percent to 14 percent in the Americas.  We were growing OEM business.  We, you know, had challenges even -- you know, we were growing, but given the challenges of some of the product issues we were having like MSSEs, we were adding partners.  We were making progress.

When you look at the metrics, my small team was doing more per head count than, let's say, Tash's team and the VP of Asia he brought over or -- or other people in terms of net new business.  So that's what's concerning.

I mean, sales is a very metric driven business, and you see what other people are doing, what are they building, you know.  They weren't growing the business.  Adam Intracan (phonetic), you know, every quarter and quarter of the business was contracting in different areas.  You know, it just seemed like people weren't treated the same across the board.

Q.  And I'm sure opposing counsel is going to object to this, so you'll want to pause and let her make the objection.

Do you feel as though your termination was related to the fact you had been raising complaints about the way the women were treated at BlackBerry?

A.  Absolutely.

MS. BECK:  Objection.

THE WITNESS:  I'm, sorry.  He just told me that.

MS. BECK:  Go ahead.

THE WITNESS:  That was an easy one though, so I had to say it.

MR. TARTAGLIO:  Okay.  And what are the grounds for the objection?

MS. BECK:  Misstates testimony.  Assumes facts, and foundation.

BY MR. TARTAGLIO:

Q.  And -- and why did you come to that conclusion, Ms. McMillan?

A.  Can I answer?

Q.  Yes.

A.  Because I tried to stand up for myself in telling them what we needed for the business.  You know, what we need to do to fix the -- the -- the MSSP business or what we needed -- you know, why were -- why was my role being diminished and other people's weren't.

I mean, these are very honest questions that you should be able to ask your manager about, and he took offense to some of them.  I don't know.  Maybe he didn't like me.  Maybe -- you know, but I never -- I never had a conversation with him around poor work performance.  So that was not the case.



Q. Did anyone at BlackBerry -- did anyone at BlackBerry ever tell you that your performance was unacceptable and needed to be brought up to par?

A. No. But after I left, it was interesting because all my employees went to help justify other people. So like John D. had no direct reports, brought in no revenue, probably a very high paid resource, like his personal consultants; and some of my staff then reported to him. He'd never managed a global channel. He never managed some of that.

So it's interesting when your role and you have been hired and you have the experience to do this is then parsed out to people to manage that they're not -- they've never done that before or they didn't care about those charts in the business.

I talked to my employees after I left and where they all went to different things and, you know, they all got parsed out to a man.

Q. You mentioned that -- I think the word you used was "good 'ole boy" kind of environment. Can you provide some examples of -- of that?

A. So when John G. first started and he hired Tom Fusco, VP of Americas, Tom Fusco did a presentation to get -- for everyone to get to know him. He has a slide deck. It has a picture of Eva Longoria on it. And he

says, "Oh, yeah, just so you guys know, this is, you know, my hall pass. If I ever -- or my wife's given me a hall pass on -- on if I, I guess, want to go cheat or whatever." I don't know. It was the weirdest thing. Like why would you put that in your slide deck, like, to let people get to know you. That appeared kind of offensive.

We had a meeting in BlackBerry up in Canada and very good 'ole boys. So Tash and John Murphy and JD, you know, the drinking and the stupid jokes and, you know, just, you know, talking about the good 'ole days. I guess they used to run wild around, you know, from their McAfee days. I don't know. But it brought a whole different culture element to it. It was not as professional. There were innuendos, lots of jokes like in the QBR like after that sitcom The Office. Like you'd add -- you'd say something and then like, "Oh, that's what she said." It's kind of like an innuendo, and that happened frequently.

When we're in the -- the office, whether -- you know, because we did have some on -- on-site meetings both in California and -- and the Canada office. And you'd hear stories, too, like when John -- JD is going all the way from Australia to travel with J -- John G. you know, you just kind of hear some of the stories and

what they're talking about and all of that. There -- there was an element there that really isn't necessary in the workplace or appropriate.

Q. And did John Giamatteo -- well, strike that.

Did you ever observe John Giamatteo personally participate in this -- in this sort of innuendo or banter or --

A. Yes.

Q. Okay. And what do you recall of that?

A. Like they would make these jokes. Like I said, comments or inappropriate things. And what struck me as odd is when he introduced himself, he mentions, "Oh, I married my high school sweetheart. I have three daughters. I have this" -- you know. So that -- that's kind of at odds with how he presents himself but then how he acts. And -- and just -- just like we'll be on sales forecast calls and they would make comments or something -- it just comes up. I don't know how -- how they do it so easily. Comments would come up.

█████████ you know, he -- he's a good example, too. Kind of had -- there's -- we did a -- what was it. We were preparing for the sales kickoff and everyone's doing a Zoom call, and he has a picture in his office, a painting of women kind of half nude, half robed, half unrobed, half -- and so several women are on the call. I

think someone from HR was on the call. ████ was on the call. I was on the call. Some men. ████ And we had to do the call again or try to do the call again or blurry it out because it's just not appropriate background. It -- so stuff like that all, you know, happened.

Q. Did -- did you ever work with Neelam Sandhu at BlackBerry?

A. We had a couple of email exchanges. Maybe a conference call here and there about a partner they brought over, but no, not direct day-to-day interactions.

Q. Do you consider yourself to be a friend of Neelam's?

A. A colleague.

Q. And did you ever socialize with her outside of work?

A. No. In fact, I've never met her in person.

Q. Did you -- okay. During the -- the time that you worked with her, what was your overall impression of what it was like to work with her?

