UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


NEELAM SANDHU,

                   **CERTIFIED TRANSCRIPT**

              Plaintiff,

vs.                        Case No:  24-cv-02002-SK

BLACKBERRY CORPORATION,
et al,

              Defendants.

_____/



VIDEO DEPOSITION OF
ERIN RANSOM


FEBRUARY 26, 2025



9:01 a.m.

(Via Zoom)



Talty Court Reporters

2131 The Alameda, Suite D

San Jose, California 95126



Reported By:  Teresa C. Smith, CSR 13473

Page 2

```
 1          A P P E A R A N C E S :
 2
 3   FOR PLAINTIFF:   GOMERMAN BOURN & ASSOCIATES
 4               BY:  ANTHONY TARTAGLIO, ESQ.
 5                    825 VAN NESS AVENUE, SUITE 502
 6                    SAN FRANCISCO, CALIFORNIA 94109
 7                    (415) 545-8608
 8                    tony@gobolaw.com
 9
10   FOR DEFENDANT:   MUNGER, TOLLES & OLSON, LLP
11               BY:  LAUREN N. BECK, ESQ.
12                    350 SOUTH GRAND AVENUE, FLOOR 50
13                    LOS ANGELES, CALIFORNIA 90071
14                    (213) 683-9576
15                    lauren.beck@mto.com
16
17
18   ALSO PRESENT:    MARGARET MAYO - BLACKBERRY
19                    JACQUELINE HIOCO - VIDEOGRAPHER
20                    NEELAM SANDHU
21
22                    --oOo--
23
24
25
```

Page 3

```
 1              INDEX OF EXAMINATION
 2   Witness:                                    Page
 3     ERIN RANSOM    (Sworn)
 4
 5   Examination by Mr. Tartaglio                   5
 6   Examination by Ms. Beck                       38
 7   Witness' Signature                            65
 8   Witness' Corrections                          66
 9   Certificate of Reporter                       67
10
11              INDEX OF EXHIBITS
12   No.        Description                       Page
13
14   EXH 1   Email - May 13, 2022                  46
15   EXH 2   Offer Letter - May 25, 2022           50
16   EXH 3   Email - March 16, 2022                58
17
18
19
20                    --oOo--
21
22
23
24
25
```

Page 4

```
 1          THE VIDEOGRAPHER:  Good morning.  We are going
 2   on the video record at 9:01 a.m. on Wednesday,
 3   February 26th, 2025.  This is the video deposition of
 4   Erin Ransom, taken by the Plaintiff in the matter of
 5   Neelam Sandhu versus BlackBerry Corporation, et al, filed
 6   in the United States District Court for the Northern
 7   District of California.  Case Number 24-CV-02002-SK.
 8          This deposition is being held via Zoom
 9   videoconference.  My name is Jacqueline Hioco, a notary
10   public in and for the state of California.  Today's
11   reporter is Terrie Smith, CSR Number 13473.  We are both
12   with the firm Talty Court Reporters, Incorporated, with
13   offices in San Jose, California.  Please note that we
14   will remain on the video record until all parties have
15   agreed to go off.
16          Before we proceed, I ask counsel to state their
17   appearance and affiliation for the record, starting with
18   the noticing attorney.
19          MR. TARTAGLIO:  This is Anthony Tartaglio, from
20   the Gomerman Bourn Law Firm representing Plaintiff, and
21   the Plaintiff will likely be observing at some point.
22          MS. BECK:  And I'm Lauren Beck of Munger, Tolles
23   & Olson, on behalf of Defendant, BlackBerry Corporation.
24   I'm also joined today by Margaret Mayo, who's in-house
25   counsel for BlackBerry.
```

Page 5

```
 1          THE VIDEOGRAPHER:  Thank you.  Will the court
 2   reporter please administer the oath.  Then counsel may
 3   proceed.
 4          THE REPORTER:  If you'll raise your right hand
 5   for me, please.
 6                    ERIN RANSOM,
 7          called as a witness, being first duly sworn,
 8                 testified as follows:
 9          THE REPORTER:  Thank you.  Counselor?
10                    EXAMINATION
11   BY MR. TARTAGLIO:
12      Q.  Good morning, Ms. Ransom.
13      A.  Good morning.
14      Q.  It's morning here anyways.
15          Have you ever had a deposition before?
16      A.  No.  This is the first one.
17      Q.  Okay.  Then I will explain how this process
18   works.  Do you understand that the oath that you just
19   took is similar to the oath that you were to take if you
20   testified in court?
21      A.  Yes.
22      Q.  Because we have a court reporter who is typing
23   down what we're saying, it's important that we try to
24   speak one at a time and not speak over each other.  Okay?
25      A.  Okay.
```



Page 18

1    Q. Besides having some logistical communications
2 with the lawyers and besides that conversation with
3 Ms. Sandhu that we talked about earlier, have you talked
4 about anyone else -- or talked with anyone else about
5 this case?
6    A. Yeah. I mean, it's been in the news, right.
7 So, like, I've certainly had conversations about it, but
8 yeah. So -- so I mean, I have had conversations about
9 the case with -- with other people.
10   Q. And so let's see. You mentioned reading about
11 the case in the news and some --
12   A. Yep.
13   Q. You also mentioned some conversations. Who were
14 those conversations with?
15   A. I -- I've had conversations with, like, family,
16 friends. Yeah. I mean, I don't know if I could list off
17 all the people. I mean, we're not talking about it every
18 day, but it certainly has come up, right.
19   Q. Did you ever work with Neelam Sandhu at
20 BlackBerry?
21   A. We didn't really cross paths. There was, like,
22 one time in particular that I can remember being on a
23 call with her, but yeah, we didn't regularly cross paths
24 at BlackBerry.
25   Q. Did -- what was your impression, if any, that

