UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NEELAM SANDHU,                          Civil Action
                                        No. 24-cv-02002-SK
      Plaintiff,

v.

BLACKBERRY CORPORATION, et al.

      Defendant.
_____/

**CERTIFIED TRANSCRIPT**

VIDEO-RECORDED DEPOSITION OF MARY SLIMMON

VIA ZOOM VIDEOCOMMUNICATIONS

Thursday, April 10, 2025

Reported by ANN R. LEITZ,

A Certified Shorthand Reporter

State of California, License No. 9149

--oOo--

Page 2

1  APPEARANCES
2
3  FOR THE PLAINTIFF NEELAM SANDHU:
4     BY: ANTHONY TARTAGLIO, ESQ.
       GOMERMAN BOURN & ASSOCIATES
5      825 VAN NESS AVENUE, SUITE 502
       SAN FRANCISCO, CALIFORNIA 94109
6      415.545.8608
       Tony@gobolaw.com
7
8  FOR THE DEFENDANT BLACKBERRY CORPORATION:
9     BY: LAUREN BECK, ESQ.
       MUNGER TOLLES & OLSON, LLP
10     350 S. GRAND AVENUE, 50TH FLOOR
       LOS ANGELES, CALIFORNIA 90071
11     Lauren.Beck@mto.com
12
13    BY: MARGARET MAYO, ESQ.
       (OF COUNSEL, BLACKBERRY CORPORATION)
14
15
16 VIDEOGRAPHER:
17    JIM PARTRIDGE, NOTARY PUBLIC/VIDEO SPECIALIST
       TALTY COURT REPORTERS, INC.
18     408.244.1900
       production@taltys.com
19
20
21 ALSO PRESENT:
22    NEELAM SANDHU (PARTIAL)
23
24            --oOo--
25

Page 3

1  INDEX
2  INDEX OF EXAMINATIONS
3                                                    Page
4  EXAMINATION BY ATTORNEY TARTAGLIO              7, 101
5  EXAMINATION BY ATTORNEY BECK                       71
6            --oOo--
7
8
9
10
11       INDEX OF EXHIBITS
12 Exhibit No.      Description                     Page
13 Exhibit 1    Emails - Re: Stefanie
              BB13-00017450 - 452                     79
14 Exhibit 2    Emails - Re MSSP Stefanie
              BB13-00017453 - 456                     84
15 Exhibit 3    Neelam Sandhu - Resume
              DOE000460-461                           97
16
17            --oOo--
18
19
20
21
22
23
24
25

Page 4

1       BE IT REMEMBERED, that pursuant to Notice to the
2  respective parties, and on Thursday, April 10, 2025,
3  commencing at the hour of 12:58 p.m. thereof, before me,
4  ANN R. LEITZ, a Certified Shorthand Reporter, License
5  No. C-9149, State of California there appeared remotely
6  by videoconference:
7                  MARY SLIMMON,
8   called as a witness herein, and who, being by me first
9  duly sworn remotely to testify the truth, the whole truth
10  and nothing but the truth, was thereupon examined and
11        testified as hereinafter set forth.
12                  --oOo--
13       THE VIDEOGRAPHER:  We are going on the record at
14 12:58 on April 10th, 2025.  This is the Video Deposition
15 of Mary Slimmon --
16       This is taken by -- oh, is it by the Plaintiff?
17       ATTORNEY TARTAGLIO:  By the Plaintiff, yes.
18       THE VIDEOGRAPHER:  Thank you.  I didn't write
19 that down.
20       -- taken by the Plaintiff in the matter of Neelam
21 Sandhu versus BlackBerry Corporation, et al.  This is
22 filed in the United States District Court for the
23 Northern District of California, Case No. 24-CV-02002-SK.
24       This deposition is being held via the Zoom
25 platform.

Page 5

1       My name is Jim Partridge.  I'm a notary public
2  for the county of Sonoma, state of California.  And the
3  court reporter is Ann Leitz.  We're both on behalf of
4  Talty Court Reporters, Inc., located in San Jose,
5  California.
6       Would the counsel please state their appearances
7  beginning with the noticing attorney.
8       ATTORNEY TARTAGLIO:  For Plaintiff Neelam Sandhu,
9  I am Anthony Tartaglio at the Gomerman Bourn law firm.
10       ATTORNEY BECK:  For Defendant BlackBerry
11 Corporation, this is Lauren Beck of Munger Tolles &
12 Olson.  And I'm joined by Margaret Mayo, who is in-house
13 counsel at BlackBerry.
14       THE VIDEOGRAPHER:  Thank you.  Would the reporter
15 please swear in the witness.
16       COURT REPORTER:  Hello, my name is Ann Leitz.  I
17 am a California licensed stenographer, No. 9149.  I am a
18 code compliant reporter. and I will be producing a
19 transcript that's automatically admissible in court.
20       Ms. Slimmon, may I have raise your right hand to
21 be sworn in, please.
22                  MARY SLIMMON,
23    having been duly sworn as a witness by the
24    Certified Shorthand Reporter, testified as follows:
25                  --oOo--



Page 6

1  THE VIDEOGRAPHER: Counsel, before you ask the
2 questions. One thing I wanted to ask before you started.
3 I've set up the recording so you're not going to be
4 showing the exhibits on the screen. Is that the way you
5 prefer it?
6  ATTORNEY TARTAGLIO: I'm probably not going to
7 have any exhibits at all. So if the defense has some
8 exhibits, I'm fine with doing it how they want to do it.
9  ATTORNEY BECK: I might put it to the witness.
10 If Ms. Slimmon -- is it Slimmon? Is that how you
11 pronounce it?
12  **THE WITNESS: That's correct, Slimmon.**
13  ATTORNEY BECK: Great. If we do exhibits, I
14 think there's sort of two ways we can do it. One, we can
15 drop them as PDFs in the Chat and you can pull it up on
16 your own screen and kind of move through it yourself or
17 we can put it up on the screen and walk through it.
18  Do you have a preference?
19  **THE WITNESS: Me?**
20  ATTORNEY BECK: Yes.
21  **THE WITNESS: In the Chat is fine.**
22  ATTORNEY BECK: Okay, great. In that case,
23 sounds good.
24  THE VIDEOGRAPHER: Counsel, you may proceed.
25  ATTORNEY TARTAGLIO: Thank you.

Page 7

1  EXAMINATION BY MR. TARTAGLIO
2  ATTORNEY TARTAGLIO: Q. Good afternoon, Ms.
3 Slimmon.
4  **A. Good afternoon.**
5  Q. So this is a deposition. As you probably heard
6 earlier, I represent the Plaintiff in this case, Neelam
7 Sandhu.
8  And the way this works is that I'm going to be
9 asking you a series of questions under oath and then
10 you're going to answer them. And then once I'm done with
11 my questions, I'll hand it off to Ms. Beck, and she'll
12 have some questions for you, I'm sure.
13  So that's the general idea. And I will give you
14 just some more specific instructions about how this whole
15 process works now. Okay?
16  **A. Okay.**
17  Q. I should ask first, do you have a lawyer
18 representing you for the purpose of this deposition
19 today?
20  **A. I do not.**
21  Q. Okay. And that's fine. You don't have to. But
22 I was just curious.
23  Do you understand that the oath that you just
24 took would be -- is similar to an oath that you would
25 take if you testified in court here in the United States?

