# EXHIBIT 47

```
                IN THE UNITED STATES DISTRICT COURT

                           FOR THE

                NORTHERN DISTRICT OF CALIFORNIA



                          ---oOo---                    CERTIFIED
                                                      TRANSCRIPT

NEELAM SANDHU,

          Plaintiff,

          VS.                          CASE NO:
                                       24-CV-02002-SK
BLACKBERRY CORPORATION, et al,

          Defendants,
_____/




              VIDEOTAPED VIDEOCONFERENCE

                      DEPOSITION OF

                       SARAH TATSIS

                    SEPTEMBER 2, 2025




       Reported by:  MYRA A. PISH, RPR, CSR #11613
```

Page 2

1 IN THE UNITED STATES DISTRICT COURT
2 FOR THE
3 NORTHERN DISTRICT OF CALIFORNIA
4
5 ---o0o---
6
7 NEELAM SANDHU,
8     Plaintiff,
9 VS.                    CASE NO:
                         24-CV-02002-SK
10 BLACKBERRY CORPORATION, et al,
11     Defendants,
   _____/
12
13
14     VIDEOTAPED VIDEOCONFERENCE deposition of Sarah
15 Tatsis, commencing at the hour of 10:07 a.m, Tuesday,
16 September 2, 2025, held remotely, before Myra Pish,
17 Certified Shorthand Reporter in and for the State of
18 California.
19
20 ---o0o---
21
22
23
24
25

Page 3

1 APPEARANCES:
2 FOR THE PLAINTIFF:
3     GOMERMAN BOURN & ASSOCIATES
      BY:  ANTHONY TARTAGLIO, ESQ.
4     825 VAN NESS AVENUE, SUITE 502
      SAN FRANCISCO, CALIFORNIA  94109
5     415.545.8608
      tony@gobolaw.com
6
7 FOR THE DEFENDANTS, BLACKBERRY CORPORATION:
8     MUNGER, TOLLES & OLSON, LLP
      BY:  KYRA E. SCHOONOVER, ESQ.
9     350 S. GRAND AVENUE, FLOOR 50
      LOS ANGELES, CALIFORNIA  90071
10    213.683.9512
      kyra.schoonover@mto.com
11
12 FOR THE WITNESS, SARAH TATSIS:
13    SORBARA, SCHUMACHER, MCCANN, LLP
      BY:  JUSTIN HEIMPEL, ESQ.
14    31 UNION STREET, E.
      WATERLOO, ON  N2J 1B8
15    519.741.8010, EXT. 224
16
17 ALSO PRESENT:

     JIM PARTRIDGE, VIDEOGRAPHER
18   LINDSAY SKYERS
     MAGGIE MAYO
19   NEELAM SANDHU
20              ---o0o---
21
22
23
24
25

Page 4

1               INDEX
2 EXAMINATION                              PAGE
3 By Mr. Tartaglio                         7, 81
  By Ms. Schoonover                        54, 82
4
5               ---o0o---
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1               EXHIBITS
2 NO.    DESCRIPTION                       PAGE
3 EXH 1  BB13-00020242                     37
4 EXH 2  Document 19118, 19119 & 19138, 19139   43
5 EXH 3  E-mail                            72
6 EXH 4  E-mail                            75
7
8               ---o0o---
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 6

1  VIDEOTAPED VIDEOCONFERENCE
2  DEPOSITION OF SARAH TATSIS
3  TUESDAY, SEPTEMBER 2, 2025
4  ---o0o---
5     THE VIDEOGRAPHER:  We are going on the record.
6     The time is 10:07 on September 2nd, 2025.  This
7  is the video deposition of Sarah Tatsis.  This is taken
8  by the plaintiff in the matter of Neelam Sandhu versus
9  BlackBerry Corporation, et al, filed in the United States
10 District Court for the Northern District of California.
11 Case number 24-CV-02002-SK.
12    This deposition is being held via the Zoom
13 platform.  My name is Jim Partridge.  I'm a notary public
14 for the county of Sonoma, State of California, and the
15 court reporter is Myra Pish.  We're both on behalf of
16 Talty Court Reporters, Inc., located in San Jose,
17 California.
18    Would the counsel please state their
19 appearances, beginning with the noticing attorney?
20    MR. TARTAGLIO:  For plaintiff, Neelam Sandhu,
21 you have Anthony Tartaglio for the Gomerman Bourn law
22 firm.  And we might later be joined by Maria Bourn, also
23 from my firm, and perhaps the plaintiff herself will
24 observe.
25    MS. SCHOONOVER:  For defendant BlackBerry

Page 7

1  Corporation, this is Kyra Schoonover of Munger Tolles &
2  Olson, and I'm joined by Margaret Mayo, who is inhouse
3  counsel at BlackBerry, as well as Lindsay Skyers who is a
4  paralegal at BlackBerry.
5     THE VIDEOGRAPHER:  Thank you.
6     Would the reporter please swear the witness?
7     (Court Reporter clarification.)
8     MR. HEIMPEL:  My name is Justin Heimpel.  I'm
9  counsel for the witness, Ms. Tatsis.
10    THE VIDEOGRAPHER:  Now would you please swear in
11 the witness?
12    (Court Reporter stated name and CSR number for
13 the record.)
14           SARAH TATSIS,
15       called as a witness by and on behalf
16       of the Plaintiff, being first duly
17       sworn, was examined and testified as
18       follows:
19    THE VIDEOGRAPHER:  Counsel, you may proceed.
20           EXAMINATION
21 BY MR. TARTAGLIO:
22    Q.  Good afternoon, Ms. Tatsis.
23    **A.  Afternoon.**
24    Q.  So, I'm going to start off by explaining a
25 little bit about how the deposition process works here in

Page 8

1  federal cases in the United States of America.  Okay?  Is
2  that a yes?
3     **A.  Yes.**
4     Q.  Okay.  The first thing is, that your answers
5  will need to be verbal.  Even though in ordinary
6  conversation we nod our head, we shrug our shoulders, but
7  today, because we have a court reporter writing down
8  everything that we're saying, you will -- you will need
9  to try to be mindful about providing verbal responses.
10    Okay?
11    **A.  Okay.**
12    Q.  This deposition video recording is likely to be
13 played at trial, assuming the case goes to trial.  Unless
14 you want to come down to San Francisco, I'm assuming no,
15 so, just so you know, this tape will, in all likelihood,
16 be played to the jury if the case does go to trial.
17    Okay?
18    **A.  Okay.**
19    Q.  And do you understand that the oath that you
20 just took is similar to the oath that you would take if
21 you were to testify here in the United States?
22    **A.  Yes.**
23    Q.  Because we have a court reporter who is writing
24 down what we are saying here today, it's important that
25 we try not to speak over each other, speak one at a time.

