# EXHIBIT 49

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NEELAM SANDHU, an individual,

        Plaintiff,        Case No.:
v.                              24-cv-02002-SK

BLACKBERRY CORPORATION, a
Delaware Corporation

        Defendant.
_____/

**CERTIFIED TRANSCRIPT**

VIDEOTAPED REMOTE DEPOSITION VIA ZOOM OF

JENNIFER BRAMHILL

FRIDAY, SEPTEMBER 19, 2025

REPORTED BY: MELISSA SNYDER, CSR NO. 13370

Page 2

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3
 4   NEELAM SANDHU, an individual,
 5          Plaintiff,        Case No.:
        v.                    24-cv-02002-SK
 6
     BLACKBERRY CORPORATION, a
 7   Delaware Corporation
 8          Defendant.
     _____/
 9
10
11
12
13   VIDEOTAPED REMOTE DEPOSITION VIA ZOOM OF JENNIFER BRAMHILL,
     taken on behalf of the Plaintiff at 9130 Grand Manor Dr.,
14   Palo Cedro, California, beginning at 9:03 a.m. and ending
     at 12:03 p.m., on FRIDAY, SEPTEMBER 19, 2025, before
15   Melissa Snyder, Certified Shorthand Reporter, No. 13370.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                      APPEARANCES:
 2   FOR THE PLAINTIFF:
 3   GOMERMAN, BOURN & ASSOCIATES
     BY:  ANTHONY J. TARTAGLIO, ESQ.
 4        MARIA A. BOURN, ESQ.
     825 VAN NESS AVENUE
 5   SUITE 502
     SAN FRANCISCO, CA 94109
 6   (415) 545-8608
     tony@gobolaw.com
 7   maria@gobolaw.com
     (APPEARED REMOTELY VIA ZOOM)
 8
 9   FOR THE DEFENDANTS BLACKBERRY:
10   MUNGER, TOLLES & OLSON, LLP
     BY:  LAUREN N. BECK, ESQ.
11   350 S GRAND AVE.
     FLOOR 50
12   LOS ANGELES, CA 90071
     213-683-9576
13   lauren.beck@mto.com
     blackberry13@mto.com
14   (APPEARED REMOTELY VIA ZOOM)
15   BLACKBERRY
     BY:  MARGARET E. MAYO, ESQ.
16   7950 LEGACY DR.
     SUITE 400
17   PLANO, TX 75024
     (APPEARED REMOTELY VIA ZOOM)
18
19   ALSO APPEARING:
20   MIKE MACK, VIDEOGRAPHER (APPEARED REMOTELY VIA ZOOM)
21   LINDSAY SKYERS, BLACKBERRY (APPEARED REMOTELY VIA ZOOM)
22                       ---oOo---
23
24
25
```

Page 4

```
 1                       INDEX
 2   WITNESS:
                                                     PAGE
 3   JENNIFER BRAMHILL
 4       EXAMINATION BY MR. TARTAGLIO               6
 5       EXAMINATION BY MS. BECK                    89
 6
                       ---oOo---
 7
 8
 9
                       EXHIBITS               PAGE
10
11   EXH 1    DEPOSITION NOTICE                     18
12   EXH 2    BLACKBERRY HR POLICIES AND PROCEDURES 21
13   EXH 3    MORRISON & FOERSTER MEMORANDUM        45
14   EXH 4    2023.03.01 TATSIS REPORT BB13-00020242 62
15   EXH 5    E-MAIL WHN00068365.0001               74
16   EXH 6    E-MAIL WHN00068365.0002               76
17   EXH 7    E-MAIL WHN00068365.0003               79
18   EXH 8    E-MAIL WHN00068365.0004               80
19   EXH 9    E-MAIL WHN00068365.0005               81
20   EXH 10   E-MAIL WHN00068365.0006               82
21   EXH 11   E-MAIL RE: IOT MANAGEMENT TRAINING    87
22
                       ---oOo---
23
24
25
```

Page 5

```
 1       FRIDAY, SEPTEMBER 19, 2025, 9:03 a.m.
 2                     ---oOo---
 3
 4       THE VIDEOGRAPHER:  We are now going on the record at
 5   9:03 a.m. on Friday, September 19th, 2025.  This is the
 6   Video Deposition of Jennifer Bramhill, taken by the
 7   Plaintiff, in the matter of Neelam Sandhu versus BlackBerry
 8   Corporation filed in the U.S. District Court for the
 9   Northern District of California, Case Number 24-CV-02002-SK.
10       This deposition is being held via Zoom Video
11   Teleconference.  My name is Michael Mack, and the Court
12   Reporter is Melissa Snyder, both on behalf of Talty Court
13   Reporters, Inc., with offices in San Jose, California.
14       Before we proceed, I will ask Counsel to state their
15   appearance and affiliation for the record, starting with the
16   noticing attorney.
17       MR. TARTAGLIO:  For Plaintiff, you have Anthony
18   Tartaglio from the Gomerman Bourn Law Firm.  It's possible
19   that my colleague, Maria Bourn, might pop in to observe, and
20   it's possible that the Plaintiff will also observe.
21       MS. BECK:  For Defendant BlackBerry Corporation,
22   Lauren Beck of Munger, Tolles, and Olson.  I am joined by
23   Maggie Mayo and Lindsay Skyers, both Inhouse at BlackBerry,
24   will be observing today.
25       THE VIDEOGRAPHER:  Will the Court Reporter please
```



Page 6

1  identify herself for the record and then swear in the
2  Witness?
3       THE REPORTER: Yes.  My name is Melissa Snyder, CSR
4  License 13370.
5       Ms. Bramhill, if you can raise your right hand,
6  please?  I will swear you in.
