# EXHIBIT 3
REVISED REDACTIONS

1          UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                    --oOo--

4   NEELAM SANDHU,

5              Plaintiff,

6   vs.                          Case No.

                                 3:24-cv-02002-SK

7   BLACKBERRY CORPORATION,

    a Delaware corporation,

8

              Defendant.

9   _____/

10

11

12

13      CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14

15      VIDEO-RECORDED DEPOSITION OF NEELAM SANDHU

16            SAN FRANCISCO, CALIFORNIA

17            FRIDAY, AUGUST 22, 2025

18

19

20

21

22

23   Reported by:

24   Anrae Wimberley, CSR No. 7778

25   Job No.  7525313

                                        Page 1

**Page 2**

```
 1        UNITED STATES DISTRICT COURT
 2      FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3              --oOo--
 4  NEELAM SANDHU,
 5        Plaintiff,
 6  vs.          Case No.
                3:24-cv-02002-SK
 7  BLACKBERRY CORPORATION,
    a Delaware corporation,
 8
 9        Defendant.
    _____/
10
11
12
13      CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
14
15
16        Transcript of video-recorded deposition
17  of NEELAM SANDHU, taken at Munger, Tolles & Olson
18  LLP, 560 Mission Street, 27th Floor, San Francisco,
19  California 94105, beginning at 10:33 a.m. and ending
20  at 7:43 p.m. on FRIDAY, AUGUST 22, 2025, before
21  Anrae Wimberley, Certified Shorthand Reporter No.
22  7778.
23
24
25
```

**Page 3**

```
 1  APPEARANCES:
 2  For Plaintiff:
 3      GOMERMAN BOURN & ASSOCIATES
 4      BY:  MARIA BOURN, ESQ.
 5      825 Van Ness Avenue, Suite 502
 6      San Francisco, California 94109
 7      (888) 855-2505
 8      maria@gobolaw.com
 9
10  For Defendant:
11      MUNGER, TOLLES & OLSON, LLP
12      BY:  CRAIG JENNINGS LAVOIE, ESQ.
13      LAUREN BECK, ESQ.
14      350 South Grand Avenue, 50th Floor
15      San Francisco, California 90071-3426
16      (213) 683-9100
17      craig.lavoie@mto.com
18      lauren.beck@mto.com
19
20  Also present:
21      MAGGIE MAYO, Vice President, Head of
22      Litigation with BlackBerry Corporation
23
24      REILLY LEET, VIDEOGRAPHER
25              --oOo--
```

**Page 4**

```
 1              I N D E X
 2  EXAMINATION BY:           PAGE
 3  MR. LAVOIE                 9
 4              --oOo--
 5      E X H I B I T S
 6  EXHIBIT    DESCRIPTION       PAGE
 7  Exhibit 1  E-mail to Nita White-Ivy    18
            from Neelam Sandhu, dated
 8          2/6/23; Bates stamped
            BB13-00004373 to
 9          BB13-00004374
10  Exhibit 2  Photo of text thread; Bates  22
            stamped DOE-0001547 through
11          DOE-0001548
12  Exhibit 3  Plaintiff's Second Amended   57
            Responses to Defendant
13          BlackBerry Corporation's
            Interrogatories, Set One;
14          no Bates stamps, 24 pages
15  Exhibit 4  Plaintiff's Interrogatories  92
            to Defendant BlackBerry
16          Corporation, Set Two; no
            Bates stamps, 3 pages
17
    Exhibit 5  E-mail chain dated          96
18          10/5/2021; Bates stamped
            BB13-00019925 through
19          BB13-00019926
20  Exhibit 6  E-mail chain; Bates stamped 104
            BB13-00019983 through
21          BB13-00019984
22  Exhibit 7  E-mail chain; Bates stamped 112
            BB13-00012471 through
23          BB13-00012474
24  Exhibit 8  E-mail dated 10/14/2021;    157
            Bates stamped BB13-00005838
25          through BB13-00005840
```

**Page 5**

```
 1      E X H I B I T S (Cont'd)
 2  EXHIBIT    DESCRIPTION       PAGE
 3  Exhibit 9  Short Message Report, Date  157
            range 10/20/2021; Bates
 4          stamped BB13-00010802
            through BB13-00010803
 5
    Exhibit 10  Two photos and a street map 157
 6           labeled "THE LOT City
             Center;" 2 pages
 7
    Exhibit 11  E-mail dated 3/26/2023;   174
 8           Bates stamped BB13-00012835
 9  Exhibit 12  E-mail dated 12/15/2021;  181
             Bates stamped BB13-00005921
10
    Exhibit 13  E-mail chain dated        181
11           12/19/2021; Bates stamped
             BB13-00005924
12
    Exhibit 14  E-mail dated 12/22/2021;  181
13           Bates stamped BB13-00005945
14  Exhibit 15  E-mail chain dated        181
             12/22/2021; Bates stamped
15           BB13-00005952 through
             BB13-00005953
16
    Exhibit 16  Photo of text thread; Bates 181
17           stamped DOE-0001529 through
             DOE-0001530
18
    Exhibit 17  E-mail chain; Bates stamped 206
19           BB13-00005971 through
             BB13-00005973
20
    Exhibit 18  E-mail dated 1/18/2022;   206
21           Bates stamped BB13-00005991
22  Exhibit 19  Photo of text thread; Bates 206
             stamped DOE-0001531 through
23           DOE-0001532
24  Exhibit 20  Photo of text thread; Bates 215
             stamped DOE-0001535
25
```

| 1 | E X H I B I T S (Cont'd) | |
|---|---|---|
| 2 | EXHIBIT         DESCRIPTION | PAGE |
| 3 | Exhibit 21  E-mail chain dating from | 216 |
|   |         11/10/21 to 1/20/22; Bates | |
| 4 |         stamped BB13-00019951 | |
|   |         through BB13-00019963 | |
| 5 | | |
|   | Exhibit 22  E-mail chain, Subject:  BB | 218 |
| 6 |         Cyber Security Weekly | |
|   |         Leadership Team Call; Bates | |
| 7 |         stamped BB13-00007161 | |
|   |         through BB13-00007162 | |
| 8 | | |
|   | Exhibit 23  Photo of text thread; Bates | 227 |
| 9 |         stamped DOE-0001542 through | |
|   |         DOE-0001543 | |
| 10 | | |
|   | Exhibit 24  Chat dating from 9/14/23 to | 263 |
| 11 |         12/10/23; Bates stamped | |
|   |         BB13-00018995 through | |
| 12 |         BB13-00019002 | |
| 13 | Exhibit 25  E-mail chain dating from | 291 |
|   |         10/17/23 to 11/2/23; no | |
| 14 |         Bates stamp, 7 pages | |
| 15 | Exhibit 26  Photo of text thread; Bates | 315 |
|   |         stamped DOE-0001539 | |
| 16 | | |
|   | Exhibit 27  Progress Notes by Michael | 331 |
| 17 |         Schierman at PrimaryCare | |
|   |         Services; Bates stamped | |
| 18 |         DOE-000836 through | |
|   |         DOE-000850 | |

19          --oOo--
20  REPORTER'S NOTE:  All quotations from exhibits are
21  reflected in the manner in which they were read into
22  the record and do not necessarily indicate an exact
23  quote from the document.
24          --oOo--
25

Page 6

---

1     QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
2         PAGE  LINE
3         212   16
4         256   14
5         257   5
6         274   15
7         338   25
8         340   9
9         340   16
10        341   6
11        342   1
12        343   16
13        344   2
14        344   5
15        346   9
16          --oOo--

17
18
19
20
21
22
23
24
25

Page 7

---

1         FRIDAY, AUGUST 22, 2025;
2         SAN FRANCISCO, CALIFORNIA;
3             10:33 A.M.
4             - - -
5     THE VIDEOGRAPHER:  Good morning.  We are going        10:33:09
6  on the record at 10:33 a.m. on August 22nd, 2025.
7  Please note that the microphones are sensitive and
8  may pick up whispering and private conversations.
9  Please mute your phones at this time.  Audio and
10  video recording will continue to take place unless        10:33:31
11  all parties agree to go off the record.
12     This is Media Unit 1 of the video-recorded
13  deposition of Neelam Sandhu taken by counsel for
14  defendant in the matter of Neelam Sandhu versus
15  BlackBerry Corporation filed in the United States        10:33:51
16  District Court for the Northern District of
17  California, Case No. 3:24-cv-02002-SK.
18     The location of the deposition is 560
19  Mission Street, 27th Floor, San Francisco,
20  California 94105.              10:34:17
21     My name is Reilly Leet representing
22  Veritext Legal Solutions and I'm the videographer.
23  I'm not related to any party in this action nor am I
24  financially interested in the outcome.
25     Counsel will now state their appearances        10:34:38

Page 8

---

1  and affiliation for the record, beginning with the        10:34:40
2  noticing attorney.
3     MR. LAVOIE:  Craig Jennings Lavoie, here
4  alongside my colleague, Lauren Beck, of Munger,
5  Tolles & Olson representing defendant BlackBerry.        10:34:51
6     MS. BOURN:  Maria Bourn on behalf of plaintiff.
7     MR. LAVOIE:  And also present is Maggie Mayo,
8  in-house counsel for BlackBerry.
9     THE VIDEOGRAPHER:  Thank you.
10     Will the court reporter please introduce        10:35:03
11  yourself and administer the oath to the witness and
12  then counsel may proceed.
13     THE REPORTER:  We are on the record.  My name
14  is Anrae Wimberley, CSR No. 7778.  And I will now
15  swear in the witness.          10:35:09
16         NEELAM SANDHU,
17  sworn in personally as a witness by the Certified
18  Shorthand Reporter, testified as follows:
19         EXAMINATION
20  BY MR. LAVOIE:                10:35:10
21     Q.  Ms. Sandhu, good morning.
22     A.  Good morning.
23     Q.  You understand that you've taken an oath
24  to tell the complete truth in response to any
25  questions today; correct?          10:35:44

Page 9

3 (Pages 6 - 9)

| | |
|---|---|
| 1    A. Yes.            10:35:45 | 1   BlackBerry CEO or were you not?      10:38:15 |
| 2    Q. And you understand that the oath you just | 2    A. I was still -- yeah, I was doing some of |
| 3   swore to tell the truth is the same oath that you | 3   the business operations type of work, yes. |
| 4   will swear when you appear before the judge and jury | 4    Q. Were you ever Dick Lynch's chief of staff? |
| 5   in this case at trial.        10:35:54 | 5    A. No.          10:38:27 |
| 6      Do you understand that? | 6    Q. Not either formally by title or |
| 7    A. Yes. | 7   informally; right? |
| 8    Q. Is there any reason is, such as being | 8    A. Correct. |
| 9   under the effect of a medication, that you can't | 9    Q. One of the things you say in your |
| 10   give your most accurate testimony today?    10:36:01 | 10   complaint in this case is that you had a, quote,    10:38:36 |
| 11    A. No. | 11   significantly smaller team than John Giamatteo had; |
| 12    Q. What was your first position at BlackBerry | 12   is that accurate? |
| 13   that was an executive position? | 13    A. That's correct. |
| 14    A. I first joined the CEO's direct reports | 14    Q. Why is that -- sorry. |
| 15   leadership team as director of business operations,   10:36:18 | 15      In what way did you have a significantly    10:38:47 |
| 16   office of the CEO, which was the chief of staff | 16   smaller team than John Giamatteo? |
| 17   role. That was in, I want to say -- I want to say | 17    A. The number of employees. |
| 18   2014. I don't remember the date exactly. | 18    Q. Can you elaborate on that? |
| 19    Q. So you would have started describing | 19    A. That is the answer. I had less number of |
| 20   yourself or conceptualizing yourself as a BlackBerry   10:36:33 | 20   employees than he did.       10:38:59 |
| 21   executive in 2014? | 21    Q. Fewer employees who reported up to you |
| 22    A. I would say a CEO direct report. I think | 22   directly or indirectly? |
| 23   my contract said leadership team member or something | 23    A. Correct. |
| 24   along those lines, yes. | 24    Q. Approximately how many employees at the |
| 25    Q. Yes. My question is a little different.    10:36:48 | 25   time -- at the most during your time at BlackBerry   10:39:07 |
| Page 10 | Page 12 |
| 1   When would you have started conceiving of yourself,   10:36:50 | 1   did you have reporting up to you directly or    10:39:12 |
| 2   or telling colleagues or telling friends, "I'm an | 2   indirectly? |
| 3   executive at BlackBerry," what year would that have | 3    MS. BOURN: Can you repeat that question back? |
| 4   been true? | 4    MR. LAVOIE: No. I can ask it again. |
| 5    A. Likely 2020 when I got the customer role,    10:37:01 | 5    THE WITNESS: Sure.       10:39:20 |
| 6   customer-facing role. | 6   BY MR. LAVOIE: |
| 7    Q. And did you have any positions that you | 7    Q. What is the greatest number of employees |
| 8   considered to be executive positions prior to when | 8   that you ever had reporting up to you directly or |
| 9   you joined BlackBerry? | 9   indirectly at BlackBerry at any point in time? |
| 10    MS. BOURN: Objection; vague and ambiguous.    10:37:17 | 10    A. I don't recall the exact number, but it    10:39:29 |
| 11      You can answer. | 11   would have been less than 100. |
| 12    THE WITNESS: Prior to BlackBerry, no. | 12    Q. Fewer than 100? |
| 13   BY MR. LAVOIE: | 13    A. (Nods head affirmatively.) |
| 14    Q. Okay. So for what period of time were you | 14    Q. And was that period of time when you had |
| 15   John Chen's or the CEO's chief of staff?    10:37:28 | 15   the most when you were both CMO and the head of the   10:39:38 |
| 16    A. From around -- sometime in 2014, I | 16   elite customer success group? |
| 17   believe, if I remember the date correctly, through | 17    A. Correct. |
| 18   to -- I was doing that role through to really when I | 18    Q. To your understanding, approximately how |
| 19   left the company. When I became CMO, that was taken | 19   many employees did John Giamatteo have who reported |
| 20   out of my title because my title was fairly long.    10:37:55 | 20   directly or indirectly up to him?      10:39:54 |
| 21   But he asked me to continue doing some of the | 21    A. I don't recall. It was more than I had. |
| 22   responsibilities but it was officially taken out of | 22    Q. Best estimate more than 200, more than |
| 23   my title. | 23   400, more than 600? |
| 24    Q. So before you had the CMO role, let's say | 24    MS. BOURN: Calls for speculation vague and |
| 25   in early 2023, were you the chief of staff to    10:38:10 | 25   ambiguous as to time, overly broad.      10:40:06 |
| Page 11 | Page 13 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

BY MR. LAVOIE: 10:40:08

Q. In 2023 after you took on the CMO role and you also had the customer success role, what was your understanding at that time as to how many employees in total reported up to John Giamatteo, 10:40:21 directly or indirectly? Just your best estimate. It could be a range.

MS. BOURN: Calls for speculation.

THE WITNESS: I have no idea. It was more than I had. It was a bigger team. 10:40:32

BY MR. LAVOIE:

Q. So you were the chief of staff for the CEO for BlackBerry for a decade and you have no idea how many reported up directly or indirectly to John Giamatteo in 2023? 10:40:43

MS. BOURN: Argumentative.

BY MR. LAVOIE:

Q. That's my question. You were the chief of staff to the CEO of the company for 10 years and it's your sworn testimony that you have no idea how 10:40:50 many people reported up directly or indirectly to John Giamatteo in 2023?

MS. BOURN: Argumentative, calls for speculation, vague and ambiguous.

You can answer if you know. 10:41:01

Page 14

THE WITNESS: I haven't worked there for over 10:41:03 18 months now. I don't recall.

BY MR. LAVOIE:

Q. You don't remember how many people reported up to him? You can't even give me any kind 10:41:10 of estimate? You can't say whether it was more -- you think best estimate it was more than 500 or fewer than 500, you can't answer that?

MS. BOURN: Asked and answered. I suggest that -- 10:41:21

MR. LAVOIE: No, Maria. Stop with the speaking objections. You're entitled to a short and plain statement of your objection. You're not entitled to a speaking objection.

MS. BOURN: Please note, for the record, 10:41:27 defense counsel is raising his voice and pointing at me and not letting me complete my objection. And we are seven minutes into the deposition already.

You can answer if you know.

THE WITNESS: My answer is it was more than I 10:41:39 had.

BY MR. LAVOIE:

Q. Best estimate, in 2023, was it your understanding that John Giamatteo had more or fewer than 500 employees directly or indirectly reporting 10:41:47

Page 15

up to him? 10:41:51

A. I would be speculating.

Q. You can't give me your best estimate more or fewer than 500?

A. Not at this time. 10:41:59

Q. So as part of your experience being the chief of staff to the CEO of BlackBerry, you didn't have any insight into how many people approximately reported to the president of BlackBerry's cybersecurity unit? 10:42:10

MS. BOURN: Asked and answered three separate times now.

THE WITNESS: If you had asked me when I worked there, I would have been able to answer the question. 10:42:17

BY MR. LAVOIE:

Q. So it's something that you think you could have answered for me in 2023 but today you have no idea?

A. Correct. I wouldn't want to speculate. 10:42:23

Q. When BlackBerry reported its revenue and earnings results to the public and to investors, did BlackBerry separate revenue from elite customers from revenue that was generated by non-elite customers? 10:42:51

Page 16

MS. BOURN: Vague and ambiguous as to time. 10:42:55

(Reporter seeks clarification.)

THE WITNESS: I asked if he could clarify the question, please.

BY MR. LAVOIE: 10:43:09

Q. At any point in time when you were at BlackBerry and leading the elite customer success group, BlackBerry made SEC reports about its earnings; right?

A. Correct. 10:43:21

Q. While BlackBerry was reporting its earnings and you led the elite customer group, did BlackBerry separate in its earnings reports the revenue and earnings that it got from elite customers from non-elite customers? 10:43:30

MS. BOURN: Vague and ambiguous as to time, calls for speculation.

You can answer if you know.

THE WITNESS: It did not. 10:43:40

BY MR. LAVOIE:

Q. It did not. Okay.

MR. LAVOIE: And, Marie, you don't need to tell her that she can answer if she knows. That just eats up time on the clock. And so that's obviously understood. 10:43:47

Page 17

5 (Pages 14 - 17)

BY MR. LAVOIE:                                    10:43:48

Q.  Unless your counsel gives you an instruction not to answer a question, you can answer notwithstanding her objection.

So you were never disciplined, written up,      10:43:56 or put on a performance improvement plan at BlackBerry; correct?

A.  Correct.

Q.  Did you ever receive a performance review that was negative overall?                       10:44:06

A.  I received performance reviews that were, as anybody would, had positive feedback and then constructive feedback.  That's the purpose of performance reviews.

Q.  That wasn't my question.                    10:44:19

My question was, did you ever receive a performance review at BlackBerry that you perceived as being negative overall?

MS. BOURN:  Asked and answered, vague and ambiguous as to time.                              10:44:28

THE WITNESS:  No.

MR. LAVOIE:  I'd like to introduce Exhibit 1, which is Tab 39 in my binder, which means nothing to anyone other than me and Lauren.

(Deposition Exhibit 1 was marked.)          10:44:56

---

BY MR. LAVOIE:                                    10:45:10

Q.  So this is an e-mail at the top that you wrote to Nita White-Ivy on February 6, 2023.

Do you see that?

A.  I see that.                                  10:45:20

Q.  And in the opening paragraph in the second sentence you write -- or sorry, in the third sentence you say, "I do not report to him," that being John Giamatteo, "so I do not consider him to have any authority over my role."      10:45:36

Do you see that?

A.  I'll read it.

MS. BOURN:  And for the record, this is Bates labeled 4373 dated February 6, 2023.

MR. LAVOIE:  Maria, Maria, you're not going to   10:45:48 read Bates numbers into the record and eat time doing that.

MS. BOURN:  With a designation as "Attorneys' Eyes Only."

MR. LAVOIE:  Maria, that is improper.  So I'm   10:45:57 going to ask you not to do that.

MS. BOURN:  Please don't point at me.

MR. LAVOIE:  No.  Maria, I'm not pointing at you.  And I'm going to ask you to stop obstructing the deposition by interjecting information like     10:46:11

---

that.  You're not entitled to do that.  So I'm going   10:46:11 to ask you not to do that again.

BY MR. LAVOIE:

Q.  So Ms. Sandhu, do you see the sentence that says, "I do not report to him"?               10:46:18

That's a reference to John Giamatteo; correct?

A.  I need a moment to read it.

Q.  Ms. Sandhu, I'm just asking you about a sentence in the first paragraph here.            10:46:37

Have you read three sentences into the document yet?

MS. BOURN:  Please stop interrupting her.  She can read the document.

MR. LAVOIE:  No, Maria.  Stop making speaking   10:46:46 objections.  Stop putting things in the record. Stop eating up time.

BY MR. LAVOIE:

Q.  I'm just asking you about the third sentence in the e-mail and I'm saying have you read   10:46:54 this sentence, "I do not report to him so I do not consider him to have any authority over my role"?

Have you read that yet?

MS. BOURN:  I will assert my objections as I necessary for the record, and she's entitled to    10:47:05

---

read the document.                                10:47:07

BY MR. LAVOIE:

Q.  Ms. Sandhu, have you read that sentence yet?

A.  I'm continuing to be interrupted so it's   10:47:11 hard to focus.

Q.  We've been on the record for a minute and a half and I've asked you to read three sentences into an e-mail.

Are you telling me you haven't had a          10:47:22 chance to read the third sentence in the e-mail?

A.  Yes.

Q.  Well, look at it right now.  It's on the second line starting on the right-hand side and it   10:47:28 says, "I do not report to him so I do not consider him to have any authority over my role."

Do you see that?

A.  I see that.

Q.  And that is a reference to John Giamatteo; correct?                                           10:47:36

A.  Correct.

Q.  Was John Giamatteo your supervisor at this point in time?

A.  No.

Q.  Did you report to John Giamatteo at this    10:47:44

---

**Page 22**

1  time?  10:47:46
2  A. No.
3  Q. Did you report to John Giamatteo at any
4  time while you were at BlackBerry?
5  A. No.  10:47:52
6  Q. Did you have a dotted line or indirect
7  reporting relationship to John Giamatteo at any
8  time?
9  A. No.
10  Q. Did you ever work under John Giamatteo's  10:48:00
11  leadership?
12  A. No.
13  MR. LAVOIE: Let's introduce Exhibit 2, which
14  is going to be Tab 26.
15  (Deposition Exhibit 2 was marked.)  10:48:11
16  MS. BOURN: Exhibit 2 is Bates labeled --
17  MR. LAVOIE: No, Maria, you're not going to eat
18  time on the record by reading into the record like
19  Bates number and confidentiality designations.
20  That's not a proper thing to eat up time with.  10:48:40
21  MS. BOURN: Exhibit 2 is 1547 dated February 4,
22  2022.
23  MR. LAVOIE: Maria, I'm just going to tell you,
24  at the end of this deposition, we're going to make
25  an evaluation as to whether Ms. Sandhu needs to come  10:48:54

**Page 23**

1  back for more testimony. So any time that you're  10:48:57
2  eating up with frivolous statements on the record
3  we're going to point out to the Court.
4  BY MR. LAVOIE:
5  Q. So this is a text exchange that you  10:49:05
6  produced in discovery.
7  Do you see this document?
8  A. Yes.
9  Q. Who is Bina, B-i-n-a?
10  A. Bina, my sister.  10:49:15
11  Q. Your sister, okay.
12  And you write to your sister on
13  February 4th, and these are just the very top lines
14  here, "On a separate topic, I was speaking with a
15  colleague who I get on well with (there are some!).  10:49:27
16  Like a work friend."
17  Do you see that?
18  A. Yes.
19  Q. Why did you say "there are some,"
20  exclamation point?  10:49:38
21  A. Because I don't generally talk about work
22  outside of work, particularly having been the chief
23  of staff, there are confidentiality requirements
24  that I consider. But if there was an instance where
25  a colleague was making me feel uncomfortable or  10:49:54

**Page 24**

1  giving me a hard time, I would lean on my sister for  10:49:57
2  advice and comfort. So she would only hear about
3  those instances, and I didn't want her to have the
4  impression that's all there is around me.
5  Because there were many people that I got on with  10:50:10
6  more so than were giving me a hard time.
7  Q. So at BlackBerry, in your experience,
8  there were many more people who you got along well
9  with than you had disputes me?
10  A. Than were giving me a hard time.  10:50:27
11  Q. Were there many more people at BlackBerry
12  who you got along well with than you had disputes
13  with at work?
14  A. I said than were giving me a hard time.
15  Q. So my question is different.  10:50:41
16  My question is, were there more people who
17  you got along well with than people who you had
18  disputes with at BlackBerry?
19  MS. BOURN: Vague and ambiguous as to time
20  given the length of employment.  10:50:52
21  MR. LAVOIE: That's a speaking objection. You
22  don't get to say "time given the length of
23  employment." That suggests an answer to the
24  witness. That is a speaking objection. That is
25  implicitly coaching your witness. I'm going to ask  10:51:02

**Page 25**

1  you not to do that again.  10:51:05
2  MS. BOURN: Defense yet again is pointing at me
3  and raising his voice. And we are now less than 20
4  minutes into the deposition that has become
5  extraordinarily argumentative and, quite frankly, to  10:51:15
6  the point if it continues to be abusive, I'll end
7  the deposition and seek a protective order.
8  MR. LAVOIE: Yeah, Maria, the record and the
9  video tape will speak for itself. And I'll just
10  point out for the record that I'm not pointing at  10:51:28
11  you. So I'll ask that you not represent things that
12  are going on in the room that are not on the camera.
13  I'm not pointing at you and I'll be happy to supply
14  a declaration to the Court that says that.
15  MS. BOURN: I will take a photo of the next  10:51:38
16  time you do it.
17  MR. LAVOIE: Okay. That sounds great.
18  BY MR. LAVOIE:
19  Q. So Ms. Sandhu, my question was, were there
20  more employees at BlackBerry who you got along well  10:51:46
21  with than there were employees who you had disputes
22  with at BlackBerry?
23  A. There were more employees -- I can't
24  answer your question because the word "dispute"
25  isn't relevant in this instance, from my  10:51:58

7 (Pages 22 - 25)

**Page 26**

1  perspective. It was harassment that I faced and      10:52:02
2  gender discrimination.
3      Q. So you say you were speaking with a
4  colleague who you get on well with, "there are
5  some."                                                10:52:13
6      A. Correct.
7      Q. So you're implying to your sister here
8  that there aren't a lot that -- her impression up to
9  this point would be that there weren't very many
10  employees that you got along well with at work;      10:52:22
11  correct?
12      MS. BOURN: Calls for speculation.
13      THE WITNESS: That's not correct.
14  BY MR. LAVOIE:
15      Q. Okay. What was your formal title at the     10:52:34
16  time you were terminated at BlackBerry?
17      A. If I recall it correctly, it was chief
18  marketing officer and chief elite customer success
19  officer, if I recall it correctly.
20      Q. And what was your title immediately before   10:52:57
21  when you held that title?
22      A. Gosh. I'll try to remember. It had chief
23  elite customer success officer in it. I believe it
24  had SVP sustainability as well and the business
25  operations that -- the chief of staff role. I don't  10:53:17

**Page 27**

1  remember exactly.                                     10:53:19
2      Q. How long did you serve as BlackBerry's
3  chief marketing officer?
4      A. I think I was -- it was announced the role
5  was in June of 2023, I think.                         10:53:33
6      Q. So my question was, how long did you serve
7  as BlackBerry's chief marketing officer?
8      A. So June through when I got fired. I guess
9  six months.
10      Q. From June or July of 2023 through December   10:53:53
11  of 2023?
12      A. I got fired in December, yes.
13      Q. So you were BlackBerry's chief marketing
14  officer from June or July 2023 through
15  December 2023?                                        10:54:07
16      MS. BOURN: Asked and answered.
17      THE WITNESS: Yes.
18  BY MR. LAVOIE:
19      Q. Was your title at BlackBerry ever chief
20  customer officer?                                     10:54:19
21      A. Not officially. I had asked for it a
22  number of times though.
23      Q. So it wasn't your title at any point?
24      A. Correct.
25      Q. But you thought that you deserved that       10:54:26

