# EXHIBIT 30

REVISED REDACTIONS

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**CERTIFIED TRANSCRIPT**

NEELAM SANDHU, an individual,

                    Plaintiff,

-vs-                              Case No.:

BLACKBERRY CORPORATION, a         24-cv-02002-SK
Delaware Corporation; and
JOHN GIAMATTEO, an individual,

                    Defendants.
_____/

VIDEO-RECORDED DEPOSITION

OF JOHN GIAMATTEO

Date:              August 28, 2025

Time:              9:07 a.m.

Location:          Zoom Videoconference

Stenographically   Cambria L. Denlinger
Reported By:       CSR #14009

Page 18

1     MR. LAVOIE:  And that's just a yes-or-no
2  question.
3     THE WITNESS:  Yes.
4     MR. TARTAGLIO:  And I'll ask Mr. Lavoie if
5  those are documents that have all been produced in the
6  case?
7     MR. LAVOIE:  You know, I don't think you're
8  entitled to know that, actually, but, yes, they were all
9  produced.
10    MR. TARTAGLIO:  Okay.  And just FYI, documents
11 used to prepare witnesses for deposition are fair game,
12 but if they've all been produced, that's fine.
13 BY MR. TARTAGLIO:
14    Q.  Mr. Giamatteo, did you search for any documents
15 in the process of getting ready for this deposition?
16    A.  No.
17    MR. TARTAGLIO:  I'm going to pull up now --
18 well, I guess I'll put it in chat first.
19    MR. LAVOIE:  Tony, I think that -- I don't know
20 whether you're using "document" in kind of a lawyerly
21 like document, meaning everything under the sun that is
22 in written form or electronic form, or if you mean
23 "document" as in, like, a piece of paper.  So I just
24 want to make sure that, you know, there's a meeting of
25 the minds there.

Page 19

1     MR. TARTAGLIO:  Well, I'll ask a follow-up
2  question, which is that when I say "document," it could
3  be text messages, it could be personal emails, it could
4  being BBMs, it could be work emails, just about anything
5  that was put in writing.
6     As part of the preparation, for the deposition,
7  did you search for any such documents.
8     MR. LAVOIE:  And I'll just tell the witness,
9  like, it's okay to disclose that you've looked at your
10 text messages.  That's fine to say; that's not
11 privileged.  The fact that you conducted a look for text
12 messages, you can say that.
13    THE WITNESS:  Yeah, yeah.  I did scan some --
14 my phone on texts that I had with different people in
15 the organization.
16    MR. TARTAGLIO:  Okay.  And let's look at
17 Exhibit 1 here.  For the record, this is the notice of
18 deposition.
19    (Whereupon, Exhibit 1 was marked for
20    identification.)
21    MR. TARTAGLIO:  Let me know when you have that.
22    (Off-the-record discussion.)
23    MR. LAVOIE:  I think we've got it now it, Tony.
24 BY MR. TARTAGLIO:
25    Q.  So Exhibit 1 is a notice of deposition, and

Page 20

1  you'll see that a couple pages in, there's an Attachment
2  A with some document requests.  Do you see that?
3     MR. LAVOIE:  Yeah, Tony, and I'll just make
4  clear for the record that we object to all of these
5  document requests.  BlackBerry has complied with all of
6  our document production responsibilities.  To the extent
7  that these requests ask for anything beyond what we'd
8  already met and conferred over and agreed to produce,
9  I'll be very direct with you, we did not undertake any
10 additional effort to do anything in response to these
11 document requests that you've been attaching to notices
12 of depositions that are duplicative of other requests
13 that you've made.
14    You know, we've had extensive, extensive
15 document production and meeting and conferring, and so
16 we're not going to replicate that process with respect
17 to witnesses who are employees of the company.
18    So I'll be very direct with you.  Per your
19 request, we asked Mr. Giamatteo to look at any text
20 messages on his personal cell phone.  We did not do that
21 in response to these requests, which, again, I'll
22 reiterate, we object to each and every one of them as
23 duplicative and overbroad and unduly burdensome in light
24 of the long history of document discovery in this case.
25 But we did ask him to look at his personal texts, and

Page 21

1  that's why you got the production of that individual
2  text message yesterday.
3     So the witness has not seen these document
4  requests.
5     MR. TARTAGLIO:  That's fine.  I think in the
6  future, I'll ask you to try to keep the objections a bit
7  shorter than that but...
8  BY MR. TARTAGLIO:
9     Q.  So, Mr. Giamatteo, it sounds like you did
10 search through your phone for some text messages that
11 might be relevant to the case; is that correct?
12    A.  Correct.
13    Q.  And in your mind, presumably, you had some
14 criteria to filter out the stuff that was not relevant;
15 to keep the stuff that was relevant; is that correct?
16    A.  Well, couple things:  One, most of the
17 communications I had was on my work phone, which we
18 produced, and I think you got everything on it.  So I
19 just did a scan of the limited number of messages that I
20 had with colleagues that were on my personal phone, and
21 I literally scanned through every one of them.  And, you
22 know, found the one that I think is remotely relatable
23 to the case, and that's why we produced that.
24    Q.  And so what criteria did you use in your mind
25 as you were scanning through your phone and looking?  In



Page 22

1 other words, what would constitute a hit if you found
2 something that you thought should be --
3     A. Anything that had to do with Neelam. Like
4 there's -- you know, one of them is what our investor
5 relations -- a lot of logistic things: Oh, we're
6 meeting this -- we're going to have this time. At 9:00,
7 we're going to meet with this investor.
8         So, naturally, a lot of that stuff got -- you
9 know, I didn't -- I didn't consider at all.
10     So I just -- the hits I would look were
11 anything involving Neelam or this case.
12     Q. Do you have a separate cell phone that is
13 issued by BlackBerry that is separate from your personal
14 phone?
15     A. I do.
16     Q. Can you recall ever sending any text messages
17 about Ms. Sandhu on your work-issued phone?
18     A. I'm sure -- I'm sure I must have, and we would
19 have produced that through the discovery.
20     MR. LAVOIE: Well, I'll be clear, Tony, we
21 collected -- as we've told you before, we collected and
22 searched Mr. Giamatteo's phone as part of our reasonably
23 diligent search. And we produced, as appropriate,
24 within the contours of what we told you that we would be
25 searching and producing. So the witness is not -- you

Page 23

1 know, he's the CEO of the company. He's not fully
2 conversant in the precise contours of what the parties
3 agreed that we would search for and not, what would be
4 in scope and not, but that's the process that we had.
5     MR. TARTAGLIO: Okay. And I'm going to ask you
6 to please limit your objections because my question was
7 whether he sent texts about Neelam on his work phone,
8 and the answer was "yes." So there was no need for a
9 long --
10     MR. LAVOIE: That wasn't your question. Your
11 question was what was done. And I think the witness,
12 after having given his phone to us, you know, doesn't
13 have personal knowledge of that, so...
14     MR. TARTAGLIO: Okay. Well, no offense, but
15 I'm interested in his testimony; that's why he's here
16 today.
17     THE WITNESS: I'm a little lost here.
18     MR. LAVOIE: Are you trying to get back to the
19 Zoom?
20     THE WITNESS: Yeah.
21     MR. LAVOIE: If you click on that.
22     THE WITNESS: Thank you.
23 BY MR. TARTAGLIO:
24     Q. At some point were you told by someone within
25 BlackBerry that you should try to preserve

Page 24

1 communications that might be relevant to the case?
2     MR. LAVOIE: Are you asking for his
3 communications with BlackBerry's lawyers?
4     MR. TARTAGLIO: Well, let me rephrase it.
5 BY MR. TARTAGLIO:
6     Q. At some point did you make an effort to
7 preserve communications that might be relevant to the
8 case?
9     A. Yes. I'm not sure when -- exactly when, but as
10 soon as it was clear there was going to be a case and,
11 you know, the complaints and this whole process kicked
12 off, I, you know, retained everything that I had on my
13 PC and my phone.
14     Q. I'm going to ask a few questions about your
15 background now, and I think you've had a pretty lengthy
16 career, so I'm not going to ask about every job you've
17 ever had.
18         So for your educational background, did you go
19 to college somewhere?
20     A. Yes. I went to college up here in New York
21 City, St. John's University, and did my undergraduate in
22 accounting and my MBA in accounting as well.
23     Q. Besides the undergraduate degree and the MBA,
24 do you have any other college degrees?
25     A. No other college degrees. I did some

Page 25

1 professional training, you know, through my career at
2 Columbia University, at Stanford University, some
3 corporate, company-sponsored professional training, but
4 not any college -- additional college degrees.
5     Q. And your current job is the chief executive
6 officer of -- well, maybe that's one of your jobs.
7 That's one of your jobs, right, is CEO of BlackBerry?
8     A. Correct.
9     Q. Do you have some other positions within the
10 company, for example, on the board, anything like that?
11     A. Yeah, I would say there's kind of three areas
12 of responsibilities: You know, CEO of the company, I'm
13 also a director on our board of directors, and I also
14 kind of lead our secure communications division as the
15 operating president of that division.
16     Q. And before you became CEO at BlackBerry, what
17 was your job title or job titles?
18     A. My job titles at BlackBerry?
19     Q. Yes, before becoming CEO.
20     A. President of the cybersecurity division of
21 BlackBerry.
22     Q. When you came to BlackBerry --
23     A. BlackBerry division. I think we kind of refer
24 to it as the "business unit."
25     Q. When you came into BlackBerry, did you have



Page 26

1  that same position as president of -- well, let me
2  rephrase.
3       So if I say president of cyber unit, would that
4  be a fair --
5       A.  That's fine.
6       MR. LAVOIE:  I think the witness is kind of
7  looking up at the top corner to see you.  I'm going to
8  try to pin -- sorry, I guess -- videographer, is there
9  any way to where the spotlight for Mr. Giamatteo will
10  not be Mr. Giamatteo himself?  I can see him kind of
11  looking at the top corner of the screen to see the small
12  picture of the examiner.
13       THE VIDEOGRAPHER:  Yeah, he needs to remain
14  spotlit for the sake of the recording of the video.
15       MR. LAVOIE:  Okay.
16       THE VIDEOGRAPHER:  Are you trying to reposition
17  his screens?
18       MR. LAVOIE:  No, no.  I just think it's more
19  natural to be kind of looking at the person asking the
20  questions instead of looking at yourself, but if there's
21  nothing we can do about that, there's nothing we can do.
22  BY MR. TARTAGLIO:
23       Q.  Okay.  So when you joined BlackBerry, did you
24  join as the president of the cyber business unit?
25       A.  Yes.

Page 27

1       Q.  Approximately when did you join BlackBerry?
2       A.  October of 2021.
3       Q.  Before then, you worked at another company I
4  assume?
5       A.  Yes.
6       Q.  Which company was that?
7       A.  That was McAfee.
8       Q.  Approximately how long did you work at McAfee?
9       A.  Approximately seven years.
10       Q.  And when you left McAfee, what was your job at
11  that point when you left?
12       A.  I was the chief revenue officer of McAfee.
13       Q.  And McAfee, did you have any -- strike that.
14       Were all of your jobs at McAfee more of a
15  finance-type role, or did you have another type of role
16  like engineering?
17       A.  Yeah.  No, no, I was the -- in my time at
18  McAfee, I was the president and general manager of our
19  consumer division for my first four-plus years, almost
20  five years, which entailed the entire organization.  It
21  was a team of about 1,600 employees.  You know, over a
22  thousand of them were engineers.  We had a global sales
23  organization, marketing organization, customer success
24  organization, and channel management organization.
25       So basically all of the operational functions

Page 28

1  were part of that responsibility, and then I took on --
2  the chief revenue officer role was much more
3  go-to-market related.  So that was sales, marketing,
4  customer success, our lead generation, inside sales, all
5  of that activity.  So those were the two different roles
6  that I was responsible for over my seven-year career at
7  McAfee.
8       Q.  And when you joined BlackBerry and joined the
9  cyber business unit, for the benefit of the jury who
10  might not understand really what the product offering
11  was within the cyber business unit at a very high
12  level -- we don't need to go into super granular
13  explanation of all the product offerings, but at a very
14  high level, what kind of software did the cyber business
15  unit develop and offer?
16       A.  Yeah, I'll give it to you, Tony, in a summary
17  level.  I won't go into all of it, but there were four
18  major significant pillars of products in the cyber
19  security division.  One was our UEM product, our unified
20  end-point management.  The second was our Cylance
21  product.  This was a company that we acquired for
22  end-point protection and response capabilities.  Our
23  third was our AtHoc, our critical events management
24  platform.  And the fourth was our encrypted voice,
25  video, and data and text with our Secusmart portfolio.

Page 29

1       So those four products:  UEM, Cylance, AtHoc
2  and Secusmart represented the cyber security business
3  unit and all the activities associated.
4       Q.  And I'm sure that you probably did a million
5  things as president of the cyber business unit, but if
6  you had to give a 30-second elevator pitch of kind of
7  what you did there, what would that be?
8       A.  Well, it was really a combination of
9  go-to-market activities with our channel partners, with
10  our customers, understanding their needs, our marketing,
11  getting our brand and our value proposition for the
12  products out into the marketplace.  So I would say there
13  was a part of my job that was go-to-market.  There was
14  another part of my job that was, you know, engineering
15  and product roadmap related, what products were we
16  developing, what were we going to develop in the future,
17  what were we doing to fix some of the issues that we
18  have in our existing products.
19       So I would kind of describe it as a third of
20  it -- maybe third to 40 percent was go-to-market, maybe
21  a third of it was, you know, engineering and product
22  related, and then the balance of it was more, you know,
23  administration and planning, revenue forecasting.
24       So those would probably be the balance of
25  activities that kind of guided my day-to-day activities



Page 30

1  in the cyber division.

2       Q.  I'm now going to ask you to provide an

3  estimate, so this is where that little discussion from

4  earlier today kicks in.  So if you don't know, you

5  should say you don't know, but if you can estimate, then

6  go ahead and do so.

7       Can you estimate about how many people worked

8  in your organization when you were president of the

9  cybersecurity business unit?

10      A.  Yeah, when I'm leading the company, Tony, it

11 was probably in the range of about -- I want to say

12 about 1,200 -- somewhere between 12- and 1,300 employees

13 were in the cyber division.

14      Q.  And one of your current positions within the

15 company is chief executive officer; is that correct?

16      A.  Now?  You mean referring to my position now?

17      Q.  That's correct.

18      A.  Correct, yeah.

19      Q.  And so even though I think the jury might have

20 a high-level understanding of what that means, again, in

21 maybe a 30-second snapshot, what do you view as your

22 main goals as CEO?

23      A.  Yeah.  Well, I will tell you, our main goal

24 over the course of the last, you know, 18 months, coming

25 up on two years since I moved into this role, was

Page 31

1  getting the company back into a better financial footing

2  and foundation.  We were a company that was unprofitable

3  at the time and burning cash, so one of our

4  responsibilities was to really fine tune our business,

5  focus on businesses that we think we can be profitable

6  with, we think we can establish leadership with.  So

7  that, you know, was a lot of the focus initially was to

8  really kind of turn around the company and get us on a

9  better financial footing.

10      Q.  And I apologize, but in addition to CEO and

11 being a member of the board of directors, I think there

12 was a third position you mentioned.  Is that accurate?

13      A.  The third area of responsibility is I've got a

14 great, strong team that kind of leads a lot of the

15 day-to-day activities.  But on what's now -- we renamed

16 the cybersecurity division "secure communications" over

17 the course of the last, you know, six months.  And as we

18 did -- so I have operational responsibility for the

19 secure communications division in addition to my role as

20 CEO of the company and a director of the board.

21      Q.  I'm going to ask a couple of questions about

22 how the company is structured, and these are meant to be

23 very high-level questions, so we don't need to get into

24 the details of being incorporated in -- I don't know --

25 Delaware.  Sometimes companies have very complicated

Page 32

1  corporate structures, but from what I've seen in the

2  documents, it looks like there's a couple of business

3  units that are kind of the foundation of what BlackBerry

4  does, one being cybersecurity, one being QNX; is that

5  fair to say?

6       A.  Correct.

7       Q.  And what does "QNX" stand for?

8       A.  QNX is the -- is the name.  It's literally the

9  name of our product for that particular division.

10      Q.  And once in a while I'll just type something

11 for the benefit of the court reporter so that we can get

12 accurate spellings.

13      What kind of products does the QNX unit offer?

14      A.  The majority of the products that makes up the

15 majority of the revenue for QNX is our safety critical

16 software operating system.  We create, basically, an

17 operating system that powers the software inside cars,

18 inside vehicles.  So if you think of, you know, how you

19 use, you know, Outlook to power your computer, you know,

20 many, many car manufacturers use QNX as kind of the

21 Outlook of powering the software in their car.

22      So that's the nature of it.  Highly

23 sophisticated, high-performance technology that we have

24 embedded in hundreds of millions of cars around the

25 world.

Page 33

1       Q.  And so is it fair to say that BlackBerry has a

2  cybersecurity unit or division and then a QNX unit or

3  division?

4       A.  Correct.  We have basically two virtually

5  autonomous business units.

6       Q.  And are those the two main business units you

7  would say, or are there other business units?

8       A.  The one -- the other business unit that we --

9  that's smaller but it's important, it's strategic, it's

10 something that we're very proud of, is our portfolio of

11 IP.

12      BlackBerry is a 40-year-old company, has

13 amassed a massive amount of intellectual property and

14 patents over the years.  So we do have a team that, you

15 know, manages that portfolio of technology, both in a

16 protective way for, you know, claims that might be made,

17 or in a proactive way to generate revenue where there

18 might be, you know, opportunities for us to license our

19 technology to other companies.

20      So those I would describe, Tony, as the three

21 divisions:  The secure communications, QNX, and our IP

22 team is kind of how the company is structured.

23      Q.  I'm going to ask a corporate structure question

24 that is going to have a little bit of a windup, but

25 hopefully this will be helpful, which is that sometimes



Page 34

a company will have business units or divisions that are
not legally distinct from the company, they're just the
internal organization of the company. But sometimes a
company will have legally distinct entities under it.

