# EXHIBIT 31
## REVISED REDACTIONS

```
                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA


NEELAM SANDHU, an individual,

     Plaintiff,
                                    Case No. 24-cv-02002-SK

BLACKBERRY CORPORATION, a
Delaware corporation; and
PHIL KURTZ, an individual,

     Defendants.
_____/
```

**CERTIFIED TRANSCRIPT**

```
              VIDEO CONFERENCE DEPOSITION OF

                        PHIL KURTZ




Date:      July 29, 2025

Time:      9:05 a.m.

Location:  Remote via Zoom




        REPORTED BY:  DEBRA A. WEST, CSR No. 14274
```

Page 42
1    A.   No.
2    Q.   Did you ever speak with John Giamatteo about the
3  difficulties of working with Ms. Sandhu?
4    A.   No.
5    Q.   Can you recall any conversation in which you
6  spoke with Mr. John Giamatteo about working with
7  Ms. Sandhu?
8    A.   No, and I should be clear. Prior to him
9  becoming CEO, I had very limited interactions with
10 John Giamatteo, very limited.
11   Q.   What is your understanding of the elite customer
12 team, what their role was in the company?
13   A.   The -- that team was created to give so-called
14 white glove treatment to a number of our largest
15 accounts, primarily in what was then the cyber security
16 business that we had but also some on the car software
17 business, the IOT business.
18        So the team was to ensure that they were
19 well-served and that we could ensure that they would stay
20 with us and renew or expand their services, that kind of
21 thing.
22   Q.   Did you ever hear about tensions between the
23 elite customer group and other groups within BlackBerry?
24   A.   I did anecdotally. I mean, it's a natural
25 opportunity for tension if you have, you know, a leader

Page 43
1  of the business unit responsible for all sales in that
2  business unit, but then you have a separate team
3  responsible for part of the sales. I mean, if that
4  relationship doesn't work really well, it's an
5  opportunity -- obvious opportunity for friction in my
6  experience as a manager.
7    Q.   And did you hear specifically about any tensions
8  within the elite customer business unit and other
9  business units?
10   A.   Not specifically, no.
11   Q.   Did you hear generally about tensions?
12   A.   Yes, I did.
13   Q.   What sort of things did you hear along those
14 lines?
15        MS. FORSTER: I'll just caution the witness not
16 to reveal any privileged communications in responding.
17        Go ahead.
18        THE WITNESS: Yeah. What I generally heard is
19 that Neelam was very territorial, and she wouldn't work
20 with the leaders of the other businesses to foster those
21 client relationships. And as a result, sometimes clients
22 were left in a state of confusion as to who they should
23 be talking to.
24 BY MR. TARTAGLIO:
25   Q.   Do you recall who you heard that from?

Page 44
1    A.   I don't.
2    Q.   Do you know whether Ms. Sandhu ever accused
3  John Giamatteo of misconduct?
4    A.   At what point in time?
5    Q.   Well, at any point in time.
6         Well, let's say before this lawsuit.
7         Obviously, there's a lot of accusations flying
8  around now, but before this lawsuit --
9    A.   Exactly.
10   Q.   -- did you hear anything?
11   A.   No, I didn't.
12   Q.   Did you ever hear that Ms. Sandhu had accused
13 Ms. John Giamatteo of attempting to marginalize her by
14 distributing an organizational chart that had her moved
15 under him?
16   A.   No, not -- not before this dispute.
17   Q.   Did you hear that Ms. Sandhu had accused
18 Ms. John Giamatteo in other ways of trying to essentially
19 diminish her role and sideline her?
20   A.   No, I didn't know.
21   Q.   Before the lawsuit was filed, had you heard that
22 Ms. Sandhu had accused John Giamatteo of discriminating
23 against her because she's a woman?
24   A.   No.
25   Q.   Before the lawsuit was filed, did you hear that

Page 45
1  Ms. Sandhu had accused John of acting inappropriately
2  with her at a dinner in which she apparently construed
3  him as making improper overtures toward her? Have you
4  heard about any of that before the lawsuit?
5    A.   No.
6    Q.   Within the last five years, has anyone else
7  filed a lawsuit accusing BlackBerry of gender
8  discrimination?
9    A.   No, not to my knowledge.
10   Q.   Was there a -- well, strike that.
11        Had there been women who have threatened to sue
12 BlackBerry within the last five over an alleged gender
13 discrimination?
14   A.   I'm aware of one.
15   Q.   Who was that?
16   A.   Colleen McMillan.
17   Q.   Can you think of any others?
18   A.   Threatened to sue, I'm not certain.
19   Q.   Well, if John Chen was CEO, was there a
20 succession plan in place for after he left?
21   A.   The succession planning was something that the
22 board -- at that level, the board and the CEO kept it to
23 themselves. So even though I attended all the board
24 meetings, that was always something that they managed in
25 camera. And so I believe a plan existed, but I have not

Page 54

1  BY MR. TARTAGLIO:
2  Q.  Did you ever have any discussions with the
3  Morrison Foerster Law Firm about expanding the scope of
4  the investigation to include investigating Ms. Sandhu?
5  A.  No, not about investigating Ms. Sandhu.
6  Q.  Was the Morrison Foerster -- well, strike that.
7  So when BlackBerry hired the Morrison Foerster
8  Law Firm, was the expectation that it would reach its own
9  conclusions about what happened?
10  Yeah, that's my question.  I know I ended it on
11  a weird tone.
12  But was that the expectation?
13  A.  Yes, it was.  They were given free rein to
14  conduct the investigation as they saw fit and
15  appropriate.
16  Q.  Did you ever suggest to the Morrison Foerster
17  Law Firm what kind of results you thought should be
18  reached?
19  A.  No.
20  Q.  Let me know if you agree or disagree with the
21  following proposition:  When hiring an outside
22  investigator, the company hiring the investigator should
23  not suggest the results that the investigator should
24  reach?
25  A.  I agree.

Page 55

1  Q.  And why do you agree with that?
2  A.  What's the point of investigating if you go in
3  with a predetermined outcome or significantly biased.  We
4  want an unbiased, independent report to tell you how
5  things are.
6  Q.  And would you agree that suggesting to the
7  investigator the result that the company would like to
8  see might bias the investigator?
9  A.  It could do that.
10  Q.  And so this John Giamatteo investigation, it
11  began with the complaint over the EthicsLink system; is
12  that right?
13  A.  Yes.
14  Q.  What's your understanding of what -- your
15  understanding of what EthicsLink is?
16  A.  It's a portal where complaints can register
17  complaints.  They can choose to remain anonymous if they
18  want, and so it's managed by a third party, and the
19  complaint can be directed to management and/or the chair
20  of the audit committee.
21  (Court Reporter requests clarification.)
22  THE WITNESS:  I'm sorry.  I'm going fast.  The
23  chair of the audit and risk management committee.
24  BY MR. TARTAGLIO:
25  Q.  Do you know who wrote the EthicsLink complaint?

Page 56

1  A.  I do not.
2  Q.  Have you -- has -- have you ever been involved
3  in any discussions in which people speculated about who
4  may have written the EthicsLink complaint?
5  A.  Yes, there was a natural degree of curiosity
6  about it.
7  Q.  What do you recall of those conversations?
8  A.  People wondering who -- who wrote it.
9  Q.  And do you recall who you discussed that with?
10  A.  The people who were aware of it.  The -- there
11  were three board members who were principally involved
12  and, sort of, overseeing the investigation.  There was
13  the chair of the audit risk management committee, there
14  was the chair of our compensation nomination and
15  governance committee; and the board chair.
16  And they were certainly wondering if anybody
17  knew, you know, who would have had those kinds of
18  thoughts about John Giamatteo.
19  Q.  Do you recall hearing any names suggested as
20  potential complainants?
21  A.  The initial questioning around it went to --
22  well, you know, we looked at -- we looked at the timing
23  of the complaint, because the complaint came in within a
24  couple of days, two days, three days, of John Chen -- of
25  it becoming clear that John Chen was not going to be the

Page 57

1  CEO after November the 3rd, and very few people knew
2  that.
3  And so it seemed like quite an incredible
4  coincidence that within just a matter of just a couple of
5  days of essentially John Chen being out, John Giamatteo
6  being in, that this complaint came in when, you know, to
7  anyone's knowledge, no complaint of that type had ever
8  been made against John Giamatteo in his 30-year career.
9  So the timing of it was very odd, and it got --
10  I was wondering, Well, who was aware of this change in
11  CEO circumstance, and there were very few people.  So
12  there was discussion around that set of people.
13  Q.  And did you draw some sort of inference about
14  the timing of the complaint?
15  A.  It was certainly very suspicious that it came in
16  exactly at that time at other time, not to be clear --
17  not after John Giamatteo's public announcement as CEO,
18  that might have been easier to -- you know, there's a --
19  yeah, there's really nothing more for me to say about
20  that.
21  The timing was very curious because it was so
22  close to when this decision had been made.
23  Q.  Do you think the timing was because someone or
24  some people were trying to prevent John Giamatteo from
25  being CEO?



