1
2
3
4
5
6
7

Maria A. Bourn
Anthony Tartaglio
GOMERMAN | BOURN & ASSOCIATES
825 Van Ness Ave, Suite 502
San Francisco, CA 94109
Telephone: (415) 545-8608
Email: maria@gobolaw.com
        tony@gobolaw.com

Attorneys for Plaintiff
NEELAM SANDHU

8

**UNITED STATES DISTRICT COURT**

9

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10
11
12
13
14
15

NEELAM SANDHU, an individual,

　　　　　Plaintiff,

vs.

BLACKBERRY CORPORATION, a
Delaware Corporation,

　　　　　Defendant.

**Case No.: 3:24-cv-02002-SK**

**PLAINTIFF'S ADMINISTRATIVE MOTION TO SEAL; [PROPOSED] ORDER**

*[Filed concurrently with Plaintiff's Opposition to Defendant's Summary Judgment Motion]*

Judge: Hon. Sallie Kim

**NO HEARING REQUESTED**

16
17
18
19
20
21
22
23
24
25
26
27
28

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that, pursuant to Civil Local Rules 7-11 and 79-5, Plaintiff Neelam Sandhu hereby moves to redact her home address from certain documents filed as part of the opposition to Defendant's summary-judgment motion. Blackberry agreed to not oppose this motion.

## **LEGAL STANDARD**

The Ninth Circuit recognizes a "strong presumption in favor of access" to judicial records in civil cases. *Kamakana v. City of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). This presumption serves critical democratic functions—ensuring the public's understanding of the judicial process and of significant public events. *Id.* A party seeking to seal a judicial record bears the burden of overcoming this strong presumption by meeting the "compelling reasons" standard. *Foltz v. State Farm*, 331 F.3d 1122, 1135 (9th Cir. 2003). That is, the party must "articulate compelling reasons supported by specific factual findings" that outweigh the general history of access and the public policies favoring disclosure, such as the "public interest in understanding the judicial process." *Id.*

The Ninth Circuit has made clear that while a "good cause" standard under Rule 26(c) applies to discovery materials generally, a much higher "compelling reasons" standard applies when those same materials are attached to dispositive motions like motions for summary judgment. The Court acknowledged explicitly in *San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1102 (9th Cir. 1999), and later confirmed in *Foltz*, 331 F.3d at 1136, that the strong presumption of access to judicial records applies fully to dispositive pleadings, including motions for summary judgment and related attachments. The Court adopted this principle of disclosure because the resolution of a dispute on the merits, whether by trial or summary judgment, is at the heart of the interest in ensuring the "public's understanding of the judicial process and of significant public events." *Valley Broadcasting Co. v. U.S. Dist. Ct.*, 798 F.2d 1289, 1294 (9th Cir. 1986); *accord Foltz*, 331 F.3d at 1135-36.

## **ARGUMENT**

Plaintiff seeks to redact her home addresses from the following exhibits to her opposition

1

1   to the summary-judgment motion: Plaintiff's Exhibits 1-8 & 21.

2          Compelling reasons are present. Plaintiff's home addresses have no relevance to the case.

3   And an unscrupulous actor might use her home addresses to try to track down where she lives and

4   harass her (or even potentially harm her). Additionally, it is possible that identity thieves will

5   "scrape" the public docket for personal information that can be exploited and/or sold.

6

7   Dated: January 5, 2026                **GOMERMAN | BOURN & ASSOCIATES**

8

9                                        */s/ Anthony Tartaglio*
                                         Maria A. Bourn
10                                       Anthony Tartaglio
                                         Attorney for Plaintiff
11                                       NEELAM SANDHU

12

13                              **[PROPOSED] ORDER**

14         Plaintiff has requested leave to redact her home addresses from certain filings in opposition

15  to Defendant's summary-judgment motion (Plaintiff's exhibit 1-8 & 21). The standard is whether

16  there is a "compelling reason" to allow the exhibits to be redacted. *Kamakana v. City of Honolulu*,

17  447 F.3d 1172, 1178 (9th Cir. 2006). This standard is satisfied here because Plaintiff's home

18  addresses have no conceivable relevance to the case, and publicly revealing Plaintiff's home

19  address information might cause her harassment or annoyance. The request is granted.

20         IT IS SO ORDERED.

21

22  Dated: _____

23

24                        _____

25                                  Hon. Sallie Kim

26

27

28

                                        2

# EXHIBIT 1



11th September 2009

Research In Motion UK Limited
200 Bath Road
Slough
Berkshire
SL1 3XE

t   +44 (0) 1753  667000
f   +44 (0) 1753  669970

www.blackberry.com

Neelam Sandhu



Dear Neelam

On behalf of Research In Motion UK Limited ("RIM Europe"), we are pleased to offer you employment with RIM Europe based on the following terms and conditions:

You will hold the position of **Brand Review Specialist**, reporting to **Justin Hollis – Senior Brand and Marketing Comms Manager**. As discussed, your employment will start on **14th September 2009** however; you will have continuous service from **16th February 2009**. You will be based out of our UK Office in Slough, currently at 200 Bath Road, Slough, Berkshire, SL1 3XE, or (at the Company's absolute discretion) at such other offices as the Company shall establish from time to time and the Company reserves the right to require you to relocate to such other offices on a temporary or permanent basis, in accordance with the needs of the business.

You may be required to visit the Canadian office on an as needed basis and to travel to to other places of business as may reasonably be required from time to time for the proper performance of your duties.

Your annual salary will be **£25,000.00** (twenty-five thousand pounds sterling), payable monthly in arrears.

You may be eligible to participate in RIM's ViP (Variable incentive Pay) Program, an annual incentive program based on both individual and company performance measures.  Please note the ViP is subject to change at the sole discretion of RIM.

You will be entitled to 25 days paid holiday per annum, plus the statutory public holiday entitlement. Additionally, you will be given a maximum of 3 paid holiday days, known as RIM days, during the days between the statutory holidays associated with Christmas and New Year's Day, as RIM Europe is closed during that time.

Your regular hours of work will be 40 hours per week, Monday to Friday, which excludes lunch breaks. However you will be expected to be at work during the core hours of between 10am and 4pm. When necessary, it is expected that you will be available to work such hours as are required to ensure that the duties are completed.  This may require working additional hours without further pay (including weekends) at such locations and times as directed by RIM Europe.

Subject to acceptance by the providers of these benefits, you are eligible for the following:-

Research In Motion UK Limited is a company registered in England and Wales with company registration number 4072422
and with registered offices at Centrum House, 36 Station Road, Egham, Surrey TW20 9LF.
BlackBerry and the BlackBerry logo are trademarks of Research In Motion Limited.

BB13-00000351

- private health and dental insurance for you and your family

- Pension Salary Sacrifice with the company contributing a maximum of 8% of base salary providing employee contributes a minimum of 3% of base salary

- life insurance to the value of four times your basic annual salary

- long term disability at 66.66% of basic annual salary less Single Person's State Incapacity Benefit, subject to the qualifying conditions of the scheme

- £200 towards the cost of health club fees at a facility of your choice, payable via payroll

- Childcare Vouchers

- Season Ticket Loan

- Subsidy of European Language Course

Details of these benefits and the process of enrolment will be given to you upon joining the company.

Research in Motion (UK) Ltd has an obligation to ensure that employment is offered in accordance with legal requirements and only to those who are legally entitled to work in the UK in a manner consistent with Sections 15-25 of the Immigration, Asylum and Nationality Act 2006 ("the Act"). Therefore, before employment commences, the Company must see and check the original and retain a copy of each of the documents evidencing your legal ability to work in the UK, as outlined in the Act.

In the event that you should require work permits and or visas the Company will use reasonable endeavours to procure this for you. This will usually involve certain costs for the Company including legal advice and assistance. As such, in the event that you decline the job offer after you have indicated your formal acceptance (verbally or in writing) or if you resign during the probationary period, or 6 months after obtaining your work permit or visa the Company reserves the right to recover from you any costs (including legal fees and expenses) incurred by the Company with regards to the work permit application process and by signing this letter you agree to be responsible for these costs in those circumstances. You will be required to reimburse the Company by direct payment immediately upon request and/or by deduction from your final salary payment, whichever method is applicable in the circumstances. In the event that your entitlement to work in the UK should cease or change in any way, it is your responsibility to advise the Company immediately.

We ask that you confirm your acceptance of this offer by signing all of the above-referenced documents and returning them to **Ian Kudzinowski - Recruitment Coordinator** as soon as possible.

We are confident that you will find your employment both personally and professionally rewarding. We look forward, with enthusiasm, to your confirmation.


Yours sincerely

**Elizabeth Roe Pfeifer**
Vice President, Organisational Development
Research In Motion UK Limited

BB13-00000353

This Agreement ("Agreement") is made on 11th September 2009 between

(1)   **Research In Motion UK Limited** (4022422), an English company with its registered office at Centrum House, 36 Station Road, Egham Surrey, (the "Company" or "RIM Europe"); and

(2)   **Neelam Sandhu**, 54 St. Pauls Avenue, Slough, SL2 5ES, ("you" and the "Employee").

Whereas the Employer wishes to employ the Employee and the Employee wishes to accept such employment, now therefore the parties agree:

## 1.    Job Title

You will hold the position of **Brand Review Specialist**, reporting to **Justin Hollis – Senior Brand and Marketing Comms Manager**.

## 2.    Commencement of Employment

Your employment will commence on **14th September 2009** however; you will have continuous service from **16th February 2009**.

## 3.    Hours of Work

Your regular hours of work will be 40 hours per week, Monday to Friday, which excludes lunch breaks. However you will be expected to be at work during the core hours of between 10am and 4pm.

You shall work such other or additional hours (including weekends and bank holidays) as are reasonably required by the Company or are necessary in order for you to properly carry out your duties from time to time. You will not be paid for any overtime worked in accordance with the requirements of this clause 4.

## 4.    Place of Employment

You will be based out of our UK Office in Slough, currently at 200 Bath Road, Slough, Berkshire, SL1 3XE, or (at the Company's absolute discretion) at such other offices as the Company shall establish from time to time and the Company reserves the right to require you to relocate to such other offices on a temporary or permanent basis, in accordance with the needs of the business.
You may be required to visit the Canadian office of the Company's parent company, Research in Motion Limited ("RIM Europe Canada") on an as needed basis and to travel to other places of business as may reasonably be required from time to time for the proper performance of your duties.

## 5.    Compensation and Benefits

Your basic annual salary will be **£25,000.00** (twenty-five thousand pounds sterling), payable monthly in arrears to a UK bank account designated by you to the Company for such purposes.

You may be eligible to join such benefit schemes as the company may operate from time to time for employees of your status, although the company reserves the right to alter or remove these benefits at any time. Details of these benefits and the process of enrolment will be given to you upon joining the company.

## 7.    Holidays

In addition to normal public holidays you are entitled to twenty five paid holiday days each calendar year, which runs from 1 January to 31 December. Additionally, you will be given a maximum of 3 paid holiday days during the days between the statutory holidays associated with Christmas and New Year's Day, as the Company is closed during that time. If your employment starts part way through the year your entitlement for that year will be based upon the remaining number of months for the year (a prorated amount). Holidays are to be taken at times agreed to by your immediate manager. The provisions of Regulation 15 of the Working Time Regulations 1998 shall be excluded in relation to your employment. Unused holiday entitlement may be carried over to a subsequent holiday year up to a maximum of 5 days, which must be taken in the first 3 months of the following year or they will be lost.

On termination of employment, you will be entitled to 1/260 of basic salary for each day's holiday entitlement. If you leave the Company's employment having taken more than the accumulated holiday entitlement for the current holiday year then a sum equivalent to wages calculated at 1/260 annual salary per day for the additional holiday taken will be deducted from any final salary or termination payment and any balance will be paid to you.

The Company reserves the right to require you to take any outstanding holiday during your notice period and/or to require you not to take holiday (whether or not previously approved) during your notice period.

## 8.    Sickness

If you are absent from work for any reason and your absence has not previously been approved you must personally inform your immediate manager, preferably one hour before your start time, on the first day of your absence, to advise them of the reasons for your absence and when you expect to return. You are then required to contact your manager each day, no later than your normal start time, until you have a doctor's certificate and then at the start of every week if your illness is certificated.

You will continue to be paid during absence due to illness, accident or other such incapacity (such payment to be inclusive of any statutory sick pay or social security benefits to which you may be entitled) for a total of up to twenty working days in each period of twelve months, each period running from January to December. Thereafter you shall continue to be paid at the discretion of RIM Europe. Such twenty day period will be assessed on a pro rata basis for new employees joining part way through the calendar year and for those leaving the employment of RIM within this twelve month period.

However, where management feel that it is warranted by circumstances e.g. frequent short absences unrelated to an underlying medical condition, the Company reserves the right to discontinue sickness salary payments for the period of absence and it may also take disciplinary action, which may lead to dismissal. Company Sick pay will be your basic salary (less any state benefits such as Statutory Sick Pay claimable by you as a result of your sickness or injury), less normal statutory deductions for tax and national insurance.

At any time required by RIM you may be requested to undergo a medical assessment by any doctor or doctors authorised by RIM at RIM's expense. You will be required to authorise the person responsible for such assessments to disclose and discuss them with RIM and / or it's medical advisors. RIM will comply with the Access to Medical Reports Act (1988). For further information please refer to the Attendance Management Guidelines.

BB13-00000355

RIM Europe shall have the right to terminate your employment if you are absent due to illness, accident or other such incapacity, in the event you are absent for more than 30 working days in any 12 consecutive months, in circumstances that do not constitute long term disability under the terms of RIM Europe's long term disability scheme as described below.

If you are prevented from performing your duties, either totally or partially, as a result of illness or accident for a continuing period of 26 weeks, you will be eligible to apply for benefit under the Company's long term disability scheme, as in force from time to time.

## 9.    Duties

During your employment with RIM Europe you will truly and faithfully serve RIM Europe and will devote your whole time, attention, energy and availability during regular business hours and whilst work is performed outside such hours, to the business of RIM Europe. You will not engage in any activity or outside interests that may in any way conflict with the business of RIM Europe or affect your job performance.

During your employment you will not (unless otherwise agreed in writing by RIM Europe) undertake any other business or profession or be or become an employee or agent of any other firm, company or other person or assist any other business or profession.

You agree to work to the best of your ability and in a competent and professional manner in maintaining top quality work to protect the image and integrity of RIM Europe. You will promptly and faithfully comply with all reasonable directions and instructions given by your manager(s).

RIM Europe requires all employees to be flexible in their roles and duties and as such reserves the right to require you at any time to serve in any role or undertake any duties or responsibilities (whether or not different to your current role, duties or responsibilities) on a temporary or permanent basis with RIM Europe or any Group Company provided that the role, duties or responsibilities in question are suitable, in RIM Europe's opinion, for your experience, potential and/or skill set. "Group Company" means any company which is at any time a holding company of RIM Europe or a subsidiary of RIM Europe, or another subsidiary of any holding company of RIM Europe (with subsidiary and holding company having their section 736 of Companies Act 1985 meanings).

Due to the nature of your position, you may be required to be available "on call" to attend to emergency situations. In such instances, RIM Europe would expect you to be able to arrive at the company premises expeditiously in order to control such situations.

At the time of signing this Agreement, you warrant that you are in good health and further agree to an independent medical examination at RIM Europe's request. You agree to disclose any such medical report to RIM Europe.

## 10.    Health and Safety

The Company attaches great importance to the provision of a working environment, which is safe and healthy for all staff, customers and visitors. You must observe the requirements and relevant Health and Safety Policies that the Company has in place and do everything possible to avoid injury to yourself or to others.

BB13-00000356

## 11.    Business Meetings

All business meetings with clients/co-workers and any other appointments pertaining to RIM Europe's business must be conducted on either RIM Europe premises or the client premises or other suitable business location. You should not entertain clients at your home address and will comply with any instructions given from time to time in relation to your homeworking. You may be required to work at various locations in the United Kingdom in order to carry out your duties at any of RIM Europe or a Group Company's premises or those of their respective customers, suppliers or associates.   RIM Europe may also, on giving you reasonable advance notice, require you to accept a new normal place of work.

## 12.    Expenses

RIM Europe will reimburse your business expenses (those expenses properly and necessarily incurred, in the course of performing your duties) on a monthly basis.  You will need to complete RIM Europe's expense form and attach all receipts and mileage information for approval by your manager. Your reimbursement will be deposited directly into your bank account.

