Maria A. Bourn (SBN 269322)
Anthony Tartaglio (SBN 280286)
**GOMERMAN | BOURN & ASSOCIATES**
825 Van Ness Avenue, Suite 502
San Francisco, CA 94109
Telephone: (415) 545-8608
Email: maria@gobolaw.com
tony@gobolaw.com

Attorneys for Plaintiff
NEELAM SANDHU

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NEELAM SANDHU, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>BLACKBERRY CORPORATION, a Delaware Corporation,<br><br>Defendant. | **Case No.: 3:24-cv-02002-SK**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S SUMMARY JUDGMENT MOTION**<br>***Redacted Copy***<br>*[Filed concurrently with Declaration of Anthony Tartaglio in Support of Plaintiff's Opposition to Defendant's Summary Judgment Motion; Notice of Documents Filed Under Seal]*<br><br>Judge: Hon. Sallie Kim<br><br>Hearing Date: January 26, 2026<br>Hearing Time: 9:30 AM<br>Courtroom: C |

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1
II. FACTUAL BACKGROUND ..... 4
1. Sandhu's Rise From £25,000 Job in England to the C-Suite ..... 4
2. Giamatteo—The Dinner, Exclusion, and the Campaign to Push Her Out ..... 5
3. The Anonymous Complaint, Investigation, and Company's Response ..... 7
4. Blackberry's "Boys' Club" ..... 9
III. LEGAL STANDARDS ..... 11
1. Labor Code § 1102.5 Whistleblower Retaliation ..... 11
2. FEHA Retaliation ..... 12
3. FEHA Sex Discrimination ..... 12
a. Standard for Showing Pretext ..... 12
IV. ARGUMENT ..... 13
1. Prima Facie Case and Protected Activity ..... 13
2. Other Evidence of Pretext ..... 17
a. Shifting and Conflicting Explanations for the Termination ..... 17
b. The "Mass Layoff" Claim Is False ..... 17
c. The HR Chief Position Was Not Eliminated ..... 18
d. Other Company-Wide Corporate Executives Were Not Fired ..... 18
e. The "Toxic Personality" Explanation is Litigation-Driven ..... 19
f. Performance Claims Contradict Sandhu's Record ..... 20
g. Lynch Contradicts the "CEO Ambition" Claim ..... 21
h. Personal Animus Toward Sandhu ..... 21
i. Consciousness of Guilt ..... 22
j. Systemic Evidence - Me-Too Witnesses ..... 23
k. Prima Facie Case for FEHA Sex Discrimination ..... 23
3. Labor Code § 1102.5 Whistleblower Claim ..... 24
4. Punitive Damages ..... 25
V. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Federal Cases**

*Bell v. Clackamas Cnty*., 341 F.3d 858 (9th Cir. 2003) ........ 15
*C.R. Dep't v. Grimmway Enters., Inc.*, -- F.Supp.3d --, No. 2:21-CV-01552-DAD-AC, 2025 WL 2694864 (E.D. Cal. Sept. 22, 2025) ........ 25
*Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338 (9th Cir. 1987) ........ 23
*Castillo v. St. Jude Med., Cardiology Div., Inc.*, No. 22-CV-00107-SI, 2023 WL 2226799 (N.D. Cal. Feb. 24, 2023) ........ 12
*Chuang v. Univ. of California Davis, Bd. of Trs*., 225 F.3d 1115 (9th Cir. 2000) ........ 12
*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018 (9th Cir. 2006) ........ 12
*Costa v. Desert Palace, Inc.*, 299 F.3d 838 (9th Cir. 2002) ........ 21
*Davis v. Team Elec. Co*., 520 F.3d 1080 (9th Cir. 2008) ........ 13
*Gunther v. Xerox Corp.*, No. 13-CV-04596-HSG, 2015 WL 5769619 (N.D. Cal. Oct. 2, 2015) 20
*Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564 (9th Cir. 2004) ........ 17
*Heyne v. Caruso*, 69 F.3d 1475 (9th Cir. 1995) ........ 23
*Killgore v. SpecPro Pro. Servs., LLC*, 51 F.4th 973 (9th Cir. 2022) ........ 11
*Lelaind v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079 (N.D. Cal. 2008) ........ 13, 23
*Miller v. Fairchild Indus., Inc.*, 797 F.2d 727 (9th Cir. 1986) ........ 3
*Miller v. T-Mobile USA, Inc.*, No. 24-CV-06792-HSG, 2025 WL 3085722 (N.D. Cal. Nov. 5, 2025) ........ 16
*Patterson v. Boeing Co.*, No. CV 16-1613-GW (SKX), 2018 WL 5937911 (C.D. Cal. Apr. 4, 2018) ........ 15
*Settlegoode v. Portland Pub. Sch*., 371 F.3d 503 (9th Cir. 2004) ........ 16
*Stegall v. Citadel Broad. Co*., 350 F.3d 1061 (9th Cir. 2003), as amended (Jan. 6, 2004) .... 15, 21
*Strother v. S. California Permanente Med. Grp*., 79 F.3d 859 (9th Cir. 1996) ........ 12
*Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276 (9th Cir. 2001) ........ 21
*Xin Liu v. Amway Corp.*, 347 F.3d 1125 (9th Cir. 2003) ........ 20

**State Cases**

*Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703 (2022) ........ 11
*Miller v. Dep't of Corr.*, 36 Cal. 4th 446 (2005) ........ 14

*Pantoja v. Anton*, 198 Cal. App. 4th 87 (2011) ........ 23
*Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95 (2004) ........ 16
*Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028 (2005) ........ 14, 15

**Statutes**

Labor Code § 1102.5........ 11
Labor Code § 1102.6........ 11

**Rules**

Fed. R. Civ. P. 56........ 13
Fed. R. Evid. 801(d)(2)(D) ........ 17

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

When an anonymous gender discrimination and sexual harassment complaint put a "hiccup" in appointing John Giamatteo to CEO, Blackberry responded not by fixing the problems, but by identifying who it suspected of making the complaint, Neelam Sandhu, firing her, and sending a message that complaints come at a price. Blackberry paid over $250,000 to conduct an "investigation," but as soon as the investigation concluded and recommended changes to make regarding how it treats women, Blackberry moved forward with announcing Giamatteo as CEO and terminating Sandhu. It made no changes suggested in its expensive investigation and instead invested in continuing its unlawful conduct. Its pattern of gender discrimination and retaliation is clear and unmistakable: termination for those that speak out against it, such as Plaintiff.

Plaintiff Sandhu dedicated fifteen years to Blackberry. She began her career in England in an entry-level marketing role and rose steadily through the ranks to become Chief Marketing Officer—one of only three women in Blackberry's C-suite.[1] Although it was never easy for her to be a woman in tech, things deteriorated dramatically when John Giamatteo joined the company in October 2021 as President of the Cybersecurity division. Within days of his arrival, Giamatteo made unwanted romantic advances toward Sandhu at a business dinner: inappropriate touching, suggestive comments, and requests that they "travel together" without business reasons. Sandhu rebuffed these advances and reported them to CEO John Chen within 24 to 48 hours. What followed was a direct threat from Giamatteo to harm her career and a systematic campaign to marginalize her. Giamatteo's team excluded her from meetings, withheld critical information, stripped away her most valuable customer accounts, openly blamed her for their own failures, and more. Although Sandhu filed multiple complaints about the harassment and retaliation she endured, the situation never improved.

