1   Maria A. Bourn
2   Anthony Tartaglio
    GOMERMAN | BOURN & ASSOCIATES
3   825 Van Ness Ave, Suite 502
    San Francisco, CA 94109
4   Telephone: (415) 545-8608
    Email: maria@gobolaw.com
5       tony@gobolaw.com

6   Attorneys for Plaintiff
7   NEELAM SANDHU

8               **UNITED STATES DISTRICT COURT**

9           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10  NEELAM SANDHU, an individual,        **Case No.: 3:24-cv-02002-SK**

11              Plaintiff,               **DECLARATION OF ANTHONY
                                         TARTAGLIO IN SUPPORT OF
12      vs.                              PLAINTIFF'S OPPOSITION TO
                                         DEFENDANT'S SUMMARY JUDGMENT
13  BLACKBERRY CORPORATION, a            MOTION**
    Delaware Corporation,
14                                       *[Filed concurrently with Plaintiff's Opposition to
                Defendant.               Defendant's Summary Judgment Motion]*
15
                                         Judge: Hon. Sallie Kim
16
                                         Hearing Date: January 26, 2026
17                                       Hearing Time: 9:30 AM
                                         Courtroom C
18

19

20

21

22

23

24

25

26

27

28

1      **I, ANTHONY TARTAGLIO,** declare that:

2      1.      I am an attorney with the law firm Gomerman | Bourn & Associates, counsel of

3  record for Plaintiff NEELAM SANDHU. I have personal knowledge of the facts stated herein and,

4  if called as a witness, could and would testify competently thereto.

5      2.      Attached hereto as **Exhibit 1** is a true and correct copy of BB13-00000351 - BB13-

6  00000363.

7      3.      Attached hereto as **Exhibit 2** is a true and correct copy of BB13-00000350.

8      4.      Attached hereto as **Exhibit 3** is a true and correct copy of BB13-00000411 - BB13-

9  00000424.

10     5.      Attached hereto as **Exhibit 4** is a true and correct copy of BB13-00000331 - BB13-

11  00000336.

12     6.      Attached hereto as **Exhibit 5** is a true and correct copy of BB13-00000425 - BB13-

13  00000430.

14     7.      Attached hereto as **Exhibit 6** is a true and correct copy of BB13-00000364 - BB13-

15  00000370.

16     8.      Attached hereto as **Exhibit 7** is a true and correct copy of BB13-00000431 - BB13-

17  00000438.

18     9.      Attached hereto as **Exhibit 8** is a true and correct copy of BB13-00004615.

19     10.     Attached hereto as **Exhibit 9** is a true and correct copy of the BlackBerry Executive

20  Team webpage from BlackBerry's web site, dated December 7, 2023, which I obtained from the

21  Wayback Machine website.

22     11.     Attached hereto as **Exhibit 10** is a true and correct copy of BB13-00011179 – BB13-

23  00011191.

24     12.     Attached hereto as **Exhibit 11** is a true and correct copy of BB13-00000877 – BB13-

25  00000881.

26     13.     Attached hereto as **Exhibit 12** is a true and correct copy of BB13-00019018 – BB13-

27  00019019.

28     14.     Attached hereto as **Exhibit 13** is a true and correct copy of BB13-00009916 – BB13-

00009924.

15.    Attached hereto as **Exhibit 14** is a true and correct copy of BB13-00020039 – BB13-00020040.

16.    Attached hereto as **Exhibit 15** is a true and correct copy of BB13-00023976.

17.    Attached hereto as **Exhibit 16** is a true and correct copy of BB13-00019475 – BB1300019476 / BB13-00024731 – BB13-00024732.

18.    Attached hereto as **Exhibit 17** is a true and correct copy of BB13-00019766 – BB13-00019767.

19.    Attached hereto as **Exhibit 18** is a true and correct copy of BB13-00019484 – BB13-00019486.

20.    Attached hereto as **Exhibit 19** is a true and correct copy of BB13-00018460 – BB13-00018461.

21.    Attached hereto as **Exhibit 20** is a true and correct copy of BB13-00019790.

22.    Attached hereto as **Exhibit 21** is a true and correct copy of BB13-00004638 – BB13-00004647.

23.    Attached hereto as **Exhibit 22** is a true and correct copy of Exhibit 10 from the September 19, 2025 deposition of Jennifer Bramhill.

24.    Attached hereto as **Exhibit 23** is a true and correct copy of BB13-00000203 – BB13-00000204.

25.    Attached hereto as **Exhibit 24** is a true and correct copy of BB13-00000275 – BB13-00000276.

26.    Attached hereto as **Exhibit 25** is a true and correct copy of BB13-00019788 – BB13-00019789.

27.    Attached hereto as **Exhibit 26** is a true and correct copy of Defendant Blackberry Corporations Verified Responses to Plaintiff's Interrogatories, Set One, dated August 12, 2024.

28.    Attached hereto as **Exhibit 27** is a true and correct copy of Exhibit 33 from the June 5, 2025 deposition of Richard Lynch.

29.    Attached hereto as **Exhibit 28** is a true and correct copy of BB13-00016949 – BB13-

1   00016950.

2       30.    Attached hereto as **Exhibit 29** is a true and correct copy of BB13-00019447 – BB13-

3   00019448.

4       31.    Attached hereto as **Exhibit 30** is a true and correct copy of BB13-00016051 – BB13-

5   00016052.

6       32.    Attached hereto as **Exhibit 31** is a true and correct copy of BB13-00016959.

7       33.    Attached hereto as **Exhibit 32** is a true and correct copy of certified reporter's

8   transcript excerpts from the August 22, 2025 deposition of Neelam Sandhu.

9       34.    Attached hereto as **Exhibit 33** is a true and correct copy of certified reporter's

10  transcript excerpts from the August 28, 2025 deposition of John Giamatteo.

11      35.    Attached hereto as **Exhibit 34** is a true and correct copy of certified reporter's

12  transcript excerpts from the August 5, 2025 deposition of John Chen.

13      36.    Attached hereto as **Exhibit 35** is a true and correct copy of certified reporter's

14  transcript excerpts from the July 29, 2025 deposition of Phil Kurtz.

15      37.    Attached hereto as **Exhibit 36** is a true and correct copy of certified reporter's

16  transcript excerpts from the June 5, 2025 deposition of Richard Lynch.

17      38.    Attached hereto as **Exhibit 37** is a true and correct copy of certified reporter's

18  transcript excerpts from the February 24, 2025 deposition of Colleen McMillan.

19      39.    Attached hereto as **Exhibit 38** is a true and correct copy of certified reporter's

20  transcript excerpts from the February 26, 2025 deposition of Erin Ransom.

21      40.    Attached hereto as **Exhibit 39** is a true and correct copy of certified reporter's

22  transcript excerpts from the April 10, 2025 deposition of Mary Slimmon.

23      41.    Attached hereto as **Exhibit 40** is a true and correct copy of certified reporter's

24  transcript excerpts from the September 2, 2025 deposition of Sarah Tatsis.

25      42.    Attached hereto as **Exhibit 41** is a true and correct copy of certified reporter's

26  transcript excerpts from the September 19, 2025 deposition of Jennifer Bramhill.

27      43.    Attached hereto as **Exhibit 42** is a true and correct copy of certified reporter's

28  transcript excerpts from the September 11, 2025 deposition of Marjorie Dickman.

3

DECLARATION OF ANTHONY TARTAGLIO IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANT'S SUMMARY JUDGMENT MOTION - 3:24-cv-02002-SK

1     44.    Attached hereto as **Exhibit 43** is a true and correct copy of BB13-00016065 – BB13-

2    00016066.

3     45.    The exhibits attached are maintained by my firm in the ordinary course of our

4    practice. The transcript excerpts are true and correct copies of certified reporter's transcripts for the

5    cited dates and pages, and the email/document exhibits are true and correct copies of records

6    produced in discovery or used at trial

Dated: January 5, 2026

                        */s/ Anthony Tartaglio*_____
                        Anthony Tartaglio

DECLARATION OF ANTHONY TARTAGLIO IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANT'S SUMMARY JUDGMENT MOTION - 3:24-cv-02002-SK

# EXHIBIT 1



11th September 2009

Neelam Sandhu



Research In Motion UK Limited
200 Bath Road
Slough
Berkshire
SL1 3XE

t  +44 (0) 1753  667000
f  +44 (0) 1753  669970

www.blackberry.com

Dear Neelam

On behalf of Research In Motion UK Limited ("RIM Europe"), we are pleased to offer you employment with RIM Europe based on the following terms and conditions:

You will hold the position of **Brand Review Specialist**, reporting to **Justin Hollis – Senior Brand and Marketing Comms Manager**. As discussed, your employment will start on **14th September 2009** however; you will have continuous service from **16th February 2009**. You will be based out of our UK Office in Slough, currently at 200 Bath Road, Slough, Berkshire, SL1 3XE, or (at the Company's absolute discretion) at such other offices as the Company shall establish from time to time and the Company reserves the right to require you to relocate to such other offices on a temporary or permanent basis, in accordance with the needs of the business.

You may be required to visit the Canadian office on an as needed basis and to travel to to other places of business as may reasonably be required from time to time for the proper performance of your duties.

Your annual salary will be **£25,000.00** (twenty-five thousand pounds sterling), payable monthly in arrears.

You may be eligible to participate in RIM's ViP (Variable incentive Pay) Program, an annual incentive program based on both individual and company performance measures.  Please note the ViP is subject to change at the sole discretion of RIM.

You will be entitled to 25 days paid holiday per annum, plus the statutory public holiday entitlement. Additionally, you will be given a maximum of 3 paid holiday days, known as RIM days, during the days between the statutory holidays associated with Christmas and New Year's Day, as RIM Europe is closed during that time.

Your regular hours of work will be 40 hours per week, Monday to Friday, which excludes lunch breaks. However you will be expected to be at work during the core hours of between 10am and 4pm. When necessary, it is expected that you will be available to work such hours as are required to ensure that the duties are completed.  This may require working additional hours without further pay (including weekends) at such locations and times as directed by RIM Europe.

Subject to acceptance by the providers of these benefits, you are eligible for the following:-

Research In Motion UK Limited is a company registered in England and Wales with company registration number 4072422 and with registered offices at Centrum House, 36 Station Road, Egham, Surrey TW20 9LF.
BlackBerry and the BlackBerry logo are trademarks of Research In Motion Limited.

- private health and dental insurance for you and your family

- Pension Salary Sacrifice with the company contributing a maximum of 8% of base salary providing employee contributes a minimum of 3% of base salary

- life insurance to the value of four times your basic annual salary

- long term disability at 66.66% of basic annual salary less Single Person's State Incapacity Benefit, subject to the qualifying conditions of the scheme

- £200 towards the cost of health club fees at a facility of your choice, payable via payroll

- Childcare Vouchers

- Season Ticket Loan

- Subsidy of European Language Course

Details of these benefits and the process of enrolment will be given to you upon joining the company.

Research in Motion (UK) Ltd has an obligation to ensure that employment is offered in accordance with legal requirements and only to those who are legally entitled to work in the UK in a manner consistent with Sections 15-25 of the Immigration, Asylum and Nationality Act 2006 ("the Act"). Therefore, before employment commences, the Company must see and check the original and retain a copy of each of the documents evidencing your legal ability to work in the UK, as outlined in the Act.

In the event that you should require work permits and or visas the Company will use reasonable endeavours to procure this for you. This will usually involve certain costs for the Company including legal advice and assistance. As such, in the event that you decline the job offer after you have indicated your formal acceptance (verbally or in writing) or if you resign during the probationary period, or 6 months after obtaining your work permit or visa the Company reserves the right to recover from you any costs (including legal fees and expenses) incurred by the Company with regards to the work permit application process and by signing this letter you agree to be responsible for these costs in those circumstances. You will be required to reimburse the Company by direct payment immediately upon request and/or by deduction from your final salary payment, whichever method is applicable in the circumstances. In the event that your entitlement to work in the UK should cease or change in any way, it is your responsibility to advise the Company immediately.

We ask that you confirm your acceptance of this offer by signing all of the above-referenced documents and returning them to **Ian Kudzinowski - Recruitment Coordinator** as soon as possible.

BB13-00000352

We are confident that you will find your employment both personally and professionally rewarding.  We look forward, with enthusiasm, to your confirmation.


Yours sincerely

**Elizabeth Roe Pfeifer**
Vice President, Organisational Development
Research In Motion UK Limited

This Agreement ("Agreement") is made on 11th September 2009 between

(1)  **Research In Motion UK Limited** (4022422), an English company with its registered office at Centrum House, 36 Station Road, Egham Surrey, (the "Company" or "RIM Europe"); and

(2)  **Neelam Sandhu**, 54 St. Pauls Avenue, Slough, SL2 5ES, ("you" and the "Employee").

Whereas the Employer wishes to employ the Employee and the Employee wishes to accept such employment, now therefore the parties agree:

## 1.  Job Title

You will hold the position of **Brand Review Specialist**, reporting to **Justin Hollis – Senior Brand and Marketing Comms Manager**.

## 2.  Commencement of Employment

Your employment will commence on **14th September 2009** however; you will have continuous service from **16th February 2009**.

## 3.  Hours of Work

Your regular hours of work will be 40 hours per week, Monday to Friday, which excludes lunch breaks. However you will be expected to be at work during the core hours of between 10am and 4pm.

You shall work such other or additional hours (including weekends and bank holidays) as are reasonably required by the Company or are necessary in order for you to properly carry out your duties from time to time. You will not be paid for any overtime worked in accordance with the requirements of this clause 4.

## 4.  Place of Employment

You will be based out of our UK Office in Slough, currently at 200 Bath Road, Slough, Berkshire, SL1 3XE, or (at the Company's absolute discretion) at such other offices as the Company shall establish from time to time and the Company reserves the right to require you to relocate to such other offices on a temporary or permanent basis, in accordance with the needs of the business.

You may be required to visit the Canadian office of the Company's parent company, Research in Motion Limited ("RIM Europe Canada") on an as needed basis and to travel to other places of business as may reasonably be required from time to time for the proper performance of your duties.

## 5.  Compensation and Benefits

Your basic annual salary will be **£25,000.00** (twenty-five thousand pounds sterling), payable monthly in arrears to a UK bank account designated by you to the Company for such purposes.

You may be eligible to join such benefit schemes as the company may operate from time to time for employees of your status, although the company reserves the right to alter or remove these benefits at any time. Details of these benefits and the process of enrolment will be given to you upon joining the company.

7.    **Holidays**

In addition to normal public holidays you are entitled to twenty five paid holiday days each calendar year, which runs from 1 January to 31 December. Additionally, you will be given a maximum of 3 paid holiday days during the days between the statutory holidays associated with Christmas and New Year's Day, as the Company is closed during that time. If your employment starts part way through the year your entitlement for that year will be based upon the remaining number of months for the year (a prorated amount). Holidays are to be taken at times agreed to by your immediate manager. The provisions of Regulation 15 of the Working Time Regulations 1998 shall be excluded in relation to your employment. Unused holiday entitlement may be carried over to a subsequent holiday year up to a maximum of 5 days, which must be taken in the first 3 months of the following year or they will be lost.

On termination of employment, you will be entitled to 1/260 of basic salary for each day's holiday entitlement. If you leave the Company's employment having taken more than the accumulated holiday entitlement for the current holiday year then a sum equivalent to wages calculated at 1/260 annual salary per day for the additional holiday taken will be deducted from any final salary or termination payment and any balance will be paid to you.

The Company reserves the right to require you to take any outstanding holiday during your notice period and/or require you not to take holiday (whether or not previously approved) during your notice period.

8.    **Sickness**

If you are absent from work for any reason and your absence has not previously been approved you must personally inform your immediate manager, preferably one hour before your start time, on the first day of your absence, to advise them of the reasons for your absence and when you expect to return. You are then required to contact your manager each day, no later than your normal start time, until you have a doctor's certificate and then at the start of every week if your illness is certificated.

You will continue to be paid during absence due to illness, accident or other such incapacity (such payment to be inclusive of any statutory sick pay or social security benefits to which you may be entitled) for a total of up to twenty working days in each period of twelve months, each period running from January to December. Thereafter you shall continue to be paid at the discretion of RIM Europe. Such twenty day period will be assessed on a pro rata basis for new employees joining part way through the calendar year and for those leaving the employment of RIM within this twelve month period.

However, where management feel that it is warranted by circumstances e.g. frequent short absences unrelated to an underlying medical condition, the Company reserves the right to discontinue sickness salary payments for the period of absence and it may also take disciplinary action, which may lead to dismissal. Company Sick pay will be your basic salary (less any state benefits such as Statutory Sick Pay claimable by you as a result of your sickness or injury), less normal statutory deductions for tax and national insurance.

At any time required by RIM you may be requested to undergo a medical assessment by any doctor or doctors authorised by RIM at RIM's expense. You will be required to authorise the person responsible for such assessments to disclose and discuss them with RIM and / or it's medical advisors. RIM will comply with the Access to Medical Reports Act (1988). For further information please refer to the Attendance Management Guidelines.

BB13-00000355

RIM Europe shall have the right to terminate your employment if you are absent due to illness, accident or other such incapacity, in the event you are absent for more than 30 working days in any 12 consecutive months, in circumstances that do not constitute long term disability under the terms of RIM Europe's long term disability scheme as described below.

If you are prevented from performing your duties, either totally or partially, as a result of illness or accident for a continuing period of 26 weeks, you will be eligible to apply for benefit under the Company's long term disability scheme, as in force from time to time.

## 9.    Duties

During your employment with RIM Europe you will truly and faithfully serve RIM Europe and will devote your whole time, attention, energy and availability during regular business hours and whilst work is performed outside such hours, to the business of RIM Europe. You will not engage in any activity or outside interests that may in any way conflict with the business of RIM Europe or affect your job performance.

During your employment you will not (unless otherwise agreed in writing by RIM Europe) undertake any other business or profession or be or become an employee or agent of any other firm, company or other person or assist any other business or profession.

You agree to work to the best of your ability and in a competent and professional manner in maintaining top quality work to protect the image and integrity of RIM Europe. You will promptly and faithfully comply with all reasonable directions and instructions given by your manager(s).

RIM Europe requires all employees to be flexible in their roles and duties and as such reserves the right to require you at any time to serve in any role or undertake any duties or responsibilities (whether or not different to your current role, duties or responsibilities) on a temporary or permanent basis with RIM Europe or any Group Company provided that the role, duties or responsibilities in question are suitable, in RIM Europe's opinion, for your experience, potential and/or skill set. "Group Company" means any company which is at any time a holding company of RIM Europe or a subsidiary of RIM Europe, or another subsidiary of any holding company of RIM Europe (with subsidiary and holding company having their section 736 of Companies Act 1985 meanings).

Due to the nature of your position, you may be required to be available "on call" to attend to emergency situations.  In such instances, RIM Europe would expect you to be able to arrive at the company premises expeditiously in order to control such situations.

At the time of signing this Agreement, you warrant that you are in good health and further agree to an independent medical examination at RIM Europe's request.  You agree to disclose any such medical report to RIM Europe.

## 10.    Health and Safety

The Company attaches great importance to the provision of a working environment, which is safe and healthy for all staff, customers and visitors.  You must observe the requirements and relevant Health and Safety Policies that the Company has in place and do everything possible to avoid injury to yourself or to others.

BB13-00000356

## 11.    Business Meetings

All business meetings with clients/co-workers and any other appointments pertaining to RIM Europe's business must be conducted on either RIM Europe premises or the client premises or other suitable business location. You should not entertain clients at your home address and will comply with any instructions given from time to time in relation to your homeworking. You may be required to work at various locations in the United Kingdom in order to carry out your duties at any of RIM Europe or a Group Company's premises or those of their respective customers, suppliers or associates.  RIM Europe may also, on giving you reasonable advance notice, require you to accept a new normal place of work.

## 12.    Expenses

RIM Europe will reimburse your business expenses (those expenses properly and necessarily incurred, in the course of performing your duties) on a monthly basis.  You will need to complete RIM Europe's expense form and attach all receipts and mileage information for approval by your manager. Your reimbursement will be deposited directly into your bank account.

## 13.    Working Time Regulation

Regulation 4(1) of the Working Time Regulations 1998 (the "Regulations") provides that an employee's average working time, including overtime, in any applicable reference period (generally a period of 17 weeks) shall not exceed 48 hours for each 7 day period.  The Regulations allow individuals to contract out of Regulation 4(1) and by accepting this offer of employment, you agree with RIM Europe, that for the duration of your employment, Regulation 4(1) or any successor provision shall not apply, unless and until you give RIM Europe 3 months' prior notice to end such agreement.  Whether or not Regulation 4(1) shall apply to your employment, you agree that the 17 week reference period referred to above shall consist of fixed 17 week periods, such 17 week periods to commence 1st March.

## 14.    Data Protection

For the purposes of the Data Protection Acts 1984 and 1998, you give your consent to the holding and processing of personal data (including sensitive personal data) provided by you to the Company for all purposes relating to the performance of this Agreement including but not limited to:-

- administering and maintaining human resources records;

- paying and reviewing salary and other remuneration benefits;

- providing and administering benefits (including if relevant, pension, life assurance, permanent health insurance and medical insurance);

- undertaking performance appraisals and reviews;

- maintaining sickness and other absence records;

- taking decisions as to your fitness for work;

- obtaining information and references from previous employers;

BB13-00000357

- providing references and information to potential future employers, and if necessary, the police, governmental and quasi-governmental bodies for social security and other purposes, the Inland Revenue and the Contributions Agency;

- providing information to potential future purchasers of the Company or of the business in which you work; and

- transferring information concerning you to a country or territory outside the EEA.

### 15.    Notice Periods

Save in summary termination situations, or extended probationary period, the minimum periods of notice to be given by either you or RIM Europe to terminate your employment are as follows:

| Period of continuous employment | Minimum notice |
| --- | --- |
| - 6 months or more but less than 2 years | 4 weeks |
| - 2 years or more but less than 6 years | 6 weeks |
| - 7 years or more | 1 week for each year of continuous employment up to a maximum of 12 weeks |

RIM Europe will be under no obligation to vest in or assign to you any powers or duties or to provide any work for you during this notice period. RIM Europe, at any time or from time to time, after or before notice of termination has been served by either party, may at its discretion:

- suspend you from the performance of some or all of your duties including, without limitation, requiring you not to contact any customers, clients, suppliers or employees of RIM Europe or any Group Company; and/or

- exclude you from any premises of RIM Europe or of any Group Company; and/or

- require you not to undertake all or any part of your duties under the terms of your employmen and/or require you to undertake duties other than your normal duties.

Salary and benefits will not cease to be payable by reason only of such suspension exclusion or requirement. You will throughout any period of suspension or exclusion continue to be an employee of RIM Europe and shall comply with all obligations under this Agreement and your contract of employment generally including without limitation your duty of confidentiality and implied good faith. In addition, you will be required to remain available for work at the Company's request and to comply with all reasonable conditions imposed by the Company and you will not be permitted to work for any other person or organisation or on your own behalf without the Company's prior written permission.

The Company also reserves the right in its absolute discretion to pay you salary in lieu of notice (whether given by you or the Company). In that event, you agree to accept any such payment in full and final settlement of any contractual rights you have in relation to notice and in particular you will not be entitled to any further benefits or payments in lieu of benefits.

Your employment will end and you will retire at the age of 65.

## 16.    Termination

RIM Europe may by notice to you terminate this Agreement with immediate effect if you:

- are guilty of any gross misconduct or commit any serious or persistent breach of obligations to RIM Europe or any Group Company or of this Agreement or the Confidentiality and Intellectual Property Agreement; or

- are guilty of any conduct which in the opinion of RIM Europe brings or is likely to bring you, RIM Europe or any Group Company into disrepute; or

- are convicted of any criminal offence punishable with [one month or more] imprisonment or of any criminal offence that, in RIM Europe's judgment, indicates unfitness for the job or raises a threat to the safety or well-being of RIM Europe, its employees, customers, vendors or property; or

- have a bankruptcy petition presented against you or you make any arrangement (including a voluntary arrangement) or composition with creditors generally; or

- are of unsound mind or a patient for the purpose of any statute relating to mental health; or

- have been offered but have refused to agree to the transfer of this Agreement to a person which acquires the whole or substantially the whole of the undertaking in which you are employed; or

- undermine RIM Europe's management process or refuse to obey the lawful directions of the board or a senior officer of RIM Europe on multiple occasions.

## 17.    Trade Protection

You covenant with the Company (for itself and as trustee for each Group Company) that, during your employment and for a period of six (6) months after the termination of your employment with RIM Europe,  you will not whether directly or indirectly:

- solicit or endeavour to entice away from RIM Europe or any Group Company the business or custom of a Restricted Customer (as hereinafter defined) with a view to providing goods or services to that Restricted Customer in competition with any Restricted Business

- provide goods or services to or otherwise have any business dealings with any Restricted Customer (as hereinafter defined) in competition with any Restricted Business

- endeavour to entice away from RIM Europe or any Group Company any Restricted Employee (as hereinafter defined) to work for a person in competition with the Restricted Business

- offer employment to any Restricted Employee (as hereinafter defined) to work for a person in competition with the Restricted Business

BB13-00000359

- be engaged in, concerned, or employed by any person which is in direct competition with any Restricted Business in the Restricted Area (as hereinafter defined).

Nothing in this clause shall restrain you from being engaged or concerned in any business concern in so far as your duties or work shall relate solely to businesses or territories that do not compete with a Restricted Business.

For purposes of this clause:

- "Restricted Business" means the business of RIM Europe and the Group Companies in which you were involved as an employee and which currently entails the designing, manufacturing and marketing of wireless Internet appliances and services and radio modems for the mobile data communications market, at the time of the termination of your employment and with which you have been concerned during the period of twelve (12) months ending on the date of termination of your employment. "Group Company" means any company which is at any time a holding company of RIM Europe or a subsidiary of RIM Europe, or another subsidiary of any holding company of RIM Europe (with subsidiary and holding company having their section 736 of Companies Act 1985 meanings).

- "Restricted Customer" means any firm, company or other person who, (i) during the period of twelve (12) months ending on the date of the termination of your employment, was a customer of or in the habit of dealing with RIM Europe or any Group Company or who at the date of termination of your employment was negotiating with RIM Europe or any Group Company to be a customer and (ii) with whom you had dealings in the course of your employment during the period of twelve months ending on the date of termination of your employment; and

- "Restricted Employee" means (i) any person who, at the date of the termination of your employment, was employed by RIM Europe or any Group Company in a managerial, supervisory, technical or sales capacity, who you knew or were aware was employed by RIM Europe or any Group Company during the period of twelve months ending on the date of termination of your employment; (ii) with whom you had significant contact during your employment; and (iii) who could materially damage the interests of RIM Europe or any Group Company if he/she became employed in any business in competition with any Restricted Business.

- "Restricted Area" means any country within Europe in which you have to a material extent performed your duties in connection with the Restricted Business in the twelve (12) months preceding termination of employment.

The obligations imposed on you by this clause extend to any actions taken by you whether directly or indirectly and also to actions taken not only on your own account but also on behalf of any other person.  For purposes of this clause, person means an individual, a company, a partnership, a trust, an unincorporated association or any other firm or business.

Each of the restrictions in this clause is entirely separate and distinct and may be

severed accordingly, and you acknowledge that the restrictions are both necessary in the legitimate interests of RIM Europe and/or any Group Company's business and do not bear undue hardship upon you. You acknowledge the right of RIM Europe in its discretion to impose any separate lesser restrictions, which will be in addition to and not in substitution for those contained in this sub-clause. If such restrictions or any of them are considered to be void but would be enforceable if some part of them or any of them were deleted and/or the period or area of restriction reduced and/or the whole of any part of any defined term were deleted and/or they did not apply to any one or more Group Companies, then it is agreed that the restrictions shall apply with such modification as is necessary to render it and/or them enforceable.

You agree that if so requested by RIM Europe from time to time you shall enter into a trade protection agreement with any one or more Group Company in the terms of this clause with the necessary modifications so that the references to RIM Europe contained in such provisions and in the definition of Restricted Business, Restricted Employee, Restricted Area and Restricted Customer shall take effect as references to such Group Company or in such other terms as specified by RIM Europe the effect of which shall be no more onerous to you than the terms of this clause.

## 18. Ownership

RIM Europe will, unless the law otherwise requires, retain all rights of ownership of all tools, graphics, documents, drawings, designs, design specifications, forecast schedules or other material transmitted or supplied to you by RIM Europe. The copying of any such material or tools is strictly forbidden.

In the event of your employment under these terms being terminated or at the request of RIM Europe all items indicated above and any other property of the Company or any Group Company in your possession and all intellectual property and other RIM Europe or Group Company property shall be returned immediately.

## 19. General

If any provision of this Agreement is held by any court or other competent authority to be void or unenforceable, in whole or in part, this Agreement shall continue to be valid as to the other provisions thereof and the remainder of the affected provision.

## 20. Employment Rights Act 1996

This Agreement contains the particulars of the terms of your employment required by the Act. There are no collective agreements, which directly or indirectly affect your terms and conditions of employment.

Grievance and disciplinary matters affecting your employment are contained in a separate document, a copy of which has been provided to you. Such document is not contractual in nature and is subject to change. A copy of the up to date document may be obtained from the HR department.

## 21. Deductions

For the purposes of the Employment Rights Act 1996 and generally, you authorize RIM Europe at any time during the term of your employment, and in any event on termination howsoever

BB13-00000361

arising, to deduct from your remuneration under this Agreement and/or require you to repay any monies due from you to RIM Europe, including but not limited to any outstanding loans, advances, overpayments, tax and employee national insurance contributions, the cost of repairing any damage or loss of RIM Europe's property caused by you (and of recovering it), excess holiday and any other monies owed by you to RIM Europe or required to be deducted by RIM Europe.

## 22.    Employee Warranty

You warrant to RIM Europe that there are no restrictions on your taking up employment with RIM Europe or contemplated by this Agreement.

BB13-00000362

### 23.    Entire Agreement

This Agreement, and your compliance with the Business Standards and Principles and associated documentation which includes but is not limted to; Confidentiality and Intellectual Property Agreement,  Insider Trading Policy and Code of Ethics, constitutes the entire understanding relating to your employment with RIM Europe, and such agreements supersede any and all other terms relating to your employment with RIM Europe.

### 24.    Enforceability

If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, it shall be adjusted by the court to achieve the intent of the parties to the extent possible and, in any event, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

### 25.    Governing Law

This Agreement shall be governed by the laws of England and Wales.

IN WITNESS whereof, the parties have executed this Agreement on the date below:

**Research in Motion UK Limited**          Signed by

**Tessa Field**                            **Neelam Sandhu**
Vice President, OD for EMEA,
LATAM & APAC

Date ..11. 09. 09.............          Date .... 11/09/09 ...................

# EXHIBIT 2

**:::BlackBerry.**

Research In Motion UK Limited
200 Bath Road
Slough
Berkshire
SL1 3XE

t  +44 (0) 1753 667000
f  +44 (0) 1753 669970

www.blackberry.com

**PRIVATE & CONFIDENTIAL**

Neelam Sandhu

■■■■■■■■■■■■■

6th December 2011

Dear Neelam,

I am pleased to confirm your promotion to Program Manager NPI, with effect from 1st December 2011 ("Promotion Date"). The following changes to the provisions of your current employment agreement with Research In Motion UK Limited (the "Agreement") will take effect from the Promotion Date.

To reflect this promotion your annual salary will increase to £34,000 per year, less deductions required by law, paid in accordance with the Agreement. Your job level grade will change to level D.

All other terms and conditions of your employment remain unchanged.

Please sign and date one copy of this letter, in order to acknowledge receipt and acceptance of the above changes and return to Sophie Howard, OD Business Partner on or before 14th December 2011.

I would like to take this opportunity of congratulating you on your new role and to wish you continued future success.
Yours sincerely,

RESEARCH IN MOTION UK LIMITED

*Louise Cockrell*

**Louise Cockrell (Emmott)**
**OD Business Partner EMEA**

---

I confirm that I have read and understood the above, and accept this new position and agree to comply with the employment policies, rules and practices of RIM now in force or which may be amended, revised or adopted from time to time.

I hereby acknowledgement and agree that I continue to be bound by the RIM Business Standards & Principles, which are subject to annual certification.

SIGNED: ....................................................... DATE: 15/12/12

NAME: .....NEELAM SANDHU.........................................................

Research In Motion UK Limited is a company registered in England and Wales with company registration number 4022422 and with registered offices at Centrum House, 36 Station Road, Egham, Surrey TW20 9LF.
BlackBerry and the BlackBerry logo are trademarks of Research In Motion Limited.

# EXHIBIT 3



June 5, 2013

Neelam Sandhu

████████████

Dear Neelam,

We would like to offer you employment with Research In Motion Corporation, a Delaware corporation, doing business as BlackBerry ("RIM").

This Agreement is between Research In Motion Corporation, a Delaware corporation, doing business as BlackBerry ("RIM") and Neelam Sandhu.

*This employment agreement replaces your existing employment agreement with RIM dated June 3, 2013.*

## 1  EMPLOYMENT

1.1    The Effective Date of this Agreement and your first day of work will be confirmed with you in writing, provided that the requirements of Section 5 have been met.  If the requirements of Section 5 are not satisfied before the first day of work, then this Agreement, at RIM's option, is terminated and if so, the offer of employment contained herein is rescinded.

1.2    You understand that upon commencement of your employment with RIM, you will no longer be employed by Research In Motion UK Limited ("RIM UK"), and any compensation, benefits, and employment terms previously provided to you by RIM UK shall cease.  RIM will, however, honor your term of service RIM UK.

1.3    You will be employed on a regular, full-time basis.

1.4    Your employment at RIM is "at will".  As such, it is for no definite term and subject to the provisions of section 4 of this letter, either you or RIM may terminate the employment relationship at any time, for any reason, with or without cause, without any further compensation.

1.5    You will work at RIM's New York office location.

1.6    Your position title will be Senior Brand Messaging & Operations Manager, reporting to Jaime Kalfus, Senior Director, Brand Strategy.

1.7    RIM's standard workweek is 40 hours. However, you will be required to devote whatever time is necessary to complete the requirements of your position, which may exceed 40 hours per week from time to time.

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

**∷∷ BlackBerry.**

## 2    COMPENSATION

2.1    RIM will pay you a base salary of $95,000 USD per annum, less deductions required by law, paid bi-weekly via direct deposit.

2.2    Variable Incentive Pay (ViP) Program - You will be eligible to participate in RIM 's Variable Incentive Pay (ViP) Program, a semi-annual incentive program based on a combination of individual and company performance measures. The ViP Program provides you with an opportunity to earn additional pay on top of your annual base salary.  For your position, the target incentive will be 15% of your base salary. To learn more about RIM's ViP Program please visit go/vip.

2.3    RIM's incentive plans are designed to address the conditions of an ever-changing marketplace, and RIM cannot make definitive representations concerning the continuation of format or the size of individual awards under the plans. Any of RIM's incentive plans are subject to change at the Company's discretion.

## 3    BENEFITS

3.1    You will be eligible to participate in RIM's US Health Care Plan.

3.2    Provided you have completed six (6) months' service with RIM, and/or its affiliated, related, subsidiary or parent corporations, you will be eligible to defer into RIM's 401k plan.  RIM will match your contributions dollar-for-dollar, up to 5% of base salary.  The match will be capped as per the salary deferral maximum set annually by the IRS regulations. Further details will be provided to you.

3.3    You are entitled to 25 days of annual paid vacation per year, which is accrued over the course of each calendar year.   All vacation must be taken annually and scheduled in accordance with RIM's vacation policy, and may be taken in full-day or half-day segments.

3.4    RIM will provide relocation assistance to you as detailed in Schedule A attached to this Agreement.

## 4    CESSATION OF EMPLOYMENT

4.1    You may resign from employment with RIM at any time upon providing two weeks' written notice, which can be waived in whole or in part by RIM.

4.2    RIM may terminate your at will employment at any time without just cause by providing you with two (2) weeks' base salary, plus two (2) weeks' base salary per completed year of service, to a cumulative maximum of twelve (12) months' base salary.   The payment of this amount is conditional upon you signing a release of claims against RIM in respect of your employment, for damages or otherwise, except for claims in respect of payment of monies earned, due and owing to date of termination.  No notice or pay in lieu of notice of termination will be paid, however, if your cessation of employment is voluntary or occurs because of misconduct or poor performance on your part, as determined by RIM.

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

**∷∷ BlackBerry.**

4.3    You agree to return all RIM property at time of cessation of employment for any reason.

## 5  CONDITIONS OF EMPLOYMENT

5.1    This Agreement is conditional on you being legally entitled to work for RIM in the United States and upon your successfully obtaining any and all necessary work visas or permits to enable you to work in this position.

5.2    If you are a citizen of a restricted country identified by the U.S. Department of Commerce and will be performing duties involving controlled technical data, RIM may be required to obtain an export license on your behalf.  In the event that an export license is required, this offer and any subsequent employment with RIM are conditional on obtaining the license within a time period deemed reasonable by RIM.  You agree that, if required, during your employment you will continue to hold a valid export license necessary for the performance of your duties.

## 6  ONGOING OBLIGATIONS OF EMPLOYMENT

6.1    As ongoing requirements of employment with RIM, you agree:

(a)    To continue to comply with the Business Standards and Principles, and related documents, and the Employee Confidentiality and Intellectual Property Agreement;

(b)    To comply with RIM company and departmental policies, rules, practices, and the terms and conditions laid out in company and/or departmental handbooks that are now in force or which may be amended, revised or introduced from time to time;

(c)    To continue to maintain legal immigration status within the country in which you are, or will be, employed by RIM and to continue to meet the requirements of the applicable immigration legislation and regulations of that country;

(d)    That you understand and consent to the fact that in the course of employment, RIM will be required, from time to time, to collect, use, and disclose personal information in order to administer the employment relationship; and

## 7  GENERAL

7.1    The titles and descriptive headings of the articles of this Agreement are inserted solely for convenience, are not part of this Agreement and do not in any way limit or amplify this Agreement.

7.2    In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any Schedule, Appendix or Addendum hereto, the provisions of this Agreement shall prevail.

7.3    The obligations contained in this Agreement and all Schedules, Appendices or Addendums to this Agreement are each independent covenants, and if any provision, or part thereof contained in this Agreement, or any Schedule, Appendix or Addendum of this Agreement is prohibited or declared invalid, illegal or unenforceable by a court or

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

BB13-00000413

**::: BlackBerry.**

other lawful authority, this Agreement and all attachments hereto shall continue in force, with respect to the enforceable provisions, and all rights and remedies accrued under the enforceable provisions shall survive any such declaration.

7.4     This Agreement and all Schedules, Appendices, Addendums or documents incorporated by reference herein constitute the entire Agreement between RIM and you and supersedes all prior negotiations and oral or written understandings, if any.

7.5     No supplement, waiver, amendment, modification or rescission of this Agreement shall be binding unless set forth in writing and signed by both parties.

7.6     This Agreement shall ensure to the benefit of and be binding upon each party and its heirs, executors, administrators, successors and permitted assigns.

7.7     This Agreement shall be governed by and construed under the laws of the State of New York.  In addition, both parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising out of matters related to this Agreement, which waiver you agree is informed and voluntary.

7.8     You acknowledge that you have been given the opportunity to read, evaluate and discuss the provisions of this Agreement and the attached schedules and documents with your personal advisors and with representatives of RIM.

7.9     In consideration of accepting this agreement from RIM, you expressly authorize RIM to deduct and withhold any documented amounts owing to RIM, including but not limited to any vacation taken in excess of accrued entitlement, from any sums owing by RIM to you. You acknowledge that this paragraph constitutes a formula from which a specific amount may be calculated and is good and sufficient authorization for the purposes of all applicable legislation.

**IN WITNESS WHEREOF** the parties hereto by their duly authorized representatives have executed this Agreement as of the date first above mentioned.

**RESEARCH IN MOTION CORPORATION**

Per:
Kelly Daly
VP, Global HR Operations & Services

To confirm your acceptance of the terms and conditions of this offer, please sign below and return one copy in the attached envelope on or before June 14, 2013 including the other documents listed on the summary sheet in your package.

Signature: _____          Date: 7th June 2013
          **Neelam Sandhu**

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA. tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

**: BlackBerry.**

## SCHEDULE A

## STANDARD INTERNATIONAL TRANSFER
### (USA)

Research In Motion Corporation, doing business as BlackBerry ("RIM") will provide you with the following relocation assistance provided you move within 25 miles of the Employment Location as stated in your offer letter:

### Immigration Support (If Required)

An Immigration Professional will advise you regarding visa, work permit and other document requirements for you and your eligible dependents* to move to, work, and become permanent residents (where permanent residence status is available) in the country in which  you will be employed.

This will include coverage for all expenses incurred directly relating to obtaining the necessary work visas/permits and required medicals to be eligible to work in the country in which you will be employed, whether or not such applications are successful.

> Note: This assistance is contingent on you having provided all required documents and information in a timely manner and with the necessary detail.

### Taxation

Taxation planning advice from external taxation consultants who will provide you with detailed advice, as well as, answers to your questions with respect to moving from your home location and moving to the new Employment Location. In addition, RIM will provide for the preparation of your tax returns by their contracted tax service provider in the year that you started with RIM.  In the course of the tax service provider's preparation of your tax returns, you will be held fully responsible for any penalties and interest charges assessed by any tax authority or for any additional fees assessed by the tax service provider. This service is provided for both home and host country.

This service is provided for both origin and destination countries, any relocation benefits that are taxable will be reported to the appropriate authority and any resultant liability is the employee's sole responsibility. Our external tax consultants will provide you with documentation outlining what are generally considered taxable/non-taxable relocation benefits for both origin and destination countries.

### Home-Finding and Orientation

Home-finding and orientation assistance includes coverage and arrangement for 1 home-finding trip for you and your eligible dependents* via air (as per the RIM Travel Guidelines) or travel reimbursement (up to a maximum amount equivalent to that of the cost of the flights), should you choose an alternate mode of transport.  Duration of your home-finding trip can be up to a maximum of 5 days and includes coverage of meals (exempt are alcoholic beverages) and local transportation expenses (excluding vehicle rental). You will also be provided with a maximum of 5 days of accompanied destination services which can be scheduled for use during your home-finding trip as well as to support you after your start date.

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

**‡‡ BlackBerry.**

**Household Goods**

Household goods assistance includes relocation of household goods (excluding vehicles) from your primary residence, including packing, crating, transporting, custom duties, storage-in-transit (for a maximum of 60 days), delivery, unloading, unpacking, and insurance coverage (replacement value) against damage or loss.

**En Route Travel**

En route travel assistance includes one-way flight arrangements for you and your eligible dependents* on moving day (as per the RIM Travel Guidelines), or travel reimbursement (up to a maximum amount equivalent to that of the cost of the flights) should you choose an alternate mode of transport to your employment location.

**Temporary Accommodations**

Temporary accommodation assistance includes, if required, up to 60 days' temporary accommodation upon your arrival to the Employment Location.  The costs of long-distance phone calls, alcohol, meals, laundry, entertainment expenses or local transportation are your responsibility.

**Relocation Allowance**

RIM will provide you with a relocation allowance of $6,500 USD (less applicable taxes) to cover incidental moving expenses such as lease cancellation charges, furniture rental, rental car and insurance expenses, utility hook-up fees, and meals. This amount will not be paid automatically. To receive payment, you must have initiated your move and have your household goods in transit. Once initiated, payment may take between 30 to 60 days to occur through RIM Payroll. This amount will only be paid once employment with RIM has started and will not be paid prior to the employee start date.

**General Terms**

If you do not relocate within a year of your start date, any unused relocation assistance will be forfeited. You may be able to claim some of your moving costs as valid expenses on your personal income tax return.  Relocation benefits that are taxable will be reported to the appropriate authority and any resultant liability is the employee's sole responsibility. For Internal Revenue Service (IRS) guidelines of eligible taxable/nontaxable moving expenses please refer to the IRS website.  http://www.irs.gov

Should you resign or be terminated for cause within one year of the start date indicated in this letter, you are required to repay 100 percent of relocation costs (excluding immigration) incurred and paid on your behalf.  Should you resign or be terminated for cause more than one year, but less than two years of the start date indicated in this letter you are required to repay 50 percent of relocation costs (excluding immigration) that were incurred and paid on your behalf.

**Research In Motion Corporation**

5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA. tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

BB13-00000416

**::: BlackBerry.**

I have read, understand and accept the terms and conditions outlined above.

_(signature)_                                              7ᵗʰ June 2013
_____                    _____

**Neelam Sandhu**                                          **Date Signed**

*Eligible dependents are defined within the employee's benefits package. In order for a dependent to receive relocation entitlements, their eligible status must exist at the time of hire.

**Research In Motion Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of Research In Motion Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

Human Resources

**BlackBerry**    Research In Motion Confidential
Employee Confidentiality & Intellectual
Property Agreement

# Employee Confidentiality & Intellectual Property Agreement

In consideration of my employment with or engagement by Research In Motion Limited or by a subsidiary or an affiliate of Research In Motion Limited (the appropriate entity called, "RIM") who is employing or engaging me, as set out in the corresponding offer letter to or agreement with me ("**Offer Letter**") and for other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), I (**Employee**) hereby agree to the following, together with any addendum to this Agreement:

## 1. Definitions

**1.1.**   In this Agreement **"Confidential Information"** means:

    1.1.1.   all trade secrets, confidential, private or secret information, know how, or proprietary information (whether such is in writing, or in electronic, oral or any other form or medium) of RIM, or of entities affiliated, associated, or related to RIM (each a "**RIM Group Member**") including without limitation Research In Motion Limited, and their respective employees, consultants, sponsored researchers, suppliers, distributors, customers, and other business partners (together with RIM Group Members, "**Associates**");

    1.1.2.   information that has been specifically identified or designated as confidential or proprietary by RIM or its Associates;

    1.1.3.   information that is by its nature such that RIM or RIM Group Members would consider it to be confidential or the nature of which is such that it would generally be considered confidential in the industry in which RIM or RIM Group Members operate, or that RIM or a RIM Group Member is obligated to treat as confidential or proprietary such as, without limitation, financial, business, legal, and corporate information and information and materials otherwise relating in any manner to the business affairs of RIM or its Associates, marketing information, strategies and tactics, research, product, technical, and manufacturing information; personnel information, personal information, and customer, distributor, and supplier information and information about other commercial relationships, of or related to RIM or its Associates; and

    1.1.4.   Developments.

**1.2.**   **"Developments"** means all Intellectual Property that is created, developed, authored, conceived, reduced to practice or originated ("**Developed**") by Employee (whether wholly or partly and whether individually or in collaboration with others) in the course of Employee's employment with or engagement by RIM or in performing duties specifically assigned to Employee, whether during normal working hours or not.

Developments exclude any Intellectual Property that Employee establishes in accordance with the provisions set out below (and at Section 6) meet all of the conditions set out in Subsections 1.2.1 to 1.2.5 below ("**Excluded Developments**"):

    1.2.1.   was Developed entirely on Employee's own time;

    1.2.2.   was Developed without the use of any RIM Property or Confidential Information;

    1.2.3.   does not relate to the business or affairs of RIM or its Associates or to research or development activities of RIM or its Associates during the term of Employee's employment with or engagement by RIM or to the actual or reasonably anticipated business, research or development activities of RIM or its Associates during this period;

    1.2.4.   was not suggested by or resulted from matters which Employee was aware of as a result of Employee's employment with or engagement by RIM or any work performed by Employee for RIM or a RIM Group Member; and

    1.2.5.   was not within the scope and is unrelated to Employee's general duties to RIM

| RIM Confidential | Owner: | Kelly Daly, VP, Global HR Operations & Services | Document Number: | HR00554.01 |
| | Approval: | Lance Crozier, Commercial Counsel-Employment & Sarah Guichard, VP, Associate General Counsel | Last Updated Date | 2013/04/30 | Page 1 of 6 |

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document. See Livelink for the most recent version of this document. © 2013 BlackBerry. All rights reserved.

BB13-00000418



Human Resources

 BlackBerry

Research In Motion Confidential
Employee Confidentiality & Trade Secret
Property Agreement

For clarity, it is agreed that Developments include any Intellectual Property Developed by Employee that does not meet any one of the conditions set out in Subsections 1.2.1 to 1.2.5 above.

1.3.    **"Intellectual Property"** means any and all intellectual and industrial property, whether recorded or not and regardless of form or method of recording, including without limitation all works in which copyright subsists or may subsist, such as computer software, systems, tools, data bases (whether or not protected by copyright), concepts, data, coding, images, designs, documentation, books and records, industrial designs, specifications, trade secrets, confidential information, ideas, concepts, know-how, trade marks, service marks, trade names, domain names, discoveries and inventions, improvements and modifications, integrated circuit topographies and mask works.

1.4.    **"Intellectual Property Rights"** includes all intellectual, industrial and other proprietary rights in any Intellectual Property including without limitation all rights in trade marks, service marks, trade names, domain names, discoveries, inventions, patents, copyrights, designs, industrial designs, integrated circuit topographies, mask works, trade secrets, confidential information, and the right to apply for, and applications and registrations for, the foregoing.

1.5.    **"RIM Property"** means any and all real or personal property including without limitation all tangible and intangible personal property (such as Intellectual Property or Intellectual Property Rights) equipment, hardware, supplies, facilities, materials, and services, of or belonging to, or owned, licensed, provided, or used by, RIM or Associates in the conduct of its business.

## 2.    Non-Disclosure And Restriction On Use And Reproduction Of Confidential Information And RIM Property

2.1.    Employee shall keep, and shall take all necessary steps to keep all Confidential Information in strict confidence. Employee shall not, directly or indirectly, either during or subsequent to Employee's employment with or engagement by RIM, disclose, allow access to, use, or reproduce any Confidential Information except as required to perform Employee's duties for RIM, except to the extent expressly permitted herein.

2.2.    Any disclosure, access, use or reproduction of Confidential Information either internally or, where expressly permitted herein, externally to RIM must be limited to those individuals who require the same for the proper performance of their duties to RIM (i.e. with the "need to know") and such disclosure, access, use or reproduction shall be in accordance with all procedures established by RIM for the protection of Confidential Information and in respect of any external party, only after the external party to whom the information is disclosed has entered into a written non-disclosure and confidentiality agreement approved by RIM which expressly extends to the purposes for which the disclosure is to be made.

2.3.    Employee shall review and comply with RIM's Insider Trading Policy, as amended from time to time by RIM, and abide by any trading restrictions imposed by the RIM Corporate Disclosure Committee, including, without limitation, pursuant to the Insider Trading Policy.

## 3.    Return Of RIM Property And Confidential Information

Upon request by RIM, and in any event upon conclusion of Employee's employment with or engagement by RIM, Employee shall immediately return to RIM all Confidential Information and RIM Property that is in Employee's possession, power, or control.

| RIM Confidential | Owner | Kelly Rahn, VP, Global HR Operations & Services | Document Number | HR00354.01 | |
| | Approver | Lance Cheney, Commercial Counsel-Employment & Sarah Ouellard, VP, Associate General Counsel | Last Updated Date | 2013/04/30 | Page 2 of 6 |

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document. See Livelink for the most recent version of this document. © 2013 BlackBerry. All rights reserved.



CONFIDENTIAL

BB13-00000419

**:: BlackBerry.**                                                                    Human Resources

## 4.   Ownership Of Developments And RIM Property

4.1.   Employee shall promptly and fully disclose in writing to RIM any Developments developed by the Employee either solely or jointly with others.

4.2.   It is agreed that all worldwide rights including all worldwide Intellectual Property Rights in the Developments shall automatically vest in and be the exclusive property of RIM immediately on its creation and regardless of the stage of its completion. To the extent that any such rights have not or do not automatically vest in RIM hereunder, (i) Employee hereby assigns and conveys (and if necessary, agrees to assign and convey) all such rights to RIM to the extent permissible by applicable law or otherwise, (ii) Employee holds them in trust for RIM to the extent and for the duration that they have not fully vested or transferred to RIM, and (iii) RIM may, at its discretion, take such steps as it deems reasonably appropriate to secure and perfect its Intellectual Property Rights in the Developments anywhere in the world.

4.3.   Without limiting the forgoing, Employee hereby also acknowledges and agrees that RIM is and shall be the exclusive owner of all Confidential Information and  RIM Property including all tangible personal property Developed by Employee (whether wholly or partly and whether individually or in collaboration with others) in the course of Employee's employment with or engagement by RIM or in performing duties specifically assigned to Employee, whether during normal working hours or not.

## 5.   Waiver Of Moral Rights

Employee agrees to waive and hereby waives unconditionally and irrevocably any and all Employee's moral rights and rights of a similar nature which Employee now or in the future may have in the Confidential Information, RIM Property and Developments (including rights in existing works and works which may come into existence after the date hereof) in which copyright may subsist in any or all jurisdictions around the world, to the extent that such rights may be waived in each respective jurisdiction.  Without limiting the generality of the foregoing, this waiver extends to any and all acts of RIM or its Associates and acts of third persons done with the authority of any of them and their successors and assigns.

## 6.   Disclosure Of Excluded Developments

To avoid any disputes regarding ownership of Excluded Developments, the Employee shall, subject to Section 8 (the Prior Employer and Third Party Information section) below, within five days following execution of this Agreement and, throughout the term of employment/engagement, within five days of having Developed any Intellectual Property that Employee believes to be an Excluded Development, provide RIM with a non-confidential general written description of any Excluded Developments specifying the reasons why such development (if any) is excluded. If the Employee fails to make this disclosure within the time specified, the Employee is deemed to have represented that any disclosure of Excluded Development within that time (if any) comprises the full extent of Employee's disclosure of Excluded Developments. No disclosure made under this Section 6 shall be binding on RIM and no action or inaction by RIM following receipt of such disclosure or becoming aware of any such developments shall waive  limit, or release any rights that RIM may have in or to any such developments.

## 7.   Employee Owned Excluded Developments

Employee agrees that Employee shall only use or incorporate or permit any other person to use or incorporate any Excluded Development into a RIM process, product, system, machine, service, Development or other RIM Property if Employee owns all Intellectual Property Rights in the Excluded Development, obtains RIM's prior written approval from a Vice President of RIM and waives all of Employee's moral rights and rights of a similar nature which Employee now or in the future may have in the Excluded Development in each jurisdiction around the world, to the extent that such rights may be waived. For any Excluded Development incorporated into any RIM

| RIM Confidential | Owner | Kelly Daly, VP, Global HR Operations & Services | Document Number | RI600564.01 | |
| | Approver | Lance Cearer, Commercial Counsel-Employment & Sarah Reichard, VP, Associate General Counsel | Last Updated Date | 2013/04/30 | Page 3 of 6 |

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document.
See Livelink for the most recent version of this document. © 2013 BlackBerry.  All rights reserved.

CONFIDENTIAL                                                                          BB13-00000420



Human Resources

**::: BlackBerry.**

Research in Motion Confidential
Employee Confidentiality & Intellectual
Property Agreement

process, product, system, machine, service, Development or other RIM Property Employee hereby grants at no charge to RIM and its Associates, a non-exclusive, irrevocable, non-terminable, perpetual, transferable, royalty-free, world-wide license, with the right to sublicense, to use, distribute, transmit, broadcast, produce, reproduce, perform including perform in public, communicate in or to the public, publish, practice, make, have made, sell, offer to sell, modify and made derivative works of, the Excluded Development and to otherwise exercise any Intellectual Property Right in the Excluded Development.

## 8.    Prior Employer And Third Party Information

8.1.    Employee agrees that during Employee's employment with or engagement by RIM:

    8.1.1.    Employee will not use or disclose any trade secrets, confidential or proprietary information or works in which copyright subsists of any third party including any of Employee's former or current employers, partners, customers, or other business associates except as permitted by law or contract; and

    8.1.2.    Employee will not, without RIM's prior written approval, bring onto RIM's premises unpublished documents (in print, electronic or any other recorded form) or any property belonging to any persons or entities identified in clause 8.1.1 above except as permitted by law or contract.

8.2.    Employee represents, warrants and covenants to RIM that any offer, acceptance and/or performance of employment/consultancy does not and shall not violate any agreement between Employee and any third party, including, without limitation, any employment/consulting agreement, non-competition agreement, non-solicitation agreement, or confidentiality agreement and that in hiring Employee RIM is not inducing Employee to breach any agreement between Employee and any such third party.

## 9.    Further Acts

Employee hereby agrees to assist and to co-operate fully with RIM, both during and after Employee's employment with or engagement by RIM, and will, at RIM's expense, sign further documents and do such acts and other things reasonably requested by RIM to confirm and record (i) RIM's ownership of Developments and Confidential Information and RIM Property and (ii) the waiver of Employee's moral and other rights therein and to otherwise confirm Employee's obligations to RIM, and assist RIM to obtain registration or protection of, to enforce its rights in, and to enjoy the full and exclusive benefit of, the Confidential Information, Developments and RIM Property.

## 10.    Enforcement

10.1.    Employee acknowledges and agrees that damages may not be an adequate remedy to compensate RIM for any breach of Employee's obligations under this Agreement, and accordingly agrees that in addition to any and all other remedies available, RIM shall be entitled to obtain relief by way of a temporary or permanent injunction or through other equitable relief to enforce these obligations without the requirement of posting a bond or other security or the requirement of providing proof of irreparable harm. Employee acknowledges the importance to RIM of the strict compliance with the terms of this Agreement and acknowledges that RIM's interest in the strict enforcement thereof will outweigh the balance of convenience or harm which Employee may suffer as a result of the strict enforcement of its obligations hereunder.

10.2.    The Employee shall fully indemnify and hold harmless RIM in respect of any loss or damage cause by any breach of the terms of this Agreement by the Employee.

10.3.    The Employee agrees that RIM Group Members are an intended third party beneficiary of this Agreement. Accordingly, Employee agrees that any RIM Group Member may enforce the terms of this Agreement against Employee and obtain any relief that may be available for the breach hereof including injunctive relief, damages, and an accounting of profits, but this Agreement shall not convey any Intellectual Property rights on any other third party.

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document.
See Livelink for the most recent version of this document. © 2013 BlackBerry   All rights reserved.

BB13-00000421





Human Resources

**::: BlackBerry**

## 11. Severability

In the event any or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement but (i) if permitted by applicable law, there shall be deemed substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue, and (ii) if substitution is not permitted by applicable law, this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been set forth herein, and the Agreement shall be carried out as nearly as possible according to its original terms and intent, and (iii) if and to the extent this Agreement is held to be invalid, illegal or unenforceable, or if this Agreement is construed as if such invalid, illegal or unenforceable provision had never been set forth herein, then the provisions of any previous employee confidentiality and intellectual property agreement or agreements between RIM and Employee shall continue to apply with respect to the Agreement or such portions thereof that are held to be invalid, illegal or unenforceable, subject to the provisions of Section 14.2.

## 12. Counterparts

This Agreement may be executed by facsimile and in any number of counterparts, each of which will be deemed to be an original and all of which taken together will be deemed to constitute one and the same instrument.

## 13. Choice Of Law And Jurisdiction

13.1.   The choice of law and jurisdiction provisions set out in the Offer Letter shall apply to this Agreement and shall prevail without regards to conflict of laws principles.

13.2.   In the event that there is no choice of law provision set out in the Offer Letter or in the event there is no Offer Letter, this Agreement shall be governed by the laws of the place of incorporation of the RIM entity to whom the Employee is providing Employee's services.

13.3.   In the event that there is no jurisdiction clause set out in the Offer Letter, or in the event there is no Offer Letter the parties hereto agree to submit all disputes arising out of or in connection with this Agreement to the Court located in the jurisdiction of place of domicile of the Employee.

## 14. Entire Agreement

14.1.   This Agreement and Employee's Offer Letter set forth the entire agreement relating to the subject-matter hereof, and any other representations, promises, or conditions that are not in writing and accepted by both parties (electronically or by signing below) shall not be binding on either party. The terms and conditions of this Agreement shall survive termination of the employment or consulting relationship giving rise to this Agreement. The provisions of this Agreement shall be binding on Employee and his/her legal representative and on RIM and its successors and assigns. For clarity, nothing herein is intended to limit or derogate from any other obligation that Employee may owe to RIM under applicable law including under common law, equity, or contract.

14.2.   Unless otherwise agreed in writing by both parties, to the extent of any conflicting provisions between this Agreement and (i) an Offer Letter, the terms of the Offer Letter shall prevail, and (ii) the provisions of any subsisting employee confidentiality and intellectual property agreement, the provisions of this Agreement shall prevail, in each case only to the extent of the conflict.

RIM Confidential     Owner     Kelly Daly, VP, Global HR Operations & Services     Document Number   H000364.01
                     Approver   Lance Cassel, Commercial Counsel Employment   Last Updated Date   2013/04/30     Page 5 of 6
                                & Sarah Guilbord, VP, Associate General Counsel

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document.
See Livelink for the most recent version of the document. © 2013 BlackBerry.  All rights reserved.

BB13-00000422



Human Resources

**∷ BlackBerry.**

Research in Motion Confidential
Employee Confidentiality & Intellectual
Property Agreement

**I acknowledge that, before signing this agreement (whether by indicating my acceptance electronically or by signing below), I was given an opportunity to read, evaluate, and discuss this Agreement with my counsel and personal advisors and with representatives of RIM. Having read and fully understood this agreement, I have executed this Agreement on the _____ day of _____, 20___.**

SIGNED, SEALED AND DELIVERED on the 22nd day of JULY , 20 13 in the presence of:

_____          _____ (Seal)
Signature of **Witness**                Signature of **Employee**

RAJVEER SANDHU                    NEELAM SANDHU
Name of Witness (Print)              Name of Employee (Print)

54 ST PAULS AVE , SL2 5ES , UK
Address of Witness (Print)

RIM Confidential      Owner      Kelly Daiv,                                    Document Number    HR00554.01
                                 VP, Global HR Operations & Services
                      Approver   Lance Ceaser, Commercial Counsel Employment    Last Updated Date  2013/04/30    Page 6 of 6
                                 & Sarah Guichard, VP, Associate General Counsel

CONTROLLED DOCUMENT: Printed copies of this document are uncontrolled copies of a controlled document.
See Livelink for the most recent version of this document. © 2013 BlackBerry  All rights reserved.







Organizational Development

## RIM Business Standards and Principles Acknowledgement Form

As you start your career with us at Research In Motion® (RIM®), it is important that you read, understand and comply with the guiding business standards and principles that shape our working environment. The RIM Business Standards and Principles are designed to help all of us do our jobs in a legal and ethical manner and outlines the behaviors expected of each of us. We are all responsible for valuing these principles and supporting RIM's commitment to integrity.

I acknowledge that I have read, understand and will comply with the following documents:

- Code of Business Standards and Principles [OD00125.0];
- Insider Trading Policy [OD00123.0];
- Prevention of Improper Payments Policy [OD00122.0].
- Corporate Disclosure Policy [OD00124.0];
- Diversity Guidelines [ODGP-GDL-0004.5];
- Anti-Discrimination and Anti-Harassment Guidelines [ODGP-GDL-0002.5];
- Anti-Bullying and Anti-Violence in the Workplace Guidelines [ODGP-GDL-0003.6];
- Corporate Security Policy [CS-POL-0001.4];
- Global Environment, Health & Safety Policy [January 2012]

I have also verified the document control numbers listed above match those in the footer of the documents provided to me in my new hire offer package.

..............................................................................................................
Signature of Employee

NEELAM SANDHU
..............................................................................................................
Name of Employee (Please print)

SIGNED AND DELIVERED on the 22nd day of JULY ........................., 2013

Document Owner: Amanda Campbell, Knowledge Management Specialist I Document Approver: Melinda Drexler, Manager, GTA Knowledge & Standards I Document number: ODGTA00095.0 | Region: Global | Approval date: 2012/11/29
Controlled Document: Printed copies of this document are uncontrolled copies of a controlled document. See Livelink® for the most recent version of this document. © 2012 Research In Motion Limited. All rights reserved.

# EXHIBIT 4

**:::** *BlackBerry.*

November 25, 2014

Neelam Sandhu
C/o BlackBerry Corporation

███████████████████████

Dear Neelam,

This letter cancels and supersedes the promotion offer letter of October 20, 2014.

Congratulations! I am pleased to offer you the position of Director of Business Operations, Office of the CEO.

This offer incorporates the terms and conditions of your employment offer or agreement with BlackBerry or its affiliates, by which you will continue to be bound, except as specifically defined below.

This offer is based on the following terms and conditions:

1) **Employment**

   a) Effective Date – Your promotion into this new position will be retroactive to November 1, 2014, upon your acceptance and signing of this offer.

   b) Employment Status – You will continue to be employed on a regular full-time basis. Your employment at BlackBerry continues to be "at will". As such, it is for no definite term and subject to the provisions of section 6 of this letter, either you or BlackBerry may terminate the employment relationship at any time, for any reason, with or without cause, without any further compensation.

   c) Title – Your new title will be Director of Business Operations, Office of the CEO at accountability Level G.

   d) Reporting Relationship – You will report directly to me in my capacity as CEO.

   e) Location – You will continue to work from BlackBerry's Pleasanton location.

2) **Compensation**

   a) Base Salary – Your new bi-weekly base salary is $5,384.62 USD ($140,000 USD annualized), paid bi-weekly via direct deposit, less payroll deductions and required withholdings.

Document Number HR00842.01
Last Date Updated: 2013/07/12

**BlackBerry Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA. tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL                                                                                      BB13-00000331

2. N. Sandhu 11/24/2014

b) You will be eligible to participate in BlackBerry's annual Variable incentive Pay (ViP) Program. The ViP Program provides you with an opportunity to earn additional pay on top of your annual base salary. For your position, the annual target incentive will be 25% of your base salary.

c) BlackBerry's incentive plans are designed to address the conditions of an ever-changing marketplace, and BlackBerry cannot make definitive representations concerning the continuation of format or the size of individual awards under the plans. BlackBerry's incentive plans are subject to change at the Company's discretion.

## 3) Benefits

a) Benefits – You will remain eligible to participate in BlackBerry's U.S. employee benefits including BlackBerry's 401(k) plan.

b) Vacation – You will continue to be eligible for annual paid vacation in accordance with BlackBerry's vacation policy.

## 4) Equity Award

In connection with this offer, BlackBerry Limited will make a recommendation to its Compensation, Nomination and Governance Committee. The details of any equity offer will be provided in a separate letter from BlackBerry Limited.

## 5) Restrictive Covenants

Attached as an Appendix to this Agreement is the BlackBerry Restrictive Covenant Addendum ("Restrictive Covenant Addendum"). By accepting this promotion and the terms of this letter, you agree to be bound by all of the terms and conditions of BlackBerry's Restrictive Covenant Addendum. Please read and sign the Addendum to confirm your agreement to the terms and conditions.

## 6) Cessation of Employment

a) Just as you may resign from employment with BlackBerry at any time, BlackBerry may terminate your employment at any time. Your employment at BlackBerry is "at-will" and may be terminated with or without notice and with or without cause. This policy may only be changed in a writing signed by BlackBerry's CEO authorizing such a change.

b) BlackBerry may terminate your "at will employment" at any time without just cause by providing you with four (4) weeks' base salary per completed year of service, to a cumulative maximum of sixteen (16) weeks of base salary. The payment of this amount is conditional upon you signing a release of claims against BlackBerry in respect of your employment, for

Document Number HR00842.01
Last Date Updated: 2013/07/12

**BlackBerry Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

3. N. Sandhu 11/24/2014

damages or otherwise, except for claims in respect of payment of monies earned, due and owing to date of termination.  However, if your cessation of employment is voluntary or occurs because of misconduct, poor performance or any of the "for cause" reasons for involuntary termination of employment, no severance payment will be made to you by the company.

c) At the time of cessation of your employment for any reason, you are required to return all BlackBerry property, including keys, badge & access cards,  equipment, devices or information in whatever form it is stored.

All other terms and conditions of your previous employment agreement will continue to govern your employment.

I believe BlackBerry offers you the challenges and rewards you seek.  I look forward, with enthusiasm, to your confirmation.

This offer of promotion will remain open until tomorrow, November 26, 2014. To confirm your acceptance of this new position, please sign below and return one copy to Nita White-Ivy not later than the end of the workday tomorrow, November 26, 2014.

Sincerely,
BLACKBERRY CORPORATION
Per:

_____
John S. Chen
Executive Chair and CEO

I hereby confirm that I have read and understood the above, and that I accept this new position.

Accepted:_____     Date:_25ᵗʰ Nov 2014_____
                        Neelam Sandhu

Document Number HR00842.01
Last Date Updated: 2013/07/12

**BlackBerry Corporation**
5000 Riverside Drive, Suite 100E, Irving, Texas, USA 75039 USA.  tel: +1 (972) 373-1700  fax: +1 (972) 501-0894

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

BB13-00000333

**BlackBerry.**

# Restrictive Covenant Addendum

## United States (California)

## 1. Non-solicitation of Employees

Employee agrees that while employed by or engaged by BlackBerry Limited, or its subsidiaries, successors or affiliates ("BlackBerry") and for a period of 12 months thereafter, Employee shall not, without the prior written consent of BlackBerry, induce or attempt to influence, directly or indirectly, an employee of BlackBerry to leave the employ of BlackBerry and shall not recruit, directly or indirectly, an employee of BlackBerry that has left the employ of BlackBerry within the past 2 months.

## 2. Non-solicitation of Customers

Employee agrees that while employed by or engaged by BlackBerry and for a period of 2 years thereafter, Employee shall not, without the prior written consent of BlackBerry, directly or indirectly solicit, endeavour to solicit, canvass, or otherwise deal with any Customer (as defined below) of BlackBerry for the purpose of selling or supplying to or purchasing from such Customer any products or services that are competitive with the products or services sold or supplied by BlackBerry. For the purposes of this paragraph, *Customer* shall mean any person that has done business with BlackBerry within the two years preceding Employee's last day of employment with BlackBerry and any person who Employee is or should reasonably be aware that BlackBerry has actively solicited for business in the six months preceding Employee's last day of employment with BlackBerry.

## 3. Reasonableness of Non-Solicitation Obligations

Employee confirms that the obligations in Sections 1 and 2 are fair and reasonable given that, among other reasons:

- Employee will be exposed to Confidential Information regarding the particular requirements of BlackBerry's Customers and regarding BlackBerry's unique relationship with and methods for satisfying the needs of such Customers, all of which Employee agrees not to act upon to the detriment of BlackBerry; and/or
- Employee will be performing important development work on the products owned or marketed by BlackBerry;

and Employee agrees that the obligations in Sections 1 and  2 are reasonably necessary for the protection of BlackBerry's proprietary interests and that, given Employee's general knowledge and experience, such obligations would not prevent Employee from being gainfully employed if the employment relationship were to end. Employee also agrees that the obligations in Sections 1 and 2 are in addition to the non-disclosure and other obligations of Employee.

Document Number HR00887
Last Date Updated: 2013/07/29

BB13-00000334

**::: BlackBerry.**

## 4. Severability

Employee also agrees that the obligations in Sections 1 and 2 are each independent covenants, and if any provision, or part thereof, contained in this Restrictive Covenant Addendum is prohibited or declared invalid, illegal or unenforceable by a court or other lawful authority, this Addendum shall continue in force, with respect to the enforceable provisions, and all rights and remedies accrued under the enforceable provisions shall survive any such declaration.

| |
|---|
| _(signature)_ |
| Signature of Employee |
| NEELAM SANDHU |
| Name of Employee (Print) |
| 25th Nov 2014. |
| Date |

Document Number HR00887
Last Date Updated: 2013/07/29

CONFIDENTIAL

BB13-00000335

**⁚⁚⁚ BlackBerry.**

November 25, 2014

Neelam Sandhu
c/o BlackBerry Corporation
███████████████████████

Dear Neelam,

This letter cancels and supersedes the letter of October 20, 2014.

This letter is to confirm that, in connection with your employment by BlackBerry Corporation, a subsidiary of BlackBerry Limited ("BlackBerry"), we will make the following recommendations to the Compensation, Nomination and Governance Committee (CNG) of BlackBerry, subject to the terms set out below for each recommendation:

(A)  **Restricted Share Units (RSUs)** – A recommendation will be made to the Compensation, Nomination and Governance Committee (CNG) that you should be allowed to participate in the BlackBerry Limited Equity Incentive Plan. We will propose that the CNG Committee approve a grant with a value of $25,000 USD. The actual number of RSUs awarded will be determined in accordance with BlackBerry's policy on granting equity awards by converting the above US dollar value into a number of RSUs based on the closing price of BlackBerry's common shares on Nasdaq on the grant date and rounded down to nearest RSU (whole numbers only). Any grant will be at the sole discretion of the CNG Committee and, if made, will not be made until the next regularly scheduled meeting of the CNG Committee to consider the grant of RSUs and will be made in accordance with BlackBerry's policy on granting equity awards. The specific terms and conditions of any RSUs granted will be governed by the BlackBerry Limited Equity Incentive Plan and the RSU agreement relating to any such grant. We will have no responsibility in the event the CNG Committee determines to grant you no RSUs or fewer RSUs than recommended.

-AND-

(B)  **Long-Term Incentive Program (LTIP) Eligibility** – In addition, starting calendar 2015, you may be eligible to participate in BlackBerry's Long-Term Incentive Program (LTIP), under which you may receive an annual equity grant. LTIP awards are at BlackBerry's discretion and subject to approval by the CNG Committee, and subject to the terms of the BlackBerry Limited Equity Incentive Plan, as applicable. Your eligibility to participate in the LTIP is not a guarantee that any equity will be granted in a given year.

In particular (i) you will have no claim relating to your Equity Award or any losses or potential losses in the event that your employment with BlackBerry Corporation is terminated for whatever reason (whether lawful or unlawful) and (ii) nothing in the grant of any options to you or in the terms of this letter or of the Plan will create or imply any employment relationship with BlackBerry Limited nor any right to continued employment with BlackBerry Corporation.

Yours sincerely,
BlackBerry Limited

John S. Chen
Executive Chair and CEO

Document Number: HR00838.01
Last Updated Date: 2013/09/10

**BlackBerry Limited** 2200 University Avenue East, Waterloo, Ontario, Canada N2K 0A7  tel: +1 (519) 888-7465  fax: +1 (519) 888-1975

CONFIDENTIAL

BB13-00000336

# EXHIBIT 5

**::: BlackBerry.**

May 18, 2016

Neelam Sandhu

███████████████

United States of America

Dear Neelam,

Congratulations! I am pleased to offer you a promotion to Senior Director of Business Operations, Office of the CEO on the BlackBerry Executive Team at BlackBerry Corporation ("BlackBerry").

This offer incorporates the terms and conditions of your previous employment agreement with BlackBerry or its affiliates, by which you will continue to be bound, except as specifically defined below.

This offer is based on the following terms and conditions:

1) **Employment**

   a) Effective Date – Your promotion is effective May 22, 2016.

   b) Employment Status – You will continue to be employed on a regular full-time basis. Your employment at BlackBerry continues to be "at will". As such, subject to the provisions of Section 4 of this letter, either you or BlackBerry may terminate the employment relationship at any time, for any reason, with or without cause, without any further compensation.

   c) Title – Your title will be Senior Director of Business Operations, Office of the CEO at Accountability Level H.

   d) Reporting Relationship – You will continue to report to the Executive Chair & CEO.

   e) Location – You will continue to work from BlackBerry's Pleasanton location. However, BlackBerry may at its sole discretion, appoint another work location in the future.

   f) Hours of Work – BlackBerry's standard work-week is 40 hours. However you will be required to devote whatever time is necessary to complete the requirements of your position, which may exceed 40 hours per week from time to time.

**BlackBerry Corporation**
6700 Koll Center Parkway, 2nd Floor, Suite 200, Pleasanton, California, 94566 USA.  tel: +1 (925) 931-6060  fax: +1 (925) 931-6061

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

BB13-00000425

## 2) Compensation

a) **Base Salary** – Your bi-weekly base salary will be $6,307.69 USD ($164,000 USD annualized), paid bi-weekly, less payroll deductions and required withholdings. By signing this letter you agree to receive your salary via direct deposit.

b) **Variable incentive Pay (ViP) Program** - You will continue to be eligible to participate in BlackBerry's annual Variable incentive Pay (ViP) Program, pursuant to ViP guidelines. The ViP Program provides you with an opportunity to earn additional pay on top of your annual base salary. For your position, the annual target incentive will be 30% of your base salary. Your ViP payout will be based on base salary you receive during the respective fiscal year while you are an active employee and you must be an active employee on the day of payout to receive a ViP award. To learn more about BlackBerry's ViP Program please visit go/vip.

c) BlackBerry's incentive plans are designed to address the conditions of an ever-changing marketplace and BlackBerry cannot make definitive representations concerning the continuation of format or the size of individual awards under the plans. The incentive plans are subject to change at the sole discretion of BlackBerry.

d) **Equity Offer** - In connection with this employment offer, a recommendation will be made to the Executive Chair and CEO of BlackBerry, John Chen, that you be granted equity. The details of any equity offer will be provided in a separate letter from BlackBerry Limited.

## 3) Benefits

a) You will continue to be eligible to participate in BlackBerry's benefits package, which may be amended by BlackBerry at its sole discretion.

b) You will accrue vacation at the accrual rate pursuant to the BlackBerry vacation policy in effect from time to time (the current vacation policy in effect provides for accrual of twenty (20) days per year). Vacation accrual, usage, and scheduling are subject to the terms of BlackBerry's U.S. vacation policy, which may be amended by BlackBerry at is sole discretion from time to time.

## 4) Cessation of Employment

a) Just as you may resign from employment with BlackBerry at any time, BlackBerry may terminate your employment at any time. Your employment at BlackBerry is "at-will" and may be terminated with or without notice and with or without cause. This policy may only be changed in a writing signed by BlackBerry's Executive Chair and CEO authorizing such a change.

b) If you are involuntary terminated as a result of layoff or a reduction in force, you are eligible for a payment in an amount equal to four (4) weeks of base salary, plus two (2) weeks of base salary for each year of service; provided, however, that the total amount of such Severance Benefit shall not exceed twenty (20) weeks of base salary. Notwithstanding the preceding sentence, no payment shall be paid unless you timely return a signed release to the Company and such release becomes irrevocable in accordance with applicable law.

**BlackBerry Corporation**
6700 Koll Center Parkway, 2nd Floor, Suite 200, Pleasanton, California, 94566 USA.  tel: +1 (925) 931-6060  fax: +1 (925) 931-6061

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

3. N. Sandhu 18/05/2016

The amount you may be eligible to receive upon cessation of employment may be modified in concurrence with future changes in employment terms, such as, but not limited to, transfer, promotion or pay modification, to provide payment based on the policy that may be in effect from time to time. BlackBerry may amend this cessation of employment provision at any time.

At the time of cessation of your employment for any reason, you are required to and agree to return all BlackBerry property, including equipment, devices or information in whatever form it is stored.

**5)  Conditions of Employment**

a)  Attached as Schedule A to this promotion letter is the BlackBerry Restrictive Covenant Addendum (the "RCA").  As a condition of accepting this promotion, you agree to sign and be bound by all of the terms and conditions of the RCA.

b)  That as a BlackBerry employee you may be deemed a restricted insider from time to time, in which event you will be subject to certain restrictions in relation to the purchase and sale of BlackBerry stock. You may also be subject to certain reporting requirements. Please refer to the BlackBerry Insider Trading Policy for more information.

All other terms and conditions of your employment agreement continue to govern your employment.

To confirm your acceptance of this new position, please sign below and return one copy to Amy Smith in BlackBerry Building B on or before May 26, 2016.

Sincerely,

BLACKBERRY CORPORATION

Per: _____
Nita C. White-Ivy
Executive Vice President
Human Resources

I confirm that I have read and understood the above and accept this new position.

Accepted:_____    Date:___24ᵗʰ May 2016___
               Neelam Sandhu

**BlackBerry Corporation**
6700 Koll Center Parkway, 2ⁿᵈ Floor, Suite 200, Pleasanton, California, 94566 USA.  tel: +1 (925) 931-6060  fax: +1 (925) 931-6061

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

BB13-00000427

**BlackBerry**

# Restrictive Covenant Addendum

## United States (Underline: California)

## SCHEDULE A

### 1.    Confidential Information

Employee understands and agrees that as part of Employee's employment with BlackBerry Limited, or its subsidiaries, successors, or affiliates ("BlackBerry") and to assist with the performance of Employee's duties, Employee will receive, conceive, observe, and/or develop Confidential Information (as defined below). Employee understands and agrees that this Confidential Information is the exclusive property of BlackBerry and agrees to preserve in confidence and not to disclose or use, either during or after the term of this agreement, any Confidential Information known or provided to Employee as a result of Employee's relationship with BlackBerry, whether or not conceived of or developed by Employee, except as required in the performance of Employee's services for and to BlackBerry. ***Confidential Information*** includes but is not limited to all plans, trade secrets, proprietary information, data, know-how, processes, patented or proprietary technologies, designs, hardware, software, software code, operating systems, techniques, specifications, drawings, instructions, research, formulae, applications, materials, test procedures and results, chemical and ceramic formulations, compositions and products, equipment, identity and description of records, customer lists, methods for identifying prospective customers and communicating with prospective or current customers, internal memoranda or policies, supplier identity, marketing and sales plans, pricing information and strategies, forecasts, margins, plans for expansion of products or services, business strategies, computer data, financial information, costs, confidential information of other employees, and all other information, concepts, or ideas involving or reasonably related to BlackBerry's business or prospective business and not generally available to the public, or information received by BlackBerry that BlackBerry has a bona fide obligation, contractual or otherwise, not to disclose. Employee acknowledges that BlackBerry maintains much of its Confidential Information on its secure network, goes to great length to secure and protect the Confidential Information, and that the Confidential Information provides a competitive advantage to BlackBerry.

Employee further agrees that, both during and after employment with BlackBerry, Employee will not directly or indirectly divulge, furnish, or make accessible to any person, firm, corporation, association, or other entity, or use in any manner, any Confidential Information or cause any Confidential Information to enter the public domain, except as may be required in the regular course of Employee's employment by BlackBerry or if the information enters the public domain through no fault of Employee's.

### 2.    Non-solicitation of Employees

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, solicit or attempt to solicit or influence, directly or indirectly, any person who is in the employment of, or is providing services to, BlackBerry to leave such employment or business relationship and shall not solicit or attempt to solicit or influence, directly or indirectly, a former employee who has left the employ of BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry.

Last updated: 11/24/2015

**BlackBerry**

## 3.    Non-solicitation of Customers

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, directly or indirectly solicit, service, endeavor to solicit or service, or otherwise have any business dealing with any Customer (as defined below) of BlackBerry for the purpose of selling or supplying to or purchasing from such Customer any product or service that is competitive with the products or services sold or supplied by BlackBerry. For the purposes of this paragraph, **Customer** means any person or entity with which Employee had contact while at BlackBerry that has done business with BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry or any person or entity with which Employee had contact while at BlackBerry that Employee is or should reasonably be aware that BlackBerry solicited for business in the twelve (12) months preceding Employee's last day of employment with BlackBerry.

## 4.    Continuation of Restrictive Period(s)

Employee agrees that in the event Employee breaches any provision(s) in Sections 1, 2, and/or 3, the restrictive time period(s) set for in the specific Section(s) shall be extended by the period of such violation. Employee therefore understands and agrees that a breach of any provision(s) in Sections 1, 2, and/or 3 effectively restarts the restrictive time period(s) for the specific Section(s) with each violation.

## 5.    Reasonableness of Obligations

Employee confirms that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are fair and reasonable given that, among other reasons:

- Employee will be exposed to Confidential Information (as defined in Section 1) and regarding BlackBerry's unique relationship with and methods for satisfying the needs of such Customers, all of which Employee agrees not to act upon to the detriment of BlackBerry;

- Employee will gain extensive, valuable knowledge of BlackBerry and its Customers' business and internal operations and will develop a close, familiar working relationship with the Customers, which experience would enable Employee to be exceptionally competitive with BlackBerry should Employee choose to leave BlackBerry and offer the same services on his or her own or for a competitor; and

- Employee will be performing important development work on the products owned or marketed by BlackBerry.

Employee further agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are reasonably necessary for the protection of BlackBerry's proprietary interests and that, given Employee's general knowledge and experience, such obligations would not prevent Employee from being gainfully employed if the employment or consulting relationship were to end. Employee also agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are in addition to the non-disclosure and other obligations of Employee.

Last updated: 11/24/2015

**:::BlackBerry**

## 6.    Choice of Law and Forum

This agreement shall be construed in accordance with and governed for all purposes by the laws of the state in which Employee resides at the time of the signing of this agreement. Employee and BlackBerry irrevocably agree to submit any claim arising from or otherwise related to this agreement to the exclusive jurisdiction of the state and federal courts of the state in which Employee resides at the time of the signing of this agreement, and irrevocably waive any objection which either may have to the same, including but not limited to any objection for lack of personal jurisdiction.

## 7.    Severability

Employee agrees that the obligations in this agreement are each independent covenants and, if any provision or part thereof contained in this Restrictive Covenant Addendum is prohibited or declared invalid, illegal, or unenforceable by a court or other lawful authority, this Addendum shall continue in force with respect to the remaining enforceable provisions and all rights and remedies accrued under the enforceable provisions shall survive any such declaration.

_(signature)_
Signature of Employee

NEELAM SANDHU
Name of Employee (Print)

27th October 2016
Date

Last updated: 11/24/2015

BB13-00000430

# EXHIBIT 6

**⠶ BlackBerry.**

February 15, 2019

Neelam Sandhu

████████████████

Dear Neelam,

Congratulations! I am pleased to offer you a promotion to Vice President of Business Operations, Office of the CEO at BlackBerry Corporation ("BlackBerry").

This offer incorporates the terms and conditions of your previous employment agreement with BlackBerry or its affiliates, by which you will continue to be bound, except as specifically defined below.

This offer is based on the following terms and conditions:

1) **EMPLOYMENT**

   a) Your promotion is effective March 1, 2019.

   b) You will continue to be employed on a regular full-time basis. Your employment at BlackBerry continues to be "at will". As such, subject to the provisions of Section 4 of this letter, either you or BlackBerry may terminate the employment relationship at any time, for any reason, with or without cause, without any further compensation.

   c) Your title will be Vice President of Business Operations, Office of the CEO.

   d) You will continue to report to the Executive Chairman & Chief Executive Officer.

   e) You will continue to work from BlackBerry's San Ramon location. However, BlackBerry may at its sole discretion, appoint another work location in the future.

   f) BlackBerry's standard work-week is 40 hours. However, you will be required to devote whatever time is necessary to complete the requirements of your position, which may exceed 40 hours per week from time to time.

2) **COMPENSATION**

   a) Your bi-weekly base salary will be $8,884.62 USD ($231,000 USD annualized), paid bi-weekly, less payroll deductions and required withholdings. By signing this letter, you agree to receive your salary via direct deposit.

   b) You will continue to be eligible to participate in BlackBerry's annual Variable incentive Pay (ViP) Program, pursuant to ViP guidelines. The ViP Program provides you with an opportunity to earn additional pay on top of your annual base salary. For your position, the annual target incentive will be 50% of your base salary. Your ViP payout will be based on base salary you receive during the respective fiscal year while you are an active employee and you must be an active employee on the day of payout to receive a ViP award. To learn more about BlackBerry's ViP Program please visit go/vip.

**BlackBerry Corporation**   Last Date Updated: 2018/12/21
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA. tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

2. N. Sandhu 02/15/2019

c) BlackBerry's incentive plans are designed to address the conditions of an ever-changing marketplace and BlackBerry cannot make definitive representations concerning the continuation of format or the size of individual awards under the plans. BlackBerry's incentive plans are subject to change at the sole discretion of BlackBerry.

d) In connection with this offer, as Executive Chair and CEO, I have approved a recommendation that you be granted equity. The details of any equity offer will be provided in a separate letter from BlackBerry Limited.

## 3) BENEFITS

a) You will continue to be eligible to participate in BlackBerry's benefits package, which may be amended by BlackBerry at its sole discretion.

b) You will accrue vacation at the accrual rate pursuant to the BlackBerry vacation policy in effect from time to time (the current vacation policy in effect provides for entitlement of twenty-five (25) days per year, accrued on a monthly basis). Vacation accrual, usage, and scheduling are subject to the terms of BlackBerry's U.S. vacation policy, which may be amended by BlackBerry at its sole discretion from time to time.

## 4) CESSATION OF EMPLOYMENT

a) Just as you may resign from employment with BlackBerry at any time, BlackBerry may terminate your employment at any time. Your employment at BlackBerry is "at-will" and may be terminated with or without notice and with or without cause. This policy may only be changed in a writing signed by BlackBerry's Executive Chair and CEO authorizing such a change.

b) If you are terminated without cause, you are eligible for a payment in an amount equal to six (6) weeks of base salary plus three (3) weeks of base salary per completed year of service; provided, however, that the total amount of such severance benefit shall not exceed twenty-six (26) weeks of base salary. Notwithstanding the preceding sentence, none of these payments shall be paid unless you timely return a signed release to the Company and such release becomes irrevocable in accordance with applicable law.

The amount you may be eligible to receive upon cessation of employment may be modified in concurrence with future changes in employment terms, such as, but not limited to, transfer, promotion or pay modification, to provide payment based on the policy that may be in effect from time to time. BlackBerry may amend this cessation of employment provision at any time.

c) At the time of cessation of your employment for any reason, you are required to and agree to return all BlackBerry property, including equipment, devices and information in whatever form it is stored.

## 5) CONDITIONS OF EMPLOYMENT

a) Attached as Schedule A to this promotion letter is the BlackBerry Restrictive Covenant Addendum (the "RCA"). As a condition of entering into this promotion you agree to sign and to be bound by all of the terms and conditions of the RCA.

**BlackBerry Corporation**   Last Date Updated: 2018/12/21
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA.  tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

CONFIDENTIAL                                                                                           BB13-00000365

3. N. Sandhu 02/15/2019

b) That as a BlackBerry employee you may be deemed a restricted insider from time to time, in which event you will be subject to certain restrictions in relation to the purchase and sale of BlackBerry stock. You may also be subject to certain reporting requirements. Please refer to the BlackBerry Insider Trading Policy for more information.

6) **GENERAL**

a) BlackBerry has an accommodation process and policies in place and provides accommodations for employees with disabilities. If you require a specific accommodation because of a disability or medical need, please contact Human Resources at HRHealthMgt@blackberry.com so that the accommodation process can begin accordingly.

All other terms and conditions of your employment agreement continue to govern your employment.

To confirm your acceptance of this new position, please sign below and return one copy to Nita White-Ivy on or before February 22, 2019.

Sincerely,

BLACKBERRY CORPORATION

Per: _____
John S. Chen
Executive Chairman of the Board and CEO

I confirm that I have read and understood the above and accept this new position.

Accepted: _____    Date: 19 Feb 2019 _____
                Neelam Sandhu

**BlackBerry Corporation**    Last Date Updated: 2018/12/21
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA.  tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

CONFIDENTIAL

BB13-00000366

**⁞⁞ BlackBerry**

# Restrictive Covenant Addendum

## United States (California)

## SCHEDULE A

### 1.    Confidential Information

Employee understands and agrees that as part of Employee's employment with BlackBerry Limited, or its subsidiaries, successors, or affiliates ("BlackBerry") and to assist with the performance of Employee's duties, Employee will receive, conceive, observe, and/or develop Confidential Information (as defined below). Employee understands and agrees that this Confidential Information is the exclusive property of BlackBerry and agrees to preserve in confidence and not to disclose or use, either during or after the term of this agreement, any Confidential Information known or provided to Employee as a result of Employee's relationship with BlackBerry, whether or not conceived of or developed by Employee, except as required in the performance of Employee's services for and to BlackBerry. *Confidential Information* includes but is not limited to all plans, trade secrets, proprietary information, data, know-how, processes, patented or proprietary technologies, designs, hardware, software, software code, operating systems, techniques, specifications, drawings, instructions, research, formulae, applications, materials, test procedures and results, chemical and ceramic formulations, compositions and products, equipment, identity and description of records, customer lists, methods for identifying prospective customers and communicating with prospective or current customers, internal memoranda or policies, supplier identity, marketing and sales plans, pricing information and strategies, forecasts, margins, plans for expansion of products or services, business strategies, computer data, financial information, costs, confidential information of other employees, and all other information, concepts, or ideas involving or reasonably related to BlackBerry's business or prospective business and not generally available to the public, or information received by BlackBerry that BlackBerry has a bona fide obligation, contractual or otherwise, not to disclose. Employee acknowledges that BlackBerry maintains much of its Confidential Information on its secure network, goes to great length to secure and protect the Confidential Information, and that the Confidential Information provides a competitive advantage to BlackBerry.

Employee further agrees that, both during and after employment with BlackBerry, Employee will not directly or indirectly divulge, furnish, or make accessible to any person, firm, corporation, association, or other entity, or use in any manner, any Confidential Information or cause any Confidential Information to enter the public domain, except as may be required in the regular course of Employee's employment by BlackBerry or if the information enters the public domain through no fault of Employee's.

### 2.    Non-solicitation of Employees

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, solicit or attempt to solicit or influence, directly or indirectly, any person who is in the employment of, or is providing services to, BlackBerry to leave such employment or business relationship and shall not solicit or attempt to solicit or influence, directly or indirectly, a former employee who has left the employ of BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry.

Last updated: 10/30/2017

**∷ BlackBerry**

### 3.    Non-solicitation of Customers

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, directly or indirectly solicit, service, endeavor to solicit or service, or otherwise have any business dealing with any Customer (as defined below) of BlackBerry for the purpose of selling or supplying to or purchasing from such Customer any product or service that is competitive with the products or services sold or supplied by BlackBerry. For the purposes of this paragraph, **Customer** means any person or entity with which Employee had contact while at BlackBerry that has done business with BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry or any person or entity with which Employee had contact while at BlackBerry that Employee is or should reasonably be aware that BlackBerry solicited for business in the twelve (12) months preceding Employee's last day of employment with BlackBerry.

### 4.    Continuation of Restrictive Period(s)

Employee agrees that in the event Employee breaches any provision(s) in Sections 1, 2, and/or 3, the restrictive time period(s) set for in the specific Section(s) shall be extended by the period of such violation. Employee therefore understands and agrees that a breach of any provision(s) in Sections 1, 2, and/or 3 effectively restarts the restrictive time period(s) for the specific Section(s) with each violation.

### 5.    Reasonableness of Obligations

Employee confirms that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are fair and reasonable given that, among other reasons:

- Employee will be exposed to Confidential Information (as defined in Section 1) and regarding BlackBerry's unique relationship with and methods for satisfying the needs of such Customers, all of which Employee agrees not to act upon to the detriment of BlackBerry;

- Employee will gain extensive, valuable knowledge of BlackBerry and its Customers' business and internal operations and will develop a close, familiar working relationship with the Customers, which experience would enable Employee to be exceptionally competitive with BlackBerry should Employee choose to leave BlackBerry and offer the same services on his or her own or for a competitor; and

- Employee will be performing important development work on the products owned or marketed by BlackBerry.

Employee further agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are reasonably necessary for the protection of BlackBerry's proprietary interests and that, given Employee's general knowledge and experience, such obligations would not prevent Employee from being gainfully employed if the employment or consulting relationship were to end. Employee also agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are in addition to the non-disclosure and other obligations of Employee.

Last updated: 10/30/2017

**::: BlackBerry**

## 6.    Choice of Law and Forum

This agreement shall be construed in accordance with and governed for all purposes by the laws of the state in which Employee resides at the time of the signing of this agreement. Employee and BlackBerry irrevocably agree to submit any claim arising from or otherwise related to this agreement to the exclusive jurisdiction of the state and federal courts of the state in which Employee resides at the time of the signing of this agreement, and irrevocably waive any objection which either may have to the same, including but not limited to any objection for lack of personal jurisdiction.

## 7.    Severability

Employee agrees that the obligations in this agreement are each independent covenants and, if any provision or part thereof contained in this Restrictive Covenant Addendum is prohibited or declared invalid, illegal, or unenforceable by a court or other lawful authority, this Addendum shall continue in force with respect to the remaining enforceable provisions and all rights and remedies accrued under the enforceable provisions shall survive any such declaration.

| |
|---|
| _Signature of Employee_ |
| NEELAM SANDHU |
| Name of Employee (Print) |
| 19 Feb 2019 |
| Date |

Last updated  10/30/2017

CONFIDENTIAL

**:: BlackBerry.**

February 15, 2019

Neelam Sandhu

████████████████

United States of America

Dear Neelam,

This letter is to confirm that, in connection with your employment by BlackBerry Corporation, a subsidiary of BlackBerry Limited ("BlackBerry"), I have approved the following recommendation, subject to the terms set out below:

(A)  **Time-Based Restricted Share Units (TBRSUs)** – As Executive Chairman & Chief Executive Officer, I have approved a recommendation that you participate in the BlackBerry Limited Equity Incentive Plan (the "Plan") with a TBRSU grant with a value of $50,000 USD. The actual number of TBRSUs awarded will be determined in accordance with BlackBerry's Policy on Granting Equity Awards by converting the above US dollar value into a number of TBRSUs based on the closing price of BlackBerry's common shares on NYSE on the grant date and rounded down to nearest TBRSU (whole numbers only). The grant will be made on the next available quarterly grant date in accordance with the Policy on Granting Equity Awards. The specific terms and conditions of any TBRSUs granted will be governed by the Plan and the TBRSU award agreement relating to any such grant.

-AND-

(B)  **Performance-Based Restricted Share Units (PBRSUs)** – As Executive Chairman & Chief Executive Officer, I have approved for you to participate in the BlackBerry Limited Equity Incentive Plan (the "Plan") with a PBRSU grant with a value of $50,000 USD. The actual number of PBRSUs awarded with be determined in accordance with the Policy on Granting Equity Awards by converting the above US dollar value into a number of PBRSUs based on the closing price of BlackBerry's common shares on NYSE on the grant date and rounded down to the nearest PBRSU (whole numbers only). The PBRSUs will vest entirely, partially, or not at all, based on BlackBerry's Annual Operation Plan (AOP) Total Software and Services Revenue attainment and the threshold of a positive Operating Income in the next fiscal year after the grant date (as defined in the PBRSU award agreement). The grant will be made on the next available quarterly grant date in accordance with the Policy on Granting Equity Awards. The specific terms and conditions of any PBRSUs granted will be governed by the Plan and the PBRSU award agreement relating to any such grant.

In particular (i) you will have no claim relating to your Equity Award or any losses or potential losses in the event that your employment with BlackBerry Corporation is terminated for whatever reason (whether with or without cause) and (ii) nothing in the grant of any equity award to you or in the terms of this letter or of the Plan will create or imply any employment relationship with BlackBerry Limited nor any right to continued employment with BlackBerry Corporation.

Yours sincerely,
BlackBerry Limited

Per:_____
John S. Chen
Executive Chairman & Chief Executive Officer

Last Updated Date  2017/11/20

**BlackBerry Limited**  2200 University Avenue East, Waterloo, Ontario, Canada N2K 0A7  tel: +1 (519) 888-7465  fax: +1 (519) 888-1975

# EXHIBIT 7

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB315F2EA



March 15, 2021

Neelam Sandhu



Dear Neelam,

I am pleased to inform you of your promotion to Senior Vice President and Chief Elite Customer Success Officer, effective March 21, 2021.  Your dedication and loyalty to BlackBerry have not gone unnoticed.  I also very much appreciate your support and hard work.

With this promotion, your focus will be dedicated to the Elite Customer Success Program, which as you know is very critical to BlackBerry's revenue growth. Therefore, we will work on transitioning the auxiliary tasks of Travel and Expense management as well as MAP update and coordination in the next few weeks.  Thank you for your patience and support during the transition period.

Attached you will find your promotion employment agreement and equity letter for your acceptance and signature.

My congratulations to you for this well-deserved promotion.

Sincerely,

John S. Chen
Executive Chairman & Chief Executive Officer


Cc:  Nita White-Ivy, EVP, HR

**BlackBerry Corporation**
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA. tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

CONFIDENTIAL                                                                                                    BB13-00000431

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB315F2EA



March 15, 2021

Neelam Sandhu

███████████████

Dear Neelam,

Congratulations! I am pleased to offer you a promotion to Senior Vice President and Chief Elite Customer Success Officer at BlackBerry Corporation ("BlackBerry").

This offer incorporates the terms and conditions of your previous employment agreement with BlackBerry or its affiliates, by which you will continue to be bound, except as specifically modified below.

This offer is based on the following terms and conditions:

**1) EMPLOYMENT**

   a) Your promotion is effective March 21, 2021.

   b) You will continue to be employed on a regular full-time basis. Your employment at BlackBerry continues to be "at will". As such, subject to the provisions of Section 4 of this letter, either you or BlackBerry may terminate the employment relationship at any time, for any reason, with or without cause, without any further compensation.

   c) Your title will be Senior Vice President and Chief Elite Customer Success Officer.

**2) COMPENSATION**

   a) Your bi-weekly base salary will be $10,961.53 USD ($285,000 USD annualized), paid bi-weekly, less payroll deductions and required withholdings. By signing this letter, you agree to receive your salary via direct deposit to your bank account.

   b) You will continue to be eligible to participate in BlackBerry's annual Variable incentive Pay (ViP) Program, pursuant to ViP guidelines. The ViP Program provides you with an opportunity to earn additional pay on top of your annual base salary. For your position, the annual target incentive will be 60% of your base salary. Your ViP payout will be based on base salary you receive during the respective fiscal year while you are an active employee and you must be an active employee on the day of payout to receive a ViP award. To learn more about BlackBerry's ViP Program please visit go/vip.

   c) BlackBerry's incentive plans are designed to address the conditions of an ever-changing marketplace and BlackBerry cannot make definitive representations concerning the continuation of format or the size of individual awards under the plans. BlackBerry's incentive plans are subject to change at the sole discretion of BlackBerry.

Last Date Updated: 2020/07/30

**BlackBerry Corporation**
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA.  tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

CONFIDENTIAL    BB13-00000432

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB315F2EA

2. N. Sandhu 03/15/2021

d) In connection with this offer, as Executive Chairman and CEO, I have approved a recommendation that you be granted equity. The details of any equity offer will be provided in a separate letter from BlackBerry Limited.

## 3) CESSATION OF EMPLOYMENT

a) Just as you may resign from employment with BlackBerry at any time, BlackBerry may terminate your employment at any time. Your employment at BlackBerry is "at-will" and may be terminated with or without notice and with or without cause. This policy may only be changed in a writing signed by BlackBerry's Executive Chairman and CEO authorizing such a change.

b) If you are terminated without cause, you are eligible for a payment in an amount equal to eight (8) weeks of base salary plus three (3) weeks of base salary per completed year of service; provided, however, that the total amount of such severance benefit shall not exceed twenty-six (26) weeks of base salary. Notwithstanding the preceding sentence, none of these payments shall be paid unless you timely return a signed release to the Company and such release becomes irrevocable in accordance with applicable law.

The amount you may be eligible to receive upon cessation of employment may be modified in concurrence with future changes in employment terms, such as, but not limited to, transfer, promotion or pay modification, to provide payment based on the policy that may be in effect from time to time. BlackBerry may amend this cessation of employment provision at any time.

c) At the time of cessation of your employment for any reason, you are required to and agree to return all BlackBerry property, including equipment, devices, and information in whatever form it is stored.

## 4) CONDITIONS OF EMPLOYMENT

a) Attached as Schedule A to this promotion letter is the BlackBerry Restrictive Covenant Addendum (the "RCA"). As a condition of entering into this promotion you agree to sign and to be bound by all of the terms and conditions of the RCA.

b) That as a senior employee you will be considered a restricted insider and will be subject to certain restrictions in relation to the purchase and sale of BlackBerry stock. You may also be subject to certain reporting requirements. Please refer to the BlackBerry Insider Trading Policy for more information.

## 5) GENERAL

a) BlackBerry has an accommodation process and policies in place and provides accommodations for employees with disabilities. If you require a specific accommodation because of a disability or medical need, please contact Human Resources at HRHealthMgt@BlackBerry.com so that the accommodation process can begin accordingly.

All other terms and conditions of your previous employment agreement continue to govern your employment.

Last Date Updated: 2020/07/30

**BlackBerry Corporation**
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA. tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

CONFIDENTIAL

BB13-00000433

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB315F2EA

3. N. Sandhu 03/15/2021

To confirm your acceptance of this new position, please sign below within DocuSign and click "Finish" on or before March 17, 2021.

Sincerely,

BLACKBERRY CORPORATION

Per: _____

John S. Chen
Executive Chairman & Chief Executive Officer

I confirm that I have read and understood the above and accept this new position.

Accepted: _Neelam Sandhu_____    Date: _3/15/2021_____
            Neelam Sandhu

**BlackBerry Corporation**
Last Date Updated: 2020/07/30
3001 Bishop Drive, Suite 400, San Ramon, California, 94583 USA.  tel: +1 (925) 242-5660 fax: +1 (925) 242-5661

*Trademarks, including but not limited to BLACKBERRY, EMBLEM Design, BBM and BES are the trademarks or registered trademarks of BlackBerry Limited, used under license, and the exclusive rights to such trademarks are expressly reserved.*

CONFIDENTIAL

BB13-00000434

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB315F2EA

**:::** *BlackBerry.*

March 15, 2021

Neelam Sandhu

███████████████

Dear Neelam,

This letter is to confirm that, in connection with your employment by BlackBerry Corporation, a subsidiary of BlackBerry Limited ("BlackBerry"), I have approved the following recommendation, subject to the terms set out below:

(A) **Time-Based Restricted Share Units (TBRSUs)** – As Executive Chairman & Chief Executive Officer, I have approved a recommendation that you participate in the BlackBerry Limited Equity Incentive Plan (the "Plan") with a TBRSU grant with a value of $75,000 USD. The actual number of TBRSUs awarded will be determined in accordance with BlackBerry's Policy on Granting Equity Awards by converting the above US dollar value into a number of TBRSUs based on the closing price of BlackBerry's common shares on NYSE on the grant date and rounded down to nearest TBRSU (whole numbers only). The grant will be made on the next available quarterly grant date in accordance with the Policy on Granting Equity Awards. The specific terms and conditions of any TBRSU granted will be governed by the Plan and the TBRSU award agreement relating to any such grant.

-AND-

(B) **Performance-Based Restricted Share Units (PBRSUs)** – As Executive Chairman & Chief Executive Officer, I have approved for you to participate in the BlackBerry Limited Equity Incentive Plan (the "Plan") with a PBRSU grant with a value of $75,000 USD. The actual number of PBRSUs awarded with be determined in accordance with the Policy on Granting Equity Awards by converting the above US dollar value into a number of PBRSUs based on the closing price of BlackBerry's common shares on NYSE on the grant date and rounded down to the nearest PBRSU (whole numbers only). The PBRSUs will vest entirely, partially, or not at all, based on BlackBerry's Annual Operation Plan (AOP) Total Software and Services Revenue attainment and the threshold of a positive Operating Income in the next fiscal year after the grant date (as defined in the PBRSU award agreement). The grant will be made on the next available quarterly grant date in accordance with the Policy on Granting Equity Awards. The specific terms and conditions of any PBRSUs granted will be governed by the Plan and the PBRSU award agreement relating to any such grant.

In particular (i) you will have no claim relating to your Equity Award or any losses or potential losses in the event that your employment with BlackBerry Corporation is terminated for whatever reason (whether with or without cause) and (ii) nothing in the grant of any equity award to you or in the terms of this letter or of the Plan will create or imply any employment relationship with BlackBerry Limited nor any right to continued employment with BlackBerry Corporation.

Yours sincerely,
BlackBerry Limited

Per: _____
John S. Chen
Executive Chairman & Chief Executive Officer

Last Updated Date: 2017/11/20

**BlackBerry Limited** 2200 University Avenue East, Waterloo, Ontario, Canada N2K 0A7  tel: +1 (519) 888-7465  fax: +1 (519) 888-1975

CONFIDENTIAL

BB13-00000435

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB313F2EA

**BlackBerry**

# Restrictive Covenant Addendum

## United States (<u>California</u>)

## SCHEDULE A

## 1.    Confidential Information

Employee understands and agrees that as part of Employee's employment with BlackBerry Limited, or its subsidiaries, successors, or affiliates ("BlackBerry") and to assist with the performance of Employee's duties, Employee will receive, conceive, observe, and/or develop Confidential Information (as defined below). Employee understands and agrees that this Confidential Information is the exclusive property of BlackBerry and agrees to preserve in confidence and not to disclose or use, either during or after the term of this agreement, any Confidential Information known or provided to Employee as a result of Employee's relationship with BlackBerry, whether or not conceived of or developed by Employee, except as required in the performance of Employee's services for and to BlackBerry. **Confidential Information** includes but is not limited to all plans, trade secrets, proprietary information, data, know-how, processes, patented or proprietary technologies, designs, hardware, software, software code, operating systems, techniques, specifications, drawings, instructions, research, formulae, applications, materials, test procedures and results, chemical and ceramic formulations, compositions and products, equipment, identity and description of records, customer lists, methods for identifying prospective customers and communicating with prospective or current customers, internal memoranda or policies, supplier identity, marketing and sales plans, pricing information and strategies, forecasts, margins, plans for expansion of products or services, business strategies, computer data, financial information, costs, confidential information of other employees, and all other information, concepts, or ideas involving or reasonably related to BlackBerry's business or prospective business and not generally available to the public, or information received by BlackBerry that BlackBerry has a bona fide obligation, contractual or otherwise, not to disclose. Employee acknowledges that BlackBerry maintains much of its Confidential Information on its secure network, goes to great length to secure and protect the Confidential Information, and that the Confidential Information provides a competitive advantage to BlackBerry.

Employee further agrees that, both during and after employment with BlackBerry, Employee will not directly or indirectly divulge, furnish, or make accessible to any person, firm, corporation, association, or other entity, or use in any manner, any Confidential Information or cause any Confidential Information to enter the public domain, except as may be required in the regular course of Employee's employment by BlackBerry or if the information enters the public domain through no fault of Employee's.

## 2.    Non-solicitation of Employees

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, solicit or attempt to solicit or influence, directly or indirectly, any person who is in the employment of, or is providing services to, BlackBerry to leave such employment or business relationship and shall not solicit or attempt to solicit or influence, directly or indirectly, a former employee who has left the employ of BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry.

Last updated: 10/30/2017

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB313F2EA

**BlackBerry**

## 3.    Non-solicitation of Customers

Employee agrees that while employed by or engaged by BlackBerry and for a period of twelve (12) months thereafter, Employee shall not, without the prior written consent of BlackBerry, directly or indirectly solicit, service, endeavor to solicit or service, or otherwise have any business dealing with any Customer (as defined below) of BlackBerry for the purpose of selling or supplying to or purchasing from such Customer any product or service that is competitive with the products or services sold or supplied by BlackBerry. For the purposes of this paragraph, *Customer* means any person or entity with which Employee had contact while at BlackBerry that has done business with BlackBerry within the twelve (12) months preceding Employee's last day of employment with BlackBerry or any person or entity with which Employee had contact while at BlackBerry that Employee is or should reasonably be aware that BlackBerry solicited for business in the twelve (12) months preceding Employee's last day of employment with BlackBerry.

## 4.    Continuation of Restrictive Period(s)

Employee agrees that in the event Employee breaches any provision(s) in Sections 1, 2, and/or 3, the restrictive time period(s) set for in the specific Section(s) shall be extended by the period of such violation. Employee therefore understands and agrees that a breach of any provision(s) in Sections 1, 2, and/or 3 effectively restarts the restrictive time period(s) for the specific Section(s) with each violation.

## 5.    Reasonableness of Obligations

Employee confirms that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are fair and reasonable given that, among other reasons:

- Employee will be exposed to Confidential Information (as defined in Section 1) and regarding BlackBerry's unique relationship with and methods for satisfying the needs of such Customers, all of which Employee agrees not to act upon to the detriment of BlackBerry;

- Employee will gain extensive, valuable knowledge of BlackBerry and its Customers' business and internal operations and will develop a close, familiar working relationship with the Customers, which experience would enable Employee to be exceptionally competitive with BlackBerry should Employee choose to leave BlackBerry and offer the same services on his or her own or for a competitor; and

- Employee will be performing important development work on the products owned or marketed by BlackBerry.

Employee further agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are reasonably necessary for the protection of BlackBerry's proprietary interests and that, given Employee's general knowledge and experience, such obligations would not prevent Employee from being gainfully employed if the employment or consulting relationship were to end. Employee also agrees that the obligations in Sections 1, 2, 3, and 4, separately and collectively, are in addition to the non-disclosure and other obligations of Employee.

Last updated: 10/30/2017

DocuSign Envelope ID: 12F4A67E-E9B8-4A29-99FF-9D9FB319F2EA

**BlackBerry**

## 6.    Choice of Law and Forum

This agreement shall be construed in accordance with and governed for all purposes by the laws of the state in which Employee resides at the time of the signing of this agreement. Employee and BlackBerry irrevocably agree to submit any claim arising from or otherwise related to this agreement to the exclusive jurisdiction of the state and federal courts of the state in which Employee resides at the time of the signing of this agreement, and irrevocably waive any objection which either may have to the same, including but not limited to any objection for lack of personal jurisdiction.

## 7.    Severability

Employee agrees that the obligations in this agreement are each independent covenants and, if any provision or part thereof contained in this Restrictive Covenant Addendum is prohibited or declared invalid, illegal, or unenforceable by a court or other lawful authority, this Addendum shall continue in force with respect to the remaining enforceable provisions and all rights and remedies accrued under the enforceable provisions shall survive any such declaration.

DocuSigned by:

*Neelam Sandhu*

CBBEDFDC5C86437

Signature of Employee

Neelam Sandhu

Name of Employee (Print)

3/15/2021

Date

Last updated: 10/30/2017

# EXHIBIT 8



June 1, 2023

Neelam Sandhu
█████████████████████

(Delivered by hand at BlackBerry's San Ramon office)

Dear Neelam,

This is to confirm your acceptance of the role of Chief Marketing & Elite Customer Success Officer.

The terms and conditions of your current Employment Agreement will continue to govern your employment with BlackBerry Corporation ("BlackBerry") except for the following modifications:

**1) Employment**

    a)  Your new position title is Chief Marketing & Elite Customer Success Officer.

    b)  You will continue to be employed on a regular full-time basis. Your employment at BlackBerry continues to be "at will."

**2. Compensation**

    a)  There will be no change to your current bi-weekly base salary of $12,307.69 ($320,000 annualized), paid bi-weekly, less payroll deductions and required withholdings, deposited to your bank account on record with the payroll department.

    b)  Your annual target incentive bonus of $192,000 will be split into two parts: 50% under Variable Incentive Pay (VIP) Program and 50% on Sales Incentive Pay (SIP) Program.

To confirm in writing your acceptance of your new position, please sign below and return a copy of this document to me by Monday, June 5, 2023.

Thank you for your ongoing dedication and commitment to BlackBerry.

Sincerely,

BlackBerry Corporation

Per: _____
Nita C. White-Ivy
Chief Human Resources Officer

Accepted: _____

_____        06 / 15 / 23
Neelam Sandhu (signature)              Date

*BlackBerry and related trademarks, names and logos are the property of BlackBerry Limited and are registered and/or used in the U.S. and countries around the world.*

CONFIDENTIAL

BB13-00004615

# EXHIBIT 9

The Wayback Machine - https://web.archive.org/web/20231207140955/https://www.blackberry.com/us/en/company/leadership

# BlackBerry Executive Team

**Richard Lynch**
Board Chair and Interim Chief Executive Officer

Mr. Lynch is Chair of the Board of Directors and Interim Chief Executive Officer of BlackBerry. He has served as a director of the Company since February 2013. He has bachelor's and master's degrees in Electrical Engineering from Lowell Technological Institute (now University of Massachusetts) and post-graduate executive education from the Wharton School at the University of Pennsylvania and the Johnson School of Management at Cornell University. Mr. Lynch is President of FB Associates, LLC, which provides advisory and consulting services at the intersection of technology, marketing and business operations. Prior to his current role, Mr. Lynch served as Executive Vice-President & Chief Technology Officer for Verizon Communications and Verizon Wireless. He is a Life Fellow of The Institute of Electrical and Electronic Engineers. Mr. Lynch previously served as Chairman of Ribbon Communications and as a director of Ruckus Wireless.  He has also served on a number of professional organizations including the GSM Association, the CDMA Development Group, the Federal Communications Commission Technical Advisory Committee and the Communications Security Reliability and Interoperability Council. Mr. Lynch has been honored with the President's Award by the Cellular Telecommunications and Internet Association and has also been inducted into the Wireless History Foundation's Hall of Fame.

**Marjorie Dickman**
Chief Government Affairs and Public Policy Officer

Marjorie Dickman is Chief Government Affairs and Public Policy Officer for BlackBerry. In this role, Marjorie is responsible for strategic oversight of the company's global government relations, regulatory affairs, and public policy operations. Additionally, she oversees the company's participation in technical standards organizations worldwide.

Marjorie has over 25 years of government relations, regulatory affairs, and public policy experience in the technology sector. She joined BlackBerry following a 16-year career with Intel Corporation, where she most recently served as Global Director and Associate General Counsel for IoT and Automated Driving Policy, managing a global team across the U.S., Europe, China, and Japan. Prior to Intel, Marjorie practiced law with a prominent Washington, D.C. firm.

Marjorie serves on the Boards of the Consumer Technology Association, the U.S. Chamber of Commerce's Technology Engagement Center, the Northern Virginia Technology Council, and the Eno Center for Transportation. She holds a J.D. cum laude from Georgetown University Law Center and a B.A. cum laude in Public Policy from Duke University.  And she is deeply dedicated to mentoring others to achieve their career goals.

Marjorie's distinctions include "Top 50 Most Powerful Women in Tech" (National Diversity Council), "Tech Titan" (*Washingtonian*), and "Top Lobbyist" (*The Hill*).

**Mattias Eriksson**
President, BlackBerry IoT

Mattias Eriksson is President and General Manager of BlackBerry's IOT Business Unit. The business unit consists of BlackBerry Technology Solutions or BTS (BlackBerry® QNX®, BlackBerry Certicom®, BlackBerry Radar® and BlackBerry Jarvis™) and BlackBerry IVY™. Prior to joining BlackBerry, Mattias spent 10 years with HERE Technologies in various leadership roles, including SVP of the core location data business group and SVP of product. Mattias brings over two decades of experience in automotive location data

BlackBerry uses cookies to help make our website better. Some of the cookies are necessary for proper functioning of the site, while others are to help us understand how you use it. Learn More

Cookie Settings

Accept

Mattias started his career in management consulting for Arthur D. Little and then spent 15 years in APAC working in a variety of management roles across Sales-, Business Development and Product Management for Nokia, Motorola, and Siemens.

Mattias holds a M.Sc. in Engineering Physics from Lund Institute of Technology, a B.Sc. in Marketing and Economics from Lund University and an M.B.A. from INSEAD.

**John Giamatteo**
President, BlackBerry
Cyber Security

John Giamatteo is President of BlackBerry's Cyber Security Business Unit with responsibility for its business strategy, engineering, go-to-market, customer support and operations. John brings to BlackBerry over 30 years of experience in P&L, go-to-market, marketing, customer relationships, and customer success with global high technology companies.  He comes to BlackBerry from McAfee where he was President and Chief Revenue Officer for over six years.  Prior to that John served as Chief Operating Officer at AVG Technologies, a leading provider of internet and mobile security. He also held leadership positions with Solera Holdings, RealNetworks, Inc., and Nortel Corporation.

John received his MBA and Bachelor of Accounting from St. John's University in New York.

**Phil Kurtz**
Chief Legal Officer and
Corporate Secretary

Phil Kurtz is BlackBerry's Chief Legal Officer and Corporate Secretary with responsibility for the company's worldwide legal affairs, including litigation, contracts administration, and regulatory compliance.

Phil joined the company over 12 years ago as M&A Commercial Counsel, progressed to Deputy General Counsel and Assistant Corporate Secretary, and Vice President, Deputy General Counsel and Corporate Secretary before his promotion to Chief Legal Officer. Phil holds a BA Philosophy from Huron University and LLB/MBA in Law & Business (Finance) from University of Toronto.

Phil holds LLB and MBA degrees from the University of Toronto and a BA from The University of Western Ontario, and he is a CFA charterholder.  In 2012, Phil was a recipient of the Forty Under 40 Award from the Ottawa Business Journal and Ottawa Chamber of Commerce.

**Steve Rai**
Chief Financial Officer

As Chief Financial Officer, Steve Rai is responsible for oversight of global internal and external financial reporting and compliance, financial strategy and management, business unit support, investor relations, and equity administration. Steve also oversees BlackBerry's Intellectual Property and Licensing operations and is responsible for the Company's Environmental, Social and Governance corporate reporting and compliance. Previously, Steve was Deputy Chief Financial Officer, and prior to that was Vice President and Corporate Controller for BlackBerry. In these roles he was responsible for overseeing various aspects of the CFO Organization, including financial reporting and compliance, non-field financial operations including corporate financial planning & analysis, treasury, procurement, facilities, insurance and equity administration.

Steve brings more than 25 years of progressive experience in financial management, business advisory and assurance services to U.S. and Canadian public companies, ranging from start-ups to multinational corporations.

Before joining BlackBerry, Steve was Corporate Controller for PMC-Sierra. He previously held senior management positions with TSX Venture Exchange and PricewaterhouseCoopers LLP.

BlackBerry uses cookies to help make our website better. Some of the cookies are necessary for proper functioning of the site, while others are to help us understand how you use it. Learn More

**Nita White-Ivy**
Chief Human Resources
Officer

Nita is responsible for leading the HR team to design and deliver global programs, initiatives, partnerships, solutions and services in all facets of HR to support the achievement of the company's operational goals and strategic objectives.

Before joining BlackBerry, Nita served as Chief People Officer for SAP Cloud and SuccessFactors. Prior to that, she was Vice President of Worldwide Human Resources for Sybase, Inc., where she was responsible for providing and implementing high quality, state-of-the-art human resource and security services and programs for Sybase employees, management, executives and campuses worldwide.

Nita has an MBA from Santa Clara University, Santa Clara, Calif., and has also completed several courses towards an MA in Counseling Psychology from the same institution. She earned her BS in Business Administration with finance and accounting major with honors.

# Senior Leaders

**Charles Eagan**
Chief Technology Officer

Appointed in June 2018, Charles Eagan is the Chief Technology Officer for BlackBerry. In this role, Charles is responsible for the advancement of new technologies, driving innovation within emerging markets and advancing security capabilities that leverage AI and Machine Learning. He is also responsible for technology partnerships and overseeing the standardization and integration of all company products with an emphasis on helping drive BlackBerry's Internet of Things platform.

Charles was previously the Global Head of Electronics at Dyson Ltd (U.K.), focused on IoT device deployment. Prior to that he served as BlackBerry's Global Head of Device Software, and spearheaded development of the BlackBerry 10 operating system and the transition to secure Android.

Charles was formerly Vice President of Engineering for QNX Software, where he concentrated on the automotive and embedded markets. He also worked at Cisco and directed development of the seminal CRS-1 carrier routing system.

In 2008, Charles co-founded Crank Software, a company dedicated to the development of embedded tools and technologies that enabled rapid building of highly functional graphical interfaces. Earlier in his career, he built connected devices for Honda in the areas of process control, factory automation and robotics.

Charles is a noted speaker, thought leader and IoT expert who has been at the forefront of new frontiers in digital connectivity for over three decades. He graduated with honors from the University of Waterloo (Canada) with a bachelor's degree in applied mathematics and electrical engineering minor.

**Vito Giallorenzo**
Senior Vice President,
Corporate Development and
Chief Operating Officer,
BlackBerry Technology
Solutions

Reporting to BlackBerry's CEO, Vito leads BlackBerry's Corporate Development activities, M&A and strategic partnerships. He is also the Chief Operating Officer of BlackBerry Technology Solutions (BTS), the Company's business unit focused on embedded IoT and AI-driven vehicle solutions. As COO of BTS reporting to the unit's President, he supports the managing of strategy, pricing, and launch of the next-generation platform, IVY, its ecosystem and partnerships development.

Vito joined BlackBerry after more than a decade as a technology investment banker in New York and London at Morgan Stanley and then at Perella Weinberg Partners as a Managing Director. He has also worked at Naspers as Corporate Development Principal, and held several engineering roles at Cisco Systems earlier in his career.

BlackBerry uses cookies to help make our website better. Some of the cookies are necessary for proper functioning of the site, while others are to help us understand how you use it. Learn More

**Jesse Harold**
Chief Information Officer

Jesse Harold is the Chief Information Officer at BlackBerry. In this role, Jesse is responsible for technology operations of the company's Cybersecurity and IoT SaaS portfolio, IT services, and Cloud and business transformation enablement.

Jesse joined BlackBerry's Core Network Engineering team in 2008. His career with the Company has seen him progress rapidly through various roles to Vice President, where he helped to transform IT into a truly enterprise function, and now CIO. Jesse's academic background includes an Executive MBA from Queen's University, an Advanced Diploma in Telecommunications Technology from Sheridan College, and CISM and CRISC credentials.

**Arvind Raman**
Chief Information Security Officer

Arvind Raman is a Senior Vice President and BlackBerry's Chief Information Security Officer. In this role, he leads all aspects of our information security, product security & GRC program globally, focusing on effective management of cybersecurity risks, policies and procedures.

Arvind brings over 20 years of information security, technology, R&D experience and leadership to BlackBerry.  Arvind's previous experience include serving as the Global CISO at Mitel, Global Head Information Security for Scotia Bank and Director of Cyber & Data Security for CIBC.

Arvind holds a Bachelors in Electronics and Communications Engineering from India, Master of Science degree in Electrical Engineering from Temple University, Philadelphia. He also holds an MBA from Saint Mary's University, Halifax, Canada.

**Neelam Sandhu**
Chief Elite Customer Success Officer and Chief Marketing Officer

Neelam Sandhu is Chief Elite Customer Success Officer and Chief Marketing Officer, at BlackBerry, reporting to the CEO. As Chief Elite Customer Success Officer she leads the strategic relationships, sales, and co-sell, and customer success, including strategic product engineering, with BlackBerry's top customers and top target customers, driving them to gain long-term competitive advantages by leveraging the breadth and depth of the BlackBerry platform. As Chief Marketing Officer she leads marketing across channels, including public relations, social media, editorial content, branding, advertising, web, and corporate events.

Neelam is also Head of Sustainability, responsible for corporate sustainability, at BlackBerry, and has delivered the company's inaugural ESG report and its carbon neutral status. Additionally, she assists the CEO on some operational tasks.

Since joining BlackBerry in 2009 Neelam has held various positions, based out of the company's United Kingdom, New York and California offices. Her responsibilities have included Brand Management, Brand Messaging, Marketing Operations, Go-To-Market Planning, Corporate Strategic Initiatives, and CEO Office Business Operations. Neelam is a Member of the DPI Advisory Council, which serves the Government of Canada, and is on the Board of AFCEA DC, which serves the U.S. Government. Neelam won the FedScoop Best Bosses in Federal IT award in 2022. She holds a Bachelor's degree, with Honors, in Business Management, from the University of Leicester and an Executive Certification in Financial Analysis from the University of California at Berkeley's Haas School of Business.

BlackBerry uses cookies to help make our website better. Some of the cookies are necessary for proper functioning of the site, while others are to help us understand how you use it. Learn More

John has been an integral member of the BlackBerry QNX team since 1998. He has held a variety of roles within the organization, including vice president of engineering and services. He holds a Bachelor's of Engineering, in Electrical and Electronics Engineering from Carleton University in Ottawa.

**Mark Wilson**
Project Imperium Officer

As Project Imperium Officer, Mark Wilson is responsible for coordinating the cross-functional effort to review BlackBerry's business portfolio and configuration. Prior to this role, Mark served as BlackBerry's Chief Marketing Officer.

Before joining BlackBerry, Mark held leadership roles in marketing, corporate development, and consulting in the technology and communications industries. He was Chief Marketing Officer for Avaya, Senior Vice President of Marketing for Sybase, an SAP Company, leader of the strategy practice at KPMG Consulting's Information, Communication and Entertainment Group, and a Marketing Manager for AT&T.

Mark holds an MBA and an MA in public policy from The University of Chicago. He received his BA from University of California at Santa Barbara. He was named by BtoB Magazine as one of the Best Marketers from 2009-2011 and 2013, a CMO to watch in the 2013 FierceCMO list, and a transformative CMO in Forbes' CMO Next 2021.

CONTACT US          SUPPORT                    CAREERS

---

**Corporate**

Company

Newsroom

Investors

Events & Webinars

Careers

Leadership

Sustainability

Certifications

Customer Success

**Developers**

Enterprise Platform & Apps

BlackBerry QNX Developer Network

**Blog**

BlackBerry Blog

Developers Blog

Help Blog

**Legal**

Overview

Accessibility

Patents

Trademarks

Privacy Policy

UK Modern Slavery Act

**Languages**

English

© 2023 BlackBerry Limited. All rights reserved.

BlackBerry uses cookies to help make our website better. Some of the cookies are necessary for proper functioning of the site, while others are to help us understand how you use it. Learn More

# EXHIBIT 10

**From**: Neelam Sandhu [nsandhu@blackberry.com]
**Sent**: 3/18/2022 7:27:28 PM
**To**: John Chen [john.chen@blackberry.com]
**Subject**: FW: Cylance Product Issues
**Attachments**: BB Cyber Security Weekly Leadership team Call

John,

For reference you can see in the attached email JG invited me to his weekly team meeting in October. I agreed to join as often as possible. Everyone on the attached email received the invite except for me. I had to follow up for it a few times and finally, after mentioning it to JG again, I received it in January. In the meantime he made comment that I wasn't joining the calls out of my own choice, which is obviously not true.

Another example of my efforts to collaborate is in the thread below, highlighted in blue. Unfortunately, as you can see in the email below, I have to ask to be included by JG in relevant discussions where we should be collaborating and I am included rarely. I will continue to make effort as collaboration is important for BlackBerry.

I bring this up to you only to correct a fallacy, not for action.

Neelam

---

**From:** Neelam Sandhu
**Sent:** Thursday, January 20, 2022 5:30 PM
**To:** John Giamatteo <jjg@blackberry.com>
**Subject:** RE: Cylance Product Issues

Hi – thanks for the chat today. This is the second note I mentioned.

Shall I ping Jenifer for the invite or do you prefer to? To reiterate, I'm happy to join as often as possible.

Neelam

---

**From:** Neelam Sandhu
**Sent:** Thursday, November 18, 2021 12:40 PM
**To:** John Giamatteo <jjg@blackberry.com>
**Subject:** RE: Cylance Product Issues

Great. See you at the FERs meeting later.

I'll look out for the invite to your weekly meeting and join whenever I can.

Thanks,
Neelam

---

**From:** John Giamatteo <jjg@blackberry.com>
**Sent:** Tuesday, November 16, 2021 7:44 AM
**To:** Neelam Sandhu <nsandhu@blackberry.com>
**Subject:** RE: Cylance Product Issues

Agreed...a great place to collaborate, Neelam.

CONFIDENTIAL

On our weekly cyber BU staff call yesterday, which you are always welcome to participate in, I asked Billy and Alex to coordinate a meeting this week to review the FER's in queue with ███████████ I want to get a handle on the magnitude of FERs and the scope of what we are working on. Afterwards, we need a coordinated communication effort with their technical team and executives to assure them we are addressing their needs.

I'll ask Jen to loop you in the invite...I believe it is Thursday.

Thanks,
JJG

**From:** Neelam Sandhu <nsandhu@blackberry.com>
**Sent:** Monday, November 15, 2021 4:59 PM
**To:** John Giamatteo <jjg@blackberry.com>
**Subject:** FW: Cylance Product Issues

John,

This seems like a good example of where we can collaborate.

███████████████ naturally I know the full picture of them very well as they're Elites and my team and I talk to them weekly if not more often, and there are several initiatives in progress with them. I mentioned below that my team and I have the background and latest on their FERs too. I understand there was a discussion this morning on them and there'll be a meeting later this week as well in San Ramon. That's great as their FERs need movement behind them. Thanks for your support with that. Wouldn't it make sense for you and I to be having those discussions too? Value is in internal efficiencies, benefit the customer that we don't have disparate engagements with them, etc.

Ps I'm sure you are aware but it's worth highlighting that, the Cylance FERs issue goes beyond ███████████████ Others are not Elite customers, such as ██████████████████████ (I heard ██████████████ have said they are leaving us though but I'm not certain that's definitive). It may make sense to look at this issue holistically.

Let me know what you think or if I misunderstood anything?

Thanks,
Neelam

**From:** Neelam Sandhu <nsandhu@blackberry.com>
**Sent:** Saturday, November 13, 2021 5:02 PM
**To:** John Giamatteo <jjg@blackberry.com>; John Chen <john.chen@blackberry.com>; Tony Lee <antlee@blackberry.com>; Alex Willis <awillis@blackberry.com>; Billy Ho <bho@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>; Karl Liebman <kliebman@blackberry.com>
**Cc:** Sasha Herakovic <sherakovic@blackberry.com>
**Subject:** Re: Cylance Product Issues

Great. Thank you.

I do engage with their CISO's (and some of their team members). And my team + support + guard + sales engineering, etc. engage with many people at ██████████████ There's a good understanding of what they need/is their highest priority.

We can provide a prioritized list. We went through that exercise with ██████████ for example a year+ ago and meet with them on it fairly regularly.
Alex has this but we can refresh it with the customers and the teams.

CONFIDENTIAL

Neelam

Sent using BlackBerry UEM - the most secure and highest productivity mobility software

**From:** jjg@blackberry.com
**Sent:** November 13, 2021 4:46 PM
**To:** john.chen@blackberry.com; antlee@blackberry.com; awillis@blackberry.com; bho@blackberry.com; aenterkin@blackberry.com; nsandhu@blackberry.com; kliebman@blackberry.com
**Cc:** sherakovic@blackberry.com
**Subject:** RE: Cylance Product Issues

Thanks, JC...I will run with this with specific emphasis on ████████████

We need to put a motion cross functional tiger teams and engage with the tech staff on prioritizing issues and functionality they are clamoring for, while Neelam and team provide air cover with the exec team. We will discuss more actions/alignment while we are all together on our staff call Monday morning.

Best regards,
JJG

---

**From:** John Chen <john.chen@blackberry.com>
**Sent:** Saturday, November 13, 2021 1:49 PM
**To:** Tony Lee <antlee@blackberry.com>; Alex Willis <awillis@blackberry.com>; Billy Ho <bho@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>; John Giamatteo <jjg@blackberry.com>; Neelam Sandhu <nsandhu@blackberry.com>; Karl Liebman <kliebman@blackberry.com>
**Cc:** Sasha Herakovic <sherakovic@blackberry.com>
**Subject:** Re: Cylance Product Issues

Team

We have so many people involve here
I will speak with JG to discuss the leadership and smaller team to tackle the two accounts as well as the bigger process

John G
Please give me a call, I will bum you the number

John

Sent from my BlackBerry - the most secure mobile device
**From:** antlee@blackberry.com
**Sent:** November 13, 2021 2:39 AM
**To:** john.chen@blackberry.com; awillis@blackberry.com; bho@blackberry.com; aenterkin@blackberry.com; jjg@blackberry.com; nsandhu@blackberry.com; kliebman@blackberry.com
**Cc:** sherakovic@blackberry.com
**Subject:** Re: Cylance Product Issues

Good day John,

If by algorithms, you mean FER intake process and prioritization then yes. We don't need to invent a feature request (FER) inbound process – we just need to copy the people that got it right.

Perfect example from Microsoft that allows submission, upvote, tracking, and more:
https://ideas.powerbi.com/ideas/

We currently perform this tracking using humans and disparate systems which does not paint an accurate picture of weighting and value of requests.

Hope that helps,
Tony

Tony Lee
Vice President, Global Services Technical Operations; Spark Division
Mobile: +1 (540) 558-8987
BlackBerry® Intelligent Security. Everywhere.

**From:** john.chen@blackberry.com
**Sent:** November 13, 2021 12:08 AM
**To:** awillis@blackberry.com; antlee@blackberry.com; bho@blackberry.com; aenterkin@blackberry.com; jjg@blackberry.com; nsandhu@blackberry.com; kliebman@blackberry.com
**Cc:** sherakovic@blackberry.com; antlee@blackberry.com
**Subject:** RE: Cylance Product Issues

Thanks Alex

Anyone has ideas to improve the algorithms ?? I will be happy to review

As a reminder to all, we set the FERs quota so we don't chase everything and end up doing none with poor quality and slip everyone
Some FERs are complex and some are relatively simple ; Alex will apply his knowledge on that as he outlines with sales consideration

John

---

**From:** Alex Willis <awillis@blackberry.com>
**Sent:** Friday, November 12, 2021 4:01 PM
**To:** John Chen <john.chen@blackberry.com>; Tony Lee <antlee@blackberry.com>; Billy Ho <bho@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>; John Giamatteo <jjg@blackberry.com>; Neelam Sandhu <nsandhu@blackberry.com>; Karl Liebman <kliebman@blackberry.com>
**Cc:** Sasha Herakovic <sherakovic@blackberry.com>
**Subject:** RE: Cylance Product Issues

Yes, I'm familiar. ███████████ make up a great deal of our SPL (attached: reviewed, responded to by PM) each round as they started with about 43 FERs all by themselves. Some have been delivered over the years and we focus on the highest priority remaining (about 8)

I help facilitate the SPL (top 10 UEM and top 25 UES) requests pulled from
- FERs that are blocking deals, weighted towards the number of customers asking for a particular request, deal value, etc
- Strategic customer requests – not necessarily a deal in play today but needed for future renewals, expansion
- Market demand – whether a customer demands or not, we know these are required or going to be required. An example is UES support for windows firewall configuration. We see this on many RFP's. We put this in the top 10 UES priority list and it's marked as "Future backlog" by PM

Very difficult to land on the perfect 10/25 items given we have so many requests to prioritize. The current SPL, submitted in October actually had:

UEM = 43 items. Of which, 1 is committed, 1 other is on the roadmap but not committed

UES = 57 items. Of which 0 are committed, 6 are on the roadmap but not committed.

What doesn't get delivered in this next version must be re-evaluated for submission on the next SPL (after next major release). Some go away as we lost the deal, others remain.

Also note, the SPL is a snapshot in time, submitted soon after a major release. We constantly receive (and try to work around) requests throughout the quarter via various sources. Anyone can enter an FER so I tend to focus on ones in the categories I listed up top

Alex

---

**From:** John Chen <john.chen@blackberry.com>
**Sent:** Friday, November 12, 2021 5:35 PM
**To:** Tony Lee <antlee@blackberry.com>; Billy Ho <bho@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>; John Giamatteo <jjg@blackberry.com>; Neelam Sandhu <nsandhu@blackberry.com>; Karl Liebman <kliebman@blackberry.com>; Alex Willis <awillis@blackberry.com>
**Cc:** Sasha Herakovic <sherakovic@blackberry.com>
**Subject:** RE: Cylance Product Issues

Alex
Are you familiar with this ? since you picked the top 20 FERS , I assume you are aware;
Any lights you are shed will be great

John

---

**From:** Tony Lee <antlee@blackberry.com>
**Sent:** Friday, November 12, 2021 1:09 PM
**To:** John Chen <john.chen@blackberry.com>; Billy Ho <bho@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>; John Giamatteo <jjg@blackberry.com>; Neelam Sandhu <nsandhu@blackberry.com>; Karl Liebman <kliebman@blackberry.com>
**Cc:** Sasha Herakovic <sherakovic@blackberry.com>
**Subject:** RE: Cylance Product Issues

Good afternoon John,

Per your request, please see the high-level customer views below for ▇▇▇▇▇▇▇▇ gathered from the field. We are doing our best to hold the accounts together via professional services and support, however I do not believe this will be enough – these customers are beyond the kind words of "strategy and partnership" and they want to see results. We all wish we could say these are issues of the past and we can move beyond them, however the continued instability (console, optics, syslog, SSL cert, etc.) combined with the product release issues (1580, 1584, Optics 3.0) are keeping wounds fresh for these customers (at least 2 new stability issues this week alone).

I understand the FER word below is not popular in the customer view below, however ▇▇▇ n particular told us they do not want anymore "vision presentations" – they do want to see a locked in product roadmap with hard dates that cover some of the features they requested. These customers are angry and it shows in their email correspondence while they hold very little back. Hugh (on Neelam's team) has an excellent strategy to help steer the conversation away from specific FERs and more toward larger epics, but it is still too early to tell how effective it will be. You will notice a common theme below and honestly we can swap nearly any medium to large UES customer name in and it still applies. In fact, we just lost the ▇▇▇▇▇▇▇▇ renewal and their reason for leaving was similar to ▇▇▇▇▇▇▇▇
▇▇▇▇▇

| | |
|---|---|
| • *Failure to deliver on many of the FER's they requested*<br>• *Missed/inconsistent release cycles*<br>• *New OS support -- Late support for new Mac OS in particular.*<br>• *Kernel support very slow. Cannot install Protect as kernel not yet supported*<br>• *Supportability of older protect versions*<br>• *Old malware misses – Excel Macro – Need to execute on long-term fix*<br>• *How are we improving the product? The quality?*<br>• *1580 concerns -- Felt 1540 was the last stable release of Protect*<br>• *NOC stability*<br>• *Optics performance issues*<br>• *RCA's for issues*<br>• *Service availability notifications* | • *Failure to deliver on many of the FER's they requested or delayed (see below)*<br>• *Missed/inconsistent release cycles*<br>• *How are we improving the product? The quality?*<br>• *New releases lack requested new features*<br>• *Console issues when we have mode changes e.g. memdef2/sc2*<br>• *Old malware misses – Excel Macro*<br>• *1580 concerns*<br>• *API and audit log limitations* |

From the customer's perspective (as for SE), please see the attached PowerPoint document. We looked up the present day status of the FERS they submitted and color coded them. Most, almost all, are *closed and marked as "Future Consideration"* (red) – with the exception of one in progress (yellow) and two that indicate that they are delivered (green). When any customer—especially our elite 30—sees that 92% of their feature requests (many of which they consider table stakes) are not delivered over the years then they lose hope and a renewal is unlikely. Hugh will only be so successful in changing the narrative – results will need to follow. I know we are all dedicated to our customer's success so I am glad we were able to have this discussion. Our customers are very vocal in their concerns, now we need to gather, prioritize, and execute.

- **In Progress = 1**
- **Delivered = 2**
- **Closed = 21**



Hope that helps.

Thanks,
Tony

**Tony Lee**

CONFIDENTIAL

Vice President, Global Services Technical Operations
BlackBerry Security Services
Mobile: +1 (540) 558-8987
**BlackBerry**. Intelligent Security. Everywhere.

---

**From:** John Chen <john.chen@blackberry.com>
**Sent:** Thursday, November 11, 2021 8:56 AM
**To:** Tony Lee <antlee@blackberry.com>; Billy Ho <bho@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>; John Giamatteo <jjg@blackberry.com>; Neelam Sandhu <nsandhu@blackberry.com>; Karl Liebman <kliebman@blackberry.com>
**Cc:** Sasha Herakovic <sherakovic@blackberry.com>
**Subject:** Re: Cylance Product Issues

Tony
Do you have a high level customer views of the recent product releases and the Marco misses etc

I like to take a look

John


Sent from my BlackBerry - the most secure mobile device
**From:** antlee@blackberry.com
**Sent:** November 11, 2021 5:44 AM
**To:** bho@blackberry.com; aenterkin@blackberry.com; jjg@blackberry.com; john.chen@blackberry.com; nsandhu@blackberry.com; kliebman@blackberry.com
**Cc:** sherakovic@blackberry.com
**Subject:** Re: Cylance Product Issues

Sounds great Billy. ████████████████ are also quite unhappy with recent product releases, macro misses, and missing features -- we could use some support there as well.

Thanks for the assistance,
Tony

Tony Lee
Vice President, Global Services Technical Operations; Spark Division
Mobile: +1 (540) 558-8987
BlackBerry® Intelligent Security. Everywhere.

**From:** bho@blackberry.com
**Sent:** November 11, 2021 1:37 PM
**To:** aenterkin@blackberry.com; jjg@blackberry.com; john.chen@blackberry.com; nsandhu@blackberry.com; kliebman@blackberry.com
**Cc:** sherakovic@blackberry.com; antlee@blackberry.com
**Subject:** RE: Cylance Product Issues

Yes. We had several ██████ alls with product SME in the past. We will continue to do it. Let's have a prep call and determine the topics and who from engineering. I can be available.

In fact, I have repeatedly suggested to resume/start the technical sessions with customers. They see what we're doing and making progress to support them.

Regards,

Billy

Sent with BlackBerry Work
([www.blackberry.com](www.blackberry.com))

---

**From:** Adam Enterkin <[aenterkin@blackberry.com](aenterkin@blackberry.com)>
**Date:** Thursday, Nov 11, 2021, 5:24 AM
**To:** Billy Ho <[bho@blackberry.com](bho@blackberry.com)>, John Giamatteo <[jjg@blackberry.com](jjg@blackberry.com)>, John Chen <[john.chen@blackberry.com](john.chen@blackberry.com)>, Neelam Sandhu <[nsandhu@blackberry.com](nsandhu@blackberry.com)>, Karl Liebman <[kliebman@blackberry.com](kliebman@blackberry.com)>
**Cc:** Sasha Herakovic <[sherakovic@blackberry.com](sherakovic@blackberry.com)>, Tony Lee <[antlee@blackberry.com](antlee@blackberry.com)>
**Subject:** RE: Cylance Product Issues

Thank you Billy.
Is there anyone that is a domain expert for Cyber on your team that you recommend we put in front of the customer?
If not, that's okay, we can cover from sales but it sometimes is effective for a customer to hear directly from someone who owns the Product, especially when they are as big as ██████ (350k+ end points)

Best regards,
Adam
+44 7557 244 581

Sent with BlackBerry Work

---

**From:** Billy Ho <[bho@blackberry.com](bho@blackberry.com)>
**Date:** Thursday, 11 Nov 2021, 12:57 pm
**To:** Adam Enterkin <[aenterkin@blackberry.com](aenterkin@blackberry.com)>, John Giamatteo <[jjg@blackberry.com](jjg@blackberry.com)>, John Chen <[john.chen@blackberry.com](john.chen@blackberry.com)>, Neelam Sandhu <[nsandhu@blackberry.com](nsandhu@blackberry.com)>, Karl Liebman <[kliebman@blackberry.com](kliebman@blackberry.com)>
**Cc:** Sasha Herakovic <[sherakovic@blackberry.com](sherakovic@blackberry.com)>, Tony Lee <[antlee@blackberry.com](antlee@blackberry.com)>
**Subject:** RE: Cylance Product Issues

Let me send a separate email on ████████

You should have the update before Wednesday.

Regards,
Billy

Sent with BlackBerry Work
([www.blackberry.com](www.blackberry.com))

---

**From:** Adam Enterkin <[aenterkin@blackberry.com](aenterkin@blackberry.com)>
**Date:** Thursday, Nov 11, 2021, 2:28 AM
**To:** John Giamatteo <[jjg@blackberry.com](jjg@blackberry.com)>, John Chen <[john.chen@blackberry.com](john.chen@blackberry.com)>, Neelam Sandhu <[nsandhu@blackberry.com](nsandhu@blackberry.com)>, Billy Ho <[bho@blackberry.com](bho@blackberry.com)>, Karl Liebman <[kliebman@blackberry.com](kliebman@blackberry.com)>
**Cc:** Sasha Herakovic <[sherakovic@blackberry.com](sherakovic@blackberry.com)>, Tony Lee <[antlee@blackberry.com](antlee@blackberry.com)>
**Subject:** RE: Cylance Product Issues

Thanks John G.
Agreed, one team and we are all in this together!

CONFIDENTIAL

We have major challenges with the perception of the product, although I think it is largely due to two factors, tactical problems in our current product and lack of major advancement in our roadmap compared with CS and S1. Much of it is unfair but when every analyst is saying we are in the back of the pack, and then they experience small tactical problems, CISOs have a very difficult time defending why they chose to go with us to their managers. We hear this daily.

We need to come out swinging. We need a solid roadmap that shows how we are going to fix where are in the market and these dec issues.

Billy, I am meeting with the Global CTO of ██████ n person next Wednesday about this very topic in hopes of saving them as a customer. They are concerned about the following:
- How are we improving the product? The quality?
- Failure to deliver on many of the FER's they requested ████ believed they would have more influence on prod dev)
- Missed/inconsistent release cycles
- New releases lack requested new features
- OS support. Late support in past for new Mac OS.
- Old malware misses
- Gartner Magic Quadrant results. Seems there is agreement in the industry that BB is not suitable for Enterprise requirements.
- 1580 concerns
- Memory bypasses
- Agents not connecting back to the console - How do we audit for this?

I would be delighted to have someone from your team who is an expert in Cyber and can help make them more comfortable with the above. Is there anyone you would volunteer to join who can address the above?

Again, we need solid answers to how we will fix and a roadmap that explains what we are doing that is compelling to them.

Best regards,
Adam
+44 7557 244 581


Sent with BlackBerry Work

---

**From:** John Giamatteo <jjg@blackberry.com>
**Date:** Thursday, 11 Nov 2021, 2:50 am
**To:** John Chen <john.chen@blackberry.com>, Neelam Sandhu <nsandhu@blackberry.com>, Billy Ho <bho@blackberry.com>, Karl Liebman <kliebman@blackberry.com>
**Cc:** Sasha Herakovic <sherakovic@blackberry.com>, Tony Lee <antlee@blackberry.com>, Adam Enterkin <aenterkin@blackberry.com>
**Subject:** RE: Cylance Product Issues

Absolutely, John...we need to look at these items individually, determine root cause and remediate asap.

Billy is on point from a product standpoint, Karl, Sasha and Tony on point for customer engagement/communications and Neelam/Adam on point from a customer relations perspective.

We need a ONE team approach and focus on what is urgent and in front of us now vs. dwelling too much on the past.

More to come on this.

Best regards,
JJG

---

**From:** John Chen <john.chen@blackberry.com>
**Sent:** Wednesday, November 10, 2021 3:18 PM
**To:** Neelam Sandhu <nsandhu@blackberry.com>; Billy Ho <bho@blackberry.com>; John Giamatteo <jjg@blackberry.com>; Karl Liebman <kliebman@blackberry.com>
**Cc:** Sasha Herakovic <sherakovic@blackberry.com>; Tony Lee <antlee@blackberry.com>
**Subject:** RE: Cylance Product Issues

Hope you all could find a way to work together better. I know all of you want to do well for the company

John G , you can probably help here

John

Sent with BlackBerry Work (www.blackberry.com)

---

**From:** Neelam Sandhu <nsandhu@blackberry.com>
**Sent:** Nov 10, 2021 3:14 PM
**To:** Billy Ho <bho@blackberry.com>; John Chen <john.chen@blackberry.com>; John Giamatteo <jjg@blackberry.com>; Karl Liebman <kliebman@blackberry.com>
**Cc:** Sasha Herakovic <sherakovic@blackberry.com>; Tony Lee <antlee@blackberry.com>
**Subject:** RE: Cylance Product Issues

Billy,

Thank you. There have been and continue to be many internal discussions on these items (and more), e.g. the UES account reviews, the supportability council meetings, the weekly customer confidence emails, the dialogues in real-time as the issues are occurring, etc.

This is not about blame. The key here is how we retain our customers as the volume of issues is problematic and seemingly increasing. Just a couple of hours ago we received an email from ███ for example, saying "We are not receiving the alerts in Cylance from past 3+ hours."

We can call them BlackBerry issues, rather than distinguish between product issues and architecture issues or other nomenclature, and as we are all in this together and have the same objective of customer retention and revenue growth.

Neelam

BB13-00011188

**From:** Billy Ho <bho@blackberry.com>
**Sent:** Wednesday, November 10, 2021 1:39 PM
**To:** Neelam Sandhu <nsandhu@blackberry.com>; John Chen <john.chen@blackberry.com>; John Giamatteo <jjg@blackberry.com>; Karl Liebman <kliebman@blackberry.com>
**Cc:** Sasha Herakovic <sherakovic@blackberry.com>; Tony Lee <antlee@blackberry.com>
**Subject:** Re: Cylance Product Issues

Neelam,
Before you jumped into conclusion "numerous issues related to the Cylance products" and sent this big email to everyone. You should get more details before criticize all these are product issues. You didn't bring these issues to me before. Otherwise, I'm more than happy to help you to understand.

Let me cut and paste what you said earlier and sent back to you – "it is impacting us as BlackBerry so we don't have the luxury of playing the blame game. We need to focus on working together to retain these customers and grow the business."

Please see my comment below. Please come by and we can sit down to discuss this.

Regards
Billy

---

**From:** Neelam Sandhu <nsandhu@blackberry.com>
**Date:** Wednesday, November 10, 2021 at 8:11 AM
**To:** John Chen <john.chen@blackberry.com>, John Giamatteo <jjg@blackberry.com>, Billy Ho <bho@blackberry.com>, Karl Liebman <kliebman@blackberry.com>
**Cc:** Sasha Herakovic <sherakovic@blackberry.com>, Tony Lee <antlee@blackberry.com>
**Subject:** Cylance Product Issues

Dear All,

In the past month alone we have had numerous issues related to the Cylance products. I am summarizing just some of them here to give everyone a sense of how regularly our Cylance customers are experiencing notable product problems. The frequency appears to be increasing and customers are saying they have had enough.

Additionally, Reddit users are aware of the issues and have been posting about them on Reddit. (Mark Wilson is handling the Reddit piece per attached, in conjunction with relevant technical experts.)

**November 9th**
- UES EU console went down. Multiple customers impacted. Root cause not yet confirmed.
- For example, ███████████ 180,000 endpoints disappeared from their console today. Endpoints are reappearing but they have lost their configurations/zoning/policies/etc. and so will need to be re-mapped. Additionally, some endpoints may require a manual effort to re-add/re-register as they are not auto reappearing/reregistering. (We have a fix plan for ███████████)

BHO>> So far, there is NO evidence it is product issue
BHO>> this instance happened on Tuesday 2am our time in the middle of the night. within the first 24 hours, CSO and Engineering are pull in to help customers to recover. I hope that customer appreciate the support.
BHO>> we just got the audit log this morning. From the audio log, it indicated someone is deleting 160,000 end-points.

**November 9th (Also note the 1580 update at the bottom of this email. It is relevant as it is one of the versions customers are being advised to upgrade to)**

- Customers informed by BlackBerry that Protect 1574 has a security vulnerability and they must upgrade to 1578 or later.
- However, older endpoints that are in use by customers (expensive, long life, endpoints that are hard to replace and are used by several of our customers) are not supported by Protect versions later than 1564.
- BlackBerry Engineering were asked if a hotfix version could be created for 1564 and the response currently is no. This will mean any customer that has a legacy OS machine ████████████████████ will have to either continue to use an affected version of BlackBerry Protect or decide to use another vendors solution. Furthermore, this means we have not given customers lead time/a notice period on this before the security vulnerability communication went out on November 9.
- Example affected customer:████████currently have 10K endpoints, with a lot of SCADA systems which are managed by old Windows platforms. Testing of 1564 was successfully completed a few months ago to validate the impact of BlackBerry Protect on their devices to ensure that, the robots could still continue to build cars when Protect is running.████████need to be able to use 1564 for 3-5 more years at least.

BHO>> 3 security vulnerabilities were report from external researcher to BBSIRT. Working closely with BBSIRT to provide the hotfix in 1578 before the vulnerability disclosure by the external researcher.

BHO>> Who said we didn't create hotfix for 1564? I replied to Adam Enterkin that we are looking into it. NS: This came from Engineering and Support.

BHO>> In fact, we should work as the trusted advisors, we should advise them to upgrade legacy Window platforms. They are NOT supported by Microsoft and have lot of vulnerabilities at the OS level.


**October 28th**

- Another customer impacted by macro virus. BlackBerry had decided not to build this functionality into Protect as we thought macro viruses are old virus types. It exists in OEM Engine/CylanceV and needs to be added to Protect.
- BlackBerry Engineering "looking to address this in upcoming releases, but that would be in Q1 2022 or later".
- Customers recently affected by old macro viruses:████████████████████████████
████████████████

BHO>> This is why I repeatedly suggested to you that we can't talk to our customers at FER level (i.e. yes or no, what time). We need to engage them at engineering technical workshop level. We should walk through we're doing instead of just saying yes/no and what time. NS: We don't say yes/no.

BHO>> Protect is single-ML-model agent (on execution files). need to move Protect to a multi-ML- model agent (support both execution file and document file). Work in progress.

BHO>> the CylanceV doesn't support Excel. We need to look into AMSI to support Excel

BHO>> then UI changes to Venue console.


**October 25th**

- UES Console - Optics portion has no data and displays errors on multiple pages, such as Error 502.
- Many affected customers including Deloitte.

BHO>> It is NOT product issue.

BHO>> it is infrastructure related


**October 20th**

- Cylance console unable to be accessed by customers as BlackBerry accidentally let a Cylance infrastructure certificate expire.
- Customers saw the 'certificate expired' message in the console and said 'BlackBerry can't even get this right'. Screenshots made it on to Reddit https://www.reddit.com/r/Cylance/comments/qbzzrf/security_100/.

BHO>> Again, it is NOT product issue.

BHO>> it is infrastructure issue.


**October 14th**

- Customers after upgrading to Protect 1584 see IIS services crashing on endpoints.
- CSO had recommended the IIS crash issue gate the release, but it was declined by PM/Engineering leadership due to other fixes needing to be released.

- MSSPs (Cyberforce and Skout) report their customers' IIS crashes triggered a large number of helpdesk tickets. One Cyberforce customer claims they lost $700K as a result.

BHO>> Sorry you are wrong. IIS crash is NOT reported before we release.

BHO>> Btw, CSO is part of the go-no-go decision. NS: This came directly from CSO.

**October 13th for several days**

- Optics syslog outage. This lasted a few days. Services impacted were e.g. Optics UI not populating – Optics Syslog, InstaQuery not loading the Zones.
- Root cause was unoptimized code caused resource starvation. Resolution was to deploy additional hardware and optimize code to relieve starvation.
- Impacted customers. Also meant Guard team lost visibility causing two incident response (IR) engagements to stall for several weeks for ███████████████████

BHO>> yes. this one is a product defect when we release Optics-3.0 that timing issue with one of the async operation.

**September 23rd and 30th**

- Multi-hour Cylance infrastructure incidents where customers are unable to see Cylance products to download from the deployment page in Venue for the EMEA region.

BHO>> Yes. this one is a product defect with Venue cloud 1.51.

**August 18th**

- 1580 released in US and customers experiencing high volume of exploit block issues.
- Before 1580, Macros showed up in Script Control as a module that could be easily disabled or tuned with wildcard exclusions. With 1580, they show up under memory protection as "Dangerous VBA Macro (Windows Only)" and this feature CANNOT be disabled. The only way to tune these is to completely exclude a given process (like excel.exe or msaccess.exe) which leads to much worse security posture as it effectively turns off Memory Protection monitoring for MS Office Products.
- BlackBerry Engineering said: "The underlying implementation was changed significantly without thinking through all the consequences throughout the product. They acknowledged the miss due to the lack of clearly defined end-to-end requirements. A formal post-mortem may not be completed due to many of the key players no longer being at BlackBerry."

BHO>> it is more than a product defect issue. It is a Cylance methodology issue (from great ideas, reverse-engineering, to beta/EA process).

There have been other issues in this timeframe but the above list gives a flavor.

Neelam Sandhu
SVP & Chief Elite Customer Success Officer
Office: +1 (925) 242 5636
Mobile: +1 (201) 912 5267
BBMe PIN: EF089DE9
Email: nsandhu@blackberry.com

BB13-00011191

# EXHIBIT 11

| | |
|---|---|
| **From:** | John Chen[/O=RESEARCH IN MOTION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JOHN S. CHEN629] |
| **Sent:** | Wed 3/30/2022 4:48:56 PM (UTC-07:00) |
| **To:** | Adam Enterkin[aenterkin@blackberry.com] |
| **Cc:** | John Giamatteo[jjg@blackberry.com] |
| **Subject:** | Private and confidential : Fw: Internal: ██████████ Meeting Briefing Summary & Bridge Fix Strategy |

Your comment on why and what happen?

Sent via [BlackBerry Hub+ Inbox for Android](BlackBerry Hub+ Inbox for Android)

**From:** nsandhu@blackberry.com
**Sent:** March 30, 2022 4:45 PM
**To:** john.chen@blackberry.com
**Subject:** FW: Internal: ████████ Meeting Briefing Summary & Bridge Fix Strategy

Mark on my team has been talking to ████████, as you know and as mentioned in thread below. Earlier Mark added me to the email thread below. Subsequently Cyber leaders replied but without me on thread.
Then Adam instructs Mark on my team to schedule a call with him, JG and Billy. Without me on thread again, without asking me, and even though Adam is aware that we are already working on this and have been for a couple of weeks.
Then Mark calls me and says "why do they always deliberately exclude you?"
This is okay?
How should I respond to my team?
As I said the other day, I don't tell you half the stuff they do as my focus is on doing the right thing for the company and on collaboration. But their behavior is unacceptable and the consequences for some reason have become mine, while their behavior goes unaddressed. So they are effectively given tacit approval to treat me this way.
So, what I see is "do the right thing for the company and work hard = get punished". This is the wrong cultural precedent to set.
Neelam

**From:** Adam Enterkin <[aenterkin@blackberry.com](aenterkin@blackberry.com)>
**Sent:** March 30, 2022 4:18 PM
**To:** Steven Fontana <[sfontana@blackberry.com](sfontana@blackberry.com)>
**Cc:** Kevin Carley <[kcarley@blackberry.com](kcarley@blackberry.com)>; Mark Mosiadz <[mmosiadz@blackberry.com](mmosiadz@blackberry.com)>; Sasha Herakovic <[sherakovic@blackberry.com](sherakovic@blackberry.com)>; John Giamatteo <[jjg@blackberry.com](jjg@blackberry.com)>; Billy Ho <[bho@blackberry.com](bho@blackberry.com)>; Todd Berger <[tberger@blackberry.com](tberger@blackberry.com)>; Alex Willis <[awillis@blackberry.com](awillis@blackberry.com)>; Sean Fischer <[sefischer@blackberry.com](sefischer@blackberry.com)>
**Subject:** RE: Internal: ██████████ Meeting Briefing Summary & Bridge Fix Strategy
Mark,
Thank you for summarising this and putting the document together for justification.
Steve,
Please schedule a call today or tomorrow to discuss next steps. Include on the call Billy, me and anyone else you think would be helpful and include John G. I know John is travelling so add him as optional. We need to get back to ███ this week with concrete feedback as to what we are doing.

Adam
Sent with BlackBerry Work
([www.blackberry.com](www.blackberry.com))
**From:** Steven Fontana <[sfontana@blackberry.com](mailto:sfontana@blackberry.com)>
**Date:** Wednesday, 30 Mar 2022, 1:19 pm
**To:** Adam Enterkin <[aenterkin@blackberry.com](mailto:aenterkin@blackberry.com)>
**Cc:** Kevin Carley <[kcarley@blackberry.com](mailto:kcarley@blackberry.com)>, Mark Mosiadz <[mmosiadz@blackberry.com](mailto:mmosiadz@blackberry.com)>, Sasha
Herakovic <[sherakovic@blackberry.com](mailto:sherakovic@blackberry.com)>, John Giamatteo <[jjg@blackberry.com](mailto:jjg@blackberry.com)>, Billy Ho
<[bho@blackberry.com](mailto:bho@blackberry.com)>, Todd Berger <[tberger@blackberry.com](mailto:tberger@blackberry.com)>, Alex Willis <[awillis@blackberry.com](mailto:awillis@blackberry.com)>,
Sean Fischer <[sefischer@blackberry.com](mailto:sefischer@blackberry.com)>
**Subject:** RE: Internal: ███████ Meeting Briefing Summary & Bridge Fix Strategy
Good morning Adam, (please note I changed the Subject to better reflect on-going efforts)
Attached is my note to Mark Mosiadz on top of Ben's thorough summary of ███ current and growth
use cases for ███ . I'm confident that this will deliver to your request for "exactly what is needed (is
it FERs or Bug Fixes) to get past this deployment blocker". Let's have a follow-up discussion to plan
next steps and responsibilities.
Thanks for the description below of your meeting with Bill and Ben. As I described previously,
"problems are opportunities" and we have an opportunity with resolving these ███ issues to
catapult into the area we want to focus on next i.e. Cybersecurity and Gateway. I'm interested to
know their mannerisms and countenance during the meeting which are often telltale.
Mark Mosiadz, Andy Martin (TAM), and I attended the Zoom meeting with Ben and his team
yesterday. ███ mostly led the conversation which was polite, even-keeled, but also direct. ███
reiterated what you described below in equally candid terms, "███ would not approve another dollar
spent with BlackBerry until these problems are fixed".
Mark is putting together a justification document for these fixes and providing to Neelam who will
discuss with Billy Ho and John Chen.
Best regards,
Steven Fontana, Client Executive - Cybersecurity Specialist
631-804-8885, [sfontana@blackberry.com](mailto:sfontana@blackberry.com)
[BlackBerry Cylance Endpoint Security vs. The Competition](#)
**::: BlackBerry. | CYLANCE.**
**From:** Adam Enterkin <[aenterkin@blackberry.com](mailto:aenterkin@blackberry.com)>
**Sent:** Wednesday, March 30, 2022 5:49 AM
**To:** Steven Fontana <[sfontana@blackberry.com](mailto:sfontana@blackberry.com)>
**Cc:** Kevin Carley <[kcarley@blackberry.com](mailto:kcarley@blackberry.com)>; Sasha Herakovic <[sherakovic@blackberry.com](mailto:sherakovic@blackberry.com)>; John
Giamatteo <[jjg@blackberry.com](mailto:jjg@blackberry.com)>; Billy Ho <[bho@blackberry.com](mailto:bho@blackberry.com)>; Todd Berger
<[tberger@blackberry.com](mailto:tberger@blackberry.com)>; Alex Willis <[awillis@blackberry.com](mailto:awillis@blackberry.com)>
**Subject:** RE: Internal: ███████ Document, New OrgChart & Updated notes
Update on ███████ !
Steve,
Thank you for your briefing on ███ Excellent and accurate notes.
█████████ both were open to learn more about Gateway as a solution to continue a long
term relationship with BB and they also were open to making intros into their cyber team to review
how we could provide added protection as well as potentially help consolidate some cyber tools.
They seemed genuinely open to help advance our discussions in the bank.
This came with a very strongly worded caveat - they will not do anything with new product unless we
fix their issues with Bridge that is preventing them from deploying it.

Apparently the top executive of one of their divisions needs to move off adobe and either requires Bridge to access 365 or will need to find another solution and abandon BB.

Steve,

We need an SE to summarise exactly what is needed (is it FERs or Bug Fixes) to get past this deployment blocker. Can you send this summary today and cc all on this thread?

Thanks

Sent with BlackBerry Work

([www.blackberry.com](http://www.blackberry.com))

**From:** Steven Fontana <[sfontana@blackberry.com](mailto:sfontana@blackberry.com)>
**Date:** Tuesday, 29 Mar 2022, 1:14 pm
**To:** Adam Enterkin <[aenterkin@blackberry.com](mailto:aenterkin@blackberry.com)>
**Cc:** Kevin Carley <[kcarley@blackberry.com](mailto:kcarley@blackberry.com)>
**Subject:** FW: Internal: ██████ Document, New OrgChart & Updated notes

Good morning Adam,

Did you have your meeting with ██████ yet? How did it go? We're my additional insight notes useful?

Steven, 631-804-8885

Sent with BlackBerry Work

([www.blackberry.com](http://www.blackberry.com))

**From:** Steven Fontana <[sfontana@blackberry.com](mailto:sfontana@blackberry.com)>
**Date:** Monday, Mar 28, 2022, 7:21 PM
**To:** Adam Enterkin <[aenterkin@blackberry.com](mailto:aenterkin@blackberry.com)>
**Cc:** Jenifer Vannoni <[jvannoni@blackberry.com](mailto:jvannoni@blackberry.com)>, Kevin Carley <[kcarley@blackberry.com](mailto:kcarley@blackberry.com)>
**Subject:** FW: Internal: ██████ Document, New OrgChart & Updated notes

Hi Adam (please forward to John G as appropriate)

In preparation for your meeting tomorrow with ██████, here are some updates to the information I sent previously, and questions that you had during our Friday discussion (also note to use this OrgChart and disregard the other which mistakenly was a ppt deck)

1. ██████ End Point Security Vendors: Currently ████████████████████

2. MTD Vendor: I wasn't able to get any insights into what ██ is using currently.

3. Adam, this is the request from ██ during our "early renewal" discussions:

   ○ mobile token only option from May 2023: I asked you to explore the possibility to have the option of not contracting the whole suite, but the mobile token only, I do not see that included

   • BlackBerry (My) Response to ██████████: Regarding the request for "Mobile Token", I responded that "BlackBerry doesn't have this separately available currently, and wouldn't in the next three months, however we offered to work with their business and technical team to initiate a discussion.

**Red Flags – other:**

   A. ██████████ team or executives still haven't received a formal client advisory statement from BlackBerry Corporate: When I spoke with Nick on Friday, he advised that the ██████████ was still disturbed that they haven't received an official BlackBerry corporate

stance on what was done in Russia, and what the anticipated thinking forward was going to be. He advised that the only thing they saw was our message to him, and whatever public statements were made, but nothing to ████ directly, with an official statement.

• ████████ boss. I'm sure that this will come up in your meeting w/ ████████ who is ████ boss.

B.  Tuesday 3/29 Meeting in US: ████████ has scheduled a meeting tomorrow @ 1:05pm est. Basis for meeting scheduling:

• 3/23 Email from Nick to Mark Mosiadz on behalf of ████████ : As I know you are aware, we are having significant issues deploying BlackBerry Bridge and have a number of support cases opened. At this time we are seeing issues with:

1.  Inconsistent failure to send documents with various error messages
2.  Documents from Work to Teams arriving corrupted and unable to be opened
3.  Inconsistent and confusing UI behaviour
4.  Documented indication that there is no current plan for a version of Bridge supporting Android

We're getting more and more concerned as we encounter more errors and issues. This is intended to be our primary route for managing document
    editing for attachments in BlackBerry Work and right now it can only be classed as non-functional.
    ==Can we please set up a meeting with the Bridge product team?== Support are doing what they can but I need to understand the direction for Bridge and
    the plans around ensuring we get the correct level of support. I'd like to understand whether other organisations are using Bridge and whether
    they're seeing the same level of issues supporting it as we are. Many thanks, ████████
    C.  Immediate Opportunity being delayed: We anticipated a $137K Elite services upgrade to be signed, but it was scheduled for – as coincidence would have it – the day after the Russian decision impacted ████ licenses. Latest update is that the services is 1) Needed, 2) Justifiable however, ████████ will need to approve. ████ proponents are waiting for Russian issues to be resolved before approaching ████

        a.  $150K services would be next – working through some requirements, and the Russia issues.


Best regards,
Steven Fontana, Client Executive - Cybersecurity Specialist
631-804-8885, sfontana@blackberry.com
BlackBerry Cylance Endpoint Security vs. The Competition
**BlackBerry** | CYLANCE.
**From:** Steven Fontana
**Sent:** Thursday, March 24, 2022 7:43 PM
**To:** Jenifer Vannoni <jvannoni@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>
**Cc:** Kevin Carley <kcarley@blackberry.com>; Sean Fischer <sefischer@blackberry.com>

**Subject:** Internal: ███████ Document

Hi Jenifer,

Attached is our ████████ document, along with a quick orgChart for JJG's meeting next week with ████████████████

Please let me know if you need any additional information.

Best regards,

Steven Fontana, Client Executive - Cybersecurity Specialist

631-804-8885, sfontana@blackberry.com

BlackBerry Cylance Endpoint Security vs. The Competition

**From:** Jenifer Vannoni <jvannoni@blackberry.com>
**Sent:** Wednesday, March 23, 2022 4:05 PM
**To:** Steven Fontana <sfontana@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>; Kevin Carley <kcarley@blackberry.com>
**Subject:** RE: Briefing Docs

Tomorrow is absolutely ok. End of day would be perfect.

**From:** Steven Fontana <sfontana@blackberry.com>
**Sent:** Wednesday, March 23, 2022 3:05 PM
**To:** Adam Enterkin <aenterkin@blackberry.com>; Kevin Carley <kcarley@blackberry.com>
**Cc:** Jenifer Vannoni <jvannoni@blackberry.com>
**Subject:** RE: Briefing Docs

Thanks. This should be easy but I want to be thorough. It looks like it will be ok if I have this to you and Jennifer tomorrow morning. Would that work for you?

Best regards,

Steven Fontana, Client Executive - Cybersecurity Specialist

631-804-8885, sfontana@blackberry.com

BlackBerry Cylance Endpoint Security vs. The Competition

**From:** Adam Enterkin <aenterkin@blackberry.com>
**Sent:** Wednesday, March 23, 2022 4:00 PM
**To:** Steven Fontana <sfontana@blackberry.com>; Kevin Carley <kcarley@blackberry.com>; Jenifer Vannoni <jvannoni@blackberry.com>
**Subject:** FW: Briefing Docs

Steve,

See attached.

Jenifer,

Steve is the rep ██████ and will provide.

Adam

Sent with BlackBerry Work
(www.blackberry.com)

**From:** Jenifer Vannoni <jvannoni@blackberry.com>
**Date:** Wednesday, 23 Mar 2022, 7:24 pm
**To:** Adam Enterkin <aenterkin@blackberry.com>
**Cc:** Catherine Marshall <cmarshall@blackberry.com>
**Subject:** Briefing Docs

Hi Adam,

Would you be able to provide me with a briefing document for the two meetings you set up on Tuesday ██████████? You can use the attached template as your guide. Please complete as much as you think is necessary. Would be great if I could have these by end of day tomorrow so I can get them to JJG before his travels.

Keiron is working on the documents for all other meetings.

Thanks so much,

Jen

Jenifer Vannoni
Executive Assistant to: John J. Giamatteo | President, Cybersecurity
Mobile: +1 (650) 722-1488
jvannoni@blackberry.com

**BlackBerry®** Intelligent Security. Everywhere.

# EXHIBIT 12



3/27/2023 11:01 AM - John Chen: disappointing

3/27/2023 11:03 AM - John Giamatteo: I just got the update from HP on our staff call this morning....I asked Sasha to pull the usage report and they are still well over ▮▮▮▮ licsenses with no noticeable declines over the weekend or today

4/3/2023 3:17 PM - John Giamatteo: FYI...Neelam seems to want to bypass approval from myself for the SSC deal

4/3/2023 3:18 PM - John Chen: yes , I am on it

4/3/2023 3:18 PM - John Chen: both CEO and CFO approved

4/3/2023 3:19 PM - John Giamatteo: Last I knew, I was the leader of the cyber business so I thought I would at least be in the loop somehow

4/3/2023 3:19 PM - John Chen: I told everyone I a, om the deal, I am trying to help

4/3/2023 3:19 PM - John Giamatteo: without my groups products, and the 1400 people who create them, she has nothing sell

4/3/2023 3:20 PM - John Giamatteo: Anyhow just another bit of chaos with Elite

4/3/2023 3:23 PM - John Chen: this one is mine

4/3/2023 3:23 PM - John Giamatteo: ok

4/3/2023 3:23 PM - John Giamatteo: I guess

4/3/2023 3:24 PM - John Giamatteo: I am not looking for comp credit for anyone, including myself, I just want to make sure it rolls into the P&L for which I am managing

4/3/2023 3:24 PM - John Chen: it will

4/3/2023 3:26 PM - John Chen: she booked the largest TCV deal in software for BlackBerry

4/3/2023 3:27 PM - John Giamatteo: she's still toxic

4/3/2023 3:32 PM - John Giamatteo: there components of SS which was built into

12

Chritoph's plan. ▓▓▓ go get for North America...so I do think we need to give him credit for that

4/3/2023 4:04 PM - John Chen: no one get credit on this deal , but you could reduce his quota if you believe it is overlap

4/3/2023 4:04 PM - John Giamatteo: yep

4/3/2023 4:05 PM - John Giamatteo: will do

4/3/2023 4:05 PM - John Chen: I am trying to help the situation , won't get there in one step. so stay calm

4/3/2023 4:06 PM - John Giamatteo: I'm trying to...but it is starting to get exhausting 😊

4/3/2023 4:06 PM - John Chen: I deal with this much longer

4/3/2023 4:07 PM - John Chen: still dealing with it

4/3/2023 4:07 PM - John Giamatteo: I know

4/3/2023 4:07 PM - John Chen: I am convinced we won't get a ▓▓▓ TCV deal done with her

4/3/2023 4:07 PM - John Giamatteo: you are Super Man as far as I'm concerned dealing with this

4/3/2023 4:07 PM - John Chen: without her

4/3/2023 4:08 PM - John Chen: it was set up wrong but it is the best result for the company

4/3/2023 4:08 PM - John Giamatteo: Actually, I like our chances without her

4/3/2023 4:08 PM - John Giamatteo: with you, me and Adam...I would put us in any fight for business like SSC and expect to come out a winner

4/3/2023 4:09 PM - John Chen: I unfortunately don't believe we could for a number of years , this has been worked on for almost 2 full years

4/3/2023 4:10 PM - John Chen: so many relationship building with different ministries

13

# EXHIBIT 13

**From:** John Giamatteo [jjg@blackberry.com]
**Sent:** 4/4/2023 12:19:38 PM
**To:** John Chen [john.chen@blackberry.com]
**Subject:** RE: Canada

I know you are, and, I appreciate it!!!

I am working equally as hard keeping the troops settled...the PTSD effect of Neelam and her interaction with the organization is very ugly/dysfunctional.

I spend a lot of time conducting therapy sessions with everyone....In my 30+ years I have never seen such a polarizing figure.

JJG

---

**From:** John Chen <john.chen@blackberry.com>
**Sent:** Tuesday, April 4, 2023 2:13 PM
**To:** John Giamatteo <jjg@blackberry.com>
**Subject:** Re: Canada

Reluctantly? Come on , I am working too hard on this buddy

Sent via BlackBerry Hub+ Inbox for Android

**From:** jjg@blackberry.com
**Sent:** April 4, 2023 2:06 PM
**To:** john.chen@blackberry.com
**Subject:** RE: Canada

I think we can reluctantly live with ██████████████ and ███████████

JJG

---

**From:** John Chen <john.chen@blackberry.com>
**Sent:** Tuesday, April 4, 2023 2:03 PM
**To:** John Giamatteo <jjg@blackberry.com>
**Subject:** Re: Canada

Will do in phase , best for the company on more than one dimensions

John , I see both sides contribute to the problem , may predated you and continue  but you already got the biggest piece back ██████████████
Let's see what can be done there


Sent via BlackBerry Hub+ Inbox for Android

**From:** jjg@blackberry.com
**Sent:** April 4, 2023 1:59 PM
**To:** john.chen@blackberry.com
**Subject:** RE: Canada

CONFIDENTIAL

We are at the peak of dysfunctionality with Elite...I really hope we can move this whole thing back to where it belongs as we have been discussing since I joined.

I get that we may need to do it in phases, but her inability to collaborate with anyone in the company is exhausting...and, honestly, make us look really bad/weak with the rank and file in the organization.

JJG

**From:** John Chen <john.chen@blackberry.com>
**Sent:** Tuesday, April 4, 2023 12:00 PM
**To:** John Giamatteo <jjg@blackberry.com>
**Subject:** RE: Canada

Noted , I may have to do something different
I hate to win the battle and lose the war

Sent with BlackBerry Work (www.blackberry.com)

**From:** John Giamatteo <jjg@blackberry.com>
**Sent:** Apr 4, 2023 10:57 AM
**To:** John Chen <john.chen@blackberry.com>
**Subject:** RE: Canada

JC,

He has $1.8m for new business and $4.4M for renewal. 75% of his variable is pegged to new business....25% towards achieving the $4.4m in renewals.

Rolling down the runway now...I'll try to get on wifi once I'm in the air.

JJG

Sent with BlackBerry Work (www.blackberry.com)

**From:** John Chen <john.chen@blackberry.com>
**Sent:** Apr 4, 2023 11:43 AM
**To:** John Giamatteo <jjg@blackberry.com>
**Subject:** Re: Canada

What is his quota ?

John
Sent via BlackBerry Hub+ Inbox for Android

**From:** jjg@blackberry.com
**Sent:** April 4, 2023 8:53 AM
**To:** john.chen@blackberry.com
**Subject:** Canada

JC,

Below is the feed from ▇▇▇ on all of the Canadian new business the team has in the pipeline ($3.3M).  ▇▇▇ covers the gov't of Canada.  His quota is made up of $1.8M in new business and the renewals listed below ($5.6M)

Renewals can only represent 25% of his variable.  ▇▇▇ achieved only 14% of his new business quota last year as we keep pulling all of the deals away from him to clear the decks for the larger ▇▇ deal.

Best regards,
JJG


## **New Business**

| Sum of New Business Forecast ACV Billings (converted) | | | DBF Category | | | | |
|---|---|---|---|---|---|---|---|
| Account Name | Industry | Type | Closed | Forecast | Upside | Pipeline | Grand Total |

BB13-00009918



CONFIDENTIAL

CONFIDENTIAL

BB13-00009920

CONFIDENTIAL



| Grand Total | | | | | |
|---|---|---|---|---|---|

## UFR (Up for Renewal accounts)

| Account Name | Account ID | Subscriptions ACV |
|---|---|---|



CONFIDENTIAL



Kind Regards,
Francesco Palopoli
Vice President, Sales Strategy and Operations
Mobile: +39 335 7000750
fpalopoli@blackberry.com
BBM Enterprise: EF05754F

**BlackBerry.** Intelligent Security. Everywhere.

---

**From:** John Giamatteo <jjg@blackberry.com>
**Sent:** 04 April 2023 02:39
**To:** Francesco Palopoli <fpalopoli@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>
**Subject:** FW: where is the Elite accounts billings quotas by account ? due last Friday

What do we have in SFDC for █████ pull everything (Lookout, renewals, MTD, other.

JJG

---

**From:** John Chen <john.chen@blackberry.com>
**Sent:** Monday, April 3, 2023 5:58 PM
**To:** John Giamatteo <jjg@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>; Hans-Peter Bauer <hbauer@blackberry.com>
**Cc:** Steve Rai <steve.rai@blackberry.com>; John Routa <jrouta@blackberry.com>
**Subject:** RE: where is the Elite accounts billings quotas by account ? due last Friday

Someone pull me the SFDC deals of ████ Canada , I don't know anything about the renewal
What makes up the ██████ new business ?

---

**From:** John Giamatteo <jjg@blackberry.com>
**Sent:** Monday, April 3, 2023 3:44 PM
**To:** John Chen <john.chen@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>; Hans-Peter Bauer <hbauer@blackberry.com>
**Subject:** RE: where is the Elite accounts billings quotas by account ? due last Friday

CONFIDENTIAL

BB13-00009923

Here it is.



**From:** John Chen <john.chen@blackberry.com>
**Sent:** Monday, April 3, 2023 5:18 PM
**To:** John Giamatteo <jjg@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>; Hans-Peter Bauer <hbauer@blackberry.com>
**Subject:** where is the Elite accounts billings quotas by account ? due last Friday

BB13-00009924

# EXHIBIT 14

**From:**     John Giamatteo [jjg@blackberry.com]
**Sent:**     4/10/2023 11:52:53 PM
**To:**       Adam Enterkin [aenterkin@blackberry.com]
**Subject:**  FW: █████

Can you double check everyone is standing down fro Lookout.

Apparently Neelam has JC convinced our team is working against us.

Thanks,
JJG


Sent with BlackBerry Work (www.blackberry.com)
_____
**From:** John Chen <john.chen@blackberry.com>
**Sent:** Apr 11, 2023 10:02 AM
**To:** John Giamatteo <jjg@blackberry.com>
**Subject:** Re: ████

Just find out if your people is still pushing lookout at ████


Sent via BlackBerry Hub+ Inbox for Android
_____
**From:** jjg@blackberry.com
**Sent:** April 10, 2023 5:01 PM
**To:** john.chen@blackberry.com
**Subject:** RE: ████

I'll work my end, however, I cannot control the machine of lies and manipulation on the other end.

JJG

_____
**From:** John Chen <john.chen@blackberry.com>
**Sent:** Monday, April 10, 2023 6:59 PM
**To:** John Giamatteo <jjg@blackberry.com>
**Subject:** Re: ███


You should find out

My instruction was clear

No matter who manipulate


Sent via BlackBerry Hub+ Inbox for Android
_____
**From:** jjg@blackberry.com
**Sent:** April 10, 2023 4:57 PM

CONFIDENTIAL

**To:** john.chen@blackberry.com
**Subject:** RE ███

JC,

We made it clear to the team, in no uncertain terms, not to be pushing Lookout throughout ███

I wonder how much of this is the team blatantly disregarding what we asked them to do vs. the manipulative tactics of our Elite leader.

JJG

---

**From:** John Chen <john.chen@blackberry.com>
**Sent:** Monday, April 10, 2023 3:06 PM
**To:** John Giamatteo <jjg@blackberry.com>; Adam Enterkin <aenterkin@blackberry.com>
**Cc:** Steve Rai <steve.rai@blackberry.com>
**Subject:** ███

Note that I am making changes to the Elite Accounts assignment , ███ will not be part of the Cyber BU
I should be done doing this within the next week and will inform all parties

One of my main focus is to have ███ and all ████████████████ using our MTD to increase stickiness of UEM. I heard George P and MM is still pushing Lookout at CRA , ask them to stop

John


Sent with BlackBerry Work
(www.blackberry.com)

CONFIDENTIAL                                                                 BB13-00020040

# EXHIBIT 15

9:41    5G

TF

T Foote ›

Oct 28, 2023 at 5:25 PM

I'm pretty sure this BS is from Neelam. I've been thinking and I remember that when you joined you gave her a name of a lady to speak to as a reference of what it's like to work with you. She claimed that she was derogatory about you, but her story seemed really flakey and weird. I'm pretty sure this is all wrapped up quickly.

Oct 30, 2023 at 10:03 AM

Just checking in. Hope you're Ok.

Oct 30, 2023 at 3:29 PM

News has leaked re: JC

**::: BlackBerry.**

Subject

iMessage

# EXHIBIT 16

**From:** Phil Kurtz [pkurtz@blackberry.com]
**Sent:** 10/28/2023 10:13:03 AM
**To:** Tate, Eric Akira [ETate@mofo.com]
**Subject:** RE: Investigation scope

Yes, am also free now if you can

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** Tate, Eric Akira <ETate@mofo.com>
**Date:** Saturday, Oct 28, 2023 at 1:12 PM
**To:** Phil Kurtz <pkurtz@blackberry.com>
**Subject:** RE: Investigation scope

**CAUTION** - This email is from an external source. Please be cautious with links and attachments. (go/taginfo)

Good morning.  I have concerns about this.  Can we discuss at 1030 am PT/130 pm ET?

---

**From:** Phil Kurtz <pkurtz@blackberry.com>
**Date:** Saturday, Oct 28, 2023 at 7:35 AM
**To:** Tate, Eric Akira <ETate@mofo.com>
**Subject:** Investigation scope

External Email

---

Hi Eric,

The board is wondering whether Neelam is in scope for our investigation now.  I think yes based on her prior complaint.

Assuming so, the question is whether this will involve merely interviewing her or also reviewing her recent emails for matters relating to JJG.  There are solid reasons to believe that she does not want to see JJG as CEO.  Looking at her recent emails would not, in my view, be an attempt to identify a legitimate anonymous complainant, because Neelam does not fit the description of anyone described as a victim in the complaint.  She can only be a fraudulent complainant, which negates any right to anonymity in my view.

Please send me your thoughts before 2 pm ET.  Thanks

Sent with BlackBerry Work
(www.blackberry.com)

---

This transmission (including any attachments) may contain confidential information, privileged material (including material protected by the solicitor-client or other applicable privileges), or constitute non-public information. Any use of this information by anyone other than the intended recipient is prohibited. If you have

BB13-00019475
BBG00000295
BB13-00024731

received this transmission in error, please immediately reply to the sender and delete this information from your system. Use, dissemination, distribution, or reproduction of this transmission by unintended recipients is not authorized and may be unlawful.

======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

.

CONFIDENTIAL

BB13-00019476
BBG00000295
BB13-00024732

# EXHIBIT 17

# INVOICE

### *Invoice Information*

| | |
|---|---|
| Firm/Vendor: | Morrison & Foerster |
| Office: | SAN FRANCISCO |
| Invoice Number: | 6297460 |
| Date of Invoice: | 02/23/2024 |
| Billing Period: | 11/01/2023 - 11/30/2023 |
| Date Posted: | 04/17/2024 |
| Invoice Description/Comment: | HOTLINE INVESTIGATION |

### *Billed To*

BlackBerry Limited
Tax ID: 87132 6179
2200 University Avenue East
Waterloo, Ontario, N2K 0A7
Canada

### *Amount Approved*

| | |
|---|---|
| **Approved Total** | **$258,968.83** |
| **Invoice Currency:** | **USD** |
| Date Approved: | 04/22/2024 |
| Final Approver: | Steve Rai |
| Approved Fees | $258,968.83 |
| Approved Expenses | $0.00 |
| Approved Total (excl. Tax) | $258,968.83 |
| Comments to AP: | |

### *Accounting Code Allocations*

| Cost Center | GL Account | PS Code | Amount | Percentage | Comment |
|---|---|---|---|---|---|
| 2000-14003 | 660005 | 6692 | $258,968.83 | 100% | |

### *Vendor Address & Tax Information in Legal Tracker*

Morrison & Foerster
425 Market Street
SAN FRANCISCO, California  94105

Tel: 415 268-5000

BB13-00019766

Fax: 415 268 7522

*Remittance Address*
Bank of America
345 Montgomery Street
San Francisco, CA 94104
For the Account of Morrison & Foerster LLP
Account # ▓▓▓▓▓▓
ABA routing ▓▓▓▓▓▓
Los Angeles, California  90074-2335

Vendor Tax ID: 94-0697210
VAT ID: --
GST ID: --
HST ID: --
PST ID: --
Sales Tax ID: --
QST ID: --
Withholding Tax ID: --

**Other Invoice and Firm Information**

  Regulatory Statements: --

**Amount Billed**

| | |
|---|---|
| **Billed Total** | **$258,968.83** |
| Invoice Currency: | USD |
| Billed Fees | $258,968.83 |
| Billed Expenses | $0.00 |
| Billed Total (excl. Tax) | $258,968.83 |

**Approval History**

| User | Action | Date | Amount | Comment |
|---|---|---|---|---|
| MORRISONFOERSTER Billing | Posted | 04/17/2024 | $258,968.83 | |
| Heather Cerrato | Approved | 04/18/2024 | $258,968.83 | |
| Phil Kurtz | TK Rates Reviewed | 04/18/2024 | | |
| Phil Kurtz | Approved | 04/18/2024 | $258,968.83 | |
| Steve Rai | Approved | 04/19/2024 | $258,968.83 | |
| Heather Cerrato | AP Reviewed | 04/22/2024 | $258,968.83 | |

CONFIDENTIAL

# EXHIBIT 18

| From: | Phil Kurtz [pkurtz@blackberry.com] |
|---|---|
| Sent: | 10/30/2023 7:49:06 PM |
| To: | Camilla Scassellati-Sforzolini [Camilla.Scassellati@FGSGlobal.com]; Rodriguez, Monica A. [MRodriguez@mofo.com]; Tim Foote [tfoote@blackberry.com] |
| CC: | Tate, Eric Akira [ETate@mofo.com]; John Christiansen [John.Christiansen@fgsglobal.com]; Blackberry [Blackberry@fgsglobal.com] |
| Subject: | RE: Leak Plan Draft |
| Attachments: | Privileged Confidential - BlackBerry Leak Plan 10.30.2023.docx |

Thanks to you all for putting this together. Copying Tim Foote, our VP of IR for his input.

A few thoughts from me:

-        If there is a leak, the first point of contact for a media inquiry is likely to be Neelam Sandhu, our CMO. She is not aware of this working group and I would not want her to handle the inquiry without referring it to us. My expectation is that she would not handle it on her own and that, at least after this week and the departure of John Chen, I would become aware of it directly or indirectly. I'm less sure about this week though. Do you have any thoughts about how to address this risk? May be better to discuss on a call.
-        If there is a leak, the target of the investigation may feel a desire to make an immediate statement in defence of his own reputation. Thoughts on this? Should we advise him to obtain his own advice in this regard?
-        How would you recommend that we address the question if we're asked whether we named Dick Lynch as Interim CEO because of this investigation?

Phil

**From:** Camilla Scassellati-Sforzolini <Camilla.Scassellati@FGSGlobal.com>
**Sent:** Monday, October 30, 2023 5:17 PM
**To:** Rodriguez, Monica A. <MRodriguez@mofo.com>; Phil Kurtz <pkurtz@blackberry.com>
**Cc:** Tate, Eric Akira <ETate@mofo.com>; John Christiansen <John.Christiansen@fgsglobal.com>; Blackberry <Blackberry@fgsglobal.com>
**Subject:** RE: Leak Plan Draft

**CAUTION** - This email is from an external source. Please be cautious with links and attachments. (go/taginfo)

**Maintaining Privilege**

Thank you, Monica. We appreciate you going through the document and all your edits made sense. Good to understand the context for future comms drafts.

We agree with adding a reference to not tolerating retaliation and have done so in the attached. The purpose of that whole paragraph is to reassure employees. We also removed any reference to potential litigation.

Phil – let us know if you have any questions or comments.

Best,
Camilla

Camilla Scassellati Sforzolini
Managing Director
Los Angeles

BB13-00019484

M. _____          424.454.8469
E. _____          camilla.scassellati@fgsglobal.com

 fgsglobal

**From:** Rodriguez, Monica A. <MRodriguez@mofo.com>
**Sent:** Monday, October 30, 2023 1:02 PM
**To:** Camilla Scassellati-Sforzolini <Camilla.Scassellati@FGSGlobal.com>; pkurtz@blackberry.com
**Cc:** Tate, Eric Akira <ETate@mofo.com>; Blackberry <Blackberry@fgsglobal.com>
**Subject:** RE: Leak Plan Draft

**Privileged & Confidential**

Camilla,

Thanks for sending the investigation plan. Our suggested revisions are in the attached. We've also included some comments below.

- **Global comments:**
o    **References to independent counsel.** We have changed the references to "independent" counsel to "outside" counsel. MoFo represents Blackberry in other matters and the investigation will be conducted independently, but we do not want to invite a discussion or debate about whether the firm is "independent."
o    **References to complaints.** Our understanding is that only one formal complaint has been lodged, so we've revised the references to "complaints" to just one, singular "complaint."
o    **Statement that the "claims remain unsubstantiated."** In an abundance of caution, we recommend revising the statement that the allegations are unsubstantiated, as it could be misconstrued by complainants as prejudging the claims and could motivate complainants to leak information. We have provided alternative proposed language.
o    **Confidentiality agreements with employees.** We deleted the references to confidentiality agreements with employees as this could be perceived as unlawful under the NLRA.
- **Page 7, Employee Letter.** We should consider whether to add language regarding retaliation given that the complainants raised concerns about retaliation.
- **Page 4, 4th item in the response plan.** For now, we recommend waiting until there has been confirmation that complainants have retained counsel before raising the potential of prospective litigation if the reporter knows the complainants have retained counsel so as to avoid potentially escalating the issue.

Please let us know if you have any questions or would like to discuss.

Best,
Monica

**Monica A. Rodriguez** (she/her/hers)
Senior Associate
mrodriguez@mofo.com
M +1 (213) 326-3220

Morrison Foerster
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017-3543

**IIIORRISON
FOERSTER**

**From:** Camilla Scassellati-Sforzolini <Camilla.Scassellati@FGSGlobal.com>
**Sent:** Sunday, October 29, 2023 6:03 PM
**To:** pkurtz@blackberry.com
**Cc:** Tate, Eric Akira <ETate@mofo.com>; Rodriguez, Monica A. <MRodriguez@mofo.com>; Blackberry <Blackberry@fgsglobal.com>
**Subject:** Leak Plan Draft

External Email

---

*Privileged & Confidential*

Phil,

As discussed, attached please find a draft leak plan that outlines a few potential scenarios and related responses.

We'd be happy to discuss and would appreciate any edits from the MoFo team as well.

Kind regards,
Camilla

Camilla Scassellati Sforzolini
Managing Director
Los Angeles

M. _____                                          424.454.8469
E. _____                                          camilla.scassellati@fgsglobal.com

fgs global

=================================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

# EXHIBIT 19

**From**: Dick Lynch [dick.lynch@blackberry.com]
**Sent**: 11/17/2023 12:19:17 PM
**To**: Neelam Sandhu [nsandhu@blackberry.com]
**BCC**: Phil Kurtz [pkurtz@blackberry.com]
**Subject**: RE: Follow Up RE: Confidential Meeting

Neelam,

You are right. I believe that with the right culture, which fosters teamwork and transparency, among other attributes, a business has a much better chance of succeeding.

On this particular issue, I obviously don't know the history but I believe that this will get solved based on the processes for change that we have undertaken. Obviously, we need a little time, but change is coming.

Dick

**From:** Neelam Sandhu <nsandhu@blackberry.com>
**Sent:** Thursday, November 16, 2023 11:08 AM
**To:** Dick Lynch <dick.lynch@blackberry.com>
**Subject:** FW: Follow Up RE: Confidential Meeting

Dick,

From our interactions to date I believe that company culture, transparency, and teamwork are important to you, to ultimately drive company results.

With that, I would like to make you aware of this recent example where that has not happened (and has not been happening for a long time), and request your help with addressing it. I would appreciate your support.

Thank you,
Neelam

**From:** Neelam Sandhu
**Sent:** Thursday, November 16, 2023 7:45 AM
**To:** Hill, Christin Joy <CHill@mofo.com>
**Cc:** BlackBerry ELInv <BlackBerry_ELInv@mofo.com>; Nita White-Ivy (nwhiteivy@blackberry.com) <nwhiteivy@blackberry.com>; Neelam Sandhu <nsandhu@blackberry.com>
**Subject:** RE: Follow Up RE: Confidential Meeting

Christin,

Unfortunately, I am sharing another example of John Giamatteo's retaliation against me as it continues today with him still cutting me out of my job.

As BlackBerry's CMO, I am responsible for Press Releases. My team intakes PR requests, writes PR's, is the point of contact with external parties (e.g. customers) if it is a joint PR, I review/edit/approve and then review with CEO for final approval. There are also other tasks my team and I undertake. This accountability is noted in the company MAP and has been for several years.

ATTORNEYS' EYES ONLY

I reached out to John Giamatteo and his team yesterday to suggest preparing a PR for a Cyber deal (attachment "PR"). He then sent an email (attachment "Malaysia Deal Communications") with the PR already written and approved. I was not involved in or aware of this process at all and nor were my team.

This is a very distressing situation.

Nita,
I have copied you on this email to note this new incident with BlackBerry HR also.

Neelam

---

**From:** Neelam Sandhu <nsandhu@blackberry.com>
**Sent:** Tuesday, November 7, 2023 5:04 PM
**To:** Hill, Christin Joy <CHill@mofo.com>
**Cc:** BlackBerry ELInv <BlackBerry_ELInv@mofo.com>; Neelam Sandhu <nsandhu@blackberry.com>
**Subject:** Follow Up RE: Confidential Meeting

As requested on our call yesterday, attached are some documents that demonstrate JJG's harassment of me, which commenced after I did not respond positively to his suggestive comments.

•     Attachment "JJG" has information I had previously sent to HR.
•     Two attachments "15 minutes with JJG" that show that I have been trying to meet with him since September on SEM, which he knows from Kevin Easterwood on his team is for cost savings I am trying to drive for the company, but he has been pushing the meeting off. He pushed the meeting off until end of September originally, then to November 3 (at the same time I had heard that he had told people in the company that 'if John Chen and Neelam aren't gone from the company by November 3rd I [JJG] am resigning.' Yesterday his EA asked to move the meeting to November 8, which we did, and today he has completely declined the meeting (attachment "Declined: John Giamatteo | Neelam".
•     Attachment "BB Cyber Security Weekly Leadership team Call" where he asked me and three others to join his weekly team call. I agreed to join as often as I could however I did not receive the invite for several months. The other three people on the email received the invite right away. JJG then proceeded to tell others, including John Chen, that I was not attending the meetings and so am not collaborative – commentary which was negatively impacting my reputation in the company. I asked for the invite several times (e.g. attachment "Cylance Product Issues") before receiving it several months later.
•     This was a pattern for JJG – telling me he would invite me to meetings but then not sending me the invite, while sending it to all others. He would then tell people I refused to attend and am not collaborative. He put me in the uncomfortable position of having to prove I was 'nice' and 'collaborative' and to do so with someone who was harassing me. Second attachment "Cylance Product Issues" is another such meeting.
•     Attachment "Analyst Day" shows him taking credit for an Elite Customer deal I had closed, which the customer had not at the time given me approval to allude to publicly or mention publicly at the time. JJG mentioned it publicly at Analyst Day as though it were one of his deals and when I asked him he denied mentioning it and then did not reply to my follow up email with a link to the recorded proof.

These are just some examples.

Neelam

ATTORNEYS' EYES ONLY

BB13-00018461

# EXHIBIT 20



# EXHIBIT 21

December 4, 2023

Neelam Sandhu

████████████████

Dear Neelam,

This letter confirms that, pursuant to your discussion with Kelly Cheun and me on this date, you have been relieved of all job duties effective immediately and your employment with BlackBerry Corporation ("BlackBerry") will cease effective December 15, 2023 (hereinafter the "Termination Date").

Upon the Termination Date, you will receive the following, subject to the terms below.

**Severance Benefits**

- **Termination Compensation** – Following the Termination Date, BlackBerry will continue to pay you your current base salary for a period of fifty (50) weeks (the "Severance Period"), less required payroll deductions and withholdings.

- **Health Insurance Continuation** – If you elect to continue to be covered under BlackBerry's group medical insurance plan, subject to the terms and conditions provided for in the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), BlackBerry will pay 100% of the premiums from the Termination Date through the end of calendar year 2023. Information regarding your COBRA rights will be provided to you as required by law.

- **Release** – The above payments are conditional upon you signing the attached separation agreement and release and returning it to Phil Kurtz, Chief Legal Officer and Corporate Secretary, by the deadline specified therein.

**Salary Through Termination Date**

You will receive payment of your regular salary through the Termination Date, subject to ordinary withholdings and deductions.

**Vacation Pay**

You will receive payment for any accrued and unused vacation hours/days up to the Termination Date.

You will also receive the following after the Termination Date:

**Incentive Compensation**

BlackBerry will pay any earned fiscal 2024 Sales Incentive Compensation Pay (SiP) Program bonus to you in accordance with the terms and conditions of your applicable SiP plan.

**Business Expense Reimbursement**

You will be reimbursed for any allowable business expenses incurred up to and including the Termination Date, per the company's Business Expense Reimbursement Policy. If you wish to claim any such unclaimed/not yet submitted allowable business expenses, please submit an expense reimbursement report within seven (7) days of your termination to Kelly Cheun.

**Employee Share Purchase Plan**

If you own BlackBerry shares through the BlackBerry Employee Share Purchase Plan (ESPP), you will need to access your Shareworks account within 90 days to indicate how you would like to receive your proceeds.

**Return of Company Property**

You must return all of BlackBerry's property in your possession (in the office and at your home) or under your control including any American Express credit card, keys, badge and building access cards, parking garage transmitter, laptop and other IT equipment/tools, BlackBerry materials and documents (in any form), on the Termination Date.

We thank you for your contributions to BlackBerry and extend to you our best wishes for the future. If you have any questions re: any of the above matters, please contact me.

Sincerely,

Richard Lynch
Chairman and Interim Chief Executive Officer

Enclosure: Confidential Agreement and General Release

cc:  HR File

BB13-00004639

Confidential

## SEPARATION AGREEMENT AND RELEASE

This Separation Agreement and Release ("Agreement") is made by and between BlackBerry Corporation (the "Company"), and Neelam Sandhu ("Employee"). This Agreement is effective on the day Employee signs it (the "Effective Date").

WHEREAS, Employee was employed by the Company;

WHEREAS, on or about March 15, 2021, the Company and Employee entered into an employment agreement, which was modified on or about June 15, 2023, and again on or about September 1, 2023 (as amended, the "Employment Agreement");

WHEREAS, the Company has decided to terminate Employee's employment and Employee wishes to release the Company from any claims arising from or related to the employment relationship in exchange for a severance payment;

NOW THEREFORE, in consideration of the mutual promises made herein, the Company and Employee (each individually referred to as a "Party" and collectively as "the Parties") hereby agree as follows:

1.    <u>Termination</u>.    Employee's employment with the Company will terminate on December 15, 2023 (the "Separation Date").

2.    <u>Severance Benefits</u>.    Subject to and conditional upon Employee's signing this Agreement no sooner than the Separation Date and no later than December 16, 2023, as well as continuing compliance with the terms and conditions of all sections of this Agreement, Employee will be eligible to receive the severance benefits set forth in Sections 2(a) and (b) (the "Severance Benefits") on the terms provided therein:

(a)    <u>Severance Payments</u>.    The Company will continue to pay Employee her base salary, less applicable payroll deductions and withholdings, for a period of fifty (50) weeks from the Separation Date (the "Severance Period").

(b)    <u>Health Insurance Continuation</u>.    Employee may elect to continue to be covered under the Company's group medical insurance plan, subject to the terms and conditions provided for in the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA").  Provided Employee timely and properly elects COBRA continuation coverage, the Company will pay 100% of the premiums from the Separation Date through the end of calendar year 2023.  Information regarding COBRA rights will be provided to Employee as required by law, and Employee is solely responsible for timely and properly electing COBRA continuation coverage.

(c)    <u>Termination of Severance Benefits</u>.  If at any time Employee fails to comply with any of Employee's promises and obligations under this Agreement, the Company's obligation to provide any and all Severance Benefits to Employee shall immediately cease and the Company

BB13-00004640

shall be entitled to repayment of all Severance Benefits paid to Employee, in addition to any other legal or equitable remedies.

    (d) <u>Vacation Pay and Expense Reimbursement</u>.  Whether or not Employee signs this Agreement, on the Separation Date, the Company will pay Employee a lump sum amount representing all salary due through the Separation Date and all accrued and unused vacation entitlements up to the Separation Date, less applicable payroll deductions and withholdings.  The Company will also reimburse Employee for any allowable business expenses incurred up to and including the Separation Date pursuant to the Company's Business Expense Reimbursement Policy provided that Employee submits a reimbursement report with respect to such expenses within seven (7) days of the Separation Date.

    (e) <u>Tax Consequences</u>.

    i. The Company makes no representations or warranties with respect to the tax consequences of the payment of any sums to Employee under the terms of this Agreement. Employee agrees and understands that Employee is responsible for payment, if any, of local, state and/or federal taxes on the sums paid hereunder by the Company and any penalties or assessments thereon. Employee further agrees to indemnify and hold the Company harmless from any claims, demands, deficiencies, penalties, assessments, executions, judgments, or recoveries by any government agency against the Company for any amounts claimed due on account of Employee's failure to pay federal or state taxes or damages sustained by the Company by reason of any such claims, including reasonable attorneys' fees.

    ii. The intent of the Parties is that payments and benefits under this Agreement comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder ("Section 409A"), to the extent subject thereto, and accordingly, to the maximum extent permitted, this Agreement shall be interpreted and administered to be in compliance therewith.

    iii. Each amount to be paid or benefit to be provided under this Agreement shall be construed as a separate and distinct payment for purposes of Section 409A. To the extent required to avoid accelerated taxation and/or tax penalties under Section 409A, amounts reimbursable to Employee under this Agreement shall be paid to Employee on or before the last day of the year following the year in which the expense was incurred and the amount of expenses eligible for reimbursement (and in-kind benefits provided to Employee) during one year may not affect amounts reimbursable or provided in any subsequent year.

    iv. The Company makes no representation that any or all of the payments described in this Agreement will be exempt from or comply with Section 409A and makes no undertaking to preclude Section 409A from applying to any such payment.  Employee understands and agrees that Employee shall be solely responsible for the payment of any taxes, penalties, interest or other expenses incurred by Employee on account of non-compliance with Section 409A.

Employee understands, acknowledges, and agrees that the Severance Benefits in subsections (a) and (b) are being given as consideration in exchange for executing this Agreement. Employee

ATTORNEYS' EYES ONLY

further acknowledges that Employee is not entitled to any additional payment or consideration not specifically referenced in this Agreement and acknowledges that, with the exception of any earned fiscal 2024 Sales Incentive Compensation Pay (SiP) Program bonus, which will be paid in accordance with the terms and conditions of Employee's applicable SiP plan, Employee has been paid all wages, bonuses, and other compensation of any kind due to Employee as a result of her employment with the Company.

3.    Release and Waiver of Claims.

(a)    General Release.    In consideration for the Severance Benefits and the Company's promises in this Agreement, Employee, on behalf of Employee and Employee's heirs, executors, administrators, and assigns, hereby completely and irrevocably releases the Company, and any of its affiliated, related, parent or subsidiary companies and its and their present and former shareholders, members, interest holders, owners, managers, directors, or officers, attorneys and employees, and each of their respective successors and assigns (the "Released Parties") from any and all claims Employee may now have or have ever had against the Released Parties, including without limitation, all claims arising from Employee's employment or termination of employment (the "Released Claims"). The Released Claims include, but are not limited to, all claims for breach of contract, breach of quasi-contract, promissory estoppel, detrimental reliance, and breach of the implied covenant of good faith and fair dealing; all tort Claims, including claims for fraud, defamation, slander, libel, negligent or intentional infliction of emotional distress, personal injury, negligence, compensatory or punitive damages, negligent or intentional misrepresentation, and discharge in violation of public policy; and any statutory claims, including any claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Civil Rights Act of 1991; the Civil Rights Acts of 1866 and/or 1871, 42 U.S.C. Section 1981; the Equal Pay Act of 1963, 29 U.S.C. § 206(d); the Americans with Disabilities Act, 42 U.S.C. 12101 et seq., 29 U.S.C. § 621 et seq.; the Family Medical Leave Act, 29 U.S.C. § 2601 et seq.; the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq.; the federal Worker Adjustment and Retraining Notification Act (WARN Act), 29 U.S.C. § 2102 et seq.; the California WARN Act, California Labor Code § 1400 et seq.; the California Fair Employment and Housing Act, Cal. Gov. Code§ 12900 et seq.; the California Labor Code and the orders of the California Industrial Welfare Commission; the California Business and Professions Code; and any other claims for violation of any federal, state, or local statutes, ordinances or common law, including, without limitation, claims for alleged retaliation or wrongful termination of any kind, and any and all claims for attorneys' fees and costs.

EMPLOYEE UNDERSTANDS AND AGREES THAT THIS AGREEMENT CONTAINS A GENERAL RELEASE OF ALL CLAIMS.

(b)    Waiver of California Civil Code Section 1542.    Employee understands and agrees that this release specifically covers known and unknown claims. Employee expressly waives and releases all rights and benefits under Section 1542 of the California Civil Code or any other comparable statute of any jurisdiction. Section 1542 states as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE

BB13-00004642

MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

(c)    Agreement Not to File.  Subject to the provisions of Section 6, Employee represents that Employee has not initiated, filed, or caused to be filed and agrees not to initiate, file or cause to be filed any Released Claims against any Released Parties. In addition, Employee agrees not to initiate, file, cause to be filed, or otherwise pursue any Released Claims, either as an individual on Employee's own behalf or as a representative, member or shareholder in a class, collective or derivative action against the Released Parties. Employee also agrees not to solicit, assist, support or in any other way cooperate in the initiation or prosecution of any action or proceeding brought against the Released Parties, or any of them, by a third party, except if compelled to do so by legal process.

(d)    Exceptions to Release.  Employee understands that Employee is not waiving any right or claim that cannot be waived as a matter of law, such as workers' compensation claims or claims for unemployment benefits.

4.    Confidentiality of Agreement.  To the furthest extent allowed by law, Employee shall hold the provisions of this Agreement in strictest confidence and shall not publicize or disclose it or its terms in any manner; except that Employee may disclose this Agreement (i) in confidence to Employee's spouse, attorneys, accountants, or tax preparers; and (ii) insofar as such disclosure may be necessary in any proceeding to enforce this Agreement, provided either that the proceeding is confidential or if not, that such disclosure is under seal. If disclosure of any term of this Agreement is compelled by legal process, Employee shall notify the Company reasonably prior to such disclosure, so that the Company may, at its option, seek a protective order. To the extent applicable, nothing in this Agreement prevents Employee from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the Employee has reason to believe is unlawful.

5.    Continuing Obligations.  Employee shall continue to maintain the confidentiality of all confidential and proprietary information of the Company and shall continue to comply with all of her confidentiality and other obligations under the Employment Agreement that continue after the termination of Employee's employment, which terms are incorporated by reference herein and remain in full force and effect.

During the course of her employment with BlackBerry, Employee acquired knowledge of matters which are now, or may become, the subject of disputed claims or litigation involving BlackBerry, its subsidiaries and affiliated or associated companies. As a result, Employee agrees to provide all assistance and cooperation reasonably requested by BlackBerry and/or its counsel relating to any litigation involving BlackBerry when it is determined by BlackBerry that Employee's assistance is needed. Employee's assistance may include, but is not limited to, participating in interviews, providing truthful information on factual issues, reviewing documents, and/or preparing for and giving truthful testimony, whether orally or by affidavit at discovery, in a deposition, at trial or otherwise. In order to minimize the economic impact that Employee may experience as a result of fulfilling these obligations, BlackBerry will reimburse Employee at a reasonable hourly rate for income lost and for reasonable expenses incurred by Employee in connection with such assistance.

6.      Protected Rights; Defend Trade Secrets Act.

(a)      Protected Rights.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall prohibit or interfere with Employee exercising protected rights, including rights under the National Labor Relations Act; filing a charge with the Equal Employment Opportunity Commission; reporting possible violations of law to or participating in an investigation by any federal, state, or local government agency or commission such as the National Labor Relations Board, the Department of Labor, OSHA, the Department of Justice, or the Securities and Exchange Commission. Employee does, however, waive any right to receive any personal relief, monetary award or benefit resulting from such a charge, report, or investigation related to any Released Claims, except that Employee may receive and fully retain a monetary award from a government-administered whistleblower award program. Employee may disclose information as set forth in this Section 6 without the Company's prior authorization. Nothing in this Agreement waives any rights that are not subject to waiver by private agreement or otherwise cannot be waived as a matter of law.

(b)      Defend Trade Secrets Act Notification.    Employee is hereby notified that 18 U.S.C. § 1833(b) states as follows: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that-(A) is made-(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Accordingly, notwithstanding any other provision of this Agreement to the contrary, Employee has the right to (1) disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of the law or (2) disclose trade secrets in a document filed in a lawsuit or other proceeding so long as that filing is made under seal and protected from public disclosure. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b).

7.      Return of Company Property.    Employee shall return all the Company property and confidential and proprietary information in Employee's possession to the Company prior to the Separation Date, including without limitation all identification cards or badges, access codes or devices, keys, laptops, computers, telephones, mobile phones, hand-held electronic devices, credit cards, electronically stored documents or files, physical files, and any other Company property in Employee's possession. Employee's eligibility for and receipt of the Severance Benefits is expressly conditioned upon return of all Company Property.

8.      Non-Disparagement.    Employee agrees that Employee shall not at any time make, publish or communicate to any person or entity in any forum any defamatory or disparaging remarks, comments or statements concerning the Company, its businesses or the Released Parties. This Section does not, in any way, restrict or impede Employee from exercising protected rights, to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.

9. <u>Knowing and Voluntary Acknowledgments and Affirmations</u>. Employee specifically represents, warrants, and confirms the following: (a) that the Company has timely and properly paid Employee all salary, wages, bonuses, accrued vacation earned and all other benefits or compensation due to Employee as of the Separation Date in accordance with applicable law; (b) except as expressly provided herein, Employee is not entitled to and will not receive any additional compensation or benefits from the Company after the Separation Date; (c) all of the decisions of the Company regarding her pay and benefits or other terms or conditions of her employment through the Effective Date of this Agreement were not discriminatory or retaliatory based on age, disability, race, color, sex, religion, national origin, protected activity, or any other classification protected by law; (d) Employee has not filed any claims, complaints, or actions of any kind against any of the Released Parties with any federal, state, or local court or government or administrative agency; (e) neither the Company, nor Employee has engaged in any unlawful conduct relating to the business of the Company, and Employee further acknowledges that to the extent she has raised any allegations about alleged unlawful acts in the workplace through the Company's internal complaint process, this Agreement is and intended to be a negotiated settlement to resolve those allegations; (f) Employee has had at least five (5) calendar days in which to consider whether to sign this Agreement, and if Employee signs sooner, she has done so voluntarily; and (g) Employee understands that she has the right to consult with counsel regarding this Agreement.

10. <u>No Admission</u>. Employee understands and agrees that this Agreement is not an admission of guilt or wrongdoing by the Company, and that the Company does not believe or admit that it has done anything wrong.

11. <u>Severability</u>. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision.

12. <u>Entire Agreement</u>. This Agreement, including the terms of any agreements incorporated by reference herein, represents the entire agreement and understanding between the Company and Employee concerning Employee's separation from the Company, and supersedes and replaces any and all prior agreements and understandings concerning Employee's relationship with the Company and Employee's compensation by the Company.

13. <u>No Oral Modification</u>. This Agreement may only be amended in writing signed by Employee and a duly authorized representative of the Company.

14. <u>Governing Law and Dispute Resolution</u>. This Agreement shall be governed by the laws of the State of California. Employee and the Company hereby irrevocably submit to the exclusive jurisdiction of federal and state courts in the State of California and waive the defense of inconvenient forum to the maintenance of any action or proceeding in such venue.

15. <u>Counterparts</u>. This Agreement may be executed in counterparts, and each counterpart shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned.

ATTORNEYS' EYES ONLY

16.     <u>Voluntary Execution of Agreement</u>.  This Agreement is executed voluntarily and without any duress or undue influence on the part or behalf of the Parties hereto, with the full intent of releasing all claims. The Parties acknowledge that:

(a)     They have read this Agreement and have been given sufficient time to consider the terms of this Agreement before signing it;

(b)     They have been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of their own choice or that they have voluntarily declined to seek such counsel;

(c)     They understand the terms and consequences of this Agreement and of the releases it contains;

(d)     They are fully aware of the legal and binding effect of this Agreement.

BB13-00004646

IN WITNESS WHEREOF, the Parties have executed this Agreement on the respective dates set forth below.

**BlackBerry Corporation**

**DATED:** December , 2023    By: _____

                Name:
                Title:

**Neelam Sandhu,** an individual

**DATED:** December , 2023    _____

ATTORNEYS' EYES ONLY

# EXHIBIT 22

JENNIFER BRAMHILL
9/19/2025
MELISSA SNYDER CSR 13370
**Exhibit 10**

**From:** Nita White-Ivy <nwhiteivy@blackberry.com>
**Sent:** Saturday, March 4, 2023 10:08 AM
**To:** Jennifer Bramhill <jbramhill@blackberry.com>
**Cc:** Nita White-Ivy <nwhiteivy@blackberry.com>
**Subject:** CONFIDENTIAL: Sarah Tatsis' Complaint and Your HR Obligations/Responsibilities

Jennifer,

I am aware that the significant workload you have may be interfering with your ability to perform all of your obligations at a satisfactory level. As a result, it is my intent to offload some of your current work in FY24 so that you will have more time to focus on the key responsibilities that are a crucial part of your job duties. We will discuss the details of the redistribution of some of your current obligations within the next few days.

However, prior to that, I want to raise an issue that is important to your continued work with me and BlackBerry. As I hope you know, I depend upon you to be a second set of eyes and ears for me in BlackBerry's extended work environment. When you see or hear something that violates a BlackBerry policy or is inconsistent with our company's values, one of your most important responsibilities is to alert me immediately so that we can take the proper action in a timely fashion. I was very disappointed that you did not immediately alert me to the comments you heard and the conduct you observed at ███████████ January QBR in Ottawa. You should also have alerted me earlier to the fact that Sarah Tatsis had raised the issue of her treatment with you so that I could have either affirmatively approached Sarah in an attempt to resolve her concerns or at least have been better prepared to address her issues when she called me in early February.

I am concerned that you delayed informing me about these serious issues because you were conflicted over representing ██████ as his HRBP and meeting your broader HR responsibilities by calling my attention to the issues that arose during the QBR. You attempted to resolve the issues yourself without involving me. You were protecting ██████ and his team instead of acting quickly and decisively to eliminate the kind of conduct Sarah had been subjected to for some period of time. I can't help but think that if you had witnessed this same conduct in another organization, you would have informed me immediately.

Jennifer, in the future, you must put your obligations and responsibilities to BlackBerry ahead of any personal or professional relationships with anyone you manage, counsel or interact with. Given your commitment to BlackBerry and your very strong performance over the past years, I am confident you will meet that objective. If you wish to discuss these issues in greater detail, please don't hesitate to reach out to me.

Nita

Nita White-Ivy
Chief Human Resources Officer
Office: +1 (925) 242-5628

WHN00068365.0006

nwhiteivy@blackberry.com

**BlackBerry®**  Intelligent Security. Everywhere.

This transmission (including any attachments) may contain confidential information, privileged material (including material protected by the solicitor-client or other applicable privileges), or constitute non-public information. Any use of this information by anyone other than the intended recipient is prohibited. If you have received this transmission in error, please immediately reply to the sender and delete this information from your system. Use, dissemination, distribution, or reproduction of this transmission by unintended recipients is not authorized and may be unlawful.

# EXHIBIT 23

**Investigation Notes from Interview with Neelam Sandhu, Senior Director of Business Operations, Office of the CEO**

**Date:** November 16, 2016
**Participants:**
John Mazurek, VP, Employee Relations and Compliance
Mary Hundt, Senior HR Business Partner Manager
Neelam Sandhu, Senior Director of Business Operations, Office of the CEO


John M began the meeting by explaining of what his Employee Relations role is and that we were chatting with her to gather the facts and to then provide the facts to the stakeholders involved who review and make any recommendation on any course of action that will come from the investigation.

When in Canada for the last Earnings Call (September 28, 2016) Neelam was sitting in the executive area on the 3ʳᵈ floor of BlackBerry B.  She was working on her laptop when ████ came over to her desk and stood in front of her.  She noted she was busy and that if he needed something they could catch up later. ████ then picked up the chocolate bar that was sitting on her desk and licked it. He then put it back on her desk. Neelam felt his actions were totally inappropriate and said right away "what are you doing?"   Neelam noted she was very angry as she was no longer able to eat her chocolate bar.  Neelam noted she told ████ to "get out of her face". ████ walked away from her desk knowing she was very angry with him. ████ then sent a BBM to Neelam saying  he was sorry but he thought they were comfortable with one another, and that he would go back to being "just business" with her.  Neelam confirmed that she responded to his BBM and told him he had crossed a line and what he did really bothered her.

Neelam then noted that when on a recent trip with John Chen and ████ that ████ had put his hands around her waist to move her out of the way when he was trying to get past her.  This made her very uncomfortable. She did not say anything to him at this time, but just shrugged away.

John M asked if Neelam felt there has been a change in ████s behavior recently.  Neelam recalled a situation on September 11, 2016 when she and ████ went to get a phone engraved.  It was a two hour trip.  After the trip, ████ had BBM'd her to let her know that he had a great day with her and that maybe they could go out for lunch sometime.  Neelam stated that she may have responded with a BBM message back "it was good", but she can't really recall her response.  His BBM made her feel uncomfortable.

Neelam stated that ████ has been coming to her office for no reason a lot.  She will ask ████ if he needs something, to which he usually responds with a no.  He typically says he is just stopping by and checking on her.  She feel he is "lurking" and it makes her feel uneasy.

When on another business trip with ████ and John Chen, ████ told Neelam he would pick up her luggage from her room and take it to the car. Neelam was on a call when ████ came to the door.  She let him in and he stood there while she finished her call. Neelam then told ████ that she was not ready and still

had to pack. ██did not leave the room and she asked him to leave and wait outside as she was not ready. ██ seemed irritated that he was asked to leave and that made her uncomfortable. Neelam noted she usually brings her own luggage to the lobby or ██ will pick it up from outside her room.

John M asked Neelam if she has ever given ██an indication that his behaviour had been bothering her. She said yes, but subtly.

On Friday, November 11, 2016 while checking out from her hotel, ██ put his arm around her at the front desk. She moved away and ██ noticed and said "oh, am I in your personal space?" Neelam replied with "yes".

Recently while Neelam and ██were in Lura Lalomio's office (John Chen's Executive Assistant) Neelam said that ██ was staring at her. She asked ██ why he was staring at her and he said "Don't be so self-conscious". This left her feeling "creeped out".

John M then asked if ██asks about her personal life, she said no, not really.

John M then asked Neelam how comfortable she is working with ██currently. Neelam noted that she feels like ██ is always watching her, walking past her office a lot. She feels tense around him and very uncomfortable. She is worried that bring this situation to light, that travel will become difficult.

Neelam then discussed as situation that happened on a recent trip to Ottawa. She had some trouble with her WiFi, so ██offered up his mobile hotspot for her use. She needed to send a file so he came to her room so she could use his hotspot. She used the service then asked him to leave three times before he left.

She feels like he sits and stares at her and is always lurking around her. She confirmed that she is nervous he will touch her physically again.


**Investigation Noted from Interview with** ████████████████
**Date**:  November 16, 2016
**Participants:**
John Mazurek, VP, Employee Relations and Compliance
Mary Hundt, Senior HR Business Partner Manager
Paul Woo, Security Director


Meeting was arranged to speak to ██ regarding a complaint about him. At the beginning of the meeting John Mazurek provided parameters around the investigation, that the goal of investigation is to gather the facts and to present those facts. John M then highlighted the need for confidentiality throughout this investigation. He then confirmed that BlackBerry will not tolerate any reprisals due to

# EXHIBIT 24

**::: BlackBerry.**

November 23, 2016                                                CONFIDENTIAL

To: ▮▮▮▮▮

Dear ▮▮▮

We have completed our investigation into the issues raised by Neelam Sandhu regarding several interactions that took place between the two of you which she claimed made her uncomfortable. We have concluded that your conduct did not constitute sexual harassment. However, we have also concluded that for you to successfully continue your employment at BlackBerry – which is something we would all like to see - you must immediately modify your behavior towards Ms. Sandhu. More specifically, you must immediately refrain from:

1.Touching things on her desk, teasing her in any way or engaging in practical jokes with her;

2. Physically touching her in any way whether it is to "move her out of the way" or "get past her" or for any other reason;

3. Asking her out for lunch, dinner or any other non-work required event at any time, whether you are traveling on behalf of BlackBerry or working from your home base;

4. Checking in on her to see if she needs anything or entering her office for any reason except when she asks you do  so or for a specific work-related purpose;

5. Picking up or carrying her luggage for her. She is capable of doing this task herself;

6. Either entering her hotel room when you are traveling or waiting for her right outside her door. If you need to wait for her, do so in the hotel lobby;

7. Engaging in any other conduct with Ms. Sandhu or any other co-worker which a reasonable manager should know is inappropriate or unwanted.

▮▮▮ we are confident that now that you have been made aware that some of your conduct in the past has made Ms. Sandu uncomfortable, you will refrain from engaging in such conduct moving forward. However, we do want you to recognize the seriousness of this issue.  If you engage in any of the above- referenced activities after being warned not to do so; we may have no choice but to terminate your employment. In addition, BlackBerry encourages its employees to bring forth any complaints or concerns they may have and assures all employees that there will be no retaliation for doing so. Therefore, we are also putting you on notice that if you engage in any conduct which could be perceived as retaliatory in nature towards Ms. Sandhu, that will likewise result in the termination of your employment. Do not discuss the issues raised by Ms. Sandhu with her. Do not attempt to apologize or "make things right." Simply go about your business in a completely professional manner and treat Ms. Sandhu with the utmost respect and courtesy. Anything less will be unacceptable.

ATTORNEYS' EYES ONLY                                                            BB13-00000275

**:::** *BlackBerry.*

Finally ▮▮▮▮ if we did not think that you would be able to modify your behavior in light of the issues that were raised, we would have terminated your employment at this time. However, as I said above, we are confident that you will take to heart what we are telling you and so that these kinds of concerns will never again be raised by any employee with respect to any interactions involving you. If you wish to discuss our investigation or the contents of this letter, please feel free to call me at any time.

John Mazurek
Vice President, Employee Relations & Compliance
Human Resources

Office: 519-597-4756
Mobile: 519-404-0562
*:  [ HYPERLINK "mailto:jmazurek@BlackBerry.com" ]

**:::** *BlackBerry.* Secured. Protected. Connected.

ATTORNEYS' EYES ONLY

# EXHIBIT 25



**8:37**

**DL**

Dick

Nov 15, 2023 at 4:38 PM

JJG could use some handholding. He seems to believe the process is taking time because there's been a change of heart - he fears he's going to be told right after Malaysia has been secured. I told him today we're actively working on comp planning (and that you and I had a long call on it yesterday) and that the investigation report should be done next week. Still, he's worried so maybe touch base if you haven't recently.

I have been deliberately avoiding him for the reasons we discussed.

I think this trumps those concerns.

I will call him

I think so too. You can still say "assuming the report is what we expect..."

Will do it now

Nov 15, 2023 at 5:53 PM

Text Message • RCS

BB13-00019788



8:38    5G+

**DL**

Dick

Nov 15, 2023 at 5:53 PM

He is well over the edge. I think I brought him back but we will somehow need to keep him calm. I told him it will be another couple of weeks, just to buy some patience on his side.

Nov 19, 2023 at 10:24 AM

The other big reason we didn't pay the S&C bills monthly was an irrational dislike that John Chen developed around them because one lawyer there one time said one innocuous thing that offended his feeling of total control. This is how we have been managing the business, especially in 2023.

Nov 19, 2023 at 11:47 AM

Thanks for color.

Go on vacation!

Dec 7, 2023 at 9:34 PM

I'll speak with Mike in the early part of next week about your service as interim CEO, as we

Text Message • RCS

# EXHIBIT 26

1  KATHERINE M. FORSTER (State Bar No. 217609)
   katherine.forster@mto.com
2  CRAIG JENNINGS LAVOIE (State Bar No. 293079)
   Craig.Lavoie@mto.com
3  LAUREN N. BECK (State Bar No. 343375)
   Lauren.Beck@mto.com
4  KYRA E. SCHOONOVER (State Bar No. 343166)
   Kyra.Schoonover@mto.com
5  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue, Fiftieth Floor
6  Los Angeles, California 90071-3426
   Telephone:    (213) 683-9100
7  Facsimile:    (213) 687-3702

8  Attorneys for Defendant BLACKBERRY
   CORPORATION, a Delaware Corporation
9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12

13
   JANE DOE, an individual,              Case No. 3:24-CV-02002-SK
14
              Plaintiff,                 **RESPONSES TO PLAINTIFF'S**
15                                        **INTERROGATORIES TO DEFENDANT**
         vs.                              **BLACKBERRY CORPORATION,**
16                                        **SET ONE**
   BLACKBERRY CORPORATION, a
17 Delaware Corporation; and JOHN
   GIAMATTEO, an individual,
18
              Defendants.
19

20

21
   PROPOUNDING PARTY:        JANE DOE ("PLAINTIFF")
22
   RESPONDING PARTY:         BLACKBERRY CORPORATION ("DEFENDANT")
23
   SET NO.:                  ONE
24

25

26

27

28

Defendant BlackBerry Corporation ("BlackBerry") hereby responds and objects to Plaintiff Jane Doe's ("Plaintiff") First Set of Interrogatories as follows:

## **PREFATORY STATEMENT**

1.       BlackBerry's disclosure of information is not a waiver of any objections set forth herein or an admission or acknowledgment that such information is relevant to the claims or defenses in this action. Further, these objections and responses are without prejudice to and not a waiver of (i) BlackBerry's right to contend at trial or in any other proceeding in this action that such material is inadmissible, irrelevant, immaterial, or not a proper basis for discovery; or (ii) any objection by BlackBerry to any future use of such material that Plaintiff or any other party may attempt to make.

2.       BlackBerry's disclosure of information in response to these Interrogatories is not intended to be and does not constitute a waiver of any legal rights, or privileges, or protections held by BlackBerry.

3.       BlackBerry answers generally that, by responding to these Interrogatories, BlackBerry does not waive its right to object, at any time and on any ground, in this or any other proceeding, to the use of its responses.

4.       BlackBerry answers generally that BlackBerry has not completed its investigation relating to this action, discovery is not yet finished, and BlackBerry has not completed preparation for trial. These responses are limited to the information known to BlackBerry at this time and do not constitute a waiver of BlackBerry's right to introduce additional evidence at trial.

5.       BlackBerry's objections and responses to these Interrogatories are given without prejudice to BlackBerry's right to supplement and/or amend its objections and responses to these Interrogatories based on discovery taken or information discovered after these objections and responses are served, to present relevant evidence at trial, and to correct inadvertent errors, mistakes, or omissions.

# **GENERAL OBJECTIONS**

The following General Objections apply to and are incorporated into each and every response to each and every specific Interrogatory, whether or not such General Objections are expressly incorporated by reference in such response.

1.      BlackBerry objects to each and every Interrogatory to the extent that it attempts to impose obligations inconsistent with or in addition to those required by the Federal Rules of Civil Procedure, the Local Rules or Orders of this Court, or any other applicable authority.  Subject to and without waiving any Objections, in responding to the Interrogatories, BlackBerry will construe the Interrogatories in accordance with the Applicable Rules.

2.      BlackBerry objects to each and every Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it is not reasonably limited in scope, or seeks information neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence, particularly to the extent that compliance would force BlackBerry to incur a substantial expense that outweighs any likely benefit of the discovery.

3.      BlackBerry objects to each and every Interrogatory to the extent that it lacks a reasonable time limitation, including but not limited to, because it poses an undue burden on BlackBerry.  To the extent BlackBerry agrees to produce information in response to a specific Interrogatory, it will do so on a timeframe that is reasonable, taking into account the nature and scope of the individual Interrogatory and what is proportional to the needs of the case.

4.      BlackBerry objects to each and every Interrogatory to the extent that it seeks information or documents protected by the attorney-client privilege, work product doctrine, or any other applicable law, privilege, or immunity, protection, or doctrine.  Defendant claims such privileges and protections to the extent implicated by each Interrogatory, and excludes privileged and protected information from its responses.  The production of any privileged information or

document by BlackBerry is unintentional, and any such inadvertent production shall not be construed as a waiver of any applicable objection or privilege.

5.     BlackBerry objects to each and every Interrogatory to the extent that it calls for a legal conclusion.  Any response by BlackBerry shall not be construed as providing a legal conclusion regarding the meaning or application of any terms or phrases used in Plaintiff's Interrogatories, definitions, or instructions.

6.     BlackBerry objects to each and every Interrogatory to the extent that it seeks information already in the possession of or more readily available to Plaintiff, that are equally available to Plaintiff as they are to BlackBerry, or that could be derived or ascertained by Plaintiff with substantially the same effort that would be required of BlackBerry.

7.     BlackBerry objects to each and every Interrogatory to the extent that it seeks information not within BlackBerry's possession, custody, or control.

8.     BlackBerry objects to each and every Interrogatory to the extent that it is unreasonably cumulative or duplicative.

9.     BlackBerry objects to each and every Interrogatory to the extent that it seeks any confidential, proprietary, competitively sensitive, trade secret information, financial information, or any other information or documents that BlackBerry is not permitted to disclose pursuant to confidentiality or other legal obligations to third parties.

10.     BlackBerry objects to each and every Interrogatory to the extent that it contains subparts or a compound, conjunctive, or disjunctive request.

11.     BlackBerry objects to each and every Interrogatory to the extent that it calls for BlackBerry to form and then render an expert opinion.

12.     BlackBerry objects to each and every Interrogatory to the extent that it is argumentative.

13.     BlackBerry objects to each and every Interrogatory to the extent that it is speculative, lacks foundation, or contains characterizations, definitions, or assumptions.  Nothing contained in or absent from BlackBerry's responses, objections, or production shall constitute, or be deemed as, an admission, concession, or agreement that Plaintiff's characterizations, definitions, or assumptions are correct or accurate.

14.     BlackBerry objects to each and every Interrogatory to the extent that it purports to require BlackBerry to compile information in a manner that is not maintained in the ordinary course of business, or to create documents, including but not limited to charts, tables, reviews, proposals, methodologies, and/or breakdowns, that do not already exist.

15.     BlackBerry objects to each and every Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it calls for "all" information concerning a subject matter, without regard to whether information is likely to be privileged, duplicative, and/or have any (or minimal) connection to the claims or defenses at issue in this case.

16.     BlackBerry objects to each and every Interrogatory, to the extent that it is vague and ambiguous, overly broad, unduly burdensome, lacking in particularity, unreasonable or seek the discovery of information that is neither relevant to the claims or defenses of any party to the pending Action nor reasonably calculated to lead to the discovery of admissible evidence, as well as to the extent that they are unduly burdensome because they impose a significant expense and inconvenience on BlackBerry.  The Responses provided herein are based on a reasonable search for responsive information. BlackBerry reserves the right at any time to revise, correct, add to, clarify or supplement its Responses.  BlackBerry objects generally to the Interrogatories to the extent that they seek information that is cumulative or duplicative of Plaintiff's First Set of Requests for Production, dated June 12, 2024 ("Plaintiff's Requests for Production").

17.     As set forth below, for certain of the Interrogatories, BlackBerry invokes Rule 33(d) of the Federal Rules of Civil Procedure to the extent that information sought in the Interrogatories may be derived or ascertained from documents that BlackBerry has produced or anticipates producing in response to Plaintiff's Requests for Production, or from an examination, audit or inspection of such documents, or that is equally obtainable from public sources or from some other source or through some other means of discovery that is more convenient, less burdensome or less expensive.

18.     BlackBerry objects generally to the Interrogatories to the extent that they contain inaccurate, incomplete or misleading descriptions of facts, persons, relationships and/or events underlying the Action.  BlackBerry further objects to the Interrogatories to the extent that they assume the existence of facts that do not exist or the occurrence of events that did not take place. Any Response, production of documents or provision of information in response to the Interrogatories is not intended to provide, and shall not constitute or be construed as providing an admission that any factual predicate stated in the Interrogatories is accurate.

19.     BlackBerry's Responses are based on its current knowledge. Further investigation may reveal additional facts or information that could lead to additions to, changes in, and/or variations from the Responses herein. Without in any way obligating itself to do so, BlackBerry expressly reserves the right to supplement, amend, correct, clarify, or modify the Responses as further information becomes available. BlackBerry also reserves the right to use or rely on, at any time, subsequently discovered information or information omitted from these objections and Responses as a result of mistake, error, oversight or inadvertence. The Responses provided herein are based on a reasonable search for responsive information. BlackBerry reserves the right at any time to revise, correct, add to, clarify or supplement its Responses.

20.    BlackBerry objects generally to the Interrogatories to the extent they seek information prior to Giamatteo's hiring on October 4, 2021, or after the effective date of Plaintiff's termination on December 15, 2023, and therefore seek information that is not relevant to any party's claim or defense or proportional to the needs of the case, or within BlackBerry's knowledge and control. Unless otherwise stated, BlackBerry responds to the Interrogatories with respect to the time period from October 4, 2021, through and including December 15, 2023.

**INTERROGATORY NO. 1:**

Identify all investigations you conducted regarding Plaintiff's complaints of John Giamatteo.

**RESPONSE TO INTERROGATORY NO. 1:**

BlackBerry incorporates its general objections as though fully set forth herein.  BlackBerry further objects to the phrases "investigations," "identify" and "you" as vague and ambiguous. BlackBerry will construe these terms in accordance with their plain English meaning.  BlackBerry objects to the phrase "Plaintiff's complaints of John Giamatteo"  as vague and ambiguous. BlackBerry will construe "Plaintiff's complaints of John Giamatteo," to refer to complaints Plaintiff submitted under her name to employees in BlackBerry's Human Resources department regarding John Giamatteo.

BlackBerry further objects to this Interrogatory under Fed. R. Civ. P. 33(d) because it seeks information that is contained in documents that have been or are expected to be produced by BlackBerry, and the burden of deriving or ascertaining the information from those documents will be substantially the same for Plaintiff as it is for BlackBerry.

Finally, BlackBerry objects to the extent this Interrogatory calls for information protected by the attorney-client and work product privileges.

Subject to and without waiving the foregoing objections or applicable privileges, BlackBerry responds as follows:  In July and August 2022, BlackBerry conducted an investigation into Plaintiff's complaints regarding an organizational chart that did not accurately reflect the reporting structure at BlackBerry.  In February 2023, BlackBerry conducted an investigation into

Plaintiff's claims that, in Plaintiff's words: (1) John Giamatteo's team "does not appropriately acknowledge my role," and (2) John Giamatteo "told his team that [Plaintiff's] role will be changing." *See* SAN00219019.  In February 2023, BlackBerry also conducted an investigation into Plaintiff's claim that BlackBerry's Cyber BU team was violating direction from then-CEO John Chen by pushing a client to adopt a third-party software solution called Lookout, instead of a BlackBerry product called MTD.  *See* SAN00219016.  In November 2023, BlackBerry investigated Plaintiff's claims of harassment and retaliation by John Giamatteo.  *See* DOE000143.

**INTERROGATORY NO. 2:**

Explain the results of the investigations you conducted regarding Plaintiff's complaints of John Giamatteo and why you reached those results.

**RESPONSE TO INTERROGATORY NO. 2:**

BlackBerry incorporates its general objections as though fully set forth herein.  BlackBerry further objects to the phrases "investigations," "explain," and "you" as vague and ambiguous. BlackBerry will construe these terms in accordance with their plain English meaning.  BlackBerry objects to the phrase "Plaintiff's complaints of John Giamatteo" and "results" as vague and ambiguous.  BlackBerry will construe "Plaintiff's complaints of John Giamatteo" to refer to complaints Plaintiff submitted under her name to employees in BlackBerry's Human Resources department regarding John Giamatteo.  BlackBerry will construe "results" to refer to the principal findings of those investigations.

BlackBerry further objects to this Interrogatory under Fed. R. Civ. P. 33(d) because it seeks information that is contained in documents that have been or are expected to be produced by BlackBerry, and the burden of deriving or ascertaining the information from those documents will be substantially the same for Plaintiff as it is for BlackBerry.

Finally, BlackBerry objects that this request—which asks BlackBerry to "explain the results" of investigations conducted by legal counsel and the rationale for those "results"—calls for information protected by the attorney-client privilege and work product doctrine.

Subject to and without waiving the foregoing objections or applicable privileges, BlackBerry responds as follows:

BlackBerry's August 2022 investigation into Plaintiff's complaints regarding an organizational chart that did not accurately reflect the reporting structure at BlackBerry found no misconduct by John Giamatteo.  The August 2022 investigation, which was conducted by BlackBerry Human Resources employees, found that the organizational chart was created in error; that the error was not intentionally circulated to clients; and that leadership had not directed the chart to be circulated.  *See* BRJ00025349.

BlackBerry's February 2023 investigation into Plaintiff's claims that, in Plaintiff's words: (1) John Giamatteo's team "'does not appropriately acknowledge my role," and (2) John Giamatteo "told his team that [Plaintiff's] role will be changing," *see* SAN00219019, found no misconduct by John Giamatteo.  Further information regarding this investigation sought by Interrogatory 2 is protected by attorney-client and work product privileges.

BlackBerry's February 2023 investigation into Plaintiff's claims that BlackBerry's Cyber BU team was violating direction from then-CEO John Chen by pushing a client to adopt a third-party software solution called Lookout, *see* SAN00219016, also found no misconduct by John Giamatteo or members of the Cyber BU team.  Further information regarding this investigation sought by Interrogatory 2 is protected by attorney-client and work product privileges.

BlackBerry's November 2023 investigation, in which Plaintiff raised a claim to BlackBerry HR that John Giamatteo sexually harassed her and retaliated against her, found no misconduct by John Giamatteo.  *See* DOE000143.  Further information regarding this investigation sought by Interrogatory 2 is protected by attorney-client and work product privileges.

**INTERROGATORY NO. 3:**

Identify all the individuals you interviewed regarding Plaintiff's complaints of John Giamatteo.

**RESPONSE TO INTERROGATORY NO. 3:**

BlackBerry incorporates its general objections as though fully set forth herein.  BlackBerry further objects to the phrases "identify" and "investigations" as vague and ambiguous.  BlackBerry will construe these terms in accordance with their plain English meaning.  BlackBerry objects to the phrase "Plaintiff's complaints of John Giamatteo" as vague and ambiguous.  BlackBerry will

construe "Plaintiff's complaints of John Giamatteo" to refer to complaints Plaintiff submitted under her name to employees in BlackBerry's Human Resources department regarding John Giamatteo.  BlackBerry further objects to the phrase "you" as vague and ambiguous.  BlackBerry will construe "you" to refer to BlackBerry employees and outside counsel.

BlackBerry further objects to this Interrogatory under Fed. R. Civ. P. 33(d) because it seeks information that is contained in documents that have been or are expected to be produced by BlackBerry, and the burden of deriving or ascertaining the information from those documents will be substantially the same for Plaintiff as it is for BlackBerry.

Subject to and without waiving the foregoing objections or applicable privileges, BlackBerry responds as follows:

BlackBerry's Human Resources employees interviewed the following individuals as part of the August 2022 investigation into Plaintiff's complaints regarding an organizational chart that did not accurately reflect the reporting structure at BlackBerry:



Neelam Sandhu

The identity of individuals interviewed as part of BlackBerry's February 2023 investigation into Plaintiff's claims that, in Plaintiff's words:  (1) John Giamatteo's team "'does not appropriately acknowledge my role," and (2) John Giamatteo "told his team that [Plaintiff's] role will be changing," *see* SAN00219019, is protected by attorney-client and work product privileges.

The identity of individuals interviewed as part of  BlackBerry's February 2023 investigation into Plaintiff's claims that BlackBerry's Cyber BU team was violating direction from then-CEO John Chen by pushing a client to adopt a third-party software solution called Lookout is also protected by attorney-client and work product privileges.

The identity of individuals interviewed as part of  BlackBerry's November 2023 investigation, in which Plaintiff raised a claim to BlackBerry HR that John Giamatteo harassed her

1  and retaliated against her, *see* DOE000143, is protected by attorney-client and work product

2  privileges.

3  **INTERROGATORY NO. 4:**

4    Identify all the individuals who accused John Giamatteo of retaliation, sexual harassment,

5  or discrimination, from 2018 to the present.

6  **RESPONSE TO INTERROGATORY NO. 4:**

7    BlackBerry incorporates its general objections as though fully set forth herein.

8  BlackBerry objects to Interrogatory No. 4 to the extent it calls for legal conclusions regarding

9  "retaliation," "sexual harassment," and "discrimination."  In addition, BlackBerry objects to this

10  Interrogatory to the extent it seeks information protected by attorney-client privilege or the

11  attorney work product privilege.

12    BlackBerry objects to Interrogatory 4 to the extent it seeks information not within

13  BlackBerry's possession, custody, or control.  BlackBerry further objects to this Interrogatory as

14  overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seek

15  information that predates John Giamatteo's hiring in October 2021.  BlackBerry further objects to

16  the phrase "identify" as vague and ambiguous.  BlackBerry will identify persons responsive to this

17  request by name. The phrase "individuals who accused," moreover, is as vague and ambiguous.

18  BlackBerry will interpret "individuals who accused" to refer to individuals who complained, using

19  their own name, of retaliation, sexual harassment, or discrimination by John Giamatteo to

20  employees in BlackBerry's Human Resources department.

21    Subject to and without waiving the foregoing objections or applicable privileges,

22  BlackBerry responds as follows:  Neelam Sandhu and ███████████

23  **INTERROGATORY NO. 5:**

24    State the reason(s) for your decision to terminate Plaintiff.

25  **RESPONSE TO INTERROGATORY NO. 5:**

26    BlackBerry incorporates its general objections as though fully set forth herein.   Subject to

27  and without waiving the foregoing objections, BlackBerry responds as follows:

28

Beginning on May 1, 2023, BlackBerry's Board of Directors, together with its advisors Morgan Stanley and Perella Weinberg Partners, evaluated multiple strategic alternatives to drive shareholder value, including the possibility of separating BlackBerry's Internet of Things ("IoT") business and its Cybersecurity business.  In October 2023, BlackBerry announced that it would separate the IoT and Cybersecurity businesses into two standalone entities.  BlackBerry also began to identify areas for cost reduction, including cuts to centralized corporate functions that were not needed by either standalone business.

Plaintiff's position at BlackBerry, which had been effectively created for her by former CEO John Chen, did not fit within either the IoT business or the Cybersecurity business.  As a result, Plaintiff's position was eliminated along with those of two other executives and more than 500 other employees.

BlackBerry declined to place Plaintiff in another role at the company because she displayed a pattern of non-collaborative, antagonistic conduct with her colleagues and expressed a belief that they were not contributing as much as she was.  BlackBerry specifically declined to place Plaintiff in another role serving the BlackBerry customer accounts she had managed in her role on the Elite team because Plaintiff's performance with those customer accounts was not strong, and former CEO John Chen had needed to step in to move projects forward or to resolve issues.  Furthermore, Plaintiff told interim CEO Richard Lynch that she wanted to be CEO herself. Mr. Lynch did not think that Plaintiff would be able to carry on with the business in a constructive or successful way when she lacked good relationships with others in the organization, especially when she wanted the CEO role and was not going to get it.

**INTERROGATORY NO. 6:**

Identify the individuals who were involved in the decision to terminate Plaintiff.

**RESPONSE TO INTERROGATORY NO. 6:**

BlackBerry incorporates its general objections as though fully set forth herein.

Subject to and without waiving the foregoing objections, BlackBerry responds as follows: BlackBerry's Interim CEO Richard Lynch.

1

2  DATED:  August 12, 2024                MUNGER, TOLLES & OLSON LLP

3

4                                          By:  _____/s/ Katherine Forster_____

5                                                    KATHERINE FORSTER

6                                          Attorneys for Defendants BLACKBERRY
                                           CORPORATION, a Delaware Corporation
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Verification of Response to Interrogatory Nos. 1, 2, 3, and 4</u>**

I, Jennifer Bramhill, am Vice President of Employee Relations at BlackBerry Corporation ("BlackBerry").  On behalf of BlackBerry, I have read the foregoing interrogatory responses and I verify that the responses are true according to the best of my knowledge, information, and belief based on a reasonable inquiry.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  9th  day of August, 2024 in Ontario, Canada.


_____

Jennifer Bramhill

RESPONSES TO PLAINTIFF'S INTERROGATORIES TO DEFENDANT BLACKBERRY CORPORATION,
SET ONE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Verification of Response to Interrogatory Nos. 5 and 6**

I, Richard Lynch, am Chair of the Board of Directors of BlackBerry Corporation ("BlackBerry"), and previously served as Interim Chief Executive Officer at BlackBerry.  On behalf of BlackBerry, I have read the foregoing interrogatory responses and I verify that the responses are true according to the best of my knowledge, information, and belief based on a reasonable inquiry.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _12_ day of August, 2024 in _Wellesley, MA_

Richard Lynch

RESPONSES TO PLAINTIFF'S INTERROGATORIES TO DEFENDANT BLACKBERRY CORPORATION, SET ONE

# EXHIBIT 27

EXHIBIT
33
RICHARD LYNCH
6/5/2025          JA

# EXHIBIT 33

Contact Us     Request a Demo     Support

PRODUCTS     SOLUTIONS     PARTNERS     COMPANY

# BlackBerry Executive Team



**John Giamatteo**
Chief Executive Officer

John Giamatteo is BlackBerry's Chief Executive Officer and President of its Cybersecurity division. John brings to BlackBerry over 30 years of experience in P&L, go-to-market, marketing, customer relationships, and customer success with global high technology companies.  He came to BlackBerry from McAfee where he was President and Chief Revenue Officer for over six years.  Prior to that John served as Chief Operating Officer at AVG Technologies, a leading provider of internet and mobile security. He also held leadership positions with Solera, RealNetworks and Nortel Networks.

John holds an MBA and Bachelor of Accounting from St. John's University in New York.



**Jennifer Armstrong-Owen**
Chief People Officer

Jennifer Armstrong-Owen is BlackBerry's Chief People Officer. In this role, she is responsible for BlackBerry's people strategy and operations in support of its business and team members around the globe. Jennifer brings over 30 years of progressive experience in the HR field and has spent the last fourteen years serving as the people leader for multiple public and private technology companies. These companies include OfferUp, SeekOut, Chef Software, Impinj, Corbis, and RealNetworks.

Jennifer holds an MBA from the University of Washington and a BA from The Evergreen State College. Additionally, she sits on the board of a non-profit organization focused on providing transitional housing for homeless families in the Seattle area.

BlackBerry uses cookies to help make our website better. Some of the cookies are necessary for proper functioning of the site, while others are to help us understand how you use it. Learn More

Cookie Settings

Accept





**John Dimitropoulos**
*Senior Vice President and*
*Chief Strategy Officer*

John Dimitropoulos (JD) is BlackBerry's Senior Vice President and Chief Strategy Officer. He brings over 30 years of extensive international experience in the telecoms, media, and technology sectors. Over the course of his career, JD has been involved with and led many international acquisitions and divestments in Europe, Asia, and the United States for various US-based tech companies.

JD's recent stints include assisting internet security giant McAfee in the United States with both Corporate Development and Sales Channel optimization.  He also acted as a Corporate Advisor to South Korea's SK Telecom's group's CEO within Southeast Asia.

Additionally, JD spent 12 years consulting with Real Networks, a Seattle-based company, where he was responsible for assisting in the development of the long-term strategy for its Mobile Entertainment division, as well as driving M&A activity for the company.

Prior to this, JD had two stints with Nortel Networks, one in the early '90s in London as well as New York and one in the mid-'00's in Seoul, South Korea.

JD holds a Bachelor of Business (Accounting and Comp Science) and is currently undertaking his GAICD accreditation.



**Mattias Eriksson**
President, BlackBerry IoT

Mattias Eriksson is President and General Manager of BlackBerry's IOT Business Unit. The business unit consists of BlackBerry Technology Solutions or BTS (BlackBerry® QNX®, BlackBerry Certicom®, BlackBerry Radar® and BlackBerry Jarvis™) and BlackBerry IVY™. Prior to joining BlackBerry, Mattias spent 10 years with HERE Technologies in various leadership roles, including SVP of the core location data business group and SVP of product. Mattias brings over two decades of experience in automotive location data services, mobile communications and embedded software to BlackBerry.

Mattias started his career in management consulting for Arthur D. Little and then spent 15 years in APAC working in a variety of management roles across Sales-, Business Development and Product Management for Nokia, Motorola, and Siemens.

Mattias holds a M.Sc. in Engineering Physics from Lund Institute of Technology, a B.Sc. in Marketing and Economics from Lund University and an M.B.A. from INSEAD.

BlackBerry uses cookies to help make our website better. Some of the cookies are necessary for proper functioning of the site, while others are to help us understand how you use it. Learn More

Tim Foote
Chief Financial Officer

Tim Foote is BlackBerry's Chief Financial Officer and is responsible for internal and external financial reporting and compliance, financial strategy and management, investor relations and treasury.

roles have included managing the Company's international finance operations, Vice President of Investor Relations and, most recently, CFO for the Cybersecurity division.

Tim holds an MBA from Imperial College Business School, London and is a Chartered Accountant.



**Jesse Harold**

Senior Vice President, Chief Information Officer and Chief Information Security Officer

Jesse Harold is Senior Vice President, Chief Information Officer and Chief Information Security Officer at BlackBerry. In this role, Jesse is responsible for technology operations of the company's Cybersecurity and IoT SaaS portfolio, IT services and Cloud and business transformation enablement. He also leads all aspects of BlackBerry's information and product security, focusing on effective management of cybersecurity risks, policies and procedures.

Jesse joined BlackBerry's Core Network Engineering team in 2008. His career with the Company has seen him progress rapidly through various roles to Vice President, where he helped to transform IT into a truly enterprise function, and now CIO. Jesse's academic background includes an Executive MBA from Queen's University, an Advanced Diploma in Telecommunications Technology from Sheridan College, and CISM and CRISC credentials.



**Phil Kurtz**

Chief Legal Officer and Corporate Secretary

Phil Kurtz is BlackBerry's Chief Legal Officer and Corporate Secretary with responsibility for the company's worldwide legal affairs, including corporate governance, strategic transactions, securities regulatory and shareholder matters, litigation, privacy, government relations, compliance and investigations.  He is also the leader of the company's Licensing business and acts as Chief Risk Officer.

Phil has served in roles of increasing responsibility at BlackBerry since 2009, including as Vice President, Deputy General Counsel and Assistant Corporate Secretary.  Before joining the company, he was a partner at VenGrowth Capital and an associate at McCarthy Tétrault LLP.

Phil holds LLB and MBA degrees from the University of Toronto and a BA from Huron University College at Western University.  In 2012, Phil was a recipient of the Forty Under 40 Award from the Ottawa Business Journal and Ottawa Chamber of Commerce.

BlackBerry uses cookies to help make our website better. Some of the cookies are necessary for proper functioning of the site, while others are to help us understand how you use it. Learn More



CONTACT US

SUPPORT

CAREERS

Corporate

Company

QNX

Newsroom

Investors

Events & Webinars

Careers

Leadership

Sustainability

Certifications

Customer Success

Developers

Enterprise Platform & Apps

BlackBerry QNX Developer Network

Blog

BlackBerry Blog

Developers Blogs

Legal

Overview

Accessibility

Patents

Trademarks

Privacy Policy

Canada Modern Slavery Act

UK Modern Slavery Act

Germany - Imprint

BlackBerry uses cookies to help make our website better. Some of the cookies are necessary for proper functioning of the site, while others are to help us understand how you use it. Learn More

Languages:

English

© 2025 BlackBerry Limited. All rights reserved.

BlackBerry uses cookies to help make our website better. Some of the cookies are necessary for proper functioning of the site, while others are to help us understand how you use it. Learn More

# EXHIBIT 28

**From:**        John Giamatteo [jjg@blackberry.com]
**Sent:**         10/27/2023 5:54:21 PM
**To:**           Tate, Eric Akira [ETate@mofo.com]
**CC:**           Phil Kurtz [pkurtz@blackberry.com]; Rodriguez, Monica A. [MRodriguez@mofo.com]
**Subject:**      RE: Confidential
**Attachments:**  JJG July QBR.pptx

Hi Eric and Monica,

As we discussed earlier, enclosed, please find the presentation material I use in our quarterly business reviews (QBR) to set the tone and focus on our priorities. I use slide 2 to emphasize my expectations on the 5 values we should all be rallying around as we execute on our goals.

Value #4 Diversity: Building an organization of diverse people (race, gender and diverse experiences) is something I believe deeply in and will continue to drive. While we have not made as much progress as I would like during my time at BlackBerry it remains a priority and something I have had success with previously. Also, unfortunately, as our business has declined, we have been in more of a cost cutting mode the last couple of years and have not been building as much of a diverse leadership team as I would like. Overall, we reduced over 200 people and $67M of opex over the last two years with more reductions coming in November.

I hope this is helpful with the investigation.

Best regards,
JJG

---

**From:** Tate, Eric Akira <ETate@mofo.com>
**Sent:** Friday, October 27, 2023 5:59 PM
**To:** John Giamatteo <jjg@blackberry.com>
**Cc:** Phil Kurtz <pkurtz@blackberry.com>; Rodriguez, Monica A. <MRodriguez@mofo.com>
**Subject:** Confidential

**CAUTION** - This email is from an external source. Please be cautious with links and attachments. (go/taginfo)

John,
Thank you for your time today. If there is anything you want to share with us with regard to the investigation, please do not hesitate to reach out to me or Monica directly. My mobile phone is (415) 702-5406 for reference as well. We appreciate your cooperation and maintaining the confidentiality of this process.
Regards,
Eric

**ERIC AKIRA TATE**
(he/him/his) | Partner

**ⅢORRISON FOERSTER**
425 Market St. | San Francisco, CA 94105
P: +1 (415) 268-6915

CONFIDENTIAL

mofo.com | LinkedIn | Twitter



======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

CONFIDENTIAL

# EXHIBIT 29

| | |
|---|---|
| **From**: | Phil Kurtz [pkurtz@blackberry.com] |
| **Sent**: | 10/27/2023 3:19:36 PM |
| **To**: | Tate, Eric Akira [ETate@mofo.com]; Rodriguez, Monica A. [MRodriguez@mofo.com] |
| **Subject**: | FW: Org Chart |
| **Attachments**: | Cybersecurity Business Unit.pdf |

Hi Eric and Monica,

Here's John Giamatteo's org chart showing his direct reports plus one level down.  I don't know why some names are in dark blue boxes and some are in light blue boxes; I've asked and will let you know when I hear back from Jenn.

Phil

**From:** Jennifer Bramhill <jbramhill@blackberry.com>
**Sent:** Friday, October 27, 2023 5:53 PM
**To:** Phil Kurtz <pkurtz@blackberry.com>
**Subject:** Org Chart

Hi Phil,

Attached please find an org chart of the cyber BU – leader + directs + their directs. You will notice that the page numbering does not align, as some direct reports have "inherited" organizations – so a separate report was required in order to capture their directs who sit in that organization.

Please call me if you have any questions upon review. If you require a cleaner view, I can export to PPT and manually adjust. It can be done with some time, but I wanted to get you a first copy as soon as possible.

Best regards,

**Jennifer Bramhill** (She/Her)
VP, Employee Relations & HR Business Partner
Phone: +1 (519) 597-0623
jbramhill@blackberry.com

*BlackBerry*®  Intelligent Security. Everywhere.

CONFIDENTIAL

## Cybersecurity Business Unit  (John Giamatteo (46415))

(12)

**BlackBerry.**
Intelligent Security. Everywhere.

**John Giamatteo (46415)**
Cybersecurity Business Unit (John Giama...
President, Cybersecurity Business Unit
Irving, Bldg 2

---

| Tash Stamatelos (46930) | Ken Murphy (46742) | Sasha Herakovic (2730) | Adam Enterkin (39162) | Nathan Jenniges (46591) | Hans-Peter Bauer (46568) | Kevin Easterwood (46451) | Alex Willis (1728) |
|---|---|---|---|---|---|---|---|
| APAC Sales (Tash Stamatelos (46930)) | AtHoc (Ken Murphy (48742)) | Customer Success and Professional Servi... | Cybersecurity Sales - NALA & Japan (Ad... | Cylance and UEM Products (Nathan Jenn... | EMEA Sales (Hans-Peter Bauer (46568)) | Field Marketing (Kevin Easterwood (46451)) | Global Sales Engineering (Alex Willis (1... |
| Vice President, Asia Pacific Sales (excludi... | Vice President and General Manager, AtHoc | Senior Vice President, Customer Support... | Chief Revenue Officer, Cybersecurity Busi... | Senior Vice President & General Manager ... | Senior Vice President - EMEA Sales for t... | Field Marketing (Kevin Easterwood (46451)) | Vice President, Global Sales Engineering |
| Singapore, Goldbell Tower | Irving, Bldg 2 | Waterloo, Bldg C | Charing Cross, Golden House | Portland | Munich, Home Office | Senior Vice President of Field Marketing | Jacksonville, Home Office |
| | | | | | | Irving, Bldg 2 | |
| 3   See Page 2 | 6   See Page 3 | 7   See Page 4 | 13   See Page 5 | 10   See Page 6 | 4   See Page 7 | 7   See Page 8 | 6   See Page 9 |

| Francesco Palopoli (35560) | Christoph Erdmann (39167) | John Dimitropoulos (46795) | Jenifer Vannoni (46428) |
|---|---|---|---|
| Global Sales Operations (Francesco Palo... | Secure Communications (Christoph Erd... | Strategy and Business Development (Jo... | Senior Business Operations Administrator |
| Vice President, Sales Strategy and Opera... | SVP, Secusmart | Senior Vice President of Strategy, Busine... | Irving, Bldg 2 |
| Milan, Home Office | Dusseldorf, Home Office | Melbourne, Home Office | |
| 8   See Page 10 | 8   See Page 11 | 3   See Page 12 | |

CONFIDENTIAL

BB13-00019448

# EXHIBIT 30

| | |
|---|---|
| **From:** | John Chen [john.chen@blackberry.com] |
| **Sent:** | 10/26/2023 9:12:38 AM |
| **To:** | Rich Curiale [rcuriale@curialewilson.com]; Nita White-Ivy [nwhiteivy@blackberry.com] |
| **Subject:** | Re: Attorney-Client Privileged and Confidential: How do we investigate this anonymous complaint against John G |

Yup
Sent via BlackBerry Hub+ Inbox for Android

---

**From:** rcuriale@curialewilson.com
**Sent:** October 26, 2023 8:06 AM
**To:** nwhiteivy@blackberry.com
**Cc:** john.chen@blackberry.com
**Subject:** Re: Attorney-Client Privileged and Confidential: How do we investigate this anonymous complaint against John G

**CAUTION** - This email is from an external source. Please be cautious with links and attachments. (go/taginfo)

Wow. Talk about bad timing.

Richard J. Curiale
Managing Partner
Curiale Wilson LLP
201 Spear Street
Suite 1100
San Francisco CA  94105
415.990.9082

On Oct 26, 2023, at 8:03 AM, Nita White-Ivy <nwhiteivy@blackberry.com> wrote:

ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL

Please advise as to how HR should help in investigating this alleged class sexual harassment complaint against John Giamatteo.

Thank you,

Nita

Nita White-Ivy
Chief Human Resources Officer
Office: +1 (925) 242-5628
nwhiteivy@blackberry.com

*BlackBerry®*  Intelligent Security. Everywhere.

BB13-00016051

This transmission (including any attachments) may contain confidential information, privileged material (including material protected by the solicitor-client or other applicable privileges), or constitute non-public information. Any use of this information by anyone other than the intended recipient is prohibited. If you have received this transmission in error, please immediately reply to the sender and delete this information from your system. Use, dissemination, distribution, or reproduction of this transmission by unintended recipients is not authorized and may be unlawful.

This transmission (including any attachments) may contain confidential information, privileged material (including material protected by the solicitor-client or other applicable privileges), or constitute non-public information. Any use of this information by anyone other than the intended recipient is prohibited. If you have received this transmission in error, please immediately reply to the sender and delete this information from your system. Use, dissemination, distribution, or reproduction of this transmission by unintended recipients is not authorized and may be unlawful.

<Ethics Complaint 362 received today re John Giamatteo.pdf>

# EXHIBIT 31

| | |
|---|---|
| **From:** | Lisa Disbrow [Lisa.s.disbrow@gmail.com] |
| **Sent:** | 10/28/2023 5:07:47 AM |
| **To:** | Phil Kurtz [pkurtz@blackberry.com] |
| **CC:** | Mike Daniels (external) [mikedanielsco@aol.com] |
| **Subject:** | Legal Question for this afternoon |

**CAUTION** - This email is from an external source. Please be cautious with links and attachments. (go/taginfo)

Privileged working papers
Phil,
Good morning—I've continued to think about Neelam's relevance to our initial fact-finding, and believe that the documents Nita provided on her previous complaints & resolution may already constitute enough rationale to include her in our investigation.

If you & Eric agree, I would hate to lose time waiting since it's possible she's pivotal to the findings. This afternoon, I would like to get your legal thoughts on whether the previous complaints she made against JG provide reasonable rationale to include her and her company communications in our review now, or whether its more advisable to wait to see whether an EthicsPoint complainant(s) emerges — or, only if some other corroborating trigger is uncovered.

We want to make sure the steps taken in the investigation are defendable and also efficient.

Thank you!

Best, Lisa
Lisa S. Disbrow
703-717-8676

BB13-00016959

# EXHIBIT 32

1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                       --oOo--

4    NEELAM SANDHU,

5                 Plaintiff,

6    vs.                              Case No.
                                      3:24-cv-02002-SK

7    BLACKBERRY CORPORATION,

     a Delaware corporation,

8

                 Defendant.

9    _____/

10

11

12

13       CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14

15     VIDEO-RECORDED DEPOSITION OF NEELAM SANDHU

16             SAN FRANCISCO, CALIFORNIA

17             FRIDAY, AUGUST 22, 2025

18

19

20

21

22

23   Reported by:

24   Anrae Wimberley, CSR No. 7778

25   Job No.  7525313

                                      Page 1

1                UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                          --oOo--

4     NEELAM SANDHU,

5                    Plaintiff,

6     vs.                              Case No.
                                       3:24-cv-02002-SK

7     BLACKBERRY CORPORATION,

      a Delaware corporation,

8

                     Defendant.

9     _____/

10

11

12

13      CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14

15

16            Transcript of video-recorded deposition

17    of NEELAM SANDHU, taken at Munger, Tolles & Olson

18    LLP, 560 Mission Street, 27th Floor, San Francisco,

19    California 94105, beginning at 10:33 a.m. and ending

20    at 7:43 p.m. on FRIDAY, AUGUST 22, 2025, before

21    Anrae Wimberley, Certified Shorthand Reporter No.

22    7778.

23

24

25

                                            Page  2

```
 1      APPEARANCES:
 2    For Plaintiff:
 3              GOMERMAN BOURN & ASSOCIATES
 4              BY:  MARIA BOURN, ESQ.
 5              825 Van Ness Avenue, Suite 502
 6              San Francisco, California 94109
 7              (888) 855-2505
 8              maria@gobolaw.com
 9
10    For Defendant:
11              MUNGER, TOLLES & OLSON, LLP
12              BY:  CRAIG JENNINGS LAVOIE, ESQ.
13              LAUREN BECK, ESQ.
14              350 South Grand Avenue, 50th Floor
15              San Francisco, California 90071-3426
16              (213) 683-9100
17              craig.lavoie@mto.com
18              lauren.beck@mto.com
19
20    Also present:
21              MAGGIE MAYO, Vice President, Head of
22              Litigation with BlackBerry Corporation
23
24              REILLY LEET, VIDEOGRAPHER
25                      --oOo--
```

                                        Page  3

```
 1                       I N D E X
 2   EXAMINATION BY:                              PAGE
 3   MR. LAVOIE                                      9
 4                      --oOo--
 5                   E X H I B I T S
 6   EXHIBIT            DESCRIPTION               PAGE
 7   Exhibit 1    E-mail to Nita White-Ivy          18
                  from Neelam Sandhu, dated
 8                2/6/23; Bates stamped
                  BB13-00004373 to
 9                BB13-00004374
10   Exhibit 2    Photo of text thread; Bates       22
                  stamped DOE-0001547 through
11                DOE-0001548
12   Exhibit 3    Plaintiff's Second Amended        57
                  Responses to Defendant
13                BlackBerry Corporation's
                  Interrogatories, Set One;
14                no Bates stamps, 24 pages
15   Exhibit 4    Plaintiff's Interrogatories       92
                  to Defendant BlackBerry
16                Corporation, Set Two; no
                  Bates stamps, 3 pages
17
     Exhibit 5    E-mail chain dated                96
18                10/5/2021; Bates stamped
                  BB13-00019925 through
19                BB13-00019926
20   Exhibit 6    E-mail chain; Bates stamped      104
                  BB13-00019983 through
21                BB13-00019984
22   Exhibit 7    E-mail chain; Bates stamped      112
                  BB13-00012471 through
23                BB13-00012474
24   Exhibit 8    E-mail dated 10/14/2021;         157
                  Bates stamped BB13-00005838
25                through BB13-00005840
```

Page 4

```
1                    E X H I B I T S   (Cont'd)
2    EXHIBIT              DESCRIPTION              PAGE
3    Exhibit 9      Short Message Report, Date      157
                    range 10/20/2021; Bates
4                   stamped BB13-00010802
                    through BB13-00010803
5
     Exhibit 10     Two photos and a street map     157
6                   labeled "THE LOT City
                    Center;" 2 pages
7
     Exhibit 11     E-mail dated 3/26/2023;         174
8                   Bates stamped BB13-00012835
9    Exhibit 12     E-mail dated 12/15/2021;        181
                    Bates stamped BB13-00005921
10
     Exhibit 13     E-mail chain dated              181
11                  12/19/2021; Bates stamped
                    BB13-00005924
12
     Exhibit 14     E-mail dated 12/22/2021;        181
13                  Bates stamped BB13-00005945
14   Exhibit 15     E-mail chain dated              181
                    12/22/2021; Bates stamped
15                  BB13-00005952 through
                    BB13-00005953
16
     Exhibit 16     Photo of text thread; Bates     181
17                  stamped DOE-0001529 through
                    DOE-0001530
18
     Exhibit 17     E-mail chain; Bates stamped     206
19                  BB13-00005971 through
                    BB13-00005973
20
     Exhibit 18     E-mail dated 1/18/2022;         206
21                  Bates stamped BB13-00005991
22   Exhibit 19     Photo of text thread; Bates     206
                    stamped DOE-0001531 through
23                  DOE-0001532
24   Exhibit 20     Photo of text thread; Bates     215
                    stamped DOE-0001535
25


                                            Page 5
```

```
1                    E X H I B I T S  (Cont'd)
2     EXHIBIT        DESCRIPTION              PAGE
3     Exhibit 21   E-mail chain dating from     216
                   11/10/21 to 1/20/22; Bates
4                  stamped BB13-00019951
                   through BB13-00019963
5
      Exhibit 22   E-mail chain, Subject:  BB   218
6                  Cyber Security Weekly
                   Leadership Team Call; Bates
7                  stamped BB13-00007161
                   through BB13-00007162
8
      Exhibit 23   Photo of text thread; Bates  227
9                  stamped DOE-0001542 through
                   DOE-0001543
10
      Exhibit 24   Chat dating from 9/14/23 to  263
11                 12/10/23; Bates stamped
                   BB13-00018995 through
12                 BB13-00019002
13    Exhibit 25   E-mail chain dating from     291
                   10/17/23 to 11/2/23; no
14                 Bates stamp, 7 pages
15    Exhibit 26   Photo of text thread; Bates  315
                   stamped DOE-0001539
16
      Exhibit 27   Progress Notes by Michael    331
17                 Schierman at PrimaryCare
                   Services; Bates stamped
18                 DOE-000836 through
                   DOE-000850
19                        --oOo--
20    REPORTER'S NOTE: All quotations from exhibits are
21    reflected in the manner in which they were read into
22    the record and do not necessarily indicate an exact
23    quote from the document.
24                        --oOo--
25


                                              Page  6
```

1    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

2                  PAGE    LINE

3                  212      16

4                  256      14

5                  257       5

6                  274      15

7                  338      25

8                  340       9

9                  340      16

10                 341       6

11                 342       1

12                 343      16

13                 344       2

14                 344       5

15                 346       9

16                   --oOo--

17

18

19

20

21

22

23

24

25

                                        Page 7

1                    FRIDAY, AUGUST 22, 2025;

2                    SAN FRANCISCO, CALIFORNIA;

3                         10:33 A.M.

4                          - - -

5        THE VIDEOGRAPHER:  Good morning.  We are going          10:33:09

6    on the record at 10:33 a.m. on August 22nd, 2025.

7    Please note that the microphones are sensitive and

8    may pick up whispering and private conversations.

9    Please mute your phones at this time.  Audio and

10   video recording will continue to take place unless          10:33:31

11   all parties agree to go off the record.

12            This is Media Unit 1 of the video-recorded

13   deposition of Neelam Sandhu taken by counsel for

14   defendant in the matter of Neelam Sandhu versus

15   BlackBerry Corporation filed in the United States          10:33:51

16   District Court for the Northern District of

17   California, Case No. 3:24-cv-02002-SK.

18            The location of the deposition is 560

19   Mission Street, 27th Floor, San Francisco,

20   California 94105.                                            10:34:17

21            My name is Reilly Leet representing

22   Veritext Legal Solutions and I'm the videographer.

23   I'm not related to any party in this action nor am I

24   financially interested in the outcome.

25            Counsel will now state their appearances          10:34:38

Page 8

| | | |
|---|---|---|
| 1 | and affiliation for the record, beginning with the | 10:34:40 |
| 2 | noticing attorney. | |
| 3 | MR. LAVOIE:  Craig Jennings Lavoie, here | |
| 4 | alongside my colleague, Lauren Beck, of Munger, | |
| 5 | Tolles & Olson representing defendant BlackBerry. | 10:34:51 |
| 6 | MS. BOURN:  Maria Bourn on behalf of plaintiff. | |
| 7 | MR. LAVOIE:  And also present is Maggie Mayo, | |
| 8 | in-house counsel for BlackBerry. | |
| 9 | THE VIDEOGRAPHER:  Thank you. | |
| 10 | Will the court reporter please introduce | 10:35:03 |
| 11 | yourself and administer the oath to the witness and | |
| 12 | then counsel may proceed. | |
| 13 | THE REPORTER:  We are on the record.  My name | |
| 14 | is Anrae Wimberley, CSR No. 7778.  And I will now | |
| 15 | swear in the witness. | 10:35:09 |
| 16 | NEELAM SANDHU, | |
| 17 | sworn in personally as a witness by the Certified | |
| 18 | Shorthand Reporter, testified as follows: | |
| 19 | EXAMINATION | |
| 20 | BY MR. LAVOIE: | 10:35:10 |
| 21 | Q.   Ms. Sandhu, good morning. | |
| 22 | A.   Good morning. | |
| 23 | Q.   You understand that you've taken an oath | |
| 24 | to tell the complete truth in response to any | |
| 25 | questions today; correct? | 10:35:44 |

Page 9

```
 1        MS. BOURN:  Calls for speculation.              11:17:26

 2        THE WITNESS:  I mean, the fact that I got

 3    fired -- I mean, I -- you're shaking.

 4            Does it mean I shouldn't answer?

 5    BY MR. LAVOIE:                                      11:17:39

 6        Q.   No.  I'm just saying this continues to be

 7    nonresponsive to my questions.

 8            I'm asking, did John Giamatteo ever have

 9    decision-making authority over your job

10    responsibilities?  That's just a yes-or-no question. 11:17:46

11        MS. BOURN:  Calls for speculation.

12        THE WITNESS:  The fact that I got fired because

13    he would not sign his CEO contract unless I was

14    fired, that makes -- in my opinion, that is

15    decision-making power.                              11:18:01

16    BY MR. LAVOIE:

17        Q.   Okay.  What facts do you know that lead

18    you to that conclusion?  It's your belief that John

19    Giamatteo communicated at some point that I will not

20    sign my CEO contract unless you fire Neelam Sandhu.  11:18:11

21            That's your understanding?

22        A.   Correct.

23        Q.   Okay.  what's your basis for that

24    understanding?

25        A.   I was told that.                           11:18:18
```

Page 48

1    Q.    By whom?                                          11:18:20

2    A.    By people who had heard it from his own

3    team in the company.    As well, I was fired I think,

4    what, 24 to 48 hours before he signed his contract.

5    As well Dick Lynch was -- he announced my exit from    11:18:34

6    the company prior to John Giamatteo being announced.

7    So the sequence of events was very clear to me.

8    Q.    Okay.    So you testified just then that the

9    sequence of events leads you to this belief.

10         But I want to ask you very concretely          11:18:55

11   about what you said, that people told you --

12   A.    Correct.

13   Q.    -- that John Giamatteo refused to sign his

14   CEO contract unless you were fired.

15         What are the names of those individuals?       11:19:07

16   A.    I don't remember who told me.    There were

17   people on my team who had heard it from people on

18   his team.    For example, Kevin Easterwood is one

19   name.

20   Q.    Kevin Easterwood is someone on John           11:19:23

21   Giamatteo's team?

22   A.    Correct, or was.    I don't know if he still

23   is.

24   Q.    So you heard from one of your employees on

25   the elite customer success team or chief marketing   11:19:30

Page  49

1  customer officer team?                                    11:19:34

2       A.   Within my org.

3       Q.   You heard from an employee within your

4  organization that they had learned from an employee,

5  Kevin Easterwood, in John Giamatteo's organization,       11:19:42

6  that John Giamatteo had communicated that he would

7  not sign his CEO agreement unless you were fired?

8            That's your testimony?

9       A.   That's one example, yes.  There were the

10  others as well but, yes, that's what I had heard.         11:19:53

11      Q.   So is there -- in terms of people telling

12  you things about the source of information, is there

13  any source of information of that that you got from

14  anybody -- from anyone other than Kevin Easterwood

15  being the ultimate source?                                11:20:11

16      A.   I had heard it from other people.  It was

17  not -- my understanding is it was not a secret he

18  was keeping.  He was very vocal about it.  And as I

19  said, I was fired 24 to 48 hours before he signed

20  his contract, and I was pushed to, and pressured to       11:20:28

21  say that I resigned.  And they wanted to do that

22  before they announced him and the dates --

23      Q.   Again, so I'm not asking about the

24  circumstances, the timing, we can get into all that.

25  But I'm asking you very specifically about where you      11:20:45

Page 50

```
 1    making decisions about my career.                        11:24:02

 2    BY MR. LAVOIE:

 3         Q.   Did John Giamatteo ever have

 4    decision-making authority, authority over your

 5    compensation?                                            11:24:07

 6         MS. BOURN:   Vague and ambiguous, calls for

 7    speculation.

 8         THE WITNESS:   Again, under oath, I would answer

 9    how -- give the answer I want to give, not what I

10    feel where I'm being kind of led.                        11:24:19

11           I felt and experienced that he had

12    influence over my compensation and I was explicitly

13    told by my direct manager, the CEO John Chen -- I'll

14    give one example.   When I was promoted to CMO, that

15    I was not being given a salary increase because         11:24:42

16    Giamatteo would get upset.

17    BY MR. LAVOIE:

18         Q.   So I'm going to explain something.   You

19    don't get to answer the question that you would like

20    to answer that you wished I asked.   You have to        11:24:53

21    answer my question.

22           And so my question was, did John Giamatteo

23    ever have decision-making authority over your

24    compensation?   And you can answer that question yes

25    or not but you have to answer that question.   Did he   11:25:05
```

Page 54

1    have decision-making authority over your                11:25:07

2    compensation or did he not?

3         MS. BOURN:   Calls for speculation.   Defense

4    counsel is not a judge and won't -- will not tell

5    you how to answer it.   You can answer as you need       11:25:16

6    to.

7         THE WITNESS:   Thank you.

8              I felt he did because I was told

9    explicitly that I was not being given a salary

10   increase because he would be upset.                      11:25:26

11   BY MR. LAVOIE:

12        Q.   Did Tim Foote ever have decision-making

13   authority over the scope of responsibility that you

14   had?

15        MS. BOURN:   Calls for speculation.                 11:25:36

16        THE WITNESS:   Similar.   His influence could at

17   times be strong enough that it did affect the

18   decisions that were made.

19   BY MR. LAVOIE:

20        Q.   I'm not asking whether it influenced a         11:25:46

21   person who had decision-making authority.

22              I'm saying, did Tim Foote have

23   decision-making authority over the scope of your

24   responsibilities?

25        MS. BOURN:   Asked and answered, calls for          11:25:58

                                                   Page 55

1          MR. LAVOIE:  I'm just trying to -- it's a          12:42:57

2     question.

3          THE WITNESS:  It's not about siding.  It's

4     about doing the right thing.  I spoke to him about

5     the sexual harassment and he did nothing really.  So    12:42:59

6     that's not siding; that's just not doing the right

7     thing.  That's going with the boys' club.

8     BY MR. LAVOIE:

9          Q.   Did you tell Steve Rai at any point that

10    John Giamatteo had touched you or tried to touch         12:43:12

11    you?

12         A.   I told him that he made me very

13    uncomfortable.  I'm not comfortable talking about

14    these kind of things.

15         Q.   Wasn't my question.  Wasn't asking whether     12:43:23

16    you told Steve Rai whether you were comfortable or

17    uncomfortable.

18              My specific question was, did you ever

19    tell Steve Rai that John Giamatteo touched you or

20    tried to touch you?                                       12:43:33

21         A.   I said he was making me very

22    uncomfortable.

23         MR. LAVOIE:  Again, I'm going to move to strike

24    as nonresponsive, because it doesn't answer my

25    question.                                                 12:43:42

                                              Page 111

```
 1   BY MR. LAVOIE:                                    12:43:42
 2       Q.   My question is very specifically, did you
 3   ever tell Steve Rai that John Giamatteo had touched
 4   you or tried to touch you?  Did you tell him that or
 5   did you not tell him that?                         12:43:51
 6       A.   I did not.
 7       Q.   Did you ever tell Steve Rai that John
 8   Giamatteo had suggested traveling together?  Did you
 9   tell Steve Rai that or did you not tell him that?
10       A.   I did.                                    12:44:04
11       Q.   When you told Steve Rai that, did you tell
12   him that you interpreted that as a sexual advance,
13   yes or no?
14       A.   Yes.
15       Q.   And so your contention -- strike that.    12:44:12
16       MR. LAVOIE:   Let's go to what I'll mark as
17   Exhibit 7 which is Tab 30 for me.
18           (Deposition Exhibit 7 was marked.)
19   BY MR. LAVOIE:
20       Q.   Did you ever tell Steve Rai that you      12:45:00
21   thought that John Giamatteo was retaliating against
22   you in some way because you had rejected a sexual
23   advance?
24       A.   Yes.
25       Q.   You did?                                  12:45:12
```

Page 112

```
 1        A.    Yes.                                          12:45:12

 2        Q.    You said he rejected my -- I rejected his

 3   sexual advance and he has retaliated against me by

 4   doing what?

 5        A.    Cutting me out of meetings, trying to get     12:45:21

 6   my -- have my role be reduced or get me fired,

 7   telling people he was working on getting me out of

 8   the company, being nonresponsive at times, those

 9   things.

10             (Reporter seeks clarification.)               12:45:47

11        Q.    Just to be very clear, it doesn't surprise

12   me that you shared your views with Steve Rai that

13   John Giamatteo didn't invite you to meetings and

14   things of that nature.   But you're certain that you

15   told Steve Rai that the reason John Giamatteo was     12:46:02

16   doing those things is because you had rejected his

17   sexual advance?

18        A.    I may not have used the words "sexual

19   advance" but I did speak to Steve Rai about this.

20        Q.    Yes.   So what specifically did you tell     12:46:14

21   Steve Rai?   When you said John Giamatteo was doing

22   X, Y, and Z things and he's doing it because --

23   what?   What words did you use?

24        A.    I don't remember the exact words.   But it

25   would have been that -- along the lines of I didn't    12:46:27
```

Page 113

| | | |
|---|---|---|
| 1 | agree to things, with doing things that would | 12:46:31 |
| 2 | have -- I believe were unprofessional and would make | |
| 3 | me uncomfortable.  For example, traveling together, | |
| 4 | which I found to be a strange thing to ask me, and | |
| 5 | after not positively responding -- that's what I | 12:46:46 |
| 6 | used to say -- positively responding to his | |
| 7 | advances.  That was it. | |
| 8 | Q.   Okay.  That's what you told Steve Rai? | |
| 9 | A.   That was a phrase I used to use because | |
| 10 | saying "sexual" in the office sounds weird to me. | 12:46:56 |
| 11 | Q.   Yeah. but it was clear to both of you, it | |
| 12 | was your understanding that that meant sexual | |
| 13 | advances? | |
| 14 | A.   Oh, yes, yeah. | |
| 15 | Q.   And when did you tell him that relative to | 12:47:07 |
| 16 | when Mr. Giamatteo engaged in the sexual advance? | |
| 17 | A.   I don't remember, to be honest with you. | |
| 18 | It was more than once.  But I remember going to John | |
| 19 | Chen first.  I don't remember when I went to Steve | |
| 20 | Rai. | 12:47:23 |
| 21 | Q.   How soon after John Giamatteo first made | |
| 22 | some kind of sexual advance, according to you, did | |
| 23 | you tell John Chen about it?  How much time between | |
| 24 | them? | |
| 25 | A.   I think it was within 24 to 48 hours. | 12:47:34 |

Page 114

1     Q.     And how did he respond?                          12:47:38

2     A.     He said he thought it was very disturbing.

3   He said I don't have to travel with him.  And that

4   was what he said.

5     Q.     Tell me everything that you told John Chen      12:47:49

6   in that conversation when you were describing John

7   Giamatteo's advance.

8     MS. BOURN:   Calls for a narrative.

9     THE WITNESS:   From what I remember, I told him

10  that Giamatteo asked me to travel with him without     12:48:00

11  giving any sort of business reason or asking me

12  about my background of what my career ambitions

13  might be or anything professional.   I mentioned the

14  dinner invitation.   I mentioned his touching over

15  dinner.   I mentioned his comment to me about his      12:48:19

16  daughters that had strong parallels to the dinner.

17  Mentioned . . . what else -- those are the things

18  that spring immediately to mind.

19        I mentioned it made me highly

20  uncomfortable.   I mentioned the conversation with     12:48:40

21  Shaila as well at some point which happened later.

22  So pretty much everything that was occurring I would

23  have brought it up to him and said this is -- I

24  don't have an e-mail that shows this but these are

25  the things that are happening and making me highly     12:48:59

Page 115

1    uncomfortable.                                          12:49:01

2    BY MR. LAVOIE:

3        Q.    And I want to drill down on the touching.

4            What did you tell John Chen that John

5    Giamatteo had done with respect to touching you or      12:49:07

6    trying to touch you?

7        A.    I didn't go into all of the specifics.

8    Again, these are things I'm not very comfortable

9    speaking about in life in general, especially in a

10   professional environment.   And John Chen didn't have   12:49:21

11   much of an appetite for these types of conversations

12   either.   So I remember telling him at dinner John

13   Giamatteo is like leaning over the table and

14   touching my hand and then after dinner he was

15   getting uncomfortably close and sort of summarized    12:49:36

16   it, I would say.

17       Q.    Let's drill down on the touching.   You

18   said two things so far.   Was there any other

19   touching other than, like, leaning over the table to

20   try to touch your hand or touching your hand and       12:49:49

21   when you walked away and you were close?   Was there

22   any -- at any point in your life that John Giamatteo

23   touched you inappropriately or tried to touch you?

24       A.    No.   And I believe that is because I was

25   pretty clear that this is not going to happen.         12:50:05

                                                      Page 116

```
 1          Q.   I just want to narrow the universe so we        12:50:08

 2    can drill down.  Let's talk about when you allege

 3    that he tried to touch your hands.

 4          A.   Touched, yeah.

 5          Q.   He did touch your hands.                        12:50:18

 6               Can you show me like what do you mean by

 7    that?  You're sitting across from each other?

 8          A.   Yeah, like a high -- in the bar there's,

 9    like, high tables.

10          Q.   High-top?  You're on a bar stool?              12:50:29

11          A.   Yes.  It was like a narrow table, not like

12    this, so it's easy -- you're in close proximity

13    let's say.  So I'm sitting at the table.  He's

14    leaning over and touching.  I ordered fries and he

15    wanted to share them.  Or it was something -- I         12:50:47

16    think it was fries.  I normally get fries and he

17    wanted to share them.  So as I'm going for them,

18    he's going for them, so it was ongoing attempts to

19    touch and that's --

20          Q.   So your recollection is you're going for a    12:51:02

21    fry and the way he tried to touch you is that he

22    would choose to go for a fry with his hands at the

23    same time that you tried to go for a fry with yours?

24          MS. BOURN:  Calls for speculation.

25          THE WITNESS:  That is one example, yeah.  But      12:51:17
```

Page 117

```
 1    as I also said, if I'm sitting at the table, kind of        12:51:18
 2    like this or just whatever -- however one sits,
 3    resting the fork down, actually leaning over and
 4    touching my hand as well.
 5    BY MR. LAVOIE:                                              12:51:29
 6        Q.   Let's focus on the fries for a second.   So
 7    you're reaching for a fry and then you're alleging
 8    that he would choose to reach for a fry at the same
 9    time you did so that he would basically have an
10    excuse to touch you.                                        12:51:42
11             Is that what you're saying?
12        A.   I think that's one example but
13    deliberately going for my hand rather than the food.
14        Q.   So you would go for a fry and when you
15    went for a fry, he would go to touch your hand?            12:51:51
16        A.   Yeah.   Like say it's a bowl.   Didn't --
17    you can reach for a fry at the same time as someone
18    and get your hand like that on theirs.   That's -- I
19    think that's inappropriate.   I didn't offer to -- it
20    wasn't something I offered to share my food either.       12:52:06
21    It was something he set up.
22        Q.   Okay.   So was it an appetizer or was it
23    your meal?
24        A.   Gosh, I don't remember.   I'm vegetarian
25    and a lot of times in restaurants unless it's, like,      12:52:21
```

Page 118

```
 1    an Indian restaurant or vegan one, there's a salad        12:52:26
 2    option but I don't really get full, so I often go
 3    for salad and fries.  So it could have been both
 4    together.  I don't know.
 5         Q.   Could have been either.                         12:52:37
 6              You're saying you're reaching for a fry
 7    and he reaches kind of into the fry dish not seeming
 8    to go for a fry but intending to touch your hand?
 9         A.   Like each time.  Maybe not every single
10    time, but often enough that it's uncomfortable and     12:52:52
11    unnatural.
12         Q.   Did he actually touch your hand?
13         A.   Correct.
14         Q.   Would he caress your hand?
15         A.   That's what I felt like and I'm pulling       12:53:01
16    back.  And eventually I stopped eating them
17    because -- I'll eat when I got home.  I want to get
18    out of there.
19         Q.   So how many times did you reach for fries
20    and he physically made contact with your hand, like   12:53:11
21    would you estimate?  Does that happen once during
22    the meal or is that something that happened five
23    times, 10 times?
24         A.   I would say like five times is a good
25    guess.                                                  12:53:27
```

Page 119

1    Q.    So -- and each of those times it's your        12:53:27

2  recollection he actually touched your hand in a

3  provocative way?

4    A.    Yeah.  He was constantly also leaning over

5  the table, like, just the -- unnecessarily closely    12:53:36

6  as well.

7    Q.    How long relative to when he started at

8  the company did this happen, this dinner?

9    A.    Oh, I recall it was like one of my first

10  interactions with him.  I remember having a           12:53:50

11  one-on-one meeting with him in his office in San

12  Ramon as the first interaction.  And the dinner

13  would have either been that same evening or that

14  week is my recollection, very soon after he started.

15    Q.    Okay.  So as you reach for a fry and he,       12:54:06

16  like, touches your hand and doesn't touch the food,

17  so he's not touching the food.  He's just touching

18  your hand?

19    A.    At that point, yeah.  I can't remember if

20  he actually ate fries or not but he may have.          12:54:21

21    Q.    And you're literally recoiling, like

22  you're making it very clear that you don't --

23    A.    Yeah.  Without -- like without also --

24  first time I'm meeting a new peer of mine.  I don't

25  want to also be disruptive but I don't want that        12:54:34

Page 120

1    behavior either.  So I'm trying to get away from him              12:54:39

2    rather than shouting or screaming or swearing, just

3    getting myself out of it.

4         Q.   You're kind of jerking back in a way

5    perceptible enough for you --                                     12:54:52

6              (Reporter seeks clarification.)

7         Q.   You're jerking your hand back like kind of

8    suddenly enough that, in your view, he should have

9    clearly been able to perceive that this was like

10   unwelcome touching?                                               12:55:11

11        A.   Correct.

12        Q.   Okay.  So we've covered the fries.  So

13   let's talk about him -- I think you were saying he's

14   leaning over the table, separate from the fries, and

15   he is trying to touch you, he is actually touching          12:55:25

16   you?

17             Can you explain?

18        A.   A mix of both.  Like at times like trying

19   to touch me and then I'm eventually kind of just

20   sitting back.  It was a stool so I can't lean back          12:55:36

21   but sitting back far enough that he cannot lean over

22   any further.

23        Q.   Can you just show me where your hands were

24   relative to your body when he was leaning over

25   trying to touch you separate from the fries           12:55:50

                                                    Page 121

1    situation?                                                    12:55:50

2        A.    Sometimes it would be like -- I tend to

3    eat especially with my elbows on the table, so

4    sometimes it would be like this.   I don't recall

5    exactly but there would be occasions when I'm like    12:56:04

6    this, versus sitting back without leaning back

7    because I didn't have a back to my stool.

8        Q.    So again, separate from the fries

9    situation -- maybe I don't have to give that

10   qualification every time.   But separate from the    12:56:18

11   fries situation, you have hands on the table and he

12   leans over and just with no other purpose, just

13   touches your hands.

14           How many times would you estimate that

15   that happened, that he like actually touched your    12:56:29

16   hands in that way?

17       A.    Once and then in a second attempt but like

18   I'm sort of moving back fast enough and then not

19   putting my hands on the table again after that.   And

20   I remember stopping eating and I had some snacks in    12:56:41

21   my car and then I ate when I got home.

22       Q.    So it was just like unmistakable to

23   anybody this was an expression of romantic interest?

24   That was your view?

25       A.    Correct.   I have never had a colleague,    12:56:56

Page 122

1   male or female, do that before or after ever.            12:56:57

2        Q.   Was this a traumatic experience for you?

3        A.   It was, yes.

4        Q.   Did it just like shake you?  I mean, like,

5   could you describe that?  It was very memorable, I        12:57:13

6   imagine; right?

7        A.   Yeah.  Gave me that tight feeling in your

8   stomach that you get when you're feeling unsafe or

9   anxious, suddenly -- maybe a women would resonate

10  more with that feeling.  But it's that tight feeling      12:57:29

11  in your stomach and you feel unsafe, like you want

12  to run but you're also stuck there -- excuse me.

13  Like that fight or flight response but you just

14  can't move.

15       Q.   If you need a break at any moment, at any       12:57:46

16  point in the day, you are welcome to take a break.

17  I don't want to make this difficult.  Okay?

18       A.   Thank you.

19       Q.   Do you want to take a break?

20       A.   Just give me a second please.  Thank you,       12:58:01

21  though.

22            Oh, yeah, so it was -- probably, trying to

23  recover too quickly.

24            Does anybody have a Kleenex, a Kleenex or

25  something?                                                12:58:48

Page 123

```
1    fries, a second category is you're sitting in a           13:01:15

2    booth.  You have your hands on the table and

3    Mr. Giamatteo, your testimony is, reached -- like

4    kind of leaned over the table and touched your hand.

5    That happened once.  And then when he attempted to       13:01:29

6    do that a second time, you pulled your hands back.

7            Is everything accurate so far?

8        A.   I think so, yes.

9        Q.   Okay.  So let's limit it to when you were

10   physically in the restaurant as opposed to when you      13:01:42

11   were walking away.

12           Any other types of touching or attempt at

13   touching while you were in the restaurant?

14       MS. BOURN:  Compound.

15       THE WITNESS:  No, not that I can recall.            13:01:55

16   BY MR. LAVOIE:

17       Q.   So you testified that as you left the

18   restaurant, you literally walked out together and

19   back towards BlackBerry's office?

20       A.   My car was in the car park just opposite        13:02:13

21   the office and his hotel was, like, in the same

22   direction.  So, yeah, like the hotel is behind the

23   office.  And so we walked in the same direction,

24   yeah.

25       Q.   And did he actually touch you or did he         13:02:28
```

Page 125

```
 1    just attempt to touch you while you were walking          13:02:31
 2    away from the dinner?
 3         MS. BOURN:  Calls for speculation, compound.
 4         THE WITNESS:  When you're walking and like
 5    someone is getting super close and they want -- here      13:02:42
 6    and attempting to put their arm around you and I was
 7    moving away.
 8    BY MR. LAVOIE:
 9         Q.   Okay.  You thought -- so your testimony is
10    he was attempting to put his arm around your              13:02:54
11    shoulder?
12         A.   Not shoulder, lower than that.  I don't
13    know if you want to call it waist, like this kind of
14    side of things.
15         Q.   Was he drunk?                                   13:03:07
16         A.   He had had wine.  I didn't drink.  I
17    didn't feel comfortable enough to drink.  I get
18    like -- alcohol affects me quickly.  And I wouldn't
19    say -- I mean, I don't know.  I don't think he drank
20    excessively so I wouldn't assume drunk.                   13:03:23
21         Q.   Do you have an estimate, just based on
22    your perception, of how many glasses of wine he had?
23         A.   I would say no more than two maybe.
24         Q.   How long was the dinner approximately?
25         A.   It was long.  I remember like -- well, I        13:03:35
```

Page 126

| | | |
|---|---|---|
| 1 | Just so we're both on the same page about what your | 13:09:58 |
| 2 | testimony is. | |
| 3 | A.    Yes. | |
| 4 | Q.    How long after this experience of the | |
| 5 | touching behavior did you say something or tell | 13:10:08 |
| 6 | anyone about it, BlackBerry or not BlackBerry? | |
| 7 | A.    I definitely told John Chen right away | |
| 8 | because like I was panicking, oh, my God, I don't | |
| 9 | want to travel with him.  I don't want to be in a | |
| 10 | situation where -- I need the job but I'm not | 13:10:31 |
| 11 | married, financially dependent on myself.  I had | |
| 12 | invested a lot in my career as well.  So I didn't | |
| 13 | want to be forced into a situation where I feel | |
| 14 | unsafe again, so I told him right away. | |
| 15 | Q.    And, like, in person the next day at work, | 13:10:50 |
| 16 | on the phone, some other way? | |
| 17 | A.    Definitely was in his office I told him. | |
| 18 | It would have been -- I definitely remember talking | |
| 19 | to him in his office.  Like I didn't go back to the | |
| 20 | office after work so it would have been the next | 13:11:07 |
| 21 | day.  I often caught up with him in the morning in | |
| 22 | his office just to kind of check in before starting | |
| 23 | the day.  But I don't recall if I called him on the | |
| 24 | way home as well, but I definitely told him as I saw | |
| 25 | him in his office the next day. | 13:11:25 |

Page 132

```
 1    level.                                              13:34:42

 2        Q.   I want to explore this joke about

 3    daughters.

 4             Could you just recount that, like when did

 5    that happen, what did he say?                       13:34:50

 6        A.   It was either at the dinner or as we were

 7    walking away from the dinner together.  He made a

 8    comment about, "Oh, when I go for -- I have two

 9    daughters" that are a little bit younger than me.  I

10    believe that's what he said but I don't remember the 13:35:14

11    exact words.

12        Q.   Younger than you Neelam, not John himself?

13        A.   Oh, yeah, younger than me.  That's the

14    impression I got.  I can't remember what words he

15    used.  But like similar age.  I guess he didn't know 13:35:25

16    my age either.  I didn't tell him my age.

17             But that was the impression I got because

18    I think he was talking about something to do with

19    universities and something around their age being

20    close to graduated maybe.  I can't remember exactly. 13:35:39

21    But the impression I had was they were younger than

22    me, although he didn't know my age so he wouldn't

23    have known if they were younger than me.

24        Q.   Did he literally say that, "I have

25    daughters around your age," or is it just that he    13:35:53
```

1   told you what they're ages were and you remember          13:35:55

2   thinking they're similar in age to me?

3        A.   It was a combination.   I remember him

4   saying something about universities and then the

5   Hamptons.   I remember something about the Hamptons,       13:36:07

6   too, they went for dinner in the Hamptons or

7   something.   Maybe he has a house there.   I don't

8   know.   Or New Hampshire, somewhere near New York,

9   like not New York City.   And, yeah, he said

10  something like -- didn't say my age or similar age,       13:36:23

11  something like that.   And then he said he gets --

12  oh, when he goes to dinner with them, he gets really

13  dressed up.   So when they're out for dinner

14  together, people think they're out on a date and

15  he's a dirty old man.                                     13:36:43

16           And that -- what he was describing I

17  already thought it was unusual that he went and got

18  dressed up and like how he prepared for the dinner.

19  So then he's talking about how gets dressed up and

20  the age similarities, like to me he was trying to        13:37:03

21  creating the parallels, and open up a conversation,

22  or test the waters, to see my if I'm like, ha, ha,

23  ha, to see my reaction.   If I'm not responding what

24  I would say positively or giving positive intent

25  signals or giving signals then, you know, he would       13:37:23

                                            Page 152

1    pick that up.  But if I was -- I think he was                13:37:28

2    testing the waters, basically.

3        Q.    So he's brand new and he knows you report

4    to the CEO directly at this time; right?

5        A.    Yeah.                                              13:37:41

6        Q.    It seems like hugely risky to do something

7    like this.

8              Is that what you were thinking at the

9    time?  Did that occur to you at the time?

10        A.    I thought it was -- the whole thing was          13:37:52

11    really weird and it made me very uncomfortable.  The

12    environment in general, I didn't feel treated well

13    as a woman in many ways.  So did that specific

14    thought cross my mind that it's highly risky.

15              I hadn't really worked anywhere else in a        13:38:18

16    corporate environment other than BlackBerry.  I

17    briefly worked -- had brief experience before

18    BlackBerry.  So my real experience of corporate

19    world was that, so I thought, gosh, this like how

20    the corporate world is, like men treat women like       13:38:36

21    that and can get away with it.  Did I think it was

22    highly risky?  Gosh, this is what men are like, they

23    treat women like crap really, in corporate

24    environments.

25        Q.    I know that you have many other -- I'm          13:38:54

Page 153

```
 1              Do you see that?                        14:39:19

 2        A.   I do.

 3        Q.   Is that, in fact, the restaurant where

 4   this dinner that you've been testifying about today

 5   took place?                                        14:39:25

 6        A.   Yes.

 7        Q.   Where the touching took place?  Let's just

 8   be very specific.

 9        A.   Yes.

10        Q.   And it's scheduled for 6:00 to 9:00 p.m.   14:39:31

11   on October 20th, 2021.

12              Do you see that?

13        A.   Yes, I do.  6:00 to 7:30 I see.

14        Q.   Oh, I may have misstated it.  Let's have

15   it clean.  This calendar invite indicates that the   14:39:44

16   dinner was scheduled for October 20th, 2021, from

17   6:00 to 7:30 p.m.; is that correct?

18        A.   Yes.

19        Q.   And then if we look at Exhibit 9 -- sorry.

20   I might have blocked the camera for a second.  Look   14:40:04

21   at exhibit 9 and you turn that over to the back

22   page, what does this appear to be?

23        A.   The back page?

24        Q.   Sorry.  This maybe -- this is the page I'm

25   referring to, the one with the actual text.  This    14:40:20
```

Page 158

```
 1    which is Exhibit 12.                              15:25:34

 2            Do you see that?

 3        A.   I don't have the exhibit numbers, but,

 4    yes, I see that.

 5        Q.   So you meet with John Giamatteo one-on-one   15:25:39

 6    on December 16, 2021, and then later, a few hours

 7    later, you text your friend Sunny about it and say,

 8    "Had an interesting convo with teeth guy today."

 9            Do you see that?

10        A.   Yes.                                        15:25:55

11        Q.   And teeth guy, you're referring to John

12    Giamatteo?

13        A.   Yes.

14        Q.   What then Sunny says, "What did Choppers

15    have to say?"                                        15:25:57

16            And Sunny is referring to John Giamatteo

17    as well?

18        A.   Yes.

19        Q.   And you were expecting Sunny to know who

20    you were referring to when you said teeth guy;       15:26:04

21    correct?

22        A.   Yes.

23        Q.   And you report here to Sunny that, in the

24    next text message, you say, "He suggested I join his

25    team."                                               15:26:23
```

Page 193

1          Do you see that?                                      15:26:24

2     A.    Yes, I do.

3     Q.    So that's a reference to John Giamatteo in

4  this meeting on December 16, 2021, suggesting that

5  you join his team; is that right?                             15:26:31

6     A.    Yes.

7     Q.    And Sunny responds, "Omg," as in, oh, my

8  God; right?

9     A.    Yes.

10     Q.    And then, "Afterwards a colleague says he      15:26:40

11  was asking a question or two about me."

12          That's what you wrote; right?

13     A.    Yes.

14     Q.    And then Sunny says, "Oh?"

15          And you said, "I don't really know you so      15:26:51

16  I'm not ready for that yet."

17          And then, "He asked how long I've been in

18  my role apparently."

19          Do you see that?

20     A.    Yes.                                          15:27:00

21     Q.    So when you say Sunny -- so Sunny

22  responds, "Oh, my God."  You say, "He suggests that

23  I join his team."

24          And Sunny says, "Oh my God."

25          Did that seem to surprise her -- him?  Did      15:27:13

                                                    Page 194

1    October 2021, he never mentions the concept of          15:33:57

2    traveling together again?

3         A.   He mentions other concepts but not that

4    one.  And I believe that's because I was pretty

5    clear I'm not interested.  And I spoke with John        15:34:09

6    Chen as well who told me he talked to him about it,

7    so that might have put him off as well.

8         Q.   I see.

9              So by this point, on December 16th, 2021,

10   when you had this meeting with Mr. Giamatteo, you        15:34:21

11   had already spoken to John Chen about your bad

12   experience at dinner with Mr. Giamatteo?

13        A.   Yes.

14        Q.   And in this e-mail, Exhibit 13, the one

15   where you write follow-up, this is an e-mail that        15:34:47

16   you write to Mr. Giamatteo on a Sunday, right, at

17   the bottom?

18        A.   Yes.

19        Q.   So he's not writing you following up about

20   the discussion about the job, you're following up       15:35:00

21   with him; right?

22        A.   Correct.  Yeah.  As I said, I knew at this

23   point it was super important to have documents

24   because he would label me as difficult or pretend

25   that if I had just called him or something like         15:35:11

                                            Page 201

```
 1    Rifkind case --                                    16:39:45

 2              Let me finish my objection.

 3              Calls for a narrative.

 4              But you can answer.

 5       THE WITNESS:  So many things.  There are so     16:39:56

 6    many examples of how I was treated differently

 7    because I'm a woman and wasn't part of the boys'

 8    club.  I was paid unfairly.  I wasn't given a pay

 9    raise when I was made CMO.  I was -- like from

10    Giamatteo's perspective, offered a role on his team  16:40:22

11    because he wanted to sleep with me, essentially.

12    That's not something that happens to men, or at

13    least you don't hear it very often.

14              The list goes on.  There's so many

15    reasons.  And all the players who were so eager to  16:40:38

16    get me out, Giamatteo, Phil Kurtz, Tim Foote, Dick

17    Lynch, all men.

18              Again, as I said, the list goes on but

19    there's a lot of examples for how I was treated

20    differently for being a woman, not respected, not   16:41:00

21    invited to -- voice was not respected at the table,

22    not invited at the table at times, not taken

23    seriously despite, at the time having closed several

24    of the company's largest software deals ever,

25    including a $▮▮▮▮▮ deal that was the largest in     16:41:15
```

Page 239

1     the company software history.  Didn't get a --          16:41:19

2     pretty much a single note of congratulations after

3     closing that deal, where the men would congratulate

4     each other and pat themselves on the back after

5     closing $100,000, a smaller deal.                        16:41:32

6              After closing that deal, my role was

7     diminished as opposed to being -- even just make the

8     same.  Wasn't paid on commission on that deal

9     either, so I didn't get paid appropriately for it.

10    Like I said, the list goes on and on and on.             16:41:51

11    BY MR. LAVOIE:

12        Q.   So a lot of bad things happened to you,

13    you contend at the company.

14             You think other people were treated better

15    than you?                                                16:42:00

16        A.   Men specifically.

17        Q.   All men were treated better than you at

18    the company.  That's your testimony.

19        A.    That wasn't my testimony.  It was not

20    other people.  The people who were treated better --     16:42:09

21    the men I've described, all the people who are --

22    who I've mentioned who were harassing me.  And

23    eventually the reason I got fired were men.  And men

24    were, like Giamatteo, promoted despite killing his

25    business in silence, had to be sold at the end of        16:42:31

Page 240

```
 1   promotion as in, like, a new and higher job or title      16:44:16

 2   because of your gender or in retaliation for

 3   something you had done?

 4       MS. BOURN:  Asked and answered, same objections

 5   as before.                                                 16:44:28

 6       THE WITNESS:  Yes.  So those are things I

 7   believe happened because of retaliation and me

 8   turning down John Giamatteo.

 9   BY MR. LAVOIE:

10       Q.   What promotion did you not get                    16:44:37

11   specifically?  What job did you try to get that you

12   were denied based on discrimination or retaliation?

13       MS. BOURN:  Calls for a legal conclusion,

14   compound.

15           You can answer.                                    16:44:50

16       THE WITNESS:  So my title in the customer --

17   elite customer success side, that was not the right

18   title because John Giamatteo would have been upset.

19   So that does diminish my role in several ways.

20   BY MR. LAVOIE:                                             16:45:07

21       Q.   You mean that you deserved to have the

22   title of chief customer officer and you were denied

23   that title because of retaliation?

24       A.   Correct.

25       Q.   But you've gone ahead and assigned your           16:45:16
```

Page 243

1    title in that résumé when you've been applying for          16:45:19

2    jobs?

3         A.    Recruiters actively told me if you don't

4    use the appropriate title in my résumé, it's going

5    to be hard to get a job.  Because the titles I was          16:45:28

6    given at BlackBerry are so obscure and are not

7    normal in the world.  You will not find another

8    chief elite customer success officer.  Because once

9    they understood the actual job I was doing, they

10   said this is the appropriate title.  The titles I          16:45:42

11   was given, senior vice president, business

12   operations, office of the CEO, that was a chief of

13   staff role.

14           So many recruiters told me, "You will not

15   get a job if you use those titles in your résumé.          16:45:57

16   You have to use the industry standards."

17           It was BlackBerry who didn't give me the

18   industry standard titles despite the fact that I was

19   doing those jobs because people like John Giamatteo

20   and white men in the company, I was told this              16:46:07

21   explicitly, would be upset if I got those titles.

22   So they had to try like soften my titles to help

23   those individuals feel better, those white men feel

24   better.

25        Q.   So you felt entitled to lie and falsify          16:46:23

                                                        Page 244

```
 1    BY MR. LAVOIE:                                              16:50:46

 2         Q.    Were you ever demoted or had job duties

 3    reassigned or lost based on discrimination or

 4    retaliation?

 5         MS. BOURN:    Compound, vague and ambiguous as to       16:50:57

 6    time, calls for a legal conclusion.

 7         THE WITNESS:    Yes.

 8    BY MR. LAVOIE:

 9         Q.    When?

10         A.    When my role -- when my customers were           16:51:04

11    reassigned.

12         Q.    And you viewed -- and at the same time,

13    you took on the chief marketing officer role;

14    correct?

15         A.    That was only because my role was reduced         16:51:17

16    and I was told it was because John Giamatteo is

17    getting very upset.

18         Q.    Sorry.    It was -- you added the chief

19    marketing officer title at the same time, right, so

20    there were some customers that left your purview.            16:51:33

21    You added some customers and then you also took on

22    the chief marketing officer title; correct?

23         A.    I'm trying to give you the answer to your

24    question.

25              My role -- I was told my role was being           16:51:45
```

Page 249

1    reduced.  Initially I was told that all of the          16:51:49

2    customers were being taken away and I would revert

3    back to being like the chief of staff role.  I

4    fought that because it was clearly retaliation and

5    absolutely unfair, especially after I had just        16:52:03

6    closed a $61 million deal, which was the largest

7    deal as a software company.

8            Eventually after daily harassment, further

9    daily harassment, landed that -- I was told okay

10   fine, well, we'll reduce your customers and give the   16:52:19

11   growing customers back to John Giamatteo and assign

12   you ones that he has lost, he and his team have

13   lost, so you can then go and win them back.

14           I rejected that because it was -- there

15   was no basis for it other than retaliation.  And it   16:52:39

16   was around -- I think it was around March 20 --

17   March 2023 when Rich Curiale invited me out to

18   lunch -- I'm answering your question, I'm answering

19   your question.

20       Q.  This is venturing far beyond what my          16:52:56

21   question was.

22       A.  It's really not.

23       MS. BOURN:  You asked a long question.  You

24   asked for a narrative on two causes of action.

25       THE WITNESS:  So around March 2023 when all        16:53:05

```
1    counsel has questions, I may ask some questions        19:41:55

2    after she asks you questions.

3         MS. BOURN:  I have no questions.

4         MR. LAVOIE:  All right.  Then that means we're

5    done.                                                 19:42:04

6              So before we go off the record, we're

7    going to designate this transcript as provisionally

8    confidential under the terms of the protective

9    order, subject to final confidentiality

10   determinations or designations being made per the    19:42:24

11   terms of the protective order.

12        MS. BOURN:  The protective order does not allow

13   mass discriminate designations.  Plaintiff objects

14   to it.  The deposition is not confidential.  It's

15   public.  And we won't agree to that.                  19:42:42

16              And the deposition is closed; we are done

17   with the time allotted to the defendant.

18        MR. LAVOIE:  You don't get to just unilaterally

19   close the deposition.  So I'm going to say that the

20   protective order speaks for itself and all parties    19:42:55

21   will comply with the protective order.  So we can

22   consult the protective order and see who's correct.

23        MS. BOURN:  The protective order does speak for

24   itself and it doesn't allow indiscriminate mass

25   designations such as defendant is engaging in and we  19:43:08
```

Page 353

1     don't agree and the deposition is closed.                    19:43:11

2          MR. LAVOIE:  That's all for me.

3          THE VIDEOGRAPHER:  Okay.  We are off the record

4     at 7:43 p.m. and this concludes today's today given

5     my Neelam Sandhu.  The total number of media used          19:43:23

6     was seven and will be retained by Veritext Legal

7     Solutions.

8               (Whereupon, the proceedings were concluded

9               at 7:43 p.m.)

10                    ---oOo---                                   19:43:30

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 354

1           I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4           That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12          Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript ( ) was (X) was not requested.

16          I further certify that I am neither

17   financially interested in the action nor a relative

18   or employee of any attorney of any party to this

19   action.

20          IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   Dated:  September 5, 2025

23

24

25          ANRAE WIMBERLEY, CSR No. 7778

                                        Page 355

1   Maria Bourn

2   maria@gobolaw.com

3                                       September 5, 2025

4   RE: Sandhu, Neelam v. Blackberry Corporation

5   8/22/2025, Neelam Sandhu, (#7525313).

6   The above-referenced transcript has been

7   completed by Veritext Legal Solutions and

8   review of the transcript is being handled as follows:

9   ___ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12  ___ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, noting the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20      Contact Veritext when the sealed original is required.

21  ___ Waiving the CA Code of Civil Procedure per Stipulation of

22      Counsel - Original transcript to be released for signature

23      as determined at the deposition.

24  ___ Signature Waived - Reading & Signature was waived at the

25      time of the deposition.

                                              Page 356

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, noting the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    _X_ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

# EXHIBIT 33

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**CERTIFIED TRANSCRIPT**

NEELAM SANDHU, an individual,

                  Plaintiff,

-vs-                            Case No.:

BLACKBERRY CORPORATION, a       24-cv-02002-SK
Delaware Corporation; and
JOHN GIAMATTEO, an individual,

                  Defendants.
_____/

VIDEO-RECORDED DEPOSITION

OF JOHN GIAMATTEO

Date:                 August 28, 2025

Time:               9:07 a.m.

Location:           Zoom Videoconference

Stenographically     Cambria L. Denlinger

Reported By:         CSR #14009

DEPONENT: JOHN GIAMATTEO                                    August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1                    A P P E A R A N C E S

 2

 3    (ALL PARTIES APPEARING VIA VIDEOCONFERENCE)

 4    FOR THE PLAINTIFF:

 5                         GOMERMAN | BOURN & ASSOCIATES
                          BY:  ANTHONY TARTAGLIO, ESQ.
 6                             MARIA BOURN, ESQ.
                          825 VAN NESS AVENUE, SUITE 502
 7                        SAN FRANCISCO, CA 94109
                          415.545.8608
 8                        tony@gobolaw.com

 9

      FOR THE DEFENDANTS:
10
                          MUNGER TOLLES & OLSON LLP
11                        BY:  CRAIG JENNINGS LAVOIE, ESQ.
                          350 S. GRAND AVE., 50TH FLOOR
12                        LOS ANGELES, CA 90071
                          213.683.9224
13                        craig.lavoie@mto.com

14
      BLACKBERRY CORPORATION:
15
                          BLACKBERRY CORPORATION
16                        BY:  MAGGIE MAYO, ESQ.
                          7950 LEGACY DR, SUITE 400
17                        PLANO, TX 75024

18
      THE REPORTER AND VIDEOGRAPHER:
19
                          TALTY COURT REPORTERS, INC.
20                        BY: CAMBRIA L. DENLINGER, CSR 14009
                             MICHAEL MACK, VIDEOGRAPHER
21                        2131 THE ALAMEDA
                          SUITE D
22                        SAN JOSE, CALIFORNIA  95126
                          408.244.1900

23

24    ALSO PRESENT:  KYRA SCHOONOVER

25                         --oOo--
```



DEPONENT: JOHN GIAMATTEO                                    August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                        INDEX OF EXAMINATION

2
                                                              PAGE
3
        Examination By Tartaglio                                8
4
        Examination By Mr. Lavoie                              255
5
                            --o0o--
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**TALTY COURT REPORTERS, INC.**                              **3**
**408.244.1900 - www.taltys.com**

DEPONENT: JOHN GIAMATTEO                          August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1                     INDEX OF EXHIBITS

 2

 3    EXHIBIT NO.              DESCRIPTION              PAGE

 4    Exhibit 1      Notice of deposition               19

 5    Exhibit 2      Securities and Exchange Commission  170
                     Form 10-Q
 6
 7    Exhibit 3      BlackBerry Executive Team          179
                     Biographies

 8    Exhibit 4      Corporate structure diagram        179

 9    Exhibit 5      BlackBerry's Code of Business      183
                     Standards and Principles; Bates
10                   BB13-00000456 - 519

11    Exhibit 6      Email dated 12/22/21, re:          188
                     Connection; Bates BB13-00005952
12
      Exhibit 7      Email dated 2/17/22, re: US Coast  190
13                   Guard; Bates BB13-00019970

14    Exhibit 8      Email dated 2/6/23, re: JJG; Bates 192
                     BB13-00004373
15
      Exhibit 9      Email dated 3/3/23, re: MAP issue; 196
16                   Bates BB13-00006377

17    Exhibit 10     Email dated 4/4/23, re: Canada;    197
                     Bates BB13-00009916
18
      Exhibit 11     Email dated 4/10/23, re: SSC; Bates 202
19                   BB13-00020039-40

20    Exhibit 12     Email dated 4/19/23, re:  MAP      205
                     Update Section 17.0; Bates
21                   BB13-00012167-168

22    Exhibit 13     Chat between Mr. Chen and Mr.      207
                     Giamatteo; Bates BB13-00019018-19
23
      Exhibit 14     Email dated 5/18/23, re:  Analyst  210
24                   Day; Bates BB13-00006417

25
```

DEPONENT: JOHN GIAMATTEO                           August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1              INDEX OF EXHIBITS, CONTINUED

 2    EXHIBIT NO.              DESCRIPTION                  PAGE

 3    Exhibit 15    Email dated 9/5/23, re:  Couple of      212
                    things...; Bates BB13-00020049
 4
      Exhibit 16    Email dated 10/27/23, re: JJG July      214
 5                  QBR.pptx; Bates BB13-00016949-950

 6    Exhibit 17    Email dated 10/27/23; Bates             216
                    BB13-00016328
 7
      Exhibit 18    Text message with T Foote dated         219
 8                  10/28/23; Bates BB13-00023976

 9    Exhibit 19    Email dated 11/1/23 re:                 221
                    Information; Bates
10                  BB13-00017011-012

11    Exhibit 20    Email dated 11/7/23, re:  Follow up     223
                    re confidential meeting; Bates
12                  BB13-00017812-866

13    Exhibit 21    Email dated 11/13/23; Bates             226
                    BB13-00018101
14
      Exhibit 22    Text messages with Dick Lynch dated     229
15                  11/15/23; Bates BB13-00019788-89

16    Exhibit 23    Email dated 11/16/23, re:  Follow       233
                    up re Confidential Mtg.; Bates
17                  BB13-00018146-18203

18    Exhibit 24    Morrison Foerster Memorandum dated      237
                    11/22/23; Bates BB13-00019104-142
19
      Exhibit 25    Employment Agreement Letter dated       243
20                  12/6/23 to Mr. Giamatteo

21    Exhibit 26    Three-page letter to Mr. Giamatteo      244
                    dated 4/4/2025
22
      Exhibit 27    Chat between Mr. Kurtz and Mr.          246
23                  Giamatteo dated 11/23; Bates
                    BB13-00019731
24
      Exhibit 28    Six-page news release dated 2/12/24     248
25
```



DEPONENT: JOHN GIAMATTEO                        August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                    INDEX OF EXHIBITS, CONTINUED

2   EXHIBIT NO.                  DESCRIPTION                PAGE

3   Exhibit 29      Defendant's responses to              249
                    Plaintiff's interrogatories
4
    Exhibit 30      Letter dated 11/29/23 from Morrison   254
5                   Foerster to Mr. Giamatteo

6

7

8

9

10

11

12

13

14

15

16

17                             --o0o--

18

19

20

21

22

23

24

25



DEPONENT: JOHN GIAMATTEO                              August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1                        9:07 a.m.

 2                   P R O C E E D I N G S

 3          THE VIDEOGRAPHER:  We're going on the record at

 4   9:07 a.m. on Thursday, August 28, 2025.  This is the

 5   video deposition of John Giamatteo, taken by the

 6   plaintiff in the matter of Neelam Sandhu v. BlackBerry

 7   Corporation, et al., filed in the U.S. District Court

 8   for the Northern District of California.  Case number

 9   24CV02002SK.

10          This deposition is being held via Zoom

11   video-teleconference.  My name is Michael Mack, and the

12   court reporter is Cambria Denlinger, both on behalf of

13   Talty Court Reporters, Inc., with offices in San Jose,

14   California.

15          Before we proceed, I will ask counsel to state

16   their appearance and affiliation for the record,

17   starting with the noticing attorney.

18          MR. TARTAGLIO:  For plaintiff you have Anthony

19   Tartaglio from the Gomerman Bourn Law Firm.  And at some

20   point today, my colleague Maria Bourn might be joining,

21   also the plaintiff might be joining at some point.

22          MR. LAVOIE:  For defendant BlackBerry, Craig

23   Jennings Lavoie of Munger Tolles & Olson, and I'm joined

24   by my colleague from Munger Tolles, Kyra Schoonover, and

25   also Maggie Mayo who is an in-house counsel for
```



DEPONENT: JOHN GIAMATTEO                         August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1   BlackBerry.

2          THE VIDEOGRAPHER:  Will the court reporter

3   please identify herself for the record and then swear in

4   the witness?

5          THE REPORTER:  Good morning.  My name is

6   Cambria Denlinger, California CSR 14009.

7                        JOHN GIAMATTEO,

8   being first duly sworn by the Certified Shorthand

9   Reporter to tell the truth, the whole truth, and nothing

10  but the truth, testified as follows:

11                        EXAMINATION

12  BY TARTAGLIO:

13      Q.  Good morning, sir.

14      A.  Morning.

15      Q.  Please state your name for the record -- full

16  name.

17      A.  John Giamatteo.

18      Q.  I'm going to ask a few questions now to briefly

19  explain how this process works, perhaps you're already

20  familiar with the process, but nevertheless, just to

21  make sure everyone here understands how this is going to

22  work today, I'll ask a few questions about how the

23  deposition process works.  Okay?

24          Is that a "yes"?

25      A.  Yes.



DEPONENT: JOHN GIAMATTEO                              August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1      Q.   Approximately when did you join BlackBerry?

2      A.   October of 2021.

3      Q.   Before then, you worked at another company I

4   assume?

5      A.   Yes.

6      Q.   Which company was that?

7      A.   That was McAfee.

8      Q.   Approximately how long did you work at McAfee?

9      A.   Approximately seven years.

10     Q.   And when you left McAfee, what was your job at

11  that point when you left?

12     A.   I was the chief revenue officer of McAfee.

13     Q.   And McAfee, did you have any -- strike that.

14         Were all of your jobs at McAfee more of a

15  finance-type role, or did you have another type of role

16  like engineering?

17     A.   Yeah.  No, no, I was the -- in my time at

18  McAfee, I was the president and general manager of our

19  consumer division for my first four-plus years, almost

20  five years, which entailed the entire organization.  It

21  was a team of about 1,600 employees.  You know, over a

22  thousand of them were engineers.  We had a global sales

23  organization, marketing organization, customer success

24  organization, and channel management organization.

25         So basically all of the operational functions



DEPONENT: JOHN GIAMATTEO                          August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1  BY MR. TARTAGLIO:

2      Q.  Are you able to provide an estimate of when the

3  Elite customer group disbanded, assuming it has?

4      A.  So I think Phase 1 of the Elite customer

5  group's activity, you know, moving to the field sales,

6  happened -- and I want to say maybe, arguably 50 percent

7  of the Elite team, in March or April of '23, started

8  phasing back into the organization as part of John

9  Chen's plan to do that.

10         And then the remainder of the accounts that

11  were part of the Elite happened, yeah, after I became

12  CEO and as we were doing the planning for the next

13  fiscal year.  So it was kind of a two-year transition

14  that that happened.

15      Q.  Are you able --

16      A.  The first year of transition happened while I

17  was president of the cyber division and John Chen was

18  CEO, and the second half of the transition happened

19  after I became CEO.

20      Q.  And for the transition that happened after you

21  became CEO, about how long did it take from the time you

22  became CEO to the time the Elite customer group was

23  disbanded?

24      A.  I would say we probably -- you know, I became

25  CEO in December of 2023, so that probably happened as we



 1   point.

 2       Q.  Well, respectfully, I do want to see if you can

 3   remember any other specific examples of tense

 4   interactions between yourself and Ms. Sandhu.

 5       A.  Okay.  Yeah, I think -- I think I can give you

 6   another one.  Another one had to do with our search

 7   engine optimization activity where Neelam moved into the

 8   role of CMO.  You know, she had a very good reputation

 9   for, you know, land-grabbing as much, you know,

10   responsibility as she could grab.  And this search

11   engine optimization team in corporate that she managed,

12   managed the small little search engine optimization

13   budget; call it a million dollars, maybe less than that.

14           And that search engine optimization activity

15   was for, you know, BlackBerry, was BlackBerry corporate.

16   So it was the BlackBerry brand.  It was the BlackBerry,

17   you know, how do we position the BlackBerry brand in the

18   market and that kind of thing.  So that was what she was

19   responsible for.

20           The business unit, the cybersecurity business

21   unit, we had our own search engine optimization budget

22   and team that was focused on investing for search engine

23   and SEO for lead generation, where you're talking about

24   the products and the value and why our product is good.

25   And so we would -- so it was much more product

DEPONENT: JOHN GIAMATTEO                        August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1   generation for the business unit.

2       Q.  And I think during your response at some point,

3   you referred to "land-grabbing."  And I'm not in the

4   corporate world, so I'm not as familiar with that.  What

5   did you mean when you mentioned land-grabbing?

6       A.  Trying to grab responsibility from another

7   organization and pull it into your organization.  Not

8   only, you know, people, but, you know, budget, funding.

9   You know, and under the guise of, well, I could do it

10  better and I could save us money.  Meanwhile, you know,

11  the corporate team, you know, they had a very different

12  function, a very different kind of SCO.

13          So they didn't necessarily have the skills to

14  manage that.  So, you know, coming in and saying well,

15  let's take the bigger budget and bigger team and move

16  them into my team and I'll manage it all, just didn't

17  seem right to me.

18      Q.  Did you hear any discussions about Ms. Sandhu

19  being a land-grabber?  I guess it doesn't have to be

20  those exact words, but did you hear any conversations

21  with her engaging in land-grabbing?

22      A.  I did.  I actually did.  And it actually had to

23  do with when she first became responsible.  And I guess

24  John Chen put her in charge of the Elite accounts, and I

25  don't know the exact time because it predated me.  But



 1  you?

 2      A.  Not that I can think of.

 3      Q.  Around the time that John Chen announced his

 4  resignation, there was an anonymous complaint that was

 5  made about you; correct?

 6      A.  Correct.

 7      Q.  And we don't have to go through the

 8  particulars, but what was the gist of that complaint?

 9      A.  The gist of that complaint alleged sexual --

10  sexual harassment and inappropriate treatment of women,

11  more generally, in the organization.

12      Q.  Did you ever come to learn who submitted that

13  complaint?

14      A.  I did not.  I mean, I suspected over time, but

15  I did not.

16      Q.  Who did you suspect of submitting the

17  complaint?

18      A.  I think at the time, when the complaint was

19  filed, I suspected that it was Ms. Sandhu, but I

20  didn't -- you know, I didn't know for sure.

21      Q.  Why did you suspect that Ms. Sandhu had

22  submitted the anonymous complaint against you?

23      A.  You just reflect on your relationships with

24  people in the organization, and, you know, when some of

25  these incidents -- you know, like I thought, well, this

DEPONENT: JOHN GIAMATTEO                      August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1  of this seemed like something Ms. Sandhu would do.  Is

2  that a fair assessment?

3       A.  What time frame are you referring to?  Like,

4  when the complaint was filed?  Like, in the end of

5  October?  Or, you know, are you talking, like, December?

6  Or, like, what time frame?  To my state of mind, you

7  know, different information was going on at different

8  times.

9     Q.  So let's talk about when you learned of the

10 complaint -- about it, and shortly afterwards.  I think

11 you said something like, it seemed like something

12 Ms. Sandhu would do.  Is that a fair summery of some of

13 your testimony?

14      A.  Correct.  My reference there is she had a

15 reputation of weaponizing the ethics hotline over her

16 career at the company.  Not necessarily on me.  There

17 might have been some on me for all I know, but there was

18 a, you know, kind of wide recognition across the

19 organization that when Neelam is upset, the ethics

20 hotline, you know, goes on -- starts buzzing.  So that

21 was kind of the reputation that she had.

22         So when suddenly 24 hours after she found out

23 from -- that I was going to be appointed to CEO, within

24 24 hours of that, all of a sudden, an ethics hotline

25 complaint comes in.  I've been there for two years.



DEPONENT: JOHN GIAMATTEO                              August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    Worked with everybody.  Never had a complaint other than

2    the other complaint that she made in February of '22.

3              So, yeah, I kind of -- well, gosh, maybe

4    this -- she had a reputation for that.  She was one of

5    the only people that knew I was going to become CEO.

6    And then 24 hours from that knowledge, all of a sudden,

7    this out-of-the-blue ethics complaint came.  Yeah, I

8    kind of in my mind thought I wonder if this is Neelam.

9    Didn't know for sure, but, you know, that was something

10   I thought.

11      Q.  Did Ms. Sandhu have a reputation for filing

12   complaints about people at the company?

13           MR. LAVOIE:  Objection; asked and answered.

14           You can answer.

15           THE WITNESS:  I said it.  I thought I said it,

16   Tony.  Yes, I heard from various people in the

17   organization that she had a reputation for that.

18   BY MR. TARTAGLIO:

19      Q.  Who did you hear that from?

20      A.  Some of them were people from HR that are no

21   longer with the company.

22      Q.  Who would those people be?

23      A.  I -- I'd rather not say.

24           MR. LAVOIE:  You have to disclose the names,

25   unfortunately.



DEPONENT: JOHN GIAMATTEO                          August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    layoffs of -- so, like I said, we went from over 3,000

2    employees to 1,700 employees.  Now, granted, 400, almost

3    500 of those employees of that reduction, came from when

4    we divested our Cylance business.

5          We sold that business off to another company.

6    400-plus people actually went with the company -- with

7    the new company.  So that was the big tranche of

8    activity.  But the others were kind of phased, forced

9    reductions as we did the restructuring.

10    Q.  And are you able to estimate about how much

11    time elapsed between your becoming CEO and the first

12    wave of layoffs that was instituted?

13    A.  Yeah, I became CEO middle of December, I guess.

14    Somewhere in December; I forget the exact date, and we

15    started, you know, a series of reductions probably in

16    February and then more in April and then more again in

17    July and August.  So, yeah, there was a series of

18    different phases.

19    Q.  Did the first round of layoffs that you

20    instituted, did it happen approximately three months

21    after you became CEO?

22    A.  Three months or less, Tony.  Could have been

23    somewhere in February or end of January, but somewhere

24    in that January, February, March time frame.

25    Q.  Was Neelam Sandhu part of that first round of



DEPONENT: JOHN GIAMATTEO                          August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    layoffs that you instituted?

2          MR. LAVOIE:  Object to the form of the

3    question.  Vague and ambiguous.

4          THE WITNESS:  No, she wasn't part of any of my

5    actions.  That was something that Dick did in his first

6    phase of reductions when he was acting CEO.

7    BY MR. TARTAGLIO:

8        Q.  Approximately how long was Mr. Lynch interim

9    CEO?

10       A.  Approximately 30 days.

11       Q.  At the time that Ms. Sandhu was fired, she was

12   chief marketing officer and may have held some other

13   titles; is that correct?

14       A.  I believe so.

15       Q.  Do you think it's unusual for an interim CEO,

16   who is on the job only about a month, to fire someone at

17   the level of chief marketing officer?

18          MR. LAVOIE:  Object to the form of the

19   question; incomplete hypothetical.

20          But you can answer.

21          THE WITNESS:  Not in the case of Dick Lynch.

22   If you know anything about Dick Lynch, he is, you know,

23   an iconic executive, one of the highest ranking

24   executives at Verizon for many, many years.

25          So he was on the board, and I think at the



1  that they were working at the company together was he

2  aware that she complained that he hadn't invited her to

3  meetings?

4          MR. TARTAGLIO:  That's correct.

5          THE WITNESS:  No, I was not.

6  BY MR. TARTAGLIO:

7      Q.  Before this lawsuit --

8      A.  I was not -- let me embellish my answer a

9  little bit.

10         I was not because I invited her to meetings.  I

11 actually invited her to a lot of meetings, almost all

12 the meetings.

13         There was a short period of time where there

14 was an administrative snafu where my admin didn't have

15 all the right people on the invite list, but once that

16 was corrected, she was systematically invited to all of

17 our staff calls and all of our quarterly business

18 reviews.

19         So I would not have -- actually, I would have

20 been very surprised for her to make a complaint that she

21 wasn't invited to the meetings when she was clearly

22 invited to a long series of meetings during that time.

23     Q.  Did you ever direct one of your staff to stop

24 inviting Ms. Sandhu to a particular meeting?

25     A.  I do recall, maybe like -- maybe a year or



DEPONENT: JOHN GIAMATTEO                          August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    18 months after, you know, having a series of our staff

2    meetings and our QBR meetings.  I do recall at one point

3    where my admin kind of prompted me to say, you know --

4    you know, I think it's probably around the time it was a

5    new year, so going to send out a new series of invites.

6    And she asked me, Who do you -- you know, who do you

7    want to -- you know, do you want to drop this person

8    off?  Do you want this person to stay on?  And at that

9    point we realized Neelam never attended any of the

10   meetings.  So about a year and a half later, we did end

11   up, you know, dropping her off that invite list.

12        Q.  Do you know whether Ms. Sandhu was notified

13   that she was being dropped from this invite list?

14        A.  I don't know.

15        Q.  Before this lawsuit started, did you ever come

16   to learn that Ms. Sandhu had accused you of leaving her

17   off of emails that should have been sent to her?

18        A.  No, I can't -- can't say I did, Tony.

19        Q.  Did Ms. Sandhu ever confront you about not

20   inviting her to meetings she should have been invited

21   to?

22        A.  Not that I recall.

23        Q.  Did she ever confront you about --

24        MR. LAVOIE:  I think the witness was about to

25   continue that answer it seemed, unless I --



1    BY MR. TARTAGLIO:

2        Q.   And we see John -- I'll put this in the chat

3    for our court reporter Dimitropoulos -- apologies to him

4    for the pronunciation.

5        A.   That wasn't too bad, Tony.

6        Q.   His role appears to be senior vice-president

7    and strategy officer?

8        A.   Correct.

9        Q.   What -- what generally does he do for the

10   company, pardon my ignorance?

11       A.   Yeah, exactly that.  He helps on strategy,

12   business development.  If we were to, you know, buy a

13   company or buy a technology or divest.  You know, for

14   instance, John was the leader -- he led the initiative

15   to divest our Cylance division when we sold it in the

16   last year.  So those are the kinds of things that he

17   does for the company.

18       Q.   Does Mr. Dimitropoulos work within one

19   particular business unit, or does he provide advice that

20   touches on the company as a whole?

21       A.   Yeah, company as a whole.

22       Q.   And then we have Mattias Eriksson.  It looks

23   like he's the president of QNX; correct?

24       A.   Correct.

25       Q.   So presumably most of his work involves just



1  the QNX division?

2        A.   Yeah.   Yeah, Mattias is solely focused on the

3  QNX division.

4        Q.   And then we have Tim Foote as chief financial

5  officer.   And so does Mr. Foote operate just within a

6  business unit, or does his work encompass all the

7  business units?

8        A.   He does -- Tim does, you know, at the company

9  level -- company level financials as the CFO and he also

10  provides leadership, similar to like Jenny, to the

11  secure communications division as well.   He's the senior

12  finance leader for that division as well.

13        Q.   Does QNX have its own senior finance division

14  leader?

15        A.   Yes.

16        Q.   Who is that person?

17        A.   Ken Murphy.

18        Q.   And then we have Jesse Harold.   I'll spell that

19  for the court reporter.   And Mr. Harold's role is senior

20  vice-president chief information officer and chief

21  information security officer; correct?

22        A.   Correct.

23        Q.   And does Mr. Harold focuses his work on just

24  one business unit, or does his work encompass all of

25  them?



DEPONENT: JOHN GIAMATTEO                         August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1        A.  His work encompasses all of them.

2        Q.  And then near the bottom, we have Mr. Kurtz,

3   who is chief legal officer and corporate secretary;

4   correct?

5        A.  Correct.

6        Q.  And is his work limited to one particular

7   business unit, or does he provide more company-wide

8   services?

9        A.  He's corporate and corporate secretary, so he's

10  at that thin corporate layer.

11          MR. TARTAGLIO:  Okay.  I think now is a good

12  time for a break.

13          THE WITNESS:  Okay.

14          MR. LAVOIE:  Five minutes.

15          MR. TARTAGLIO:  Let's go ahead and go off the

16  record unless people are begging for more corporate

17  roles.

18          THE VIDEOGRAPHER:  This marks the end of Media

19  Number 3.

20          We are now going off the record.  The time is

21  2:31 p.m.

22          (Whereupon a recess was taken.)

23          (Whereupon, Exhibit 5 was marked for

24          identification.)

25          THE VIDEOGRAPHER:  We are now going on the



1    This is produced at page 23976.

2            (Whereupon, Exhibit 18 was marked for

3            identification.)

4    BY MR. TARTAGLIO:

5        Q.  And let me know when you're ready to discuss

6    this one.

7        A.  Okay.

8        Q.  And is this a text message from your phone?

9        A.  I believe so.

10       Q.  This appears to be a text messages between

11   yourself and Mr. Foote?

12       A.  Correct.

13       Q.  Mr. Foote says:  I'm pretty sure this BS is

14   from Neelam.

15            What's your understanding of what he was

16   referring to there?

17       A.  Yeah, I think he was referring to the complaint

18   that came in.

19       Q.  And then he goes on to say:

20            I've been thinking, and I remember that when

21        you joined, you gave her a name of a lady to

22        speak as a reference of what it's like to work

23        with you.

24            What's your understanding of who he's

25   referring to?



1   to the witness?  The witness has not seen this before.

2          MR. TARTAGLIO:  Okay.  Well, that was going to

3   be my first question.

4          MR. LAVOIE:  I don't think it's appropriate to

5   show the witness statements of other people at the

6   company who are current direct reports.  I -- in the

7   spirit of things that you claim to be about in this

8   lawsuit, I would just ask that you not share this

9   document with him.

10  BY MR. TARTAGLIO:

11      Q.  Well, let's do this.  I think this is quite

12  important.  On page 17 of Exhibit 24 -- so this starts

13  at Bates 19120 -- there's a list of recommendations from

14  the Morrison Foerster Law Firm.  Do you see that?

15      A.  Yes, I see it now.

16      Q.  Okay.  And I can scroll down if you'd like to

17  review these.

18      A.  Okay.  Okay.  This is the first time I'm seeing

19  any of this, Tony.

20      Q.  You anticipated my first question:  So did

21  anyone convey this list of recommendations to you?

22      A.  No, I never saw this document.

23      Q.  Do you think that this is something that should

24  have been conveyed to you?

25          MR. LAVOIE:  Objection.  Calls for a legal



DEPONENT: JOHN GIAMATTEO                                    August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1   BY MR. LAVOIE:

2       Q.  Have you seen any indication that Ms. Sandhu's

3   termination had something to do with a belief that she'd

4   made a false complaint or report?  Have you seen any

5   indication that that was a reason for her termination?

6           MR. TARTAGLIO:  Lack of foundation.

7           THE WITNESS:  No indication at all.

8   BY MR. LAVOIE:

9       Q.  Have you seen any indication that Ms. Sandhu's

10  termination had something to do with her race or her

11  gender?

12          MR. TARTAGLIO:  Lack of foundation; compound.

13          THE WITNESS:  No indication at all.

14  BY MR. LAVOIE:

15      Q.  You spoke today or testified about the thinning

16  of this corporate layer.  Do you have any sense, in

17  terms of a head count perspective, how much head count

18  was in that corporate umbrella layer around the time

19  John Chen stepped down in October of 2023 as compared to

20  today?

21      A.  Yeah, I remember when I stepped into the CEO

22  role in the middle of December of 2023, that big

23  corporate kind of infrastructure was over 700 people.

24  And then as we implemented, you know, Mr. Lynch's

25  strategy, which he kind of set in motion and then I



DEPONENT: JOHN GIAMATTEO                              August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

 1  carried on when I was appointed CEO, six months later

 2  from the time that that 700-person organization got, you

 3  know, thinner, down to, you know, 500 people.  And about

 4  six months from there, it went down further to about 300

 5  people.

 6          So over the course of the year, as part of that

 7  strategy of creating a thin layer at the corporate

 8  level, we went from 700 to 500 to 300 as part of our

 9  execution against that strategy.

10          MR. LAVOIE:  That's all I have subject to Tony

11  having more questions.

12          MR. TARTAGLIO:  I don't have any questions.

13          MR. LAVOIE:  Okay.  Before we go off the

14  record, I'm going to provisionally designate the

15  transcript as confidential pursuant to final

16  confidentiality designations being made pursuant to the

17  timing in terms called for by the protective order.

18          THE REPORTER:  Mr. Lavoie, did you need a copy

19  of the transcript?

20          MR. LAVOIE:  Yes, please.

21          THE VIDEOGRAPHER:  Counsel, could you take the

22  screenshare down?

23          MR. LAVOIE:  Oh, yes.

24          THE VIDEOGRAPHER:  We all done?

25          MR. LAVOIE:  From my perspective, yes.

DEPONENT: JOHN GIAMATTEO                                    August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1             THE VIDEOGRAPHER:  I will read us off.

2             This concludes today's video-recorded

3    deposition of John Giamatteo.

4             The original media of this deposition will

5    remain in the custody of Talty Court Reporters, Inc.,

6    located in San Jose, California.

7             We are now going off the record.  The time is

8    5:30 p.m.

9             (Whereupon, the deposition of JOHN

10            GIAMATTEO was concluded at 5:30p.m.)

11

12                         --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

DEPONENT: JOHN GIAMATTEO                              August 28, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                    REPORTER'S CERTIFICATE

2        I, Cambria Denlinger, California Certified

3    Shorthand Reporter No. 14009, certify;

4    That the foregoing proceedings were taken before me at

5    the time and place therein set forth, at which time the

6    witness declared under penalty of perjury; that the

7    testimony of the witness and all objections made at the

8    time of the examination were recorded stenographically

9    by me and were thereafter transcribed under my direction

10   and supervision; that the foregoing is a full, true and

11   correct transcript of my shorthand notes so taken and of

12   the testimony so given;

13   That before completion of the deposition, review of the

14   transcript (  ) was ( X ) was not requested; (  ) that

15   the witness has failed or refused to approve the

16   transcript.

17   I further certify that I am not financially interested

18   in the action, and I am not a relative or employee of

19   any attorney of the parties, nor of any of the parties.

20   I declare under penalty of perjury under the laws of

21   California that the foregoing is true and correct.

22   Dated this 9th of September, 2025

23

24                    _Cambria L Denlinger_

25                    Cambria L. Denlinger, CSR 14009



**Exhibits**

**Exhibit 01** 4:4 19:17,19, 25

**Exhibit 02** 4:5 170:9,11, 20

**Exhibit 03** 4:6 178:23 179:1,5,9,18,19,22 180:4

**Exhibit 04** 4:8 179:14,15, 24

**Exhibit 05** 4:9 183:23 184:5,9

**Exhibit 06** 4:11 188:2,3

**Exhibit 07** 4:12 190:1,3,9

**Exhibit 08** 4:14 192:1,4, 7,13

**Exhibit 09** 4:15 196:6,9, 13,15

**Exhibit 10** 4:17 197:11, 12,14

**Exhibit 11** 4:18 202:17, 19 203:3

**Exhibit 12** 4:20 205:3,5, 18

**Exhibit 13** 4:22 207:9,10, 20

**Exhibit 14** 4:23 209:23, 24 210:1

**Exhibit 15** 5:3 212:17,18, 19

**Exhibit 16** 5:4 214:14

**Exhibit 17** 5:6 216:13,15

**Exhibit 18** 5:7 218:25 219:2

**Exhibit 19** 5:9 221:9,18

**Exhibit 20** 5:11 223:3,6,7

**Exhibit 21** 5:13 226:22, 24

**Exhibit 22** 5:14 229:5,8

**Exhibit 23** 5:16 233:14, 17,23

**Exhibit 24** 5:18 237:18, 22 238:12

**Exhibit 25** 5:19 243:17, 19

**Exhibit 26** 5:21 244:11, 13,17

**Exhibit 27** 5:22 246:6,9

**Exhibit 28** 5:24 248:5,8, 11

**Exhibit 29** 6:3 249:18,21

**Exhibit 30** 6:4 254:25 255:7

---

**$**

**$2** 58:3,11

**$25** 206:7,25

**$400** 38:17,18

**$50** 147:3

**$58** 209:2,12,16

---

**-**

**--o0o--** 3:5 6:17

**--ooo--** 2:25 262:12

---

**0**

**0s** 188:16 192:5

---

**1**

**1** 4:4 19:17,19,25 47:4 87:8 101:7,14 194:18 195:23 223:21 249:5

**1,200** 30:12 150:18

**1,300** 30:12

**1,600** 27:21

**1,700** 101:5 102:2 130:20 149:1

**1,700-person** 140:4,20 149:6

**10** 4:17 197:11,12,14

**10-Q** 4:5 170:20 171:3

**10-qs** 173:23

**10/27/23** 5:4,6

**10/28/23** 5:8

**100** 39:24 191:5,8,10

**100,000-person** 140:6

**10:10** 49:12

**10:18** 49:15

**11** 4:18 172:21,25 173:3, 12 202:17,19 203:3

**11/1/23** 5:9

**11/13/23** 5:13

**11/15/23** 5:15

**11/16/23** 5:16

**11/23** 5:23

**11/29/23** 6:4

**11/7/23** 5:11

**11:15** 87:10

**11:25** 87:13

**11th** 172:16 173:15

**12** 4:20 153:20 205:3,5, 18 248:11

**12-** 30:12

**12/22/21** 4:11

**12/6** 247:19

**12/6/23** 5:20

**12167** 205:4

**12168** 205:4

**12:40** 135:24 136:3

**12th** 250:1

**13** 4:22 184:23 207:9,10, 20

**14** 4:23 185:24 209:23,24 210:1 244:2

**14009** 2:20 8:6

**15** 5:3 16:24 212:17,18, 19

**150** 38:18

**15th** 236:17

**16** 5:4 214:10,14

**16328** 216:14

**16949** 214:13

**16950** 214:13

**17** 5:6 101:5 216:12,13, 15 238:12

**17.0** 4:20

**170** 4:5

**17011** 221:8

**17012** 221:8

**17812** 223:7

**179** 4:6,8

**17th** 235:3

**18** 5:7 30:24 101:17 113:1 139:6 149:3 152:24 153:15 218:25 219:2

**18101** 226:23

**18146** 233:18

**18200** 236:16

**183** 4:9

**188** 4:11

**19** 4:4 5:9 126:11 221:7, 9,18

**190** 4:12

**19018** 207:21

**19019** 207:21

**19104** 237:24

**19120** 238:13

**192** 4:14

**196** 4:15

**197** 4:17

**19731** 246:11

**19732** 246:11

**19788** 229:9

**19789** 229:9

**19970** 190:2

**1:10** 135:25

**1:14** 136:6

---

**2**

**2** 4:5 87:14 101:11 136:2 170:9,11,20 223:22 249:9

**2/12/24** 5:24

**2/17/22** 4:12



**2/6/23** 4:14

**20** 5:11 135:16 171:9 172:8 223:3,6,7

**200** 39:24 101:22,24 215:21

**200-person** 249:14

**20049** 212:18

**202** 4:18

**2021** 27:2 36:3 213:17

**2022** 46:17,18 67:5

**2023** 46:18,24 47:25 53:11 171:8,9 172:21 173:3,12 194:19 198:12 213:19 246:21 255:12,21 260:19,22

**2024** 48:1 248:11

**2025** 7:4 87:15 130:14 136:8 184:3 223:2

**2039** 202:18

**2040** 202:18

**205** 4:20

**207** 4:22

**20th** 84:13

**21** 5:13 161:19 226:22,24

**210** 4:23

**212** 5:3

**2131** 2:21

**214** 5:4

**216** 5:6

**219** 5:7

**22** 5:14 74:2 161:20 229:5,8

**221** 5:9

**223** 5:11

**226** 5:13

**229** 5:14

**23** 5:16 47:7 233:14,17, 23

**233** 5:16

**237** 5:18

**23976** 219:1

**24** 5:18 72:12 73:22,24 74:6 160:5 166:14,17,21 237:18,22 238:12

**24/7** 121:5

**243** 5:19

**244** 5:21

**246** 5:22

**248** 5:24

**249** 6:3

**24CV02002SK** 7:9

**25** 5:19 243:17,19

**254** 6:4

**255** 3:4

**26** 5:21 244:11,13,17

**27** 5:22 246:6,9

**27th** 221:21 222:4

**28** 5:24 7:4 87:15 136:8 184:3 223:2 248:5,8,11

**29** 6:3 249:18,21 255:12, 21

**29th** 228:14

**2:26** 184:1

**2:31** 183:21

---

**3**

**3** 4:6 101:11 136:7 178:23 179:1,5,9,18,19, 22 180:4 183:19 249:9

**3,000** 101:4 102:1 149:1

**3,000-person** 149:5

**3,000-plus** 130:19

**3/3/23** 4:15

**30** 6:4 40:5 44:25 103:10 135:19,20,21 171:8 172:8,9 254:25 255:7

**30-40** 135:16

**30-second** 29:6 30:21

**300** 261:4,8

**30s** 107:3

**33** 54:5

**35** 63:3 171:11

**38-minute** 211:19

**38-second** 211:19

**39** 186:20

**39-minute** 54:5

**3:59** 222:22

---

**4**

**4** 4:8 101:11 173:3 179:14,15,24 184:2 222:20 249:9

**4/10/23** 4:18

**4/19/23** 4:20

**4/4/2025** 5:21

**4/4/23** 4:17

**40** 29:20 39:22 187:15

**40-year-old** 33:12

**400** 2:16 102:2

**400-plus** 102:6

**40s** 107:3

**4373** 192:6

**4:15** 222:25

**4th** 49:21 173:7

---

**5**

**5** 4:9 183:23 184:5,9 223:1 250:18

**5/18/23** 4:23

**50** 39:23 43:9 47:6

**50,000-person** 140:5

**500** 102:3 251:5 253:13, 16,18,22 254:4,9,10 261:3,8

**502** 2:6

**50s** 107:2

**50TH** 2:11

**519** 4:10

**55** 223:8

**5952** 188:16

**5:00** 243:10,13

**5:14** 254:23

**5:22** 255:3

**5:30** 262:8

**5:30p.m** 262:10

---

**6**

**6** 4:11 188:2,3 242:2 246:21

**60** 114:17 189:4,23

**60s** 107:3

**6377** 196:8

**6417** 209:25

**67** 215:21

---

**7**

**7** 4:12 190:1,3,9

**70** 13:23 172:10 240:11

**70-75** 53:22

**700** 260:23 261:8

**700-person** 261:2

**75** 13:23

**75024** 2:17

**7th** 247:24

---

**8**

**8** 3:3 4:14 126:11 192:1, 4,7,13

**80** 122:22 123:15

---

**9**

**9** 4:15 196:6,9,13,15 241:15

**9/5/23** 5:3

**90** 38:12,15

**90071** 2:12

**94109** 2:7

**95126** 2:22

**9916** 197:13

**9924** 197:13

**9:00** 22:6



# EXHIBIT 34

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--o0o--

NEELAM SANDHU, an individual,

       Plaintiff,

     vs.                 Case No.:
                              3:24-cv-02002-SK

BLACKBERRY CORPORATION; a
Delaware Corporation; and
JOHN GIAMATTEO, an
individual,

       Defendants.
_____/

**CERTIFIED TRANSCRIPT**

REMOTE VIDEOTAPED

DEPOSITION OF JOHN CHEN

DATE:  Tuesday, August 5, 2025

TIME: 8:59 a.m. – 4:03 p.m.

LOCATION: REMOTE VIA ZOOM

REPORTED BY:    Karen Ferguson, CSR
                 Certified Shorthand Reporter #5970
                 TALTY COURT REPORTERS
                 2131 The Alameda, Suite D
                 San Jose, California 95126
                 (408) 244-1900

DEPONENT: JOHN CHEN                                    August 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                              APPEARANCES

2    FOR THE PLAINTIFF:  NEELAM SANDHU

3         GOMERMAN BOURN & ASSOCIATES
          BY:  ANTHONY TARTAGLIO, ATTORNEY AT LAW
4              MARIA BOURN, ATTORNEY AT LAW
          825 VAN NESS AVENUE, SUITE 502
5         SAN FRANCISCO, CALIFORNIA 94109
          (415) 545-8608
6         Tony@gobolaw.com

7    FOR THE DEFENDANT:  BLACKBERRY CORPORATION

8         MUNGER, TOLLES & OLSON LLP
          BY:  CRAIG JENNINGS LAVOIE, ATTORNEY AT LAW
9              LAUREN N. BECK, ATTORNEY AT LAW
          350 SOUTH GRAND AVENUE, FIFTIETH FLOOR
10        LOS ANGELES, CALIFORNIA  90071
          (213) 683-9224
11        craig.lavoie@mto.com
          lauren.beck@mto.com

12

13   FOR THE WITNESS:  JOHN CHEN

14        HIRSCHFELD KRAEMER LLP
          BY:  ADAM R. MALDONADO, ATTORNEY AT LAW
15        456 MONTGOMERY STREET, SUITE 2200
          SAN FRANCISCO, CALIFORNIA 94104
16        (415) 835-9075
          amaldonado@hkemploymentlaw.com

17

18   ALSO PRESENT:     MAGGIE MAYO, BLACKBERRY
                       NEELAM SANDHU
19                     SHIVANI KAVULURU

20   VIDEOGRAPHER:     JIM PARTRIDGE

21

22

23

24

25



**TALTY COURT REPORTERS, INC.**                        **2**
**408.244.1900 · www.taltys.com**

DEPONENT: JOHN CHEN                                    August 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                          I-N-D-E-X
                                                      PAGE
2
     Examination by ANTHONY TARTAGLIO                    9
3
     Examination by CRAIG JENNINGS LAVOIE             150
4
     Further examination by ANTHONY TARTAGLIO         263
5
     Further examination by CRAIG JENNINGS LAVOIE     266
6

7

8                          --oOo--

9                      E X H I B I T S

10   PLAINTIFF'S
     EXHIBIT NO.                                      PAGE
11
     Exhibit 1      Subpoena to Testify at a            80
12                  Deposition in a Civil Action

13   Exhibit 2      BlackBerry Code of Business         81
                    Standards and Principles
14                  BB13-00000456 thru BB13-00000519

15   Exhibit 3      Neelam Sandhu-FY15 Employee         91
                    Performance Review
16                  BB13-00000165 thru BB13-00000167

17   Exhibit 4      Neelam Sandhu, Director of          94
                    Business Operations, Office of the
18                  CEO, Performance Feedback
                    Summary-2016
19                  BB13-000001715

20   Exhibit 5      Email from John Chen with Neelam    97
                    Sandhu, Senior Director of
21                  Business Operations, Office of the
                    CEO, Performance Feedback Summary
22                  FY17 Attached
                    BB13-00000312 thru BB13-00000315
23
     Exhibit 6      Email Chain                        100
24                  BB13-00011179 thru BB13-00011191
25



**TALTY COURT REPORTERS, INC.**                         **3**
**408.244.1900 - www.taltys.com**

DEPONENT: JOHN CHEN                                        August 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                        E X H I B I T S (Con't)

2       PLAINTIFF'S
        EXHIBIT NO.                                            PAGE
3
        Exhibit 7          Email Chain                         103
4                          BB13-00000877

5       Exhibit 8          Email with BlackBerry's Officers'   106
                           Succession Plan Attached
6                          BB13-00011448 thru BB13-00011449

7       Exhibit 9          Email Chain                         108
                           BB13-00012725 thru BB13-00012726
8
        Exhibit 10         Email from Richard Curiale to       109
9                          Neelam Sandhu, Dated 3-3-2023
                           BB13-00012141
10
        Exhibit 11         Email from John Chen to Rich        112
11                         Curiale, Dated 3-26-23
                           BB13-00012835
12
        Exhibit 12         Email Chain                         116
13                         BB13-00009916 thru BB13-00009924

14      Exhibit 13         Email Chain                         119
                           BB13-00009934 thru BB13-00009936
15
        Exhibit 14         Email from John Chen to Various     121
16                         People, Dated 4-12-23
                           BB13-00009962
17
        Exhibit 15         Email Chain                         122
18                         BB13-00012167 thru BB13-00012168

19      Exhibit 16         BBMe Messages                       123
                           BB13-00019018 thru BB13-00019019
20
        Exhibit 17         Email Chain                         126
21                         BB13-00012219 thru BB13-00012220

22      Exhibit 18         Email Chain                         128
                           BB13-00013083
23

24

25



**TALTY COURT REPORTERS, INC.**                            **4**
**408.244.1900 - www.taltys.com**

DEPONENT: JOHN CHEN                                    August 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1                    E X H I B I T S  (Con't)

 2     PLAINTIFF'S
       EXHIBIT NO.                                      PAGE
 3
       Exhibit 19     Investigation Report re:  Issues    129
 4                    Raised by Neelam Sandhu, Dated
                      2-10-23
 5                    BB13-00016477 thru BB13-00016479

 6     Exhibit 20     Reuters Article, Dated 10-30-23     134

 7     Exhibit 21     Responses to Plaintiff's            139
                      Interrogatories to Defendant
 8                    BlackBerry Corporation, Set One

 9     Exhibit 22     Defendant's Answer to Plaintiff's   143
                      First Amended Complaint
10
       Exhibit 23     BlackBerry Executive Team Excerpt   145
11                    from BlackBerry Website

12     Exhibit 24     Email Chain                         152
                      BB13-00019925 thru BB13-00019926
13
       Exhibit 25     Email Chain                         156
14                    BB13-00019927 thru BB13-00019928

15     Exhibit 26     Email Chain                         160
                      BB13-00019939 thru BB13-00019945
16
       Exhibit 27     Email Chain                         163
17                    BB13-00019983 thru BB13-00019984

18     Exhibit 28     Email Chain                         167
                      BB13-00011767
19
       Exhibit 29     Email Chain                         167
20                    BB13-0001776

21     Exhibit 30     Email Chain                         176
                      BB13-00012885 thru BB13-00012886
22
       Exhibit 31     Email Chain                         181
23                    BB13-00012225 thru BB13-00012226

24     Exhibit 32     Email Chain                         183
                      BB13-00013046 thru BB13-00013049
25
```

DEPONENT: JOHN CHEN                                    August 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                 E X H I B I T S (Con't)

2    PLAINTIFF'S
     EXHIBIT NO.                                        PAGE
3
     Exhibit 33      Email Chain                         185
4                    BB13-00013044 thru BB13-00013045

5    Exhibit 34      Email Chain                         187
                     BB13-00013082
6
     Exhibit 35      Email from Richard Curiale to       193
7                    Neelam Sandhu, Dated 3-3-23
                     BB13-00012141
8
     Exhibit 36      Email from Richard Curiale to John  198
9                    Chen, Dated 3-20-23
                     BB13-00012834
10
     Exhibit 37      Email Chain                         200
11                   BB13-00012838 thru BB13-00012839

12   Exhibit 38      BBMe Messages                       206
                     BB13-00018995 thru BB13-00019002
13
     Exhibit 39      Plaintiff's Second Amended          214
14                   Responses to Defendant BlackBerry
                     Corporation's Interrogatories, Set
15                   One

16   Exhibit 40      First Amended Complaint             218

17   Exhibit 41      Email From Richard Curiale to John  239
                     Chen, Dated 3-8-23
18                   BB13-00012829

19   Exhibit 42      KRON4 Article                       244

20   Exhibit 43      Email Chain                         263
                     BB13-00011784 thru BB13-00011785
21

22                         --oOo--

23

24

25



**TALTY COURT REPORTERS, INC.**                          **6**
**408.244.1900 - www.taltys.com**

1      BE IT REMEMBERED, that pursuant to Notice to

2   the respective parties, and on Tuesday, the 5th day

3   of August, 2025, commencing at the hour of 8:59 a.m.

4   thereof, via Zoom Videoconference before me, KAREN

5   L. FERGUSON, a Certified Shorthand Reporter, License

6   No. C-5970, State of California, the following

7   proceedings were had:

8                     PROCEEDINGS

9      THE VIDEOGRAPHER:  We are going on the record.

10     The time is 8:59 a.m. on August 5th, 2025.

11     This is the video deposition of John Chen.

12     This is taken -- oops, I'm not sure -- is it by

13   the plaintiff or the defendant -- I'm sorry -- I

14   don't have that.

15     ATTORNEY TARTAGLIO:  By the plaintiff.

16     THE VIDEOGRAPHER:  Thank you.

17     ATTORNEY MALDONADO:  Both -- both actually.

18     THE VIDEOGRAPHER:  Okay.  Thank you.

19     This is taken by both the plaintiff and the

20   defendant in the matter of Neelam Sandhu versus

21   Blackberry Corporation, et al.

22     This is filed in the United States District

23   Court for the Northern District of California, case

24   No. 24-CV-02002-SK.

25     This deposition is being held via the Zoom



DEPONENT: JOHN CHEN                                    August 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    platform.

2         My name is Jim Partridge.  I'm a Notary Public

3    for the County of Sonoma, State of California and

4    the Court Reporter is Karen Ferguson.  We're both on

5    behalf of Talty Court Reporters, Inc. located in San

6    Jose, California.

7         Would the counsel please state their

8    appearances, beginning with the noticing attorney.

9         ATTORNEY TARTAGLIO:  Well, I guess I'll start

10   -- I think there are -- there is a cross notice, but

11   for plaintiff you have Anthony Tartaglio from the

12   Gomerman Bourn Law Firm.

13        We have Shivani Kavuluru who is a clerk at the

14   firm and maybe the plaintiff will be watching -- I

15   don't know.

16        ATTORNEY LAVOIE:  Craig Jennings Lavoie of

17   Munger, Tolles & Olson, along with my colleague

18   Lauren Beck for the defendant BlackBerry

19   Corporation.

20        ATTORNEY MALDONADO:  Adam Maldonado of

21   Hirschfeld Kraemer LLP, counsel for the deponent

22   John Chen.

23        THE VIDEOGRAPHER:  All right.  Thank you.

24        Would the reporter please swear the witness.

25        THE REPORTER:  Hi, my name is Karen Ferguson.



**TALTY COURT REPORTERS, INC.**                          **8**
**408.244.1900 - www.taltys.com**

1  take over if business growth were there and -- and

2  so I don't -- I don't believe that we have hire a

3  search firm to do another search in parallel to

4  that.

5      Q.  To your knowledge, did BlackBerry ever

6  consider anyone other than John Giamatteo to succeed

7  you as CEO?

8      A.  To my knowledge, no, but then what the

9  independent director discuss among themselves, that

10  I'm not privileged to that.

11      Q.  Are you currently working anywhere?

12      A.  Am I what?

13      Q.  Do you work anywhere currently?

14      A.  No.

15      Q.  Do you still own stock in BlackBerry?

16      A.  Yes.

17      Q.  So Miss Sandhu -- Neelam Sandhu -- at some

18  point she was the head of the Elite Customer Group;

19  is that correct?

20      A.  That's correct.

21      Q.  Could you please describe what the Elite

22  Customer Group did generally?

23      A.  Elite customers focus on our top revenue

24  producing or representational customers and to

25  create a deeper relationship with a much broader set



1  of the people at the customer base, so i.e., for

2  example, not just focusing on dealing with head of

3  engineering or procurement, but much broader and

4  their objective is to actually move up strategically

5  with the account at the CEO, CIO, CTO level that the

6  C-suites of the customer base.  So that -- that's

7  the elite program.

8      Q.  And was there some sort of problem or need

9  that led to the creation of the elite customer

10 program?

11     A.  Well, that -- could you please ask that

12 again.

13     Q.  Sure.

14     Was there some sort of incident or problem or

15 unfulfilled need that led to the creation of the

16 Elite Customer Group?

17     A.  So there were both offensive and defensive

18 reasons.

19     The offensive reason is that we would like to

20 expand our footprint in these top customers.  These

21 top customers are the who's who's in banks --

22 investment banking -- like ███████████ and Bank of

23 America and ███████████ et cetera -- as well as

24 who's who's in the major government around the

25 world, particularly, Canada and United States.



1          So -- so for an offensive reason we want to be

2    more strategic to the account.  We want them to know

3    that they're important to us and they could any time

4    pick up the phone and call the elite group and then

5    the elite group will on a daily basis re-update me

6    as the CEO of what is happening.

7          So on the more defensive reason we were under a

8    lot of competitive pressure because these are the

9    accounts that everybody would want and, in

10   particularly, Microsoft has been creating a lot of

11   account doubts and problems for us so it was very

12   important that we keep our customer base happy with

13   us and well understood of our strategic direction

14   and then we understand their strategic direction so

15   that -- so that we could provide the product and

16   services required.

17         So that was -- those were the two major

18   reasons.

19         Q.  For the time period that the elite customer

20   program existed, was Miss Sandhu the -- the head of

21   that program?

22         A.  Yes.

23         Q.  What -- well, strike that.

24         Did you decide to have Miss Sandhu be the head

25   of the elite customer program?



1  together with Miss Sandhu, and I'll ask about the

2  last two years that you were at BlackBerry, just to

3  put a timeframe around it.

4      So about how frequently would you interact with

5  Miss Sandhu in your last two years at BlackBerry?

6      A.  Almost daily.

7      Q.  And when you interacted with her, would

8  that be in person, phone calls, emails, some

9  combination of those things?

10     A.  Combinations -- a combination.

11     Q.  How would you describe Miss Sandhu's work

12  ethic compared to her peers?

13     A.  She is very devoted, committed and work

14  extremely, extremely hard.

15     Q.  Can you think of an example or two to help

16  the jury understand her work ethic.

17     A.  Whenever I gave her assignment -- and it

18  ranges from very specific to quite broad -- she has

19  been -- she has always impressed me being able to

20  jump in and kind of put the arms around the problem

21  and just work very diligently.  So it's very

22  extremely reliable in that -- in that sense.

23     Q.  I'm going to ask now about her -- her

24  competence -- so her ability to solve problems,

25  let's say, her ability to get things done, I guess,



```
 1    for lack of a better way of describing it.

 2        How would you describe Miss Sandhu's competence

 3    compared to her peers?

 4        A.  Better than average.  Certainly, as I said,

 5    is very reliable to produce results.  As I said

 6    earlier -- I didn't mean jokingly -- but, you know,

 7    I would have wanted more sooner, but that's the

 8    nature of the business, but it's -- I am -- I was

 9    always comfortable with her diligent and the ability

10    to be -- to be on top of the assignments.

11        Q.  I'm going to ask now about Miss Sandhu's

12    ability to get along with clients and customers,

13    customer service attitude -- that sort of thing.

14        Did you ever have any concerns about her

15    ability to get along with her clients and customers?

16        A.  No, I would say 90 percent of the time she

17    gets along great with the customers and I

18    occasionally have a side email or a comment even

19    verbally from some customers said good things about

20    her ability to manage the account and service the

21    account and -- no, I don't normally have that

22    problem.

23        Q.  How would you describe Miss Sandhu's

24    ability to get along with her co-workers -- let's

25    call it her collegiality -- how would you describe
```

 1  view -- and then we go back and I review that in

 2  private session with the entire board of director

 3  and then they would approve whatever or not

 4  regarding the recommendation I made in equity, in

 5  pay, in other benefits.

 6      So that's -- that's just a process.

 7      My performance review with my staff is a more

 8  of a one-on-one -- I tend -- I normally do a

 9  one-on-one every week -- if not every week, every

10  other week for sure -- with each of my staff to

11  discuss performance, challenges, help that's

12  required on a regular basis and I've done that for,

13  I would say, the decade I was at BlackBerry.

14      Q.  To your knowledge, was Miss Sandhu ever

15  formally disciplined at the company -- and I'll give

16  you a few examples of potential discipline -- could

17  be something as minor as a counseling letter that's

18  put in the their personnel file, could be a letter

19  of reprimand, could be a suspension, could be a

20  demotion -- could be a lot of different things.

21      To your knowledge, did Miss Sandhu ever receive

22  any company discipline like that?

23      A.  No, I do not remember that.  No, I don't --

24  no, I don't.

25      Q.  And for the performance evaluations and



```
1        Q.  So the win back targets are companies that
2    were once BlackBerry customers that BlackBerry is --
3    would like to recover as clients?
4        A.  Uh-huh, correct.
5        Q.  And was it -- or strike that.
6        Were you in agreement with the idea of
7    offloading some of Miss Sandhu's current clients and
8    giving her some win back targets?
9        A.  Yes, I came up with that idea.
10       Q.  And this last sentence says "I think this
11   will really challenge you" and it goes on for a bit.
12       Do you think it was a challenge for Miss Sandhu
13   to be given a list of win back clients as opposed to
14   current clients?
15       A.  Yes, win back is always difficult.
16       Q.  And this is probably pretty obvious to you,
17   but for the benefit of the jury, why is a win back
18   target more difficult than servicing a current
19   customer?
20       A.  Because winning back in pride you have to
21   replace something that's already in store that was
22   just replaced you so, you know, that would require
23   quite a bit of work and not to say -- not to, you
24   know, mention political -- politicalness of the
25   account inside the account who had made a
```



DEPONENT: JOHN CHEN                                        August 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    determination to move away from us, so to win back

2    causes some operational challenges, causes some

3    political challenges at the account so it's not

4    easy.

5         So the competitor has to stumble, has not, you

6    know, has to not be able to deliver per their will

7    promises for somebody who say, okay, we're going --

8    we going to go back to BlackBerry.  So it is a

9    challenge.

10        Q.  So based on this email here, was the plan

11   to give John Giamatteo some existing clients and to

12   then give Miss Sandhu some win back targets?

13        A.  Yes, that's correct.

14        Q.  And do you recall if that plan was ever

15   ultimately implemented?

16        A.  I don't -- I don't recall because shortly

17   after when this happened with the CMO change shortly

18   after I was leaving.

19        ATTORNEY TARTAGLIO:  We'll turn now to

20   Exhibit 11, which is produced at Bates No. 12835.

21             (Whereupon, Plaintiff's Exhibit No. 11 was

22             marked for identification.)

23        ATTORNEY TARTAGLIO:

24        Q.  So take a look at this then I'll ask you a

25   couple of questions about it.



1    BlackBerry?

2        A.  That had nothing to do with me.

3        Q.  Do you have any feelings one way or another

4    about the case?

5        A.  I shouldn't speculate.  This is the

6    cornerstone of the whole lawsuit and complaint so

7    I'll let you folks, you know, worry about that.

8        Q.  When Mr. Lynch became interim CEO, did you

9    have any conversation with him to help pass the

10   baton, so to speak -- help transition him?

11       A.  No, none.

12       Q.  Do you think that BlackBerry should have

13   fired Miss Sandhu?

14       A.  Speculation.

15       ATTORNEY LAVOIE:  Yeah, objection.  Lacks

16   foundation.  Calls for speculation.

17       ATTORNEY TARTAGLIO:

18       Q.  If you had stayed on as CEO would you have

19   fired Miss Sandhu?

20       ATTORNEY LAVOIE:  Objection.  Assumes facts.

21   Lacks foundation.  Calls for speculation.

22   Incomplete hypothetical.

23       THE WITNESS:  I don't have any -- if things

24   continue -- progresses the way that it's been

25   progresses for the past ten years, I have no

1    intention to fire Miss Sandhu.

2        ATTORNEY TARTAGLIO:

3        Q.  And what makes you say that?

4        A.  As we have a long discussion this morning,

5    there's a -- the whole equation of net positive.

6    She has a lot of quality and qualifications and she

7    has edges that needs to be addressed, but on balance

8    it's a good employee for our company.

9        ATTORNEY TARTAGLIO:  Okay.

10       That's all the questions I have.

11       THE WITNESS:  Thank you.

12       ATTORNEY MALDONADO:  Mr. Chen's prepared to go

13   ahead to switch here -- we don't need a break.

14       ATTORNEY LAVOIE:  Sounds good.

15                      EXAMINATION BY

16       ATTORNEY LAVOIE:

17       Q.  Mr. Chen, I'm going to just try to be

18   really direct and respect your time -- go as quickly

19   as I can.

20       So just to clean up something that just

21   occurred, do you, yourself, have any personal

22   knowledge, i.e. rooted in your experience or

23   observation about what functions people at the

24   company have been performing since you stopped

25   working there, for example, do you have personal



DEPONENT: JOHN CHEN                                    August 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1       So there's a combination -- and in the meantime
2   we could reduce the tension to some degree.  I never
3   thought it would completely eliminate the tension,
4   but it will reduce the tension.
5       Q.  Let's look at -- I want to ask you about
6   this statement.
7       Mr. Giamatteo, further up the chain, says "The
8   PTSD effect of Neelam and her interaction with the
9   organization is very ugly," slash, "dysfunctional.
10  I spend a lot of time conducting therapy sessions
11  with everyone.  In my 30-plus years I have never
12  seen such a polarizing figure."
13      Do you see that?
14      A.  Yeah.
15      Q.  Is John Giamatteo the only person who ever
16  made comments to you about Neelam like this?
17      A.  Oh, yeah.  I believe so.
18      Q.  He's the only person who said that she was
19  this polarizing?
20      A.  Oh, no, no, not polarizing, you know,
21  the -- you know, other implication, you know, I
22  mean, other things like PTSD effect and stuff -- I
23  just ignore it.  It's totally inappropriate.
24      But polarizing, I understand where he's coming
25  from, but I maintain -- I maintain -- I maintain my



DEPONENT: JOHN CHEN                                              August 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1      I, KAREN L. FERGUSON, CSR No. 5970, Certified

2  Shorthand Reporter, certify;

3      That the foregoing proceedings were taken before me

4  at the time and place therein set forth, at which time

5  the witness declared under penalty of perjury;

6      That the testimony of the witness and all

7  objections made at the time of the examination were

8  recorded stenographically by me and were thereafter

9  transcribed under my direction and supervision;

10      That the foregoing is a full, true, and correct

11  transcript of my shorthand notes so taken and of the

12  testimony so given;

13      (  ) Reading and signing was requested.

14      (  ) Reading and signing was waived.

15      (XX) Reading and signing was not requested.

16      I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties, nor of any of

19  the parties.

20      I declare under penalty of perjury under the laws

21  of California that the foregoing is true and correct.

22      Dated this 5th day of August, 2025.

23

24      KAREN L. FERGUSON, CSR No. 5970

25

**Exhibits**

**Exhibit 01**  3:11 79:18 80:8,12

**Exhibit 02**  3:13 81:9,12 82:2

**Exhibit 03**  3:15 91:1,2,5, 14,15 211:17

**Exhibit 04**  3:17 94:16,18 212:5

**Exhibit 05**  3:20 97:8,9,17 212:22

**Exhibit 06**  3:23 100:16, 17 102:8

**Exhibit 07**  4:3 103:16,17

**Exhibit 08**  4:5 106:1,3

**Exhibit 09**  4:7 107:25 108:1

**Exhibit 10**  4:8 109:12,13

**Exhibit 11**  4:10 112:20, 21

**Exhibit 12**  4:12 116:9,10 117:1,2 170:8

**Exhibit 13**  4:14 119:20, 21 120:7,23

**Exhibit 14**  4:15 121:6,7

**Exhibit 15**  4:17 121:23 122:1

**Exhibit 16**  4:19 123:14, 15

**Exhibit 17**  4:20 126:7,8

**Exhibit 18**  4:22 128:18, 19

**Exhibit 19**  5:3 129:5,6

**Exhibit 20**  5:6 134:6,8 135:22

**Exhibit 21**  5:7 139:9,11

**Exhibit 22**  5:9 143:12,14

**Exhibit 23**  5:10 145:12, 25

**Exhibit 24**  5:12 152:6,7

**Exhibit 25**  5:13 156:21, 22

**Exhibit 26**  5:15 160:12, 13

**Exhibit 27**  5:16 163:14, 15

**Exhibit 28**  5:18 167:5

**Exhibit 29**  5:19 167:6 169:4

**Exhibit 30**  5:21 176:19, 20 177:15,18

**Exhibit 31**  5:22 181:11, 13

**Exhibit 32**  5:24 183:20, 22

**Exhibit 33**  6:3 145:11 185:8,9

**Exhibit 34**  6:5 187:3,4

**Exhibit 35**  6:6 193:2,3

**Exhibit 36**  6:8 197:23,24 198:1

**Exhibit 37**  6:10 200:2,3

**Exhibit 38**  6:12 206:21, 22 207:25

**Exhibit 39**  6:13 214:9,10, 12 220:19 229:17

**Exhibit 40**  6:16 218:13, 14 234:7 235:17 237:22 249:20

**Exhibit 41**  6:17 239:21

**Exhibit 42**  6:19 244:14

**Exhibit 43**  6:20 263:8,9

---

**$**

**$1.8**  265:8,15

**$25**  122:10,13,17

**$400**  255:22

---

**1**

**1**  48:1 79:18 80:8,12 93:17,18 152:5 248:24 249:1

**1,000**  254:3 255:20

**1,200**  254:3

**10**  19:15 78:9 109:12,13 214:17 216:20 220:20

**100**  26:25 254:12 269:14

**10:01**  48:3,4

**10:06**  48:5,7

**10th**  207:4

**11**  19:16 112:20,21 169:7 197:25 218:22,25 222:21 235:17

**110**  140:19

**11179**  100:20

**11448**  106:2

**11449**  106:2

**1191**  100:21

**11:07**  89:11,13

**11:15**  89:3,14,15

**12**  116:9,10 117:2 170:8 200:2 229:17

**12141**  109:17

**12167**  121:24

**12219**  126:12

**12725**  108:4

**12726**  108:5

**12835**  112:20

**12:27**  136:22,23

**12:30**  136:6

**13**  18:4 82:14,20 119:20, 21 120:7,23 176:17,19 177:14,15 237:21

**13083**  128:22

**13th**  163:23 167:11 168:20

**14**  121:6,7 181:11 222:21

**14th**  164:9

**15**  91:17 121:23 122:1 185:8

**150**  254:12

**16**  123:14,15 218:21,22, 25 225:24 237:22

**16477**  129:9

**165**  91:6

**167**  91:6

**17**  98:1 126:7,8 187:7 213:13,18 214:18

**175**  94:17

**18**  128:18,19 206:25 214:18

**19**  113:13 129:5,6 135:11,14 183:21 214:21

**1950**  246:15

**1950s**  249:15

**1:00**  136:24 137:1

**1:30**  137:18

**1:52**  177:5,6

**1:58**  177:7,9

---

**2**

**2**  48:7 81:9,12 82:2 93:4 156:20 177:18 247:6 249:2,24

**2-20-15**  91:17

**20**  134:6,8 135:22 193:2 198:4 203:18 214:21 237:23 257:8 265:1

**20-**  55:2

**2009**  36:20

**2010**  36:20

**2011**  36:19,20

**2013**  19:11 55:3 226:4 241:3,22 246:13

**2014**  91:17 226:5

**2015**  211:17 212:18 213:13 225:24

**2016**  212:6,18 213:13

**2017**  212:24 213:7

**2018**  151:22 158:5

**2019**  12:2,3 151:22 158:5

**2021**  20:25 152:14 153:1 157:2 159:3,9,18 160:18, 23 161:4

**2022**  56:14 58:10 163:23

**2023**  19:14 27:22 51:7 56:10,14 151:4 167:11 170:13 172:17 177:17 187:10 193:7 195:24 196:2 198:5 200:9 208:2



DEPONENT: JOHN CHEN
NEELAM SANDHU vs BLACKBERRY CORPORATION

August 05, 2025

209:2 210:15 213:16
238:1 239:24 241:3,22
246:13 267:7,8

**2025** 7:3,10

**20th** 135:12

**21** 139:9,11 216:20

**22** 143:12,14

**23** 145:10,12,25 216:20

**23rd** 208:2 209:2 210:15

**24** 152:6,7 220:20

**24-CV-02002-SK** 7:24

**24th** 164:11

**25** 156:21,22 220:21

**26** 160:12,13 187:10
200:9 222:20

**27** 163:14,15 249:22

**28** 167:5,7

**29** 160:23 161:4 167:6,8
169:4

---

**3**

**3** 89:16 91:1,2,5,14,15
136:21 170:7 211:17
234:8

**3,000** 242:18 266:22

**30** 176:19,20 177:15,18
194:10 203:18 242:20

**30-plus** 174:11

**31** 181:11,13

**312** 97:12

**315** 97:13

**32** 183:20,22

**33** 145:11 185:8,9

**34** 187:3,4

**35** 193:1,2,3

**36** 197:24 198:1

**37** 200:2,3

**38** 206:21,22 207:25

**39** 214:10,12 220:19
229:17

**3:50** 262:23,24

**3:55** 262:25 263:1

**3rd** 193:7

---

**4**

**4** 93:5 94:16,18 137:2
160:11 177:2 212:5

**4,500** 242:15

**40** 218:13,14 234:7
235:17 237:22 249:20

**41** 143:22 239:20,21

**42** 244:10,14

**43** 263:8,9

**463** 82:16

**468** 82:19

**469** 85:3

**494** 85:11,22

**495** 85:23 86:22

**4:00** 47:5,18 88:12
113:19 134:17 138:21
244:7 267:17 268:2

**4:03** 270:23

**4th** 157:1 159:3 170:13

---

**5**

**5** 93:17,18 97:8,9,17
163:13 177:10 207:25
212:22 262:22

**50** 242:20

**57** 237:22

**5th** 7:2,10 152:14

---

**6**

**6** 100:16,17 102:8 167:5,
9 234:8 254:7 263:2

**6:49** 169:5,8

---

**7**

**7** 103:16,17 167:5 169:3
218:21

**700** 254:7

**7:42** 168:20

---

**8**

**8** 106:1,3 193:2 234:8
239:24 249:22

**877** 103:20

**8:59** 7:3,10

---

**9**

**9** 107:25 108:1 249:23

**90** 29:16

**9916** 117:2

**9934** 120:7

**9962** 121:10

---

**A**

**a.m.** 7:3,10 48:3,4,5
89:13,14 168:20

**abiding** 134:17

**ability** 14:1 15:16 28:24,
25 29:9,12,15,20,24 55:8
117:21 161:7 243:2

**absolutely** 151:14 173:12
220:8 222:3 231:25
238:18 247:11 252:11,
17,20 269:14,25

**accept** 51:12 66:7 195:1
202:13

**acceptable** 194:21
195:15,21 268:7

**accepted** 196:7

**accepts** 53:1

**access** 81:6 219:11

**accommodate** 137:25

**accomplish** 57:5

**account** 22:5 23:2,11
25:6,10,23 29:20,21
36:11,13 107:19 111:25
112:3 118:23 120:20
161:12 232:5

**accounts** 23:9 25:24
35:19 110:25 120:9
141:11,12,14 142:1
158:18 159:25 172:14,
17,18,23 173:9,23 175:8,

9,14,18,21 194:8,10,11
197:2 239:9,12

**accuracy** 100:13 131:6

**accurate** 14:1,10 26:2,4
121:1 155:8 159:16
189:7 203:9,12 256:24
261:11

**accurately** 247:10

**accusing** 89:22 115:6

**accustomed** 155:9
204:11

**achieve** 168:5

**acknowledge** 90:3

**act** 50:9 70:2 86:23

**acting** 247:17,19

**action** 217:10

**actions** 217:17

**Adam** 8:20 104:25 105:2
137:22 152:21 153:12
154:6 157:2 160:22
189:5

**add** 133:12 183:3

**added** 134:3 168:15
219:8

**addition** 219:3

**additional** 122:6 138:8

**additionally** 173:19

**address** 101:8 116:2
140:17 165:24 192:8
217:12 250:19

**addressed** 150:7 212:19
214:20 228:19 253:13

**addressing** 195:22

**adjustment** 65:25

**admissible** 9:3

**advance** 62:3 164:15
233:21 237:5,6

**advancement** 252:9

**advances** 237:17

**advantage** 107:21 156:16
193:24

**advice** 43:14 44:18 45:17
51:18 52:19,25 53:2,8
81:8 177:25 178:6



# EXHIBIT 35

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


NEELAM SANDHU, an individual,

     Plaintiff,

                      Case No. 24-cv-02002-SK

BLACKBERRY CORPORATION, a
Delaware corporation; and
PHIL KURTZ, an individual,

     Defendants.
_____/

**CERTIFIED TRANSCRIPT**


VIDEO CONFERENCE DEPOSITION OF

PHIL KURTZ


Date:      July 29, 2025

Time:      9:05 a.m.

Location:  Remote via Zoom


REPORTED BY:  DEBRA A. WEST, CSR No. 14274

DEPONENT: PHIL KURTZ                                          July 29, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                            APPEARANCES

2

3    FOR THE PLAINTIFF:
     (VIDEO CONFERENCE APPEARANCE)
4
              GOMERMAN BOURN & ASSOCIATES
5             BY: ANTHONY TARTAGLIO, ESQ.
              825 VAN NESS AVENUE, SUITE 502
6             SAN FRANCISCO, CALIFORNIA 94109
              (415) 545-8608
7             tony@gobolaw.com

8

9    FOR THE DEFENDANTS BLACKBERRY CORPORATION:
     (VIDEO CONFERENCE APPEARANCE)
10
              MUNGER TOLLES & OLSON LLP
11            BY:  KATHERINE M. FORSTER, ESQ.
              AND KYRA SCHOONOVER, ESQ.
12            350 SOUTH GRAND AVENUE, 50TH FLOOR
              LOS ANGELES, CALIFORNIA 90071
13            katherine.forster@mto.com

14            BLACKBERRY
              BY:  MAGGIE MAYO, IN-HOUSE COUNSEL
15

16
     ALSO PRESENT:
17   (VIDEO CONFERENCE APPEARANCE)

18            TALTY COURT REPORTERS, INC.
              BY:  JACQUELINE HIOCO, VIDEOGRAPHER
19            2131 THE ALAMEDA, SUITE D
              SAN JOSE, CALIFORNIA 95126
20            (408) 244-1900
              production@taltys.com
21

22            SHIVANI KAVULURA, INTERN LAW CLERK

23

24

25



**TALTY COURT REPORTERS, INC.**                               **2**
408.244.1900 - www.taltys.com

DEPONENT: PHIL KURTZ                                    July 29, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                          CONTENTS

2                                                      PAGE

3    Appearances                                        02

4    Examinations                                       03

5    Exhibits                                           04

6    Deponent Signature Page                           197

7    Correction Sheet                                  198

8    Court Reporter's Certificate                      199

9

10

11

12                        EXAMINATIONS

13                                                     PAGE

14
     By Mr. Tartaglio                                   09
15
     By Ms. Forster                                    192
16

17

18

19

20

21

22

23

24

25



**TALTY COURT REPORTERS, INC.**                          **3**
**408.244.1900 - www.taltys.com**

DEPONENT: PHIL KURTZ                                    July 29, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

INDEX OF EXHIBITS

NO.                                                    PAGE

Exh 1    Plaintiff's Notice of Taking Deposition
         and Request for Production of Documents
         of Phil Kurtz                                  16

Exh 2    Bates Number BB13-00002476, Email
         Chain, Subject:  Strictly Confidential:
         Matter                                         73

Exh 3    Bates Numbers BB13-00012501 - 12505,
         1/26/23, Email and Attached Demand
         Letter Final                                   75

Exh 4    Bates Number BB13-00004373, 2/6/23,
         Email, Subject:  JJG                           77

Exh 5    Bates Numbers BB13-00016477 - 16479,
         2/10/23, Email, Subject:  Investigation
         Report, Re:  Issues Raised by Neelam
         Sandhu                                         79

Exh 6    Bates Numbers BB13-00016004 - 16007,
         10/26/23, Email, Subject:
         Solicitor-Client Privileged &
         Confidential:  New EthicsLink 362 with
         Attachment                                     82

Exh 7    Bates Numbers BB13-00016053 - 16055,
         Email, Subject:  Additional Information
         from EthicsLink                                83

Exh 8    Bates Numbers BB13-00019387 - 19397,
         Email Chain, Subject:  Materials and
         Next Steps, with Attachment                    89

Exh 9    Bates Number BB13-00016328, 10/27/23,
         Email Chain Between Phil Kurtz and
         Mike Daniels                                   92

Exh 10   Bates Number BB13-00016944, 10/27/23,
         Email from Phil Kurtz to Mike Daniels,
         Subject:  Update After JJG Interview           95

Exh 11   Bates Number BB13-00019473, 10/28/23/,
         Email, Subject:  Investigation Scope           99



DEPONENT: PHIL KURTZ                                July 29, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1               INDEX OF EXHIBITS CONTINUED

2   NO.                                                PAGE

3   Exh 12    Bates Numbers BB13-00016971 - 16974,
              Email Chain, Subject:  Introduction Re:
4             BlackBerry Case                           105

5   Exh 13    Bates Number BB13-00016979, 10/28/23,
              Email, Subject:  Confidential - Response  107
6

    Exh 14    Bates Numbers BB13-00019484 - 19495,
7             Email Chain, Subject:  Leak Plan Draft,
              with Attachment                           108
8

    Exh 15    Bates Number BB13-00019483, 10/30/23,
9             Email From Phil Kurtz to Eric Akira,
              Subject:  Question Re:  Employment
10            Agreement                                 111

11  Exh 16    Bates Number BB13-00019561, 11/2/23,
              Email from Tate, Eric Akira to Phil
12            Kurtz, Subject:  EL Investigation -
              Information Request List                  114
13

    Exh 17    Bates Numbers BB13-00017504 - 17505,
14            Email Chain, Subject:  Connecting         120

15  Exh 18    Bates Number BB13-00020074, Email from
              Phil Kurtz to Tate, Eric Akira,
16            Subject:  Question About Wording in
              Draft Employee Letter (In Event of
17            a Leak)                                   123

18  Exh 19    Bates Numbers BB13-00020106 - 20107,
              Email Chain, (Redacted)                   125
19

    Exh 20    Bates Numbers BB13-00019788 - 19789,
20            Text Messages                             128

21  Exh 21    Bates Number BB13-00018405, Email
              Chain, Subject:  Email Access             132
22

    Exh 22    Bates Numbers BB13-00018320 - 18321,
23            Email Chain, Subject:  Follow Up Re:
              Confidential Meeting                      138
24

    Exh 23    Bates Numbers BB13-00019789 - 19790,
25            Text Messages                             140



**TALTY COURT REPORTERS, INC.**                    **5**
**408.244.1900 - www.taltys.com**

DEPONENT: PHIL KURTZ                                      July 29, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                    INDEX OF EXHIBITS CONTINUED

2    NO.                                                    PAGE

3    Exh 24    Bates Number BB13-00020163, 11/24/23,
              Email from Dick Lynch to Phil Kurtz,
4              Subject:  With Whom Do I Talk?              144

5    Exh 25    Bates Number BB13-00020172, 11/27/23,
              Email from Phil Kurtz to Dick Lynch,
6              Subject:  External Counsel                  146

7    Exh 26    Bates Numbers BB13-00018688 - 18689,
              11/28/23, Email Chain, Subject: Email
8              to Close-Out Investigation                  150

9    Exh 27    Bates Numbers BB13-00018714 - 18715,
              11/29/23, Email Chain, Subject:
10             Severance Calculations                      161

11   Exh 28    Bates Number BB13-00018725, 11/30/23,
              Email from Dick Lynch to Phil Kurtz,
12             Subject:  Can You Call Me                    163

13   Exh 29    Bates Number BB13-00020185, 12/1/23,
              Email Chain, Subject:  Investigative
14             Updates                                      165

15   Exh 30    Bates Numbers BB13-00018714 - 18751,
              12/2/23, Email Chain, Subject:  Status
16             Update with Attachments                     168

17   Exh 31    Bates Numbers BB13-00019731 - 19732,
              Call Log                                     172
18
     Exh 32    Bates Numbers BB13-000 18931 - 18933,
19             12/7/23, Email Chain, Subject:  Draft
              Response to EthicsLink Complainant           173
20
     Exh 33    Bates Number BB13-00018966 12/10/23,
21             Email Chain  Subject Neelam Response         177

22   Exh 34    Responses to Plaintiff's Interrogatories
              to Defendant BlackBerry Corporation,
23             Set One                                      178

24   Exh 35    Confidential Separation Agreement and
              Release                                       185

25



**TALTY COURT REPORTERS, INC.**          6
**408.244.1900 · www.taltys.com**

DEPONENT: PHIL KURTZ                                    July 29, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1              INDEX OF EXHIBITS CONTINUED

2    NO.                                            PAGE

3    Exh 36    Bates Numbers BB13-00018989 - 18991,
               Email Chain, Subject:  Neelam Response    194
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



DEPONENT: PHIL KURTZ                                          July 29, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1           Tuesday, July 29, 2025; 9:05 a.m.

2                     --oo0oo--

3           THE VIDEOGRAPHER:  Good morning.  We are going

4    on the video record at 9:05 a.m. on Tuesday, July 29th,

5    2025.

6           This is the video deposition of Phil Kurtz taken

7    by the plaintiff in the matter of Neelam Sandhu versus

8    BlackBerry Corporation, et al., filed in the

9    United States District Court for the Northern District of

10   California, Case Number 24-cv-02002-SK.

11          This deposition is being held via Zoom video

12   conference.  My name is Jacqueline Hioco, a Notary

13   Public in and for the State of California.  Today's

14   Reporter is Debra West, CSR Number 14274.  We are both

15   with the firm Talty Court Reporters, Incorporated, with

16   offices in San Jose, California.

17          Please note that we will remain on the video

18   record until all parties have agreed to go off.

19          Before we proceed, I will ask counsel to state

20   their appearance and affiliation for the record starting

21   with the noticing attorney.

22          MR. TARTAGLIO:  For plaintiff, Neelam Sandhu,

23   you have Anthony Tartaglio from the Gomerman Bourn Law

24   Firm.  It is possible also that the plaintiff will join,

25   possible also that one of our law clerks Shivani Kavuluru



**TALTY COURT REPORTERS, INC.**                              **8**
**408.244.1900 · www.taltys.com**

 1   will also join as well.

 2               MS. FORSTER:  Good morning.  This is

 3   Katherine Forster with Munger Tolles & Olson.  My

 4   colleague Kyra Schoonover is also here for Munger Tolles.

 5   We are counsel for Blackberry Corporation.

 6               THE VIDEOGRAPHER:  Thank you.  Will the court

 7   reporter please administer the oath, then counsel may

 8   proceed.

 9               MR. FORSTER:  Actually, before we do that, if I

10   may, Maggie Mayo who is internal counsel at BlackBerry is

11   also present.

12               COURT REPORTER:  Good morning.  My name is

13   Debra West.  I am a California licensed stenographer,

14   Certification Number 14274.  I am a code compliant

15   reporter, and I will be producing a transcript that's

16   automatically admissible in court.

17                          PHIL KURTZ,

18   having been first duly sworn to testify to the truth, the

19   whole truth, and nothing but the truth, was examined and

20   testified under oath as follows, to wit:

21                          EXAMINATION

22   BY MR. TARTAGLIO:

23        Q.   Good morning, Mr. Kurtz.

24        A.   Morning.

25        Q.   So even though you're a lawyer, I'm going to go



1      A.   That was the hypothesis that some people had.

2      Q.   And did you ever hear any specific names

3   discussed as potential complainants?

4      A.   Well, it was speculated that Neelam might be one

5   of them, because it was believed that she was one of the

6   very few people aware of the fact that Chen was not

7   staying as CEO and that John Giamatteo was coming in.

8           And so in that set of circumstances, you know,

9   as I said before, the only person who really was a

10  supporter of Neelam in the organization was John Chen.

11          And so if she was becoming aware that, her

12  champion, if you will, was no longer going to be at the

13  company, and the CEO was going to be someone with whom

14  there had been friction regarding the lead accounts, that

15  certainly could be a motive for a complaint.

16     Q.   Do you recall any others name being floated?

17     A.   I don't recall.

18     Q.   Was -- was Colleen McMillan ever discussed as a

19  possible complainant?

20     A.   Not that I would -- not in a conversation I was

21  part of.

22     Q.   Do you remember who you spoke with about the

23  possibility that perhaps it was Ms. Sandhu who had filed

24  the EthicsLink complaint?

25     A.   Those directors that I mentioned, when they were



1    asking -- they were asking, "Where do you think this

2    complaint could have come from."  They asked me if I had

3    any reason to believe that there was validity to the

4    complaint, so in those conversations.

5         Q.   And when you say "directors," members of the

6    board of directors?

7         A.   Yeah, the three folks I mentioned before, the

8    two committee -- excuse me -- the two committee chairs

9    and the board chair.

10        Q.   And what are the names of those three folks?

11        A.   So Lisa Disbrow, that's D-I-S-B-R-O-W,

12   Michael Daniels, and Dick Lynch, or Richard Lynch, but

13   everyone calls him Dick.

14        Q.   And do you recall speaking with anyone else

15   about the possibility that it was Ms. Sandhu who had

16   filed the EthicsLink complaint?

17        A.   Yes, discussed -- so when the existence of the

18   complaint was made known to John Giamatteo, it was

19   discussed with him.  I had a discussion with him too.

20        Q.   And what do you recall of that conversation with

21   John Giamatteo?

22        A.   Nothing specific.  Just musing about where this

23   could have come from.

24        Q.   And do you recall who -- who suggested first

25   that maybe it was Ms. Sandhu?



DEPONENT: PHIL KURTZ
NEELAM SANDHU vs BLACKBERRY CORPORATION

July 29, 2025



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



DEPONENT: PHIL KURTZ                                    July 29, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1

2

3

4

5    BY MR. TARTAGLIO:

6        Q.    And my next question is going to distinguish

7    between deciding to terminate someone -- and maybe they

8    end up resigning before they get terminated -- and also

9    going through with the termination and signing the papers

10   and officially terminating someone.

11            So with that distinction in mind, is it fair to

12   say that the only person that Mr. Lynch actually

13   terminated was Ms. Sandhu?

14       A.    As far as I know.  I'm just trying to think if

15   there was anybody else, but, no, I think that's -- that's

16   correct.

17       Q.    And you discussed -- well, we discussed earlier

18   there was some contemplated reductions of some of the

19   corporate management roles given that the idea was to

20   split company into, kind of, a two essential, you know,

21   units, for lack of a better term, and maybe I'm

22   butchering that, but is that basically the gist of what

23   we were talking about earlier?

24       A.    Yes.

25       Q.    And were there any other positions that were



DEPONENT: PHIL KURTZ                                July 29, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1  period of time, or are you referring to these issues that
2  are before me in Exhibit 22?
3       Q.   All right.  So it's a bit broader than
4  Exhibit 22.
5            The question is, during the time that Mr. Lynch
6  was interim CEO, did you have a conversation with him
7  about the fact that Ms. Sandhu had been filing complaints
8  against coworkers?
9       A.   Yeah, so I believe he was aware, because we were
10 collecting -- well, I didn't know about it against
11 coworkers, I don't think, but, you know, the -- when we
12 collected reports of complaints against John Giamatteo,
13 the prior complaint from Neelam against him came up
14 through that.  That's really all I can say.
15           MR. TARTAGLIO:  Let's go to Exhibit 23, and for
16 the record, this is a one-page exhibit, Exhibit 23, was
17 produced at page 19790.
18           (Exhibit Number 23 is marked.)
19           THE WITNESS:  Yes, I have it in front of me.
20 BY MR. TARTAGLIO:
21      Q.   Okay.  And it looks like the top -- you know
22 what, let me see if I can get a better version of this,
23 because the top is, kind of, cut off.  Let's see.
24           MS. FORSTER:  Tony, I think the termite
25 inspector just appeared, so can we take a brief break so



1  now Sunday, December 10th at 8:28 p.m.  And you said,

2  "Her messaging access which includes BBM was left intact

3  because cutting it off would have run counter to the

4  intended resignation narrative.  The theory was she would

5  likely have used BBM among other usual means to help

6  communicate the message.  Given where we are, we could

7  remove it."

8          Dick responds, "Thanks, I didn't appreciate the

9  subtlety.  I had assumed email since that is the only

10 thing I use."  And it goes on to explain, you know, that

11 the whole point was to have the option of the

12 resignation, sort of, portrayal.

13         And so he asked for your advice, and you

14 respond, "BBM content isn't accessible" is not -- excuse

15 me -- "isn't accessible by us.  I think we can shut that

16 off now, and I can ask Jessie to make it happen."

17         Did you do that?  Did you ask that her BBM

18 access be suspended or --

19     A.   Yes.

20     Q.   -- shut off at that point?

21     A.   Yes.

22     Q.   Did you receive any confirmation back whether it

23 was cut off?

24     A.   I believe I did, but I haven't looked at that

25 lately.

DEPONENT: PHIL KURTZ                                July 29, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1        Q.    But you remember that you received that

2   confirmation after you said here that you would ask

3   Jessie to make it happen.

4        A.    Oh, yes.  Certainly not before.

5             MS. FORSTER:  Okay.  That's all I have.

6             MR. TARTAGLIO:  All right.  Well, I guess that's

7   it.

8             THE WITNESS:  Okay.

9             COURT REPORTER:  Shall we get orders on the

10   record, please.

11            Katherine, do you want a copy of the transcript?

12            MS. FORSTER:  Yes, please.

13            COURT REPORTER:  And how about the video?

14            MS. FORSTER:  Yes, please.

15            MR. TARTAGLIO:  We'll order the transcript.

16   Standard delivery is fine.  Doesn't have to be expedited.

17   Same thing for the video, and we would like it synced.

18            THE VIDEOGRAPHER:  Thank you.

19            This concludes the video record of today's

20   deposition of Phil Kurtz.  The original media of this

21   deposition will remain in the custody of Talty Court

22   Reporters, Incorporated, located in San Jose, California.

23            We are going off the record at 2:49 p.m.

24        (Whereupon, deposition concluded at 2:49 p.m.)

25                        --oo0oo--



**TALTY COURT REPORTERS, INC.**                    **196**
**408.244.1900 · www.taltys.com**

1                          JURAT PAGE

2

3          I, PHIL KURTZ, have read my statement consisting

4    of the preceding 196 pages, taken on July 29, 2025, and I

5    certify that:

6

7              (Check one.)

8

9        (_____) I have no corrections.

10

11       (_____) I have corrections as reflected on the

12   attached errata sheet, and I now approve my statement as

13   true and correct.

14

15

16       Dated this _____ day of _____, 20___.

17

18

19                    _____
                      PHIL KURTZ

20

21

22

23

24

25



**TALTY COURT REPORTERS, INC.**                          **197**
**408.244.1900 - www.taltys.com**

DEPONENT: PHIL KURTZ                                          July 29, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1              ERRATA SHEET FOR THE TRANSCRIPT OF:

 2   CASE NAME:  Neelam Sandhu v BlackBerry Corporation,
                 et al.
 3
     CASE NUMBER:  24-cv-02002-SK
 4
     DEPOSITION DATE:  July 29, 2025
 5
     DEPONENT:  Phil Kurtz
 6
 7   PAGE  LINE   NOW READS              SHOULD READ

 8   ____ ____   _____    _____

 9   ____ ____   _____    _____

10   ____ ____   _____    _____

11   ____ ____   _____    _____

12   ____ ____   _____    _____

13   ____ ____   _____    _____

14   ____ ____   _____    _____

15   ____ ____   _____    _____

16   ____ ____   _____    _____

17   ____ ____   _____    _____

18   ____ ____   _____    _____

19   ____ ____   _____    _____

20   ____ ____   _____    _____

21   ____ ____   _____    _____

22   ____ ____   _____    _____

23   ____ ____   _____    _____

24
     _____    _____
25   PHIL KURTZ                      DATE
```



DEPONENT: PHIL KURTZ
NEELAM SANDHU vs BLACKBERRY CORPORATION

July 29, 2025

1
2
3                              CERTIFICATE

4          I, Debra A. West, Certified Shorthand Reporter,

5     License Number 14274, in and for the State of California,

6     do hereby certify that the witness, PHIL KURTZ, herein

7     was previously duly sworn to testify to the truth, the

8     whole truth, and nothing but the truth in the case

9     aforesaid; that the foregoing is a full, true, and

10    correct transcript of the proceedings at the taking of

11    said deposition, reported to the best of my ability, and

12    transcribed under my direction; that the same was taken

13    on the date aforementioned;

14          ( x ) Reading and signing was requested.

15          (   ) Reading and signing was waived.

16          (   ) Reading and signing was not requested.

17          I further certify that I am not attorney for nor

18    relative of any of said parties nor otherwise

19    interested in the event of said action;

20          IN WITNESS WHEREOF, I have hereunto set my hand

21    and official seal this 15th day of August, 2025.

22

23                              _____

24                              Debra A. West
                                Certified Shorthand Reporter
25                              Certificate No. 14274



DEPONENT: PHIL KURTZ
NEELAM SANDHU vs BLACKBERRY CORPORATION

July 29, 2025

**Exhibits**

**Exhibit 01** 4:3 16:3,5

**Exhibit 02** 4:5 73:20,21 74:4,16

**Exhibit 03** 4:7 75:19,23

**Exhibit 04** 4:9 77:5,12 78:24 79:12

**Exhibit 05** 4:10 79:18,21 80:14

**Exhibit 06** 4:13 82:13

**Exhibit 07** 4:16 83:9,14

**Exhibit 08** 4:18 89:12

**Exhibit 09** 4:20 92:3,5 94:11

**Exhibit 10** 4:22 95:15

**Exhibit 11** 4:24 99:5,6

**Exhibit 12** 5:3 105:10,13

**Exhibit 13** 5:5 107:2,4

**Exhibit 14** 5:6 108:8,9,11

**Exhibit 15** 5:8 111:7,8,9

**Exhibit 16** 5:11 114:2,5

**Exhibit 17** 5:13 120:10, 11 121:4,13

**Exhibit 18** 5:15 123:10, 15

**Exhibit 19** 5:18 125:12, 14

**Exhibit 20** 5:19 128:1,3 130:12,15

**Exhibit 21** 5:21 132:13, 15

**Exhibit 22** 5:22 137:23 138:1 140:2,4

**Exhibit 23** 5:24 140:15, 16,18 141:10

**Exhibit 24** 6:3 144:22,24

**Exhibit 25** 6:5 146:20,22

**Exhibit 26** 6:7 150:3,5

**Exhibit 27** 6:9 155:9,12 161:11

**Exhibit 28** 6:11 163:20

**Exhibit 29** 6:13 164:24 165:3 192:17

**Exhibit 30** 6:15 168:2,4

**Exhibit 31** 6:17 172:8,12

**Exhibit 32** 6:18 173:16, 18

**Exhibit 33** 6:20 177:5

**Exhibit 34** 6:22 178:17, 19 191:1

**Exhibit 35** 6:24 185:17, 20

**Exhibit 36** 7:3 193:12,17 194:3,5

**$**

**$1.4** 159:15

**$19** 23:14

**$700,000** 156:17

**-**

**--oo0oo--** 8:2 196:25

**1**

**1** 16:3,5 88:16,23 89:6 114:19 143:2 168:15

**1.1** 160:5

**1.4** 160:3

**1.6** 160:16

**10** 94:14 95:12,15 179:7 194:13

**100** 157:17 162:2

**10:10** 47:18 48:1

**10:12** 48:10

**10:13** 48:13

**10th** 178:3 195:1

**11** 99:5,6 191:2,4

**11:25** 98:22

**11:30** 98:19

**11:32** 98:25

**12** 22:4 105:10,13 107:6 182:14

**12501** 75:21

**12505** 75:22

**12:15** 127:21

**12:16** 130:7

**12:30** 95:1 106:17,20,21 127:21,23

**12:45** 129:25

**12:48** 130:10

**13** 24:15 107:2,4

**14** 108:8,9,11

**14274** 8:14 9:14

**15** 111:7,8,9

**15th** 132:8

**16** 114:2,5

**16004** 82:11

**16007** 82:12

**16053** 83:13

**16055** 83:13

**16328** 92:4

**16477** 79:19

**16479** 79:20

**16944** 95:12

**1697** 107:3

**16971** 105:12

**16974** 105:12

**16979** 107:8

**17** 120:10,11 121:4,13

**17504** 121:14

**17505** 121:14

**17851** 168:3

**18** 123:10,15

**18320** 137:24

**18321** 137:25

**18405** 132:14

**18688** 150:4

**18689** 150:4

**18714** 161:9

**18715** 161:10

**18725** 163:18

**18741** 168:3

**18742** 168:23

**18931** 173:17

**18933** 173:17

**18966** 177:7

**18989** 194:8

**18991** 194:8

**19** 125:12,14,16

**19387** 89:11

**19397** 89:11

**19473** 99:5

**19483** 111:8

**19484** 108:9

**19495** 108:10

**19568** 114:3

**19731** 172:9 173:6

**19732** 172:9

**19788** 128:2

**19789** 128:2

**19790** 140:17

**19th** 63:21

**1:04** 141:5

**1:08** 141:8

**2**

**2** 73:20,21 74:4,16 121:13 143:2 161:1

**20** 128:1,3 130:12,15

**20074** 123:14

**2009** 15:19

**20106** 125:13

**20107** 125:13

**2012** 122:23

**20163** 144:23

**20172** 146:20

**20185** 164:25

**2022** 15:12 86:19



DEPONENT: PHIL KURTZ
NEELAM SANDHU vs BLACKBERRY CORPORATION

July 29, 2025

**2023** 77:20 104:11 114:20 115:15,17 194:13

**2024** 159:2,10 160:16

**2025** 8:1,5 156:17,21 159:13 160:15,24 161:2

**21** 132:13,15

**22** 137:23 138:1 140:2,4

**22nd** 137:21

**23** 140:15,16,18 141:10

**23rd** 137:21

**24** 144:22,24

**24-cv-02002-sk** 8:10

**25** 146:20,22

**2509** 50:24

**26** 150:3,5

**27** 155:9,12 161:5,11

**28** 163:17,20

**29** 8:1 164:24 165:3 192:17

**29th** 8:4

**2:00** 163:24

**2:12** 187:13

**2:18** 187:16

**2:21** 190:21

**2:30** 190:18

**2:34** 190:24

**2:36** 191:24

**2:42** 192:2

**2:49** 196:23,24

---

**3**

**3** 75:19,23 143:3

**30** 168:2,4

**30-year** 57:8

**308,000** 161:25

**31** 172:8,12

**32** 173:16,18

**33** 177:4,5,7

**34** 178:17,19 191:1

**35** 185:17,20 186:17,19

**36** 193:12,17 194:3,5

**3:06** 173:9

**3rd** 57:1 156:21

---

**4**

**4** 77:5,12 78:24 79:12 87:23 117:6

**40** 155:8

**400-plus** 153:20

**4373** 77:10

---

**5**

**5** 79:18,21 80:14 179:2,3, 4,8,9,14

**50** 161:16,17 162:13

**500** 191:6,8,13,14

**500,000** 161:3

---

**6**

**6** 82:8,13 83:10 154:4 173:9 179:2,3,5,10 183:5 184:11

**60** 186:10

**650** 155:23

---

**7**

**7** 83:9,14 88:23 89:7

**700** 157:12,14 160:3

**700,000** 155:24 159:13

**706,000** 159:14

**740,000** 160:4

**750** 157:13

**750,000** 156:1

**7:00** 94:20

---

**8**

**8** 88:21 89:12

**8.4** 159:10

**8:28** 195:1

---

**9**

**9** 92:3,5 94:11,13 191:4

**980,000** 160:16

**9:05** 8:1,4

**9:59** 47:23

---

**A**

**a.m.** 8:1,4 47:23 48:1,10, 13 98:22,25

**ability** 11:24 17:22,25 18:4 26:22 29:24 159:1

**abrupt** 163:5

**absolutely** 113:7

**abuse** 103:22

**abusing** 104:4

**abusive** 61:3 124:4

**academic** 51:22

**accept** 27:13 36:17,18 163:15

**accepting** 30:8

**access** 11:7 169:10,13, 18,20 181:8 195:2,18

**accessible** 195:14,15

**accomplishments** 26:10

**account** 169:19 171:3

**accounts** 42:15 58:14 90:14 180:7

**accurate** 11:24 12:4 19:1 20:3

**accusation** 187:19

**accusations** 44:7 76:7

**accuse** 187:2 189:24

**accused** 44:2,12,17,22 45:1 143:25

**accusing** 45:7 90:25

**achieve** 64:2 102:7

**achieved** 26:10

**achievement** 181:2

**acronym** 25:19

**acronyms** 92:20

**act** 188:12 191:20

**acting** 45:1

**action** 24:21 50:15,20 51:2,3,6,12,16 174:9

**actions** 50:25 51:1,9 143:10 176:3

**active** 29:25 194:19

**actively** 26:13

**activity** 123:23

**actual** 19:12 23:19 113:14 142:2

**Adam** 71:5,14

**add** 19:7 26:19 31:1 124:18

**addition** 25:9 29:2 87:25

**addressed** 81:17

**administer** 9:7

**administrative** 153:25

**admissible** 9:16

**admonitions** 38:2

**adopted** 154:9

**advance** 154:19 155:1

**advanced** 19:14 49:7

**advancement** 24:6 51:8 152:7

**advancing** 51:24

**adverse** 50:15,19,25 51:2,6,11,15

**adversely** 51:4

**advice** 21:19 28:11 105:4,5 124:2 125:3 185:8 195:13

**advisable** 34:9

**advise** 126:13

**advised** 131:13 171:16

**advising** 131:15

**affect** 162:15

**affected** 51:4

**affiliation** 8:20



# EXHIBIT 36

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


NEELAM SANDHU,

      Plaintiff,

vs.                          CASE NO. 24-cv-02002-SK

BLACKBERRY CORPORATION, a
Delaware Corporation; and JOHN
GIAMATTEO, an individual,

      Defendants.
_____/

**CERTIFIED TRANSCRIPT**


VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF
RICHARD LYNCH


DATE:        Thursday, June 5, 2025

TIME:        9:06 a.m. - 5:05 p.m.

LOCATION:    (All attendees appearing remotely.)

REPORTED BY: JULIE L. ANDERSON, CSR
             Stenographic California CSR No. 11422


             Talty Court Reporters
             2131 The Alameda, Suite D
             San Jose, California 95126
             (408) 244-1900

```
 1                   ::: APPEARANCES :::

 2

 3   FOR THE PLAINTIFF:

 4        GOMERMAN BOURN & ASSOCIATES
          BY:  ANTHONY TARTAGLIO, ATTORNEY AT LAW
 5             (APPEARING VIA VIDEOCONFERENCE)
          825 VAN NESS AVENUE, SUITE 502
 6        SAN FRANCISCO, CALIFORNIA 94109
          (415) 545-8608
 7        tony@gobolaw.com

 8

 9

10   FOR THE DEFENDANTS:

11        MUNGER, TOLLES & OLSON LLP
          BY:  KATHERINE M. FORSTER, ATTORNEY AT LAW
12             (APPEARING VIA VIDEOCONFERENCE)
          BY:  KYRA E. SCHOONOVER, ATTORNEY AT LAW
13             (APPEARING VIA VIDEOCONFERENCE)
          560 MISSION STREET, 27TH FLOOR
14        SAN FRANCISCO, CALIFORNIA 94105
          (213) 683-9538
15        katherine.forster@mto.com
          kyra.schoonover@mto.com
16

17

18

19   ALSO APPEARING REMOTELY:

20        MICHAEL MACK, VIDEOGRAPHER

21        MAGGIE MAYO, BLACKBERRY CORPORATION, IN-HOUSE

22        COUNSEL

23        NEELAN SANDHU

24

25
```



DEPONENT: RICHARD LYNCH                                June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                ::: INDEX OF EXAMINATIONS :::

2    EXAMINATION BY:                              PAGE

3

4            MR. TARTAGLIO                    10, 261

5            MS. FORSTER                  252, 263

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**TALTY COURT REPORTERS, INC.**                    **3**
**408.244.1900 - www.taltys.com**

DEPONENT: RICHARD LYNCH                              June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1              ::: INDEX OF EXHIBITS :::

 2    NUMBER        DESCRIPTION                    PAGE

 3    Exhibit 1     BlackBerry Code of Business     108
                    Standards and Principles —
 4                  Confidential (BB13-00000456 —
                    BB13-00000519)
 5
      Exhibit 2     June 23, 2022, email; Subject:  115
 6                  FW: STRICTLY CONFIDENTIAL: v3
                    — BlackBerry Officers'
 7                  Succession Planning —
                    CONFIDENTIAL (BB13-00011448 —
 8                  BB13-00011449)

 9    Exhibit 3     January 26, 2023, email;        118
                    Subject:  McMillan v.
10                  BlackBerry — Legal
                    Correspondence — CONFIDENTIAL
11                  (BB13-00012501 —
                    BB13-00012505)
12
      Exhibit 4     October 26, 2023, email;        122
13                  Subject:  Solicitor-Client
                    Privileged & Confidential:
14                  New EthicsLink 362 —
                    CONFIDENTIAL (BB13-00016004 —
15                  BB13-00016007)

16    Exhibit 5     Morrison Foerster Appendix B    124
                    dated 10/28/2023 —
17                  CONFIDENTIAL (BB13-00010787)

18    Exhibit 6     November 2, 2023, email         126
                    string; Subject:  Fw:
19                  Connecting — CONFIDENTIAL
                    (BB13-00017504 —
20                  BB13-00017505)

21    Exhibit 7     November 6, 2023, email;        130
                    Subject: file transfer —
22                  CONFIDENTIAL (BB13-00017564 —
                    BB13-00017581)
23
      Exhibit 8     Handwritten notes — ATTORNEYS'  137
24                  EYES ONLY (BB13-00019036 —
                    BB13-00019051)
25
```



**TALTY COURT REPORTERS, INC.**                              4
**408.244.1900 - www.taltys.com**

DEPONENT: RICHARD LYNCH                          June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1              ::: INDEX OF EXHIBITS :::

2     NUMBER          DESCRIPTION                        PAGE

3     Exhibit 9       November 13, 2023, email            162
                      string; Subject: –
4                     CONFIDENTIAL (BB13–00018101)

5     Exhibit 10      Text messages — CONFIDENTIAL         167
                      (BB13–00019788 —
6                     BB13–00019789)

7     Exhibit 11      November 16, 2023, email             172
                      string; Subject:  FW: Follow
8                     Up RE: Confidential Meeting —
                      CONFIDENTIAL (BB13–00018320 —
9                     BB13–00018321)

10    Exhibit 12      November 17, 2023, email             175
                      string; Subject:  RE: Follow
11                    Up RE: Confidential Meeting —
                      CONFIDENTIAL (BB13–00018460 —
12                    BB13–00018461)

13    Exhibit 13      Text messages — CONFIDENTIAL         177
                      (BB13–00019790)
14
      Exhibit 14      November 27, 2023; Subject:          184
15                    Confidential Report —
                      CONFIDENTIAL (BB13–00018650 —
16                    BB13–00018673)

17    Exhibit 15      November 29, 2023, email             191
                      string; Subject:  RE: STRICTLY
18                    CONFIDENTIAL — BlackBerry
                      Preliminary Severance
19                    Calculations  — CONFIDENTIAL
                      (BB13–00018714 —
20                    BB13–00018715)

21    Exhibit 16      December 1, 2023, email;             194
                      Subject:  who – CONFIDENTIAL
22                    (BB13–00004627)

23    Exhibit 17      December 2, 2023, email              194
                      string; Subject:  RE:  Status
24                    update — CONFIDENTIAL
                      (BB13–00018741 —
25                    BB13–00018751)



DEPONENT: RICHARD LYNCH                                    June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1              ::: INDEX OF EXHIBITS :::

2     NUMBER          DESCRIPTION                          PAGE

3     Exhibit 18      December 4, 2023, letter to           197
                      Neelam Sandhu from Richard
4                     Lynch — ATTORNEYS' EYES ONLY
                      (BB13-00004638 —
5                     BB13-00004639)

6     Exhibit 19      December 6, 2023, email;              198
                      Subject:  question of
7                     preference — ATTORNEYS' EYES
                      ONLY (BB13-00018892)
8
      Exhibit 20      December 7, 2023, email;              200
9                     Subject:  CEO and related item
                      status — ATTORNEYS' EYES ONLY
10                    (BB13-00004693 —
                      BB13-00004694)
11
      Exhibit 21      December 7, 2023, email;              203
12                    Subject:  CEO (and related)
                      update item status —
13                    CONFIDENTIAL (BB13-00018942 —
                      BB13-00018943)
14
      Exhibit 22      December 8, 2023, email;              204
15                    Subject:  Resignation option -
                      CONFIDENTIAL (BB13-00004714)
16
      Exhibit 23      December 10, 2023, email              207
17                    string; Subject: RE:  Neelam
                      response — CONFIDENTIAL
18                    (BB13-00018966)

19    Exhibit 24      December 10, 2023, email;             208
                      Subject:  RE:  Personal
20                    announcement for the Marketing
                      and Elite Teams — CONFIDENTIAL
21                    (BB13-00018972)

22    Exhibit 25      December 12, 2023, email              209
                      string; Subject:  RE:  Neelam
23                    Sandhu v. Blackberry —
                      CONFIDENTIAL (BB13-00005008)

24

25



DEPONENT: RICHARD LYNCH                                    June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1              ::: INDEX OF EXHIBITS :::

2    NUMBER          DESCRIPTION                            PAGE

3    Exhibit 26      Defendant Blackberry                    210
                     Corporation and John
4                    Giamatteo's Initial Written
                     Discovery Under GO 71 (5
5                    pages)

6    Exhibit 27      Responses to Plaintiff's               212
                     Interrogatories to Defendant
7                    Blackberry Corporation, Set
                     One (15 pages)
8
     Exhibit 28      Defendant's Amended Answer to          223
9                    Plaintiff's First Amended
                     Complaint (41 pages)
10
     Exhibit 29      Confidential Separation                230
11                   Agreement and Release (9
                     pages)
12
     Exhibit 30      November 9, 2023, email                234
13                   string; Subject: "Redacted —
                     Attorney-Client Privilege/Work
14                   Product" — CONFIDENTIAL
                     (BB13-00020104 —
15                   BB13-00020105)

16   Exhibit 31      November 24, 2023, email;              237
                     Subject: with whom do I talk?
17                   — CONFIDENTIAL (BB13-00020163)

18   Exhibit 32      November 27, 2023, email;              239
                     Subject: External counsel –
19                   CONFIDENTIAL (BB13-00020172)

20   Exhibit 33      BlackBerry Executive Team              241
                     (5 pages)
21
     Exhibit 34      Handwritten notes — ATTORNEYS'         241
22                   EYES ONLY (BB13-00019036 -
                     — BB13-00019051)
23

24   Exhibit 35      October 28, 2023, email;               247
                     Subject: Investigation scope
25                   — CONFIDENTIAL (BB13-00019473)



**TALTY COURT REPORTERS, INC.**                              7
**408.244.1900 - www.taltys.com**

DEPONENT: RICHARD LYNCH                                June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
1                  ::: INDEX OF EXHIBITS :::

2     NUMBER          DESCRIPTION                      PAGE

3     Exhibit 36      Performance Update — FY23 VIP      252
                      Payout — CONFIDENTIAL
4                     (BB13-00009784 –
                      BB13-00009800)
5

6

7

8

9     ::: INDEX OF QUESTIONS INSTRUCTED NOT TO ANSWER :::

10                          PAGE     LINE

11                          59        7

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**TALTY COURT REPORTERS, INC.**                          **8**
**408.244.1900 - www.taltys.com**

1               P R O C E E D I N G S

2                       -oOo-

3        THE VIDEOGRAPHER:  We are now on the record

4   at 9:06 a.m. on Thursday, June 5, 2025.  This is the

5   video deposition of Dick Lynch taken by the

6   plaintiff in the matter of Sandhu vs. BlackBerry

7   Corporation, et al., filed in the U.S. District

8   Court for the Northern District of California, Case

9   Number 24-cv-02002-SK.

10        This deposition is being held via Zoom video

11   teleconference.  My name is Michael Mack and the

12   court reporter is Julie Anderson, both on behalf of

13   Talty Court Reporters, Inc., with offices in

14   San Jose, California.

15        Before we proceed, I will ask counsel to

16   state their appearance and affiliation for the

17   record, starting with the noticing attorney.

18        MR. TARTAGLIO:  For plaintiff, you have

19   Anthony Tartaglio from the Gomerman Bourn Law Firm.

20   And the plaintiff herself is also expected to

21   observe.

22        MS. FORSTER:  Good morning.  This is

23   Katherine Forster with Munger, Tolles & Olson for

24   the defendant BlackBerry Corporation.  With me today

25   as well is Kyra Schoonover, also with Munger Tolles.



**TALTY COURT REPORTERS, INC.**
**408.244.1900 · www.taltys.com**

9

DEPONENT: RICHARD LYNCH                          June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

 1  And Maggie Mayo, who is in-house counsel for
 2  BlackBerry.
 3        THE VIDEOGRAPHER:  Will the court reporter
 4  please identify herself for the record and then
 5  swear in the witness.
 6        THE REPORTER:  My name is Julie Anderson.  I
 7  am a California Certified Shorthand Reporter.  My
 8  license number is 11422.
 9                  RICHARD LYNCH,
10   having been duly sworn remotely by the California
11  Certified Shorthand Reporter, testified as follows:
12                     -oOo-
13            EXAMINATION BY MR. TARTAGLIO
14  BY MR. TARTAGLIO:
15     Q.  Good morning, sir.
16     A.  Good morning.
17     Q.  I'm going to start off the deposition by
18  giving an explanation of how this whole process
19  works.  You might already be familiar with the
20  deposition process, but nevertheless I'll go through
21  it just to make sure that you have a good
22  understanding of what to expect today.
23        Do you understand that the oath that you
24  just took is similar to the oath you would take if
25  you testified in court?



DEPONENT: RICHARD LYNCH                          June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
1    very small portion of its holdings be in BlackBerry,
2    let's say.  But -- but other than -- other than
3    that, do you own BlackBerry stock that you're aware
4    of?
5        A.  No.  That's the -- that's the reference I'm
6    making to index stocks and the like.
7        Q.  And if we go back to 2023, and -- yeah,
8    that's probably the most important year for the
9    purposes of this lawsuit.  So in 2023, did you own
10   any BlackBerry stock other than perhaps some
11   holdings in an index fund or mutual fund?
12       A.  No.
13       Q.  Other than serving on the board of
14   directors, have you ever worked within BlackBerry?
15       A.  I was the interim CEO between the past
16   chairman and chief executive officer and the current
17   chief executive officer.
18       Q.  And about how long did you serve as interim
19   CEO?
20       A.  Less than a month.
21       Q.  Other than serving as interim CEO for less
22   than a month, have you ever held any other positions
23   within BlackBerry other than sitting on the board of
24   directors?
25       A.  No.
```



1   working with Neelam?

2       A.  I would not describe it as "working with."

3   I was -- I had been introduced to her.  I knew who

4   she was but did not work with her.

5       Q.  And what was the context in which you had

6   been introduced to her if you can recall?

7       A.  I believe that it was at board dinner once I

8   was first introduced to her in person.  Of course, I

9   saw the performance statistics for all of the

10  management people that reported to John Chen on a

11  regular basis at board meetings, and her name was on

12  there.

13      Q.  And so before John Chen resigned, other than

14  meeting Neelam -- or Ms. Sandhu at this dinner, do

15  you recall interacting with her besides that?

16      A.  I do not.

17      Q.  And I think you mentioned some performance

18  statistics that were presented to the board that

19  discussed the managers.  Is that -- is that

20  accurate?

21      A.  Yes.

22      Q.  What do you recall from -- well, if

23  anything, what do you recall of Ms. Sandhu's

24  performance statistics?

25      A.  The last ones that I recall seeing, the



1     Q.  Well, let me put it this way --

2     A.  Yeah.  I think I'd like the question

3  rephrased if you could.

4     Q.  Based on your firsthand knowledge of -- of

5  dealing with Ms. Sandhu, did you have an opinion

6  about what it would be like to work with her before

7  John Chen resigned?

8     A.  Based on the dinner I had with her, yes, I

9  had developed some initial beliefs.

10    Q.  What were those initial beliefs?

11    A.  That she was very aggressive.  That she was

12 not necessarily focused on the same things that I

13 might have been focused on.

14    Q.  What was it that Ms. Sandhu did or said that

15 led you to form the belief that she was acting

16 aggressively or was aggressive?

17    A.  The -- the dialogue that we had suggested to

18 me that opinion.  I also would say that she was

19 particularly opinionated relative to -- and I

20 honestly can't remember exactly what topics we were

21 talking about.  But she was very opinionated on

22 these various topics during the course of our

23 discussion, and I would necessarily not have agreed

24 with all of those views.

25    Q.  And so can you remember specifically some of



DEPONENT: RICHARD LYNCH                          June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    A.  Because the business already had functioning

2  marketing people in those roles, and it seemed to me

3  that that was a more effective way to -- to handle

4  the business.

5    Q.  Did Ms. Sandhu's personality have anything

6  to do with the decision not to place her in a

7  different role in the company?

8    A.  I would say yes, it did.

9    Q.  How so?

10    A.  I had come to learn from the variety of

11  interviews I had done and some feedback I'd received

12  since I became the interim CEO that she had

13  difficulties in relating to others within the

14  business.  I had watched her interact very

15  negatively with one of her peers that I had to

16  manage and make peace.  It just seemed to me that

17  based upon my experiences with her in that period of

18  time that she was not -- there was no justification

19  for me to move someone else out to find her a role.

20  I thought it made more sense to -- since none of her

21  roles would continue as they were, it seemed logical

22  that she would be the one that we would terminate.

23    Q.  I'm going to ask now a series of questions,

24  and I'm going to make a distinction between

25  firsthand knowledge -- so things that you observe



**TALTY COURT REPORTERS, INC.**          80
**408.244.1900 · www.taltys.com**

1  executed your instruction to update the website; is

2  that right?

3      A.  He attempted to, yes.

4      Q.  Do you know if Ms. Sandhu was aware that

5  even though Mr. Kurtz was the one giving this order,

6  that it was actually you who had originated the

7  order?

8      A.  I do not know that.

9      Q.  So we talked about -- or you mentioned

10 rather some conversations with HR about Ms. Sandhu.

11 What do you recall from that?

12     A.  At the time that I indicated that, you know,

13 I was looking to package the necessary documents to

14 terminate her, I was told that she probably would be

15 difficult to deal with about these things and that I

16 needed to just be aware of that and I was.  She --

17 I'd been made aware of it.

18     Q.  Can you recall with any more specificity

19 what was told to you about her being difficult?

20     A.  No, I can't.

21     Q.  Okay.  And so we spoke about the fact that

22 you had some discussions with HR in which Ms. Sandhu

23 was described as being difficult to work with in

24 some ways.  We discussed about -- we discussed this

25 website update incident.  Do you recall any other



**TALTY COURT REPORTERS, INC.**
**408.244.1900 - www.taltys.com**

87

1   conversations where you heard secondhand about

2   Ms. Sandhu being difficult to work with?

3          MS. FORSTER:  Vague and ambiguous as to

4   time.

5          THE WITNESS:  I can't give you a specific

6   time and individual, but I can tell you that during

7   the course of my dialogues with the executive team

8   immediately after taking place -- taking John Chen's

9   place that I was told that she was difficult to work

10  with.

11  BY MR. TARTAGLIO:

12     Q.  Do you remember who told you that?

13     A.  No.

14     Q.  Can you remember with any more detail the

15  words that were used to convey this idea that she

16  was difficult to work with?

17     A.  No.

18     Q.  Did -- well, so this is kind of a broader

19  question.  We've been talking for a while now about

20  the reasons why you decided not to -- to, I guess,

21  reposition or relocate Ms. Sandhu within the

22  company.  Can you think of any other reasons other

23  than what we've discussed today about why you

24  decided not to place Ms. Sandhu somewhere else

25  within the organization?



DEPONENT: RICHARD LYNCH                           June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1      A.  No.  Frankly, I don't think that I would

2   need any other reasons.  I think I had a very

3   logical management-driven process that I used and

4   that -- that was really my decision process that

5   drove to that -- that end point.

6      Q.  Did you ask Ms. Sandhu her opinion about

7   project mustard and her role being eliminated as a

8   result of that?

9      A.  No.

10     Q.  Did you ask Ms. Sandhu about these

11  allegations you had been hearing about her being

12  difficult to work with?

13     A.  No.

14     Q.  So I'll give you an example of something

15  that happens in the media.  Oftentimes when an

16  article is published about someone, that person

17  will -- the reporter will call up that person, give

18  them the chance to respond before the article goes

19  to press.  The thinking being that if accusations

20  are being made against someone, they should have a

21  chance to give their side of the story so to speak.

22  So that's a preamble.  That's not my question.

23      My question is did you go to Ms. Sandhu and

24  ask her for her side of the story as to these

25  allegations about her being difficult to work with?



1       A.  No, because it wasn't relevant.  I had

2   already made the decision based on, I think, sound

3   management judgment that she was in a position that

4   was going to be terminated -- or eliminated is the

5   better word, and that I had concluded that we needed

6   to eliminate some of our executive team, and that it

7   was logical that a person whose total job was

8   eliminated that would be one of the people that

9   would leave.  So the answer to your question with

10  that caveat is no, I did not, and I don't think I

11  should have at that point because it would have been

12  of no additional value since the decision process

13  that I made was driven primarily by the

14  organizational requirements and those other items

15  that we've talked about, the -- our -- what I would

16  call confirmatory points that justified -- not

17  justified but confirmed my earlier decision.  So

18  sorry to be so emotional about it, but it just seems

19  like we're going down a track that says, "Well,

20  shouldn't we ask?"  Well, not, really.  In my view,

21  at this point we're talking about a management

22  decision that needed to be made.  So sorry about

23  that, but I just needed to get that off my chest.

24      Q.  Do you know whether Ms. Sandhu was ever

25  given performance reviews, let's say for the time

1    that is signed at the end "Phil"; correct?

2        A.  Yes.

3        Q.  And there's some discussion about two

4    versions, one with witnesses named and one

5    anonymized.  Do you know what document they are

6    talking about here?

7        A.  They're talking about the report of the

8    investigation.

9        Q.  And Mr. Kurtz says, "I struggle to see the

10   harm in sharing the version with the names," and

11   then he provides an explanation; correct?

12       A.  Yes.

13       Q.  And then there's a message that appears to

14   be from you.  Do you see that?

15       A.  Yes.

16       Q.  And you wrote, "Given what personnel actions

17   are planned, might there be protective value in me

18   not seeing the version with names?"

19            What -- what are the personnel actions that

20   you're alluding to there?

21       A.  By this point in time I have clearly in my

22   mind decided that we need to reduce the people at

23   the top level of the business, and that based on

24   that and not knowing what was going to be coming out

25   in the report, I decided that it would be better for



1    me not to see any names whatsoever on any side of

2    these arguments.

3        Q.  Why would it not be better for you to see

4    those names?

5        A.  Because I didn't want to color my decision

6    in any way based upon the outcome of the report.

7    The report to me had nothing to do with the actions

8    I was going to take.  The additional action that

9    would have been possible based upon the outcome of

10   the report is I may have terminated John Giamatteo

11   in addition to the others.  But at this point I felt

12   that regardless of the names and the dates and the

13   whatevers, that I would be better off not seeing

14   anything additional.

15       Q.  Would one of the personnel actions being

16   referred to here be the termination of Neelam

17   Sandhu?

18       A.  Among the others, yes.

19       Q.  What -- what might -- what bad consequences

20   might happen had you seen the report with the names

21   in it?

22       A.  In my view that the -- seeing the names in

23   the report would have provided me with no added

24   value and potential for being accused of retaliating

25   or something, and I wasn't in the mood of being --



DEPONENT: RICHARD LYNCH                              June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    for retaliating because my decision process was

2    pretty clear by that point.  So I thought it better

3    not to be able to be accused of retaliating for

4    something.

5        Q.  As the interim CEO did you think it was

6    important to be apprised and aware of the complaint

7    that had been made against John Giamatteo?

8        A.  Yes.  But that has nothing to do with the

9    names that were at that point supposed to be

10   completely foreign to me.  I was supposed to see

11   this as anonymous, and I wanted to continue to see

12   it as anonymous.

13       Q.  And when you referred to "protective value"

14   were -- what were you referring to?

15       A.  I was referring to what I just described.  I

16   didn't want to be able to be accused later of having

17   taken any names out of a report and taken any

18   actions against anyone as a result of the decisions

19   that I needed to make as the CEO.

20       Q.  So at this point how many people had you

21   decided to terminate?

22       A.  At the top level of the business or

23   throughout the whole business --

24       Q.  Let's say --

25       A.  -- total.



DEPONENT: RICHARD LYNCH                        June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1      A.  Yes.

2      Q.  And did you review this document while you

3  were still interim CEO?

4      A.  I did not review the entirety of the

5  document in the detail that I've had an opportunity

6  to do since then.  So when I was CEO, no, I did not

7  review the accusations, the investigation.  I merely

8  focused on the executive summary and the -- and, if

9  you will, the end.  The analysis of what could be

10 done differently.

11     Q.  And you may have already answered this, but

12 do you think when you were interim CEO that you did

13 review this executive summary at the beginning of

14 the report?

15     A.  Yes.

16     Q.  In response to receiving this report, did

17 you do anything -- well, let me ask this:  What, if

18 anything, did you do to respond to the allegations

19 about lack of women in leadership roles, culture --

20 about so-called boy's club culture, et cetera,

21 et cetera?

22         Did you do anything in response to seeing

23 these allegations here?

24     A.  No.  And the reason is that I was in the

25 role for three weeks.  And during that time, focused



DEPONENT: RICHARD LYNCH                          June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1   on getting project mustard off the ground, focused
2   on reducing the executive cadre.  The thing I did
3   know is that the board has been reviewing the
4   analysis of women in the business and taken actions
5   on that over time.  So it was not a new finding, but
6   it was one that I knew was already something that
7   was sensitive to the board and sensitive to the top
8   management.  So I didn't feel that in the two -- in
9   the less than two weeks that I was in place after
10  this, that I could create any momentum in these
11  areas.  So I did not attempt to even begin to.
12      Q.  Did you ask Giamatteo to take a look at
13  these allegations and try to do something within the
14  company to address them?
15      A.  I have not talked to John about the
16  investigation or the follow-ups to that.  This would
17  be something that would have come out of Lisa's
18  group within the audit team.  It would have come out
19  of the HR organization within the business.
20      Q.  Let's turn -- it's near the end.  Let's go
21  to page 18667, please.
22      A.  Okay.
23      Q.  And there's a list of recommendations here.
24  Do you see that?
25      A.  Yes.

DEPONENT: RICHARD LYNCH                          June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1      Q.  And the first recommendation is "Workplace
2   culture survey."
3          Do you know if BlackBerry conducted such a
4   survey in response to this recommendation?
5      A.  I believe this morning you asked me about a
6   survey that Lisa referred to in an email and that's
7   the survey that she was talking about.  And to my
8   knowledge that has been completed and a follow-up
9   has been scheduled.
10     Q.  And the second recommendation is "exit
11  interviews," and more specifically the
12  recommendation is to leverage the information
13  BlackBerry learned during the interviews to improve
14  the workplace culture.
15         Do you know if there were any efforts made
16  in response to this recommendation?
17     A.  My understanding is there are exit
18  interviews done regularly and have been.  What is
19  done with them, I am not able to testify to you
20  today that exactly A, B, and C have happened.  But I
21  know those exit interviews take place.
22     Q.  And the third recommendation is a "pay
23  equity audit."  Do you know if BlackBerry conducted
24  such a pay equity audit in response to this
25  recommendation?



1        A.  In response to this, no, I don't believe so

2   because it's been done as a routine item.

3        Q.  And is -- is a pay equity audit completed

4   regularly, like once a year, once every two years?

5   Do you know if there's a regular schedule for that?

6        A.  I can't -- I can't give you the answer to

7   that.  I'd have to look.

8        Q.  Do you know whether a pay equity audit has

9   been conducted since this report was provided to

10  BlackBerry?

11       A.  No.

12       Q.  Number 4 says, "Review statistical analysis

13  of impact of reductions in force on certain

14  demographics."  Do you know if --

15       A.  No.

16       Q.  Okay.  And you're going to -- you're going

17  to have to let me finish my question.

18          Do you know if any statistical analysis was

19  performed in response to this recommendation?

20       A.  No.

21       Q.  And does that response mean you don't know

22  or you feel confident that no response -- or that no

23  analysis has been performed?

24       A.  I'm saying exactly the answer to your

25  question.  I don't know whether it has or has not.



DEPONENT: RICHARD LYNCH                          June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1       Q.   Recommendation 5 is "mentoring and
2   professional development program."  Did BlackBerry
3   do anything to implement the recommendation here in
4   Number 5?
5       A.   I do not know.
6       Q.   And Number 6 is "create a role focus on
7   DEI."  Has BlackBerry created a role focused on DEI
8   within the company?
9       A.   I do not know.
10      Q.   And does BlackBerry currently have an
11  executive-level position on DEI or ESG?
12      A.   Executive level position, no.  Only the
13  chief people officer.
14      Q.   Number 7 says, "Employee resource groups."
15  Has BlackBerry done anything to implement
16  recommendation number 7?
17      A.   No, not to my knowledge.
18      Q.   Number 8 is "training," implicit bias
19  training.  Do you know whether BlackBerry conducted
20  implicit bias training?
21      A.   No.
22      Q.   And I should -- I should rephrase that.
23  Does BlackBerry implement implicit bias training?
24      A.   I don't know.
25      Q.   Number 9 says, "Accessibility of C-Suite and



DEPONENT: RICHARD LYNCH                                 June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    senior leaders."  Has BlackBerry done anything to

2    implement the recommendations at Number 9?

3         A.  I can't answer that question.  I don't know.

4         Q.  Let's go to Number 15.  This was produced at

5    18714 and it goes to 18715.

6              (DEPOSITION EXHIBIT 15 WAS MARKED.)

7    BY MR. TARTAGLIO:

8         Q.  Let me know when you're ready to discuss

9    this one.

10        A.  Okay.  Ready.

11        Q.  So if we go near the bottom, there

12   is -- well, strike that.

13             So this appears to be an email chain upon --

14   or which you were included on; is that correct?

15        A.  Yes.

16        Q.  And it appears that this email chain, near

17   the bottom anyways, concerns potential severance

18   calculations for several employees?

19        A.  Correct.

20        Q.  And one of those is Ms. Sandhu; correct?

21        A.  Yes.

22        Q.  So would you agree that by this point in

23   November 29, 2023, it appears that progress was

24   underway for terminating Ms. Sandhu?

25        A.  That is correct.

DEPONENT: RICHARD LYNCH                                    June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1      A.   Correct.

2      Q.   The last paragraph says, "By the way, I

3  spent yesterday afternoon and evening with John.

4  He's a decent negotiator relative to his comp

5  package," and goes on for a bit.

6           So is it fair to say that as of December 6,

7  2023, that BlackBerry was negotiating a potential

8  compensation package for Mr. Giamatteo?

9      A.   Yes.

10     Q.   And do you recall when negotiations over his

11 compensation package started?

12     A.   I believe it was the day before.

13     Q.   So December 5, 2023?

14     A.   Yes.

15     Q.   And then you go on to write, "The delay is

16 waiting for Neelam to tell me whether she wants her

17 separation from the company to be portrayed as a

18 resignation or severance," and it goes on for a

19 little bit.

20     A.   Uh-huh.

21     Q.   So what was the delay that you were

22 referring to here?

23     A.   Let me -- let me reread to make sure I'm

24 going to answer you correctly.  I believe that I had

25 concluded that it would be better for Neelam to have



1  announced before John was announced as the CEO so

2  that it provided more validation to a resignation

3  scenario for Neelam.

4        If we had -- by this point in time I

5  obviously knew that Neelam and John did not get

6  along well, and I found out, of course, that, you

7  know, that was not a secret.  I wanted Neelam to be

8  able to leave head high and not be pro -- be

9  perceived as having been fired by the new incoming

10  CEO, so I was anxious to delay the announcement on

11  John until such time as Neelam had made her decision

12  and hopefully would have decided to resign or

13  portray the thing as a resignation.

14     Q.  So to recap, you thought that it would have

15  been beneficial to have Ms. Sandhu announce her

16  departure from the company before Mr. Giamatteo was

17  announced to be the CEO?

18     A.  Yes.

19        MR. TARTAGLIO:  Let's go to Exhibit 20.

20  This goes from 4693 and goes to 4694, so two pages.

21        (DEPOSITION EXHIBIT 20 WAS MARKED.)

22  BY MR. TARTAGLIO:

23     Q.  Let me know when you're ready to discuss

24  this one.  And just so you know, I'm basically going

25  to ask you to authenticate this email.  I'm not



1    quote, good reason, unquote, clause in her contract.

2    Do you see that?

3        A.  Yes, I do.

4        Q.  Does that refresh your recollection as to

5    that clause in the contract?

6        A.  It very much does, yes.

7        Q.  And so does the summary of it in this email

8    appear consistent with your recollection of this

9    contract?

10       A.  Let me again read it in detail.  Yes, that's

11   accurate.



24       Q.  And so as interim CEO, would you agree that

25   the only termination you personally affected was



DEPONENT: RICHARD LYNCH                          June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1     that of Neelam Sandhu?

2         A.   In a very strict interpretation of your

3     words, the answer is yes.  But I would object to the

4     question in the sense -- I know I'm not supposed

5     to -- but all of these people would have been

6     terminated if we hadn't been able to find another

7     way to exit them from the business.

8     

9     

10    

11    

12    

13    

14    

15        Q.   And so if we're looking at the number of

16    people that you yourself terminated, it was just

17    Ms. Sandhu; correct?

18        A.   No, I wouldn't say so.  Except in a very

19    technical term of terminated, yes.  But exited from

20    the business, I would take credit for all three of

21    these.

22            MR. TARTAGLIO:  Let's turn to Exhibit 21.

23    For the record, this is 18942 and goes to 18943.

24            (DEPOSITION EXHIBIT 21 WAS MARKED.)

25            MR. TARTAGLIO:  And actually this may be a



1          Now that we've gone through a bunch of

2    exhibits, are you able to -- to say whether she

3    wanted to be CEO or whether she wanted to be

4    considered for CEO?

5      A.  I don't parse the difference very well in my

6    mind.  A person may -- if they want to be CEO, they

7    want to be considered to be CEO.  And if you don't

8    want to be, you don't want to be considered.  So to

9    me it's one in the same.  She wanted to be the CEO,

10   and I didn't feel that she was ready for it, and I

11   didn't feel she was ready for it from an experience

12   standpoint nor did I feel she was ready for it from

13   a relationship standpoint with her peers.

14     Q.  So is it fair to say one of the reasons why

15   she was let go from the company rather than being

16   given a new placement is that she had expressed

17   interest in being CEO?

18     A.  No, no.  She was in a job which

19   unfortunately was a job that was all corporate level

20   and would be all put back into the business units

21   from which it would have come logically as you were

22   laying out the two business units' strategy.  She

23   had a piece of something that belonged in cyber

24   business unit.  She had a piece of something that

25   would be divided and put into the two business

DEPONENT: RICHARD LYNCH                        June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    at the same time?

2        A.  In the context in which I was operating at

3    that time, I drew that conclusion and would stick by

4    that conclusion.

5        Q.  And did -- did anyone ever tell you why

6    these two folks had gone out on leave?

7        A.  I never asked.

8        Q.  So earlier we talked about the fact that

9    Neelam's -- well, that Ms. Sandhu's elite business

10   group had been having some performance issues.  Do

11   you remember that?

12       A.  Yes.

13       Q.  Did you ever speak with Ms. Sandhu to ask

14   her to explain why these performance issues had been

15   happening?

16       A.  No, no.  The performance issues that I'm

17   referring to were in 2022, 2023, prior to my -- my

18   taking the temporary role, and I was not in a

19   position to do that at that time.

20       Q.  Well, before deciding to terminate

21   Ms. Sandhu, did you give her a chance to explain

22   what might have caused some of the performance

23   problems with the elite customer group?

24       A.  I did not because the primary decision had

25   nothing to do with the performance.  It had to do



**TALTY COURT REPORTERS, INC.**
**408.244.1900 - www.taltys.com**                        244

DEPONENT: RICHARD LYNCH                                    June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1   with the role that she was playing in the company at

2   that point in time.  The performance component was

3   merely an additional, what I would call, relevant

4   contributor to my confirmation of my decision.

5       Q.  At some point while the Morrison Foerster

6   Law Firm was investigating the allegation of --

7   against John Giamatteo, did that investigation's

8   scope grow to also increase some allegations against

9   Neelam Sandhu?

10      A.  I am not aware of the investigation other

11  than the reading that I have done on it, and so to

12  the extent that its description in the -- in the

13  document, that's all I have to read from.  So I

14  can't -- I can't comment on that.

15      Q.  And so to kind of summarize, can you say one

16  way or another whether the scope of the

17  investigation grew to include some allegations

18  against Ms. Sandhu?

19      A.  I don't recall that.

20      Q.  Do you think that it would be best -- or it

21  would have been best to have waited for the Morrison

22  Law Firm to complete its investigation before

23  reaching a conclusion as to whether the allegations

24  investigated were actually true?

25          MS. FORSTER:  Sorry.  Can you -- may I ask



**TALTY COURT REPORTERS, INC.**                          **245**
408.244.1900 - www.taltys.com

DEPONENT: RICHARD LYNCH                                    June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    February.  So the end of February of this year was

2    the end of fiscal year 2025.  So we are now in

3    fiscal year 2026, and they'll -- since February was

4    the end of the first quarter.  You add three, you

5    get May.  You add three more, you get August.  And

6    you add three more, you get November.  Those are the

7    ends of the quarters.

8        Q.  So when we look at quarter 4, fiscal year

9    2023, on page 14 of Exhibit 36, what months and

10   calendar year were represented by Q4 fiscal year

11   2023?

12       A.  That is actually -- that is calendar year

13   2022/2023.  For fourth quarter is December of '22

14   and January and February of '23.

15           MS. FORSTER:  Thank you.  That's all I have.

16           THE WITNESS:  Okay.

17           THE REPORTER:  Ms. Forster, would you like a

18   copy of the transcript?

19           MS. FORSTER:  Yes, please.

20           Oh, and I'd -- before we actually -- I'm

21   sorry.  Before we can go off the record, I don't

22   know that we will need to make any, but we do

23   reserve the right to make confidentiality

24   designations to deposition testimony within 21 days

25   as provided by the protective order in the case.

1           MR. TARTAGLIO:  Okay.  I like that system a
2    lot better than having to do it on the fly.
3           That's all for me unless anyone needs orders
4    or anything.
5           THE VIDEOGRAPHER:  I'll take us off.
6           This concludes today's video record of
7    deposition of Dick Lynch.  The original media of
8    this deposition will remain in the custody of Talty
9    Court Reporters, Inc., located in San Jose,
10   California.  We are now going off the record at
11   5:05 p.m.
12           (End time:  5:05 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25



DEPONENT: RICHARD LYNCH                                    June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1              ::: DECLARATION OF WITNESS :::

2

3          I hereby declare I am the deponent in the
   within matter; that I have read the foregoing
4   deposition and know the contents thereof, and I
   declare that the same is true of my knowledge except
5   as to the matters which are therein stated upon my
   information or belief, and as to those matters, I
6   believe it to be true.
           I declare under the penalties of perjury of
7   the State of California that the foregoing is true
   and correct.

8

9          Executed this _____ day of
   _____,
10
   2025, at _____, _____.
11              (City)                        (State)

12

13          _____
           RICHARD LYNCH

14

15

16

17

18

19

20

21

22

23

24

25



DEPONENT: RICHARD LYNCH                                    June 05, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1           ::: CERTIFICATE OF REPORTER :::

2

3           I, JULIE L. BANTLEY, a Certified Shorthand
     Reporter, holding a valid and current license issued
4    by the State of California, CSR No. 11422, duly
     authorized to administer oaths, do hereby certify:
5           That the witness in the foregoing remote
     deposition was administered an oath remotely to
6    testify to the whole truth in the within-entitled
     cause.
7           That said deposition was taken down
     remotely by me in shorthand at the time and place
8    therein stated and thereafter transcribed into
     typewriting, by computer, under my direction and
9    supervision.

10   (X) Reading and signing was not requested/offered.

11          Should the signature of the witness not be
     affixed to the original deposition transcript, the
12   witness shall not have availed himself/herself of
     the opportunity to sign or the signature has been
13   waived.
     The dismantling, unsealing, or unbinding of the
14   original transcript will render the Reporter's
     Certificate null and void.

15

16          I further certify that I am neither counsel
     for nor related to any party in the foregoing
     depositions and caption named nor in any way
17   interested in the outcome thereof.

18

19

20   DATED:  June 20, 2025

21

22   *Julie L. Anderson*

23   _____
     JULIE L. BANTLEY, CSR
24   California Certified Shorthand Reporter 11422

25

# EXHIBIT 37

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


NEELAM SANDHU,

              Plaintiff,

vs.                    Case No:  24-cv-02002-SK

BLACKBERRY CORPORATION,
et al,

              Defendants.

_____/

**CERTIFIED TRANSCRIPT**


VIDEO DEPOSITION OF
COLLEEN McMILLAN

FEBRUARY 24, 2025


9:05 a.m.

(Via Zoom)


Talty Court Reporters

2131 The Alameda, Suite D

San Jose, California 95126


Reported By:  Teresa C. Smith, CSR 13473

DEPONENT: COLLEEN MCMILLAN                           February 24, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1                    A P P E A R A N C E S:

 2

 3    FOR PLAINTIFF:    GOMERMAN BOURN & ASSOCIATES

 4                      BY:  ANTHONY TARTAGLIO, ESQ.

 5                      825 VAN NESS AVENUE, SUITE 502

 6                      SAN FRANCISCO, CALIFORNIA 94109

 7                      (415) 545-8608

 8                      tony@gobolaw.com

 9

10    FOR DEFENDANT:    MUNGER, TOLLES & OLSON, LLP

11                      BY:  LAUREN N. BECK, ESQ.

12                      350 S. GRAND AVENUE, FLOOR 50

13                      LOS ANGELES, CALIFORNIA 90071

14                      (213) 683-9576

15                      lauren.beck@mto.com

16

17

18    ALSO PRESENT:    MARGARET MAYO - BLACKBERRY

19                     MATTHEW PEYTON - VIDEOGRAPHER

20                     NEELAM SANDHU

21

22                         --oOo--

23

24

25
```



DEPONENT: COLLEEN MCMILLAN                                    February 24, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                        INDEX OF EXAMINATION

2       Witness:                                             Page

3         COLLEEN McMILLAN          (Sworn)

4

5       Examination by Mr. Tartaglio                           5

6       Examination by Ms. Beck                               56

7       Further Examination by Mr. Tartaglio                 121

8       Witness' Signature                                   124

9       Witness' Corrections                                 125

10      Certificate of Reporter                              126

11

12                        INDEX OF EXHIBITS

13      No.            Description                           Page

14

15      EXH 1    Letter dated January 25, 2023                45

16      EXH 2    Email correspondence - June 2022             76

17      EXH 3    Email correspondence - June 2021             76

18      EXH 4    Email correspondence - November 2022         84

19      EXH 5    Email correspondence - December 2022         97

20      EXH 6    FY21 Year-End Performance Review

21               (1 Mar 2020 - 28 Feb 2021)                  101

22

23

24                        --oOo--

25



**TALTY COURT REPORTERS, INC.**                                    3
**408.244.1900 - www.taltys.com**

1          THE VIDEOGRAPHER:  We are going on the record at

2    9:05 a.m. on February 24th, 2025.  This is the video

3    deposition of Colleen McMillan, taken by the Plaintiff in

4    the matter of Neelam Sandhu versus BlackBerry

5    Corporation, filed in the United States District Court

6    for the Northern District of California.  Case

7    Number 24-cv-02002-SK.

8          This deposition is being held via Zoom

9    videoconference.  My name is Matthew Peyton, and the

10   court reporter is Terrie Smith, CSR Number 13473, both

11   from the firm Talty Court Reporters, Inc., with offices

12   in San Jose, California.

13         Before we proceed, I will ask counsel to state

14   their appearance and affiliation for the record, starting

15   with the noticing attorney.

16         MR. TARTAGLIO:  For Plaintiff you have Anthony

17   Tartaglio from the Gomerman Bourn Law Firm, and the

18   Plaintiff herself is also observing today.

19         MS. BECK:  For Defendant you have Lauren Beck of

20   Munger, Tolles & Olson.  I'm also joined by Margaret

21   Mayo, who's in-house counsel for BlackBerry.

22         THE VIDEOGRAPHER:  Will the court reporter

23   please swear in the witness and we may begin.

24         THE REPORTER:  Yes.  Just a correction.  My name

25   is actually Teresa Smith, California CSR Number 13473.



DEPONENT: COLLEEN MCMILLAN                           February 24, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

 1   If you'll raise your right hand for me, please.

 2                   COLLEEN McMILLAN,

 3        called as a witness, being first duly sworn,

 4                 testified as follows:

 5        THE REPORTER:  I think you're on mute, ma'am.

 6        THE WITNESS:  Yes.

 7        THE REPORTER:  Thank you.  Counselor?

 8                     EXAMINATION

 9   BY MR. TARTAGLIO:

10      Q.  Good morning, Ms. McMillan.

11      A.  Good morning, Anthony.

12      Q.  Do you have a lawyer representing you for the

13   purposes of the deposition today?

14      A.  No.

15      Q.  Okay.  I'm going to start off by giving an

16   explanation for how this process works.  Okay?

17      A.  That sounds good.

18      Q.  So do you understand that the oath that you just

19   took is similar to the oath that you would take if you

20   testified in court?

21      A.  Yes.

22      Q.  Because we have a court reporter who's writing

23   down what we're all saying, it's important that we try

24   not to speak over each other and speak only one at a

25   time.  Okay?



DEPONENT: COLLEEN MCMILLAN                                    February 24, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    inappropriate.

2        Q.  And you mentioned some guys that he brought in.

3    Did you remember the names of any of those folks?

4        A.  I did.  And that's what was interesting to me,

5    and I don't know if this would be considered

6    inappropriate behavior to answer your other -- it was

7    interesting.  When he joined the company, there were

8    several women that did report to this role by the

9    predecessor, Tom Eacobacci, and then overtime, the

10   women's roles were greatly diminished and the men he kept

11   on hiring were getting more and more responsibility and

12   -- whether they had the criteria or experience in that

13   role, and they were held to a different standard in terms

14   of quota and other things.

15       It was kind of odd to me like why am I not

16   getting those resources if we're doing so much sales per

17   head count and other people have a much smaller number or

18   they have a much greater title and -- and they don't have

19   the direct reports or their quota isn't as high.

20       So people he brought over would be Kevin

21   Easterwood, who was marketing who came in as a VP of

22   marketing when he was a senior director previously, and

23   now he's a senior VP.  There was Tash.  I don't remember

24   Tash's last name, but he's the VP of Asia.  A small

25   amount of revenue was expected from him.  Very, very



 1 | new Kevin Easterwood, who's a new VP, and thus minimized
 2 | her role that she's not -- she a VP and reporting to a
 3 | VP.  So she left the company to go do something else.
 4 |      Neily who was doing global renewals within a
 5 | similar situation where her folks, she had global
 6 | resources, were then supporting -- were then told to
 7 | report into the gentlemen male leaders.
 8 |      So all of us were hired with a certain role and
 9 | responsibility, and all the women's roles were cut
10 | significantly in scope.  And when I asked him very
11 | specifically, "Well then why did you do this," it was
12 | like, "Well, we just want it closer aligned.  We don't
13 | want to do the whole global thing."  And I said, "Well,
14 | you still have marketing that has global.  Why are they
15 | not reporting into the regions.  You have system
16 | engineers.  Why are they not" -- and both of those two
17 | roles were led by gentlemen.  And he said, "Well,
18 | eventually we might get to those to do that as well, but
19 | for now we're doing these," which were just kind of
20 | coincidental the three women who reported to him.
21 |    Q.  And did you ever tell John G. that you thought
22 | that women in particular seemed to be getting their roles
23 | diminished?
24 |    A.  Yes, I did.  I did.  It did not go over very
25 | well, as you can imagine.  It was during one of our 101s.



DEPONENT: COLLEEN MCMILLAN                                    February 24, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    And I had had another incident with him where when I
2    first started, there was some people I inherited that
3    were already still in their roles and some people had
4    left and I had to build the team up.  So I didn't have a
5    lot of say in terms of who we hired and -- and -- and
6    classified their jobs in terms of how they paid -- got
7    paid, right, because some people were already there.
8           So it was brought to my attention that one
9    person on my team, Stefanie -- I would have to get her
10   last name.  Stefanie was in the MSSP group, and she was
11   being paid differently than her male counterparts; and
12   she had the longest experience and the most tenure in
13   this position.
14          And when we were hiring backfills, we got the
15   role and the classifications and everything from HR.  I
16   didn't get a say in how much they got paid or how their
17   comp worked.  That was done by the grading folks at the
18   HR.  And Stefanie found out that the men they were
19   bringing in, even though she had more experience and she
20   was doing a fabulous job, she -- she -- she really,
21   really -- and I -- I had done reviews on her, you know,
22   tried everything to give her what I could in terms of any
23   bonuses or anything, she was being paid 60 percent
24   salary, 40 percent comp, whereas the men that they were
25   hired, they were bringing in -- they were paid at



DEPONENT: COLLEEN MCMILLAN                          February 24, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1   70 percent salary, 30 percent comp.

2          So right away she's at more at risk.  And when

3   you looked at the total comp, like if you were to hit a

4   hundred percent, she's still being paid less.  So I tried

5   to go through HR.  I worked with Mary Slimmon on that

6   from HR.  We -- we wrote it up.  She went to someone

7   else.  They all agreed this is wrong, this isn't right.

8   This is -- and he actually approved it in an email, and

9   then later on came back and said, "No, just we -- why

10  don't we just give her $10,000" or whatever amount, and I

11  said, "Well, that -- that's great, but that doesn't fix

12  the problem.  She should be treated like everyone else.

13  In fact, she should be on par if not higher.  She has

14  more experience."

15         And -- and I point out this is -- if she

16  realizes the full extent of this, she could sue

17  BlackBerry.  This is concerning.  We're treating a woman

18  differently than a man.  And the question that really

19  kind of struck me as odd was he asked me how old she was.

20  And I was like, "I -- I don't know.  Why?  What's that?"

21  And he's like, "Well, I mean, if she's a younger woman

22  early in her career, I mean" --

23      Q.  And who is it that asked that?

24      A.  John G.

25      Q.  Okay.  Sorry to interrupt, but continue.



DEPONENT: COLLEEN MCMILLAN                          February 24, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1     Q.  Did anyone at BlackBerry -- did anyone at

2     BlackBerry ever tell you that your performance was

3     unacceptable and needed to be brought up to par?

4     A.  No.  But after I left, it was interesting

5     because all my employees went to help justify other

6     people.  So like John D. had no direct reports, brought

7     in no revenue, probably a very high paid resource, like

8     his personal consultants; and some of my staff then

9     reported to him.  He'd never managed a global channel.

10    He never managed some of that.

11         So it's interesting when your role and you have

12    been hired and you have the experience to do this is then

13    parsed out to people to manage that they're not --

14    they've never done that before or they didn't care about

15    those charts in the business.

16         I talked to my employees after I left and where

17    they all went to different things and, you know, they all

18    got parsed out to a man.

19    Q.  You mentioned that -- I think the word you used

20    was "good 'ole boy" kind of environment.  Can you provide

21    some examples of -- of that?

22    A.  So when John G. first started and he hired Tom

23    Fusco, VP of Americas, Tom Fusco did a presentation to

24    get -- for everyone to get to know him.  He has a slide

25    deck.  It has a picture of Eva Longoria on it.  And he



DEPONENT: COLLEEN MCMILLAN                         February 24, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    says, "Oh, yeah, just so you guys know, this is, you

2    know, my hall pass.  If I ever -- or my wife's given me a

3    hall pass on -- on if I, I guess, want to go cheat or

4    whatever."  I don't know.  It was the weirdest thing.

5    Like why would you put that in your slide deck, like, to

6    let people get to know you.  That appeared kind of

7    offensive.

8         We had a meeting in BlackBerry up in Canada and

9    very good 'ole boys.  So Tash and John Murphy and JD, you

10   know, the drinking and the stupid jokes and, you know,

11   just, you know, talking about the good 'ole days.  I

12   guess they used to run wild around, you know, from their

13   McAfee days.  I don't know.  But it brought a whole

14   different culture element to it.  It was not as

15   professional.  There were innuendos, lots of jokes like

16   in the QBR like after that sitcom The Office.  Like you'd

17   add -- you'd say something and then like, "Oh, that's

18   what she said."  It's kind of like an innuendo, and that

19   happened frequently.

20        When we're in the -- the office, whether -- you

21   know, because we did have some on -- on-site meetings

22   both in California and -- and the Canada office.  And

23   you'd hear stories, too, like when John -- JD is going

24   all the way from Australia to travel with J -- John G.

25   you know, you just kind of hear some of the stores and



 1   correct?

 2       A.  Correct.

 3           MS. BECK:  I think that's it for questions from

 4   me.  Thank you for your time, Ms. McMillan.

 5           MR. TARTAGLIO:  I have one quick follow-up

 6   question.

 7           THE WITNESS:  Please.

 8                     FURTHER EXAMINATION

 9   BY MR. TARTAGLIO:

10       Q.  So Ms. McMillan, when you were laid off, did

11   anyone tell you you had been laid off because the -- the

12   sales channel team had not been meeting its expectations

13   for sales?

14       A.  So I don't know if it's just my phone, but it

15   came through very garbled.  I could not understand you.

16       Q.  Okay.  I'll - I'll ask this again.

17           When you were laid off, did anyone tell you that

18   one of the reasons you were laid off was because of the

19   poor financial performance of the channel sales?

20       A.  No.  That was not -- that was not the rational.

21           MR. TARTAGLIO:  That's all my questions.

22           THE REPORTER:  Before we go off the written

23   record, would counsel be kind enough, please, to state

24   their orders for the transcript and/or the video,

25   starting with the taking attorney?

```
1              MR. TARTAGLIO:  Plaintiff will order the
2   transcript and a video.  Standard delivery is fine.  No
3   need to -- well, actually yeah, let's get it synced.
4              THE REPORTER:  Thank you.  Ma'am?
5              THE WITNESS:  Anthony, can I make a statement to
6   add on to that last question you asked me about?
7              MR. TARTAGLIO:  Yeah.  Let's go back on the
8   record for that.
9              THE REPORTER:  We're still on the record, sir.
10             MR. TARTAGLIO:  Okay.  Then, yeah, go ahead and
11  make your statement.
12             THE WITNESS:  So that was not the rational
13  provided, and if that is the rational that they're trying
14  to provide, then it should have been spread across the
15  way and enforced equally then.
16             MR. TARTAGLIO:  Okay.  Thank you for that.
17             THE WITNESS:  So I'm saying in terms of, you
18  know, Tash or HP or Adam or, you know, you have to use
19  the same measuring stick across the board.
20             MR. TARTAGLIO:  Thank you.
21             THE REPORTER:  Ma'am, what can we get for you?
22             MS. BECK:  Oh, we'll take the same, please.
23             THE REPORTER:  And the reading and signing,
24  since my witness is not represented, should I just get
25  her email address and send it directly to her?
```



DEPONENT: COLLEEN MCMILLAN                                February 24, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1          MR. TARTAGLIO:  How about you send it to me and

2    Ms. Beck, and one of us will explain the process.

3          THE REPORTER:  Perfect.  Thank you.  Matthew?

4          THE VIDEOGRAPHER:  Okay, everyone.  This

5    concludes the video deposition of Colleen McMillan.  The

6    original media of this deposition will remain in the

7    custody of Talty Court Reporters, Incorporated, located

8    in San Jose, California.

9          We're going off the record at 12:33 p.m.

10          (The deposition concluded at 12:33 p.m.)

11          (NOTE:  All quotations from exhibits are

12    reflected in the manner in which they were read into the

13    record and do not necessarily denote an exact quote from

14    the document.)

15                        --oOo--

16

17

18

19

20

21

22

23

24

25



DEPONENT: COLLEEN MCMILLAN                              February 24, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                          WITNESS' SIGNATURE

2

3          Please be advised I have read, under penalty of

4    perjury, the foregoing deposition, pages 1 through 126,

5    inclusive.  I hereby state there are:

6

7          _____ no corrections

8

9          _____ corrections per attached

10

11

12

13

14   COLLEEN McMILLAN

15

16

17                          --oOo--

18

19

20

21

22

23

24

25



DEPONENT: COLLEEN MCMILLAN                                February 24, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                    WITNESS' CHANGES OR CORRECTIONS

2

3          NOTE:  If you are adding to your testimony,
    print the exact words you want to add.  If you are
4   deleting words from your testimony, print the exact words
    you want to delete.  Specify with "Add" or "Delete" and
5   sign this form.
    Deposition of:          COLLEEN McMILLAN
6   Case Title:             Sandhu -v- BlackBerry, et al
    Date of Deposition:  February 24, 2025
7
    I,                    , have the following corrections to
8   make to my deposition.  (Use an extra sheet of paper if
    necessary.)
9

10  Page/Line          Changes/Add/Delete

11       /

12       /

13       /

14       /

15       /

16       /

17       /

18       /

19       /

20       /

21       /

22       /

23       /

24       /

25       /



**TALTY COURT REPORTERS, INC.**                         **125**
**408.244.1900 - www.taltys.com**

1    CERTIFICATE OF REPORTER

2    I, TERESA C. SMITH, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition, COLLEEN McMILLAN, was by me duly

5    sworn to tell the truth, the whole truth, and nothing but

6    the truth in the within-entitled cause; that the

7    testimony of said witness was taken down in shorthand by

8    me, a Certified Shorthand Reporter and a disinterested

9    person, at the time and place herein stated, and that the

10   testimony of the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision.

13   I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the outcome of

16   this cause, and that I am not related to any of the

17   parties thereto.

18   I hereto declare under penalty of perjury that

19   the foregoing is true and correct to the best of my

20   ability utilizing the Zoom/Internet connections.  I have

21   hereunto set my hand on March 6, 2025.



24   Teresa C. Smith, CSR no. 13473

## Exhibits

**Exhibit 01** 3:15 44:24
45:1,4

**Exhibit 02** 3:16 76:13,14

**Exhibit 03** 3:17 76:16,18

**Exhibit 04** 3:18 84:2,3

**Exhibit 05** 3:19 97:8,9,10

**Exhibit 06** 3:20 101:12,
13

## $

**$10,000** 25:10

**$176,748** 48:17

**$2,000** 80:6

**$224,000** 80:16

**$320,000** 80:17

**$40** 14:23,25

## -

**--ooo--** 123:15

**-and** 119:14

## 1

**1** 44:24 45:1,4 97:19
101:16 104:15

**10** 99:25

**100,000** 65:5

**100K** 65:8

**101s** 23:25

**10:04** 44:8

**10:15** 44:6

**10:24** 44:10

**11:08** 76:5

**11:21** 76:9

**12:14** 115:12

**12:22** 115:18

**12:33** 123:9,10

**13473** 4:10,25

**14** 28:2

**15** 71:18 84:5

**16** 53:18

**18** 53:18

## 2

**2** 76:13,14 109:16

**20** 91:20 103:9 108:15

**2020** 97:19 101:16

**2021** 76:23 99:7 100:18,
22 101:17 102:3,18
111:8

**2022** 8:6 66:14 84:5,13,
24 87:5 88:11,21 97:13

**20221914** 84:7 85:6

**2023** 16:10,14 17:22
59:17,20 60:3,7,9,16,20
73:4,7

**2025** 4:2

**21** 101:16 102:12 103:3

**24-cv-02002-sk** 4:7

**24-months'** 47:25

**24th** 4:2

**26** 48:25

**28** 101:16

## 3

**3** 76:16,18 98:12 99:25
104:16

**30** 25:1 65:4,6

## 4

**4** 76:23 84:2,3

**40** 24:24 65:1

## 5

**5** 97:9,10

**50** 100:2 104:13

**50-some** 99:22

## 6

**6** 101:12,13

**60** 24:23 65:1,9 111:5

**60/40** 38:6 64:21,24,25
66:23 67:7 69:9 71:22
72:1,13 74:22 82:12
83:8,19 85:9,12,14 86:10
88:13,14

**6th** 16:10 27:4 59:18

## 7

**7** 28:2 47:25

**7,000** 48:1

**70** 25:1 65:4,10

**70/30** 65:4 66:23 67:7
69:7,20 73:22,24 74:12
80:22 81:14,17,24 82:1,
8,10,20 83:2,3,5,9,22

**70K** 65:6

## 8

**80s** 20:25

## 9

**90** 9:7

**9:05** 4:2

## A

**a.m.** 4:2 44:8,11 76:5,9

**ability** 10:11,15 90:22
117:17

**Absolutely** 28:25

**accepted** 59:15

**access** 11:12,15 55:18
93:12

**accounts** 37:4 57:11
98:21

**accrued** 46:22

**accuracy** 46:9

**accurate** 10:11,16

**act** 58:12

**acted** 18:21 34:1

**acting** 56:16 58:10

**actions** 40:16 102:10

**acts** 32:16

**Adam** 28:15 33:2 39:19
107:17 122:18

**add** 31:17 122:6

**added** 34:8 56:21,25

**adding** 28:6

**address** 122:25

**addressing** 19:24

**admin** 114:19

**advantage** 96:23

**affiliation** 4:14

**Africa** 108:21

**age** 45:14

**agenda** 114:17

**agendas** 114:20

**agitated** 20:16 26:10

**agree** 86:23

**agreed** 25:7

**agreement** 57:14

**ahead** 8:7 9:16,23 10:2
29:3 37:11 38:2 44:5
62:11 75:19 85:18
122:10

**Alcantar** 66:16 67:6 71:8
72:14 83:8 85:2 87:23

**Alcantar's** 71:9 83:18

**Alcantara** 69:12

**Alex** 107:3

**Alex's** 26:7

**aligned** 23:12 86:19 97:1

**alignment** 85:8 105:4

**alliance** 17:6 69:6

**alliances** 16:21 75:4
95:15

**allocate** 104:23

**allocated** 107:19



allocates 105:1

allowed 20:19 69:16

America 22:10,17,22

Americas 22:21 28:2
30:23 39:19 52:24 94:15
97:4 107:16 110:5

amount 21:25 25:10
59:15

analysis 70:14 71:11

and/or 121:24

Angel 77:13

Angel/highest 76:25

announced 27:6

anonymous 117:12,25
118:3,5,7,11

answers 6:5,8

Anthony 4:16 5:11 122:5

anticipating 7:3

anymore 17:24 18:11
19:11 60:17 106:5

APAC 109:22

apparently 52:24 85:13

appearance 4:14

appeared 31:6

appears 84:5 97:12

applied 104:7,8,12

apply 105:6

appointed 50:7

appreciative 55:5

approach 66:22 68:8
109:7

approaching 68:14

appropriately 89:12

approval 66:15 74:1,12,
13 76:24 84:6 85:22

approve 66:21 67:23
68:1,8,17,19 71:11 85:5

approved 25:8 67:16,25
68:21 72:9

approximately 47:21
91:14

area 106:21 109:24

areas 28:17 103:25

argued 120:1,6

artificial 7:12

as-is 6:22

Asia 21:24 22:17 28:9
108:20 109:15,17,23

aspect 6:19

assigned 57:9 105:15

assist 85:4

assume 87:12 120:11

Assumes 29:8 106:22

assure 78:25

atmosphere 53:2 64:7

attend 15:11,13 111:12,
16 113:16

attended 113:16,19
114:10

attention 24:8 26:2 57:10
65:22 70:8,9,13 83:12

attitude 20:20 40:12

attorney 4:15 46:7
121:25

attorneys 118:18

Australia 22:2,4 31:24
39:18 108:5,8

authorized 80:7

avenues 55:7

aware 57:13 60:5,9,14,
21,25 75:9 79:25 91:22
120:9,16


B

B-U-F-F 42:8,9

back 11:11 16:2 20:24
25:9 44:6,10 47:13 49:19
51:7 52:19 55:13 57:16
61:1 71:16 72:19 76:7,8,
10 80:4,6,9 93:20 99:8
107:24 109:2 111:17
115:14,17,20 116:9
117:6,14 122:7

backed 68:1

backfill 35:22 36:2,9
74:13 77:13 81:19 83:2

85:24

backfills 24:14 35:19

background 15:8 16:1
33:5 45:22,23 46:3,10

backtrack 89:21

bad 19:1 49:9 51:24

Baker 41:10

banter 32:6

barely 104:15

Barracuda 90:2 91:4

base 48:12,25 80:16
107:6

based 26:17 46:6 79:18
81:2,11 82:4 84:25 85:20
86:25 87:8,11 109:7,23
119:1

bases 68:19

basically 27:9 44:18
67:22

basing 72:23,24

basis 63:15 118:25
119:24

Bauer 22:8 108:10

Beck 4:19 27:13 29:1,3,8
37:9,19,23 40:3,21,23
44:20,22 51:1 52:8 53:10
54:7,12 55:5 56:5,7 72:4,
21 75:19,23 76:3,7,10,
15,19 77:18 78:6,20 83:6
84:1,4 85:17 95:24 96:7
97:11 98:3 101:10,14
102:2 103:18 105:7,23
106:11 107:8 108:18
110:23 115:11,14,19,22
118:8,14 119:11 120:8
121:3 122:22 123:2

begin 4:23

beginning 17:22 52:11

behavior 12:7 14:13
20:15,17 21:6 50:9 58:19

believed 72:12 96:3

bet 54:9

big 53:1 63:7,8 90:20

bigger 26:19

biggest 99:15

85:24

binder 11:6 55:3,22

bit 7:12 15:25 20:14
34:15 45:21 56:10 57:3
58:24

biweekly 115:1,3

Blackberry 4:4,21 9:7,11
11:7 13:13 14:1,4 16:7,8,
11,14,17,24 17:4,5,13,
15,21 18:18 25:17 27:18
28:24 30:1,2 31:8 33:8
34:14 35:11 37:2,8,14,15
38:15,16 41:14,21 45:12,
17 46:17 47:1,12 48:8,18
49:2,10 53:4,16 55:19
56:3 59:5,8,11,17,22
60:24 64:5 68:16 71:6
74:21 79:12,19 82:6
91:1,8,11 92:6 95:10,16,
17 96:12 97:16 98:16
109:14,25 110:10 112:22
113:1,6,19 120:25

Blackberry's 65:22 67:10
92:8,10 96:4 117:9
118:22

blurry 33:4

board 28:18 100:5 109:9
122:19

boat 72:9

bonding 112:2

bonuses 24:23

book 52:22 111:19

boss 38:25 117:16

Bourn 4:17

box 81:4

boy 30:20

boy-type 20:20

boys 31:9 53:2,22 54:2

break 9:2,4 10:23 11:20
42:24 44:5,12 56:11
75:21,23 84:12

breaks 8:25 9:1

briefly 95:12

bright 98:24 99:14
103:10

bringing 24:19,25 87:14

brought 20:21 21:2,20
22:5,8,9,12,19 24:8 26:2,



# EXHIBIT 38

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


NEELAM SANDHU,

                    **CERTIFIED TRANSCRIPT**

          Plaintiff,

vs.                              Case No:  24-cv-02002-SK

BLACKBERRY CORPORATION,
et al,

          Defendants.

_____/


VIDEO DEPOSITION OF
ERIN RANSOM

FEBRUARY 26, 2025


9:01 a.m.

(Via Zoom)


Talty Court Reporters

2131 The Alameda, Suite D

San Jose, California 95126


Reported By:  Teresa C. Smith, CSR 13473

DEPONENT: ERIN RANSOM                                    February 26, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1                    A P P E A R A N C E S:

 2

 3   FOR PLAINTIFF:   GOMERMAN BOURN & ASSOCIATES

 4                    BY:  ANTHONY TARTAGLIO, ESQ.

 5                    825 VAN NESS AVENUE, SUITE 502

 6                    SAN FRANCISCO, CALIFORNIA 94109

 7                    (415) 545-8608

 8                    tony@gobolaw.com

 9

10   FOR DEFENDANT:   MUNGER, TOLLES & OLSON, LLP

11                    BY:  LAUREN N. BECK, ESQ.

12                    350 SOUTH GRAND AVENUE, FLOOR 50

13                    LOS ANGELES, CALIFORNIA 90071

14                    (213) 683-9576

15                    lauren.beck@mto.com

16

17

18   ALSO PRESENT:    MARGARET MAYO - BLACKBERRY

19                    JACQUELINE HIOCO - VIDEOGRAPHER

20                    NEELAM SANDHU

21

22                       --oOo--

23

24

25
```



DEPONENT: ERIN RANSOM                                    February 26, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1              INDEX OF EXAMINATION

 2  Witness:                              Page

 3    ERIN RANSOM    (Sworn)

 4

 5  Examination by Mr. Tartaglio               5

 6  Examination by Ms. Beck                   38

 7  Witness' Signature                        65

 8  Witness' Corrections                      66

 9  Certificate of Reporter                   67

10

11              INDEX OF EXHIBITS

12  No.          Description              Page

13

14  EXH 1    Email - May 13, 2022           46

15  EXH 2    Offer Letter - May 25, 2022    50

16  EXH 3    Email - March 16, 2022         58

17

18

19

20                  --oOo--

21

22

23

24

25
```



**TALTY COURT REPORTERS, INC.**
**408.244.1900 - www.taltys.com**

3

1          THE VIDEOGRAPHER:  Good morning.  We are going

2     on the video record at 9:01 a.m. on Wednesday,

3     February 26th, 2025.  This is the video deposition of

4     Erin Ransom, taken by the Plaintiff in the matter of

5     Neelam Sandhu versus BlackBerry Corporation, et al, filed

6     in the United States District Court for the Northern

7     District of California.  Case Number 24-CV-02002-SK.

8          This deposition is being held via Zoom

9     videoconference.  My name is Jacqueline Hioco, a notary

10    public in and for the state of California.  Today's

11    reporter is Terrie Smith, CSR Number 13473.  We are both

12    with the firm Talty Court Reporters, Incorporated, with

13    offices in San Jose, California.  Please note that we

14    will remain on the video record until all parties have

15    agreed to go off.

16          Before we proceed, I ask counsel to state their

17    appearance and affiliation for the record, starting with

18    the noticing attorney.

19          MR. TARTAGLIO:  This is Anthony Tartaglio, from

20    the Gomerman Bourn Law Firm representing Plaintiff, and

21    the Plaintiff will likely be observing at some point.

22          MS. BECK:  And I'm Lauren Beck of Munger, Tolles

23    & Olson, on behalf of Defendant, BlackBerry Corporation.

24    I'm also joined today by Margaret Mayo, who's in-house

25    counsel for BlackBerry.



DEPONENT: ERIN RANSOM                                    February 26, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1          THE VIDEOGRAPHER:  Thank you.  Will the court

2    reporter please administer the oath.  Then counsel may

3    proceed.

4          THE REPORTER:  If you'll raise your right hand

5    for me, please.

6                         ERIN RANSOM,

7        called as a witness, being first duly sworn,

8                    testified as follows:

9          THE REPORTER:  Thank you.  Counselor?

10                        EXAMINATION

11   BY MR. TARTAGLIO:

12      Q.  Good morning, Ms. Ransom.

13      A.  Good morning.

14      Q.  It's morning here anyways.

15          Have you ever had a deposition before?

16      A.  No.  This is the first one.

17      Q.  Okay.  Then I will explain how this process

18   works.  Do you understand that the oath that you just

19   took is similar to the oath that you were to take if you

20   testified in court?

21      A.  Yes.

22      Q.  Because we have a court reporter who is typing

23   down what we're saying, it's important that we try to

24   speak one at a time and not speak over each other.  Okay?

25      A.  Okay.



DEPONENT: ERIN RANSOM                                    February 26, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1   wasn't that there wasn't opportunity, but I -- I don't
2   know.  Sorry.  That's kind of just a hard question to
3   answer, right.  Like, I spent 18 years there and it -- it
4   was definitely, you know, male dominated, especially in
5   leadership.
6       Q.  And what do you -- what do you mean when you say
7   that it was "male dominated"?
8       A.  Well, if you just look at the number of men in
9   leadership positions compared to the number of -- of
10  women, I mean, yeah, they're just -- you know, the
11  ratios.  I mean, there would have to be -- there's
12  probably more Johns in leadership than women, right.
13          Like so -- so yeah.  I mean, I don't know what
14  the exact stats would be, but I don't think the women
15  would be anywhere close to 50 percent of leadership
16  positions.
17      Q.  Did you ever witness your male coworkers
18  engaging in sexual banter or innuendo that you thought
19  was not appropriate for the workplace?
20      A.  Yeah.  So probably in, like, February or March
21  of '22, like the year before I left, we were putting
22  together a virtual sales kickoff, so we would be
23  recording sessions with various leaders and then kind of
24  putting it all together and it was like video content for
25  the sales teams.



1          And one of the items that we were doing was kind

2     of like a quick recognition, right.  So the leader would

3     say a few words and we'd record and -- but the -- when we

4     went to do the recording, the -- I think he was the head

5     of the Europe sales, Hans-Peter, so we get on this video

6     call and behind him is like this kind of weird painting

7     of, like, women half dressed.  And it was one of those

8     situations where you like -- it's like a little bit

9     surreal, right.  And in the moment you're kind of like,

10    oh, is this normal, is this not normal, do I say

11    something, do I not say something.  It was kind of one of

12    those most moments.

13          And we went through, we got the recording, and

14    then afterwards, like, you know, I was -- you know, I was

15    thinking about it.  I spoke with a couple of the other

16    women.  Neily Buff and Colleen, who had been on that

17    session because we had a broad, you know, group of

18    leaders on it, and we all just thought that it was not

19    appropriate, right.

20          So we ended up with -- the video, we ended up

21    that we were able to kind of cut it out or blur it,

22    right, so it wasn't, like, in the final product; but I

23    also took it to HR and just said to them, like -- like I

24    think, you know, someone needs to have a conversation

25    with Hans-Peter about it because, you know, I think if



DEPONENT: ERIN RANSOM                                    February 26, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1   you were, like, a young female salesperson and that's
2   your VP, like that's kind of an uncomfortable vibe,
3   right, if you're on video calls with him.
4          So anyways, HR agreed.  I left it with them, and
5   you know, I didn't -- I don't know what came of it or
6   didn't come of it, but anyways, that was kind of like one
7   example of just, you know, there wasn't anything said,
8   but it was -- I don't know.  It -- it was just weird.  It
9   was -- it was uncomfortable.
10          It was -- you know, I think for him, he felt
11  like it was normal, but yeah, we just -- anyways.  We
12  just decided in the end we would cut it and then took it
13  to HR.
14      Q.  And besides the painting, did you have any other
15  experiences at BlackBerry where you felt as though a man
16  or one of the men had done -- had acted in a way that was
17  inappropriate towards yourself or any other women?
18      A.  Yeah.  I mean, not that I recall.  I don't have
19  any other, like, examples or -- yeah, I don't remember
20  being made to feel uncomfortable, yeah.
21      Q.  I think something you mentioned earlier was a
22  boss was inappropriate to you.  Do you remember
23  mentioning something along those lines?
24      A.  Yeah.  So I mean, yeah.  I guess earlier in my
25  career.  So yeah.  So I was pregnant and -- with my



DEPONENT: ERIN RANSOM                                    February 26, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    Q.   And -- and was Ms. Sandhu present for this

2    training?

3        A.   No.   Nope.

4        MS. BECK:   I think that's -- I think that's all

5    I have.   Thank you for -- for your time, Ms. Ransom.   I

6    -- I repeat appreciate it.   I pass the witness.

7        THE REPORTER:   Is that it everyone?

8        MR. TARTAGLIO:   Nothing further from the

9    Plaintiff.

10       THE REPORTER:   Before we go off the record,

11   would counsel be kind enough, please, to state their

12   orders on the record for the transcript and/or the video,

13   starting with the taking attorney?

14       MR. TARTAGLIO:   Plaintiff will order the

15   transcript, standard deliver.   We'll order the video

16   synced, also standard delivery.

17       THE REPORTER:   Thank you.   Ma'am?

18       MS. BECK:   The same for BlackBerry, please.

19       THE REPORTER:   And where should I send the

20   reading and signing?

21       MR. TARTAGLIO:   If you send it to myself and

22   make Ms. Smith -- Ms. Beck both, one of us will figure

23   out that process.

24       THE REPORTER:   Thank you.   Jacqueline?

25       THE VIDEOGRAPHER:   This con- -- this concludes



DEPONENT: ERIN RANSOM                                    February 26, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1  the video record of today's deposition of Erin Ransom.

2  The original media of this deposition will remain in the

3  custody of Talty Court Reporters, Incorporated, located

4  in San Jose, California.

5          We're going off the record at 10:45 a.m.

6          (The deposition concluded at 10:45 a.m.)

7          (NOTE:  All quotations from exhibits are

8  reflected in the manner in which they were read into the

9  record and do not necessarily denote an exact quote from

10  the document.)

11                        --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25



DEPONENT: ERIN RANSOM                                February 26, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                     WITNESS' SIGNATURE

2

3          Please be advised I have read, under penalty of

4    perjury, the foregoing deposition, pages 1 through 67,

5    inclusive.  I hereby state there are:

6

7          _____ no corrections

8

9          _____ corrections per attached

10

11

12

13

14   ERIN RANSOM

15

16

17                        --oOo--

18

19

20

21

22

23

24

25



DEPONENT: ERIN RANSOM                                    February 26, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                WITNESS' CHANGES OR CORRECTIONS

2

3        NOTE:  If you are adding to your testimony,
   print the exact words you want to add.  If you are
4  deleting words from your testimony, print the exact words
   you want to delete.  Specify with "Add" or "Delete" and
5  sign this form.
   Deposition of:        ERIN RANSOM
6  Case Title:           SANDHU -v- BLACKBERRY, et al
   Date of Deposition:   February 26, 2025
7
   I,                    , have the following corrections to
8  make to my deposition.  (Use an extra sheet of paper if
   necessary.)
9

10  Page/Line          Changes/Add/Delete

11       /

12       /

13       /

14       /

15       /

16       /

17       /

18       /

19       /

20       /

21       /

22       /

23       /

24       /

25       /

1            CERTIFICATE OF REPORTER

2            I, TERESA C. SMITH, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition, ERIN RANSOM, was by me duly sworn

5    to tell the truth, the whole truth, and nothing but the

6    truth in the within-entitled cause; that the testimony of

7    said witness was taken down in shorthand by me, a

8    Certified Shorthand Reporter and a disinterested person,

9    at the time and place herein stated, and that the

10   testimony of the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision.

13           I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the outcome of

16   this cause, and that I am not related to any of the

17   parties thereto.

18           I hereto declare under penalty of perjury that

19   the foregoing is true and correct to the best of my

20   ability utilizing the Zoom/Internet connections.  I have

21   hereunto set my hand on March 9, 2025.

22

23                    _Teresa C. Smith_

24                    Teresa C. Smith, CSR no. 13473

25

# EXHIBIT 39

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


NEELAM SANDHU,                          Civil Action
                                        No. 24-cv-02002-SK
          Plaintiff,

v.

BLACKBERRY CORPORATION, et al.

          Defendant.
_____/

**CERTIFIED TRANSCRIPT**


VIDEO-RECORDED DEPOSITION OF MARY SLIMMON

VIA ZOOM VIDEOCOMMUNICATIONS

Thursday, April 10, 2025


Reported by ANN R. LEITZ,

A Certified Shorthand Reporter

State of California, License No. 9149

--oOo--

DEPONENT: MARY SLIMMON                              April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                          APPEARANCES

2

3    FOR THE PLAINTIFF NEELAM SANDHU:

4         BY: ANTHONY TARTAGLIO, ESQ.
          GOMERMAN BOURN & ASSOCIATES
5         825 VAN NESS AVENUE, SUITE 502
          SAN FRANCISCO, CALIFORNIA 94109
6         415.545.8608
          Tony@gobolaw.com
7

8    FOR THE DEFENDANT BLACKBERRY CORPORATION:

9         BY: LAUREN BECK, ESQ.
          MUNGER TOLLES & OLSON, LLP
10        350 S. GRAND AVENUE, 50TH FLOOR
          LOS ANGELES, CALIFORNIA 90071
11        Lauren.Beck@mto.com

12

13        BY: MARGARET MAYO, ESQ.
          (OF COUNSEL, BLACKBERRY CORPORATION)
14

15

16   VIDEOGRAPHER:

17        JIM PARTRIDGE, NOTARY PUBLIC/VIDEO SPECIALIST
          TALTY COURT REPORTERS, INC.
18        408.244.1900
          production@taltys.com
19

20

21   ALSO PRESENT:

22        NEELAM SANDHU (PARTIAL)

23

24                         --oOo--

25

   **TALTY COURT REPORTERS, INC.**                    **2**
          **408.244.1900 - www.taltys.com**

DEPONENT: MARY SLIMMON                                    April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                              INDEX

2                     INDEX OF EXAMINATIONS

3                                                        Page

4     EXAMINATION BY ATTORNEY TARTAGLIO              7, 101

5     EXAMINATION BY ATTORNEY BECK                       71

6                           --oOo--

7

8

9

10

11                     INDEX OF EXHIBITS

12    Exhibit No.            Description              Page

13    Exhibit 1       Emails - Re: Stefanie
                      BB13-00017450 - 452              79
14    Exhibit 2       Emails - Re MSSP Stefanie
                      BB13-00017453 - 456              84
15    Exhibit 3       Neelam Sandhu - Resume
                      DOE000460-461                    97
16

17                           --oOo--

18

19

20

21

22

23

24

25

    **TALTY COURT REPORTERS, INC.**          **3**
                  **408.244.1900 - www.taltys.com**

1      BE IT REMEMBERED, that pursuant to Notice to the

2   respective parties, and on Thursday, April 10, 2025,

3   commencing at the hour of 12:58 p.m. thereof, before me,

4   ANN R. LEITZ, a Certified Shorthand Reporter, License

5   No. C-9149, State of California there appeared remotely

6   by videoconference:

7                          MARY SLIMMON,

8    called as a witness herein, and who, being by me first

9   duly sworn remotely to testify the truth, the whole truth

10    and nothing but the truth, was thereupon examined and

11            testified as hereinafter set forth.

12                          --oOo--

13      THE VIDEOGRAPHER:  We are going on the record at

14   12:58 on April 10th, 2025.  This is the Video Deposition

15   of Mary Slimmon --

16            This is taken by -- oh, is it by the Plaintiff?

17            ATTORNEY TARTAGLIO:  By the Plaintiff, yes.

18            THE VIDEOGRAPHER:  Thank you.  I didn't write

19   that down.

20            -- taken by the Plaintiff in the matter of Neelam

21   Sandhu versus BlackBerry Corporation, et al.  This is

22   filed in the United States District Court for the

23   Northern District of California, Case No. 24-CV-02002-SK.

24            This deposition is being held via the Zoom

25   platform.



**TALTY COURT REPORTERS, INC.**                          **4**
**408.244.1900 · www.taltys.com**

1          My name is Jim Partridge.  I'm a notary public

2     for the county of Sonoma, state of California.  And the

3     court reporter is Ann Leitz.  We're both on behalf of

4     Talty Court Reporters, Inc., located in San Jose,

5     California.

6          Would the counsel please state their appearances

7     beginning with the noticing attorney.

8          ATTORNEY TARTAGLIO:  For Plaintiff Neelam Sandhu,

9     I am Anthony Tartaglio at the Gomerman Bourn law firm.

10          ATTORNEY BECK:  For Defendant BlackBerry

11     Corporation, this is Lauren Beck of Munger Tolles &

12     Olson.  And I'm joined by Margaret Mayo, who is in-house

13     counsel at BlackBerry.

14          THE VIDEOGRAPHER:  Thank you.  Would the reporter

15     please swear in the witness.

16          COURT REPORTER: Hello, my name is Ann Leitz.  I

17     am a California licensed stenographer, No. 9149.  I am a

18     code compliant reporter. and I will be producing a

19     transcript that's automatically admissible in court.

20          Ms. Slimmon, may I have raise your right hand to

21     be sworn in, please.

22                    MARY SLIMMON,

23          having been duly sworn as a witness by the

24      Certified Shorthand Reporter, testified as follows:

25                      --oOo--



```
 1            THE VIDEOGRAPHER:  Counsel, before you ask the

 2     questions.  One thing I wanted to ask before you started.

 3     I've set up the recording so you're not going to be

 4     showing the exhibits on the screen.  Is that the way you

 5     prefer it?

 6            ATTORNEY TARTAGLIO:  I'm probably not going to

 7     have any exhibits at all.  So if the defense has some

 8     exhibits, I'm fine with doing it how they want to do it.

 9            ATTORNEY BECK:  I might put it to the witness.

10     If Ms. Slimmon -- is it Slimmon?  Is that how you

11     pronounce it?

12            THE WITNESS:  That's correct, Slimmon.

13            ATTORNEY BECK:  Great.  If we do exhibits, I

14     think there's sort of two ways we can do it.  One, we can

15     drop them as PDFs in the Chat and you can pull it up on

16     your own screen and kind of move through it yourself or

17     we can put it up on the screen and walk through it.

18            Do you have a preference?

19            THE WITNESS:  Me?

20            ATTORNEY BECK:  Yes.

21            THE WITNESS:  In the Chat is fine.

22            ATTORNEY BECK:  Okay, great.  In that case,

23     sounds good.

24            THE VIDEOGRAPHER:  Counsel, you may proceed.

25            ATTORNEY TARTAGLIO:  Thank you.
```



1           EXAMINATION BY MR. TARTAGLIO

2           ATTORNEY TARTAGLIO:  Q.  Good afternoon, Ms.

3    Slimmon.

4       A.  Good afternoon.

5       Q.  So this is a deposition.  As you probably heard

6    earlier, I represent the Plaintiff in this case, Neelam

7    Sandhu.

8           And the way this works is that I'm going to be

9    asking you a series of questions under oath and then

10   you're going to answer them.  And then once I'm done with

11   my questions, I'll hand it off to Ms. Beck, and she'll

12   have some questions for you, I'm sure.

13          So that's the general idea.  And I will give you

14   just some more specific instructions about how this whole

15   process works now.  Okay?

16      A.  Okay.

17      Q.  I should ask first, do you have a lawyer

18   representing you for the purpose of this deposition

19   today?

20      A.  I do not.

21      Q.  Okay.  And that's fine.  You don't have to.  But

22   I was just curious.

23          Do you understand that the oath that you just

24   took would be -- is similar to an oath that you would

25   take if you testified in court here in the United States?



1      A.  Yes, I do.

2      Q.  Because we have a court reporter who is writing

3   down what I am saying as well as what you're saying, it's

4   important that we try to have one person speaking at any

5   given time, to the extent possible.  So I'm going to try

6   to make sure that I'm not talking over anyone.  If you

7   could do the same, that would be great.  Thank you.

8      A.  Understood.

9      Q.  And another consequence of having a court

10  reporter here today who is typing down what we're saying

11  is that your answers will need to be verbalized, even

12  though during ordinary conversation, we'll just often

13  just nod or shrug our shoulders or maybe do an eye roll

14  or something in response to a question.

15          But today you'll have to say "yes/no" or explain

16  a longer answer, that sort of thing.  Okay?

17      A.  Okay, understood.

18      Q.  Although you can make gestures -- sometimes

19  people do, if it's important, and if it happens, I'll

20  probably say something like, The witness is extending her

21  right hand.  But for the most part, let's try to give

22  your answers verbal.  Okay?

23      A.  Okay.

24      Q.  The court reporter might interrupt you from time

25  to time, might interrupt me from time to time.  Sometimes



DEPONENT: MARY SLIMMON                                    April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    want women.  Decisions around delineation of work, of

2    sales deals, actions of that nature.

3        Q.  And sorry, I'm taking notes here.

4            As for the exclusion of women from events, can

5    you remember any specific incidents about that?

6        A.  Yes.

7        Q.  Okay.  And what do you recall about that?

8        A.  I recall a gathering of sales leaders in one of

9    BlackBerry's offices in Texas where the only invitees

10   were -- my perception was they identified as men, and

11   that women -- female women-identified sales leaders

12   within the organization had not been invited.  And, in

13   fact, didn't even know about the meeting until I

14   discovered that the meeting was taking place and inquired

15   why they weren't in attendance.

16       Q.  And how did you learn that this meeting in Texas

17   was just for men, or only men were scheduled to appear at

18   this meeting in Texas?

19           ATTORNEY BECK:  Object to form.

20           THE WITNESS:  My leader Sean was at the meeting.

21   And he made reference to me about being at this meeting.

22           ATTORNEY TARTAGLIO:  Q.  And how, in particular,

23   did you discover that the meeting had male attendees?

24       A.  I reached out to one of the female women-

25   identified sales leaders that I was their assigned HR



**TALTY COURT REPORTERS, INC.**                          **40**
**408.244.1900 - www.taltys.com**

DEPONENT: MARY SLIMMON                                    April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    business partner and asked them if they were in

2    attendance to this meeting, and they let me know that

3    they were not.  And the leader said to me, What meeting

4    are you talking about?  I don't even know about this

5    meeting.  Oh, sorry.

6        Q.  You go ahead.

7        A.  I am sorry, Tony.

8            And that sales leader reached out to another

9    female sales leader and asked if she was in attendance,

10   and she didn't know about the meeting either.

11       Q.  Do you recall the names of either of these two

12   women who told you that they were not made aware of this

13   event?

14       A.  Yes, I know their names.

15       Q.  And what are their names?

16       A.  Colleen McMillan and ███████  ██████████

17   ███████████████████|

18       Q.  Other than this Texas meeting that we've just

19   been talking about, were there any other meetings or

20   gatherings where, to your knowledge, at least women were

21   excluded?

22       A.  No.

23       Q.  I think you mentioned something about sales

24   deals.  Maybe I'm misquoting you here.

25           But was there anything involving sales deals



DEPONENT: MARY SLIMMON                                  April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1  that, to you anyways, seemed like there was some gender

2  politics at play?

3     A.  Yes.  The other instance was specifically around

4  equity in the pay -- in HR we call it the "pay split."

5  Which means what is somebody's base salary compared to

6  what their sales commission was.

7        And there was one individual on a team that had a

8  very different sales split than her male counterparts.

9  And they were in the exact same job.  They had the same

10 title.  They were the same level.

11       And I was trying to get that rectified because it

12 was -- the men had a higher -- so the way the splits work

13 is 70 percent is your base and 30 percent is your

14 commission or it could be 60 percent base, 40 percent

15 commission.

16       So in this instance, the female-identified

17 employee, it was a 60/40 split, which meant she got a

18 lower base and had to work harder to get the 40 percent

19 commission.  But her male counterparts were 70/30,

20 meaning they got a higher base salary.

21       And so, I was working with the sales rep to have

22 that rectified.  I will share that I don't know that it

23 ever was fixed.  But it was very, very difficult to

24 insure parity amongst the team.

25     Q.  So this might be obvious to you, but just to make



DEPONENT: MARY SLIMMON                                April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    sure that we spell this out.

2        So having a lower fixed percentage means that

3    less of her income was guaranteed and more of it depended

4    on her performance or sales numbers; right?

5    A.   That's correct.

6    Q.   Do you remember her name this individual?

7    A.   I don't.  I believe I could recognize it if it

8    was told to me, but I don't.

9    Q.   I think the third thing you said was, you

10   mentioned delineation of work when I asked about whether

11   gender impacted the work at all.

12       What did you mean by that?

13   A.   Yes.  There were -- there was a -- I'll call it a

14   reorganization.  However, I don't believe anybody lost

15   their job as a result, so it was a realignment of sales

16   regions.

17       And in the realignment of sales regions across

18   the world -- it was an international lineup of sales

19   regions -- the two female leaders on staff at the time,

20   similar to my experience, resulted with a smaller sales

21   region, like I resulted in having fewer people to

22   support.  Their sales regions were decreased and several

23   of their male counterparts received a larger sales

24   region.

25   Q.   Do you remember who this individual, this female



DEPONENT: MARY SLIMMON                                    April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    A.  Yes.

2    Q.  Who did you report that to?

3    A.  I reported it on more than occasion to my leader

4    Sean and I included it on a regular report that I sent to

5    Nita White-Ivy as being a potential concern.

6    Q.  Did you receive a response to either of these

7    complaints?  Or reports, I should say.

8    A.  Nita White-Ivy did not respond to my report.  My

9    leader Sean was dismissive of my concern.

10   Q.  And what did he say -- or maybe it was the way he

11   said it.

12       But what was it about the way he told you this

13   that led you to conclude that he was being dismissive?

14   A.  He indicated that the female employee was more

15   junior and, as a result, her compensation split should be

16   different than the other members of the team.

17   Q.  Do you know whether, in fact, she was junior

18   compared to her male peers?

19   A.  I do know that she was not more junior.

20   Q.  Do we -- strike that.

21       Do you know whether her compensation was ever

22   adjusted to match that of her male peers?

23   A.  I don't recall.

24   Q.  And the third thing we talked about was this

25   delineation of work, a couple women getting smaller sales



DEPONENT: MARY SLIMMON                                    April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    A.  No.  Oh, I'm incorrect.  One; his executive

2    assistant.

3       Q.  And so, besides his executive assistant, the

4    people that John Giamatteo brought with him to BlackBerry

5    were all men?

6       A.  Yes.

7            ATTORNEY BECK:  Objection; vague.

8            ATTORNEY TARTAGLIO:  Q.  Did you ever witness any

9    of the men that John Giamatteo brought with him acting in

10   a manner that you considered to be potentially sexist?

11           ATTORNEY BECK:  Objection; vague.

12           THE WITNESS:  Yes.

13           ATTORNEY TARTAGLIO:  Q.  And what did you

14   observe?

15      A.  I observed a recording that a sales leader made

16   for a large company gathering and in the video behind him

17   was a painting of naked women.

18      Q.  And besides this recording involving the painting

19   of the women, can you recall any other incidents in which

20   you observed some potentially sexist behavior from the

21   folks that John Giamatteo brought over with him?

22      A.  No.

23           ATTORNEY BECK:  Objection; vague.

24           THE WITNESS:  No.

25           ATTORNEY TARTAGLIO:  Q.  And so, my previous



1    questions were about firsthand observations.  So now I'm

2    going to ask about things you may have heard from someone

3    else.

4          Did you hear any complaints from someone else

5    about any of these folks that John Giamatteo brought over

6    with him acting in a sexist manner?

7          A.  I don't recall.

8          Q.  So a term that had been used by at least one

9    person in this lawsuit to describe the atmosphere of John

10   Giamatteo and his close coworkers is that they're a "boys

11   club."  And you don't have to agree with that.  Maybe you

12   have no opinion.  Maybe you disagree with it.  I don't

13   know.  But that is an opinion that has been expressed.

14          And so, I'm wondering, do you -- would you agree

15   with that statement?  Disagree with that statement?

16   Neutral?

17          A.  I agree with that statement.

18          Q.  And what leads you to conclude that?

19          A.  The behavior that I witnessed when it came to

20   changing the sales regions resulting in female leaders

21   not having as much opportunity for deals, the meeting in

22   Texas, the painting in the background of this recording

23   and the person wasn't willing to re-record it, with the

24   naked women in the background.  Those are some examples

25   of what I would consider the "boys club."



**TALTY COURT REPORTERS, INC.**                           **49**
**408.244.1900 - www.taltys.com**

DEPONENT: MARY SLIMMON                                  April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1       Q.  Did you feel she received impressive promotions

2   while she was at BlackBerry?

3            ATTORNEY TARTAGLIO:  Objection.  Vague.

4            THE WITNESS:  I don't know that I was aware that

5   they were promotions as opposed to taking on additional

6   work.

7            ATTORNEY BECK:  Sorry.  I should have been more

8   precise.

9       Q.  Did you perceive that Ms. Sandhu had -- was being

10  given an impressive scope of responsibility during her

11  time at BlackBerry?

12           ATTORNEY TARTAGLIO:  Objection.  Vague,

13  "impressive."

14           THE WITNESS:  Yes, under John Chen's leadership.

15           ATTORNEY BECK:  Q.  Did you understand that

16  Ms. Sandhu -- excuse me, strike that.  Let me start

17  again.

18           Did you understand Ms. Sandhu to have a close

19  working relationship with John Chen?

20      A.  Yes, I did.  That was my understanding.

21      Q.  Was John Chen perceived as someone who thought

22  highly of her?

23      A.  Yes, he was perceived to think highly of her.

24      Q.  And he increased the scope of her role numerous

25  times?



DEPONENT: MARY SLIMMON                                    April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1      A.  He would have supported that.  If Neelam -- it's

2  possible that Neelam identified a need for there to be a

3  new initiative, a new program, a new group.  She would

4  have proposed that to Mr. Chen, and he would have likely

5  agreed or disagreed.  I don't know that anything was ever

6  handed to Ms. Sandhu.

7      Q.  Fair enough.  I think that's it for me for

8  questions.  Thank you, Ms. Slimmon.

9      A.  Thank you.

10          ATTORNEY TARTAGLIO:  I have, I think, just two

11  questions.

12                      --oOo--

13          FURTHER EXAMINATION BY ATTORNEY TARTAGLIO

14          ATTORNEY TARTAGLIO:  Q.  So when -- you testified

15  earlier that ███████████ did get a raise or increase in

16  her pay?

17      A.  Yes, I did.

18      Q.  And that was after she had complained about her

19  pay.  Correct?

20      A.  Yes.  A significant time later, yes.

21      Q.  And you also testified that this painting in the

22  training video ended up getting blurred out of the video.

23  Correct?

24      A.  Correct.

25      Q.  That was after a complaint was made about the



DEPONENT: MARY SLIMMON                                    April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1   painting.  Right?

2       A.  Correct.

3           ATTORNEY TARTAGLIO:  No further questions for me.

4           THE VIDEOGRAPHER:  Before I read the closing

5   statement, could we get the orders for the transcript and

6   the video, please?

7           ATTORNEY TARTAGLIO:  Plaintiff will order both.

8   Let's go ahead and sync the transcript.  Standard

9   delivery, no rush.

10          ATTORNEY BECK:  Same for Defendant, please.

11          ATTORNEY TARTAGLIO:  I think I said "sync the

12  transcript."  The video, sync the video.

13          THE VIDEOGRAPHER:  Yes, you did.

14          This concludes today deposition of Mary Slimmon.

15  The original media of this deposition will remain in the

16  custody of Talty Court Reporters, Inc., located in

17  San Jose, California.

18          Off the record.  Time is 3:55.

19              (Whereupon the deposition was concluded at

20              3:55 p.m.)

21                          --oOo--

22

23

24

25



DEPONENT: MARY SLIMMON                                      April 10, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1                  CERTIFICATE OF REPORTER

 2

 3

 4          I, ANN R. LEITZ, CSR, License No. C-9149, State

 5     of California, do hereby certify:

 6          That the witness in the foregoing remote

 7     deposition, was by me duly sworn to testify the truth,

 8     the whole truth and nothing but the truth in the

 9     within-entitled cause;

10          That said remote deposition was reported at the

11     time and place therein stated by me, a Certified

12     Shorthand Reporter, and was thereafter transcribed into

13     typewriting;

14        I further certify that I am not interested in the

15     outcome of said action, nor connected with, nor related

16     to, any of the parties of said action or to their

17     respective counsel.

18        IN WITNESS WHEREOF, I have hereunto set my hand

19     this 21st day of April, 2025.

20

21     _____

            ANN R. LEITZ, CSR, License No. C-9149,
22          State of California

23

24

25
```

DEPONENT: MARY SLIMMON
NEELAM SANDHU vs BLACKBERRY CORPORATION

April 10, 2025

**Exhibits**

**Exhibit 01** 3:13 79:16,18
**Exhibit 02** 3:14 84:20,23
**Exhibit 03** 3:15 97:4,5

**$**

**$40** 18:13

**-**

**--ooo--** 2:24 3:6,17 4:12
5:25 71:2 101:12 102:21

**1**

**1** 3:13 79:16,18
**10** 4:2 27:11
**101** 3:4
**10th** 4:14
**12:58** 4:3,14
**16** 27:16
**19.8** 85:16 86:22

**2**

**2** 3:14 84:20,23
**20** 27:16
**2009** 97:18
**2014** 97:18,25
**2015** 20:17,18
**2019** 98:4 99:2,5
**2020** 98:19
**2021** 30:13,14 73:3,9
**2022** 10:14 20:14 24:16
26:23 31:22 71:18,24
72:3,7,16,20,25 80:2
83:2 85:4,11 86:7,13,21
**2023** 20:6 83:5,11 87:7
97:25 98:24 99:2,5
**2025** 4:2,14
**215** 47:6
**24-CV-02002-SK** 4:23

**2:03** 47:5,7
**2:10** 47:2
**2:15** 47:8,9
**2:50** 67:17,18
**2:59** 67:19,20
**2nd** 20:6 85:4

**3**

**3** 3:15 97:4,5
**30** 42:13 53:10
**350** 2:10 28:9
**38** 27:4
**3:37** 94:16,17
**3:44** 94:18,20
**3:55** 102:18,20

**4**

**40** 42:14,18 78:19
**408.244.1900** 2:18
**415.545.8608** 2:6
**45** 27:6,13
**452** 3:13
**456** 3:14

**5**

**50** 26:11,12 27:6,14
**50/50** 69:12
**502** 2:5
**50TH** 2:10
**56** 53:2

**6**

**60** 42:14 78:18
**60/40** 42:17 78:14,17
81:2,9,18 82:4,18 83:11
86:1,14 87:4

**7**

**7** 3:4

**70** 42:13
**70/30** 42:19 78:15 86:2
**71** 3:5
**79** 3:13

**8**

**8** 80:2
**825** 2:5
**84** 3:14

**9**

**90** 27:11
**90071** 2:10
**9149** 5:17
**94109** 2:5
**97** 3:15

**A**

**ability** 13:20 14:6 23:21
29:20,23
**absolutely** 58:19 69:2
**accepted** 55:3
**access** 11:19,23
**account** 99:22
**accurate** 13:20 14:11
29:1
**achieved** 22:12
**acquaintance** 34:25 35:1
**acronyms** 58:24
**act** 38:24
**acted** 39:3,11 96:1
**acting** 34:7 48:9 49:6
73:22
**action** 69:4
**actions** 40:2
**activities** 90:13
**added** 21:4
**additional** 98:23 99:7,17
100:5

**address** 44:12,14 50:21
68:8
**adjusted** 45:22 46:23
**adjustment** 85:7,10
**admissible** 5:19
**advancement** 22:10
**advise** 12:4
**affirmative** 30:7
**afraid** 56:2,6 82:21
**afternoon** 7:2,4
**agenda** 90:1
**agree** 13:3 24:11 26:12
49:11,14,17 51:2 72:12
94:10
**agreed** 101:5
**agreement** 72:11
**ahead** 10:4,19 12:16 22:6
23:2,8 41:6 55:11 57:24
98:17 102:8
**Alcantar** 80:10 82:3
83:21 84:3,9 85:7,11,25
86:5,13,22 101:15
**Alcantar's** 84:1 87:3
**alienated** 51:12
**allegations** 39:2 57:8
**Alliance** 85:6
**allowed** 16:25
**amend** 70:11
**America** 25:24 26:23,25
70:16,18
**American** 26:1 27:2
**amount** 21:20 29:25 68:2
99:15,16
**analyzing** 78:22
**Andrea** 80:1,13,14,15,17
**ANGELES** 2:10
**angry** 61:25
**animosity** 51:10
**Ann** 4:4 5:3,16
**answering** 9:16 14:23
72:10
**answers** 8:11,22



antagonistic 51:9

Anthony 2:4 5:9

anti-harassment 94:7

anticipate 11:13

anymore 66:1

anyone's 71:6

Apologies 96:24

apologize 24:25 75:20
  77:3 83:1 93:10 96:23
  98:7

apparently 44:16

appearances 2:1 5:6

appeared 4:5 44:24 51:7

appears 80:1 99:9

apply 63:16

applying 63:2

approval 38:17,18 79:9
  85:8

approved 86:25

approximately 15:4
  20:12,16 27:7 30:12
  31:21 47:23 70:14

April 4:2,14 98:4

area 65:18 95:16

argumentative 26:17
  52:6,14 53:18 55:24

arrive 93:24 96:12

art 50:12

Arts 19:3

asks 9:8

aspect 9:14

assigned 40:25 75:23
  76:1

assistant 48:2,3 66:23

associates 2:4 89:19

Assumes 29:22

assumption 24:10 55:15

assumptions 13:11

atmosphere 49:9

attached 83:16

attendance 40:15 41:2,9

attendees 40:23

attention 86:5

attorney 3:4,5 4:17 5:7,8,
  10 6:6,9,13,20,22,25 7:2
  12:14 22:4,16 23:1,2,3,6,
  22,25 26:4,6,16,19
  29:15,18,21 30:3 31:2,12
  36:14,16 37:6,8 39:19,22
  40:19,22 47:1,6,11,14,16
  48:7,8,11,13,23,25
  51:17,18 52:6,8,13,16
  53:14,16,18,20 54:10,11,
  17,21 55:11,17,24 56:1,
  5,7,11,13,16,18 58:5,8,
  13,21 67:12,23 70:22
  71:1,3,4 73:5,8 79:12,20
  81:11,14,19,23 82:6,8
  84:4,7,17,19,25 92:5,8
  94:11,21 95:7,17 97:3,7
  98:7,12,16,18 100:3,7,
  12,15 101:10,13,14
  102:3,7,10,11

attorney-client 16:16

automatically 5:19

AVENUE 2:5,10

aware 41:12 63:15 72:4,
  8,17,21 89:3 93:7 100:4

awhile 44:5


                B

back 19:20 21:21 24:25
  30:4 32:22 47:2 55:18
  56:18 61:13 67:13 78:8
  85:22 94:21 98:9,15
  99:21

backfill 38:21

background 18:19,20
  19:19 49:22,24 88:16

backup 38:13

ballpark 27:17

Bartley 81:5

base 42:5,13,14,18,20
  78:19

based 50:4 53:24 55:1
  90:13,20 94:4,9

Bates 84:21 97:8

BB13-00009916 53:4

BB13-00017450 3:13
  79:17

BB13-00017453 3:14
  84:22

bearing 71:7

Beck 2:9 3:5 5:10,11 6:9,
  13,20,22 7:11 22:4 23:1,
  3,22 26:4,16 29:15,21
  31:2 36:14 37:6 39:19
  40:19 47:6,14 48:7,11,23
  51:17 52:6,13 53:14,18
  54:10,17 55:11,24 56:5,
  11,14,16 58:5,13 70:23
  71:1,3,4 73:8 79:12,20
  81:14,23 82:8 84:7,19,25
  92:8 94:11,21 95:17
  97:3,7 98:12,18 100:7,15
  102:10

beginning 5:7 21:4
  82:13,15 83:4

begins 67:21

behalf 5:3

behavior 39:13 48:20
  49:19 69:9

belated 82:6

believed 29:23 30:1
  32:13 63:12 81:9,17

beneath 25:14

big 58:21

bigger 37:11,12

bit 10:18 18:20 24:5
  32:22 34:20 53:3 56:19
  66:7 67:24 68:25 99:9

biz 16:8

Blackberry 2:8,13 4:21
  5:10,13 9:14,23 15:8
  17:16 18:6,7 20:11,13,
  16,18,22 21:7,10,16
  24:14 25:5 26:15,22
  27:2,24 28:4,9 29:13,14,
  20 32:6 33:5 35:6,10,13
  36:13 37:2,5,20 38:17
  47:12,25 48:4 51:8 52:5
  54:8,23 55:3,5,8,21 56:1
  57:4,7 58:2,10,25 59:11,
  14 60:4,6 61:2 62:16,19
  63:5 66:4,6 68:8 71:18,
  24 72:3,7,16,20,22 73:3,
  9,13,15,19,21 74:4,18,23
  75:2,7,21 76:16 77:1
  82:23,24 83:7 86:1,21

87:2 88:7 91:25 92:9
  94:1,7 95:6 96:6 97:17
  99:20 100:2,11

Blackberry's 40:9 51:13
  85:15 91:16 92:4,17
  93:20

blocked 24:23 51:10

blowback 56:8

blur 88:7

blurred 101:22

bonus 78:20

boss 16:1 17:12,22

bottom 85:14 97:16

Bourn 2:4 5:9 16:2

boys 49:10,25

Bramhill 31:14,16 32:8,
  10,19

breach 94:6

break 11:17 14:25 47:1
  67:12 69:20 70:7 71:9
  94:12

breaks 11:12,13,14,16

bring 47:12,20 68:18
  81:24

brought 47:18,22,24
  48:4,9,21 49:5 52:19,22
  57:6 66:2 86:5,8,10 89:3

BU 91:6

bucket 16:21

Buff 41:17 44:3 76:13
  91:2

Buff's 76:22

build 96:18

burgers 19:20

business 20:20 21:5
  28:8,13 29:3,6 38:11
  39:24 41:1 46:8 62:15
  63:7 75:7,10 76:2,17
  77:11,14,17 88:5 94:2,6
  95:15 96:18

business-related 33:12

buy 18:13



# EXHIBIT 40

IN THE UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


---o0o---

**CERTIFIED TRANSCRIPT**

NEELAM SANDHU,

        Plaintiff,

     VS.               CASE NO:
                        24-CV-02002-SK

BLACKBERRY CORPORATION, et al,

        Defendants,
_____/


VIDEOTAPED VIDEOCONFERENCE

DEPOSITION OF

SARAH TATSIS

SEPTEMBER 2, 2025


Reported by:  MYRA A. PISH, RPR, CSR #11613

DEPONENT: SARAH TATSIS
NEELAM SANDHU vs BLACKBERRY CORPORATION

September 02, 2025

1                IN THE UNITED STATES DISTRICT COURT

2                           FOR THE

3                  NORTHERN DISTRICT OF CALIFORNIA

4

5                          ---o0o---

6

7     NEELAM SANDHU,

8               Plaintiff,

9          VS.                        CASE NO:
                                      24-CV-02002-SK
10    BLACKBERRY CORPORATION, et al,

11              Defendants,
      _____/

12

13

14         VIDEOTAPED VIDEOCONFERENCE deposition of Sarah

15    Tatsis, commencing at the hour of 10:07 a.m, Tuesday,

16    September 2, 2025, held remotely, before Myra Pish,

17    Certified Shorthand Reporter in and for the State of

18    California.

19

20                         ---o0o---

21

22

23

24

25



DEPONENT: SARAH TATSIS                                    September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:

 3          GOMERMAN BOURN & ASSOCIATES
            BY:  ANTHONY TARTAGLIO, ESQ.
 4          825 VAN NESS AVENUE, SUITE 502
            SAN FRANCISCO, CALIFORNIA  94109
 5          415.545.8608
            tony@gobolaw.com
 6

 7    FOR THE DEFENDANTS, BLACKBERRY CORPORATION:

 8          MUNGER, TOLLES & OLSON, LLP
            BY:  KYRA E. SCHOONOVER, ESQ.
 9          350 S. GRAND AVENUE, FLOOR 50
            LOS ANGELES, CALIFORNIA  90071
10          213.683.9512
            kyra.schoonover@mto.com
11

12    FOR THE WITNESS, SARAH TATSIS:

13          SORBARA, SCHUMACHER, MCCANN, LLP
            BY:  JUSTIN HEIMPEL, ESQ.
14          31 UNION STREET, E.
            WATERLOO, ON  N2J 1B8
15          519.741.8010, EXT. 224

16

17    ALSO PRESENT:

18          JIM PARTRIDGE, VIDEOGRAPHER
            LINDSAY SKYERS
            MAGGIE MAYO
19          NEELAM SANDHU

20                          ---o0o---

21

22

23

24

25
```



**TALTY COURT REPORTERS, INC.**                          **3**
**408.244.1900 - www.taltys.com**

DEPONENT: SARAH TATSIS                                    September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1                            INDEX

 2   EXAMINATION                                    PAGE

 3   By Mr. Tartaglio                              7, 81
     By Ms. Schoonover                             54, 82
 4

 5                         ---o0o---

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



DEPONENT: SARAH TATSIS                              September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

```
 1                              EXHIBITS

 2    NO.   DESCRIPTION                                    PAGE

 3    EXH 1    BB13-00020242                                37

 4    EXH 2    Document 19118, 19119 & 19138, 19139        43

 5    EXH 3    E-mail                                       72

 6    EXH 4    E-mail                                       75

 7

 8                            ---o0o---

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1              VIDEOTAPED VIDEOCONFERENCE

2              DEPOSITION OF SARAH TATSIS

3              TUESDAY, SEPTEMBER 2, 2025

4                    ---oOo---

5        THE VIDEOGRAPHER:  We are going on the record.

6        The time is 10:07 on September 2nd, 2025.  This

7   is the video deposition of Sarah Tatsis.  This is taken

8   by the plaintiff in the matter of Neelam Sandhu versus

9   BlackBerry Corporation, et al, filed in the United States

10  District Court for the Northern District of California.

11  Case number 24-CV-02002-SK.

12        This deposition is being held via the Zoom

13  platform.  My name is Jim Partridge.  I'm a notary public

14  for the county of Sonoma, State of California, and the

15  court reporter is Myra Pish.  We're both on behalf of

16  Talty Court Reporters, Inc., located in San Jose,

17  California.

18        Would the counsel please state their

19  appearances, beginning with the noticing attorney?

20        MR. TARTAGLIO:  For plaintiff, Neelam Sandhu,

21  you have Anthony Tartaglio for the Gomerman Bourn law

22  firm.  And we might later be joined by Maria Bourn, also

23  from my firm, and perhaps the plaintiff herself will

24  observe.

25        MS. SCHOONOVER:  For defendant BlackBerry



1   Corporation, this is Kyra Schoonover of Munger Tolles &

2   Olson, and I'm joined by Margaret Mayo, who is inhouse

3   counsel at BlackBerry, as well as Lindsay Skyers who is a

4   paralegal at BlackBerry.

5           THE VIDEOGRAPHER:  Thank you.

6           Would the reporter please swear the witness?

7           (Court Reporter clarification.)

8           MR. HEIMPEL:  My name is Justin Heimpel.  I'm

9   counsel for the witness, Ms. Tatsis.

10          THE VIDEOGRAPHER:  Now would you please swear in

11  the witness?

12          (Court Reporter stated name and CSR number for

13  the record.)

14                      SARAH TATSIS,

15            called as a witness by and on behalf

16            of the Plaintiff, being first duly

17            sworn, was examined and testified as

18            follows:

19          THE VIDEOGRAPHER:  Counsel, you may proceed.

20                          EXAMINATION

21  BY MR. TARTAGLIO:

22      Q.  Good afternoon, Ms. Tatsis.

23      A.  Afternoon.

24      Q.  So, I'm going to start off by explaining a

25  little bit about how the deposition process works here in

1  Elite customer group that Neelam was in charge of,

2  versus, like, the cybersecurity sales team, and that

3  there was difficulty there.

4      Q.  Can you remember anything more along those

5  lines?

6          MS. SCHOONOVER:  Objection, vague.

7          THE WITNESS:  Just -- just that the

8  cybersecurity sales team was upset at the -- that Neelam

9  was in charge of the Elite customer, and that they felt

10  that they should be in charge of those relationships.

11  BY MR. TARTAGLIO:

12      Q.  Did you ever hear anyone talk about Ms. Sandhu's

13  personality as being a difficult personality to work

14  with?

15      A.  No.

16      Q.  Did you ever hear anyone talk about the way

17  Ms. Sandhu dressed?

18      A.  Yes.

19          MS. SCHOONOVER:  Objection, leading.

20  BY MR. TARTAGLIO:

21      Q.  What did you hear about those discussions?

22      A.  There was a specific incident where -- there was

23  a specific time when Neelam had met -- John Chen and

24  Neelam had met with Prime Minister Trudeau, and there was

25  pictures of Neelam and Trudeau, and people were



DEPONENT: SARAH TATSIS                                    September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    commenting on the dress that Neelam was wearing in that

2    picture.

3        Q.  And what specifically were people saying about

4    the dress?

5        A.  Just that it was not appropriate in terms of,

6    like, having uncovered shoulders.

7        Q.  Do you recall who was saying that about

8    Ms. Sandhu?

9        A.  I don't remember fully, but it was a number of

10   people commenting.

11       Q.  And would those have been people within the

12   Internet of Things group?

13       A.  No.  Primarily within, like, like, a more

14   generally throughout the office, not primarily in the IoT

15   position itself.

16       Q.  Do you recall if any of those communications

17   were sent electronically, such as over e-mail or

18   BlackBerry Messenger?

19       A.  I don't recall.

20       Q.  Did Ms. Sandhu ever talk to you about a dinner

21   that she had with John Giamatteo?

22       A.  I don't remember whether we talked about that in

23   her last, like, in the meeting that we -- or in our call

24   after she left or not.  But, no.

25       Q.  At BlackBerry, how often did you -- well, strike



 1   not sure how it is relevant to the proceeding.

 2          MR. TARTAGLIO:  Well, the offer of proof is that

 3   Ms. Tatsis' complaints were communicated to the highest

 4   levels of BlackBerry, and our position is that Blackberry

 5   did not adequately respond to them.

 6          MR. HEIMPEL:  Right.  But she's already -- she's

 7   already deposed that the statement attributed to her

 8   about the QNX culture was accurate at the time.  Why she

 9   thinks that, really has nothing, no bearing.

10          The fact that she -- your concern is that she

11   made the complaint or she raised the issue.  Well, she's

12   confirmed that.  I don't think it matters why she felt

13   that way or what the basis of it was.

14          MR. TARTAGLIO:  Okay.  Well, I'll move on.

15   BY MR. TARTAGLIO:

16      Q.  And so the next bullet point says that John Wall

17   has always put her down, is disrespectful of her, and

18   always states that she does not know what she is talking

19   about.

20          Do you believe that statement to be accurate?

21      A.  Yes.

22      Q.  And the third bullet point says that the

23   January 2023 QBR -- what does QBR stand for?

24      A.  Quarterly business review.

25      Q.  Held in Ottawa, several major non-inclusive



DEPONENT: SARAH TATSIS                              September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

 1    comments were made to put her down and feel disrespected.

 2           Is that sentence accurate?

 3    A.  Yes.

 4    Q.  And then, the next bullet point says that,

 5    Justin Moon made unprofessional and disrespectful

 6    comments while she was doing her presentation.

 7           Is that accurate?

 8    A.  Yes.

 9    Q.  And what was it that Mr. Moon said that was

10    unprofessional and disrespectful?

11    A.  I don't remember specifically.

12    Q.  And I -- I should have asked about this earlier,

13    but the third bullet point where it says "several major

14    non-inclusive comments were made," do you know what those

15    were?

16    A.  I think it's referring to the comment -- I don't

17    remember.  I don't remember.

18    Q.  And the next bullet point says that, Vito told

19    her that during dinner that evening, Justin -- well,

20    actually, before I get to that one.

21           So, the second sentence of the fourth bullet

22    point says, "he", meaning Justin Moon, "did this twice

23    and nobody in the room stopped him or said anything."

24           Is that statement accurate?

25    A.  Yes.



DEPONENT: SARAH TATSIS                                    September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

 1      A.  Yes.

 2      Q.  And so, I want to walk through this document and

 3  make sure that this is an accurate summary of what you

 4  told Morrison Foerster, so that's kind of the goal of

 5  this exercise.  Okay?

 6          And so, this document says that, "Tatsis," well,

 7  actually, so the first sentence says that your business

 8  unit was male dominated.

 9          Do you agree with that statement?

10      A.  Yes.

11      Q.  And why was it male dominated?

12      A.  Well --

13          MR. HEIMPEL:  I'm not sure that that's an

14  appropriate question, counsel.  She's confirmed that that

15  was an accurate statement.

16          MS. SCHOONOVER:  Also, objection, calls for

17  speculation about why a unit was male dominated or not.

18          MR. TARTAGLIO:  Okay.  Well, I'll move on.

19      So did you informally complain to HR and John

20  Chen about what you viewed as a toxic work environment?

21          THE WITNESS:  Yes.

22  BY MR. TARTAGLIO:

23      Q.  What do you recall of the informal complaint to

24  human resources being referred to here?

25          MS. SCHOONOVER:  Objection, vague.



DEPONENT: SARAH TATSIS                                    September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

 1      A.  Yes.

 2      Q.  And where the sentence says, "Questioning

 3   whether she is competent to perform her job," what do you

 4   recall hearing about that?

 5      A.  Just that there was open conversations about

 6   this, like, within the office.

 7      Q.  And were there specific critiques about

 8   Ms. Sandhu's inability to do her job?

 9      A.  Not that I can recall.

10      Q.  And do you recall who would be talking about

11   whether Ms. Sandhu is competent to perform her job?

12      A.  Like I said, it was more of an open kind of

13   conversation.

14      Q.  So, was it multiple people who were questioning

15   whether Ms. Sandhu was competent to perform her job?

16      A.  More like it was the, kind of, a topic of

17   conversation within the office.

18      Q.  And that was even though Ms. Sandhu did not work

19   in the Internet of Things group?

20      A.  Yes.

21      Q.  Did you find it strange that Ms. Sandhu's

22   competence was the topic of discussion within the

23   Internet of Things group?

24         MS. SCHOONOVER:  Objection, argumentative and

25   leading.



1    Q.  What did you mean when you said it was "not in

2    line with BlackBerry's culture"?

3    A.  I don't -- I don't recall.

4    Q.  Okay.  So I have a couple of questions just to

5    establish sort of when you left BlackBerry relative to

6    your interview with the Morrison & Foerster law firm.

7         You left BlackBerry in December of 2023; is that

8    correct?

9    A.  Yes.

10   Q.  And BlackBerry informed you in November of 2023

11   that you were being terminated; is that correct?

12   A.  I can't recall at that time we had the

13   conversation.

14   Q.  Okay.  I'm going to introduce an exhibit here.

15        Sorry it's marked Exhibit C, I was intending to

16   use my own exhibits, but this is BlackBerry's Exhibit C.

17        MR. TARTAGLIO:  I think for the record let's go

18   with Exhibit 3.  I know it says Exhibit C, but --

19        MS. SCHOONOVER:  Yeah, I think that's very fair.

20          (Thereafter, Defendant's Exhibit

21          Number 3 was marked for

22          identification.)

23        MS. SCHOONOVER:  Just give me one moment to pull

24   it up myself.

25        Do you have it in front of you, Ms. Tatsis?



DEPONENT: SARAH TATSIS                                September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1      Q.   How did you learn you were being terminated from

2    BlackBerry?

3      A.   Nita and I had a conversation upon my return to

4    work from leave where we discussed the future.   And

5    during that conversation, we mutually agreed that we

6    would sever my relationship with BlackBerry.

7      Q.   One second.   Were you told by Vito Giallorenzo

8    that your role had been identified as redundant?

9      A.   No.

10     Q.   Were you ever told that you were being

11   terminated from BlackBerry for redundancy?

12     A.   No.

13     Q.   Go back to Exhibit 3, please.   I'm looking at

14   the e-mail dated November 13, 2023, and it's at the

15   bottom of the e-mail.   Do you see that?

16          It's an e-mail -- actually, let's start one up.

17   So, there's an e-mail from Jen Bramhill to Christin Joy

18   Hill on Tuesday, November 14th, at 7:01 a.m.

19          Do you see that e-mail?

20     A.   Okay.   Yes.

21     Q.   Okay.   And it says, "Hi Christin, please see

22   highlighted notes below."

23          Do you see that?

24     A.   Yes.

25     Q.   Do you see that?   Sorry, I could not hear you.



DEPONENT: SARAH TATSIS                                    September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1  speculation.

2          MR. TARTAGLIO:  Well, let me put it this way.

3          When you got the notice of redundancy, were you

4  just spending your working days sitting in a room, doing

5  nothing?

6          MS. SCHOONOVER:  Objection, argumentive.

7          THE WITNESS:  I had just returned from leave and

8  I had the conversation with Nita about leaving, and did

9  not return to work until, then, the final date of

10  December 26th.

11  BY MR. TARTAGLIO:

12     Q.  And during this conversation with Ms. White-Ivy

13  in which you discussed potentially leaving the company,

14  did you also discuss some of the sexist treatment you had

15  received at BlackBerry?

16          MS. SCHOONOVER:  Objection, misstates testimony.

17          MR. TARTAGLIO:  What was the answer?

18          THE WITNESS:  Yes.

19          MR. TARTAGLIO:  Okay.  That's all my questions.

20          MS. SCHOONOVER:  Can I ask two more, Tony?

21                          EXAMINATION

22  BY MS. SCHOONOVER:

23     Q.  Ms. Tatsis, you have not brought any claims

24  against BlackBerry related to your termination, correct?

25     A.  Correct.



DEPONENT: SARAH TATSIS                                    September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1    Q.  And you signed a release when you left

2  BlackBerry in exchange for additional compensation,

3  correct?

4    A.  Yes.

5    Q.  Okay.  Thank you.  Nothing further from me.

6        MR. TARTAGLIO:  Okay.  Looks like we're done.

7        THE VIDEOGRAPHER:  Before I read the closing,

8  could we get the orders for the transcript and the video,

9  please?

10        MR. TARTAGLIO:  Plaintiff will order transcript,

11  video synced, but not expedited.  Standard delivery is

12  just fine.

13        THE VIDEOGRAPHER:  Kyra?

14        MS. SCHOONOVER:  Yeah, defendant, BlackBerry

15  would also like a copy.

16        THE VIDEOGRAPHER:  For both, the video and the

17  transcript?

18        MS. SCHOONOVER:  Yes, for both.

19        THE VIDEOGRAPHER:  Do you want that synced as

20  well?

21        MS. SCHOONOVER:  Yes, thank you.

22        THE VIDEOGRAPHER:  And, Mr. Heimpel?

23        MR. HEIMPEL:  Is it common practice for the

24  examining attorney to provide a copy of the transcript to

25  the witness, or --



DEPONENT: SARAH TATSIS                              September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1          MR. TARTAGLIO:  Yeah.  What we'll do is, after

2    we get the transcript, we'll provide a copy to your

3    office.  And if the witness wants to make any

4    corrections, she can send us a notice of errata.  I think

5    the deadline is 30 days, but I'm not a stickler for that,

6    so we'll do that.

7          MR. HEIMPEL:  Okay.  So we'll just rely on the

8    copy we get from Mr. Tartaglio's office.

9          MR. TARTAGLIO:  Okay.  Anything further needed

10   from myself?

11         (Court Reporter clarification.)

12         THE VIDEOGRAPHER:  Well, this concludes today's

13   video record of deposition of Sarah Tatsis.  The original

14   media of this deposition will remain in the custody of

15   Talty Court Reporters, Inc., in San Jose, California.

16         Off the record at 12:08 p.m.

17         (Whereupon, the deposition concluded.)

18

19                        ---o0o---

20

21

22

23

24

25



DEPONENT: SARAH TATSIS                                    September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1  STATE OF CALIFORNIA  )
                        )    Ss.
2  COUNTY OF MARIPOSA   )

3          I, MYRA A. PISH, Certified Shorthand Reporter, in and

4  for the State of California, Certificate No. 11613, do hereby

5  certify:

6          That the witness in the foregoing remote deposition was

7  by me first duly sworn to testify to the truth, the whole

8  truth, and nothing but the truth in the foregoing cause; that

9  the deposition was taken before me at the time and place herein

10 named; that said deposition was reported by me, to the best of

11 my ability by machine shorthand, and transcribed through

12 computer-aided means, under my direction; and that the

13 foregoing transcript is a true record of the testimony elicited

14 at the proceedings had at said remote deposition.

15         I do further certify that I am a disinterested person

16 and am in no way interested in the outcome of this action or

17 connected with, or related to, any of the parties in this

18 action, or to their respective counsel.

19

20         DATED:    September 5, 2025
                     MARIPOSA, CALIFORNIA
21

22

23

           MYRA A. PISH, CSR, RPR
24         Certificate No. 11613

25

DEPONENT: SARAH TATSIS                                    September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1                    DECLARATION UNDER PENALTY OF PERJURY

2

3          I, Sarah Tatsis, do hereby certify under penalty of

4     perjury that I have read the foregoing transcript of my

5     deposition, taken on September 2, 2025, that I have made such

6     corrections as appear noted on the Deposition Errata Page,

7     attached hereto, signed by me; that my testimony as contained

8     herein, as corrected, is true and correct.

9

10         Dated this _____ day of _____, 2025, at

11    _____, California.

12

13

14              _____

15              SARAH TATSIS

16

17

18

19

20

21

22

23

24

25



DEPONENT: SARAH TATSIS                              September 02, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION

1              DEPOSITION ERRATA SHEET

2

3   Page No. _____ Line No. _____ Change to: _____

4   _____

5   Reason for change: _____

6   Page No. _____ Line No. _____ Change to: _____

7   _____

8   Reason for change: _____

9   Page No. _____ Line No. _____ Change to: _____

10  _____

11  Reason for change: _____

12  Page No. _____ Line No. _____ Change to: _____

13  _____

14  Reason for change: _____

15  Page No. _____ Line No. _____ Change to: _____

16  _____

17  Reason for change: _____

18  Page No. _____ Line No. _____ Change to: _____

19  _____

20  Reason for change: _____

21  Signature: _____ Date: _____

22

23

24  _____        _____

25  SARAH TATSIS                      DATE



# EXHIBIT 41

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


NEELAM SANDHU, an individual,

           Plaintiff,          Case No.:
  v.                     24-cv-02002-SK

BLACKBERRY CORPORATION, a
Delaware Corporation

           Defendant.
_____/

**CERTIFIED TRANSCRIPT**


VIDEOTAPED REMOTE DEPOSITION VIA ZOOM OF

JENNIFER BRAMHILL

FRIDAY, SEPTEMBER 19, 2025


REPORTED BY:  MELISSA SNYDER, CSR NO. 13370

DEPONENT: JENNIFER BRAMHILL                          September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1                    UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4    NEELAM SANDHU, an individual,

5                 Plaintiff,              Case No.:
         v.                               24-cv-02002-SK
6
     BLACKBERRY CORPORATION, a
7    Delaware Corporation

8                 Defendant.
     _____/
9

10

11

12

13    VIDEOTAPED REMOTE DEPOSITION VIA ZOOM OF JENNIFER BRAMHILL,
      taken on behalf of the Plaintiff at 9130 Grand Manor Dr.,
14    Palo Cedro, California, beginning at 9:03 a.m. and ending
      at 12:03 p.m., on FRIDAY, SEPTEMBER 19, 2025, before
15    Melissa Snyder, Certified Shorthand Reporter, No. 13370.

16

17

18

19

20

21

22

23

24

25

DEPONENT: JENNIFER BRAMHILL                    September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1                          APPEARANCES:

2    FOR THE PLAINTIFF:

3    GOMERMAN, BOURN & ASSOCIATES
     BY:   ANTHONY J. TARTAGLIO, ESQ.
4          MARIA A. BOURN, ESQ.
     825 VAN NESS AVENUE
5    SUITE 502
     SAN FRANCISCO, CA 94109
6    (415) 545-8608
     tony@gobolaw.com
7    maria@gobolaw.com
     (APPEARED REMOTELY VIA ZOOM)
8

9    FOR THE DEFENDANTS BLACKBERRY:

10   MUNGER, TOLLES & OLSON, LLP
     BY:   LAUREN N. BECK, ESQ.
11   350 S GRAND AVE.
     FLOOR 50
12   LOS ANGELES, CA 90071
     213-683-9576
13   lauren.beck@mto.com
     blackberry13@mto.com
14   (APPEARED REMOTELY VIA ZOOM)

15   BLACKBERRY
     BY:   MARGARET E. MAYO, ESQ.
16   7950 LEGACY DR.
     SUITE 400
17   PLANO, TX 75024
     (APPEARED REMOTELY VIA ZOOM)
18

19   ALSO APPEARING:

20   MIKE MACK, VIDEOGRAPHER (APPEARED REMOTELY VIA ZOOM)

21   LINDSAY SKYERS, BLACKBERRY (APPEARED REMOTELY VIA ZOOM)

22                          ---oOo---

23

24

25



**TALTY COURT REPORTERS, INC.**                    3
**408.244.1900 - www.taltys.com**

DEPONENT: JENNIFER BRAMHILL                    September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

```
 1                        INDEX

 2   WITNESS:
                                              PAGE
 3   JENNIFER BRAMHILL

 4          EXAMINATION BY MR. TARTAGLIO           6

 5          EXAMINATION BY MS. BECK               89

 6
                         ---oOo---
 7

 8

 9                      EXHIBITS              PAGE

10

11   EXH 1      DEPOSITION NOTICE               18

12   EXH 2      BLACKBERRY HR POLICIES AND PROCEDURES   21

13   EXH 3      MORRISON & FOERSTER MEMORANDUM     45

14   EXH 4      2023.03.01 TATSIS REPORT BB13-00020242   62

15   EXH 5      E-MAIL WHN00068365.0001          74

16   EXH 6      E-MAIL WHN00068365.0002          76

17   EXH 7      E-MAIL WHN00068365.0003          79

18   EXH 8      E-MAIL WHN00068365.0004          80

19   EXH 9      E-MAIL WHN00068365.0005          81

20   EXH 10     E-MAIL WHN00068365.0006          82

21   EXH 11     E-MAIL RE: IOT MANAGEMENT TRAINING   87

22
                         ---oOo---
23

24

25
```



1          FRIDAY, SEPTEMBER 19, 2025, 9:03 a.m.

2                        ---oOo---

3

4          THE VIDEOGRAPHER:  We are now going on the record at

5     9:03 a.m. on Friday, September 19th, 2025.  This is the

6     Video Deposition of Jennifer Bramhill, taken by the

7     Plaintiff, in the matter of Neelam Sandhu versus BlackBerry

8     Corporation filed in the U.S. District Court for the

9     Northern District of California, Case Number 24-CV-02002-SK.

10         This deposition is being held via Zoom Video

11     Teleconference.  My name is Michael Mack, and the Court

12     Reporter is Melissa Snyder, both on behalf of Talty Court

13     Reporters, Inc., with offices in San Jose, California.

14          Before we proceed, I will ask Counsel to state their

15     appearance and affiliation for the record, starting with the

16     noticing attorney.

17         MR. TARTAGLIO:  For Plaintiff, you have Anthony

18     Tartaglio from the Gomerman Bourn Law Firm.  It's possible

19     that my colleague, Maria Bourn, might pop in to observe, and

20     it's possible that the Plaintiff will also observe.

21         MS. BECK:  For Defendant BlackBerry Corporation,

22     Lauren Beck of Munger, Tolles, and Olson.  I am joined by

23     Maggie Mayo and Lindsay Skyers, both Inhouse at BlackBerry,

24     will be observing today.

25          THE VIDEOGRAPHER:  Will the Court Reporter please



DEPONENT: JENNIFER BRAMHILL                          September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1   identify herself for the record and then swear in the

2   Witness?

3          THE REPORTER:  Yes.  My name is Melissa Snyder, CSR

4   License 13370.

5           Ms. Bramhill, if you can raise your right hand,

6   please?  I will swear you in.

7

8                          JENNIFER BRAMHILL

9   being first duly sworn by the Certified Shorthand Reporter,

10                      testified as follows:

11

12         THE WITNESS:  I do.

13                          EXAMINATION

14  BY MR. TARTAGLIO:

15    Q.   Good morning, Ms. Bramhill.

16    A.   Good morning.

17    Q.   I am going to explain a little bit now about how this

18  process works before I get into the substantive questioning.

19  Okay?

20    A.   Yes.

21    Q.   Do you understand that the oath that you just took is

22  similar to the oath that you would take if you testified in

23  court in the United States?

24    A.   I do.

25    Q.   Incidentally, do you -- are you testifying from the



**TALTY COURT REPORTERS, INC.**                         6
**408.244.1900 - www.taltys.com**

DEPONENT: JENNIFER BRAMHILL                          September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1  alleged HR complaints that others had made about her

2  personality and communication style.

3        And I'll start by asking whether there were any HR

4  complaints against Ms. Sandhu about her personality and

5  communication style?  Do you know if there were any such

6  complaints?

7   A.   No.

8   Q.   Okay.  And I phrased that rather poorly.  So were

9  there any HR complaints made against Plaintiff about her

10  personality and communication style?

11   A.   No.

12   Q.   So looking at number 9:  The steps that Blackberry

13  took, if any, to discipline Plaintiff about the alleged HR

14  complaints that others had made about her personality and

15  communication style.

16        Did BlackBerry take any steps to discipline

17  Plaintiff in response to an HR complaint about her

18  personality or communication style?

19   A.   No.

20   Q.   And so number 10 asks about:  The documentation that

21  BlackBerry collected regarding HR complaints about

22  Plaintiff's personality and communication style.

23        Does any such documentation exist?

24   A.   No.

25   Q.   And number 11 --



DEPONENT: JENNIFER BRAMHILL                          September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1        MS. BECK:  Oh --

2        MR. TARTAGLIO:  Sorry, did I cut someone off?

3        MS. BECK:  Me.  I was just going to clarify, Tony,

4    just so the record is crystal clear, that the parties agreed

5    here that this refers to formal HR complaints.

6        MR. TARTAGLIO:  That's fine.

7        MS. BECK:  Great.

8        MR. TARTAGLIO:  Yeah, that was our agreement.

9    BY MR. TARTAGLIO:

10       Q.   And number 11 is, asks about:  Investigations into HR

11   complaints that others made against Plaintiff's regarding

12   her personality and communication style.

13            Were any such investigations ever conducted?

14       A.   No.  There were no formal complaints.

15       MR. TARTAGLIO:  All right.  Well, we might get done

16   sooner than I expected.  I am going to pull up Exhibit 2

17   now, and this is marked "Confidential," but I think it's

18   probably okay if I show you this.  Although, Ms. Beck will

19   let me know if that's not okay.

20            (Exhibit 2 was marked for identification.)

21       MR. TARTAGLIO:  And while we're pulling this up, so

22   this was produced at -- by BlackBerry at pages 19205, and it

23   goes to 19311.  And I know earlier I said you can read the

24   whole thing if you want to, but for this one, you might want

25   to just wait until we go to the sections that I'm going to

1   BY MR. TARTAGLIO:

2       Q.   Did you observe ██████ saying, "I have tried to

3   promote women in the past and they were not interested"?

4       A.   A comment to that effect, yes.

5       Q.   And did you find that troubling?

6       A.   Yes.

7       Q.   Why was that troubling to you?

8       A.   There was an implication that women were not willing

9   to be promoted.

10      Q.   And then there's some discussion here of ███████

11  responding dismissively to a presentation by Sarah Tatsis.

12  Do you remember that?

13      A.   Yes.

14      Q.   Did you observe ████████ speaking dismissively about

15  Ms. Tatsis?

16      A.   Not about Ms. Tatsis, no.

17      Q.   Did you think it was inappropriate in the way that

18  ████████ said that he had already provided direction to the

19  Ivy team, and nothing more was required?

20          MS. BECK:  Objection, compound, assumes facts, and,

21  again, it's a standing objection far beyond the scope here.

22          THE WITNESS:  And could you please repeat that

23  question?

24          MR. TARTAGLIO:  Could you have the question read out,

25  please?

DEPONENT: JENNIFER BRAMHILL                          September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

```
 1          THE WITNESS:  I see that it's in this report.
 2   BY MR. TARTAGLIO:
 3     Q.    Do you remember how you learned about that alleged
 4   comment?
 5          MS. BECK:  Objection, assumes facts.
 6          THE WITNESS:  ████████████  reported hearing that
 7   conversation.
 8   BY MR. TARTAGLIO:
 9     Q.    And what was ████████████  role at the time?
10     A.    She was an HR Business Partner.
11          MR. TARTAGLIO:  I am going to -- to my line of
12   questioning, so I think this standing objection is, I guess,
13   no longer in force.  So, Ms. -- I'll be more clear.
14           Plaintiff's position is that the standing objection
15   is no longer in force.  So if Defense wants to make an
16   objection to outside the scope, the Defense will have to do
17   so on a question-by-question basis here on out.
18          MS. BECK:  That's fine.
19   BY MR. TARTAGLIO:
20     Q.    So, Ms. Bramhill, what did BlackBerry do in response
21   to the issues raised in this report from Mr. Curiale?
22     A.    The individual -- a number of individuals received
23   coaching, as well as training.
24     Q.    Was anyone suspended as a result of the -- this
25   report here?
```



DEPONENT: JENNIFER BRAMHILL                    September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1    A.    No.

2    Q.    Was anyone docked pay as a result of what was found

3    by Mr. Curiale?

4    A.    No.

5    Q.    Was anyone fired as a result of what Mr. Curiale

6    found?

7    A.    No.

8    Q.    Was anyone transferred as a result of the Curiale

9    report?

10   A.    No.

11   Q.    Was Ms. Tatsis separated from the men accused of

12   statements in this report?

13   A.    No.

14   Q.    So did Ms. Tatsis continue working with the people

15   that were discussed in this report?

16   A.    Yes.

17   Q.    And you mentioned coaching was provided, correct?

18   A.    Yes.

19   Q.    What kind of coaching was provided in response to

20   this report?

21   A.    There were coaching e-mails or letters issued.

22   Q.    And besides the letter being issued, was there any

23   other type of coaching that was provided?

24   A.    I don't know.

25   Q.    And I think you mentioned some training was provided



**TALTY COURT REPORTERS, INC.**                    71
**408.244.1900 - www.taltys.com**

DEPONENT: JENNIFER BRAMHILL                    September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1        MR. TARTAGLIO:  And introducing Exhibit 5 now.  There

2    is no Bates number, but for the record, this appears to be

3    e-mail chain between Sarah Tatsis and Nita White-Ivy.

4            (Exhibit 5 was marked for identification.)

5    BY MR. TARTAGLIO:

6    Q.   Let me know when you're done reading this.

7    A.   Okay.  Okay.  I'm ready.

8    Q.   Does this appear to be an authentic copy of an e-mail

9    chain from BlackBerry?

10   A.   Yes.

11   Q.   And at the bottom, we have an e-mail from Nita

12   White-Ivy to Sarah Tatsis; is that correct?

13   A.   Yes.

14   Q.   And it appears Ms. White-Ivy found that Ms. Tatsis's

15   complaint had merit, correct?  Is that BlackBerry's

16   conclusion?

17   A.   Yes.  That's recorded in the letter, yes.

18   Q.   And BlackBerry also concluded that Ms. Tatsis

19   accurately reported the comments and conduct that she

20   considered to be dismissive and exclusionary.  Does

21   BlackBerry agree with that?

22       MS. BECK:  I'm going to object as outside the scope.

23       THE WITNESS:  Yes.  That is recorded in this letter.

24   BY MR. TARTAGLIO:

25   Q.   And this letter goes on to state that:  All parties



1  law firm and were customized to BlackBerry and to the

2  circumstances.

3  BY MS. BECK:

4    Q.    And by -- what do you mean by "the circumstances"?

5    A.    To address the findings of the investigation

6  specifically.

7         MS. BECK:  Thank you.  That's all the questions I

8  had.

9         MR. TARTAGLIO:  No further questions for me.  I just

10  have a housekeeping item for Ms. Beck.  We can do that off

11  the record.

12         MS. BECK:  Great.

13         THE VIDEOGRAPHER:  I will read us off.

14         THE REPORTER:  Mr. Videographer, can I get the copy

15  orders before we go off?

16         THE VIDEOGRAPHER:  Please.

17         THE REPORTER:  Ms. Beck, do you need a copy of the

18  transcript?

19         MS. BECK:  Yes, please, and the video synced, as

20  well, please.  Thank you.

21         THE VIDEOGRAPHER:  This concludes today's video

22  record of Deposition of Jennifer Bramhill.  The original

23  media of this deposition will remain in the custody of

24  Talty Court Reporters, Inc., located in San Jose,

25  California.  We are now going off the record.  The time is

DEPONENT: JENNIFER BRAMHILL                    September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1   12:03 p.m.

2              (Deposition concluded at 12:03 p.m.)

3                        ---oOo---

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEPONENT: JENNIFER BRAMHILL                      September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

```
 1                 DEPONENT'S CHANGES OR CORRECTIONS

 2

 3    Note:  If you are adding to your testimony, print the exact

 4    words you want to add.  If you are deleting from your

 5    testimony, print the exact words you want to delete.

 6    Specify with "Add" or "Delete" before each entry, please

 7    sign and date this form.

 8

 9         DEPOSITION OF:  JENNIFER BRAMHILL

10         DATE OF DEPOSITION:  FRIDAY, SEPTEMBER 19, 2025

11      I, _____, have made the

12    following changes in my deposition:

13      PAGE   LINE   ADD/DELETE

14      ____   ____   _____

15      ____   ____   _____

16      ____   ____   _____

17      ____   ____   _____

18      ____   ____   _____

19      ____   ____   _____

20      ____   ____   _____

21      ____   ____   _____

22      ____   ____   _____

23      ____   ____   _____

24

25    SIGNATURE_____DATE_____
```



DEPONENT: JENNIFER BRAMHILL                        September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1    STATE OF CALIFORNIA,          )
                                   )      ss.
2    COUNTY OF SANTA CLARA         )

3

4          I, JENNIFER BRAMHILL, hereby certify under penalty

5    of perjury under the laws of the State of California that

6    the foregoing is true and correct.

7

8          Executed this _____ day of _____,

9    20_____, at _____, California.

10

11

12

13

14                          _____

15                          JENNIFER BRAMHILL

16

17

18

19

20

21

22

23

24

25



DEPONENT: JENNIFER BRAMHILL                          September 19, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

```
 1   STATE OF CALIFORNIA,          )
                                   )     ss.
 2   COUNTY OF SHASTA              )

 3

 4        I, MELISSA SNYDER, a licensed Certified Shorthand

 5   Reporter, duly qualified and certified as such by the State

 6   of California, do hereby certify:

 7        That prior to being examined, the witness named in

 8   the foregoing deposition was by me duly sworn to testify to

 9   the truth, the whole truth, and nothing but the truth;

10        That the said remote deposition was by me recorded

11   stenographically at the time and place first therein

12   mentioned; and the foregoing pages constitute a full, true,

13   complete and correct record of the testimony given by the

14   said witness;

15        That I am a disinterested person, not being in any

16   way interested in the outcome of said action, nor connected

17   with, nor related to any of the parties in said action, or

18   to their respective counsel, in any manner whatsoever.

19   (x) Reading and signing was not requested.

20        IN WITNESS WHEREOF, I have subscribed my name on

21   this 14th day of October, 2025.

22

23

24        _____

25        MELISSA SNYDER, CSR NO. 13370
```

# EXHIBIT 42

IN THE UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


---o0o---

**CERTIFIED TRANSCRIPT**

NEELAM SANDHU,

         Plaintiff,

     VS.                 CASE NO:
                         24-CV-02002-SK

BLACKBERRY CORPORATION, et al,

         Defendants,
_____/


VIDEOTAPED VIDEOCONFERENCE

DEPOSITION OF

MARJORIE DICKMAN

SEPTEMBER 11, 2025


Reported by:  MYRA A. PISH, RPR, CSR #11613

DEPONENT: MARJORIE DICKMAN
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.                    September 11, 2025

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                           FOR THE

 3                 NORTHERN DISTRICT OF CALIFORNIA

 4

 5                          ---o0o---

 6

 7    NEELAM SANDHU,

 8                Plaintiff,

 9          VS.                        CASE NO:
                                       24-CV-02002-SK
10    BLACKBERRY CORPORATION, et al,

11                Defendants,
      _____/
12

13

14         VIDEOTAPED VIDEOCONFERENCE deposition of Marjorie

15    Dickman, commencing at the hour of 9:06 a.m, Thursday,

16    September 11, 2025, held remotely, before Myra Pish,

17    Certified Shorthand Reporter in and for the State of

18    California.

19

20                          ---o0o---

21

22

23

24

25
```



DEPONENT: MARJORIE DICKMAN                                September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

```
 1    APPEARANCES:

 2   FOR THE PLAINTIFF:

 3        GOMERMAN BOURN & ASSOCIATES
          BY: ANTHONY TARTAGLIO, ESQ.
 4            MARIA BOURN, ESQ.
          825 VAN NESS AVENUE, SUITE 502
 5        SAN FRANCISCO, CALIFORNIA  94109
          415.545.8608
 6        Tony@gobolaw.com

 7
     FOR THE DEFENDANTS, BLACKBERRY CORPORATION:
 8
          MUNGER, TOLLES & OLSON, LLP
 9        BY:  LAUREN BECK, ESQ.
          350 S. GRAND AVENUE, FLOOR 50
10        LOS ANGELES, CALIFORNIA  90071
          213.683.9576
11        Lauren.Beck@mto.com

12
     FOR THE WITNESS, MARJORIE DICKMAN:
13
          EMPLOYMENT LAW GROUP
14        BY:  BRIANA SCHOLAR, ESQ.
          1717 K STREET, NW, SUITE 1110
15        WASHINGTON, D.C.  20006
          202.331.3911
16        bscholar@employmentlawgroup.com

17
     ALSO PRESENT:
18
          JACQUELINE HIOCO, VIDEOGRAPHER
19        LINDSAY SKYERS
          MARGARET MAYO
20

21                        ---o0o---

22

23

24

25
```



DEPONENT: MARJORIE DICKMAN                        September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

```
 1                          INDEX

 2    EXAMINATION                                   PAGE

 3    By Mr. Tartaglio                                 8
      By Ms. Beck                                     121
 4    By Ms. Bourn                                    168

 5
                        ---o0o---
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



DEPONENT: MARJORIE DICKMAN                          September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1                              EXHIBITS

2    NO.    DESCRIPTION                                    PAGE

3    EXH 0    Document                                     15

4    EXH 1    Text Messages                                17

5    EXH 2    Text Messages Bates Stamped                  19
              Dickman 4-19
6
7    EXH 3    Text Messages Bates Stamped                  22
              20-23

8    EXH 4    Document Bates Stamped                        23
              24-27
9
     EXH 5    E-mail                                       47
10
     EXH 6    E-mails                                      51
11
     EXH 7    E-mail                                       57
12
     EXH 8    E-mail                                       65
13
     EXH 9    Confidential Separation and Release          89
14
     EXH 10   E-mail                                       94
15
     EXH 11   BlackBerry Proxy Statement for              160
16            June 25, 2024 Meeting

17                            ---o0o---

18

19

20

21

22

23

24

25



**TALTY COURT REPORTERS, INC.**
**408.244.1900 - www.taltys.com**                              **5**

DEPONENT: MARJORIE DICKMAN                                    September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1                    VIDEOTAPED VIDEOCONFERENCE

2                  DEPOSITION OF MARJORIE DICKMAN

3                   THURSDAY, SEPTEMBER 11, 2025

4                          ---oOo---

5           THE VIDEOGRAPHER:  Good morning.  We are going

6    on the video record at 9:06 a.m., on Thursday,

7    September 11th, 2025.  This is the video deposition of

8    Marjorie Dickman, taken by the plaintiff, in the matter

9    of Neelam Sandhu versus BlackBerry Corporation, et al.,

10   filed in the United States District Court for the

11   Northern District of California.  Case number

12   24-CV-02002-SK.

13          This deposition is being held via Zoom

14   videoconference.  My name is Jacqueline Hioco, a notary

15   public in and for the state of California.  Today's

16   reporter is Myra Pish, CSR number 11613.  We are both

17   with the firm Talty Court Reporters, Incorporated, with

18   offices in San Jose, California.

19          Please note that we will remain on the video

20   record until all parties have agreed to go off.

21          Before we proceed, I will ask counsel to state

22   their appearance and affiliation for the record, starting

23   with the noticing attorney.

24          MR. TARTAGLIO:  For the plaintiff, you have

25   Anthony Tartaglio from the Gomerman, Bourn law firm.



DEPONENT: MARJORIE DICKMAN                          September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1  It's possible that the client herself will be observing,

2  by which I mean the plaintiff -- and it's also possible

3  that Maria Bourn from my office might also hop in and

4  observe.

5          MS. BECK:  This is Lauren Beck with Munger,

6  Tolles & Olson, for defendant BlackBerry Corporation.

7  I'm also joined on the line by Margaret Mayo and Lindsay

8  Skyers, who are both in-house at BlackBerry.

9          MS. SCHOLAR:  This is Briana Scholar, of The

10  Employment Law Group, on behalf of the witness, Marjorie

11  Dickman.

12          THE VIDEOGRAPHER:  Thank you.  Will the court

13  reporter please administer the oath, then counsel may

14  proceed.

15          THE COURT REPORTER:  My name is Myra Pish.  I'm

16  a certified shorthand reporter in the state of

17  California.  My license number is 11613.

18          Ms. Dickman, if you will please raise your right

19  hand.

20                  MARJORIE DICKMAN,

21          called as a witness by and on behalf

22          of the Plaintiff, being first duly

23          sworn, was examined and testified as

24          follows:

25  ///



DEPONENT: MARJORIE DICKMAN                          September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1    eliminate your position?

2        A.  No.

3        Q.  Who notified you that you would be leaving the

4    company?

5        A.  John Giamatteo and Jenny C-H-R-O.

6        Q.  And did you have an in-person meeting for that?

7        A.  No.  No.

8        Q.  Was that over Zoom?

9        A.  Yes.

10       Q.  Or I guess it could be Teams, but I mean that

11   generically.  Some sort of videoconferencing software?

12       A.  Yes.

13       Q.  Were you given an explanation for why you would

14   be leaving the company?

15       A.  Yes.

16       Q.  What was that explanation that was given?

17       A.  That my function -- now that -- my function was

18   cut and the company -- I don't know what they said now.

19   But my function was no longer needed at my level.

20       Q.  Do you -- well, strike that.

21           To your knowledge, has BlackBerry continued to

22   sell products to governments?

23           MS. SCHOLAR:  Objection to the extent it calls

24   for speculation.

25           MS. BECK:  Join that objection.



DEPONENT: MARJORIE DICKMAN                     September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1   right?

2       A.  Okay.

3       Q.  And so if we add those up, that appears to be

4   around 1.35 million or so.  Check my math if you want.

5   But is that kind of a fair ballpark of, if we had to add

6   everything up?

7       A.  Sounds like the correct addition.

8       Q.  And there's some equity on top of that that you

9   don't know the value of, correct?

10      A.  Correct.

11      Q.  So would you agree that the value of the

12  severance agreement to you is about 1.35 million, plus

13  some equity that we're not sure of right now, correct?

14      A.  Correct.

15      Q.  Let's go to Exhibit 10.

16          (Thereafter, Plaintiff's Exhibit

17          Number 10 was marked for

18          identification.)

19  BY MR. TARTAGLIO:

20      Q.  And while you are reading this, for the record,

21  this is produced by BlackBerry at 23771 to 23774.

22      A.  Okay.

23      Q.  Let me know when you are ready to discuss this

24  one.

25      A.  Can I read it?



DEPONENT: MARJORIE DICKMAN                          September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1  you know -- and I would, you know, socialize with -- not

2  like, only on business trips, right?  Where I socialized

3  with Mr. Giamatteo and the rest of everyone.

4          But, you know, Mattias and I got along.  And,

5  you know -- you know, I heard him, or one of his people

6  refer to, you know, QNXs, you know, Mr. Mattias' business

7  as the enemy camp.

8          So, essentially I was trying to straddle, right?

9  The part of his inner circle, as well as still, you

10  know -- my job is overarching over the whole company,

11  right?  We have two lines of business.  I have to be

12  professional with both, and work with both of those lines

13  of business.  And I have great respect for Mr. Mattias

14  Eriksson.  Very smart guy.

15          You know, but I think, you know, I -- like I

16  said, Mr. Giamatteo hired a C-suite of his cronies, and

17  people he's known for 20 some, 30 years.  And that was

18  made well known to, you know -- somehow I came to know

19  that.

20          And, you know, we'd get on CEO staff calls, and,

21  you know, the only woman, the CHRO, the only other woman,

22  was a friend of a long time, and it would be, you know,

23  they would, you know, joke around with him in a way that

24  you wouldn't -- normally you wouldn't joke around with a

25  CEO or make fun of a CEO on those types.  They are very



DEPONENT: MARJORIE DICKMAN                          September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1   comfortable with him.  There were inside jokes.  There

2   were -- and I did express this to Mr. Giamatteo after two

3   business trips, that, you know, I didn't feel like a part

4   of the team, you know.  Tried to get, you know -- after

5   two business, ELT business trips.  It was very

6   disheartening.

7        It was -- it's nothing like I have ever

8   experienced in my career.  I didn't experience it under

9   Mr. Chen.  Mr. Chen was tough, right?  Mr. Chen, no one

10  is going to say Mr. Chen was not a tough CEO.  He's a

11  tough CEO.  He would let me know what he thought.

12       Q.  Sorry to interrupt, but it's better for the

13  record if we kind of break up your testimony a little

14  bit.

15       A.  Sorry.

16       Q.  So, with this conversation with Mr. Giamatteo

17  about feeling like you are not part of his group, what do

18  you remember about that conversation?

19       A.  I remember telling him that I felt

20  uncomfortable, felt like an outsider, felt like whenever

21  I offered to help, or, you know, be part of the team

22  doing certain things, you know, I was kept in my little

23  corner, despite having, you know, significant experience

24  beyond that little corner he wanted to keep me in.  And,

25  you know, both legally, both transactionally,



DEPONENT: MARJORIE DICKMAN                        September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1    transactionally, many, many ways I could have helped, and
2    I offered to.
3            And he wanted his people, you know, people
4    around him that either he brought into the company -- he
5    kind of created -- it's a C-suite of loyalists, right?
6    Not loyalists to the company, but loyalists to him.  And
7    he brought in people that that would be the case.  As
8    well as then promoting -- I believe there was one
9    promotion from within that was a large promotion which
10   created extreme loyalty to him.  And so there was a lot
11   of yes people in the C-suite.
12           And I'll give you -- it was just uncomfortable.
13   I was never in on the jokes.  I was never -- and you have
14   the head of HR doing it.  There's no out here, right?
15   Because, you know, the head of HR is making the jokes.
16   And his best buddy, you know, that, this guy JD is making
17   the jokes.  And, you know, all these people.  And Tim
18   that he -- so they all owed something to him, right?
19   They were given an internal promotion that was a
20   significant promotion by him, or they were given a --
21   from outside, they were given a job by him.
22           I was an outlier to that.  My allegiance was to
23   the company first, and I was hired by Mr. Chen.  So it --
24   I was -- I felt it for very soon after he became CEO.  I
25   felt it very deeply.  I didn't -- and tried to -- it was



DEPONENT: MARJORIE DICKMAN                        September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1    a -- it was a rough situation.

2            But this is, I mean, if I -- if I may, this

3    is -- like I said at the beginning, this is my first

4    deposition.  And this is just -- I would rather be at the

5    dentist.

6            This is antithetical to -- sorry to break up a

7    little here -- to everything that I am.  You know, I

8    never talk about my prior company, including BlackBerry,

9    in any way but positively in public.

10           I talk about Mr. Giamatteo positively in public,

11   as I would any prior employer, any, you know, prior

12   manager.  Any prior colleague, you know, and I'm sorry if

13   I'm getting emotional.  This is incredibly uncomfortable

14   for me, because this is completely opposite to the person

15   who I am.  So just -- sorry.

16           MS. SCHOLAR:  Why don't we take a break.

17           THE WITNESS:  Yeah.

18           MR. TARTAGLIO:  Okay.  Let's take a break.

19           THE VIDEOGRAPHER:  We are now off the record.

20   The time is 11:59 a.m.

21           (Whereupon, a break was taken.)

22           THE VIDEOGRAPHER:  We are now back on the

23   record.  The time is 12:10 p.m.

24   BY MR. TARTAGLIO:

25      Q.  Ms. Dickman, I want to try to zoom in on what it



DEPONENT: MARJORIE DICKMAN                     September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1   feeling like you were not fitting in, was that one

2   conversation or was that multiple conversations?

3       A.   There was one conversation.

4       Q.   And --

5       A.   You know, to try and kind of continue trying.

6   And it was -- it was after a second ELT business trip, I

7   think within a few weeks of that, I raised it with him.

8       Q.   And so about how much time elapsed between the

9   conversation with Mr. Giamatteo in which you said you

10  felt like you were not fitting in, and you were told that

11  you were going to be terminated from the company?

12      A.   Less than a year.  Prob- -- I mean, I don't

13  know, somewhere between six -- I want to guess around six

14  months'ish.

15      Q.   We looked earlier at an exhibit showing that you

16  had an interview with some lawyers from Morrison

17  Foerster, correct?

18      A.   Yes, sir.

19      Q.   And you told Morrison Foerster, among other

20  things, that you thought BlackBerry was a pretty

21  challenging place for women; is that right?

22      A.   Yes, sir.

23      Q.   Did anyone at the company ever indicate to you

24  that they knew that you had told the Morrison Foerster

25  investigators that BlackBerry was a challenging place to



1    answer.  I did not get a clean response to that.

2          THE WITNESS:  I do not know what my,

3    specifically my lawyer was thinking as he was having a

4    conversation with BlackBerry, and I do not know if -- I

5    wasn't on the phone.  I don't know if the words

6    retaliation were used.

7    BY MR. TARTAGLIO:

8        Q.  Yeah.  Your lawyer told BlackBerry, "She has one

9    of the best retaliation cases that I have ever seen under

10   the DCHRA, which has no damages caps."

11         That's what your lawyer told BlackBerry's

12   lawyers, right?

13       A.  That -- that is in the e-mail I'm reading.

14         MS. BECK:  Foundation and calls for speculation.

15   The document speaks for itself.

16         MR. TARTAGLIO:  And so my -- my question is,

17   what were you retaliated against?  What did you do that

18   caused you to be retaliated against?

19         THE WITNESS:  I don't know the answer to that.

20   BY MR. TARTAGLIO:

21       Q.  Well, at some point your lawyer explained to

22   BlackBerry why you had been retaliated against, correct?

23       A.  I wasn't on -- I'm trying here.  But I wasn't on

24   that phone call, so I don't know what he talked about

25   that -- I don't know.

DEPONENT: MARJORIE DICKMAN                     September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1    A.  Yeah, we did.  I mean, we -- you know, a good

2  working relationship, like we got, you know, we were

3  professional.  Colleagues.

4    Q.  So that was true?

5    A.  Correct.

6    Q.  You talked this morning, and it's reflected here

7  about -- about the fact that BlackBerry had a difficult

8  culture for women in your view; is that right?

9    A.  Yes.  Stemming from women being

10  underrepresented, you know, in the C-suite, and then it

11  kinda falls, you know, when women are underrepresented in

12  the C-suite it tends to, you know, have cascading

13  effects.

14    Q.  And you talked about that with the Morrison

15  Foerster investigators?

16    A.  True.

17    Q.  It says here that you believed those issues had

18  nothing to do with Mr. Giamatteo.

19        Do you see that?  It's the last sentence in the

20  paragraph.

21    A.  Correct.  Correct.

22    Q.  Was that true?  Was your view that BlackBerry

23  had a challenging culture for women, but -- but that

24  wasn't to do with Mr. Giamatteo, at the time of this

25  interview?



DEPONENT: MARJORIE DICKMAN                         September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1    think the record's clear, and -- and hopefully we can let

2    Ms. Dickman go.

3            MS. BOURN:  Yeah.  Have a good evening,

4    Ms. Dickman.  Thank you.

5            MS. SCHOLAR:  The witness will read and sign.

6            Will I receive the contact information for

7    Ms. Pish so that I may reach out for a transcript or will

8    I receive automatic notification?

9            THE VIDEOGRAPHER:  I was going to get them on

10   the record, just a moment, and then I will ask for

11   everybody's -- thank you.

12           Madam Court Reporter, would you like to get all

13   orders, including video requests, on the record?

14           MS. BOURN:  The plaintiff will take the

15   deposition and video, no rush.

16           MS. BECK:  Same for defendant, please, and

17   synced, please.

18           MS. SCHOLAR:  Yes.  Yes.  You asked for that,

19   and it completely slipped my mind, and I apologize.

20           THE VIDEOGRAPHER.  Thank you.

21           This concludes the video record of today's

22   deposition of Marjorie Dickman.  The original media of

23   this deposition will remain in the custody of Talty Court

24   Reporters, Incorporated, located in San Jose, California.

25           We're going off the record at 2:30 p.m.



DEPONENT: MARJORIE DICKMAN                          September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1  (Whereupon, the proceedings concluded.)

2                  ---o0o---

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



DEPONENT: MARJORIE DICKMAN                        September 11, 2025
NEELAM SANDHU vs BLACKBERRY CORPORATION, et al.

1   STATE OF CALIFORNIA   )
                          )    Ss.
2   COUNTY OF MARIPOSA    )

3        I, MYRA A. PISH, Certified Shorthand Reporter, in and

4   for the State of California, Certificate No. 11613, do hereby

5   certify:

6        That the witness in the foregoing remote deposition was

7   by me first duly sworn to testify to the truth, the whole

8   truth, and nothing but the truth in the foregoing cause; that

9   the deposition was taken before me at the time and place herein

10  named; that said deposition was reported by me, to the best of

11  my ability by machine shorthand, and transcribed through

12  computer-aided means, under my direction; and that the

13  foregoing transcript is a true record of the testimony elicited

14  at the proceedings had at said remote deposition.

15       I do further certify that I am a disinterested person

16  and am in no way interested in the outcome of this action or

17  connected with, or related to, any of the parties in this

18  action, or to their respective counsel.

19

20       DATED:     September 25, 2025
                    MARIPOSA, CALIFORNIA
21

22

23

                    MYRA A. PISH, CSR, RPR
24                  Certificate No. 11613

25

# EXHIBIT 43

**From:** Nita White-Ivy [nwhiteivy@blackberry.com]
**Sent:** 10/26/2023 5:11:57 PM
**To:** Lisa Disbrow █████████████████████
**CC:** Prem Watsa (external ████████████████ Mike Daniels (external) [████████████]; John Chen [john.chen@blackberry.com]
**Subject:** RE: Ethics Link 362 - Sexual Harassment Allegation re: John Giamatteo
**Attachments:** Ethics Link 350.docx; Neelam Sandhu complaint re JJG 2 6 2023.docx; 2023.01.26 ████████ Demand Letter from her legal counsel.pdf

Lisa,

Thank you for the note back.

Glad that an independent investigation will be done right away.

You asked if any other complaints have been made in the past about the individual in question while employed here.
-         There have not been any sexual harassment complaints made to HR about John Giamatteo in the past.
-         There was an anonymous Ethics Link complaint (EL350) on 4/20/22 (attachment provided for ease of review).
-         Neelam Sandhu complained to me about being stressed re: treatment of her by John Giamatteo and his team (complaint pasted below).  This was investigated by outside counsel and addressed.
-         Demand Letter from ███████████████████ sent by her legal counsel on 1/26/23.  This case was resolved.

Let me know if I could be of further assistance.

Best,
Nita

---

**From:** Lisa Disbrow ███████████████████ >
**Sent:** Thursday, October 26, 2023 2:42 PM
**To:** Nita White-Ivy <nwhiteivy@blackberry.com>
**Cc:** Prem Watsa (external) ██████████████ >; Mike Daniels (external) ████████████ >; John Chen <john.chen@blackberry.com>
**Subject:** Re: Ethics Link 362 - Sexual Harassment Allegation re: John Giamatteo

**CAUTION** - This email is from an external source. Please be cautious with links and attachments. (go/taginfo)

Nita,
We need to initiate an independent investigation right away—I'll coordinate with Mike D and Phil K to initiate it.

Meanwhile, please let Mike D and me know if any other complaints have been made in the past about the individual in question while employed here.
Thank you,
Lisa

**Lisa S. Disbrow**
703-717-8676

On Oct 26, 2023, at 11:28 AM, Nita White-Ivy <nwhiteivy@blackberry.com> wrote:

Dear all,

I received a copy of this attached complaint today at 7:40am PT (10:40am ET) which is addressed to HR and BlackBerry Board members.

Let me know how you would like me (and our retained external employment counsel) to assist in the investigation of this complaint which appears to be a class action one.

Nita


This transmission (including any attachments) may contain confidential information, privileged material (including material protected by the solicitor-client or other applicable privileges), or constitute non-public information. Any use of this information by anyone other than the intended recipient is prohibited. If you have received this transmission in error, please immediately reply to the sender and delete this information from your system. Use, dissemination, distribution, or reproduction of this transmission by unintended recipients is not authorized and may be unlawful.

-------------------------------------------------------------------
This transmission (including any attachments) may contain confidential information, privileged material (including material protected by the solicitor-client or other applicable privileges), or constitute non-public information. Any use of this information by anyone other than the intended recipient is prohibited. If you have received this transmission in error, please immediately reply to the sender and delete this information from your system. Use, dissemination, distribution, or reproduction of this transmission by unintended recipients is not authorized and may be unlawful.