United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEELAM SANDHU,<br>Plaintiff,<br>v.<br>BLACKBERRY CORPORATION, et al.,<br>Defendants. | Case No. 24-cv-02002-SK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Regarding Docket No. 111 |

This matter comes before the Court upon consideration of the motion for summary judgment filed by Defendants BlackBerry Corporation and John Giamatteo (collectively, "Defendants"). (Dkt. No. 111.) This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, and all parties consented to the jurisdiction of the undersigned. (Dkt. Nos. 7, 8, 17.) Upon careful consideration of the parties' papers, relevant legal authority, case record, and oral argument, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment for the reasons set forth below.

## BACKGROUND

### I. FACTUAL BACKGROUND[1]

Plaintiff Neelam Sandhu ("Plaintiff") began her career at Blackberry Corporation ("Blackberry") in 2009 as a brand review specialist. (Dkt. No. 125-1, Ex. 1.) During her tenure, Plaintiff received multiple promotions with corresponding salary increases. (Dkt. No. 125-1, Exs. 2–7.) In March 2021, for instance, Plaintiff was promoted to Senior Vice President and Chief Elite Customer Success Officer, leading Blackberry's Elite Customer Success Program, which was critical to Blackberry's revenue growth. (Dkt. No. 125-1, Ex. 7.)

/ / /

[1] Unless otherwise indicated, the following facts are undisputed.

United States District Court
Northern District of California

**A. Plaintiff's First Complaint in 2016**

Plaintiff's claims center around alleged unwanted conduct by male coworkers, retaliation for reporting said conduct, and Blackberry's failure to prevent harassment, discrimination, and retaliation. Plaintiff first filed a formal complaint regarding a male coworker's sexual harassment in November 2016. (Dkt. No. 125-1, Ex. 24.) The male employee—[redacted]—received a warning for physically touching Plaintiff, entering her hotel room, and asking her to dinner. (Dkt. No. 125-1, Exs. 23–24.)

**B. Plaintiff's Complaints about John Giamatteo's Actions in 2021 and 2022**

Plaintiff alleges that Defendant John Giamatteo subjected her to sexual harassment and gender discrimination. Giamatteo began working at Blackberry in October 2021 as President of Blackberry's Cybersecurity Business Unit and a potential successor to then-Chief Executive Officer ("CEO") John Chen. (Dkt. No. 11-4, Ex. 1, Chen Dep. 19:18-20:4.) Plaintiff and Giamatteo, as leaders of their respective teams, reported directly to then-CEO John Chen. (*Id.* at 21:17-25:18.)

Plaintiff testified about specific exchanges between her and Giamatteo that made her uncomfortable and which she subsequently reported to superiors or Human Resources ("HR"). First, in October 2021, shortly after Giamatteo joined Blackberry, Giamatteo invited Plaintiff to a one-on-one dinner where he allegedly made unwanted sexual advances. (Dkt. No. 125-1, Ex. 32, Sandhu Dep. 113:24-114:14.) During the dinner, Giamatteo allegedly touched Plaintiff's hand, tried to put his arm around her waist, and asked Plaintiff to travel with him, even though he provided no business reason for doing so. (*Id.* at 115:9-123:1, 125:25-126:14.) Within two days, Plaintiff reported Giamatteo's behavior to then-CEO Chen and then-Chief Financial Officer Steve Rai. (*Id.* at 112:20-116:1.)

Second, in December 2021, during a one-on-one meeting between Giamatteo and Plaintiff, Giamatteo suggested that Plaintiff join his team and report to him, which would be a demotion because, as the Elite team's leader, she reported directly to then-CEO Chen. (*See id.* at 193:5-194:6.) A few months later, in March 2022, Plaintiff complained to Chen about being deliberately excluded from calls by Giamatteo's team even though the calls directly involved her

responsibilities. (Dkt. No. 125-1, Ex. 10.) In July 2022, Plaintiff complained to HR concerning an organizational chart Giamatteo's Cybersecurity team sent to a client that incorrectly showed Plaintiff as reporting to Giamatteo. (Dkt. No. 111-4, Ex. 4.)

**C. Plaintiff's Complaint in February 2023**

On February 6, 2023, Plaintiff filed a formal complaint with HR against Giamatteo, and she reported that Giamatteo was trying to diminish her role and force her out of the company. (Dkt. No. 111-4, Ex. 8.) In the complaint, Plaintiff detailed specific (but not all) incidents where Giamatteo and his Cybersecurity sales team did not acknowledge her role and interfered with her responsibilities:

> (1) the Cybersecurity sales team's publication of an organizational chart incorrectly indicating Plaintiff as reporting to Giamatteo and Giamatteo's hesitation in taking action to address the issue despite Plaintiff's multiple follow-ups with him;
> (2) the Cybersecurity sales team's failure to send customer proposals to Plaintiff's team, which was against company policy; and
> (3) the Cybersecurity sales team's attempts to exclude Plaintiff's team from dealing with major customers for whom Plaintiff was responsible.

(*Id.*)

Plaintiff indicated in her complaint that these actions may have stemmed from Giamatteo's telling his team that her role at Blackberry would change on March 1, 2023. (*Id.*) She reported that in January and February of 2023, Giamatteo was working to remove Plaintiff from working with Elite customers and told individuals that Plaintiff would no longer be responsible for Elite customers starting on March 1, 2023. (*Id.*)

**D. Blackberry's Investigation of Plaintiff's February 2023 Complaint**

Blackberry hired outside counsel Richard Curiale and Monica Lee to investigate Plaintiff's allegations against Giamatteo. (Dkt. No. 111-4, Ex. 10.) On February 10, 2023, Curiale and Lee sent their findings to then-CEO Chen and HR. (*Id.*) Curiale and Lee concluded that "there is no concerted intentional effort to diminish [Plaintiff]'s role within the Elite Group or force her out of the company." (*Id.*) Their findings further stated:

> While there are significant issues that are impeding the working relationship between the Elite Group and the sales people, these are issues that have been ongoing for some period of time and are not unique to John Giamatteo or his sales



United States District Court
Northern District of California

> people. With regard to [Plaintiff]'s belief that the Cyber BU team was continuing to push the GoC to purchase Lookout even though she is engaged with the CIO's negotiating for the sale of BlackBerry's MTD, while that was initially accurate, that activity has now subsided.

(*Id.*)

Three days later after Curiale and Lee sent their findings to then-CEO Chen and HR, Curiale emailed Plaintiff and asked her to meet him for lunch to discuss a plan to improve relations between her and Giamatteo's team. (Dkt. No. 111-4, Ex. 11.) The "plan" to improve relations between the teams was for Chen to reallocate client accounts between the Elite and Cybersecurity sales groups and provide each group exclusive jurisdiction over their respective clients. (Dkt. No. 111-4, Ex. 40.) For this plan to go in effect, Plaintiff was required to "offload a number of her current clients [to Giamatteo's team] and replace them with a larger group of win back targets" that Giamatteo's team lost. (*Id.*; Dkt. No. 111-4, Ex. 3, Sandhu Dep. 250:8-13.) Plaintiff indicated that offloading several of her existing clients made her uncomfortable and testified that there was "no basis" for reallocating client accounts. (Dkt. No. 111-4, Ex. 3, Sandhu Dep. 250:14-19; Ex. 40.)