A. Our interactions were -- were few. She was trying to do her job; I'm trying to do my job. I believe she was highly respected. Like I said, I -- we -- we didn't work actually together.

Q. Did you have any interactions with her in which



you thought that she acted unprofessionally?

A. In what way?

Q. Did you consider -- well, did you have any interactions with her in which you thought she was unduly harsh or critical?

A. I don't think unduly harsh or critical would come to mind. We worked on one thing with a -- a partner where she added a partner and I didn't know about it and I felt like there's a process that we had to go through, but it wasn't unduly or harsh and, you know, tried to let her know what my team and I were trying to do and shared that with her.

Q. Did -- did Neelam have a reputation at BlackBerry of being someone who's difficult to work with?

A. I think there was a little bit of that in that I did hear from some folks that Neelam would get involved in things they did not consider to be within her -- her range of her work or that things bypassed them and they didn't get to see it. Like maybe she was trying to close something and didn't share it with someone else until it was after the fact.

Q. And in terms of her personality, did she have a reputation for having a personality that was difficult to work with?

A. I don't know because I never -- I never met her,

like even in person. I only have an, you know, email interaction. I think we talked on the phone direct maybe once. Other times we're on calls with a group of people.

Q. And so we -- we spoke earlier about a discussion you had with John Giamatteo about some of the women that you thought were having their roles diminished. Is that fair to say?

A. Yes.

Q. Did you ever have any other conversations in person or electronically with John Giamatteo in which you expressed concerns about how BlackBerry was treating women?

A. Yeah. So this -- that conversation was the conversation around my employee who was not being paid in the same manner as the men.

Q. And -- and those were two separate conversations?

A. Two separate conversations. I also had a conversation with him in terms of getting backfills and resources, why I was not being given the same support in terms of head count, or if an employee left, why I could not backfill it on a business that was, you know, previously been told we could. The resources went to one of his colleagues.

Q. And I'm a little unfamiliar about some of the

nuances of the business world, so what -- what was it about the backfill and the resources that -- that implicated -- that implicated gender-type issues?

A. Well, it was just -- it -- it wasn't so much gender, it was just that why if I'm an employee reporting to him, why are other people on the team getting greater number of resources if when you look at the numbers and the different things, mine would justify having the backfill versus their team. And --

Q. Okay.

A. -- ultimately it's his decision, right, where to place resources. So if I'm getting less resources than people who are carrying a far smaller number or smaller scope or whatever, mathematically it doesn't work out.

Like if you take -- you know, if you're just objective about it, other than he has a relationship with these people that happen to be men, right. So, like, why -- why are you not putting the resources when we're carrying more than our fair share of the load.

Q. And the other folks who were getting disproportionately large number of resources compared to the revenue that they were driving, were they all men?

A. Yes.

Q. Have you ever spoken Richard Lynch? Dick Lynch?

A. I don't know him.

Q. What -- what was your -- what's your understanding of the elite team at BlackBerry?

A. Just that they worked with the top level of accounts. And since I was more partner -- focused on the partners, I -- I didn't really have much interaction with the elite team.

Q. Did you sense any tension between the elite team and the other business units within BlackBerry?

MS. BECK: Objection. Foundation.

BY MR. TARTAGLIO:

Q. You can go ahead and answer if you know.

A. I wasn't privy to that.

Q. Do you feel as though you were compensated fairly when compared to the other men that BlackBerry -- well, compared to the men at BlackBerry who were performing work that was substantially similar to your work?

A. That's what I don't know.

MS. BECK: Objection. Lacks foundation.

THE WITNESS: Sorry.

MR. TARTAGLIO: Can you make the objection again? I didn't hear it.

MS. BECK: Yeah. Foundation. Personal knowledge.

///



BY MR. TARTAGLIO:

Q. You can go ahead and answer.

A. It would be great to know, you know, especially with the people he brought over, what their compensation was compared with mine. I had a lot more at risk. I believe I was in 60/40. I don't know what they were, but it -- I would be interesting to see because they were brought over, one was as a VP and a GM title and it was a very small part of the business he was responsible for. So it would be interesting to see their pay against me and the other women who have now left the company.

Q. Were you -- well, strike that.

Did anyone ever -- strike that.

Did you ever participate in any formal complaints [sic] that was made to BlackBerry about the way women were treated at BlackBerry, by which --

(Simultaneous crosstalk.)

BY MR. TARTAGLIO:

Q. Yeah. By which I mean submitting something to HR, that sort of thing?

A. I had confided to HR, yes, on the -- the ███ pay discrepancy. I had talked to HR about, you know, the role being changed. Unfortunately, there was not much that the woman, Mary Slimmon, could do. She had a boss that reported to John G., and, you know, it didn't

go anywhere. I don't know if it was considered a formal complaint. I -- I didn't, like, fill out a form and say this is a formal complaint, but I -- I did share my concerns with HR. And I believe HR saw that at different levels that this was not correct. And even that HR person's left the company now.

Q. And who is the HR person you spoke with?

A. Mary Slimmon.

Q. Do you know who -- well, strike that.

Do you know if someone replaced you within the same role that you had at the company after you left?

A. I don't believe so, but as I mentioned earlier, all parts of my role were divided up, and they were reporting to different parts of the business, whether or not those gentlemen had the experience in supporting that.