Page 19

1 you formed about her when -- during the limited time that
2 you worked with her?
3    A. She seemed very professional. She seemed very
4 smart, very capable. Yeah. I mean, I would say the
5 impression was good. She worked directly for John Chen
6 who was known to be, you know, I would say demanding,
7 maybe is a good word, right. So I think there was kind
8 of credibility there that for somebody to be successful
9 working directly for him, right. I think that spoke
10 quite a bit for her capabilities.
11   Q. Did she have any sort of reputation at
12 BlackBerry about her ability to get along with her
13 coworkers?
14   A. No. Not that I was aware of.
15   Q. Did you ever interact with Richard Lynch, also
16 goes by Dick Lynch?
17   A. No. No. Never.
18   Q. Did you ever work with the Elite team that
19 Neelam worked on?
20   A. No, I did not.
21   Q. Was there -- was there some -- did you ever hear
22 any discussion at BlackBerry about tension between the
23 Elite team and some of the other business units?
24   A. No.
25   Q. This -- so this lawsuit involves John Giamatteo

Page 20

1 and some of the people who worked closely with him, and
2 so I'll start off with kind of a -- a broad question.
3 Did you have any experience working with John
4 Giamatteo?
5    A. My experience with him was really limited. When
6 I let BlackBerry know that I was planning to leave -- so
7 I was -- I was offered a position as chief of staff for
8 John G. That was what they had offered me. And so I
9 had, I don't know, two or three, three or four phone
10 calls with John G. talking about that position.
11       It had felt at the time like a little bit
12 unusual. I think BlackBerry was trying to keep me at the
13 company, but I really didn't have experience working with
14 John G. or an existing relationship there, so it did
15 strike me as odd at the time that -- for them to offer me
16 that position because typically in that role, right, you
17 would want to have somebody that you had worked with
18 before or that there would be, you know, trust and an
19 established working relationship, and there wasn't in
20 this case.
21       So prior to that, my experience with -- with
22 John G. was pretty limited. So that was really my
23 experience. And then in the end, that offer, you know,
24 it took them a long time to get it to me. It was for --
25 they wanted to switch how my bonus compensation would

Page 21

1 work, and so it ended up that that offer, I would have
2 made less money. The whole thing was just -- it was just
3 kind of strange.
4       So in the end I turned it down and -- and left.
5 But that was really my experience working with John G.
6    Q. Ms. Sandhu alleges in her lawsuit that she had
7 some negative experiences at BlackBerry that she believed
8 happened to her because she's a woman, and so I want to
9 ask another pretty broad question which is, did -- did
10 you ever feel at BlackBerry that you were treated
11 negatively because you were a woman?
12   A. I think when you're a woman in tech, the
13 undercurrent is always a little bit there, right. I -- I
14 mean, in my career at BlackBerry, I mean, you know, I
15 mean, I've had -- for example, when I was pregnant with
16 my third child, like, I had a boss that, you know, was
17 inappropriate at the time.
18       So -- so I mean, I feel like I've had, you know,
19 at least that incident. Probably others. I don't know
20 if BlackBerry was, like -- you know, at the same time,
21 I -- I was promoted. I had several promotions at
22 BlackBerry. I don't think I ever had a promotion that I
23 didn't put up my hand and -- and ask for or advocate for
24 myself to go get.
25       So you know, I don't think there was -- it



and I just kind of brushed it off and, yeah, and just let it go. I mean, in hindsight, you know, I -- I wish I had, but at the time, I just -- yeah, I didn't.

Q. And I think you mentioned that you went to HR about the -- the painting --

A. Yep.

Q. -- is that -- is that true?

A. That is, yep.

Q. What kind of response did you get from HR about the painting issue?

A. It was Mary Slimmon who I spoke with. She was my HR business partner. I worked with her for a number of years at BlackBerry. She agreed that it was inappropriate. She said they would follow up with him, but I didn't -- I didn't ask her again about it. I just left it. I figured at that point it was between HR and -- and ███████ or whoever else needed to be involved.

Q. And did Mary Slimmon ever tell you what the company ended up doing about that complaint?

A. Not that I recall.

Q. Do you feel as though you were paid fairly compared to the men who did similar work at BlackBerry?

A. I don't know. I don't know what they would have made. When I -- when I moved into the VP of sales

enablement role, I was given an increase at that time that I think was fairly substantial, but I don't know what -- I don't know what the predecessor in that role would have made.

Q. Besides the -- the painting HR complaint, did you participate in any other complaint to HR about working at BlackBerry?

A. I had -- when I was in sales operations -- let me -- sorry. Let me just look at this timeline again. Probably, like, maybe 2016, maybe 2018, I took on a team that was order operations and customer master, so that was a new responsibility. And the team was mostly women with one or two men on it, and one of the first things I did was just a salary review of the employees that I had come over to me. And several of those women were quite low in their pay band for similar roles.

So when I took that team over -- so I had that -- I had that happen twice, actually. Once with that team, and it was -- I'm trying to remember the women's names, but I actually went back to HR and to my boss at the time, who would have been ███████ and asked for an exception to get their pay bumped up. So like a -- I can't remember if we did it out of cycle or we did it with the cycle, but it was like above and beyond whatever the pay raise budget was to bring them up

to parity, right.

So I had one case of that. I think there was maybe two or three women that we ended up doing a one-time adjustment, but when they came under me, it was -- it was pretty obvious that they had been underpaid and it wasn't comparable.

And then I had another employee, ███████ and when she came onto my team, we had her and I think there was a gentleman, ███████ who they were both at the same -- they were both at the same band, similar type of roles; and again, she was -- she was much lower paid.

And again, I went to HR, and I don't know if it would have been ███████ or somebody else at that time, but -- and again asked for a one-time increase to get her just to a better position.

So I -- I don't know for myself, right. I don't know what the other VPs were making, but I definitely had twice where I had people that came onto my team that were women and -- and we could see that they were -- you could see that they were underpaid.

Q. And the first incident you described with the group of women --

A. Yeah.

Q. -- what response did you get from BlackBerry

when you suggested that they be paid more?

A. So BlackBerry did the adjustment, but then it was kind of -- it was kind of strange. And this was I -- I actually -- I'm sorry. I'm kind of remembering it better. It was -- I think it was done outside of the normal pay increase cycle. And they did the increase, but then -- I want to say that it was done in the fall. And then in the spring when we had, like, the standard merit increases and pay increases, right, we, like, evaluate the employees and whatever, people get 1 percent, 2 percent, they came back and said that because they had done the adjustment, that they wouldn't qualify for the merit that spring, which I thought was a little bit -- like, in the adjustment to get them to where they need to be, then they shouldn't be penalized another year, right, for a merit increase. In my mind, those were two separate things.