Page 8

1  **A. Yes, I do.**
2  Q. Because we have a court reporter who is writing
3 down what I am saying as well as what you're saying, it's
4 important that we try to have one person speaking at any
5 given time, to the extent possible. So I'm going to try
6 to make sure that I'm not talking over anyone. If you
7 could do the same, that would be great. Thank you.
8  **A. Understood.**
9  Q. And another consequence of having a court
10 reporter here today who is typing down what we're saying
11 is that your answers will need to be verbalized, even
12 though during ordinary conversation, we'll just often
13 just nod or shrug our shoulders or maybe do an eye roll
14 or something in response to a question.
15  But today you'll have to say "yes/no" or explain
16 a longer answer, that sort of thing. Okay?
17  **A. Okay, understood.**
18  Q. Although you can make gestures -- sometimes
19 people do, if it's important, and if it happens, I'll
20 probably say something like, The witness is extending her
21 right hand. But for the most part, let's try to give
22 your answers verbal. Okay?
23  **A. Okay.**
24  Q. The court reporter might interrupt you from time
25 to time, might interrupt me from time to time. Sometimes

Page 9

1 the court reporter has trouble hearing what was said.
2 That often happens over Zoom depositions like this. So
3 if that happens, I'm going to do my best to help the
4 court reporter out, so I'll speak more slowly, if
5 necessary, I'll repeat something, if necessary, to make
6 sure we have a clean record so that everything we say is
7 properly recorded down.
8  If the court reporter asks a favor of you, I
9 would ask you to do your best to try and help her out
10 today.
11  **A. I understand. I will.**
12  Q. You can ask me to clarify a question that I ask.
13 In other words, if I asked a question that's not clear,
14 if I'm misunderstanding some aspect of how BlackBerry
15 works, you can say, Can you rephrase that? Can you
16 clarify that? I'm having some trouble answering because
17 XYZ. I say that because some people, they think that
18 they just have to take the question as it's given. But
19 you don't have to if there's something wrong with the
20 question. Okay?
21  **A. Okay, I understand.**
22  Q. I am probably not going to be giving you any
23 exhibits, but the defense BlackBerry might be providing
24 you with some exhibits. If that happens, you can take
25 time to read the whole exhibit, even though oftentimes we



Page 18

1  room to be a part of this conversation.  That is the only
2  person I've talked to.
3      Q.  What is your understanding, just at a high level,
4  if you have one, of what this lawsuit is about?
5      A.  My understanding is that a former employee at
6  BlackBerry by the name of Neelam Sandhu, there was a
7  situation that occurred during her time at BlackBerry
8  that was unprofessional, was not -- was -- you know,
9  violated policies.  That's what I know.
10     Q.  And just so you know, if you haven't already
11 gotten it yet, you are entitled to a witness fee for your
12 time here today.  Don't get too excited.  I think it's
13 around $40 or so.  So here that will buy you a couple
14 dozen eggs.
15         Other than the very generous witness fee, are you
16 getting any other sort of compensation for your time here
17 today?
18     A.  No, I am not.
19     Q.  I'm going to ask about your background a little
20 bit, educational background, professional background and
21 so forth.
22         Do you have a high school degree or equivalent of
23 that?
24     A.  Yes, I do.
25     Q.  And do you have any sort of college degree?

Page 19

1      A.  Yes, I have a university degree.
2      Q.  What was the general field of studies?
3      A.  Dramatic Arts.
4      Q.  Do you have any postgraduate college work that
5  you've done for, let's say, a master's degree, MBA,
6  anything like that?
7      A.  I continued my studies in HR, and so I have an HR
8  certificate which was done after my university degree.
9      Q.  For the HR certificate, did you obtain that from
10 a university somewhere?
11     A.  A college, yes.
12     Q.  College.  And how long was that program?  Was
13 that like a one-year program?
14     A.  That's correct, one year.
15     Q.  Do you remember the name of the college where you
16 got that?
17     A.  Yes.  Conestoga College.
18     Q.  I'm going to ask about your professional
19 background now.  I'm not going to ask about every job you
20 had back to the time you were, you know, flipping burgers
21 in high school.  So I'll try to keep it short.
22         But are you currently working now?
23     A.  Yes.
24     Q.  Where do you work now?
25     A.  I work for an organization called PointClickCare.

Page 20

1      Q.  What's the general nature of the work you do for
2  PointClickCare?
3      A.  It is healthcare software.
4      Q.  Do you remember about when you start working at
5  PointClickCare?
6      A.  Yes.  It was January 2nd of 2023.
7      Q.  And do you do human resources type work?
8      A.  Yes.
9      Q.  And where did -- what was your job before working
10 at PointClick?
11     A.  It was at BlackBerry.
12     Q.  Do you remember approximately when you left
13 BlackBerry?
14     A.  It was the middle of December of 2022.
15     Q.  Do you remember when you started working at
16 BlackBerry, approximately?
17     A.  I do, yes.  It was the middle of January of 2015.
18     Q.  When you started at BlackBerry in 2015, what was
19 your job title, if you remember it?
20     A.  I was Human Resources Business Partner Manager.
21     Q.  Did your job title change at some point while you
22 were working at BlackBerry?
23     A.  Yes, it did.
24     Q.  Was that because you had a promotion or is that
25 more of like a lateral move?

Page 21

1      A.  Promotion.
2      Q.  And after you were promoted, what was your job
3  title then?
4      A.  It was -- "senior" was added to the beginning of
5  it.  So Senior Human Resources Business Partner Manager.
6      Q.  And was that your same job title when you left
7  BlackBerry or did you have another change at some point?
8      A.  It was the same when I left.
9      Q.  And I'm going ask the question now -- I'm going
10 to ask why you left BlackBerry.  But I'm not going to
11 make you answer that question if you don't want to.  So
12 if you feel comfortable sharing that, you can share that.
13 But if you don't feel comfortable, then I'm not going to
14 press the issue and I'll move on.
15         So that being said, are you okay with sharing why
16 you left BlackBerry?
17     A.  Yes, I am.
18     Q.  And why did you leave?
19     A.  A lack of opportunity for promotion and my --
20 the, I guess, type of work or the amount of work that I
21 did have had been cut back.
22     Q.  So I'm going to go through these one by one.
23         So when you say "lack of opportunity for
24 promotion," why was it that you perceived that you were
25 not getting the opportunity that was appropriate for

**Page 22**

1  promotion?
2  A. Uh-huh. I sought guidance from -- oh, I'm sorry,
3  did somebody else have a question?
4      ATTORNEY BECK: Sorry. I was objecting. I said
5  "misstates testimony."
6      But you can go ahead and answer.
7      THE WITNESS: Thank you. Sorry.
8      The question. Oh, so I sought guidance from
9  senior HR leadership on the gaps in my skills or
10 experience that would prepare me for advancement. I
11 received that guidance. I was told that I successfully
12 achieved the required skills of competencies and
13 experience for the next level. However, after two
14 periods of promotion -- it was promotions only certain
15 times of the year -- I had not received promotion.
16     ATTORNEY TARTAGLIO: Q. Were you given
17 explanations as to why you did not get these promotions
18 that you had just discussed?
19 A. No.
20 Q. And this is going to be an opinion. It's going
21 to be speculative. I don't know if the judge would allow
22 this, but I'll ask it anyways. You never know.
23     Do you have an opinion as to why you were not
24 given these promotions?
25 A. Do I have an opinion? Yes, I do have an opinion.