Page 9

1  And I will do my best to not talk when someone else is
2  talking, and hopefully everyone else can do the same.
3     Okay?
4     **A.  Okay.**
5     Q.  The court reporter might interrupt us from time
6  to time.  Often times I'm told, "you are going too fast,
7  what was that last thing you said," that sort of thing.
8  That's -- that happens quite a bit, especially over Zoom.
9     So, if the court reporter asks for a
10 clarification, or to slow down, I'm going to do my best
11 to try and help us get a good record today, and hopefully
12 you can do the same.
13    Okay?
14    **A.  Okay.**
15    Q.  From time to time, I will probably ask a
16 question that is not clear to you, or perhaps I'm
17 misunderstanding some aspects of the questioning.  If
18 that happens, you can ask me to clarify a question or you
19 can ask me to rephrase a question that makes more sense
20 to you.  In other words, you don't have take the question
21 as it's given if you think that the question can be
22 improved, because I want to do my best to answer
23 questions -- or to ask questions -- that make sense to
24 you.
25    Okay?

Page 22

1  currently work at a job?
2      A.  Yes.
3          MR. HEIMPEL:  Well, yeah.  I'm not sure how her
4  current employment is relevant, counsel, so I would
5  object.
6          MR. TARTAGLIO:  That's fine.
7          So, at some point you were employed by
8  BlackBerry, correct?
9          THE WITNESS:  Yes.
10 BY MR. TARTAGLIO:
11     Q.  Are you able to estimate when you began working
12 for BlackBerry?
13     A.  2001 as a law student, and 2004 as a full-time
14 employee.
15     Q.  So, 2001, was that the part-time work as a
16 student?
17     A.  Yes.  As a class placement.
18     Q.  And so your full-time work began in 2004?
19     A.  Yes.
20     Q.  And do you recall approximately when you left
21 BlackBerry?
22     A.  At 2023.
23     Q.  So, it sounds like you worked for BlackBerry for
24 around 19 years or so?
25     A.  Yes.

Page 23

1      Q.  I'm not going to ask about every position within
2  BlackBerry, maybe that might take awhile.  But what was
3  your last position that you held within BlackBerry?
4      A.  Senior Vice President of the Platform
5  Development.
6      Q.  And so, just generally at a high-level, what
7  were your job duties within your last position at
8  BlackBerry?
9      A.  I led the engineering team in the development of
10 an IoT platform for modern mover, so I had a team of
11 engineers reporting to me, and they recorded all the data
12 to the AWS.
13     Q.  And are you able to estimate about how many
14 engineers you had working for you?
15         MS. SCHOONOVER:  Objection, vague as to time.
16         MR. TARTAGLIO:  Okay.  Around the time you left
17 BlackBerry.
18         THE WITNESS:  Yeah.  I -- somewhere around 70.
19 BY MR. TARTAGLIO:
20     Q.  And your last position at Blackberry, was that
21 more of a management job or was that a job in which you
22 also did some technical work yourself?
23         MS. SCHOONOVER:  Objection, form of the
24 question.  Vague.
25 ///

Page 24

1  BY MR. TARTAGLIO:
2      Q.  If you understand it, you can go ahead.
3      A.  I was in the leadership position.
4      Q.  For this next question I'm going to ask you why
5  you left BlackBerry.  Often times, witnesses don't want
6  to discuss this, so I'm not going to force the issue.  If
7  you don't want to discuss it, I'll move on, we can talk
8  about other matters.
9          MR. HEIMPEL:  I'm going to object.  I don't
10 think the witness should be answering the question.
11         MR. TARTAGLIO:  Okay.  Well, then I'll move on.
12 BY MR. TARTAGLIO:
13     Q.  In the 12 months before you left BlackBerry,
14 were you working full-time?
15     A.  No.  Not for the entire 12 months.
16     Q.  Was there a point in which you worked reduced
17 hours?
18     A.  No.
19     Q.  What was the reason, then, where -- for not
20 working full-time that whole 12 months?
21     A.  I was on leave.
22     Q.  And during that time you were on leave, did you
23 work reduced hours or were you off entirely?
24     A.  Off entirely.
25     Q.  Approximately how long did that leave last?

Page 25

1      A.  Four months.
2      Q.  And approximately how much -- well, strike that.
3          When you -- when your employment ended with
4  BlackBerry, were you still on that leave?
5      A.  No.
6      Q.  So there was a time period where you came back
7  from BlackBerry and then you left.  And was there some
8  time in between returning from leave and then leaving
9  BlackBerry?
10         MS. SCHOONOVER:  Objection, form of the
11 question.  Misstates testimony.
12         MR. TARTAGLIO:  Well, she can correct me if I'm
13 wrong.
14         THE WITNESS:  Could you ask again?
15         MR. TARTAGLIO:  Yeah.  Was there a period of
16 time between the time you returned from leave and the
17 time you left BlackBerry?
18         MR. HEIMPEL:  I'm going to object.  I'm not sure
19 how this is relevant to anything to do what the issues
20 that have been pleaded in the lawsuit.
21         MR. TARTAGLIO:  Okay.  I'll -- I'll move on.
22 BY MR. TARTAGLIO:
23     Q.  Did you work with Ms. Sandhu at BlackBerry?
24     A.  She was a colleague, but I didn't work directly
25 with her.



Page 26

1  Q. About how frequently would you say that you
2  worked with her?
3      MS. SCHOONOVER: Objection, vague as to time.
4      MR. HEIMPEL: And to clarify, she said she
5  didn't work with her. She said she was a colleague.
6      MR. TARTAGLIO: Oh, okay.
7      Well, did you ever have any work events where
8  you would socialize with Ms. Sandhu?
9      THE WITNESS: Yes.
10 BY MR. TARTAGLIO:
11 Q. And in, like, let's say the last two years that
12 you worked at BlackBerry, approximately how often would
13 you see Ms. Sandhu at work events?
14 A. I don't remember, but a handful of times. Less
15 than a handful of times in the last year.
16 Q. Do you consider yourself to be a friend of
17 Ms. Sandhu's?
18 A. I don't know.
19 Q. Has she ever been to your house?
20 A. No.
21 Q. Have you ever been to her house?
22 A. No.
23 Q. Outside of work, have you ever socialized
24 together?
25 A. No.