7
8                       JENNIFER BRAMHILL
9  being first duly sworn by the Certified Shorthand Reporter,
10                     testified as follows:
11
12      **THE WITNESS:  I do.**
13                         EXAMINATION
14 BY MR. TARTAGLIO:
15   Q.  Good morning, Ms. Bramhill.
16   **A.  Good morning.**
17   Q.  I am going to explain a little bit now about how this
18 process works before I get into the substantive questioning.
19 Okay?
20   **A.  Yes.**
21   Q.  Do you understand that the oath that you just took is
22 similar to the oath that you would take if you testified in
23 court in the United States?
24   **A.  I do.**
25   Q.  Incidentally, do you -- are you testifying from the

Page 7

1  United States right now or Canada?
2    **A.  I'm in Canada.**
3    Q.  Okay.  And is that where you reside?
4    **A.  Yes.**
5    Q.  Because we have a court reporter today who is writing
6  down what we're saying, it's important that only one of us
7  speak at any given time, otherwise, it's difficult to record
8  the conversation.  So I am going to do my best not to speak
9  over you, and hopefully you can extend the same courtesy to
10 me.  Okay?
11   **A.  Understood.**
12   Q.  Because we have a court reporter here today who is
13 writing down these proceedings, your answers will need to be
14 verbal, even though in ordinary conversation, oftentimes, we
15 respond using gestures, but today you'll need to answer all
16 my questions using words.  Okay?
17   **A.  Okay.**
18   Q.  The court reporter might interrupt one of us
19 occasionally to ask us to slow down or repeat something.
20 That happens pretty commonly, and if that happens, just do
21 your best to try to help the court reporter get a good
22 record, and I will be doing the same.  Okay?
23   **A.  Okay.**
24   Q.  Some of my questions might not be very clear.  They
25 could be improved.  If that's the case, you can ask me to

Page 8

1  clarify my question or rephrase it in a way that makes more
2  sense to you.  Okay?
3    **A.  Understood.**
4    Q.  You can look to documents today to assist you.  I
5  will ask that you do your best to try to testify from memory
6  first before you do that, but that is an option, and,
7  occasionally, it happens if a witness thinks, well, I don't
8  know the answer, but I know I have an e-mail that I can just
9  find really quickly that will answer that question, I don't
10 want you to spend 45 minutes looking for something, but if
11 you want to, you can refer to documents to help you,
12 although, you don't have to.  Okay?
13   **A.  Okay.**
14   Q.  And this is a corporate deposition today, a 30(b)(6)
15 deposition today.  So I'll explain to you a little bit about
16 what that means.  Normally a witness testifies just in his
17 or her own capacity as an individual, but there are special
18 rules that allow a party to take the deposition of the
19 company.  And given that the company is something of an
20 artificial construct, witnesses have to testify on behalf of
21 the company, and you are one of those witnesses today.  So
22 you're going to be testifying on behalf of BlackBerry.  Is
23 that consistent with your understanding?
24   **A.  Yes.**
25   Q.  And one quirk of corporate depositions is that it's

Page 9

1  more common in corporate depositions for the witness, during
2  the course of a deposition, to look for documents or to send
3  out an e-mail to help them answer a question.  So you can do
4  that.  You can send out a quick e-mail or text message to a
5  colleague.  Hopefully we're not doing that every question,
6  but every once in a while, that's okay.  So that's an option
7  for you if you need a little help answering a question.
8  Okay?
9    **A.  Okay.**
10   Q.  There is a rule of thumb in depositions, which is
11 that it's okay to estimate.  In fact, you should estimate,
12 provided you have a basis to estimate, but that you should
13 not speculate or guess in response to question.  So
14 estimating, a common form of estimating would be dates.
15 Witnesses rarely remember the exact date something happened,
16 but maybe they remember the month or the year, that's fine
17 if that's the case.  Just go ahead and do your best, and
18 also witnesses -- another example of estimating, witnesses
19 rarely remember word for word how a conversation happened,
20 but they can remember the gist of it or part of it that was
21 particularly vivid.  So you can testify as to the gist of a
22 conversation, but you don't want to speculate by, for
23 example, testifying about what someone else was thinking
24 when they said something or did something, because you can't
25 know for sure what someone else was thinking.  You can only

Page 62


of our C-Suite and senior leaders to the employees.

Q. For number 13, what steps did BlackBerry take, if any, in response to the recommendations provided by the March 1, 2023 Richard Curiale report regarding allegations made by Sarah Tatsis and yourself?

A. Could we review that document that you're referring to, the report that you're referring to?

MR. TARTAGLIO: Yeah. I'll put it in chat. Any objection, by the way, to providing the full report to the Witness?

MS. BECK: No, that's fine.

(Exhibit 4 was marked for identification.)

BY MR. TARTAGLIO:

Q. Okay. Let me know when you've had a chance to review it.

A. Okay.

Q. All right. So this is a report that was prepared by Richard Curiale and Monica Lee, correct?

A. Yes. They're listed on this report.

Q. And if we go to page 2 of the report, there's some discussion of an interview with yourself, correct?

A. Yes.

Q. Who is that interview with?

MS. BECK: I'm going to object that this is -- this is outside the scope to the extent it's about the --

anything other than the steps BlackBerry took in response to the recommendation.