**Page 28**

1  title?                                                10:54:29
2      A. That's not how -- that is not how I would
3  represent it.
4      Q. You asked for the title of chief customer
5  officer even though you didn't think you deserved      10:54:40
6  it?
7      A. That's not what I said.
8      Q. No, that's my question.
9          So you just testified you asked for the
10  title of chief customer officer, but you also just    10:54:47
11  testified you didn't think you deserved that title?
12      MS. BOURN: No question pending.
13  BY MR. LAVOIE:
14      Q. So my question is, did you think you
15  deserved the title of chief customer officer?        10:55:00
16      A. The question isn't one you can answer in a
17  yes-or-no way.
18      Q. You don't think you can answer one way or
19  another whether you thought you deserved the title
20  of chief customer officer?                            10:55:14
21      MS. BOURN: Asked and answered twice now.
22  BY MR. LAVOIE:
23      Q. You don't think that you can answer the
24  question as to whether you deserved the title of
25  chief customer officer?                               10:55:26

**Page 29**

1      A. The role was a chief customer officer role    10:55:27
2  and I was told by John Chen that, while he agreed
3  with that, he couldn't make that the title because
4  John Giamatteo would get upset.
5      Q. So you asked to be given the title of         10:55:40
6  chief customer officer and BlackBerry declined?
7      A. Because John Giamatteo would be upset.
8      Q. So you asked for the title of chief
9  customer officer and BlackBerry declined; is that
10  correct?                                              10:55:52
11      A. Because John Giamatteo would be upset.
12      Q. I'm not asking for why. I'm asking, they
13  declined your question or granted your request. So
14  you asked to be chief customer officer.
15          Did BlackBerry say yes to that request or   10:56:04
16  did they decline that request?
17      A. They declined it because John Giamatteo
18  would be upset.
19      Q. How many times while you were at
20  BlackBerry were you promoted by John Chen?            10:56:13
21      A. A number of times. I couldn't count off
22  the top of my head.
23      Q. Best estimate, more than 10 or fewer than
24  10?
25      A. I was promoted throughout my career at       10:56:23

Page 30:

1  BlackBerry a number of times.                    10:56:26
2      Q.  That's not my question.
3          My question is, is it your best estimate
4  that you were promoted by John Chen more than 10
5  times or fewer than 10 times?              10:56:32
6      MS. BOURN:  Asked and answered.
7      THE WITNESS:  I would have to actually write
8  out and count the answer.  I don't know.
9  BY MR. LAVOIE:
10     Q.  So you cannot give -- you're incapable of   10:56:41
11 giving a best estimate as to whether you were
12 promoted by Chen more or fewer than 10 times?
13     A.  It was a number of times.  I don't know if
14 it was more than 10 or less than 10, but it was a
15 number of times.                          10:56:55
16     Q.  Were you promoted my John Chen more or
17 fewer than five times?
18     A.  Gosh . . . let's see.  So when I started
19 to work for him, I was promoted to director.  I got
20 to senior director.  VP definitely obviously.  There   10:57:11
21 was an expansion of scope, SVP -- yes, I would say
22 yes.
23     Q.  More than five times John Chen promoted
24 you?
25     A.  I mean, I couldn't say definitively but it   10:57:29
Page 30

Page 31:

1  was a number of times.                     10:57:32
2      Q.  Was it more or fewer than five?
3      A.  I don't know.  Five might be a good
4  estimate.  I don't know.
5      Q.  You sold the BBMe product to elite      10:57:39
6  BlackBerry customers; correct?
7      A.  Correct.
8      Q.  And one of the BBMe features advertised to
9  customers was that it kept messages secure; correct?
10     A.  Correct.                           10:57:51
11     Q.  BBMe messages were end-to-end encrypted;
12 right?
13     A.  Correct.
14     Q.  So BBMe messages are only available on a
15 user's own device?  They can't be reviewed by third   10:58:06
16 parties; right?
17     A.  That's not right.
18     Q.  Oh, explain.
19     A.  It's an enterprise solution, not a
20 customer solution.  So it's managed by IT        10:58:13
21 administrators and they can see the messages,
22 archive the messages, manage controls and things
23 like that.
24     Q.  So when you exchanged BBMe messages with
25 John Chen, for example, there was someone in IT at   10:58:30
Page 31

Page 32:

1  BlackBerry that could read those messages if they   10:58:34
2  wanted to?  That was your understanding?
3      A.  That was my understanding.
4      Q.  And what's that understanding based on?
5      A.  Based on the fact that it's an enterprise   10:58:43
6  tool and so it is managed and distributed by IT
7  admins.
8      Q.  One of the BBMe features advertised to
9  BlackBerry customers that you sold the product to
10 was the ability to retract messages; correct?     10:58:56
11     MS. BOURN:  Vague and ambiguous as to time.
12     THE WITNESS:  From having sent them -- just
13 like you can undo -- recall an e-mail, yes, you can
14 retract a message, but it doesn't take it out of the
15 server which the IT admin has assess to.        10:59:12
16 BY MR. LAVOIE:
17     Q.  That's not my question.
18         I said one of the features that BlackBerry
19 advertised to its customers for BBMe --
20     THE REPORTER:  Can you start over?         10:59:16
21 BY MR. LAVOIE:
22     Q.  So my question was --
23     MS. BOURN:  Just a second.  Can we stop?  I
24 need to get the real-time.  Your questions are so
25 long and convoluted.                       10:59:24
Page 32

Page 33:

1      MR. LAVOIE:  Okay.  Let's go off the record.   10:59:26
2      MS. BOURN:  Can I get the real-time?
3      THE VIDEOGRAPHER:  Going off the record.  The
4  time is 10:59 a.m.
5      (Discussion off the record.)            10:59:35
6      THE VIDEOGRAPHER:  Going back on the record.
7  The time is 11:01 a.m.
8  BY MR. LAVOIE:
9      Q.  One of the features of BBMe that
10 BlackBerry advertised to its customers was the      11:01:54
11 ability to retract messages; correct?
12     A.  Correct.
13     Q.  John Chen testified at deposition that he
14 started at BlackBerry in 2013.
15         Does that sound right to you?          11:02:07
16     A.  Yes.
17     Q.  You overlapped with John Chen for
18 approximately your last 10 years at the company,
19 between 2013 and 2023; correct?
20     A.  Yes.                             11:02:17
21     Q.  Did you consider John Chen to be one of
22 your biggest advocates during your time at
23 BlackBerry?
24     A.  He was a big advocate of mine.  I wouldn't
25 say the biggest.                          11:02:31
Page 33

9 (Pages 30 - 33)

**Page 34**

1    Q.   Was he one of the biggest advocates?         11:02:33
2    A.   He was someone I learned a lot from, I
3   would say.
4    Q.   Was John Chen -- did you perceive him as
5   one of your biggest advocates at the company?       11:02:45
6    A.   When you say "advocate," what do you mean?
7    Q.   You just used the term.  You said he was
8   one of your advocates.
9        So what do you mean by that term?
10   A.   Someone who supports your career, wants to    11:02:53
11  teach you, wants you to grow.  That's how I see it.
12   Q.   And he was a person like that to you?
13   A.   Yes.
14   Q.   Do you believe that John Chen was
15  prejudiced against you because of your race or       11:03:06
16  gender?
17   A.   No.
18   Q.   Based on your experiences with John Chen,
19  have you seen any evidence that he is sexist?
20   MS. BOURN:  Vague and ambiguous as to time,        11:03:17
21  calls for speculation.
22   THE WITNESS:  I experienced a lot of gender
23  discrimination at the company, and I don't think it
24  was dealt with appropriately.  I don't know the
25  motivation behind that so . . .                      11:03:30

**Page 35**

1   BY MR. LAVOIE:                                       11:03:33
2    Q.   Just to be clear as to your testimony, are
3   you saying that because you perceive that you
4   experienced gender discrimination, that you
5   interpret that as evidence that John Chen himself is 11:03:41
6   sexist?  Is that your testimony?
7    A.   That is not my testimony.
8    Q.   So then I'll go back to my question.
9        Based on your experiences with John Chen,
10  have you seen any evidence that John Chen is sexist? 11:03:50
11   MS. BOURN:  Vague and ambiguous as to time,
12  calls for speculation.
13   THE WITNESS:  I don't know.  I don't know if I
14  see him as sexist or not.  But I know that I've
15  faced a lot of gender discrimination in the company. 11:04:03
16  BY MR. LAVOIE:
17   Q.   So my question is different.
18       I'm saying, during your interactions with
19  him over a period of 10 years, did you see any
20  evidence that John Chen is sexist?                   11:04:12
21   MS. BOURN:  Calls for a legal conclusion.
22   THE WITNESS:  I don't know how to answer that
23  question in the way that you're asking me to.
24  BY MR. LAVOIE:
25   Q.   You don't know how to answer the question     11:04:22

**Page 36**

1   of whether, over the course of 10 years of working   11:04:25
2   with John Chen, whether you saw any indication that
3   he was sexist?
4    MS. BOURN:  Calls for a legal conclusion.
5    THE WITNESS:  I'm saying I don't know how to      11:04:34
6   answer the question in the way you're trying to get
7   me to.  That's what I'm saying.
8   BY MR. LAVOIE:
9    Q.   It's not on you to try to intuit like how
10  I'm trying to get you to answer a question.  I'm     11:04:43
11  just asking a question.
12       You worked with John Chen for 10 years.
13  During that time, did you see any indication that he
14  himself was sexist, yes or no?
15   MS. BOURN:  Calls for speculation, calls for a    11:04:54
16  legal conclusion.
17   THE WITNESS:  No, I'm not trying to intuit what
18  you're expecting me to say, but I feel like I've
19  answered the question.
20  BY MR. LAVOIE:                                       11:05:06
21   Q.   You haven't so I'm going to ask it again.
22       During your 10 years of working and
23  interacting with the John Chen, did you see any
24  indication that John Chen was sexist?
25   MS. BOURN:  Calls for a legal conclusion.         11:05:15

**Page 37**

1    THE WITNESS:  I don't know how to answer it       11:05:17
2   other than when I was at the company, I faced gender
3   discrimination and I don't think it was dealt with
4   appropriately.
5   BY MR. LAVOIE:                                       11:05:26
6    Q.   And so that was an indication to you that
7   John Chen himself was sexist or no?
8    A.   There could be different reasons for that,
9   so I don't know.
10   Q.   So you have no -- you have no opinion,        11:05:36
11  based on 10 years of working with him, as to whether
12  John Chen is sexist or not?
13   A.   He supported me and I learned a lot from
14  him; but at the same time, there was gender
15  discrimination that wasn't dealt with appropriately  11:05:52
16  in the company.  That's how I see it.  I haven't, in
17  my mind, made a conclusion based on what his
18  motivation was.
19   Q.   So based on your experience with him, John
20  Chen might be sexist or he might not be?             11:06:05
21   MS. BOURN:  Calls for speculation, asked and
22  answered.
23   THE WITNESS:  I don't know.  I really don't
24  know.
25  BY MR. LAVOIE:                                       11:06:16

**Page 38**

1    Q.   You don't know whether he might be sexist    11:06:16
2    or not based on your experiences with him?
3        MS. BOURN:  Asked and answered about four
4    times.
5        THE WITNESS:  I don't know.    11:06:24
6    BY MR. LAVOIE:
7    Q.   You don't know whether he's sexist, okay.
8        Based on your experiences with John Chen,
9    have you seen any indication that he's racist?
10       MS. BOURN:  Calls for a legal conclusion.    11:06:37
11       THE WITNESS:  I didn't face racism from him;
12   and when I did face racism in the company, which was
13   explicit, it was dealt with appropriately.
14   BY MR. LAVOIE:
15   Q.   So have you seen any evidence that John    11:06:52
16   Chen -- sorry, strike that.
17       During your 10 years of experiences with
18   John Chen, did you ever see any indication that John
19   Chen preferred employees of one race over employees
20   of another race?    11:07:07
21       MS. BOURN:  Calls for speculation, calls for a
22   legal conclusion.
23       THE WITNESS:  Not something that I have thought
24   about.  All I know is that when I faced racism and
25   it was explicit and there was -- it was    11:07:20

**Page 39**

1    investigated, it was dealt with effectively from my    11:07:23
2    perspective.
3        MR. LAVOIE:  So I'll move to strike that answer
4    as nonresponsive.
5    BY MR. LAVOIE:    11:07:32
6    Q.   My question again was, based on your
7    experiences with him over 10 years, did you see any
8    indication that John Chen preferred employees of one
9    race over employees of another race?  Did you see
10   any indication of that or did you not?    11:07:41
11   A.   I mean as -- I would say no I guess.  I
12   don't know.  I can't speak for him so I don't know.
13   Q.   No, I'm not asking you to speak for him.
14   I'm asking you to speak to yourself and your own
15   observations.  So I'll ask the question again.    11:07:58
16       During your 10 years of working with him,
17   did you see any indication that John Chen preferred
18   employees of one race over employees of another
19   race?  Did you see indications of that yourself or
20   did you not?    11:08:11
21       MS. BOURN:  Argumentative.
22       THE WITNESS:  No.
23   BY MR. LAVOIE:
24   Q.   You say that you faced "explicit racism."
25   I think that's the term that you used.    11:08:20

**Page 40**

1        What explicit racism did you face?    11:08:22
2    A.   So an example is there's a male, a white
3    male, colleague ████████████, and he was
4    making my life -- he was harassing me, I would say
5    as well, in the workplace.  And it was reported by    11:08:40
6    other employees is my understanding.  And I remember
7    having a call with him and him telling me there was
8    too many people of color and black people in the
9    company.  And it was investigated and he admitted
10   saying it and he was terminated based on that.    11:09:02
11   Q.   When he said this to you, did you
12   understand it to be an implication that there were
13   too many people of color in the company and that
14   included you, that you shouldn't be in the company?
15   A.   Correct.  As he had told people -- he had    11:09:15
16   made -- there had been a number of surrounding
17   experiences that made it clear to me that he did not
18   like having me in the company and it was so apparent
19   that others complained about it, to my
20   understanding, to HR.  And then when it was    11:09:36
21   investigated, I raised the comment that he had made
22   to me and he admitted saying it.
23   Q.   So when BlackBerry investigated it, you
24   told the BlackBerry investigators that he had said
25   there are too many people of color and too many    11:09:52

**Page 41**

1    black people at the company?  You told the    11:09:57
2    BlackBerry investigators that?
3    A.   Correct.
4    Q.   I'll represent to you that based on public
5    announcements and internal company documents that    11:10:03
6    John Giamatteo joined BlackBerry on October 4th,
7    2021.
8        Do you have any reason to dispute that?
9    A.   No.
10   Q.   Your office with BlackBerry, your physical    11:10:12
11   office, was in San Ramon, California; right?
12   A.   Yes.
13   Q.   John Giamatteo's physical office was in
14   Texas; correct?
15   A.   I don't know if it was Texas or New York,    11:10:22
16   but it was not in San Ramon.  He did have an office
17   in San Ramon with his name on it, but I believe his
18   like home address was elsewhere.
19   Q.   You didn't see John Giamatteo -- during
20   the time that you overlapped with John Giamatteo at    11:10:38
21   the company -- which was approximately two years;
22   right?  October 2021 until you were let go in
23   December of 2023?
24   A.   Yeah, that makes sense.
25   Q.   You overlapped for a little over two    11:10:49

Page 42

1  years.  And during that time, you didn't see him in    11:10:51
2  person on a daily basis; correct?
3      A.  Correct.
4      Q.  You didn't see him in person on a weekly
5  basis; correct?    11:11:01
6      A.  Definitely not every week, no.
7      Q.  Did you see John Giamatteo in person most
8  weeks during the two-plus years that you worked
9  together?
10     MS. BOURN:  Vague and ambiguous as to "see."    11:11:14
11     THE WITNESS:  You mean in person or virtually
12  or what's the definition?
13  BY MR. LAVOIE:
14     Q.  My literal question was, did you see John
15  Giamatteo in person most weeks during the two-plus    11:11:26
16  years that you worked together?
17     A.  In person most weeks?  No, I would not say
18  most weeks.
19     Q.  Were there ever months at BlackBerry where
20  you did not see John Giamatteo in person?    11:11:39
21     A.  I mean, I used to travel -- yeah,
22  probably, yes, probably.
23     Q.  Did you see Mr. Giamatteo in person on
24  average closer to once a month, once a quarter, or
25  once a year?    11:11:59

Page 43

1      A.  Somewhere between once a month and once a    11:12:04
2  quarter, not as sparse as once a year.
3      Q.  Did you have one-on-one phone calls with
4  John Giamatteo on a daily basis during the time that
5  you overlapped with the company?    11:12:18
6      A.  Not on a daily basis.
7      Q.  Did you talk to John Giamatteo once a week
8  one-on-one by phone?
9      A.  I mean, occasionally -- I had asked him
10  for a one-on-one and he took it offensively so that    11:12:32
11  was not set up.
12     Q.  So my question was different.
13         Just factually speaking, did you talk to
14  John Giamatteo by phone one-on-one once a week while
15  you overlapped?    11:12:47
16     A.  No, because he thought it was offensive
17  that he would need to speak with me one-on-one
18  because he did not see me as an equal.
19     Q.  Did you talk one-on-one on the phone with
20  John Giamatteo closer to once a month, once a    11:12:58
21  year, or once a year, one-on-one by phone?
22     A.  Once a quarter maybe.
23     Q.  And in terms of your in-person
24  interactions with John Giamatteo, were those
25  typically one-on-one or were they typically in    11:13:14

Page 44

1  groups?    11:13:18
2      A.  A mix.
3      Q.  Were you on group conference calls with
4  John Giamatteo closer to once a week, once a month,
5  once a quarter?    11:13:30
6      A.  Once a quarter possibly, yeah.
7      Q.  Were you on group video conferences with
8  John Giamatteo closer to once a week, once a month
9  or once a quarter?
10     A.  I would say the same, once a quarter.    11:13:44
11     Q.  Were there ever weeks at BlackBerry where
12  you didn't have any communication with John
13  Giamatteo at all in any medium?
14     A.  I don't know for sure, but I would guess
15  not.    11:14:06
16     Q.  So you think that you had at least one
17  communication with him in some medium roughly every
18  week?
19     A.  I really wouldn't know how to answer that
20  question.  I don't know.    11:14:17
21     MS. BOURN:  Don't speculate.
22  BY MR. LAVOIE:
23     Q.  Yeah.  So your counsel is telling you not
24  to speculate in response to my question.
25         My question is just your best estimate,    11:14:24

Page 45

1  were there weeks at BlackBerry where -- is it your    11:14:27
2  testimony that roughly at least once a week at
3  BlackBerry you had some form of communication with
4  John Giamatteo?  Is that your testimony?
5      A.  I really don't know.  I mean, it was -- it    11:14:41
6  was -- we were working together.  I don't know how
7  often, if it was weekly -- I don't know how to
8  answer that question.
9      Q.  During the time that you overlapped at
10  BlackBerry -- I'm talking about the entirety of the    11:14:57
11  time -- was John Giamatteo a higher-ranked executive
12  within the organization as compared to you?
13     MS. BOURN:  Calls for speculation.
14     THE WITNESS:  We all reported to the CEO.  I
15  don't know what his grading was.    11:15:11
16  BY MR. LAVOIE:
17     Q.  What do you mean you don't know what his
18  grading was?
19     A.  I don't know what grade he was in his
20  contract.  I have no idea.    11:15:18
21     Q.  John Giamatteo was the president of
22  BlackBerry's cybersecurity division; correct?
23     A.  Correct.
24     Q.  Would you consider his title of president
25  to be of higher status in the organization than the    11:15:27

12 (Pages 42 - 45)

1  titles that you held during the time that you                11:15:31
2  overlapped with him?
3      A.  I saw everyone who was a direct report of
4  the CEO as an executive team member.
5      Q.  That's not my question, who is an          11:15:41
6  executive team member and who is not.  So I'll ask
7  my question again.
8          Would you consider John Giamatteo's title
9  of president to be of higher status within the
10 organization than the titles you held during the      11:15:49
11 time you overlapped with him, yes or no?
12     A.  No.  I would see everybody as being equal
13 on the team.
14     Q.  So you don't think that someone who had a
15 president title within the organization had a higher     11:16:03
16 status in the organization than someone with your
17 title?
18     MS. BOURN:  Asked and answered.
19     THE WITNESS:  No, I don't.
20 BY MR. LAVOIE:                                     11:16:15
21     Q.  Did John Giamatteo ever have
22 decision-making power over whether you were
23 promoted, yes or no?
24     MS. BOURN:  Calls for speculation.
25     THE WITNESS:  No.                               11:16:25

---

1  BY MR. LAVOIE:                                     11:16:25
2      Q.  Did John Giamatteo ever have
3  decision-making power over the scope of your job
4  responsibilities, yes or no?
5      MS. BOURN:  Calls for speculation.              11:16:33
6      THE WITNESS:  He tried to but he did not
7  officially, no.
8  BY MR. LAVOIE:
9      Q.  So the answer to that question is, John
10 Giamatteo never had decision-making power over the     11:16:40
11 scope of your job responsibilities?  He attempted to
12 exert influence but he did not have decision-making
13 power; correct?
14         You can answer.  There's no objection.
15     MS. BOURN:  If you understand the question.      11:16:54
16     THE WITNESS:  He exerted, to use your words,
17 exerted heavy influence and I would say went on a
18 campaign to affect my career and, ultimately, he is
19 the reason I got fired.
20 BY MR. LAVOIE:                                     11:17:11
21     Q.  I'm not asking about campaign and I'll
22 move to strike that answer as nonresponsive.
23         My question is, did John Giamatteo ever
24 have decision-making power over the scope of your
25 job responsibilities, yes or no?                    11:17:24

---

1      MS. BOURN:  Calls for speculation.              11:17:26
2      THE WITNESS:  I mean, the fact that I got
3  fired -- I mean, I -- you're shaking.
4          Does it mean I shouldn't answer?
5  BY MR. LAVOIE:                                     11:17:39
6      Q.  No.  I'm just saying this continues to be
7  nonresponsive to my questions.
8          I'm asking, did John Giamatteo ever have
9  decision-making authority over your job
10 responsibilities?  That's just a yes-or-no question.    11:17:46
11     MS. BOURN:  Calls for speculation.
12     THE WITNESS:  The fact that I got fired because
13 he would not sign his CEO contract unless I was
14 fired, that makes -- in my opinion, that is
15 decision-making power.                              11:18:01
16 BY MR. LAVOIE:
17     Q.  Okay.  What facts do you know that lead
18 you to that conclusion?  It's your belief that John
19 Giamatteo communicated at some point that I will not
20 sign my CEO contract unless you fire Neelam Sandhu.    11:18:11
21 That's your understanding?
22     A.  Correct.
23     Q.  Okay.  what's your basis for that
24 understanding?
25     A.  I was told that.                            11:18:18

---

1      Q.  By whom?                                   11:18:20
2      A.  By people who had heard it from his own
3  team in the company.  As well, I was fired I think,
4  what, 24 to 48 hours before he signed his contract.
5  As well Dick Lynch was -- he announced my exit from     11:18:34
6  the company prior to John Giamatteo being announced.
7  So the sequence of events was very clear to me.
8      Q.  Okay.  So you testified just then that the
9  sequence of events leads you to this belief.
10     But I want to ask you very concretely          11:18:55
11 about what you said, that people told you --
12     A.  Correct.
13     Q.  -- that John Giamatteo refused to sign his
14 CEO contract unless you were fired.
15     What are the names of those individuals?        11:19:07
16     A.  I don't remember who told me.  There were
17 people on my team who had heard it from people on
18 his team.  For example, Kevin Easterwood is one
19 name.
20     Q.  Kevin Easterwood is someone on John         11:19:23
21 Giamatteo's team?
22     A.  Correct, or was.  I don't know if he still
23 is.
24     Q.  So you heard from one of your employees on
25 the elite customer success team or chief marketing     11:19:30

1 customer officer team?                    11:19:34
2    A.  Within my org.
3    Q.  You heard from an employee within your
4 organization that they had learned from an employee,
5 Kevin Easterwood, in John Giamatteo's organization,   11:19:42
6 that John Giamatteo had communicated that he would
7 not sign his CEO agreement unless you were fired?
8         That's your testimony?
9    A.  That's one example, yes.  There were the
10 others as well but, yes, that's what I had heard.     11:19:53
11   Q.  So is there -- in terms of people telling
12 you things about the source of information, is there
13 any source of information of that that you got from
14 anybody -- from anyone other than Kevin Easterwood
15 being the ultimate source?                 11:20:11
16   A.  I had heard it from other people.  It was
17 not -- my understanding is it was not a secret he
18 was keeping.  He was very vocal about it.  And as I
19 said, I was fired 24 to 48 hours before he signed
20 his contract, and I was pushed to, and pressured to   11:20:28
21 say that I resigned.  And they wanted to do that
22 before they announced him and the dates --
23   Q.  Again, so I'm not asking about the
24 circumstances, the timing, we can get into all that.
25 But I'm asking you very specifically about where you   11:20:45

1 developed this understanding that he had        11:20:49
2 communicated this.  John Giamatteo had said this.
3         At any point did you speak to anyone who
4 told you, "John Giamatteo told me that he would not
5 sign his CEO contract unless you were fired?"  Did    11:21:01
6 you speak to anyone who told you that?
7    A.  No.
8    Q.  And you have no recollection whatsoever as
9 to which members of your organization who told you
10 this?  You can't give me a single name?         11:21:19
11   A.  It's been 18 months.  At this moment in
12 time I don't recall.
13   Q.  So your sworn testimony here today, your
14 very best recollection, you're trying your best but
15 you can't conjure a single name of someone who told  11:21:33
16 you this?
17        Is that your testimony?
18   A.  I would say you can ask various members
19 who used to be on my team.  There were a lot of
20 people who said it.  I don't remember specifics.      11:21:44
21 There was a lot of people.
22   MR. LAVOIE:  I'll move to strike that answer as
23 nonresponsive.
24 BY MR. LAVOIE:
25   Q.  Your sworn testimony is that to the very     11:21:49

1 best of your recollection, you cannot conjure a     11:21:50
2 single name of someone who told you this?  Is that
3 your testimony?
4    A.  My sworn testimony is what I said, which
5 is there were a lot of people who said it to me, so   11:21:59
6 you are welcome to go and ask those people who used
7 to be in my organization.
8    Q.  I'm not asking them.  I'm asking you
9 because you're testifying that you were told this
10 and I'm asking, can you name a single individual by   11:22:11
11 name who told you this?
12   MS. BOURN:  Please don't raise your voice at
13 the witness.  It's inappropriate.
14   THE WITNESS:  There was a number of people.  I
15 don't remember who specifically.             11:22:23
16 BY MR. LAVOIE:
17   Q.  It was a number of people, but you can't
18 name a single one?
19   A.  Not specifically and with clarity so I
20 wouldn't want to -- would want to answer another     11:22:32
21 way.
22   MS. BOURN:  For the record, defense counsel is
23 making faces at plaintiff and shaking his hand.
24   MR. LAVOIE:  I do find this behavior pretty
25 clearly obstructionist and evasive.  And the         11:22:41

1 responses are not responsive.  And so I am a bit     11:22:44
2 incredulous at the approach of kind of tactical,
3 calculated evasion.  So I will acknowledge that I am
4 perplexed.
5 BY MR. LAVOIE:                          11:22:58
6    Q.  So Tim Foote never had decision-making
7 authority over whether you were promoted; correct?
8    MS. BOURN:  Calls for speculation.
9    THE WITNESS:  He was not my direct manager and
10 he was more junior than me.                11:23:11
11 BY MR. LAVOIE:
12   Q.  So my question was different.  I'll move
13 to strike that answer as nonresponsive.
14        My question is simply this:  Did Tim Foote
15 ever have decision-making authority over whether you  11:23:20
16 were promoted or not?
17   MS. BOURN:  Calls for speculation.
18   THE WITNESS:  I mean, your questions are not
19 easy to answer.  They are kind of unclear and I
20 don't want to say something that I don't believe in   11:23:32
21 because I'm under oath.  So he, like Giamatteo, had
22 influence.  Whether others saw that as decision --
23 influencing a decision, decision-making power, I
24 don't know.  But on paper, hierarchically, he was
25 not my direct manager and in theory should not be     11:23:57

Page 54

1  making decisions about my career.                    11:24:02
2  BY MR. LAVOIE:
3      Q.  Did John Giamatteo ever have
4  decision-making authority, authority over your
5  compensation?                              11:24:07
6      MS. BOURN:  Vague and ambiguous, calls for
7  speculation.
8      THE WITNESS:  Again, under oath, I would answer
9  how -- give the answer I want to give, not what I
10  feel where I'm being kind of led.              11:24:19
11      I felt and experienced that he had
12  influence over my compensation and I was explicitly
13  told by my direct manager, the CEO John Chen -- I'll
14  give one example.  When I was promoted to CMO, that
15  I was not being given a salary increase because      11:24:42
16  Giamatteo would get upset.
17  BY MR. LAVOIE:
18      Q.  So I'm going to explain something.  You
19  don't get to answer the question that you would like
20  to answer that you wished I asked.  You have to      11:24:53
21  answer my question.
22      And so my question was, did John Giamatteo
23  ever have decision-making authority over your
24  compensation?  And you can answer that question yes
25  or not but you have to answer that question.  Did he   11:25:05