So I'll give you an example: Alphabet is a
company; it's a holding company, and there are LLCs
under Alphabet, one of which is Google. And there are
other conglomerates that kind of work this way where
there will be legally distinct business entities
underneath the corporate umbrella entity. I think
Berkshire Hathaway might be kind of similar.

In other words, sometimes companies are one
company and just have informal divisions, but sometimes
there are kind of legal divisions and separate business
entities in one, big corporate family.

And so when we talked about the cyber unit,
QNX, IP, are those legally distinct entities, or are
those just divisions in one entity?

A. No, there's legally distinct entities. And you
know, within QNX, there's a number of different
entities. There's a QNX entity in Japan, in Korea, in
other markets similar. So they do roll into the, you
know, kind of the corporate structure, but we do have a
number of entities, you know, across the world for both
divisions, generally, you know, in a -- segmented in a

Page 35

geography-type of setting.

Q. If I were an investor and I wanted to buy stock
in BlackBerry, would I have -- one option which is
BlackBerry stock, or would I just to be able to buy
stock just in QNX or just in cybersecurity? Is the
stock sliced and diced that way or is there just one
stock offering?

A. Yeah, no. The stock is one offering as
BlackBerry only.

Q. One allegation in this case -- well, one
potential allegation in this case is -- might be that
the financial performance of the cybersecurity business
unit declined under your tenure. How would you respond
to the allegation that the financial performance of the
cyber business unit declined while you were president?

A. How do you define declined? Like revenue,
profit, customer base, number of licenses that we power?
So there's a lot of different definitions of "decline."

Q. Let's go with revenue then. Did revenue
decline?

A. So, yeah, the company -- when I entered the
company, one of the biggest issues, which was the
decline in revenue, particularly with our UEM product.
Our UEM product is a product that we sold to big banks
and big governments. We have these Elite customers that

Page 36

use this UEM product.

That product was on a steep headwind and steep
decline when I joined the company in October of 2021.
Now, just for context, you know, of the reason why it
was declining was, you know, Microsoft is a big
conglomerate and has a gigantic ecosystem. So Microsoft
embarked on a strategy where they would go to their
enterprise customers and say, well, if you're using my
Azure Cloud, if you're using my Outlook, if you're using
Windows, if you're using all of these different
Microsoft applications, we'll give you these other
tools, you know, like a cybersecurity end point. We'll
give you MDM, mobile device management, their product
name was InTune. So we'll give you that for free.

So as a result of this strategy, Microsoft
would go to their biggest customers and say, if you're
buying all this other stuff from us, we'll give you
InTune for free. InTune was a direct competitor to the
BlackBerry UEM product.

So this was a very difficult kind of value
proposition for us as a company because our customers
would say, Microsoft is giving it to us for free. I
know yours might be a little bit -- have better security
and might have some other features and capabilities, but
-- so I give you that context because that created a

Page 37

massive, massive headwind for the UEM-side of the
business, and we were on a massive decline.

It's since now starting to level off because a
lot of those big customers -- those big, Elite
customers, a lot of them, during that tenure of the team
that was managing the Elite, was dropping off
precipitously. It's now kind of leveled off because a
lot of that is stabilized, those customers have went
away, and the customers that want to use that product
are continuing to stay with us.

So I give you all of that color. That was one
of the biggest dynamics of the headwinds of the decline
that was happening in the business before I even walked
in the door, and I was trying, you know, to work very
closely with the team to, you know, correct that and get
it into a better place.

Q. And so taking into -- well, strike that.

So it sounds like there were competitive
headwinds that were a challenge for BlackBerry, but just
to kind of circle back to my original question, is it
accurate that revenue within the cyber business unit
declined while you were president?

A. Due to those significant market dynamics and
headwinds, yes, the business was declining.

Q. One issue in this case is the relative



Page 38

1  financial performance of the cybersecurity business unit
2  while you were president compared with the financial
3  performance of the Elite customer group headed by
4  Ms. Sandhu, and there have been kind of some arguments
5  back and forth about which performed better.
6       One kind of preliminary question I have is, do
7  you think it's a comparison that makes sense to compare
8  the cybersecurity business unit's financial performance
9  to the Elite customers' financial performance, or is
10 that sort of like comparing apples and oranges?
11      A.  Yeah, it's comparing apples and oranges for
12 sure.  The reason why all of -- most:  90 percent-plus
13 of all of the Elite activity was a subset.  So when you
14 say well, what was the cybersecurity performance?
15 90 percent of those Elite customers were a subset of the
16 cybersecurity business.
17      So if the cybersecurity was $400 million, and
18 the Elite customers were, you know, 150 of the $400
19 million, it was a subset part of that.  So that's why I
20 don't think it's accurate to say, well, how do the Elite
21 do because the Elite was a direct reflection -- what was
22 happening with the Elite accounts was a direct
23 reflection of the direction of the cybersecurity
24 division as a whole.  So that's why I think it would be
25 inaccurate -- or it would be like comparing apples and

Page 39

1  oranges.
2       Q.  I have a few questions now about the Elite
3  customer group, and I'll start off distinguishing
4  between the goal of the group and the execution of the
5  group because maybe those were not in synch.
6       So for the goal or the theory of the group
7  that -- for the Elite customers group, did you think
8  that was a worthwhile goal to have a distinct business
9  unit to cater to the needs of very big customers?
10      A.  I didn't think it was the greatest, you know,
11 structure.  You know, my boss at the time, when I was
12 entering the company, informed me that he created this
13 Elite -- this is a dedicated team focused on these Elite
14 accounts.  And I've often found them having separated
15 from the main, you know, go-to-market sales force and
16 engineering teams, and having it separated is not the
17 best structure because it -- you know, it can create
18 some tension inside the organization.
19      But, you know, my boss at the time said, hey, I
20 really needed to put this structure in place because we
21 were having massive attrition in the field, in our sales
22 organization.  Literally, we were having, like, 40 or
23 50 percent a year attrition.  So that means if you had a
24 sales team of 200 people, a 100 people of them would
25 leave by the end of the year.

Page 40

1       So this was becoming a real concern because our
2  customers, who the salespeople that were responsible for
3  maintaining the relationship were all walking out the
4  door, so my boss at the time put in place, well, I got
5  to keep my finger on the pulse of these top 30
6  customers, so I'm going to have somebody just focus on
7  them and make sure that I hear their voice, that I hear
8  their concerns.
9       So that structure was put in place because the
10 company was going through a massive amount of attrition,
11 and it was a way for him to have direct kind of contact
12 with these top accounts at a time when there was a lot
13 of, you know, turmoil in the workforce.
14      Q.  And so I know that there was some issues with
15 the way that Elite worked out in practice, and we'll get
16 to those, but when you heard about the group and you
17 heard about the theory of the case for the group, the
18 kind of goal behind it, did that seem like a good idea?
19      A.  Yeah.  Well, you know, his judgment is much
20 better than my judgment.  I'm coming in on day one on
21 the job.  If the CEO at the time says I think this is
22 the best way for us to maintain, yes, I trusted his
23 judgment and thought I'm going to do everything I can to
24 make this structure work.
25      Q.  And I'll ask now about the execution, how

Page 41

1  things worked out in practice.  So were there any
2  challenges caused by the fact that there was this
3  separate group, this Elite customer group?
4       A.  Yeah.  Yeah, there were -- there were a number
5  of challenges, and a lot of it had to do with --
6  sometimes when you have multiple streams of
7  communications going into the customer, if you have the
8  Elite team talking to them about a number of things and
9  then you've got the field sales team engaging with them
10 and trying to sell them things, you know, sometimes the
11 communication flow between the two teams and what's
12 being said to the customer isn't great.  So that,
13 certainly, I think played in the way that the
14 structure of this organization was.
15      Q.  And so you mentioned multiple communications
16 flows.  Were there any other problems caused by the
17 Elite customer group?
18      A.  I would say most of the problems were, you
19 know, sharing information on what's going on with the
20 account.  You know, and if you don't have the
21 information on what's going on with the account, the
22 sales team, the rest of the organization, have a really
23 difficult time supporting things.
24      So it was kind of -- things were kept in a
25 little bit of a -- a lot of a bit of a black box where



Page 42

1  it was difficult to understand the direction.  What's
2  the quote, what's the strategy, what are we trying to
3  position, where are we going?  That was kept very quiet
4  and separate from the field sales team organization who
5  is trying to engage with the customer on a regular
6  basis.  So I think those, I think, were some of the
7  common problems and friction that I think created issues
8  for us.
9      Q.  And so we talked -- and this is a bit
10  repetitive, by the way, but this is all part of my
11  effort to see if we can get a complete view of the
12  problems with the Elite group.
13          So we talked about multiple communications
14  flows.  We talked about sharing, or perhaps non sharing,
15  of information.  Can you think of any other reasons why
16  there were problems caused by the Elite customer group?
17      A.  Those communications, strategy documents,
18  information, sharing information, commercial
19  discussions, I think those were the crux of really what
20  was going on, and I think created the biggest -- the
21  biggest challenge of that.
22          And, you know, it's unfortunate.  I think if
23  the team, you know, worked in a more collaborative-type
24  of a manner, I think a lot of those communication
25  issues, you know, could have worked themselves out.  But

Page 43

1  I think sometimes the dynamics and the personalities and
2  things like that come into play, and it certainly
3  created a bit of friction.
4      Q.  Were there any benefits that you saw from the
5  Elite customer group?  Any good things that came about
6  from that structure?
7      A.  Well, certainly, I think before my arrival,
8  having -- like I said, one benefit of when you have
9  50 percent attrition and the entire organization is
10  walking out the door, having a direct line of
11  communication into these important customers, I think
12  was a benefit, was a good move where we could hear and
13  understand what their needs are, what their concerns
14  are.  So I think that was a very good move, and, you
15  know, the Elite -- the organization that focused on the
16  Elite account would, you know, get an understanding of
17  what the issues were with the accounts, and I think that
18  was helpful.
19      Q.  It sounds like there may have been -- and you
20  could push back on this; you don't have to agree with
21  the premise of my questions -- but it sounds like there
22  may have been some personality conflicts between the
23  cybersecurity business unit and the Elite customer
24  group.  Is that accurate?
25      A.  Yeah, I think that's accurate.

Page 44

1      Q.  What kind of personality conflicts did you
2  observe?
3      A.  I think there was -- you know, there were trust
4  issues.  You know, people would speak to the customer
5  and then not share that information of what they spoke
6  to them about with other members of the team.  That
7  impacts trust, and people go, geez, you know, you had a
8  whole meeting with that person and you didn't even share
9  that information with me?  I'm going in and talking to
10  them the next day.
11          So -- so I think it's those -- those were the
12  kinds of things that eroded trust and created, I think,
13  a real difficult -- across-the-board; not just on the
14  sales side of things, even on the engineering side of
15  the business and the interactions with the engineering
16  side.  So I think those were, you know, what really --
17  what really impacted those relationships.
18      Q.  And during the time that the Elite customer --
19  well, strike that.
20          At some point, did the Elite customer group
21  cease to exist?
22      A.  No.  It's -- it actually started to morph and
23  transition.  Again, it was originally started to make
24  sure we've got our -- our kind of pulse-check on these
25  top 30 or so accounts at a time where there was

Page 45

1  attrition, turmoil in the company.  So that was the
2  reason why it was created.
3          And when I spoke to John Chen, his coming in,
4  he was, like, once you stabilize the organization, get a
5  leader in the Amia Region, Asia Pacific Region.  We
6  didn't have a leader -- you know, our largest business
7  was the federal government in the U.S.  That was our
8  largest segment of business.  We didn't have a leader
9  there.  So my job, when I first came in, was to use my
10  Rolodex, and try to recruit people and try to create --
11  you know, fill some of these roles and some of these
12  gaps.
13          So after a year of doing that, we hired, we
14  backfilled, we strengthened; attrition started to
15  improve; it started to go down.  That was when we
16  started thinking, okay, well, at what point now -- if
17  the organization is stabilizing, then the need for this,
18  you know, Elite organization -- which was put in place
19  because of the turmoil at the time -- now that it's
20  stabilizing, now let's talk about going back to, you
21  know, a more conventional kind of go-to-market structure
22  where the field sales teams were managing it.  So -- and
23  we, you know, slowly started to implement that over
24  time.
25      Q.  Okay.  And so I want to present to you kind of



Page 46

1  alternative scenarios, and you can tell me which one is
2  closer to the truth.
3       Scenario one would be you become CEO, and you
4  say, okay, we don't need this Elite customer group
5  anymore.  Let's get rid of this.
6       And the other would be that it was more of a
7  gradual process that took some time.  Is number two more
8  accurate?
9       MR. LAVOIE:  Object to the form of the
10  question; incomplete hypothetical; vague.
11       THE WITNESS:  With that objection noted, I
12  would say, Tony, number two is more accurate.  It was
13  much more -- this -- this transition of some of these
14  accounts back into the field sales organization happened
15  well, well before I became CEO, where I was even
16  contemplated to become CEO.  This was a conversation
17  that was going on at the end of 2022 -- February of
18  2022, February, March, of 2023 and April of -- kind of
19  that.  As we were doing the planning for the next fiscal
20  year, that's when John Chen was thinking, all right, now
21  that this kind of Elite organization -- I don't want to
22  say has served its purpose -- and we've strengthened the
23  field sales, we'll start to transition some of these
24  accounts, and that started in the beginning of 2023.
25  ///

Page 47

1  BY MR. TARTAGLIO:
2       Q.  Are you able to provide an estimate of when the
3  Elite customer group disbanded, assuming it has?
4       A.  So I think Phase 1 of the Elite customer
5  group's activity, you know, moving to the field sales,
6  happened -- and I want to say maybe, arguably 50 percent
7  of the Elite team, in March or April of '23, started
8  phasing back into the organization as part of John
9  Chen's plan to do that.
10       And then the remainder of the accounts that
11  were part of the Elite happened, yeah, after I became
12  CEO and as we were doing the planning for the next
13  fiscal year.  So it was kind of a two-year transition
14  that happened.
15       Q.  Are you able --
16       A.  The first year of transition happened while I
17  was president of the cyber division and John Chen was
18  CEO, and the second half of the transition happened
19  after I became CEO.
20       Q.  And for the transition that happened after you
21  became CEO, about how long did it take from the time you
22  became CEO to the time the Elite customer group was
23  disbanded?
24       A.  I would say we probably -- you know, I became
25  CEO in December of 2023, so that probably happened as we

Page 48

1  were doing the planning for, you know, March of 2024.
2  So probably three or four months after.  That's usually
3  -- honestly, Tony, that's usually the natural, normal
4  time in business to make a kind of change is to align it
5  with the next fiscal year.  This way, you know, the
6  people have their annual targets, what they're focused
7  on, what their customers.  You generally want to get
8  that lined up at the time of -- you know, when the next
9  fiscal year starts.  So that's why, you know, that
10  seemed like the logical progression.
11       Q.  During the time that John Chen was CEO, did you
12  have any conversations with him about moving customers
13  from the Elite customer group into the general
14  cybersecurity sales organization?
15       A.  Yeah, we did.
16       Q.  Did you ask John Chen to move some of those
17  customers over to the cybersecurity division?
18       A.  I didn't have to ask John Chen.  That was John
19  Chen's intention and strategy, as I tried to articulate
20  earlier.  John Chen put this Elite thing in place
21  because we had attrition.  Once the attrition got
22  stabilized and we got leadership replaced in these
23  different places, it was John Chen's plan all along
24  to -- you know, to transition.
25       So it's not like I needed to go ask him.  I

Page 49

1  did, you know, support it, and I did want to do it
2  faster because I thought it was a better operating
3  structure for us to have these accounts more aligned
4  into the integrated go-to-market structure.  So I did
5  encourage it, and I did pursue it.  But it really was
6  part of John's original strategy to transition things
7  back once the organization stabilized.
8       MR. TARTAGLIO:  I think now is a good time for
9  a break.  Why don't we take a break?  We can talk about
10  coming back once we go off the record.
11       THE VIDEOGRAPHER:  We are going off the record.
12  The time is 10:10 a.m.
13       (Whereupon a recess was taken.)
14       THE VIDEOGRAPHER:  We are now back on the
15  record.  The time is 10:18 a.m.
16  BY MR. TARTAGLIO:
17       Q.  So the plaintiff in this case is Neelam Sandhu,
18  who I represent.  Do you remember approximately when you
19  met her?
20       A.  In the early part of October, Tony.  My first
21  day on the job at BlackBerry was October 4th, so chances
22  are I probably came to San Ramon, and I might have met
23  her in the office that week as the first time, but
24  somewhere around that time.
25       Q.  And do you remember what -- well, strike that.

Page 50

1          Do you remember anything from the first
2  conversation you had with her?
3      A.  No, I don't -- nothing in particular.  Just it
4  was literally a one-minute hello, introducing ourselves,
5  and just kind of greetings and salutations.  There was
6  nothing -- nothing really significant about it.
7      Q.  When you met Ms. Sandhu, did you ask her if she
8  was Indian?
9      A.  I don't recall.  I might have.  That's, you
10 know, something I -- I don't know if I would have said
11 anything or asked in the -- when I very first met her,
12 or if it was something I would have -- you know, we
13 would have talked about at a subsequent time, but I
14 certainly would think that that might be something I
15 would ask.
16     Q.  Before you became -- strike that.
17         So let's look at the last year at BlackBerry
18 before you became CEO, so from the time you became CEO
19 to one year prior.  On any given week, let's say, about
20 how much time would you spend communicating with
21 Ms. Sandhu?  Was it every day, multiple times a day,
22 once a week, that sort of thing?
23     MR. LAVOIE:  Objection; assumes facts.
24 BY MR. TARTAGLIO:
25     Q.  Or maybe it wasn't as frequent as once a week,

Page 51

1  but what's your best estimate of about how frequently
2  you would work together with Ms. Sandhu?
3      A.  Tony, you're referring to when I first joined
4  the company?  Before?
5      Q.  This would be your last year before you became
6  CEO.
7      A.  Last year?  Very infrequently.  Very
8  infrequently.  Definitely not once a week.  So we would
9  have infrequent discussions.
10     Q.  Did you have some sort of a standing, regular
11 call together or meeting where you would both be
12 present?
13     A.  Generally you'd have a one-on-one call, but I
14 don't recall if it was, like, a regularly scheduled
15 every other week, or if it was a call that we scheduled
16 as needed.  But we, on occasion, would have, like, a
17 one-on-one catch-up call.
18     Q.  How would you describe -- well, assuming you
19 have an opinion about it, what opinion do you have of
20 Ms. Sandhu's work ethic?
21     A.  Yeah, I -- I heard about, and what little that
22 I engaged with her on, observed a really strong work
23 ethic.  She lived and breathed her work.  So I would
24 definitely, you know, give her high marks for a strong
25 work ethic.