Page 58

1  A.  That was the hypothesis that some people had.
2  Q.  And did you ever hear any specific names
3  discussed as potential complainants?
4  A.  Well, it was speculated that Neelam might be one
5  of them, because it was believed that she was one of the
6  very few people aware of the fact that Chen was not
7  staying as CEO and that John Giamatteo was coming in.
8      And so in that set of circumstances, you know,
9  as I said before, the only person who really was a
10 supporter of Neelam in the organization was John Chen.
11     And so if she was becoming aware that, her
12 champion, if you will, was no longer going to be at the
13 company, and the CEO was going to be someone with whom
14 there had been friction regarding the lead accounts, that
15 certainly could be a motive for a complaint.
16 Q.  Do you recall any others name being floated?
17 A.  I don't recall.
18 Q.  Was -- was Colleen McMillan ever discussed as a
19 possible complainant?
20 A.  Not that I would -- not in a conversation I was
21 part of.
22 Q.  Do you remember who you spoke with about the
23 possibility that perhaps it was Ms. Sandhu who had filed
24 the EthicsLink complaint?
25 A.  Those directors that I mentioned, when they were

Page 59

1  asking -- they were asking, "Where do you think this
2  complaint could have come from." They asked me if I had
3  any reason to believe that there was validity to the
4  complaint, so in those conversations.
5  Q.  And when you say "directors," members of the
6  board of directors?
7  A.  Yeah, the three folks I mentioned before, the
8  two committee -- excuse me -- the two committee chairs
9  and the board chair.
10 Q.  And what are the names of those three folks?
11 A.  So Lisa Disbrow, that's D-I-S-B-R-O-W,
12 Michael Daniels, and Dick Lynch, or Richard Lynch, but
13 everyone calls him Dick.
14 Q.  And do you recall speaking with anyone else
15 about the possibility that it was Ms. Sandhu who had
16 filed the EthicsLink complaint?
17 A.  Yes, discussed -- so when the existence of the
18 complaint was made known to John Giamatteo, it was
19 discussed with him.  I had a discussion with him too.
20 Q.  And what do you recall of that conversation with
21 John Giamatteo?
22 A.  Nothing specific.  Just musing about where this
23 could have come from.
24 Q.  And do you recall who -- who suggested first
25 that maybe it was Ms. Sandhu?

Page 60

1  A.  I don't recall.
2  Q.  Can you recall anything generally about that
3  conversation besides what we've already discussed?
4  A.  No, just his shock.
5  Q.  "His shock," you said?
6  A.  His shock as being the subject matter of the
7  complaint like that.
8  Q.  And what led you to conclude that he was shocked
9  by the complaint?
10 A.  He said so in as many words.
11 Q.  And can you recall what he said, the words he
12 used?
13 A.  No.
14 Q.  Did you ever discuss with someone from the
15 Morrison Law Firm the possibility that Ms. Sandhu may
16 have been the EthicsLink complainant?
17 A.  No.  I discussed with them the hypothetical
18 regarding what if the complaint was not made in good
19 faith.
20 Q.  What do you recall of that discussion?
21 A.  I asked them because I hadn't been involved in
22 an investigation like this before.  I wanted their
23 understanding of what could be -- what could be part of
24 the investigation.
25     And so the thing I was wondering about was --

Page 61

1  positive to them, in the case where you have an anonymous
2  reporting mechanism and retaliation is prohibited, it
3  invites the possibility of an abusive process.
4      So it creates the possibility that someone could
5  make an invalid claim, make up some facts, bad faith
6  claim, and I wanted to know whether -- whether that
7  changed anything for the investigation.
8      And the answer I received was, no, it doesn't.
9  You conduct the investigation, and it's either
10 substantiated or it's not substantiated.  And if it's not
11 substantiated, why it's not substantiated, really doesn't
12 matter, which I thought was an excellent point.  And so
13 it was -- we didn't discuss it again.
14 Q.  Sitting here today, did you eventually learn to
15 discover who wrote the EthicsLink complaint?
16 A.  I do not know to this day.
17 Q.  How did the EthicsLink complaint delay the
18 process of appointing a new CEO, assuming it did?
19 A.  Oh, yeah, the board was certainly quite
20 concerned.  They did not want to announce the new CEO if
21 it wasn't clear that that CEO had a clean record, so to
22 speak.
23     So they insisted that the investigation be
24 conducted and completed before they made a final decision
25 about whether or not to announce John Giamatteo was the



Page 62

1  new CEO.
2      Q.   Are you aware that Ms. Sandhu was terminated
3  around the same time that the new CEO was announced?
4      A.   Yes.
5      Q.   Was there a connection in the timing between
6  those two events?  In other words, did the timing of one
7  be influenced by the timing of the other?
8      A.   No, I mean, only to say that Dick Lynch was the
9  interim CEO, and he had made the decision to terminate
10 Neelam, that he wanted -- he -- he had made the decision,
11 and he wanted it to be clear that he had made the
12 decision.  He wanted it internally --
13          (Court Reporter requests clarification.)
14          THE WITNESS:  Sorry.  He -- so Dick Lynch was
15 the interim CEO he and wanted it to be clear within the
16 company and outside the company that the decision for
17 Neelam to go was his decision, had been his decision, and
18 happened when he was interim CEO.
19 BY MR. TARTAGLIO:
20     Q.   And that's something that Mr. Lynch explained to
21 you or is that more of, like, an inference you're
22 drawing?
23     A.   Oh, it was just a flat statement.  He didn't
24 really explain it, but he said it    that this is my
25 decision and I want people to know that it's my decision.

Page 63

1      Q.   Did he explain why it was apparently important
2  for the decision to terminate Ms. Sandhu to be seen as
3  his decision?
4      A.   No.
5      Q.   While the Morrison Foerster investigation was
6  ongoing, were there negotiations with Mr. Giamatteo about
7  his role as potential new CEO?
8      A.   There were, because we wanted to be prepared for
9  any outcome.  In an outcome where the report did not --
10 I'll just use, for lack of a better word -- clear
11 Mr. John Giamatteo, the outcome would be that Dick Lynch
12 would have remained as interim chair for some specific
13 period.
14          The outcome where the report found no
15 wrongdoing, we wanted to be prepared to move ahead with
16 Mr. Giamatteo given the holiday schedule that was coming
17 up.  So if you think about the timing, the report was
18 delivered in the wee hours of Thanksgiving Day, so
19 Thanksgiving break.
20          And then we report our quarterly results usually
21 around December 19th, and so the thinking was if the
22 report enabled the board to proceed with Mr. Giamatteo,
23 they wanted to be able to do an announcement, have him
24 install the CEO with a little bit of time before the
25 board meets -- the quarterly board meeting and the

Page 64

1  earnings call so that he could prepare for that.
2          So the only way to achieve that was to negotiate
3  in parallel to the investigation so that that timing
4  could work if things turned out well for Mr. Giamatteo.
5      Q.   And those discussions with Mr. Giamatteo while
6  the investigation was pending, did that include
7  discussions about his compensation or potential
8  compensation as CEO?
9      A.   It did.
10     Q.   What's your understanding -- well, actually,
11 I'll start off, did you make the decision to fire
12 Ms. Sandhu?
13     A.   No.
14     Q.   Okay.  So presumably somebody else did?
15     A.   Yes.
16     Q.   What's your understanding of who made that
17 decision?
18     A.   Dick Lynch.
19     Q.   And what's that understanding based on?
20     A.   He told me he did.
21     Q.   And did Mr. Lynch tell you why he made that
22 decision?
23     A.   Yes.  So when -- when Dick came in as interim
24 CEO and, in fact, even before that, he had a very clear
25 vision for a restructuring of the company where it would

Page 65

1  be essentially divided into two principal operating
2  divisions:  Cyber security and -- and the IOT, what he
3  called "a thin corporate lawyer."
4          And that restructuring would result in changes
5  to many roles in the company, particularly a number of
6  senior roles.  And looking at roles that Neelam occupied
7  and her desire to divide the company and also reduce
8  costs in a very significant way, he realized that -- that
9  her position would no longer exist in the context of that
10 restructuring.
11     Q.   And were there discussions about any other
12 positions being eliminated as a result of this
13 restructuring?
14     A.   There were, yeah.  And also, frankly, in
15 connection with the departure of John Chen, because John
16 had -- had brought in with him and kept with him a number
17 of people that worked with him for a very long period of
18 time, in some cases decades.
19          And it's not unusual when you have a CEO change
20 to try to bring about a certain measure of cultural
21 change.  It's unusual, in my experience, for there to
22 only -- you have change at the CEO level, usually some
23 people around the CEO get changed as well.
24          So I know that was part of Dick's thinking from
25 a corporate culture perspective.