## 13.    Working Time Regulation

Regulation 4(1) of the Working Time Regulations 1998 (the "Regulations") provides that an employee's average working time, including overtime, in any applicable reference period (generally a period of 17 weeks) shall not exceed 48 hours for each 7 day period.   The Regulations allow individuals to contract out of Regulation 4(1) and by accepting this offer of employment, you agree with RIM Europe, that for the duration of your employment, Regulation 4(1) or any successor provision shall not apply, unless and until you give RIM Europe 3 months' prior notice to end such agreement.   Whether or not Regulation 4(1) shall apply to your employment, you agree that the 17 week reference period referred to above shall consist of fixed 17 week periods, such 17 week periods to commence 1st March.

## 14.    Data Protection

For the purposes of the Data Protection Acts 1984 and 1998, you give your consent to the holding and processing of personal data (including sensitive personal data) provided by you to the Company for all purposes relating to the performance of this Agreement including but not limited to:-

- administering and maintaining human resources records;

- paying and reviewing salary and other remuneration benefits;

- providing and administering benefits (including if relevant, pension, life assurance, permanent health insurance and medical insurance);

- undertaking performance appraisals and reviews;

- maintaining sickness and other absence records;

- taking decisions as to your fitness for work;

- obtaining information and references from previous employers;

BB13-00000357

- providing references and information to potential future employers, and if necessary, the police, governmental and quasi-governmental bodies for social security and other purposes, the Inland Revenue and the Contributions Agency;

- providing information to potential future purchasers of the Company or of the business in which you work; and

- transferring information concerning you to a country or territory outside the EEA.

### 15.    Notice Periods

Save in summary termination situations, or extended probationary period, the minimum periods of notice to be given by either you or RIM Europe to terminate your employment are as follows:

| Period of continuous employment | Minimum notice |
|---|---|
| 6 months or more but less than 2 years | 4 weeks |
| 2 years or more but less than 6 years | 6 weeks |
| 7 years or more | 1 week for each year of continuous employment up to a maximum of 12 weeks |

RIM Europe will be under no obligation to vest in or assign to you any powers or duties or to provide any work for you during this notice period. RIM Europe, at any time or from time to time, after or before notice of termination has been served by either party, may at its discretion:

- suspend you from the performance of some or all of your duties including, without limitation, requiring you not to contact any customers, clients, suppliers or employees of RIM Europe or any Group Company; and/or

- exclude you from any premises of RIM Europe or of any Group Company; and/or

- require you not to undertake all or any part of your duties under the terms of your employmen and/or require you to undertake duties other than your normal duties.

Salary and benefits will not cease to be payable by reason only of such suspension exclusion or requirement. You will throughout any period of suspension or exclusion continue to be an employee of RIM Europe and shall comply with all obligations under this Agreement and your contract of employment generally including without limitation your duty of confidentiality and implied good faith. In addition, you will be required to remain available for work at the Company's request and to comply with all reasonable conditions imposed by the Company and you will not be permitted to work for any other person or organisation or on your own behalf without the Company's prior written permission.

The Company also reserves the right in its absolute discretion to pay you salary in lieu of notice (whether given by you or the Company). In that event, you agree to accept any such payment in full and final settlement of any contractual rights you have in relation to notice and in particular you will not be entitled to any further benefits or payments in lieu of benefits.

Your employment will end and you will retire at the age of 65.

## 16.    Termination

RIM Europe may by notice to you terminate this Agreement with immediate effect if you:

- are guilty of any gross misconduct or commit any serious or persistent breach of obligations to RIM Europe or any Group Company or of this Agreement or the Confidentiality and Intellectual Property Agreement; or

- are guilty of any conduct which in the opinion of RIM Europe brings or is likely to bring you, RIM Europe or any Group Company into disrepute; or

- are convicted of any criminal offence punishable with [one month or more] imprisonment or of any criminal offence that, in RIM Europe's judgment, indicates unfitness for the job or raises a threat to the safety or well-being of RIM Europe, its employees, customers, vendors or property; or

- have a bankruptcy petition presented against you or you make any arrangement (including a voluntary arrangement) or composition with creditors generally; or

- are of unsound mind or a patient for the purpose of any statute relating to mental health; or

- have been offered but have refused to agree to the transfer of this Agreement to a person which acquires the whole or substantially the whole of the undertaking in which you are employed; or

- undermine RIM Europe's management process or refuse to obey the lawful directions of the board or a senior officer of RIM Europe on multiple occasions.

## 17.    Trade Protection

You covenant with the Company (for itself and as trustee for each Group Company) that, during your employment and for a period of six (6) months after the termination of your employment with RIM Europe, you will not whether directly or indirectly:

- solicit or endeavour to entice away from RIM Europe or any Group Company the business or custom of a Restricted Customer (as hereinafter defined) with a view to providing goods or services to that Restricted Customer in competition with any Restricted Business

- provide goods or services to or otherwise have any business dealings with any Restricted Customer (as hereinafter defined) in competition with any Restricted Business

- endeavour to entice away from RIM Europe or any Group Company any Restricted Employee (as hereinafter defined) to work for a person in competition with the Restricted Business

- offer employment to any Restricted Employee (as hereinafter defined) to work for a person in competition with the Restricted Business

BB13-00000359

- be engaged in, concerned, or employed by any person which is in direct competition with any Restricted Business in the Restricted Area (as hereinafter defined).

Nothing in this clause shall restrain you from being engaged or concerned in any business concern in so far as your duties or work shall relate solely to businesses or territories that do not compete with a Restricted Business.

For purposes of this clause:

- "Restricted Business" means the business of RIM Europe and the Group Companies in which you were involved as an employee and which currently entails the designing, manufacturing and marketing of wireless Internet appliances and services and radio modems for the mobile data communications market, at the time of the termination of your employment and with which you have been concerned during the period of twelve (12) months ending on the date of termination of your employment. "Group Company" means any company which is at any time a holding company of RIM Europe or a subsidiary of RIM Europe, or another subsidiary of any holding company of RIM Europe (with subsidiary and holding company having their section 736 of Companies Act 1985 meanings).

- "Restricted Customer" means any firm, company or other person who, (i) during the period of twelve (12) months ending on the date of the termination of your employment, was a customer of or in the habit of dealing with RIM Europe or any Group Company or who at the date of termination of your employment was negotiating with RIM Europe or any Group Company to be a customer and (ii) with whom you had dealings in the course of your employment during the period of twelve months ending on the date of termination of your employment; and

- "Restricted Employee" means (i) any person who, at the date of the termination of your employment, was employed by RIM Europe or any Group Company in a managerial, supervisory, technical or sales capacity, who you knew or were aware was employed by RIM Europe or any Group Company during the period of twelve months ending on the date of termination of your employment; (ii) with whom you had significant contact during your employment; and (iii) who could materially damage the interests of RIM Europe or any Group Company if he/she became employed in any business in competition with any Restricted Business.

- "Restricted Area" means any country within Europe in which you have to a material extent performed your duties in connection with the Restricted Business in the twelve (12) months preceding termination of employment.

The obligations imposed on you by this clause extend to any actions taken by you whether directly or indirectly and also to actions taken not only on your own account but also on behalf of any other person.  For purposes of this clause, person means an individual, a company, a partnership, a trust, an unincorporated association or any other firm or business.

Each of the restrictions in this clause is entirely separate and distinct and may be

CONFIDENTIAL

severed accordingly, and you acknowledge that the restrictions are both necessary in the legitimate interests of RIM Europe and/or any Group Company's business and do not bear undue hardship upon you. You acknowledge the right of RIM Europe in its discretion to impose any separate lesser restrictions, which will be in addition to and not in substitution for those contained in this sub-clause. If such restrictions or any of them are considered to be void but would be enforceable if some part of them or any of them were deleted and/or the period or area of restriction reduced and/or the whole of any part of any defined term were deleted and/or they did not apply to any one or more Group Companies, then it is agreed that the restrictions shall apply with such modification as is necessary to render it and/or them enforceable.

You agree that if so requested by RIM Europe from time to time you shall enter into a trade protection agreement with any one or more Group Company in the terms of this clause with the necessary modifications so that the references to RIM Europe contained in such provisions and in the definition of Restricted Business, Restricted Employee, Restricted Area and Restricted Customer shall take effect as references to such Group Company or in such other terms as specified by RIM Europe the effect of which shall be no more onerous to you than the terms of this clause.

## 18.    Ownership

RIM Europe will, unless the law otherwise requires, retain all rights of ownership of all tools, graphics, documents, drawings, designs, design specifications, forecast schedules or other material transmitted or supplied to you by RIM Europe. The copying of any such material or tools is strictly forbidden.

In the event of your employment under these terms being terminated or at the request of RIM Europe all items indicated above and any other property of the Company or any Group Company in your possession and all intellectual property and other RIM Europe or Group Company property shall be returned immediately.

## 19.    General

If any provision of this Agreement is held by any court or other competent authority to be void or unenforceable, in whole or in part, this Agreement shall continue to be valid as to the other provisions thereof and the remainder of the affected provision.

## 20.    Employment Rights Act 1996

This Agreement contains the particulars of the terms of your employment required by the Act. There are no collective agreements, which directly or indirectly affect your terms and conditions of employment.

Grievance and disciplinary matters affecting your employment are contained in a separate document, a copy of which has been provided to you. Such document is not contractual in nature and is subject to change. A copy of the up to date document may be obtained from the HR department.

## 21.    Deductions

For the purposes of the Employment Rights Act 1996 and generally, you authorize RIM Europe at any time during the term of your employment, and in any event on termination howsoever

BB13-00000361

arising, to deduct from your remuneration under this Agreement and/or require you to repay any monies due from you to RIM Europe, including but not limited to any outstanding loans, advances, overpayments, tax and employee national insurance contributions, the cost of repairing any damage or loss of RIM Europe's property caused by you (and of recovering it), excess holiday and any other monies owed by you to RIM Europe or required to be deducted by RIM Europe.

**22.    Employee Warranty**

You warrant to RIM Europe that there are no restrictions on your taking up employment with RIM Europe or contemplated by this Agreement.

CONFIDENTIAL

**23.    Entire Agreement**

This Agreement, and your compliance with the Business Standards and Principles and associated documentation which includes but is not limted to; Confidentiality and Intellectual Property Agreement,   Insider Trading Policy and Code of Ethics, constitutes the entire understanding relating to your employment with RIM Europe, and such agreements supersede any and all other terms relating to your employment with RIM Europe.

**24.    Enforceability**

If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, it shall be adjusted by the court to achieve the intent of the parties to the extent possible and, in any event, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

**25.    Governing Law**

This Agreement shall be governed by the laws of England and Wales.

IN WITNESS whereof, the parties have executed this Agreement on the date below:

**Research in Motion UK Limited**                    Signed by

..........................                     ...............................

**Tessa Field**                                     **Neelam Sandhu**
Vice President, OD for EMEA,
LATAM & APAC

Date ...11. 09. 09...........              Date ...11/09/09.........................

                                                    BB13-00000363

# EXHIBIT 2



**PRIVATE & CONFIDENTIAL**

Neelam Sandhu

Research In Motion UK Limited
200 Bath Road
Slough
Berkshire
SL1 3XE

t   +44 (0) 1753 667000
f   +44 (0) 1753 669970

www.blackberry.com

6th December 2011

Dear Neelam,

I am pleased to confirm your promotion to Program Manager NPI, with effect from 1st December 2011 ("Promotion Date"). The following changes to the provisions of your current employment agreement with Research In Motion UK Limited (the "Agreement") will take effect from the Promotion Date.

To reflect this promotion your annual salary will increase to £34,000 per year, less deductions required by law, paid in accordance with the Agreement. Your job level grade will change to level D.

All other terms and conditions of your employment remain unchanged.

Please sign and date one copy of this letter, in order to acknowledge receipt and acceptance of the above changes and return to Sophie Howard, OD Business Partner on or before 14th December 2011.

I would like to take this opportunity of congratulating you on your new role and to wish you continued future success.
Yours sincerely,

RESEARCH IN MOTION UK LIMITED



**Louise Cockrell (Emmott)**
**OD Business Partner EMEA**

---

I confirm that I have read and understood the above, and accept this new position and agree to comply with the employment policies, rules and practices of RIM now in force or which may be amended, revised or adopted from time to time.

I hereby acknowledgement and agree that I continue to be bound by the RIM Business Standards & Principles, which are subject to annual certification.

SIGNED: ................................................... DATE: 15/12/12

NAME: NEELAM SANDHU.

Research In Motion UK Limited is a company registered in England and Wales with company registration number 4022422 and with registered offices at Centrum House, 36 Station Road, Egham, Surrey TW20 9LF. BlackBerry and the BlackBerry logo are trademarks of Research In Motion Limited.

# EXHIBIT 3



June 5, 2013

Neelam Sandhu

█████████████

Dear Neelam,

We would like to offer you employment with Research In Motion Corporation, a Delaware corporation, doing business as BlackBerry ("RIM").

This Agreement is between Research In Motion Corporation, a Delaware corporation, doing business as BlackBerry ("RIM") and Neelam Sandhu.

*This employment agreement replaces your existing employment agreement with RIM dated June 3, 2013.*

## 1  EMPLOYMENT

1.1    The Effective Date of this Agreement and your first day of work will be confirmed with you in writing, provided that the requirements of Section 5 have been met.  If the requirements of Section 5 are not satisfied before the first day of work, then this Agreement, at RIM's option, is terminated and if so, the offer of employment contained herein is rescinded.

1.2    You understand that upon commencement of your employment with RIM, you will no longer be employed by Research In Motion UK Limited ("RIM UK"), and any compensation, benefits, and employment terms previously provided to you by RIM UK shall cease.  RIM will, however, honor your term of service RIM UK.

1.3    You will be employed on a regular, full-time basis.

1.4    Your employment at RIM is "at will".  As such, it is for no definite term and subject to the provisions of section 4 of this letter, either you or RIM may terminate the employment relationship at any time, for any reason, with or without cause, without any further compensation.

1.5    You will work at RIM's New York office location.

1.6    Your position title will be Senior Brand Messaging & Operations Manager, reporting to Jaime Kalfus, Senior Director, Brand Strategy.

1.7    RIM's standard workweek is 40 hours. However, you will be required to devote whatever time is necessary to complete the requirements of your position, which may exceed 40 hours per week from time to time.

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

BB13-00000411

**╬╬ BlackBerry.**

**2    COMPENSATION**

2.1    RIM will pay you a base salary of $95,000 USD per annum, less deductions required by law, paid bi-weekly via direct deposit.

2.2    Variable Incentive Pay (ViP) Program - You will be eligible to participate in RIM 's Variable Incentive Pay (ViP) Program, a semi-annual incentive program based on a combination of individual and company performance measures. The ViP Program provides you with an opportunity to earn additional pay on top of your annual base salary. For your position, the target incentive will be 15% of your base salary. To learn more about RIM's ViP Program please visit go/vip.

2.3    RIM's incentive plans are designed to address the conditions of an ever-changing marketplace, and RIM cannot make definitive representations concerning the continuation of format or the size of individual awards under the plans. Any of RIM's incentive plans are subject to change at the Company's discretion.

**3    BENEFITS**

3.1    You will be eligible to participate in RIM's US Health Care Plan.

3.2    Provided you have completed six (6) months' service with RIM, and/or its affiliated, related, subsidiary or parent corporations, you will be eligible to defer into RIM's 401k plan. RIM will match your contributions dollar-for-dollar, up to 5% of base salary. The match will be capped as per the salary deferral maximum set annually by the IRS regulations. Further details will be provided to you.

3.3    You are entitled to 25 days of annual paid vacation per year, which is accrued over the course of each calendar year. All vacation must be taken annually and scheduled in accordance with RIM's vacation policy, and may be taken in full-day or half-day segments.

3.4    RIM will provide relocation assistance to you as detailed in Schedule A attached to this Agreement.

**4    CESSATION OF EMPLOYMENT**

4.1    You may resign from employment with RIM at any time upon providing two weeks' written notice, which can be waived in whole or in part by RIM.