[1] Currently, there is only one woman in Blackberry's C-suite, who is the head of HR.

When then-CEO John Chen announced his retirement in October 2023, Board of Directors member Richard Lynch became interim CEO. This was a caretaker role that lasted less than a month because Giamatteo was the presumptive successor for the CEO position. Unexpectedly, however, his succession was jeopardized when an anonymous EthicsLink complaint accused him of creating a boys' club culture where he mistreated, harassed, and marginalized women with impunity. Multiple witnesses confirmed that company leadership, including Lynch, immediately and openly suspected Sandhu of filing the complaint. BlackBerry retained the law firm Morrison & Foerster to investigate, which discussed with her the retaliation and discrimination she had experienced.[2] Less than three weeks after Sandhu participated in the investigation and explicitly accused Giamatteo of "retaliation" in an email to interim CEO Lynch, Lynch fired her. She is the only employee Lynch fired during his entire interim tenure. Three days later, Giamatteo was announced as CEO.

Blackberry's explanation for why it fired Plaintiff has changed over time. The contemporaneous evidence indicates that the initial justification was pure cost-cutting: her position had become "redundant." But Sandhu was not terminated as part of a larger layoff. Lynch did not eliminate her team or conduct a broader corporate restructuring—he fired only her. And why would Lynch—who was in a caretaker role as interim CEO for fewer than 30 days and had only had one, 30-minute one-to-one meeting with Sandhu—have fired a fifteen-year employee with a stellar track record and no disciplinary history? Why did he not wait for the incoming permanent CEO to decide how to restructure the company's C-suite? Why did he not fire Sandhu's direct reports? Why are there still two high-paid male executives with corporate job duties not tied to any particular business unit? ("Chief Strategy Officer" and "Chief Information Officer")?

Once litigation commenced, Blackberry's theory about the reason for firing Sandhu—cost-cutting—promptly changed. Blackberry now declares that Sandhu was fired because she was

---

[2] The investigation cost over $250,000 and resulted in a lengthy list of recommended reforms, none of which were implemented by Blackberry. Lynch Depo. at 186:16-187:11 & 187:23-191:3.

allegedly toxic and incapable of collaborating with colleagues. But Sandhu had no disciplinary history—no performance improvement plan, no written warnings, and no formal complaints lodged against her. Furthermore, Lynch admits he barely knew Sandhu and was fuzzy on what she allegedly did wrong. Lynch made no effort whatsoever to investigate these even-now unsubstantiated personality allegations or get Sandhu's side of the story before terminating her. And the contemporaneous termination documents cite only "redundancy" and "business separation"—they contain no mention of personality problems.

The simplest explanation for what actually happened is retaliation. Company leadership knew that Sandhu had filed multiple complaints against coworkers, including Giamatteo. When the anonymous complaint was submitted, leadership immediately suspected her and labeled her as "a fraudulent complainant." Both Lynch and Giamatteo viewed Sandhu as a troublemaker who needed to go. But they also knew that if Giamatteo fired her, the evidence of retaliation would be too blatant. By firing Sandhu himself, Lynch could shield the incoming CEO from accusations of retaliation while eliminating the woman who dared to complain.

This case is not just about one woman. At least three other women were fired after reporting a "boys' club" culture. In every case, the justification was "redundancy" and "cost-cutting." Although Blackberry has experienced financial difficulties, it does not have a license to discriminate or retaliate. *See, e.g., Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 733 (9th Cir. 1986) (denying summary judgment even though company headcount had shrunk by a third).

Because this is a summary-judgment motion, Plaintiff's evidentiary burden is minimal. Genuine disputes of material fact abound: the close timing between Sandhu's complaints and her termination, Blackberry's shifting and contradictory explanations, the pattern of adverse treatment toward women who complained, Lynch's consciousness of guilt, and the company's failure to address the systemic problems it was aware of. These are quintessential jury questions. When applying the plaintiff-friendly summary judgment standard and viewing all evidence in Sandhu's favor, the Court must deny Blackberry's Motion for Summary Judgment.

## II. FACTUAL BACKGROUND

### 1. Sandhu's Rise From £25,000 Job in England to the C-Suite

Neelam Sandhu's career at Blackberry began in 2009 when she was hired in England as a Brand Review Specialist earning £25,000. Pl. Ex. 1.[3] Her trajectory was steady and impressive: Program Manager in December 2011, Sr. Brand Messaging & Operations Manager in June 2013 when she transferred to New York, Director of Business Operations in the Office of the CEO in November 2014, Sr. Director in May 2016, VP of Business Operations in February 2019, and Sr. VP & Chief Elite Customer Success Officer in March 2021. Pl. Exs. 2-7.

The Elite Customer Success role was Blackberry's crown jewel—managing relationships with the company's largest and most strategically important government and enterprise accounts, where she won some of the company's largest deals (including a $[redacted]M deal). Pl. Ex. 34 - Chen Depo. at 21:21-23:18; Pl. Ex. 32 - Sandhu Depo. at 239:18-240:1. CEO John Chen personally recommended Sandhu for these promotions and approved bonuses for her. *See, e.g.*, Pl. Exs. 4, 6, & 7. Chen described her as "very devoted, committed and work extremely, extremely hard," and praised her competence and reliability. Chen Depo. at 28:11-29:10. Chen did not consider firing Sandhu during his tenure as CEO. *Id*. at 149:18-150:1.

By June 2023, Sandhu reached what should have been the pinnacle of her career: Chief Marketing Officer, making her one of only three women in Blackberry's C-suite. Pl. Exs. 8 & 9. But even this promotion carried ominous signs. While she gained the CMO title, valuable Elite customer accounts were simultaneously transferred away from her control to Giamatteo's team and replaced with "win-back" accounts that Giamatteo's Business Unit had lost. Sandhu Depo. at 249:1-250:13. And Sandhu received no salary increase with the promotion. Pl. Exs. 8. Chen did not give her a raise because he did not want to upset Giamatteo. Sandhu Depo. at 54:3-55:10.

[3] Citations to "Pl. Ex." refer to the exhibits to the Tartaglio Declaration. Citations to deposition transcripts also refer to the corresponding Tartaglio Declaration.