**D. Plaintiff's Promotion to Chief Marketing Officer**

Around the same time Chen suggested reallocating client accounts between the two teams, Chen offered Plaintiff the Chief Marketing Officer ("CMO") position. (Dkt. No. 111-4, Ex. 1, Chen Dep. at 173:8-25; Ex. 3, Sandhu Dep. 250:25-251:10.) Plaintiff testified that Chen only offered her the CMO role after she told Chen in March 2023 that she could not handle how she was being treated and intended to resign. (Dkt. No. 111-4, Ex. 3, Sandhu Dep. 250:25-251:10.) In March 2023, Curiale emailed Chen, stating: "I told her take the CMO position in a heartbeat . . . I told [her] that when you leave BB she is either not going to survive there or want to be there[,] and she agreed . . . My bet is she will let you know in a day or two she wants the CMO job." (Dkt. No. 111-4, Ex. 12.) In April 2023, Chen reallocated accounts between Plaintiff's Elite and Giamatteo's Cybersecurity team. (Dkt. No. 111-4, Ex. 41.)

In June 2023, Plaintiff's promotion to Chief Marketing and Elite Customer Succes Officer took effect. (Dkt. No. 125-1, Ex. 8.) Plaintiff performed her roles as CMO, Chief Elite Customer



United States District Court
Northern District of California

Success Officer, and Head of Sustainability simultaneously, and she reported directly to Chen. (Dkt. No. 125-1, Ex. 9.) Her salary did not increase when she was promoted, and her annual target incentive bonus was split into two parts: 50% on variable incentive pay and 50% on sales incentive pay. (*Id.*)

**E. Anonymous EthicsLink Complaint in October 2023**

On October 26, 2023, an anonymous EthicsLink complaint was filed, and the complaint alleged that Giamatteo (1) made unprofessional, sexually suggestive, and aggressive comments; (2) made women feel marginalized and like they are unable to succeed in their careers; (3) made "veiled threats" based on his "influence and reach within the industry"; and (4) proliferated a sexist, male dominated mindset. (Dkt. No. 111-4, Exs. 19, 26.)

Four days later, on October 30, 2023, Chen announced his retirement as CEO. (Dkt. No. 111-4, Ex. 18.) On the same day, Blackberry's Board of Directors appointed Richard Lynch, a member of Blackberry's Board since 2013, as interim CEO and Board Chair. (*Id.*) However, Giamatteo was presumed to be the next permanent Blackberry CEO. (Dkt. No. 125-1, Ex. 36, Lynch Dep. 200:14-18.)

**F. Speculation about Source of EthicsLink Complaint**

On an unspecified date, presumably on or after October 26, 2023, three Blackberry Board members speculated that Plaintiff filed the EthicsLink complaint. (Dkt. No. 125-1, Ex. 35, Kurtz Dep. 58:2-59:13.) Blackberry's then-Chief Legal Officer and Corporate Secretary Phil Kurtz testified that he discussed the possibility that Plaintiff filed the EthicsLink complaint with the two committee chairs, Lisa Disbrow and Michael Daniels, and the Board Chair—Richard Lynch. (*Id.*) It is not clear from the testimony when that conversation took place.

**G. Investigation by Morrison & Foerster of EthicsLink Complaint**

The Audit Committee of BlackBerry's Board of Directors hired Morrison & Foerster LLP ("Morrison") to investigate the EthicsLink complaint against Giamatteo. (Dkt. No. 111-4, Ex. 26.) No party has provided evidence to identify the members of the Audit Committee, but it appears that Disbrow was the chair. (*Id.*) On October 28, 2023, Kurtz emailed Morrison & Foerster LLP attorney Eric Tate ("Tate'), in relevant part, the following: "[t]he board is wondering whether

[Plaintiff] is in scope for our investigation now. I think yes based on her prior complaint." (Dkt. No. 125-1, Ex. 16.) On November 6, 2023, Morrison attorneys Christin Hill ("Hill") and Tate interviewed Plaintiff regarding Giamatteo's alleged harassment of her. (Dkt. No. 111-4, Ex. 25.) The next day, Plaintiff emailed Hill, including bullet points and multiple attachments detailing Giamatteo's alleged harassment, which she alleges commenced after she did not respond positively to his suggestive comments. (Dkt. No. 111-4, Ex. 29.)

### H. Lynch's Decision to Restructure and Terminate Employment of Three Executives

On November 13, 2023, Lynch, then-interim CEO, identified three executives to terminate as part of an alleged "restructuring" at Blackberry aimed at eliminating corporate roles. (Dkt. No. 111-4, Ex. 20, Lynch Dep. 71:24-73:16 , 259:20-260:7.) The three executive corporate roles that Lynch allegedly intended to eliminate included: (1) Plaintiff, who at that time was the CMO, head of the Elite Customer Success team, and head of sustainability; (2) [redacted]. (Dkt. No. 111-4, Ex. 20, Lynch Dep. 70:24-80:22, 181:20-184:6, 202:12-203:21, 259:13-260:22.)

The parties dispute whether [redacted] roles were eliminated or whether they resigned voluntarily. Lynch testified that [redacted] resigned and that Plaintiff was the only executive whose employment he "technically" terminated. (*Id.* at 202:24-203:21) Plaintiff argues that [redacted] was not eliminated but rather renamed to [redacted] (Dkt. No. 125-1, Exs. 9, 27.) [redacted] (Dkt. No. 125-1, Ex. 27.)

### I. Plaintiff's Communications with Morrison and then-CEO Lynch

On November 16, 2023, Plaintiff emailed Morrison attorney Hill, copying HR, sharing another example of Giamatteo's alleged retaliation against her. (Dkt. No. 111-4, Ex. 28.) In her email, Plaintiff alleges that Giamatteo interfered with one of her CMO job responsibilities: preparing press releases and finalizing their approval with the CEO. (*Id.*) She noted a recent example of her reaching out to Giamatteo and his team to prepare a press release for a Cybersecurity deal. (*Id.*) Giamatteo had allegedly responded to Plaintiff's email with the press

release already written and approved. (*Id.*) Neither Plaintiff nor her team were involved in or aware of this alternative "process" for preparing and finalizing press releases. (*Id.*)

On the same day, November 16, 2023, Plaintiff forwarded Lynch, at that time the interim CEO, the emails she sent to Hill, which provided details about the "retaliation against [her]" and Giamatteo's alleged harassment "which commenced after [she] did not respond positively to his suggestive comments." (Dkt. No. 111-4, Ex. 32.)

**J. Morrison's Report on its EthicsLink Complaint Investigation**

On November 27, 2023, Hill sent Morrison's report of its investigation to Blackberry's board members, including Lynch and Disbrow, describing complaints from female employees. (Dkt. No. 111-4, Ex. 27.) The report included examples of behavior by Giamatteo that "Female Executive 1" regarded as inappropriate and sexually suggestive. (*Id.*) The report did not identify "Female Executive 1" but stated: "At this time, Female Executive 1 reported directly to the CEO, John Chen." The report also included allegations that Plaintiff previously made about Giamatteo, such as a one-on-one dinner. (*Id.*) The report concluded that complaints about Giamatteo were not substantiated: "we conclude that there is no evidence that Giamatteo engaged in conduct that rises to the level of sexual or any other unlawful harassment or gender discrimination under California law or that would constitute a violation of BlackBerry policy." (*Id.*) The report also included the following statement:

> While not specific to Giamatteo, a number of women raised concerns about a longstanding trend (pre-dating Giamatteo) of a lack of women in leadership roles within the Company, and a Company culture that leaves little opportunities for advancement for women. Again, separate from any issues related to Giamatteo, several female witnesses (current and former employees) described challenging aspects of Blackberry's culture specifically as it relates to women. More than one witness described BlackBerry as a "Boy's Club," wherein women face certain disadvantages. This sentiment was not universal, but it was certainly present. This report closes with recommendations for BlackBerry to consider that may help to address some of these concerns, and that could minimize legal risk and potentially prevent complaints regarding gender discrimination in the future.