So part of the team went to John D. in Australia, which didn't make sense. Part of the global piece went to Adam, who did Americas and Japan, but he was in Europe. Part of it went to, you know, different pieces and parts but all to the -- the gentlemen on his team.

Q. Was there a -- a difference in the demographic makeup of the people that were hired after John Giamatteo joined versus beforehand? And to be more specific, did

John Giamatteo seem to hire more men than his predecessor?

MS. BECK: Objection. Foundation.

THE WITNESS: I can just share my experience with you. In working with Tom Eacobacci, he hired Neily, he hired me, he hired Scott Henderson, he promoted Erin. There was much more of a diverse hiring; whereas, John G. was very specifically hiring. And the people I -- I mentioned were -- were all men. I -- I don't know if he went out to just hire men or if that's -- if that was the result.

So yes, there was a -- seemed to be an attitude of more male-oriented leadership on his team than women. And the women that were on his team, he reduced their roles and they ultimately all left either by them or their own actions.

BY MR. TARTAGLIO:

Q. Did you notice any difference in the way that promotions were provided to men and women after John Giamatteo came with the company?

MS. BECK: Objection.

THE WITNESS: Yes.

MS. BECK: Foundation.

BY MR. TARTAGLIO:

Q. Okay. And what did you notice about that?

A. Yeah. So, you know, ███ kind of got demoted and ended up leaving. Kevin Easterwood got promoted. JD got promoted, got more -- so yeah. So the very fact that they took away parts of our jobs to give them to the men, then they get promotions because they have more responsibilities I mean, there was a -- a very persistent, pervasive, whatever the word is, pattern. It's hard to ignore.

Q. Do you know what -- well, strike that.

Do you know who Ed Baker is?

A. I don't think so. Can you refresh my memory and --

Q. He may have been someone who has worked at BlackBerry at some point. I don't -- I'm more interested in seeing what you know than what I know.

A. Okay. I -- I -- I -- I -- maybe I -- I don't recall. I don't think I know him.

Q. Okay. Do you -- do you know if -- who goes by the Twitter name Nerdy Tech Gal?

A. I have no idea.

Q. Can you think of any other women at BlackBerry who had experiences similar to yours with John Giamatteo that I might reach out to speak with?

A. I would suggest you speak with ███ speaking with me. I don't know ███. I know her role was



reduced. She eventually left on her own. I already
mentioned Mary, right. There was very few women
executives already, but the ones that were there pretty
much left. Maybe they have new ones. I don't know.
I --

Q. Okay. And ███████ would be -- do you know her
last name?

A. ████████████

Q. ███████

A. I think so. She lasted longer than most of us.
But she was part of the group that when they changed the
roles and responsibilities, her folks had to then report
in to the regions making her team, like, half the size.

Q. And you mentioned Mary. Do you remember her
last name?

A. Slimmons [sic], S-L-I-M-M-O-N-S, I think. She's
in Canada.

Q. And other than the conversation with Neelam
after she was notified that she was being let go, did you
ever talk with Neelam about her experiences with John
Giamatteo?

A. Only like after, you know, she -- she just left.

Q. Did you ever speak with ████████████ And I
guess we can do spellings during the break or something.
Did you ever speak with ██████████ about her

experiences with John Giamatteo?

A. I don't know who that is.

Q. Did you ever speak with ██████████████ about
her experiences with John Giamatteo?

A. I don't know who that is.

Q. Did you ever speak with ██████████ about her
experiences with John Giamatteo?

A. We talked about our roles and -- and
frustrations with that. I did talk with her about my
experiences. She did talk with me about her experiences,
how frustrated she was to, you know, be a valued employee
and now she's reporting to a VP. And she was supposed to
possibly transition to, like, a chief of staff role and
-- and didn't hear anything for a while, so it was more
around that.

And we talked about, like, at ████████████ you
know, because we're all on that call. There's, you know,
these naked women on a Zoom call, right? So we -- we did
talk about some of our common experiences.

Q. Did you ever speak with ██████████ about John
Giamatteo?

A. I don't know who that is.

Q. Did you ever speak with ██████████ about John
Giamatteo?

A. I don't think I know what that is.

Q. Did you ever speak with ██████████ (phonetic)
about her experience with John Giamatteo?

A. I don't know who that is.

MR. TARTAGLIO: Okay. We have been going about
an hour, so let's -- let's go ahead and take a break
here, come back at 10:15, if that works for people.

THE WITNESS: Okay. Great.

THE VIDEOGRAPHER: Off the record at 10:04 a.m.

(A recess transpired.)

THE VIDEOGRAPHER: Back on the record at 10:24
a.m.

MR. TARTAGLIO: Okay. During the break, the
witness provided a letter. I'm going to ask now if
the -- if the witness and opposing counsel would object
to making this an exhibit.

So Ms. McMillan, do you object to turning this
document into an exhibit to your deposition?

THE WITNESS: No, because I -- it's basically
the same things I shared here.

MR. TARTAGLIO: And what about you, Ms. Beck,
any objections?

MS. BECK: No objection.

MR. TARTAGLIO: Okay. I'll put it in the chat
then. And this will be Exhibit 1. It might take a
couple of seconds to come through.

(Exhibit Number 1 was marked.)