But BlackBerry did do the adjustment in both cases when I brought it forward.

Q. And do you remember approximately when you brought up the issue about -- and I'll ask about both separately. So --

A. Yeah.

Q. -- the first time, do you remember, approximately, when that was when you went to BlackBerry



and asked about bumping up the pay?

A. I think it would have been around, like, 2017 or 2016. It would have been, like, fall of one of those years, I think.

Q. And --

A. I --

Q. Sorry. Go ahead.

A. Yeah. And I can remember because I had -- I was working for ▮▮▮▮▮ at the time, and we had -- we had done the Silence (phonetic) -- not the Silance. We had done the acquisition of good, and we had, like, two instances of the CRM system, we had two financial systems, we had different back-end licensing systems.

And when we were selling, for example, to a customer, let's just say Bank of America, right, let's say we -- we sold them software. When they went to transact with us, we had all these, like, duplicates, right. And it -- it had become this big kind of mess.

And I had gone to my boss and I'd asked -- I'd asked for the role to take on and manage this, and he come back and told me, no, that it needed to stay with finance. But then, like, later that summer or early fall, I think the company got worried that they weren't going to be able to close out the quarter because things were so messy and they came to me and said, essentially,

pick your team, we'll give you the role, and go clean it up.

And so it would have been, right, at like -- it would have been fall of either, I think, maybe 2017 or 2016, somewhere in there that, yeah, I would have had those staff then reporting into me and I would have been doing a review of -- of salaries.

Q. Did you participate in any sort of complaint about John Giamatteo?

A. No.

Q. I'll -- I'll represent to you that there was an investigation that was done around the time that John Giamatteo was -- was nominated to be CEO, with a law firm. Did you participate in that investigation at all?

A. No.

Q. Do you know who goes by the Twitter alias Nerdy Tech Gal?

A. No.

Q. I know that's a bit random, but it -- it's an issue in the case. Let's see.

Did you ever talk about Colleen McMillan, about some of the experiences that she had at BlackBerry --

A. Yes.

Q. Okay. -- dealing with gender-type issues?

A. Yes.

Q. What did she tell you about her experiences?

A. I mean, yeah. She definitely had some negative experiences, and she would have been, I think, reporting into John G. directly. She was probably the only woman reporting into him for a while. I mean, Neily Buff was global head of renewals, but then was, I think, moved under North America. So I mean, Colleen would have been in those sales meetings, I think, with John G. and his direct reports before he was CEO.

So yeah, I definitely had conversations with her when we were at BlackBerry and then post-BlackBerry as well. But yeah, she talked about -- she talked about being on, like, calls with some of the other leaders because she would sometimes be on -- she ran partner sales and so she would sometimes be on, like, the regional sales calls and -- yeah, about, I think it was Tom Fusco I can remember her telling me about, talking about, like, I don't know, like his wife's permission to go sleep with whatever his fantasy woman was.

Yeah. I mean, she was definitely -- you know, she would -- she would have seen more than I would have, right. I was not a direct report. I was not in those meetings, but yeah, I definitely had conversations with her about it.

Q. And can you remember any of the specifics of

the -- the kind of, I guess we could say, sexually inappropriate comments that she -- that she relayed to you?

A. Yeah. I mean, I remember that one about Tom. I don't remember any other specifics. I mean, yeah. I don't remember any other specific stories. I can remember her just talking about it generally being uncomfortable, but I don't remember, like, the details of other incidents or what other incidents there were.

Q. Did your -- did your decision to leave BlackBerry have anything to do with Colleen McMillan's treatment at BlackBerry?

MS. BECK: Objection. Vague.

BY MR. TARTAGLIO:

Q. You can go ahead and answer if you understand the question.

A. Yeah. I -- you know, yeah, I didn't -- I didn't love the new leadership. I think I was also -- well, let me just kind of back up a bit.

I mean, BlackBerry had been through a ton of change, right, in 18 years, right. I mean, I rode that train up to the heyday and then back down to the bottom. And BlackBerry, I mean, churned out its head of cyber or president of sales position pretty much every two years, right. Sometimes sooner.



So yeah. When John Giamatteo came in and he brought in -- right, I mean like there was just a ton of leaders that he brought in, which -- which by the way, every leader does that at a senior level. That is not necessarily unusual. But yeah, I just didn't -- I just -- I just didn't love the feeling. I was -- on paper, that job with John Giamatteo should have been the perfect job, right. That was, like -- you know, that should have been the great opportunity. I had lots of friends and family that told me that was a good opportunity, but I just wasn't -- you know, there wasn't anything in particular that John G. said, but I just wasn't feeling like that was the right opportunity.

So I mean, I didn't leave because of Colleen's treatment. I didn't leave because there was something strange that John G. said, but I just -- yeah, I wasn't excited to work for him. I didn't love the vibe. And I know that's very loose terminology, but yeah. I just wasn't -- I just wasn't excited to stay there.

And -- and I mean, it just worked out. At the same time I had actually called up somebody that I had worked with previously to just get their opinion on the job, and it turned out that his VP of sales ops quit that same morning and -- and that started the conversation for me to go to Sierra Wireless.

But yeah, I wouldn't say I left because of the way Colleen was treated, but I also -- you know, I didn't like that I was being put under ▓▓▓▓ I didn't really like the changes. I was kind of -- I felt like I was done with that job. The new offer was less money. I mean, yeah. I just wasn't excited to stay, yeah.

Q. Were you worried that if you worked more closely with John Giamatteo, that you might be subjected to some of the treatment that Colleen McMillan had described to you?

MS. BECK: Objection. Leading. Misstates prior testimony.