**Page 23**

1      ATTORNEY BECK: Sorry.
2      ATTORNEY TARTAGLIO: Go ahead.
3      ATTORNEY BECK: I also should object. Calls for
4  speculation. You sort of self-reflected. It took me a
5  second. But I do object.
6      ATTORNEY TARTAGLIO: I think I objected to
7  myself. But, yeah, your objection is noted.
8  Q. Sorry. Go ahead, Ms. Slimmon.
9  A. Sorry. So, yes, I do have an opinion. Would you
10 like me to share?
11 Q. Yes, please.
12 A. Thank you. Thank you.
13     That I am a woman. That I identify as a woman.
14 Q. And what leads you to believe that identifying --
15 or that being a woman might have played some part in your
16 lack of promotion?
17 A. I don't know. I don't honestly know. I wish I
18 knew. I don't know.
19 Q. Did you ever see or hear anything that indicated
20 to you that the fact that you are a woman might limit
21 your ability to get promoted?
22     ATTORNEY BECK: Objection. Calls for
23 speculation.
24     THE WITNESS: Yes, I do.
25     ATTORNEY TARTAGLIO: Q. And what did you see or

**Page 24**

1  hear along those lines?
2  A. The number -- specifically, within my department,
3  which was HR, there were more employees that identified
4  as men that were receiving promotions compared to women.
5  Q. And this is a little bit of a -- not really a
6  question. But in the U.S., I think it's fair to say that
7  most HR employees are female. I don't know if it's
8  different in Canada, but -- and I don't have the numbers
9  at my fingertips. But I think that's probably a fair
10 assumption.
11     Would you agree with that?
12 A. Yes.
13 Q. So, I guess, let's talk about the leadership of
14 HR at BlackBerry. And since that may have changed over
15 time, let's talk about near the end of your time there,
16 so around late 2022.
17     Did you have -- well, presumably, you had a
18 supervisor. Was it one supervisor?
19 A. Yes, I did have one supervisor, yes.
20 Q. Who was your supervisor?
21 A. His name was Sean; so it's spelled S-E-A-N. And
22 now -- isn't that terrible? I've totally forgotten his
23 last name. Isn't that terrible. I've blocked it from my
24 memory. I'm sorry. I'm sorry. I can't remember. It
25 may come back to me. I apologize.

**Page 25**

1  Q. Sometimes that happens.
2      So I guess Sean -- let's discuss the leadership
3  of HR, how it was structured.
4      So who was at the top of the HR within
5  BlackBerry?
6  A. Yes. The head of HR was Nita White-Ivy. And
7  "White-Ivy" is hyphenated.
8  Q. What was the layer below Ms. White-Ivy for HR
9  specifically?
10 A. It was VPs. Vice presidents would report
11 directly to Nita White-Ivy. And my former leader Sean --
12 I can't remember his last name -- was a VP. I believe he
13 was a VP. If he wasn't a VP, he was a senior director.
14 But he was a senior HR leader directly beneath Nita.
15 Q. And so, is it fair to say between you -- strike
16 that. Is it fair to say that there would have been
17 Nita -- and I'm gesturing high -- and then another layer
18 of HR managers -- I'm gesturing middle -- and then you,
19 so two layers. Is that fair to say?
20 A. That's correct, yes.
21 Q. And Ms. White-Ivy, she is a woman; right?
22 A. Yes.
23 Q. For the layer below Ms. White-Ivy -- let's say
24 for North America, because maybe there's leadership in
25 other parts of the world.



Page 30

1  had changed, and so I believed that that would prevent me
2  from getting a promotion.
3  ATTORNEY TARTAGLIO: Q. And I want to circle
4  back now to something I should have asked about earlier.
5  But I believe you mentioned that there were two
6  times where you were passed over for promotion --
7  A. (Affirmative head nod.)
8  Q. -- even though you felt as though you had done
9  the work necessary. Is that fair to say?
10  A. Yes, that is correct.
11  Q. And so the first time, do you remember
12  approximately when that happened?
13  A. It was in 2021. I would have to speculate the
14  time of year. But I do know it was in 2021.
15  Q. And do you know -- well, strike that.
16  Were you told that the promotion went to someone
17  else in particular or were you just told that it was not
18  going to happen for you?
19  A. The promotion did not go to anyone else. I just
20  expressed my disappointment that I hadn't been promoted.
21  Q. And when you expressed your disappointment about
22  not getting the promotion, do you remember -- this is
23  where the estimation comes in -- the gist of how you
24  conveyed that information? In other words, to the best
25  of your recollection, how do you remember expressing your

Page 31

1  displeasure?
2  ATTORNEY BECK: Objection. Misstates testimony
3  and object to form.
4  THE WITNESS: I spoke with the person in the
5  department that is considered HR for HR, because even HR
6  departments need HR representatives. And so, I spoke to
7  that individual and let them know that I felt I had met
8  all the criteria, sought feedback whether or not there
9  was something that I was missing, and said that I would
10  just continue to work harder and, hopefully, I would
11  receive a promotion during the next promotion cycle.
12  ATTORNEY TARTAGLIO: Q. Who was this HR for HR
13  individual?
14  A. Yes. Her name is Jennifer Bramhill.
15  Q. And after this first promotion, did you express
16  to Ms. Bramhill that you thought maybe your gender played
17  into the decision to not give you the promotion?
18  A. I don't recall having that conversation with her
19  in the first time.
20  Q. And the second time you did not get the
21  promotion, do you remember approximately when that was?
22  A. Yes. It was earlier in the year in 2022.
23  Q. And when you learned that you were not getting
24  the second promotion, did you hear that the promotion had
25  gone to someone else instead or was it -- or were you

Page 32

1  instead just told it's not happening for you?
2  A. I was not told that it had gone to someone else.
3  I -- similar to the first instance, I was -- I just was
4  simply not told that I was receiving a promotion.
5  Q. And did you express your disappointment to anyone
6  at BlackBerry about not getting the second promotion?
7  A. Yes, I did.
8  Q. And was that, again, with Ms. Bramhill?
9  A. Yes. It was with Jen.
10  Q. What is it that you told Ms. Bramhill about the
11  second time you did not get the promotion?
12  A. I told her that I was disappointed that -- I told
13  her that I was disappointed. I told her that I believed
14  that I was -- had met all of the -- sorry.
15  I told her I met all the criteria for the next
16  level to receive a promotion. And I compared myself to
17  some of my peers, who were already at the more senior
18  level than me.
19  Q. Did Ms. Bramhill give you an explanation for why
20  you did not get the promotion the second time?
21  A. She did not.
22  Q. And circling back a little bit.
23  Did she give you an explanation, the first
24  promotion, as to why you didn't get it?
25  A. She did not.