Page 27

1  Q. Did you ever -- well, strike that.
2      Did you hear -- well, strike that.
3      To your understanding, did Ms. Sandhu have a
4  reputation at Blackberry as being someone who was
5  difficult to work with?
6      MS. SCHOONOVER: Objection, calls for
7  speculation.
8      THE WITNESS: Can you ask again? I'm sorry.
9      MR. TARTAGLIO: Did you ever hear that
10 Ms. Sandhu had a reputation for being difficult to work
11 with?
12     THE WITNESS: Yes.
13 BY MR. TARTAGLIO:
14 Q. And what did you hear about that?
15 A. I -- I heard that -- that she had, like, how do
16 you describe it. I've heard that she would essentially
17 do whatever John Chen had asked her to do, which at times
18 meant that she would take, maybe what people had given
19 her and misrepresent that, or they felt that it was
20 misrepresented to John.
21 Q. And can you -- do you recall hearing anything
22 else about Ms. Sandhu's being difficult to work with,
23 beyond what we just discussed?
24 A. I had heard that it was difficult to, based on
25 the event, there was some difficulty in working with the

Page 28

1  Elite customer group that Neelam was in charge of,
2  versus, like, the cybersecurity sales team, and that
3  there was difficulty there.
4  Q. Can you remember anything more along those
5  lines?
6      MS. SCHOONOVER: Objection, vague.
7      THE WITNESS: Just -- just that the
8  cybersecurity sales team was upset at the -- that Neelam
9  was in charge of the Elite customer, and that they felt
10 that they should be in charge of those relationships.
11 BY MR. TARTAGLIO:
12 Q. Did you ever hear anyone talk about Ms. Sandhu's
13 personality as being a difficult personality to work
14 with?
15 A. No.
16 Q. Did you ever hear anyone talk about the way
17 Ms. Sandhu dressed?
18 A. Yes.
19     MS. SCHOONOVER: Objection, leading.
20 BY MR. TARTAGLIO:
21 Q. What did you hear about those discussions?
22 A. There was a specific incident where -- there was
23 a specific time when Neelam had met -- John Chen and
24 Neelam had met with Prime Minister Trudeau, and there was
25 pictures of Neelam and Trudeau, and people were

Page 29

1  commenting on the dress that Neelam was wearing in that
2  picture.
3  Q. And what specifically were people saying about
4  the dress?
5  A. Just that it was not appropriate in terms of,
6  like, having uncovered shoulders.
7  Q. Do you recall who was saying that about
8  Ms. Sandhu?
9  A. I don't remember fully, but it was a number of
10 people commenting.
11 Q. And would those have been people within the
12 Internet of Things group?
13 A. No. Primarily within, like, like, a more
14 generally throughout the office, not primarily in the IoT
15 position itself.
16 Q. Do you recall if any of those communications
17 were sent electronically, such as over e-mail or
18 BlackBerry Messenger?
19 A. I don't recall.
20 Q. Did Ms. Sandhu ever talk to you about a dinner
21 that she had with John Giamatteo?
22 A. I don't remember whether we talked about that in
23 her last, like, in the meeting that we -- or in our call
24 after she left or not. But, no.
25 Q. At BlackBerry, how often did you -- well, strike

Page 30

that.
      Did you ever work with John Giamatteo at BlackBerry?
    **A.  No.**
    Q.  Did you ever see Mr. Giamatteo at social events, or work-related social events?
    **A.  Yes.  I met him one time at a cybersecurity summit.**
    Q.  Did you form any impression as to his personality when you met him?
        MS. SCHOONOVER:  Objection, vague.
        **THE WITNESS:  I -- I don't remember.**
BY MR. TARTAGLIO:
    Q.  Have you ever met Richard Lynch?
    **A.  No.  Well, no, I don't remember meeting him.**
    Q.  Who is ▇▇▇▇▇▇
    **A.  He is the -- or was when I was at Blackberry anyway -- the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇**
    Q.  Did you have any interactions with ▇▇▇▇▇ in which you thought that he was behaving unprofessionally towards you?
        MS. SCHOONOVER:  Objection, leading.  Vague as to time.
        MR. TARTAGLIO:  At any time.
        MR. HEIMPEL:  I'd also object as to relevance.

Page 31

How is that relevant to the issues that are pleaded in the lawsuit?
        MR. TARTAGLIO:  I'll ask it more specifically.
        Do you ever felt that ▇▇▇▇▇▇ treated you unfairly because of your gender?
        MR. HEIMPEL:  Again, I'm going to object.  How is that relevant to anything to do with this lawsuit?  ▇▇▇▇▇▇ is not a defendant.  He's not mentioned in the lawsuit, to my recollection, so how he treated or may have treated Ms. Tatsis, didn't have anything to do with anything Mr. Giamatteo may have treated plaintiff.
        MR. TARTAGLIO:  Let me -- let me think about that.
        Did you ever communicate with human resources about the way that ▇▇▇▇▇▇ treated you?
        MS. SCHOONOVER:  Objection, vague, and leading.
        **THE WITNESS:  No.**
BY MR. TARTAGLIO:
    Q.  Who is ▇▇▇▇▇▇
    **A.  He was a peer of mine that reported to ▇▇▇▇▇▇**
    Q.  Did ▇▇▇▇▇▇ ever treat you in a way that you thought was sexist?
        MR. HEIMPEL:  I'm just going to object for the same -- on the same basis as the question as to related to ▇▇▇▇▇▇

Page 32

        MR. TARTAGLIO:  Did you ever communicate to human resources that you thought ▇▇▇▇▇ had behaved in a sexist manner?
        **THE WITNESS:  Yes.**
BY MR. TARTAGLIO:
    Q.  And do you know whether human resources ever investigated that?
    **A.  Yes.**
    Q.  Did human resources communicate with you about the results of that investigation?
    **A.  Yes.**
    Q.  And what did they communicate to you?
        MR. HEIMPEL:  Hold on.  I'm going to object.  I don't know how the, what was communicated as a result of that investigation would you have any relevance to the issues that were pleaded in the lawsuit involving the plaintiff and Mr. Giamatteo.
        MR. TARTAGLIO:  Well, I'll -- I'll explain.
        So, we view Ms. Tatsis as a Me Too witness, someone who experienced misconduct similar to what the plaintiff experienced.  And in many cases, that testimony is admissible as to the plaintiff's case.  Even though it may not be the exact same people, exact same circumstances, if the company knew about these things and didn't do anything to fix it, then that's relevant to our

Page 33

case, so that's the offer of proof, and --
        MS. SCHOONOVER:  I'll note that Blackberry is also disputing the relevance and future admissibility of this evidence, just for the record.
        MR. HEIMPEL:  So the witness has given evidence that a complaint was made, the witness has given evidence that she is aware that an investigation was completed, and the witness has given evidence that the result of that investigation were communicated to her.
        So, what the actual results of that investigation were, or the particulars of that investigation, I'm not sure how that bears on the relevance, so I would continue to take the same position.
        MR. TARTAGLIO:  Did BlackBerry tell you that it had done anything to fix the issues you raised in your complaint?
        MS. SCHOONOVER:  Objection, vague.  Assumes facts not stated.
        **THE WITNESS:  My apologies, can you repeat your question?**
        MR. TARTAGLIO:  You know, I'll ask a different question.
        After you made the human resources complaint, were you -- were you separated from the colleagues that mentioned in that complaint?