BY MR. TARTAGLIO:

Q. Who is the interview with?

A. Which interview, please?

Q. Well, there's an interview here being referred to at the top of page 2.

A. That was with myself, Monica Lee, and Richard Curiale.

Q. And then there's some -- let's see. There's a reference to male employees repeatedly made reference to guys, as in: We need to find a guy, let's get a guy to do it, hire a guy.

Is that something that you personally observed?

MS. BECK: To clarify, this is outside the scope, objection.

THE WITNESS: Yes.

BY MR. TARTAGLIO:

Q. Who -- well, strike that. What was improper about using the word "guy" in this way?

MS. BECK: Object as outside the scope and vague, insofar as the question is unclear whose opinion it's seeking.

MR. TARTAGLIO: Personal.

THE WITNESS: Could you please restate the

question?

BY MR. TARTAGLIO:

Q. Yeah. Why was it inappropriate for employees to say things like: We need to find a guy, let's get a guy to do it, hire a guy, the guys on the team?

MS. BECK: Outside the scope.

THE WITNESS: And, personally, this is just a tone of communication that many people or company have when referring to an individual, just interchanging the term "individual" or "person" with "guy," and it's an observation.

BY MR. TARTAGLIO:

Q. It might feel exclusionary to women on the team who hear this kind of talk, right?

MS. BECK: Objection, scope.

THE WITNESS: It could, yes.

BY MR. TARTAGLIO:

Q. And then the report says that ▉▉▉▉, in talking about -- well, what is a VIP award?

MS. BECK: Objection, scope.

THE WITNESS: It's Variable Incentive Plan.

BY MR. TARTAGLIO:

Q. So is that kind of like a bonus, essentially?

A. Yes.

Q. And Mr. -- well, strike that.

Do you recall ▉▉▉▉ saying that his VIP award "was like a kick in the nuts"?

MS. BECK: Objection, scope.

THE WITNESS: Not specifically ▉▉▉▉ making that statement about himself, no.

BY MR. TARTAGLIO:

Q. Do you recall someone on ▉▉▉▉ team saying that a VIP award "was like a kick in the nuts"?

MS. BECK: Objection. This is outside the scope of what the Witness is here to testify about.

THE WITNESS: I did not hear it directly from a member of ▉▉▉▉ team.

BY MR. TARTAGLIO:

Q. Who did you hear that from?

MS. BECK: Objection, scope, and assumes facts.

THE WITNESS: ▉▉▉▉ stated that he had received feedback to that effect from his team.

BY MR. TARTAGLIO:

Q. So this is something that someone told ▉▉▉▉?

MS. BECK: Objection, scope, foundation.

THE WITNESS: I would be speculating if I -- if I confirmed how you -- how that information was portrayed.

BY MR. TARTAGLIO:

Q. Did ▉▉▉▉ tell you that someone on his team had told him that getting the VIP award "was like a kick in the



nuts"?

MS. BECK: Objection, scope, objection to the extent it's -- it's not clear whether -- or, sorry, strike that. Object to scope.

**THE WITNESS: Could you please repeat the question?**

MR. TARTAGLIO: Yeah, and I think what we can do is we'll stipulate that Defense has a standing objection to questioning about the top of page 2. You know, whether the Judge agrees with you or not, we'll find out, but we can certainly stipulate that Defense has a standing objection to this line of questioning. So that's fine. We don't have to keep repeating it.

MS. BECK: But I think it is very important, because the questions are blurring the line between whether they're asking for Ms. Bramhill's testimony as a corporate representative, for which this is outside the scope, and whether they're seeking her, it sounds like, personal experience of some of the things in the document. That's still outside the scope, but it's important to the record to clarify whether you are asking Ms. Bramhill questions as a corporate representative or as an individual.

MR. TARTAGLIO: Okay. If you want to make an objection to every question, I suppose that's your right.

BY MR. TARTAGLIO:

Q. So did ▇▇▇ tell you that he had heard this

comment -- well, strike that.

Who on ▇▇▇ -- well, strike that.

Who was it who said that getting the VIP award "was like a kick in the nuts"?

MS. BECK: Objection to scope, assumes facts.

**THE WITNESS: ▇▇▇ made that statement.**

BY MR. TARTAGLIO:

Q. Did he make that statement in your presence?

**A. Yes.**

Q. So you saw ▇▇▇ say that getting the last VIP award "was like a kick in the nuts"?

**A. Yes.**

Q. And did you observe two men use a phrase "just between us girls" when they were speaking to each other?

**A. Yes.**

MS. BECK: I should say, Tony, I will take you up on the standing objection that this is outside the scope. I've not been objecting to these questions, because I take them to be more clear that these are asking for Ms. Bramhill's testimony in her personal capacity, but I'll take you up on the standing scope objection.

MR. TARTAGLIO: Okay. Sorry, could you have the question read out again?

(The last question was read back by the Reporter.)

**THE WITNESS: Yes.**

BY MR. TARTAGLIO:

Q. Did you observe ▇▇▇ saying, "I have tried to promote women in the past and they were not interested"?

**A. A comment to that effect, yes.**

Q. And did you find that troubling?

**A. Yes.**

Q. Why was that troubling to you?

**A. There was an implication that women were not willing to be promoted.**

Q. And then there's some discussion here of ▇▇▇ responding dismissively to a presentation by Sarah Tatsis. Do you remember that?

**A. Yes.**

Q. Did you observe ▇▇▇ speaking dismissively about Ms. Tatsis?

**A. Not about Ms. Tatsis, no.**

Q. Did you think it was inappropriate in the way that ▇▇▇ said that he had already provided direction to the Ivy team, and nothing more was required?