Page 55

1  have decision-making authority over your            11:25:07
2  compensation or did he not?
3      MS. BOURN:  Calls for speculation.  Defense
4  counsel is not a judge and won't -- will not tell
5  you how to answer it.  You can answer as you need     11:25:16
6  to.
7      THE WITNESS:  Thank you.
8      I felt he did because I was told
9  explicitly that I was not being given a salary
10  increase because he would be upset.             11:25:26
11  BY MR. LAVOIE:
12      Q.  Did Tim Foote ever have decision-making
13  authority over the scope of responsibility that you
14  had?
15      MS. BOURN:  Calls for speculation.            11:25:36
16      THE WITNESS:  Similar.  His influence could at
17  times be strong enough that it did affect the
18  decisions that were made.
19  BY MR. LAVOIE:
20      Q.  I'm not asking whether it influenced a      11:25:46
21  person who had decision-making authority.
22      I'm saying, did Tim Foote have
23  decision-making authority over the scope of your
24  responsibilities?
25      MS. BOURN:  Asked and answered, calls for      11:25:58

Page 56

1  speculation.                                11:25:59
2      THE WITNESS:  I see influence at -- that strong
3  level of influence as decision-making power or
4  whatever you want to call it.  I do see it that way.
5  BY MR. LAVOIE:                              11:26:10
6      Q.  Looking back over your final few years at
7  BlackBerry, when did it first occur to you that you
8  might sue the company?
9      A.  After I was fired in early 2024, sometime
10  in 2024.                                  11:26:27
11      Q.  So prior to you having a conversation with
12  Dick Lynch when he told you that you were being let
13  go, the thought never occurred to you that you might
14  sue BlackBerry?
15      A.  No.                               11:26:39
16      Q.  You've given sworn responses in this case
17  that you reached out to your counsel's Miss Bourn's
18  firm in mid-November, November 17th, 2023.
19      A.  Correct.
20      Q.  And you were not let go from BlackBerry      11:26:59
21  until early December of 2023; correct?
22      A.  December the fourth I was told I was
23  terminated.
24      Q.  So between when you yourself reached out
25  to Ms. Bourn's firm on November 17th, 2023, and when   11:27:10

Page 57

1  you were told that you were being let go in December   11:27:17
2  of 2023, it never once occurred to you that you
3  might sue the company?  That's your sworn testimony?
4      A.  That is, yeah, it never occurred to me.
5      Q.  Let's look at what is tab B in my binder     11:27:33
6  which I'll mark as Exhibit 3.
7      (Deposition Exhibit 3 was marked.)
8      MR. LAVOIE:  And we will go to page 19 of this
9  document.
10  BY MR. LAVOIE:                              11:28:09
11      Q.  So in the middle of page 19 there's an
12  interrogatory response which you swore to the truth
13  of under the penalty of perjury where you write --
14  and this is beginning on line 13 on the left-hand
15  side.                                     11:28:22
16      Do you see the line 13?
17      A.  Yes.
18      Q.  So underneath that it says, "Plaintiff
19  responds she first contacted the Gomerman Bourn law
20  firm on November 17, 2023."                     11:28:32
21      Do you see that?
22      A.  Yes.
23      Q.  Is that true?
24      A.  It is, yeah.
25      Q.  And the Gomerman Bourn firm is the firm      11:28:37

15 (Pages 54 - 57)

**Page 86**

1  John Chen of any kind in which either of you    12:10:55
2  discussed the possibility of John Giamatteo taking
3  over for him as CEO at some point?
4     A.  I recall John Chen mentioning that neither
5  Mattias nor Giamatteo's performance was there so he    12:11:10
6  didn't feel confident that they could be the next
7  CEO.
8     Q.  So when John Chen discussed with you about
9  the timing potentially drawing tight, what time
10  frame was that?    12:11:31
11     A.  I think it was early 2023, maybe into 2022
12  as well, 2022, 2023.
13     Q.  So in that period it was -- John Chen
14  himself considered it possible that he might no
15  longer be CEO at some point in 2023 or soon after?    12:11:49
16     MS. BOURN:  Calls for speculation.
17     THE WITNESS:  His contract term was five years
18  so he wasn't sure if he was going to renew it.
19  BY MR. LAVOIE:
20     Q.  And when did that contract expire    12:11:59
21  according to your understanding?
22     A.  Sometime in November of 2023 I believe,
23  early December.
24     Q.  So it was your understanding as
25  November 2023 approached that John Chen's contract    12:12:09

Page 86

**Page 87**

1  was up to expire; correct?    12:12:13
2     A.  Yeah.  He told me he was in discussions to
3  renew it but that's all I knew.
4     Q.  You never wanted John Giamatteo to be your
5  boss; correct?    12:12:21
6     A.  After he sexually harassed me and gender
7  discriminated against me, no.
8     Q.  And you had no respect for John Giamatteo,
9  did you?
10     A.  I mean somebody who sexually harassed you,    12:12:34
11  it's hard to respect them.
12     Q.  So the answer is no, you did not respect
13  him; right?
14     A.  I did not respect him.
15     Q.  In your communications with    12:12:43
16  Mr. Giamatteo -- strike that.
17       Did you respect him as a professional in
18  terms of his background and experience?
19     A.  I didn't think his results were there.
20  Did I respect him as a professional?  Wasn't really    12:12:57
21  my decision to make, so it wasn't something I
22  focused on.  I had a big job, busy job.  That was my
23  focus.
24     Q.  In your communications with Mr. Giamatteo,
25  did he ever ask you where you lived prior to the    12:13:11

Page 87

**Page 88**

1  United States?    12:13:15
2     A.  Not that I recall.
3     Q.  In communicating with him, did he ever
4  comment to you on your physical appearance?
5     A.  He asked me if I was an Indian, that was    12:13:22
6  the very first thing he said to me.
7     Q.  Did he ask, "Are you an Indian," like
8  Native American, or Indian descent or heritage?
9     A.  He didn't say the word "descent" as far as
10  I recall, so my guess would be, "Are you Indian?"    12:13:36
11     Q.  So not, "Are you an Indian?"
12     A.  I mean I guess not, no.
13     Q.  Did he ever -- other than asking if you
14  were -- strike that.
15       Other than the comment that you just    12:13:50
16  described, did John Giamatteo ever remark on your
17  physical appearance?
18     A.  Did he remark on my physical appearance?
19  Not specifically like a feature of something like
20  that.  He made comments about how -- this is related    12:14:07
21  to the dinner that he and he went on which he
22  invited me to about how his daughters were a similar
23  age and when he's out for dinner with them and was
24  describing that, so that was the extent of it.
25     Q.  So I asked for whether he ever remarked on    12:14:26

Page 88

**Page 89**

1  your physical appearance and your answer refers to    12:14:29
2  an allegation you've made about a joke that he made
3  about his daughters.  So I'll just say your counsel
4  is going to have an opportunity to ask you questions
5  and you're going to have a chance to testify about    12:14:40
6  whatever you want in response to your counsel's
7  question.
8       My question was not whether he made a joke
9  about his daughters.
10       My question was, did John Giamatteo ever    12:14:50
11  make a remark to you about your physical appearance
12  other than the one that you've already described?
13     MS. BOURN:  Calls for speculation.
14       You can answer as you need to.
15     THE WITNESS:  To me, there's not an example I    12:15:05
16  could think of at this point.
17  BY MR. LAVOIE:
18     Q.  Did he ever say that you were pretty or
19  good-looking or anything to that effect?
20     A.  Not with words, no.    12:15:15
21     Q.  What do you mean "not with words"?
22     A.  His -- like his physical -- the things he
23  did showed me that he was interested in me, the
24  touching and other things.  So he didn't say it but
25  there are other ways of saying it.    12:15:35

Page 89

23 (Pages 86 - 89)

Page 90

1  Q.  So he -- did Mr. Giamatteo ever compliment    12:15:37
2  or comment on something that you wore, your attire?
3    A.  Not that I recall.
4    Q.  Have you ever heard Mr. Giamatteo use a
5  racial slur?                        12:15:49
6    A.  Not that I recall.
7    Q.  Have you ever heard him use some kind of
8  derogatory racial term or tell a racist joke?
9    A.  No.
10   Q.  Have you ever heard Mr. Giamatteo use some    12:16:02
11 kind of gender insult such as calling someone a
12 bitch?
13   A.  I haven't heard him call somebody a bitch,
14 no.
15   Q.  Have you ever heard him make an off-color    12:16:14
16 joke other than the one that you've described?
17   A.  That was the key one and I didn't respond
18 well to it, so my view is he didn't do it again in
19 front of me.  But I've heard from others that he
20 would do things like that.                12:16:30
21   Q.  Have you ever heard -- you've testified
22 about this joke.  Have you in any other interaction
23 with him, did you ever hear him make a remark that
24 you considered to be sexist?
25   A.  Directly to me, he was definitely --    12:16:46

Page 91

1  definitely discriminated against me based on my    12:16:48
2  gender and making a comment to me after his early
3  behaviors where I was very clear that this was not
4  going to fly with me.  He was better -- like he
5  didn't make those comments again in front of me, but    12:17:04
6  I have heard that he did it in front of other women.
7    MR. LAVOIE:  So I'll move to strike that as
8  nonresponsive.
9  BY MR. LAVOIE:
10   Q.  So my very specific question was, have you    12:17:13
11 ever had -- so strike that.
12   You've never had an interaction with John
13 Giamatteo where he made a remark that you perceived
14 as sexist other than the joke that you've referenced
15 about his daughters; correct?                12:17:27
16   A.  His behavior was very sexist but a comment
17 specifically, no.
18   Q.  Other than the comment that you described
19 about asking whether you're Indian, did you ever
20 hear John Giamatteo make any other remark regarding    12:17:46
21 your race?
22   A.  That was the one.
23   Q.  Only one?
24   A.  Yes.
25   MR. LAVOIE:  Let's look at Tab No. 4 which I    12:17:59

Page 92

1  think we're on Exhibit 4 now.            12:18:02
2    MS. BECK:  Yes.
3    MR. LAVOIE:  Sorry, Tab I.  They look very
4  similar.
5      (Deposition Exhibit 4 was marked.)        12:18:37
6  BY MR. LAVOIE:
7    Q.  So these are -- this is a single
8  interrogatory that your lawyer served on BlackBerry.
9  If you look at the second page, this is a written
10 question that came from your lawyers requiring an    12:18:47
11 under-oath response from BlackBerry.
12   A.  Okay.
13   Q.  So on the second page your counsel served
14 a written question on BlackBerry that said, "Have
15 you or anyone acting on your behalf, conducted    12:19:01
16 surveillance of Plaintiff?"  That's you.  And, "If
17 so, for each surveillance state," the details,
18 essentially.
19   Do you see that?
20   A.  I see that.                    12:19:19
21   Q.  Have you ever suspected that BlackBerry
22 might be conducting surveillance on you?
23   A.  I thought -- I had thought, like, I
24 wouldn't put it past them.  The harassment was so
25 extreme.  So it was something that I thought they    12:19:31

Page 93

1  would do.                        12:19:35
2    Q.  Did you ever see or observe any indication
3  like someone following you or some online activity
4  or something that you thought was suspicious or
5  indicative of surveillance?                12:19:46
6    A.  No.
7    Q.  But you thought BlackBerry might, for
8  example, like, hire a private detective to trail you
9  around town or something?
10   A.  Their behavior in harassing and        12:19:56
11 discriminating against me was so extreme, I want to
12 say I wouldn't put anything past them.
13   Q.  For the final few years you had at
14 BlackBerry, we've talked that you led the elite
15 customer success team.                    12:20:12
16   I want to take you back to early 2021.
17 John Giamatteo joins in October of 2021.
18   Are you with me so far?
19   A.  Yes.
20   Q.  So before John Giamatteo started at    12:20:23
21 BlackBerry, and I believe you've referenced this
22 already in your testimony today, you made a
23 complaint about ████████████████████ correct?
24
25   A.  I don't remember how -- I don't think I    12:20:38

24 (Pages 90 - 93)

**Page 94**

1  made the complaint.  I don't recall exactly, but I          12:20:40
2  think somebody made a complaint.  A situation
3  arose -- I don't remember if I submitted a complaint
4  but I remember an investigation.
5      Q.   And Mr. Curiale led that investigation;          12:20:52
6  correct?
7      A.   I believe so.  I don't know if he was
8  leading or HR was but he was definitely somebody I
9  spoke with.
10      Q.   And after HR or Mr. Curiale concluded the          12:21:03
11  investigation, and this is according to one of the
12  documents that you held onto and produced to us in
13  this case, the conclusion of the investigation was
14  that, among other things, there was a, quote, toxic
15  atmosphere between your elite customer team and          12:21:19
16  ███████████████████.
17          Do you think that's accurate that there
18  was a toxic environment, separating who's to blame,
19  right, but just to begin, did you agree with the
20  outcome of that investigation that there was a toxic          12:21:34
21  atmosphere between your elite customer organization
22  and the cyber sales team?
23      A.   I -- maybe somebody has the document.  I
24  remember the outcome of the investigation being that
25  ████████████ got fired.  I don't remember the          12:21:46

**Page 95**

1  full document.          12:21:49
2      Q.   We'll get to that and I'm not asking you
3  what the document said.
4          I'm saying, did you agree at the time in
5  early 2021 that the relationship between the elite          12:21:56
6  customer organization and the cybersecurity sales
7  team was toxic?
8      A.   Like the full teams, no, I don't think so.
9  I think there was an issue between ███████████,
10  ████████, but I didn't have that same issue with,          12:22:14
11  let's say -- so I believe ████ if I remember
12  correctly, ██████████████████ I didn't have that issue
13  ████████████████, I didn't have that issue
14  with.  So I thought it was localized to, like,
15  ████████████ and then ████████ worked for him.          12:22:34
16      Q.   So my question was different.
17          I'm just saying, was the dynamic between
18  the two teams toxic or was it not toxic at that
19  time, in early 2021?
20      A.   When you say "team," I think everybody.          12:22:46
21  So I would say no.
22      Q.   Was it toxic as between anybody?
23      A.   With ████████ it was, yes, because
24  I believe he was racist.
25      Q.   And Mr. Curiale described the situation          12:22:58

**Page 96**

1  between the elite customer team and ████████████          12:23:01
2  ████████ as completely dysfunctional.
3          Did you agree with that?
4      A.   Completely dysfunctional?  No, I think the          12:23:16
5  teams were collaborating on some things that they
6  needed to collaborate on.
7      Q.   ████████ was also fired at the
8  conclusion of this investigation; correct?
9      A.   I recall him being fired.  I don't know          12:23:28
10  that the timing was the same as ████  So I don't
11  know the reasons for his firing.  Or if he left in
12  fact.  I don't know.
13      Q.   And all of this obviously transpired
14  before John Giamatteo joined the company; correct?
15      A.   Correct.          12:23:42
16      MR. LAVOIE:  Let's look at Tab 7 which I'll
17  just mark as the next exhibit, Exhibit 5.
18      (Deposition Exhibit 5 was marked.)
19  BY MR. LAVOIE:
20      Q.   Exhibit 5 is an e-mail exchange and it          12:24:12
21  reads in reverse chron order, so at the bottom it's
22  the earliest in time in e-mail.  So it starts with
23  an e-mail from John Chen to Steve Rai and Neelam
24  Sandhu copying John Giamatteo on October 5, 2021.
25  And the subject line is Elite/Field Working Together          12:24:34

**Page 97**

1  Framework and Plan.          12:24:39
2          Do you see that?
3      A.   I see that.
4      Q.   And Mr. Chen writes, "Please get this
5  completed as none of you (you, me, Neelam, and          12:24:48
6  Adam)" -- who is Adam?
7      A.   I think he's the Europe leader.  I don't
8  know if he -- he moved to the U.S. -- he was back
9  and forth between U.S. and Europe.  At this point I
10  can't remember which location he was in, but he was          12:25:06
11  in the sales team.
12      Q.   Adam Enterkin?
13      A.   Correct.
14      Q.   So he was in the cyber sales team that
15  John Giamatteo was then hired to lead?          12:25:13
16      A.   Correct.
17      Q.   So Mr. Chen writes, "Please get this
18  complete as none of us (you, me, Neelam, and Adam)
19  would like to continue to spend time on this."
20      (Reporter seeks clarification.)          12:25:25
21      "Neelam brought it up again with me
22  regarding the MAP approval.  This is now a binary
23  situation."
24          Do you see that?
25      A.   I see that.          12:25:33

25 (Pages 94 - 97)

1 Q. What was it -- what did you understand to 12:25:36
2 be taking up the time that John Chen references this
3 year?
4 (Witness reviews document.)
5 A. From what I remember, this was 2021, the 12:25:49
6 sales team, as salespeople always do, want the best
7 accounts or want the accounts that are doing well.
8 Salespeople always fight about territories and
9 things like that. So with the accounts that I was
10 responsible for, we were doing -- we were seeing 12:26:15
11 success with them in terms of getting deals and
12 other things. And the sales team had asked if those
13 accounts could be reabsorbed by their business. And
14 John Chen had said no. And I can't remember
15 exactly, but at some point, I don't know if it was 12:26:34
16 2021 or 2022, but there was a clear MAP update made.
17 I think there were a couple of updates, but I don't
18 remember the exact timing.
19 Q. And this is dated October 5th, 2021. I'll
20 represent to you that was one day after John 12:26:47
21 Giamatteo joined the company on October 4th, 2021.
22 Do you have reason to dispute that?
23 A. I know Giamatteo joined in October 2021.
24 I don't remember the exact date. Saying the 5th,
25 could be one day or four days after but soon after, 12:27:02

---

1 yeah. I don't know the exact date he joined. 12:27:03
2 Q. So in the next e-mail Steve Rai responds
3 to the group and says, "Understood. John G and I
4 are scheduled to speak tomorrow."
5 Then you write and you drop John Chen and 12:27:15
6 John Giamatteo, write only to Steve Rai, "This is an
7 example of what I mean by constant
8 opinion/discussions about my role."
9 What did you mean by that?
10 A. So I was at BlackBerry for nearly 15 12:27:35
11 years, if I remember correctly, like just shy of, I
12 think, before I got fired and had lots of good
13 experiences. And it was around the time I joined
14 John Chen's leadership team that I started to
15 experience what I would describe as gender 12:28:03
16 discrimination. It was -- I do think it was a
17 culture problem within the company and it was -- you
18 know, it got worse and worse over time. And then
19 when John Giamatteo joined, it was when it became
20 worse than it had ever been before. 12:28:23
21 I don't remember the question, but if you
22 could repeat it.
23 Q. So it's your testimony that you
24 experienced long-running gender discrimination at
25 the company prior to sending this e-mail on 12:28:36

---

1 October 5th, 2021; is that fair? 12:28:40
2 A. That's fair.
3 Q. I assume you don't blame John Giamatteo
4 for that conduct that predated his employment there;
5 right? 12:28:50
6 A. I don't blame him for the pre-conduct, no.
7 Q. And you don't -- well, strike that.
8 Mr. Giamatteo's written communications to
9 you like e-mails -- let me actually ask this
10 question. 12:29:11
11 In what formats did you have written
12 communications with John Giamatteo, like e-mail,
13 BBMe, text?
14 A. Definitely e-mail, BBM I believe as well.
15 Text, I don't remember. I think that's it. That 12:29:26
16 would be what we used to use.
17 Q. So when Mr. Giamatteo wrote e-mails to you
18 or BBMe messages to you, was he generally polite and
19 professional?
20 A. I would say passive/aggressive. 12:29:47
21 Q. So my question is different.
22 Is it your testimony that when John
23 Giamatteo wrote e-mails and BBMe messages to you,
24 that he was impolite or unprofessional?
25 A. If you define passive/aggressive as 12:30:07

---

1 impolite, I would say impolite. I wouldn't say he 12:30:08
2 was always professional.
3 Q. Well, can you recall an example of a
4 written communication, an e-mail or a BBMe where
5 Mr. Giamatteo was passive/aggressive? 12:30:22
6 MS. BOURN: Calls for a narrative.
7 THE WITNESS: Let's see, what do I recall?
8 I've got an example where he e-mailed -- sent an
9 e-mail saying he wants to set up something like a
10 regular review meeting where he and Steve Rai will 12:30:40
11 review deals that my team are working on and make
12 decisions on them and essentially implying that I
13 would not be part of that, he would be directly
14 interfacing with my team and got -- directing them.
15 I think that's unprofessional and 12:31:04
16 passive/aggressive.
17 BY MR. LAVOIE:
18 Q. So the substance of what he was trying to
19 do you viewed as passive/aggressive.
20 I'm talking about, like, the tone and 12:31:12
21 tenor and word choice of his e-mails, was anything
22 about that unprofessional or impolite?
23 A. The tone, from what I recall, no, but I
24 don't think unprofessional comes down to just tone.
25 Q. In any interaction with you, has 12:31:35

---

26 (Pages 98 - 101)

Mr. Giamatteo ever raised his voice?          12:31:40
   A.  Yes.
   Q.  In what interaction?  Did he raise his
voice directed at you or was it in a group setting?
Can you describe?                              12:31:55
   A.  I believe it was one-on-one.  It's more
like you could hear the frustration coming through
in his voice so I would say yes.
   Q.  Which conversation was that?
   A.  After a while I would say it became most   12:32:08
conversations with him.  It wasn't friendly and --
yeah, it was not a friendly tone of voice.
   Q.  Did you ever display frustration when you
were talking to John Giamatteo?
   A.  I tried not to.  I tried to be             12:32:30
professional.  I don't recall a time I -- in a
conversation with him.  Perhaps in an e-mail to John
Chen I would have.
   Q.  So it's your testimony, in some of your
one-on-one interactions with John Giamatteo, he      12:32:45
would display frustration with you but you did not
display frustration with him?  That's your
testimony?
   A.  Yes.
   Q.  And he raised his voice at you on one or    12:32:55

Page 102

---

more occasions in conversation and you never raised   12:32:57
your voice with him?
   A.  I'm not very good at like -- it's not like
something I do.
   Q.  Steve Rai -- sorry.  Strike that.          12:33:05
        Did John Giamatteo ever direct profanity
at you?
   A.  Like to me one-on-one, like what do you
mean, swear words?  No.
   Q.  Steve Rai was -- so -- strike that.        12:33:20
        Is it your testimony you never raised your
voice with people at work?
   A.  Yeah.  I mean that's just not me
personally or professionally.
   Q.  So the answer is no, you never raised your  12:33:36
voice with people at BlackBerry?
   A.  Yes.
   Q.  Steve Rai BlackBerry's chief financial
officer for the last several years you were at the
company; correct?                               12:33:47
   A.  Several like?
   Q.  The last couple of years.
   A.  Yeah.
   Q.  And you had conflicts at work with Steve
Rai, did you not?                               12:33:55

Page 103

---

   A.  I was certainly frustrated that nobody      12:33:57
was -- I didn't feel like my -- the treatment I was
receiving, both based on gender discrimination and
sexual harassment, was being taken seriously or
acted upon.                                     12:34:11
        MR. LAVOIE:  We'll pull what I will mark as
Exhibit 6.
        (Deposition Exhibit 6 was marked.)
        THE WITNESS:  Do you want me to read the whole
thing?                                          12:34:47
BY MR. LAVOIE:
   Q.  Sorry.  I can take you to -- so I'll look
at the first page.  There's an e-mail from you to
Steve Rai and David Dougall, copying Tim Foote and
Phil Kurtz on April 14th, 2022.                 12:35:04
        Do you see that?
   A.  I see that.
   Q.  So John Giamatteo had been at the company
for like half a year at this point, right, since
October of 2021?                               12:35:13
   A.  Yeah, that sounds reasonable.
   Q.  And you write to Steve Rai, the chief
financial officer at the time, "No problem.  Phil
sent an e-mail a few days ago.  Will send you a
solid draft by tend of next week."              12:35:27

Page 104

---

        Do you see that?                         12:35:29
   A.  Yes.
   Q.  And in the next e-mail -- so that's on
Thursday, April 14th, so on a Thursday.  And then 10
days later, on a Sunday, Steve Rai writes back to     12:35:38
you and says, "Neelam, appreciate update tomorrow,
please.  Board material needs to be posted one week
in advance."
        So you had said, "I'll get you a draft by
the end of next week," which I think, judging from    12:35:50
the dates, that would have been Friday, April 22nd;
right?
   A.  Yes.
   Q.  It's now Sunday, April 24th, and Mr. Rai
is just asking you for an update here informing you   12:36:01
that the board materials need to be posted one week
in advance.
        Do you see that?
   A.  Correct, yeah.
   Q.  And then you write to John Chen, dropping   12:36:12
everyone else -- well, adding John Chen.  You add
John Chen, you forward this to him without anyone
else on the e-mail.
        Do you see that?
   A.  Yes.                                      12:36:24

Page 105

27 (Pages 102 - 105)

Page 106

1  Q. And you write, "I did respond." And then  12:36:24
2  at the bottom of this you write, "Let's stop
3  attacking me. It is not right."
4      Do you see that?
5  A. Yes. I just want to read the in-between  12:36:34
6  in case you ask me a question about it.
7      (Witness reviews document.)
8  A. Yes.
9  Q. You thought that Mr. Rai was attacking
10 you; correct?  12:36:51
11 A. I didn't -- again, I didn't feel like I
12 was being taken seriously and I felt that I had
13 been -- I was not generally, as other execs were,
14 given the opportunity to present my own work to the
15 board. And so with this ask, I was looped in very  12:37:08
16 late. To put an ESG report together is a lengthy
17 process and I was given this request very late and
18 asked to turn it around in a short time frame. What
19 I remember and -- it does say Vancouver here. I
20 remember having to go to Canada in between maybe for  12:37:29
21 a customer meeting or something. It was a work
22 trip.
23      And so, again, having that short
24 turn-around time. And so I called Steve Rai and
25 said hey, I'm working on this, short turn-around  12:37:42

Page 107

1  time, not familiar with the board process because  12:37:44
2  I'm not normally included in them or being given
3  like the opportunity to submit -- present my own
4  work.
5      And so, yes, on a regular basis I felt  12:37:51
6  like I was being attacked. And any small thing like
7  being a day -- which I do not call it late, but a
8  day or so late when I had been pulled in really late
9  and to pull together an entire ESG report and then
10 having to travel in between, calling Steve and  12:38:09
11 saying I'm going to need a little bit more time.
12 Let me know if that's okay. And then him sending an
13 e-mail that didn't represent that conversation, I
14 did feel like it was in that same vein of me being
15 attacked.  12:38:24
16 MR. LAVOIE: Okay. I'm going to move to strike
17 the majority of that answer that did not reference
18 whether you believed you were being attacked or not.
19 That was my simple question.
20 BY MR. LAVOIE:  12:38:32
21 Q. You testified that you felt like you were
22 being attacked regularly?
23 A. Yes.
24 Q. Who? Can you list for me just the names,
25 not the back story, just the names of the  12:38:40

Page 108

1  individuals who you believe were attacking you  12:38:44
2  regularly?
3  A. John Giamatteo, Tim Foote, Phil Kurtz.
4  Those are really the key ones. And then at times I
5  didn't feel like Steve Rai was being appropriately  12:38:59
6  professional or supportive either.
7  Q. So would you include Steve Rai in the list
8  of individuals who were attacking you?
9  A. He went along with the crowd at times.
10 Q. But did he himself attack you or did he  12:39:20
11 just like not stop it, is that what you're saying?
12 A. I think a mix of both. When I look at
13 this e-mail, he was again kind of misrepresenting
14 things so I do see that in the same vein especially
15 when you bring all of these examples together.  12:39:38
16 Q. So John Giamatteo was one of your
17 attackers, according to your testimony, and then
18 other attackers, the key ones were Tim Foote and
19 Phil. You also testified that you believe Steve Rai
20 was one of your attackers.  12:39:52
21      What other individuals at the company, and
22 we can limit it to like the last couple of years at
23 the company, would you consider to have been your
24 attackers at the company?
25 A. Attackers, it would be really kind of  12:40:07