Page 52

1      Q.  Did Ms. Sandhu, to your hearing about it, have
2  a reputation for being someone who is difficult to work
3  with?
4      A.  Yes.
5      Q.  And what sort of things did you hear about her
6  reputation of being difficult to work with?
7      A.  You know, depending on the organization.  You
8  know, so the field sales organization found it very
9  frustrating that, you know, she would have conversations
10 with customers, wouldn't share any information.  When
11 they would complain or inquire about it, she would
12 immediately pull out, well, if you look at Section, you
13 know, XX in our MAP policy book, it says that I am, you
14 know, entitled to do this and don't have to tell you.
15         So she had that kind of demeanor about her.
16 You know, keep the relationship, keep the information,
17 and when people would resist it, a lot of times invoke,
18 you know, "I report to the CEO."  "The MAP is the
19 policy."
20         So she would kind of, you know -- there was a
21 reputation of bullying and belittling people underneath
22 her.  I would get that a lot.
23     Q.  Let's see, and so I'll draw a distinction
24 now -- and legally, distinction is sometimes important
25 between things that you observed firsthand and things

Page 53

1  that you heard about from other people.
2         And so did you have any firsthand experiences
3  with Ms. Sandhu in which you found her to be acting in a
4  way that was, let's say, a bit hostile?
5      A.  Yeah.  You know, the one that -- the one that
6  comes to mind that -- right out of the bag when I hear
7  that question has to be just the petty, small-ball type
8  of, you know, behavior that she did.
9         And I'll give you a great example was in our
10 investor conference that we had in, I think it was, May
11 of 2023.  You know you have the business unit presidents
12 present.  So I presented for the cyber division.
13 Mattias Eriksson presented for the QNX division, John
14 Chen kicked it off as the CEO, and then we had the CFO
15 talk about the numbers.  So this was kind of the general
16 flow of it.
17         And when I present, you're presenting to Wall
18 Street, the investors.  You're talking about the
19 business, the trajectory, you know, the customers, the
20 excitement that you have, the future direction.  And
21 somewhere in my presentation, I said, you know,
22 governments represent 70-75 percent of our business.
23         And, in fact, we renewed one of our -- one of
24 the G7 governments did a long-term renewal for our
25 entire portfolio.  That's a typical thing that you would



Page 54

1  say at an investor conference.  I don't know, a day
2  later -- maybe the same day -- I think I got an email or
3  a BBM -- sometimes we communicated with BBM -- where she
4  accused me, like, of -- you know, literally, she said:
5           At the 39-minute mark and 33 second, you
6           referred to a G7 customer, which happened to be,
7           you know, an Elite customer.
8           And:  What did you mean by that?  And why
9           did you say that?
10          And I thought -- I was just flabbergasted by
11  the question.  I was absolutely flabbergasted by the
12  question because I think the inference was why didn't I
13  recognize her by name?  It's an investor conference.
14  You never recognize anybody by name.
15          If you look at the earnings scripts for myself
16  and John Chen going back five years, you'll never see
17  anybody's name mentioned when you're talking to
18  customers.  You're talking about the business, about the
19  trends, about the dynamics, where you're making
20  investments, not about recognizing people.  And that was
21  a real telling tale of how she thought about herself,
22  and that, to me, was a conflict.  I was really taken
23  aback by that, honestly.
24      Q.  Other than this anecdote you just recounted
25  regarding the investor call and the follow-up email from

Page 55

1  Ms. Sandhu, can you recall any other instances in which
2  Ms. Sandhu treated you in a way that you thought was
3  hostile?
4      A.  Yeah, I think the other one that comes to mind
5  was a contract that we were doing with the federal
6  government, and we had a partner -- long-standing
7  partner.  I won't say their name; I don't want to bring
8  them into it.  But we had a long-standing partner who
9  handled this account and took care of the business of
10  this particular customer of ours.  And for some reason,
11  Ms. Sandhu wanted to, you know, move that customer off
12  of that account and move it to another account, you
13  know, another channel partner.
14          I thought that was inappropriate.  I thought,
15  you know, we've got a great relationship with the
16  end-user customer.  The partner that we're using today,
17  the distributor that we're using today is doing a fine
18  job at managing, you know, the relationship there.  So I
19  didn't feel that there was any need to try to move that
20  customer to a different partner, and that was another
21  area where we kind of, you know, conflicted a bit.
22      Q.  And sorry to be repetitive, but I do want to
23  see if we can get as complete a list of examples as
24  possible.
25          Can you think of any other examples in which

Page 56

1  there was some conflict that arose between yourself and
2  Ms. Sandhu?
3      A.  You know, a third one would have to probably be
4  -- involve, ABB, one of our big customers in Europe.
5  We're working on a renewal, and we needed to come
6  together on a coordinated strategy as a team because our
7  field team in Europe was talking to one set of customers
8  and had an opinion on the strategy that we should be
9  employing to renew that customer.  And then Neelam's,
10  you know, Elite team was having another set of
11  conversations with the customer.  And I was trying
12  desperately to get her to get, you know, Neelam and Hans
13  Bauer on the phone for us to, you know, get synched up
14  on how we strategize, and that wasn't an easy process.
15          So those were a couple of, you know, examples
16  between the investor conference, between the -- you
17  know, the federal government partner thing and, you
18  know, getting on the same page with ABB was -- there
19  were kind of three specific areas that I can kind of
20  remember where, you know, it was -- it was difficult
21  working together.
22      Q.  Can you recall any other anecdotes along those
23  lines?
24      A.  Tony, there's three.  I guess I could probably
25  come up with some more, but I think that gives you the

Page 57

1  point.
2      Q.  Well, respectfully, I do want to see if you can
3  remember any other specific examples of tense
4  interactions between yourself and Ms. Sandhu.
5      A.  Okay.  Yeah, I think -- I think I can give you
6  another one.  Another one had to do with our search
7  engine optimization activity where Neelam moved into the
8  role of CMO.  You know, she had a very good reputation
9  for, you know, land-grabbing as much, you know,
10  responsibility as she could grab.  And this search
11  engine optimization team in corporate that she managed,
12  managed the small little search engine optimization
13  budget; call it a million dollars, maybe less than that.
14          And that search engine optimization activity
15  was for, you know, BlackBerry, was BlackBerry corporate.
16  So it was the BlackBerry brand.  It was the BlackBerry,
17  you know, how do we position the BlackBerry brand in the
18  market and that kind of thing.  So that was what she was
19  responsible for.
20          The business unit, the cybersecurity business
21  unit, we had our own search engine optimization budget
22  and team that was focused on investing for search engine
23  and SEO for lead generation, where you're talking about
24  the products and the value and why our product is good.
25  And so we would -- so it was much more product



1  orientation generating leads.

2       And we would spend quite a bit of money with

3  that. We would spend probably over $2 million a year on

4  search engine optimization. More than double what was

5  spent on the small corporate search engine optimization

6  budget.

7       And when Neelam, promptly when she moved into

8  the CMO role, she started to, you know, engage my team

9  around, well, we should bring all of this SEO to me; it

10 should all be in corporate. You know, and I should take

11 over -- that $2 million budget and that team that

12 manages, they should be part of my team. And if they

13 came to me, I could optimize it and save us money by

14 bringing it over.

15      And that's something I didn't agree with. I

16 resisted. You know, completely two different teams,

17 we're completely two different missions. You have to

18 have a certain set of skill set to do SEO for brand

19 stuff versus a very different skill set for SEO, for

20 product-related lead generation activity.

21      So that would be another area where we

22 disagreed. You know, she thought it should all come to

23 her, and she could save some money. And, you know, I

24 thought it should stay where it is because it's more

25 aligned to the business unit and focused on driving lead

1  generation for the business unit.

2       Q. And I think during your response at some point,

3  you referred to "land-grabbing." And I'm not in the

4  corporate world, so I'm not as familiar with that. What

5  did you mean when you mentioned land-grabbing?

6       A. Trying to grab responsibility from another

7  organization and pull it into your organization. Not

8  only, you know, people, but, you know, budget, funding.

9  You know, and under the guise of, well, I could do it

10 better and I could save us money. Meanwhile, you know,

11 the corporate team, you know, they had a very different

12 function, a very different kind of SEO.

13      So they didn't necessarily have the skills to

14 manage that. So, you know, coming in and saying well,

15 let's take the bigger budget and bigger team and move

16 them into my team and I'll manage it all, just didn't

17 seem right to me.

18      Q. Did you hear any discussions about Ms. Sandhu

19 being a land-grabber? I guess it doesn't have to be

20 those exact words, but did you hear any conversations

21 with her engaging in land-grabbing?

22      A. I did. I actually did. And it actually had to

23 do with when she first became responsible. And I guess

24 John Chen put her in charge of the Elite accounts, and I

25 don't know the exact time because it predated me. But

1  when she first did it, the scope of her responsibility

2  was kind of like customer service, customer success, the

3  liaison. Be the communication channel with the customer

4  so we know what's going on.

5       So the relationship -- you know, her scope of

6  responsibility with that started as -- as, you know,

7  kind of customer service and customer success and

8  keeping your finger on the pulse of the customer. And I

9  guess, from what I heard -- because again, I wasn't

10 privy to it because apparently there was this mad

11 scramble to expand the charter of her team. Before I

12 arrived, I heard about it, that there was mad scramble

13 to expand MAP, the management, you know, approval

14 process, from what her scope of being the customer service

15 MAP to now she's got strategic responsibility for the

16 overall account.

17      So anything that goes on with the account, goes

18 under her bailiwick. And I know there were people in

19 the organization, particularly on the field sales side

20 of the organization, thought that was a complete

21 land-grab. Like, usually the strategy and the

22 commercial and the relationship, usually that sits with

23 the field sales. Any organization. When I was at

24 McAfee, Intel, Nortel, the conventional structure is

25 that field sales owns the relationship and the strategy.

1  Having this separate team that was put in place just to

2  be the liaison suddenly now is responsible for all of

3  the strategy, was a very, very unsettling, you know,

4  development for the field sales team.

5       So, again, Tony, a lot of this predated me, and

6  these were kind of gripes that I would hear from the

7  field sales team. But that was very much viewed as a,

8  gosh, she's supposed to be the customer liaison. Now

9  all of a sudden, she's land-grabbing and managing the

10 strategy of all of the accounts. So that would probably

11 be another example.

12      I wasn't with the company and watched it happen

13 first -- you know, firsthand, but I heard about it from

14 others in the company. And I also heard about it as it

15 was some kind of mad scramble to get it in place before

16 I started so she could have the position to say, well,

17 I'm responsible for these accounts. So those are

18 probably the best examples of land-grabbing that I could

19 probably recollect.

20      Q. Do you recall specifically any -- or which

21 individuals made complaints about Ms. Sandhu's

22 land-grabbing?

23      MR. LAVOIE: Objection. Misstates the

24 testimony; assumes facts.

25      You can answer if you know or understand the



Page 62

1  question.
2      THE WITNESS: Can you say the question again?
3  Who complained about Ms. Sandhu is that --
4  BY MR. TARTAGLIO:
5      Q. Yeah, can you recall who specifically made
6  these sorts of complaints about land-grabbing?
7      MR. LAVOIE: Object to the form of the
8  question; assumes facts; misstates the testimony.
9      THE WITNESS: Yeah, the field sales team, Tony.
10 BY MR. TARTAGLIO:
11     Q. Can you remember any names?
12     A. Adam Enterkin, who was our kind of senior
13 leader for sales, was pretty vocal about the land
14 grabbing on the Elite accounts.
15     Q. Can you recall anyone else?
16     A. No, I can't recall anybody else.
17     Q. Is there something against corporate policy for
18 someone in Ms. Sandhu's position to try to expand the
19 scope of her responsibilities within the company?
20     A. I'm sorry, Tony, can you ask that again?
21     Q. Yeah. Was it a violation of corporate policy
22 for Ms. Sandhu to try to expand the scope of her
23 responsibilities?
24     MR. LAVOIE: Object to the form of the
25 question.

Page 63

1      THE WITNESS: No. I don't think that's -- I
2  don't think that's ever -- you know, Tony, I've been in
3  business for 35 years. You don't have bylaws that say
4  you know, "don't land grab." So I'm not sure, honestly,
5  how relevant -- in the real world of business, in the
6  real world of people working together, there's going to
7  be that kind of, you know, political infighting that's
8  going on. And, clearly, there was a lot of it going on
9  with the Elite team at BlackBerry.
10 BY MR. TARTAGLIO:
11     Q. So if Ms. Sandhu was trying to expand the scope
12 of her responsibilities, would there be something wrong
13 with that?
14     A. Yeah. To the extent that it undermines the
15 rest of the organization. You know, because she has the
16 ear of the CEO and says I need to take on
17 responsibility. Meanwhile, the field sales, who has a
18 voice in this whole play, you know, wasn't consulted,
19 wasn't anything. And they woke up one day, and all of a
20 sudden Neelam is completely responsible for all of their
21 accounts. So as you can imagine, it must have been very
22 frustrating for them.
23     Q. And -- strike that.
24     To your knowledge, did Ms. Sandhu ever violate
25 BlackBerry corporate policy?

Page 64

1      MR. LAVOIE: Object to the form of the
2  question; lacks foundation; calls for speculation;
3  vague.
4      THE WITNESS: Yeah, I don't know, Tony. I
5  don't know.
6  BY MR. TARTAGLIO:
7      Q. I'll assume -- well, strike that.
8      Does BlackBerry have a formal disciplinary
9  policy that includes things like warning letters and
10 formal counseling, letters of reprimand, that sort of
11 thing? Is there some sort of formal disciplinary policy
12 in place?
13     MR. LAVOIE: Objection. Lacks foundation;
14 incomplete hypothetical.
15     You can answer if you know.
16     THE WITNESS: Yeah, I don't know. I'm sure
17 there's a policy that -- that we have. I mean, you
18 know, in my leadership, we try to treat everybody in the
19 organization with respect and dignity, and, you know, to
20 create a good rapport across the organization. So we
21 encourage everybody to do that, and when we see signs of
22 conflict, we call it out.
23 BY MR. TARTAGLIO:
24     Q. Do you know whether Ms. Sandhu was ever
25 formally disciplined by BlackBerry one way or the other?

Page 65

1      MR. LAVOIE: Objection. Lacks foundation;
2  calls for speculation.
3      THE WITNESS: I wouldn't know. She didn't
4  report to me, so what her manager -- how her manager,
5  you know, coached her or encouraged her to work with
6  others or improve on her, you know, behavior and
7  relationships is not something I was privy to.
8  BY MR. TARTAGLIO:
9      Q. Did Ms. Sandhu ever tell you in so many words
10 that she did not like the way that you were treating
11 her?
12     A. I can't recall -- I can't recall of a direct
13 communication, you know, that -- about I don't care for
14 the way that you're treating me. We would have
15 differences along the lines of what I talked about
16 between the investor conference and ABB and SEM and
17 things like that. But, you know, if there was a
18 difference, if there was a conflict, I think it happened
19 in the matter of the instance. Not, you know, a general
20 I don't care for the way you're treating me type of
21 thing.
22     Q. Did she ever accuse you -- by which I mean did
23 she ever tell you that she believed you were treating
24 her differently because she was a woman?
25     A. Never that -- never did she bring up that she's



Page 82

1  of us, but he had a different reporting relationship.
2      Q.  And you also mentioned that Adam Enterkin had
3  said something to the effect of -- something about
4  Ms. Sandhu's filing of the complaint within HR; is that
5  right?
6      A.  Yes.
7      Q.  Can you recall -- now that we've been talking
8  along these lines for a while, can you recall any
9  specifics of what Mr. Enterkin told you about --
10     A.  I don't.  I don't.  It was a long time ago, and
11  it was actually before my time.  And, again, it was
12  something that was, you know, kind of speculative and
13  rumor.  He didn't have any fact or information about
14  anything.
15          You know, it's that type of thing that happens,
16  I think, a lot in corporate world where people are
17  saying somebody was let go.  I think that was because of
18  this.  So it's just somebody speculating; had no
19  specific date or facts about it.
20     Q.  Besides Mr. Shea and Mr. Enterkin, did you hear
21  anyone else discuss Ms. Sandhu potentially filing an HR
22  complaint?
23     A.  No.
24     Q.  Are you aware that Ms. Sandhu is alleging that
25  there was a dinner that she attended with you in which

Page 83

1  you had acted inappropriately with her?
2      A.  Yes.
3      Q.  And did you see that -- well, strike that.
4          Have you read the complaint or one of the
5  complaints that Ms. Sandhu has filed in this case?
6      MR. LAVOIE:  Objection.  I think "complaint" is
7  sort of ambiguous in this context.  You mean the first
8  amended complaint, or something like that, or like an
9  internal complaint at BlackBerry?
10     MR. TARTAGLIO:  Yeah, I'm talking about the
11  complaint was filed on the public docket as part of this
12  lawsuit.
13  BY MR. TARTAGLIO:
14     Q.  Have you read that document?
15     A.  Yes.
16     Q.  And there was some discussion there about a
17  dinner that you had with Ms. Sandhu.  Are you
18  remembering that?
19     A.  Yes.
20     Q.  So what would be your response as to what
21  happened during that dinner?
22     MR. LAVOIE:  Objection.  Calls for a narrative;
23  calls for a legal contention.
24          You can answer.
25     THE WITNESS:  My description or