Page 66

[Lines 1-25 redacted]

Page 67

[Lines 1-25 redacted]

Page 68

1  [redacted]
2  [redacted]
3  [redacted]
4  [redacted]
5  BY MR. TARTAGLIO:
6    Q.  And my next question is going to distinguish
7  between deciding to terminate someone -- and maybe they
8  end up resigning before they get terminated -- and also
9  going through with the termination and signing the papers
10 and officially terminating someone.
11       So with that distinction in mind, is it fair to
12 say that the only person that Mr. Lynch actually
13 terminated was Ms. Sandhu?
14   A.  As far as I know.  I'm just trying to think if
15 there was anybody else, but, no, I think that's -- that's
16 correct.
17   Q.  And you discussed -- well, we discussed earlier
18 there was some contemplated reductions of some of the
19 corporate management roles given that the idea was to
20 split company into, kind of, a two essential, you know,
21 units, for lack of a better term, and maybe I'm
22 butchering that, but is that basically the gist of what
23 we were talking about earlier?
24   A.  Yes.
25   Q.  And were there any other positions that were

Page 69

1  eliminated as a result of this corporate restructuring?
2       MS. FORSTER:  Objection.  Vague and ambiguous as
3  to time.
4  BY MR. TARTAGLIO:
5    Q.  Well, let me -- let me say this:  So let's say
6  the first three months that -- the first three months
7  after Ms. Sandhu was terminated, were there any other
8  layoffs or termination decisions to reduce that high
9  level corporate overhead?
10   A.  There were.  I mean there were a lot of
11 structural changes.  I'm not sure I could list them all,
12 not even aware of all of them.  They happened so quickly.
13      Yeah, there were -- there were significant
14 changes really at every level of the company.
15   Q.  Did Mr. Lynch ever say that Neelam's personality
16 was a factor in why she was terminated?
17   A.  No, and I'm not sure that he would have had a
18 view into her personality.  Neelam had very little
19 exposure to the board while John Chen was CEO.  She only
20 made one presentation to the board in her entire time.
21 So they didn't know her.
22   Q.  So is it your understanding that Ms. Sandhu was
23 terminated purely as just kind of a corporate
24 restructuring.  Is that fair to say?
25      MS. FORSTER:  I'll object to that.  It calls for



Page 70

1 speculation.
2         But you can answer.
3         THE WITNESS: That's my understanding.
4 BY MR. TARTAGLIO:
5    Q. And let me phrase it a different way. So from
6 what you heard from Mr. Lynch, Mr. Lynch expressed to you
7 that Neelam, Ms. Sandhu, was terminated as part of a
8 corporate restructuring, and that was the only reason he
9 explained to you; is that right?
10   A. Yes.
11   Q. Okay. We talked about that earlier.
12        Did Mr. Giamatteo ever express to you that he
13 would like to see Ms. Sandhu leave the company?
14   A. No.
15   Q. Did Tim Foote ever express to you that he would
16 like to see Ms. Sandhu leave the company?
17   A. Him and I discussed that the earnings process
18 would be easier without her involvement. And I can't see
19 another way for her not to be involved without her
20 leaving, at least. I'm talking about during the
21 John Chen era. That's when we talked about it, not after
22 that.
23   Q. And other than these discussions about the
24 earnings -- the earnings call process would be easier
25 without Ms. Sandhu, did you have any other discussions

Page 71

1 with Mr. Foote about Ms. Sandhu's parting the company?
2    A. Not that I recall.
3    Q. And I won't ask about your conversations with
4 Phil Kurtz about that, but did you ever speak with
5 Adam Enterkin about the prospect of Ms. Sandhu leaving
6 the company?
7    A. No.
8    Q. And I think this is how it's spelled but --
9    A. Yes.
10   Q. Close enough.
11   A. Yeah, that's how it's spelled.
12   Q. This is --
13   A. For the record, he sent me a chat with
14 Adam Enterkin's his last name --
15   Q. Yeah.
16   A. -- and also Hans Peter-Bauer's name.
17   Q. This is for the benefit of the court reporter to
18 write these down later. Did you ever --
19   A. Oh, I see these two. Okay.
20        (Court Reporter requests clarification.)
21        THE WITNESS: Oh, you see the chat messages
22 also?
23        COURT REPORTER: Yes.
24        THE WITNESS: Okay. That's what I was
25 clarifying.

Page 72

1 BY MR. TARTAGLIO:
2    Q. Did you ever communicate with Hans Peter-Bauer
3 about Ms. Sandhu potentially leaving the company?
4    A. No. Prior to this year, this calendar year, I
5 have never spoken to Hans Peter-Bauer, ever.
6    Q. Did you ever have any communications with the
7 board of directors while the Morrison Foerster
8 investigation was pending about what the results might
9 be?
10        In other words, was there some speculation about
11 thinking that it would end up clearing John Giamatteo?
12   A. No.
13   Q. Are you aware that Ms. Sandhu -- and if it's
14 okay -- it's okay if you learned about this through the
15 lawsuit, but are you aware that Ms. Sandhu made multiple
16 complaints about how she was treated at BlackBerry?
17   A. I became aware of that from the time I got the
18 Morrison Foerster report.
19   Q. And do you know if BlackBerry ever hired an
20 outside -- well, actually, let me rephrase that.
21        Do you know whether Mr. Richard Curiale was ever
22 asked to investigate those complaints?
23   A. Yes, apparently he was.
24   Q. And do you know if any other lawyer or law firm
25 was asked to investigate a complaint made by Ms. Sandhu?

Page 73

1    A. I'm not aware of any.
2    Q. Was there an investigation into a leak of a
3 press release announcing that John Chen was leaving the
4 company?
5    A. I believe there was. That sounds familiar. I
6 recall a leak. I'm just not recalling the details of the
7 investigation. But I believe -- I believe there was a
8 check of emails that occurred.
9    Q. Do you know what the conclusion of that
10 investigation was?
11   A. That there was no source of any leak found.
12   Q. Shortly after Richard Lynch became the interim
13 CEO, he spoke with many people within management, and we
14 have some notes from that.
15        Do you recall that conversation you had with
16 him?
17   A. I had quite a few conversations with him during
18 that period. We talked quite regularly.
19        MR. TARTAGLIO: Okay. I think I'll just go to
20 the exhibits then. So let's go to Exhibit 2.
21        (Exhibit Number 2 is marked.)
22 BY MR. TARTAGLIO:
23   Q. And while you're looking at that, which country
24 do you reside in?
25   A. Canada.



Page 102

1  you say, "There was some part of the complaint that
2  didn't match Neelam," do you recall any specifics about
3  that?
4      A.  One of the things in there was I believe a
5  statement along the lines of, you know, we have been held
6  back or, you know, held back in our career, not been able
7  to achieve our potential, something to that effect, which
8  wouldn't fit Neelam's case, because as I mentioned, she
9  was promoted more rapidly than anyone that I ever knew in
10 the company.  So, no, that -- that one item, that
11 wouldn't have fit.
12     Q.  The next sentence says, "There are solid reasons
13 to believe that she does not want to see John Giamatteo
14 as CEO."
15         What reasons were you thinking of there?
16     A.  Well, first, that underlying friction that I've
17 referred to a couple of times between her Elite sales
18 group and John Giamatteo's group that I was familiar with
19 before this investigation started.
20         And then, you know, by this point in time, I had
21 already gotten information about some of the complaints
22 that she had made regarding John before.
23         So clearly, this was -- Neelam was not someone
24 who had a favorable view of John Giamatteo.  And also, as
25 I mentioned -- well, I'll leave it at that.