4.2    RIM may terminate your at will employment at any time without just cause by providing you with two (2) weeks' base salary, plus two (2) weeks' base salary per completed year of service, to a cumulative maximum of twelve (12) months' base salary. The payment of this amount is conditional upon you signing a release of claims against RIM in respect of your employment, for damages or otherwise, except for claims in respect of payment of monies earned, due and owing to date of termination. No notice or pay in lieu of notice of termination will be paid, however, if your cessation of employment is voluntary or occurs because of misconduct or poor performance on your part, as determined by RIM.

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA. tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

**⁙ BlackBerry.**

4.3     You agree to return all RIM property at time of cessation of employment for any reason.


## 5   CONDITIONS OF EMPLOYMENT

5.1     This Agreement is conditional on you being legally entitled to work for RIM in the United States and upon your successfully obtaining any and all necessary work visas or permits to enable you to work in this position.

5.2     If you are a citizen of a restricted country identified by the U.S. Department of Commerce and will be performing duties involving controlled technical data, RIM may be required to obtain an export license on your behalf.  In the event that an export license is required, this offer and any subsequent employment with RIM are conditional on obtaining the license within a time period deemed reasonable by RIM.  You agree that, if required, during your employment you will continue to hold a valid export license necessary for the performance of your duties.


## 6   ONGOING OBLIGATIONS OF EMPLOYMENT

6.1     As ongoing requirements of employment with RIM, you agree:

   (a)    To continue to comply with the Business Standards and Principles, and related documents, and the Employee Confidentiality and Intellectual Property Agreement;

   (b)    To comply with RIM company and departmental policies, rules, practices, and the terms and conditions laid out in company and/or departmental handbooks that are now in force or which may be amended, revised or introduced from time to time;

   (c)    To continue to maintain legal immigration status within the country in which you are, or will be, employed by RIM and to continue to meet the requirements of the applicable immigration legislation and regulations of that country;

   (d)    That you understand and consent to the fact that in the course of employment, RIM will be required, from time to time, to collect, use, and disclose personal information in order to administer the employment relationship; and


## 7   GENERAL

7.1     The titles and descriptive headings of the articles of this Agreement are inserted solely for convenience, are not part of this Agreement and do not in any way limit or amplify this Agreement.

7.2     In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any Schedule, Appendix or Addendum hereto, the provisions of this Agreement shall prevail.

7.3     The obligations contained in this Agreement and all Schedules, Appendices or Addendums to this Agreement are each independent covenants, and if any provision, or part thereof contained in this Agreement, or any Schedule, Appendix or Addendum of this Agreement is prohibited or declared invalid, illegal or unenforceable by a court or

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL                                                                     BB13-00000413

**⁘BlackBerry.**

other lawful authority, this Agreement and all attachments hereto shall continue in force, with respect to the enforceable provisions, and all rights and remedies accrued under the enforceable provisions shall survive any such declaration.

7.4    This Agreement and all Schedules, Appendices, Addendums or documents incorporated by reference herein constitute the entire Agreement between RIM and you and supersedes all prior negotiations and oral or written understandings, if any.

7.5    No supplement, waiver, amendment, modification or rescission of this Agreement shall be binding unless set forth in writing and signed by both parties.

7.6    This Agreement shall ensure to the benefit of and be binding upon each party and its heirs, executors, administrators, successors and permitted assigns.

7.7    This Agreement shall be governed by and construed under the laws of the State of New York. In addition, both parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising out of matters related to this Agreement, which waiver you agree is informed and voluntary.

7.8    You acknowledge that you have been given the opportunity to read, evaluate and discuss the provisions of this Agreement and the attached schedules and documents with your personal advisors and with representatives of RIM.

7.9    In consideration of accepting this agreement from RIM, you expressly authorize RIM to deduct and withhold any documented amounts owing to RIM, including but not limited to any vacation taken in excess of accrued entitlement, from any sums owing by RIM to you. You acknowledge that this paragraph constitutes a formula from which a specific amount may be calculated and is good and sufficient authorization for the purposes of all applicable legislation.

**IN WITNESS WHEREOF** the parties hereto by their duly authorized representatives have executed this Agreement as of the date first above mentioned.

**RESEARCH IN MOTION CORPORATION**

Per: _____
Kelly Daly
VP, Global HR Operations & Services

To confirm your acceptance of the terms and conditions of this offer, please sign below and return one copy in the attached envelope on or before June 14, 2013 including the other documents listed on the summary sheet in your package.

Signature: _____    Date: 7th June 2013
          **Neelam Sandhu**

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA. tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

BB13-00000414

**∷ BlackBerry.**

## SCHEDULE A

## STANDARD INTERNATIONAL TRANSFER
### (USA)

Research In Motion Corporation, doing business as BlackBerry ("RIM") will provide you with the following relocation assistance provided you move within 25 miles of the Employment Location as stated in your offer letter:

### Immigration Support (If Required)

An Immigration Professional will advise you regarding visa, work permit and other document requirements for you and your eligible dependents* to move to, work, and become permanent residents (where permanent residence status is available) in the country in which  you will be employed.

This will include coverage for all expenses incurred directly relating to obtaining the necessary work visas/permits and required medicals to be eligible to work in the country in which you will be employed, whether or not such applications are successful.

> Note: This assistance is contingent on you having provided all required documents and information in a timely manner and with the necessary detail.

### Taxation

Taxation planning advice from external taxation consultants who will provide you with detailed advice, as well as, answers to your questions with respect to moving from your home location and moving to the new Employment Location. In addition, RIM will provide for the preparation of your tax returns by their contracted tax service provider in the year that you started with RIM.  In the course of the tax service provider's preparation of your tax returns, you will be held fully responsible for any penalties and interest charges assessed by any tax authority or for any additional fees assessed by the tax service provider. This service is provided for both home and host country.

This service is provided for both origin and destination countries, any relocation benefits that are taxable will be reported to the appropriate authority and any resultant liability is the employee's sole responsibility. Our external tax consultants will provide you with documentation outlining what are generally considered taxable/non-taxable relocation benefits for both origin and destination countries.

### Home-Finding and Orientation

Home-finding and orientation assistance includes coverage and arrangement for 1 home-finding trip for you and your eligible dependents* via air (as per the RIM Travel Guidelines) or travel reimbursement (up to a maximum amount equivalent to that of the cost of the flights), should you choose an alternate mode of transport.  Duration of your home-finding trip can be up to a maximum of 5 days and includes coverage of meals (exempt are alcoholic beverages) and local transportation expenses (excluding vehicle rental). You will also be provided with a maximum of 5 days of accompanied destination services which can be scheduled for use during your home-finding trip as well as to support you after your start date.

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA. tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

**:¨: BlackBerry.**

**Household Goods**

Household goods assistance includes relocation of household goods (excluding vehicles) from your primary residence, including packing, crating, transporting, custom duties, storage-in-transit (for a maximum of 60 days), delivery, unloading, unpacking, and insurance coverage (replacement value) against damage or loss.

**En Route Travel**

En route travel assistance includes one-way flight arrangements for you and your eligible dependents* on moving day (as per the RIM Travel Guidelines), or travel reimbursement (up to a maximum amount equivalent to that of the cost of the flights) should you choose an alternate mode of transport to your employment location.

**Temporary Accommodations**

Temporary accommodation assistance includes, if required, up to 60 days' temporary accommodation upon your arrival to the Employment Location.  The costs of long-distance phone calls, alcohol, meals, laundry, entertainment expenses or local transportation are your responsibility.

**Relocation Allowance**

RIM will provide you with a relocation allowance of $6,500 USD (less applicable taxes) to cover incidental moving expenses such as lease cancellation charges, furniture rental, rental car and insurance expenses, utility hook-up fees, and meals. This amount will not be paid automatically. To receive payment, you must have initiated your move and have your household goods in transit. Once initiated, payment may take between 30 to 60 days to occur through RIM Payroll. This amount will only be paid once employment with RIM has started and will not be paid prior to the employee start date.

**General Terms**

If you do not relocate within a year of your start date, any unused relocation assistance will be forfeited. You may be able to claim some of your moving costs as valid expenses on your personal income tax return.  Relocation benefits that are taxable will be reported to the appropriate authority and any resultant liability is the employee's sole responsibility. For Internal Revenue Service (IRS) guidelines of eligible taxable/nontaxable moving expenses please refer to the IRS website. http://www.irs.gov

Should you resign or be terminated for cause within one year of the start date indicated in this letter, you are required to repay 100 percent of relocation costs (excluding immigration) incurred and paid on your behalf.  Should you resign or be terminated for cause more than one year, but less than two years of the start date indicated in this letter you are required to repay 50 percent of relocation costs (excluding immigration) that were incurred and paid on your behalf.

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA. tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

BB13-00000416

**⁙BlackBerry.**

I have read, understand and accept the terms and conditions outlined above.

_____                7ᵗʰ June 2013
                                        _____

**Neelam Sandhu**                        **Date Signed**

*Eligible dependents are defined within the employee's benefits package. In order for a dependent to receive relocation entitlements, their eligible status must exist at the time of hire.

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL                                      BB13-00000417

**:::BlackBerry**                                                                                 Human Resources

# Employee Confidentiality & Intellectual Property Agreement

In consideration of my employment with or engagement by Research In Motion Limited or by a subsidiary or an affiliate of Research In Motion Limited (the appropriate entity called, "RIM") who is employing or engaging me, as set out in the corresponding offer letter to or agreement with me ("**Offer Letter**") and for other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), I (**Employee**) hereby agree to the following, together with any addendum to this Agreement:

## 1. Definitions

**1.1.**    In this Agreement **"Confidential Information"** means:

  1.1.1. all trade secrets, confidential, private or secret information, know how, or proprietary information (whether such is in writing, or in electronic, oral or any other form or medium) of RIM, or of entities affiliated, associated, or related to RIM (each a "**RIM Group Member**") including without limitation Research In Motion Limited, and their respective employees, consultants, sponsored researchers, suppliers, distributors, customers, and other business partners (together with RIM Group Members, "**Associates**");

  1.1.2. information that has been specifically identified or designated as confidential or proprietary by RIM or its Associates;

  1.1.3. information that is by its nature such that RIM or RIM Group Members would consider it to be confidential or the nature of which is such that it would generally be considered confidential in the industry in which RIM or RIM Group Members operate, or that RIM or a RIM Group Member is obligated to treat as confidential or proprietary such as, without limitation, financial, business, legal, and corporate information and information and materials otherwise relating in any manner to the business affairs of RIM or its Associates, marketing information, strategies and tactics, research, product, technical, and manufacturing information; personnel information, personal information, and customer, distributor, and supplier information and information about other commercial relationships, of or related to RIM or its Associates; and

  1.1.4. Developments.

**1.2.**    **"Developments"** means all Intellectual Property that is created, developed, authored, conceived, reduced to practice or originated ("**Developed**") by Employee (whether wholly or partly and whether individually or in collaboration with others) in the course of Employee's employment with or engagement by RIM or in performing duties specifically assigned to Employee, whether during normal working hours or not.
Developments exclude any Intellectual Property that Employee establishes in accordance with the provisions set out below (and at Section 6) meet all of the conditions set out in Subsections 1.2.1 to 1.2.5 below ("**Excluded Developments**"):

  1.2.1. was Developed entirely on Employee's own time;

  1.2.2. was Developed without the use of any RIM Property or Confidential Information;

  1.2.3. does not relate to the business or affairs of RIM or its Associates or to research or development activities of RIM or its Associates during the term of Employee's employment with or engagement by RIM or to the actual or reasonably anticipated business, research or development activities of RIM or its Associates during this period;

  1.2.4. was not suggested by or resulted from matters which Employee was aware of as a result of Employee's employment with or engagement by RIM or any work performed by Employee for RIM or a RIM Group Member; and

  1.2.5. was not within the scope and is unrelated to Employee's general  duties to RIM

| RIM Confidential | Owner: | Kelly Daly,<br>VP, Global HR Operations & Services | Document Number | HR00554.01 | |
|---|---|---|---|---|---|
| | Approval: | Lance Crosby, Commercial Counsel-Employment<br>& Sarah Guichard, VP, Associate General Counsel | Last Updated Date | 2013/04/30 | Page 1 of 6 |

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document.
See Livelink for the most recent version of this document. © 2013 BlackBerry.  All rights reserved.

CONFIDENTIAL                                                                            BB13-00000418





Human Resources

**::: BlackBerry**

Research In Motion Confidential
Employee Confidentiality & Trade Secret
Property Agreement

For clarity, it is agreed that Developments include any Intellectual Property Developed by Employee that does not meet any one of the conditions set out in Subsections 1.2.1 to 1.2.5 above.

1.3.    **"Intellectual Property"** means any and all intellectual and industrial property, whether recorded or not and regardless of form or method of recording, including without limitation all works in which copyright subsists or may subsist, such as computer software, systems, tools, data bases (whether or not protected by copyright), concepts, data, coding, images, designs, documentation, books and records, industrial designs, specifications, trade secrets, confidential information, ideas, concepts, know-how, trade marks, service marks, trade names, domain names, discoveries and inventions, improvements and modifications, integrated circuit topographies and mask works.

1.4.    **"Intellectual Property Rights"** includes all intellectual,  industrial and other proprietary rights in any Intellectual Property including without limitation all rights in trade marks, service marks, trade names, domain names, discoveries, inventions, patents, copyrights, designs, industrial designs, integrated circuit topographies, mask works, trade secrets, confidential information, and the right to apply for, and applications and registrations for, the foregoing.

1.5.    **"RIM Property"** means any and all real or personal property including without limitation all tangible and intangible personal property (such as Intellectual Property or Intellectual Property Rights)  equipment, hardware, supplies, facilities, materials, and services, of or belonging to, or  owned, licensed, provided, or used by, RIM or Associates in the conduct of its business.

## 2.    Non-Disclosure And Restriction On Use And Reproduction Of Confidential Information And RIM Property

2.1.    Employee shall keep, and shall take all necessary steps to keep all Confidential Information in strict confidence. Employee shall not, directly or indirectly, either during or subsequent to Employee's employment with or engagement by RIM, disclose, allow access to, use, or reproduce any Confidential Information except as required to perform Employee's duties for RIM, except to the extent expressly permitted herein.

2.2.    Any disclosure, access, use or reproduction of Confidential Information either internally or, where expressly permitted herein, externally to RIM must be limited to those individuals who require the same for the proper performance of their duties to RIM (i.e. with the "need to know") and such disclosure, access, use or reproduction shall be in accordance with all procedures established by RIM for the protection of Confidential Information and in respect of any external party, only after the external party to whom the information is disclosed has entered into a written non-disclosure and confidentiality agreement approved by RIM which expressly extends to the purposes for which the disclosure is to be made.

2.3.    Employee shall review and comply with RIM's Insider Trading Policy, as amended from time to time by RIM, and abide by any trading restrictions imposed by the RIM Corporate Disclosure Committee, including, without limitation, pursuant to the Insider Trading Policy.

## 3.    Return Of RIM Property And Confidential Information

Upon request by RIM, and in any event upon conclusion of Employee's employment with or engagement by RIM, Employee shall immediately return to RIM all Confidential Information and RIM Property that is in Employee's possession, power, or control.

| RIM Confidential | Owner | Kelly Dare, VP, Global HR Operations & Services | Document Number | HR00354:01 | |
| | Approver | Laura Cesar, Commercial Counsel-Employment & Sarah Gouchard, VP, Associate General Counsel | Last Updated Date | 2013/04/30 | Page 2 of 6 |

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document. See Livelink for the most recent version of this document. © 2013 BlackBerry  All rights reserved.



BB13-00000419

**::: BlackBerry**

Human Resources

Resolution In Motion Confidential
Employee Confidentiality & Intellectual
Property Agreement

## 4.  Ownership Of Developments And RIM Property

4.1.  Employee shall promptly and fully disclose in writing to RIM any Developments developed by the Employee either solely or jointly with others.

4.2.  It is agreed that all worldwide rights including all worldwide Intellectual Property Rights in the Developments shall automatically vest in and be the exclusive property of RIM immediately on its creation and regardless of the stage of its completion. To the extent that any such rights have not or do not automatically vest in RIM hereunder, (i) Employee hereby assigns and conveys (and if necessary, agrees to assign and convey) all such rights to RIM to the extent permissible by applicable law or otherwise, (ii) Employee holds them in trust for RIM to the extent and for the duration that they have not fully vested or transferred to RIM, and (iii) RIM may, at its discretion, take such steps as it deems reasonably appropriate to secure and perfect its Intellectual Property Rights in the Developments anywhere in the world.