Throughout her fifteen years at Blackberry, Sandhu had ***no*** disciplinary history, was ***never*** placed on a performance improvement plan, and had ***zero*** written warnings in her personnel file.[4]

**2. Giamatteo—The Dinner, Exclusion, and the Campaign to Push Her Out**

John Giamatteo joined Blackberry as President of the Cybersecurity division on October 4, 2021. Pl. Ex. 33 - Giamatteo Depo. at 27:1-2. Within weeks, on October 20, 2021, he invited Sandhu to dinner. Sandhu Depo. at 158:14-18. During the dinner, Giamatteo repeatedly touched her hand in what she felt was a caress. Sandhu Depo. at 116:4-123:1. As they left the restaurant, Giamatteo tried to put his arm around her waist. *Id*. at 125:25-126:14. He also mentioned that Sandhu is around his daughters' age and that when he goes out with one of his daughters, people think he is on a date and is a dirty old man. *Id.* at 151:24-153:2. Within 24 to 48 hours, Sandhu reported Giamatteo's conduct to CEO Chen, telling him that Giamatteo's behavior had made her "highly uncomfortable." *Id.* at 113:11-115:4 & 132:4-25. Chen responded that he thought it was "very disturbing" and told Sandhu she did not have to travel with Giamatteo. *Id.* at 115:1-4. Sandhu also reported the incident to then-CFO Steve Rai. *Id.* at 111:9-114:20. In December 2021, during a one-on-one meeting, Giamatteo again pushed Sandhu to work for him and report to him, which she declined—by this point, she had already told Chen about Giametto's sexual advances at the dinner with Giamatteo. *Id*. at 193:5-194:6 & 201:9-13.

What followed was persistent retaliation. On March 18, 2022, Sandhu reported to Chen that she was being deliberately excluded from call invites by Giamatteo's team and had to repeatedly request invitations to meetings that directly involved her responsibilities. Pl. Ex. 10. On March 30, 2022, Sandhu recounted to Chen an incident where she was deliberately excluded from a call on a project she was working on. One of her team members asked her: "why do they always deliberately exclude you?" Pl. Ex. 11. Giamatteo confirmed that he directed his assistant to remove her from a meeting invite list. Giamatteo Depo. at 112:23-113:11. Sandhu was never properly notified of many meetings and had to chase down invitations. Sandhu Depo. at 239:18-240:5.

[4] Chen Depo. at 33:14-24; Pl. Ex. 41 - Bramhill Depo. at 20:12-21:14.

Around Dec. 2022, Giamatteo told Sandhu that "it is important that you be nice to me, as I know a lot of people in the industry/have a large network so it could impact you negatively if you are not nice to me." Def. Ex. 9 at Resp. to Rog 2.

On February 6, 2023, Sandhu wrote to HR Chief Nita White-Ivy with a formal complaint about Giamatteo's pattern of exclusion and attempts to diminish her role. Def. Ex. 8. She detailed that Giamatteo's business unit published an organization chart that incorrectly showed her reporting to Giamatteo, and he slow-rolled correcting the error; that Giamatteo's team was not sending customer proposals to her team, which was against company policy; and that Giamatteo's team was attempting to squeeze her team out of dealings with major customers that she was responsible for. *Id*. External attorney Richard Curiale, who sporadically provided legal services to Blackberry, investigated and found: "there certainly is evidence that they [Giamatteo's team] do try to avoid interacting with her to every extent they possibly can. . . . I have been investigating issues raised by Neelam for many years now. This is at least my third or fourth investigation regarding issues she has raised." Def. Ex. 10. He observed that "many of the salespeople I spoke with here and in the past are egotistical, whining crybabies who need a very strong manager . . . They are an independent group of cowboys who resist what they perceive as any interference with how they want to do their job. Many do not want Neelam around because quite frankly, she makes them look bad. She has energy, talents and a record of success that they don't have. In short, they are jealous." *Id*.

Giamatteo put in writing his hostility toward Sandhu. On April 3, 2023, Giamatteo messaged CEO Chen accusing Sandhu of being "toxic" and stating, regarding a big deal opportunity, "I like our chances without her." Pl. Ex. 12. The next day, Giamatteo wrote to Chen: "the PTSD effect of Neelam and her interaction with the organization is very ugly/dysfunctional. I spend a lot of time conducting therapy sessions with everyone . . . In my 30+ years I have never seen such a polarizing figure." Pl. Ex. 13. On April 10, 2023, Giamatteo accused Sandhu of "lies and manipulation." Pl. Ex. 14. By March 20, 2023, external attorney Curiale emailed Chen: "when you leave BB she [Sandhu] is either not going to survive there or want to be there and she agreed."

Def. Ex. 12. CEO Chen was aware of the discrimination and retaliation Sandhu was experiencing but took no meaningful action to stop it.

**3. The Anonymous Complaint, Investigation, and Company's Response**

On October 26, 2023—just days after CEO John Chen announced his retirement—an anonymous EthicsLink complaint was filed alleging that Giamatteo made "sexually suggestive and aggressive comments towards women," as well as "loosely veiled threats he has made about his alleged 'influence and reach within the industry.'" Def. Ex. 19. The complaint identified itself as coming from "a collective of about 10 women." Def. Ex. 21. Curiale remarked: "Wow. Talk about bad timing," which Chen agreed with. Pl. Ex. 30. Blackberry leadership immediately suspected Sandhu of filing the complaint. CFO Tim Foote texted Giamatteo: "I'm pretty sure this BS is from Neelam." Pl. Ex. 15; Giamatteo Depo. at 219:13-18. That same day, Chief Legal Officer Phil Kurtz emailed the outside investigators at Morrison & Foerster: "the board [of directors] is wondering whether Neelam is in scope for our investigation now. I think yes based on her prior complaint . . . There are solid reasons to believe that she does not want to see JJG [Giamatteo] as CEO. Looking at her recent emails would not, in my view, be an attempt to identify a legitimate anonymous complainant, because Neelam does not fit the description of anyone described as a victim in the complaint. She can only be a fraudulent complainant, which negates any right to anonymity in my view." Pl. Ex. 16. The MoFo attorney responded: "I have concerns about this," and requested a phone call. *Id*.

Blackberry quickly retained MoFo and ultimately spent over $250,000 on the investigation. Pl. Ex. 17. The company also simultaneously hired FGS Global, a crisis communications firm, to manage the fallout. Pl. Ex. 18. On Oct. 29, 2023, FGS Global sent a draft leak plan to Kurtz that copied two MoFo lawyers working on the investigation. *Id*. The draft leak plan said that the "claims remain unsubstantiated," indicating that Blackberry had already decided on the result it wanted to see. *Id*. The MoFo attorneys helped edit the leak plan, for example, by scrubbing language describing the MoFo investigation as "independent." *Id*.

On Nov. 6, 2023, MoFo interviewed Sandhu and discussed the discrimination and retaliation she experienced. Def. Ex. 25. The following day, Sandhu sent a detailed email to the MoFo investigators outlining five categories of complaints, including "JJG's harassment of me, which commenced after I did not respond positively to his suggestive comments." Def. Ex. 29. On November 16, 2023, Sandhu sent a follow-up email to MoFo explicitly accusing Giamatteo of "retaliation" and of "cutting me out of my job." Def. Ex. 28. She then forwarded both emails to interim CEO Richard Lynch, Def. Ex. 32, who gave the cryptic response that "I believe that this will get solved based on the processes for change that we have undertaken . . . change is coming." Pl. Ex. 19.

On Nov. 23, 2023, Lynch wrote to Kurtz and Board member Lisa Disbrow: "Given what personnel actions are planned, might there be protective value in me not seeing the version [of the MoFo report] with names?" Pl. Ex. 20. Lynch admitted that he did not want Sandhu to "be perceived as having been fired by the new incoming CEO [Giamatteo]," which explains why Lynch personally fired Sandhu. Pl. Ex. 36 - Lynch Depo. at 199:21-200:18.