(*Id.*)

**K. Termination of Plaintiff's Employment**

On December 4, 2023, Lynch met with Plaintiff and allegedly told her that her



United States District Court
Northern District of California

employment was terminated due to "restructuring" at Blackberry. (Dkt. No. 117-5, p. 10; Dkt. No. 111-4, Ex. 20, Lynch Dep. 194:23-197:9; Dkt. No. 125-1, Ex. 21.) Lynch testified that, at the time he decided to terminate Plaintiff's employment on November 13, 2023, he did not know that Plaintiff had complained about colleagues in the past. (*Id.* at 260:18-22.) The parties dispute whether Lynch was aware of Plaintiff's complaints before he decided to terminate her employment. Defendants argue that Lynch made the decision to terminate Plaintiff by November 13, 2023, and that Plaintiff herself did not make Lynch aware of any complaints until November 16, 2023. (Dkt. No. 128-2, p. 19 (citing Dkt. No. 111-4, Ex. 20, Lynch Dep. 259:10-260:22; Ex. 32).)

### L. Appointment of Giamatteo as CEO

On December 11, 2023, seven days after Lynch terminated Plaintiff's employment, Blackberry publicly announced the appointment of Giamatteo as CEO of BlackBerry, a role he continues to hold today. (Dkt. No. 111-4, Ex. 39.)

## II. PROCEDURAL BACKGROUND

Plaintiff commenced this action by filing her initial Complaint on April 3, 2024. (Dkt. No. 1.) Defendants subsequently filed a motion to dismiss and motion to strike, seeking partial dismissal of Plaintiff's claims for hostile work environment, wage discrimination, and failure to promptly pay wages. (Dkt. No. 10.) The Court dismissed (1) Plaintiff's failure to promptly pay wages and wage discrimination claims against Defendant Giamatteo with prejudice, and (2) Plaintiff's hostile work environment claim against both Defendants and wage discrimination claim against Defendant Blackberry with leave to amend. (Dkt. No. 31.) On August 19, 2024, Plaintiff filed her First Amended Complaint ("FAC")—the operative Complaint in this action. (Dkt. No. 34.) In the FAC, Plaintiff reasserted her claims for hostile work environment and wage discrimination. (*Id.*)

On September 16, 2024, Defendants filed a second motion to dismiss and motion to strike, seeking dismissal of Plaintiff's wage discrimination and hostile work environment claims. (Dkt. No. 37, p. 7.) The Court granted Defendants' motion to dismiss and denied Defendants' motion to strike. (Dkt. No. 51.) The Court dismissed Plaintiff's claims for hostile work environment and

United States District Court
Northern District of California

United States District Court
Northern District of California

wage discrimination with prejudice. (*Id.* at p. 18.)

Plaintiff's five remaining claims include: (1) unlawful retaliation under the California Fair Employment and Housing Act ("FEHA") (Cal. Gov. Code § 12940) and whistleblower retaliation under Cal. Lab. Code § 1102.5; (2) unlawful discrimination based on sex and/or gender under FEHA (Cal. Govt. Code § 12900 *et seq.*); (3) failure to prevent harassment, retaliation, and discrimination based on sex and/or gender under FEHA (Cal. Govt. Code § 12900 *et seq.*); (4) wrongful termination in violation of public policy; and (5) negligent retention. (Dkt. No. 34.)

Thus, Plaintiff alleges that the termination of her employment was wrongful under four theories: (1) FEHA retaliation, (2) whistleblower retaliation, (3) unlawful discrimination under FEHA, and (4) wrongful termination in violation of public policy. In addition, she alleges that the pre-termination decision to take away some of her clients when she was promoted to CMO was wrongful under three theories: (1) FEHA retaliation, (2) whistleblower retaliation, and (3) unlawful discrimination under FEHA.

Defendants filed the instant motion on December 10, 2025, seeking summary judgment on Plaintiff's claims and Plaintiff's prayer for punitive damages. (Dkt. No. 111.) Plaintiff opposed the motion, and Defendants filed a reply in support of its motion. (Dkt. Nos. 125, 134.) The Court heard oral argument on January 26, 2026. (Dkt. No. 142.) At oral argument, Plaintiff informed the Court that she is abandoning her negligent retention claim. (*Id.*) The Court addresses each of Plaintiff's four remaining claims in turn.

## ANALYSIS

### I. Motion for Summary Judgment Legal Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts that are subject to genuine dispute are viewed in the light most favorable to the nonmovant. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett,* 477 U.S. 317, 323 (1986). An issue of fact is

"genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248.

If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or that party must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party meets their initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, set forth specific facts showing that there is a genuine issue for trial. *Id.* To make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). In addition, the party seeking to establish a genuine issue of material fact must adequately point a court to the evidence precluding summary judgment because a court is "not required to comb the record to find some reason to deny a motion for summary judgment." *See Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (citation omitted). If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

United States District Court
Northern District of California

**II. Defendants' Motion for Summary Judgment.**

**A. Plaintiff's Claims for Retaliation under FEHA and Cal. Lab. Code § 1102.5.**

**1. Unlawful Retaliation under FEHA (Cal. Govt. Code. § 12940).**

Claims for retaliation under FEHA are analyzed under the *McDonnell Douglas* framework. *Moses v. Aerotek, Inc.*, No. 17- CV-06251-BLF, 2021 WL 1643221, at *4 (N.D. Cal. Apr. 27, 2021). Plaintiffs bringing claims for retaliation under FEHA must show (1) that they engaged in a protected activity, (2) the employer subjected them to an adverse employment action, and (3) a causal link existed between the protected activity and the adverse employment action. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). Once this prima facie case is established, the employer must offer a "legitimate, nonretaliatory reason for the adverse employment action." *Id.*

If the employer offers said legitimate, nonretaliatory reason, "the burden shifts back to the employee" to prove that the nonretaliatory reason was pretextual. *Id.*

Plaintiff argues that she establishes her prima facie case because (1) she engaged in protected activity from 2016 to 2023; (2) she suffered adverse employment actions; and (3) a causal link exists between her protected activity and adverse employment actions. (Dkt. No. 128-2, p. 22.) Because Plaintiff argues that both her termination of employment and actions that occurred in the years preceding her termination of employment constitute adverse employment actions, the Court divides its retaliation analysis section into two sequential parts—pre-termination actions and Plaintiff's termination of employment.