BY MR. TARTAGLIO:

Q. And so Ms. McMillan, what is, at high level,
what is Exhibit 1?

A. It was after I was laid off, I was considering
what I needed to do to try to, you know, take care of
myself in terms of the situation because I definitely
felt like it was a form of -- of, you know, being
discriminated against or retaliation for complaining
about different things in terms of how I had been treated
as a woman, and so I hired a lawyer to help me draft a
letter to document that to see how I could get BlackBerry
to work with me, since obviously finding a job at the
same level and when you're, you know, older in age, too,
it can take some time.

So documented it and sent to them and it was
very challenging trying to work with BlackBerry on it.
And I considered suing, but it just -- I had too many
other things in my life going on with my husband's health
that I couldn't do it.

Q. And I want to ask a little bit now about this
Background of the Claim information. Do you see this
part, or Background of the Claim section?

A. Let me open it again. Are you talking about the
document itself?



here for; that's how -- how, you know, we sign up partners." And I think her response at the time was, you know, either "Oh, we weren't familiar with that," which was part of it. She didn't know the people we had to do that. And also, they were trying to be, I guess, expeditious from their point of view, and our point of view it was like, "Hey, we have to go through this process."

Q. I see. Were -- were there any other instances in which you observed Ms. Sandhu acting in a way that you felt was unprofessional?

A. I never said that I've seen her act unprofessional. So because many -- so unprofessional to me means something different than, "Oh, they did something that, you know, happened to fall in our realm of responsibility."

So I haven't really personally interacted with her other than that instance, and then we were on some calls; but I did not see any unprofessional behavior from my interaction with her.

Q. Got it. So just this instance in which the -- the team encroached on -- on something you would have expected your team to -- to deal with?

A. Exactly. There's a -- a little bit of conflict there like, "Hey, that's -- that's our role; this is what

we're supposed to do." They needed something different.

Q. Got it. I have a few questions for you that -- that will sound repetitive, but I just want to make sure we have a clean record.

After your employment with BlackBerry ended, you hired legal counsel; is that right?

A. Correct.

Q. And you sent BlackBerry a demand letter?

A. Correct.

Q. And you ultimately reached a settlement with BlackBerry?

A. I don't know "ultimately reached a settlement." I took what they offered per my contract.

Q. So they offered you, in response to the demand letter, some amount of payment, and you accepted?

A. Right, which was part of my contract with them.

Q. And you left BlackBerry in January 2023?

A. Yes. January 6th.

Q. You haven't been privy to the company's internal strategy discussions since leaving in 2023, January 2023, right?

A. Other than just seeing BlackBerry in the news, you know, watching the stock go down or up.

Q. So you haven't had knowledge of the company's internal discussions --

A. No.

Q. -- or decisions about strategy since January 2023?

A. Nope.

Q. And you also haven't been aware of the details of the company's decisions about who to hire or why since January 2023; is that right?

A. No.

Q. Since January 2023, have you been aware of the details of the company's decisions about what business divisions to invest in?

A. No. I can only be familiar with the time I was there and my experiences during that time there.

Q. And so fair to say you also haven't been aware of the details of the company's decisions about how to structure its internal operations since January 2023?

A. No. I'm -- I'm not part of the company anymore, so no, I don't have any knowledge of their internal strategy after I've left.

Q. And since leaving in 2023, you also haven't been aware of the details of the company's decisions about salary, correct?

A. No.

Q. When you were employed at BlackBerry, were you aware of the salary of your peers?

A. No, but I -- it would be interesting to go back and look at a review of that.

Q. But sitting here today, you don't know what the salaries of the people you worked with were?

A. No. The people who were my peers, I can only tell you the role they came from, the role they went to in terms of title, if they were experienced in that or not, had the capability or experience with it, and the quota they carried.

Q. Moving to a different subject, you testified earlier that members of the cyber sales team made sexually suggestive comments.

Do you recall that?

A. Yes.

Q. I think you referred to some of these as innuendos; is that right?

A. Right.

Q. You mentioned examples of someone named ▓▓▓ for example --

A. Yes.

Q. -- making suggestive comments?

A. Yes.

Q. And you mentioned a trip to Canada in which someone named ▓▓▓ think ▓▓▓▓▓ and ▓▓ drinking and telling suggestive jokes; is that right?



A.  Yes.  Yes.  And reliving their past like wild days.

Q.  You didn't mention any specific instances in which Mr. Giamatteo made sexually suggestive comments, correct?

A.  I would say that there were comments made by him and the other gentleman during our QBRs in Canada and in California.

Q.  Do you recall --

A.  They --

Q.  Okay.  I'm sorry.  Go ahead.

A.  I'm just saying you're in a room with these gentlemen for eight hours a day, three -- three days, three or four days that week, so their -- some of their jokes were inappropriate, yes, correct.  And John G. did participate in that.

Q.  Do you recall any specific instances in which Mr. Giamatteo made sexually suggestive comments or innuendoes?

A.  Like I said, at the -- at the QBRs, that was quite prevalent, both in the -- at the Toronto one and in the California QBR.

Q.  Do you remember specifically what Mr. Giamatteo said?

A.  No, I don't.  I don't remember the specifics of

each joke.

Q.  So you don't remember any specific sexually suggestive comments?

A.  I just remember that it was quite common.  He and others would say -- say something and they'd throw out, "That's what she said," similar to the Michael Scott character on The Office.  Like if someone was big, right, that -- they used that all the time, right, a big deal came up, "Oh.  That's what she said."