THE WITNESS: I wasn't. Like, I don't think I really thought about it. I was thinking -- it was just the whole thing with the job with him was just -- it was kind of strange. It was strange that it was being offered because he hadn't worked with me prior. They were really slow putting together the offer letter, which maybe wasn't strange because BlackBerry was slow in putting together offer letters. But then it was, like, you know, the way they wanted to change the comp. It was for less compensation. Like it just didn't -- I don't know. It was -- yeah, I just wasn't -- on paper, that should have been a fantastic job, a fantastic opportunity. I just wasn't -- I just wasn't excited for

it, yeah.

BY MR. TARTAGLIO:

Q. I'm going to ask now about some of the other names that have popped up at one point or another in this lawsuit. Did you ever talk with ▓▓▓▓▓▓ about her experience working at BlackBerry?

A. No. I don't recognize that name.

Q. Did you ever talk with ▓▓▓▓▓▓

A. No.

Q. What about ▓▓▓▓▓▓

A. No.

Q. ▓▓▓▓▓▓

A. No.

Q. Sarah Tatsis (phonetic)?

A. I know Sarah, but I did not talk with her about John G. or any HR issues.

Q. Let me --

MR. TARTAGLIO: Let's take a break here. I think I probably don't have too many more questions, so let's take, like, a ten-minute break, and I'll see what else I have to ask.

THE VIDEOGRAPHER: We are going off the record. The time is 9:55 a.m.

(A recess transpired.)

THE VIDEOGRAPHER: We are now back on the

record. The time is 10:06 a.m.

BY MR. TARTAGLIO:

Q. Ms. Ransom, are you able to estimate when you had the conversation with Ms. Sandhu about what she -- her complaints about the way that she was treated at BlackBerry?

A. I think I was driving to the dentist, so I want to say it was, like, maybe July of '22, or maybe it would have been -- maybe it was -- I was -- maybe it was in the winter. Yeah, maybe it was December of '22. Maybe it was -- I just remember being in the car and taking the call from the car with her.

Q. And earlier we discussed some conversations with Colleen McMillan about her experiences with John Giamatteo and his team?

A. Uh-huh.

Q. Did those happen while -- I'm not going to ask you the date for that --

A. Yeah.

Q. -- but did those happen while Ms. McMillan was still working for BlackBerry?

A. Well, we had -- I would have talked with Colleen while she was still there and I was still there, but I also would have spoken with her after she had left as well, yeah.



Page 38

1    Q.  And when Ms. McMillan was still working for
2  BlackBerry --
3    A.  Yep.
4    Q.  -- did she say to you that she had been
5  subjected to the sort of, you know, sexist banter we
6  talked about earlier?
7    A.  Yes.  I -- I'm sure that would have come up.
8    Q.  Okay.
9        MR. TARTAGLIO:  I'll let opposing counsel ask --
10  ask her questions now.
11       MS. BECK:  Okay.  Great.
12            EXAMINATION
13  BY MS. BECK:
14   Q.  Good morning, Ms. Ransom.  My name, as I said at
15  the beginning, is Lauren Beck, and I represent
16  BlackBerry.  I have a couple follow-up questions for you,
17  but I will -- I will try to be efficient and -- and --
18  and do my best to keep it as short as I -- as I can.
19       We talked this morning about -- a bit about your
20  resume.
21   A.  Uh-huh.
22   Q.  In your last ten or so years at BlackBerry, you
23  were promoted approximately once every two years; is that
24  right?
25   A.  So yeah.  I had a -- let me just look here.  So

Page 39

1  October 2020 was when I took the vice president sales
2  enablement role, and the senior director role was May of
3  2018.
4    Q.  So about every two years you were promoted?
5    A.  Yep.
6    Q.  And the vice president of sales enablement role,
7  that was an executive level role?
8    A.  Yes.  So at the time, they were bringing in a
9  new VP of sales operations, and I said to Karl at the
10  time that if you're going to hire for that position, that
11  I'm interested in that role; that I would like to be
12  considered for that role.  He told me he already had
13  somebody else that he wanted, but I was told I would be
14  given the favor of doing the executive interviews.
15       So I interviewed with Nita, Tom Eacobacci, Billy
16  Hoe.  I forget who the gentleman was.  Somebody else in
17  HR.  I had a whole series of interviews.  And I think the
18  problem was that I was qualified for that role, but that
19  Karl already had somebody else that he wanted for it.
20       And so the sales enablement role wasn't
21  something that was posted or that I had applied for.
22  After the fact, Karl came back and said, "We're not going
23  to give you the VP of sales operations role, but we have
24  this other role as the VP of sales enablement that we're
25  willing to offer you."  And sales enablement at the time

Page 40

1  was kind of in disarray, so I think it was a bit of a
2  problem child that they needed someone to come in and
3  fix.
4        So I wasn't super interested in sales
5  enablement, but VP positions don't come along that often,
6  and so, you know, I took that role because of that, but
7  yeah, it wasn't -- yeah, it was kind of unusual how that
8  role came to be for me.
9    Q.  And that was in -- that was in 2020, that
10  interview process you just described?
11   A.  Correct.  Yep.
12   Q.  And the -- and the -- the VP sales enablement
13  role, that -- that's an executive level role at
14  BlackBerry?
15   A.  Yeah.  I don't know how BlackBerry classifies
16  executive level.  I mean, you could check the bands, but
17  it was a VP sales enablement role.
18   Q.  Okay.  And -- and when -- when John Giamatteo
19  joined the company, joined BlackBerry, at that point did
20  you report to him indirectly as the VP of sales
21  enablement?
22   A.  I reported to Karl Liebman, who was COO at the
23  time, and Karl would have reported to John when Tom
24  Eacobacci left.
25   Q.  So it sounds like that's a yes?