Page 33

1  Q. I'm going to move on to another topic here.
2  So the plaintiff, my client in this case, is
3  Neelam Sandhu.
4  Did you ever work with her directly while you two
5  were at BlackBerry?
6  A. Could you please define "directly"?
7  Q. Did you ever -- well, I guess I should ask you.
8  So if you worked with Ms. Sandhu, in what
9  capacity did you work with her or to what extent did you
10  work with her?
11  A. I was on a couple of committees with her,
12  business-related committees. They were smallish
13  committees, less than a dozen people. So I would be on
14  telephone calls, video calls, where she was a part of
15  them.
16  Q. And during your experience working with
17  Ms. Sandhu, did you form an opinion as to whether she was
18  an easy person to work with, a difficult person to work
19  with?
20  A. That is -- shall I tell you my opinion?
21  Q. Yes.
22  A. Very -- my opinion is that she is very
23  intelligent. I would not say she was difficult to work
24  with. She's just very, very intelligent and wanted the
25  best for the organization.



Page 38

there had been these issues.
So do you have any firsthand knowledge of these tensions or is that just something you heard from someone else?

A. I have no firsthand knowledge.

Q. Did you ever work with John Giamatteo?

A. Yes.

Q. And in what sort of circumstances did you work with him?

A. My leader Sean -- can't remember his last name -- was John's HR business partner. And there would be times where Sean may be on, you know, PTO, would be on vacation, would be on holiday, and I would be his backup, so I may work directly with John.

There were a few smaller initiatives that I may have to work on with John, whether it was seeking his approval for something, which happened at BlackBerry, where you had to get senior leadership approval for things.

But for the most part, it would just be largely when my leader was away and I was his backfill or I had to send John Giamatteo an email.

Q. During the time that you worked with John Giamatteo, did you ever witness him act in a way that you considered to be unprofessional or disrespectful?

Page 39

A. No.

Q. One of the allegations in this case is that Mr. John Giamatteo acted inappropriately towards women in a sexist manner.

Did you ever witness anything like that?

A. I did not.

Q. And now I'm going to ask about things you may have heard secondhand from other people along those lines.

So did you ever hear that Mr. John Giamatteo had acted inappropriately towards women in a sexist manner?

A. Could you give me examples of inappropriate behavior?

Q. I would think expansively, and whether it qualifies as sex harassment or not, that's a legal determination. But I would just think expansively and, you know, the lawyers can figure out later on what kind of significance it has.

ATTORNEY BECK: Object to form.

THE WITNESS: Then yes, I would say I did witness examples.

ATTORNEY TARTAGLIO: Q. What examples are you thinking of there?

A. Examples that are primarily of a business nature, excluding women from events that -- where they didn't

Page 40

want women. Decisions around delineation of work, of sales deals, actions of that nature.

Q. And sorry, I'm taking notes here.
As for the exclusion of women from events, can you remember any specific incidents about that?

A. Yes.

Q. Okay. And what do you recall about that?

A. I recall a gathering of sales leaders in one of BlackBerry's offices in Texas where the only invitees were -- my perception was they identified as men, and that women -- female women-identified sales leaders within the organization had not been invited. And, in fact, didn't even know about the meeting until I discovered that the meeting was taking place and inquired why they weren't in attendance.

Q. And how did you learn that this meeting in Texas was just for men, or only men were scheduled to appear at this meeting in Texas?

ATTORNEY BECK: Object to form.

THE WITNESS: My leader Sean was at the meeting. And he made reference to me about being at this meeting.

ATTORNEY TARTAGLIO: Q. And how, in particular, did you discover that the meeting had male attendees?

A. I reached out to one of the female women-identified sales leaders that I was their assigned HR

Page 41

business partner and asked them if they were in attendance to this meeting, and they let me know that they were not. And the leader said to me, What meeting are you talking about? I don't even know about this meeting. Oh, sorry.

Q. You go ahead.

A. I am sorry, Tony.
And that sales leader reached out to another female sales leader and asked if she was in attendance, and she didn't know about the meeting either.

Q. Do you recall the names of either of these two women who told you that they were not made aware of this event?

A. Yes, I know their names.

Q. And what are their names?

A. Colleen McMillan and ███████████
███████████

Q. Other than this Texas meeting that we've just been talking about, were there any other meetings or gatherings where, to your knowledge, at least women were excluded?

A. No.

Q. I think you mentioned something about sales deals. Maybe I'm misquoting you here.
But was there anything involving sales deals



Page 70

1  corrections, supplements, you can do that now. Also,
2  you'll be provided with an opportunity to do so after we
3  get the transcript. My office will email you a copy.
4  You can read it and note any corrections you would like
5  to make. You don't have to, but you can if you like.
6  But you can also do it now. Sometimes it pops into
7  someone's head during the break.
8       Can you think of any?
9       A. I can think of one thing. I'm sorry. I
10 interrupted you, Tony.
11      I believe the only thing I should amend slightly
12 is when your question was about the number of employees
13 that would have reported to Nita White-Ivy, I believe my
14 answer was, you know, approximately a dozen or so. I
15 believe that that was the international number. But I
16 believe you had specified in North America.
17      So my -- I would change my answer to be probably
18 closer to about eight individuals in North America
19 specifically that reported directly to Nita White-Ivy.
20 And that is the only thing I would change right now.
21 Thank you.
22      ATTORNEY TARTAGLIO: Thank you for that. And so
23 what I'll do now, I'll ask -- I'll let Ms. Beck ask some
24 questions. And I might have some follow-ups. But
25 perhaps not. So I'll let her take the floor.

Page 71

1       ATTORNEY BECK: Great, thank you.
2            --oOo--
3       EXAMINATION BY ATTORNEY BECK
4       ATTORNEY BECK: Q. Thank you, Ms. Slimmon. I
5  know it's late your time. I also know being deposed is
6  not almost anyone's idea of a good time. So I appreciate
7  you bearing with us. I do have some questions. I'll try
8  my best to be efficient. And as Tony said at the top of
9  his segment, if at any time you want to take a break,
10 just let me know and I'll be happy to do that. I'll just
11 ask that you answer whatever question I've asked if
12 there's a sort of question hanging.
13      Sound fair?
14      A. Yes, thank you.
15      Q. Okay, great. I want to start by talking a little
16 just about timing, sort of make sure I'm clear on some of
17 the times we're talking about.
18      You left BlackBerry in December 2022. Is that
19 right?
20      A. Yes.
21      Q. And so you'll have to forgive a few repetitive
22 questions that are coming your way. But I'll go through
23 them.
24      Since leaving BlackBerry in December 2022, you
25 haven't been privy to the company's internal HR