Page 34

1   MS. SCHOONOVER: Objection, vague as to
2   complaint. Assumes facts not stated.
3       THE WITNESS: I don't know.
4   BY MR. TARTAGLIO:
5       Q. Did BlackBerry, to your understanding, to your
6   understanding, do anything to protect you from sex
7   discrimination after you made a human resources
8   complaint?
9       MS. SCHOONOVER: Objection, argumentive.
10  Assumes fact not stated.
11      THE WITNESS: I went on leave after the formal
12  complaint.
13  BY MR. TARTAGLIO:
14      Q. And was that leave to protect you or did you
15  take that leave for other reasons?
16      MS. SCHOONOVER: Objection, form of the
17  question. Assumes facts.
18      THE WITNESS: Could you ask the question again?
19      MR. TARTAGLIO: I'll provide a bit of an
20  explanation.
21      Sometimes after an employee makes a complaint to
22  human resources they are separated from the people who
23  are mentioned in the complaint. Maybe the complainer
24  gets moved to another department, or the subject of the
25  complaint gets moved to another department, or gets put

Page 35

1   on leave or something like that, so that's just a little
2   background, because perhaps my questions were not very
3   clear.
4       So, after you communicated to human resources a
5   complaint, were you separated from the subject of the
6   complaint at all?
7       MS. SCHOONOVER: Objection, vague as to the
8   complaint you are referring to.
9       THE WITNESS: I don't know. Like, maybe you
10  could -- I guess I'm not really understanding the
11  question.
12  BY MR. TARTAGLIO:
13      Q. Okay. In the last 12 months that you worked at
14  BlackBerry, did you make a complaint to human resources?
15      A. Yes.
16      Q. Did BlackBerry do anything to separate you from
17  the people you mentioned in that complaint?
18      A. I -- so, maybe the trouble I'm having is just
19  that it's still the question.
20      Do you mean formal complaint?
21      Q. Yes. Yes. Let's -- let's go with formal
22  complaint.
23      A. No.
24      Q. So, did you continue to work with the people
25  that you had mentioned in the human resources complaint

Page 36

1   after you made it?
2       A. So, after I made the formal HR complaint, I went
3   on leave.
4       Q. And at some point you returned from leave,
5   right? About four months later?
6       A. Yes.
7       Q. And when you returned from leave, did you have
8   -- well, strike that.
9       When you returned from leave, were you working
10  with the same people you worked with before leave?
11      A. No.
12      Q. Do you feel as though BlackBerry did anything to
13  protect you from retaliation after making the HR
14  complaint that you made?
15      MS. SCHOONOVER: Objection, vague. Argumentive.
16  Form of the question.
17      MR. HEIMPEL: And I would object on the basis of
18  relevance again. What happened with Ms. Tatsis and her
19  complaint, I fail to see how it's relevant.
20      MR. TARTAGLIO: Well, let me ask it this way.
21      Do you think that -- strike that.
22      Do you think that you were retaliated against
23  for making an HR complaint?
24      THE WITNESS: I don't know.
25  ///

Page 37

1   BY MR. TARTAGLIO:
2       Q. I'm going to put some exhibits in the chat now.
3       Let's look at Exhibit 1.
4           (Thereafter, Plaintiff's Exhibit
5           Number 1 was marked for
6           identification.)
7       MS. SCHOONOVER: Just one moment. It's taking
8   me a second to download it.
9       MR. TARTAGLIO: And Ms. Tatsis, are you able to
10  access this document?
11      THE WITNESS: Yes.
12      MR. TARTAGLIO: Okay. And for the record,
13  Exhibit 1 is page BB13-00020242.
14      And, Ms. Schoonover, are you able to read it
15  now?
16      MS. SCHOONOVER: Yes, thank you.
17      MR. TARTAGLIO: Okay. So, before the last week
18  or so, let's say, had you ever seen this document?
19      THE WITNESS: No.
20  BY MR. TARTAGLIO:
21      Q. Did you write this document?
22      MR. HEIMPEL: How could she have written it if
23  she hadn't seen it before?
24      MR. TARTAGLIO: Well, I'll move on to my next
25  question.

Page 50

1.  THE WITNESS: No.
2.  BY MR. TARTAGLIO:
3.  Q. The next paragraph says, "Tatsis also stated
4.  that Sandhu had complained to her over dinner that an
5.  individual at BlackBerry had made a sexist and racist
6.  comment to her."
7.  Are you able to recall what that comment was?
8.  Alleged comment was?
9.  A. No, I don't think Neelam ever told me the exact
10. comment.
11. Q. Did she ever tell you who allegedly made the
12. comment?
13. A. No.
14. Q. Moving down a little bit, the document says,
15. "According to Tatsis, the IoT group is toxic and
16. attributes this as the reason why she is leaving
17. BlackBerry."
18. Is that sentence accurate?
19. A. Yes.
20. Q. And it goes on to say, "In her view, people do
21. not respect each other and say inappropriate things
22. during meetings."
23. Is that also accurate?
24. A. Yes.
25. Q. And it goes on to say, "Tatsis reported that

Page 51

1.  there was a group of men who engaged this behavior."
2.  Which group of men did you have in mind?
3.  A. I can't recall the specific group of men that I
4.  was talking about in this letter.
5.  Q. And then the last sentence of this paragraph
6.  says, "This complaint was investigated by Rich Curiale."
7.  Do you know who he is?
8.  A. Yes.
9.  Q. Who is he?
10. A. He was working for BlackBerry as, I think for
11. the employment -- employment lawyer.
12. Q. Were you ever interviewed by Mr. Curiale within
13. the last three years you worked at BlackBerry?
14. A. Good question. I don't remember.
15. Q. And the last sentence here says, "Tatsis further
16. reported that women at BlackBerry experience the culture
17. differently than men."
18. Is that statement accurate, or was it accurate
19. at the time?
20. A. Yes.
21. Q. And to document says that you lamented that
22. there are not many women in leadership positions and that
23. it is getting worse.
24. What did you mean by "it is getting worse" if
25. that is indeed what you told the investigator?

Page 52

1.  A. Less women in leadership positions than
2.  previously.
3.  Q. And when did the issue of women in leadership
4.  positions start getting worse?
5.  A. I can't recall exactly, but certainly over the
6.  time period that I was at BlackBerry it appeared to get
7.  worse.
8.  Q. Do you feel that at BlackBerry you were paid an
9.  amount of money commensurate to what similarly-situated
10. men were being paid?
11. MS. SCHOONOVER: Objection, foundation. Calls
12. for speculation.
13. MR. HEIMPEL: I also object on the basis of
14. relevance. I don't think it's relevant what Ms. Tatsis'
15. compensation was.
16. MR. TARTAGLIO: Ms. Tatsis, what was the reason
17. you went on leave, that four-month leave that we were
18. talking about earlier today?
19. THE WITNESS: It is medical leave.
20. BY MR. TARTAGLIO:
21. Q. And are you willing to say what medical
22. condition prompted that leave?
23. MR. HEIMPEL: No, don't answer that. Not
24. relevant.
25. MR. TARTAGLIO: Sorry, there's a siren going by.