MS. BECK: Objection, compound, assumes facts, and, again, it's a standing objection far beyond the scope here.

**THE WITNESS: And could you please repeat that question?**

MR. TARTAGLIO: Could you have the question read out, please?

(The last question was read back by the Reporter.)

MR. TARTAGLIO: Ivy. Like poison Ivy, yeah.

**THE WITNESS: I'm sorry, I missed that first part of that again.**

(The last question was read back by the Reporter.)

**THE WITNESS: Yes.**

BY MR. TARTAGLIO:

Q. Why did you think that was inappropriate?

**A. The response was very terse.**

Q. And what was wrong about the response being terse?

**A. In the context of a group meeting, the comment did -- I did perceive it as dismissive.**

Q. And the -- and it looks like ▇▇▇ repeated the statement that he had done enough, and nothing more was required. Was that -- is that consistent with your recollection?

**A. Yes.**

Q. And then the report discusses that ▇▇▇ leaned over and whispered to ▇▇▇, "Sarah is not technical enough to know when her team is bullshitting her." Is that something that you personally observed?

**A. No.**

Q. Who did you hear that from?

**A. I didn't --**

MS. BECK: Objection, assumes facts.



**THE WITNESS:** I see that it's in this report.
BY MR. TARTAGLIO:
  Q. Do you remember how you learned about that alleged comment?
    MS. BECK: Objection, assumes facts.
    THE WITNESS: ███████ reported hearing that conversation.
BY MR. TARTAGLIO:
  Q. And what was ███████ role at the time?
  **A. She was an HR Business Partner.**
    MR. TARTAGLIO: I am going to -- to my line of questioning, so I think this standing objection is, I guess, no longer in force. So, Ms. -- I'll be more clear.
    Plaintiff's position is that the standing objection is no longer in force. So if Defense wants to make an objection to outside the scope, the Defense will have to do so on a question-by-question basis here on out.
    MS. BECK: That's fine.
BY MR. TARTAGLIO:
  Q. So, Ms. Bramhill, what did BlackBerry do in response to the issues raised in this report from Mr. Curiale?
  **A. The individual -- a number of individuals received coaching, as well as training.**
  Q. Was anyone suspended as a result of the -- this report here?

  **A. No.**
  Q. Was anyone docked pay as a result of what was found by Mr. Curiale?
  **A. No.**
  Q. Was anyone fired as a result of what Mr. Curiale found?
  **A. No.**
  Q. Was anyone transferred as a result of the Curiale report?
  **A. No.**
  Q. Was Ms. Tatsis separated from the men accused of statements in this report?
  **A. No.**
  Q. So did Ms. Tatsis continue working with the people that were discussed in this report?
  **A. Yes.**
  Q. And you mentioned coaching was provided, correct?
  **A. Yes.**
  Q. What kind of coaching was provided in response to this report?
  **A. There were coaching e-mails or letters issued.**
  Q. And besides the letter being issued, was there any other type of coaching that was provided?
  **A. I don't know.**
  Q. And I think you mentioned some training was provided

in response to the Curiale report, correct?
  **A. Yes.**
  Q. What kind of training was provided in response to the Curiale report?
  **A. Training was provided by an outside firm who specialized in employment law and employment matters, and training was conducted either one-to-one or in a group session with a number of individuals.**
  Q. What was the general nature of the training, like the topics at high level?
  **A. Just give me a moment, please.**
  Q. I'm hearing some kind of music, by the way. I don't know whose it is.
  **A. It's not music. There's some construction going on inside of our building, in our building.**
  Q. Okay. Well, I guess we'll have to deal with it then.
  **A. Okay. Could you please ask the question again?**
  Q. What was the nature of the training that was provided in response to the Curiale report here?
  **A. The training was either conducted in one-on-one sessions or as group training, and I'm not aware of what specifically was discussed in the training.**
  Q. And I wrote down three things in response to your question. I wrote down coaching, training, and I can't read the third one in my own handwriting. It looks like

discipline. Is that right?
  **A. No.**
  Q. Okay. So there was coaching provided, there is training provided, and what was the third thing that was provided?
  **A. I believe I only said -- oh, sorry.**
    MS. BECK: I was just going to object that it misstates prior testimony.
    Go ahead.
    **THE WITNESS: Yes. I stated coaching was provided and training.**
BY MR. TARTAGLIO:
  Q. Okay. So besides the coaching and training, did BlackBerry do anything else in response to the Tatsis investigation report?
  **A. No. Or, rather, I don't know.**
  Q. Before this deposition, did you try to determine what BlackBerry did in response to the recommendations from the Curiale report?
  **A. Yes.**
  Q. And as -- and after you searched for what BlackBerry did, you found that there was coaching and training and nothing else, correct?
  **A. Yes. I confirmed that there was coaching provided and training provided.**



MR. TARTAGLIO: And introducing Exhibit 5 now. There is no Bates number, but for the record, this appears to be e-mail chain between Sarah Tatsis and Nita White-Ivy.

(Exhibit 5 was marked for identification.)

BY MR. TARTAGLIO:

Q. Let me know when you're done reading this.

**A. Okay. Okay. I'm ready.**

Q. Does this appear to be an authentic copy of an e-mail chain from BlackBerry?

**A. Yes.**

Q. And at the bottom, we have an e-mail from Nita White-Ivy to Sarah Tatsis; is that correct?

**A. Yes.**

Q. And it appears Ms. White-Ivy found that Ms. Tatsis's complaint had merit, correct? Is that BlackBerry's conclusion?

**A. Yes. That's recorded in the letter, yes.**

Q. And BlackBerry also concluded that Ms. Tatsis accurately reported the comments and conduct that she considered to be dismissive and exclusionary. Does BlackBerry agree with that?