Page 109

1  focused on Giamatteo's team. People within his  12:40:08
2  team -- men within his team were emboldened by him
3  and did not treat me professionally as a woman. And
4  he allowed that and then so it kind of spread within
5  his team.  12:40:30
6  Q. I'm just asking for names of individuals.
7      So what names of individuals who've
8  attacked you?
9  A. I wouldn't be able to list them all, but
10 maybe if I can think of some. Hans-Peter would be  12:40:42
11 one. Who else was on his team? I think Billy Ho
12 would be another. Again, when he moved to report
13 under Giamatteo is when that started, from my
14 perspective, and those are a couple I can think of.
15 Q. So I just want to get a comprehensive list  12:41:04
16 of people who you considered to have attacked you in
17 your final couple years at the company. You listed
18 John Giamatteo, Tim Foote, Phil Kurtz, Steve Rai,
19 Hans-Peter Bauer, Billy Ho.
20      Anyone else who attacked you?  12:41:29
21 A. Those are the names I can remember at this
22 time. That's a good list.
23 Q. Is there anyone else who you remember from
24 your last couple of years at the company in your
25 experience who attacked you as you sit here right  12:41:42

28 (Pages 106 - 109)

**Page 110**

1  now?                                    12:41:45
2  A.  At this moment in time, no.
3  Q.  If you think of additional people
4  throughout the remaining hours of the deposition
5  that you didn't mention, will you let me know?    12:41:53
6  A.  Of course.  No problem.
7  Q.  And is it your opinion that Steve Rai is
8  racist or sexist and that's why he attacked you?
9  A.  I don't know, obviously, but my guess
10 would be he would go along with the crowd as he    12:42:12
11 wanted to be part of kind of that boys' club.
12 Q.  So my question wasn't whether he wanted to
13 go along with the crowd or not.
14     My question is, based on your interactions
15 with Steve Rai, do you believe he was racist or    12:42:29
16 sexist?
17 A.  Possibly sexist, yeah, I do think so.
18 Q.  And what facts informed that opinion that
19 Steve Rai is a sexist person?
20 A.  He would go along with the boys' club    12:42:43
21 rather than standing up for the right thing.
22 Q.  So he wouldn't always side with you or he
23 would often side with people, men, who disagreed
24 with you?
25 MS. BOURN:  Misstates prior testimony.    12:42:55

Page 110

**Page 111**

1  MR. LAVOIE:  I'm just trying to -- it's a    12:42:57
2  question.
3  THE WITNESS:  It's not about siding.  It's
4  about doing the right thing.  I spoke to him about
5  the sexual harassment and he did nothing really.  So    12:42:59
6  that's not siding; that's just not doing the right
7  thing.  That's going with the boys' club.
8  BY MR. LAVOIE:
9  Q.  Did you tell Steve Rai at any point that
10 John Giamatteo had touched you or tried to touch    12:43:12
11 you?
12 A.  I told him that he made me very
13 uncomfortable.  I'm not comfortable talking about
14 these kind of things.
15 Q.  Wasn't my question.  Wasn't asking whether    12:43:23
16 you told Steve Rai whether you were comfortable or
17 uncomfortable.
18     My specific question was, did you ever
19 tell Steve Rai that John Giamatteo touched you or
20 tried to touch you?    12:43:33
21 A.  I said he was making me very
22 uncomfortable.
23 MR. LAVOIE:  Again, I'm going to move to strike
24 as nonresponsive, because it doesn't answer my
25 question.    12:43:42

Page 111

**Page 112**

1  BY MR. LAVOIE:    12:43:42
2  Q.  My question is very specifically, did you
3  ever tell Steve Rai that John Giamatteo had touched
4  you or tried to touch you?  Did you tell him that or
5  did you not tell him that?    12:43:51
6  A.  I did not.
7  Q.  Did you ever tell Steve Rai that John
8  Giamatteo had suggested traveling together?  Did you
9  tell Steve Rai that or did you not tell him that?
10 A.  I did.    12:44:04
11 Q.  When you told Steve Rai that, did you tell
12 him that you interpreted that as a sexual advance,
13 yes or no?
14 A.  Yes.
15 Q.  And so your contention -- strike that.    12:44:12
16 MR. LAVOIE:  Let's go to what I'll mark as
17 Exhibit 7 which is Tab 30 for me.
18     (Deposition Exhibit 7 was marked.)
19 BY MR. LAVOIE:
20 Q.  Did you ever tell Steve Rai that you    12:45:00
21 thought that John Giamatteo was retaliating against
22 you in some way because you had rejected a sexual
23 advance?
24 A.  Yes.
25 Q.  You did?    12:45:12

Page 112

**Page 113**

1  A.  Yes.    12:45:12
2  Q.  You said he rejected my -- I rejected his
3  sexual advance and he has retaliated against me by
4  doing what?
5  A.  Cutting me out of meetings, trying to get    12:45:21
6  my -- have my role be reduced or get me fired,
7  telling people he was working on getting me out of
8  the company, being nonresponsive at times, those
9  things.
10     (Reporter seeks clarification.)    12:45:47
11 Q.  Just to be very clear, it doesn't surprise
12 me that you shared your views with Steve Rai that
13 John Giamatteo didn't invite you to meetings and
14 things of that nature.  But you're certain that you
15 told Steve Rai that the reason John Giamatteo was    12:46:02
16 doing those things is because you had rejected his
17 sexual advance?
18 A.  I may not have used the words "sexual
19 advance" but I did speak to Steve Rai about this.
20 Q.  Yes.  So what specifically did you tell    12:46:14
21 Steve Rai?  When you said John Giamatteo was doing
22 X, Y, and Z things and he's doing it because --
23 what?  What words did you use?
24 A.  I don't remember the exact words.  But it
25 would have been that -- along the lines of I didn't    12:46:27

Page 113

29 (Pages 110 - 113)

**Page 114**

1  agree to things, with doing things that would   12:46:31
2  have -- I believe were unprofessional and would make
3  me uncomfortable.  For example, traveling together,
4  which I found to be a strange thing to ask me, and
5  after not positively responding -- that's what I   12:46:46
6  used to say -- positively responding to his
7  advances.  That was it.
8       Q.   Okay.  That's what you told Steve Rai?
9       A.   That was a phrase I used to use because
10  saying "sexual" in the office sounds weird to me.   12:46:56
11      Q.   Yeah. but it was clear to both of you, it
12  was your understanding that that meant sexual
13  advances?
14      A.   Oh, yes, yeah.
15      Q.   And when did you tell him that relative to   12:47:07
16  when Mr. Giamatteo engaged in the sexual advance?
17      A.   I don't remember, to be honest with you.
18  It was more than once.  But I remember going to John
19  Chen first.  I don't remember when I went to Steve
20  Rai.                                   12:47:23
21      Q.   How soon after John Giamatteo first made
22  some kind of sexual advance, according to you, did
23  you tell John Chen about it?  How much time between
24  them?
25      A.   I think it was within 24 to 48 hours.   12:47:34

**Page 115**

1       Q.   And how did he respond?   12:47:38
2       A.   He said he thought it was very disturbing.
3  He said I don't have to travel with him.  And that
4  was what he said.
5       Q.   Tell me everything that you told John Chen   12:47:49
6  in that conversation when you were describing John
7  Giamatteo's advance.
8       MS. BOURN:  Calls for a narrative.
9       THE WITNESS:  From what I remember, I told him
10  that Giamatteo asked me to travel with him without   12:48:00
11  giving any sort of business reason or asking me
12  about my background of what my career ambitions
13  might be or anything professional.  I mentioned the
14  dinner invitation.  I mentioned his touching over
15  dinner.  I mentioned his comment to me about his   12:48:19
16  daughters that had strong parallels to the dinner.
17  Mentioned . . . what else -- those are the things
18  that spring immediately to mind.
19       I mentioned it made me highly
20  uncomfortable.  I mentioned the conversation with   12:48:40
21  Shaila as well at some point which happened later.
22  So pretty much everything that was occurring I would
23  have brought it up to him and said this is -- I
24  don't have an e-mail that shows this but these are
25  the things that are happening and making me highly   12:48:59

**Page 116**

1  uncomfortable.                          12:49:01
2  BY MR. LAVOIE:
3       Q.   And I want to drill down on the touching.
4       What did you tell John Chen that John
5  Giamatteo had done with respect to touching you or   12:49:07
6  trying to touch you?
7       A.   I didn't go into all of the specifics.
8  Again, these are things I'm not very comfortable
9  speaking about in life in general, especially in a
10  professional environment.  And John Chen didn't have   12:49:21
11  much of an appetite for these types of conversations
12  either.  So I remember telling him at dinner John
13  Giamatteo is like leaning over the table and
14  touching my hand and then after dinner he was
15  getting uncomfortably close and sort of summarized   12:49:36
16  it, I would say.
17       Q.   Let's drill down on the touching.  You
18  said two things so far.  Was there any other
19  touching other than, like, leaning over the table to
20  try to touch your hand or touching your hand and   12:49:49
21  when you walked away and you were close?  Was there
22  any -- at any point in your life that John Giamatteo
23  touched you inappropriately or tried to touch you?
24       A.   No.  And I believe that is because I was
25  pretty clear that this is not going to happen.   12:50:05

**Page 117**

1       Q.   I just want to narrow the universe so we   12:50:08
2  can drill down.  Let's talk about when you allege
3  that he tried to touch your hands.
4       A.   Touched, yeah.
5       Q.   He did touch your hands.   12:50:18
6       Can you show me like what do you mean by
7  that?  You're sitting across from each other?
8       A.   Yeah, like a high -- in the bar there's,
9  like, high tables.
10      Q.   High-top?  You're on a bar stool?   12:50:29
11      A.   Yes.  It was like a narrow table, not like
12  this, so it's easy -- you're in close proximity
13  let's say.  So I'm sitting at the table.  He's
14  leaning over and touching.  I ordered fries and he
15  wanted to share them.  Or it was something -- I   12:50:47
16  think it was fries.  I normally get fries and he
17  wanted to share them.  So as I'm going for them,
18  he's going for them, so it was ongoing attempts to
19  touch and that's --
20      Q.   So your recollection is you're going for a   12:51:02
21  fry and the way he tried to touch you is that he
22  would choose to go for a fry with his hands at the
23  same time that you tried to go for a fry with yours?
24      MS. BOURN:  Calls for speculation.
25      THE WITNESS:  That is one example, yeah.  But   12:51:17

30 (Pages 114 - 117)

Page 118

1    as I also said, if I'm sitting at the table, kind of    12:51:18
2    like this or just whatever -- however one sits,
3    resting the fork down, actually leaning over and
4    touching my hand as well.
5    BY MR. LAVOIE:    12:51:29
6        Q.   Let's focus on the fries for a second.   So
7    you're reaching for a fry and then you're alleging
8    that he would choose to reach for a fry at the same
9    time you did so that he would basically have an
10   excuse to touch you.    12:51:42
11       Is that what you're saying?
12       A.   I think that's one example but
13   deliberately going for my hand rather than the food.
14       Q.   So you would go for a fry and when you
15   went for a fry, he would go to touch your hand?    12:51:51
16       A.   Yeah.   Like say it's a bowl.   Didn't --
17   you can reach for a fry at the same time as someone
18   and get your hand like that on theirs.   That's -- I
19   think that's inappropriate.   I didn't offer to -- it
20   wasn't something I offered to share my food either.    12:52:06
21   It was something he set up.
22       Q.   Okay.   So was it an appetizer or was it
23   your meal?
24       A.   Gosh, I don't remember.   I'm vegetarian
25   and a lot of times in restaurants unless it's, like,    12:52:21

Page 119

1    an Indian restaurant or vegan one, there's a salad    12:52:26
2    option but I don't really get full, so I often go
3    for salad and fries.   So it could have been both
4    together.   I don't know.
5        Q.   Could have been either.    12:52:37
6        You're saying you're reaching for a fry
7    and he reaches kind of into the fry dish not seeming
8    to go for a fry but intending to touch your hand?
9        A.   Like each time.   Maybe not every single
10   time, but often enough that it's uncomfortable and    12:52:52
11   unnatural.
12       Q.   Did he actually touch your hand?
13       A.   Correct.
14       Q.   Would he caress your hand?
15       A.   That's what I felt like and I'm pulling    12:53:01
16   back.   And eventually I stopped eating them
17   because -- I'll eat when I got home.   I want to get
18   out of there.
19       Q.   So how many times did you reach for fries
20   and he physically made contact with your hand, like    12:53:11
21   would you estimate?   Does that happen once during
22   the meal or is that something that happened five
23   times, 10 times?
24       A.   I would say like five times is a good
25   guess.    12:53:27

Page 120

1        Q.   So -- and each of those times it's your    12:53:27
2    recollection he actually touched your hand in a
3    provocative way?
4        A.   Yeah.   He was constantly also leaning over
5    the table, like, just the -- unnecessarily closely    12:53:36
6    as well.
7        Q.   How long relative to when he started at
8    the company did this happen, this dinner?
9        A.   Oh, I recall it was like one of my first
10   interactions with him.   I remember having a    12:53:50
11   one-on-one meeting with him in his office in San
12   Ramon as the first interaction.   And the dinner
13   would have either been that same evening or that
14   week is my recollection, very soon after he started.
15       Q.   Okay.   So as you reach for a fry and he,    12:54:06
16   like, touches your hand and doesn't touch the food,
17   so he's not touching the food.   He's just touching
18   your hand?
19       A.   At that point, yeah.   I can't remember if
20   he actually ate fries or not but he may have.    12:54:21
21       Q.   And you're literally recoiling, like
22   you're making it very clear that you don't --
23       A.   Yeah.   Without -- like without also --
24   first time I'm meeting a new peer of mine.   I don't
25   want to also be disruptive but I don't want that    12:54:34

Page 121

1    behavior either.   So I'm trying to get away from him    12:54:39
2    rather than shouting or screaming or swearing, just
3    getting myself out of it.
4        Q.   You're kind of jerking back in a way
5    perceptible enough for you --    12:54:52
6        (Reporter seeks clarification.)
7        Q.   You're jerking your hand back like kind of
8    suddenly enough that, in your view, he should have
9    clearly been able to perceive that this was like
10   unwelcome touching?    12:55:11
11       A.   Correct.
12       Q.   Okay.   So we've covered the fries.   So
13   let's talk about him -- I think you were saying he's
14   leaning over the table, separate from the fries, and
15   he is trying to touch you, he is actually touching    12:55:25
16   you?
17       Can you explain?
18       A.   A mix of both.   Like at times like trying
19   to touch me and then I'm eventually kind of just
20   sitting back.   It was a stool so I can't lean back    12:55:36
21   but sitting back far enough that he cannot lean over
22   any further.
23       Q.   Can you just show me where your hands were
24   relative to your body when he was leaning over
25   trying to touch you separate from the fries?    12:55:50

31 (Pages 118 - 121)

| | |
|---|---|
| 1 situation? 12:55:50 | 1 MS. BECK: I'm sure we do. 12:58:54 |
| 2     A. Sometimes it would be like -- I tend to | 2 THE WITNESS: Thanks. |
| 3 eat especially with my elbows on the table, so | 3 MR. LAVOIE: Why don't we take a quick break? |
| 4 sometimes it would be like this. I don't recall | 4 I don't think this needs to be video taped. |
| 5 exactly but there would be occasions when I'm like 12:56:04 | 5 THE VIDEOGRAPHER: This marks the end of Media 12:59:09 |
| 6 this, versus sitting back without leaning back | 6 Unit 2. Going off the record. The time is |
| 7 because I didn't have a back to my stool. | 7 12:59 p.m. |
| 8     Q. So again, separate from the fries | 8 (Off the record.) |
| 9 situation -- maybe I don't have to give that | 9 THE VIDEOGRAPHER: This marks the beginning of |
| 10 qualification every time. But separate from the 12:56:18 | 10 Media Unit 3. We are going back on the record. The 13:00:32 |
| 11 fries situation, you have hands on the table and he | 11 time is 1:00 p.m. |
| 12 leans over and just with no other purpose, just | 12 BY MR. LAVOIE: |
| 13 touches your hands. | 13     Q. So you've testified so far, and I'm |
| 14     How many times would you estimate that | 14 summarizing this. If I'm not summarizing it |
| 15 that happened, that he like actually touched your 12:56:29 | 15 correctly, I'm counting on you to correct me. 13:00:46 |
| 16 hands in that way? | 16     A. Okay, thanks. |
| 17     A. Once and then in a second attempt but like | 17     Q. So at the dinner, we're trying to drill |
| 18 I'm sort of moving back fast enough and then not | 18 down on the different categories of allegations |
| 19 putting my hands on the table again after that. And | 19 about touching or attempted touching. So far my |
| 20 I remember stopping eating and I had some snacks in 12:56:41 | 20 understanding of your testimony is that there was 13:00:59 |
| 21 my car and then I ate when I got home. | 21 one category that was that you were reaching for |
| 22     Q. So it was just like unmistakable to | 22 fries, he went in and touched your hand and you |
| 23 anybody this was an expression of romantic interest? | 23 estimate -- and your best estimate is that that |
| 24 That was your view? | 24 happened approximately five times. |
| 25     A. Correct. I have never had a colleague, 12:56:56 | 25     In addition to that, separate from the 13:01:13 |
| Page 122 | Page 124 |

| | |
|---|---|
| 1 male or female, do that before or after ever. 12:56:57 | 1 fries, a second category is you're sitting in a 13:01:15 |
| 2     Q. Was this a traumatic experience for you? | 2 booth. You have your hands on the table and |
| 3     A. It was, yes. | 3 Mr. Giammatteo, your testimony is, reached -- like |
| 4     Q. Did it just like shake you? I mean, like, | 4 kind of leaned over the table and touched your hand. |
| 5 could you describe that? It was very memorable, I 12:57:13 | 5 That happened once. And then when he attempted to 13:01:29 |
| 6 imagine; right? | 6 do that a second time, you pulled your hands back. |
| 7     A. Yeah. Gave me that tight feeling in your | 7     Is everything accurate so far? |
| 8 stomach that you get when you're feeling unsafe or | 8     A. I think so, yes. |
| 9 anxious, suddenly -- maybe a women would resonate | 9     Q. Okay. So let's limit it to when you were |
| 10 more with that feeling. But it's that tight feeling 12:57:29 | 10 physically in the restaurant as opposed to when you 13:01:42 |
| 11 in your stomach and you feel unsafe, like you want | 11 were walking away. |
| 12 to run but you're also stuck there -- excuse me. | 12     Any other types of touching or attempt at |
| 13 Like that fight or flight response but you just | 13 touching while you were in the restaurant? |
| 14 can't move. | 14 MS. BOURN: Compound. |
| 15     Q. If you need a break at any moment, at any 12:57:46 | 15 THE WITNESS: No, not that I can recall. 13:01:55 |
| 16 point in the day, you are welcome to take a break. | 16 BY MR. LAVOIE: |
| 17 I don't want to make this difficult. Okay? | 17     Q. So you testified that as you left the |
| 18     A. Thank you. | 18 restaurant, you literally walked out together and |
| 19     Q. Do you want to take a break? | 19 back towards BlackBerry's office? |
| 20     A. Just give me a second please. Thank you, 12:58:01 | 20     A. My car was in the car park just opposite 13:02:13 |
| 21 though. | 21 the office and his hotel was, like, in the same |
| 22     Oh, yeah, so it was -- probably, trying to | 22 direction. So, yeah, like the hotel is behind the |
| 23 recover too quickly. | 23 office. And so we walked in the same direction, |
| 24     Does anybody have a Kleenex, a Kleenex or | 24 yeah. |
| 25 something? 12:58:48 | 25     Q. And did he actually touch you or did he 13:02:28 |
| Page 123 | Page 125 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Page 126

1    just attempt to touch you while you were walking       13:02:31
2    away from the dinner?
3        MS. BOURN:  Calls for speculation, compound.
4        THE WITNESS:  When you're walking and like
5    someone is getting super close and they want -- here     13:02:42
6    and attempting to put their arm around you and I was
7    moving away.
8    BY MR. LAVOIE:
9        Q.  Okay.  You thought -- so your testimony is
10   he was attempting to put his arm around your     13:02:54
11   shoulder?
12       A.  Not shoulder, lower than that.  I don't
13   know if you want to call it waist, like this kind of
14   side of things.
15       Q.  Was he drunk?     13:03:07
16       A.  He had had wine.  I didn't drink.  I
17   didn't feel comfortable enough to drink.  I get
18   like -- alcohol affects me quickly.  And I wouldn't
19   say -- I mean, I don't know.  I don't think he drank
20   excessively so I wouldn't assume drunk.     13:03:23
21       Q.  Do you have an estimate, just based on
22   your perception, of how many glasses of wine he had?
23       A.  I would say no more than two maybe.
24       Q.  How long was the dinner approximately?
25       A.  It was long.  I remember like -- well, I     13:03:35

Page 127

1    remember wanting -- feeling like I was stuck and I     13:03:38
2    wanted to get away.  But I also knew that within
3    BlackBerry, as a woman, you're not saying please and
4    thank you enough, like the blame always comes on the
5    woman.  So like I didn't feel like I could leave.  I     13:03:53
6    don't know how long.  It felt long.
7        Q.  When you left, was it dark outside or was
8    it still somewhat light?
9        A.  I don't remember.
10       Q.  Don't remember.     13:04:06
11           So as you were walking away, your
12   testimony is that he tried to put his arm around
13   like the middle of your back, around your waist?
14       A.  Yeah, it wasn't lower than that.  It
15   wasn't -- definitely wasn't trying to touch my -- I     13:04:24
16   didn't feel like he was trying to touch my bottom or
17   my shoulders but somewhere in between.
18       Q.  And so did he, in fact, touch your back or
19   not?
20       A.  From what I remember, I'm trying to walk     13:04:41
21   and keep enough distance between me and him, just
22   like I would with anybody really.  Unless it's like
23   a boyfriend or something.  I'm not walking that
24   close to them or maybe my nephew holding my hand.
25   He was constantly -- when I would move away, he     13:04:58

Page 128

1    would move closer.  And I didn't walk, obviously,     13:05:01
2    all the way to his hotel.  It's just to the car park
3    that I walked.
4            What was your question?
5        Q.  Did he actually touch your back or was it     13:05:10
6    just that you anticipated that that's what he was
7    trying to do and you prevented him from doing that?
8        A.  Yeah.  I saw -- he came close enough and I
9    saw his arm move and so I moved again so the attempt
10   was there.     13:05:26
11       Q.  So that was an attempt.  He didn't -- he
12   didn't successfully touch you is your testimony.  He
13   attempted to and you avoided?
14       A.  He did touch me in the sense of like the
15   whole side of the body getting so close that we're     13:05:37
16   touching.
17       Q.  You're brushing up against each other?
18       A.  Enough pressure as well, yeah.  It's not a
19   brush.  I would say like a pushing into me a little
20   bit but I'm not falling over, but yeah.     13:05:50
21       Q.  Was it your sense that Mr. Giammatteo was
22   like hoping to go home with you that night or go
23   have -- like continue the evening?  Was that your
24   interpretation?
25       MS. BOURN:  Calls for speculation.     13:06:05

Page 129

1        THE WITNESS:  I don't know.  I mean I saw his     13:06:06
2    behavior as a come-on.  Whether he wanted -- like
3    what he was thinking, going back to his hotel
4    together, I don't know.  But I thought -- he even
5    showed up to the dinner especially dressed up and     13:06:21
6    like -- so I definitely saw his behavior as a
7    come-on.
8    BY MR. LAVOIE:
9        Q.  You say he was dressed up.
10           Was he wearing a tie?  What was his     13:06:32
11   attire?
12       A.  Oh, God, I don't remember exactly.  But I
13   remember like he had gone for dinner, I don't know
14   if it was the same week or like he was there -- I
15   remember it was the same week or week before or     13:06:45
16   whatever, but close to that time for dinner with
17   John Chen.  The office is in San Ramon near Bishop
18   Ranch.  I don't know if you know that area, but just
19   walking distance -- say this is the office, car park
20   here, there's I think it's called Bishop Ranch.     13:07:04
21       Q.  There's like a shopping center and
22   restaurants and things really close by.
23       A.  Yeah.  And so generally after work, if
24   you're having dinner with a colleague or like
25   whatever you try to do, the dinner is just walking     13:07:17

33 (Pages 126 - 129)

**Page 130**

```
 1   distance.  So I do remember him having dinner with        13:07:21
 2   John Chen more than once.  I don't know how many
 3   times.
 4       Q.  You mean yourself and John Chen and/or
 5   just John Chen?                                           13:07:32
 6       A.  When he joined, he was doing one-on-one
 7   dinners with anyone -- at least in the San Ramon
 8   office.  And then there was like two or three -- I
 9   remember like more than one and then like that --
10   that he -- they would walk out together basically        13:07:46
11   when he would go to the dinner.  And then with me,
12   when I would --
13           (Reporter seeks clarification.)
14       A.  With me, I went over to his office and
15   said, "Should we walk over to dinner together?"          13:08:01
16   Because that was the normal thing to do and I knew
17   he was doing that with others.  And he said, "Oh,
18   no, no, I want to go back to my hotel and freshen up
19   first."  But it's not something he did with others.
20   But I remember distinctly when I came into the           13:08:17
21   restaurant, he was just like -- all I could smell
22   was aftershave and his hair was gelled and slicked,
23   just looked different than how he did in the office.
24       Q.  So you recall like a face-to-face
25   conversation with him before the dinner where you        13:08:37
```

**Page 131**

```
 1   went to his office to say, "You want to walk over         13:08:39
 2   together?"  And he says, "I'm going to go freshen
 3   know up"?
 4       A.  Yes, exactly.  So I went back to my office
 5   and just did paperwork, because there's always like      13:08:49
 6   so much work to do.
 7       Q.  So I just want to make sure that we kind
 8   of nail down everything related to the touching.  So
 9   we -- I think we nailed down the two things that
10   were in the restaurant itself and I think you've         13:09:03
11   described your allegations related to the touching
12   as you left the dinner outside.
13           Was there any other touching or attempted
14   touching by Mr. Giamatteo at any point in your
15   relationship that night or any other time?               13:09:21
16       A.  No.  From my perspective -- you may not
17   want me to answer it or not but, like, I wouldn't
18   put myself in an unsafe situation again.  Once I
19   know something is unsafe, I'm going to try and stay
20   away from it.                                             13:09:45
21       Q.  So it's those three kind of categories of
22   touching or attempting touching that we've discussed
23   and nothing more than that; correct?
24       A.  Yeah.  For me that was a lot, but yeah.
25       Q.  I don't mean to make a judgment about it.        13:09:56
```

**Page 132**

```
 1   Just so we're both on the same page about what your      13:09:58
 2   testimony is.
 3       A.  Yes.
 4       Q.  How long after this experience of the
 5   touching behavior did you say something or tell          13:10:08
 6   anyone about it, BlackBerry or not BlackBerry?
 7       A.  I definitely told John Chen right away
 8   because like I was panicking, oh, my God, I don't
 9   want to travel with him.  I don't want to be in a
10   situation where -- I need the job but I'm not            13:10:31
11   married, financially dependent on myself.  I had
12   invested a lot in my career as well.  So I didn't
13   want to be forced into a situation where I feel
14   unsafe again, so I told him right away.
15       Q.  And, like, in person the next day at work,       13:10:50
16   on the phone, some other way?
17       A.  Definitely was in his office I told him.
18   It would have been -- I definitely remember talking
19   to him in his office.  Like I didn't go back to the
20   office after work so it would have been the next         13:11:07
21   day.  I often caught up with him in the morning in
22   his office just to kind of check in before starting
23   the day.  But I don't recall if I called him on the
24   way home as well, but I definitely told him as I saw
25   him in his office the next day.                          13:11:25
```

**Page 133**

```
 1       Q.  When you described it to him, how much          13:11:29
 2   detail did you share with him about the touching or
 3   the attempted touching?
 4       A.  Not all the specifics but, again, these
 5   aren't things I'm super comfortable talking about.      13:11:40
 6   Again, he doesn't have the appetite for it.  He's
 7   just work, work.  And so I described it in a little
 8   bit of detail and mostly talked about his behavior
 9   was like overly -- it was unprofessional, making me
10   uncomfortable, and he was like leaning over the        13:12:01
11   table.  I would have described it at that level,
12   not, "Here's how he touched my hand."
13       Q.  But you definitely told him not just that
14   he had tried to touch you but he had, in fact,
15   touched you?  You told John Chen that?                  13:12:16
16       A.  I don't know if I used the word "touch."
17   I'm thinking of how I know myself.  I'm not the most
18   comfortable talking about these things.  And he's
19   pretty clear he's not comfortable -- he's not open
20   to these conversations.  But I definitely told him     13:12:30
21   he was getting too close and it was making me
22   uncomfortable.  And I don't feel comfortable or safe
23   at all being in a one-on-one meeting with him or at
24   least at the time and all like traveling with him.
25   Like I need to feel -- I need to know that I'm not     13:12:46
```