Page 84

1  characterization, it was a perfectly friendly and
2  professional meeting -- dinner meeting.
3  BY MR. TARTAGLIO:
4      Q.  Do you recall anything more specifically than
5  that about what happened during the meeting?
6      MR. LAVOIE:  Object to the form of the
7  question; vague.
8  BY MR. TARTAGLIO:
9      Q.  Well, let me ask this:  Do you remember what
10  you talked about during the meeting?
11     A.  I don't remember the -- I remember the themes
12  of it -- of the meeting were, A, you know, this was an
13  October 20th meeting.  I had just started two weeks --
14  so two weeks ago.  So this was a get-to-know-you type
15  of, you know, dinner meeting.
16          So, one, it was to establish a relationship and
17  to establish a rapport.  And the other theme of it was
18  about, you know -- you know, the business.  She was
19  responsible for these Elite accounts, and, you know, we
20  talked about, you know, the dynamics of what was going
21  on with the Elite accounts.
22          So those were generally the topics of, you
23  know, getting to know each other, you know, establishing
24  a personal rapport and relationship and talking about,
25  you know, business -- business matters, particularly as

Page 85

1  it related to, you know, these Elite accounts.
2      Q.  Do you recall who suggested that the meeting
3  happen?
4      MR. LAVOIE:  Object to the form of the
5  question; vague.  And I just want to make sure we're
6  talking about the dinner, right, or are you talking
7  about a meeting?
8      MR. TARTAGLIO:  Well, the witness is referring
9  to it as a "meeting," so I'm okay with calling it a
10  meeting, but it's the dinner meeting we're talking.
11  BY MR. TARTAGLIO:
12     Q.  Do you know who requested it, whose idea it
13  was?
14     A.  You know, I don't recall, Tony.  It was kind of
15  a mutual hey, you know, next time I'm in town why don't
16  we get together, we'll have some dinner, we'll -- you
17  know.
18          So I don't know if that was her suggestion or
19  my suggestion, but it was definitely a mutual let's --
20  you know, let's get together and get to know each other
21  and talk about business.
22     Q.  Was there anything in the meeting -- the dinner
23  meeting that you said in hindsight you think, oh, maybe
24  I shouldn't have said that; maybe that was a little
25  inappropriate.  Was there anything like that that



Page 86

1    happened at the meeting?
2        A.  No, I thought it was a perfectly fine and
3    professional meeting.
4        Q.  Did you say anything during the dinner meeting
5    about being called a "dirty old man"?
6        A.  "Dirty old man" is not something that rolls off
7    my tongue, so it's not something -- an expression I
8    would say.
9            You know, knowing about the complaint or what
10   came into it now, I can totally see myself making a
11   self-deprecating comment around, you know, myself and my
12   three lovely daughters and my wife.  You know, so I can
13   certainly see myself making a self-deprecating comment
14   around it, but not in the context of, you know, "dirty
15   old man" or anything like that.  That's probably some
16   spin that might of came out from elsewhere.
17       Q.  Before this lawsuit was filed, did you hear
18   that Ms. Sandhu had talked about the dinner meeting with
19   John Chen?
20       A.  No, nope.
21       Q.  Before this lawsuit got filed, did you ever
22   hear that Ms. Sandhu had requested that she not be asked
23   to travel with you?
24           MR. LAVOIE:  Objection; assumes facts.
25           You can answer.

Page 87

1        THE WITNESS:  No, I was not aware that she made
2    a request not to travel with me.
3        MR. TARTAGLIO:  This is probably a good time
4    for a break.  How about we take a break?
5        MR. LAVOIE:  Sure.
6        THE WITNESS:  Sounds good.
7        THE VIDEOGRAPHER:  This marks the end of Media
8    Number 1.
9            We are now going off the record.  The time is
10   11:15 a.m.
11           (Whereupon a recess was taken.)
12           THE VIDEOGRAPHER:  We are now on the record.
13   The time is 11:25 a.m.  This marks the beginning of
14   Media Number 2 in the deposition of John Giamatteo on
15   August 28, 2025.
16           Please continue.
17   BY MR. TARTAGLIO:
18       Q.  And did you ever discuss with John Chen the
19   possibility of having Ms. Sandhu work under you?
20       A.  Yes, I did, but it was something that he bought
21   up.  So it's something I responded to from something he
22   brought up.  It's not something I approached him with.
23       Q.  What did he bring up to you along those lines?
24       A.  He brought up to me that Ms. Sandhu approached
25   him about wanting to have part of the engineering team

Page 88

1    report -- report directly to her to support the Elite
2    accounts.  So she wanted to, effectively, be like the
3    general manager of these accounts and have the
4    engineering resources moved from my team.  Billy Ho was
5    the leader of all of our engineering, so she wanted to
6    have those people come over, report to her, and be part
7    of her, you know, Elite team.
8            So that's what John mentioned that, you know,
9    she proposed to him.  He told me that he told her, well,
10   that's not a structure he agrees with.  You know John --
11   myself, John Giamatteo, is responsible for the business
12   unit.  If you want to be the general manager of that
13   segment of the business, you would have to move over and
14   report into him versus extracting the engineering team
15   and having them go over and report to you.
16           So that was the nature of the discussion that
17   John brought up with me.
18       Q.  Did you ever suggest to John Chen that
19   Ms. Sandhu should come work in your business unit?
20       A.  I didn't proactively suggest that she should
21   come over, but I did offer, as a solution, if she wants
22   to be a general manager of the division, then she
23   should, you know, come over and be part of my team.  So
24   I offered that as a solution to solve her request.
25       Q.  And was that an offer -- well, strike that.

Page 89

1    Who did you make that offer to?
2        A.  I made that offer in response to John Chen.
3    John already -- his instincts were already -- he told me
4    that he told Neelam that if you want to have that
5    responsibility, you have to go over and report to John.
6    I was in no way lobbying for her to come over.  I was
7    more responding to, you know, this conversation that he
8    told me.
9        Q.  Did you ever speak with Ms. Sandhu about her
10   possibly joining your organization and working under
11   you?
12       A.  Yes, I did.
13       Q.  What do you remember from that discussion?
14       A.  Yeah, we talked about the structure.  We talked
15   about the accounts.  We talked about, you know, the --
16   you know, the functional duties inside of the account.
17   You know, I tried to assure her, you know -- you know,
18   that -- you know, look forward to working with her, and
19   we could work together and, you know, that, you know, I
20   would be a good team member, a good manager, and a good,
21   you know, supporter of hers.
22           And I even suggested, you know, you want to get
23   some kind of firsthand feedback, there's a person I used
24   to work at McAfee.  She's a woman who ran the largest,
25   you know, engineering organization, and we had a



Page 90

1  long-standing working relationship.  And I helped her do
2  something similar to what you're looking to do as far as
3  trying to broaden your career to become a general
4  manager, and I suggest that you -- that you connect with
5  her.
6          So that was the kind of the depth and breadth
7  of the conversation we had.
8      Q.  And I apologize, but I missed some of that
9  because my screen froze.  Would it be possible to have
10 the reporter read out the answer?
11         (Record read.)
12 BY MR. TARTAGLIO:
13     Q.  How did this conversation with Ms. Sandhu come
14 about?
15     A.  I believe she approached me, Tony, on -- you
16 know, I spoke to John.  Interested about the GM, the
17 engineering resources being part of, you know, one team.
18 He suggested, you know, it would have to be within the
19 context of being on your team, so I wanted to understand
20 that better.  So that's my recollection was she
21 approached me to -- you know, to discuss how this
22 structure could work.
23     Q.  How did Ms. Sandhu respond to the possibility
24 of her moving to your organization?
25     A.  I think she was just absorbing it.  You know,

Page 91

1  at the time, I didn't really know her well, so I could
2  tell she was just thinking about it.  And you could see
3  she was probably maybe processing the pros and cons of
4  it and what that would mean to her.
5          So I kind of felt like she was in a little bit
6  more of a fact-finding mode, and, you know, trying to
7  get some information and consider whether that's
8  something she wanted to do or not.
9      Q.  Did she tell you whether she would be open to
10 moving to your organization or not?
11     A.  She said she was, you know, thinking about it,
12 going to consider it.
13     Q.  And I think we've been talking about just one
14 discussion the last few minutes; is that correct?
15     A.  Yes.
16     Q.  Were there any other discussions you had with
17 Ms. Sandhu about the possibility of her coming into your
18 organization?
19     A.  I think there were a couple, Tony.  I think --
20 I don't know -- two or three conversations that we had,
21 you know, around it.  And, again, all around, you know,
22 structure, you know, segregation of responsibilities how
23 it would work.  You know, all of that, and -- but I
24 think in the end, you know, she opted to.  I don't think
25 she was, you know, wanted to -- I kind of feel like she

Page 92

1  didn't want to move into the business unit.  You know,
2  the thought of not reporting directly to the CEO, in my
3  instincts, was kind of the bigger issue.  But she, you
4  know -- it eventually just kind of died; it just didn't
5  go anywhere.
6      Q.  Did Ms. Sandhu say something to you about
7  reporting to the CEO, whether that was important to her?
8      A.  No.  She didn't.  That was just my just
9  impression.
10     Q.  And what led you to form that impression?
11     A.  Well, just, you know, the -- sometimes when
12 you're, the, you know, kind of assistant to the CEO and
13 you're involved in all the CEO matters, I didn't -- my
14 instincts were she didn't want to, you know, give that
15 up.  You know, that this would have been a -- you know,
16 a different role and a different focus.  She didn't, I
17 don't think, blatantly say anything about it.  It was
18 just more my read on it.
19     Q.  You mentioned a -- well, strike that.
20         You mentioned that Ms. Sandhu could potentially
21 talk with one of your former coworkers about what it was
22 like to work with you; is that right?
23     A.  Correct.
24     Q.  What was her name?
25     A.  Shailaja Shankar, S-H-A-N-K-A-R.

Page 93

1      Q.  Since leaving McAfee, have you stayed in touch
2  with Ms. Shankar?
3      A.  Yes, I have.
4      Q.  Do you consider yourself to be a friend of
5  Ms. Shankar's?
6      A.  Yeah, colleague and, you know, we grew to have
7  a friendly relationship.
8      Q.  These days, about how often would you say you
9  communicate with Ms. Shankar?
10     A.  Usually we communicate around the holidays, so
11 I would say, you know, two, three times, usually through
12 text:  Happy holidays; hope you're doing well.
13 Sometimes she would send me:  Hey, I met somebody from
14 our old days; I was thinking of you.  So I would say two
15 or three kind of touch-base communications per year,
16 sounds about right.
17     Q.  Did you ever tell Ms. Sandhu that she should be
18 nice to you because you have a large network?
19     A.  No.
20     Q.  Did you ever say anything to Ms. Sandhu along
21 those lines?
22     A.  No.
23     Q.  So Ms. Sandhu is accusing you in her complaint
24 of telling her that, allegedly, you told her she should
25 be nice to you because he has a big network.  What would



Page 94

1  be your response to that allegation?
2      A.  I would say it's a silly allegation.  It's
3  something I would never say -- ever.
4      Q.  And why was it silly?
5      A.  Who says that?  Literally, Tony, who says that?
6          You better be nice to me, or I'm going to put
7  my network against you.
8          It's something I would never say.
9      Q.  Did you ever tell John Chen that it was -- that
10 there was something offensive about the way Ms. Sandhu
11 tried to organize meetings with you?
12     A.  Can you say that again?  I'm not sure.  What do
13 you mean organize -- something offensive with the way
14 she tried to organize meetings with me?
15     Q.  I'll ask it a little broader.  Did you ever
16 tell John Chen that there was something offensive about
17 the way Ms. Sandhu treated you?
18     A.  I can't recall.  I can't recall -- I could
19 certainly, you know, see myself making comments around
20 how -- you know, her and her team, how difficult it is
21 to collaborate with it.  But I can't think of a time
22 where I would say she mistreated me, or that I would go
23 with a complaint that she was mistreating me.  I can't
24 think of it.
25     Q.  Did you ever talk with John Chen about Neelam's

Page 95

1  potentially leaving the company?
2      A.  No.
3      Q.  Did you ever speak with Richard Lynch about
4  Neelam's potentially leaving the company, so before she
5  left?
6      A.  No.
7      Q.  Did you ever speak with Richard Lynch about
8  Neelam's leaving the company after she left?
9          MR. LAVOIE:  Objection.  Vague; potentially
10 leaving after she had actually left?
11 BY MR. TARTAGLIO:
12     Q.  I'll reformulate the question.
13         After Ms. Sandhu left the company, did you talk
14 with Richard Lynch about her departure?
15     A.  I only would have talked to him about it in the
16 context of, you know, transitioning the corporate
17 marketing team into the business units as part of his
18 strategy.
19     Q.  Have you ever spoken -- and so I'll put a time
20 frame now.  So before you learned that Ms. Sandhu had
21 been terminated or was leaving the company, so before
22 then, did you ever hear any discussions about
23 Ms. Sandhu's potentially leaving the company?
24     A.  No.
25     Q.  Before this lawsuit was filed, did you ever

Page 96

1  speak with anyone about why Ms. Sandhu left the company?
2      A.  Before this lawsuit was filed, did I ever speak
3  to -- say it again, Tony?  I'm sorry.
4      Q.  Before this lawsuit was filed, did you ever
5  speak with anyone within the company about why
6  Ms. Sandhu left the company?
7      A.  Yeah, I don't think that's -- that's something
8  I spent my time on.  You know, Dick Lynch came in as
9  acting CEO and made a decisive decision to split the
10 company into two business units and thin out the
11 corporate layer.  And by thinning out the corporate
12 layer, there was a number of functions and a number of
13 people that left the company.
14         So, literally, he announced that and executed
15 on it.  And the only context I -- once Neelam left, it
16 was all about, you know, how do we transition, you know,
17 the work and the team into this new structure?
18         So that's the only conversation that -- we
19 wouldn't have had, why did Neelam left?  Or she left
20 because of this.
21         Now, Dick made the decision to split into two
22 companies to reduce the size of the corporate
23 infrastructure, and, you know, we were executing on
24 those decisions.  So, no, we were not talking why she
25 left.

Page 97

1      Q.  So did -- beyond just general discussions of
2  corporate restructuring, did Mr. Lynch ever discuss with
3  you why you decided to terminate Ms. Sandhu?
4      A.  He mentioned that -- he mentioned that he -- he
5  informed me of his decision of splitting the company
6  into two business units and reducing the corporate
7  infrastructure layer.  And so he informed me that he was
8  doing that, and as he got further along into that, he
9  informed me that, you know, be ready to take on the
10 marketing functions because, you know, we're going to be
11 thinning out the marketing group, and Neelam will be
12 leaving.  So he did communicate that as part, you know,
13 of his whole master plan and strategy.
14     Q.  Can you recall anything else Mr. Lynch told you
15 about why he decided to terminate Ms. Sandhu?
16     A.  No.
17     Q.  Do you know whether -- well, strike that.





Page 98

Page 99

Page 100

21 company, was that part of a larger -- well, did that
22 happen at the same time as a larger layoff within the
23 company?
24          MR. LAVOIE:  Object to the form of the
25 question; vague.

Page 101

1          You can answer if you think you understand it.
2          THE WITNESS:  Yeah, that -- I would say, Tony,
3 that was -- just to give you some color, we went from
4 3,000 employees -- more than that -- at that point in
5 time to 17 -- now, we're about 1,700 employees.
6          So that -- that complete restructuring as a
7 company happened in phases.  Dick set in motion Phase 1
8 by kind of thinning out some of those top layers, and
9 then, you know, when I was inevitably was appointed CEO,
10 I carried out that strategy, and we ended up doing Phase
11 2, Phase 3, Phase 4 of other, you know, restructuring to
12 the point now where we, you know, basically halved the
13 size of the company.
14          So I think it started as a Phase 1 with Dick
15 kicking it off with his strategy.  Then I kind of
16 carried it forward, you know, after I, you know, moved
17 into the role and executed on that over the last 18
18 months.
19 BY MR. TARTAGLIO:
20     Q.  And I'll ask a little bit more specifically,
21 which is that a little bit after you became CEO, there
22 was a round of layoffs of around 200 people.  And maybe
23 there were subsequent ones, but do you remember doing a
24 round of layoffs of about 200 people after becoming CEO?
25     A.  Yeah, that sounds about right.  We did multiple

1  layoffs of -- so, like I said, we went from over 3,000
2  employees to 1,700 employees.  Now, granted, 400, almost
3  500 of those employees of that reduction, came from when
4  we divested our Cylance business.
5       We sold that business off to another company.
6  400-plus people actually went with the company -- with
7  the new company.  So that was the big tranche of
8  activity.  But the others were kind of phased, forced
9  reductions as we did the restructuring.
10      Q.  And are you able to estimate about how much
11 time elapsed between your becoming CEO and the first
12 wave of layoffs that was instituted?
13      A.  Yeah, I became CEO middle of December, I guess.
14 Somewhere in December; I forget the exact date, when we
15 started, you know, a series of reductions probably in
16 February and then more in April and then more again in
17 July and August.  So, yeah, there was a series of
18 different phases.
19      Q.  Did the first round of layoffs that you
20 instituted, did it happen approximately three months
21 after you became CEO?
22      A.  Three months or less, Tony.  Could have been
23 somewhere in February or end of January, but somewhere
24 in that January, February, March time frame.
25      Q.  Was Neelam Sandhu part of that first round of

1  layoffs that you instituted?
2       MR. LAVOIE:  Object to the form of the
3  question.  Vague and ambiguous.
4       THE WITNESS:  No, she wasn't part of any of my
5  actions.  That was something that Dick did in his first
6  phase of reductions when he was acting CEO.
7  BY MR. TARTAGLIO:
8       Q.  Approximately how long was Mr. Lynch interim
9  CEO?
10      A.  Approximately 30 days.
11      Q.  At the time that Ms. Sandhu was fired, she was
12 chief marketing officer and may have held some other
13 titles; is that correct?
14      A.  I believe so.
15      Q.  Do you think it's unusual for an interim CEO,
16 who is on the job only about a month, to fire someone at
17 the level of chief marketing officer?
18      MR. LAVOIE:  Object to the form of the
19 question; incomplete hypothetical.
20      But you can answer.
21      THE WITNESS:  Not in the case of Dick Lynch.
22 If you know anything about Dick Lynch, he is, you know,
23 an iconic executive, one of the highest ranking
24 executives at Verizon for many, many years.
25      So he was on the board, and I think at the

1  board, the way the board was run, the board didn't have
2  as much influence on decision-making that happened in
3  the company.  So I kind of feel like when Dick moved
4  into the chair of acting CEO, he wanted to put his
5  thumbprint on changes that he thinks -- thought were
6  appropriate for the company.  So it doesn't surprise me
7  at all that he moved as swiftly and decisively as he did
8  around the changes that he made.
9  BY MR. TARTAGLIO:
10      Q.  Did you hear any discussions -- or I guess I
11 should say, were there any communications that you're
12 aware of about terminating Ms. Sandhu before you became
13 CEO?
14      MR. LAVOIE:  Object to the form of the
15 question; vague; lacks foundation; calls for
16 speculation.
17 BY MR. TARTAGLIO:
18      Q.  And I'll be more specific.  Do you recall
19 seeing or hearing any communications about having the
20 timing work out such that Ms. Sandhu would be fired
21 before you became CEO?
22      A.  No, that was never -- never discussed with me.
23      Q.  Sometimes when a position within a company
24 becomes redundant, the employee is offered another spot
25 within the company.  Does that happen sometimes?