Page 103

1      Q.  And the next sentence, the second clause says,
2  "Neelam does not fit the description of anyone described
3  as a victim in the complaint."  It said, kind of, the
4  same thing as what we were talking about earlier of her
5  rising through the ranks, not really matching the
6  description of someone who had been held back.
7      A.  Yes, that's right.
8      Q.  And the next sentence says, "She can only be a
9  fraudulent complainant which negates any right to
10 anonymity in my view."
11         What do you mean by the first half of that
12 sentence:  "She can only be a fraudulent complainant"?
13     A.  So if -- if she was the complainant, then it's
14 not a legitimate complaint because the complaint doesn't
15 match Neelam, not -- it was not saying that if she made a
16 complaint, it would, by definition, be fraudulent.  it
17 was this complaint, if she had made this complaint,
18 that's not her.  That's the first half of that sentence.
19     Q.  And the second half is, "which negates any right
20 to anonymity in my view," and --
21     A.  So this goes back to what I was saying earlier
22 about abuse of process.  You've got -- systems like
23 EthicsLink are designed to encourage whistleblowing which
24 is the raising of legitimate complaints when the power
25 structure might otherwise, you know, put a -- have a

Page 104

1  chilling effect on that.
2          These are designed for incredibly valid and
3  important purposes.  And to me, the thought of someone
4  abusing that process for their own personal gain or to
5  settle the score was so morally offensive that I -- I
6  had a duty to ask this question, because I -- imagining
7  that that might have been done -- this complaint might
8  have been made fraudulently was, to be honest, personally
9  upsetting, not having anything to do with John Giamatteo,
10 or even Blackberry, but, you know, this was -- this was
11 2023, where a couple years further away from "The Me Too
12 Movement" now than -- than we were then.
13         This was a very live issue then, still is today,
14 but even more so at that time.  And the thought that
15 someone might use this kind of a process illegitimately
16 bothered me.  So I wanted to explore this.
17     Q.  And do you know if Mr. Tate ever responded to
18 this email, either with another email or over the phone
19 or --
20     A.  Oh, we spoke -- we did -- we did speak about it.
21 I don't know if he sent any emails about it, but we did
22 speak about it and that -- you know, as I said earlier,
23 he said to me, it doesn't matter if it's unsubstantiated,
24 it's unsubstantiated.  You leave it at that.
25     Q.  Do you remember anything else beyond what you

Page 105

1  just mentioned as part of that conversation?
2      A.  No.  I mean, I chose Eric because he was a
3  national practice leader at a prominent firm in exactly
4  this field and paid him a lot of money to give me advice,
5  and I took it, and it was good advice.
6          So we didn't need to discuss it further, and he
7  got on with his investigation.
8      Q.  Do you think that this -- well, never mind.
9          MR. TARTAGLIO:  Let's go to the next exhibit.
10         This will be Exhibit 12.  And while the witness
11 is reviewing this one, for the record, this starts at
12 16971 and goes to 16974.
13         (Exhibit Number 12 is marked.)
14         THE WITNESS:  Okay.  I've got it open.
15 BY MR. TARTAGLIO:
16     Q.  Let me know when you're ready to discuss this
17 one.
18     A.  Yeah, I just needed to be at the beginning of
19 the thread.  So, yeah, I'm ready.
20     Q.  Who is John Christianson, if you remember?
21     A.  Yeah, he's a senior managing director of
22 FGS Global which is a global communications firm, public
23 relations.
24     Q.  So FGS Global is -- global is the PR firm,
25 essentially?



Page 106

1  A.  Yes.
2  Q.  And in this first paragraph, at the last
3  sentence you say -- well, the last two sentences, I
4  guess, "No mention of John G for now.  Let's take some of
5  the pressure off for now."
6      What were you referring to there by -- by that,
7  that discussion of taking pressure off?
8  A.  We had a sense of -- of direction and nothing
9  needs to -- there's no -- there's no urgency regarding
10 John Giamatteo because the investigation is going to
11 happen.  So we're going to focus our communications
12 elsewhere.
13     MR. TARTAGLIO:  All right.  Let's go to the next
14 one.
15     And remind me what time we should take our
16 break.  I forget.
17     MS. FORSTER:  Around, I think, 12:30 should be
18 when -- I won't know for sure.  There's, like, a window
19 when I have to answer the door.  It should be, I think,
20 around 12:30.
21     MR. TARTAGLIO:  Okay.  I can go to 12:30, then,
22 that's fine with me.
23     MS. FORSTER:  It's really up to Mr. Kurtz.
24     THE WITNESS:  It's fine with me.  I have one
25 minor logistical issue here at my house, but I think

Page 107

1  we're all good.  So let's carry on.
2      MR. TARTAGLIO:  All right.  So Exhibit 13 has --
3  it's one page, Bates Number 1697.
4      (Exhibit Number 13 is marked.)
5      THE WITNESS:  Oh, sorry.  I didn't realize we
6  moved from 12.
7  BY MR. TARTAGLIO:
8  Q.  Yes.  This is a one-page document.  16979 is the
9  page number.
10     And let me know when you're ready to discuss
11 this one.
12 A.  Okay.  Yeah.
13 Q.  And this appears -- well, do you recall what
14 this document is?
15 A.  This appears to be a copy of the response from
16 the EthicsLink complainant.  So the complaint was made,
17 company responded.  This is the response to that company
18 response.
19 Q.  And this response says that the complainant was
20 the collective of about ten women; right?
21 A.  That's what it says.
22 Q.  And obviously, you probably don't know whether
23 that's true or not, but that's -- that's what they
24 purport to say; right?
25 A.  Yes.

Page 108

1  Q.  And this response says that it includes
2  employees from McCaffrey, current and former; correct?
3  A.  Yes, it says that.
4  Q.  And is that a company where John Giamatteo
5  worked at prior to coming to BlackBerry?
6  A.  Yes.
7      MR. TARTAGLIO:  All right.  Let's go to
8  Exhibit 14.  This is a -- well, for the record, this
9  starts -- Exhibit 14 starts at page 19484 and goes all
10 the way to 19495.
11     (Exhibit Number 14 is marked.)
12 BY MR. TARTAGLIO:
13 Q.  And I'm not going to go over every little thing
14 in here, but feel free to read the whole thing if you'd
15 like.
16 A.  Okay.
17 Q.  And if we look at four pages in, this says,
18 "BlackBerry Leak Plan"; right?
19 A.  Yes.
20 Q.  What of the high level was this leak plan?
21 A.  Some scenario planning in case news about the
22 investigation leaked out publicly through one of a
23 variety of means, so we wanted to be able to have the
24 responses ready.
25 Q.  Okay.  And I'm going to go to the first page of

Page 109

1  the document now, which is an email from you to several
2  other people, at the top of the first page.  Do you see
3  that?
4  A.  Yes.
5  Q.  And then the first dash says, "If there is a
6  leak, the first point of contact for immediate inquiry is
7  likely to be Neelam Sandhu from our CEO."  Do you see
8  that?
9  A.  Yes.
10 Q.  You go on to say, (as read):  "She's not aware
11 of this working group and now not want sure to handle the
12 inquiry without referring it us."
13     What was the working group that you were
14 referring to there?
15 A.  The people copied on the email.
16 Q.  And so was this working group to plan for a
17 leak?
18 A.  Yes.
19 Q.  And you -- well, strike that.
20     Was Ms. Sandhu part of the working group?
21 A.  No.
22 Q.  Was she aware of the working group?
23 A.  No.
24 Q.  Was there a particular reason why she was not
25 informed of the working group?



Page 118

1  complaints against Giamatteo that were worth any kind of
2  note was Neelam.  I can't imagine that fact was lost on
3  Morrison Foerster.
4          So she -- there are very valid reasons why she
5  would have stood out as a different witness than others
6  in this matter.
7  BY MR. TARTAGLIO:
8      Q.   There was, in fact, more than one person who
9  made pretty substantial complaints against
10 Mr. John Giamatteo in the interviews; right?
11     A.   Are you asking me whether I agree with that
12 statement?
13     Q.   Yes.
14     A.   I think Neelam's responses were of an entirely
15 different class from other people who were interviewed.
16     Q.   Colleen McMillan had some pretty strong things
17 to say about Mr. John Giamatteo during her interview; is
18 that right?
19          MS. FORSTER:  Argumentative.
20          You can answer.
21          THE WITNESS:  I don't share your opinion.
22 BY MR. TARTAGLIO:
23     Q.   How would you characterize the complaints
24 against Mr. Giamatteo that Ms. McMillan made in her
25 interview?