4.3.  Without limiting the forgoing, Employee hereby also acknowledges and agrees that RIM is and shall be the exclusive owner of all Confidential Information and  RIM Property including all tangible personal property Developed by Employee (whether wholly or partly and whether individually or in collaboration with others) in the course of Employee's employment with or engagement by RIM or in performing duties specifically assigned to Employee, whether during normal working hours or not.

## 5.  Waiver Of Moral Rights

Employee agrees to waive and hereby waives unconditionally and irrevocably any and all Employee's moral rights and rights of a similar nature which Employee now or in the future may have in the Confidential Information, RIM Property and Developments (including rights in existing works and works which may come into existence after the date hereof) in which copyright may subsist in any or all jurisdictions around the world, to the extent that such rights may be waived in each respective jurisdiction.  Without limiting the generality of the foregoing, this waiver extends to any and all acts of RIM or its Associates and acts of third persons done with the authority of any of them and their successors and assigns.

## 6.  Disclosure Of Excluded Developments

To avoid any disputes regarding ownership of Excluded Developments, the Employee shall, subject to Section 8 (the Prior Employer and Third Party Information section) below, within five days following execution of this Agreement and, throughout the term of employment/engagement, within five days of having Developed any Intellectual Property that Employee believes to be an Excluded Development, provide RIM with a non-confidential general written description of any Excluded Developments specifying the reasons why such development (if any) is excluded. If the Employee fails to make this disclosure within the time specified, the Employee is deemed to have represented that any disclosure of Excluded Development within that time (if any) comprises the full extent of Employee's disclosure of Excluded Developments. No disclosure made under this Section 6 shall be binding on RIM and no action or inaction by RIM following receipt of such disclosure or becoming aware of any such developments shall waive  limit, or release any rights that RIM may have in or to any such developments.

## 7.  Employee Owned Excluded Developments

Employee agrees that Employee shall only use or incorporate or permit any other person to use or incorporate any Excluded Development into a RIM process, product, system, machine, service, Development or other RIM Property if Employee owns all Intellectual Property Rights in the Excluded Development, obtains RIM's prior written approval from a Vice President of RIM and waives all of Employee's moral rights and rights of a similar nature which Employee now or in the future may have in the Excluded Development in each jurisdiction around the world, to the extent that such rights may be waived. For any Excluded Development incorporated into any RIM

| RIM Confidential | Owner | Kelly Daly, VP, Global HR Operations & Services | Document number | IN600554.01 | |
|---|---|---|---|---|---|
| | Approver | Lance Cooper, Commercial Counsel-Employment & Sarah Boechard, VP, Associate General Counsel | Last Updated Date | 2013/04/30 | Page 3 of 4 |

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document.
See Livelink for the most recent version of this document. © 2013 BlackBerry.  All rights reserved.

BB13-00000420



Human Resources

**BlackBerry**

Research In Motion Confidential
Employee Confidentiality & Intellectual
Property Agreement

process, product, system, machine, service, Development or other RIM Property Employee hereby grants at no charge to RIM and its Associates, a non-exclusive, irrevocable, non-terminable, perpetual, transferable, royalty-free, world-wide license, with the right to sublicense, to use, distribute, transmit, broadcast, produce, reproduce, perform including perform in public, communicate in or to the public, publish, practice, make, have made, sell, offer to sell, modify and made derivative works of, the Excluded Development and to otherwise exercise any Intellectual Property Right in the Excluded Development.

## 8.    Prior Employer And Third Party Information

8.1.    Employee agrees that during Employee's employment with or engagement by RIM:
    8.1.1.    Employee will not use or disclose any trade secrets, confidential or proprietary information or works in which copyright subsists of any third party including any of Employee's former or current employers, partners, customers, or other business associates except as permitted by law or contract; and
    8.1.2.    Employee will not, without RIM's prior written approval, bring onto RIM's premises unpublished documents (in print, electronic or any other recorded form) or any property belonging to any persons or entities identified in clause 8.1.1 above except as permitted by law or contract.
8.2.    Employee represents, warrants and covenants to RIM that any offer, acceptance and/or performance of employment/consultancy does not and shall not violate any agreement between Employee and any third party, including, without limitation, any employment/consulting agreement, non-competition agreement, non-solicitation agreement, or confidentiality agreement and that in hiring Employee RIM is not inducing Employee to breach any agreement between Employee and any such third party.

## 9.    Further Acts

Employee hereby agrees to assist and to co-operate fully with RIM, both during and after Employee's employment with or engagement by RIM, and will, at RIM's expense, sign further documents and do such acts and other things reasonably requested by RIM to confirm and record (i) RIM's ownership of Developments and Confidential Information and RIM Property and (ii) the waiver of Employee's moral and other rights therein and to otherwise confirm Employee's obligations to RIM, and assist RIM to obtain registration or protection of, to enforce its rights in, and to enjoy the full and exclusive benefit of, the Confidential Information, Developments and RIM Property.

## 10.    Enforcement

10.1.    Employee acknowledges and agrees that damages may not be an adequate remedy to compensate RIM for any breach of Employee's obligations under this Agreement, and accordingly agrees that in addition to any and all other remedies available, RIM shall be entitled to obtain relief by way of a temporary or permanent injunction or through other equitable relief to enforce these obligations without the requirement of posting a bond or other security or the requirement of providing proof of irreparable harm. Employee acknowledges the importance to RIM of the strict compliance with the terms of this Agreement and acknowledges that RIM's interest in the strict enforcement thereof will outweigh the balance of convenience or harm which Employee may suffer as a result of the strict enforcement of its obligations hereunder.

10.2.    The Employee shall fully indemnify and hold harmless RIM in respect of any loss or damage cause by any breach of the terms of this Agreement by the Employee.

10.3.    The Employee agrees that RIM Group Members are an intended third party beneficiary of this Agreement. Accordingly, Employee agrees that any RIM Group Member may enforce the terms of this Agreement against Employee and obtain any relief that may be available for the breach hereof including injunctive relief, damages, and an accounting of profits, but this Agreement shall not convey any Intellectual Property rights on any other third party.

| RIM Confidential | Owner | Kelly Deng, VP, Global HR Operations & Services | Document Number | HR00554.01 | |
| | Approver | Lance Crosier, Commercial Counsel-Employment & Spencer Quirke, VP, Associate General Counsel | Last Updated Date | 2013/04/30 | Page 4 of 8 |

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document. See LiveLink for the most recent version of this document. © 2013 BlackBerry. All rights reserved.

CONFIDENTIAL

BB13-00000421



Human Resources

 **BlackBerry.**

## 11. Severability

In the event any or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement but (i) if permitted by applicable law, there shall be deemed substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue, and (ii) if substitution is not permitted by applicable law, this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been set forth herein, and the Agreement shall be carried out as nearly as possible according to its original terms and intent, and (iii) if and to the extent this Agreement is held to be invalid, illegal or unenforceable, or if this Agreement is construed as if such invalid, illegal or unenforceable provision had never been set forth herein, then the provisions of any previous employee confidentiality and intellectual property agreement or agreements between RIM and Employee shall continue to apply with respect to the Agreement or such portions thereof that are held to be invalid, illegal or unenforceable, subject to the provisions of Section 14.2.

## 12. Counterparts

This Agreement may be executed by facsimile and in any number of counterparts, each of which will be deemed to be an original and all of which taken together will be deemed to constitute one and the same instrument.

## 13. Choice Of Law And Jurisdiction

13.1.   The choice of law and jurisdiction provisions set out in the Offer Letter shall apply to this Agreement and shall prevail without regards to conflict of laws principles.

13.2.   In the event that there is no choice of law provision set out in the Offer Letter or in the event there is no Offer Letter, this Agreement shall be governed by the laws of the place of incorporation of the RIM entity to whom the Employee is providing Employee's services.

13.3.   In the event that there is no jurisdiction clause set out in the Offer Letter, or in the event there is no Offer Letter the parties hereto agree to submit all disputes arising out of or in connection with this Agreement to the Court located in the jurisdiction of place of domicile of the Employee.

## 14. Entire Agreement

14.1.   This Agreement and Employee's Offer Letter set forth the entire agreement relating to the subject-matter hereof, and any other representations, promises, or conditions that are not in writing and accepted by both parties (electronically or by signing below) shall not be binding on either party. The terms and conditions of this Agreement shall survive termination of the employment or consulting relationship giving rise to this Agreement. The provisions of this Agreement shall be binding on Employee and his/her legal representative and on RIM and its successors and assigns. For clarity, nothing herein is intended to limit or derogate from any other obligation that Employee may owe to RIM under applicable law including under common law, equity, or contract.

14.2.   Unless otherwise agreed in writing by both parties, to the extent of any conflicting provisions between this Agreement and (i) an Offer Letter, the terms of the Offer Letter shall prevail, and (ii) the provisions of any subsisting employee confidentiality and intellectual property agreement, the provisions of this Agreement shall prevail, in each case only to the extent of the conflict.

RIM Confidential    Owner    Kelly Daly,
VP, Global HR Operations & Services    Document Number    HR000364.01

Approver    Leon Csaszi, Commercial Counsel-Employment
& Sarah Gulzhard, VP, Associate General Counsel    Last Updated Date    2013/04/30    Page 5 of 6.

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document.
See Livelink for the most recent version of this document. © 2013 BlackBerry.   All rights reserved.

BB13-00000422



Human Resources

**BlackBerry**

Research in Motion Confidential
Employee Confidentiality & Intellectual
Property Agreement

**I acknowledge that, before signing this agreement (whether by indicating my acceptance electronically or by signing below), I was given an opportunity to read, evaluate, and discuss this Agreement with my counsel and personal advisors and with representatives of RIM. Having read and fully understood this agreement, I have executed this Agreement on the _____ day of _____, 20___.**

| | |
|---|---|
| SIGNED, SEALED AND DELIVERED on the 22nd day of JULY , 2013 in the presence of: | |
| _Kant_ | _(signature)_ (Seal) |
| Signature of **Witness** | Signature of **Employee** |
| RASVEER SANDHU | NEELAM SANDHU |
| Name of Witness (Print) | Name of Employee (Print) |
| 54 ST PAULS AVE , SL2 5ES , UK | |
| Address of Witness (Print) | |

RIM Confidential    Owner    Kelly Daiv,
VP, Global HR Operations & Services
Approver    Lance Crease, Commercial Counsel Employment
& Sarah Guichard, VP, Associate General Counsel

Document Number    HR00554.01
Last Updated Date    2013/04/30    Page 6 of 6

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document.
See Livelink for the most recent version of this document. © 2013 BlackBerry. All rights reserved.

CONFIDENTIAL

BB13-00000423







Organizational Development

**RIM Business Standards and Principles Acknowledgement Form**

As you start your career with us at Research In Motion® (RIM®), it is important that you read, understand and comply with the guiding business standards and principles that shape our working environment. The RIM Business Standards and Principles are designed to help all of us do our jobs in a legal and ethical manner and outlines the behaviors expected of each of us. We are all responsible for valuing these principles and supporting RIM's commitment to integrity.

I acknowledge that I have read, understand and will comply with the following documents:

• Code of Business Standards and Principles [OD00125.0];
• Insider Trading Policy [OD00123.0];
• Prevention of Improper Payments Policy [OD00122.0].
• Corporate Disclosure Policy [OD00124.0];
• Diversity Guidelines [ODGP-GDL-0004.5];
• Anti-Discrimination and Anti-Harassment Guidelines [ODGP-GDL-0002.5];
• Anti-Bullying and Anti-Violence in the Workplace Guidelines [ODGP-GDL-0003.6];
• Corporate Security Policy [CS-POL-0001.4];
• Global Environment, Health & Safety Policy [January 2012]

I have also verified the document control numbers listed above match those in the footer of the documents provided to me in my new hire offer package.

........................................................................................................
Signature of Employee

NEELAM SANDHU
........................................................................................................
Name of Employee (Please print)

SIGNED AND DELIVERED on the 22nd day of ........JULY....................., 20.13

Document Owner: Amanda Campbell, Knowledge Management Specialist I Document Approver: Melinda Drexler, Manager, GTA Knowledge & Standards I Document number: ODGTA00095.0 | Region: Global | Approval date: 2012/11/29
Controlled Document: Printed copies of this document are uncontrolled copies of a controlled document. See Livelink® for the most recent version of this document. © 2012 Research In Motion Limited. All rights reserved.

BB13-00000424

# EXHIBIT 4

**::: BlackBerry.**

November 25, 2014

Neelam Sandhu
C/o BlackBerry Corporation
█████████████████████████████

Dear Neelam,

This letter cancels and supersedes the promotion offer letter of October 20, 2014.

Congratulations!  I am pleased to offer you the position of Director of Business Operations, Office of the CEO.

This offer incorporates the terms and conditions of your employment offer or agreement with BlackBerry or its affiliates, by which you will continue to be bound, except as specifically defined below.

This offer is based on the following terms and conditions:

1)    **Employment**

    a)    Effective Date – Your promotion into this new position will be retroactive to November 1, 2014, upon your acceptance and signing of this offer.

    b)    Employment Status – You will continue to be employed on a regular full-time basis. Your employment at BlackBerry continues to be "at will".  As such, it is for no definite term and subject to the provisions of section 6 of this letter, either you or BlackBerry may terminate the employment relationship at any time, for any reason, with or without cause, without any further compensation.

    c)    Title – Your new title will be Director of Business Operations, Office of the CEO at accountability Level G.

    d)    Reporting Relationship – You will report directly to me in my capacity as CEO.

    e)    Location – You will continue to work from BlackBerry's Pleasanton location.

2)    **Compensation**

    a)    Base Salary – Your new bi-weekly base salary is $5,384.62 USD ($140,000 USD annualized), paid bi-weekly via direct deposit, less payroll deductions and required withholdings.

Document Number HR00842.01
Last Date Updated: 2013/07/12

**BlackBerry Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

b)  You will be eligible to participate in BlackBerry's annual Variable incentive Pay (ViP) Program. The ViP Program provides you with an opportunity to earn additional pay on top of your annual base salary.  For your position, the annual target incentive will be 25% of your base salary.

c)  BlackBerry's incentive plans are designed to address the conditions of an ever-changing marketplace, and BlackBerry cannot make definitive representations concerning the continuation of format or the size of individual awards under the plans. BlackBerry's incentive plans are subject to change at the Company's discretion.

## 3)  Benefits

a)  Benefits – You will remain eligible to participate in BlackBerry's U.S. employee benefits including BlackBerry's 401(k) plan.

b)  Vacation – You will continue to be eligible for annual paid vacation in accordance with BlackBerry's vacation policy.

## 4)  Equity Award

In connection with this offer, BlackBerry Limited will make a recommendation to its Compensation, Nomination and Governance Committee.  The details of any equity offer will be provided in a separate letter from BlackBerry Limited.

## 5)  Restrictive Covenants

Attached as an Appendix to this Agreement is the BlackBerry Restrictive Covenant Addendum ("Restrictive Covenant Addendum").  By accepting this promotion and the terms of this letter, you agree to be bound by all of the terms and conditions of BlackBerry's Restrictive Covenant Addendum.  Please read and sign the Addendum to confirm your agreement to the terms and conditions.

## 6)  Cessation of Employment

a)  Just as you may resign from employment with BlackBerry at any time, BlackBerry may terminate your employment at any time. Your employment at BlackBerry is "at-will" and may be terminated with or without notice and with or without cause.  This policy may only be changed in a writing signed by BlackBerry's CEO authorizing such a change.

b)  BlackBerry may terminate your "at will employment" at any time without just cause by providing you with four (4) weeks' base salary per completed year of service, to a cumulative maximum of sixteen (16) weeks of base salary. The payment of this amount is conditional upon you signing a release of claims against BlackBerry in respect of your employment, for

Document Number HR00842.01
Last Date Updated: 2013/07/12

**BlackBerry Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

3. N. Sandhu 11/24/2014

damages or otherwise, except for claims in respect of payment of monies earned, due and owing to date of termination.  However, if your cessation of employment is voluntary or occurs because of misconduct, poor performance or any of the "for cause" reasons for involuntary termination of employment, no severance payment will be made to you by the company.

c)  At the time of cessation of your employment for any reason, you are required to return all BlackBerry property, including keys, badge & access cards,  equipment, devices or information in whatever form it is stored.