MoFo delivered its report on November 27, 2023, making significant recommendations including: conducting a workplace culture survey, leveraging exit interviews to improve culture, a pay equity audit, reviewing the statistical impact of reductions in force on women, improving dialogue between leadership and employees, designating a DEI officer, creating employee resource groups, and providing implicit bias training. Def. Ex. 27 at pp. 17-19. Interim CEO Lynch did not attempt to implement these recommendations during his tenure. Lynch Depo. at 186:16-187:11 & 187:23-191:3, and Giamatteo had never even seen them. Giamatteo Depo. at 238:11-22.

On December 2, 2023, Blackberry's talking points for Sandhu's termination cited only "redundancy" due to "business separation," saying nothing about personality or performance issues. Def. Ex. 35 at 18742. Two days later, on December 4, 2023, Lynch fired Sandhu. Def. Ex. 36. The termination letter included a draft severance agreement with a release clause, which Sandhu did not accept. Pl. Ex. 21. Three days later, on December 7, 2023, Lynch announced to the Board of Directors that Giamatteo would be the new CEO. Def. Ex. 34. According to Lynch's

communication to the Board, negotiations with Giamatteo regarding his CEO employment had concluded on December 5, 2023—one day after Sandhu's termination. *Id*.

**4. Blackberry's "Boys' Club"**

Multiple women at Blackberry described the same toxic culture and faced similar retaliation for speaking up. Marjorie Dickman (Chief of Government Affairs) testified that Blackberry was "a challenging place for women" and that "women being underrepresented in the C-suite" created "cascading effects" throughout the organization. Pl. Ex. 42 - Dickman Depo. at 105:19-22, 125:6-13. Giamatteo surrounded himself with "a C-suite of his cronies" and "people he's known for 20 some, 30 years," creating an environment where loyalists would "joke around with him" and engage in inside banter that excluded others. *Id*. at 99:15-100:6. After participating in the MoFo investigation and discussing her concerns with Giamatteo,[5] Dickman was terminated by Giamatteo and received a separation agreement worth more than $1.3 million after her counsel told Blackberry that she had "one of the best retaliation cases" he had ever seen. *Id*. at 84:3-5, 94:11-14, & 114:8-12.

Sarah Tatsis, an engineering executive with 20 years at Blackberry, testified that even though she did not work in Sandhu's division, people within her division gossiped about Sandhu's competence and whether the dress Sandhu wore to meet the Prime Minister of Canada was too revealing. Pl. Ex. 40 - Tatsis Depo. at 28:16-29:15, 49:2-20. Tatsis was fired from Blackberry in December 2023—almost the exact same time as Sandhu—after making formal HR complaints about "toxic" culture and "non-inclusive comments." *Id*. at 39:22-40:3; 44:19-21; 72:7-9; 77:1-6.

Colleen McMillan (who was also fired by Giamatteo) testified that there was a "good old boy" environment within the company and that one VP joked, at a work presentation, that Eva Longoria was his "hall pass", Pl. Ex. 37 - McMillan Depo. at 30:19-31:7; male executives made frequent "that's what she said" jokes, *Id.* at 31:8-19; and that when she complained to Giamatteo about a female employee who was underpaid, he asked about the female employee's age and

[5] Dickman Depo. at 100:16-102:15.

explained that "well, I mean, if she's a younger woman early in her career, I mean. . . . [implying that young women did not need to be paid as well as other types of employees]." *Id.* at 23:21-25:24. She also testified that after Giamatteo joined, "women's roles were greatly diminished and the men he kept on hiring were getting more and more responsibility and -- whether they had the criteria or experience in that role, and they were held to a different standard in terms of quota and other things." *Id.* at 21:2-14.

Erin Ransom, a Vice President of Sales Enablement Ransom, testified about a sales kickoff video where a male sales leader recorded his segment with "a kind of weird painting of, like, women half dressed" visible behind. Pl. Ex. 38 - Ransom Depo. at 22:17-24:13. She also testified that the company's leadership was so male-dominated that "there's probably more Johns in leadership than women." *Id*. at 22:6-16.

Mary Slimmon (Senior HR Business Partner) testified that Giamatteo's all-male leadership team created a "boys' club" environment. Pl. Ex. 39 - Slimmon Depo. at 49:8-25. Slimmon documented a sales leadership gathering in Texas where only male leaders were invited, and female sales leaders "didn't even know about the meeting" until Slimmon learned about it. *Id.* at 40:4-41:10. Slimmon also testified about discriminatory compensation practices, including one female sales employee who had a 60/40 base-to-commission split while her male counterparts received more favorable 70/30 splits for identical roles. *Id.* at 41:25-43:5. When Slimmon raised concerns about these disparities, her manager acted dismissively. *Id.* at 45:2-16. Slimmon further testified that besides his executive assistant, all of Giamatteo's hires were men. *Id.* at 48:3-6.

Jennifer Bramhill (HR) reported male executives making explicitly sexist comments, including the statement "I have tried to promote women in the past and they were not interested"—implying that women were to blame for their own lack of advancement. Bramhill Depo. at 68:2-9. Even though an internal investigator (Curiale) concluded that these complaints were "likely accurate," the men who made the sexist comments were not punished or disciplined in any meaningful way. Bramhill Depo. at 74:14-23 & 70:20-71:24. Instead, Bramhill had the scope of her work reduced for how she had reported the complaints. Pl. Ex. 22.

The pattern is unmistakable: women who participated in investigations or made complaints—Sandhu, Dickman, Tatsis, and McMillan —were terminated under the guise of a "restructuring" while the accused men suffered no consequences.

## III. LEGAL STANDARDS

### 1. Labor Code § 1102.5 Whistleblower Retaliation

As relevant here, the elements of a Labor Code § 1102.5 claim are: 1) plaintiff disclosed, or defendant believed that plaintiff had disclosed, information to an employee with authority to investigate, discover, or correct legal violations; 2) plaintiff had reasonable cause to believe that the information disclosed a violation of a state or federal statute; 3) an adverse employment action; and 4) plaintiff's disclosure (or perceived disclosure) was a contributing factor to the adverse employment action. CACI 4603. "A 'contributing factor' is any factor, which alone or in connection with other factors, tends to affect the outcome of a decision. A contributing factor can be proved even when other legitimate factors also contributed to the employer's decision." CACI 4603. "Under the statute, the relevant inquiry is not whether the conduct 'actually violated' any specific statute or regulation, but whether the plaintiff 'reasonably believed that there was a violation of a statute, rule, or regulation' at the time it was reported." *Killgore v. SpecPro Pro. Servs., LLC*, 51 F.4th 973, 988 (9th Cir. 2022).

Unlike the *McDonnell Douglas* burden-shifting framework, "once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." Labor Code § 1102.6. "Under section 1102.6, a plaintiff does not need to show that the employer's nonretaliatory reason was pretextual." *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 715-16 (2022). To prevail on summary judgment, an employer must demonstrate that any reasonable jury would find, by clear and convincing evidence, that the employee would have been terminated for non-retaliatory reasons. *Castillo v. St. Jude*

*Med., Cardiology Div., Inc.*, No. 22-CV-00107-SI, 2023 WL 2226799, at *2 (N.D. Cal. Feb. 24, 2023).