**a. Prima Facie Case for Retaliation Theory No. 1: Pre-Termination Actions.**

Plaintiff argues that after engaging in protected activity between 2016 and 2023, she suffered several adverse employment actions and that a causal link exists between her protected activity and the adverse employment actions. (Dkt. No. 128-2, pp. 18–19.) Defendants argue they are entitled to summary judgment as to pre-termination actions because (1) Plaintiff's alleged pre-termination actions do not constitute adverse employment actions, and (2) no causal link exists between Plaintiff's alleged protected activity and the adverse employment actions. (Dkt. No. 117-5, pp. 20–21.)

**(1) Protected Activity**

Plaintiff argues that she engaged in the following protected activities prior to her termination of employment: her 2016 complaint regarding [redacted] sexual harassment; her October 2021 complaint to Chen about Giamatteo's unwanted sexual advances; her March 2022 complaint to Chen about being deliberately excluded from meetings directly related to her job responsibilities by Giamatteo's team; her July 2022 complaint to HR concerning an organizational chart Giamatteo's team sent to a client that incorrectly showed Plaintiff as reporting to Giamatteo; and her February 2023 formal complaint to HR alleging that Giamatteo was trying to diminish her role and force her out of the company. (Dkt. No. 128-2, pp. 9–10.)

Here, Defendants appear to concede that Plaintiff's 2021 complaint to Chen and 2022 complaint to HR qualify as protected activities. Plaintiff testified about specific exchanges



United States District Court
Northern District of California

between her and Giamatteo that made her uncomfortable and which she subsequently reported to superiors or HR. In October 2021, shortly after Giamatteo joined Blackberry, Giamatteo invited Plaintiff to a one-on-one dinner where he allegedly made unwanted sexual advances. (Dkt. No. 125-1, Ex. 32, Sandhu Dep. 113:24-114:14.) Within two days, Plaintiff reported Giamatteo's behavior to then-CEO Chen and then-Chief Financial Officer Steve Rai. (*Id.* at 112:20-116:1.)

A few months later, in March 2022, Plaintiff complained to Chen about being deliberately excluded from calls by Giamatteo's team even though the calls directly involved her responsibilities. (Dkt. No. 125-1, Ex. 10.) In July 2022, Plaintiff complained to HR concerning an organizational chart Giamatteo's Cybersecurity team sent to a client that incorrectly showed Plaintiff as reporting to Giamatteo. (Dkt. No. 111-4, Ex. 4.)

Defendants, however, contend that Plaintiff's February 2023 HR complaint regarding Giamatteo is not a protected activity because it did not put Blackberry on notice of conduct that FEHA prohibits. (Dkt. No. 117-5, p. 21.) On February 6, 2023, Plaintiff filed a formal complaint with HR against Giamatteo, reporting that Giamatteo was trying to diminish her role and force her out of the company. (Dkt. No. 111-4, Ex. 8.) In the complaint, Plaintiff detailed specific (but not all) incidents where Giamatteo and his Cybersecurity sales team did not acknowledge her role and interfered with her responsibilities: (1) the Cybersecurity team's publication of an organizational chart incorrectly indicating Plaintiff as reporting to Giamatteo and Giamatteo's hesitation in taking action to address the issue despite Plaintiff's multiple follow-ups with him; (2) the Cybersecurity sales team's failure to send customer proposals to Plaintiff's team, which was against company policy; and (3) the Cybersecurity sales team's attempts to exclude Plaintiff's team from dealing with major customers that Plaintiff was responsible for. (*Id.*)

The Court concludes that Plaintiff has adduced sufficient evidence to create a triable issue of fact as to whether the February 2023 complaint constitutes protected activity. Plaintiff testified that she continually complained about Giamatteo's discriminatory conduct. *See Yanowitz*, 36 Cal. 4th at 1131 ("It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory.") In her February 2023 complaint to HR, she reported that in January and

February of 2023, Giamatteo was working to remove Plaintiff from working with Elite customers and told individuals that Plaintiff would no longer be responsible for Elite customers starting on March 1, 2023. (Dkt. No. 111-4, Ex. 8.) Even though Plaintiff did not use the words "discrimination" or "retaliation" in her complaint, the relevant question is "whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." *Husman v. Toyota Motor Credit Corp.*, 12 Cal. App. 5th 1168, 1193 (2017).

By filing multiple complaints to superiors between 2021 and 2023 regarding Giamatteo's alleged conduct, Plaintiff sufficiently conveyed her concerns that Blackberry acted or was acting in an unlawful discriminatory manner. In sum, at a minimum, even excluding the February 2023 complaint, a reasonable jury could find that Plaintiff engaged in protected activities to meet her burden for her prima facie case.

**(2) Adverse Employment Actions**

In the FEHA retaliation context, adverse actions "require[] a showing that a reasonable employee would have found the challenged action materially adverse, meaning it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Lelaind v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1097 (N.D. Cal. 2008).

The parties dispute whether pre-termination actions constitute adverse employment actions. Plaintiff alleges that the pre-termination actions she suffered included: Giammatteo excluding her from staff meetings; being cut out of key business decisions that fell squarely within her job responsibilities; and that then-CEO Chen reallocated client accounts, denied her a salary increase upon her promotion to CMO, and denied her the title "Chief Customer Officer." (Dkt. No. 128-2, p. 18.)

Plaintiff argues the Court should consider all pre-termination actions collectively to determine whether she suffered from an adverse employment action. (Dkt. No. 128-2, p. 18 (citing *Yanowitz*, 36 Cal. 4th at 1058).) The Court declines to do so. Because Plaintiff's alleged pre-termination actions occurred over a span of two years and were made by different decisionmakers, the Court analyzes each of the pre-termination actions separately. *See McRae v.*

*Dep't of Corr. & Rehab.*, 142 Cal. App. 4th 377, 391 (2006) (noting that a series of alleged wrongful acts "taken by many different persons, for different reasons" did not constitute a single course of conduct). Plaintiff's reliance on *Yanowitz* is misplaced because in that case the plaintiff's immediate supervisor engaged in the allegedly wrongful acts, which were taken in response to a single protected act by the plaintiff. *See Yanowitz*, 36 Cal. 4th at 1052–53.

The Court begins with addressing Plaintiff's argument that Giammatteo excluding her from staff meetings and being cut out of key business decisions that fell squarely within her job responsibilities constitute adverse employment actions. (Dkt. No. 128-2, p. 18.)

First, Plaintiff does not explain in her opposition how exclusion from Giamatteo's team meetings constitutes an adverse employment action. Plaintiff did not report to Giammatteo, (Dkt. No. 111-4, Ex. 3, Sandhu Dep. 146:17-147:7), and she does not specifically explain how being excluded from these meetings affected her job. Second, regarding Plaintiff's argument that being cut out of key decisions qualifies as an adverse employment action, Plaintiff does not identify the decisionmaker that cut her out of these decisions. Thus, Plaintiff cannot meet her burden on summary judgment to advance this claim. For these reasons, Plaintiff cannot base her claim for retaliation on these alleged pre-termination adverse employment actions.

Next, the Court addresses Plaintiff's contention that then-CEO Chen's reallocation of client accounts, denial of a salary increase upon her promotion to CMO, and denial of the title "Chief Customer Officer" constitute adverse employment actions. (Dkt. No. 128-2, p. 18.) Defendants argue that Chen's reallocation of client accounts does not constitute an adverse employment action because the account transfers coincided with Plaintiff's promotion to CMO. (Dkt. No. 117-5, pp. 20, 22, 24.)