Q.  And do you recall Mr. Giamatteo saying that?

A.  Yes.  They all use -- they all did.

Q.  When do you recall him saying that?

A.  I'm saying in the QBRs, both in Canada and in California, it was concerning the innuendoes and jokes that John G. and his team would make on a regular basis.

Q.  I guess what I'm -- I'm -- I'm trying to do is understand the sort of specific words and what specifically Mr. Giamatteo said that -- that you're referring to.

Is there anything besides the "That's what she said" jokes that you recall Mr. Giamatteo saying?

A.  Yes.  There were other things that were said, but I don't remember the specifics of each joke, no.

Q.  Do you remember anything else that Mr. Giamatteo specifically said, as opposed to the other people that --

that you have been referencing?

A.  No.

Q.  Did you report any instances of Mr. Giamatteo making sexually suggestive comments to HR while you were at BlackBerry?

A.  I complained to HR about the pervasive, toxic atmosphere that was created under his leadership and the -- and how -- even the language, the profanity, yes, I -- I complained about that to HR.

Q.  Did you tell HR about any specific sexually suggestive or -- or other inappropriate comments by Mr. Giamatteo specifically?

A.  No.  Just that -- not specific, other than like what we're talking about right now.  Like, look, this is -- this is, like, old school.  Like what -- what -- you know, what year are we in.  This is inappropriate.

Q.  Okay.  You testified about certain members of your team having a different commission structure.

Do you recall that?

A.  Yes.

Q.  And I think you talked about a 60/40 commission split?

A.  Yes.

Q.  What does a 60/40 commission split refer to?

A.  So if you're on a commission, and it's 60/40,

Lauren, you'll get 60 percent salary, 40 percent commission.  So for you to hit a hundred percent of your number, you would make your full payout.  If you're on a 70 percent 30 or 70/30, you make 70 percent of your money.  Let's say you're supposed to get 100,000, you make 70K guaranteed, your 30 is at risk.

So the gentlemen in the MSSP business, you know, are struggling.  For her to make 100K they had to hit a hundred.  She would only make 60 guaranteed.  They're making more of that hundred.  They're making 70.  So she has more at risk.  The gentlemen were paid better.  And at the time, the MSSP business, although we had done everything to grow it and had been growing, we were having product issues where partners were leaving because the product was not working.

So it's unfair that she should not be paid as the gentlemen were when she had far more responsibility, and she had done a great job of keeping the partners we had.  And we would get letters from the partners, you know, praising her work, her ethic, you know, her -- how hard she worked.  Everything.

And so I brought that to BlackBerry's attention, HR and John G.

Q.  I'd like to look at a document on this.  I'll put it in the chat.  While I do -- before I do, what is



And the partner specifically was called Barracuda, and it was also right around probably the first month of John G, month or two, of being onboard. So you can look at the dates of when he came onboard. So that was what it was about.

And we also encouraged him to actually go meet with some of these partners because he wanted to get out and meet some of the partners, and then later on he said, "No, you know, I don't want to use my time to deal with, you know, upset partners."

Q. So the -- the malfunction meant that the -- sorry.

You said that the malfunction caused the -- the -- the client's product to go down; is that right?

A. So we have a product that you use as a service, and our partners run it on their hardware. And our partners sell that service to customers. And so if we release a change in code or something that impacts it, and you don't tell your partner community that are running these big data centers to try to provide this service, "Hey, we're changing something," and they just roll out this change, it impacted their ability to provide this service, and several -- lots of our partners were quite upset by it because it caused them to -- to provide a less than, you know, positive experience using

BlackBerry because it -- it -- you know, several customers were down, you know, for a day, for two days. You know, they're losing business.

And this partner Barracuda was quite, you know, upset about it. And they might have been doing, you know, over a million-dollars' worth of business with us, and they have effectively started moving all their customers off BlackBerry onto another platform because we couldn't provide them the reliability of a stable product.

Q. So this product problem caused BlackBerry to lose business?

A. Correct.

Q. And it -- approximately how much business did it cost --

A. Significant. Not only was it right then short term, you know, a lot of it, but it also impacted long term where you're trying to get more partners on. So you know, immediately it impacted a lot, but if those partners were -- were growing at a rate of 20 percent, then that's loss of future business as well.

And the company is aware of it. And it was like -- there's a name for the change. I forget what it was, but it was, you know, probably in the first quarter John G. was there and we went to them with this information

and what we were trying to do to rectify it and how, you know, we're trying to give them some concessions, help them with different things, put a plan in place, here's the product fixes that we needed to have to provide a stable platform so that our partners could sell the BlackBerry product.

Q. Fair to say this was a -- a major problem for BlackBerry's partners when it occurred?

A. Significant.

Q. At the time, how was BlackBerry's financial performance?

A. Fair.

Q. Was the company focused on improving its financial performance at the time?

A. I certainly would hope so.

Q. You mentioned earlier that you were with two other colleagues when Mr. Giamatteo spoke harshly to you; is that right?

A. Yes.

Q. What was -- what were the names of those two other colleagues?

A. Tim Hayden and Stegall.

Q. So those are male colleagues?

A. Yes. So Josh reports to Tim; Tim reports to me.

Q. So the incident in which Mr. Giamatteo spoke to

you harshly about this product malfunction, involved him speaking harshly to and to male colleagues together; is that right?