Page 41

1    A.  Through -- through Karl to John, yes.  Yep.
2    Q.  You testified earlier that -- that Karl left in,
3  I think you said, April 2020.  Do you remember that?
4    A.  Yeah.  I don't know if it was exactly April or
5  if it was March or May, but sometime around then is my
6  recollection.
7    Q.  Do you know if he left as part of a
8  reorganization of the sales group?
9    A.  Yes.  Yes.
10   Q.  He did?
11   A.  Yep.
12   Q.  Okay.  I think you testified that Mr. Giamatteo
13  brought in a bunch of new leadership under him when he
14  joined BlackBerry.  Do you remember that?
15   A.  Yep.
16   Q.  And I think you said that people often do this
17  when they come in as executives into tech companies.  Is
18  that --
19   A.  Yes.
20   Q.  -- from your experience?
21   A.  Yes.
22   Q.  Okay.  When you left BlackBerry, you resigned;
23  is that right?
24   A.  That's correct.
25   Q.  Because you'd received a competing offer from



Page 42

1  Sierra Wireless?
2      A.  Yes.  I was -- I was in the process of
3  negotiating, right, with John on that chief of staff
4  role, but yeah.  I mean, I just wasn't -- anyways, I -- I
5  had had a virtual coffee with Steve Harmon, who was a --
6  several years back had worked at BlackBerry, and yeah, I
7  just -- I hopped on a call with him and we were just
8  going to talk about it.  I just wanted to get his opinion
9  on it.  And yeah, he hopped on the call and said, you
10  know, strangest thing, my VP of operations quit this
11  morning.  And he was like, I'm going to hire you, Erin,
12  for that role.
13         And so Sierra Wireless, just very quickly, I
14  think within a week or two, put together an offer, which
15  I accepted.
16      Q.  And that was at the same time that you were
17  negotiating with Mr. Giamatteo about the chief of staff
18  role?
19      A.  Correct.  So BlackBerry had put forward an
20  offer, but the compensation was -- they wanted to switch
21  me from the sales plan to the corporate plan, which paid
22  out at very different rates, and so I had gone back to
23  John.  I feel like I maybe had two conversations with
24  John about it, just explaining it and going through it
25  that I would be making less money in the new role than I

Page 43

1  would have been in the old role.
2         So anyways, yeah.  We were -- we were in
3  discussions on that when I spoke with Steve and -- and
4  then had the offer from Sierra Wireless.
5      Q.  So you were negotiating with Mr. Giamatteo about
6  salary and bonus for the new chief of staff role?
7      A.  Correct.
8      Q.  Were you negotiating about any other aspects of
9  the job?
10      A.  No.  No.  It was -- yeah, it -- it was a bit
11  strange.  Like, it was -- the interview process, I just
12  felt -- I thought was, like, a little bit strange because
13  it was -- you know, when I interviewed for that VP of
14  sales enablement, it was, like, six, one-hour interviews
15  over two days, right, and then here was this position for
16  somebody that I really didn't know or hadn't worked
17  closely with in a position that, you know, you're
18  essentially their right hand person, right.  You have to
19  have a handle on a lot of things, and I don't even know
20  if the first conversation with him was for an hour,
21  right.  Like, I spent some time talking with him on the
22  phone.  I spent an hour talking with JD, who I think had
23  had that role with him at McAfee.
24         But yeah, I just -- I don't know.  It just -- it
25  seemed odd at the time, and in retrospect it seems odd.

Page 44

1      Q.  I think you testified earlier that -- that you
2  had the impression that -- that BlackBerry really wanted
3  to keep you?
4      A.  Yes.
5      Q.  Do I have that right?
6      A.  Yes.  I think I was well-known.  I had been
7  there for a long time, right.  I held different roles.  I
8  had run -- like, I had run special projects that spanned
9  more than my area of responsibility, right.  I had done
10  that a couple of different times at BlackBerry.
11         John Chen had given me a special award in front
12  of the entire company at one point.  So yeah, I think --
13  you know, I think BlackBerry was keen to keep me.  I
14  don't know if John G. was keen for me in that role or if
15  it was more, you know, John Chen and Nita that wanted to
16  find the spot for me.  But yeah, I think they were --
17  they were keen for me not to resign, I think.
18      Q.  Sounds like you had a lot of credibility --
19      A.  Yes.
20      Q.  -- as a leader?
21      A.  Yes.
22      Q.  So we were talking about you're negotiating the
23  offer?
24      A.  Uh-huh.
25      Q.  BlackBerry eventually gave you a counteroffer;

Page 45

1  is that right, for the chief of staff job?
2      A.  I'm not sure.
3      Q.  We can look at -- we can look at some documents
4  that might help.
5      A.  Yeah.
6      Q.  Before we do that, do you -- do you recall
7  asking for specific changes to the -- to the bonus and
8  compensation for that chief of staff offer?
9      A.  I'm sure I would have been specific about it.
10  I'm sure I would have been.
11      Q.  Okay.  Let me see if I can pull up a document
12  that will help.
13      A.  Okay.  Yep.  Because I also remember -- like, I
14  can remember being on the phone with John G. and -- and
15  talking him through it.
16      Q.  Talking him through your --
17             (Simultaneous crosstalk.)
18         THE WITNESS:  I think what I'd -- I think my ask
19  and also just how the -- I feel like I talked him through
20  how the corporate plan paid out versus the sales plan;
21  although, when I say that, it seems like that should be
22  something he would have known already.  So I don't know
23  if there was some nuisance there, but I feel like I had a
24  conversation with him where we went through it, yeah.
25  ///

Page 46

BY MS. BECK:

2    Q.   And the corporate plan versus the sales plan --

3    A.   Yeah.

4    Q.   -- do those refer to bonus plans?

5    A.   Yes.  Yes.  And the problem with the corporate

6  plan was that the sales plan, I mean, it must have been

7  the way the sales comp was set, right.  Even though we

8  weren't hitting the number, it was still paying out at,

9  like, I don't know, 75 percent or something; right;

10 whereas, the corporate plan, I mean I feel like it paid

11 out at 30 percent or less, right.  It was just year after

12 year it hadn't -- right.  It just never -- it just never

13 performed.  Yeah.

14   Q.   And is that because these bonus plans were --

15 were pegged to different targets, sales targets or

16 corporate targets?

17   A.   Yeah.  So I can't remember why.  Like, it seems

18 not congruent to me that, like, sales teams would pay out

19 at 75 and corporate at 30 percent, but I can't remember

20 what the metrics were or -- or why that was, but yeah.

21   Q.   Okay.  I'm going to -- I'm going to pull up a

22 document, which if we could mark as Ransom Exhibit 1.

23        (Exhibit Number 1 was marked.)