Page 72

1  decisions. Correct?
2       A. No.
3       Q. Since leaving BlackBerry in December of 2022, you
4  haven't been aware of details of the company's decisions
5  about hiring or promotions. Right?
6       A. No.
7       Q. Since leaving BlackBerry in December 2022, you
8  also haven't been aware of details about the company's
9  decision on who to fire or why. Correct?
10      A. Yes, that's correct. I think I've been answering
11 "no," but in agreement with what you're saying. So I
12 agree with your statement.
13      Q. Thank you. Thank you.
14      That's true of the last two questions as well.
15      A. Okay, thank you.
16      Q. Since leaving BlackBerry in December 2022, you
17 also haven't been aware of the details of the company's
18 decisions about employee compensation. Right?
19      A. That's correct.
20      Q. And since leaving BlackBerry in December 2022,
21 you also haven't been aware of the details of any
22 internal investigations at BlackBerry. Correct?
23      A. That's correct.
24      Q. So if an employee was investigated for misconduct
25 after December 2022, you wouldn't have any firsthand

Page 73

1  knowledge of that. Right?
2       A. That's correct.
3       Q. Was hired in BlackBerry of 2021. Does that sound
4  right?
5       ATTORNEY TARTAGLIO: I think I missed the first
6  part of that question, by the way.
7       THE WITNESS: Me, too. Sorry.
8       ATTORNEY BECK: Q. Sorry. I said, John
9  Giamatteo was hired by BlackBerry in October of 2021.
10 Does that sound right?
11      A. That sounds right.
12      Q. So you and John Giamatteo overlapped at
13 BlackBerry for a little over a year. Is that right?
14      A. Yes.
15      Q. You were not at BlackBerry when Neelam Sandhu was
16 terminated. Correct?
17      A. That's correct.
18      Q. Fair to say you have no firsthand knowledge of
19 Neelam Sandhu's termination from BlackBerry?
20      A. I have no firsthand knowledge of it, no.
21      Q. You were also no longer at BlackBerry when
22 Richard Lynch was acting CEO. Is that right?
23      A. That's correct, I was not.
24      Q. You testified earlier about an investigation into
25 Mr. Giamatteo after John Chen left as CEO. Do you

Page 74

remember that?

A. Yes.

Q. I think you were specifically asked whether BlackBerry conducted that investigation or whether they hired someone external to do the investigation.

Do you remember that?

A. Yes.

Q. And I think you said that you thought the investigation was about misconduct by John Giamatteo.

Do I have that right?

A. Yes.

Q. You don't have any firsthand knowledge of this investigation or the claims. Is that right?

A. No, none.

Q. No firsthand knowledge?

A. No firsthand knowledge.

Q. Thank you. You also testified about Colleen McMillan's exit from BlackBerry. Do you remember that?

A. Yes, I do.

Q. And I think you talked some about the rationale and dynamics involved in her leaving the company?

A. Yes.

Q. That was also after you left BlackBerry. Correct?

A. That's correct.

Page 75

Q. So you have no firsthand knowledge of Colleen McMillan's exit from BlackBerry or the rationale for it?

A. No.

Q. No firsthand knowledge?

A. I do not. No firsthand knowledge.

Q. Thank you. You testified that you were -- you had two roles as an HR business partner at BlackBerry. Do I have that right?

A. Yes.

Q. What were your responsibilities as an HR business partner? At a high level.

A. At a high level, okay. Employee relations within the teams. Terminations. Helping identify skill gaps within the organization. Supporting restructures within the organization. There's high level, yes.

Q. And when you say "within the organization," what do you mean by that?

A. Sorry. I mean the department that I was supporting, the departments I was supporting within the time. I apologize. Sometimes I use them synonymously. So not BlackBerry as the organization.

Q. Not at all. That's very helpful.

So it sounds like you were assigned to specific departments that you would work with. Is that right?

A. That's correct.

Page 76

Q. What departments were you assigned to as an HR business partner?

A. It did change. Would you like me to -- when I was first hired, I was supporting the technical support organization. I believe -- I don't know the precise dates, but I would say probably within a couple of years I also started supporting some of the sales organizations, sales enablement, sales operations.

Ultimately, the technical support organization was given -- given away. Was reassigned to somebody else, but I -- I -- I voluntarily took on other organizations to support within the sales organization, such as channel sales, the team that ▓▓▓▓▓▓▓▓ held as well. So it was almost predominantly sales at that point.

Q. Okay. So in your last few years at BlackBerry, you worked with very -- you worked as an HR business partner with various sales organizations?

A. That's correct. Yes.

Q. And you worked -- during that time, you specifically worked with sales enablement, channel sales and ▓▓▓▓▓▓▓▓ team. Is that right?

A. Yes.

Q. Any organizations I'm missing?

A. Yes. I also worked with a team that was a --

Page 77

they were like a different division of BlackBerry. They were a part of the QNX division under a gentleman by the -- actually, sorry, no. It wasn't QNX. I apologize.

It was Radar is the part of the organization. And the leader was Vito, V-I-T-O, and his last name started with a "G." I can't remember or pronounce it, so ...

Q. Fair enough. And Radar was totally separate from any of the sales departments. Is that right?

A. Yes, yes. It was very different, yes.

Q. So am I right that you were never an HR business partner for the Elite customer group?

A. No, I never was.

Q. And you were never the HR business partner for the marketing organization?

A. No, I wasn't.

Q. Were you ever an HR business partner for a team that included Neelam Sandhu?

A. No, I never was.

Q. So you were never personally involved in employee relations in a group that included Neelam Sandhu. Is that right?

A. That's correct.

Q. You were never personally involved in terminations in a group that included Neelam Sandhu. Is



Page 78

that right?

A. Not that I know of. So that's correct.

Q. And same for scale gaps, you were never --

A. That's correct.

Q. -- involved with scale gaps in a group that Neelam Sandhu was a part of?

A. That's correct.

Q. I want to go back to -- you testified earlier today about a complaint regarding the pay split for a member of Colleen McMillan's team.

Do you recall that?

A. I do.

Q. And the complaint was specifically that someone had a 60/40 compensation split while others on her team had a 70/30 split. Is that right?

A. Yes, that's correct.

Q. And the 60/40 compensation split, that refers to a compensation package where 60 percent of the employees expected compensation as base salary and 40 percent is bonus. Is that right?

A. That's correct. That's correct.

Q. And you were involved in analyzing and responding to this complaint. Is that right?

A. That's correct.

Q. And ultimately, I think you said you were

Page 79

involved in raising the complaint?

A. Yes.

Q. To HR?

A. Yes.

Q. And were you also involved in raising the complaint with Mr. Giamatteo?

A. I can't recall if I sent him a note directly about it. I don't recall.

The path -- the approval path would have been through my leader to John or from Colleen to her leader, who was John. So I don't recall.

ATTORNEY BECK: I want to look at a document that I think might help. I will drop it in the Chat. If I can figure out how to do that.

If we could mark this, please, as Slimmon Exhibit 1. For the record, this is a document that's been produced as BB13-00017450.

(Whereupon Exhibit 1
was marked for identification.)

ATTORNEY BECK: Q. Do you see -- do you have that document up, Ms. Slimmon?

A. Yes, it's just coming up. Yes.

Q. Do you want to take a minute and look it over and tell me when you've had a chance to do that?

A. Yes. Okay. Thank you. I'm ready. Yes, thanks.

Page 80

Q. So this appears to be an email from you to Andrea Symonds on September 8, 2022. Is that right?

A. Oh, sorry.

Q. The top email.

A. At the top, yes, yes.

Q. And does this refer to the complaint that you were testifying about earlier?

A. That's correct.

Q. So does this refresh your recollection that the person who complained was ▉▉▉▉▉▉▉?

A. Yes, it does.

Q. Okay, great. And your top email here is to someone Andrea Symonds.

Who is Andrea Symonds?