Page 53

1.  Ms. Tatsis, did you leave BlackBerry
2.  voluntarily?
3.  THE WITNESS: Yes.
4.  BY MR. TARTAGLIO:
5.  Q. And you negotiated a separation agreement with
6.  BlackBerry; is that correct?
7.  A. Yes.
8.  Q. Let's see. Give me a couple of minutes to think
9.  here.
10. In response to the formal complaint that you
11. made to BlackBerry human resources, did you see any
12. reforms that BlackBerry implemented?
13. MS. SCHOONOVER: Objection, vague as to
14. complaint and as to reforms.
15. MR. TARTAGLIO: Go ahead, if you understand.
16. THE WITNESS: I believe I was on leave after my
17. complaint.
18. BY MR. TARTAGLIO:
19. Q. Sorry, what was that?
20. A. I went on leave after my complaint, so I
21. couldn't observe that any changes.
22. Q. And when you returned from your leave, did you
23. see any changes that had been implemented to, in response
24. to your complaint?
25. A. No. Sorry, I said no.

Q. I'm just thinking here. Okay.

I'm going to end my questioning. Even though BlackBerry did not serve a notice of deposition as far as I'm aware, I'm going to allow BlackBerry to ask some questions that are within the scope of my direct.

MS. SCHOONOVER: Yes, my questions will be within the scope of your direct, Tony.

Would you like to take a short break, Ms. Tatsis, or are you ready to proceed now?

**THE WITNESS: I'm ready to proceed.**

EXAMINATION

BY MS. SCHOONOVER:

Q. Okay. You testified earlier that you worked in the Internet of Things, or IoT business unit of BlackBerry.

Do I have that right?

**A. Yes.**

Q. When did you begin working in IoT?

**A. I don't recall, however -- like, exact date -- however, it was after ▮▮▮▮ joined -- joined BlackBerry as the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In other words, when that unit was formed.**

Q. Was it prior to 2021 do you know?

**A. I can't recall.**

Q. Okay. When did you stop working at IoT?

**A. When I left BlackBerry.**

Q. When you worked in the IoT division at BlackBerry, did Neelam Sandhu ever work in that business unit with you?

**A. No.**

Q. She worked in a different business unit, correct?

**A. Yes.**

Q. When you worked in the IoT business unit, did John Giamatteo ever work in that business unit with you?

**A. No.**

Q. He also worked in a different business unit, right?

**A. Yes.**

Q. Who was your direct supervisor between October 2021 and December 2023?

**A. I can't recall all dates, but I moved from reporting to, from Charles Egan, who was the CTO at the time, to Mattias Eriksson, and then to Vito Giallorenzo.**

Q. And did those three people you just named also work in IoT?

**A. No. Charles Egan did not. Again, I don't know the exact timing, but Charles Egan did not. Mattias Eriksson and Vito Giallorenzo did.**

Q. From your knowledge across those three

supervisors you described, did Neelam Sandhu ever report to Charles Egan, Vito Giallorenzo, or Mattias Eriksson?

**A. My apologies, I misheard. Can you ask again?**

Q. Yes. From your understanding, did Neelam Sandhu ever report to Vito Giallorenzo, Mattias Eriksson, or Charles Egan?

**A. No.**

Q. From your knowledge, did John Giamatteo ever report to Charles Egan, Vito Giallorenzo, or Mattias Eriksson?

**A. No.**

Q. So you would agree you had a different supervisor than Neelam Sandhu while you were at BlackBerry?

**A. Yes.**

Q. And you also had a different supervisor than John Giamatteo?

**A. Yes.**

Q. I also had a similar exhibit to Mr. Tartaglio to show you, but I'll just use his version since we already have it up. So if you could turn to his Exhibit 2, which is what we were just looking at. Give you a second to get there.

And I'll represent to you that this is the report that Morrison & Foerster prepared after

investigating the ethics and complaint in November 2023.

So if you could turn to internal page 35 of that document, which is page 6 of the PDF. And I'm looking at number 18, which says Sarah Tatsis, underlined.

Do you see that?

**A. Yes.**

Q. Okay. So according to Morrison & Foerster's notes before us, you said that you had very limited interactions with John Giamatteo.

Do you see that?

**A. Yes.**

Q. Is it true that you had very limited interactions with John Giamatteo while you were at BlackBerry?

**A. Yes.**

Q. The notes also state that you met John Giamatteo in person once.

Do you see that?

**A. Yes.**

Q. Is it true that you met John Giamatteo in person only once?

**A. Yes.**

Q. The notes also state that you met John Giamatteo at a summit in San Ramon.

Do you see that?



Page 58

1  A. Yes.
2  Q. Is it true that you met John Giamatteo at a
3  summit in San Ramon?
4  A. Yes.
5  Q. When was the summit in San Ramon where you met
6  John Giamatteo?
7  A. Don't recall the exact timing. Somewhere in
8  2022, 2023.
9  Q. Okay. I'm going to ask some questions about
10 your interactions with John Giamatteo more specifically.
11     How many times in total have you interacted with
12 John Giamatteo by telephone?
13 A. Do you mean, like, just one-on-one?
14 Q. On a group call or one-on-one.
15 A. Maybe a couple times with being on the same
16 group call, but never interacted.
17 Q. Okay. So you never had a one-on-one telephone
18 call with John Giamatteo?
19 A. No.
20 Q. Same question about e-mail. How many times have
21 you interacted with John Giamatteo directly by e-mail,
22 just you and him?
23 A. None.
24 Q. How many times have you been present on e-mails
25 with John Giamatteo where either you or him were one of

Page 59

1  the recipients?
2  A. Well, I don't know.
3  Q. Would you say it was, you interacting with John
4  Giamatteo via e-mail in these group settings, closer to
5  once a week, once a month, once a quarter, or once a
6  year?
7  A. I don't know.
8  Q. Would you be able to say if you interacted via
9  these e-mails we're discussing, occasionally or
10 frequently?
11     MR. TARTAGLIO: Vague.
12     THE WITNESS: I, again, I don't know.
13 BY MS. SCHOONOVER:
14 Q. Okay. How many times in total have you appeared
15 on video call where John Giamatteo was present?
16 A. I don't know.
17 Q. Same question. Would you be able to estimate if
18 it was closer to once a week, once a month, once a
19 quarter, or once per year?
20 A. I don't know.
21 Q. Okay. Looking back at page 35, the notes here
22 state that you said Mr. Giamatteo was professional in
23 your interactions with him.
24     Do you see that?
25 A. Yes.