MS. BECK: I'm going to object as outside the scope.

**THE WITNESS: Yes. That is recorded in this letter.**

BY MR. TARTAGLIO:

Q. And this letter goes on to state that: All parties

involved in this investigation have been advised about BlackBerry's zero tolerance policy regarding retaliation of any kind, right?

**A. Yes, I see that in the letter.**

Q. Do you have any reason to doubt that all parties involved were advised about BlackBerry's zero tolerance policy regarding retaliation?

**A. No.**

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**THE WITNESS: I don't want to misspeak on this point. So I don't -- I don't -- actually, I don't know conclusively one way or the other. I do know she left.**

BY MR. TARTAGLIO:

Q. Do you know which year she left?

MS. BECK: Outside the scope.

**THE WITNESS: I don't today, not right now.**

BY MR. TARTAGLIO:

Q. Did she leave after March 4, 2023?

MS. BECK: Same objection.

**THE WITNESS: Yes.**

MR. TARTAGLIO: We'll turn to Exhibit 6 now.

(Exhibit 6 was marked for identification.)

BY MR. TARTAGLIO:

Q. Let me know when you're ready to discuss Exhibit 6.

**A. Okay.**

Q. Does Exhibit 6 appear to be an accurate copy of an e-mail between Nita White-Ivy and ▮▮▮▮▮▮▮▮?

**A. Yes.**

Q. And this e-mail discusses the Sarah Tatsis's complaint report, correct?

**A. Yes.**

Q. And this e-mail says, "We do not believe at this point that any discipline against you is warranted." That's what the e-mail says, correct?

**A. Yes.**

Q. Is it true that, in fact, the company did not discipline ▮▮▮▮▮▮▮▮ for the matters discussed in the Curiale report?

MS. BECK: Objection, vague as to "discipline."

**THE WITNESS: Yes.**

BY MR. TARTAGLIO:

Q. Earlier we talked about in the HR policy, we talked about coaching, verbal complaints, or verbal -- what was the phrase? I don't want to get that wrong.

MS. BECK: Objection.

BY MR. TARTAGLIO:

Q. Counseling. I think it was verbal counseling and written counseling, right?

**A. Coaching.**

Q. Okay. But in addition to coaching, I believe there was also verbal counseling and written counseling; is that right?

**A. I would have -- I don't want to misspeak about the terminology that's used there.**

Q. Okay. Let me see if I can find it real quick. Okay. Oh, written warning and verbal warning, does that sound right?

**A. Yes. That's what's reflected in the policy.**

Q. And so is Exhibit 6 an example of a written warning?

**A. That would -- I don't want to speculate on what Nita's intent was in sending this.**

Q. All right. Well, let me share something real quick. So do you see here, this is from Exhibit 2: That employees who receive a verbal or written warning will be ineligible



for an internal job transfer, promotion, and it goes on for a while, for six months following the issuing -- issuance of the warning. Is that consistent with your understanding of company policy?

**A. Yes. That's recorded in the policy.**

Q. And so Exhibit 6, did this e-mail here make ▇▇▇ ineligible for job transfer and promotion for six months?

**A. There are none of those stipulations included in this letter.**

Q. Was the e-mail in Exhibit 6 placed in ▇▇▇ HR file?

**A. Yes.**

Q. So other than having this e-mail placed in his HR file, did ▇▇▇ suffer any additional corrective actions or punishments?

MS. BECK: Objection, vague.

BY MR. TARTAGLIO:

Q. Let me rephrase that. So other than having Exhibit 6 placed in his HR file, did ▇▇▇ experience any other discipline beyond that as a result of the Sarah Tatsis investigation?

**A. I don't know.**

MR. TARTAGLIO: Putting Exhibit 7 in chat, let me know when you've had a chance to review this one.

(Exhibit 7 was marked for identification.)

**THE WITNESS: Okay.**

BY MR. TARTAGLIO:

Q. Exhibit 7 appears to be an e-mail from Nita White-Ivy to ▇▇▇, correct?

**A. Yes.**

Q. With ▇▇▇ cc'd?

**A. Yes.**

Q. Does this appear to be an authentic copy of an e-mail from BlackBerry?

**A. Yes.**

Q. Ms. White-Ivy wrote to ▇▇▇ that: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. So was ▇▇▇ disciplined as a result of the Sarah Tatsis, Curiale investigation?

MS. BECK: Objection, vague.

**THE WITNESS: I don't know.**

BY MR. TARTAGLIO:

Q. Was Exhibit 7 placed in ▇▇▇ HR file?

**A. Yes.**

Q. Did ▇▇▇ experience any discipline, additional discipline beyond the placing of this e-mail in his HR file?

**A. I don't know.**

Q. Is there anything in this letter indicating that

▇▇▇ received additional discipline beyond the placing of this letter in his HR file?

**A. No.**

MR. TARTAGLIO: Let's go to Exhibit 8. Let me know when you're ready to discuss this one.

(Exhibit 8 was marked for identification.)

**THE WITNESS: Okay.**

BY MR. TARTAGLIO:

Q. Exhibit 8 appears to be an e-mail between yourself and ▇▇▇ -- no, let me start over.

Exhibit 8 appears to be an e-mail from Nita White-Ivy to ▇▇▇ cc'd, correct?