1  going to be put in that situation.  13:12:49
2  Q.  Did you get emotional at all whenever you
3  told John Chen about this?
4  A.  I didn't cry, no.
5  Q.  Were you emotional at all short of crying?  13:12:58
6  A.  That company, it was just -- there was so
7  many bad experiences.  You have to stay strong,
8  particularly as a woman.  If you break down, they
9  use that against you.  She's not capable to be an
10  executive, because he's crying, or whatever else,  13:13:15
11  things like that.  So I was not -- like I didn't
12  feel like I had the ability to be like that, no.
13  Q.  Did you ever, after that dinner that we've
14  been describing, or that you've been testifying
15  about, I should say, did you ever have another  13:13:31
16  one-on-one meal with John Giamatteo?
17  A.  No.
18  Q.  I would like you to just try to remember
19  for me every person that you told about this within
20  a week or two of it happening, the dinner and the  13:13:50
21  touching.
22  Like other than John Chen, who else did
23  you tell?
24  A.  I don't know sequence but I know I've told
25  Steve Capelli, Steve Rai.  Again, I don't know the  13:14:06

1  timing.  My sister, my friend.  13:14:11
2  Q.  Which friend?
3  A.  My friend Sunny.
4  Who else have I talked to about it?  These
5  are the names that spring to mind.  13:14:33
6  Q.  And all of those, your best estimate is
7  that you spoke to those people relatively soon after
8  it happened?
9  A.  Yeah.
10  Q.  Like within how much time would you say?  13:14:43
11  A.  So my boss, John Chen at the time, as I
12  said, within 24 hours; sister, her and I talk like
13  nearly daily so similar; friend Sunny, he and I
14  don't talk every day.  He's in the UK.  Like a week
15  or two something like that.  Capelli, within one or  13:15:08
16  two -- one week probably.  I don't remember exactly,
17  but he's like -- he's someone who was like -- I felt
18  like he was really a fair person and like treated
19  everybody fairly, so I felt safe with him.  Didn't
20  think he was biased or part of the boys' club.  13:15:36
21  And then Steve Rai I think was a bit later
22  because I was bringing it up when I was more
23  frustrated about the additional behaviors that kept
24  continuing.
25  Q.  And this concept of traveling together, is  13:15:48

1  that something that originated at that dinner?  13:15:51
2  A.  It was the first one-on-one meeting I had
3  with him before the dinner, so it was in his office
4  in San Ramon.
5  Q.  So it was sometime between when he started  13:16:01
6  in, let's say, early October and the dinner,
7  whenever the dinner was?
8  A.  So he started -- I remember having the
9  one-on-one -- when he started -- remember -- okay.
10  I'll take a step back.  13:16:16
11  I remember John Chen saying that one of
12  the issues he had with the prior president of that
13  BU was that the guy joined during COVID so they
14  didn't get a lot of face time together.  So he was
15  really -- wanted to make sure that Giamatteo was  13:16:34
16  coming into the San Ramon office regularly.  I think
17  they agreed that it would be every other week or
18  something.  He thought that was a big part of why
19  the prior president and Chen -- things didn't go
20  well between them I guess.  13:16:52
21  So I remember Giamatteo coming into the
22  office -- he was there I think the first week when
23  he was announced, or at least the second week, so
24  early on.  And that was my first one-on-one with
25  him.  And the dinner, it was either that evening or  13:17:04

1  the next day or something but it was in the same  13:17:08
2  time frame.
3  Q.  The same trip that he took out to San
4  Ramon?  Like he would come out to San Ramon
5  occasionally.  It's your recollection it was like  13:17:17
6  the first time he came to San Ramon?
7  A.  If I remember it correctly, it was like
8  super early.
9  Q.  And you met him in the office and then you
10  had the dinner with him during his same visit to San  13:17:28
11  Ramon?
12  A.  It was the same one or the following week.
13  Super close.  It could have been the same day, to be
14  honest with you.  I don't remember.
15  Q.  And tell me -- we'll put a pin in that.  13:17:39
16  We'll come back to that meeting.
17  Your friend Sunny, you've produced a
18  number of text messages with him in this case.
19  How did you tell him about this experience
20  with the touching?  Was it by text, by phone?  13:17:56
21  A.  We basically talk on the phone.  I'm not
22  big on like texting.  I have to do so much e-mail in
23  a day, I don't want to do more stuff that feels like
24  work I guess.  And I usually often catch up with him
25  like late his time, morning when his commute,  13:18:18

35 (Pages 134 - 137)

1 Because that's normally how long meetings are 13:22:50
2 scheduled for, so I don't know.
3 Q. Describe to me -- you said that the travel
4 together concept arose during this very first
5 one-on-one meeting that you had with him. 13:23:00
6 Can you describe everything you remember
7 about how that came up?
8 A. I remember walking into his office and he
9 was at his -- like in his office there's like a desk
10 with the screen and all those kind of things and a 13:23:16
11 table and chairs for like small meetings, maybe like
12 two to four chairs in there, small. And sat down he
13 came over and sat down and said, "Are you Indian?"
14 I don't know if he said, Oh, or those
15 words but he asked me if I'm Indian. And I said 13:23:35
16 yes. I was like at least say hello or something
17 first or nice to meet me. It was literally the
18 first thing. I remember it clearly. I thought it
19 was strange, that's the first thing that somebody
20 would say to me. 13:23:48
21 And then like he didn't ask me anything
22 about my career or my interests, like there was no
23 real conversation, but I remember him pretty
24 straight going into -- like I asked him, "Can I take
25 you through like what we've been doing on the elite 13:24:11

1 customer side? It would be great to have a strong 13:24:15
2 partnership," like just trying to be professional
3 and transparent and open. I think collaboration in
4 general is like the best way to do one's job and
5 makes work a little bit more enjoyable too. 13:24:28
6 Didn't entertain that conversation and
7 just said, like, you could report to me and we could
8 travel together. I don't remember the exact words
9 but it was literally as blunt and as basic as that.
10 Go ahead. 13:24:46
11 Q. Within like how many minutes of this
12 30-minute or hour-long conversation did he first
13 say, "You can report to me and we can travel
14 together"?
15 A. I remember it being in the top of the 13:24:56
16 conversation so in my mind, from what I remember, it
17 was like the first five minutes maybe.
18 Q. And was it your impression -- did he say
19 anything to give you an indication he knew anything
20 about you or what your role at the company was or 13:25:12
21 anything? Did he evidence that in any way when you
22 started talking to him?
23 A. No.
24 Q. So this is almost like a stranger. He
25 knows that you work at BlackBerry and you tried to 13:25:20

1 initiate a conversation around like what your role 13:25:27
2 was and what you were doing. And almost immediately
3 he pivots to, "You can report to me and we can
4 travel together."
5 Am I summing up your recollection 13:25:36
6 correctly?
7 A. Correct, yeah.
8 Q. So when he said, "You can report to me,"
9 you're sure he said that like, "You can report to
10 me"? 13:25:49
11 A. Yeah.
12 Q. And then, "We can travel together." Like
13 did you in the moment, did you interpret that to
14 mean we'll, like, go to like an exotic island or
15 some romantic location together? Is that what you 13:26:03
16 interpreted it to mean?
17 A. I didn't really have thoughts about what
18 location he was thinking about, an island versus
19 like a city. I don't know. Certainly didn't have
20 those thoughts. But I did think -- I'm trying to 13:26:18
21 talk about work and he is not entertaining that
22 conversation and behaving in a way that's kind of
23 the weird vibes that you get from a person sometimes
24 and just keeps taking the conversation to things
25 that are just not relevant. If I'm Indian or not, 13:26:39

1 what does that matter? Why would I want -- I told 13:26:43
2 him like I'm working for the CEO. What would be a
3 compelling reason for me to -- what I would see as
4 taking a step down, like what's the reason for it?
5 And he's like, "Oh, so we can travel 13:26:57
6 together." That's not a reason. Like is there a
7 job scope, maybe I could get a new experience in
8 something I haven't done before. There's nothing;
9 just so we can travel together.
10 Q. So he didn't elaborate in any way at all 13:27:09
11 about what the benefits of traveling together would
12 be?
13 A. No. And I remember I had prepared slides
14 because I was like, oh, I want to start off on it
15 being super open, because transparency creates 13:27:25
16 trust, so I prepared slides, like here's the
17 customers I'm responsible for, love to share
18 learning from them, especially from the big
19 customers you learn a lot from them what tech buyers
20 generally are thinking, because small companies tend 13:27:41
21 to follow the big ones. And like he wasn't
22 interested. I remember I was thinking God I spent
23 time putting the slides together and he didn't even
24 look at them.
25 Q. It was like unmistakable to you in the 13:27:56

Page 146

1  moment, "We could travel together" -- let me just   13:27:59
2  ask directly.
3       Did you think it was possible even at the
4  time that he was saying, well, we can travel and go
5  meet with clients together?       13:28:12
6    A.  No, because like I had spoken with others,
7  like Tim Foote for example, Tim Foote and I used to
8  work closely together.  Before Giammatteo joined the
9  company, we did get on well with each other in the
10  work environment, at least from my side,   13:28:29
11  perspective.  Like I heard from others about their
12  one-on-ones with Giammatteo and they would be talking
13  about what the job is and what had they heard from
14  investors, like showed specifics so he could be
15  brought up to speed on the business.  I didn't get  13:28:46
16  any of that from him in my meeting.
17    Q.  Yeah, although I guess -- are you
18  saying -- I guess I'm just saying, what informed
19  your perception in the moment that he's saying it,
20  that when he says, "We can go travel together," that  13:28:59
21  there's no way he means, "We can go meet with
22  clients together," what he means we'll go and
23  spend time romantically together, like what was it
24  that made you perceive it that way at the time?
25    A.  So I was trying to take the conversation   13:29:18

Page 147

1  to work topics.  He just was not engaging at all.   13:29:21
2  It was just radio silence.  And then when I said, I
3  would see reporting to you, not you as an individual
4  in your role, like a step back for me because I
5  report to the CEO now.  That feels good for me, how  13:29:37
6  old am I, I'm in my 30s, reporting to a CEO, it's an
7  achievement for me at least anyway.
8       Like I said, what's the compelling reason
9  for me to report to you?  Do you want to know about
10  my career history, like a little bit about what I'm  13:29:56
11  interested in, what I've done before or not, what
12  are the gaps on your team?  Didn't give me anything.
13  There was absolutely nothing.
14    Q.  So I'm just trying to get at the full
15  basis for your perception in the moment that when he  13:30:11
16  said travel together, he didn't mean for business;
17  he meant for romantic purposes.  And so I think what
18  I'm hearing is that what informed that impression at
19  the time was during that conversation you tried to
20  talk about business, he wouldn't engage on that and  13:30:28
21  that's what made you think that the travel together
22  comment was not about business travel, it was about
23  romantic travel.
24       Am I summarizing that fairly?
25    A.  There was a -- go ahead.   13:30:41

Page 148

1    Q.  I'm trying to get your testimony, so tell   13:30:43
2  me if that's not accurate.
3    A.  I thought it was a highly unusual
4  conversation and I kind of walked away from it and I
5  was uncomfortable.  You and I are talking now, I   13:30:56
6  don't feel like you are -- you're not making those
7  facial expressions or your tone of voice is that
8  certain way.  So he had that and then when you
9  combine it then with the dinner behavior, which
10  could have been the same day, for me it's just --   13:31:15
11  even at dinner I was trying to talk about work, like
12  I really wanted to show that I am open and like want
13  to work together and like -- you know, I wanted to
14  just start off on the right foot.
15       You can know anything about what we're   13:31:36
16  working on if it can help your customers, too.
17  I wanted to give that impression but he wasn't even
18  engaging in the conversation.  I don't think he even
19  left the conversation knowing how many customers I
20  was responsible for.  Nothing.  I just remember it   13:31:50
21  being super strange.  What just happened?  I just
22  didn't get it.
23    Q.  So you thought at the time unmistakably,
24  like as you're walking out of the room, when he said
25  travel together, he meant romantic travel, not   13:32:02

Page 149

1  business travel.  That was your unmistakable   13:32:05
2  understanding at the time?
3    A.  That was my thought at the time and then
4  at the dinner made it unmistakable.
5    Q.  An issue with leaving that room, were you   13:32:17
6  thinking to yourself like this person is a creep?
7  Like at the meeting, were you already thinking that
8  at the time?
9    A.  I thought he gave creepy vibes, yeah.
10    Q.  And how many times during that initial   13:32:29
11  conversation in the office did he mention the
12  concept of traveling together?  Was it once, three
13  times, five times?
14    A.  More than once.  I guess you could say two
15  or three maybe.  Not more than that maybe probably.   13:32:46
16  I kept pulling it back to trying to talk about work,
17  talking about work and giving me like just some
18  context about why he's saying these things and
19  having just met each other.  We're both on the
20  leadership team; we both have responsibility for   13:33:09
21  customers.  It should be such an interesting
22  conversation about work and it just wasn't going
23  there.
24    Q.  Did he mention the concept of traveling
25  together also when you went to dinner, whenever that   13:33:21

38 (Pages 146 - 149)

1   A.  Yes.         15:46:41
2   Q.  And that's where you refer to
3  Mr. Giamatteo as a piece of shit; right?
4   A.  Yes.
5   Q.  So does that refresh your recollection   15:46:46
6  that you have referred to Mr. Giamatteo as a piece
7  of shit?
8   A.  I didn't say I hadn't but previously I
9  believe I expressed that based on the context.
10  Having a human expression with a close friend is not  15:46:57
11  a problem and I may have said that, yes.
12   Q.  Again, in this text on January 20th, 2022,
13  you don't mention anything about the traveling
14  together concept; correct?
15   A.  Not something that you bring up every day.  15:47:14
16   Q.  Did you mention it in this text exchange
17  on January 20th or did you not?
18    MS. BOURN:  The document speaks for itself.
19  BY MR. LAVOIE:
20   Q.  Did you mention it or did you not during  15:47:23
21  this text?
22    MS. BOURN:  Argumentative.
23    THE WITNESS:  I've mentioned it plenty of times
24  so this one text is not kind of encompassing of
25  everything.         15:47:33

---

1  BY MR. LAVOIE:         15:47:33
2   Q.  You didn't mention it in this text, the
3  concept of traveling together; correct?
4    MS. BOURN:  The document speaks for itself.
5    THE WITNESS:  My friend, who I speak with   15:47:39
6  regularly, already knew all of the context between
7  Giamatteo and I, so it's not something I need to
8  repeat. I'm just giving him the new information,
9  not the old information.
10  BY MR. LAVOIE:         15:47:52
11   Q.  And you didn't mention traveling together
12  in the next.
13    MR. LAVOIE:  I'm going to move to strike the
14  last answer as nonresponsive.
15  BY MR. LAVOIE:         15:47:55
16   Q.  You didn't mention it in this set of texts
17  on January 20th, did you?
18    MS. BOURN:  Asked and answered. The document
19  speaks for itself.
20    THE WITNESS:  I only provided new information.  15:48:02
21  BY MR. LAVOIE:
22   Q.  And you didn't mention anything about
23  dinner or touching or anything like that in this
24  text exchange with your friend Sunny on
25  January 20th, 2022. You didn't mention either the  15:48:12

---

1  dinner, anything about touching, anything about a  15:48:16
2  sexual advance. You didn't mention anything like
3  this with your friend on January 20th, did you?
4    MS. BOURN:  Asked and answered four times.
5    THE WITNESS:  I've only provided new    15:48:24
6  information in this text.
7  BY MR. LAVOIE:
8   Q.  You're very careful to just keep it to the
9  new information without any overlap in past events?
10    MS. BOURN:  There's no question pending.   15:48:35
11  BY MR. LAVOIE:
12   Q.  That's my question. That's a
13  clarification.
14    MS. BOURN:  That's not a question. It's a
15  statement by you. Make a question.      15:48:38
16  BY MR. LAVOIE:
17   Q.  When you were communicating with your
18  friend Sunny, you were careful to just always make
19  sure that your spontaneous communications with her
20  via text only captured new information and didn't  15:48:49
21  refer back to any information you had previously
22  shared; correct?
23    That's what you're saying?
24    MS. BOURN:  Argumentative.
25    I'm going to instruct you not to answer.  15:48:56

---

1    You've asked the question four times. The  15:48:58
2  document speaks for itself. I'm going to instruct
3  her not to answer.
4  BY MR. LAVOIE:
5   Q.  Are you going to follow that instruction?  15:49:02
6    MS. BOURN:  Yes, you are going to follow my
7  instruction.
8    MR. LAVOIE:  And you're instructing the witness
9  not to answer because you think it's been asked and
10  answered?         15:49:13
11    MS. BOURN:  Because you're harassing her.
12  You're yelling. You're shaking the paper. The
13  document speaks for itself. You've asked her six
14  times now and this is just harassment at this point.
15  That's enough. Move on. Ask a question that means  15:49:22
16  something legally.
17    MR. LAVOIE:  The record speaks for itself,
18  Maria. I'm not harassing your witness.
19    MS. BOURN:  Yes, you are. You are very
20  aggressive with her and it's totally unnecessary and  15:49:34
21  inappropriate and a judge will not allow this in
22  court. You're now laughing so the record will
23  reflect that you're laughing and smiling.
24    MR. LAVOIE:  I think you're being
25  inappropriate.         15:49:45

54 (Pages 210 - 213)

```
 1      MS. BOURN:  You've been in a deposition      15:49:45
 2   harassing a sexual harassment victim and yelling
 3   about her regarding a text message that says what it
 4   says.  Like that's just inappropriate.  Like come
 5   on.                                              15:49:57
 6      MR. LAVOIE:  Maria, I'm not going to engage
 7   further.
 8      MS. BOURN:  Get to facts in the case that
 9   matter.
10      MR. LAVOIE:  I'm not going to engage further  15:50:02
11   with this on the record.  This is just my
12   examination.
13      MS. BOURN:  Right.  Be appropriate and don't be
14   abusive.  This woman has been abused for years by
15   this company that you represent and now you're      15:50:11
16   smiling, too.  Do you think it's funny?  Do you
17   think sexual harassment is funny?
18      MR. LAVOIE:  Maria, this is beyond the pale.
19   This is beyond the pale, beyond the pale.
20      MS. BOURN:  Absolutely.  I'm not going to allow  15:50:21
21   you to sit here and harass her after years of B.S.
22   that she went through.  That's not happening, not
23   with me sitting here.  Ask a question that means
24   something and move on.
25      MR. LAVOIE:  Maria, your behavior is completely  15:50:33
```

```
 1   inappropriate.                                  15:50:35
 2      MS. BOURN:  Yours is.  It's not funny.  It is
 3   not funny.  There is nothing funny about this.
 4      MR. LAVOIE:  Okay.
 5      Okay, let's look at 25H.                      15:51:04
 6      (Deposition Exhibit 20 was marked.)
 7      MS. BOURN:  Defendant's 20 is 1535.
 8   BY MR. LAVOIE:
 9      Q.  So Exhibit 20 is another text exchange you
10   had with your friend Sunny.  And if you look in the  15:51:50
11   middle of the first page, on March 20th, 2022, you
12   write, "Choppers being an ahole, so I guess same
13   old."  "For example, he told Jay" -- that's John
14   Chen; right?
15      A.  Yes.                                      15:52:06
16      Q.  -- "I haven't been attending his team
17   weekly meetings.  Well, he never sent me the invite
18   and I asked a few times for it.  He kept saying
19   he'll send it (since October) but didn't."
20      Do you see that?                              15:52:16
21      A.  Yes.
22      Q.  Is this what you're referring to in your
23   complaint about being excluded from meetings?
24      A.  It's one example.
25      Q.  And this is on March 20th, 2022, and you  15:52:26
```

```
 1   reference October.                              15:52:30
 2      Is that October 2021?
 3      A.  Yes.
 4      Q.  And had you attended any of these meetings
 5   at all during this period from October 2021 to      15:52:37
 6   March 20th, 2022?
 7      A.  Not that I recall.
 8      Q.  These are John Giamatteo's weekly
 9   cybersecurity business unit meetings; correct?
10      A.  I believe so.                             15:52:50
11      Q.  And you're telling your friend that the
12   reason that you haven't been attending his meetings
13   from October 2021 through March of 2022 is because
14   you hadn't gotten the invitations; correct?
15      A.  That's what I'm relaying, yes.            15:53:06
16      Q.  And that was true at the time that you
17   said it to your friend; correct?
18      A.  Yeah.  It was true at some point.  I
19   definitely had a conversation with John Giamatteo
20   about it.                                        15:53:20
21      MR. LAVOIE:  Okay.  Let's look at Tab 23.
22      (Deposition Exhibit 21 was marked.)
23      MS. BOURN:  Defendant's 21, Bates labeled 19951
24   through 19963.
25   BY MR. LAVOIE:                                   15:54:00
```

```
 1      Q.  So this is an e-mail exchange and I'll      15:54:01
 2   just direct your attention to the top of the first
 3   page of Exhibit 21.  And you write to Mr. Giamatteo
 4   on November 18th, 2021, in the middle of that first
 5   page saying you'll "look out for the invite of your  15:54:14
 6   meeting and join whenever I can."
 7      Do you see that?
 8      A.  Yes.
 9      Q.  And then the next message is also from you
10   on January 20th, 2022.  This is a little bit later  15:54:30
11   in the day that you met with Mr. Giamatteo on
12   January 20th, 2022.
13      Do you see that?
14      A.  Yes.  This is after he had complained to
15   me that I had not been joining his meetings.  And I  15:54:42
16   had heard from John Chen that I was not
17   collaborative.  And I said to him that -- I said to
18   Giamatteo that I had not received the invite.  I've
19   asked for it a few times.  And that was another
20   example where he was wide-eyed, because he wasn't    15:55:01
21   expecting me to be -- my assumption is he wasn't
22   expecting me to be so forthright and he got called
23   out.
24      Q.  And when you told him that, he said that
25   it wasn't intentionally that you hadn't gotten the   15:55:17
```

**Page 218**

1  meeting invitations; correct?                    15:55:20
2    A.  No, he didn't say that.
3    Q.  He didn't say that?  Oh, what did he say?
4    A.  A bit of silence really because I said to
5  him, you know, I've got a couple of e-mails where    15:55:30
6  I've pinned you for the invite.  And Maria, my BA at
7  the time, had been -- or Maria, my AI at the time,
8  had been asking his AI for the invite, too.  So I
9  guess he wasn't expecting those facts.
10    Q.  And he then writes, about four minutes      15:55:52
11  later, to -- Mr. Giamatteo writes to his secretary
12  saying, "Apparently, Neelam is not on the invitation
13  list.  Can you please loop her in starting next
14  week?"
15       Do you see that?                            15:56:07
16    A.  I see that.
17    Q.  And you received these invitations just
18  not longer after this e-mail; correct?
19    A.  I don't recall, to be honest.
20  Potentially, yeah.                                15:56:18
21    MR. LAVOIE:  Okay.  Let's look at Tab 24.
22       (Deposition Exhibit 22 was marked.)
23    MS. BOURN:  Defendant's Exhibit 22 Bates
24  labeled 7161 through 7162.
25    MR. LAVOIE:  Exhibit 22?  Is that right?        15:56:51

**Page 219**

1    MS. BOURN:  24.  22.                             15:56:52
2    MR. LAVOIE:  22, that's what I thought.
3  BY MR. LAVOIE:
4    Q.  And so that same night, on January 20th,
5  2022, Mr. Giamatteo's assistant sends you the        15:57:02
6  meeting invites, the recurring meeting invites for
7  the weekly team meeting.
8       Do you see that?
9    A.  Looks like it for -- yes.  Looks like it.
10    Q.  And you respond, "Received thanks"?          15:57:15
11    A.  Correct.  Three or four months after,
12  yeah.
13    Q.  Yet in your text with your friend, you
14  said that the reason that you hadn't been joining
15  the meetings all the way up through March of 2022    15:57:30
16  was because you hadn't received the invitation.
17       That wasn't true, was it?
18    A.  It was true at the time.  The conversation
19  that Giamatteo had with John Chen and with me was
20  back in -- your meeting invite shows it somewhere --  15:57:45
21  was prior to that and then I received the invite.
22  There's also an e-mail here showing that I had a
23  conversation with Giamatteo in January, mentioned to
24  him that I had heard he had been saying these things
25  about me.  And I'll be sending him the proof and so    15:58:06

**Page 220**

1  that sort of adds up -- the sequence adds up in that   15:58:11
2  sense.
3    Q.  How many times between when you received
4  these invitations on January 20th, 2022, and when
5  you texted your friend Sunny in March 2022, how many   15:58:20
6  times did you amend the weekly meeting?
7    A.  I don't recall.  I know I had a
8  conversation with John Chen that I had attended one,
9  maybe two of the meetings, and then also had
10  conversation and the e-mail exchange with Giamatteo   15:58:38
11  about his QBRs and he was not treating me on the
12  calls like a peer.  He was having me provide updates
13  and asking me questions as tough I reported with him
14  and I was not comfortable with that.
15    Q.  So you didn't join the calls very often;     15:58:53
16  correct?
17    A.  I had a conversation with John Chen.
18       (Reporter seeks clarification.)
19    A.  It wasn't an absence because I wasn't on
20  John Giamatteo's team, so I'm not required on those   15:59:08
21  calls.  So it wasn't an absence, no.  It was
22  optional for me to attend from like John Chen and my
23  perspective as well as would be the case occur in
24  any normal environment.  I didn't report to John
25  Giamatteo.  This was a call for his direct reports.    15:59:27

**Page 221**

1    Q.  So you hardly joined the team meetings,       15:59:29
2  either before or after you received the invitation;
3  correct?
4    A.  When I did join, after receiving the
5  invite, he was treating me like I reported to him.    15:59:38
6  So we were running into the same issue that I was
7  having problems with before.
8    Q.  So let's look at tab --
9    MS. BOURN:  We've been going since 2:30 and
10  it's 4:00.                                         16:00:05
11    MR. LAVOIE:  That's fine.  You can take a break
12  if you want.
13    THE VIDEOGRAPHER:  This marks the end of Media
14  Unit 4.  We are going off the record.  The time is
15  4:00 p.m.                                          16:00:14
16       (Recess taken.)
17    THE VIDEOGRAPHER:  This marks the beginning of
18  Media Unit 5.  We are going back on the record.  The
19  time is 4:18 p.m.
20  BY MR. LAVOIE:                                      16:18:32
21    Q.  To your understanding, no one replaced you
22  as chief marketing officer at BlackBerry after you
23  were terminated; correct?
24    A.  I mean I have not kept in touch with like
25  strategy and things like that so I don't know.       16:18:49

1    Q.  You don't know one way or another?    16:18:51
2    A.  I don't know.
3    Q.  And to your understanding, no one replaced
4    you as chief elite customer success officer at
5    BlackBerry; correct?                       16:19:03
6    MS. BOURN:  Calls for speculation.
7    THE WITNESS:  I don't know.
8    BY MR. LAVOIE:
9    Q.  You don't know?  Okay.
10   You don't have any evidence that today    16:19:09
11   there's someone with a title of chief marketing
12   officer or chief elite customer success officer at
13   BlackBerry?  You're not aware of that?
14   MS. BOURN:  Calls for a legal conclusion, calls
15   for speculation.                            16:19:23
16   THE WITNESS:  I have no idea.
17   BY MR. LAVOIE:
18   Q.  When you were testifying before about
19   disclosing or -- the day after the dinner talking to
20   John Chen about it, do you remember that testimony?    16:19:36
21   A.  Yes.
22   Q.  And you testified that John Chen generally
23   didn't really want to have conversations about these
24   types of things.  Is that like personnel -- you
25   know, messy personnel situations?  Is that what

---

1    you're referring to, that he didn't want to have    16:19:53
2    discussions about?
3    A.  Anything personnel wise, always just more
4    focused on the work itself.
5    Q.  Did you ever talk to John Chen about the    16:20:07
6    topic again?  Did you ever bring it up again, the
7    dinner, the travel together comment, anything like
8    that?
9    A.  Yes.  When the retaliation started and
10   continued, so I brought up with him again that I    16:20:20
11   felt that was -- I was being treated this way
12   and I felt that it was because I had turned down
13   John Giamatteo's sexual advances.
14   Q.  And you did that just orally with John
15   Chen, like in the subsequent time that you brought    16:20:35
16   it up with him?
17   A.  I don't remember exactly but that would be
18   my best guess, yes.
19   Q.  And how many times did you bring it up
20   with John Chen, the situation regarding the sexual    16:20:47
21   advance let's say?
22   A.  Quite a few times, especially as the
23   conversations about reducing my role came up.  That
24   for me was extreme retaliation and so I brought it
25   up again at those times.                     16:21:07