1       A.  Yeah, sometimes depending on the position and
2  the scope.
3       Q.  Do you know one way or another whether, after
4  Ms. Sandhu's position was eliminated, she was offered
5  some other position within the company?
6       A.  No, I'm not aware --
7       Q.  Do you think it's unusual -- sorry.  Could
8  you -- I was talking.  Could you repeat that last part?
9       A.  No, I was not aware, Tony, if she was offered
10 anything else.
11      Q.  Do you think it's unusual that -- someone who
12 had been with the company for over a decade and had
13 risen to the ranks to become chief marketing officer, do
14 you think it was unusual she would not be offered any
15 sort of alternative position within the company upon
16 being terminated?
17      MR. LAVOIE:  Object to the form of the
18 question; vague; calls for speculation; lacks
19 foundation.
20      You can answer if you understand it.
21      THE WITNESS:  I'm sorry, Tony.  Can you say it
22 again?
23 BY MR. TARTAGLIO:
24      Q.  Do you think it's strange that -- even though
25 Ms. Sandhu had worked for the company for over a decade





Page 106

1  and reached the ranks of chief marketing officer, do you
2  think it was strange that she was fired without being
3  offered a replacement job?
4        MR. LAVOIE:  Objection; lacks foundation; calls
5  for speculation.
6        But you can answer.
7        THE WITNESS:  No, I don't think it's strange.
8  I think that happens all the time.

Page 107

1  BY MR. TARTAGLIO:

21        THE WITNESS:  Sorry, Tony.  I don't know.
22  BY MR. TARTAGLIO:
23     Q.  Before this lawsuit happened, did you ever hear
24  any oral discussions or see any written discussions
25  about whether Ms. Sandhu's personality was a factor in

Page 108

1  her termination?
2     A.  No.
3     Q.  Did Mr. Lynch ever tell that you Ms. Sandhu's
4  personality was one reason why she was terminated?
5     A.  I don't recall him -- Dick's, you know, a
6  person of few words:  This is what I'm doing; this is
7  what's happening; get ready, you gotta implement it.  He
8  didn't go into details about decisions that he made.
9     Q.  Did you ever discuss with Mr. Lynch the reasons
10  why Ms. Sandhu -- well, strike that.
11        Did you ever discuss with Mr. Lynch whether
12  Ms. Sandhu had been offered some sort of alternative
13  position within the company?
14     A.  No.
15     Q.  Did Mr. Lynch ever tell you why he decided not
16  to offer Ms. Sandhu an alternative position within the
17  company?
18     A.  No, he did not.
19     Q.  So do you know one way or the other -- well,
20  strike that.
21        Did you -- have you ever been told whether
22  Ms. Sandhu's personality -- and let me rephrase that.
23        So before this lawsuit started, had anyone ever
24  discussed with you whether Ms. Sandhu's personality was
25  one reason why she was terminated and not given a

Page 109

1  replacement position?
2     A.  No.
3     Q.  Before this lawsuit was filed, did you ever
4  come to learn that Ms. Sandhu had complained about an
5  organization chart that had been sent around that had
6  her reporting to you?
7     A.  Yes, I did become aware of that org chart that
8  was created by somebody, you know, lower level in the
9  organization.
10     Q.  And before this lawsuit -- well, strike that.
11        So at the time you learned about this issue,
12  did you know it was Ms. Sandhu who complained about it?
13     A.  I'm not sure.  I'm not sure if it I knew it was
14  Ms. Sandhu directly.  I remember I was approached by
15  Nita, our head of HR, who came to me, you know,
16  notifying me that this org chart went out, and that we
17  need to have it corrected.  Apparently it got corrected
18  in short order.
19        But I kind of recall my first engagement on it
20  was Nita.  But, honestly, I don't remember.  There could
21  be an email from -- there could be an email from Neelam
22  as well on it, but I do know I was in touch -- in
23  contact with the two of them on it.  I'm not sure which
24  one came first.
25     Q.  What, if anything, did you do to investigate

Page 110

1  whether an org chart had been sent out that had
2  improperly had Ms. Sandhu as a report of yours?
3      A.  Yeah.  I reached out to our -- the leader of
4  our -- apparently this was something that happened in
5  our European business division.  And so I reached out to
6  the leader, and there was a little bit of delay in
7  getting in touch with him because he was on holiday at
8  the time.  And then I was informed that, you know, it
9  was corrected.
10     Q.  What, if anything, did you do to try to prevent
11 a similar incident from happening again?
12     A.  Yeah, it's -- it's -- you know, it's something
13 you keep your radar, you keep your antennas up and you
14 look out for it, you know, again.  It's not something
15 that happens often.  It's an innocent mistake by
16 somebody a few layers down into the organization.  It
17 got corrected, and we moved on.  So I didn't feel like
18 we needed to institute a new policy across the
19 organization to prevent this from ever happening again.
20 We dealt with it, and we moved on.
21     Q.  Did you ever communicate with Mr. Lynch about
22 some of the personality conflicts that Ms. Sandhu had at
23 the company?
24     A.  Did I ever communicate with Mr. Lynch -- say it
25 again.  When, before I was CEO or after?  What was the

Page 111

2      Q.  So before Ms. -- well, before you became CEO,
3  did you ever communicate with Mr. Lynch about some of
4  the personality conflicts that Ms. Sandhu had been a
5  part of?
6      A.  I don't know if I would have gotten into that
7  with Mr. Lynch.  When he came in as, you know, CEO, we
8  had a call, and there was a lot of things going on at
9  the time.  You know, we had a project Imperium, we had
10 the Malaysia deal.  You know, November is the closing of
11 the third quarter.  So I remember my dealings and
12 communications with him were not about, you know, any
13 dysfunctional relationships that existed in the company.
14 It was more about business; what's going on in the
15 business.
16     Q.  Before you became CEO, did you ever tell
17 Mr. Lynch that Ms. Sandhu had a reputation for being
18 difficult to work with?
19     A.  I don't believe so.
20     Q.  Before this lawsuit started, do you know
21 whether Ms. Sandhu ever made a complaint about you of
22 not inviting her to meetings that she should have been
23 invited to?
24         MR. LAVOIE:  Sorry, Tony.  I just want to --
25 are you saying before this lawsuit, i.e., at the time

Page 112

1  that they were working at the company together was he
2  aware that she complained that he hadn't invited her to
3  meetings?
4         MR. TARTAGLIO:  That's correct.
5         THE WITNESS:  No, I was not.
6  BY MR. TARTAGLIO:
7      Q.  Before this lawsuit --
8      A.  I was not -- let me embellish my answer a
9  little bit.
10         I was not because I invited her to meetings.  I
11 actually invited her to a lot of meetings, almost all
12 the meetings.
13         There was a short period of time where there
14 was an administrative snafu where my admin didn't have
15 all the right people on the invite list, but once that
16 was corrected, she was systematically invited to all of
17 our staff calls and all of our quarterly business
18 reviews.
19         So I would not have -- actually, I would have
20 been very surprised for her to make a complaint that she
21 wasn't invited to the meetings when she was clearly
22 invited to a long series of meetings during that time.
23     Q.  Did you ever direct one of your staff to stop
24 inviting Ms. Sandhu to a particular meeting?
25     A.  I do recall, maybe like -- maybe a year or

Page 113

1  18 months after, you know, having a series of our staff
2  meetings and our QBR meetings.  I do recall at one point
3  where my admin kind of prompted me to say, you know --
4  you know, I think it's probably around the time it was a
5  new year, so going to send out a new series of invites.
6  And she asked me, Who do you -- you know, who do you
7  want to -- you know, do you want to drop this person
8  off?  Do you want this person to stay on?  And at that
9  point we realized Neelam never attended any of the
10 meetings.  So about a year and a half later, we did end
11 up, you know, dropping her off that invite list.
12     Q.  Do you know whether Ms. Sandhu was notified
13 that she was being dropped from this invite list?
14     A.  I don't know.
15     Q.  Before this lawsuit started, did you ever come
16 to learn that Ms. Sandhu had accused you of leaving her
17 off of emails that should have been sent to her?
18     A.  No, I can't -- can't say I did, Tony.
19     Q.  Did Ms. Sandhu ever confront you about not
20 inviting her to meetings she should have been invited
21 to?
22     A.  Not that I recall.
23     Q.  Did she ever confront you about --
24         MR. LAVOIE:  I think the witness was about to
25 continue that answer it seemed, unless I --



Page 114

1    THE WITNESS: Yeah. Not that I recall.
2        Again, the reason why I don't think this was an
3    issue, I proactively -- just for context, Tony -- when I
4    started with the company in October, you know, I started
5    a staff meeting. Probably happened sometime towards the
6    end of October, you know, when I first kind of got
7    settled in.
8        I found out sometime in December that Neelam
9    was not included on those staff meeting invites, and I
10   approached my new admin at the time and she was like,
11   Oh, I didn't realize. I thought she reported to John
12   Chen. I didn't think she reported to you, so I didn't
13   include her on the invite list. And I wrote to her and
14   said, Please include her -- you know, include Neelam on
15   the invite list.
16       And sometime thereafter, it was maybe
17   December -- so this is maybe 60 days after I started
18   with the company -- Neelam was added to our weekly staff
19   call that we had every Monday for the next year, year
20   and a half. She was also, further, added to our
21   quarterly business review. We would have a QBR, and I
22   wrote to her inviting her to participate in the QBR. To
23   my knowledge, she didn't ever attend one QBR, and to my
24   knowledge, maybe she attended one or two of our staff
25   calls over the course of a year.

Page 115

1    So I was -- it would be shocking to me that she
2    would have made a complaint that she wasn't invited to
3    meetings when, clearly, you know, she was invited to the
4    lion's share, almost all, of our key business process
5    meetings. And I'm sure all of those invites are in the
6    documentation that you have.
7    BY MR. TARTAGLIO:
8        Q. Before this lawsuit was filed, did you come to
9    learn that Ms. Sandhu had accused you of excluding her
10   from customer meetings?
11       A. No.
12       Q. And I'll expand it a little broader now. Did
13   you learn that she had accused one of your direct
14   reports of excluding her from customer meetings?
15       MR. LAVOIE: Object to the form of the
16   question; vague.
17       THE WITNESS: Honestly, I don't recall, Tony.
18   BY MR. TARTAGLIO:
19       Q. Before this lawsuit was filed, did you come to
20   learn that Ms. Sandhu had accused you of taking credit
21   for her work?
22       A. No. Well, I shouldn't say that. Remember that
23   anecdote that I told you before about the investor
24   conference and her sending me a message thereafter
25   inquiring about my reference to the G7 account, that's

Page 116

1    the only instance I -- she didn't overtly accuse me of,
2    You're taking credit for my work, but she was inquiring
3    why did you say the G7? What did you mean by that? I
4    didn't quite -- honestly, I didn't quite understand what
5    she was getting at until later on.
6        So -- but for the most part, no, I was not
7    aware that she was concerned or making complaints about
8    me taking credit for her work.
9        Q. Did -- before this lawsuit was filed, did you
10   ever come to learn that Ms. Sandhu had complained about
11   customer proposals not being sent to the Elite group?
12       A. Yeah. I don't remember the exact example, but
13   I could see that being -- that was always -- honestly,
14   Tony, that was always a two-way complaint. You know, it
15   was the field sales team saying they met with the
16   customer, they spoke about all these things, and they
17   didn't share any of it with me; I'm in the dark talking
18   to my customer.
19       And then you've got the field sales teams that
20   would, you know, take it upon themselves to send out a
21   proposal to the customer and maybe not communicate it
22   with her. So I do think that was part of the -- you
23   know, the dysfunction that existed between the two
24   teams, so I could see that being a kind of a two-way
25   activity.

Page 117

1        Q. Earlier today we talked about an anonymous
2    complaint that was filed against you around the time
3    John Chen announced his resignation. Do you recall
4    that?
5        A. Yes, sir.
6        Q. For my -- so for my next series of questions,
7    we don't have to mention that because we already
8    discussed that one. But other than that Ethicslink
9    complaint we talked about, are you aware of -- before
10   this lawsuit started, did you become aware of anyone
11   else at the company accusing you of sexual harassment?
12       A. No. I was never accused of sexual harassment
13   in any way. Nobody communicated anything to me that
14   there was any complaints in my whole time here.
15       Q. Other than the anonymous complaint that we
16   already talked about, are you aware of anyone else
17   within the company accusing you of sex discrimination?
18       A. No.
19       Q. Other than the -- other than perhaps the
20   Ethicslink complaint that we already talked about, did
21   anyone at BlackBerry ever accuse you of retaliating
22   against you -- let me rephrase that.
23       So this is a retaliation lawsuit. So other
24   than this lawsuit, and other than the anonymous
25   complaint we already talked about, has anyone at



Page 118

1  BlackBerry -- anyone else at BlackBerry ever accused you
2  of retaliation to your knowledge?
3       MR. LAVOIE:  You're talking about distinctly at
4  BlackBerry, meaning someone who was a BlackBerry
5  employee at the same time as John Giamatteo and at the
6  same time as they made the complaint?  Or are you
7  including former employees?
8       MR. TARTAGLIO:  Could be former employees.
9       MR. LAVOIE:  So other than the Ethicslink
10  complaint, is he aware of anyone --
11       **THE WITNESS:  Accusing me of retaliation?**
12  BY MR. TARTAGLIO:
13       Q.  Yes.
14       A.  No, I wasn't aware.
15       Q.  When you were working at McAfee, did anyone
16  accuse you of sexual harassment?
17       **A.  No, sir.**
18       Q.  When you worked at McAfee, did anyone accuse
19  you of sex discrimination?
20       **A.  No, sir.**
21       Q.  When you were at McAfee, did anyone accuse you
22  of retaliating against them because they had made a
23  whistleblower report?
24       **A.  No, sir.**
25       Q.  At any -- at any point previous in your career

Page 119

1  to working at McAfee, has anyone accused you of sexual
2  harassment?
3       **A.  No, sir.**
4       Q.  And before working at McAfee, did anyone accuse
5  you of sex discrimination?
6       **A.  No, sir.**
7       Q.  Before McAfee, had anyone accused you of
8  retaliating against them for making a whistleblowing
9  complaint?
10       **A.  No, sir.**
11       Q.  Did you -- one second here.
12       Did you ever speak with John Chen about
13  Ms. Sandhu's compensation?
14       **A.  No.  No, sir.**
15       Q.  Did you ever speak with Mr. Chen about whether
16  Ms. Sandhu should get a raise?
17       **A.  No.  Never.**
18       Q.  Did you ever --
19       **A.  John is not the type that would ever talk about**
20  **people's compensation of various team members of his**
21  **direct reports.  It's not a conversation that would ever**
22  **be -- that would ever happen.**
23       Q.  Did you ever talk about -- well, talk with --
24  communicate with Mr. Chen about whether Ms. Sandhu's job
25  title should be Chief Elite Customer Officer

Page 120

1  Chief Elite Customer Success Officer?
2       **A.  I don't recall that, Tony.  No.**
3       Q.  Did you ever discuss with Mr. Chen your
4  feelings about whether Ms. Sandhu should have been made
5  chief marketing officer?
6       **A.  No.**
7       Q.  Did you ever tell Mr. Chen that you're upset
8  that Ms. Sandhu had been given the role of chief
9  marketing officer?
10       **A.  No.  Nope, not at all.**
11       Q.  Did you ever discuss with Mr. Chen whether it
12  might create problems if Ms. Sandhu had been given a
13  raise?
14       **A.  No.**
15       Q.  Before this lawsuit was filed, did you ever
16  come to learn that Ms. Sandhu had accused you of not
17  sending her a press release for her review?
18       **A.  I was not -- no.  Was not aware of that until**
19  **after the complaint surfaced.**
20       Q.  When Ms. Sandhu was on a trip in Africa, did
21  you make any comments about her responsiveness?
22       **A.  I don't recall.  I really don't recall, Tony.**
23       Q.  More specifically, when she was on a trip in
24  Africa, did you say that she was not being responsive to
25  checking her emails?