Page 119

1      A.   The distinction I'm drawing between Neelam's
2  responses and everyone else's was that they were -- it
3  was a litany, great and small, leaving me with the
4  impression of reading it that she couldn't get up in the
5  morning without thinking of a reason to be unhappy with
6  John Giamatteo.
7           And that's how I distinguish her from others in
8  the report.
9      Q.   Would you agree that Ms. McMillan had some
10 pretty negative things to say about Mr. Giamatteo during
11 the interview?
12          MS. FORSTER:  Vague and ambiguous.
13          Go ahead.
14          THE WITNESS:  Perhaps you want to take me
15 through it because I'm -- I don't -- I haven't focused on
16 Colleen McMillan's complaints.
17 BY MR. TARTAGLIO:
18     Q.   Were you -- well, strike that.
19          Do you know why Morrison Foerster asked for
20 prior complaints raised by Neelam against anyone but
21 apparently made no -- well, let me -- let me go back.
22          Do you know whether Morrison Foerster ever
23 investigated all the complaints filed by Colleen McMillan
24 against anyone?
25          MS. FORSTER:  Calls for speculation.

Page 120

1          Go ahead.
2          THE WITNESS:  I don't know whether they
3  investigated this either.  I don't -- I don't have any
4  details beyond what's in the report.
5  BY MR. TARTAGLIO:
6      Q.   Do you know why it is that Morrison Foerster
7  asked for prior complaints raised by Neelam but did not
8  ask for prior complaints raised by Ms. McMillan?
9      A.   I do not.
10         MR. TARTAGLIO:  Let's go to Exhibit 17.
11         (Exhibit Number 17 is marked.)
12 BY MR. TARTAGLIO:
13     Q.   Just to be clear, from that last email, the only
14 person that Morrison Foerster sought the full complaint
15 history for was Ms. Sandhu; right?
16         MS. FORSTER:  Calls for speculation.
17         THE WITNESS:  Within that email, yes.  I don't
18 know what happened beyond that.  As I said, I didn't
19 direct the investigation.  I only know what's in the
20 report.
21 BY MR. TARTAGLIO:
22     Q.   And you, kind of, broke up in that last
23 sentence.  Would you mind repeating that.
24         Could you repeat that last sentence, but there
25 were a few little words I had trouble hearing.

Page 121

1      A.   Can you hear me?
2      Q.   Yes.
3      A.   Okay.  I was getting messages that my -- my
4  audio system had changed.  Okay.  Exhibit 17.
5          MR. TARTAGLIO:  Yeah, and let's see.
6          Ms. West, did you get the last sentence of the
7  witness?
8          No, okay.
9          (Court Reporter clarifies and reads testimony.)
10         THE WITNESS:  I didn't "direct the
11 investigation."  Please clarify that.
12 BY MR. TARTAGLIO:
13     Q.   All right.  So Exhibit 17 is 2 pages.  It starts
14 at 17504 and goes 17505.
15         Let me know when you're ready to discuss this
16 one.
17     A.   Yes, ready.
18     Q.   Okay.  And so there are some communications here
19 between Mr. Lynch and Ms. Sandhu about sending out emails
20 to the company.
21     A.   Yes.
22     Q.   But -- and then there's an email from Mr. Lynch
23 forwarding this email chain apparently.  And there's a
24 redaction here so I don't know if you can answer this.
25 But there's -- is there a non-privileged reason why



Page 122
1  Mr. Lynch forwarded this email chain to you?
2     A.  No.
3         MS. FORSTER:  Objection.  Calls for speculation.
4         THE WITNESS:  No.
5  BY MR. TARTAGLIO:
6     Q.  Did Mr. Lynch forward this to you as part of
7  building a paper trail to prepare to terminate
8  Ms. Sandhu?
9         MS. FORSTER:  Objection.  Calls for speculation.
10        THE WITNESS:  I can't answer that.
11 BY MR. TARTAGLIO:
12    Q.  Because the answer's privileged or just some
13 other reason?
14    A.  I honestly don't know.  I don't know why he
15 forwarded it to me.
16        As I said earlier, he and I were in very regular
17 communication about lots of things.  When you think about
18 the circumstances of a board member becoming interim CEO,
19 it's very natural.  I think, anyone would do this, is to
20 work with the people that you've come to know and trust
21 over the years serving on the board.
22        Dick joined the board at the same time I started
23 supporting it in February of 2012.  And so we've known
24 each other a very long time and had a really good
25 relationship of trust.

Page 123
1  So we were keeping each other up to speed on
2  things that were happening from both of our perspectives,
3  because it was a very chaotic time.  We hadn't had a CEO
4  transition in ten years.
5         Just leaving the investigation out of it, just
6  the ordinary course transitioning from a very centralized
7  power authority in a CEO that was John Chen to an interim
8  CEO is difficult and fraught.  And so he kept me up to
9  speed and I kept him up to speed on a lot of things.
10        MR. TARTAGLIO:  I'm putting Exhibit 18 in the
11 chat.
12        THE WITNESS:  Okay.
13        MR. TARTAGLIO:  This one will be one page from
14 page 20074.  That's it.
15        (Exhibit Number 18 is marked.)
16 BY MR. TARTAGLIO:
17    Q.  Let me know when you're ready to discuss this
18 one.
19    A.  Yeah.
20    Q.  And we've, kind of, already talked about this
21 before a little bit, but this is related to discussions
22 earlier about -- well, let me put it this way:  Is it
23 your opinion that protected activity has to be made in
24 good faith?
25    A.  No.

Page 124
1     Q.  And why do you disagree with that statement?
2     A.  On advice of counsel.  no, it doesn't have to be
3  made in good faith.  Again, my point is, I think it
4  creates an opportunity for an abusive process, but it
5  ultimately doesn't matter.
6         You know, one hopes that reports will only be
7  made in good faith; one wants to encourage people who
8  made reports in good faith.
9         (Court Reporter requests clarification.)
10        THE WITNESS:  Sorry.  Sorry.
11        You want to encourage people to only make good
12 faith complaints, because otherwise, the system collapses
13 and it's not of any value anymore.  But it doesn't
14 matter.  There's no retaliation whether the claim is --
15 the complaint is made in good faith or not.
16 BY MR. TARTAGLIO:
17    Q.  And here in this email, looks like you wanted to
18 add the word "good faith" before the word participant so
19 that it would read:  "You should also rest assured that
20 retaliation or reprisals against good faith participants
21 in investigation will not be tolerated under any
22 circumstances"; right?
23    A.  Well, happily, I'm not aware of any complaints
24 that had been made in bad faith.  But I think it's
25 important not to forget the last part of that sentence:

Page 125
1  "Please let me know your thoughts."
2         So we waived privilege over this.  But this is
3  clearly an example of me seeking the advice of my
4  professional legal counsel which was received and taken
5  and the words were not included.
6     Q.  All right.  Do you think that it is okay to
7  retaliate against someone who makes a complaint in bad
8  faith?
9     A.  I think I just answered that question.
10    Q.  Could you please repeat your answer.
11    A.  No.
12        MR. TARTAGLIO:  Let's go to Exhibit 19.  This
13 goes from pages 20106 to 20107.
14        (Exhibit Number 19 is marked.)
15 BY MR. TARTAGLIO:
16    Q.  All right.  This is 19?
17    A.  Yeah.
18    Q.  Yes.
19    A.  Yeah.  Okay.  I have it.  Okay.  Yeah.
20    Q.  And there's quite a bit of redactions here.  But
21 this appears to be some communications with members of
22 the board of directors, at least the ones except for --
23 well, at least the ones from the bottom of the firsthand
24 (sic) page down.
25    A.  Yes.



Page 126

1  Q.  And then you write to Mr. Lynch, "I can also
2  provide an update on the investigation tomorrow if you'd
3  like."  Do you see that?
4      It's about two-thirds down the first page.
5  A.  Yeah, there it is.  Yep.
6  Q.  Was that an update on the John Giamatteo
7  investigation?
8  A.  Yes.
9  Q.  And then if we look at the next email up,
10 Mr. Lynch says, "But if there's still something out there
11 and Lisa's sort of implied to me that then" -- I think he
12 meant to say "there," -- "might be something, then please
13 advise them accordingly so the board isn't surprised."
14     Do you know what Mr. Lynch was referring to
15 here?
16 A.  I don't.  I don't know what Lisa sort of implied
17 to him.
18 Q.  And it looks like your response is essentially
19 that it's going to take a little more time for things
20 to -- for the process to --
21 A.  Yeah.
22 Q.  -- complete itself?
23 A.  Yes.
24 Q.  And you write, "Mike and I just got some
25 indicative compensation terms from Mercer tonight."