All other terms and conditions of your previous employment agreement will continue to govern your employment.

I believe BlackBerry offers you the challenges and rewards you seek.  I look forward, with enthusiasm, to your confirmation.

This offer of promotion will remain open until tomorrow, November 26, 2014. To confirm your acceptance of this new position, please sign below and return one copy to Nita White-Ivy not later than the end of the workday tomorrow, November 26, 2014.

Sincerely,
BLACKBERRY CORPORATION
Per:

_____
John S. Chen
Executive Chair and CEO

I hereby confirm that I have read and understood the above, and that I accept this new position.

Accepted:_____        Date:_25th Nov 2014_____
                    Neelam Sandhu

Document Number HR00842.01
Last Date Updated: 2013/07/12

**BlackBerry Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

BB13-00000333

**BlackBerry.**

# Restrictive Covenant Addendum

## United States (California)

## 1. Non-solicitation of Employees

Employee agrees that while employed by or engaged by BlackBerry Limited, or its subsidiaries, successors or affiliates ("BlackBerry") and for a period of 12 months thereafter, Employee shall not, without the prior written consent of BlackBerry, induce or attempt to influence, directly or indirectly, an employee of BlackBerry to leave the employ of BlackBerry and shall not recruit, directly or indirectly, an employee of BlackBerry that has left the employ of BlackBerry within the past 2 months.

## 2. Non-solicitation of Customers

Employee agrees that while employed by or engaged by BlackBerry and for a period of 2 years thereafter, Employee shall not, without the prior written consent of BlackBerry, directly or indirectly solicit, endeavour to solicit, canvass, or otherwise deal with any Customer (as defined below) of BlackBerry for the purpose of selling or supplying to or purchasing from such Customer any products or services that are competitive with the products or services sold or supplied by BlackBerry. For the purposes of this paragraph, ***Customer*** shall mean any person that has done business with BlackBerry within the two years preceding Employee's last day of employment with BlackBerry and any person who Employee is or should reasonably be aware that BlackBerry has actively solicited for business in the six months preceding Employee's last day of employment with BlackBerry.

## 3. Reasonableness of Non-Solicitation Obligations

Employee confirms that the obligations in Sections 1 and 2 are fair and reasonable given that, among other reasons:

- Employee will be exposed to Confidential Information regarding the particular requirements of BlackBerry's Customers and regarding BlackBerry's unique relationship with and methods for satisfying the needs of such Customers, all of which Employee agrees not to act upon to the detriment of BlackBerry; and/or
- Employee will be performing important development work on the products owned or marketed by BlackBerry;

and Employee agrees that the obligations in Sections 1 and 2 are reasonably necessary for the protection of BlackBerry's proprietary interests and that, given Employee's general knowledge and experience, such obligations would not prevent Employee from being gainfully employed if the employment relationship were to end. Employee also agrees that the obligations in Sections 1 and 2 are in addition to the non-disclosure and other obligations of Employee.

Document Number HR00887
Last Date Updated: 2013/07/29

CONFIDENTIAL

BB13-00000334

**::: BlackBerry.**

## 4. Severability

Employee also agrees that the obligations in Sections 1 and 2 are each independent covenants, and if any provision, or part thereof, contained in this Restrictive Covenant Addendum is prohibited or declared invalid, illegal or unenforceable by a court or other lawful authority, this Addendum shall continue in force, with respect to the enforceable provisions, and all rights and remedies accrued under the enforceable provisions shall survive any such declaration.

---

Signature of Employee

NEELAM SANDHU

Name of Employee (Print)

25ᵗʰ Nov 2014.

Date

---

CONFIDENTIAL

**⁚⁚⁚ BlackBerry.**

November 25, 2014

Neelam Sandhu
c/o BlackBerry Corporation
█████████████████████████

Dear Neelam,

This letter cancels and supersedes the letter of October 20, 2014.

This letter is to confirm that, in connection with your employment by BlackBerry Corporation, a subsidiary of BlackBerry Limited ("BlackBerry"), we will make the following recommendations to the Compensation, Nomination and Governance Committee (CNG) of BlackBerry, subject to the terms set out below for each recommendation:

(A)  **Restricted Share Units (RSUs)** – A recommendation will be made to the Compensation, Nomination and Governance Committee (CNG) that you should be allowed to participate in the BlackBerry Limited Equity Incentive Plan. We will propose that the CNG Committee approve a grant with a value of $25,000 USD. The actual number of RSUs awarded will be determined in accordance with BlackBerry's policy on granting equity awards by converting the above US dollar value into a number of RSUs based on the closing price of BlackBerry's common shares on Nasdaq on the grant date and rounded down to nearest RSU (whole numbers only). Any grant will be at the sole discretion of the CNG Committee and, if made, will not be made until the next regularly scheduled meeting of the CNG Committee to consider the grant of RSUs and will be made in accordance with BlackBerry's policy on granting equity awards. The specific terms and conditions of any RSUs granted will be governed by the BlackBerry Limited Equity Incentive Plan and the RSU agreement relating to any such grant. We will have no responsibility in the event the CNG Committee determines to grant you no RSUs or fewer RSUs than recommended.

-AND-

(B)  **Long-Term Incentive Program (LTIP) Eligibility** – In addition, starting calendar 2015, you may be eligible to participate in BlackBerry's Long-Term Incentive Program (LTIP), under which you may receive an annual equity grant. LTIP awards are at BlackBerry's discretion and subject to approval by the CNG Committee, and subject to the terms of the BlackBerry Limited Equity Incentive Plan, as applicable. Your eligibility to participate in the LTIP is not a guarantee that any equity will be granted in a given year.

In particular (i) you will have no claim relating to your Equity Award or any losses or potential losses in the event that your employment with BlackBerry Corporation is terminated for whatever reason (whether lawful or unlawful) and (ii) nothing in the grant of any options to you or in the terms of this letter or of the Plan will create or imply any employment relationship with BlackBerry Limited nor any right to continued employment with BlackBerry Corporation.

Yours sincerely,
BlackBerry Limited

John S. Chen
Executive Chair and CEO

Document Number: HR00838.01
Last Updated Date: 2013/09/10

**BlackBerry Limited** 2200 University Avenue East, Waterloo, Ontario, Canada N2K 0A7  tel: +1 (519) 888-7465  fax: +1 (519) 888-1975

CONFIDENTIAL

BB13-00000336

# EXHIBIT 5

**⋮⋮⋮ BlackBerry.**

May 18, 2016

Neelam Sandhu

███████████████████

United States of America

Dear Neelam,

Congratulations! I am pleased to offer you a promotion to Senior Director of Business Operations, Office of the CEO on the BlackBerry Executive Team at BlackBerry Corporation ("BlackBerry").

This offer incorporates the terms and conditions of your previous employment agreement with BlackBerry or its affiliates, by which you will continue to be bound, except as specifically defined below.

This offer is based on the following terms and conditions:

1) **Employment**

   a)  Effective Date – Your promotion is effective May 22, 2016.

   b)  Employment Status – You will continue to be employed on a regular full-time basis. Your employment at BlackBerry continues to be "at will". As such, subject to the provisions of Section 4 of this letter, either you or BlackBerry may terminate the employment relationship at any time, for any reason, with or without cause, without any further compensation.

   c)  Title – Your title will be Senior Director of Business Operations, Office of the CEO at Accountability Level H.

   d)  Reporting Relationship – You will continue to report to the Executive Chair & CEO.

   e)  Location – You will continue to work from BlackBerry's Pleasanton location. However, BlackBerry may at its sole discretion, appoint another work location in the future.

   f)  Hours of Work – BlackBerry's standard work-week is 40 hours. However you will be required to devote whatever time is necessary to complete the requirements of your position, which may exceed 40 hours per week from time to time.

---

**BlackBerry Corporation**
6700 Koll Center Parkway, 2ⁿᵈ Floor, Suite 200, Pleasanton, California, 94566 USA.  tel: +1 (925) 931-6060  fax: +1 (925) 931-6061

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL                                                                 BB13-00000425

2. N. Sandhu 18/05/2016

## 2) Compensation

a) Base Salary – Your bi-weekly base salary will be $6,307.69 USD ($164,000 USD annualized), paid bi-weekly, less payroll deductions and required withholdings. By signing this letter you agree to receive your salary via direct deposit.

b) Variable incentive Pay (ViP) Program - You will continue to be eligible to participate in BlackBerry's annual Variable incentive Pay (ViP) Program, pursuant to ViP guidelines. The ViP Program provides you with an opportunity to earn additional pay on top of your annual base salary. For your position, the annual target incentive will be 30% of your base salary. Your ViP payout will be based on base salary you receive during the respective fiscal year while you are an active employee and you must be an active employee on the day of payout to receive a ViP award. To learn more about BlackBerry's ViP Program please visit go/vip.

c) BlackBerry's incentive plans are designed to address the conditions of an ever-changing marketplace and BlackBerry cannot make definitive representations concerning the continuation of format or the size of individual awards under the plans. The incentive plans are subject to change at the sole discretion of BlackBerry.

d) Equity Offer - In connection with this employment offer, a recommendation will be made to the Executive Chair and CEO of BlackBerry, John Chen, that you be granted equity. The details of any equity offer will be provided in a separate letter from BlackBerry Limited.

## 3) Benefits

a) You will continue to be eligible to participate in BlackBerry's benefits package, which may be amended by BlackBerry at its sole discretion.

b) You will accrue vacation at the accrual rate pursuant to the BlackBerry vacation policy in effect from time to time (the current vacation policy in effect provides for accrual of twenty (20) days per year). Vacation accrual, usage, and scheduling are subject to the terms of BlackBerry's U.S. vacation policy, which may be amended by BlackBerry at is sole discretion from time to time.

## 4) Cessation of Employment

a) Just as you may resign from employment with BlackBerry at any time, BlackBerry may terminate your employment at any time. Your employment at BlackBerry is "at-will" and may be terminated with or without notice and with or without cause. This policy may only be changed in a writing signed by BlackBerry's Executive Chair and CEO authorizing such a change.

b) If you are involuntary terminated as a result of layoff or a reduction in force, you are eligible for a payment in an amount equal to four (4) weeks of base salary, plus two (2) weeks of base salary for each year of service; provided, however, that the total amount of such Severance Benefit shall not exceed twenty (20) weeks of base salary. Notwithstanding the preceding sentence, no payment shall be paid unless you timely return a signed release to the Company and such release becomes irrevocable in accordance with applicable law.

**BlackBerry Corporation**
6700 Koll Center Parkway, 2nd Floor, Suite 200, Pleasanton, California, 94566 USA. tel: +1 (925) 931-6060 fax: +1 (925) 931-6061

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

BB13-00000426

3. N. Sandhu 18/05/2016

The amount you may be eligible to receive upon cessation of employment may be modified in concurrence with future changes in employment terms, such as, but not limited to, transfer, promotion or pay modification, to provide payment based on the policy that may be in effect from time to time. BlackBerry may amend this cessation of employment provision at any time.

At the time of cessation of your employment for any reason, you are required to and agree to return all BlackBerry property, including equipment, devices or information in whatever form it is stored.

**5) Conditions of Employment**

a) Attached as Schedule A to this promotion letter is the BlackBerry Restrictive Covenant Addendum (the "RCA"). As a condition of accepting this promotion, you agree to sign and be bound by all of the terms and conditions of the RCA.

b) That as a BlackBerry employee you may be deemed a restricted insider from time to time, in which event you will be subject to certain restrictions in relation to the purchase and sale of BlackBerry stock. You may also be subject to certain reporting requirements. Please refer to the BlackBerry Insider Trading Policy for more information.

All other terms and conditions of your employment agreement continue to govern your employment.

To confirm your acceptance of this new position, please sign below and return one copy to Amy Smith in BlackBerry Building B on or before May 26, 2016.

Sincerely,

BLACKBERRY CORPORATION

Per: _____
Nita C. White-Ivy
Executive Vice President
Human Resources

I confirm that I have read and understood the above and accept this new position.

Accepted: _____    Date: ___24ᵗʰ May 2016___
                      Neelam Sandhu

**BlackBerry Corporation**
6700 Koll Center Parkway, 2ⁿᵈ Floor, Suite 200, Pleasanton, California, 94566 USA.  tel: +1 (925) 931-6060  fax: +1 (925) 931-6061

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

**:::BlackBerry**

# Restrictive Covenant Addendum

## United States (California)

## SCHEDULE A

## 1.    Confidential Information

Employee understands and agrees that as part of Employee's employment with BlackBerry Limited, or its subsidiaries, successors, or affiliates ("BlackBerry") and to assist with the performance of Employee's duties, Employee will receive, conceive, observe, and/or develop Confidential Information (as defined below). Employee understands and agrees that this Confidential Information is the exclusive property of BlackBerry and agrees to preserve in confidence and not to disclose or use, either during or after the term of this agreement, any Confidential Information known or provided to Employee as a result of Employee's relationship with BlackBerry, whether or not conceived of or developed by Employee, except as required in the performance of Employee's services for and to BlackBerry. ***Confidential Information*** includes but is not limited to all plans, trade secrets, proprietary information, data, know-how, processes, patented or proprietary technologies, designs, hardware, software, software code, operating systems, techniques, specifications, drawings, instructions, research, formulae, applications, materials, test procedures and results, chemical and ceramic formulations, compositions and products, equipment, identity and description of records, customer lists, methods for identifying prospective customers and communicating with prospective or current customers, internal memoranda or policies, supplier identity, marketing and sales plans, pricing information and strategies, forecasts, margins, plans for expansion of products or services, business strategies, computer data, financial information, costs, confidential information of other employees, and all other information, concepts, or ideas involving or reasonably related to BlackBerry's business or prospective business and not generally available to the public, or information received by BlackBerry that BlackBerry has a bona fide obligation, contractual or otherwise, not to disclose. Employee acknowledges that BlackBerry maintains much of its Confidential Information on its secure network, goes to great length to secure and protect the Confidential Information, and that the Confidential Information provides a competitive advantage to BlackBerry.

Employee further agrees that, both during and after employment with BlackBerry, Employee will not directly or indirectly divulge, furnish, or make accessible to any person, firm, corporation, association, or other entity, or use in any manner, any Confidential Information or cause any Confidential Information to enter the public domain, except as may be required in the regular course of Employee's employment by BlackBerry or if the information enters the public domain through no fault of Employee's.

## 2.    Non-solicitation of Employees

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, solicit or attempt to solicit or influence, directly or indirectly, any person who is in the employment of, or is providing services to, BlackBerry to leave such employment or business relationship and shall not solicit or attempt to solicit or influence, directly or indirectly, a former employee who has left the employ of BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry.

Last updated: 11/24/2015

**∴∴ BlackBerry**

## 3.    Non-solicitation of Customers

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, directly or indirectly solicit, service, endeavor to solicit or service, or otherwise have any business dealing with any Customer (as defined below) of BlackBerry for the purpose of selling or supplying to or purchasing from such Customer any product or service that is competitive with the products or services sold or supplied by BlackBerry. For the purposes of this paragraph, *Customer* means any person or entity with which Employee had contact while at BlackBerry that has done business with BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry or any person or entity with which Employee had contact while at BlackBerry that Employee is or should reasonably be aware that BlackBerry solicited for business in the twelve (12) months preceding Employee's last day of employment with BlackBerry.

## 4.    Continuation of Restrictive Period(s)

Employee agrees that in the event Employee breaches any provision(s) in Sections 1, 2, and/or 3, the restrictive time period(s) set for in the specific Section(s) shall be extended by the period of such violation. Employee therefore understands and agrees that a breach of any provision(s) in Sections 1, 2, and/or 3 effectively restarts the restrictive time period(s) for the specific Section(s) with each violation.

## 5.    Reasonableness of Obligations

Employee confirms that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are fair and reasonable given that, among other reasons:

- Employee will be exposed to Confidential Information (as defined in Section 1) and regarding BlackBerry's unique relationship with and methods for satisfying the needs of such Customers, all of which Employee agrees not to act upon to the detriment of BlackBerry;

- Employee will gain extensive, valuable knowledge of BlackBerry and its Customers' business and internal operations and will develop a close, familiar working relationship with the Customers, which experience would enable Employee to be exceptionally competitive with BlackBerry should Employee choose to leave BlackBerry and offer the same services on his or her own or for a competitor; and

- Employee will be performing important development work on the products owned or marketed by BlackBerry.