Adverse employment actions extend to actions "that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of plaintiff's employment . . . [and] includes conduct that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion." CACI 2509.

**2. FEHA Retaliation**

As relevant here, the elements of FEHA retaliation are: 1) plaintiff engaged in protected activity; 2) an adverse employment action; 3) and the protected activity was a substantial motivating reason for the adverse employment action. CACI 2505. "A 'substantial motivating reason' is a reason that actually contributed to the [adverse employment action]. It must be more than a remote or trivial reason. It does not have to be the only reason motivating the [adverse employment action]." CACI 2507.

**3. FEHA Sex Discrimination**

As relevant here, the elements of FEHA sex discrimination are: 1) an adverse employment action; and 2) plaintiff's sex was a substantial motivating reason for the adverse employment action. CACI 2500.

**a. Standard for Showing Pretext**

Although there is case law suggesting that a plaintiff's circumstantial evidence of pretext should be "specific and substantial," there is also case law stating that an employee need submit only "very little evidence" that an employer's motivations were pretextual. *Strother v. S. California Permanente Med. Grp.*, 79 F.3d 859, 870 (9th Cir. 1996); *Chuang v. Univ. of California Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000). And there is also authority that direct and circumstantial evidence should be treated the same at the summary-judgment stage. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1030 (9th Cir. 2006). It is not clear whether the "specific and substantial" rule is controlling law. *See Davis v. Team Elec. Co.*, 520 F.3d 1080,

1091 & n.6 (9th Cir. 2008). In any event, the governing rule is that it is the movant's burden to show that there is "no genuine dispute as to any material fact." FRCP 56.

## IV. ARGUMENT

### 1. Prima Facie Case and Protected Activity

"To state a prima facie case for retaliation, plaintiff must establish: (1) she was engaged in protected activity; (2) defendant took an adverse employment action; and (3) a causal connection existed between plaintiff's protected activity and defendant's adverse employment action." *Lelaind v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1094 (N.D. Cal. 2008). "The requisite degree of proof necessary to establish a prima facie case on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.*

Plaintiff has easily made a prima facie case. Sandhu (1) engaged in extensive protected activity spanning nearly a decade. Indeed, Giamatteo testified that Sandhu had a reputation for "weaponizing" the ethics hotline. Giamatteo Dep. at 73:9-74:17. For example, in Nov. 2016, Sandhu filed a formal complaint about a male coworker's unwanted conduct (the male employee received only a warning). Pl. Exs. 23 & 24. In Oct. 2021, Sandhu complained to Chen and then-CFO Steve Rai about Giamatteo's unwanted sexual advances, including inappropriate touching and comments that made her "highly uncomfortable." Sandhu Depo. at 113:11-115:4; 111:9-114:20; & 132:4-25. In March 2022, Sandhu complained to Chen multiple times about being deliberately excluded by Giamatteo's team from meetings directly related to her responsibilities. Pl. Exs. 10 & 11. In Feb. 2023, Sandhu filed a formal complaint that Giamatteo was trying to diminish her role and force her out of the company. Def. Ex. 8.

There were also critical complaints that immediately preceded her termination. On Nov. 6, 2023, Sandhu participated in a formal interview with the MoFo investigators. Def. Ex. 25. On Nov. 7, 2023, Sandhu sent an email to MoFo containing "five bullet points and multiple attachments" detailing "JJG's harassment of me, which commenced after I did not respond positively to his suggestive comments." Def. Ex. 29. On Nov. 16, 2023, she sent a follow-up email to MoFo

accusing Giamatteo of "retaliation" and of "cutting me out of my job," and forwarded both emails to interim CEO Lynch. Def. Ex. 28, 32.

The employee need not use magic words like "discrimination" or "harassment" when reporting misconduct. *Miller v. Dep't of Corr.*, 36 Cal. 4th 446, 475 (2005); *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1048 (2005). Sandhu's complaints about Giamatteo's unwanted advances, systematic exclusion from meetings, efforts to diminish her role, and explicit accusations of "harassment" and "retaliation" unquestionably constitute protected activity under FEHA.

There is also no question that (2) Sandhu suffered adverse employment actions. She was terminated on Dec. 4, 2023. But even before her termination, she was subjected to a pattern of adverse actions that must be viewed collectively, not one-by-one in isolation. *Yanowitz*, 36 Cal. 4th at 1058 ("[A] series of separate retaliatory acts collectively may constitute an 'adverse employment action' ***even if some or all of the component acts might not be individually actionable***.") (emphasis added).

The pre-termination adverse actions included: systematic exclusion from Giamatteo's weekly staff meetings despite Sandhu's requests for invitations, Pl. Ex. 10 & 11; Sandhu Depo. at 239:18-240:5; being cut out of key business decisions, including materials that fell squarely within her responsibilities Def. Ex. 8; having major Elite customer accounts taken away—the most valuable and strategically important relationships at Blackberry—despite closing many of the company's largest software and services deals, in exchange for more challenging "win-back" accounts Giamatteo's Business Unit had lost, Sandhu Depo. at 249:1-250:13; and denial of a salary increase when promoted to CMO in June 2023 because "Giamatteo would be upset" if she received a raise. *Id*. at 54:3-55:10. Similarly, Sandhu was denied the title "Chief Customer Officer" because it would have upset Giamatteo. *Id*. at 243:10-244:24.

Whether these collective actions constitute an adverse employment action is a question for the jury. *Yanowitz*, 36 Cal. 4th at 1061 ("It remains for the trier of fact to decide whether [plaintiff's] allegations are true."). As explained above, "adverse employment action" "must be

interpreted broadly to further the fundamental antidiscrimination purposes of the FEHA." *Id.* at 1053. Sandhu is not required to prove that every indignity she suffered on the road to her termination, in isolation, was legally actionable. *See, e.g., Patterson v. Boeing Co.*, No. CV 16-1613-GW (SKX), 2018 WL 5937911, at *18 (C.D. Cal. Apr. 4, 2018) ("[B]ecause the Court has determined that there is at least a triable issue of fact with respect to the existence of some adverse employment action here, the Court has no need to reach a definitive conclusion as to each of the alleged adverse employment actions proffered (at least for purposes of this claim).").

Element (3)—causal connection—is demonstrated through multiple factors. The temporal proximity is particularly damning.[6] On Nov. 16, 2023, Sandhu forwarded to interim CEO Lynch two emails detailing Giamatteo's discrimination and retaliation. Def. Ex. 32. Eighteen days later, Lynch terminated Sandhu's employment. Def. Ex. 36. Three days after that—on Dec. 7, 2023—Giamatteo was announced as CEO. Def. Ex. 34. A jury could rationally conclude that Lynch decided to "solve" the complaint of harassment and retaliation by firing Sandhu—and doing so just days before Giamatteo's CEO announcement to shield the incoming CEO from the appearance of retaliation.