Chen testified that he did not reallocate accounts to retaliate against Plaintiff for reporting about the alleged unwanted sexual advances she suffered at the 2021 one-on-one dinner with Giamatteo. (Dkt. No. 111-4, Ex. 1, Chen Dep. 172:2-174:4.) Plaintiff testified that in discussing possible account transfers with Chen, she told him that she cannot handle how she was being treated, intended to resign, and that Chen was the person who told her that all of her accounts were going to be taken away from her and that she would revert to only the chief of staff role and that it



United States District Court
Northern District of California

was because of Giamatteo. (Dkt. No. 111-4, Ex. 3, Sandhu Dep. 250:3-251:19.) As noted above, in March 2023, outside counsel Curiale emailed Chen noting that he encouraged Plaintiff to take the CMO position and in April 2023, Chen reallocated accounts between Plaintiff's Elite and Giamatteo's Cybersecurity team. (Dkt. No. 111-4, Exs. 12, 41.)

The Court concludes that there is a genuine dispute as to whether Chen's reallocation of accounts in April 2023 constitutes an adverse employment action. Plaintiff's loss of existing client accounts may constitute an adverse employment action because it potentially impacts her sales incentive pay. Plaintiff does not argue, specifically, that she lost wages and/or benefits due to the loss of client accounts in her opposition. However, in her FAC, she alleges that she "suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial." (Dkt. No. 34, ¶ 176.)

Upon her promotion to CMO, Plaintiff did not receive a salary increase and her annual target incentive bonus was split into two parts: 50% on variable incentive pay and 50% on sales incentive pay. (Dkt. No. 125-1, Ex. 9.) As part of the reallocation of accounts, Plaintiff was required to "offload a number of her current clients [to Giamatteo's team] and replace them with a larger group of win back targets" that Giamatteo's team lost. (Dkt. No. 111-4, Ex. 40.; Ex. 3, Sandhu Dep. 250:8-13.) Plaintiff indicated that offloading several of her existing clients made her uncomfortable and testified that there was "no basis" for reallocating client accounts. (Dkt. No. 111-4, Ex. 3, Sandhu Dep. 250:14-19; Dkt. No. 111-4; Ex. 40.)

***

For these reasons, the Court concludes that Plaintiff has presented sufficient evidence to raise a genuine dispute of material fact as to whether Chen's April 2023 reallocation of accounts constitutes an adverse employment action. But Plaintiff's argument that being excluded from Giamatteo's team meetings and cut out of key business decisions constitute adverse employment actions fails for the reasons explained above.

**(3) Causal Link**

Lastly, as to the third prong of the prima facie case, the requisite "causal link" between the



United States District Court
Northern District of California

employee's protected activity and the adverse employment action can be established by direct or circumstantial evidence. *See Lee v. Eden Med. Ctr.*, 690 F. Supp. 2d 1011, 1025 (N.D. Cal. 2010). Indeed, the causal link requirement "may be established by an inference derived from circumstantial evidence." *Flores v. City of Westminster*, 873 F.3d 739, 749 (9th Cir. 2017). To infer causation from temporal proximity alone, the time between an employer's knowledge of protected activity and the adverse employment action must be "very close." *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (per curiam). In addition, the Ninth Circuit has held that a plaintiff can establish a causal link by proving that "the biased subordinate influenced or was involved in the decision or decision[-]making process." *France v. Johnson*, 795 F.3d 1170, 1176 (9th Cir. 2015) (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007)).

Here, Plaintiff fails to allege a causal link between her complaints and Chen's decision to reallocate client accounts. Plaintiff never alleges that Chen, the decisionmaker, acted in a retaliatory manner. Chen, the person who made the decision to reallocate accounts between Plaintiff and Giamatteo's teams, testified that he did not reallocate accounts to retaliate against Plaintiff. (Dkt. No. 111-4, Ex. 1, Chen Dep. 173:8-15.) Plaintiff presents no evidence to refute that testimony. In addition, Plaintiff testified that she did not believe Chen was prejudiced against her based on race or gender. (Dkt. No. 111-4, Ex. 3, Sandhu Dep. 34:14-17.)

Thus, the only way that Plaintiff can allege that actions by Chen, the decisionmaker, were retaliatory is to allege that Chen was acting as the "cat's paw" of Giamatteo. Plaintiff that upon her promotion to CMO, Chen denied her a salary increase and the title of "Chief Customer Officer" because of Giamatteo's influence. (Dkt. No. 128-2, p. 18.) The "cat's paw" theory imposes liability on a decisionmaker who has no retaliatory or discriminatory motive if the decisionmaker was merely the tool of the person with no retaliatory or discriminatory motive. *Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 94, 113–114 (2004). However, this theory is only available where an employee's *supervisor* influences the decisionmaker. *See Miller v. T-Mobile, U.S.A., Inc.*, 2025 WL 3085722, at *10 (N.D. Cal. 2025) (declining to extend cat's paw liability to a coworker in part because "[t]he Ninth Circuit has yet to address whether a coworker's biased conduct supports cat's paw liability. And California courts do not yet appear to have

addressed whether cat's paw liability applies to a coworker's biased conduct either.") (internal citations omitted). The Court finds that Plaintiff's cat's paw theory fails because Giamatteo was not Plaintiff's supervisor. Indeed, Plaintiff and Giamatteo, as leaders of their respective teams, reported directly to then-CEO Chen. (Dkt. No. 11-4, Ex. 1, Chen Dep. 21:17-25:18.)

***

In summary, Plaintiff fails to establish her prima facie case for pre-termination actions. Specifically, Plaintiff does not meet her burden in arguing that exclusion from Giamatteo's team meetings and being cut out of business decisions constitute adverse employment actions. Further, as to Chen's April 2023 reallocation of accounts, Plaintiff cannot show a causal link between her complaints and Chen's decision to reallocate accounts. For these reasons, the Court GRANTS summary judgment to Defendants on Plaintiff's FEHA retaliation claim for pre-termination actions.

**b. Prima Facie Case for Retaliation Theory No. 2: Termination of Employment.**

Plaintiff argues that interim CEO Lynch retaliated against her in December 2023 by terminating her employment after she participated in interviews with Morrison attorneys regarding the anonymous October 2023 EthicsLink complaint, followed up with investigators detailing Giamatteo's harassment of her in November 2023, and sent Lynch an email detailing Giamatteo's harassment of her in November 2023. (Dkt. No. 128-2, pp. 17–19.) Defendants contend they are entitled to summary judgment as to Plaintiff's termination of employment because Lynch, the decisionmaker, was unaware that Plaintiff engaged in any protected activity at the time he decided to terminate her and because Plaintiff fails to put forth evidence to the contrary. (Dkt. No. 117-5, p. 19.)

Here, the parties do not appear to dispute that Plaintiff's participation in interviews with Morrison, follow up emails to investigators, and the email to Lynch detailing Giamatteo's harassment of her in November 2023 constitute protected activity. In addition, there is no dispute that Plaintiff's termination of employment constitutes an adverse employment action. Instead, the parties dispute whether a causal link exists between the protected activity and Plaintiff's termination of employment.