A. No. It was to me. He and I were having a dialogue. They're on the call as well. They're listening, participating. I deliver, you know, the message and he's like, you know, "I don't know why you can't F'ing run your business." I'm like, you know, "We're -- we're providing you, you know, the news. I get that you don't like it, right, but my colleagues and I don't have the -- the skill, experience, or even the -- the access to go fix these product problems. We'd love to fix them if we could." But when he turned to talk to them, so Tim or Josh said something, you know, he responded much differently to them.

And I get a call afterwards from Tim saying, "Well that was the strangest call I've ever been on, you know. It's the weirdest thing the way he talked to you. That was so inappropriate." So -- and I said I felt like I'm maybe holding them back. Like if -- if they reported to one of John G's folks, maybe they'd get the support and help they needed. Like, what am I not doing or saying or do I not phrase it the right way.

And my colleague pointed out he felt like it was -- that he was talking to me as a woman differently than



he's talking to them as men.

Q. Those colleagues, were they your reports?

A. They were. As I said, Josh reported to Tim; Tim reported to me.

Q. So you led the team that was meeting with Mr. Giamatteo?

A. I did.

Q. Is it fair to say that -- that you were the one responsible for the team's progress and client relationships?

A. We're all responsible, but no, that's not fair to say. I mean, obviously we hired people to run the business. Josh was responsible for the MSSP business. He had a global MSSP unit. Tim worked with him. He reported to Tim. Tim had MSSP to Americas, but ultimately, right, they all reported up to me.

So I guess it's how you define -- are you saying ultimately I'm responsible? Yeah, we're responsible, but obviously you control the things you can control. And the things that were going on were not within my control, Tim's control, or Josh's control.

Q. But I'm asking you a more specific question, which is were you the lead among the colleagues that were meeting with Mr. Giamatteo? You were the team lead of the other two colleagues?

A. Yes. Yes.

Q. Okay. You led a division called Channel Sales; is that right?

A. Channel Sales. I don't -- that -- that was the entire channel sales. Like it wasn't separate like channel sales and then there's MSNR (phonetic) that fell under the umbrella of channel sales.

Q. Sorry. I was switching to -- switching to another topic. So is the answer, yes, you led a division called Channel Sales at BlackBerry?

A. Yes. I was worldwide VP of Channel Sales.

Q. And very briefly, what is Channel Sales?

A. Channel Sales involves all risk (phonetic) to market, so customers by indirectly versus directly. So MSSP, OEM, alliances, resellers that sell to customers so that they're not buying directly from BlackBerry.

Q. When you left BlackBerry, John Chen was still CEO, correct?

A. I believe so.

Q. Did you have an under -- any understanding about John Chen's view of the Channel Sales business?

MR. TARTAGLIO: Objection. Vague. Calls for speculation.

BY MS. BECK:

Q. You can answer.

A. I have no idea.

Q. Did you have any understanding about whether John Chen believed the Channel Sales business was a growing part of BlackBerry's business?

MR. TARTAGLIO: Objection. Calls for speculation.

BY MS. BECK:

Q. You can answer.

A. I don't know. I do know that many quarters we were growing more than the direct sales.

Q. In the quarter before you left, you -- you left BlackBerry, did Channel Sales perform well?

A. I can't remember that, but I'm sure it was on par with how the -- the sales teams were performing. No one in the company was doing well in that space. In fact, many of the different regions had gone down quarter after quarter.

Q. So fair to say that performance for the Channel Sales division was challenging in -- in the -- in the time before you left the company?

A. I -- I think it's challenging for the whole company. There were other business units that the direct salespeople were able to take advantage of and sell. Maybe it was SecuSmart (phonetic) and some of the other pieces, but the channel sale on the products we could

sell, you know, aligned no differently than -- than the other folks selling it. In some quarters the channel actually grew, the deal registration doubled the registration in the Americas and did better than other parts of the business, OEM, MSSPs. There were quarters where we grew the business, yes.

Q. Okay. Let's look at another document. I'll share my screen again, and we'll mark this as Exhibit Number 5.

(Exhibit Number 5 was marked.)

BY MS. BECK:

Q. This appears to be an email from you to Ms. Sandhu and Tim Foote in December 2022, correct?

A. Okay. Uh-huh.

Q. And sorry. So this is roughly a month before you left BlackBerry, correct?

A. Okay.

Q. And I'm sorry. If we scroll down, there's an email from Ms. Sandhu to you on December 1, 2020?

A. Uh-huh.

Q. And she writes, "I'm working on earnings prep and wanted to check in on whether you have anything newsworthy for Q3. No worries if not."

Do you see that?

A. Uh-huh. I see it. I'm familiar with it --



A.  Of course John G's not going to say that.

Q.  Did anyone tell you that the company was restructuring the sales division at the time?

A.  John G. said that he decided that they did not need my role anymore and it was his decision.  That's what I was told.

Q.  Did anyone tell you that the company was restructuring the sales division at the time?

MR. TARTAGLIO:  Sorry.  I didn't hear part of your question.  Could you repeat that, please?

BY MS. BECK:

Q.  I asked again, did anyone tell you that the company was restructuring the sales division at the time you were terminated?

A.  No, other than, you know, what, five months earlier they had taken away different pieces of the business for all the women that worked for John G.  That was the next step.

Q.  The company was realigning the sales organization to operate geographically instead of by subject area; is that right?

MR. TARTAGLIO:  Objection.  Assumes facts.  Leading.