24 BY MS. BECK:

25   Q.   I'm putting it in the chat.  I can also share my

Page 47

1  screen if that's helpful.  Do you have a preference?

2    A.   Let me just open it here and --

3    Q.   Sure.

4    A.   I've got an extra monitor, so --

5    Q.   Do you have it open?

6    A.   Yes.  Yep.  Okay.  I've got it open here.

7    Q.   Okay.  Great.  This appears to be an email you

8  sent to Mr. Giamatteo on May 13, 2022.  Do you see that?

9    A.   Yep.

10   Q.   And is this an email you sent as part of your

11 work at BlackBerry?

12   A.   Yes.  Yeah.

13   Q.   And you say here, "I understand that the new

14 position VP of" --

15   A.   Okay.

16        (Simultaneous crosstalk.)

17 BY MS. BECK:

18   Q.   -- "operations" --

19   A.   Yep.

20   Q.   -- "is a VIP role; however, moving from SIP to

21 VIP creates risk to my expected take home."  Is -- is

22 this raising the -- the concerns you were just talking

23 through about the --

24   A.   Yes.  Yes.  So VIP is variable incentive pay

25 versus sales incentive pay.  That's what those acronyms

1  are.  And yes, this -- yep.  This is exactly that, yep.

2    Q.   And then you go on to say, "To mitigate the

3  risk, I would like to propose," and then you propose

4  three terms.  Do you see that?

5    A.   Yep.

6    Q.   So is this a specific counterproposal from you

7  that you're asking -- asking for from BlackBerry?

8    A.   Yes.  Yep.

9    Q.   And the terms you ask for are, first, you asked

10 for a start date of June 1?

11   A.   Uh-huh.

12   Q.   And then you asked to be on the SIP plan until

13 the end of Q2?

14   A.   Yep.

15   Q.   And then you ask that at the start of Q3, you

16 move onto the VIP plan and get a 15-percent increase in

17 base salary; is that right?

18   A.   Yep.  That's what's in here.

19   Q.   And BlackBerry presented you with a new offer in

20 -- in response to this ask?

21   A.   I'm not sure if they did or not, but if you say

22 yes, I'll -- I'll believe you, or if you --

23        (Simultaneous crosstalk.)

24 BY MS. BECK:

25   Q.   I don't want you to take my word for it, but we

Page 49

1  can look at a document that maybe -- maybe will

2  refresh --

3    A.   They did.  They did.  And then -- they did and

4  it -- it expired in, like, 24 hours or something.  I -- I

5  remember that part of it.  So I think they did, after --

6  like, I'll be curious when they did.  I feel like it was

7  several weeks later because I remember it took a really

8  long time, and then when I got it, it was like, you've

9  got 24 hours to sign this.  Sorry.  I just remembered

10 that piece of it.

11   Q.   No, no problem.  I'm going to reask the question

12 just because we were sort of going --

13   A.   Sure.  Sorry.  Yep.

14   Q.   No, not at all, but I'll reask the question just

15 so we have it sort of clearly.

16        So in response to these asks that you had at

17 BlackBerry about salary and bonus for the chief of staff

18 role, BlackBerry responded with a -- with a counteroffer;

19 is that right?

20   A.   Yes.

21   Q.   Okay.  And do you recall whether the

22 counteroffer gave you all -- all these terms that you had

23 requested?

24   A.   I -- I don't.

25   Q.   Okay.  I can -- let's pull up a document.  Maybe

Page 50

1   it will refresh your recollection.  If we could mark this
2   as Ransom Exhibit 2.
3           (Exhibit Number 2 was marked.)
4   BY MS. BECK:
5       Q.  I've just put that in the chat as well.  Let me
6   know when you have that up.
7       A.  Okay.  Yep.  I've got it up here.
8       Q.  Okay.  And this is dated May 25, 2022 to you,
9   Erin Ransom, and the first line says, "This employment
10  offer cancels and supersedes the BlackBerry employment
11  offer of May 4, 2022."
12          Do you see that?
13      A.  Yep.
14      Q.  Is this a -- is -- do you recognize this as a
15  formal counteroffer that was presented to you in late
16  May?
17      A.  Yes.  Yep.
18      Q.  And if you scroll down to the bottom, it's
19  signed by Nita White Ivy.  Do you see that?
20      A.  Yep.
21      Q.  And she was the chief human resources officer at
22  --
23      A.  Correct.
24      Q.  -- BlackBerry?
25      A.  Yep.

Page 51

1       Q.  And it's not signed by you --
2       A.  No.
3       Q.  -- obviously.  Okay.  If we scroll up, on the
4   first page under Employment, it says, "Your position is
5   effective June 1, 2022."
6           Do you see that?
7       A.  I do.
8       Q.  And that's the first term you had requested in
9   your email, right?
10      A.  Uh-huh.
11      Q.  And in Section 2, Compensation, the first bullet
12  says that you'll continue to be on your biweekly base
13  salary and participate in BlackBerry sales incentive
14  program, the SIP program, until August 31, 2022.
15          Do you see that?
16      A.  Yep.
17      Q.  And that's the second term you had requested in
18  your email, right?
19      A.  Uh-huh.
20      Q.  And then under B it says, "Effective
21  September 1, 2022, your biweekly base salary will be
22  10,472.73," which is an increase from the prior, correct?
23      A.  Correct.
24      Q.  And that's 15 -- about 15-percent higher than --
25  than your prior base salary, right?