A. Andrea -- it's actually Symonds is how she pronounces it.

Andrea is a -- was an employee -- a member of the employee relations team. They would help with investigations, internal investigations. I'll just leave it at that. Complaints. That kind of thing, yeah.

Q. So you say at the end of the first paragraph, you say, "There is now a resolution..."

Do you see that?

A. Yes.

Q. And at the end of the next paragraph you say,

Page 81

"The outcome is that John Giamatteo would prefer the whole team to be 60/40..."

A. Yes.

Q. "So he's working with ▉▉▉▉▉▉▉ ▉▉▉▉ to change everyone by FY'24."

Do you see that?

A. Yes, yes.

Q. And so you're saying here that Mr. Giamatteo believed the full group should have a 60/40 pay split. Is that right?

ATTORNEY TARTAGLIO: Objection. Calls for speculation.

THE WITNESS: Can you repeat the question?

ATTORNEY BECK: Q. I was asking what you were conveying with this paragraph.

And I was specifically asking if you are conveying when you wrote this that Mr. Giamatteo believed the full group should have a 60/40 pay split?

ATTORNEY TARTAGLIO: Same objection.

THE WITNESS: Yes. That is -- his implication is that he would prefer the whole team to be on that split at a time in the future.

ATTORNEY BECK: Q. And that's what you were told as part of your work investigating and trying to bring to resolution this complaint?



A. That's correct.

Q. So, in other words, Mr. Giamatteo's response was that the whole group, both Ms. Alcantar and her peers should be on a 60/40 compensation mix. Is that right?

A. Yes, in the future.

ATTORNEY TARTAGLIO: I'll make a belated objection. Calls for speculation.

ATTORNEY BECK: Q. And you also say in this email that Mr. Giamatteo was working with ▓▓▓▓ to change everyone by FY'24.

A. Yes.

Q. What does "FY'24" refer to?

A. That it is the beginning of the next fiscal year. So when sales compensation plans are created for a fiscal year, it's generally at the beginning of a new fiscal year. And so, the request was that as the sales plans were being created for the next year, the whole team should move to that 60/40 split.

Q. And do you know when the start of that fiscal year would have been in regular years?

A. I was afraid you were going to ask me that. I don't recall. I don't recall what the fiscal years were at BlackBerry at the time. I -- I don't know.

Q. Do you know if it was after you left BlackBerry?

A. Yes. Because this was -- sorry. I'm going to

open the email again. I apologize. At the top, I believe it says "2022."

I believe it was. And so, the email is delayed -- yes. And so, the beginning of the next fiscal year would have been at some point in 2023. The fiscal year did not end in the later part of a calendar year at BlackBerry. I do know it was sometime in the spring, so it would have been -- it could have been as long as six months later. But I don't remember.

Q. So the plan was-- for the change to put the full group on a 60/40 split sometime after January 2023?

A. That's correct.

Q. Great. In the next paragraph you say, "In the meantime, John Giamatteo has received the ok from Nita and Mr. Chen to give ▓▓▓▓ a salary increase (attached). ▓▓▓▓ is pleased with this outcome and has signed her salary increase letter."

Do you see that?

A. Yes.

Q. So is it true that Mr. Giamatteo made sure ▓▓▓▓ received a salary increase after she complained about the compensation split?

A. Yes.

Q. And he did that while he was also working to change the rest of the group's pay split to make theirs

match ▓▓▓▓. Is that right?

A. That's correct.

Q. And ▓▓▓▓ was pleased with the outcome?

ATTORNEY TARTAGLIO: Objection. Calls for speculation.

THE WITNESS: I -- yes.

ATTORNEY BECK: Q. Or another way to say it. You wrote at the time to your colleagues that ▓▓▓▓ was pleased with the pay increase?

A. I honestly don't remember.

Q. Okay. Fair enough.

You wrote it here, though?

A. It's possible then.

Q. Do you remember how much the raise was?

A. I do not.

Q. Do you remember if it was a substantial raise?

ATTORNEY TARTAGLIO: Objection. Vague.

THE WITNESS: I do not.

ATTORNEY BECK: You can look at another document on this. We can mark this, please, as Slimmon Exhibit 2. For the record, it was produced with Bates stamp BB13-00017453.

(Whereupon Exhibit 2 was marked for identification.)

ATTORNEY BECK: Q. If you can open that,

Ms. Slimmon, and let me know when you have that.

A. Uh-huh. Okay. Yes, I have it.

Q. This is an email chain that you are cc'd into on September 2nd, 2022. Is that right?

A. Yes.

Q. And the Subject line here includes MSSP Alliance Manager ▓▓▓▓ out-of-cycle pay adjustment recommendation for approval. Right?

A. Yes, that's correct.

Q. So this discusses the out-of-cycle pay adjustment that ▓▓▓▓ received in September of 2022. Correct?

A. Correct.

Q. If you scroll down to the bottom email, it says that the salary increase BlackBerry's recommending is 19.8 percent.

Do you see that?

A. I do see that.

Q. Does that refresh your recollection about the size of the raise?

A. Yes. Yes, it does.

Q. So I just want to sort of step back and kind of recap it all because I've taken you through all these documents.

So in mid-2022, ▓▓▓▓ reported to



Page 86

BlackBerry HR that her 60/40 pay mix was less favorable, in her view, than her peers' 70/30 pay mix. Is that right?

A. I would disagree with that comment. I do not recollect when ▇ brought it to my attention. The email that you provided, the first one, made reference to sometime in July in 2022. I don't know if that's when she actually initially brought the concern to me or her leader. So I don't know that that's when she first brought it forward. So that's the only part that I would change.

Q. Fair enough. And I appreciate you being precise. So, at some point in 2022, ▇ reported that she felt that her 60/40 pay mix was less favorable than the pay mix her peers had.
Is that right?

A. Correct.

Q. And you were involved in responding to that complaint?

A. Yes.

Q. And BlackBerry responded in September 2022 by giving ▇ a 19.8 percent raise.
Is that right?

A. Yes.

Q. And Mr. Giamatteo approved that raise?

Page 87

A. Yes.

Q. And BlackBerry also responded to the complaint by developing a plan to move ▇ peers to the same 60/40 split that she had.
Is that right?

A. Yes.

Q. And the move was meant to be sometime in 2023?

A. Calendar year, yes, that's correct.

Q. Perfect. Thank you. I'm going to move to another topic.
Plaintiff's counsel asked you some questions about an incident involving a training video in front of a painting. Do you remember that?