Page 60

1  Q. Is it true that Mr. Giamatteo was professional
2  in your interactions with him?
3  A. Yes. When I met him in San Ramon, he was
4  professional.
5  Q. The notes on page 35 also state that you had not
6  seen Mr. Giamatteo engage in any inappropriate sexually
7  suggestive or aggressive comments.
8     Do you see that?
9  A. Yes.
10 Q. Is it true that you had not seen Mr. Giamatteo
11 engage in any inappropriate comments?
12 A. Yes.
13 Q. Is it true that you had not seen Mr. Giamatteo
14 engage in any sexually suggestive comments?
15 A. Yes.
16 Q. Is it true that you had not seen Mr. Giamatteo
17 engage in any aggressive comments?
18 A. Yes.
19 Q. Have you ever observed Mr. Giamatteo do anything
20 you considered to be sexist?
21 A. No.
22 Q. Have you ever observed Mr. Giamatteo do anything
23 you considered to be racist?
24 A. No.
25 Q. Have you ever observed Mr. Giamatteo do anything

Page 61

1  you considered to be discriminatory?
2  A. No.
3  Q. Was Mr. Giamatteo ever your direct supervisor at
4  BlackBerry?
5  A. No.
6  Q. So when you were testifying earlier about your
7  experiences in the IoT business unit and some of the
8  toxic work culture you experienced, you were talking
9  about IoT specifically, correct?
10     MR. TARTAGLIO: Calls for legal conclusion.
11     THE WITNESS: Would you ask me that again?
12     MS. SCHOONOVER: Yes. I'll rephrase. Actually,
13 we'll move on. Come back to this.
14 BY MS. SCHOONOVER:
15 Q. You testified earlier that you heard John
16 Giamatteo was not nice to Neelam Sandhu.
17     Do I have that right?
18 A. Yes.
19 Q. You could not recall who you heard that from
20 specifically. Do you recall now who you heard that from
21 specifically?
22 A. No.
23 Q. Do you recall when you heard these comments
24 about John Giamatteo not being nice to Neelam Sandhu?
25 A. Not specifically. Somewhere in the 2022, 2023.

Page 62

1  Q.  Turning back to the exhibit which I hope is
2  still up in front of you.  I'm looking at same bottom
3  page of 35 here.  Morrison & Foerster's note states that
4  you believe John Giamatteo did not agree with the Elite
5  customers being handled by Neelam Sandhu instead of the
6  cybersecurity unit.
7      Do you see that?
8  A.  Yes.
9  Q.  Is it true that you believed John Giamatteo did
10 not agree with the Elite customers being handled by
11 Neelam Sandhu instead of the cybersecurity unit?
12     MR. TARTAGLIO:  Calls for speculation.
13     THE WITNESS:  Yeah.  I believe that.
14 BY MS. SCHOONOVER:
15 Q.  And why did you -- why do you think that?
16     MR. TARTAGLIO:  Same objection.
17     THE WITNESS:  It had been part of the
18 conversation, like, that was just referenced.
19 BY MS. SCHOONOVER:
20 Q.  So from your understanding, the dispute between
21 cybersecurity and the Elite team was about sales
22 responsibility.
23     Is that fair to say?
24     MR. TARTAGLIO:  Objection, argumentive.
25     THE WITNESS:  I don't remember.

Page 63

1  BY MS. SCHOONOVER:
2  Q.  How many times in total did you see Mr.
3  Giamatteo and Ms. Sandhu interact in person?
4  A.  I don't know.
5  Q.  Okay.  Would you say it was more than five times
6  or less than five times?
7  A.  Probably less than five times.
8  Q.  And in those interactions, you never witnessed
9  Mr. Giamatteo do anything that was not nice to
10 Ms. Sandhu, did you?
11 A.  No.
12 Q.  How many times did you witness Mr. Giamatteo and
13 Ms. Sandhu interact in writing, such as through e-mail?
14 A.  I don't know.
15 Q.  Would you say it was more than five times you
16 saw e-mails between the two or less?
17 A.  I don't know.
18 Q.  In the interactions, did you ever witness Mr.
19 Giamatteo and Ms. Sandhu interact via e-mail?
20 A.  I'm not sure.  I don't know.
21 Q.  Okay.  And as you sit here today, do you recall
22 a time when Mr. Giamatteo said anything via e-mail that
23 was not nice to Ms. Sandhu?
24 A.  I don't -- I don't remember.
25 Q.  Have you ever seen Mr. Giamatteo make a sexist

Page 64

1  remark to Ms. Sandhu, whether verbally or in writing?
2  A.  No.
3  Q.  Have you ever seen Mr. Giamatteo make a racist
4  remark to Ms. Sandhu, whether verbally or in writing?
5  A.  No.
6  Q.  Have you ever seen Mr. Giamatteo use profanity
7  towards Ms. Sandhu, whether verbally or in writing?
8  A.  I don't remember.
9  Q.  You testified earlier that some people at
10 BlackBerry in your office made comments about
11 Ms. Sandhu's job performance, correct?
12 A.  Yes.
13 Q.  But those comments weren't made by Mr.
14 Giamatteo, were they?
15     MR. TARTAGLIO:  Objection, argumentive.
16     THE WITNESS:  I don't know.
17 BY MS. SCHOONOVER:
18 Q.  Did you ever hear Mr. Giamatteo make a comment
19 about Ms. Sandhu's job performance?
20 A.  No.
21 Q.  Did you ever hear John Chen make a comment about
22 Ms. Sandhu's job performance?
23 A.  No.
24 Q.  Did you ever hear Richard Lynch make a comment
25 about Ms. Sandhu's job performance?

Page 65

1  A.  No.
2  Q.  You also testified earlier that some people in
3  your office at BlackBerry made comments about
4  Ms. Sandhu's attire, correct?
5  A.  Yes.
6  Q.  Did you ever hear Mr. Giamatteo make a comment
7  about Ms. Sandhu's attire?
8  A.  No.
9  Q.  Did you ever hear Mr. John Chen make a comment
10 about Ms. Sandhu's attire?
11 A.  No.
12 Q.  Did you ever hear Richard Lynch make a comment
13 about Ms. Sandhu's attire?
14 A.  No.
15 Q.  Did you ever report the comments you heard about
16 Ms. Sandhu's job performance or attire, to BlackBerry's
17 HR department?
18 A.  No.
19 Q.  So you're -- you don't know one way or another
20 whether BlackBerry HR was ever made aware of these
21 comments about Ms. Sandhu, correct?
22     MR. TARTAGLIO:  Lack of foundation.
23 Argumentive.
24     THE WITNESS:  Could you ask me that again?
25     MS. SCHOONOVER:  Yeah, I'll rephrase.