**A. Yes.**

Q. And in this e-mail, Ms. White-Ivy wrote: At this point, comma, we do not feel imposing disciplinary measures is necessary to get this conduct stopped.

Do you see that?

**A. Yes.**

Q. So do you know whether Exhibit 8 was placed in ▇▇▇ HR file?

**A. Yes.**

Q. Was Exhibit 8, in fact, placed in ▇▇▇ HR file?

**A. Yes.**

Q. Beyond having Exhibit 8 placed in his HR file, did ▇▇▇ experience any other discipline from BlackBerry?

**A. I don't know.**

Q. Does Exhibit 8 indicate that ▇▇▇ received any sort of discipline beyond the placing of this letter in his HR file?

**A. No.**

MR. TARTAGLIO: I'll introduce Exhibit 9 now. Let me know when you've had a chance to read this one.

(Exhibit 9 was marked for identification.)

**THE WITNESS: Okay.**

BY MR. TARTAGLIO:

Q. Does Exhibit 9 -- strike that.

Is Exhibit 9 a copy of an e-mail from John Chen to ▇▇▇ with Nita White-Ivy cc'd?

**A. Yes.**

Q. Does this appear to be an authentic copy of a BlackBerry e-mail?

**A. Yes.**

Q. And Mr. Chen wrote: I do not believe at this point that the comments made at the QBR can only be stopped by imposing severe discipline or discharge, correct?

**A. Yes.**

Q. Was this letter placed in ▇▇▇ HR file?

**A. Yes.**

Q. Beyond having this letter placed in his HR file, did ▇▇▇ experience any additional discipline from



Page 82

1  BlackBerry?
2  A.  I don't know.
3  Q.  Mr. Chen wrote here that, "BlackBerry has zero
4  tolerance for retaliation," correct?
5  A.  I'm just looking to verify where that is written.
6  Yes, that's correct.
7  Q.  Does Blackberry, the company, have a zero tolerance
8  policy prohibiting retaliation against people who make
9  complaints about a hostile work environment or gender
10 discrimination?
11 A.  Yes.
12     MR. TARTAGLIO:  Putting Exhibit 10 into the chat.
13 Let me know when you're ready to discuss Exhibit 10.
14     (Exhibit 10 was marked for identification.)
15     THE WITNESS:  Okay.
16 BY MR. TARTAGLIO:
17 Q.  So this is a letter from Nita White-Ivy to yourself,
18 correct?
19 A.  That's correct.  Yes.
20 Q.  Does this appear to be an authentic copy of a
21 BlackBerry e-mail?
22 A.  Yes.
23 Q.  And Ms. White-Ivy writes here:  It is my intent to
24 offload some of your current work in fiscal year '24.
25     Did that effect happen?

Page 83

1  A.  Yes.
2  Q.  How did your work change?
3  A.  I focused primarily on the Employee Relations part of
4  my role.
5  Q.  And what were you doing previously that you stopped
6  doing?
7  A.  So prior to that, I was working with Employee
8  Relations, as well as Business Partner with the IOT group.
9  Q.  So after this e-mail, you stopped working as Business
10 Partner with the IOT group?
11 A.  Yes.  It was a time after that e-mail.
12 Q.  So is it fair to say that the scope of your
13 responsibilities was diminished by Ms. White-Ivy?
14 A.  I took on the Employee Relations -- prior to being a
15 Business Partner for the -- for the IOT group, my
16 responsibility was employee relations with some Business
17 Partner work.  So after this, I resumed -- I continued on
18 with the Employee Relations, and then I also started working
19 with other groups as Business Partner, other smaller groups
20 within the company.
21 Q.  Was some of your work offloaded in fiscal year
22 2024?
23 A.  It was changed, yes.
24     MS. BECK:  Objection, asked and answered.
25 BY MR. TARTAGLIO:

Page 84

1  Q.  And, in fact, the word she uses is "redistribution"
2  of some of your current obligations, correct?
3      MS. BECK:  Objection.  Sorry, strike that.
4      THE WITNESS:  Yes, that's how she described it.
5  BY MR. TARTAGLIO:
6  Q.  And didn't Ms. White-Ivy, in fact, redistribute some
7  of your current work obligations?
8  A.  Yes.  The work was reorganized.
9  Q.  Did the reorganization of work have something to do
10 with the way that you handled what you had heard about --
11 well, strike that.
12     Did the redistribution of work happen because of the
13 way that you -- you reported the potentially sexist comments
14 you had heard?
15     MS. BECK:  Objection, object to form, assumes facts,
16 also, object that it's -- it's vague as to whether this is a
17 question for Ms. Bramhill's personal knowledge or if you're
18 seeking 30(b)(6) testimony.
19     THE WITNESS:  I can --
20     MR. TARTAGLIO:  Let me --
21     THE WITNESS:  Oh.
22 BY MR. TARTAGLIO:
23 Q.  Let me rephrase it here.  Ms. White-Ivy criticized
24 you for the way that you reported the comments that ended up
25 in the Curiale report, correct?

Page 85

1      MS. BECK:  Object to scope.
2      THE WITNESS:  Yes.  She provided feedback.
3  BY MR. TARTAGLIO:
4  Q.  And was the redistribution of work a result of how
5  you handled reporting those comments that ended up in the
6  Curiale report?
7      MS. BECK:  Object to -- objection, based on scope.
8  I'll also object that the question calls for speculation.
9      THE WITNESS:  And I can't speculate on
10 Ms. White-Ivy's thought process in making those changes.
11 BY MR. TARTAGLIO:
12 Q.  As a result of the Curiale investigation of the
13 Sarah Tatsis complaint, did any other employee have the
14 scope of -- well, did any other employee have his or her
15 responsibilities distributed -- redistributed?