---

1    Q.  How did you document that you raised it    16:21:10
2    with him?
3    A.  I had conversations with the CEO.  That's
4    the . . .
5    Q.  Well, I'm asking a different question.    16:21:17
6    Did you document in any way?  Can you
7    point me to a document or a communication where you
8    raised this alleged sexual advance with John Chen?
9    A.  Where I raised it with him?  I don't
10   recall.  I mean I've given my lawyers a bunch of    16:21:31
11   documents, but I definitely know I've spoken to John
12   Chen about it a numbers of times.  Once you tell the
13   CEO something, he has a responsibility or she -- in
14   this case it was a he -- has a responsibility to do
15   something about it.                         16:21:49
16   Q.  So my question is just very simple, are
17   you aware of any e-mail or other document in writing
18   in which you communicated with John Chen anything
19   about this travel together, sexual advance,
20   touching?  Are you aware of any document in which    16:22:04
21   you put that before John Chen or are you not?
22   A.  I don't recall.  I've given all the
23   documents I have to Maria and the team.  So that
24   would be a question for them.  But in terms of my
25   communication with John Chen, a lot of it was verbal    16:22:21

---

1    in general, not just on this topic.  That was just    16:22:24
2    the nature of the beast I guess.
3    Q.  You made various -- how many times across
4    your career at BlackBerry would you estimate that
5    you submitted some form of complaint to the HR    16:22:40
6    department?
7    A.  The first few years of my career I would
8    say really none, from what I recall, but obviously
9    that was a long time ago.  After I moved to
10   California and began reporting directly to John    16:22:59
11   Chen, and that's when I started facing some gender
12   discrimination and other sexual harassment type of
13   experiences.
14   So it was really after that I
15   submitted complaints sometimes to John Chen.  I    16:23:14
16   can't remember if I did to HR.  If I did, it would
17   be maybe once or twice.  I don't recall exactly, but
18   that should be in my personnel file if you've got a
19   copy of that.
20   Q.  So John Chen testified that when you --    16:23:33
21   the one time that you brought this situation about
22   the sexual advance up to him, he told you to go and
23   tell HR about it.
24   Did you do that?
25   A.  I spoke with him more than once.  He did    16:23:45

---

57 (Pages 222 - 225)

Page 226

1  suggest to me I could go to HR. My feedback to him        16:23:49
2  was twofold or threefold. One is, "I said I told
3  you and I expect you to handle it," because the
4  prior time I had gone to HR about something that was
5  a sexual harassment was my experience with ███.        16:24:06
6  And the feedback I get back from that from HR was
7  ███, whilst he is in the security team, he's
8  not there to protect me -- he's not there to make me
9  feel safe was the feedback I got from HR. And so --
10  I just would like to answer.        16:24:28
11        He's not there to make me feel safe and I
12  was told that -- this is by Nita White-Ivy, that in
13  her career experience as a woman, it's been very
14  difficult. And her advice to me is as a woman is in
15  corporate environment, don't smile, don't make        16:24:44
16  jokes. Men see it as an opportunity or turn-on or
17  come-on and also dress like a man. That was her
18  advice to me.
19        So I told John Chen I don't feel
20  comfortable bringing these things up to HR again so        16:24:58
21  I expect him to handle it. And also I said I don't
22  have -- repeat something in writing from Giamatteo
23  so it would be HR will give me advice like they did
24  before or it will become like a he said/she said
25  kind of thing and I don't want to go through what I        16:25:14

Page 227

1  went through last time.        16:25:18
2        MR. LAVOIE: Let's look at Tab 25B.
3        (Deposition Exhibit 23 was marked.)
4        MR. LAVOIE: Exhibit 23?
5        THE REPORTER: Yes.        16:25:41
6        MS. BOURN: Bates labeled 1548 plaintiff.
7        MR. LAVOIE: Actually, I think -42 is going to
8  be the first page so it starts at the top with
9  January 6th, 2022.
10        Do you see that?        16:25:53
11  BY MR. LAVOIE:
12        Q. So this is another text exchange with
13  Sunny. This one is January 6th, 2022, and you write
14  to him, "J. called. He said 'what you said about
15  Choppers is very disturbing.'"        16:26:08
16        Do you see that?
17        A. Yes.
18        Q. And then turn it to the back where you
19  write a pretty long text and you said -- and this is
20  in January -- that you, "told John Chen that        16:26:22
21  Choppers may be okay but I need time to determine
22  that."
23        Is that true? Did you tell John Chen that
24  in January of 2022?
25        A. No. The XYZ piece was from historical.        16:26:38

Page 228

1  The top of the text exchange is sort of where the        16:26:42
2  newer stuff comes in. So it's kind of mish-mashing
3  two situations or events together, so XYZ was
4  previous.
5        Q. But is it true that at any point in time        16:27:00
6  you told John Chen that Choppers, John Giamatteo,
7  may be okay but you need time to determine that?
8  Did you ever tell John Chen that at any point in
9  time?
10        A. Prior to the dinner with my first        16:27:15
11  experience with Giamatteo, which made me feel
12  uncomfortable, I said to John Chen -- because I have
13  to be measured. I've only met the person for the
14  first time. And, again, I don't want to be labeled
15  the difficult one. Within BlackBerry, raising        16:27:29
16  sexual harassment was not taken favorably. Women,
17  from my experience, were not supported. So I wanted
18  to come across measured to John Chen not be like
19  this guy sexually harassed me. I can't work with
20  him. John Chen would take me more seriously like if        16:27:48
21  I'm coming across like I'm being more thoughtful
22  about the situation.
23        Q. Just to be clear, when you're writing to
24  Sunny on January 6th, 2022, and you're saying, "I
25  told John that Choppers may be okay and I need time        16:27:59

Page 229

1  to determine first. The first time I met, he asked        16:28:04
2  me if I'm Indian. He told me the joke about being a
3  dirty old man," and like you go blow by blow; right?
4        A. Yeah.
5        Q. You're describing a conversation that you        16:28:09
6  had with John Chen when?
7        A. Previously. That's where the XYZ.
8        Q. So you're saying Sunny, this person I
9  share everything with contemporaneously, I'm telling
10  you about a conversation I had with the CEO about        16:28:23
11  this dinner with John Giamatteo. This is a
12  conversation I had with the CEO like two or three
13  months ago?
14        A. No. I think you're misunderstanding. So
15  John Chen called me in January after I had again        16:28:32
16  gone to him and said -- like shared more information
17  about how I was being treated by John Giamatteo.
18  And then my friend Sunny says -- like previously, I
19  thought -- this is like him saying, "Previously I
20  thought you said Choppers had said something to        16:28:49
21  him."
22        And I said, "Oh, the X, Y, Z part," that
23  was like historical conversation I've had. He's
24  trying to remember previous facts so I'm recounting
25  the previous facts to him.        16:29:04

58 (Pages 226 - 229)

created distance. He eventually separated the accounts that we had and created the separation, the MAP documents as well, but that's as far as I saw him do something. 16:33:16

Q. When those accounts were reassigned, who made -- who made the decision as to which customers were going to go who? Was that John Chen who made that decision ultimately? 16:33:34

A. I know there's dialogue between Giamatteo and Chen. I don't know who made the decision. 16:33:48

Q. So it may have been Giamatteo who made the decision, not the CEO of the company, as to whose -- where the customers were going to be as between elite and cyber? That's your testimony?

MS. BOURN: Calls for speculation. 16:34:00

THE WITNESS: It could have been, yes.

BY MR. LAVOIE:

Q. And is it -- do you contend that John Chen retaliated against you and one way in which he retaliated against you was by changing the customer accounts? 16:34:14

A. He was being highly pressured by Giamatteo on a regular basis. And John Chen told me that, as the company is not doing well, he's being told by Tim Foote, who is in charge of investor relations, 16:34:30



that if he makes a change on the president of the cyber BU role, the investors will kick up a fuss and John Chen will lose his job. So he told me he was stuck between a rock and a hard place and he couldn't make the move to axe John Giamatteo because investors would just, I guess, abandon the company and he would lose his job. 16:34:34 16:34:45

Q. So your testimony is that John Chen didn't retaliate against you because he wanted to but he was just a rubber stamp for John Giamatteo's retaliation against you? 16:34:59

MS. BOURN: Misstates testimony, calls for speculation.

THE WITNESS: I am saying that John Chen -- I'm telling you what John Chen told me. That's all I know from a facts perspective. 16:35:14

BY MR. LAVOIE:

Q. So you allege discrimination and retaliation in this lawsuit. I'm going to ask you some specific questions about employment actions and whether you believe that they were taken against you because of discrimination or retaliation. 16:35:25

Do you believe that your termination was because of retaliation, discrimination or both?

MS. BOURN: Calls for a legal conclusion, 16:35:40



compound. 16:35:42

THE WITNESS: Both.

BY MR. LAVOIE:

Q. And based on race discrimination or sex discrimination or both? 16:35:51

A. Sexual harassment retaliation for reporting that and gender discrimination.

Q. So you're not contending that you were terminated because of your race?

A. I mean hard to say. I don't know. I mean, all the players were white males. 16:36:10

Q. This is your lawsuit. You get to define the allegations.

Are you contending in this case that one of the reasons you were fired was because of your race? 16:36:20

A. It is a possibility.

Q. You don't know whether -- I'm not asking -- I'm saying, are you contending that in this case, that you were fired based on your race? 16:36:30

MS. BOURN: Calls for a legal conclusion.

THE WITNESS: My answer is what it is. I think there's a possibility.

BY MR. LAVOIE:

Q. So what conduct did you engage in that you believe the company fired you in response to? 16:36:41 16:36:43



A. I spoke -- well first off, I turned down John Giamatteo's advances back in October of 2021. He, following that, threatened me and told me if I didn't give into his sexual advances, he would ruin my career. For the next period of two years he harassed me, told people he was working on getting me out of the company. And then when it came to the time around where he was appointed CEO, I was asked by the company to speak to this outside law firm or investigators, MoFo, Morrison & Foerster. 16:37:02 16:37:21

And I did that. And I believe two things: One, I was retaliated against for that testimony; two, Giamatteo wanted me out of the company and it was very clear about that. And he would not sign his contract as CEO until I was fired which the dates show -- the dates back that up. 16:37:41

Q. So I was asking very specifically about what conduct you engaged in that you believe the company fired you in response so. So what you did you contend the company fired you for. So, one, you said you rebuffed the sexual advances; and then, two, you made a complaint to the outside law firm that was investigating Mr. Giamatteo. Those are two things; right? You say you did those things and the 16:37:53 16:38:10

Page 238

1  company fired you for it; right?                    16:38:13
2      A.  I was asked to give a testimony.  I didn't
3  make -- submit the complaint.  I was asked to give
4  it and I gave it, and so I was retaliated against
5  for that testimony.                                 16:38:24
6      Q.  Anything else that you did that you
7  contend caused the company to fire you, any conduct
8  that you engaged in other than rebuffing John
9  Giammatteo's advances and giving statements to the
10  law firm investigating Mr. Giammatteo?             16:38:39
11      MS. BOURN:  Calls for a legal conclusion, calls
12  for contention legal conclusion, calls for a
13  narrative.  And just a bad question.
14      THE WITNESS:  Those are the two big things.
15  BY MR. LAVOIE:                                     16:38:55
16      Q.  So you've testified that you think that
17  your termination was based on discrimination because
18  you're a woman, so you were fired because you're a
19  woman.  You may have been fired because of your
20  race.                                              16:39:28
21      What facts make you believe that you were
22  fired because you're a woman or because you're a
23  woman of color?
24      MS. BOURN:  Calls for a legal conclusion.
25  Calls for a legal contention and violation of the  16:39:39

Page 239

1  Rifkind case --                                     16:39:45
2      Let me finish my objection.
3      Calls for a narrative.
4      But you can answer.
5      THE WITNESS:  So many things.  There are so     16:39:56
6  many examples of how I was treated differently
7  because I'm a woman and wasn't part of the boys'
8  club.  I was paid unfairly.  I wasn't given a pay
9  raise when I was made CMO.  I was -- like from
10  Giammatteo's perspective, offered a role on his team  16:40:22
11  because he wanted to sleep with me, essentially.
12  That's not something that happens to men, or at
13  least you don't hear it very often.
14      The list goes on.  There's so many
15  reasons.  And all the players who were so eager to  16:40:38
16  get me out, Giammatteo, Phil Kurtz, Tim Foote, Dick
17  Lynch, all men.
18      Again, as I said, the list goes on but
19  there's a lot of examples for how I was treated
20  differently for being a woman, not respected, not   16:41:00
21  invited to -- voice was not respected at the table,
22  not invited at the table at times, not taken
23  seriously despite, at the time having closed several
24  of the company's largest software deals ever,
25  including a ▓▓▓▓▓▓ deal that was the largest in     16:41:15

Page 240

1  the company software history.  Didn't get a --      16:41:19
2  pretty much a single note of congratulations after
3  closing that deal, where the men would congratulate
4  each other and pat themselves on the back after
5  closing $100,000, a smaller deal.                   16:41:32
6      After closing that deal, my role was
7  diminished as opposed to being -- even just make the
8  same.  Wasn't paid on commission on that deal
9  either, so I didn't get paid appropriately for it.
10  Like I said, the list goes on and on and on.        16:41:51
11  BY MR. LAVOIE:
12      Q.  So a lot of bad things happened to you,
13  you contend at the company.
14      You think other people were treated better
15  than you?                                           16:42:00
16      A.  Men specifically.
17      Q.  All men were treated better than you at
18  the company.  That's your testimony.
19      A.  That wasn't my testimony.  It was not
20  other people.  The people who were treated better --  16:42:09
21  the men I've described, all the people who are --
22  who I've mentioned who were harassing me.  And
23  eventually the reason I got fired were men.  And men
24  were, like Giammatteo, promoted despite killing his
25  business in silence, had to be sold at the end of   16:42:31

Page 241

1  it.  And he got promoted to CEO.  So it wasn't a    16:42:34
2  fair organization towards women at all.
3      Q.  The board didn't decide to extend John
4  Chen.
5      Is that because he was a man, because he        16:42:47
6  was a person of color?
7      MS. BOURN:  Calls for speculation.
8  BY MR. LAVOIE:
9      Q.  Like people get let go based on different
10  opinions about their value to the company.          16:42:56
11      What is your indication that the reason
12  that you were let go not just because there was an
13  honest difference of opinion about your value to the
14  company but because you're a woman specifically?
15      MS. BOURN:  Calls for a legal conclusion, calls  16:43:08
16  for a narrative, calls for a legal context which is
17  an inappropriate question for a lawyer to ask, as
18  I'm sure you know.
19      But you can answer it if you understand
20  his question.                                       16:43:19
21      MR. LAVOIE:  This is, again, a speaking
22  objection, Maria.  We'll go the Court on this, but
23  you are stopping the deposition time -- don't
24  interrupt me.  I've waited for you to finish.
25      You were sopping up time in this               16:43:29

61 (Pages 238 - 241)

**Page 242**

1　deposition and you are making speaking objections　16:43:32
2　that are so long that it makes it hard for the
3　witness to remember what the question was. And
4　you're suggesting answers to the witness. So I'm
5　asking you to stop. You're entitled to a short and　16:43:40
6　plain statement of your objection. You're not
7　entitled to make speaking objections.
8　　　MS. BOURN: The record will speak for itself.
9　I've been very polite today, and you're just
10　testifying and you're not asking questions. But do　16:43:49
11　what you want.
12　BY MR. LAVOIE:
13　　Q. Do you believe you were ever denied a
14　promotion because of discrimination or retaliation
15　or both?　16:43:59
16　　　MS. BOURN: Calls for a legal conclusion, calls
17　for a legal contention in violation of the Rifkind
18　case.
19　　　You can answer.
20　　　THE WITNESS: Yes. As I said, I was not　16:44:07
21　paid -- given a salary increase when I was made CMO.
22　That's a perfect example.
23　BY MR. LAVOIE:
24　　Q. Well, I'm going to ask about compensation.
25　I'm saying were you ever denied a　16:44:15

**Page 243**

1　promotion as in, like, a new and higher job or title　16:44:16
2　because of your gender or in retaliation for
3　something you had done?
4　　　MS. BOURN: Asked and answered, same objections
5　as before.　16:44:28
6　　　THE WITNESS: Yes. So those are things I
7　believe happened because of retaliation and me
8　turning down John Giamatteo.
9　BY MR. LAVOIE:
10　　Q. What promotion did you not get　16:44:37
11　specifically? What job did you try to get that you
12　were denied based on discrimination or retaliation?
13　　　MS. BOURN: Calls for a legal conclusion,
14　compound.
15　　　You can answer.　16:44:50
16　　　THE WITNESS: So my title in the customer --
17　elite customer success side, that was not the right
18　title because John Giamatteo would have been upset.
19　So that does diminish my role in several ways.
20　BY MR. LAVOIE:　16:45:07
21　　Q. You mean that you deserved to have the
22　title of chief customer officer and you were denied
23　that title because of retaliation?
24　　A. Correct.
25　　Q. But you've gone ahead and assigned your　16:45:16

**Page 244**

1　title in that résumé when you've been applying for　16:45:19
2　jobs?
3　　A. Recruiters actively told me if you don't
4　use the appropriate title in my résumé, it's going
5　to be hard to get a job. Because the titles I was　16:45:28
6　given at BlackBerry are so obscure and are not
7　normal in the world. You will not find another
8　chief elite customer success officer. Because once
9　they understood the actual job I was doing, they
10　said this is the appropriate title. The titles I　16:45:42
11　was given, senior vice president, business
12　operations, office of the CEO, that was a chief of
13　staff role.
14　　　So many recruiters told me, "You will not
15　get a job if you use those titles in your résumé.　16:45:57
16　You have to use the industry standards."
17　　　It was BlackBerry who didn't give me the
18　industry standard titles despite the fact that I was
19　doing those jobs because people like John Giamatteo
20　and white men in the company, I was told this　16:46:07
21　explicitly, would be upset if I got those titles.
22　So they had to try like soften my titles to help
23　those individuals feel better, those white men feel
24　better.
25　　Q. So you felt entitled to lie and falsify　16:46:23

**Page 245**

1　what your actual title was when you applied to jobs　16:46:24
2　because you thought you had been mistreated?
3　　　MS. BOURN: Argumentative. Don't answer. That
4　is not a question.
5　BY MR. LAVOIE:　16:46:35
6　　Q. You acknowledge that on your résumé that
7　you sent to a bunch of prospective employers, you
8　listed your title as chief customer officer. You
9　acknowledge that; right?
10　　A. He's just making -- you're creating a　16:46:43
11　story here that isn't there.
12　　Q. No, no. I'm asking a fact.
13　　　In the résumés you sent to prospective
14　employers after you lost your job at BlackBerry, did
15　you list your title as chief customer officer or did　16:46:55
16　you not?
17　　　MS. BOURN: Please lower your tone. There's no
18　reason to be yelling at the witness. It's
19　inappropriate and we will seek a protective order
20　and stop the deposition if you continue.　16:47:07
21　　　MR. LAVOIE: I'll repeat my question --
22　　　MS. BOURN: With a proper tone.
23　　　MR. LAVOIE: Maria, your tone is very
24　problematic and the continuous speaking objections
25　are obstructing the deposition. I'll ask my　16:47:17

62 (Pages 242 - 245)

**Page 246**

```
 1   question again.                      16:47:19
 2        MS. BOURN:  You are crazy.  You are lying about
 3   what I'm doing.  So just stop.
 4   BY MR. LAVOIE:
 5        Q.  In the résumés you sent to prospective    16:47:23
 6   employers, did you list your title as chief customer
 7   officer or did you not?
 8        A.  I was discriminated at BlackBerry and
 9   given obscure titles that do not exist anywhere in
10   the industry.  You will not find a single person who   16:47:40
11   had those titles anywhere else.  So that
12   discrimination at BlackBerry led to me not only
13   being -- I guess getting paid less and penalized at
14   BlackBerry but also then affecting my future career.
15        So as recruiters -- when I described to        16:48:02
16   them the actual job I did, specifically fact based,
17   they said, "These are the titles you should have
18   had.  To get another job, you need to list the
19   actual titles, not the ones that they gave you."
20        MR. LAVOIE:  I'm going to move that entire     16:48:17
21   answer as nonresponsive.
22   BY MR. LAVOIE:
23        Q.  My question is yes or no.  Yes or no.
24   When you sent out résumés to prospective employers,
25   did you list your title as chief customer officer?   16:48:26
```

**Page 247**

```
 1   Yes or no?                           16:48:30
 2        A.  It's not a yes-or-no question.
 3        Q.  It is a yes-no question.
 4        Do you want to look at your piece of
 5   paper?  Do you want to look at your résumé where you   16:48:35
 6   had it on there?  I guess we can just look at it.
 7   I'm asking you a question just factually speaking,
 8   what was on your résumé?  When you sent out your
 9   résumé to prospective employers, did you list your
10   title as chief officer or did you not?              16:48:48
11        MS. BOURN:  Asked and answered three times now.
12   Argumentative.
13        THE WITNESS:  I'm the one under oath.  I will
14   answer what I think is accurate.  And I've given my
15   answer.  I was discriminated against and I was --    16:49:03
16   that was the issue.
17   BY MR. LAVOIE:
18        Q.  Okay.  Well, the record will speak for
19   itself.
20        So any other promotions, as in jobs that       16:49:16
21   you sought at BlackBerry that you didn't get, jobs
22   or titles that you sought that you didn't get, based
23   on discrimination or retaliation?
24        MS. BOURN:  Objection; compound, asks for a
25   legal contention, and vague and ambiguous as to      16:49:30
```

**Page 248**

```
 1   time.                                16:49:36
 2        THE WITNESS:  I don't know what other
 3   opportunities I missed out on based on my gender or
 4   race or other things.  I don't know.
 5   BY MR. LAVOIE:                                      16:49:46
 6        Q.  What decision regarding your pay, bonus or
 7   benefits was, in your view, based on discrimination
 8   or retaliation?
 9        MS. BOURN:  Compound, calls for a legal
10   conclusion.                          16:50:00
11        THE WITNESS:  Not getting a pay raise when I
12   was made CMO was one.  And I was explicitly told by
13   John Chen it was because John Giamatteo would be
14   upset.  He's already upset I got the CMO job; he'll
15   be more upset if you get a pay raise, too.          16:50:14
16   BY MR. LAVOIE:
17        Q.  Any other times when you were denied a pay
18   increase or a bonus or other compensation because of
19   your -- based on discrimination or retaliation?
20        MS. BOURN:  Compound, calls for a legal         16:50:34
21   conclusion, vague and ambiguous as to time, calls
22   for speculation.
23        THE WITNESS:  You would have to ask HR.  I
24   don't know.  I wouldn't know if they're not giving
25   me things.                           16:50:46
```

**Page 249**

```
 1   BY MR. LAVOIE:                       16:50:46
 2        Q.  Were you ever demoted or had job duties
 3   reassigned or lost based on discrimination or
 4   retaliation?
 5        MS. BOURN:  Compound, vague and ambiguous as to   16:50:57
 6   time, calls for a legal conclusion.
 7        THE WITNESS:  Yes.
 8   BY MR. LAVOIE:
 9        Q.  When?
10        A.  When my role -- when my customers were      16:51:04
11   reassigned.
12        Q.  And you viewed -- and at the same time,
13   you took on the chief marketing officer role;
14   correct?
15        A.  That was only because my role was reduced   16:51:17
16   and I was told it was because John Giamatteo is
17   getting very upset.
18        Q.  Sorry.  It was -- you added the chief
19   marketing officer title at the same time, right, so
20   there were some customers that left your purview.    16:51:33
21   You added some customers and then you also took on
22   the chief marketing officer title; correct?
23        A.  I'm trying to give you the answer to your
24   question.
25        My role -- I was told my role was being         16:51:45
```

1 reduced. Initially I was told that all of the     16:51:49
2 customers were being taken away and I would revert
3 back to being like the chief of staff role. I
4 fought that because it was clearly retaliation and
5 absolutely unfair, especially after I had just     16:52:03
6 closed a $61 million deal, which was the largest
7 deal as a software company.
8      Eventually after daily harassment, further
9 daily harassment, landed that -- I was told okay
10 fine, well, we'll reduce your customers and give the     16:52:19
11 growing customers back to John Giamatteo and assign
12 you ones that he has lost, he and his team have
13 lost, so you can then go and win them back.
14      I rejected that because it was -- there
15 was no basis for it other than retaliation. And it     16:52:39
16 was around -- I think it was around March 20 --
17 March 2023 when Rich Curiale invited me out to
18 lunch -- I'm answering your question, I'm answering
19 your question.
20     Q. This is venturing far beyond what my     16:52:56
21 question was.
22     A. It's really not.
23     MS. BOURN: You asked a long question. You
24 asked for a narrative on two causes of action.
25      THE WITNESS: So around March 2023 when all     16:53:05

1 this was happening, I told John Chen I can't handle     16:53:08
2 how I'm being treated here anymore. I've put up
3 with it for long enough. I'm out. I resign. I had
4 that conversation with him.
5      He called Rich Curiale and said, "Can't     16:53:17
6 lose her from the company. She's not going to
7 listen to me. You need to speak to her." And
8 that's when the offer for CMO came on the table.
9 Okay, we're going to take this away from you but
10 giving you something else.     16:53:35
11 BY MR. LAVOIE:
12     Q. What is the name of the person -- and that
13 is the only information I'm asking for. What is the
14 name of the person who told you that all of your
15 accounts were going to be taken away and that you     16:53:40
16 would revert to only the chief of staff role?
17     A. John Chen and he told me it was because of
18 John Giamatteo.
19     MR. LAVOIE: Okay. I'll move to strike
20 everything after "John Chen."     16:53:50
21 BY MR. LAVOIE:
22     Q. So you were not given a pay increase when
23 you became chief marketing officer.
24      Is there any other time where there was a
25 discriminatory or retaliatory treatment against you     16:54:04

1 that affected your pay or compensation?     16:54:08
2     MS. BOURN: Calls for a legal conclusion,
3 compound, calls for a contention question, calls for
4 a narrative, vague and ambiguous as to time.
5      THE WITNESS: I don't know when others were     16:54:21
6 getting pay raises, what pay raises they were
7 getting, so I certainly could have been
8 discriminated against. I mean I'd like to see that
9 information from BlackBerry.
10 BY MR. LAVOIE:     16:54:31
11     Q. Any other time besides when the customers
12 were reassigned that you just discussed, any other
13 time where you were demoted, reassigned, or had
14 responsibilities taken away based on discrimination
15 or retaliation?     16:54:46
16     MS. BOURN: Quadruple compound, so object to
17 the form of the question. Calls for a legal
18 contention, calls for a legal answer, vague and
19 ambiguous, overly broad.
20      THE WITNESS: When my titles were so obscure     16:55:05
21 that, from my perspective, and what I've heard from
22 recruiters across countries is that that was a form
23 of retaliation and harassment as well.
24 BY MR. LAVOIE:
25     Q. So I'm asking specifically about     16:55:21

1 demotions, reassignments, loss of job duties. And     16:55:22
2 you talked about not getting a title. So I'm just
3 going to ask my question again.
4      Other than when the customers were
5 reassigned, is there any other instance where you     16:55:33
6 were demoted, reassigned, or your job duties were
7 changed based on discrimination or retaliation?
8     MS. BOURN: Compound, calls for a narrative,
9 calls for a legal conclusion, overly broad as to
10 time.     16:55:48
11      THE WITNESS: There are a number of times the
12 discussion came up but I fought it.
13 BY MR. LAVOIE:
14     Q. Specifically when? Like with regard with
15 what change? Like what demotion, what reassignment,     16:55:58
16 what change in responsibilities occurred because of
17 discrimination or retaliation? I'm not trying to
18 fight with you about whether this stuff occurred or
19 not. I'm literally trying to understand the breath
20 of what you claim happened to you based on     16:56:13
21 discrimination or retaliation so I'll ask again.
22      Other than having the customers
23 reassigned, can you think of another instance where
24 you were demoted, reassigned, or had
25 responsibilities taken away based on discrimination     16:56:26