Page 121

1       **A.  I honestly don't recall or remember.**
2       **One thing I will say, you know, even though,**
3  **you know, we got this whole ordeal.  Neelam was, you**
4  **know, pretty responsive; she was pretty on, you know,**
5  **24/7, so I can't see generally that's something I would**
6  **be complaining about.  Maybe I did.  Maybe I needed to**
7  **get some information from her on a particular time, but**
8  **in general she was quite responsive.**
9       **So if I made a comment like that, it must have**
10  **been for whatever, a one-off instance, but I don't**
11  **remember.**
12       Q.  Do you know who Colleen McMillan is?
13       **A.  I do.**
14       Q.  Do you worked with her at BlackBerry?
15       **A.  Yes, we did work --**
16       Q.  Sorry if I cut you off.  You can go ahead and
17  finish that.
18       **A.  That's okay.  Yeah, we worked together at**
19  **BlackBerry.**
20       Q.  Did you ever work with her at another company?
21       **A.  No.**
22       Q.  Generally, how would you describe your
23  experience working with Ms. McMillan:  positive,
24  negative, neutral?
25       **A.  Neutral to positive.**

Page 134

1   her being responsible for sales enablement training, if
2   I'm not mistaken.  I think that's what her
3   responsibilities were at the time.
4        Q.  Do you know whether she ended up leaving the
5   company?
6        A.  Yes, she did.  She -- she voluntarily moved on
7   to another opportunity, to another, I believe, Canadian
8   company.
9        Q.  Were you ever provided an explanation for why
10  she left?
11       A.  I really don't remember the specifics.
12  Vaguely -- you know, she was with the company for a long
13  time, and I think vaguely was, where is my career
14  trajectory?  You know, where can I go from here?  And,
15  you know, I'm not sure I can continue to grow in
16  BlackBerry, so she pursued something outside the
17  company.  I thought those were the general circumstances
18  of her departure.
19       Q.  Do you know whether Ms. Ransom had ever
20  complained about an activity within BlackBerry that she
21  found to be disrespectful to women?
22       A.  No.  Never was aware of that.
23       Q.  Did you ever hear about an incident in which
24  someone within the company was giving a presentation,
25  and in the background there was a picture of women who

Page 135

1   were not fully clothed?
2        A.  No, never heard of that.
3        Q.  Do you know who Mary Slimmon is?
4        A.  No, I'm not familiar with Mary.
5        Q.  If I said that she might have been in HR, does
6   that refresh your recollection at all?
7        A.  I'm not familiar.  It's not somebody I must
8   have worked with on a regular basis.  I don't recall
9   her.
10            MR. TARTAGLIO:  Now is probably a good time to
11  take a lunch break.
12            MR. LAVOIE:  Okay.  Do we want to keep it kind
13  of on the shorter side?  I guess I kind of -- on
14  this one I'd probably defer to John.  I mean, how much
15  time would you prefer to take?  I would say anywhere
16  from 20 minutes on the low end to, you know, 30-40
17  minutes on the high end is kind of customary.
18            THE WITNESS:  Are you guys okay splitting the
19  difference?  30 minutes?
20            MR. LAVOIE:  Yeah, we can do 30 minutes.
21            THE WITNESS:  30 minutes sound all right for
22  you?  Perfect.
23            MR. LAVOIE:  We'll see everyone back here --
24  it's currently 12:40.  We'll see everyone back here at
25  1:10.

Page 136

1            THE VIDEOGRAPHER:  I'll read us off the record.
2   This marks the end of Media Number 2.  We are now going
3   off the record.  The time is 12:40 p.m.
4            (Whereupon a recess was taken.)
5            THE VIDEOGRAPHER:  We are now on the record.
6   The time is 1:14 p.m.  This marks the beginning of Media
7   Number 3 in the deposition of John G. Giamatteo on
8   August 28, 2025.  Please continue.
9   BY MR. TARTAGLIO:
10       Q.  Do you know who ███████ is?
11       A.  ████████.  I believe ██████████
12  ████████████████████
13       Q.  Did you ever come to learn that ████ had
14  made a complaint about ████████████████████
15  ████████████████████
16       A.  I don't -- I don't recall, Tony.  I don't
17  recall it.  ████ -- you know, it's funny you mention
18  ████ because she's on -- this is our end-of-quarter
19  time.  And the last week of the quarter, all of our team
20  gets on a call to talk about all the deals and
21  everything.  ████████████████████████
22  ██████████████  So a little surprising to me that,
23  you know, she -- there was a complaint, or she felt like
24  she was left off something because she, you know, from
25  my perspective, is pretty engaged in the -- in the

Page 137

1   business on a day-to-day business -- day-to-day basis.
2        Q.  When you learned that Ms. Sandhu was going to
3   be terminated from the company, was that before you
4   became the CEO or after?
5        A.  That was after I was notified that the
6   investigation was complete and that they were going to
7   move forward with appointing me as CEO.  But it was
8   before I was announced as CEO, and we still had to
9   negotiate a comp package and all that.  So it was -- I
10  was kind of notified we were going to move forward, but
11  it was before it was actually announced.
12       Q.  When John Chen was CEO, do you know if there
13  was some sort of a succession plan in place to replace
14  him?
15       A.  I do not.
16       Q.  Do you know whether there was a plan to have
17  John Chen be replaced by a particular individual before
18  he left?
19            MR. LAVOIE:  Object to the form of the
20  question; vague; lacks foundation.
21            THE WITNESS:  Honestly, Tony, I wouldn't have
22  been privy to that.  Whatever conversation John Chen
23  would have had with the board around succession planning
24  and who his successor would be, that's not something I
25  was privy to.

Page 138

BY MR. TARTAGLIO:

Q. Were you -- or it could be your attorneys; could be through your attorney. Were you and/or your attorney negotiating with BlackBerry about a CEO agreement while the investigation against you from Morrison Foerster was still pending?

A. No. No. That, I remember because I was asking them about what's the process and the status and shouldn't we talk about the comp plan. And the answer was continually, Let's just wait until we get through the investigation, and when the investigation is complete, then we'll engage with you on a comp, you know, discussion. So that was my understanding of how -- the chronology of it.

Q. Did negotiations of your compensation occur while the Morrison Foerster investigation was still pending?

A. No.

Q. Does BlackBerry make any efforts to provide a welcoming and inclusive workplace for its female employees?

A. Yeah, of course we do. They're -- we try to keep it a welcoming environment for everybody, not just for female employees but for all employees -- all new employees.

Page 139

Q. What, if anything, does BlackBerry to try to provide an inclusive environment for women in particular?

A. I guess I could speak to, Tony, what I've implemented over the course of the last, you know, 18 months where we -- you know, we've implemented a very formal succession-planning process, we've implemented a talent -- you know, high potential talent process as part of that. We -- as part of that, we have a filter on, you know, DEI and, you know, diversity. So we talk about our high potentials and our talent pool, how many of them are women, how many are, you know, people of color, what kind of opportunities can we create for them.

So in my, you know, almost two years with the company, we had an offsite retreat where we talk about these topics, about talent management, about succession planning. And as part of that agenda, is how do we improve upon our overall diversity, you know, metrics, and, you know, improving that as part of what we do as a company.

Q. Some companies, they have an individual within the company whose job is dedicated to diversity and inclusion type efforts. Sometimes officer -- diversity officer, inclusion, chief diversity officer, et cetera.

Page 140

Does BlackBerry have anyone within the company whose job is devoted to diversity and inclusion?

A. No, we don't -- I mean, honestly, you know, we're a 1,700-person company. I don't think we have the luxury of having -- you know, if you're 50,000-person company, 100,000-person company, they probably have the office of diversity and inclusion and they have a staff. I think a company like ours, the more natural place for that is our HR. Jenny Armstrong-Owen is our chief people officer who kind of, you know, leads the charge there. And we as the leadership and the management team lean in with her to implement strategies to improve on our overall diversity initiatives.

Q. Is the primary obstacle to not having a DEI officer a lack of funding?

A. No, I just think it's better placed being part of the leader of the people. Our chief people officer has enough bandwidth to, you know, be responsible for that as an initiative without having to hire somebody dedicated for, you know, a 1,700-person company.

Q. I will represent to you that over the course of the lawsuit, we have found some sex discrimination complaints that were made within the last couple of years against BlackBerry.

Do you know whether BlackBerry has taken any

Page 141

measures to improve some of the conditions that were described in some of these complaints?

MR. LAVOIE: You know, Tony, I don't -- I think the commentary -- like, if you have a complaint, you should put it in front of him. Just saying complaints, do you mean, like, lawsuits? Do you mean that in the term of lawsuits? Do you mean anonymous Ethicslink complaints? Do you mean people making allegations in the context of severance negotiations with the company?

I don't think it's -- if you're going to give a commentary and just, like, assume a factual foundation, I think you're going have be specific. If not, put a document in front of him.

MR. TARTAGLIO: I'm fine with the question as is. And we can have it re-read if you would like that, sir.

MR. LAVOIE: Well, if you're going to stick with the question as is, then I'm going to object to the form of the question; it calls for speculation; it lacks foundation; it's vague and ambiguous. Those are my objections.

BY MR. TARTAGLIO:

Q. Would you like the question re-read out?

A. Yeah, Tony, can you please repeat it or Cambria?



Page 142

1    MR. TARTAGLIO:  Could the court reporter please
2  read that out?
3    (Record read as follows:  Question:  I
4    will represent to you that over the course
5    of the lawsuit, we have found some sex
6    discrimination complaints that were made
7    within the last couple of years against
8    BlackBerry.
9    Do you know whether BlackBerry has taken
10    any measures to improve some of the
11    conditions that were described in some of
12    these complaints?)
13    MR. LAVOIE:  I'll object.  It's vague and
14  ambiguous; object to the form of the question; lacks
15  foundation; calls for speculation.
16    THE WITNESS:  I guess my comment on it, Tony,
17  would be, you know, as a person who, you know, came in
18  as a CEO almost two years ago, what I've tried to do is
19  really, you know, make the company a safe, fun,
20  rewarding place to work, to be at, is tone from the top:
21  Treat everybody with respect, be open and transparent,
22  and kind of really set that tone from my level.
23    It's not, to my knowledge, in my time with the
24  company, since I became CEO, I'm actually not aware --
25  maybe there are -- but I'm not aware of any sex

Page 143

1  discrimination claims that have come on board in the
2  almost two years that I've been with the company.
3    So what I've tried to do specifically is set
4  the right tone, lead from the top, ask my leaders and
5  managers to do the same.  And I think, as a result,
6  going to be honest, we're seeing really good results.
7  We're seeing -- like, we do employee surveys now, we get
8  feedback, and people talk about how they're feeling
9  about the company and how they're treated and the
10  environment.  And those are the things I've tried to do
11  as a new CEO to set a different tone, and I think we're
12  making progress.
13  BY MR. TARTAGLIO:
14    Q.  Do you have regular communications with HR in
15  which you talk about complaints that have been made
16  against the company?
17    MR. LAVOIE:  Object to the form of the
18  question; vague and ambiguous as to the word
19  "complaints."
20    THE WITNESS:  What kind of complaints, Tony,
21  are you referring -- any complaint?  Or what?  A sexual
22  discrimination complaint in particular?
23  BY MR. TARTAGLIO:
24    Q.  Is there a process in place for elevating HR
25  complaints to your attention?

Page 144

1    A.  There is.  There is.
2    Q.  Please describe your understanding of that
3  process.
4    A.  We have our ethics hotline, we have our HR
5  teams that are plugged into all the business units and
6  the operating units.  And, you know, if there are
7  complaints that come up, we have a team that looks at
8  them.  And depending on severity of it, you know, things
9  will -- whether or not it gets, you know, raised to my
10  attention or not.  But I have a standing meeting with
11  our chief people officer every week, and if there are
12  employee complaints that rise to the level of something
13  that should be on my radar on -- you know, on my plate,
14  she would bring it up to me.
15    So those are kind of the different mechanisms
16  that we solicit feedback throughout the organization.
17    Q.  I think you said something to the effect of
18  that BlackBerry has had some good results under your
19  tenure as CEO for -- well, actually, I shouldn't assume
20  that.
21    So do you think BlackBerry has had good results
22  under your tenure of recruiting and retaining female
23  employees?
24    MR. LAVOIE:  Tony, I'm just going to ask:
25  Ms. Sandhu never worked at the company while

Page 145

1  Mr. Giamatteo was CEO.  So I don't understand.  Like,
2  what is the relevance basis for asking about the
3  present-day operations of the company?  It doesn't go to
4  whether Ms. Sandhu was discriminated against, it doesn't
5  go to retaliation, it doesn't go to a failure to prevent
6  harassment or discrimination because none of what you're
7  asking about occurred while Ms. Sandhu was at the
8  company.
9    So, you know, your attorney -- like, your
10  colleague instructed Ms. Sandhu -- improperly by the
11  way -- not to answer questions about her time at
12  Vaughnage.  And so right now what you're doing is you're
13  asking Mr. Giamatteo to talk about things that happened
14  at the company since he's been CEO in this regard,
15  things that couldn't definitionally affected Ms. Sandhu
16  at all.
17    So I don't understand the relevance of this
18  line of inquiry, and given the repeated intent at, you
19  know, proposing any sort of confidentiality over
20  testimony or documents, I have some concern about
21  eliciting testimony about present-day operations of the
22  company that are not relevant to the case and that
23  plaintiff is going to allege, you know, should become
24  public information.  What is the relevance of whatever
25  has happened since he has become CEO?  Ms. Sandhu didn't



Page 166

1      Q. And other than that, the text message
2   communications, which you provided to your lawyers with
3   Mr. Foote, can you recall any other communications with
4   Mr. Foote in which you talked about or communicated
5   about whether it was Ms. Sandhu who had filed a
6   complaint against you?
7      A. No, I can't think of it. Like I said, Tony, it
8   was like, you know, this -- this bomb got dropped at
9   this -- about this ethics complaint that came. We all
10  kind of speculated in the moment where it came from or
11  who it would have come from, et cetera.
12        Again, specifically, I think a lot of times we
13  alluded to Neelam because it was really ironic that
14  24 hours after her finding out from John Chen that he
15  was going to leave and they were going to appoint me,
16  suddenly an ethics complaint came over literally within
17  24 hours of her finding out.
18        So I think at the time we all -- I think it was
19  human nature, we speculated, oh, my gosh is it, you
20  know? But after the bomb got dropped and after we did
21  our 24 hours of speculation, I think very quickly we
22  moved towards, let's do the investigation. We got to,
23  you know, make sure that, you know, we go through that
24  process to, you know, get to the right answer
25     Q. Other than Mr. Foote, do you remember

Page 167

1   specifically any other people who speculated about who
2   had filed that complaint against you?
3      A. No, this was very closely kept. It was not
4   something that was widely talked about. I can't think
5   of other people that I would have engaged with in this.
6      Q. And I ask that because it sounds like after the
7   complaint filed or was submitted, that there was some
8   chatter, gossip about who may have filed it. So are you
9   aware of anyone else speculating about who might have
10  filed it?
11     A. I'm not.
12     Q. Who is Rich Curiale?
13     A. Rich Curiale is an outside attorney that did a
14  lot of work for, you know, John Chen and Nita, worked
15  directly with them at that level.
16     Q. I'll represent to you that at least for one
17  person, Mr. Curiale has given some executive
18  mentoring-type advice that's not strictly legal in
19  nature. Did Mr. Curiale ever give you any sort of
20  mentoring or coaching -- executive mentoring or
21  coaching?
22     A. I don't recall, Tony, honestly. I spoke to him
23  very infrequently. I could see him maybe -- that
24  complaint that we talked about earlier where he called
25  about -- I think it was a complaint that Neelam made

Page 168

1   that we were trying to undermine her role or suggest to
2   people that her role was going to go away, and he did
3   his investigation.
4         And when he called me -- you know, literally
5   very infrequent times that I would talk -- I could see
6   somewhere in the call maybe with him saying, you know,
7   Hang in there; keep your head down; just focus on the
8   business. Don't let any -- you know, kind of just like
9   encouraging, you know, kind of feedback to, you know,
10  don't let this distract you. You know, focus on the
11  business, focus on doing the right thing for the
12  company.
13        I kind of vaguely remember maybe some words of
14  encouragement around that, but it wasn't like, you know,
15  I spoke to Rich Curiale, you know, once a month for
16  career advice and coaching. You know, it was kind of an
17  offhand thing on the back end of a conversation that I
18  had with him on another topic.
19     Q. I'll represent to you that Mr. Curiale did an
20  investigation about some allegations made by Sarah
21  Tatsis, and he wrote a report about that. Have you ever
22  seen that report?
23     A. No, not at all.
24     Q. Has Mr. Curiale -- and this is going up to the
25  present day. Has Mr. Curiale ever spoken with you about

Page 169

1   some ways that BlackBerry could become a more inclusive
2   workplace for women?
3      A. No, not that I recall, Tony.
4      Q. We've spoken about this a little bit, but I
5   want to go into a little more detail about the strategy
6   around the time Mr. Lynch was interim CEO of splitting
7   up the business units within BlackBerry. Okay? And
8   you're nodding your head, so it sounds like you know
9   what I'm talking about.
10        Initially what was the plan for splitting up
11  the business units in that way?
12     MR. LAVOIE: Object to the form of the
13  question; vague. Are you talking project Imperium
14  versus something else? I just think we may not be on
15  the same page.
16  BY MR. TARTAGLIO:
17     Q. Well, do you know what I'm referring to there,
18  Mr. Giamatteo?
19     A. I'm happy to answer, Tony. I just want a
20  little bit of clarity.
21        When Mr. Lynch came in and really implemented,
22  and he started the implementation. Just -- we called it
23  "Project Mustard." Project Mustard was the splitting of
24  the two divisions and creating two, and he would -- you
25  know, we talked about it this way: Two virtually



Page 170

1  autonomous business units that would operate, you know,
2  almost independent of one another with a really thin
3  corporate layer at the top.  Much, much thinner now than
4  it ever was.
5       So that was the strategy that Mr. Lynch came in
6  and articulated and implemented.  So if that's what
7  you're referring to, yeah, I'm familiar with that.
8       MR. TARTAGLIO:  Okay.  And I'll put a document
9  in chat.  This will be Exhibit 2, just to make sure
10  we're all on the same page.
11       (Whereupon, Exhibit 2 was marked for
12       identification.)
13  BY MR. TARTAGLIO:
14       Q.  Let me know when you're able to access this
15  exhibit.
16       A.  Just a second.  Yeah, I've got it in front of
17  me now, Tony.
18       Q.  And I'll share my screen.  It might just make
19  things go faster.
20       So Exhibit 2 appears to be a Form 10-Q;
21  correct?
22       A.  Yep.
23       Q.  And that's something that certain corporations
24  are required to file with the SEC?
25       A.  Correct.