Page 127

1  A.  Yeah.
2  Q.  Who is Mercer?
3  A.  Mercer is a compensation consultant that the
4  board engaged.
5  Q.  And would those compensation terms be regarding
6  potential compensation for John Giamatteo?
7  A.  Yes.
8  Q.  And I know it, kind of, says here but, "An
9  employment agreement also needs to be negotiated in
10 parallel."  Was that happening at this time?
11 A.  It was beginning and --
12 Q.  And that was John Giamatteo.
13     There were compensation negotiations beginning
14 for John Giamatteo in parallel with the investigation;
15 correct?
16 A.  They were starting around this time.  We hadn't
17 started negotiating yet.  We were trying to figure out
18 what we -- the board was trying to figure out what the
19 initial offer would be.
20     MR. TARTAGLIO:  And I forget if we were going to
21 stop at 12:15 or 12:30, but if it's 12:15, now is a good
22 time.
23     MS. FORSTER:  It was 12:30.
24     MR. TARTAGLIO:  Okay.  I should keep going,
25 then.

Page 128

1      Let's go to Exhibit 20.  And this goes from
2  pages 19788 to 19789.
3      (Exhibit Number 20 is marked.)
4  BY MR. TARTAGLIO:
5  Q.  Let me know when you're ready to discuss.
6  A.  Yes.
7  Q.  And some of these texts are the darker color on
8  the right and some of them are the lighter color on the
9  left; correct?
10 A.  Yes.
11 Q.  Do you know who was sending the text messages on
12 the right?
13 A.  The, sort of, fainter gray ones are from me, and
14 the black text is from Dick Lynch.
15 Q.  And so the -- the Dick Lynch ones are those on
16 the right-hand side or the left-hand side?
17 A.  Yeah, the left side.
18     (Intermittent audio and Court Reporter requests
19 clarification.)
20     MR. TARTAGLIO:  And -- I think that's fine.  And
21 now I'm confused.
22 BY MR. TARTAGLIO:
23 Q.  But the text on the right are from yourself;
24 correct?
25 A.  Yes, yes.

Page 129

1  Q.  And did these text messages come from your
2  phone?
3  A.  Yes.
4  Q.  So it appears that you went through some sort of
5  exercise where you searched your phone for text messages
6  that might --
7  A.  Yes.
8  Q.  -- be relevant to the case?
9  A.  I did.
10 Q.  And you wrote, "JJG could use some
11 hand-holding."  What did you mean by that?
12 A.  Yes, you know, John --
13     (Intermittent audio and Court Reporter requests
14 clarification.)
15     MR. TARTAGLIO:  Maybe this is a good time for a
16 lunch break.
17     MS. FORSTER:  Yeah, we can all hear you.
18     Yeah, I think we should just break and come
19 back.
20     MR. TARTAGLIO:  All right.
21     (Court Reporter requests clarification.)
22     MS. FORSTER:  What time do you want to come back
23 and if my things end up slipping we'll deal with it.
24 What time do you want to come back from lunch?
25     MR. TARTAGLIO:  I was thinking 12:45.  We can



Page 150

1  not have standing U.S. employment law counsel.  So we
2  needed -- we needed somebody.
3       MR. TARTAGLIO:  Let's go to Exhibit 26.  This
4  was produced at pages 18688 and 18689.
5       (Exhibit Number 26 is marked.)
6       THE WITNESS:  Yes, I've got it.  I've got it
7  open.  Terrible font, hard to read.  Okay.
8  BY MR. TARTAGLIO:
9   Q.  And are you ready to discuss this one?
10  A.  Yes.
11  Q.  And so this is an email discussing the results
12 of the Morrison Foerster investigation; is that fair to
13 say?
14  A.  Yes.
15  Q.  And up near the top you write, in the email to
16 the board, it would be better to say, Given the findings
17 from the investigation, rather than, "Nothing significant
18 was found in the investigation."
19  A.  Yes.
20  Q.  Why is it that you suggested writing the email
21 that way?
22  A.  Well, I thought the investigation was
23 significant.  I didn't want to suggest that we had this
24 lengthy, costly time-consuming report that produced
25 nothing of significance.

Page 151

1   Q.  And generally -- and I think we have the report
2  in here somewhere in one of the related exhibits.
3       But just generally, what was significant that
4  the report found, do you think?
5   A.  Oh, the greatest item of significance was their
6  conclusion regarding John Giamatteo's conduct.
7   Q.  All right.  Did the -- the Morrison Foerster
8  investigation, notwithstanding the conclusion regarding
9  John Giamatteo, did the investigators find other
10 information suggesting that BlackBerry or that women of
11 BlackBerry faced challenges because they were women?
12      MS. FORSTER:  Vague and ambiguous.
13      THE WITNESS:  Yeah.  I don't know how to answer
14 that question.
15 BY MR. TARTAGLIO:
16  Q.  Did Morrison Foerster make some recommendations
17 to BlackBerry about what BlackBerry could do to improve
18 the culture for women?
19  A.  They made some recommendations, yes, at the end
20 of the report.
21  Q.  And you don't have to remember them all
22 verbatim.  But do you remember the specifics of those or
23 some of those?
24  A.  I remember some of them, yeah.
25  Q.  And what sort of things do you remember?

Page 152

1   A.  They recommended an employee culture survey.
2  They recommended improved dialogue between leaders or
3  maybe it was senior leaders and their reports, like,
4  improving communication.  They recommended having a, kind
5  of, a dedicated DE&I, diversity, equity, and inclusion
6  employee, I believe.  And they recommended, I think,
7  programs for the advancement of women and upwards through
8  the ranks.  That's what comes to mind.
9   Q.  Do you recall whether the survey you alluded to
10 earlier was ever executed?
11  A.  We -- we have done, actually, two interglobal
12 employee surveys since the time of the report.  One was
13 done approximately a year ago, and the second was done
14 quite recently, within the last six-week or so.  So we
15 have done that.  Yeah, I'll stop there.
16  Q.  And is that something that was legally required?
17      Some countries, they require big corporations to
18 engage in such measures.  Do you know if that was legally
19 required or if that was something that BlackBerry did
20 voluntarily?
21  A.  No, it was voluntary, not -- not required.
22  Q.  As for the dialog that you mentioned, do you
23 know whether BlackBerry did try to host some dialog for
24 women to talk about their experience working at
25 BlackBerry?

Page 153

1   A.  It wasn't referring to dialog so much like that,
2  but just more, better communication from the senior
3  leadership team, more transparency and availability to
4  employees.
5       So my recollection is that not every
6  recommendation in the Morrison Foerster report was
7  basically focused on -- on women.  But my recollection on
8  that one was that it was more about greater executive
9  availability and transparency.
10  Q.  And so the dedicated DEI employee, would that be
11 someone like a chief inclusion officer or a chief
12 diversity officer, someone like that?
13  A.  I -- I suspect that's the kind of thing they had
14 in mind in the report.  It's important to remember that
15 immediately after the report we went into this
16 significant period of restructuring and cost cutting,
17 and, you know, unfortunately, we had to let go hundreds
18 of people and in that process, continued in waves
19 throughout the last calendar year.  And then we saw
20 another 400-plus people go early this year when we sold
21 our Cylance business.
22      And so in connection with the initiative that
23 Dick Lynch started to whittle down the corporate layers
24 to something thin, we have been mercilessly attacking our
25 general and administrative expenses and very publicly we



Page 154

1  announced that we've reduced our operating expense run
2  rate by over a hundred million dollars a year, which is
3  very significant for a company that has approximately
4  6 hundred million in revenue.
5       So all of that to say, it's been a time of
6  shrinking and cost-cutting, and a DE&I specified employee
7  is -- can be a good thing to have but it is not conducive
8  to a thin, inexpensive corporate layer.
9       So we haven't adopted that recommendation.
10 There are many others resources in the corporate layer
11 that I wouldn't mind having aside from the DE&I expert.
12 But It's just not the environment for that.
13      Q.   And sometimes I ask short, little foul questions
14 just to try to have snappy little answers.  So to
15 confirm, BlackBerry does not currently have a dedicated
16 DE&I employees; is that correct?
17      A.   We do not.
18      Q.   And I think you mentioned the suggestion to have
19 some sort of program to help women advance through the
20 company.  Do you know if that sort of program ever got
21 implemented?
22      A.   We have -- we have had some.  I don't know if
23 anything new has come along since the time of the report,
24 but we have had some programs, one, to help -- I think we
25 call it "Women in Leadership" to help coach women and how