Employee further agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are reasonably necessary for the protection of BlackBerry's proprietary interests and that, given Employee's general knowledge and experience, such obligations would not prevent Employee from being gainfully employed if the employment or consulting relationship were to end. Employee also agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are in addition to the non-disclosure and other obligations of Employee.

Last updated: 11/24/2015

BB13-00000429

## :::BlackBerry

### 6.    Choice of Law and Forum

This agreement shall be construed in accordance with and governed for all purposes by the laws of the state in which Employee resides at the time of the signing of this agreement. Employee and BlackBerry irrevocably agree to submit any claim arising from or otherwise related to this agreement to the exclusive jurisdiction of the state and federal courts of the state in which Employee resides at the time of the signing of this agreement, and irrevocably waive any objection which either may have to the same, including but not limited to any objection for lack of personal jurisdiction.

### 7.    Severability

Employee agrees that the obligations in this agreement are each independent covenants and, if any provision or part thereof contained in this Restrictive Covenant Addendum is prohibited or declared invalid, illegal, or unenforceable by a court or other lawful authority, this Addendum shall continue in force with respect to the remaining enforceable provisions and all rights and remedies accrued under the enforceable provisions shall survive any such declaration.

Signature of Employee

NEELAM SANDHU
Name of Employee (Print)

27th October 2016
Date

Last updated: 11/24/2015

# EXHIBIT 6

**∷∷ BlackBerry.**

February 15, 2019

Neelam Sandhu

████████████

Dear Neelam,

Congratulations! I am pleased to offer you a promotion to Vice President of Business Operations, Office of the CEO at BlackBerry Corporation ("BlackBerry").

This offer incorporates the terms and conditions of your previous employment agreement with BlackBerry or its affiliates, by which you will continue to be bound, except as specifically defined below.

This offer is based on the following terms and conditions:

1)  **EMPLOYMENT**

    a)  Your promotion is effective March 1, 2019.

    b)  You will continue to be employed on a regular full-time basis. Your employment at BlackBerry continues to be "at will". As such, subject to the provisions of Section 4 of this letter, either you or BlackBerry may terminate the employment relationship at any time, for any reason, with or without cause, without any further compensation.

    c)  Your title will be Vice President of Business Operations, Office of the CEO.

    d)  You will continue to report to the Executive Chairman & Chief Executive Officer.

    e)  You will continue to work from BlackBerry's San Ramon location. However, BlackBerry may at its sole discretion, appoint another work location in the future.

    f)  BlackBerry's standard work-week is 40 hours. However, you will be required to devote whatever time is necessary to complete the requirements of your position, which may exceed 40 hours per week from time to time.

2)  **COMPENSATION**

    a)  Your bi-weekly base salary will be $8,884.62 USD ($231,000 USD annualized), paid bi-weekly, less payroll deductions and required withholdings. By signing this letter, you agree to receive your salary via direct deposit.

    b)  You will continue to be eligible to participate in BlackBerry's annual Variable incentive Pay (ViP) Program, pursuant to ViP guidelines. The ViP Program provides you with an opportunity to earn additional pay on top of your annual base salary. For your position, the annual target incentive will be 50% of your base salary. Your ViP payout will be based on base salary you receive during the respective fiscal year while you are an active employee and you must be an active employee on the day of payout to receive a ViP award. To learn more about BlackBerry's ViP Program please visit go/vip.

**BlackBerry Corporation**    Last Date Updated: 2018/12/21
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA. tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

c) BlackBerry's incentive plans are designed to address the conditions of an ever-changing marketplace and BlackBerry cannot make definitive representations concerning the continuation of format or the size of individual awards under the plans. BlackBerry's incentive plans are subject to change at the sole discretion of BlackBerry.

d) In connection with this offer, as Executive Chair and CEO, I have approved a recommendation that you be granted equity. The details of any equity offer will be provided in a separate letter from BlackBerry Limited.

## 3) BENEFITS

a) You will continue to be eligible to participate in BlackBerry's benefits package, which may be amended by BlackBerry at its sole discretion.

b) You will accrue vacation at the accrual rate pursuant to the BlackBerry vacation policy in effect from time to time (the current vacation policy in effect provides for entitlement of twenty-five (25) days per year, accrued on a monthly basis). Vacation accrual, usage, and scheduling are subject to the terms of BlackBerry's U.S. vacation policy, which may be amended by BlackBerry at its sole discretion from time to time.

## 4) CESSATION OF EMPLOYMENT

a) Just as you may resign from employment with BlackBerry at any time, BlackBerry may terminate your employment at any time. Your employment at BlackBerry is "at-will" and may be terminated with or without notice and with or without cause. This policy may only be changed in a writing signed by BlackBerry's Executive Chair and CEO authorizing such a change.

b) If you are terminated without cause, you are eligible for a payment in an amount equal to six (6) weeks of base salary plus three (3) weeks of base salary per completed year of service; provided, however, that the total amount of such severance benefit shall not exceed twenty-six (26) weeks of base salary. Notwithstanding the preceding sentence, none of these payments shall be paid unless you timely return a signed release to the Company and such release becomes irrevocable in accordance with applicable law.

The amount you may be eligible to receive upon cessation of employment may be modified in concurrence with future changes in employment terms, such as, but not limited to, transfer, promotion or pay modification, to provide payment based on the policy that may be in effect from time to time. BlackBerry may amend this cessation of employment provision at any time.

c) At the time of cessation of your employment for any reason, you are required to and agree to return all BlackBerry property, including equipment, devices and information in whatever form it is stored.

## 5) CONDITIONS OF EMPLOYMENT

a) Attached as Schedule A to this promotion letter is the BlackBerry Restrictive Covenant Addendum (the "RCA"). As a condition of entering into this promotion you agree to sign and to be bound by all of the terms and conditions of the RCA.

**BlackBerry Corporation**    Last Date Updated: 2018/12/21
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA.  tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

CONFIDENTIAL

3. N. Sandhu 02/15/2019

b) That as a BlackBerry employee you may be deemed a restricted insider from time to time, in which event you will be subject to certain restrictions in relation to the purchase and sale of BlackBerry stock. You may also be subject to certain reporting requirements. Please refer to the BlackBerry Insider Trading Policy for more information.

6) **GENERAL**

a) BlackBerry has an accommodation process and policies in place and provides accommodations for employees with disabilities. If you require a specific accommodation because of a disability or medical need, please contact Human Resources at HRHealthMgt@blackberry.com so that the accommodation process can begin accordingly.

All other terms and conditions of your employment agreement continue to govern your employment.

To confirm your acceptance of this new position, please sign below and return one copy to Nita White-Ivy on or before February 22, 2019.

Sincerely,

BLACKBERRY CORPORATION

Per: _____
John S. Chen
Executive Chairman of the Board and CEO

I confirm that I have read and understood the above and accept this new position.

Accepted: _____     Date: 19 Feb 2019
Neelam Sandhu

**BlackBerry Corporation**     Last Date Updated: 2018/12/21
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA.  tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

CONFIDENTIAL

**⁙ BlackBerry**

# Restrictive Covenant Addendum

## United States (California)

## SCHEDULE A

## 1.    Confidential Information

Employee understands and agrees that as part of Employee's employment with BlackBerry Limited, or its subsidiaries, successors, or affiliates ("BlackBerry") and to assist with the performance of Employee's duties, Employee will receive, conceive, observe, and/or develop Confidential Information (as defined below). Employee understands and agrees that this Confidential Information is the exclusive property of BlackBerry and agrees to preserve in confidence and not to disclose or use, either during or after the term of this agreement, any Confidential Information known or provided to Employee as a result of Employee's relationship with BlackBerry, whether or not conceived of or developed by Employee, except as required in the performance of Employee's services for and to BlackBerry. *Confidential Information* includes but is not limited to all plans, trade secrets, proprietary information, data, know-how, processes, patented or proprietary technologies, designs, hardware, software, software code, operating systems, techniques, specifications, drawings, instructions, research, formulae, applications, materials, test procedures and results, chemical and ceramic formulations, compositions and products, equipment, identity and description of records, customer lists, methods for identifying prospective customers and communicating with prospective or current customers, internal memoranda or policies, supplier identity, marketing and sales plans, pricing information and strategies, forecasts, margins, plans for expansion of products or services, business strategies, computer data, financial information, costs, confidential information of other employees, and all other information, concepts, or ideas involving or reasonably related to BlackBerry's business or prospective business and not generally available to the public, or information received by BlackBerry that BlackBerry has a bona fide obligation, contractual or otherwise, not to disclose. Employee acknowledges that BlackBerry maintains much of its Confidential Information on its secure network, goes to great length to secure and protect the Confidential Information, and that the Confidential Information provides a competitive advantage to BlackBerry.

Employee further agrees that, both during and after employment with BlackBerry, Employee will not directly or indirectly divulge, furnish, or make accessible to any person, firm, corporation, association, or other entity, or use in any manner, any Confidential Information or cause any Confidential Information to enter the public domain, except as may be required in the regular course of Employee's employment by BlackBerry or if the information enters the public domain through no fault of Employee's.

## 2.    Non-solicitation of Employees

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, solicit or attempt to solicit or influence, directly or indirectly, any person who is in the employment of, or is providing services to, BlackBerry to leave such employment or business relationship and shall not solicit or attempt to solicit or influence, directly or indirectly, a former employee who has left the employ of BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry.

Last updated: 10/30/2017

**:::BlackBerry**

### 3.    Non-solicitation of Customers

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, directly or indirectly solicit, service, endeavor to solicit or service, or otherwise have any business dealing with any Customer (as defined below) of BlackBerry for the purpose of selling or supplying to or purchasing from such Customer any product or service that is competitive with the products or services sold or supplied by BlackBerry. For the purposes of this paragraph, **Customer** means any person or entity with which Employee had contact while at BlackBerry that has done business with BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry or any person or entity with which Employee had contact while at BlackBerry that Employee is or should reasonably be aware that BlackBerry solicited for business in the twelve (12) months preceding Employee's last day of employment with BlackBerry.

### 4.    Continuation of Restrictive Period(s)

Employee agrees that in the event Employee breaches any provision(s) in Sections 1, 2, and/or 3, the restrictive time period(s) set for in the specific Section(s) shall be extended by the period of such violation. Employee therefore understands and agrees that a breach of any provision(s) in Sections 1, 2, and/or 3 effectively restarts the restrictive time period(s) for the specific Section(s) with each violation.

### 5.    Reasonableness of Obligations

Employee confirms that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are fair and reasonable given that, among other reasons:

- Employee will be exposed to Confidential Information (as defined in Section 1) and regarding BlackBerry's unique relationship with and methods for satisfying the needs of such Customers, all of which Employee agrees not to act upon to the detriment of BlackBerry;

- Employee will gain extensive, valuable knowledge of BlackBerry and its Customers' business and internal operations and will develop a close, familiar working relationship with the Customers, which experience would enable Employee to be exceptionally competitive with BlackBerry should Employee choose to leave BlackBerry and offer the same services on his or her own or for a competitor; and

- Employee will be performing important development work on the products owned or marketed by BlackBerry.

Employee further agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are reasonably necessary for the protection of BlackBerry's proprietary interests and that, given Employee's general knowledge and experience, such obligations would not prevent Employee from being gainfully employed if the employment or consulting relationship were to end. Employee also agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are in addition to the non-disclosure and other obligations of Employee.

Last updated: 10/30/2017

**≡≡ BlackBerry**

## 6.    Choice of Law and Forum

This agreement shall be construed in accordance with and governed for all purposes by the laws of the state in which Employee resides at the time of the signing of this agreement. Employee and BlackBerry irrevocably agree to submit any claim arising from or otherwise related to this agreement to the exclusive jurisdiction of the state and federal courts of the state in which Employee resides at the time of the signing of this agreement, and irrevocably waive any objection which either may have to the same, including but not limited to any objection for lack of personal jurisdiction.

## 7.    Severability

Employee agrees that the obligations in this agreement are each independent covenants and, if any provision or part thereof contained in this Restrictive Covenant Addendum is prohibited or declared invalid, illegal, or unenforceable by a court or other lawful authority, this Addendum shall continue in force with respect to the remaining enforceable provisions and all rights and remedies accrued under the enforceable provisions shall survive any such declaration.

Signature of Employee

NEELAM SANDHU
Name of Employee (Print)

19 Feb 2019
Date

Last updated  10/30/2017

**❝ BlackBerry**

February 15, 2019

Neelam Sandhu

████████████

United States of America

Dear Neelam,

This letter is to confirm that, in connection with your employment by BlackBerry Corporation, a subsidiary of BlackBerry Limited ("BlackBerry"), I have approved the following recommendation, subject to the terms set out below:

(A)  **Time-Based Restricted Share Units (TBRSUs)** – As Executive Chairman & Chief Executive Officer, I have approved a recommendation that you participate in the BlackBerry Limited Equity Incentive Plan (the "Plan") with a TBRSU grant with a value of $50,000 USD. The actual number of TBRSUs awarded will be determined in accordance with BlackBerry's Policy on Granting Equity Awards by converting the above US dollar value into a number of TBRSUs based on the closing price of BlackBerry's common shares on NYSE on the grant date and rounded down to nearest TBRSU (whole numbers only). The grant will be made on the next available quarterly grant date in accordance with the Policy on Granting Equity Awards. The specific terms and conditions of any TBRSUs granted will be governed by the Plan and the TBRSU award agreement relating to any such grant.

-AND-

(B)  **Performance-Based Restricted Share Units (PBRSUs)** – As Executive Chairman & Chief Executive Officer, I have approved for you to participate in the BlackBerry Limited Equity Incentive Plan (the "Plan") with a PBRSU grant with a value of $50,000 USD. The actual number of PBRSUs awarded with be determined in accordance with the Policy on Granting Equity Awards by converting the above US dollar value into a number of PBRSUs based on the closing price of BlackBerry's common shares on NYSE on the grant date and rounded down to the nearest PBRSU (whole numbers only). The PBRSUs will vest entirely, partially, or not at all, based on BlackBerry's Annual Operation Plan (AOP) Total Software and Services Revenue attainment and the threshold of a positive Operating Income in the next fiscal year after the grant date (as defined in the PBRSU award agreement). The grant will be made on the next available quarterly grant date in accordance with the Policy on Granting Equity Awards. The specific terms and conditions of any PBRSUs granted will be governed by the Plan and the PBRSU award agreement relating to any such grant.

In particular (i) you will have no claim relating to your Equity Award or any losses or potential losses in the event that your employment with BlackBerry Corporation is terminated for whatever reason (whether with or without cause) and (ii) nothing in the grant of any equity award to you or in the terms of this letter or of the Plan will create or imply any employment relationship with BlackBerry Limited nor any right to continued employment with BlackBerry Corporation.

Yours sincerely,
BlackBerry Limited

Per:_____
John S. Chen
Executive Chairman & Chief Executive Officer

Last Updated Date  2017/11/20

**BlackBerry Limited** 2200 University Avenue East, Waterloo, Ontario, Canada N2K 0A7  tel: +1 (519) 888-7465  fax: +1 (519) 888-1975

# EXHIBIT 7

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB315F2EA



March 15, 2021

Neelam Sandhu



Dear Neelam,

I am pleased to inform you of your promotion to Senior Vice President and Chief Elite Customer Success Officer, effective March 21, 2021.  Your dedication and loyalty to BlackBerry have not gone unnoticed.  I also very much appreciate your support and hard work.

With this promotion, your focus will be dedicated to the Elite Customer Success Program, which as you know is very critical to BlackBerry's revenue growth. Therefore, we will work on transitioning the auxiliary tasks of Travel and Expense management as well as MAP update and coordination in the next few weeks.  Thank you for your patience and support during the transition period.

Attached you will find your promotion employment agreement and equity letter for your acceptance and signature.

My congratulations to you for this well-deserved promotion.

Sincerely,

John S. Chen
Executive Chairman & Chief Executive Officer

Cc:  Nita White-Ivy, EVP, HR

**BlackBerry Corporation**
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA. tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB315F2EA



March 15, 2021

Neelam Sandhu

█████████████████

Dear Neelam,

Congratulations! I am pleased to offer you a promotion to Senior Vice President and Chief Elite Customer Success Officer at BlackBerry Corporation ("BlackBerry").