Defendant contends that "Lynch was unaware Plaintiff had engaged in any protected activity at the time he decided to terminate her." A reasonable jury could disagree. First, Defendant assumes that the first time Lynch became aware of Sandhu's protected activity was her November 16, 2023 email to him. But CLO Kurtz told Lynch about at least one of Sandhu's prior complaints about Giamatteo. Pl. Ex. 35 - Kurtz Depo. at 140:5-14 ("Yeah, so I believe he was aware . . . the prior complaint from Neelam against him came up through that."). Second, after the filing of the October 26 anonymous complaint against Giamatteo, the Board of Directors (including Lynch) speculated that it might have been Sandhu who filed the anonymous complaint. *Id.* at 58:22-59:13. Third, as of October 28, 2023, the Board of Directors (which included Lynch) had been briefed

[6] "Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas Cnty*., 341 F.3d 858, 865 (9th Cir. 2003); *Stegall v. Citadel Broad. Co*., 350 F.3d 1061, 1069 (9th Cir. 2003), as amended (Jan. 6, 2004).

about Sandhu's prior complaints. Pl. Ex. 31 (e-mail from board member Disbrow, cc'ing board member Daniels, stating that "the documents Nita [White-Ivy] provided on her [Sandhu] previous complaints & resolution may already constitute enough rationale to include her in our investigation."). So the jury could find that even before the Nov. 16 email, Lynch knew about at least one of Sandhu's protected complaints.

Furthermore, Defendant's claim that Lynch decided to terminate Sandhu on Nov. 13, 2023—three days before her Nov. 16 email—is not supported by any contemporaneous documentation and raises credibility issues for the jury. No document corroborates the Nov. 13 date. The earliest documentary evidence Defendant cites is from Nov. 29—11 days after Sandhu's Nov. 16 email, and 16 days after Lynch had supposedly decided to fire her. No explanation is given for why there would be a 16-day gap between deciding to fire Sandhu and putting that decision in writing. And Lynch's deposition testimony that he remembered the exact date he decided to fire Sandhu, approximately a year-and-a-half later, is highly suspect. Finally, because the Nov. 13 date falls just three days before Sandhu sent the November 16 email, Lynch's testimony is highly convenient and self-serving, which the jury can consider. *See Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 510 (9th Cir. 2004). The question of when Lynch decided to fire Sandhu should therefore go to the jury. *Id.* at 511 ("Thus, evidence of Settlegoode's deficiencies in writing IEPs hinged entirely on Winthrop's word, which the jury was certainly entitled to disregard.").

As for the argument that Giamatteo was not involved in the termination decision, the jury could rationally infer that as part of the permanent-CEO negotiations, Lynch assured Giamatteo that he would get rid of Sandhu. A company cannot avoid liability by having the person who nominally terminates the plaintiff act as a "cat's paw." *See Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95, 116 (2004).[7] Giamatteo was afraid the company was having a "change of heart" about

[7] *Miller v. T-Mobile USA, Inc.*, No. 24-CV-06792-HSG, 2025 WL 3085722, at *10 (N.D. Cal. Nov. 5, 2025) is distinguishable because the question was whether a trainee with no supervisory authority could trigger the cat's paw doctrine. Here, Giamatteo was a C-suite executive and the heir-apparent CEO.

making him CEO; Lynch and Kurtz exchanged messages about the need to "keep him [Giamatteo] calm" during the transition; and Lynch communicated with Giamatteo when expressing this concern. Pl. Ex. 25. And it is highly implausible that a temporary, caretaker, interim CEO serving for less than thirty days would have fired the company's Chief Marketing Officer—a fifteen-year employee with a stellar record—without the approval of the heir-apparent CEO who was negotiating his employment contract during that same time period. And Sandhu testified that multiple employees told her Giamatteo had stated he would not sign his CEO contract unless she was fired, with at least one source from Giamatteo's own team. Sandhu Depo. at 48:8-50:22.[8]

In sum: (1) Sandhu engaged in extensive protected activity spanning from 2016 through November 2023; (2) she was both fired and suffered a pattern of pre-termination adverse actions that must be viewed collectively under *Yanowitz*; and (3) there is evidence of retaliatory nexus, including temporal proximity (eighteen days from the Nov. 16 complaint to the Dec. 4 termination), suspicious timing relative to Giamatteo's CEO succession (3 days before Dec. 7 announcement), and evidence suggesting Lynch was a cat's paw.

**2. Other Evidence of Pretext**

In addition to temporal proximity, there are many other indicators of pretext.

**a. Shifting and Conflicting Explanations for the Termination**

Blackberry's shifting, contradictory explanations for why it terminated Sandhu is powerful evidence of pretext. *See Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 569 (9th Cir. 2004).

**b. The "Mass Layoff" Claim Is False**

The jury could conclude that Blackberry's sworn interrogatory response that Plaintiff was terminated "along with more than 500 other employees" is outright false. Pl. Ex. 26, p. 11, lines 5-7. Although two executives resigned while Lynch was interim CEO (per clauses that allowed them to leave when Chen left)[9], the only employee he terminated was Sandhu. Lynch Depo. at

---

[8] Employee statements are not hearsay if "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." FRE 801(d)(2)(D).

[9] Kurtz Depo. Tr. at 66:12-18.

202:24-203:7; Kurtz Depo. at 68:6-16. It is therefore not true that "more than 500 other employees" were terminated along with Sandhu. Giamatteo confirmed that although there was a reduction in force after Sandhu was fired, it occurred about ***three months*** after Sandhu's termination. Giamatteo Depo. at 102:10-103:6.

Additionally, if Lynch had determined that Sandhu's role and the Elite Customer group were truly redundant, then why did he fire only Sandhu and not disband the entire team? The Elite Customer group continued to exist after her termination. In fact, Giamatteo testified that transitioning the Elite Customer group's customers back to the field sales organization was a gradual process that occurred over approximately two years and was still ongoing when he became CEO. Giamatteo Depo. at 47:2-14.

**c. The HR Chief Position Was Not Eliminated**

The jury could also disbelieve the sworn interrogatory response that "Plaintiff's position was eliminated along with those of two other executives." Pl. Ex. 26, p. 11, lines 5-6. As for the female executive,[10] [redacted], the jury could find that her role had not been eliminated at all—it was merely renamed. [redacted] held the position of Chief Human Resources Officer. Pl. Ex. 9. Her successor is Jennifer Armstrong-Owen, whose title is "Chief People Officer." Pl. Ex. 27. Although Blackberry attempts to argue that the roles are different, a reasonable jury could conclude that 1) "Chief Human Resources Officer" and "Chief People Officer" are functionally the same role and that the position was renamed rather than eliminated, and 2) Blackberry was dishonest when it stated that [redacted]'s position had been "eliminated."

**d. Other Company-Wide Corporate Executives Were Not Fired**

When Lynch was interim CEO, there were many high-level executives at the corporate level, not within any particular business unit, who were not terminated.[11] A jury could reasonably ask: why did Lynch fire Sandhu, but not them?

[10] Two executives, one male and one female, resigned while Lynch was interim CEO. It appears the male executive's separation was not involuntary.