United States District Court
Northern District of California

Defendants contend that Lynch made the decision to terminate Plaintiff's employment on November 13, 2023, and that at that time, he was not aware Plaintiff engaged in any protected activity. (Dkt. No. 117-5, p. 19 (citing Dkt. No. 111-4, Ex. 20, Lynch Dep. 259:10-260:22.) Plaintiff argues that "Defendant's claim that Lynch decided to terminate [Plaintiff's employment] on Nov. 13, 2023—three days before her Nov. 16 email—is not supported by any contemporaneous documentation and raises credibility issues for the jury." (Dkt. No. 125, p. 20.) Plaintiff points to evidence, as described above, that Kurtz testified that, on an unspecified date on or after October 26, 2023, he discussed the possibility that Plaintiff filed the EthicsLink complaint with Disbrow, Daniels, and Lynch. (Dkt. No. 125-1, Ex. 35, Kurtz Dep. 58:2-59:13.) Blackberry Audit Committee of its board of directors hired Morrison soon thereafter to investigate the EthicsLink Complaint against Giamatteo. (Dkt. No. 125-1, Exs. 16, 26.) Kurtz also testified that he believed Lynch, while interim CEO (October 30, 2023-December 11, 2023), was aware of an unspecified complaint Plaintiff filed against Giamatteo. (Dkt. No. 125-1, Ex. 35, Kurtz Dep. 140:5-14.) A reasonable jury could assess this evidence and determine that Lynch at least speculated that Plaintiff had filed a formal complaint.

In addition, Plaintiff argues there is a causal link because Lynch was the cat's paw for Giamatteo. (Dkt. No. 128-2, p. 20.) Defendant argues that Lynch made the decision to terminate Plaintiff's employment alone—without input from Giamatteo or anyone else. (Dkt. No. 117-5, p. 16 (citing Dkt. No. 111-4, Ex. 20, Lynch Dep. 211:1-212:5, 92:5-93:2.) Giamatteo testified that Lynch did not discuss Plaintiff's termination with him until after the decision was made. (Dkt. No. 111-4, Ex. 30, Giamatteo Dep. 95:3-6, 108:3-18, 111:16-19, 256:3-25.) Plaintiff argues that the "jury could rationally infer that as part of the permanent-CEO negotiations, Lynch assured Giamatteo that he would get rid of Sandhu." (Dkt. No. 128-2, p. 20.) However, for the reasons explained above, Plaintiff's cat's paw theory fails because Giamatteo was not Plaintiff's supervisor. Moreover, Plaintiff points to no admissible evidence – only her speculation and double hearsay – that Lynch was acting on Giamatteo's command when he terminated Plaintiff's employment. Contrasted with this inadmissible evidence is Lynch's testimony that Giamatteo did not tell Lynch to fire Plaintiff. (Dkt. No. 11-4, Ex. 20, Lynch Dep. 92:19-21, 92:25-93:2, 212: 1-



United States District Court
Northern District of California

5.) Because the Court finds that a reasonable jury could find that Lynch was aware of Plaintiff's protected activity before Lynch decided to terminate Plaintiff's employment, it is not necessary for Plaintiff to rely upon this theory.

***

Thus, a reasonable jury could infer that Lynch was aware of Plaintiff's protected activity when he decided to terminate her employment. Accordingly, Plaintiff establishes her prima facie case as to her termination of employment only.

**c. Defendants' Proffered Reason for Plaintiff's termination of employment.**

Because Plaintiff has established her prima facie case as to her termination of employment, the burden shifts to Defendants to establish a legitimate, nondiscriminatory reason for its decision terminate Plaintiff's employment in December 2023. In relevant part, to satisfy its burden Blackberry must demonstrate that "the procedure by which [Plaintiff] was terminated was validly and fairly devised and administered to serve a legitimate business purpose." *Hanson v. Lucky Stores, Inc.*, 87 Cal. Rptr. 2d 487, 492–93 (1999) (internal citations omitted).

Defendants assert that they have articulated a legitimate reason for Plaintiff's termination of employment - that Lynch terminated Plaintiff's employment as part of an overall restructuring at Blackberry in which he wanted to reduce the number of executives. (Dkt. No. 117-5, p. 17, (citing Dkt. No. 111-4, Ex. 20, Lynch Dep. 194:23-197:9) and p. 25.) Defendants argue that "[Plaintiff's] termination was part of a broader restructuring, which eliminated her roles along with many others." (Dkt. No. 117-5, p. 30.)

**d. Evidence of Pretext.**

Finally, at the final step of the *McDonnell Douglas* framework, the burden shifts to Plaintiff to show a genuine issue of fact as to whether Defendants' proffered reason for her termination of employment was pretextual. *See McDonnell Douglas*, 411 U.S. at 802–03; G*uz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354–55 (2000). The Ninth Circuit has instructed that "very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1127 (9th Cir. 2009).

To establish pretext, a plaintiff may present either direct or indirect evidence. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). Where, as here, a plaintiff presents indirect evidence, it must be "specific and substantial." *Id.* at 1222. Notably, however, this standard "is tempered by [the Ninth Circuit's] observation that a plaintiff's burden to raise a triable issue of pretext is hardly an onerous one." *France*, 795 F.3d at 1175 (quotation marks omitted). "This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Id.* (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000)).

The Court finds that there is a genuine issue of fact regarding Defendant's proffered reason for terminating Plaintiff's employment. Plaintiff argues that the alleged "restructuring" at Blackberry was pretextual because other executive positions were not in fact eliminated. (Dkt. No. 128-2, p. 22.) While two other executives—[redacted]—resigned while Lynch was interim CEO, the only executive whom Lynch fired was Plaintiff. (Dkt. No. 111-4, Ex. 20, Lynch Dep. 202:24-203:7; Dkt. No. 125-1, Ex. 35, Kurtz Dep. 68:6-16.) Plaintiff argues that [redacted] was not eliminated but rather renamed to [redacted] (Dkt. No. 125-1, Ex. 27.)

***

Underlying Plaintiff's FEHA retaliation claim for her December 2023 termination of employment is the parties' factual disagreement as to the actual reason for Plaintiff's termination—legitimate business reasons, as Defendants claim, or the retaliatory reason that Plaintiff alleges. However, this fact-bound determination is not appropriate for the Court to make at the summary judgment stage. Accordingly, the Court DENIES summary judgment as to Plaintiff's retaliation claim under FEHA as to her termination of employment only.

**2. Whistleblower Retaliation under Cal. Lab. Code § 1102.5.**

The California Supreme Court recently clarified that California Labor Code § 1102.6, not *McDonnell Douglas*, "supplies the applicable framework for litigating and adjudicating section 1102.5 whistleblower claims." *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 712



United States District Court
Northern District of California

(2022). Section 1102.6 sets forth a two-step framework. *See id.* at 718. "First, it places the burden on the plaintiff to establish, by a preponderance of the evidence, that retaliation for an employee's protected activities was a contributing factor in a contested employment action." *Id.* Importantly, "[t]he plaintiff need not satisfy *McDonnell Douglas* in order to discharge this burden." *Id.* "Once the plaintiff has made the required showing, [at step two], the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity." *Id.*

For the same reasons Plaintiff can assert a FEHA retaliation claim based on her termination of employment, she can assert a whistleblower claim under California Labor Code § 1102.5. *See Miller*, 2025 WL 3085722, at *5 (denying motion for summary judgement on Section 1102.5 whistleblower retaliation claim because the plaintiff raised triable issues of fact, which in part, overlapped with the triable issues of fact regarding the plaintiff's FEHA retaliation claim); *Cf. Buhl v. Abbott Lab'ys*, No. 17-CV-04244-NC, 2019 WL 13248034, at *6 (N.D. Cal. Mar. 14, 2019), aff'd, 817 F. App'x 408 (9th Cir. 2020) (granting summary judgment on FEHA retaliation and whistleblower retaliation on the same grounds).