THE WITNESS:  Months earlier, they said they were going to do that.  When I asked him about that, why

did it only impact the global roles where women were the leaders, ▮▮▮▮▮▮me, and it did not impact the roles of the men who were in similar global roles, Alex or Kevin, they could not explain that.

So if you truly are trying to realign to a theater base versus global, you do it consistently.  I just find that odd.

BY MS. BECK:

Q.  You testified this morning that men, during this reorganization, had their responsibilities increased.

Do you remember that?

A.  Correct.

Q.  Who were you referring to?

A.  I was referring to John D.  I was referring to, let's see, Tash, HP, and the gentleman who was leading Americas at the time, which I can't -- was probably Tom Fusco.  So -- oh, Adam Intracan.  So several of the -- the men were given more roles and responsibility, both when they allocated from a global to regional, as well as then when they eliminated my role, they gave the pieces to the -- the -- the men on the team.

Q.  Let's start with John D.  What was John D's role?

A.  I'd have to look him back up on LinkedIn.  He's done one of many -- he's a consultant, he -- he

supposedly had a number, then he didn't have a number, then he had no employees.

Q.  So you don't know?

A.  But he's out of -- no, I do know.  I can look at LinkedIn.  But you know, he's out of Australia, and he worked with John G. in the past.  They had an expense role for someone not carrying a quota and being out of Australia.

Q.  You mentioned HP.  Is that a reference to Hans-Peter Bauer?

A.  It is.

Q.  Do you know what his role was?

A.  He's a leader for EMEA.  So a team of maybe --

(Simultaneous crosstalk.)

THE WITNESS:  -- 20 people then reported into him.  So my EMEA channel folks who had been leading and reporting, working with were moved over to his staff.

BY MS. BECK:

Q.  What does EMEA stand for?

A.  Europe, middle east, and Asia -- Europe, middle east, and Africa.

Q.  So EMEA is a geographic designation.  Is that fair?

A.  Yes.

Q.  So he ran a geographically-based sales team; is

that right?

A.  Yeah.  But going back, they did not -- they weren't consistent.  The SEs didn't get moved over to Hans-Peter.

Q.  What does SE stand for?

A.  Systems engineers.  So I understand if -- if the company wants to move to a more theater based approach, do that, but why was it not effectively done across the board and it was only the women's, you know, role that they eliminated or diminished.

Q.  You mentioned someone named Tash.  Can you -- do you know that person's full name?

A.  I'd have to look him up on LinkedIn.

Q.  Do you know what his role was at BlackBerry?

A.  He was, I believe, VP of Asia, which had a very, very -- I mean, they might have done 2 million a quarter.

Q.  And Asia, VP of Asia, that's a geographic designation?

A.  Yes, it is.

Q.  You also mentioned Tom Fusco; is that right?

A.  Yeah.  So Tash's last name is Stametelos, S-T-A-M-A-T-E-L-O-S.  He's vice president of APAC, which is Asia Pacific based in Singapore.

Q.  Okay.  So he also had a geographic focus area within BlackBerry?



A. Correct.

Q. You also mentioned Tom Fusco; is that right?

A. Yes.

Q. And I think you said he was responsible for the Americas?

A. Correct, yes.

Q. So he --

A. I think he left, but I don't know when he left.

Q. But he also had a geographic role of responsibility within BlackBerry?

A. Correct.

Q. And this restructuring happened when John Chen was CEO, correct?

A. I -- I believe so, yes, before he left.

Q. So John Chen would have been the ultimate decision-maker on -- on a restructuring like that?

MR. TARTAGLIO: Objection. Calls for speculation.

THE WITNESS: I would just say that John Chen deferred to John G. on many things. So this was, to my knowledge and what John G., John Giamatteo, personally told me that it was his decision.

BY MS. BECK:

Q. You talked earlier today about a meeting in Dallas.

Do you remember that?

A. I do.

Q. When did that meeting in Dallas occur?

A. We'd have to look up when John Giamatteo first started. Probably in the first 60 days of when he came onboard.

Q. I can represent to you for convenience that he started in October 2021.

A. So it happened October, November. Probably not December. But I -- I'd say either October or November.

Q. And you testified that you asked Mr. Giamatteo if you could attend the meeting; is -- is that right?

A. Yeah. I asked him why I was not included, and you know, should I be available to that meeting.

Q. And I think you testified that he said you could attend the meeting; is that right?

A. He came back to me later on, like, a day before the meeting and was like, "Oh, well you can go if" you know. And it was too late to book tickets, rearrange my meetings. I mean, I wasn't part of that at all. I was excluded from it.

Q. Did you dial into the meeting?

A. That wasn't offered to me.

Q. Did you ask to dial into the meeting?

A. I don't remember. It was really hard to

participate in eight hours. And if these are new people joining the company, you really don't get the bonding time either. I mean, you should be part of that. Why should I not be included and my male counterparts that haven't even joined the company are included.

Q. Aside from this meeting in Dallas, were you excluded from any other meetings by Mr. Giamatteo?

A. That's hard to know when you're excluded from a meeting. Sometimes you don't know about the meetings. And there were other times. He brought on -- he brought on this consultant who had he worked with before, and he'd -- I'd hear about these meetings like this consultant, a third-party, is meeting with some of our partners and he doesn't even work for our company.

So yes, there were other meetings and other things, but many times I didn't know about it unless I happen to hear from one of my -- my teammates like, "Hey, why weren't you part of this." The guy -- the gentleman's name was Ken. I can't remember his last name. But he was brought on as a consultant to John G.