1       A.  Correct.
2       Q.  And then in bullet three it says that at the
3   same time, you'll transition to the VIP bonus program,
4   right?
5       A.  Correct.
6       Q.  And so this is what you'd asked for in the third
7   term in your email to Mr. Giamatteo, right?
8       A.  Correct.  And the reason that I had requested it
9   was because by moving to this VIP program, right, my
10  total take home would have been less otherwise.  So the
11  first offer that I received would have actually had my
12  take home pay been less than what I was currently making.
13          So it wasn't like, right, with the bonuses, all
14  of a sudden this would be plus 15 percent.  This would
15  have essentially put me back on equal footing.
16      Q.  That makes sense.
17      A.  Right.
18      Q.  But this counteroffer that -- that BlackBerry
19  eventually gave you --
20      A.  Yes.
21      Q.  -- gave you everything you had negotiated for
22  for the chief of staff?
23      A.  Correct.  Correct.
24      Q.  To your knowledge, did BlackBerry hire someone
25  to succeed you after you expressed interest in the chief

Page 53

1   of staff role?
2       A.  Yes.
3       Q.  Was that Jean Treadwell?
4       A.  Yes, it was.
5       Q.  And did you interview Jean Treadwell?
6       A.  I did.
7       Q.  Do you know whether she had been an executive at
8   McAfee before then?
9       A.  She was at McAfee, and she was, I think, in a
10  position of marketing operations, so yes.  Yes, she was.
11      Q.  Did you have an understanding about whether she
12  had worked with Mr. Giamatteo at McAfee?
13      A.  She had worked at McAfee when John G. was there,
14  yes.  Yep.
15      Q.  And do you know one way or the other if -- if
16  Mr. Giamatteo had recommended Ms. Treadwell for -- for
17  the executive role at BlackBerry?
18      A.  Yes.  Yes, he had.
19      Q.  He had?
20      A.  Yes.
21      Q.  And were you impressed with Ms. Treadwell when
22  you interviewed her?
23      A.  She seemed competent.  She didn't have sales
24  enablement background.  Like, her role was pretty
25  different at McAfee, but she seemed competent.  She



seemed good. She seemed fine, yeah.

Q. Okay. I want to move to a different topic. You testified earlier about a call with Ms. Sandhu. Do you remember that?

A. Uh-huh.

Q. And you -- you referenced a dinner that -- that Ms. Sandhu had had with Mr. Giamatteo?

A. Yes.

Q. Do you have any personal knowledge of that dinner, beyond what Ms. Sandhu told you on the phone?

A. No. No.

Q. You also talked about Ms. Sandhu's termination. Do you remember that?

A. Yes.

Q. Do you have any personal knowledge of her termination, beyond what she told you on the phone?

A. No.

Q. And I -- I think you testified a little bit about the timing of that call. Is it -- is it fair to say you don't know when that call happened?

A. I don't. I remember taking it from the car and that it was the dentist. I would -- I would probably say it was December of '22, but I'm not -- I'm not sure.

Q. You also testified a bit about your understanding of Colleen McMillan's experience at

BlackBerry?

A. Uh-huh.

Q. Do you remember that?

A. Yep.

Q. Do you have personal knowledge about that, beyond what Colleen told you?

A. No.

Q. And I think you testified in particular about a comment by ████. Do you remember that?

A. Yes.

Q. Do you have any personal knowledge of that, beyond what Colleen told you?

A. No.

Q. So you weren't there?

A. I was not in the meeting, no.

Q. Okay. You also testified earlier about two instances in which you reported to HR that -- or excuse me. Let me start over.

You testified about two instances in which you requested to HR that female employees have their salaries increased.

A. Uh-huh.

Q. Do you remember that?

A. Yes.

Q. The first one was in 2016 or 2017?

A. Yep.

Q. And when was the second instance?

A. Sorry. Just let me look at the -- probably would have been, like, 2018. So it was when I took on responsibility for sales force, which was, like -- would that have been -- yeah, maybe late 2017. It probably would have been -- I think that one was with the review cycle of, like, the spring or early in the year of 2018, is what I think.

Q. Okay. So -- so both the instances in which you requested that female employees have their salaries increased were around 2016 to 2018?

A. Yes. Yep.

Q. And both of those were before John Giamatteo was -- was hired at BlackBerry?

A. Correct. That's correct.

Q. And I think you testified that BlackBerry did approve special increases in response to each of those requests?

A. They did. Yep.

Q. Okay. You also testified about an incident where a male boss spoke to you inappropriately while you were pregnant. Do you recall that?

A. Yes. Yep.

Q. And I -- I think you said all this, but I just

want to kind of go through this to make sure it's really clear. That boss was someone named ████████ (phonetic)?

A. ████.

Q. ████. Thank you. And that was approximately 2015?

A. No. I think it would have been -- I think it would have been earlier, is what I think. I think it would have actually been, like, maybe 2013, 2012. I was still in a marketing position at that time.

Q. That was my next question. So it was while you were in marketing, not -- not in sales?

A. Correct. Correct. Yep.

Q. And 2013 or -- 2012 or 2013 is also before Mr. Giamatteo was hired at BlackBerry?

A. Correct.

Q. I think I have only one more set of questions, but I am realizing that we -- it's been a while without a break. Do you want to continue, or do you want to take a break?

A. No, I would just continue.

Q. Okay.

A. If you're okay. Yep.

Q. Totally.

A. Okay.



Q.  Okay.  You also testified about an incident involving a -- a training video in front of a painting.  Do you remember that?

A.  Uh-huh.  Yes.

Q.  And I think you said that the person in front of the painting was ███████████

A.  Correct.

Q.  Do you know where he's based?

A.  ███████

Q.  Was anyone else involved in the taping of that training video?

A.  Yes.  Yes.  There was -- like, there was lots of people on that call that day, and that's because we were -- like, each leader would say a few words about people on their team that were getting awards, right, and then we'd go to, like, everybody on video and all clap.  So there was, like, lots of people that day on with that recording, yep.

Q.  I want to show you another email, which we can mark as Ransom Exhibit 3.

(Exhibit Number 3 was marked.)

BY MS. BECK:

Q.  Let me know when you have that one up.

A.  Okay.  Yep.  I see it.

Q.  And this appears to be an email between you and

Mary Slimmon on March 16, 2022, subject --

A.  Yep.

Q.  -- Background Update.  Do you see that?

A.  Yep.

Q.  Is this an email you sent and received as part of your work at BlackBerry?

A.  Yes.

Q.  And if you scroll down, in Ms. Slimmon's email to you she says, "Are you able to send me a screen shot of the recording with the painting in the background."

Do you see that?

A.  Yep.

Q.  Do you understand that to refer to the -- the painting that ███████████ used as a background in the training video we have been discussing?

A.  Yes.

Q.  You reply at the top of the screen and say, "The entire session is 30 minutes, 30 men with HP coming out at the beginning and end to announce a few award winners.  He has maybe five to ten min of screen time."