A. Yes, I do.

Q. I think you testified that Erin Ransom reported that incident to you. Is that right?

A. That's correct, yes.

Q. Was Ms. Ransom responsible for putting the training video together?

A. Her team, yes.

Q. And you were responsible for sort of responding to the complaint from the HR side?

A. Yes.

Q. Did you review images from the training?

A. Yes.

Page 88

Q. And you reviewed images from the training that showed the person in front of the painting?

A. Yes.

Q. And you concluded that the painting was not business appropriate. Right?

A. Yes.

Q. Did BlackBerry blur the painting from the training video, to your recollection?

A. Yes. At the time of distribution, yes.

Q. So the video was edited to omit the painting ultimately?

A. Yes, because he would not redo it.

Q. Did you speak with his manager?

A. No.

Q. Did you speak with -- did you speak with him about the background?

A. No. I spoke with my manager.

Q. Did you receive any subsequent reports about the issue?

A. From others -- sorry. Yes, I did.

Q. About the same training video?

A. About the same training video, yes.

Q. Did you receive subsequent reports about the painting showing up again?

A. No.

Page 89

Q. To your knowledge, was Mr. Giamatteo involved in this incident in any way?

A. He was aware. He was brought, made aware of it, yes.

Q. Once there was a complaint?

A. Yes.

Q. But when it was happening, was he involved at all?

A. No.

Q. So he didn't appear in the video, for example, in front of the painting?

A. No, no, he did not.

Q. To your knowledge, was Ms. Sandhu involved in this incident in any way?

A. No, I don't believe she was.

Q. She also didn't appear in the video?

A. No.

Q. You testified about a gathering of sales associates at an event in Texas. Do you remember that?

A. Yes, I do.

Q. And I think you specifically testified to that as an event where women weren't invited. Correct?

A. Yes.

Q. What kind of meeting was that? Do you know what was discussed?



A. I do not know what was on the agenda for discussion, no.

Q. Do you know who organized the meeting?

A. I do not.

Q. Do you know who sent the invite list?

A. I do not.

Q. Do you know when the meeting occurred?

A. I don't recall.

Q. I think you described it as an event where they didn't want women around. Do I have that right?

A. That's what I was -- was implied to me, yes.

Q. Who implied that to you?

A. It was Colleen McMillan, based on the activities that had been organized for that event.

Q. So no one from the meeting indicated to you that they didn't want women around?

(Talking over)

A. No. That's correct.

Q. Your sense that they didn't want women around was just based on what you heard from Colleen McMillan?

A. Correct.

Q. And I think you -- actually, no. Sorry. Strike that.

To your knowledge, did Colleen McMillan ever submit any formal complaint to HR about that meeting?

A. Not to my knowledge, no.

Q. Did [REDACTED] ever submit a formal complaint to HR about that meeting?

A. Not to my knowledge, no.

Q. Did Colleen McMillan ever submit a formal complaint to HR regarding the culture of the Cyber BU sales organization, to your knowledge?

A. Formal complaint, not to my knowledge, no.

Q. But she complained to you about the culture of the sales organization?

A. Correct.

Q. Did you encourage her to submit a formal complaint?

A. No. Not to my knowledge.

Q. Plaintiff's counsel asked you quite a few questions about the composition of BlackBerry's HR department by gender.

Do you remember that?

A. I do.

Q. And plaintiff's counsel also asked you questions about the share of leadership in the HR department that was male as opposed to female.

Do you recall that?

A. I do.

Q. When you worked at BlackBerry, the HR department

was led by Nita White-Ivy. Is that correct?

A. That's correct.

Q. Was she the ultimate decision maker for what employees BlackBerry's HR department would hire?

ATTORNEY TARTAGLIO: Objection. Incomplete hypothetical.

THE WITNESS: Yes, she was.

ATTORNEY BECK: Q. And was she the ultimate decision maker for what employees BlackBerry HR department would promote within HR?

A. Yes, she was.

Q. Sorry. I just wanted to -- I should have asked this earlier.

When you were talking about the share of employees who were men versus women in response to plaintiff's questions earlier, that testimony was all about BlackBerry's HR department. Correct?

A. That's correct.

Q. Not any other departments?

A. That's correct. No other departments.

Q. Did you know what others, specifically in the HR department, were paid besides yourself?

A. I was not.

Q. You didn't know?

A. I did not know.

Q. You talked about an instance in which you were asked to speak about your career and your experience as an out lesbian in your career.

Do you remember that?

A. Yes, I do.

Q. Was Neelam involved in that in any way?

A. Not that I'm aware of, no.

Q. (Frozen screen.)

Giamatteo involved in that in any way?

A. I apologize -- yeah, you froze there. Are you able to repeat? Sorry, Tony. No, I'm sorry. Thank you.

Q. I was asking if John Giamatteo was involved in that in any way.

A. No, he was not.

Q. You were asked earlier what this lawsuit was about, what your understanding of it was.

Do you recall that?

A. I do.

Q. I think you said that this lawsuit was about a situation in which Mr. Giamatteo violated BlackBerry's policies.

Do I have that right?

A. Yes.

Q. How did you arrive at that understanding of what the lawsuit was about?



Page 94

1  A.  I -- BlackBerry had a very -- from my
2  perspective, a very excellent business code of conduct
3  policy and program, and so, my -- my observation, just
4  based on the questions being asked were, were that,
5  perhaps, there was some wrongdoing that Mr. Giamatteo
6  had, perhaps was in breach of either the business code of
7  conduct or the anti-harassment policy at BlackBerry.
8      So it was my observation, my guess.
9  Q.  Guess based on the questions in this deposition?
10 A.  Correct, yes.  I would agree with that.
11     ATTORNEY BECK:  I think I may be close to done,
12 but it would be helpful if we took a quick break and I
13 can make sure that's right.
14     Can we go off the record?
15     THE VIDEOGRAPHER:  Off the record.  The time is
16 3:37.
17     (Off the record at 3:37 p.m.)
18     (Resumed at 3:44 p.m.)
19     THE VIDEOGRAPHER:  We are on the record.  The
20 time is now 3:44.  You may continue.
21     ATTORNEY BECK:  Q.  Welcome back, Ms. Slimmon.
22 A.  Thank you.
23 Q.  I have what I hope are just, truly, a few
24 questions left for you.
25 A.  No trouble.

Page 95

1  Q.  I think you testified earlier that you had worked
2  on some small committees with Ms. Sandhu.
3      Do I have that right?
4  A.  Yes, that's correct.
5  Q.  Fair to say those were not part of your core job
6  responsibilities at BlackBerry?
7      ATTORNEY TARTAGLIO:  Objection.  Vague.
8      THE WITNESS:  I don't recall.  I believe they
9  might actually have been.  When I -- what I was referring
10 to by "committee," I mean almost small work groups,
11 whether it was related to a sales kickoff or a sales
12 conference or something.  It would have been within my --
13 the scope of my role as opposed to an employee resource
14 group or something of that nature.  It would have been of
15 a more business nature where we might have been the
16 stakeholder for our subject area in this group.
17     ATTORNEY BECK:  Q.  I see.  Do you feel you
18 worked with her often?
19 A.  No, I did not.
20 Q.  Did you ever work with her one-on-one?
21 A.  I did not.
22 Q.  Were you ever part of conversations with her and
23 her direct reports?
24 A.  Not that I recall, no.
25 Q.  And I think you testified earlier that you never