Page 66

1 Do you know one way or another whether
2 BlackBerry HR was ever made aware of the comments you
3 testified, about that you heard in the office regarding
4 Ms. Sandhu?
5 MR. TARTAGLIO: Lack of foundation. Sorry, go
6 ahead. I'll object after.
7 THE WITNESS: I don't.
8 MR. TARTAGLIO: Lack of foundation.
9 MS. SCHOONOVER: You also testified earlier that
10 Ms. Sandhu complained to you over dinner about a remark
11 that someone had made to her, right? Correct?
12 THE WITNESS: Yes.
13 BY MS. SCHOONOVER:
14 Q. Where was the dinner with Ms. Sandhu where she
15 made this comment to you?
16 A. In San Ramon.
17 Q. When was the dinner with Ms. Sandhu?
18 A. Sometime in 2022, 2023. It was around the same
19 summit.
20 Q. Okay. And you testified that Ms. Sandhu said it
21 was a sexist and racist comment?
22 A. That's what I recall, yes.
23 Q. That's your testimony? Did Ms. Sandhu say what
24 the comment was?
25 A. Not that I recall.

Page 67

1 Q. Did she tell you who made the comment?
2 A. No.
3 Q. Did she tell you when the comment was made to
4 her?
5 A. No. I don't think so.
6 Q. Did you ever find out who made this comment to
7 Ms. Sandhu?
8 A. No.
9 Q. Ms. Sandhu never told you that a Blackberry
10 employee touched her inappropriately, did she?
11 A. No.
12 Q. You testified earlier that you informally
13 complained to both John Chen and BlackBerry HR about some
14 of your colleagues in the IoT business unit, correct?
15 A. Yes.
16 Q. Did that group of men include John Giamatteo?
17 A. No.
18 Q. Did that group of men include Phil Kurtz,
19 BlackBerry's general counsel?
20 A. No.
21 Q. Did that group of men include Richard Lynch?
22 A. No.
23 Q. Did that group of men include Tim Foote?
24 A. No.
25 MR. TARTAGLIO: I'm having a little trouble

Page 68

1 hearing the witness, by the way.
2 THE WITNESS: No.
3 BY MS. SCHOONOVER:
4 Q. Okay. That group of men only included people in
5 your unit, the IoT business unit, correct?
6 A. Correct.
7 Q. You also testified that certain colleagues in
8 IoT didn't treat other colleagues with respect, correct?
9 A. Correct.
10 Q. All of the colleagues you were referring to
11 worked in IoT, correct?
12 A. Sorry, could you ask that again?
13 Q. Yes. The colleagues you were referring to who
14 did not treat other colleagues with respect, they all
15 worked in IoT with you, correct?
16 A. I don't remember if everybody worked in IoT.
17 Q. Okay. Do you recall any?
18 MR. HEIMPEL: So, counsel, can we just pause for
19 one second? I'm going to plug my laptop into a different
20 plug.
21 MS. SCHOONOVER: Yeah.
22 As you sit here today, do you recall being
23 disrespected by any colleagues outside of IoT?
24 THE WITNESS: Could you be more specific as to,
25 like, when?

Page 69

1 BY MS. SCHOONOVER:
2 Q. From 2021 to 2023?
3 A. No.
4 Q. So during your entire career at BlackBerry, did
5 you ever complain about John Giamatteo to BlackBerry's
6 HR?
7 A. No.
8 Q. Same question. During your time at BlackBerry,
9 did you ever complain about Richard Lynch to BlackBerry's
10 HR?
11 A. No.
12 Q. Did you ever complain about Phil Kurtz to
13 BlackBerry's HR?
14 A. No.
15 Q. Did you ever complaint to Tim Foote to
16 BlackBerry's HR?
17 A. No.
18 Q. You also testified earlier about the formal
19 complaint you made about your male colleagues in IoT,
20 correct?
21 A. Yes.
22 Q. Did your February 2023 formal complaint to HR in
23 any way involve John Giamatteo?
24 A. No.
25 Q. Did it in any way involve Phil Kurtz?

Page 70

1  A.  No.
2  Q.  Did it in any way involve Tim Foote?
3  A.  No.
4  Q.  Did it in any way involve Richard Lynch?
5  A.  No.
6  Q.  When you described BlackBerry's culture as toxic
7  to the Morrison & Foerster investigators, you were
8  referring specifically to the culture with IoT, correct?
9       MR. TARTAGLIO:  Leading.
10      THE WITNESS:  Can you point me to where that,
11 where I said that?
12      MS. SCHOONOVER:  Yes.  If you go to page 36,
13 it's sort of like, the second to last paragraph before
14 the redacted portion.
15      I can read the statement:  "When asked about the
16 culture at BlackBerry, Tatsis stated that it depends on
17 the group in the period in time.  According to Tatsis the
18 IoT group is toxic, and she attributed this to the reason
19 why she is leaving BlackBerry."
20      Do you see that?
21      THE WITNESS:  I see that.
22 BY MS. SCHOONOVER:
23  Q.  Would you agree that this statement is
24 specifically about the IoT group at BlackBerry?
25  A.  Which statement?

Page 71

1  Q.  "According to Tatsis, the IoT group is toxic."
2  A.  Yes.
3  Q.  I'm going to show you another document now which
4  Mr. Tartaglio already showed you.  It is Exhibit 1 of
5  his, of his exhibits, and I'm on page 1.  And as Mr.
6  Tartaglio explained, this is a summary of your
7  allegations with some purported quotations of things you
8  said on the phone to Nita White-Ivy.
9       Do you see the bullet points I'm referring to?
10  A.  Yes.
11  Q.  Do you have any reason to think that these
12 bullet points don't reflect what you said to Nita
13 White-Ivy?
14  A.  No.
15  Q.  Please look at the last bullet point.  It
16 states, "How senior leaders can talk and act like this.
17 They should be held accountable for their actions.  They
18 are not BlackBerry's way and not in line with
19 BlackBerry's culture."
20      You said that to Nita White-Ivy, correct?
21  A.  Yes.
22  Q.  When you said "the leaders behavior was not in
23 line with BlackBerry's culture," you meant the larger
24 culture of the company; is that right?
25  A.  I don't recall.

Page 72

1  Q.  What did you mean when you said it was "not in
2  line with BlackBerry's culture"?
3  A.  I don't -- I don't recall.
4  Q.  Okay.  So I have a couple of questions just to
5  establish sort of when you left BlackBerry relative to
6  your interview with the Morrison & Foerster law firm.
7       You left BlackBerry in December of 2023; is that
8  correct?
9  A.  Yes.
10  Q.  And BlackBerry informed you in November of 2023
11 that you were being terminated; is that correct?
12  A.  I can't recall at that time we had the
13 conversation.
14  Q.  Okay.  I'm going to introduce an exhibit here.
15      Sorry it's marked Exhibit C, I was intending to
16 use my own exhibits, but this is BlackBerry's Exhibit C.
17      MR. TARTAGLIO:  I think for the record let's go
18 with Exhibit 3.  I know it says Exhibit C, but --
19      MS. SCHOONOVER:  Yeah, I think that's very fair.
20      (Thereafter, Defendant's Exhibit
21      Number 3 was marked for
22      identification.)
23      MS. SCHOONOVER:  Just give me one moment to pull
24 it up myself.
25      Do you have it in front of you, Ms. Tatsis?