16 A.  I don't know.
17 Q.  So the only person who had his or her obligations
18 redistributed as a result of the Curiale report was you,
19 correct?
20 A.  I don't know.
21 Q.  So as someone who reported the allegedly sexist
22 comments, not as a person who made the comments, you were
23 the only one who had your work duties diminished, correct?
24     MS. BECK:  Objection, argumentative, and object to
25 scope to the extent this calls for personal testimony.

Page 86

1  THE WITNESS: And as I stated, I don't know what
2  other circumstances may have happened.
3  BY MR. TARTAGLIO:
4  Q. Do you think the criticisms of you in this e-mail in
5  Exhibit 10 are fair?
6  MS. BECK: Object to scope.
7  THE WITNESS: I think that Nita is entitled to
8  express her opinion.
9  BY MR. TARTAGLIO:
10  Q. Do you agree with her opinion?
11  MS. BECK: Object to scope.
12  THE WITNESS: I don't agree with the full
13  characterization in this letter, no.
14  BY MR. TARTAGLIO:
15  Q. Because you did report the comments you heard that
16  ended up in the Curiale report, correct? You reported
17  those?
18  MS. BECK: Object, argumentative.
19  THE WITNESS: Yes.
20  BY MR. TARTAGLIO:
21  Q. And maybe you didn't do so as quickly as
22  Ms. White-Ivy would have liked, but you did report them,
23  correct?
24  A. Yes.
25  MR. TARTAGLIO: Let's look at Exhibit 11. Let me

Page 87

1  know when you're ready to discuss Exhibit 11.
2  (Exhibit 11 was marked for identification.)
3  THE WITNESS: Yes, I'm ready.
4  BY MR. TARTAGLIO:
5  Q. Does Exhibit 11 appear to be authentic copy of an
6  e-mail from BlackBerry?
7  A. Yes, it does.
8  Q. And I guess I should say from their -- from
9  BlackBerry's e-mail system?
10  A. Yes. It appears consistent.
11  Q. And there's some discussion here about IOT management
12  training, correct?
13  A. Yes.
14  Q. Does Exhibit 11 refer to the training that was
15  provided in response to the Curiale investigation of the
16  Sarah Tatsis complaint?
17  A. Yes, that's my understanding.
18  MR. TARTAGLIO: All right. Let's take a break. I
19  think -- do you have a hard stop today, Ms. Bramhill?
20  THE WITNESS: I do not.
21  MR. TARTAGLIO: Okay. Let's take a break, like ten
22  minutes.
23  THE VIDEOGRAPHER: We are going off the record. The
24  time is 11:45 a.m.
25  (A break was taken.)

Page 88

1  THE VIDEOGRAPHER: We are now back on the record.
2  The time is 11:56 a.m.
3  BY MR. TARTAGLIO:
4  Q. Earlier today in Exhibit 3, we looked at the Morrison
5  and Foerster report in response to a complaint submitted
6  against John Giamatteo, correct?
7  A. Yes.
8  Q. Before this lawsuit was filed, did you ever
9  communicate with anyone about who might have submitted that
10  complaint against John Giamatteo?
11  MS. BECK: Objection, scope. Object, insofar as
12  vague as to -- I mean, clearly this calls for the Witness's
13  personal -- personal views, but object to the question is
14  vague on that score.
15  THE WITNESS: No.
16  BY MR. TARTAGLIO:
17  Q. Before this lawsuit was filed, did you ever
18  communicate with anyone about why Neelam Sandhu was fired?
19  MS. BECK: Objection, scope.
20  THE WITNESS: Yes.
21  BY MR. TARTAGLIO:
22  Q. What do you recall from that? Don't tell me if it
23  was a conversation with a lawyer.
24  MS. BECK: Object to scope.
25  THE WITNESS: I discussed with Blackberry's Counsel.

Page 89

1  BY MR. TARTAGLIO:
2  Q. Other than that discussion with BlackBerry's Counsel,
3  before this lawsuit, did you discuss the reasons for
4  Ms. Sandhu's firing with anyone else?
5  MS. BECK: Object to scope.
6  THE WITNESS: I believe Counsel was present at any
7  discussions.
8  MR. TARTAGLIO: Okay. Well, that's my questioning.
9  MS. BECK: Ms. Bramhill, I just had a couple of
10  questions for you, if you'll bear with me.
11  THE WITNESS: Yes.
12  EXAMINATION
13  BY MS. BECK:
14  Q. I want to talk about topic 13 for the Sarah Tatsis
15  report and what you did to prepare on that topic. Do you
16  have some personal recollection of that report and the steps
17  BlackBerry took afterwards?
18  A. Personal recollection in that I reviewed it to
19  prepare for today.
20  Q. Do you remember anything from when it happened?
21  A. Yes.
22  Q. And did you look at documents today to prepare for
23  today about what happened after the report?
24  A. Yes.
25  Q. I think you testified that -- that you didn't know

Page 90

1  whether individuals were disciplined beyond the letters that
2  Plaintiff's Counsel walked you through today.  Do you
3  remember that testimony?
4  A.  Yes.
5  Q.  Based on your preparation for the deposition today,
6  would it be fair to say you don't -- you're not aware of any
7  further discipline?