64 (Pages 250 - 253)

| | |
|---|---|
| 1 or retaliation?      16:56:29 | 1    Q. Yep, that's right. So you just read the    17:06:11 |
| 2    MS. BOURN: Calls for a legal conclusion, | 2 entirety of your response and amended response to |
| 3 compound. Objection to the form of the question, | 3 defendant's interrogatory No. 2; correct? |
| 4 calls for a legal contention in violation of | 4    A. Yes. |
| 5 Rifkind.      16:56:39 | 5    Q. And that interrogatory asks you to    17:06:20 |
| 6    THE WITNESS: Over that period of two years, | 6 describe in detail each act of retaliation you |
| 7 there was numerous discussions about taking the | 7 contend was taken against you by defendants. |
| 8 customers away, about those types of things because | 8    Do you see that? It's page 5. |
| 9 Giamatteo was unhappy. So eventually it ended up | 9    A. Yes. |
| 10 happening but that's the key case.    16:56:58 | 10    Q. And you attested to the accuracy of this    17:06:30 |
| 11    MR. LAVOIE: Okay, let's a look at Tab B. | 11 interrogatory response under penalty of perjury. |
| 12    MS. BOURN: Videographer, what time did we | 12    Do you remember doing that? |
| 13 start? | 13    A. Yeah. I mean, I remembered at the time. |
| 14    THE VIDEOGRAPHER: We're at 39 minutes on. | 14    Q. And so my question is this: are all of |
| 15    MS. BOURN: Defense Exhibit 24.    16:57:42 | 15 these acts of retaliation that you describe here, do    17:06:45 |
| 16    MS. BECK: It was already introduced as | 16 you also contend that they were acts of |
| 17 Exhibit 3. | 17 discrimination? |
| 18    MR. LAVOIE: Oh, the responses to | 18    MS. BOURN: Objection; calls for a legal |
| 19 interrogatory, the first set of interrogatories? | 19 conclusion. |
| 20 Oh, right, I see what you mean.    16:58:06 | 20    I'm going to instruct you not to answer    17:06:55 |
| 21    Sorry. We previously marked this as | 21 that question. |
| 22 Exhibit 3, which is why we only had two copies of | 22 BY MR. LAVOIE: |
| 23 it, so we don't have to dig through the prior | 23    Q. You're going to follow that instruction to |
| 24 exhibits to find it, or you can use the new copy. | 24 not answer the question? |
| 25 It's the same thing.    16:58:17 | 25    A. Yes.      17:07:03 |
| Page 254 | Page 256 |

| | |
|---|---|
| 1    MS. BOURN: Do you want to retract the number?    16:58:17 | 1    MR. LAVOIE: I think that is improper and we'll    17:07:04 |
| 2    MR. LAVOIE: Yeah. We should refer to it as | 2 reserve the right to bring Ms. Sandhu back here for |
| 3 Exhibit 3, so I think we just tried to mark that | 3 further questioning. |
| 4 as -- what? | 4    MS. BOURN: You can ask a better question. |
| 5    MS. BECK: 24.      16:58:26 | 5 BY MR. LAVOIE:      17:07:14 |
| 6    MR. LAVOIE: 24, so forget that. We'll make | 6    Q. Are there any ways in which you were |
| 7 something else 24 and this remains Exhibit 3. | 7 retaliated against, which you describe here over the |
| 8 BY MR. LAVOIE: | 8 course of many pages, are all of those instances you |
| 9    Q. So I'm going to direct your attention to | 9 believe also acts of discrimination? |
| 10 page 5. So in the middle of the page, the question,    16:58:42 | 10    MS. BOURN: Objection; calls for a legal    17:07:27 |
| 11 which is labeled as interrogatory No. 2, says, | 11 conclusion. |
| 12 "Describe in detail each act of retaliation that you | 12    I'm going to instruct you not to answer. |
| 13 contend was taken against you by defendants." | 13 BY MR. LAVOIE: |
| 14    And then I just want you to just scan | 14    Q. Are you following that instruction? |
| 15 through the next few pages all the way through the    16:59:03 | 15    A. Yes.      17:07:37 |
| 16 middle of page 12. | 16    MS. BOURN: You can ask a better question. |
| 17    (Witness reviews document.) | 17 You've asked her to read multiple pages and you're |
| 18    A. Do I read the amendment, too? | 18 saying, "Is that discrimination?" That's a legal |
| 19    Q. Yes. | 19 conclusion. |
| 20    MS. BOURN: Setting an alarm for 6:30.    17:04:02 | 20 BY MR. LAVOIE:      17:07:47 |
| 21 BY MR. LAVOIE: | 21    Q. I'm saying, are these -- you just read a |
| 22    Q. And you're almost there. Just a half page | 22 list of alleged acts of retaliation. |
| 23 left. | 23    I'm just saying, is it your position that |
| 24    A. That's good. So just stop at line 30 on | 24 these were all acts of discrimination as well, |
| 25 page 12?      17:06:10 | 25 gender discrimination?      17:08:00 |
| Page 255 | Page 257 |

**Page 258**

1    MS. BOURN: I'll object, calls for a legal    17:08:03
2  conclusion.  You can ask a better question such as,
3  do you think you were treated differently because
4  you're a woman?
5    MR. LAVOIE: No, that's not my question.    17:08:12
6    MS. BOURN: You're asking a legal conclusion.
7  You know that's improper.
8      Don't answer that.  He can ask a better
9  question that is proper for an attorney to ask a lay
10 witness.    17:08:24
11 BY MR. LAVOIE:
12   Q.  Do you think all of the events and actions
13 that you describe in your interrogatory response
14 No. 2 happened because you were a woman?
15   MS. BOURN: Better question.    17:08:34
16     You can answer that.
17   THE WITNESS: I need to kind --
18 BY MR. LAVOIE:
19   Q.  No.  You just read them.  I gave you 12
20 minutes on the record.  You just read them.    17:08:43
21     Are you contending that all these actions
22 happened to you because you're a woman?
23   MS. BOURN: You can take your time to review
24 and properly answer the question.
25   MR. LAVOIE: I'll just take that as an    17:08:55

**Page 259**

1  instruction not to answer if that's what you're    17:08:57
2  going to do.
3    MS. BOURN: I'm not instructing her not to
4  answer.
5    MR. LAVOIE: No.  That's okay.    17:09:02
6    MS. BOURN: Please don't interrupt me.  Just a
7  second.  I'd like to make the record clear.
8    MR. LAVOIE: Let's --
9    MS. BOURN: I'm not instructing you not to
10 answer, but if you need to review it to provide a    17:09:07
11 full and complete answer, you are entitled to do
12 that.
13   MR. LAVOIE: I just provided 10 minutes or five
14 minutes for the witness to read the entirety of the
15 seven-page response.  If you want to read it again,    17:09:20
16 we can go off the record.
17   THE WITNESS: I don't want to read it again,
18 but I want to be able to say yes or no to you in a
19 factual way.
20 BY MR. LAVOIE:    17:09:29
21   Q.  We're at the time for a break so let's
22 take a break.  And you can review it off the record.
23   A.  And you're saying gender discrimination?
24   Q.  Yes.  All these things that you describe
25 in No. 2, do you believe they happened to you    17:09:39

**Page 260**

1  because you're a woman?    17:09:44
2    A.  Okay.  Are you going to ask me another
3  question after that about --
4    Q.  Yes.  And I'm going to say, are there any
5  other acts of retaliation against you that you    17:09:48
6  remember other than those here?
7    A.  Okay.
8    MS. BOURN: Just a second.  You're going to ask
9  her that question when she comes back?
10   MR. LAVOIE: Yes.    17:10:00
11   MS. BOURN: Okay.  So there's no pending
12 question.
13   MR. LAVOIE: Great.  Okay.  Thanks, Maria.
14     Let's go off the record.
15   THE VIDEOGRAPHER: This marks the end of Media    17:10:05
16 Unit 5.  We are going off the record.  The time is
17 5:10 p.m.
18     (Recess taken.)
19   THE VIDEOGRAPHER: This marks the beginning of
20 Media Unit 6.  We are going back on the record.  The    17:25:55
21 time is 5:26 p.m.
22 BY MR. LAVOIE:
23   Q.  During the break, you had a chance to
24 re-review your response to defendant's interrogatory
25 No. 2 asking about each act of retaliation you    17:26:10

**Page 261**

1  contend was taken against you by defendants.    17:26:13
2      When you reviewed that response again --
3  after having reviewed that response again, can you
4  identify a single additional instance that was an
5  act of retaliation against you that you didn't    17:26:27
6  mention in your interrogatory response?
7    MS. BOURN: Calls for a narrative, calls for a
8  legal conclusion.
9    THE WITNESS: I think I said this at the end of
10 the amended response to the interrogatory, that I    17:26:40
11 was retaliated against, harassed on a -- I would say
12 almost daily basis.  It hard for me to recount every
13 single example but this is a good flavor of them.
14 BY MR. LAVOIE:
15   Q.  I'm not asking for flavor.    17:27:01
16     I'm saying as you sit here right now, can
17 you identify an additional single instance of act of
18 retaliation that you don't mention in this
19 interrogatory response?
20   MS. BOURN: Objection; misstates the request    17:27:14
21 because you're adding discrimination and compound
22 and calls for a narrative.
23   THE WITNESS: Like, honestly, I don't know
24 without, like, writing down, okay, this is what I've
25 got here, this is what I've got there.  Like I would    17:27:35

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

| | |
|---|---|
| 1  need more time to think, okay is there anything I've    17:27:39 | 1      Do you see that?                          17:30:35 |
| 2  missed.  This is a lot of information here to be | 2    A.  Yep. |
| 3  able to say, but for sure there were other examples | 3    Q.  What letter is he referring to? |
| 4  because this is a short list and I was harassed and | 4    A.  There we posted a letter publicly on the |
| 5  retaliated against on a daily basis.         17:27:52 | 5  BlackBerry blog so it was a letter to employees    17:30:42 |
| 6  BY MR. LAVOIE: | 6  which we posted publicly. |
| 7    Q.  You just can't tell me any examples right | 7    Q.  And it didn't relate to his resignation? |
| 8  now as you sit here; is that right? | 8    A.  No.  Had nothing to do with that. |
| 9    A.  It's not that.  It's just that it's such a | 9    Q.  Related to his departure? |
| 10  long list.  I don't know how I could cross-reference   17:28:01 | 10    A.  It was a letter when he was announcing to   17:30:52 |
| 11  what's in here and what's not.  I can't take | 11  employees, which is why he mentions the town hall, |
| 12  these -- how many pages in, to be able to answer | 12  like an e-mail that went out to all employees to say |
| 13  that. | 13  I'm leaving, I've had a great time here and then I |
| 14    Q.  These instances are the most severe acts | 14  can't remember what the rest of it.  But we posted |
| 15  of retaliation that you experienced; correct?    17:28:11 | 15  it publicly on the BlackBerry blog.          17:31:07 |
| 16    MS. BOURN:  Objection to the extent it calls | 16    Q.  So at least as of October 23rd, 2023, you |
| 17  for a legal conclusion and to the extent it calls | 17  were aware that John Chen would be leaving |
| 18  for a narrative. | 18  BlackBerry; correct? |
| 19    THE WITNESS:  I can't answer that without like | 19    A.  He told me he had not made a final |
| 20  thinking through -- most severe, I don't know.  Like  17:28:23 | 20  decision but that to prepare in case that was where   17:31:18 |
| 21  if it's a legal definition, I don't know but | 21  he landed. |
| 22  eventually getting fired is pretty bad.  That's | 22    Q.  All we see is John Chen's -- this is BBMe |
| 23  ultimately the biggest retaliation. | 23  messages; right? |
| 24    MR. LAVOIE:  Let's look at Tab 53.  We'll mark | 24    A.  I don't know.  Is there like a marker |
| 25  that as the next exhibit in line.            17:28:51 | 25  somewhere?                                  17:31:32 |
| Page 262 | Page 264 |

| | |
|---|---|
| 1       (Deposition Exhibit 24 was marked.)     17:28:54 | 1    Q.  You can't tell?                        17:31:33 |
| 2  BY MR. LAVOIE: | 2    A.  I could not tell.  No.  That would be a |
| 3    Q.  Did you know that John Chen's contract was | 3  good guess.  This doesn't look like an e-mail. |
| 4  not going to be renewed and he would be leaving | 4    Q.  These are directed at you; right? |
| 5  BlackBerry before that became public knowledge?    17:29:20 | 5      (Witness reviews document.)              17:31:45 |
| 6    A.  Before it became public knowledge?  Yes. | 6    A.  I mean looking at just -- I haven't read |
| 7    Q.  You worked with him on his resignation | 7  the full document but this piece, I would say yes, |
| 8  letter; right? | 8  it looks like it's directed at me. |
| 9    A.  No.  I did not. | 9    MS. BOURN:  It looks like it's directed at me. |
| 10    Q.  Did you work with him on some kind of      17:29:32 | 10  I need some time to see what she's saying.    17:31:53 |
| 11  letter to the board relating to the end of his | 11  BY MR. LAVOIE: |
| 12  tenure at BlackBerry? | 12    Q.  It's not so easy to tell because we only |
| 13    A.  No. | 13  have John Chen's side of the conversation; right? |
| 14    Q.  Okay.  Maybe this will refresh your | 14    A.  It looks like that, yes. |
| 15  recollection.  This is Exhibit 24.           17:29:43 | 15    Q.  We don't have the other person's side of   17:32:05 |
| 16    MS. BOURN:  Bates labeled 18995 through 19002. | 16  the conversation; correct? |
| 17  BY MR. LAVOIE: | 17    A.  Not what you have printed out and given to |
| 18    Q.  Direct your attention to page 5.  At the | 18  me, no. |
| 19  top of page 5, the very first line at the top of | 19    Q.  Okay.  So that's Exhibit 23 -- or, sorry, |
| 20  page 5 is a message from John Chen dated       17:30:15 | 20  24.                                          17:32:19 |
| 21  October 23rd, 2023, at 8:55 p.m. and he writes, | 21      Let's look at the very bottom of |
| 22  "Tomorrow we need to work on my letter.  Let's carve | 22  Exhibit 24, last page on the back, and it says -- |
| 23  out an hour.  I don't know if the town hall is | 23  this is on December 10th, 2023, and it says, "Neelam |
| 24  appropriate, maybe it will, especially if the gossip | 24  Sandhu," that's you. |
| 25  is true."                                    17:30:34 | 25      Does that make you think that this was a    17:32:50 |
| Page 263 | Page 265 |

1 chat that you had with John Chen? 17:32:52
2 A. At least this portion. As I said, I
3 haven't read the whole document but at least this
4 bit looks like it, yes.
5 Q. This is the BBMe exchange that you had 17:32:59
6 with John Chen; correct?
7 A. Appears that way.
8 Q. And you don't see any other participants
9 in this, do you?
10 A. I do not. 17:33:08
11 Q. So it says December 10th, 2023, Neelam
12 Sandhu chat retracted. December 10th, 2023, when
13 was that in comparison with Dick Lynch met with you
14 and told you you were being let go from BlackBerry?
15 A. Six days later. I was told on 17:33:27
16 December 4th.
17 Q. And during that conversation Mr. Lynch
18 told you that you would have the option to portray
19 your departure as a resignation if you chose;
20 correct? 17:33:38
21 A. Correct.
22 Q. And he gave you some time to make that
23 decision. He didn't ask for it on the spot; right?
24 A. I don't remember what the deadline was but
25 I didn't have that much time, no. 17:33:50

---

1 Q. Did he ask you to decide during the very 17:33:52
2 conversation that he informed you that you were
3 being let go?
4 A. He did not. He said because I'm in Dubai,
5 that he was going to give me a bit of time to 17:34:04
6 decide.
7 Q. Okay. And so December 10th, 2023, at
8 6:47 a.m. you retracted the messages that you had
9 contributed to this BBMe chain with John Chen;
10 correct? 17:34:24
11 A. It appears that way, yes.
12 Q. And when you -- and to do that, you had to
13 click on an option that says "retract chat";
14 correct?
15 A. Yes. 17:34:35
16 Q. So you opened this particular chat with
17 John Chen and clicked on "retract chat"; right?
18 A. It appears that way, yes. I don't
19 remember.
20 Q. And when you clicked on "retract chat" in 17:34:46
21 your BBMe with John Chen, you would have seen a
22 notification that said, "All of your sent messages
23 will be permanently deleted." You saw that; right?
24 A. That message does not come up, no. No,
25 retract chat, when -- from my memory, it just like 17:35:03

---

1 makes the chat disappear from my home screen. So if 17:35:08
2 I've got a list of like 100 chats, it would
3 disappear from there. To delete a chat, my
4 understanding the only way to delete a chat is if
5 the IT admin takes an action. But like that 17:35:25
6 otherwise -- say, record -- like BBMe could be used
7 for record-keeping purposes.
8 Q. Why did you retract your portion of the
9 chat with John Chen?
10 A. I used to do it regularly, retract chats 17:35:40
11 regularly throughout the course of my career at
12 BlackBerry. It was the only way to remove chats
13 from the view. And sometimes I would retract them
14 to shorten the list of chats that were in the view,
15 because it's really hard to scroll through them all. 17:35:58
16 There's no real reason other than I was just kind of
17 really upset about what had happened and didn't want
18 to see kind of that memory of things on my phone
19 anymore.
20 Q. So you were just doing some clean-up on 17:36:17
21 your BBMe. You intended to -- which phone was this?
22 Was this BlackBerry-owned device or was it your
23 personal device?
24 A. It was a device that I had -- executives
25 were given a device and that was -- like it was 17:36:32

---

1 given to you and after a year, like it becomes your 17:36:36
2 device. That was a policy or something. So that
3 was the device it was. But it's like a BYOD setup
4 so it had a -- it was a compartment for work. I
5 think they call it container. So it containerizes 17:36:51
6 work data from personal.
7 Q. So this was a device that you were going
8 to continue to own and use after you left
9 BlackBerry?
10 A. I hadn't decided at the time if I ended 17:37:03
11 up -- like I use an iPhone now. So no, it wasn't a
12 decision I was making. If I'm going to keep using
13 that phone, use something else, I don't know.
14 Phones come and go. I don't know how to answer that
15 question. 17:37:22
16 Q. Is John Chen the only person that you
17 retracted your side of the BBMe chat with on
18 December 10th, 2023?
19 A. I don't know.
20 Q. You don't remember? 17:37:31
21 A. No.
22 Q. And the reason you retracted your side of
23 the chat was that you wanted to avoid painful
24 memories?
25 A. Exactly. What did end up happening, 17:37:46

---

68 (Pages 266 - 269)

1　though -- I can't remember quite when.  It was　17:37:49
2　around this time frame that BlackBerry wiped my
3　device.  They wiped container.  So everything, like
4　the BBM app just went away.  So everything on the
5　device was wiped from a work data perspective.  I　17:37:59
6　did get a notification of that on my phone.
7　　Q.  You also retracted your side of the chat
8　with someone named Mary Hundt?
9　　A.  Yeah.  I don't remember doing that; but if
10　I had -- just someone I felt who -- she was in HR.　17:38:15
11　She had set up the call between Dick Lynch and I.
12　So she would have known I was fired and I found that
13　upsetting.
14　　Q.  So you just wanted to retract your chats
15　with Mary Hundt to avoid painful memories?　17:38:32
16　　A.  Exactly.
17　　It was a very emotional time.  I mean, as
18　I said, being fired for not sleeping with somebody,
19　it's pretty tough when you work really hard and
20　invest so much in your career.  As I said,　17:38:43
21　ultimately BlackBerry wiped the work container off
22　my phone and everything went away, every single
23　chat, all the e-mails, all the chats, whatever work
24　data was on the phone.
25　　Q.  You also retracted your chats with　17:39:03

1　Jennifer Bramhill; correct?　17:39:08
2　　A.  I don't remember.  But if I did, another
3　person who I think sort of just it was upsetting
4　that she knew as well about what was going on and
5　just felt like it was a really toxic environment.　17:39:22
6　　Q.  You also retracted your chats with Marc
7　Cormier?
8　　A.  Who's Marc Cormier?  I don't remember who
9　that is.
10　　Q.  Painful memories with him?　17:39:35
11　　A.  Whoever I did, yeah, it would be the same
12　sort of thing.  It was a combination of two reasons.
13　The emotional side of things and then also there
14　were people on my team who were -- so when I was
15　told I was fired by Dick Lynch, he said my job　17:39:52
16　duties are eliminated I guess effective immediately.
17　I don't remember the exact words, but effective
18　immediately.  And I wasn't allowed to communicate
19　with my team unless I was telling them I resigned.
20　　So my team was messaging me, "We need　17:40:10
21　approval on this and that."  Like I'm responsive and
22　care about my team and take pride in being that way.
23　And so when they're messaging me, and I'm not
24　allowed to respond, that's really difficult.  So I
25　didn't want to see that on my phone.  So I just like　17:40:30

1　hid that chat from my phone by using the retract　17:40:35
2　feature.
3　　Q.  By this time on December 10th, 2023, you
4　had hired lawyers; correct?
5　　A.  I had talked to a lawyer.  I hadn't hired　17:40:48
6　one at the time, no.
7　　Q.  How many times had you spoken to a lawyer
8　from Ms. Bourn's law firm?
9　　A.  Just once I believe.
10　　Q.  So you spoke to someone from Ms. Bourn's　17:40:59
11　firm once on what date?
12　　MS. BOURN:  Asked and answered.
13　BY MR. LAVOIE:
14　　Q.  Your rog response says November 17th.
15　That's when you spoke to a lawyer at Ms. Bourn's　17:41:09
16　firm?
17　　A.  That's when I spoke with you.  That was
18　the first time I spoke with you.
19　　Q.  So your testimony is that you never spoke
20　with Ms. Borne again from the first time you spoke　17:41:20
21　with her on November 17th, 2023, all the way through
22　when you had your conversation with Dick Lynch where
23　he told you you were being let go?
24　　A.  Correct, yes.
25　　Q.  Did you have any conversations with any　17:41:36

1　lawyers in the two or three days after Dick Lynch　17:41:38
2　told you that you were being let go?
3　　A.  Not that I recall.  I've only even spoken
4　with a lawyer perspective with my current law firm
5　that's representing me.　17:41:51
6　　Q.  How long was it after December 10th, 2023,
7　that you hired Ms. Bourn's firm to represent you?
8　　A.  I would have to explain the contract but
9　it was January or late December, something like
10　that.  Mid-December.  It wasn't right away.  It was　17:42:06
11　whenever you contacted BlackBerry.  That would have
12　been about the time I signed something.  And it was
13　just to review -- like review the legal letter that
14　I had been sent by BlackBerry.  That was the purpose
15　of it.　17:42:23
16　　Q.  In the days after Dick Lynch told you that
17　you were being let go, did you ever -- did the
18　thought ever cross your mind that you might sue the
19　company?
20　　A.  Not until like -- I want to say like　17:42:33
21　January, probably January time frame.
22　　Q.  And that's when you requested your
23　personnel record?
24　　A.  I wanted my personnel record like --
25　because I know that lawyers generally kind of　17:42:47

1 or an e-mail, but I remember him being in the loop    17:52:06
2 somehow. And, yeah, it was highly confidential.
3    Q. It was a very tight-knit group of people,
4 closely held information?
5    A. I know there were other people who knew,    17:52:20
6 like Phil Kurtz knew and Phil Kurtz told Tim Foote.
7 But other than that -- from my perspective on who I
8 spoke with, that's who I had spoken with.
9    Q. Your impression at the time was that it
10 was a small circle of people who knew that John Chen    17:52:40
11 was about to depart? This is in the late
12 October 2023 time period; right?
13    A. Yeah. I mean, it should have been at
14 least. I believe John Giamatteo knew as well
15 because I was being asked from people in the    17:52:52
16 company, John Giamatteo saying he's going to be the
17 next CEO and Neelam -- like do you know if that's
18 true? And I didn't have a conversation but he was
19 telling people.
20    Q. You mentioned being interviewed by an    17:53:08
21 outside law firm as part of an investigation of
22 allegations against John Giamatteo.
23       Are you aware of the existence -- I'm not
24 asking anything more than just whether you're aware
25 as of the today that this ever existed. Are you    17:53:27

1 aware as of today that at some point in October of    17:53:30
2 2023, there was an anonymous EthicsLink complaint
3 made alleging sexual misconduct by John Giamatteo?
4       Are you aware of that as of today?
5    A. I'm aware of a complaint. I don't know    17:53:44
6 when it was submitted. Like it would have been
7 sometime before MoFo interviewed me I'm guessing.
8    Q. And so prior to your interview with
9 Morrison & Forester, were you aware that there had
10 been some sort of complaint about -- other than your    17:54:01
11 own, about sexual misconduct by John Giamatteo?
12    A. I was -- was I aware? I was aware that
13 there had been complaints about the boys' club
14 culture he was creating, but I didn't know if that
15 was like an official HR complaint or what, but I    17:54:27
16 knew there was complaints about it.
17    Q. Did you write or submit an anonymous
18 EthicsLink complaint regarding John Giamatteo in
19 October or November of 2023?
20    A. I did not.    17:54:41
21    Q. Did you see any words that, to your
22 understanding, wound up in an anonymous EthicsLink
23 against John Giamatteo before any such complaint was
24 filed, even if you didn't write them yourself?
25    MS. BOURN: Vague and ambiguous.    17:54:57

1 BY MR. LAVOIE:    17:54:58
2    Q. Did you ever see a draft of a complaint
3 against John Giamatteo regarding sexual misconduct
4 in October or November of 2023 before such a
5 complaint was filed?    17:55:09
6    A. No. I don't even know what was in the
7 complaint to be able to say anything.
8    Q. Have you ever seen a copy of the
9 complaint, the EthicsLink complaint, that initiated
10 the law firm investigation? Have you ever read it?    17:55:25
11    A. Not that I recall. I know you've probably
12 got it, but -- you've mentioned it but, no, I have
13 not.
14    Q. So it's your testimony that certainly not
15 prior to this litigation; right? So prior to this    17:55:39
16 lawsuit starting, your testimony is you never laid
17 eyes on an EthicsLinks complaint from October or
18 November of 2023 that alleged sexual misconduct by
19 John Giamatteo?
20    MS. BOURN: Asked and answered.    17:55:54
21    THE WITNESS: Asked and answered, right?
22    MS. BOURN: He's asking what your testimony is,
23 so he's clearly asking and answering the same
24 question.
25       Please don't point at her.    17:56:06

1    MR. LAVOIE: This is another example of you    17:56:09
2 giving an objection. The witness then just repeated
3 your objection and declined to answer the question.
4 So now I have to ask the question again.
5 BY MR. LAVOIE:    17:56:18
6    Q. Your testimony is that at no point prior
7 to this litigation did you ever lay eyes on an
8 EthicsLink complaint filed in October or November of
9 2023 that alleged sexual misconduct by John
10 Giamatteo?    17:56:31
11       Is that your testimony?
12    MS. BOURN: Asked and answered.
13    THE WITNESS: Correct. Yeah, I was not the
14 recipient. I was not looped into that.
15 BY MR. LAVOIE:    17:56:39
16    Q. In October or November of 2023 did you
17 have any conversations with anyone in which they
18 told you that they were thinking about filing a
19 complaint about John Giamatteo?
20    A. Not that I recall.    17:56:53
21    Q. I'm not asking whether you recall it.
22       I'm asking, did it happen or did it not?
23 So is it your testimony that at no time in October
24 or November of 2023 did anyone tell you that they
25 were contemplating submitting a complaint against    17:57:06

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

John Giamatteo?                    17:57:09
2     MS. BOURN:  Can you read back the question,
3 please?
4     MR. LAVOIE:  No.
5     MS. BOURN:  Your question is confusing.  You're   17:57:13
6 asking a double negative.  "At no time" isn't it
7 correct.
8     MR. LAVOIE:  These speaking objections are
9 obviously obstructive.
10    MS. BOURN:  Answer the question.  I want it    17:57:23
11 read back so it's clear what you're asking.
12 BY MR. LAVOIE:
13    Q.  Here's my question.
14        At any time in October or November 2023,
15 did anyone tell you that they were thinking about    17:57:31
16 submitting a complaint about John Giamatteo?
17    A.  Not that I recall, no.
18    Q.  Do you think that would be memorable to
19 you if it had occurred?  If someone had come to you
20 during that time period when John Chen was    17:57:45
21 departing, and they said, "I'm thinking about filing
22 a complaint against John Giamatteo for sexual
23 misconduct," do you think that would be memorable to
24 you?
25    (Reporter seeks clarification.)    17:57:59