Page 171

1       Q.  I'm going to go now to page -- oh, I guess,
2  just to be for the sake of completeness, are you able to
3  determine when this 10-Q form was filed approximately?
4       A.  I'm looking for a date on it.
5       Q.  Yeah, you can look at your screen because I'm
6  not sure exactly where -- oh, actually.  Okay.
7       Do you see what I'm highlighting?
8       A.  This is November 30, 2023.  So this is -- okay.
9  For the quarterly period ended November 20, 2023.  Got
10  it.
11       Q.  And I'm going to go to page 35 now.  And
12  there's a paragraph here that I'll ask you to read.  Of
13  course, you can read whatever other parts you want, but
14  this is a pretty long document, so take whatever time
15  you need to read this or the surrounding material.
16       MR. LAVOIE:  So I think you might be better off
17  looking at the Zoom because Tony had highlighted the
18  part.  Can you zoom in a little bit, Tony?
19       MR. TARTAGLIO:  Better?
20       THE WITNESS:  Yeah, got it.  Yep, I'm familiar
21  with it.
22       (Sotto voce reading.)
23  BY MR. TARTAGLIO:
24       Q.  There's some discussion here about a subsidiary
25  initial public offering for the Internet of Things

Page 172

1  business.  Do you see that?
2       A.  Yes.
3       Q.  What is a subsidiary initial public offering in
4  this context?
5       A.  Subsidiary IPO in this context is where you --
6  IPO, you sell shares into that division, but the parent
7  company, or BlackBerry, maintains the majority of it.
8       So maybe we would sell 20 percent of it or 30
9  percent of the company, and so we'd IPO 30 percent of
10  the shares and 70 percent of it would maintain -- would
11  stay within BlackBerry's ownership.  That's my
12  understanding of subsidiary IPO.
13       Q.  And I think you used the phrase "Project
14  Mustard."  Is this Project Mustard?
15       A.  No, that's not project -- this is on December
16  11th, the company announced that it has reassessed the
17  strategy and will no longer pursue a sub IPO but intends
18  to pursue a full separation of the IOT and cybersecurity
19  businesses, including the separation and streamlining of
20  the company's centralized corporate functions into --
21  that, from December 11, 2023, onward, that's Project
22  Mustard.
23       Q.  Okay.  So Project Mustard would be, not the sub
24  IPO strategy, but the other strategy you mentioned in
25  this paragraph that was announced on December 11?

Page 173

1       A.  Correct.
2       Q.  And so it appears that at some point between
3  October 4, 2023, and December 11, 2023, there was a
4  pivot and strategy.  Is that accurate?
5       A.  Correct.  Just so you know, that's not
6  something I was a party to.  That was a board discussion
7  that -- during that time from, you know, October 4th up
8  to the decide -- the board decided to pull back.  I
9  wasn't part of the board or privy to any of those
10  discussions.
11       Q.  And according to this SEC report, the company
12  announced the change in strategy on December 11, 2023.
13  So that appears to be the date that it was announced,
14  but do you know if the date was -- or if the decision
15  was made on December 11th versus some earlier date?
16       A.  Yeah, no.  I definitely think the decision to,
17  you know, start the execution and the implementation of
18  that, you know, started when Dick assumed the acting CEO
19  role.  That was certainly something he wanted to have
20  his thumbprint on; he felt strongly about the direction
21  of the company.  So that started in early, you know --
22  early November time frame.  Then, I guess, you know,
23  this was announced as part of the 10-Qs, you know,
24  subsequently.
25       Q.  And do you know approximately -- which date



Page 174

1  between these two dates, presumably, but in any event,
2  do you know which date the strategy pivoted from the sub
3  IPO strategy to the other strategy?
4      A.  I think that date was -- I don't know the exact
5  date.  I do know when Dick was appointed acting CEO,
6  that's when that got verbalized to the leadership team
7  of the direction of the company.
8      Q.  And there's some discussion here about
9  separation and streamlining of the company's centralized
10  corporate functions into business unit specific teams.
11  Did BlackBerry take some efforts to accomplish that
12  objective?
13      A.  Yeah.  Yeah, we did a mammoth amount of work to
14  do that, to split a lot of those corporate functions
15  back into -- honestly, sometimes we split maybe too
16  much.  We got to think about, you know, what's the most
17  efficient thing.
18      But we split a lot of those functions, like the
19  finance team, the HR team, the legal team.  We all got
20  aligned underneath the business units, and there's a
21  very thin layer of finance, HR, and legal at the
22  corporate level.  So that was a big part of that.
23      And the other thing that, you know, that
24  enabled us do, you could see where it says:
25      With a view of establishing each business

Page 175

1      unit in an independently operated profitable and
2      cash-flow positive division.
3      We started reporting last year all the way
4  down to, you know, earnings before interest, you know,
5  complete pro forma P and L for both of those divisions,
6  which is something we never did before.  It was always
7  just at the corporate level.
8      And all the work that we did on separating and
9  centralizing and streamlining the cost structure of the
10  corporate team and embedding it into the business units,
11  all that work manifested itself in having complete
12  end-to-end financials, soup-to-nuts, revenue-to-earnings
13  on each of the business units.
14      And I'll give you little more color because I
15  think it's important.  The reason why we did that is --
16  I think you were asking questions -- some investors
17  were -- they were confused.  Like, how profitable is the
18  QNX business versus how profitable is the secure coms
19  business?  We never reported it that way.  We just
20  reported it as one big BlackBerry.  So by giving them
21  this kind of transparency by division, investors have a
22  more informed view of, you know, what they might want to
23  invest in and how much because they have a clearer view
24  of the health of those two underlying businesses.
25      So I know that's a lot, but, hopefully, that

Page 176

1  gives you some perspective of how, you know, we were
2  thinking about that process.
3      Q.  All right.  And I will make a very poorly drawn
4  visual, but perhaps this will be helpful.
5      MR. LAVOIE:  This is going to be exciting.
6      MR. TARTAGLIO:  Yeah, okay.
7      MR. LAVOIE:  I've never seen this before.
8      MR. TARTAGLIO:  Well, you're in for a treat.
9  Can everyone see this?
10      MR. LAVOIE:  The type is small.
11      MR. TARTAGLIO:  Okay.  Let me make it bigger.
12  This is what happens when you do things on the fly.
13  BY MR. TARTAGLIO:
14      Q.  Okay.  So I have a diagram here, and we have a
15  cyber division, a QNX division and then above them,
16  there's a corporate division.  And this is a
17  simplification because, obviously, there's IP and other
18  things, but it sounds like the goal is to have a cyber
19  division, a QNX, and above it a corporate layer that's
20  thin and streamlined.  Is that basically the gist of it?
21      A.  Yeah, yeah.  I think that's right, Tony.
22      Q.  And so before Mr. Lynch became interim CEO, who
23  is in this corporate layer up here?
24      A.  So inside the corporate layer was -- so you
25  had, you know, Mark Wilson, who was, like, business

Page 177

1  operations.  You had Billy Ho, who was kind of a special
2  advisor to Mr. Chen.  You had HR, finance, and legal;
3  those three functions were -- were part of that
4  organization.  You had the marketing -- the corporate
5  marketing organization was part of that.  And you had --
6  the chief technology team was part of that.  And so
7  those were -- those were -- then you had -- I'm sorry,
8  Tony.  You had the CIO organization was a part of that.
9  Two things:  You had the CIO and the CISO, chief
10  information security officer.  So all of those kind of
11  made up this big corporate entity that we had.





Page 178



22    MR. TARTAGLIO:  I'm going to introduce another
23 exhibit.  And this one will be Exhibit 3.  There's no
24 Bates number, but I will represent to you that I printed
25 this out from the BlackBerry website this week.

Page 179

1          (Whereupon, Exhibit 3 was marked for
2          identification.)
3 BY MR. TARTAGLIO:
4    Q.  Let me know when you're ready to discuss
5 Exhibit 3.
6    A.  Are you sharing it?  Are you displaying it,
7 Tony, or should I be pulling it up separately?
8    Q.  I am not sharing it?
9    A.  I've opened the document.  This is Exhibit 3;
10 right?
11   Q.  Yes.
12   A.  Okay.  I've got that.
13         MR. TARTAGLIO:  Before I forget, I will put my
14 beautiful artwork into the record as Exhibit 4.
15        (Whereupon, Exhibit 4 was marked for
16        identification.)
17 BY MR. TARTAGLIO:
18   Q.  And so Exhibit Number 3 is -- well, what is
19 Exhibit Number 3, if you recognize it?
20   A.  This looks like the leadership profile of --
21 that's on the website.
22   Q.  Does -- do the leadership profiles on Exhibit 3
23 correspond to that thin corporate layer that we
24 discussed in Exhibit 4, the paint drawings?
25   A.  Let me just -- yeah, this looks pretty

Page 180

1 accurate.
2    Q.  And it's straight from the website.  You can go
3 to the website if you'd like.
4         So I'll walk through Exhibit 3 now, and we see
5 at the top is yourself as the chief executive officer;
6 correct?
7    A.  Correct.
8    Q.  And do you make decisions that cover both QNX
9 and the cybersecurity business units?
10   A.  Yes.
11   Q.  And then below you, you have Jennifer
12 Armstrong-Owen, chief people officer; correct?
13   A.  Correct.  She does both, as I articulated
14 earlier, you know, kind of manages the secure
15 communications division.  She's the head of the HR for
16 the secure communication as well as kind of the leader
17 and advisor in that thin corporate layer, so she has
18 kind of, you know, a dual set of responsibilities.
19   Q.  Is there someone else who is in charge of HR
20 for QNX?
21   A.  Yes, there is.
22   Q.  Who is that?
23        THE WITNESS:  Should I say her name?
24        MR. LAVOIE:  Oh, of course.
25        THE WITNESS:  Jen Branhill.

Page 181

1 BY MR. TARTAGLIO:
2    Q.  And we see John -- I'll put this in the chat
3 for our court reporter Dimitropoulos -- apologies to him
4 for the pronunciation.
5    A.  That wasn't too bad, Tony.
6    Q.  His role appears to be senior vice-president
7 and strategy officer?
8    A.  Correct.
9    Q.  What -- what generally does he do for the
10 company, pardon my ignorance?
11   A.  Yeah, exactly that.  He helps on strategy,
12 business development.  If we were to, you know, buy a
13 company or buy a technology or divest.  You know, for
14 instance, John was the leader -- he led the initiative
15 to divest our Cylance division when we sold it in the
16 last year.  So those are the kinds of things that he
17 does for the company.
18   Q.  Does Mr. Dimitropoulos work within one
19 particular business unit, or does he provide advice that
20 touches on the company as a whole?
21   A.  Yeah, company as a whole.
22   Q.  And then we have Mattias Eriksson.  It looks
23 like he's the president of QNX; correct?
24   A.  Correct.
25   Q.  So presumably most of his work involves just



Page 182

1  the QNX division?
2      A.  Yeah.  Yeah, Mattias is solely focused on the
3  QNX division.
4      Q.  And then we have Tim Foote as chief financial
5  officer.  And so does Mr. Foote operate just within a
6  business unit, or does his work encompass all the
7  business units?
8      A.  He does -- Tim does, you know, at the company
9  level -- company level financials as the CFO and he also
10 provides leadership, similar to like Jenny, to the
11 secure communications division as well.  He's the senior
12 finance leader for that division as well.
13     Q.  Does QNX have its own senior finance division
14 leader?
15     A.  Yes.
16     Q.  Who is that person?
17     A.  Ken Murphy.
18     Q.  And then we have Jesse Harold.  I'll spell that
19 for the court reporter.  And Mr. Harold's role is senior
20 vice-president chief information officer and chief
21 information security officer; correct?
22     A.  Correct.
23     Q.  And does Mr. Harold focuses his work on just
24 one business unit, or does his work encompass all of
25 them?

Page 183

1      A.  His work encompasses all of them.
2      Q.  And then near the bottom, we have Mr. Kurtz,
3  who is chief legal officer and corporate secretary;
4  correct?
5      A.  Correct.
6      Q.  And is his work limited to one particular
7  business unit, or does he provide more company-wide
8  services?
9      A.  He's corporate and corporate secretary, so he's
10 at that thin corporate layer.
11     MR. TARTAGLIO:  Okay.  I think now is a good
12 time for a break.
13     THE WITNESS:  Okay.
14     MR. LAVOIE:  Five minutes.
15     MR. TARTAGLIO:  Let's go ahead and go off the
16 record unless people are begging for more corporate
17 roles.
18     THE VIDEOGRAPHER:  This marks the end of Media
19 Number 3.
20     We are now going off the record.  The time is
21 2:31 p.m.
22     (Whereupon a recess was taken.)
23     (Whereupon, Exhibit 5 was marked for
24 identification.)
25     THE VIDEOGRAPHER:  We are now going on the

Page 184

1  record.  The time is 2:26 p.m. this marks the beginning
2  of Media Number 4 in the deposition of John Giamatteo on
3  August 28, 2025.
4  BY MR. TARTAGLIO:
5      Q.  All right.  I put Exhibit 5 into the chat.  I
6  think this will go faster if I share my screen, but
7  you're welcome to review your copy that you have on your
8  computer over there.
9      Let me -- okay.  And so Exhibit 5, do you
10 recognize this document?
11     A.  Yeah, it's not -- yes, I recognize it.
12     Q.  And this is the BlackBerry Code of Business
13 Standards and Principles?
14     A.  Yes.
15     Q.  Okay.  And is this a collection of corporate
16 policies for BlackBerry?
17     A.  Correct.  What's the timing of this one?  Is
18 this something -- a current one that you took off the
19 website, or is this an older one?
20     Q.  Appears to be a little bit older.
21     A.  Yeah, okay.  So I may not be as familiar with
22 it, but okay.
23     Q.  And we're going to page 13 now, and I'm going
24 to -- of course, you can read other parts if you want,
25 but I'm going to highlight the parts that I'm interested

Page 185

1  in, then I'll ask you some questions about them.
2      Do you see I have a paragraph highlighted here
3  about retaliation is not tolerated?
4      A.  Correct; I see it, yep.
5      Q.  Do you agree that retaliating against anyone
6  who makes a good-faith report of suspected unethical or
7  illegal conduct is a violation of the business standards
8  and policy and will not be tolerated by BlackBerry?
9      A.  Yes, I absolutely agree.
10     Q.  Do you think it's important that a corporation
11 not retaliate against good-faith whistleblowers?
12     A.  Yes.  Good-faith whistleblowers, yep.
13     Q.  And you placed some emphasis on the phrase
14 "good-faith" in your answer.  Is that a particular
15 reason for that?
16     A.  No, I was just reiterating your description of
17 it.
18     Q.  Why is important for BlackBerry not to
19 retaliate against good-faith whistleblowers?
20     A.  It protects the company, it protects people,
21 and keeps a professional environment.  So that's, you
22 know, a standard practice with any major corporation,
23 and I'm glad this is something that we abide by as well.
24     Q.  And if we scroll down to page 14, there's a
25 paragraph that -- here that says "confidentiality."  Why



Page 210

1    (Whereupon, Exhibit 14 was marked for
2        identification.)
3 BY MR. TARTAGLIO:
4    Q.  Let me know when you're ready to discuss this
5 one.
6    A.  Yeah, I am familiar with this one, Tony.  Yep.
7    Q.  So sounds like this document helps -- well,
8 sounds like you remember what this document is talking
9 about; correct?
10    A.  Correct.
11    Q.  And is this the same discussion that we had
12 earlier about getting email from Neelam about the
13 presentation you gave where she emailed you afterwards?
14    A.  Correct.
15    Q.  And she's saying:
16        I'm looking to understand which G7
17    government you were referring to.
18        Do you remember which -- well, before I ask
19 that, what does "G7" mean?
20    A.  Top seven governments, G7.  So one of the top
21 global governments around the world.
22    Q.  Do you remember which G7 government was
23 discussed, if it was discussed, at this Analyst Day
24 meeting?
25    A.  Yeah, no.  We did not disclose the name of the

Page 211

1 government.  We just made reference to it as, you know,
2 we expanded our relationship with one of the G7
3 governments.
4    Q.  And did that, in fact, happen that there was a
5 deal with a G7 government that closed?
6    A.  Yes.
7    Q.  And Ms. Sandhu was asking about which
8 government it was; correct?
9    A.  Correct.
10    Q.  Did she ever -- I know we have just this email
11 chain in front of us, but beyond this email chain, did
12 she ever communicate with you about why she was asking
13 about this G7 government deal?
14    A.  Well, I don't know -- I don't recall, Tony, if
15 this email was the extent of it or whether, you know, we
16 had a BBM communication back and forth on it, but I
17 definitely -- you know, I definitely interpreted this as
18 when somebody writes you an email and says:  At the
19 38-minute, 38-second part of your presentation, you
20 mentioned this, you know, I definitely felt she was
21 making some kind of accusation that I didn't understand.
22 So I was a little confused by it.
23    Q.  This email chain concerns a call with
24 investment analysts; correct?
25    A.  This -- not just a call.  This is investor --

Page 212

1 this is an Analyst Day, so we were on stage presenting
2 publicly to hundreds of investors.  We had some people
3 in the room, if I'm not mistaken.  So it was kind of our
4 main investor day presentation.
5    Q.  And when presenting information to investors,
6 it's important that that information be accurate;
7 correct?
8    A.  Correct.
9    Q.  Because if a company releases information to
10 investors that's not accurate, that might cause some
11 problems for the company down the line; correct?
12    A.  Correct.
13    Q.  Did Ms. Sandhu ever tell you -- ever express to
14 you she was trying to confirm that the information
15 provided to investors was accurate?
16    A.  No, she did not.
17    MR. TARTAGLIO:  Let's look now at Exhibit 15.
18 And this is produced at Bates 20049, Exhibit 15.
19    (Whereupon, Exhibit 15 was marked for
20        identification.)
21 BY MR. TARTAGLIO:
22    Q.  Go ahead and read it.  Let me know when you're
23 done.
24    A.  Okay.
25    Q.  Okay.  And this email chain -- well, who is

Page 213

1 Jenifer Vannoni?
2    A.  Yeah, Jen was -- is my assistant.
3    Q.  And you asked Ms. Vannoni to remove Neelam from
4 in invitation; correct?
5    A.  Yeah.  Well, yeah, I was responding to Jen.
6 Jen was, you know, cleaning up our meetings, looking at
7 the schedule, and wanted my input on these four items.
8    Q.  Do you remember what meeting was being referred
9 to here at this meeting that Ms. Sandhu was removed
10 from?
11    A.  I'm pretty sure that would have been the staff
12 call, the weekly staff call, Tony.
13    Q.  And so here in this email, you're asking
14 Ms. Vannoni to remove Ms. Sandhu from the weekly staff
15 call; is that correct?
16    A.  So, yeah.  So this -- so Neelam is on the --
17 was on the staff call invites from December of 2021,
18 and, you know, this now is -- we're into September of
19 2023.  So she was on for that entire period of time, and
20 very few times, if ever -- maybe once or -- maybe two or
21 three times over the course of like, almost, you know, a
22 year and a half or two years.  So I thought, clearly,
23 this is not a meeting that she finds useful or doesn't
24 participate in, so there's no need in continuing to keep
25 her on the invite list.