Page 155

1  they advance.
2       And another that is about communication, to help
3  women communicate effectively, I suppose, in the
4  workplace.  I'm not as familiar with that one.
5       But, you know, again, during this time of
6  massive employee upheaval, it's been difficult to
7  prioritize new programs.  Our HR department alone was cut
8  by at least 40 percent.
9       MR. TARTAGLIO:  Let's go to Exhibit 27, and next
10 would be --
11 BY MR. TARTAGLIO:
12      Q.   Before we talk about Exhibit 27, do you know
13 whether BlackBerry is legally required to disclose the
14 compensation of any of its executives?
15      A.   We are.
16      Q.   How much does John Giamatteo make,
17 approximately?
18      A.   In, like, total comp, base salary?
19      Q.   Well, I guess we can start with base salary and
20 then we can talk about other parts, if there are other
21 parts.
22      A.   I should know this off the top of my head.  His
23 starting salary when he became CEO was either 650 or
24 700,000.  I believe it was increased a little bit at the
25 beginning of this year.  So his base is in the range of

Page 156

1  750,000.
2       Q.   And this is something you can pull up a
3  document, by the way, if you have one close by you.  You
4  don't have to spend, like -- in fact, I don't want you
5  spending half an hour looking, but if you have something
6  you could find in a, like, minute or two that talks about
7  executive compensation, we could use that.
8       A.   I can pull up some information that was in our
9  proxy circular that we filed in May of this year.  That's
10 the public facing document where we're required to
11 disclose named executive officer compensation.
12      Q.   Okay.
13      A.   So one moment while I -- I've got references to
14 John Giamatteo.  This is a little bit backward looking,
15 though, so it doesn't include his most recent.  But I'm
16 going to the Summary Compensation Table, so, yeah.
17      Okay.  So his base salary in 2025 was $700,000.
18      Q.   And now let me see if I can find this.  What --
19 what document are -- are you reading from?
20      A.   It's our Management Proxy Circular from -- I
21 think dated May 2025.  I think it's May the 3rd.
22      Q.   Okay.  And I see from BlackBerry's website
23 there's the ten Q quarterly report from June.  Do you
24 think that would have that --
25      A.   No.

Page 157

1       Q.   -- information?
2       A.   No, no.  It only appears once a year in
3  anticipation of the shareholder meeting where there's a
4  say on pay, the vote on executive compensation.  That's
5  where that appears.
6       Q.   Okay.
7       A.   It's -- it's difficult to quickly flip through
8  it, to be honest.  Compensation disclosures that are
9  required under securities laws are famously complex.  So
10 there isn't one, like, nice neat place unfortunately.  I
11 wish.
12      Q.   Okay.  So his compensation base, is that 700 or
13 750?  Do you remember?
14      A.   It's 700.
15      Q.   And did he have compensation beyond his base
16 compensation?
17      A.   He did.  His target bonus of 100 percent of his
18 base salary and then equity awards from time to time.
19      Q.   So in the given year in, let's say, last year,
20 are you able to estimate about how much John Giamatteo
21 made in total?
22      A.   I'm not trying to be difficult, but the question
23 does not lend itself to an easy answer, because when you
24 say "made," is it -- so for a CEO, almost all CEOs the
25 lion's share of their compensation is equity based.



Page 178

1  bring extra attention to it?
2      A.   No special reason, except that I'm looking at
3  the date here which was the 10th of December, and the
4  next day, if I recall correctly, we were going to
5  announce John Giamatteo as the CEO.  So that was -- that
6  was the focus of messaging at that point.
7      Q.   And you also write, "I also wouldn't have John G
8  do it in his messaging."
9           Were you referring to announcing the departure
10 of Ms. Sandhu?
11     A.   Yeah, yeah.
12     Q.   Why would you not want John Giamatteo to make
13 that announcement?
14     A.   Because it wasn't his decision.
15     Q.   Any other reason?
16     A.   No.
17          MR. TARTAGLIO:  Exhibit 34 does not have a Bates
18 number.
19          (Exhibit Number 34 is marked.)
20 BY MR. TARTAGLIO:
21     Q.   These are interrogatory responses, and I'm not
22 going to ask you -- well, you can read the whole thing.
23 I'm not going to ask you -- well, you can read the whole
24 thing.  I'm not going to ask you about the whole thing.
25 But you can if you'd like.

Page 179

1      A.   Where should we focus?
2      Q.   So I'm going to ask about Number 5 and Number 6?
3      A.   Paragraph No. 5 and 6.
4      Q.   Interrogatory Number 5 and Interrogatory Number
5  6?
6      A.   What page?
7      Q.   It starts on page 10.
8      A.   I see.  Okay.  Okay.  Interrogatory Number 5?
9      Q.   Yes.  So I suggest reading 5 and its response
10 and reading 6 and the response.  And then letting me know
11 when you're done.
12     A.   Okay.  Take a minute.
13          Okay.  I've gone through them.
14     Q.   In response to -- well, Number 5 asks for the
15 reasons why Ms. Sandhu was terminated; correct?
16     A.   Yes.
17     Q.   And the first two paragraphs in the response
18 talk about corporate destruction, essentially.
19          Is that basically what we were talking about
20 earlier?
21     A.   Yes, it is.
22     Q.   And then in the third paragraph, it says that
23 BlackBerry declined to place plaintiff in another role at
24 the company because she displayed a pattern of
25 noncollaborative antagonistic conduct with colleagues.

Page 180

1  And he goes on for a bit.
2           Did Mr. Lynch ever tell you that he was firing
3  plaintiff because of her behavioral issues?
4      A.   He did not discuss all of his thinking on this
5  with me.  I don't think that he did ever discuss that.
6      Q.   The next sentence, among other things says that
7  Plaintiff's performance of those customer accounts was
8  not strong.
9      A.   Yeah.
10     Q.   Do you feel like you have enough knowledge to
11 comment one way or the other about whether that's true?
12     A.   I do.  I mean, so on your previous question you
13 were asking, sort of, what was in his thinking.  I can
14 say he did speak with me about this, these matters.  He
15 did speak with me about my views on what did I think of
16 Neelam and, you know, my -- I did talk to -- my
17 perceptions of her, the way she got along or didn't get
18 along with other employees, and also about her sales
19 performance.
20          But he was already familiar with that sales
21 performance because he was -- he got -- he understood
22 from the quarterly board reports how the business was
23 doing, and oftentimes the elite teams' results were
24 presented separately from the business units.  In
25 particular, as head of her elite section, Neelam had her

Page 181

1  own, very own incentive plan so a cash bonus plan each
2  year that depended on the achievement of certain targets
3  within her business.
4           And these were years when a lot of BlackBerry
5  employees were getting low bonuses because performance
6  wasn't good.  But her groups' performance against her
7  targets was especially low compared to most other groups.
8  So Dick had access to that information through the annual
9  review of bonuses by the board.
10     Q.   Did Mr. Lynch ever tell you that Ms. Sandhu told
11 him that she wanted to be CEO herself?
12     A.   He did tell me that.
13     Q.   And as specifically as possible, what do you
14 recall him saying about that?
15     A.   Oh, just that in one of the earliest -- I think
16 we talked about this before, that when Dick stepped in as
17 interim CEO, he had a series of one-to-one meetings with
18 senior leaders.  And he told me -- I think it might have
19 been in that -- that first meeting that he had with her
20 that she expressed the desire to be the CEO.
21     Q.   And now that we've had a chance to go through
22 this third paragraph, at any point, did Mr. Lynch tell
23 you that he was going to terminate Ms. Sandhu based on
24 one of the reasons articulated in this third paragraph?
25     A.   Yes, he did eventually tell me he was going to



Page 182

1  terminate her, for the -- for the reasons discussed.
2     Q.   Was that after it happened?
3     A.   After what happened?
4     Q.   After the termination.
5     A.   I don't understand.
6     Q.   The reason I'm asking is because earlier today
7  when I asked you, What Mr. Lynch told you about why he
8  fired Ms. Sandhu, you said it was a business
9  restructuring decision.
10    A.   Yes.
11    Q.   And here in this paragraph, we're seeing a lot
12 more reasons beyond that; correct?
13    A.   Oh.  Oh, well, no, this is a different thing.
14 If you look at the beginning, you look at line 12 on this
15 page, these are reasons why we didn't look for another
16 role.
17         So I suppose before, I was -- I was talking
18 about her exiting the roles that she had.  So I view this
19 as kind of a different question.  Okay.  Could she have
20 done another role?  Could we have found her another role?
21 And so these are reasons contributing to that that was
22 not appropriate for her to have another role.
23    Q.   Did Mr. Lynch talk with you specifically about
24 whether Ms. Sandhu could be placed in some other role
25 besides the role she had?