This offer incorporates the terms and conditions of your previous employment agreement with BlackBerry or its affiliates, by which you will continue to be bound, except as specifically modified below.

This offer is based on the following terms and conditions:

**1) EMPLOYMENT**

   a)  Your promotion is effective March 21, 2021.

   b)  You will continue to be employed on a regular full-time basis. Your employment at BlackBerry continues to be "at will". As such, subject to the provisions of Section 4 of this letter, either you or BlackBerry may terminate the employment relationship at any time, for any reason, with or without cause, without any further compensation.

   c)  Your title will be Senior Vice President and Chief Elite Customer Success Officer.

**2) COMPENSATION**

   a)  Your bi-weekly base salary will be $10,961.53 USD ($285,000 USD annualized), paid bi-weekly, less payroll deductions and required withholdings. By signing this letter, you agree to receive your salary via direct deposit to your bank account.

   b)  You will continue to be eligible to participate in BlackBerry's annual Variable incentive Pay (ViP) Program, pursuant to ViP guidelines. The ViP Program provides you with an opportunity to earn additional pay on top of your annual base salary. For your position, the annual target incentive will be 60% of your base salary. Your ViP payout will be based on base salary you receive during the respective fiscal year while you are an active employee and you must be an active employee on the day of payout to receive a ViP award. To learn more about BlackBerry's ViP Program please visit go/vip.

   c)  BlackBerry's incentive plans are designed to address the conditions of an ever-changing marketplace and BlackBerry cannot make definitive representations concerning the continuation of format or the size of individual awards under the plans. BlackBerry's incentive plans are subject to change at the sole discretion of BlackBerry.

Last Date Updated: 2020/07/30

**BlackBerry Corporation**
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA.  tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

CONFIDENTIAL

BB13-00000432

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB315F2EA

2. N. Sandhu 03/15/2021

d) In connection with this offer, as Executive Chairman and CEO, I have approved a recommendation that you be granted equity. The details of any equity offer will be provided in a separate letter from BlackBerry Limited.

## 3) CESSATION OF EMPLOYMENT

a) Just as you may resign from employment with BlackBerry at any time, BlackBerry may terminate your employment at any time. Your employment at BlackBerry is "at-will" and may be terminated with or without notice and with or without cause. This policy may only be changed in a writing signed by BlackBerry's Executive Chairman and CEO authorizing such a change.

b) If you are terminated without cause, you are eligible for a payment in an amount equal to eight (8) weeks of base salary plus three (3) weeks of base salary per completed year of service; provided, however, that the total amount of such severance benefit shall not exceed twenty-six (26) weeks of base salary. Notwithstanding the preceding sentence, none of these payments shall be paid unless you timely return a signed release to the Company and such release becomes irrevocable in accordance with applicable law.

The amount you may be eligible to receive upon cessation of employment may be modified in concurrence with future changes in employment terms, such as, but not limited to, transfer, promotion or pay modification, to provide payment based on the policy that may be in effect from time to time. BlackBerry may amend this cessation of employment provision at any time.

c) At the time of cessation of your employment for any reason, you are required to and agree to return all BlackBerry property, including equipment, devices, and information in whatever form it is stored.

## 4) CONDITIONS OF EMPLOYMENT

a) Attached as Schedule A to this promotion letter is the BlackBerry Restrictive Covenant Addendum (the "RCA"). As a condition of entering into this promotion you agree to sign and to be bound by all of the terms and conditions of the RCA.

b) That as a senior employee you will be considered a restricted insider and will be subject to certain restrictions in relation to the purchase and sale of BlackBerry stock. You may also be subject to certain reporting requirements. Please refer to the BlackBerry Insider Trading Policy for more information.

## 5) GENERAL

a) BlackBerry has an accommodation process and policies in place and provides accommodations for employees with disabilities. If you require a specific accommodation because of a disability or medical need, please contact Human Resources at HRHealthMgt@BlackBerry.com so that the accommodation process can begin accordingly.

All other terms and conditions of your previous employment agreement continue to govern your employment.

Last Date Updated: 2020/07/30

**BlackBerry Corporation**
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA.  tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

CONFIDENTIAL

BB13-00000433

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB315F2EA

3. N. Sandhu 03/15/2021

To confirm your acceptance of this new position, please sign below within DocuSign and click "Finish" on or before March 17, 2021.

Sincerely,

BLACKBERRY CORPORATION

Per: _____
John S. Chen
Executive Chairman & Chief Executive Officer

I confirm that I have read and understood the above and accept this new position.

Accepted: Neelam Sandhu              Date: 3/15/2021
          Neelam Sandhu

Last Date Updated: 2020/07/30

**BlackBerry Corporation**
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA.  tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

CONFIDENTIAL                                                                    BB13-00000434

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB315F2EA

**⁞⁞⁞ BlackBerry.**

March 15, 2021

Neelam Sandhu

███████████████

Dear Neelam,

This letter is to confirm that, in connection with your employment by BlackBerry Corporation, a subsidiary of BlackBerry Limited ("BlackBerry"), I have approved the following recommendation, subject to the terms set out below:

(A) **Time-Based Restricted Share Units (TBRSUs)** – As Executive Chairman & Chief Executive Officer, I have approved a recommendation that you participate in the BlackBerry Limited Equity Incentive Plan (the "Plan") with a TBRSU grant with a value of $75,000 USD. The actual number of TBRSUs awarded will be determined in accordance with BlackBerry's Policy on Granting Equity Awards by converting the above US dollar value into a number of TBRSUs based on the closing price of BlackBerry's common shares on NYSE on the grant date and rounded down to nearest TBRSU (whole numbers only). The grant will be made on the next available quarterly grant date in accordance with the Policy on Granting Equity Awards. The specific terms and conditions of any TBRSU granted will be governed by the Plan and the TBRSU award agreement relating to any such grant.

-AND-

(B) **Performance-Based Restricted Share Units (PBRSUs)** – As Executive Chairman & Chief Executive Officer, I have approved for you to participate in the BlackBerry Limited Equity Incentive Plan (the "Plan") with a PBRSU grant with a value of $75,000 USD. The actual number of PBRSUs awarded with be determined in accordance with the Policy on Granting Equity Awards by converting the above US dollar value into a number of PBRSUs based on the closing price of BlackBerry's common shares on NYSE on the grant date and rounded down to the nearest PBRSU (whole numbers only). The PBRSUs will vest entirely, partially, or not at all, based on BlackBerry's Annual Operation Plan (AOP) Total Software and Services Revenue attainment and the threshold of a positive Operating Income in the next fiscal year after the grant date (as defined in the PBRSU award agreement). The grant will be made on the next available quarterly grant date in accordance with the Policy on Granting Equity Awards. The specific terms and conditions of any PBRSUs granted will be governed by the Plan and the PBRSU award agreement relating to any such grant.

In particular (i) you will have no claim relating to your Equity Award or any losses or potential losses in the event that your employment with BlackBerry Corporation is terminated for whatever reason (whether with or without cause) and (ii) nothing in the grant of any equity award to you or in the terms of this letter or of the Plan will create or imply any employment relationship with BlackBerry Limited nor any right to continued employment with BlackBerry Corporation.

Yours sincerely,
BlackBerry Limited

Per: _____
John S. Chen
Executive Chairman & Chief Executive Officer

Last Updated Date: 2017/11/20

**BlackBerry Limited** 2200 University Avenue East, Waterloo, Ontario, Canada N2K 0A7  tel: +1 (519) 888-7465  fax: +1 (519) 888-1975

# BlackBerry

# Restrictive Covenant Addendum

## United States (<u>California</u>)

## SCHEDULE A

### 1.      Confidential Information

Employee understands and agrees that as part of Employee's employment with BlackBerry Limited, or its subsidiaries, successors, or affiliates ("BlackBerry") and to assist with the performance of Employee's duties, Employee will receive, conceive, observe, and/or develop Confidential Information (as defined below). Employee understands and agrees that this Confidential Information is the exclusive property of BlackBerry and agrees to preserve in confidence and not to disclose or use, either during or after the term of this agreement, any Confidential Information known or provided to Employee as a result of Employee's relationship with BlackBerry, whether or not conceived of or developed by Employee, except as required in the performance of Employee's services for and to BlackBerry. **Confidential Information** includes but is not limited to all plans, trade secrets, proprietary information, data, know-how, processes, patented or proprietary technologies, designs, hardware, software, software code, operating systems, techniques, specifications, drawings, instructions, research, formulae, applications, materials, test procedures and results, chemical and ceramic formulations, compositions and products, equipment, identity and description of records, customer lists, methods for identifying prospective customers and communicating with prospective or current customers, internal memoranda or policies, supplier identity, marketing and sales plans, pricing information and strategies, forecasts, margins, plans for expansion of products or services, business strategies, computer data, financial information, costs, confidential information of other employees, and all other information, concepts, or ideas involving or reasonably related to BlackBerry's business or prospective business and not generally available to the public, or information received by BlackBerry that BlackBerry has a bona fide obligation, contractual or otherwise, not to disclose. Employee acknowledges that BlackBerry maintains much of its Confidential Information on its secure network, goes to great length to secure and protect the Confidential Information, and that the Confidential Information provides a competitive advantage to BlackBerry.

Employee further agrees that, both during and after employment with BlackBerry, Employee will not directly or indirectly divulge, furnish, or make accessible to any person, firm, corporation, association, or other entity, or use in any manner, any Confidential Information or cause any Confidential Information to enter the public domain, except as may be required in the regular course of Employee's employment by BlackBerry or if the information enters the public domain through no fault of Employee's.

### 2.      Non-solicitation of Employees

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, solicit or attempt to solicit or influence, directly or indirectly, any person who is in the employment of, or is providing services to, BlackBerry to leave such employment or business relationship and shall not solicit or attempt to solicit or influence, directly or indirectly, a former employee who has left the employ of BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry.

Last updated: 10/30/2017

**BlackBerry**

## 3.    Non-solicitation of Customers

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, directly or indirectly solicit, service, endeavor to solicit or service, or otherwise have any business dealing with any Customer (as defined below) of BlackBerry for the purpose of selling or supplying to or purchasing from such Customer any product or service that is competitive with the products or services sold or supplied by BlackBerry. For the purposes of this paragraph, *Customer* means any person or entity with which Employee had contact while at BlackBerry that has done business with BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry or any person or entity with which Employee had contact while at BlackBerry that Employee is or should reasonably be aware that BlackBerry solicited for business in the twelve (12) months preceding Employee's last day of employment with BlackBerry.

## 4.    Continuation of Restrictive Period(s)

Employee agrees that in the event Employee breaches any provision(s) in Sections 1, 2, and/or 3, the restrictive time period(s) set for in the specific Section(s) shall be extended by the period of such violation. Employee therefore understands and agrees that a breach of any provision(s) in Sections 1, 2, and/or 3 effectively restarts the restrictive time period(s) for the specific Section(s) with each violation.

## 5.    Reasonableness of Obligations

Employee confirms that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are fair and reasonable given that, among other reasons:

- Employee will be exposed to Confidential Information (as defined in Section 1) and regarding BlackBerry's unique relationship with and methods for satisfying the needs of such Customers, all of which Employee agrees not to act upon to the detriment of BlackBerry;

- Employee will gain extensive, valuable knowledge of BlackBerry and its Customers' business and internal operations and will develop a close, familiar working relationship with the Customers, which experience would enable Employee to be exceptionally competitive with BlackBerry should Employee choose to leave BlackBerry and offer the same services on his or her own or for a competitor; and

- Employee will be performing important development work on the products owned or marketed by BlackBerry.

Employee further agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are reasonably necessary for the protection of BlackBerry's proprietary interests and that, given Employee's general knowledge and experience, such obligations would not prevent Employee from being gainfully employed if the employment or consulting relationship were to end. Employee also agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are in addition to the non-disclosure and other obligations of Employee.

Last updated: 10/30/2017

**BlackBerry**

## 6.    Choice of Law and Forum

This agreement shall be construed in accordance with and governed for all purposes by the laws of the state in which Employee resides at the time of the signing of this agreement. Employee and BlackBerry irrevocably agree to submit any claim arising from or otherwise related to this agreement to the exclusive jurisdiction of the state and federal courts of the state in which Employee resides at the time of the signing of this agreement, and irrevocably waive any objection which either may have to the same, including but not limited to any objection for lack of personal jurisdiction.

## 7.    Severability

Employee agrees that the obligations in this agreement are each independent covenants and, if any provision or part thereof contained in this Restrictive Covenant Addendum is prohibited or declared invalid, illegal, or unenforceable by a court or other lawful authority, this Addendum shall continue in force with respect to the remaining enforceable provisions and all rights and remedies accrued under the enforceable provisions shall survive any such declaration.

DocuSigned by:

*Neelam Sandhu*

C8B5DFDC5C86437

Signature of Employee

Neelam Sandhu

Name of Employee (Print)

3/15/2021

Date

Last updated: 10/30/2017

# EXHIBIT 8



June 1, 2023

Neelam Sandhu

████████████████████

(Delivered by hand at BlackBerry's San Ramon office)

Dear Neelam,

This is to confirm your acceptance of the role of Chief Marketing & Elite Customer Success Officer.

The terms and conditions of your current Employment Agreement will continue to govern your employment with BlackBerry Corporation ("BlackBerry") except for the following modifications:

**1) Employment**

    **a)** Your new position title is Chief Marketing & Elite Customer Success Officer.

    **b)** You will continue to be employed on a regular full-time basis. Your employment at BlackBerry continues to be "at will."

**2. Compensation**

    **a)** There will be no change to your current bi-weekly base salary of $12,307.69 ($320,000 annualized), paid bi-weekly, less payroll deductions and required withholdings, deposited to your bank account on record with the payroll department.

    **b)** Your annual target incentive bonus of $192,000 will be split into two parts: 50% under Variable Incentive Pay (VIP) Program and 50% on Sales Incentive Pay (SIP) Program.

To confirm in writing your acceptance of your new position, please sign below and return a copy of this document to me by Monday, June 5, 2023.

Thank you for your ongoing dedication and commitment to BlackBerry.

Sincerely,

BlackBerry Corporation

Per:
Nita C. White-Ivy
Chief Human Resources Officer

Accepted:

_____    06 / 15 / 22
Neelam Sandhu (signature)            Date

BlackBerry Corporation, 3001 Bishop Drive, Suite 400, San Ramon, CA 94583 Tel: (925) 242-5660

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

BB13-00004615

# EXHIBIT 21

December 4, 2023

Neelam Sandhu

████████████████

Dear Neelam,

This letter confirms that, pursuant to your discussion with Kelly Cheun and me on this date, you have been relieved of all job duties effective immediately and your employment with BlackBerry Corporation ("BlackBerry") will cease effective December 15, 2023 (hereinafter the "Termination Date").

Upon the Termination Date, you will receive the following, subject to the terms below.

## Severance Benefits

- **Termination Compensation** – Following the Termination Date, BlackBerry will continue to pay you your current base salary for a period of fifty (50) weeks (the "Severance Period"), less required payroll deductions and withholdings.

- **Health Insurance Continuation** – If you elect to continue to be covered under BlackBerry's group medical insurance plan, subject to the terms and conditions provided for in the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), BlackBerry will pay 100% of the premiums from the Termination Date through the end of calendar year 2023. Information regarding your COBRA rights will be provided to you as required by law.

- **Release** – The above payments are conditional upon you signing the attached separation agreement and release and returning it to Phil Kurtz, Chief Legal Officer and Corporate Secretary, by the deadline specified therein.

## Salary Through Termination Date

You will receive payment of your regular salary through the Termination Date, subject to ordinary withholdings and deductions.

## Vacation Pay

You will receive payment for any accrued and unused vacation hours/days up to the Termination Date.

You will also receive the following after the Termination Date:

## Incentive Compensation

BlackBerry will pay any earned fiscal 2024 Sales Incentive Compensation Pay (SiP) Program bonus to you in accordance with the terms and conditions of your applicable SiP plan.

**<u>Business Expense Reimbursement</u>**

You will be reimbursed for any allowable business expenses incurred up to and including the Termination Date, per the company's Business Expense Reimbursement Policy. If you wish to claim any such unclaimed/not yet submitted allowable business expenses, please submit an expense reimbursement report within seven (7) days of your termination to Kelly Cheun.