[11] Pl. Ex. 9 (Dickman was Chief of Government Affairs and Public Policy Officer, Kurtz was Chief Legal Officer and Corporate Secretary, Rai was Chief Financial Officer, Eagan was Chief

And a year-and-a-half after Sandhu was terminated, Blackberry's corporate layer still included several company-wide executives whose roles were not aligned to either standalone business unit: in addition to the Chief People Officer, there is a "Senior Vice President and Chief Strategy Officer" and a "Senior Vice President, Chief Information Officer and Chief Information Security Officer" (both men). Pl. Ex. 27. Giamatteo confirmed that these are company-wide corporate roles not tied to any particular business unit. Giamatteo Depo. at 181:18-21 & 182:23-183:1. The ongoing employment of these company-wide executives undermines Defendant's justification that it needed to implement "cuts to centralized corporate functions that were not needed by either standalone business." Pl. Ex. 27, p. 11, lines 3-4.

**e. The "Toxic Personality" Explanation is Litigation-Driven**

Although Defendant now claims Sandhu's personality was a factor in her termination, the contemporaneous evidence flatly contradicts this claim. The Dec. 2, 2023 talking points prepared for Sandhu's termination state only: "with the company's new direction of business separation, your position has become redundant." Def. Ex. 35 at 18742. There is no mention whatsoever of personality issues, performance problems, or interpersonal difficulties. If personality was genuinely a factor in the termination decision, why would the contemporaneous termination documents make no reference to it?

Lynch's deposition testimony on this issue is contradictory and evasive. Lynch Depo. at 80:5-8 (testifying that Sandhu's personality was a factor in not placing her in a different role in the company); *Id.* at 89:23-90:9 ("No, because it [personality] wasn't relevant. I had already made the decision based on, I think, sound management judgment that she was in a position that was going to be terminated . . . . it was logical that a person whose total job was eliminated [] would be one of the people that would leave."). The jury will need to resolve this contradiction. "[D]isambiguating ambiguous utterances is for trial, not for summary judgment." *Gunther v. Xerox*

---

Technology Officer, Giallorenzo was Senior Vice President, Corporate Development and Chief Operating Officer, Blackberry Technology Solutions, Harold was Chief Information Officer, and Raman was Chief Information Security Officer).

*Corp.*, No. 13-CV-04596-HSG, 2015 WL 5769619, at *9 (N.D. Cal. Oct. 2, 2015) (citation omitted).

And because Lynch never worked with Sandhu in a day-to-day capacity, he did not have enough personal experience with her to form an independent judgment about her personality. Lynch Depo. at 29:13-25. Before Chen's resignation, Lynch's only interaction with Sandhu was meeting her once at a 20+ person dinner. *Id*. at 33:13-16. When asked about what he had heard regarding Sandhu's being difficult to work with, Lynch gave a vague, hazy response devoid of details. *Id*. at 87:21-88:17.

Blackberry has presented no evidence that Lynch performed any investigation to verify the personality allegations. He never even asked Sandhu about them. Lynch Depo. at 89:10-13. And Sandhu had no disciplinary history, had never been placed on a performance improvement plan, and had no HR complaints filed against her by subordinates or colleagues. Chen Depo. at 33:14-24; Bramhill Depo. at 20:12-21:14.

Because someone's "personality" is inherently subjective, this justification warrants heightened scrutiny. *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003) ("Where termination decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted because such evaluations are particularly susceptible of abuse and more likely to mask pretext."). The fact that Lynch barely knew Sandhu, made no effort to investigate the allegations, and personality issues appear nowhere in the contemporaneous termination documents strongly suggests that the personality justification is a post-hoc rationalization manufactured for this litigation.

**f. Performance Claims Contradict Sandhu's Record**

Although Blackberry now claims that one reason it fired Sandhu was because "Plaintiff's performance with those [Elite] customer accounts was not strong," Pl. Ex. 26, p. 11, lines 16-17, a jury could find this statement is not credible. Sandhu had a meteoric rise through the company and was praised by then-CEO Chen, who never considered firing her. Chen Depo. at 28:11-29:10 & 149:18-149:1. She won a number of the company's largest software and services deals,

including a $[redacted] deal. Sandhu Depo. at 239:18-240:5. Sandhu was never disciplined, never placed on a PIP, and never formally investigated by HR. Chen Depo. at 33:14-24; Bramhill Depo. at 20:12-21:14. The contemporaneous termination talking points did not cite performance as a reason for her termination. Def. Ex. 35 at 18742. And Lynch himself testified that "the primary [termination] decision had nothing to do with the performance. It had to do with the role that she was playing in the company at that point in time." Lynch Depo. at 244:20-245:2.

**g. Lynch Contradicts the "CEO Ambition" Claim**

A sworn interrogatory response states that one reason Sandhu was fired was because "Plaintiff told interim CEO Richard Lynch that she wanted to be CEO herself." Pl. Ex. 26, p. 11, line 18. But Lynch testified that Sandhu's alleged interest in being CEO was not a factor in the termination decision. Lynch Depo. at 222:14-18.

**h. Personal Animus Toward Sandhu**

There is strong evidence that Lynch and Giamatteo both harbored personal animus toward Sandhu. A jury could rationally conclude that they disliked her because she is a woman who pushed back against what she perceived to be sexism in the workplace.[12]

Despite his very limited interactions with her, Lynch testified that he had an unfavorable opinion of Sandhu from their very first meeting. His initial impression upon meeting her was that she was "very aggressive" and "very opinionated." Lynch Depo. at 35:4-24. A jury could conclude that Lynch disliked Sandhu because she did not conform to the stereotype that women should be deferential and submissive. *See Costa v. Desert Palace, Inc.*, 299 F.3d 838, 861 (9th Cir. 2002) ("At trial, Caesars' consistent objection to Costa as an employee was that she was 'strong-willed' and 'opinionated,' a view that the jury could have reasonably interpreted as gender stereotyping.").

---

[12] Personal antipathy can be evidence that a supposed "restructuring" was a mere pretext for a targeted purge. *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1070 (9th Cir. 2003), *as amended* (Jan. 6, 2004) ("tumultuous relationship" was evidence of retaliation); *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1286 (9th Cir. 2001) ("exasperation, lack of sympathy, and even animosity toward Winarto" was evidence of retaliation).

Giamatteo was even more extreme in his hostility toward Sandhu. On April 3, 2023, he messaged CEO Chen that Sandhu was "toxic" and that he liked the company's "chances without her." Pl. Ex. 12. The next day, he wrote that "the PTSD effect of Neelam and her interaction with the organization is very ugly/dysfunctional. I spend a lot of time conducting therapy sessions with everyone . . . In my 30+ years I have never seen such a polarizing figure." Pl. Ex. 13. Chen himself testified that he found this language "totally inappropriate." Chen Depo. at 174:23. On April 10, 2023, Giamatteo accused Sandhu of "lies and manipulation." Pl. Ex. 14. Giamatteo also testified that he suspected Sandhu had filed the anonymous complaint against him that could have prevented him from becoming CEO. Giamatteo Depo. at 71:16-20, 73:9-74:10.