However, for the reasons explained above, Plaintiff's retaliation claim for pre-termination actions fails because she cannot show that retaliation for the pre-termination actions was the contributing factor for Chen's actions. Accordingly, the Court DENIES summary judgment as to Plaintiff's retaliation claim under California Labor Code § 1102.5 for the termination of her employment but GRANTS summary judgment to Defendants on this claim with regard to Defendants' pre-termination actions.

**B. Plaintiff's Claim for Wrongful Termination in Violation of Public Policy**

Plaintiff alleges wrongful termination in violation of public policy. Specifically, Plaintiff argues that Blackberry terminated her employment because of her complaints regarding discrimination and harassment. "The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public



United States District Court
Northern District of California

policy, and (4) the discharge caused the plaintiff harm." *Yau v. Santa Margarita Ford, Inc.*, 229 Cal. App. 4th 144, 154 (2014).

Here, there is no dispute that there was an employer-employee relationship, that Blackberry terminated Plaintiff's employment, and that she was harmed by her termination of employment. The question here is whether Plaintiff's termination of employment was substantially motivated by her complaints, which is the same argument underlying Plaintiff's claims for retaliation under FEHA and the whistleblower retaliation statute. For the same reasons discussed above, the Court finds that there is sufficient evidence for a reasonable jury to determine that Lynch made the decision to fire Plaintiff because she submitted complaints about discrimination and harassment. Thus, the Court DENIES summary judgment on Plaintiff's claim for wrongful termination in violation of public policy.

**C. Plaintiff's Discrimination Claim under FEHA (Cal. Govt. Code. § 12940).**

Discrimination claims under FEHA, like retaliation claims, are analyzed under the burden-shifting framework articulated in *McDonnell Douglas* and apply "pertinent federal precedent." *Godwin*, 150 F.3d at 1220; *Guz*, 24 Cal. 4th at 354. Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. *Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 658 (9th Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for terminat[ion]." *Id.* If the defendant articulates such a reason, at step three, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason was pretext. *Id.* at 658–59.

**1. Prima Facie Case.**

To establish a prima facie case for discrimination under FEHA, a plaintiff must show that (1) she is a member of a protected class; (2) she is qualified for her position or was performing her job satisfactorily; (3) she experienced an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *See*

*Sanders v. Bay Area Air Quality Mgmt. Dist.*, No. 23-CV-04416-RFL, 2025 WL 3038993, at *1 (N.D. Cal. Oct. 30, 2025) (internal citations omitted); *Guz*, 24 Cal. 4th at 355.

Plaintiff argues she establishes her prima facie case because she (1) is a woman; (2) satisfactorily performed her job; (3) suffered adverse employment actions; and (4) male executives who were subjects of complaints only received warnings, not termination of employment. (Dkt. No. 128-2, pp. 27–28.)

Here, the parties do not dispute the first two prima facie case elements. First, Plaintiff is a woman and thus, a member of a protected class. FEHA prohibits employers from discriminating against employees on several grounds, including gender. Cal. Gov't Code § 12940(a). Second, at oral argument, the parties indicated that they do not dispute that Plaintiff was qualified for the positions she held at the time of her termination of employment. (Dkt. No. 142.) The issue here is whether Plaintiff suffered adverse employment actions and whether male executives were treated more favorably. Plaintiff alleges that she suffered adverse employment actions because of her gender. As noted above, the Court addresses the alleged pre-termination actions and the termination of Plaintiff's employment separately.

**a. Pre-termination Adverse Employment Actions.**

For the reasons discussed above, Plaintiff has only presented sufficient evidence to raise a genuine dispute of material fact as to whether Chen's reallocation of accounts is an adverse employment action. However, as noted above, the Court concludes that Plaintiff cannot establish the causal link between her gender and the pre-termination decisions because the alleged pre-termination adverse employment actions were made by Chen, whom Plaintiff admitted did not act with discriminatory intent. (Dkt. No. 111-4, Ex. 3, Sandhu Dep. 34:14-17.) And for the same reasons discussed above, Chen was not the "cat's paw" of Giamatteo. Therefore, the Court GRANTS summary judgment to Defendants on Plaintiff's FEHA discrimination claim for pre-termination adverse employment actions.

/ / /

/ / /

/ / /



United States District Court
Northern District of California

**b. Termination of Employment.**

The parties do not dispute that Plaintiff's termination of employment constitutes an adverse employment action. Rather, the contested issue is whether male employees were treated more favorably than Plaintiff was or whether there is other evidence of discrimination.

Plaintiff argues that male executives who were subjects of complaints received warnings only, not termination of their employment, despite the investigators' findings that the complaints were "likely accurate." (Dkt. No. 128-2, p. 28 (citing Dkt. No. 125-1, Ex. 41, Bramhill Dep. 70:20-71:24, 74:14-23).) Plaintiff further argues that: "In contrast, women who complained—[Plaintiff], Dickman, McMillan, and Tatsis —were terminated." (Dkt. No. 128-2, p. 28.)

The Court finds that this evidence is not specific enough to show that other employees who were similarly situated were treated better than Plaintiff because Plaintiff does not identify specific male employees. This evidence is not sufficient to demonstrate that Lynch, the decisionmaker, was biased against Plaintiff because there is no evidence showing that Lynch participated in any of the other decisions about men who were allegedly treated better than Plaintiff. There is no evidence that Lynch, as a member of the board of directors until October 30, 2023, and only the interim CEO from October 30, 2023 to December 11, 2023),was involved in any way with those other action against other women. Thus, this evidence cannot substantiate gender discrimination by Lynch.

Plaintiff also argues that other employees—Disbrow, Foote, and Kurtz—opposed her and influenced Lynch's decision to terminate her employment. (Dkt. No. 128-2, pp. 16, 22.) Again, the only evidence is that Lynch was the sole decisionmaker. (Dkt. No. 134 (citing, Dkt. No. 111-4, Ex. 30, Lynch Dep. 210:25-212:4); Ex. 31, Kurtz Dep. 181:21-23.) As discussed in detail above, the Court rejects the "cat's paw" theory of influence by employees who were not Plaintiff's supervisor. At the time Lynch made his decision to terminate Plaintiff's employment, he was the interim CEO, and she reported directly to him.

Plaintiff then argues that there is other evidence of discrimination – the "boys' club" at Blackberry. Multiple female witnesses testified about the "boys' club" culture at Blackberry. (Dkt. No. 128-2, pp. 13–14.) For instance, Marjorie Dickman, former Blackberry Chief of Government Affairs and Public Policy, testified that Blackberry had a difficult culture for women

and the underrepresentation of women in the executive suite created "cascading effects" throughout the company. (Dkt. No. 125-1, Ex. 42, Dickman Dep. 105:19-22, 125:6-13.) Shortly after Dickman participated in the Morrison investigation in November 2023 and discussed her concerns with Giamatteo regarding "not fitting in with other executives," Giamatteo allegedly terminated Dickman's employment. (*Id.* at 84:3-5, 94:11-14, 108:5-21, 114:8-12, 122:14-16.)