Q. You were included in every regular QBR meeting after John Giamatteo was hired until you left BlackBerry, right?

A. I don't know what you mean by "regular."

Q. I'll ask then, does -- what does QBR refer to at

BlackBerry?

A. Quarterly Business Review.

Q. Did those meetings happen quarterly?

A. Sometimes yes; sometimes we wouldn't have them. It just depends.

Q. Am I right that -- did BlackBerry hold QBR meetings for the cyber group?

A. Yes. And I did participate in any and all of them that I was invited to. If they had other meetings to just talk strategy or anything else, I don't know if I was excluded or not because you usually don't know about the meeting.

Q. But the quarterly meetings, were you included in those meetings?

A. Yes.

Q. So you attended -- did you attend them all?

A. Yes.

Q. So every QBR between when John Giamatteo was hired and you left BlackBerry, you attended the meeting?

A. Those particular meetings, yes; but if there's other meetings on strategy or other things and there were partner meetings and different things going on where I was not included.

Q. Did the cyber sales organization have weekly team meetings for leadership, to your knowledge?



A.  Some did; some didn't.

Q.  Did the -- did the cyber sales organization have a weekly call for --

A.  Oh, sorry.  I thought you meant the different regions.  Sometimes we did; sometimes we didn't.  Sometimes they were cancelled.

Q.  But in general, did the cyber sales organization have a weekly meeting for its leadership?

A.  Yes.

Q.  And you attended those meetings, correct?

A.  Yes.

Q.  Did you give regular updates in those meetings?

A.  Yes.

Q.  Who asked you to give regular updates in those weekly leadership meetings for --

A.  Whoever was leading it at the time.

Q.  Who set the agenda for those meetings?

A.  I don't know.  I don't know if it was John D, John G.  I don't know if it was his admin.  It wasn't, like, separate agendas.  It was like everyone reviews it many times.  If there wasn't time and you were providing an update and it didn't fit the time, you didn't participate.

Q.  You also met one-on-one with Mr. Giamatteo?

A.  I did.

Q.  And those meetings were scheduled biweekly; is that right?

A.  Sometimes biweekly; sometimes longer out, depending on his -- his schedule.

Q.  I think I might be close to through, but it would be helpful for me if we could take ten minutes off the record so I can check my notes.  Does that work for you, Ms. McMillan?

A.  Yes.  I've spent a better part of my day doing this, so yes, I'd love to wrap it up.

MS. BECK:  Great.

THE VIDEOGRAPHER:  Off the record at 12:14 p.m.

(A recess transpired.)

MS. BECK:  Welcome back, Ms. McMillan.  I have just a few more questions and then we can get you out of here.

THE VIDEOGRAPHER:  We are back on the record at 12:22 p.m.

MS. BECK:  I jumped the gun.  I was saying welcome back, and I have just a few last questions for you, Ms. McMillan.

BY MS. BECK:

Q.  Earlier today you mentioned that you complained to HR regarding toxic culture in the cyber sales organization.

Do you remember that?

A.  Yes.

Q.  How did you complain to HR about that?

A.  In a conversation with them.

Q.  With whom?

A.  Mary Slimmon, S-L-I-M-M-O-N.

Q.  And when did you have that conversation with Ms. Slimmon?

A.  I'd have to go back to my notes.  I don't have the exact dates, but I'm positive it was after -- I mean, probably a few times after a QBR mentioning that to them, the environment.  Also after they made the change to diminish the roles because I know the other women complained as well, and also during the ███████ obviously I consulted with HR on the same.  They were also concerned.

So, yes, I highlighted it to -- to Mary, who was responsible for the sales business units.

Q.  So you --

A.  As our HR person.

Q.  So you had multiple conversations with Ms. Slimmon about --

A.  HR, yes.

Q.  But you never submitted any type of formal complaint?

A.  No.  By "formal," I don't know if you mean written.  I don't know what you mean by "formal."

Q.  Well, did you ever submit a written complaint about the toxic culture in the cyber sales business unit?

A.  No.  I guess nothing in writing, other than maybe emails going back and forth, but obviously in conversations.

Q.  Did you ever submit a written complaint to BlackBerry's human resources department about John Giamatteo?

A.  No.

Q.  Were you ever involved in a formal, anonymous complaint about John Giamatteo?

A.  No.  But going back to the other one, it's been my experience that when you're in a sales position and you make a formal complaint against your boss, they have the ability to retaliate in quotas or different, you know, lack of resources or different things like that.

So I was not very confident that it would be received in trying to fix something versus me just getting retaliated against.

Q.  That wasn't my question.  My question is a simple yes-or-no question, and the question is, did you ever submit a written complaint -- excuse me, a written, anonymous complaint regarding John Giamatteo?



CERTIFICATE OF REPORTER

      I, TERESA C. SMITH, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition, COLLEEN McMILLAN, was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause; that the testimony of said witness was taken down in shorthand by me, a Certified Shorthand Reporter and a disinterested person, at the time and place herein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision.

      I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the outcome of this cause, and that I am not related to any of the parties thereto.

      I hereto declare under penalty of perjury that the foregoing is true and correct to the best of my ability utilizing the Zoom/Internet connections.  I have hereunto set my hand on March 6, 2025.

_Teresa C. Smith_

Teresa C. Smith, CSR no. 13473