Do you see that?

A.  Yep.

Q.  And ██ is ███████████

A.  Correct.

Q.  And you also say, "Screen grab below."  Do you

see that?

A.  Yep.

Q.  If you scroll down to the third page, there is an image.

A.  Uh-huh.

Q.  Is that the image you sent Ms. Slimmon?

A.  Correct.

Q.  And what does the image show?

A.  It's like women in shirts, bare legs, got a nice little bit of underwear showing over his right shoulder.

Q.  Besides the bare legs, is there any nudity in the painting?

A.  No, just a lot of bare legs and frolicking women, legs around each other.

Q.  And I think you testified that -- that BlackBerry ultimately did manage to -- to blur this out; is that right?

A.  That's correct.  So we worked with the video agency and blurred it out, but my conversation with Mary was also just about, like, that that's kind of a weird image, right, especially if you're -- he's in this position of an executive and if you are somebody who's younger starting out in your career, that it's just -- it's a little bit uncomfortable, right.

And so we blurred out the image, and so it was

like for that specific activity, fine, right.  You blur it out, it's fine.  But the conversation that I had with Mary was just about, you know, is it okay ongoing if that's his regular, you know, place where he's doing video calls.  So -- and that was left with -- with Mary.  I don't -- I mean, I don't recall that we had more back and forth on that.  I just kind of -- I feel like I just left that with Mary to then follow up as HR saw fit.

Q.  To your knowledge, was Mr. Giamatteo involved in creating this training video?

A.  I don't think we had John in it, but I'm not 100-percent sure.  We had -- this would have just been, like, one video out of, like, a whole bunch, and he would have been -- like, he would have been the person that kicked off the whole thing.  He would have had closing notes.  We would have had pieces of him.

I don't think he was on this call or in this recording.  I don't think we had him handing out awards to winners in this one, but I'm not 100-percent sure.  I don't recall him -- I'm -- I'm not sure.  I'm not sure if he was.  There was a lot of people that were involved in this.  We were kind of just doing, like, quick snippets of people and letting leaders give kudos to their teams.

Q.  So were you recording sort of separate segments, then splicing them together; is that right?  I'm just



going off what I'm hearing --

(Simultaneous crosstalk.)

THE WITNESS: -- we were for the entire sales kickoff, right, because there would have been, like, probably multiple hours of video, right, and there would have been, like, people that would have had a session on, like, a new product or something, right. But I think for this one, I think we had all the leaders -- I think we recorded the whole thing, but it was kind of like ███████ would talk for five minutes, then we'd go to, like, ███████ then we'd go to Colleen. But I don't think we recorded them all as, like, five minutes and then put it together. It was like we were all on together, and each person had their, like, five or ten minutes.

So we recorded this session as, like, one altogether. And the reason -- yes, that is how we did it. And the reason we did that was that, like after they would say, "Congratulations to Jane Smith for her outstanding sales performance," then we would put -- I think we put all the leaders on camera again to, like, do the hurrah, right.

BY MS. BECK:

Q. Got it.

A. Yep.

Q. And -- and was Ms. Sandhu present for this training?

A. No. Nope.

MS. BECK: I think that's -- I think that's all I have. Thank you for -- for your time, Ms. Ransom. I -- I repeat appreciate it. I pass the witness.

THE REPORTER: Is that it everyone?

MR. TARTAGLIO: Nothing further from the Plaintiff.

THE REPORTER: Before we go off the record, would counsel be kind enough, please, to state their orders on the record for the transcript and/or the video, starting with the taking attorney?

MR. TARTAGLIO: Plaintiff will order the transcript, standard deliver. We'll order the video synced, also standard delivery.

THE REPORTER: Thank you. Ma'am?

MS. BECK: The same for BlackBerry, please.

THE REPORTER: And where should I send the reading and signing?

MR. TARTAGLIO: If you send it to myself and make Ms. Smith -- Ms. Beck both, one of us will figure out that process.

THE REPORTER: Thank you. Jacqueline?

THE VIDEOGRAPHER: This con- -- this concludes

the video record of today's deposition of Erin Ransom. The original media of this deposition will remain in the custody of Talty Court Reporters, Incorporated, located in San Jose, California.

We're going off the record at 10:45 a.m.

(The deposition concluded at 10:45 a.m.)

(NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.)

--o0o--

WITNESS' SIGNATURE

Please be advised I have read, under penalty of perjury, the foregoing deposition, pages 1 through 67, inclusive. I hereby state there are:

_____ no corrections

_____ corrections per attached

ERIN RANSOM

--o0o--



Page 66

1          WITNESS' CHANGES OR CORRECTIONS

2

3          NOTE:  If you are adding to your testimony,
print the exact words you want to add.  If you are
4    deleting words from your testimony, print the exact words
you want to delete.  Specify with "Add" or "Delete" and
5    sign this form.
Deposition of:        ERIN RANSOM
6    Case Title:           SANDHU -v- BLACKBERRY, et al
Date of Deposition:   February 26, 2025
7
I,                     , have the following corrections to
8    make to my deposition.  (Use an extra sheet of paper if
necessary.)
9
10   Page/Line      Changes/Add/Delete
11      /
12      /
13      /
14      /
15      /
16      /
17      /
18      /
19      /
20      /
21      /
22      /
23      /
24      /
25      /

Page 67

1          CERTIFICATE OF REPORTER

2          I, TERESA C. SMITH, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition, ERIN RANSOM, was by me duly sworn

5    to tell the truth, the whole truth, and nothing but the

6    truth in the within-entitled cause; that the testimony of

7    said witness was taken down in shorthand by me, a

8    Certified Shorthand Reporter and a disinterested person,

9    at the time and place herein stated, and that the

10   testimony of the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision.

13        I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the outcome of

16   this cause, and that I am not related to any of the

17   parties thereto.

18        I hereto declare under penalty of perjury that

19   the foregoing is true and correct to the best of my

20   ability utilizing the Zoom/Internet connections.  I have

21   hereunto set my hand on March 9, 2025.

22

23

24        Teresa C. Smith, CSR no. 15473

25