Page 96

1  acted as an HR partner for one of her teams.  Is that
2  right?
3  A.  That's correct, I did not.
4  Q.  You were asked about some questions by
5  plaintiff's counsel about Ms. Sandhu's reputation at
6  BlackBerry.
7      Do you remember that?
8  A.  I do.
9  Q.  Did you have a sense of her wider reputation in
10 the organization one way or the other?
11 A.  Yes, I do.  I do.  I did.
12 Q.  How did you arrive at that sense?
13 A.  Umm, feedback from others, including her having,
14 you know, high expectations.  That, you know, we should
15 always try our best.  We should work hard.  You know,
16 she's very intelligent and so would expect people to come
17 to meetings with great ideas and, you know, ways to drive
18 revenue and build business.  That was generally the
19 expectation, that individuals knew that they had to come
20 prepared to be able to deliver if they were, you know, in
21 a meeting with her or, you know, had a one-on-one or any
22 other kind of interaction.
23     I apologize; I should not speak about Ms. Sandhu
24 in the past tense.  Is intelligent.  Apologies.
25 Q.  Ms. Sandhu -- actually, let me show you a

Page 97

1  document.
2  A.  Okay.
3      ATTORNEY BECK:  If we could mark this as
4  Exhibit 3.
5      (Whereupon Exhibit 3
6      was marked for identification.)
7      ATTORNEY BECK:  Q.  For the record, this is a
8  document produced by Plaintiff under the Bates number
9  DOE000460.
10     Do you have that open, Ms. Slimmon?
11 A.  I do, yes.
12 Q.  I'll represent to you that this is a copy of
13 Ms. Sandhu's resume which she produced to us as part of
14 discovery in this litigation.
15 A.  Okay.
16 Q.  It says at the very bottom of the first page that
17 she worked at BlackBerry in various roles between
18 February 2009 and September 2014.
19     Do you see that?
20 A.  I do, yes.
21 Q.  It says she was recognized with multiple
22 promotions.  Do you see that?
23 A.  Yes, I do.
24 Q.  It shows that she was then Chief of Staff to the
25 CEO from October 2014 to December 2023.



Do you see that?

A. Yes, I do, yes.

Q. And then it indicates that she was promoted to Head of Sustainability in April 2019.

Do you see that?

A. Yes, I do.

ATTORNEY TARTAGLIO: I apologize, but I missed the last couple of questions. We started looking at the resume. I guess you don't have to read back the whole thing, but what was the gist of the last two questions, let's say?

ATTORNEY BECK: We were walking through the resume entries from various roles up to Head of Sustainability.

Do you want to have it read back?

ATTORNEY TARTAGLIO: That's fine. No, you can go ahead.

ATTORNEY BECK: Q. It then says, Ms. Slimmon, in March 2020 she was made Chief Customer Officer.

Do you see that?

A. I do see that.

Q. And then, according to this resume, she was given an additional role as Chief Marketing Officer in June of 2023?

A. Yes, I see that.

Q. So according to this resume, Ms. Sandhu was promoted three times between 2019 and 2023. Is that right?

A. Between -- I'm sorry. Can you repeat the dates?

Q. 2019 and 2023.

A. I don't necessarily see them as promotions. But additional responsibility in the case of the Chief Customer Officer and the Head of Sustainability. I believe there appears to be a bit of overlap between the two. But then, certainly, it looks like her role -- there was some overlap between the other two roles.

So I can't speak to whether or not they were actually promotions from a compensation perspective. However, it does look like her role expanded significantly in that amount of time.

Q. Fair enough. She was given, in this amount of time, additional executive level responsibility. Is that fair?

A. Yes, it would appear so.

Q. When you were at BlackBerry, was it your impression that Neelam Sandhu was being held back from promotions on account of being a woman?

A. I have -- I can't speculate on that. I -- I don't know the -- I don't know the inner workings of her interactions with the decision makers.

Q. Did you feel she received impressive promotions while she was at BlackBerry?

ATTORNEY TARTAGLIO: Objection. Vague.

THE WITNESS: I don't know that I was aware that they were promotions as opposed to taking on additional work.

ATTORNEY BECK: Sorry. I should have been more precise.

Q. Did you perceive that Ms. Sandhu had -- was being given an impressive scope of responsibility during her time at BlackBerry?

ATTORNEY TARTAGLIO: Objection. Vague, "impressive."

THE WITNESS: Yes, under John Chen's leadership.

ATTORNEY BECK: Q. Did you understand that Ms. Sandhu -- excuse me, strike that. Let me start again.

Did you understand Ms. Sandhu to have a close working relationship with John Chen?

A. Yes, I did. That was my understanding.

Q. Was John Chen perceived as someone who thought highly of her?

A. Yes, he was perceived to think highly of her.

Q. And he increased the scope of her role numerous times?

A. He would have supported that. If Neelam -- it's possible that Neelam identified a need for there to be a new initiative, a new program, a new group. She would have proposed that to Mr. Chen, and he would have likely agreed or disagreed. I don't know that anything was ever handed to Ms. Sandhu.

Q. Fair enough. I think that's it for me for questions. Thank you, Ms. Slimmon.

A. Thank you.

ATTORNEY TARTAGLIO: I have, I think, just two questions.

--oOo--

FURTHER EXAMINATION BY ATTORNEY TARTAGLIO

ATTORNEY TARTAGLIO: Q. So when -- you testified earlier that [redacted] did get a raise or increase in her pay?

A. Yes, I did.

Q. And that was after she had complained about her pay. Correct?

A. Yes. A significant time later, yes.

Q. And you also testified that this painting in the training video ended up getting blurred out of the video. Correct?

A. Correct.

Q. That was after a complaint was made about the



Page 102

1  painting.  Right?
2       A.  Correct.
3           ATTORNEY TARTAGLIO:  No further questions for me.
4           THE VIDEOGRAPHER:  Before I read the closing
5  statement, could we get the orders for the transcript and
6  the video, please?
7           ATTORNEY TARTAGLIO:  Plaintiff will order both.
8  Let's go ahead and sync the transcript.  Standard
9  delivery, no rush.
10          ATTORNEY BECK:  Same for Defendant, please.
11          ATTORNEY TARTAGLIO:  I think I said "sync the
12 transcript."  The video, sync the video.
13          THE VIDEOGRAPHER:  Yes, you did.
14          This concludes today deposition of Mary Slimmon.
15 The original media of this deposition will remain in the
16 custody of Talty Court Reporters, Inc., located in
17 San Jose, California.
18          Off the record.  Time is 3:55.
19          (Whereupon the deposition was concluded at
20          3:55 p.m.)
21                          --oOo--

Page 103

1                CERTIFICATE OF REPORTER
2
3
4       I, ANN R. LEITZ, CSR, License No. C-9149, State
5  of California, do hereby certify:
6       That the witness in the foregoing remote
7  deposition, was by me duly sworn to testify the truth,
8  the whole truth and nothing but the truth in the
9  within-entitled cause;
10      That said remote deposition was reported at the
11 time and place therein stated by me, a Certified
12 Shorthand Reporter, and was thereafter transcribed into
13 typewriting;
14      I further certify that I am not interested in the
15 outcome of said action, nor connected with, nor related
16 to, any of the parties of said action or to their
17 respective counsel.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19 this 21st day of April, 2025.
20
21      _____
        ANN R. LEITZ, CSR, License No. C-9149,
22      State of California