Page 73

1       THE WITNESS:  Not yet.
2       MS. SCHOONOVER:  Okay.
3       MR. TARTAGLIO:  And I'll just note that this is
4  produced by MoFo and has a confidential stamp, but I
5  don't really care about that.
6       MR. HEIMPEL:  This is an e-mail dated
7  November 14, 2023?
8       MS. SCHOONOVER:  Yes.  Exactly.
9       MR. HEIMPEL:  Okay.  We have that up.
10      MS. SCHOONOVER:  Thank you.
11 BY MS. SCHOONOVER:
12  Q.  So, I'll represent to you, Ms. Tatsis, that this
13 is an e-mail from Jen Bramhill, who works in HR at
14 BlackBerry, to one of the lawyers at Morrison & Foerster
15 who is named Christin Hill.
16      I'm looking at page 1.  The e-mail, first e-mail
17 in the thread from Jen to Christin, which is dated
18 November 14, 2023.
19      Do you see that e-mail?
20  A.  Yes.
21  Q.  Have you had a moment to read over the e-mail?
22 Would you like a moment to read over the e-mail?
23  A.  Yes.  I would like a moment.  That would be
24 great.
25  Q.  And you are free to read the entire thread, but

Page 78

1  A. Yes.
2  Q. So, now we scroll down a bit, we see an e-mail
3  from Christin to Jen Bramhill on Monday, November 13th,
4  at 9:48 p.m.
5     Do you see that?
6  A. Yes.
7  Q. And in this e-mail there are some bullet points
8  with highlighted notes underneath, correct?
9  A. Yes.
10 Q. So, you understand that Jen Bramhill's reference
11 to highlighted notes refers to her annotations on this
12 e-mail, correct?
13    MR. TARTAGLIO: Calls for speculation.
14    THE WITNESS: Yes.
15    MR. HEIMPEL: Do you know that or --
16    THE WITNESS: It's just, don't know it, but --
17    MR. HEIMPEL: It appears that way, but I don't
18 think the witness can testify to that.
19    MS. SCHOONOVER: Okay. I'll represent to you
20 that these highlighted notes referred to the annotations
21 Jen mentioned in her e-mail.
22    Please look the the second bullet point in this
23 e-mail. It starts with a question from Christin Hill
24 which reads, "Can you please let us know if Sarah Tatsis
25 is an active employee?"

Page 79

1     Do you see that?
2     THE WITNESS: Yes.
3  BY MS. SCHOONOVER:
4  Q. Okay. And the third, sorry, the second dash
5  point here reads, "I had heard from others that Sarah and
6  Nita have had a discussion in the past week regarding her
7  role at BlackBerry."
8     Do you see that?
9  A. Yes.
10 Q. Is that the discussion you were referring to
11 that you had with Ms. White-Ivy about your role at
12 BlackBerry?
13 A. Yes.
14 Q. And this e-mail is dated November 13, 2023,
15 correct?
16 A. Yes.
17 Q. So, you had this discussion with Ms. White-Ivy
18 about your role at BlackBerry, prior to meeting with the
19 Morrison & Foerster investigator, correct?
20 A. Yes.
21 Q. Okay. A couple more questions.
22    Have you ever interacted with Richard Lynch?
23 A. I don't know.
24 Q. Have you ever observed Richard Lynch do or say
25 anything you considered to be sexist?

Page 80

1  A. No.
2  Q. Have you ever observed Richard Lynch do or say
3  anything you considered to be racist?
4  A. No.
5  Q. Have you ever observed Richard Lynch do or say
6  anything you considered to be discriminatory?
7  A. No.
8  Q. Was Richard Lynch ever your direct supervisor at
9  BlackBerry?
10 A. No.
11 Q. Were you involved in BlackBerry's decision to
12 terminate Neelam Sandhu?
13 A. No.
14 Q. Have you ever spoken to anyone you understood to
15 be involved in the decision to terminate Ms. Sandhu,
16 regarding why she was terminated?
17    MR. TARTAGLIO: Lack of foundation.
18    THE WITNESS: No.
19 BY MS. SCHOONOVER:
20 Q. Do you, yourself, know the reasons Neelam Sandhu
21 was terminated?
22 A. No.
23 Q. Okay. Thank you. Those are all the questions
24 that I have.
25    MR. TARTAGLIO: I have a few followups.

Page 81

1              EXAMINATION
2  BY MR. TARTAGLIO:
3  Q. So, Ms. Tatsis, what was your position again,
4  please remind me, when you left BlackBerry?
5  A. Vice President IVY Platform Development.
6  Q. And after you left, did that position go away in
7  the organization chart?
8     MS. SCHOONOVER: Objection, calls for
9  speculation. Lack of foundation.
10    MR. TARTAGLIO: Sorry, what was the answer?
11    THE WITNESS: Yes. My understanding is yes.
12 BY MR. TARTAGLIO:
13 Q. When you were given the notice of redundancy,
14 did you feel as though you were actually redundant within
15 the company?
16    MS. SCHOONOVER: Objection, vague. Calls for
17 speculation.
18    MR. TARTAGLIO: Let me put it this way.
19    You -- you were working full-time when you got
20 the notice of redundancy, correct?
21    THE WITNESS: Yes.
22 BY MR. TARTAGLIO:
23 Q. Did you feel as though your work was productive?
24 Was adding value to the company?
25    MS. SCHOONOVER: Objection, vague. Calls for

Page 86

1    DECLARATION UNDER PENALTY OF PERJURY
2
3       I, Sarah Tatsis, do hereby certify under penalty of
4    perjury that I have read the foregoing transcript of my
5    deposition, taken on September 2, 2025, that I have made such
6    corrections as appear noted on the Deposition Errata Page,
7    attached hereto, signed by me; that my testimony as contained
8    herein, as corrected, is true and correct.
9
10      Dated this _____ day of _____, 2025, at
11   _____, California.
12
13
14         _____
15             SARAH TATSIS
16
17
18
19
20
21
22
23
24
25

Page 87

1    DEPOSITION ERRATA SHEET
2
3    Page No. _____ Line No. _____ Change to: _____
4    _____
5    Reason for change: _____
6    Page No. _____ Line No. _____ Change to: _____
7    _____
8    Reason for change: _____
9    Page No. _____ Line No. _____ Change to: _____
10   _____
11   Reason for change: _____
12   Page No. _____ Line No. _____ Change to: _____
13   _____
14   Reason for change: _____
15   Page No. _____ Line No. _____ Change to: _____
16   _____
17   Reason for change: _____
18   Page No. _____ Line No. _____ Change to: _____
19   _____
20   Reason for change: _____
21   Signature: _____ Date: _____
22
23
     _____        _____
24
     SARAH TATSIS                          DATE
25