8  A.  Yes, that's correct to characterize, and, yes, when I
9  say "I don't know," it's that I'm not aware of any other
10 measures that were taken.
11 Q.  Plaintiff's Counsel showed you an e-mail from Nita
12 White-Ivy to yourself as -- after the Sarah Tatsis report.
13 Do you remember that?
14 A.  Yes.
15 Q.  Was Ms. White-Ivy your boss?
16 A.  Yes.
17 Q.  Was this an e-mail she sent you in her capacity as
18 your boss?
19     MR. TARTAGLIO:  Legal conclusion.
20 BY MS. BECK:
21 Q.  You can answer.
22 A.  My understanding is yes.
23 Q.  So when she talks about reallocating your work, is
24 that -- is that something she was, to your understanding,
25 communicating as -- as your boss?

Page 91

1  A.  Yes.
2  Q.  And Plaintiff's Counsel mentioned that this -- this
3  e-mail included a -- a note about Ms. White Ivy's
4  dissatisfaction that you hadn't reported the Sarah Tatsis
5  incident sooner than you had.  Do you remember that?
6  A.  Yes, I do.
7  Q.  Do you think that's a -- do you agree that that's a
8  fair characterization of Ms. White-Ivy's concern?
9  A.  Yes.  That's how she characterized it, yes.
10 Q.  Was the issue that you had reported the Sarah
11 Tatsis comment, or was the issue about how quickly you
12 reported?
13 A.  It was about the speed of the reporting.
14 Q.  Was her complaint that she -- she wished that you had
15 reported more quickly?
16 A.  Yes.
17 Q.  Okay.  Oh, one last question.  You were asked some
18 questions about the trainings that were held in response to
19 the Sarah Tatsis investigation.  Do you remember those
20 questions?
21 A.  Yes, I do.
22 Q.  Do you have an understanding about whether the
23 trainings given were customized trainings?
24     MR. TARTAGLIO:  Vague.
25     THE WITNESS:  Yes.  The trainings were compiled by a

Page 92

1  law firm and were customized to BlackBerry and to the
2  circumstances.
3  BY MS. BECK:
4  Q.  And by -- what do you mean by "the circumstances"?
5  A.  To address the findings of the investigation
6  specifically.
7      MS. BECK:  Thank you.  That's all the questions I
8  had.
9      MR. TARTAGLIO:  No further questions for me.  I just
10 have a housekeeping item for Ms. Beck.  We can do that off
11 the record.
12     MS. BECK:  Great.
13     THE VIDEOGRAPHER:  I will read us off.
14     THE REPORTER:  Mr. Videographer, can I get the copy
15 orders before we go off?
16     THE VIDEOGRAPHER:  Please.
17     THE REPORTER:  Ms. Beck, do you need a copy of the
18 transcript?
19     MS. BECK:  Yes, please, and the video synced, as
20 well, please.  Thank you.
21     THE VIDEOGRAPHER:  This concludes today's video
22 record of Deposition of Jennifer Bramhill.  The original
23 media of this deposition will remain in the custody of
24 Talty Court Reporters, Inc., located in San Jose,
25 California.  We are now going off the record.  The time is

Page 93

1  12:03 p.m.
2      (Deposition concluded at 12:03 p.m.)
3              ---oOo---

Page 94

1    DEPONENT'S CHANGES OR CORRECTIONS
2
3  Note:  If you are adding to your testimony, print the exact
4  words you want to add.  If you are deleting from your
5  testimony, print the exact words you want to delete.
6  Specify with "Add" or "Delete" before each entry, please
7  sign and date this form.
8
9       DEPOSITION OF:  JENNIFER BRAMHILL
10      DATE OF DEPOSITION:  FRIDAY, SEPTEMBER 19, 2025
11   I, _____, have made the
12  following changes in my deposition:
13    PAGE    LINE     ADD/DELETE
14    ____    ____     _____
15    ____    ____     _____
16    ____    ____     _____
17    ____    ____     _____
18    ____    ____     _____
19    ____    ____     _____
20    ____    ____     _____
21    ____    ____     _____
22    ____    ____     _____
23    ____    ____     _____
24
25    SIGNATURE_____DATE_____

Page 95

1  STATE OF CALIFORNIA,        )
                               )   ss.
2  COUNTY OF SANTA CLARA       )
3
4       I, JENNIFER BRAMHILL, hereby certify under penalty
5  of perjury under the laws of the State of California that
6  the foregoing is true and correct.
7
8       Executed this _____ day of _____,
9  20_____, at _____, California.
10
11
12
13
14                      _____
15                             JENNIFER BRAMHILL

Page 96

1  STATE OF CALIFORNIA,        )
                               )   ss.
2  COUNTY OF SHASTA            )
3
4       I, MELISSA SNYDER, a licensed Certified Shorthand
5  Reporter, duly qualified and certified as such by the State
6  of California, do hereby certify:
7       That prior to being examined, the witness named in
8  the foregoing deposition was by me duly sworn to testify to
9  the truth, the whole truth, and nothing but the truth;
10      That the said remote deposition was by me recorded
11 stenographically at the time and place first therein
12 mentioned; and the foregoing pages constitute a full, true,
13 complete and correct record of the testimony given by the
14 said witness;
15      That I am a disinterested person, not being in any
16 way interested in the outcome of said action, nor connected
17 with, nor related to any of the parties in said action, or
18 to their respective counsel, in any manner whatsoever.
19 (x) Reading and signing was not requested.
20      IN WITNESS WHEREOF, I have subscribed my name on
21 this 14th day of October, 2025.
22
23
24               _____
                 MELISSA SNYDER, CSR NO. 13370
25