1    A.  So people were complaining about John    17:58:04
2 Giamatteo and the boys' club culture he was creating
3 on a regular basis.  It was a conversation in the
4 company.  So if that happened again in October or
5 November, I don't know.    17:58:17
6    Q.  So you think it's possible that in October
7 or November of 2023, right around the time that John
8 Chen was departing BlackBerry, that someone may have
9 said, "I'm thinking about filing a complaint
10 alleging sexual misconduct by John Giamatteo," and    17:58:31
11 you just don't remember that?
12    MS. BOURN:  Calls for speculation.  Defense
13 counsel is putting his hands up in the air and
14 making faces.
15    THE WITNESS:  Yeah.  As I said, there's nothing    17:58:42
16 there I remember happening.
17 BY MR. LAVOIE:
18    Q.  So did you ever contribute information
19 that you understood was going to go into an
20 anonymous complaint against John Giamatteo?    17:59:01
21    A.  I mean, if it's one of the people I told
22 you I've talked to about my experience or if it's
23 someone I talked to about my experience that I don't
24 remember, then I don't know who submitted it so --
25 like I don't know.  But I haven't like -- I didn't    17:59:17

1 write the complaint or submit it.    17:59:21
2    Q.  And you didn't provide information to
3 someone else who you understood to be submitting it;
4 correct?
5    MS. BOURN:  Calls for speculation.    17:59:31
6    THE WITNESS:  I don't know who submitted it.
7 BY MR. LAVOIE:
8    Q.  Which would mean that you didn't provide
9 information to another person who you understood to
10 be submitting it.  That's my question.    17:59:39
11    MS. BOURN:  Wait a minute.  You didn't not do
12 something; isn't that correct?  Is that the
13 question?
14    THE WITNESS:  Let's say hypothetically, it
15 was -- it was -- I don't know, Rich Curiale who    17:59:49
16 submitted the complaint, right, I'm making this up
17 and I'm trying to use a very obscure example so
18 people don't think I'm like giving it up.  I've
19 talked to him about -- or someone from MoFo, I've
20 talked to them about the harassment.  If they then    18:00:10
21 submit something, that's like -- is that saying I'm
22 contributing?  I don't know.  I did not write or
23 submit the complaint.
24 BY MR. LAVOIE:
25    Q.  So this complaint said that it was being    18:00:23

1 submitted on behalf of a collective of about 10    18:00:26
2 women.
3    A.  Okay.
4    Q.  Did you understand yourself, in October of
5 2023, to be a member of a collective of about 10    18:00:32
6 woman who were submitting a complaint about John
7 Giamatteo?
8    MS. BOURN:  Calls for speculation.
9    THE WITNESS:  I believe what I told MoFo is
10 what I know.  They asked me if I knew of other women    18:00:45
11 and I think I knew of about two others at the time.
12    MR. LAVOIE:  I'm going to move to strike as
13 nonresponsive.
14 BY MR. LAVOIE:
15    Q.  My question is, the complaint was    18:00:54
16 submitted by a group that identified themselves as a
17 collective of about 10 woman.
18    In October 2023, did you consider yourself
19 to be within a group of about 10 women who were
20 submitting an EthicsLink complaint about John    18:01:08
21 Giamatteo?
22    MS. BOURN:  Calls for speculation.
23    THE WITNESS:  No, I did not.  I was not part of
24 a collective complaint.
25 BY MR. LAVOIE:    18:01:17

73 (Pages 286 - 289)

**Page 302**

1 for the role and there's really no perfect answer to  18:15:27
2 that question. It wasn't some career I was
3 pursuing. I wasn't pursuing it. But saying no
4 could be the wrong answer and saying yes could be
5 the wrong answer. So I gave -- I was just answering  18:15:45
6 his question and gave a sort of middle-of-the-road
7 answer because I didn't want to -- I didn't know
8 that there was a right answer. But it wasn't
9 something I had asked John Chen for or put an
10 ambition out there for.  18:15:59
11   Q.  Dick Lynch testified that you brought up
12 the concept of you yourself becoming CEO. You deny
13 that?
14   A.  Yes.
15   Q.  You testified that Dick Lynch was the one  18:16:08
16 who initiated the conversation about whether you
17 would be interested in being CEO, not you; right?
18   A.  I asked him have they already decided
19 who's going to be CEO and that's when he asked me
20 would I want to be it.  18:16:24
21   Q.  Dick Lynch testified that you told him
22 that you felt you were qualified to be BlackBerry's
23 CEO.
24       Did you tell Dick Lynch that you felt you
25 were qualified to be BlackBerry's CEO?  18:16:33

**Page 303**

1   A.  I don't remember using those words. But  18:16:36
2 as I say, I kind of gave a middle-of-the-road answer
3 from what I remember because I didn't think a
4 yes-or-no answer would have been the right thing at
5 that time.  18:16:46
6   Q.  Did you tell Dick Lynch that you'd like to
7 be considered for the CEO role in response to his
8 question?
9   MS. BOURN:  Asked and answered.
10   THE WITNESS:  Yeah. I remember giving a  18:16:53
11 middle-of-the-road answer because I was thinking if
12 I say yes, it could be seen as problematic. To say
13 no, I'm not driven enough or don't think I've got
14 the skill set. So it's like I'll give a
15 middle-of-the-road answer, that I didn't think there  18:17:06
16 was a right answer to the question.
17 BY MR. LAVOIE:
18   Q.  Did you ever instruct members of your
19 elite customer success team that they shouldn't work
20 with Mr. Giamatteo's cybersecurity unit because his  18:17:16
21 team wasn't very competent?
22   A.  No. I was told by John Chen that we
23 needed to keep certain deals separate from the cyber
24 BU because the sales teams would otherwise want to
25 be paid on those deals. And also he said that John  18:17:35

**Page 304**

1 Giamatteo's numbers were not where they needed to  18:17:40
2 be. They were quite poor. And so he needed -- his
3 team, John Giamatteo and his team, to be focused on
4 different deals than us so that we weren't -- we
5 were driving as much opportunity and pipeline for  18:17:55
6 the business. So I was told to drive that
7 separation for those two reasons.
8   Q.  You would reprimand members of your team
9 if you found out that they had collaborated with
10 other teams or individuals within the company;  18:18:10
11 correct?
12   A.  Absolutely not, no.
13   Q.  You routinely spoke negatively about
14 Mr. Giamatteo to your employees on the elite
15 customer success team, did you not?  18:18:20
16   A.  No, I did not.
17   Q.  You told your team not to work with
18 Mr. Giamatteo's team because if they did,
19 Mr. Giamatteo's team would claim the wins; correct?
20   A.  No. As I explained, John Chen had said he  18:18:31
21 didn't want to get put into a situation of double
22 comp. It happened a few times, and he asked us to
23 ensure that separation. And he needed the teams --
24 the business was doing very poorly. He needed the
25 teams to be looking at different accounts because we  18:18:47

**Page 305**

1 needed all to be driving as much pipeline as  18:18:52
2 possible and as many deals as possible. That's what
3 I would have communicated if anything.
4   MR. LAVOIE:  Do you want to take a break?
5   THE REPORTER:  Sure.  18:19:07
6   THE VIDEOGRAPHER:  This marks the end of Media
7 Unit 6. We are going off the record. The time is
8 6:19 p.m.
9       (Recess taken.)
10   THE VIDEOGRAPHER:  This marks the beginning of  18:46:17
11 Media Unit 6 -- or 7. We are going back on the
12 record. The time is 6:46 p.m.
13 BY MR. LAVOIE:
14   Q.  Who do you believe made the decision to
15 terminate you?  18:46:30
16   MS. BOURN:  Calls for speculation.
17   THE WITNESS:  I think it was an ultimatum from
18 John Giamatteo.
19 BY MR. LAVOIE:
20   Q.  So you think John Giamatteo was ultimately  18:46:42
21 the person who decided to fire you?
22   A.  Yeah. I would say he wouldn't sign the
23 CEO contract unless I was fired, so . . .
24   Q.  What's the most concrete thing you're
25 aware of that leads you to believe that the person  18:46:58

Page 306 (left top):

1  who made the decision to fire you wasn't Dick Lynch,    18:47:02
2  it was actually John Giamatteo?
3    A.  The two years leading up to my
4  termination, my firing, where he threatened me that
5  he was going to ruin my career.  He said he was    18:47:20
6  working on getting me out of the company.  I heard
7  from multiple people that he was not going to sign
8  the contract for CEO if he didn't get -- if I wasn't
9  fired first.
10      And then the timing of me being fired    18:47:41
11  versus when he actually ended up signing the
12  contract, and then the timing of my deadline to tell
13  people I had resigned versus when he was announced,
14  all of those things.
15    Q.  Did you ever tell Hans-Peter Bauer about    18:48:04
16  John Giamatteo having made an advance?
17    A.  Hans-Peter Bauer was part of the boys'
18  club so no.
19    Q.  Did you ever tell Phil Kurtz that John
20  Giamatteo had made an advance on you?    18:48:19
21    A.  Also part of the boys' club.
22    Q.  So?
23    A.  So no, I did not.
24    Q.  Did you ever tell Tim Foote that John
25  Giamatteo had made an advance?    18:48:28
Page 306

Page 307 (left bottom):

1    A.  Yes, I did.  And Tim Foote and Phil Kurtz    18:48:29
2  were very close as well.
3    Q.  So what facts did you share with Tim
4  Foote?  Did you share the touching with him?
5    A.  Yes, I did.    18:48:41
6    Q.  And did you share any details about the
7  touching as like in terms of where on your body or
8  things like that with Tim Foote?
9    A.  Not as specific as I've gotten into today
10  but enough detail that it was clear what was    18:48:55
11  happening.
12    Q.  So you didn't just tell him that
13  Mr. Giamatteo said, "We should travel together."  He
14  made a joke about his daughters and I interpreted
15  that as an advance.  You told him that Mr. Giamatteo    18:49:07
16  had touched you inappropriately?
17    A.  Yes, I did.
18    Q.  You routinely spoke negatively about Tim
19  Foote to members of your elite customer success
20  team; correct?    18:49:23
21    A.  No, they didn't have exposure to Tim
22  Foote.
23    Q.  You also routinely spoke negatively to
24  your elite customer success team about Phil Kurtz;
25  correct?    18:49:31
Page 307

Page 308 (right top):

1    A.  No.  Again, not somebody they worked with.    18:49:33
2    Q.  You would often call members of your elite
3  customer success team at BlackBerry at 9:00 p.m.,
4  10:00 p.m., 11:00 p.m. at night and talk to them for
5  a long time about work; correct?    18:49:53
6    A.  Not correct.
7    Q.  If one of your team members told you they
8  couldn't get a particular thing done, you would
9  often respond to them, "Is that what you would want
10  me to tell John Chen?"    18:50:05
11    A.  Absolutely not.
12    Q.  You deny that?
13    A.  I deny that.
14    Q.  Have you ever said that to a subordinate
15  at BlackBerry when they told you they couldn't get    18:50:10
16  something done?  Did you ever tell them, "Is that
17  what you want me to tell John Chen?"
18    A.  No, I don't speak like that.
19    Q.  In talking to colleagues or members of
20  your team, you would refer to your relationship with    18:50:25
21  John Chen nonstop.
22      Do you agree with that?
23    A.  It was actually the opposite.  I would
24  make sure I wasn't doing that.
25    Q.  You would name-drop John Chen all the time    18:50:41
Page 308

Page 309 (right bottom):

1  in your conversations around the company.    18:50:43
2      Do you disagree with that?
3    A.  I disagree with that.
4    Q.  You were often demonstrably angry when you
5  were talking to your employees on the elite customer    18:50:51
6  success team.
7      Do you deny that?
8    A.  I deny that.
9    Q.  Mark Mosiadz was a member of your elite
10  customer success team; correct?    18:51:02
11    A.  Correct.
12    Q.  What's your understanding of the reason he
13  took medical leave?
14    A.  At the time I wasn't aware of why he was    18:51:16
15  taking medical leave.  I had had multiple
16  conversations with him about his performance.  And I
17  had let HR, Jenn Bramhill specifically, know that I
18  was thinking of either terminating him or moving his
19  reporting line to report to -- not to report
20  directly to me as he needed much more coaching and    18:51:34
21  mentoring and wasn't operating effectively.
22      So that may have had something to do with
23  it, because I wonder if that leaked from the Jenn
24  Bramhill somehow.
25    Q.  So you think he may have taken medical    18:51:50
Page 309

78 (Pages 306 - 309)

**Page 318**

1  A. Yes.                                  19:02:12
2  Q. You're expressing skepticism about the
3  medical need for her leave; correct?
4  A. To a friend privately, not in a
5  professional environment, and I followed the right    19:02:20
6  procedures and processes at work and never expressed
7  that at work.
8  Q. You wrote, "She thinks Choppers will be
9  CEO by then." Why did you write that?
10  A. Because I had heard that from others on    19:02:34
11  the team that that was why she was being difficult
12  with me, because she felt that she didn't need to
13  work with me as her manager, that I would be gone
14  soon.
15  Q. Did you think that John Giamatteo might be    19:02:48
16  CEO in four weeks?
17  A. I had no idea what John Giamatteo had
18  decided about his contract at that point.
19  Q. Well, this is after John Chen had
20  departed. This was when Dick Lynch was the interim    19:02:59
21  CEO, so November of 2023. And at that point, did
22  you have any thought as to whether Mr. Giamatteo
23  would be CEO four weeks from then?
24  A. Well, based on what Dick Lynch said, that
25  they had already decided who the CEO is, when I --    19:03:14

**Page 319**

1  around the time of my MoFo interview, then I would    19:03:17
2  say yes. If that date is -- I can't remember the
3  date I met Dick Lynch.
4  Q. So after your conversation -- after your
5  one-on-one with Dick Lynch, whenever that was, you    19:03:32
6  believed that John Giamatteo would become the next
7  CEO?
8  A. That was pretty much clearly what Dick
9  Lynch said in the conversation. He said they have
10  already decided who the CEO is going to be.    19:03:45
11  Q. And you understood that person to be John
12  Giamatteo?
13  A. Yes.
14  Q. Okay. So from the time that you spoke
15  one-on-one with Dick Lynch, at least from that point    19:03:57
16  forward, you understood that the next CEO of
17  BlackBerry was going to be John Giamatteo?
18  A. That's what it was coming across like. I
19  mean I wouldn't say understood because I hadn't seen
20  it, a contract or anything like that.    19:04:10
21  Q. Well, about 10 days after that, you
22  e-mailed a complaint to Dick Lynch about John
23  Giamatteo?
24  A. Correct.
25  Q. Do you recall that?    19:04:21

**Page 320**

1  A. Yes.                                  19:04:22
2  Q. And the reason you did that is because you
3  were hoping to block him from becoming CEO; correct?
4  A. No. Dick Lynch had expressed that he
5  wanted an organization that -- I can't remember the    19:04:33
6  e-mail. So if you could pull it up. But he said
7  something about -- it was in the e-mail, I can't
8  recall, but the kind of organization that he was
9  looking for. And so I was showing him, in the hope
10  that he would help resolve the issues, that this    19:04:50
11  is -- I'm allowed to report internally if I'm being
12  sexually harassed or retaliated against. So that's
13  what I was doing.
14  Q. Did you ever tell Dick Lynch that John
15  Giamatteo had made an advance at you?    19:05:07
16  A. I didn't get the opportunity to, and I
17  assumed he knew because of the MoFo investigation.
18  So my testimony in the MoFo investigation, the
19  board -- my assumption was that they would be aware
20  of those things.    19:05:25
21  Q. You never told MoFo that John Giamatteo
22  ever touched you or tried to touch you
23  inappropriately?
24  A. I don't remember exactly what I said to
25  them, but I remember very clearly -- I asked them    19:05:33

**Page 321**

1  before the call to give me a heads up on what the    19:05:36
2  call was about so I could be thoughtful and prepare
3  for it. And when I got on the call, I was surprised
4  to learn about what the call was about. And it was
5  very hard to recollect and gather all my thoughts.    19:05:47
6  So I gave them the information that I
7  could emotionally get together in that moment in
8  time, and it was a very short conversation. Today
9  we've been almost all day versus with them, it would
10  have been a 30-, 45-, or 60-minute call.    19:06:07
11  Q. You're saying that when you were speaking
12  to the Morrison & Foerster lawyers about alleged
13  misconduct, sexual misconduct by John Giamatteo,
14  when you spoke to them for an hour, you just forgot
15  that he had touched you at a dinner?    19:06:21
16  A. No, that's absolutely not what I said.
17  What I said was that I can't recall all the details
18  I told them. But I would have told them that his
19  behavior was inappropriate, made me uncomfortable,
20  all of those things. Whether I said, "He touched my    19:06:36
21  hand when we're going for the food," or those
22  specifics that we've gone through today, I don't
23  recall.
24  Q. You didn't tell the Morrison & Foerster
25  lawyers during your interview with him that John    19:06:46

Page 322

```
 1  Giamatteo had touched you or tried to touch you.   19:06:49
 2  You didn't tell them that; right?
 3      A.  I've answered this question.  I'm not sure
 4  why you're asking me again.
 5      Q.  Go ahead and answer it again if you think   19:06:59
 6  you answered it.  I'm saying you didn't tell the
 7  Morrison & Foerster lawyers that John Giamatteo
 8  touched or tried to touch you, you didn't tell them
 9  that; correct?
10      A.  Like -- no, that's not correct at all.   19:07:07
11      Q.  So you told them, the Morrison & Foerster
12  lawyers, that John Giamatteo touched you or tried to
13  touch you.  That's your testimony?
14      A.  I've given my testimony.  You're asking me
15  again in a way that is trying to change my   19:07:22
16  testimony.
17      Q.  How?  I'm just asking, did you tell the
18  Morrison & Foerster lawyers that John Giamatteo
19  touched you?  Did you tell them that or did you not
20  tell them that?   19:07:32
21      A.  I answered the question and you're
22  trying to change my testimony.  My answer is what it
23  is.  I had a conversation with them.  It was a very
24  emotionally distressing conversation, and I
25  expressed to them that in whatever terms -- they   19:07:45
```

Page 323

```
 1  must have a transcript of the conversation or a   19:07:50
 2  recording, that I was sexually harassed and that he
 3  told me then that he was going to -- what was the
 4  phrase -- ruin my career.  He was working on getting
 5  me out of the company and all of the other things   19:08:07
 6  I've described.
 7      MR. LAVOIE:  I'll move to strike all that as
 8  nonresponsive.
 9  BY MR. LAVOIE:
10      Q.  I actually don't know your answer to this   19:08:14
11  question.
12          Did you tell the Morrison & Foerster
13  lawyers that John Giamatteo touched you?
14      THE WITNESS:  Maria --
15      MS. BOURN:  Asked and answered.   19:08:23
16  BY MR. LAVOIE:
17      Q.  No, you don't get to ask your lawyer.  I'm
18  asking you the question.  You have not answered this
19  question.
20          Did you tell the Morrison & Foerster   19:08:29
21  lawyers that John Giamatteo touched you?
22      A.  As I said, I don't remember the exact
23  details I gave them, but I was clear with them that
24  it was sexual harassment.  I was worried he -- about
25  all the retaliation and I was worried about   19:08:40
```

Page 324

```
 1  retaliation from the conversation with them, too.   19:08:43
 2  So I could have told them he touched me.  I don't
 3  recall the words and the specifics I used.  It was a
 4  very emotionally distressing conversation.
 5      Q.  You also sent a follow-up e-mail or maybe   19:08:54
 6  more than one to the Morrison & Foerster lawyers;
 7  correct?
 8      A.  I forwarded them some information that I
 9  had provided previously to HR.
10      Q.  And in those follow-up communications with   19:09:04
11  Morrison & Foerster, you never told them that John
12  Giamatteo touched you; correct?
13      A.  In the e-mails to Morrison & Foerster, I
14  didn't recount all the things that I had told them
15  on the call; that was already done.   19:09:20
16      Q.  But I'm just asking about what was in the
17  e-mails and what wasn't.
18          So in the e-mails, you didn't tell them
19  that John Giamatteo had touched you; correct?
20      A.  I had already had the conversation with   19:09:29
21  them on the call, so the e-mails -- I wasn't writing
22  anything -- I was forwarding them something
23  specific.  I wasn't writing something new
24  necessarily.
25      MR. LAVOIE:  I'm going to movie to strike all   19:09:41
```

Page 325

```
 1  that as nonresponsive again.   19:09:43
 2  BY MR. LAVOIE:
 3      Q.  In your e-mails with Morrison & Foerster
 4  in your follow-up after your meeting with them, did
 5  you tell them that John Giamatteo had touched you?   19:09:49
 6      A.  We can review the e-mails.  I can't
 7  remember what was in them.
 8      Q.  You don't remember one way or another in
 9  your e-mails whether you mentioned that John
10  Giamatteo touched you?   19:09:57
11      A.  I have provided the e-mails.  Could we
12  review them?
13          Q.  No.  I'm asking for your recollection.
14          Is it your testimony that you just don't
15  remember one way or another whether, in your e-mails   19:10:07
16  to Morrison & Foerster after your interview with
17  them, you told them that John Giamatteo had touched
18  you?  You just don't remember one way or another?
19      A.  I don't recall.
20      Q.  Okay.  Thank you.   19:10:20
21          Is it possible that you never told
22  Morrison & Foerster that John Giamatteo had touched
23  you?
24      MS. BOURN:  Calls for speculation.
25      THE WITNESS:  I highly doubt it but you're   19:10:33
```

82 (Pages 322 - 325)

1  going to have read the transcript or watch the          19:10:36
2  recording.  I couldn't remember.
3  BY MR. LAVOIE:
4      Q.  Why do you doubt it?
5      A.  Because he sexually harassed me.  Why          19:10:40
6  would I not bring that up?  But at the same time, it
7  was a very emotionally distressing call.  As I said,
8  they surprised me with it.  I asked for advanced
9  notice so I could recollect -- prepare for the
10  conversation and they didn't give that grace.  So I     19:10:58
11  don't even remember what I said on the call, so it
12  was definitely a very difficult situation and it's
13  very hard to recall it all.
14      Q.  When you were on the video conference with
15  Dick Lynch where you were let go from BlackBerry,      19:11:16
16  you were physically in Dubai; correct?
17      A.  Correct.
18      Q.  BlackBerry paid for your trip to Dubai,
19  including your airfare and hotel; right?
20      A.  It was a business trip so yes.               19:11:28
21      Q.  And you stayed at the Ritz Carlton;
22  correct?
23      A.  Correct.
24      Q.  And did anyone from BlackBerry approve in
25  advance you staying at the Ritz Carlton on this trip   19:11:35

1  to Dubai?                                              19:11:38
2      A.  Dick Lynch said he didn't want to get
3  involved in admin and we should just operate on
4  those things as we need to and Dubai hotels are --
5  the name Ritz Carlton might sound jazzy but Dubai      19:11:48
6  hotels are generally not priced that way.
7      Q.  When you logged onto this call with Dick
8  Lynch, did you think it was possible that you were
9  going to be let go during this call?
10      A.  I did not because I just landed in Dubai      19:12:03
11  and HR before doing a termination, they would always
12  check, is the person on vacation?  Are they on
13  business travel?  They can see those details in the
14  system.  So we never fire someone if they are on
15  vacation or on business travel.  So, no, I did not.    19:12:21
16      MS. BOURN:  Thirty-five minutes left.
17      THE WITNESS:  Thank you.
18  BY MR. LAVOIE:
19      Q.  After you left BlackBerry, were you
20  financially stable in the months -- let's say --       19:13:04
21  just limit that to the months immediately after you
22  were let go from BlackBerry.
23      A.  Why do I need to answer this question?
24      Q.  Damages.  You're alleging damages.  You're
25  seeking, according to your lawyers, $50 million in     19:13:18

1  damages in this case.  It also goes to your efforts    19:13:21
2  to find a new job.
3           You don't get to make objections,
4  Ms. Sandhu.
5      MS. BOURN:  Ask a question and don't instruct     19:13:29
6  her how to answer questions.  Your job is to ask
7  questions, not to tell her what to do.  And don't do
8  that again.  She's my client, not yours.
9           You can answer the question.
10      THE WITNESS:  I had savings to tide me over       19:13:42
11  some time, for a short period of time.
12  BY MR. LAVOIE:
13      Q.  How long?
14      A.  I don't feel like I need to provide --
15      MS. BOURN:  You can -- it's okay.                 19:13:49
16      THE WITNESS:  I don't know.  A year and a half,
17  something like that.
18  BY MR. LAVOIE:
19      Q.  A year and a half?  And you took a break
20  before you started looking for a new job?             19:14:00
21      A.  I got fired on December the fourth and it
22  was the Christmas period.  I started looking for a
23  job in January.  And I also needed some time to
24  emotionally, like, start to heal and -- I had just
25  been fired.  That's a very, very difficult            19:14:16

1  experience.                                            19:14:20
2      Q.  So when did you begin your job search in
3  earnest?
4      A.  Sometime in January.  I don't remember the
5  exact dates, but I think I provided you those, this    19:14:26
6  information.
7      Q.  January 2024?
8      A.  Correct, yeah.  I was fired in
9  December 2023.
10      Q.  Okay.  So by February and March of 2024       19:14:34
11  you were full blown looking for a new job?
12      A.  Correct.  Yeah, I was reaching out to
13  recruiters, having conversations applying for jobs.
14  I hadn't applied for a job in 15 years almost.  So
15  trying to figure out what that looked like and        19:14:54
16  writing a résumé and doing all those things.
17      Q.  You took -- did you take any trips to the
18  UK in the months after you were fired from
19  BlackBerry?
20      A.  I did, yeah.  I always go to the UK for       19:15:09
21  Christmas and New Year.
22      Q.  How many weeks were you there after -- in
23  the months after you left BlackBerry?
24      A.  Maybe four weeks.
25      Q.  Four weeks?                                   19:15:21

1 don't agree and the deposition is closed.          19:43:11

2      MR. LAVOIE:  That's all for me.

3      THE VIDEOGRAPHER:  Okay.  We are off the record

4 at 7:43 p.m. and this concludes today's today given

5 my Neelam Sandhu.  The total number of media used      19:43:23

6 was seven and will be retained by Veritext Legal

7 Solutions.

8      (Whereupon, the proceedings were concluded

9      at 7:43 p.m.)

10      ---oOo---          19:43:30

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 354

1 Maria Bourn

2 maria@gobolaw.com

3          September 5, 2025

4 RE: Sandhu, Neelam v. Blackberry Corporation

5 8/22/2025, Neelam Sandhu, (#7525313).

6 The above-referenced transcript has been

7 completed by Veritext Legal Solutions and

8 review of the transcript is being handled as follows:

9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10     to schedule a time to review the original transcript at

11     a Veritext office.

12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13     Transcript - The witness should review the transcript and

14     make any necessary corrections on the errata pages included

15     below, notating the page and line number of the corrections.

16     The witness should then sign and date the errata and penalty

17     of perjury pages and return the completed pages to all

18     appearing counsel within the period of time determined at

19     the deposition or provided by the Code of Civil Procedure.

20     Contact Veritext when the sealed original is required.

21 __ Waiving the CA Code of Civil Procedure per Stipulation of

22     Counsel - Original transcript to be released for signature

23     as determined at the deposition.

24 __ Signature Waived – Reading & Signature was waived at the

25     time of the deposition.

Page 356

1      I, the undersigned, a Certified Shorthand

2 Reporter of the State of California, do hereby

3 certify:

4      That the foregoing proceedings were taken

5 before me at the time and place herein set forth;

6 that any witnesses in the foregoing proceedings,

7 prior to testifying, were administered an oath; that

8 a record of the proceedings was made by me using

9 machine shorthand which was thereafter transcribed

10 under my direction; that the foregoing transcript is

11 a true record of the testimony given.

12      Further, that if the foregoing pertains to

13 the original transcript of a deposition in a Federal

14 Case, before completion of the proceedings, review

15 of the transcript ( ) was (X) was not requested.

16      I further certify that I am neither

17 financially interested in the action nor a relative

18 or employee of any attorney of any party to this

19 action.

20      IN WITNESS WHEREOF, I have this date

21 subscribed my name.

22 Dated:  September 5, 2025

23

24

25      ANRAE WIMBERLEY, CSR No. 7778

Page 355

1 __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2     Transcript - The witness should review the transcript and

3     make any necessary corrections on the errata pages included

4     below, notating the page and line number of the corrections.

5     The witness should then sign and date the errata and penalty

6     of perjury pages and return the completed pages to all

7     appearing counsel within the period of time determined at

8     the deposition or provided by the Federal Rules.

9 _X_ Federal R&S Not Requested - Reading & Signature was not

10     requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 357