Page 214

1     Q.  Did you speak -- strike that.

2        Did you communicate with Ms. Sandhu about

3 removing her from the invitation?

4     A.  No.  I don't recall.  I don't recall speaking

5 to her about it.

6     Q.  Do you know whether Ms. Vannoni communicated

7 with Ms. Sandhu about removing her from the invitation?

8     A.  I don't, Tony.

9     MR. TARTAGLIO:  Give me one second here.  We're

10 on 16 now?  Okay.  So this will be 16 -- sorry.  One

11 second.

12        I'll share this.  So this is series of emails

13 that start at page 16949 and go to 16950.

14     (Whereupon, Exhibit 16 was marked for

15        identification.)

16 BY MR. TARTAGLIO:

17     Q.  Go ahead and -- go ahead read this one.

18     A.  Okay.

19     Q.  And so this is an email from yourself to some

20 of the Morrison Foerster lawyers and Phil Kurtz;

21 correct?

22     A.  Correct.

23     Q.  And you -- say here:

24        While we have not made as much progress as I

25        would like during my time at BlackBerry, it

Page 215

1        remains a priority and something I have had

2        success with previously.

3        What were you referring to there?

4     A.  Diversity.

5     Q.  And when you said, We have not made as much

6 progress as I would like during my time at BlackBerry,

7 what were you basing that on?

8     A.  We'd like to have a more diverse workforce and

9 continually improve on our overall diversity on the

10 team.  So that's what I was referring to.  Acknowledging

11 it has been a difficult task because, while we're trying

12 to improve our diversity at the same time we're reducing

13 the staff pretty dramatically.

14        So sometimes that's a hard challenge to make

15 when you're not really looking to hire, we were in

16 cost-cutting mode to, you know, try to get the business

17 in a better place, so I think that made the goal of

18 trying to improve our diversity that much more

19 difficult.

20     Q.  And the last sentence here says:

21        Overall we've reduced over 200 people and 67

22        million of opex.

23        What is opex?

24     A.  That's operating expense, Tony, and this is

25 attributable to the cyber business unit solely.

Page 216

1     Q.  Then you refer to:

2        With more reductions coming in November.

3        What were those more reductions coming in

4 November that you were referring to?

5     A.  Yeah, we were planning for another set of

6 reduction in force activity in November inside the cyber

7 division.

8     Q.  And so this more reductions coming November,

9 that's referring to layoffs within the cyber business

10 unit specifically?

11     A.  Correct.

12     MR. TARTAGLIO:  All right, 17.  And I will also

13 share the screen.  So Exhibit 17 was produced at page

14 16328.

15     (Whereupon, Exhibit 17 was marked for

16        identification.)

17 BY MR. TARTAGLIO:

18     Q.  Let me know when you're done reading this one.

19     A.  Okay.  I'm familiar with this now.

20     Q.  And so here, Mike Daniels is discussing a

21 conversation he had with you; correct?

22     A.  Correct.

23     Q.  Do you know what he means by:  PR would be John

24 Chen retiring?

25     A.  I think he's referring to the -- you know, the

Page 217

1 PR, the press release, the information that we would

2 release to the market, would be that John Chen is

3 retiring and that Dick Lynch is going to be chairman and

4 interim CEO.

5     Q.  And then Mr. Daniels writes:

6        Had to go through a process that would take

7        a bit of time.

8        Do you know what he's referring to there?

9     MR. LAVOIE:  Object.  Objection.  Lacks

10 foundation; calls for speculation.  He didn't write

11 this; didn't receive this.

12 BY MR. TARTAGLIO:

13     Q.  Let me put it this way:  Did Mr. Daniels

14 discuss with you a process that might take a bit of

15 time?

16     A.  Yes, he did.  In light of the ethics complaint

17 that came in, he indicated that we had to go through an

18 investigative process and that was going to take some

19 time.

20     Q.  Sometimes when witnesses see a document, it

21 will refresh their recollection as to something they

22 didn't remember before.  Does viewing this email refresh

23 your recollection as to any other details of this phone

24 call that we did not discuss earlier?

25     A.  No.  No, this is -- this is pretty

Page 250

1  August 12th of last year.

2  　A.  Okay.

3  　Q.  And so these are interrogatories responses that

4  were provided by BlackBerry.  Are you familiar with what

5  an "interrogatory" is?

6  　A.  I think an explanation would be great, Tony, be

7  helpful.

8  　Q.  Sure.  That's a written question in the lawsuit

9  process where a party has to respond in writing and then

10 have those responses verified under oath.  So it's kind

11 of like what we're doing today, but in writing.

12 　A.  Okay.

13 　　MR. LAVOIE:  These are FROG responses that we,

14 BlackBerry, have written and given to you, Tony.  Is

15 that what you're saying?

16 　　MR. TARTAGLIO:  Yes.

17 BY MR. TARTAGLIO:

18 　Q.  Okay.  So let's look at Interrogatory 5.  Do

19 you see this here?

20 　A.  Yes.  State the reason for your decision to

21 terminate plaintiff."

22 　Q.  Yeah, and you can go ahead and read the

23 response silently to yourself.  Let me know when you're

24 ready to discuss this.

25 　A.  Okay.

Page 251

1  　Q.  All right.  So I'm going to ask you about this

2  sentence here where it says:

3  　　As a result, plaintiff's position was

4  　　eliminated, along with those of two other

5  　　executives and more than 500 other employees.

6  　　Do you know who the two other executives are

7  being referred to here?

8  　　MR. LAVOIE:  Objection.  Lacks foundation;

9  calls for speculation.

10 　　THE WITNESS:  Yeah, I don't know, Tony.  This

11 was -- at the time that this -- this was something that

12 was implemented as --- as Mr. Lynch in his acting-CEO

13 role.

14 BY MR. TARTAGLIO:

Page 252

Page 253

10 　Q.  And this response says that:

11 　　Plaintiff's position was eliminated, along

12 　　with those two other executives and more than

13 　　500 other employees.

14 　　Do you know whether it's true that

15 Ms. Sandhu's position was eliminated along with more

16 than 500 other employees'.

17 　A.  I don't know specifically, but it's

18 conceivable, yeah.  I think also in that 500 other

19 employees, a large share of them was the cyber business

20 unit; it wasn't all corporate.  So that was kind of

21 company-wide reductions that were happening at the time.

22 　Q.  But this response says that these 500 hundred

23 other employees were eliminated because they did not fit

24 within either of the two business units here; correct?

25 　　MR. LAVOIE:  Objection.  Argumentative; I



Page 254

1  object to the commentary.  What was the question?
2  BY MR. TARTAGLIO:
3      Q.  Is it accurate Ms. Sandhu's -- strike that.
4          Is it accurate that more than 500 other
5  employees and Ms. Sandhu were terminated in the manner
6  described in this paragraph?
7      A.  I think it's accurate that she was terminated
8  by Mr. Lynch and that we did, at the same time, have a
9  reduction of over 500 employees.  The only thing I'm
10 calling out is, those 500 employees was broader -- I
11 believe it was broader than just the corporate team.
12 There was, I think, a large chunk of them were part of
13 the cybersecurity reductions that were going on at the
14 time as well.
15         MR. TARTAGLIO:  All right.  That's fine.
16 That's all the questions I have.
17         MR. LAVOIE:  Let take a quick break.  I don't
18 know if I'll have questions or not, but let me just
19 gather, and we'll come back in three to five minutes.
20 Something like that.  I know the court reporter needs to
21 get out of here but -- so I'll try to be quick.
22         THE VIDEOGRAPHER:  We're going off the record.
23 The time is 5:14 p.m.
24         (Whereupon a recess was taken.)
25         (Whereupon Exhibit 30 was marked for

Page 255

1      identification.)
2          THE VIDEOGRAPHER:  We are back on the record.
3  The time is 5:22 p.m.
4                    EXAMINATION
5  BY MR. LAVOIE:
6      Q.  Mr. Giamatteo, do you recognize what's
7  displayed here as Exhibit 30?
8      A.  Yes.  This is the letter I received from
9  Morrison Foerster on the conclusions of their
10 investigation.
11     Q.  And what's the date on the letter?
12     A.  November 29, 2023.
13     Q.  You testified earlier today about at some point
14 Dick Lynch informed you that he had decided to thin the
15 corporate layer and to make certain separations,
16 including Ms. Sandhu, ████████████████████
17 and you learned that from Dick at some point; is that
18 correct?
19     A.  Correct.
20     Q.  In relation to this letter that you received
21 from Morrison Foerster on November 29, 2023, what's your
22 best estimate of when Mr. Lynch informed you that he had
23 decided to let go these three executives?
24     A.  It was probably around the same time.  You
25 know, maybe a day or two before or after, but somewhere

Page 256

1  right in this time was when he informed me of the
2  changes he wanted to make.
3      Q.  When Mr. Lynch talked to you about these
4  planned changes, did he say, I've decided to make these
5  three separations or changes?  Or did he say, I'm
6  thinking about making these changes?
7      A.  No.  He was pretty clear that he was decisive
8  and made that decision to make those changes.
9      Q.  And when he told you that he had decided this,
10 did he ask for your input on these decisions?
11     A.  No.  I was definitely being more informed that
12 this was the decision that, you know, he came to and
13 wanted to implement.
14     Q.  Did you volunteer input on these decisions?
15     A.  No, I didn't.
16     Q.  And what was your understanding as the reason
17 that Mr. Lynch was informing you that he had made the
18 decision to part ways with these three executives?
19         MR. TARTAGLIO:  Calls for speculation.
20         THE WITNESS:  He -- I believe he informed me so
21 I can prepare, because when these people were going to
22 leave the organization, we had to transition their teams
23 into these two business units as part of his strategy.
24 So I think it was more to prepare me to get ready to
25 help with the transition of some of those folks.

Page 257

1  BY MR. LAVOIE:
2      Q.  You testified earlier today that until opposing
3  counsel showed you a portion of the law firm's report,
4  that you had never seen the report of the law firm that
5  investigated the Ethicslink complaint against you.  Do I
6  have that right?
7      A.  Correct.
8      Q.  Do you know whether -- just to be clear, have
9  you ever seen a report from the law firm that
10 investigated the Ethicslink complaint that says we
11 interviewed this person, that person, the other person.
12 Here's what they said.  We looked at these documents;
13 this is what they showed.  Have you ever seen a report
14 from the law firm anything like that?
15     A.  No.  The only thing I ever received from the
16 law firm was this letter that we have on display now.
17     Q.  The letter that --
18     A.  The letter of November --
19     Q.  -- the one-page letter --
20     A.  The one-page letter.
21     Q.  Okay.  Informing you that the -- that the
22 allegations were not substantiated, essentially?
23     A.  Correct.
24     Q.  And do you know whether Marjorie Dickman was
25 interviewed as part the law firm's investigation of the

1  Ethicslink complaint?
2       A.  I don't know who exactly they interviewed.  And
3  I don't know that Marjorie was one of them.
4       Q.  Assuming Marjorie Dickman was interviewed, do
5  you have any idea what she told the law firm?
6       MR. TARTAGLIO:  Assumes facts.
7       THE WITNESS:  No.
8  BY MR. LAVOIE:
9       Q.  You testified earlier about certain
10  communications you had with Dick Lynch while he was
11  acting CEO and while the Ethicslink investigation was
12  going on.  Do you recall answering questions about that
13  earlier?
14      A.  Yes, I do.
15      Q.  During any of these conversations that you had
16  with Dick Lynch, while the Ethicslink investigation was
17  going on, did he imply to you that everything is going
18  to be okay?
19      A.  No, not at all.
20      Q.  Did he ever imply that the investigation was
21  just a formality?
22      A.  No --
23      MR. TARTAGLIO:  Leading.
24      THE WITNESS:  -- not at all.
25  ///

1  BY MR. LAVOIE:
2       Q.  Did he ever imply to you that the company was
3  just going through the motions with this investigation?
4       MR. TARTAGLIO:  Leading.
5       THE WITNESS:  No, not at all.
6  BY MR. LAVOIE:
7       Q.  Did he ever imply that the board was going to
8  hire you regardless of what the law firm found?
9       A.  No.
10      Q.  What was your impression as to what would
11  happen -- what was your impression at the time as to
12  what would happen if the results of the investigation
13  had been the opposite?
14      MR. TARTAGLIO:  Incomplete hypothetical.
15      THE WITNESS:  I think at a minimum, I'm sure I
16  wouldn't have been appointed as CEO, and probably I
17  would have been let go from the company.
18  BY MR. LAVOIE:
19      Q.  Have you seen any indication that the decision
20  to separate Ms. Sandhu had something to do with her
21  complaints against you?  Have you seen any indication of
22  that?
23      MR. TARTAGLIO:  Lack of foundation; legal
24  conclusion.
25      THE WITNESS:  No.

1  BY MR. LAVOIE:
2       Q.  Have you seen any indication that Ms. Sandhu's
3  termination had something to do with a belief that she'd
4  made a false complaint or report?  Have you seen any
5  indication that that was a reason for her termination?
6       MR. TARTAGLIO:  Lack of foundation.
7       THE WITNESS:  No indication at all.
8  BY MR. LAVOIE:
9       Q.  Have you seen any indication that Ms. Sandhu's
10  termination had something to do with her race or her
11  gender?
12      MR. TARTAGLIO:  Lack of foundation; compound.
13      THE WITNESS:  No indication at all.
14  BY MR. LAVOIE:
15      Q.  You spoke today or testified about the thinning
16  of this corporate layer.  Do you have any sense, in
17  terms of a head count perspective, how much head count
18  was in that corporate umbrella layer around the time
19  John Chen stepped down in October of 2023 as compared to
20  today?
21      A.  Yeah, I remember when I stepped into the CEO
22  role in the middle of December of 2023, that big
23  corporate kind of infrastructure was over 700 people.
24  And then as we implemented, you know, Mr. Lynch's
25  strategy, which he kind of set in motion and then I

1  carried on when I was appointed CEO, six months later
2  from the time that that 700-person organization got, you
3  know, thinner, down to, you know, 500 people.  And about
4  six months from there, it went down further to about 300
5  people.
6       So over the course of the year, as part of that
7  strategy of creating a thin layer at the corporate
8  level, we went from 700 to 500 to 300 as part of our
9  execution against that strategy.
10      MR. LAVOIE:  That's all I have subject to Tony
11  having more questions.
12      MR. TARTAGLIO:  I don't have any questions.
13      MR. LAVOIE:  Okay.  Before we go off the
14  record, I'm going to provisionally designate the
15  transcript as confidential pursuant to final
16  confidentiality designations being made pursuant to the
17  timing in terms called for by the protective order.
18      THE REPORTER:  Mr. Lavoie, did you need a copy
19  of the transcript?
20      MR. LAVOIE:  Yes, please.
21      THE VIDEOGRAPHER:  Counsel, could you take the
22  screenshare down?
23      MR. LAVOIE:  Oh, yes.
24      THE VIDEOGRAPHER:  We all done?
25      MR. LAVOIE:  From my perspective, yes.

Page 262

1        THE VIDEOGRAPHER:  I will read us off.

2        This concludes today's video-recorded

3  deposition of John Giamatteo.

4        The original media of this deposition will

5  remain in the custody of Talty Court Reporters, Inc.,

6  located in San Jose, California.

7        We are now going off the record.  The time is

8  5:30 p.m.

9        (Whereupon, the deposition of JOHN

10        GIAMATTEO was concluded at 5:30p.m.)

11

12              --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 263

1        REPORTER'S CERTIFICATE

2        I, Cambria Denlinger, California Certified

3  Shorthand Reporter No. 14009, certify;

4  That the foregoing proceedings were taken before me at

5  the time and place therein set forth, at which time the

6  witness declared under penalty of perjury; that the

7  testimony of the witness and all objections made at the

8  time of the examination were recorded stenographically

9  by me and were thereafter transcribed under my direction

10  and supervision; that the foregoing is a full, true and

11  correct transcript of my shorthand notes so taken and of

12  the testimony so given;

13  That before completion of the deposition, review of the

14  transcript ( ) was ( X ) was not requested; ( ) that

15  the witness has failed or refused to approve the

16  transcript.

17  I further certify that I am not financially interested

18  in the action, and I am not a relative or employee of

19  any attorney of the parties, nor of any of the parties.

20  I declare under penalty of perjury under the laws of

21  California that the foregoing is true and correct.

22  Dated this 9th of September, 2025

23

24

25        Cambria L. Denlinger, CSR 14009