Page 183

1     A.   At what point in time?  I don't -- yeah, I don't
2  recall talking with him about her going into another
3  role, just that he told me at one point that she said
4  that she wanted to be CEO.
5     Q.   And let's look at Number 6 in the response.  Do
6  you see that?
7     A.   Yes.
8     Q.   And here plaintiff asks who was involved in the
9  decision to terminate Ms. Sandhu; right?
10    A.   Sorry.  Say again.  I missed a word.
11    Q.   Here plaintiff is asking who was involved in the
12 decision to --
13    A.   Oh, yeah.
14    Q.   -- terminate Ms. Sandhu; right?
15    A.   Yes.
16    Q.   And the response is Mr. Lynch; correct?
17    A.   Yes.
18    Q.   Was there anyone else involved in the decision
19 to terminate Ms. Sandhu?
20    A.   No.
21    Q.   Were you involved in the decision to terminate
22 Ms. Sandhu?
23    A.   No.
24    Q.   Were any other members of the board of directors
25 involved in the decision to terminate Ms. Sandhu?

Page 184

1          MS. FORSTER:  Calls for speculation.
2          THE WITNESS:  Not to my knowledge.
3  BY MR. TARTAGLIO:
4     Q.   All right.  Did you provide information to
5  Mr. Lynch that went into the decision to terminate
6  Ms. Sandhu?
7          MS. FORSTER:  Calls for speculation.
8          THE WITNESS:  I don't know what facts that went
9  into the decision.
10 BY MR. TARTAGLIO:
11    Q.   Do you think this response here, Number 6, is
12 correct?
13    A.   Yes, I do.
14    Q.   Do you think it's complete?
15    A.   Yes, I do.
16    Q.   Well.  We've seen a lot of emails talking about
17 the decision to terminate Ms. Sandhu that involved
18 several people.
19         Don't you think there were multiple people
20 involved in that decision?
21    A.   I think a good CEO collects a lot of information
22 before making a decision.  That's why they have good
23 people in their employment.  And I think that's what Dick
24 Lynch did.  He hadn't been CEO for very long, even though
25 he had been on the board for a long time.  His day to day

Page 185

1  involvement and his involvement with nonexecutive
2  employees like Neelam was somewhat limited.
3          So when he stepped into the role, he quickly
4  examined the playing field.  Of course he did the logical
5  thing and asked people who had worked with the executive
6  team who he trusted, what they thought.  I mean, anyone
7  would do that.
8          So he took inputs and he took advice, but he
9  made the decision.
10    Q.   Do you know one way or the other whether
11 Ms. Sandhu ever had an opportunity to plead her case, so
12 to speak, or whether the termination decision was just
13 presented to her as a done deal.
14         MS. FORSTER:  Calls for speculation.
15         THE WITNESS:  I don't know all of the exchanges
16 she had with Dick Lynch.
17         MR. TARTAGLIO:  Exhibit 35 does not have a Bates
18 number.  But this is a separation agreement between
19 Marjorie Dickman and BlackBerry.
20         (Exhibit Number 35 is marked.)
21 BY MR. TARTAGLIO:
22    Q.   You can read the whole thing if you want, but
23 I'm not going to ask you about specific provisions other
24 than --
25    A.   That's fine.



**Page 186**

1  Q.  -- the money.
2  A.  Yeah.
3  Q.  But generally, do you know the circumstance --
4      MS. FORSTER:  I'm sorry.  I'm still trying to
5  get the exhibit.  It's taking awhile to load.
6      MR. TARTAGLIO:  Sure.
7      THE WITNESS:  Go ahead.
8      Actually, before we proceed, in a minute, I'm
9  not going to be alone in this room.  So if you bear with
10 me 60 seconds, I can just move into another room with a
11 door, and we can pause for that.
12     MR. TARTAGLIO:  Yeah.  Go ahead.
13     THE WITNESS:  Okay.  Thanks.
14     Can you hear me?
15     MR. TARTAGLIO:  Yes, I can.
16     MS. FORSTER:  Yes.
17     THE WITNESS:  So we're looking at 35?
18 BY MR. TARTAGLIO:
19 Q.  Yes, 35.  And so this is -- I'll just tell
20 you -- I'm sure you know what this is too, but we can
21 save a little time perhaps.
22     So this is the separation agreement between
23 Marjorie Dickman and BlackBerry; correct?
24 A.  Yes.
25 Q.  Do you know why she left the company?

**Page 187**

1  A.  Her position was also eliminated.
2  Q.  [redacted]
3  [redacted]
4  [redacted]
5  [redacted]
6  [redacted]
7      MR. TARTAGLIO:  Yeah, I lost him.
8      MS. FORSTER:  Me too.
9      COURT REPORTER:  Shall we go off the record?
10     MS. FORSTER:  Yes.
11     MR. TARTAGLIO:  Sure.
12     THE VIDEOGRAPHER:  We are now off the record.
13 The time is 2:12 p.m.
14     (A break is taken for technical resolution.)
15     THE VIDEOGRAPHER:  We are now back on the
16 record.  The time is 2:18 p.m.
17 BY MR. TARTAGLIO:
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]

**Page 188**

1  [redacted]
2  [redacted].
3  Q.  [redacted]
4  [redacted]
5  [redacted]
6  [redacted]
7  [redacted]
8  [redacted]
9  [redacted]
10 [redacted]
11 [redacted]
12 [redacted]
13 [redacted].
14 [redacted]
15 [redacted]
16 Q.  [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23     MS. FORSTER:  I'm sorry.  I just realized that I
24 need to caution you not to --
25     THE WITNESS:  Yeah.

**Page 189**

1      MS. FORSTER:  -- reveal privileged
2  communications.
3      THE WITNESS:  You're right.  I was just thinking
4  that too.  Sorry.
5      MS. FORSTER:  Yeah, so to the extent you can
6  respond without disclosing privileged communications, you
7  may answer; otherwise, you're not allowed to disclose
8  privileged stuff.
9      THE WITNESS:  That's right.  This is not under,
10 the waiver.
11     MS. FORSTER:  Correct.
12     THE WITNESS:  Yeah.  No.
13     The answer to that question relates to
14 privileged conversations that I had with John Giamatteo
15 who was the person who decided to terminate Marjorie's
16 employment.
17 BY MR. TARTAGLIO:
18 Q.  [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]



Page 198

```
 1         ERRATA SHEET FOR THE TRANSCRIPT OF:
 2   CASE NAME:  Neelam Sandhu v BlackBerry Corporation,
                 et al.
 3
     CASE NUMBER:  24-cv-02002-SK
 4
     DEPOSITION DATE:  July 29, 2025
 5
     DEPONENT:  Phil Kurtz
 6
 7   PAGE  LINE   NOW READS            SHOULD READ
 8   ____  ____   _____    _____
 9   ____  ____   _____    _____
10   ____  ____   _____    _____
11   ____  ____   _____    _____
12   ____  ____   _____    _____
13   ____  ____   _____    _____
14   ____  ____   _____    _____
15   ____  ____   _____    _____
16   ____  ____   _____    _____
17   ____  ____   _____    _____
18   ____  ____   _____    _____
19   ____  ____   _____    _____
20   ____  ____   _____    _____
21   ____  ____   _____    _____
22   ____  ____   _____    _____
23   ____  ____   _____    _____
24
     _____   _____
25   PHIL KURTZ                   DATE
```

Page 199

```
 1                      CERTIFICATE
 2
 3         I, Debra A. West, Certified Shorthand Reporter,
 4   License Number 14274, in and for the State of California,
 5   do hereby certify that the witness, PHIL KURTZ, herein
 6   was previously duly sworn to testify to the truth, the
 7   whole truth, and nothing but the truth in the case
 8   aforesaid; that the foregoing is a full, true, and
 9   correct transcript of the proceedings at the taking of
10   said deposition, reported to the best of my ability, and
11   transcribed under my direction; that the same was taken
12   on the date aforementioned;
13         ( x ) Reading and signing was requested.
14         (   ) Reading and signing was waived.
15         (   ) Reading and signing was not requested.
16         I further certify that I am not attorney for nor
17   relative of any of said parties nor otherwise
18   interested in the event of said action;
19         IN WITNESS WHEREOF, I have hereunto set my hand
20   and official seal this 15th day of August, 2025.
21
22                         _____
23                         Debra A. West
                           Certified Shorthand Reporter
24                         Certificate No. 14274
25
```