**<u>Employee Share Purchase Plan</u>**

If you own BlackBerry shares through the BlackBerry Employee Share Purchase Plan (ESPP), you will need to access your Shareworks account within 90 days to indicate how you would like to receive your proceeds.

**<u>Return of Company Property</u>**

You must return all of BlackBerry's property in your possession (in the office and at your home) or under your control including any American Express credit card, keys, badge and building access cards, parking garage transmitter, laptop and other IT equipment/tools, BlackBerry materials and documents (in any form), on the Termination Date.

We thank you for your contributions to BlackBerry and extend to you our best wishes for the future. If you have any questions re: any of the above matters, please contact me.

Sincerely,

Richard Lynch
Chairman and Interim Chief Executive Officer

Enclosure: Confidential Agreement and General Release

cc:  HR File

ATTORNEYS' EYES ONLY

Confidential

## SEPARATION AGREEMENT AND RELEASE

This Separation Agreement and Release ("Agreement") is made by and between BlackBerry Corporation (the "Company"), and Neelam Sandhu ("Employee"). This Agreement is effective on the day Employee signs it (the "Effective Date").

WHEREAS, Employee was employed by the Company;

WHEREAS, on or about March 15, 2021, the Company and Employee entered into an employment agreement, which was modified on or about June 15, 2023, and again on or about September 1, 2023 (as amended, the "Employment Agreement");

WHEREAS, the Company has decided to terminate Employee's employment and Employee wishes to release the Company from any claims arising from or related to the employment relationship in exchange for a severance payment;

NOW THEREFORE, in consideration of the mutual promises made herein, the Company and Employee (each individually referred to as a "Party" and collectively as "the Parties") hereby agree as follows:

1.    <u>Termination</u>.    Employee's employment with the Company will terminate on December 15, 2023 (the "Separation Date").

2.    <u>Severance Benefits</u>.    Subject to and conditional upon Employee's signing this Agreement no sooner than the Separation Date and no later than December 16, 2023, as well as continuing compliance with the terms and conditions of all sections of this Agreement, Employee will be eligible to receive the severance benefits set forth in Sections 2(a) and (b) (the "Severance Benefits") on the terms provided therein:

(a)    <u>Severance Payments</u>.    The Company will continue to pay Employee her base salary, less applicable payroll deductions and withholdings, for a period of fifty (50) weeks from the Separation Date (the "Severance Period").

(b)    <u>Health Insurance Continuation</u>.    Employee may elect to continue to be covered under the Company's group medical insurance plan, subject to the terms and conditions provided for in the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA").  Provided Employee timely and properly elects COBRA continuation coverage, the Company will pay 100% of the premiums from the Separation Date through the end of calendar year 2023.  Information regarding COBRA rights will be provided to Employee as required by law, and Employee is solely responsible for timely and properly electing COBRA continuation coverage.

(c)    <u>Termination of Severance Benefits</u>.  If at any time Employee fails to comply with any of Employee's promises and obligations under this Agreement, the Company's obligation to provide any and all Severance Benefits to Employee shall immediately cease and the Company

BB13-00004640

shall be entitled to repayment of all Severance Benefits paid to Employee, in addition to any other legal or equitable remedies.

        (d)    <u>Vacation Pay and Expense Reimbursement</u>.  Whether or not Employee signs this Agreement, on the Separation Date, the Company will pay Employee a lump sum amount representing all salary due through the Separation Date and all accrued and unused vacation entitlements up to the Separation Date, less applicable payroll deductions and withholdings.  The Company will also reimburse Employee for any allowable business expenses incurred up to and including the Separation Date pursuant to the Company's Business Expense Reimbursement Policy provided that Employee submits a reimbursement report with respect to such expenses within seven (7) days of the Separation Date.

        (e)    <u>Tax Consequences</u>.

        i.    The Company makes no representations or warranties with respect to the tax consequences of the payment of any sums to Employee under the terms of this Agreement. Employee agrees and understands that Employee is responsible for payment, if any, of local, state and/or federal taxes on the sums paid hereunder by the Company and any penalties or assessments thereon. Employee further agrees to indemnify and hold the Company harmless from any claims, demands, deficiencies, penalties, assessments, executions, judgments, or recoveries by any government agency against the Company for any amounts claimed due on account of Employee's failure to pay federal or state taxes or damages sustained by the Company by reason of any such claims, including reasonable attorneys' fees.

        ii.    The intent of the Parties is that payments and benefits under this Agreement comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder ("Section 409A"), to the extent subject thereto, and accordingly, to the maximum extent permitted, this Agreement shall be interpreted and administered to be in compliance therewith.

        iii.    Each amount to be paid or benefit to be provided under this Agreement shall be construed as a separate and distinct payment for purposes of Section 409A. To the extent required to avoid accelerated taxation and/or tax penalties under Section 409A, amounts reimbursable to Employee under this Agreement shall be paid to Employee on or before the last day of the year following the year in which the expense was incurred and the amount of expenses eligible for reimbursement (and in-kind benefits provided to Employee) during one year may not affect amounts reimbursable or provided in any subsequent year.

        iv.    The Company makes no representation that any or all of the payments described in this Agreement will be exempt from or comply with Section 409A and makes no undertaking to preclude Section 409A from applying to any such payment.  Employee understands and agrees that Employee shall be solely responsible for the payment of any taxes, penalties, interest or other expenses incurred by Employee on account of non-compliance with Section 409A.

Employee understands, acknowledges, and agrees that the Severance Benefits in subsections (a) and (b) are being given as consideration in exchange for executing this Agreement. Employee

BB13-00004641

further acknowledges that Employee is not entitled to any additional payment or consideration not specifically referenced in this Agreement and acknowledges that, with the exception of any earned fiscal 2024 Sales Incentive Compensation Pay (SiP) Program bonus, which will be paid in accordance with the terms and conditions of Employee's applicable SiP plan, Employee has been paid all wages, bonuses, and other compensation of any kind due to Employee as a result of her employment with the Company.

       3.    <u>Release and Waiver of Claims</u>.

       (a)    <u>General Release</u>.  In consideration for the Severance Benefits and the Company's promises in this Agreement, Employee, on behalf of Employee and Employee's heirs, executors, administrators, and assigns, hereby completely and irrevocably releases the Company, and any of its affiliated, related, parent or subsidiary companies and its and their present and former shareholders, members, interest holders, owners, managers, directors, or officers, attorneys and employees, and each of their respective successors and assigns (the "Released Parties") from any and all claims Employee may now have or have ever had against the Released Parties, including without limitation, all claims arising from Employee's employment or termination of employment (the "Released Claims"). The Released Claims include, but are not limited to, all claims for breach of contract, breach of quasi-contract, promissory estoppel, detrimental reliance, and breach of the implied covenant of good faith and fair dealing; all tort Claims, including claims for fraud, defamation, slander, libel, negligent or intentional infliction of emotional distress, personal injury, negligence, compensatory or punitive damages, negligent or intentional misrepresentation, and discharge in violation of public policy; and any statutory claims, including any claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Civil Rights Act of 1991; the Civil Rights Acts of 1866 and/or 1871, 42 U.S.C. Section 1981; the Equal Pay Act of 1963, 29 U.S.C. § 206(d); the Americans with Disabilities Act, 42 U.S.C. 12101 et seq., 29 U.S.C. § 621 et seq.; the Family Medical Leave Act, 29 U.S.C. § 2601 et seq.; the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq.; the federal Worker Adjustment and Retraining Notification Act (WARN Act), 29 U.S.C. § 2102 et seq.; the California WARN Act, California Labor Code § 1400 et seq.; the California Fair Employment and Housing Act, Cal. Gov. Code§ 12900 et seq.; the California Labor Code and the orders of the California Industrial Welfare Commission; the California Business and Professions Code; and any other claims for violation of any federal, state, or local statutes, ordinances or common law, including, without limitation, claims for alleged retaliation or wrongful termination of any kind, and any and all claims for attorneys' fees and costs.

    EMPLOYEE UNDERSTANDS AND AGREES THAT THIS AGREEMENT CONTAINS A GENERAL RELEASE OF ALL CLAIMS.

       (b)    <u>Waiver of California Civil Code Section 1542</u>. Employee understands and agrees that this release specifically covers known and unknown claims. Employee expressly waives and releases all rights and benefits under Section 1542 of the California Civil Code or any other comparable statute of any jurisdiction. Section 1542 states as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE

BB13-00004642

MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

      (c)   <u>Agreement Not to File</u>.  Subject to the provisions of Section 6, Employee represents that Employee has not initiated, filed, or caused to be filed and agrees not to initiate, file or cause to be filed any Released Claims against any Released Parties. In addition, Employee agrees not to initiate, file, cause to be filed, or otherwise pursue any Released Claims, either as an individual on Employee's own behalf or as a representative, member or shareholder in a class, collective or derivative action against the Released Parties. Employee also agrees not to solicit, assist, support or in any other way cooperate in the initiation or prosecution of any action or proceeding brought against the Released Parties, or any of them, by a third party, except if compelled to do so by legal process.

      (d)   <u>Exceptions to Release</u>.  Employee understands that Employee is not waiving any right or claim that cannot be waived as a matter of law, such as workers' compensation claims or claims for unemployment benefits.

    4.   <u>Confidentiality of Agreement</u>.  To the furthest extent allowed by law, Employee shall hold the provisions of this Agreement in strictest confidence and shall not publicize or disclose it or its terms in any manner; except that Employee may disclose this Agreement (i) in confidence to Employee's spouse, attorneys, accountants, or tax preparers; and (ii) insofar as such disclosure may be necessary in any proceeding to enforce this Agreement, provided either that the proceeding is confidential or if not, that such disclosure is under seal. If disclosure of any term of this Agreement is compelled by legal process, Employee shall notify the Company reasonably prior to such disclosure, so that the Company may, at its option, seek a protective order. To the extent applicable, nothing in this Agreement prevents Employee from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the Employee has reason to believe is unlawful.

    5.   <u>Continuing Obligations</u>.  Employee shall continue to maintain the confidentiality of all confidential and proprietary information of the Company and shall continue to comply with all of her confidentiality and other obligations under the Employment Agreement that continue after the termination of Employee's employment, which terms are incorporated by reference herein and remain in full force and effect.

During the course of her employment with BlackBerry, Employee acquired knowledge of matters which are now, or may become, the subject of disputed claims or litigation involving BlackBerry, its subsidiaries and affiliated or associated companies. As a result, Employee agrees to provide all assistance and cooperation reasonably requested by BlackBerry and/or its counsel relating to any litigation involving BlackBerry when it is determined by BlackBerry that Employee's assistance is needed. Employee's assistance may include, but is not limited to, participating in interviews, providing truthful information on factual issues, reviewing documents, and/or preparing for and giving truthful testimony, whether orally or by affidavit at discovery, in a deposition, at trial or otherwise. In order to minimize the economic impact that Employee may experience as a result of fulfilling these obligations, BlackBerry will reimburse Employee at a reasonable hourly rate for income lost and for reasonable expenses incurred by Employee in connection with such assistance.

6.    Protected Rights; Defend Trade Secrets Act.

      (a)    Protected Rights.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall prohibit or interfere with Employee exercising protected rights, including rights under the National Labor Relations Act; filing a charge with the Equal Employment Opportunity Commission; reporting possible violations of law to or participating in an investigation by any federal, state, or local government agency or commission such as the National Labor Relations Board, the Department of Labor, OSHA, the Department of Justice, or the Securities and Exchange Commission. Employee does, however, waive any right to receive any personal relief, monetary award or benefit resulting from such a charge, report, or investigation related to any Released Claims, except that Employee may receive and fully retain a monetary award from a government-administered whistleblower award program. Employee may disclose information as set forth in this Section 6 without the Company's prior authorization. Nothing in this Agreement waives any rights that are not subject to waiver by private agreement or otherwise cannot be waived as a matter of law.

      (b)    Defend Trade Secrets Act Notification.    Employee is hereby notified that 18 U.S.C. § 1833(b) states as follows: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that-(A) is made-(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Accordingly, notwithstanding any other provision of this Agreement to the contrary, Employee has the right to (1) disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of the law or (2) disclose trade secrets in a document filed in a lawsuit or other proceeding so long as that filing is made under seal and protected from public disclosure. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b).

7.    Return of Company Property.    Employee shall return all the Company property and confidential and proprietary information in Employee's possession to the Company prior to the Separation Date, including without limitation all identification cards or badges, access codes or devices, keys, laptops, computers, telephones, mobile phones, hand-held electronic devices, credit cards, electronically stored documents or files, physical files, and any other Company property in Employee's possession. Employee's eligibility for and receipt of the Severance Benefits is expressly conditioned upon return of all Company Property.

8.    Non-Disparagement.    Employee agrees that Employee shall not at any time make, publish or communicate to any person or entity in any forum any defamatory or disparaging remarks, comments or statements concerning the Company, its businesses or the Released Parties. This Section does not, in any way, restrict or impede Employee from exercising protected rights, to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.

BB13-00004644

9.    <u>Knowing and Voluntary Acknowledgments and Affirmations</u>.    Employee specifically represents, warrants, and confirms the following: (a) that the Company has timely and properly paid Employee all salary, wages, bonuses, accrued vacation earned and all other benefits or compensation due to Employee as of the Separation Date in accordance with applicable law; (b) except as expressly provided herein, Employee is not entitled to and will not receive any additional compensation or benefits from the Company after the Separation Date; (c) all of the decisions of the Company regarding her pay and benefits or other terms or conditions of her employment through the Effective Date of this Agreement were not discriminatory or retaliatory based on age, disability, race, color, sex, religion, national origin, protected activity, or any other classification protected by law; (d) Employee has not filed any claims, complaints, or actions of any kind against any of the Released Parties with any federal, state, or local court or government or administrative agency; (e) neither the Company, nor Employee has engaged in any unlawful conduct relating to the business of the Company, and Employee further acknowledges that to the extent she has raised any allegations about alleged unlawful acts in the workplace through the Company's internal complaint process, this Agreement is and intended to be a negotiated settlement to resolve those allegations; (f) Employee has had at least five (5) calendar days in which to consider whether to sign this Agreement, and if Employee signs sooner, she has done so voluntarily; and (g) Employee understands that she has the right to consult with counsel regarding this Agreement.

10.    <u>No Admission</u>.    Employee understands and agrees that this Agreement is not an admission of guilt or wrongdoing by the Company, and that the Company does not believe or admit that it has done anything wrong.

11.    <u>Severability</u>.    In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision.

12.    <u>Entire Agreement</u>.    This Agreement, including the terms of any agreements incorporated by reference herein, represents the entire agreement and understanding between the Company and Employee concerning Employee's separation from the Company, and supersedes and replaces any and all prior agreements and understandings concerning Employee's relationship with the Company and Employee's compensation by the Company.

13.    <u>No Oral Modification</u>.    This Agreement may only be amended in writing signed by Employee and a duly authorized representative of the Company.

14.    <u>Governing Law and Dispute Resolution</u>.    This Agreement shall be governed by the laws of the State of California. Employee and the Company hereby irrevocably submit to the exclusive jurisdiction of federal and state courts in the State of California and waive the defense of inconvenient forum to the maintenance of any action or proceeding in such venue.

15.    <u>Counterparts</u>.    This Agreement may be executed in counterparts, and each counterpart shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned.

ATTORNEYS' EYES ONLY

16.    <u>Voluntary Execution of Agreement</u>.  This Agreement is executed voluntarily and without any duress or undue influence on the part or behalf of the Parties hereto, with the full intent of releasing all claims. The Parties acknowledge that:

(a)    They have read this Agreement and have been given sufficient time to consider the terms of this Agreement before signing it;

(b)    They have been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of their own choice or that they have voluntarily declined to seek such counsel;

(c)    They understand the terms and consequences of this Agreement and of the releases it contains;

(d)    They are fully aware of the legal and binding effect of this Agreement.

ATTORNEYS' EYES ONLY

IN WITNESS WHEREOF, the Parties have executed this Agreement on the respective dates set forth below.

**BlackBerry Corporation**

**DATED:** December ___, 2023      By: _____
                                     Name:
                                     Title:

**Neelam Sandhu,** an individual

**DATED:** December ___, 2023      _____

BB13-00004647