Animus toward Sandhu permeated Giamatteo's entire team. Giamatteo testified that Sandhu had a reputation as a "land-grabber." Giamatteo Depo. at 57:8-10 & 59:18-22. This characterization exemplifies how assertive behavior by women—behavior that would be praised as "ambitious" or "entrepreneurial" in men—is punished when exhibited by women. CFO Tim Foote texted Giamatteo on October 28, 2023: "I'm pretty sure this BS is from Neelam." Pl. Ex. 15. Chief Legal Officer Kurtz went even further, characterizing Sandhu in an email to MoFo as "a fraudulent complainant, which negates any right to anonymity in my view." Pl. Ex. 16. Kurtz also stated that the Board suspected Sandhu of filing the anonymous complaint and that there were "solid reasons to believe that she does not want to see JJG [Giamatteo] as CEO." *Id.*

**i. Consciousness of Guilt**

On Nov. 23, 2023—after Sandhu had forwarded her complaints to Lynch but before her termination—Lynch sent a revealing text message to Chief Legal Officer Kurtz and Board member Lisa Disbrow: "Given what personnel actions are planned, might there be protective value in me not seeing the version [of the MoFo report] with names?" Pl. Ex. 20. Lynch knew firing Sandhu might be perceived as retaliatory and wanted plausible deniability about knowing she had participated in the investigation. Lynch essentially admitted as much at his deposition. Lynch Depo. at 179:16-181:4. Furthermore, Lynch admitted that he did not want Sandhu to "be perceived as having been fired by the new incoming CEO [Giamatteo]," demonstrating a calculated effort to

shield Giamatteo from accusations of retaliation. Lynch Depo. at 199:21-200:18. If there was nothing improper about the termination, why would Lynch be concerned about how it would be "perceived"? Finally, the Dec. 4, 2023 termination letter to Sandhu includes a draft severance agreement with a release clause. Pl. Ex. 21. The inclusion of a release clause is evidence of BlackBerry's consciousness of wrongdoing. *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1342 (9th Cir. 1987) (offer of severance agreement with release clause was "probative on the issue of discrimination").

**j. Systemic Evidence - Me-Too Witnesses**

The pattern of me-too evidence discussed in the "factual background" section establishes that Blackberry had a systemic culture problem that extended far beyond Sandhu. Under *Heyne v. Caruso*, 69 F.3d 1475, 1479 (9th Cir. 1995), and *Pantoja v. Anton*, 198 Cal. App. 4th 87, 110 (2011), me-too evidence is admissible to show intent, pattern, and practice, and to impeach. Women who complained about discrimination faced adverse consequences, while the men they complained about continued in their positions without meaningful accountability. And even though Blackberry spent over $250,000 on the MoFo investigation, Pl. Ex. 17, a jury could find that Blackberry had blown off MoFo's recommendations. Lynch Depo. at 186:16-187:11 & 187:23-191:3; Giamatteo Depo. at 238:11-22.

**k. Prima Facie Case for FEHA Sex Discrimination**

"A plaintiff establishes a prima facie case of disparate treatment if she shows that (1) she belongs to a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) her employer treated her differently than a similarly situated employee who does not belong to the same protected class." *Lelaind v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1094 (N.D. Cal. 2008).

Plaintiff has easily made a prima facie case. (1) She is a woman. (2) She performed her job satisfactorily, as demonstrated by fifteen years of promotions roughly every two years and lack of disciplinary history. (3) She suffered adverse employment actions: systematic exclusion from

Giamatteo's meetings;[13] transfer of valuable Elite customer accounts replaced with more difficult "win-back" accounts;[14] denial of salary increase with her CMO promotion because Giamatteo "would be upset";[15] and termination. (4) Male executives who were subjects of complaints received warnings only, not termination, despite investigator findings that the complaints were "likely accurate." Bramhill Depo. at 74:14-23 & 70:20-71:24. In contrast, women who complained—Sandhu, Dickman, McMillan, and Tatsis —were terminated.

The entire pattern of conduct reflects gender bias. Lynch's initial impression of Sandhu was that she was "very aggressive" and "very opinionated"—characteristics that would be praised as "leadership" in men. Lynch Depo. at 35:4-24. Giamatteo characterized Sandhu as a "land-grabber"—a pejorative term for behavior that would be called "ambitious" in a man. Giamatteo Depo. at 59:18-22. The October 20, 2021 dinner where Giamatteo made unwanted sexual advances demonstrates he viewed Sandhu through a sexualized lens rather than as a professional colleague. Giamatteo admitted that he had "not made as much progress as I would have liked" building an organization of diverse people. Pl. Ex. 28; Pl. Ex. 29 (org chart showing only one woman, a "senior business operations administrator" reporting to Giamatteo). And multiple female witnesses testified about the "boys' club" culture where women were excluded, underpaid, and marginalized.

The pretext evidence discussed throughout this brief also establishes discriminatory motive. The fact that Blackberry spent over $250,000 investigating systemic discrimination yet implemented virtually none of MoFo's recommended reforms demonstrates deliberate indifference to sex discrimination. Lynch Depo. at 186:16-187:11 & 187:23-191:3; Giamatteo Depo. at 238:11-22.

**3. Labor Code § 1102.5 Whistleblower Claim**

The evidence discussed throughout this brief demonstrates that Sandhu's protected whistleblowing was a contributing factor in her termination. Blackberry has not met—and has not

---

[13] Pl. Exs. 10 & 11.
[14] Sandhu Depo. at 249:1-250:13 & Chen Depo. at 111:6-112:13.
[15] Sandhu Depo. at 54:3-55:10.

even attempted to meet—its burden under section 1102.6 to prove ***by clear and convincing evidence*** that Sandhu would have been terminated for legitimate, independent reasons.

**4. Punitive Damages**

Punitive damages are generally available when the jury concludes, by clear and convincing evidence, that the defendant engaged in malice, oppression, or fraud. *C.R. Dep't v. Grimmway Enters., Inc.*, -- F.Supp.3d --, No. 2:21-CV-01552-DAD-AC, 2025 WL 2694864, at *21 (E.D. Cal. Sept. 22, 2025). "In the usual case, the question of whether the defendant's conduct will support an award of punitive damages is for the trier of fact, since the degree of punishment depends on the peculiar circumstances of each case." *Id.* at *22 (quotations omitted).

If believed, Sandhu's evidence shows conscious disregard for her rights by Blackberry's managing agents. The conduct went to the top—the CEO, CLO, and Board members were directly involved. Kurtz called her "a fraudulent complainant" in an email to investigators. Pl. Ex. 16. Lynch sought "protective value" in not seeing witness names, demonstrating consciousness of wrongdoing. Pl. Ex. 20. Blackberry tolerated a hostile environment for women, as shown by the me-too evidence and MoFo's findings, yet made no effort to implement the recommended reforms. Lynch Depo. at 186:16-187:11 & 187:23-191:3; Giamatteo Depo. at 238:11-22. Blackberry also lied in interrogatory responses, manufacturing grounds for termination inconsistent with the contemporaneous documents. Here, "an assessment of whether Plaintiff's evidence can clear the high bar necessary to recover punitive damages must await the presentation of a full factual record at trial." *Grimmway*, 2025 WL 2694864, at *22.

**V. CONCLUSION**

For all these reasons, genuine disputes of material fact exist on all claims involving motive, intent, and credibility—precisely the questions a jury must resolve.

Dated: January 5, 2026

**GOMERMAN | BOURN & ASSOCIATES**

By: *_/s/ Anthony Tartaglio_*