Similarly, Sarah Tatsis (Engineering Executive), Collen McMillan, Erin Ransom (Vice President of Sales Enablement), Mary Slimmon (Senior HR Business Partner), and Jennifer Bramhill testified about specific instances of sexism and/or gender discrimination. After either participating in investigations or reporting complaints regarding gender discrimination, Tatsis, McMillan, and Bramhill were either allegedly fired or had their workload reduced. (Dkt. No. 128-2, pp. 27–28 (citing Dkt. No. 125-1, Ex. 40, Tatsis Dep. 28:16-29:15, 39:22-40:3, 44:19-21, 49:2-20, 72:7-9, 77:1-6; Ex. 37, McMillan Dep. 21:2-14, 23:21-25:24, 30:19-31; Ex. 22, Bramhill Dep. 68:2-9, 70:20-71:24, 74:14-23.) Again, this evidence is not specific to gender discrimination that Plaintiff suffered, allegedly at the hands of Lynch. The other women complained and then allegedly fired by either Giamatteo or an unknown person. The Court concludes that this evidence is simply not enough to show that Lynch, the decisionmaker, was biased against Plaintiff based on her gender.

Plaintiff also points to the Morrison report as proof of discrimination because Blackberry did not implement the recommendations in the report. Blackberry was not required to adopt recommendations by an outside investigator that did not substantiate the complaints raised. That a company did not adopt recommendations to make the workplace better in general does not show discrimination. Furthermore, the evidence of the report is inadmissible to show gender discrimination because it is based on anonymous reporting and thus not susceptible to cross-examination.

Finally, Plaintiff argues that Lynch was motivated by gender discrimination in making his decision to fire her because his initial impression of her was that she was "very aggressive" and "very opinionated." (Dkt. No. 111-4, Ex. 20, Lynch Dep. 35:4-24.) Plaintiff argues that this language is very gendered and can be considered to be targeted at women. (Dkt. No. 128-2, p. 27 (citing *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 861 (9th Cir. 2002).) However, these

comments alone are not enough to show discriminatory intent. *See Hittle v. City of Stockton, California*, 101 F.3d 1000, 1015 (9th Cir. 2024) (comments "by decisionmaker must be clearly sexist, racist, or similarly discriminatory to create an inference of discriminatory motive." (internal citation and quotation marks omitted).

For these reasons, Plaintiff fails to establish her prima facie case at the first step of the *McDonnell Douglas* test for pre-termination actions and her termination of employment. Accordingly, the Court GRANTS summary judgment to Defendants on Plaintiff's claim for gender discrimination under FEHA.

**C. Plaintiff's Derivative Claims.**

Defendant seeks summary judgment on Plaintiff's remaining claims for failure to prevent harassment, retaliation, and discrimination based on sex and/or gender under FEHA. (Dkt. No. 117-5, p. 32.)

Plaintiff's claims for failure to prevent harassment, retaliation, and discrimination under FEHA are derivative of Plaintiff's retaliation and discrimination claims. *See Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 804 (N.D. Cal. 2015) ("a failure to prevent discrimination claim is essentially derivative of a discrimination claim"). Because Plaintiff raises triable factual issues with respect to FEHA retaliation, the Court DENIES summary judgment with respect to Plaintiff's derivative claims for failure to prevent retaliation in violation of FEHA. *See Lopez v. WinCo Holdings, Inc.*, No. 19-CV-05727-CRB, 2021 WL 3773619, at *19 (N.D. Cal. Aug. 25, 2021), aff'd, No. 21-16565, 2022 WL 17547804 (9th Cir. Dec. 9, 2022) (noting that an element of a failure to prevent claim is that "plaintiff was subjected to discrimination, harassment or retaliation") (internal citation omitted). Furthermore, the Court GRANTS summary judgment as to Plaintiff's failure to prevent discrimination claim because the Court GRANTS summary judgment on Plaintiff's FEHA discrimination claim.

**D. Punitive Damages.**

California Civil Code § 3294 allows for punitive damages only when "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice" and limits corporate employer liability to instances where an officer, director, or managing agent has

advance knowledge and consciously disregards, authorizes, or ratifies the wrongful conduct. *Id.* § 3294(a)–(b). "'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." *Id.* § 3294(c)(1). "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id.* § 3294(c)(2). Lastly, a "managing agent must be someone who exercises substantial discretionary authority over decisions that ultimately determine corporate policy. *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 573 (1999). Corporate policies "affect a substantial portion of the company and ... are the type likely to come to the attention of corporate leadership." *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 715 (2009), *as modified* (Feb. 10, 2010). "[I]n the usual case, the question of whether the defendant's conduct will support an award of punitive damages is for the trier of fact, since the degree of punishment depends on the peculiar circumstances of each case." *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1053 (2009) (quotation omitted).

The Court finds that at this stage and the record before it, the Court cannot conclude, as a matter of law, that no reasonable jury could find clear and convincing evidence that Defendants acted with "willful and conscious disregard" of Plaintiff's rights (malice) or inflicted "cruel and unjust hardship" upon her "in conscious disregard" of her rights (oppression). *See* Cal. Civ. Code § 3294(c)(1)–(2). Similarly, the Court cannot find as a matter of law that Lynch was not a managing agent given his interim CEO position. Indeed, Lynch testified that as interim CEO he had authority to implement the Blackberry "restructuring" plan. (Dkt. No. 111-4, Ex. 20, Lynch Dep. 71:24-73:16 , 259:20-260:7.) He also testified that he exercised broad authority over personnel matters, including the power to terminate employees, such as Plaintiff. (*Id.* at 70:24-80:22, 181:20-184:6, 202:12-203:21, 259:13-260:22.); *See Tilkey v. Allstate Ins. Co.*, 56 Cal. App. 5th 521, 555 (2020) (finding that a supervisor "would make the decisions about discipline" and "[i]n doing so, [ ] formulated operational corporate policy at least related to discipline and attendance").

/ / /

United States District Court
Northern District of California

Accordingly, the Court DENIES Defendants' motion for summary judgment as to punitive damages for Plaintiff's surviving claims.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment. The Court GRANTS summary judgment in favor of Defendants as to Plaintiff's claims for sex and/or gender discrimination under FEHA, failure to prevent discrimination under FEHA, retaliation for pre-termination adverse actions under FEHA, whistleblower retaliation under Cal. Lab. Code § 1102.5 as to pre-termination adverse actions, and negligent retention. Because Plaintiff stated at oral argument that she abandoned her claim for negligent retention, the Court GRANTS summary judgment as to that claim also.

The Court DENIES Defendants' motion for summary judgment as to Plaintiff's claims for retaliation under FEHA for her termination of employment, whistleblower retaliation as to her termination of employment, wrongful termination in violation of public policy, failure to prevent retaliation and harassment under FEHA, and punitive damages for Plaintiff's surviving claims.

Because the parties' filed their papers and supporting evidence under seal, this Order is accordingly also filed under seal. The parties shall file a joint statement notifying the Court whether any portions of this Order shall remain under seal by March 16, 2026. The Court will address the parties' motions to seal in a separate order.

**IT IS SO ORDERED**.

Dated: March 9, 2026



SALLIE KIM
United States Magistrate Judge